**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DARNELL SMITH, DARREN NATHAN, GREGORY DAVIS, JEFF COLEMAN, PHILLIP OVERTON, and MARQUE ROSS, individually and on behalf of a class of all others similarly situated; | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. |
| v. | ) ) | |
| THE CITY OF CHICAGO; a municipal corporation, CHICAGO POLICE SUPERINTENDENT GARRY MCCARTHY, in his individual and official capacity; and UNKNOWN CHICAGO POLICE OFFICERS ("JOHN DOE OFFICERS 1-14"); | ) ) ) ) ) ) ) ) | **CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND INDIVIDUAL DAMAGES** |
| Defendants. | ) ) ) | **PLAINTIFFS DEMAND A TRIAL BY JURY** |

## COMPLAINT AT LAW

NOW COME the Plaintiffs, DARNELL SMITH, DARREN NATHAN, GREGORY DAVIS, JEFF COLEMAN, PHILLIP OVERTON, and MARQUE ROSS, individually and on behalf of a class of similarly situated individuals, by and through their attorneys, ROMANUCCI & BLANDIN, LLC, and THE GREGORY LAW FIRM, and for their Complaint at Law against Defendants, CITY OF CHICAGO, a municipal corporation, Chicago Police Superintendent GARRY MCCARTHY, and JOHN DOE OFFICERS 1 through 14, pleading hypothetically and in the alternative, states as follows:

## PRELIMINARY STATEMENT

1.     This is a civil rights action in which named Plaintiffs DARNELL SMITH, DARREN NATHAN, GREGORY DAVIS, JEFF COLEMAN, PHILLIP OVERTON, and

1

MARQUE ROSS, on behalf of themselves and a class of similarly situated individuals, seek relief for Defendants' violation of their rights, privileges, and immunities secured by the Civil Rights Act of 1871, 42 U.S.C. §1983, the Fourth and Fourteenth Amendments to the United States Constitution, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d), et seq. ("Title VI"), and the Constitution and laws of the State of Illinois.

2.      The Defendants in this action, the CITY OF CHICAGO ("City"), Chicago Police Superintendent GARRY MCCARTHY ("MCCARTHY"), and DOE OFFICERS 1-14 have implemented and are continuing to enforce, encourage and sanction a policy, practice and/or custom of unconstitutional stops and frisks of City residents, including Plaintiffs, by the Chicago Police Department ("CPD") which are being done without the reasonable articulable suspicion required under the Fourth Amendment.

3.      In addition, this pattern and practice of unconstitutional stops and frisks by CPD officers often have used, and continue to use, race and/or national origin, not reasonable suspicion, as the determinative factors in deciding to stop and frisk individuals in violation of the Equal Protection Clause of the Fourteenth Amendment. The victims of such racial and/or national origin profiling are principally African-American males.

4.      The CPD's widespread constitutional abuses have flourished as a result of, and are directly and proximately caused by, policies, practices and/or customs devised, implemented and enforced by the City and its final policymakers, including Superintendent MCCARTHY. The City and Superintendent MCCARTHY have acted with deliberate indifference to the constitutional rights of those who would come into contact with CPD officers by: (a) failing to properly screen, train, and supervise CPD officers; (b) inadequately monitoring CPD officers and their stop and frisk practices; (c) failing to sufficiently discipline CPD officers who engage in

constitutional abuses; and (d) encouraging, sanctioning and failing to rectify the CPD's unconstitutional practices.

5.      As a direct and proximate result of Defendants' policies, practices and/or customs, hundreds of thousands of City residents, in particular African-American individuals, have been subjected to unconstitutional stops and frisks by CPD officers. Indeed, many African-American persons repeatedly have been victims of suspicionless stops and frisks by the CPD. Moreover, the CPD's constitutional abuses have included unlawful searches and seizures and, at times, excessive force, of which the fatal shooting of Freddie Wilson is but one tragic example.

6.      The named Plaintiffs seek to represent a certified class for the purpose of obtaining injunctive and declaratory relief only. The named Plaintiffs seek a class-wide judgment declaring that the policies, practices and/or customs described herein violate the Fourth and Fourteenth Amendments and a class-wide injunction enjoining Defendants from continuing such policies, practices and/or customs. In addition, the named Plaintiffs seek compensatory and punitive damages for themselves. All Plaintiffs seek an award of attorneys' fees and costs and such other relief as this Court deems equitable and just.

## JURISDICTION

7.      Jurisdiction is conferred upon this Court under 28 U.S.C. §§ 1331 and 1343(3) and (4), as this action seeks redress for the violation of Plaintiffs' constitutional and civil rights under 42 U.S.C. § 1983 and 42 U.S.C. § 2000(d).

8.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

9.      Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over any and all state constitutional and state law claims that are so related to

the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

## VENUE

10.     Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. §§ 1391 (b) and (c) because all of the relevant events occurred within this judicial district and, upon information and belief, all parties to this action reside within this judicial district.

## JURY DEMAND

11.     Plaintiffs demand trial by jury in this action on each and every one of their claims.

## PARTIES

**A.  Plaintiffs**

12.     Plaintiff DARNELL SMITH ("SMITH") is a 37-year-old African-American man who resides in the Englewood neighborhood of the City of Chicago. Plaintiff SMITH resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

13.     Plaintiff DARREN NATHAN ("NATHAN") is a 49-year-old African-American man who resides in the Englewood neighborhood of the City of Chicago. Plaintiff NATHAN resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

14.     Plaintiff GREGORY DAVIS ("DAVIS") is a 58-year-old African-American man who resides in the Woodlawn neighborhood of the City of Chicago. Plaintiff DAVIS resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

15.     Plaintiff JEFF COLEMAN ("COLEMAN") is a 47-year-old African-American man who resides in the West Pullman neighborhood of the City of Chicago. Plaintiff COLEMAN resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

16.     Plaintiff PHILLIP OVERTON ("OVERTON") is a 36-year-old African-American man who resides in a West Side neighborhood of the City of Chicago. Plaintiff OVERTON resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

17.     Plaintiff MARQUE ROSS ("ROSS") is an 18-year-old African-American man who resides in East Garfield Park neighborhood of the City of Chicago. Plaintiff ROSS resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

**B.  Defendants**

18.     Defendant CITY OF CHICAGO ("City") is a municipal entity created and authorized under the laws of the State of Illinois. It is authorized under the laws of the State of Illinois to maintain a police department, the CPD, which acts as the City's agent in the area of law enforcement and for which the City is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers. The CPD's operations include the operations as described herein. On information and belief, the law enforcement activities of the CPD are funded, in part, with funds from the federal government.

19.     Defendant Chicago Police Superintendent GARRY MCCARTHY is and was, at all times relevant herein, the Police Superintendent for the City, and is and was responsible for, and the chief architect of, the policies, practices and/or customs of the CPD, a municipal agency

of the City. He is and was, at all times relevant herein, responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the police officers under his command who are or were employed by the CPD, including the Defendants named herein. He is sued individually and in his official capacity.

20.     Defendant JOHN DOE OFFICER 1 is, and/or was, at all times relevant herein, an officer, employee and agent of the CPD, a municipal agency of the City. Upon information and belief, Defendant JOHN DOE OFFICER 1 has a badge number of 12064. He is sued in his individual capacity.

21.     Defendants JOHN DOE OFFICERS 2 through 14 are, and/or were, at all times relevant herein, officers, employees, and agents of the CPD, a municipal agency of the City. Defendants JOHN DOE OFFICERS 2 through 14 are sued in their individual capacities.

22.     At all times relevant herein, Defendants Superintendent MCCARTHY and other CITY OF CHICAGO policymakers have acted under color of state law in the course and scope of their duties and functions as agents, employees, and officers of the City and/or the CPD in engaging in the conduct described herein. At all times relevant herein, Defendants have acted for and on behalf of the City and/or the CPD with the power and authority vested in them as officers, agents and employees of the City and/or the CPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the City and/or the CPD.

23.     At all times relevant herein, Defendants JOHN DOE OFFICERS 1-14, Superintendent MCCARTHY and other CITY OF CHICAGO policymakers have violated clearly established constitutional standards under the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment of which a reasonable person would have known.

6

## CLASS ACTION ALLEGATIONS

24.     Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, the named Plaintiffs seek to represent a certified Plaintiff class consisting of all persons who have been or will be subjected by CPD officers to Defendants' policy, practice and/or custom of stopping or stopping and frisking persons in the absence of a reasonable, articulable suspicion that criminal activity is taking place, in violation of the Fourth Amendment, including persons stopped or stopped and frisked based on race and/or national origin, in violation of the Equal Protection Clause of the Fourteenth Amendment.

25.     The members of the class are so numerous as to render joinder impracticable. Based on information made publicly available by the CPD, and recently publicized by the American Civil Liberties Union (ACLU) of Illinois, hundreds of thousands of people are stopped or stopped and frisked each year by the CPD without reasonable, articulable suspicion of criminal conduct.

26.     In addition, joinder is impracticable because, upon information and belief, many members of the class are not aware of the fact that their constitutional rights have been violated and that they have the right to seek redress in court. Many members of the class are without the means to retain an attorney to represent them in a civil rights lawsuit. Moreover, many class members who have been victimized by the CPD's unconstitutional practices do not bring individual claims for fear of retaliation and reprisals by CPD officers. There is no appropriate avenue for the protection of the class members' constitutional rights other than a class action.

27.     The class members share a number of questions of law and fact in common, including, but not limited to:

a. whether the CPD engages in a policy, practice and/or custom of stopping and frisking members of the class in the absence of reasonable, articulable suspicion of criminal conduct required by the Fourth Amendment;

b. whether the CPD engages in profiling on the basis of race and/or national origin in targeting class members for such stops and frisks in violation of the Equal Protection Clause of the Fourteenth Amendment;

c. whether the CPD, incidental to such stops and frisks, conducts searches and seizures and uses excessive force in violation of the Fourth Amendment;

d. whether the City, Superintendent McCarthy, and other City policymakers have failed to adequately and properly screen, train, supervise, monitor and discipline CPD officers, and whether those failures have caused the constitutional violations inflicted by CPD officers against class members; and

e. whether the City, Superintendent McCarthy and other City policymakers have encouraged, sanctioned and failed to rectify unconstitutional stops and frisks by members of the CPD, and whether such acts and omissions have caused constitutional violations by CPD officers against class members.

28.     The named Plaintiffs' claims are typical of those of the class. Like the other members of the class, the named Plaintiffs have been and likely will be again victims of the CPD's policy, practice and/or custom of suspicionless stops and frisks in that they have been and likely will continue to be, stopped or stopped and frisked with the reasonable articulable suspicion of criminal conduct required under the Fourth Amendment and on the basis of their race and/or national origin.

29.     The legal theories under which the named Plaintiffs seek declaratory and injunctive relief are the same or similar to those on which all members of the class will rely, and the harms suffered by the named Plaintiffs are typical of the harms suffered by the class members.

30.      The named Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interest with members of the Plaintiff class, and will fairly and adequately protect the interests of the class. The named Plaintiffs are all African-American men and reside

in and/or visit neighborhoods where CPD officers have been deployed and conduct stop and frisks. As long as the CPD engages in its policy, practice and/or custom of suspicionless stops and frisks, the named Plaintiffs are, and will remain, at high risk of being illegally stopped and frisked again by the CPD. Indeed, at least two of the named Plaintiffs have been victimized by CPD officers repeatedly. The named Plaintiffs are seeking compensatory and punitive damages only on an individual basis.

31.     The named Plaintiffs are represented by Romanucci & Blandin, LLC, and the Gregory Law Firm. All are experienced civil rights counsel who have litigated class action lawsuits and/or have extensive experience handling civil rights cases in federal court. Counsels for the Plaintiffs have the resources, expertise and experience to prosecute this action. Counsels for the Plaintiffs know of no conflicts among members of the class or between the attorneys and members of the class.

32.     The Plaintiff class should be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because the Defendants have acted on grounds generally applicable to the class, thereby making class-wide declaratory and injunctive relief appropriate.

## STATEMENT OF FACTS

### A.   The Experiences of the Named Plaintiffs

#### i.     Darnell Smith and Darren Nathan

33.     On or about May 3, 2013, around 11:00 A.M., Plaintiffs DARNELL SMITH and DARREN NATHAN were visiting neighbors at or near the 6000 block of S. Paulina St. in Chicago, Illinois.

34.     SMITH and NATHAN were speaking to a group of several friends on the front porch steps.

35.    Without basis to formulate a reasonable articulable suspicion that SMITH, NATHAN, or anyone in the group had engaged in or was about to engage in criminal conduct, Defendant Officers, JOHN DOE OFFICERS 1 and 2, pulled up in an SUV and approached the group.

36.    Defendant Officers questioned Plaintiffs asking them if they had any weapons on them. The Plaintiffs responded in the negative.

37.    Without consent and with no reasonable belief that NATHAN was armed or dangerous, JOHN DOE OFFICER 1 ordered NATHAN to put his hands up and began to pat NATHAN down and search his pockets and jacket.

38.    JOHN DOE OFFICER 1 took NATHAN's wallet out of his pocket and pulled out NATHAN's ID.

39.    NATHAN told JOHN DOE OFFICER 1 "you know you ran through my wallet for no reason and searched me without probable cause."

40.    After finding no illegal contraband or weapons, JOHN DOE OFFICER 1 instructed NATHAN to go home.

41.    At the same time, JOHN DOE OFFICER 2 had approached SMITH.

42.    JOHN DOE OFFICER 2 had told SMITH and NATHAN that the officers "just wanted to make sure they weren't armed."

43.    SMITH responded, "What makes you think I'm armed?"

44.    JOHN DOE OFFICER 2 searched through all of SMITH's pockets and only found a phone charger. JOHN DOE OFFICER 2 stated, "Oh, you're not armed. We OK, right?"

45.    Plaintiff SMITH asked for the Defendant Officers' badge numbers but they refused to give them to Plaintiff.

46.     JOHN DOE OFFICERS 1 and 2 returned to their police SUV and drove away.

47.     Plaintiffs SMITH and NATHAN did not see the Defendant Officers fill out a contact card or form.

48.     These officers subjected SMITH and NATHAN to a suspicionless stop based on their race and/or national origin.

49.     In a separate incident, on October 9, 2014, at around 10:00 P.M., Plaintiff SMITH was standing outside his and his grandparents' building, located at 6612 S. Paulina Street in Chicago, Illinois. SMITH was waiting for the food delivery man to deliver his food.

50.     SMITH saw Defendant JOHN DOE OFFICERS 3 and 4 driving down the one way street traveling south. Defendant Officers then turned down the opposite side of the street than SMITH.

51.     Without basis to formulate a reasonable articulable suspicion that SMITH had engaged in or was about to engage in criminal conduct, JOHN DOE OFFICERS 3 and 4 exited their unmarked car, asked Plaintiff SMITH why he was standing there, and whether he had any weapons.  Plaintiff SMITH responded that he did not have any weapons and that his grandmother, who was watching the incident from a window, lived in the building behind them.

52.     JOHN DOE OFFICERS 3 and 4 asked SMITH to step over to their car with them and SMITH refused.

53.     With no reasonable belief that Smith was armed or dangerous, Defendant Officers patted SMITH down and put their hands in SMITH's pockets and removed all of his belongings, including his wallet and identification. They threw SMITH's wallet on the floor.

54.     One of the Defendant Officers ran Plaintiff's identification on the police radio.

55.     Plaintiff did not see Defendant Officers fill out a contact card or form.

56. After failing to find anything incriminating, the Defendant Officers left and did not issue SMITH any citations.

57. JOHN DOE OFFICERS 3 and 4 subjected Smith to a suspicionless stop and search based on his race and/or national origin.

**ii.    Gregory Davis**

58. In July 2014, Plaintiff DAVIS was in his vehicle outside a Chase Bank located at 6650 S. Stony Island Avenue while he waited for his daughter's mother to come out of Walgreen's.

59. Without basis to formulate a reasonable articulable suspicion that DAVIS had engaged in or was about to engage in criminal conduct, JOHN DOE OFFICERS 5 and 6 pulled DAVIS over and  positioned themselves on both sides of DAVIS's vehicle.

60. Defendant Officers asked DAVIS why he was sitting there and demanded DAVIS's driver's license and insurance information.

61. The Defendant Officers looked through the window into DAVIS's vehicle before allowing Plaintiff DAVIS to return to his nearby home.

62. Defendant Officers did not issue any citations. Plaintiff DAVIS did not see Defendant Officers fill out a contact card or form.

63. JOHN DOE OFFICERS 5 and 6 subjected DAVIS to a suspicionless stop based on his race and/or national origin.

64. In a separate incident in October 2014, Plaintiff DAVIS pulled out of his parking space near his home and made a left turn into an alley. Plaintiff DAVIS believed that another vehicle was coming through the alley so he briefly stopped in the alley.

65. Without any basis to formulate a reasonable articulable suspicion that DAVIS had

engaged in or was about to engage in criminal conduct, JOHN DOE OFFICERS 7 and 8 then put their lights on and pulled Plaintiff DAVIS over. Defendant Officers asked DAVIS for his license and registration.

66.     The Defendant Officers asked DAVIS what he had in the car and asked to search DAVIS's car. Plaintiff DAVIS denied the Defendant Officers' request to search the car because they had no probable cause.

67.     Defendant Officers took Plaintiff DAVIS's driver's license and insurance information and forced DAVIS to wait 20 minutes while they searched his background information.

68.     Defendant Officers then told DAVIS he was free to go. DAVIS did not see Defendant Officers fill out a contact card or form.

69.     These officers subjected DAVIS to a suspicionless stop based on his race and/or national origin.

**iii.     Jeff Coleman**

70.     In August 2014, Plaintiff COLEMAN was a passenger driving with a friend heading east on Ashland Avenue in Chicago, Illinois.

71.     Without any basis to formulate a reasonable articulable suspicion that Coleman had engaged in or was about to engage in criminal conduct, JOHN DOE OFFICERS 9 and 10 pulled COLEMAN's friend over at or near the intersection of Ashland Avenue and 95th Street in Chicago.

72.      Defendant Officers asked COLEMAN and his friend if they had any drugs or weapons on them and ordered them to get out of their car.

73.     With no reasonable suspicion that COLEMAN or his friend was armed or

13

dangerous, JOHN DOE OFFICERS 9 and 10 asked COLEMAN and his friend if they had any weapons or drugs and proceeded to pat down and frisk them.

74.     COLEMAN asked the Defendant Officers why they were being stopped and frisked, but the Officers refused to answer or provide any reason for the stop or frisk.

75.     Without any basis to formulate a reasonable articulable suspicion that COLEMAN or his friend had engaged in or was about to engage in criminal conduct, Defendant Officers asked the men if they could search the trunk. COLEMAN and his friend did not consent to the search.

76.     Plaintiff COLEMAN informed the Defendant Officers he knew several Chicago police officers and did some political work in the neighborhood. COLEMAN and his friend were then permitted to go without citation.

77.     COLEMAN did not see JOHN DOE OFFICERS 9 or 10 fill out a contact card or form.

78.     JOHN DOE OFFICERS 9 and 10 subjected COLEMAN to a suspicionless stop, frisk and unlawful search based on his race and/or national origin.

iv.     **Phillip Overton**

79.     In or around December 2013, at or around 7 P.M., Plaintiff OVERTON was walking to a convenience store or gas station to buy groceries after work. The convenience or gas station was located at or near the intersection of W. Division St. and Pulaski Road in Chicago, Illinois.

80.     JOHN DOE OFFICERS 11 and 12 pulled up next to OVERTON as he walked on the sidewalk and asked him where he was going and whether he lived around the neighborhood.

14

81.     OVERTON responded that he was going to the convenience store and that he did live in the neighborhood.

82.     The Defendant Officers asked OVERTON for identification. OVERTON provided it, and stated that he recently moved and did not update his identification yet, so the address on his identification was different than his current address.

83.     Defendant Officers ordered OVERTON to go up against their police car and handcuffed him.

84.     With no reasonable belief that OVERTON was armed or dangerous, Defendant Officers patted OVERTON down and put their hands in his pockets and removed all of his belongings.

85.     Defendant Officers also conducted a background check on OVERTON.

86.     After only finding a pack of cigarettes, money and keys, OVERTON was permitted to continue on his way to the convenience store and no citations were issued. The Defendant Officers stated, "Well, you don't have any warrants and you're name is clean. You can go."

87.     Upon information and belief, the entire stop and frisk took about 20 minutes.

88.     JOHN DOE OFFICERS 11 and 12 subjected OVERTON to a suspicionless stop, frisk and unlawful search based on his race and/or national origin.

**v.      Marque Ross**

89.     On or about April 8, 2015, at or around 2 P.M., Plaintiff ROSS walked into the Kedzie & Ohio Food Mart, located at 549 N. Kedzie Ave. in Chicago, Illinois.

90.     JOHN DOE OFFICERS 13 and 14 approached ROSS while he was inside the convenience store and one of the officers asked him, "Do you know who I am?" ROSS

15

responded in the negative.

91.     The Defendant Officers took ROSS outside the convenience store, asked for identification, put him against their police car and hand-cuffed him.

92.     With no reasonable belief that ROSS was armed or dangerous, Defendant Officers patted ROSS down and put their hands in his pockets and searched his pockets.

93.     Defendant Officers also ordered ROSS to take his shoes off so they could search his shoes.

94.     After finding no weapons or illegal contraband, Plaintiff ROSS was let go.

95.     JOHN DOE OFFICERS 13 and 14 subjected OVERTON to a suspicionless stop, frisk and unlawful search based on his race and/or national origin.

**B.   CPD's History of a Policy, Practice and/or Custom of Suspicionless Stops and Frisks**

96.     The CPD has a history of conducting suspicionless stops and frisks which traces back to sweeps of high-crime neighborhoods in the 1980s. A review of how *Terry* stops have been used in Chicago demonstrates a persistent problem – inadequate training, supervision and monitoring of law enforcement in minority communities.

97.      In the early 1980s, the Chicago Reporter found that more than 100,000 citizens were arrested for "disorderly conduct" during sweeps of high-crime neighborhoods. These arrests were usually preceded by a stop and frisk. These cases almost never resulted in convictions because the police generally did not show up in court to defend the arrest. An ACLU lawsuit successfully challenged this practice and, as a result, disorderly conduct arrests and their accompanying stops and frisks plummeted. *Michael Nelson v. City of Chicago*, 83-C-1168 (N.D. Ill.).

98.     These unnecessary stops and arrests alienated African-American communities in

16

Chicago. In the 1990s, *Terry* stops re-emerged under the "gang loitering ordinance." That ordinance – later struck down by the U.S. Supreme Court– resulted in more than 40,000 arrests over 18 months of enforcement. *See City of Chicago v. Morales*, 527 U.S. 41 (1999). These massive numbers of people were arrested and searched, often without a legally justifiable reason, for refusing to follow dispersal orders. In reality, the ordinance was a method for stopping and searching young men of color.

99.     In the early 2000s, unwarranted stops and searches were still commonplace. In 2003, the ACLU filed a lawsuit on behalf of Olympic Gold medalist Shani Davis and several others, challenging a series of humiliating stop and frisk searches by Chicago police. *See* Complaint for Plaintiffs, *Davis v. City of Chicago*, 219 F.R.D. 593 (N.D. Ill. 2004), (No. 03 C 2094), 2003 WL 23800673.

100.     Data collected in connection with that suit showed a pattern of unjustified stops and searches, resulting in the unnecessary detention of young people, mostly young people of color. As a result of the *Davis* lawsuit, the Chicago police made changes to their policy of stopping and searching on the streets, including a requirement to record why stops occur.

101.     The manner in which the City implemented the recordkeeping has proved insufficient. Today, Chicago's reliance on unconstitutional stop and frisks has increased dramatically.

**i.     ACLU's March 2015 Report and Statistics**

102.     Under current CPD policy, Chicago police officers are required to justify their stops on "contact cards." Supervisors are required to review the facts and circumstances of each individual stop, correct the officer, and if necessary, recommend training or discipline to officers who have failed to provide a legal justification for a stop.

103.    In March 2015, the ACLU published a report regarding its investigation into the CPD's practice of stop and frisk and the statistics were alarming.

104.    The ACLU found that for half of the CPD's stops (based on the sample analyzed), the officer did not record legally sufficient reasons to establish reasonable suspicion. The ACLU also found that a large percentage of Chicago police officers did not record the reasons for the stop, even though the department requires that officers do so. These stops made without sufficient cause violate the Fourth Amendment guarantee against unreasonable searches and seizures.

105.    In many narrative fields, the officers stated that they stopped people for reasons unrelated to a suspicion of a crime.

106.    A review of the contact card database for the four-month period of May through August 2014 indicates that African Americans are disproportionately subjected to stops when compared to their white counterparts.  African-American Chicagoans were subjected to 182,048 stops and frisks, which was 72% of all stops, yet constitute just 32% of the city's population.

107.    Also, there are more stops per capita in minority neighborhoods. For example, in the minority district Englewood there were 266 stops per 1,000 people, while in the predominately white district Lincoln/Foster there were 43.

108.    The difference in stop rates among different races also occurs outside minority communities. In Chicago's predominantly white police districts—Near North, Town Hall, and Jefferson Park—the disparity between African-American population and percentage of stops is even more blatant than city-wide data. For example, although Jefferson Park's African American population is just 1%, African Americans make up almost 15% of all stops.

109.    Most shockingly, there were more than 250,000 stops that did not lead to an arrest

in Chicago for the time period of May 1, 2014 through August 31, 2014. Comparing stops to population, Chicagoans were stopped at a far higher rate than New Yorkers at the height of New York City's stop and frisk practice in 2011.

110.     In 2014, there were 93.6 stops in Chicago per 1,000 people (between the months of May-August 2014). By contrast, in 2011, at the height of New York City's stop and frisk practice, there were 22.9 stops per 1,000 people.

111.     Defendants have applied a facially neutral policy, the written anti-racial profiling policy, to Plaintiffs, and similarly situated individuals, in an intentionally racially discriminatory manner.

112.     Upon information and belief, CPD officers are also under pressure to conduct increased stops and frisks. Upon information and belief, the stop and frisk reports are tracked and evaluated at the CPD's CompStat meetings where commanders are questioned about their precinct's crime statistics. CompStat focus gives CPD officers a strong incentive to make and document stops because an officer's numbers suggest productivity.

113.     At a CompStat meeting, Defendant MCCARTHY was quoted by the Chicago Tribune stating that "[e]verything will improve if [police officers] get out of the cars and put our hands on people. Make sure your officers are doing this, making out contact cards, and make sure we are stopping the right people at the right times and the right places."

114.     Through the first 10 months of 2014, officers filled out more than 600,000 contact cards, which exceeds the previous year's total of 516,000 and is far more than the 379,000 written in 2011, when Defendant MCCARTHY took office.

115.     CPD officers are not required to fill out contact cards during "voluntary" interactions with citizens nor if an investigatory stop leads to an arrest. Thus, the amount of stops

19

and frisks performed by police is projected to be significantly higher.

116. Public accounts provide further evidence of unlawful stops and frisks which lack the reasonable suspicion required by the Fourth Amendment and reveal intent to discriminate on the basis of race. In January 2013, the ACLU wrote a memo to Chicago Mayor Rahm Emanuel, Defendant MCCARTHY and the City of Chicago's Corporation Counsel about the importance of monitoring Chicago's stop and frisk policy.

117. Despite receiving numerous requests by various organizations to conduct stop and frisks within the bounds of the Constitution, the CITY OF CHICAGO and its final policymakers have repeatedly and consciously failed to take appropriate action.

## C. CPD's Suspicionless Stop and Frisk Practice is a Direct and Proximate Result of Defendants' Policies, Practices and/or Customs

118. The Fourth Amendment prohibits police officers from conducting stops and frisks without a reasonable, articulable suspicion of criminal conduct; frisking persons without a reasonable belief that they are armed or presently dangerous; searching and seizing persons without probable cause; or using excessive force in the course of policing activities. Additionally, the Equal Protection Clause of the Fourteenth Amendment bars police officers from targeting individuals for stops and frisks on the basis of race or national origin.

119. The pervasive unconstitutional practices of the CPD are a direct and proximate result of policies, practices and/or customs devised, implemented, enforced and sanctioned by the City and its policymakers, including Superintendent MCCARTHY, and their confederates whose identities are presently unknown, with the knowledge that such policies, practices and/or customs would lead to violations of the Fourth and Fourteenth Amendments. Those policies, practices and/or customs include: (a) failing to properly screen, train and supervise CPD officers, (b) failing to adequately monitor and discipline CPD officers, and (c) encouraging, sanctioning

and failing to rectify the CPD's custom and practice of suspicionless stops and frisks.

### i.    Chicago's failure to properly screen, train and Supervise CPD Officers

120.    Although fully aware that the work of the CPD demands extensive training, superior judgment and close supervision, the City and Superintendent MCCARTHY failed to properly screen, train and supervise CPD officers, knowing that such failures would result in Fourth and Fourteenth Amendment violations.

121.    Pursuant to CPD General Order G02-04, Superintendent MCCARTHY was required to implement numerous training requirements concerning the written CPD policy prohibiting racial profiling. Upon information and belief, Defendants have failed to properly train and supervise CPD officers, including supervisors, concerning the legal and factual bases for conducting stops and/or frisks that comply with the Fourth and Fourteenth Amendments in an effective manner.

122.    The inadequate screening, training and supervision of the CPD is a direct and proximate cause of the CPD's rampant unconstitutional stops and frisks. As a direct and proximate result of the Defendants' failure to screen, train and supervise CPD officers, tens of thousands of people have been subjected to unlawful stops and frisks, many times simply because of their race and/or national origin. By failing to properly screen, train and supervise CPD officers, the City, Superintendent MCCARTHY, and other City policymakers have acted recklessly and with deliberate indifference to the constitutional rights of those who would come into contact with the CPD.

### ii.    Chicago's failure to monitor and discipline CPD officers

123.    The CPD's widespread abuses are also a direct and proximate result of the failure of the City and Superintendent MCCARTHY to properly and adequately monitor, discipline and

take necessary corrective action against CPD officers who engage in, encourage or conceal unconstitutional practices. Among other things, these Defendants knowingly, deliberately and recklessly have failed:

a. to take appropriate disciplinary action and corrective measures against CPD officers who have engaged in suspicionless stops and frisks;

b. to adequately monitor CPD officers who have incurred a substantial number of civilian complaints, even in instances where the number of complaints should have triggered monitoring under established departmental guidelines;

c. to devise and implement appropriate oversight, disciplinary and remedial measures in the face of extensive evidence that no charges are brought against the overwhelming majority of persons stopped and frisked by CPD officers;

d. to conduct adequate auditing to determine if the stop and frisks conducted by CPD officers comply with the CPD's written policy prohibiting stop and frisks that are not based upon reasonable suspicion and use race and/or national origin as the determinative factor in initiating police action;

e. to take sufficient, if any, steps to curb CPD officers' non-compliance with departmental directives requiring that contact cards be completed for each stop and frisk;

f. to take sufficient corrective and remedial action against CPD officers who provide fabricated, false, or impermissible justifications for stops and frisks; and

g. to take sufficient corrective, disciplinary and remedial action to combat the so-called "blue wall of silence," wherein CPD officers regularly conceal or fail to report police misconduct, *inter alia*, in sworn testimony, official reports, statements to the Independent Police Review Authority (IPRA), the Internal Affairs Division, and in public statements.

124. The City and Superintendent MCCARTHY failed to properly and adequately monitor, discipline and take necessary corrective action against CPD officers, knowing that such omissions would lead to Fourth and Fourteenth Amendment violations. By such acts and omissions, the City and MCCARTHY have acted recklessly and with deliberate indifference to the constitutional rights of those who would come into contact with the CPD.

iii.   **Encouraging, sanctioning and failing to rectify the CPD's suspicionless stops and frisks**

125.   With the knowledge that such acts and omissions would create a likelihood of Fourth and Fourteenth Amendment violations, the City and its policymakers, including Superintendent MCCARTHY, also have encouraged, sanctioned and failed to rectify the CPD's abusive and unconstitutional practices.

126.   For example, Defendants, upon information and belief, have enacted and enforced unwritten "productivity standards" or de facto quotas of a certain number of stops and frisks and specific types of arrests per month for each CPD officer. Upon information and belief, in their efforts to satisfy the productivity standards, CPD officers have engaged in widespread suspicionless stops and frisks of individuals.

127.   As a direct and proximate result of the above policies, practices and/or customs, tens of thousands of people have been, and will continue to be, subjected to unconstitutional stops, frisks, searches and seizures by CPD officers, sometimes in violent encounters, simply because such individuals happen to be the wrong color, in the wrong place, at the wrong time. Through such acts and omissions, the City and Superintendent MCCARTHY have acted recklessly and with deliberate indifference to the constitutional rights of individuals who would come into contact with the CPD.

**D.  Recent Measures Are Inadequate and Insufficient to Eradicate, Curb or Deter the Suspicionless Stop and Frisk Policy**

128.   The Chicago Police Department refuses to keep sufficient data about its officers' stops and frisks. This administrative failure to record data on whether an arrest was made, whether a frisk was made, and the results of a search makes it impossible for police supervisors, or the public, to identify problem areas in order to make necessary policy changes.

129.     Without accurate data, there is no way to determine whether a CPD officer's search was lawful.

130.     Contact cards are not required to be filled out if the stop leads to an arrest or an ordinance violation. Currently, CPD officers do not identify on arrest reports whether a *Terry* stop led to an arrest.

131.     In April 2014, the CPD changed its policy to limit contact cards to stops and the enforcement of loitering ordinances. This measure has not sufficiently or adequately addressed, much less irrevocably eradicated, curbed, or deterred the CPD's pervasive policy, practice and/or custom of unconstitutional stops and frisks. Thus, despite these policy changes, Plaintiffs, and hundreds of thousands of other individuals, continue to face the imminent likelihood of becoming victims of the CPD's constitutional abuses in violation of the Fourth and Fourteenth Amendments to the U.S. and Illinois Constitutions.

## COUNT 1 – Violations of the Fourth Amendment
### (Claims of All Named Plaintiffs and Class Members Pursuant to 42 U.S.C. §1983 Against All Defendants for Violation of the Fourth Amendment)

132.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

133.     Defendants City, Superintendent MCCARTHY, and DOE OFFICERS 1-14 have implemented, enforced, encouraged and sanctioned a policy, practice and/or custom of stopping and frisking the members of the Plaintiff class without the reasonable articulable suspicion of criminality required by the Fourth Amendment. These constitutional abuses often are coupled with unconstitutional searches and seizures and, at times, excessive force.

134.     The CPD's constitutional abuses and violations were, and are, directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged and sanctioned by the City and Superintendent MCCARTHY, including: (a) the

failure to adequately and properly screen, train, and supervise CPD officers; (b) the failure to properly and adequately monitor and discipline CPD officers; and (c) the overt and tacit encouragement and sanctioning of, and the failure to rectify, the CPD's suspicionless stop and frisk practices.

135. Each of the Defendants has acted with deliberate indifference to the Fourth Amendment rights of the named Plaintiffs and other members of the class. As a direct and proximate result of the acts and omissions of each of the Defendants, the Fourth Amendment rights of the named Plaintiffs and other class members have been violated. By acting under color of state law to deprive the named Plaintiffs and other class members of their rights under the Fourth Amendment, the Defendants are in violation of 42 U.S.C. § 1983, which prohibits the deprivation under color of state law of rights secured under the United States Constitution.

136. The CPD targets African-American individuals for illegal stops and frisks in areas where Plaintiffs reside and/or visit. Thus, a real and immediate threat exists that the Fourth Amendment rights of the named Plaintiffs and other class members will be violated by CPD officers in the future. Moreover, because Defendants' policies, practices and/or customs subject the named Plaintiffs and other class members to stops and frisks without any reasonable, articulable suspicion of criminality, and often on the basis of race and/or national origin, the named Plaintiffs and other class members cannot alter their behavior to avoid future violations of their constitutional and civil rights at the hands of the CPD.

137. The named Plaintiffs and other members of the class have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from continuing the CPD's policy, practice and/or custom of unconstitutional stops

and frisks, and the policies, practices and/or customs that have directly and proximately caused such constitutional abuses.

### COUNT 2 – Violations of the Equal Protection Clause
**(Claims of All Named Plaintiffs and Class Members Pursuant to 42 U.S.C. §1983 Against All Defendants for Violation of the Equal Protection Clause)**

138.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

139.    Defendants City, Superintendent MCCARTHY, and DOE OFFICERS 1-14 have implemented and enforced a policy, practice and/or custom of stopping and frisking the named Plaintiffs and members of the Plaintiff class without the reasonable articulable suspicion of criminality required by the Fourth Amendment and based solely on their race and/or national origin. These suspicionless stops and frisks have and are being conducted predominantly on African-American individuals on the basis of racial and/or national origin profiling. As a result, the CPD's policy, practice and/or custom of suspicionless stops and frisks violate the Equal Protection Clause of the Fourteenth Amendment.

140.    The CPD's constitutional abuses were and are directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged, and sanctioned by the City and Superintendent MCCARTHY, including: (a) the failure to adequately and properly screen, train, and supervise CPD officers; (b) the failure to adequately and properly monitor and discipline the CPD and its officers; and (c) the encouragement and sanctioning of and failure to rectify the CPD's use of racial and/or national origin profiling in making stops and frisks.

141.    Each of the Defendants has acted with deliberate indifference to the Fourteenth Amendment rights of the named Plaintiffs and class members. As a direct and proximate result of the aforesaid acts and omissions of the Defendants and each of them, the Fourteenth

Amendment rights of the named Plaintiffs and class members have been violated. By their acts and omissions, Defendants have acted under color of state law to deprive the named Plaintiffs and class members of their Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

142.    Due to the CPD targeting African-American persons in areas where the named Plaintiffs and other class members reside and/or visit, a real and immediate threat exists that the Fourteenth Amendment rights of the named Plaintiffs and other class members will be violated by CPD officers in the future. Moreover, because Defendants' policies, practices and/or customs subject the named Plaintiffs and other class members to repeated stops and frisks without any reasonable, articulable suspicion of criminality, and often on the basis of race and/or national origin, the named Plaintiffs and other class members cannot alter their behavior to avoid future violations of their constitutional and civil rights at the hands of the CPD.

143.    The named Plaintiffs and other class members have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from continuing the CPD's policy, practice and/or custom of unconstitutional race and/or national origin-based stops and frisks, and the policies, practices and/or customs that have directly and proximately caused such constitutional abuses.

### COUNT 3 – Violations of Title VI of the Civil Rights Act
**(Claims of All Named Plaintiffs and Class Members Under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d), et seq. Against the City of Chicago)**

144.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

145.    The law enforcement activities described in this complaint have been funded, in part, with federal funds.

146.    Discrimination based on race in the law enforcement activities and conduct described herein is prohibited under 42 U.S.C. § 2000(d), et seq. The acts and conduct

complained of herein by the Defendants were motivated by racial animus, and were intended to discriminate on the basis of race and/or had a disparate impact on minorities, particularly African-American males.

147.    As a direct and proximate result of the above mentioned acts, the named Plaintiffs and members of the class have suffered injuries and damages and have been deprived of their rights under the civil rights laws. Without appropriate injunctive relief, these violations will continue to occur.

## COUNT 4 – 42 U.S.C. §1983— *Monell* – Unconstitutional Customs, Policies, and Practices
### (Individual Named Plaintiffs' Claims Against the City of Chicago and Superintendent McCarthy)

148.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

149.    Defendants City and Superintendent MCCARTHY have directly and proximately caused the CPD's policy, practice and/or custom of suspicionless stops and frisks in violation of the Fourth and Fourteenth Amendments, with deliberate indifference to the constitutional rights of Plaintiffs by devising, implementing, enforcing, adopting, sanctioning and ratifying a policy, practice and/or custom of: (a) failing to properly screen, train, and supervise CPD officers; (b) failing to adequately monitor and discipline the CPD and its officers; and (c) encouraging, sanctioning and failing to rectify the CPD's constitutional abuses.

150.    As a direct and proximate result of the aforesaid acts and omissions, Defendants City and Superintendent MCCARTHY have each deprived Plaintiffs of their Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

151.    The acts and omissions of Defendants Superintendent MCCARTHY and other City policymakers explained herein were intentional, wanton, malicious, reckless and oppressive, thus, entitling Plaintiffs to an award of punitive damages. In engaging in such conduct,

28

Superintendent MCCARTHY and City policymakers acted beyond the scope of their jurisdiction, without authority under law, and in abuse of their powers.

### COUNT 5 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
**(Individual Claims of Darnell Smith & Darren Nathan against John Doe Officers 1 & 2)**

152.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

153.     The conduct of JOHN DOE OFFICERS 1 and 2 in stopping, frisking and searching Plaintiffs DARNELL SMITH and DARREN NATHAN on May 3, 2013, were performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, each of these stops and frisks were performed on the basis of racial and/or national origin profiling.

154.     As a direct and proximate result of such acts, JOHN DOE OFFICERS 1 and 2 deprived SMITH and NATHAN of their Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

155.     As a direct and proximate result of those constitutional abuses, Plaintiffs had suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

156.     The acts of JOHN DOE OFFICERS 1 and 2 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 6 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
**(Individual Claims of Darnell Smith against John Doe Officers 3 & 4)**

157.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

158.     The conduct of JOHN DOE OFFICERS 3 and 4 in stopping, frisking and searching Plaintiff DARNELL SMITH on October 9, 2014, was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds.

Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

159.    As a direct and proximate result of such acts, JOHN DOE OFFICERS 3 and 4 deprived SMITH of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

160.    As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

161.    The acts of JOHN DOE OFFICERS 3 and 4 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 7 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
**(Individual Claims of Gregory Davis against John Doe Officers 5, 6, 7 & 8)**

162.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

163.    The conduct of JOHN DOE OFFICERS 5 and 6 in stopping Plaintiff GREGORY DAVIS in July 2014, and the conduct of JOHN DOE OFFICERS 7 and 8 in stopping GREGORY DAVIS in October 2014, was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, each of these stops was performed on the basis of racial and/or national origin profiling.

164.    As a direct and proximate result of such acts, Defendant Officers deprived DAVIS of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

165.    As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

166.    The acts of Defendant Officers were intentional, wanton, malicious, reckless and

oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 8 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
### (Individual Claims of Jeff Coleman against John Doe Officers 9 & 10)

167.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

168.     The conduct of JOHN DOE OFFICERS 9 and 10 in stopping, frisking and searching Plaintiff JEFF COLEMAN in August 2014, was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

169.     As a direct and proximate result of such acts, JOHN DOE OFFICERS 9 and 10 deprived DAVIS of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

170.     As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

171.     The acts of JOHN DOE OFFICERS 9 and 10 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 9 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
### (Individual Claims of Phillip Overton against John Doe Officers 11 & 12)

172.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

173.     The conduct of JOHN DOE OFFICERS 11 and 12 in stopping, frisking and searching Plaintiff PHILLIP OVERTON in December 2013, was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin

profiling.

174.     As a direct and proximate result of such acts, JOHN DOE OFFICERS 11 and 12 deprived OVERTON of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

175.     As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

176.     The acts of JOHN DOE OFFICERS 11 and 12 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 10 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
**(Individual Claims of Marque Ross against John Doe Officers 13 & 14)**

177.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

178.     The conduct of JOHN DOE OFFICERS 13 and 14 in stopping, frisking and searching Plaintiff MARQUE ROSS in April 2015, was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

179.     As a direct and proximate result of such acts, JOHN DOE OFFICERS 13 and 14 deprived ROSS of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

180.     As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

181.     The acts of JOHN DOE OFFICERS 13 and 14 were intentional, wanton,

malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

## COUNT 11 – Violation of Rights Under Illinois Law

182.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

183.     By the actions described above, each and every Defendant, jointly and severally, has committed the following wrongful acts against the named Plaintiffs and other class members, which are tortious under the Constitution and laws of the State of Illinois:

a.  assault and battery;

b.  trespass;

c.  violation of the right to privacy;

d.  negligence; and

e.  violation of rights otherwise guaranteed under the Constitution and the laws of the State of Illinois.

184.     In addition, by the actions described above, JOHN DOE OFFICERS 1 through 14, jointly and severally, have committed the following wrongful acts against Plaintiffs DARNELL SMITH (October 2014 incident), GREGORY DAVIS (July 2014 and October 2014 incidents), JEFF COLEMAN (August 2014 incident), and MARQUE ROSS (April 2015 incident), which are tortious under the Constitution and laws of the State of Illinois:

f.  false arrest; and

g.  false imprisonment.

185.     In addition, Defendants City and Superintendent MCCARTHY were negligent in their hiring, screening, training, supervision and retention of JOHN DOE OFFICERS 1 through 14.

186.     The foregoing acts and conduct of Defendants were a direct and proximate cause of injury and damage to the named Plaintiffs and other class members and violated the statutory

and common law rights as guaranteed to them by the Constitution and laws of the State of

Illinois.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the named Plaintiffs and other members of the class they seek to

represent pray that the Court will:

(a) Issue an order certifying this action as a class action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure in the manner described above herein, with the named Plaintiffs as class representatives;

(b) Issue a class-wide judgment declaring that the CPD's policy, practice and/or custom of suspicionless stops and frisks challenged herein is unconstitutional in that it violates the Fourth and Fourteenth Amendments to the United States Constitution, Title VI, and the Constitution and laws of the State of Illinois, and that its implementation, enforcement and sanctioning by CPD officers is a direct and proximate result of the following policies, practices and/or customs of the City and Superintendent MCCARTHY:

   i. failing to adequately screen, train and supervise officers;

   ii. failing to adequately monitor the CPD and its officers and

   iii. discipline those CPD officers who violate the constitutional rights of residents of the communities they patrol; and encouraging, sanctioning, and failing to rectify the CPD's unconstitutional stops and frisks.

(c) Issue an order for the following injunctive relief:

   i. enjoining the CPD from continuing its policy, practice and/or custom of suspicionless stops and frisks;

   ii. enjoining the CPD from continuing its policy, practice and/or custom of conducting stops and frisks based on racial and/or national origin profiling;

   iii. enjoining the use of formal or informal productivity standards or other de facto quotas for arrests and/or stops and frisks by CPD officers;

   iv. requiring the City, Superintendent McCarthy and other City policymakers to institute and implement improved policies and programs with respect to training, discipline, and promotion designed to eliminate the CPD's policy, practice and/or custom of suspicionless stops and frisks;

    v.    requiring the City, Superintendent McCarthy and other City policymakers to deploy CPD officers with appropriate and adequate supervision;

    vi.    requiring the City, Superintendent McCarthy and other City policymakers to institute and implement appropriate measures to ensure compliance with departmental directives that CPD officers complete contact cards on each and every stop and frisk they conduct;

    vii.    requiring the City, Superintendent McCarthy and other City policymakers to institute and implement appropriate measures to mandate that contact cards or other documentation be prepared and maintained in an up to date computerized database for each stop conducted by an officer, regardless of whether the stop is followed by the use of force, a frisk, a search, or an arrest; and

    viii.    requiring the City, Superintendent McCarthy and other City policymakers to monitor stop and frisk practices of the CPD, including periodically and regularly reviewing contact card forms and audits conducted of the CPD's stop and frisk practices to determine whether reported stops and frisks have comported with constitutional requirements.

(d) Award named Plaintiffs compensatory damages in amounts that are fair, just and reasonable, to be determined at trial;

(e) Award named Plaintiffs damages against Defendants Superintendent McCarthy and John Doe Officers 1 through 14 to the extent that their liability is based upon reprehensible actions and/or inaction undertaken in their individual capacities, in an amount which is fair, just and reasonably designed to punish and deter said reprehensible conduct, to be determined at trial;

(f) Award all Plaintiffs, including the members of the class, reasonable attorneys' fees pursuant to 42 U.S. C.§ 1988;

(g) Award all Plaintiffs, including the members of the class, costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988; and

(h) Award such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

    Respectfully Submitted,
    ROMANUCCI & BLANDIN, LLC


    _____/s Antonio M. Romanucci_____
    Attorney for Plaintiff

Antonio M. Romanucci
Martin D. Gould
**ROMANUCCI & BLANDIN, LLC**
321 North Clark Street, Suite 900
Chicago, Illinois 60654
(312) 458-1000
(312) 458-1004 *facsimile*
Firm No. 35875

Rodney G. Gregory
**THE GREGORY LAW FIRM**
3127 Atlantic Blvd., Suite 3
Jacksonville, Florida 32207
Ph: (904) 398-0012
Fax: (904) 398-5131

***Attorneys for Plaintiffs and the Class***