**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DARNELL SMITH, DARREN NATHAN,       )
GREGORY DAVIS, JEFF COLEMAN,        )
PHILLIP OVERTON, MARQUE ROSS,       )
MARK NEVILLES, ANTHONY L. BROWN,    )
CHRISTOPHER LOCKE, HECTOR           )
FANTANEZ, MARCELL DAVIS, ANTHONY    )
POLK, CALVIN JACKSON, CARL N.       )
MCCORD, TIMOTHY THIGPEN, KEITH      )     No. 1:15-cv-03467
RIGGINS, JAMES SHINAUL, MARK        )
NEVILLES, BRANDON BUFORD, MELVIN    )     Honorable Amy J. St. Eve
THOMPSON, DARION BEENE, LAVESTER    )
MCWANE, DEANDRE STEWART, STEVE      )
MCABEE, HERBERT DYER, JR., ARTHUR   )
STRINGER, JONATHAN JACKSON,         )
SHANTAY JOHNSON, ARTHUR MOTON,      )
DUDLEY BURNS, EDGAR MARSHALL,       )
JR., MICHAEL SANDERS, RASHAWN       )
LINDSEY, SIDNEY BELL, and CALVIN    )
JACKSON, individually and on behalf of a )
class of all others similarly situated;  )
                                    )
          Plaintiffs,               )
                                    )
                                    )
     v.                             )
                                    )
THE CITY OF CHICAGO; a municipal    )     **CLASS ACTION COMPLAINT**
corporation, CHICAGO POLICE         )     **FOR DECLARATORY AND**
SUPERINTENDENT GARRY MCCARTHY,      )     **INJUNCTIVE RELIEF AND**
in his individual and official capacity; )     **INDIVIDUAL DAMAGES**
COMMANDER GLENN EVANS, and          )
UNKNOWN CHICAGO POLICE OFFICERS     )
("JOHN DOE OFFICERS 1-110"),        )
                                    )
                                    )
          Defendants.               )

## COMPLAINT AT LAW

NOW COME the Plaintiffs, DARNELL SMITH, DARREN NATHAN, GREGORY

DAVIS, JEFF COLEMAN, PHILLIP OVERTON, MARQUE ROSS, MARK NEVILLES,

1

ANTHONY L. BROWN, CHRISTOPHER LOCKE, HECTOR FANTANEZ, MARCELL

DAVIS, ANTHONY POLK, CALVIN JACKSON, CARL N. MCCORD, TIMOTHY

THIGPEN, KEITH RIGGINS, JAMES SHINAUL, MARK NEVILLES, BRANDON BUFORD,

MELVIN THOMPSON, DARION BEENE, SHANTAY JOHNSON, LAVESTER MCWANE,

DEANDRE STEWART, STEVE MCABEE, HERBERT DYER, JR., ARTHUR STRINGER,

JONATHAN JACKSON, ARTHUR MOTON, DUDLEY BURNS, EDGAR MARSHALL, JR.,

MICHAEL SANDERS, RASHAWN LINDSEY, SIDNEY BELL, and CALVIN JACKSON,

individually and on behalf of a class of all others similarly situated, by and through their

attorneys, ROMANUCCI & BLANDIN, LLC, THE CENTER FOR CONSTITUTIONAL

LITIGATION, and THE GREGORY LAW FIRM, and for their Complaint at Law against

Defendants, CITY OF CHICAGO, a municipal corporation, Chicago Police Superintendent

GARRY MCCARTHY, Commander GLENN EVANS, and JOHN DOE OFFICERS 1 through

110, pleading hypothetically and in the alternative, states as follows:

## PRELIMINARY STATEMENT

1.        This is a civil rights action in which named Plaintiffs, on behalf of themselves

and a class of similarly situated individuals, seek relief for Defendants' violation of their rights,

privileges, and immunities secured by the Civil Rights Act of 1871, 42 U.S.C. §1983, the Fourth

and Fourteenth Amendments to the United States Constitution, Title VI of the Civil Rights Act

of 1964, 42 U.S.C. § 2000(d), et seq. ("Title VI"), and the Constitution and laws of the State of

Illinois.

2.        The Defendants in this action, the CITY OF CHICAGO ("City"), Chicago Police

Superintendent GARRY McCARTHY ("McCARTHY"), and DOE OFFICERS 1-110 have

implemented and are continuing to enforce, encourage and sanction a policy, practice and/or

custom of unconstitutional stops and frisks of City residents, including Plaintiffs, by the Chicago Police Department ("CPD") which are being done without the reasonable articulable suspicion required under the Fourth Amendment.

3.     In addition, this pattern and practice of unconstitutional stops and frisks by CPD officers often have used, and continue to use, race and/or national origin, not reasonable suspicion, as the determinative factors in deciding to stop and frisk individuals in violation of the Equal Protection Clause of the Fourteenth Amendment. The victims of such racial and/or national origin profiling are principally African-American and Hispanic males.

4.     The CPD's widespread constitutional abuses have flourished as a result of, and are directly and proximately caused by, policies, practices and/or customs devised, implemented and enforced by the City and its final policymakers, including Superintendent McCARTHY. The City and Superintendent McCARTHY have acted with deliberate indifference to the constitutional rights of those who would come into contact with CPD officers by: (a) failing to properly screen, train, and supervise CPD officers; (b) inadequately monitoring CPD officers and their stop and frisk practices; (c) failing to sufficiently discipline CPD officers who engage in constitutional abuses; and (d) encouraging, sanctioning and failing to rectify the CPD's unconstitutional practices.

5.     As a direct and proximate result of Defendants' policies, practices and/or customs, hundreds of thousands of City residents, in particular African-American and Hispanic individuals, have been subjected to unconstitutional stops and frisks by CPD officers. Indeed, many African-American and Hispanic persons repeatedly have been victims of suspicionless stops and frisks by the CPD. Moreover, the CPD's constitutional abuses have included unlawful searches and seizures and, at times, excessive force, of which the fatal shooting of Freddie

Wilson is but one tragic example. *See Private Bank & Trust Co. v. The City of Chicago*, No. 08-L-012698 (Ill. Cir. Ct.).

6.    The named Plaintiffs seek to represent a certified class for the purpose of obtaining injunctive and declaratory relief only. The named Plaintiffs seek a class-wide judgment declaring that the policies, practices and/or customs described herein violate the Fourth and Fourteenth Amendments and a class-wide injunction enjoining Defendants from continuing such policies, practices and/or customs. In addition, the named Plaintiffs seek compensatory and punitive damages for themselves. All Plaintiffs seek an award of attorneys' fees and costs and such other relief as this Court deems equitable and just.

## **JURISDICTION**

7.    Jurisdiction is conferred upon this Court under 28 U.S.C. §§ 1331 and 1343(3) and (4), as this action seeks redress for the violation of Plaintiffs' constitutional and civil rights under 42 U.S.C. § 1983 and 42 U.S.C. § 2000(d).

8.    Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U .S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

9.    Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over any and all state constitutional and state law claims that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

## **VENUE**

10.    Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. §§ 1391 (b) and (c) because all of the relevant events occurred within this judicial district and, upon information and belief, all parties to this action reside

within this judicial district.

## JURY DEMAND

11.     Plaintiffs demand trial by jury in this action on each and every one of their claims.

## PARTIES

**A.  Plaintiffs**

12.     Plaintiff DARNELL SMITH ("SMITH") is a 37-year-old African-American man who resides in the Englewood neighborhood of the City of Chicago. Plaintiff SMITH resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

13.     Plaintiff DARREN NATHAN ("NATHAN") is a 49-year-old African-American man who resides in the Englewood neighborhood of the City of Chicago. Plaintiff NATHAN resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

14.     Plaintiff GREGORY DAVIS ("DAVIS") is a 58-year-old African-American man who resides in the Woodlawn neighborhood of the City of Chicago. Plaintiff DAVIS resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

15.     Plaintiff JEFF COLEMAN ("COLEMAN") is a 47-year-old African-American man who resides in the West Pullman neighborhood of the City of Chicago. Plaintiff COLEMAN resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

16.     Plaintiff PHILLIP OVERTON ("OVERTON") is a 36-year-old African-American man who resides in a West Side neighborhood of the City of Chicago. Plaintiff OVERTON

resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

17.     Plaintiff MARQUE ROSS ("ROSS") is an 18-year-old African-American man who resides in the East Garfield Park neighborhood of the City of Chicago. Plaintiff ROSS resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

18.     Plaintiff MARK NEVILLES ("NEVILLES") is a 41-year-old man who resides in a South Side neighborhood of the City of Chicago. Plaintiff NEVILLES resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

19.     Plaintiff HERBER DYER, JR. ("DYER") is a 66-year-old African-American man who resides in the Roseland neighborhood of the City of Chicago. Plaintiff DYER resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

20.     Plaintiff MARK NEVILLES ("NEVILLES") is a 41-year-old African-American man who resides in a South Side neighborhood of the City of Chicago. Plaintiff NEVILLES resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

21.     Plaintiff ANTHONY L. BROWN ("BROWN") is a 50-year-old African-American man who resides in the Lathrop Homes housing project in the City of Chicago. Plaintiff BROWN resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

22.     Plaintiff CHRISTOPHER LOCKE ("LOCKE") is a 44-year-old African-American man who resides in the Calumet Heights neighborhood of the City of Chicago.

Plaintiff LOCKE resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

23.     Plaintiff HECTOR FANTANEZ ("FANTANEZ") is a 12-year-old Hispanic boy who resides in the Little Village neighborhood of the City of Chicago. Plaintiff FANTANEZ resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

24.     Plaintiff MARCELL DAVIS ("DAVIS") is a 33-year-old African-American man who resides in the Woodlawn neighborhood of the City of Chicago. Plaintiff DAVIS resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

25.     Plaintiff ANTHONY POLK ("POLK") is a 65-year-old African-American man who resides in a West Side neighborhood of the City of Chicago. Plaintiff POLK resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

26.     Plaintiff CALVIN JACKSON ("JACKSON") is a 55-year-old African-American man who resides in the Englewood neighborhood of the City of Chicago. Plaintiff JACKSON resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

27.     Plaintiff CARL McCORD ("McCORD") is a 52-year-old African-American man who resides in a western suburb of the City of Chicago. Plaintiff McCORD visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

28.     Plaintiff TIMOTHY THIGPEN ("THIGPEN") is a 52-year-old African-American man who resides in South Austin neighborhood of the City of Chicago. Plaintiff THIGPEN

resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

29.     Plaintiff KEITH RIGGINS ("RIGGINS") is a 47-year-old African-American man who resides in South Austin of the City of Chicago. Plaintiff RIGGINS resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

30.     Plaintiff JAMES SHINAUL ("SHINAUL") is a 25-year-old African-American man who resides in a South Side neighborhood of the City of Chicago. Plaintiff SHINAUL resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

31.     Plaintiff BRANDON BUFORD ("BUFORD") is a 27-year-old African-American man who resides in East Garfield Park neighborhood of the City of Chicago. Plaintiff BUFORD resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

32.     Plaintiff MELVIN THOMPSON ("THOMPSON") is a 46-year-old African-American man who resides in Washington Park neighborhood of the City of Chicago. Plaintiff THOMPSON resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

33.     Plaintiff DARION BEENE ("BEENE") is a 21-year-old African-American man who resides in the East Garfield Park neighborhood of the City of Chicago. Plaintiff BEENE resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

34.     Plaintiff DEANDRE STEWART ("STEWART") is a 20-year-old African-American man who resides in the South Austin neighborhood of the City of Chicago. Plaintiff

STEWART resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

35. Plaintiff LAVESTER McWANE ("McWANE") is a 21-year-old African-American man who resides in the East Garfield Park neighborhood of the City of Chicago. Plaintiff McWANE resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

36. Plaintiff STEVE McABEE ("McABEE") is a 16-year-old African-American boy who resides in the Englewood neighborhood of the City of Chicago. Plaintiff McABEE resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

37. Plaintiff JONATHAN JACKSON ("JACKSON") is a 49-year-old African-American man who resides in a South Side neighborhood of the City of Chicago. Plaintiff JACKSON resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

38. Plaintiff ARTHUR STRINGER ("STRINGER") is a 58-year-old African-American man who resides in the Chatham neighborhood of the City of Chicago. Plaintiff STRINGER resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

39. Plaintiff ARTHUR MOTON ("MOTON") is a 49-year-old African-American man who resides in the West Pullman neighborhood of the City of Chicago. Plaintiff MOTON resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

40. Plaintiff DUDLEY BURNS ("BURNS") is a 57- year-old African-American man

who resides in a South Side neighborhood of the City of Chicago. Plaintiff BURNS resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

41.     Plaintiff EDGAR MARSHALL, JR. ("MARSHALL") is an African-American man who resides in a West Side neighborhood of the City of Chicago. Plaintiff MARSHALL resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

42.     Plaintiff MICHAEL SANDERS ("SANDERS") is a 40-year-old African-American man who resides in the Englewood neighborhood of the City of Chicago. Plaintiff SANDERS resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

43.     Plaintiff RASHAWN LINDSEY ("LINDSEY") is a 21-year-old African-American man who resides in the Englewood neighborhood of the City of Chicago. Plaintiff LINDSEY resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

44.     Plaintiff SHANTAY JOHNSON ("JOHNSON") is a 24-year-old African-American woman who resides in Chicago, Illinois. Plaintiff JOHNSON resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

45.     Plaintiff SIDNEY BELL ("BELL") is a 54-year-old African-American man who resides in a West Side neighborhood of the City of Chicago. Plaintiff DAVIS resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

46.     CALVIN JACKSON ("JACKSON") is a 55-year-old African-American man who

resides in the Englewood neighborhood of the City of Chicago. Plaintiff JACKSON resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

**B. Defendants**

47.     Defendant CITY OF CHICAGO ("City") is a municipal entity created and authorized under the laws of the State of Illinois. It is authorized under the laws of the State of Illinois to maintain a police department, the CPD, which acts as the City's agent in the area of law enforcement and for which the City is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers. The CPD's operations include the operations as described herein. On information and belief, the law enforcement activities of the CPD are funded, in part, with funds from the federal government.

48.     Defendant Chicago Police Superintendent GARRY MCCARTHY is and was, at all times relevant herein, the Police Superintendent for the City, and is and was responsible for, and the chief architect of, the policies, practices and/or customs of the CPD, a municipal agency of the City. He is and was, at all times relevant herein, responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the police officers under his command who are or were employed by the CPD, including the Defendants named herein. He is sued individually and in his official capacity.

49.     Defendant JOHN DOE OFFICER 1 is, and/or was, at all times relevant herein, an officer, employee and agent of the CPD, a municipal agency of the City. Upon information and belief, Defendant JOHN DOE OFFICER 1 has a badge number of 12064. He is sued in his individual capacity.

50.     Defendants JOHN DOE OFFICERS 2 through 110 are, and/or were, at all times

11

relevant herein, officers, employees, and agents of the CPD, a municipal agency of the City. Defendants JOHN DOE OFFICERS 2 through 110 are sued in their individual capacities.

51.     At all times relevant herein, Defendants Superintendent McCARTHY and other CITY OF CHICAGO policymakers have acted under color of state law in the course and scope of their duties and functions as agents, employees, and officers of the City and/or the CPD in engaging in the conduct described herein. At all times relevant herein, Defendants have acted for and on behalf of the City and/or the CPD with the power and authority vested in them as officers, agents and employees of the City and/or the CPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the City and/or the CPD.

52.     At all times relevant herein, Defendants JOHN DOE OFFICERS 1-110, Superintendent McCARTHY and other CITY OF CHICAGO policymakers have violated clearly established constitutional standards under the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment of which a reasonable person would have known.

## CLASS ACTION ALLEGATIONS

53.     Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, the named Plaintiffs seek to represent a certified Plaintiff class consisting of all persons who have been or will be subjected by CPD officers to Defendants' policy, practice and/or custom of stopping or stopping and frisking persons in the absence of a reasonable, articulable suspicion that criminal activity is taking place, in violation of the Fourth Amendment, including persons stopped or stopped and frisked based on race and/or national origin, in violation of the Equal Protection Clause of the Fourteenth Amendment.

54.     The members of the class are so numerous as to render joinder impracticable. Based on information made publicly available by the CPD, and recently publicized by the

12

American Civil Liberties Union (ACLU) of Illinois, hundreds of thousands of people are stopped or stopped and frisked each year by the CPD without reasonable, articulable suspicion of criminal conduct.

55.    In addition, joinder is impracticable because, upon information and belief, many members of the class are not aware of the fact that their constitutional rights have been violated and that they have the right to seek redress in court. Many members of the class are without the means to retain an attorney to represent them in an individual civil rights lawsuit. Given the time, money and resources required to pursue a lawsuit, many attorneys are hesitant to do so in cases involving unconstitutional stop and frisks because of concerns that costs will exceed any potential recovery for the plaintiff(s). Moreover, many class members who have been victimized by the CPD's unconstitutional practices do not bring individual claims for fear of retaliation and reprisals by CPD officers. Accordingly, there is no appropriate avenue for the protection of the class members' constitutional rights other than a class action.

56.    The class members share a number of questions of law and fact in common, including, but not limited to:

     a.  whether the CPD engages in a policy, practice and/or custom of stopping and frisking members of the class in the absence of reasonable, articulable suspicion of criminal conduct required by the Fourth Amendment;

     b.  whether the CPD engages in profiling on the basis of race and/or national origin in targeting class members for such stops and frisks in violation of the Equal Protection Clause of the Fourteenth Amendment;

     c.  whether the CPD, incidental to such stops and frisks, conducts searches and seizures and uses excessive force in violation of the Fourth Amendment;

     d.  whether the City, Superintendent McCARTHY, and other City policymakers have failed to adequately and properly screen, train, supervise, monitor and discipline CPD officers, and whether those failures have caused the constitutional violations inflicted by CPD officers against class members; and

     e.    whether the City, Superintendent McCARTHY and other City policymakers have encouraged, sanctioned and failed to rectify unconstitutional stops and frisks by members of the CPD, and whether such acts and omissions have caused constitutional violations by CPD officers against class members.

57.    The named Plaintiffs' claims are typical of those of the class. Like the other members of the class, the named Plaintiffs have been and likely will be again victims of the CPD's policy, practice and/or custom of suspicionless stops and frisks in that they have been and likely will continue to be, stopped or stopped and frisked with the reasonable articulable suspicion of criminal conduct required under the Fourth Amendment and on the basis of their race and/or national origin.

58.    The legal theories under which the named Plaintiffs seek declaratory and injunctive relief are the same or similar to those on which all members of the class will rely, and the harms suffered by the named Plaintiffs are typical of the harms suffered by the class members.

59.    The named Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interest with members of the Plaintiff class, and will fairly and adequately protect the interests of the class. The named Plaintiffs are all African-American or Hispanic men and reside in and/or visit neighborhoods where CPD officers have been deployed and conduct stop and frisks. As long as the CPD engages in its policy, practice and/or custom of suspicionless stops and frisks, the named Plaintiffs are, and will remain, at high risk of being illegally stopped and frisked again by the CPD. Indeed, many of the named Plaintiffs have been victimized by CPD officers repeatedly. The named Plaintiffs are seeking compensatory and punitive damages only on an individual basis.

60.    The named Plaintiffs are represented by Romanucci & Blandin, LLC, Center for Constitutional Litigation, PC, and the Gregory Law Firm.  All are experienced civil rights

counsel who have litigated class action lawsuits and/or have extensive experience handling civil rights cases in federal court. Counsels for the Plaintiffs have the resources, expertise and experience to prosecute this action. Counsels for the Plaintiffs know of no conflicts among members of the class or between the attorneys and members of the class.

61.     The Plaintiff class should be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because the Defendants have acted on grounds generally applicable to the class, thereby making class-wide declaratory and injunctive relief appropriate.

## STATEMENT OF FACTS

### A.  The Experiences of the Named Plaintiffs

#### i.      Darnell Smith and Darren Nathan

62.     Plaintiff DARNELL SMITH is a 37-year-old African-American man who resides in the Englewood neighborhood of the City of Chicago. Plaintiff SMITH resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

63.     Plaintiff DARREN NATHAN is a 49-year-old African-American man who resides in the Englewood neighborhood of the City of Chicago. Plaintiff NATHAN resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

64.     On or about May 3, 2013, around 11:00 A.M., Plaintiffs DARNELL SMITH and DARREN NATHAN were visiting neighbors at or near the 6000 block of S. Paulina St. in Chicago, Illinois.

65.     SMITH and NATHAN were speaking to a group of several friends on the front porch steps.

66.      Without basis to formulate a reasonable articulable suspicion that SMITH,

15

NATHAN, or anyone in the group had engaged in or was about to engage in criminal conduct, Defendant Officers, JOHN DOE OFFICERS 1 and 2, pulled up in an SUV and approached the group.

67.     Defendant Officers questioned Plaintiffs asking them if they had any weapons on them. The Plaintiffs responded in the negative.

68.     Without consent and with no reasonable belief that NATHAN was armed or dangerous, JOHN DOE OFFICER 1 ordered NATHAN to put his hands up and began to pat NATHAN down and search his pockets and jacket.

69.     JOHN DOE OFFICER 1 took NATHAN's wallet out of his pocket and pulled out NATHAN's ID.

70.     NATHAN told JOHN DOE OFFICER 1 "you know you ran through my wallet for no reason and searched me without probable cause."

71.     After finding no illegal contraband or weapons, JOHN DOE OFFICER 1 instructed NATHAN to go home.

72.     At the same time, JOHN DOE OFFICER 2 had approached SMITH.

73.     JOHN DOE OFFICER 2 had told SMITH and NATHAN that the officers "just wanted to make sure they weren't armed."

74.     SMITH responded, "What makes you think I'm armed?"

75.     JOHN DOE OFFICER 2 searched through all of SMITH's pockets and only found a phone charger. JOHN DOE OFFICER 2 stated, "Oh, you're not armed. We OK, right?"

76.     Plaintiff SMITH asked for the Defendant Officers' badge numbers but they refused to give them to Plaintiff.

77.     JOHN DOE OFFICERS 1 and 2 returned to their police SUV and drove away.

16

78.     Plaintiffs SMITH and NATHAN did not see the Defendant Officers fill out a contact card or form.

79.     These officers subjected SMITH and NATHAN to a suspicionless stop based on their race and/or national origin.

80.     In a separate incident, on October 9, 2014, at around 10:00 P.M., Plaintiff SMITH was standing outside his and his grandparents' building, located at 6612 S. Paulina Street in Chicago, Illinois. SMITH was waiting for the food delivery man to deliver his food.

81.     SMITH saw Defendant JOHN DOE OFFICERS 3 and 4 driving down the one way street traveling south. Defendant Officers then turned down the opposite side of the street than SMITH.

82.     Without basis to formulate a reasonable articulable suspicion that SMITH had engaged in or was about to engage in criminal conduct, JOHN DOE OFFICERS 3 and 4 exited their unmarked car, asked Plaintiff SMITH why he was standing there, and whether he had any weapons.  Plaintiff SMITH responded that he did not have any weapons and that his grandmother, who was watching the incident from a window, lived in the building behind them.

83.     JOHN DOE OFFICERS 3 and 4 asked SMITH to step over to their car with them and SMITH refused the invitation.

84.     With no reasonable belief that Smith was armed or dangerous, Defendant Officers patted SMITH down and put their hands in SMITH's pockets and removed all of his belongings, including his wallet and identification. They threw SMITH's wallet on the floor.

85.     One of the Defendant Officers ran Plaintiff's identification on the police radio.

86.     Plaintiff did not see Defendant Officers fill out a contact card or form.

87.     After failing to find anything incriminating, the Defendant Officers left and did

not issue SMITH any citations.

88.     JOHN DOE OFFICERS 3 and 4 subjected Smith to a suspicionless stop and search based on his race and/or national origin.

**ii.     Gregory Davis**

89.     Plaintiff GREGORY DAVIS is a 58-year-old African-American man who resides in the Woodlawn neighborhood of the City of Chicago. Plaintiff DAVIS resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

90.     In July 2014, Plaintiff DAVIS was in his vehicle outside a Chase Bank located at 6650 S. Stony Island Avenue while he waited for his daughter's mother to come out of a Walgreen's store.

91.     Without basis to formulate a reasonable articulable suspicion that DAVIS had engaged in or was about to engage in criminal conduct, JOHN DOE OFFICERS 5 and 6 pulled DAVIS over and  positioned themselves on both sides of DAVIS's vehicle.

92.     Defendant Officers asked DAVIS why he was sitting there and demanded DAVIS's driver's license and insurance information.

93.     The Defendant Officers looked through the window into DAVIS's vehicle before allowing Plaintiff DAVIS to return to his nearby home.

94.     Defendant Officers did not issue any citations. Plaintiff DAVIS did not see Defendant Officers fill out a contact card or form.

95.     JOHN DOE OFFICERS 5 and 6 subjected DAVIS to a suspicionless stop based on his race and/or national origin.

96.     In a separate incident in October 2014, Plaintiff DAVIS pulled out of his parking space near his home and made a left turn into an alley. Plaintiff DAVIS believed that another

vehicle was coming through the alley so he briefly stopped in the alley.

97.     Without any basis to formulate a reasonable articulable suspicion that DAVIS had engaged in or was about to engage in criminal conduct, JOHN DOE OFFICERS 7 and 8 then put their lights on and pulled Plaintiff DAVIS over. Defendant Officers asked DAVIS for his license and registration.

98.     The Defendant Officers asked DAVIS what he had in the car and asked to search DAVIS's car. Plaintiff DAVIS denied the Defendant Officers' request to search the car because they had no probable cause.

99.     Defendant Officers took Plaintiff DAVIS's driver's license and insurance information and forced DAVIS to wait 20 minutes while they searched his background information.

100.    Defendant Officers then told DAVIS he was free to go. DAVIS did not see Defendant Officers fill out a contact card or form.

101.    These officers subjected DAVIS to a suspicionless stop based on his race and/or national origin.

### iii.     Jeff Coleman

102.    Plaintiff JEFF COLEMAN is a 47-year-old African-American man who resides in the West Pullman neighborhood of the City of Chicago. Plaintiff COLEMAN resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

103.    In August 2014, Plaintiff COLEMAN was a passenger driving with a friend heading east on Ashland Avenue in Chicago, Illinois.

104.     Without any basis to formulate a reasonable articulable suspicion that Coleman had engaged in or was about to engage in criminal conduct, JOHN DOE OFFICERS 9 and 10 pulled COLEMAN's friend over at or near the intersection of Ashland Avenue and 95th Street in Chicago.

105.      Defendant Officers asked COLEMAN and his friend if they had any drugs or weapons on them and ordered them out of their car.

106.     With no reasonable suspicion that COLEMAN or his friend was armed or dangerous, JOHN DOE OFFICERS 9 and 10 asked COLEMAN and his friend if they had any weapons or drugs and proceeded to pat down and frisk them.

107.     COLEMAN asked the Defendant Officers why they were being stopped and frisked, but the Officers refused to answer or provide any reason for the stop or frisk.

108.     Without any basis to formulate a reasonable articulable suspicion that COLEMAN or his friend had engaged in or was about to engage in criminal conduct, Defendant Officers asked the men if they could search the trunk. COLEMAN and his friend did not consent to the search.

109.     Plaintiff COLEMAN informed the Defendant Officers he knew several Chicago police officers and did some political work in the neighborhood. COLEMAN and his friend were then permitted to continue on their way without being issued a citation.

110.     JOHN DOE OFFICERS 9 and 10 subjected COLEMAN to a suspicionless stop, frisk and unlawful search based on his race and/or national origin.

**iv.     Phillip Overton**

111.     Plaintiff PHILLIP OVERTON is a 36-year-old African-American man who resides in a West Side neighborhood of the City of Chicago. Plaintiff OVERTON resides in

and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

112.     In or around December 2013, at or around 7 P.M., Plaintiff OVERTON was walking to a convenience store/gas station to buy groceries after work. The convenience store/gas station was located at or near the intersection of W. Division St. and Pulaski Road in Chicago, Illinois.

113.     JOHN DOE OFFICERS 11 and 12 pulled up next to OVERTON as he walked on the sidewalk and asked him where he was going and whether he lived around the neighborhood.

114.     OVERTON responded that he was going to the convenience store and that he did live in the neighborhood.

115.     The Defendant Officers asked OVERTON for identification. OVERTON provided it, and stated that he recently moved and did not update his identification yet, so the address on his identification was different than his current address.

116.     Defendant Officers ordered OVERTON to go up against their police car and handcuffed him.

117.     With no reasonable belief that OVERTON was armed or dangerous, Defendant Officers patted OVERTON down and put their hands in his pockets and removed all of his belongings.

118.     Defendant Officers also conducted a background check on OVERTON.

119.     After only finding a pack of cigarettes, money and keys, OVERTON was permitted to continue on his way to the convenience store and no citations were issued. The Defendant Officers stated, "Well, you don't have any warrants and you're name is clean. You can go."

21

120.     Upon information and belief, the entire stop and frisk took about 20 minutes.

121.     JOHN DOE OFFICERS 11 and 12 subjected OVERTON to a suspicionless stop, frisk and unlawful search based on his race and/or national origin.

**v.     Marque Ross**

122.     Plaintiff MARQUE ROSS is an 18-year-old African-American man who resides in East Garfield Park neighborhood of the City of Chicago. Plaintiff ROSS resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

123.     On or about April 8, 2015, at or around 2 P.M., Plaintiff ROSS walked into the Kedzie & Ohio Food Mart, located at 549 N. Kedzie Ave. in Chicago, Illinois.

124.     JOHN DOE OFFICERS 13 and 14 approached ROSS while he was inside the convenience store and one of the officers asked him, "Do you know who I am?" ROSS responded in the negative.

125.     The Defendant Officers took ROSS outside the convenience store, asked for identification, put him against their police car and hand-cuffed him.

126.     With no reasonable belief that ROSS was armed or dangerous, Defendant Officers patted ROSS down and put their hands in his pockets and searched his pockets.

127.     Defendant Officers also ordered ROSS to take his shoes off so they could search his shoes.

128.     After finding no weapons or illegal contraband, Plaintiff ROSS was let go.

129.     JOHN DOE OFFICERS 13 and 14 subjected OVERTON to a suspicionless stop, frisk and unlawful search based on his race and/or national origin.

22

vi.    **Herbert Dyer, Jr.**

130.    HERBER DYER, JR. is a 66-year-old African-American man who resides in the Roseland neighborhood of the City of Chicago. Plaintiff DYER resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

131.    In August 2014, Plaintiff DYER was walking near the corner of N. Central Avenue and Race Avenue in Chicago, Illinois on his way to the grocery store. He was waiting for the light to change so he could cross the street.

132.    Plaintiff DYER is a retired litigation paralegal and former tutor at Roosevelt University's "Life Skills and Re-Entry Program" for ex-offenders.

133.    Without any basis to formulate a reasonable, articulable suspicion that DYER had engaged in or was about to engage in a crime, JOHN DOE OFFICERS 15, 16, 17, 18 and 19 sped through the intersection against the light in their unmarked car and pulled up on to the sidewalk in front of Plaintiff DYER. JOHN DOE OFFICER 15 was African-American. The other four officers were white.

134.    Defendant Officers flung open all four doors of their car and shouted at Plaintiff DYER to show his hands. Two of the Defendant Officers ran towards Plaintiff DYER, while the other three stayed by the car.

135.    One of the Defendant Officers grabbed DYER and pushed him face-first up against the unmarked police car.

136.    With no reasonable suspicion that DYER was armed or dangerous, Defendant Officers made DYER place his hands on the unmarked police car and began to frisk him. Defendant Officers also went through DYER's pockets, throwing the contents on the ground.

137. One of the Defendant Officers took DYER's wallet and ran his license on the police computer in his unmarked police car.

138. Upon information and belief, Defendant Officers repeatedly cursed at Plaintiff Dyer. One Defendant Officer said, "What are you doin' out here, old man? Slingin' that shit, huh?"

139. Upon information and belief, one Defendant Officer said, "Yeah, he's after that product."

140. Defendant Officers ordered DYER not to move and to be quiet. Upon information and belief, one Defendant Officer said, "Shut your fuckin' mouth old man, or we'll run you in just for the hell of it."

141. Plaintiff DYER began demanding to know from the Defendant Officers what he had done wrong.

142. JOHN DOE OFFICER 15 told DYER to stay up against the car. Upon information and belief, Plaintiff DYER looked the African-American officer, JOHN DOE OFFICER 15, in the eye and said, "You of all people should know better than this. I could be your father, your uncle. Why are you doing this?"

143. In response, JOHN DOE OFFICER 15 and the other Defendant Officers handcuffed Plaintiff DYER.

144. While Defendant Officers were frisking DYER and waiting for the results of DYER's background and/or license plate check, they continued to accuse DYER of selling drugs. Upon information and belief, some Defendant Officers also told DYER he was too old to be selling drugs.

145.     Defendant Officers asked Plaintiff DYER if he had a job, and DYER responded that he did. Upon information and belief, one of the Defendant Officers sarcastically asked DYER, "Oh yeah? And what kind of work do you do?"

146.     Plaintiff DYER told Defendant Officers that he was a retired litigation paralegal and college tutor. DYER also told Defendant Officers that he knew his rights and what they were doing was unconstitutional.

147.     After Plaintiff DYER explained to the officers that what they were doing was unconstitutional, Defendant Officers took the handcuffs off of DYER and gave him back his wallet.

148.     Without saying another word to DYER, Defendant Officers got back into their unmarked car and drove off.  No citations were issued.

149.     Upon information and belief, the entire stop and frisk incident took about forty-five minutes.

150.     Defendant Officers subjected DYER to a suspicionless stop, frisk, and unlawful search based on his race and/or national origin.

151.     In a separate incident in late February 2015, Plaintiff was leaving the Hilltop Liquor Store at the corner of 103rd Street and S. Michigan Avenue in Chicago, Illinois. The store is about a block north of DYER's home.

152.     Without any basis to formulate a reasonable, articulable suspicion that DYER had engaged in or was about to engage in a crime, JOHN DOE OFFICERS 20 and 21 who were in plain clothes suddenly stopped in front of DYER on the corner of 103rd and S. Michigan Avenue. Both Defendant Officers were white.

153.     With no reasonable suspicion that DYER was armed or dangerous, Defendant Officers made DYER place his hands on the unmarked police car and began to frisk him. Defendant Officers also went through DYER's pockets.

154.     During the search, DYER's cell phone fell out of his pocket and the battery popped out.

155.     When DYER reached down to pick the phone up, JOHN DOE OFFICER 20 grabbed Plaintiff DYER and pushed his head forward into the car.

156.     Upon information and belief, JOHN DOE OFFICER 20 whispered into Plaintiff DYER's ear, "Don't you move, nigger, or I'll blow your fuckin' head off."

157.     Unlike his previous stop, Plaintiff Dyer did not assert that he knew his rights to these Defendant Officers out of fear that it could escalate the situation and he could be harmed.

158.     JOHN DOE OFFICER 21 ran Plaintiff DYER's license through the police computer system in his car.

159.     After it was revealed that DYER had no outstanding warrants or holds, he was let go without being arrested or issued a citation.

160.     As Defendant Officers drove off, they ran over Plaintiff DYER's cellphone, which was still lying in the parking lot where Defendant Officers had cast it.

161.     Upon information and belief, the incident lasted about twenty minutes.

162.     Defendant Officers subjected DYER to a suspicionless stop, frisk, and unlawful search based on his race and/or national origin.

**vii.    Mark Nevilles**

26

163. Plaintiff MARK NEVILLES is a 41-year-old man who resides in a South Side neighborhood of the City of Chicago. Plaintiff NEVILLES resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

164. On April 1, 2015, Plaintiff NEVILLES was walking alone near the corner of 79th and Drexel in Chicago, Illinois on his way to a local store.

165. Without basis to formulate reasonable, articulable suspicion that NEVILLES had engaged in or was about to engage in criminal conduct, JOHN DOE OFFICERS 22 and 23 stopped NEVILLES and told him to put his hands on their police car.

166. Defendant Officers frisked NEVILLES and searched inside his pockets and bags.

167. After finding no weapons or illegal contraband, Defendant Officers let Plaintiff go and did not issue any citations.

168. JOHN DOE OFFICERS 22 and 23 subjected NEVILLES to a suspicionless stop, frisk, and illegal search based on his race and/or national origin.

**viii.    Anthony L. Brown**

169. Plaintiff ANTHONY L. BROWN is a 50-year-old African-American man who resides in the Lathrop Homes housing project in the City of Chicago. Plaintiff BROWN resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

170. In September 2013, Plaintiff BROWN was walking home from an Alcoholics Anonymous meeting close to the intersection of N. Larabee Street and W. Menomonee Street in Chicago, Illinois.

171. Without any basis to formulate a reasonable, articulable suspicion that BROWN had engaged in or was about to engage in criminal conduct, JOHN DOE OFFICER 24 approached BROWN from behind and stopped him.

172. Defendant JOHN DOE OFFICER 24 asked BROWN for his identification card (driver's license or state ID). Defendant Officer said BROWN fit the description of a criminal suspect, but gave no further details.

173. Plaintiff BROWN told Defendant Officer that he could not frisk him. Defendant Officer responded that BROWN could either be searched or they could "go down to the station."

174. With no reasonable belief that BROWN was armed or dangerous, Defendant Officer frisked BROWN by patting him down.

175. After failing to find any contraband or weapons on BROWN, Defendant Officer let him go and did not issue any citations.

176. JOHN DOE OFFICER 24 subjected Plaintiff Brown to a suspicionless stop and frisk based on his race and/or national origin.

**ix.    Christopher Locke**

177. Plaintiff CHRISTOPHER LOCKE is a 44-year-old African-American man who resides in the Calumet Heights neighborhood of the City of Chicago. Plaintiff LOCKE resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

178. Plaintiff LOCKE was illegally stopped and frisked on several separate occasions by CPD Officers.

179. In late May 2014 at around 6:00 A.M., Plaintiff LOCKE was at the intersection of 82nd Street and Muskegon Avenue in Chicago, Illinois. He was taking pictures of the trees,

buildings, and neighborhood in general for a digital imaging consulting class at Harold Washington College.

180.     Without basis to formulate a reasonable, articulable suspicion that LOCKE was engaged in or was about to engage in criminal conduct, JOHN DOE OFFICER 25 came up to LOCKE and asked what he was doing there.

181.     Plaintiff LOCKE told Defendant Officer that he was a student. In response, Defendant Officer called LOCKE a liar and pushed him up against a wall.

182.     With no reasonable suspicion that LOCKE was armed or dangerous, JOHN DOE OFFICER 18 frisked LOCKE and searched through LOCKE's pockets.

183.     When LOCKE protested, Defendant Officer told him to "shut the fuck up." Defendant Officer then punched LOCKE in the back of the head.

184.     After this, JOHN DOE OFFICER 25 got a call on his radio. Defendant Officer stopped his search of LOCKE and drove off. Defendant Officer did not issue LOCKE any citations.

185.     JOHN DOE OFFICER 18 subjected Plaintiff LOCKE to a suspicionless stop based on his race and/or national origin.

186.     In a separate incident in August 2014, Plaintiff LOCKE was stopped on the 8300 block of S. Escanaba Avenue in Chicago, Illinois three times on the same day in the same neighborhood of Chicago by the same group of Chicago Police Department officers.

187.     In the first interaction, LOCKE was walking his bicycle to the Save a Lot grocery store on the corner.

188.    Without basis to formulate a reasonable, articulable suspicion that LOCKE had engaged in or was about to engage in criminal conduct, JOHN DOE OFFICERS 26, 27, 28, and 29 jumped out of an unmarked van and approached LOCKE.

189.    JOHN DOE OFFICER 26 grabbed LOCKE's bicycle and threw it to the ground, breaking it.

190.    With no reasonable suspicion that LOCKE was armed or dangerous, all four Defendant Officers then patted LOCKE down.

191.    After finding no contraband or weapons, Defendant Officers let LOCKE go and no citation was issued.

192.    Upon information and belief, this interaction lasted about ten minutes.

193.    In the second interaction, later that same August day, LOCKE was walking to meet a female friend at the bus stop at the intersection of 79th Street and Marquette Avenue in Chicago, Illinois.

194.    Without any basis to formulate a reasonable, articulable suspicion that LOCKE had engaged in or was about to engage in a crime, the same four Defendant Officers from earlier pulled up in their unmarked van and told LOCKE, "Hey buddy, come here."

195.    With no reasonable belief that LOCKE was armed or dangerous, Defendant Officers patted LOCKE down once again. After again failing to find any weapons or other contraband, Defendant Officers let LOCKE go and issued no citations.

196.    Later the same day, LOCKE had another interaction with the same Defendant Officers.

197.    LOCKE was walking his friend back to the bus stop at 79th and Marquette. Without any basis to formulate a reasonable, articulable suspicion that LOCKE had engaged in

or was about to engage in a crime, the four Defendant Officers pulled up in front of LOCKE and yelled, "Hey, come here!"

198.    Defendant Officers grabbed LOCKE and pressed him against their unmarked police car. With no reasonable belief that LOCKE was armed or dangerous, for a third time that day Defendant Officers patted LOCKE down.

199.    Having failed to find any contraband or weapons on LOCKE, Defendant Officers let LOCKE go and issued no citations.

200.    These Defendant Officers repeatedly subjected LOCKE to suspicionless stops and frisks based on his race and/or national origin.

**x.    Hector Fantanez**

201.    Plaintiff HECTOR FANTANEZ is a 12-year-old Hispanic boy who resides in the Little Village neighborhood of the City of Chicago. Plaintiff FANTANEZ resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

202.    On April 3, 2015, during the day, FANTANEZ was riding his bike by his father's house near the intersection of 24th Street and Spalding Avenue in Chicago, Illinois.

203.    Without any basis to formulate a reasonable, articulable suspicion that FANTANEZ had engaged in or was about to engage in criminal conduct, JOHN DOE OFFICER 30 grabbed FANTANEZ by the arm while FANTANEZ was still on his bike. Defendant Officer then took FANTANEZ over to a fence.

204.    When FANTANEZ told the Defendant Officer that he was only 12 years old, the officer responded, "That's old enough to gangbang." FANTANEZ was then placed in the back of the police car.

205. Without any reasonable suspicion that FANTANEZ was armed or dangerous, Defendant Officer handcuffed the 12 year old boy and searched his pockets.

206. Plaintiff FANTANEZ's father, also named Hector Fantanez, and his father's friend David Gutierrez saw what was happening and came outside. When another officer arrived on the scene, David Gutierrez verbally protested the treatment of FANTANEZ.

207. For protesting the Chicago police officers' conduct, David Gutierrez was eventually handcuffed and placed in the backseat of the police car with FANTANEZ.

208. FANTANEZ had broken his wrist the year before and complained that the handcuffs were on too tightly.

209. The police sergeant later arrived on the scene, spoke with witnesses, and FANTANEZ was let out of the back seat of the police car. No tickets or citations were issued.

210. Chicago police officers later told FANTANEZ's family that he "fit the description" of criminal suspect.

211. JOHN DOE OFFICER 30 subjected FANTANEZ to a suspicionless stop, frisk, and unlawful search based on his race and/or national origin.

xi. **Marcell Davis**

212. Plaintiff MARCELL DAVIS is a 33-year-old African-American man who resides in the Woodlawn neighborhood of the City of Chicago. Plaintiff DAVIS resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

213. In October 2014, December 2014, February 2015, and twice in March 2015, Plaintiff DAVIS was stopped and frisked while standing in front of his home in the Fuller Park neighborhood on or near S. Princeton Street in Chicago, Illinois.

32

214.     On each of these occasions, DAVIS was sitting in front of his house talking with family and friends.

215.     Without any basis to formulate a reasonable articulable suspicion that DAVIS had engaged or was about to engage in criminal conduct, JOHN DOE OFFICERS 31 et. al. repeatedly pulled up in front of DAVIS's home, sometimes with guns drawn, and stopped him.

216.     With no reasonable belief that DAVIS was armed or dangerous, Defendant Officers frisked DAVIS down each time he was stopped. Defendant Officers also always went through Plaintiff DAVIS's pockets, but never found any contraband.

217.     During each of these stops, no citations were issued.

218.     Upon information and belief, these incidents each lasted about twenty to thirty minutes.

219.     JOHN DOE OFFICERS 31 et al. subjected DAVIS to multiple suspicionless tops, frisks, and unlawful searches based on his race and/or national origin.

**xii.     Anthony Polk**

220.     Plaintiff ANTHONY POLK is a 65-year-old African-American man who resides in a West Side neighborhood of the City of Chicago. Plaintiff POLK resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

221.     In January 2015, Plaintiff POLK was in his vehicle at the traffic light on Roosevelt Road in Chicago, Illinois. An unmarked car with two undercover police detectives pulled up next to him. Not knowing at the time that the men were police officers, POLK bowed his head as a greeting.

222.     The light turned green and POLK had crossed the intersection. Without basis to formulate reasonable, articulable suspicion that POLK had engaged in or was about to engage in a crime, the undercover officers pulled him over.

223.     JOHN DOE OFFICERS 32 and 33 asked POLK if he had any weapons in the vehicle and POLK responded in the negative.

224.     Defendant Officers ordered POLK step out of his vehicle. When POLK asked why he was being forced to step out of his vehicle, JOHN DOE OFFICER 32 or 33 told him "I got the power to whoop your ass if I want."

225.     POLK was handcuffed and placed in the back of the police car while Defendant Officers searched his vehicle.

226.     Failing to find anything incriminating, Defendant Officers told POLK he would not receive any citations. When Plaintiff POLK asked Defendant Officers for their names and badge numbers, they refused to provide it. The Defendant Officers advised POLK that he should just get in his car and drive away.

227.     JOHN DOE OFFICERS 32 and 33 subjected POLK to a suspicionless stop and unlawful search based on his race and/or national origin.


**xiii.     Calvin Jackson**

228.     Plaintiff CALVIN JACKSON is a 55-year-old African-American man who resides in the Englewood neighborhood of the City of Chicago. Plaintiff JACKSON resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

34

229.     In June 2013, Plaintiff JACKSON was walking with his girlfriend to the gas station at the intersection of 103rd Street and Wentworth Avenue in Chicago.

230.     JACKSON was walking southbound down Wentworth on the west side of the street. Undercover JOHN DOE OFFICERS 34 and 35 were headed northbound in an unmarked car.

231.     Without any basis to formulate reasonable, articulable suspicion that JACKSON had engaged in or was about to engage in a crime, Defendant officers' police car drove across the opposite lane of traffic and JOHN DOE OFFICER 27 jumped out and asked where JACKSON was going.

232.     With no reasonable belief that JACKSON was armed or dangerous, JOHN DOE OFFICER 27 frisked JACKSON and pulled his wallet out of his pants.

233.     After Defendant Officers found no weapons, drugs, or other contraband, they let JACKSON go without issuing any citations.

234.     JOHN DOE OFFICER 34 and 35 subjected JACKSON to a suspicionless stop and frisk based on his race and/or national origin.

**xiv.     Carl McCord**

235.     Plaintiff CARL McCORD is a 52-year-old African-American man who resides in a western suburb of the City of Chicago. Plaintiff McCORD visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

236.     Plaintiff McCORD was improperly stopped and frisked by Chicago Police Department officers three times from November 2014 to December 2014.

237.    On the first occasion, Plaintiff McCORD was driving near the intersection of Cicero Avenue and Roosevelt Road. He was on his way to a nearby Sonic restaurant to get something to eat.

238.    Without any basis to formulate reasonable, articulable suspicion that McCORD had engaged in or was about to engage in a crime, JOHN DOE OFFICER 36 pulled McCORD over.

239.    Defendant Officer made McCORD step out of his car. With no reasonable belief to suspect that McCORD was armed or dangerous, JOHN DOE OFFICER 36 handcuffed and frisked McCORD and searched his pockets. Defendant Officer also searched McCORD's vehicle.

240.    After Defendant Officer found no weapons or other contraband on McCORD or in his vehicle, McCORD was let go and no citations were issued.

241.    Plaintiff MCCORD asked Defendant Officer for his name and badge number, but Defendant Officer refused to provide it.

242.    Upon information and belief, the incident lasted around twenty minutes.

243.    JOHN DOE OFFICER 36 subjected McCORD to a suspicionless stop, frisk, and unlawful search based on his race and/or national origin.

244.    On the second occasion, MCCORD was driving near the intersection of Cicero Avenue and Fifth Avenue in Chicago, Illinois on his way to church.

245.    Without any basis to formulate a reasonable, articulable suspicion that McCORD had engaged in or was about to engage in a crime, JOHN DOE OFFICER 37 pulled McCORD over.

246. Defendant Officer made McCORD exit his vehicle. With no basis to believe that McCORD was armed or dangerous, JOHN DOE OFFICER 37 frisked and then handcuffed McCORD.

247. Defendant Officer then searched McCORD's car.

248. Defendant Officer told McCORD he had pulled him over because the neighborhood was known for drug trafficking.

249. After failing to find any contraband, JOHN DOE OFFICER 37 allowed McCORD to continue on his way to Church without receiving any citations.

250. JOHN DOE OFFICER 37 subjected McCORD to a suspicionless stop, frisk, and unlawful search based on his race and/or national origin.

251. On the third occasion, McCORD was driving near the intersection of S. Cicero Avenue and W. Polk St. in Chicago, heading to a friend's house.

252. McCORD was initially trying to take a left turn at the intersection and was driving in the left lane. Because of the traffic, McCord switched to the right lane, and turned right on the street, where he was planning to take a different route. Once McCORD switched lanes and turned right, two squad cars and an unmarked police car pulled McCORD over.

253. Without any basis to formulate a reasonable, articulable suspicion that McCORD had engaged in or was about to engage in a crime, JOHN DOE OFFICERS 38, et al. stopped McCORD.

254. The Defendant Officers approached Plaintiff MCCORD's car on both sides. They asked McCORD for his license and proof of insurance. The Defendant Officers then ordered McCORD to step out of his car.

255.    With no reasonable belief that McCORD was armed or dangerous, Defendant

Officers handcuffed McCORD and made him place his head on the back of a squad car while

they frisked him. Defendant Officers also searched McCORD's car.

256.    When McCORD asked Defendant Officers why they were doing this to him, the

Defendant Officers responded that they pulled him over because he was driving in a high drug

trafficking neighborhood.

257.    After failing to find any drugs, weapons, or other contraband, Defendant Officers

told McCORD he was free to go and did not issue him any citations.

258.    McCORD asked Defendant Officers for their names and badge numbers, but they

refused to provide it.

259.    Defendant Officers subjected McCORD to a suspicionless stop, frisk, and

unlawful search based on his race and/or national origin.

**xv.   Timothy Thigpen**

260.    Plaintiff TIMOTHY THIGPEN is a 52-year-old African-American man who

resides in the South Austin neighborhood of the City of Chicago. Plaintiff THIGPEN resides in

and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop

and frisks.

261.    On April 15, 2015 at around 5:30 AM, Plaintiff THIGPEN was driving his car

near the intersection of Washington Boulevard and Mayfield Avenue in Chicago, Illinois.

Plaintiff THIGPEN works as a truck driver, and was driving to the lot where he keeps his truck

parked.

262.    Without any basis to formulate a reasonable, articulable suspicion that THIGPEN

had engaged in or was about to engage in a crime, JOHN DOE OFFCIER 39 who was

undercover in an unmarked police car pulled THIGPEN's car over.

263.    Defendant Officer asked THIGPEN where the drugs were and then ordered THIGPEN to get out of his car.

264.    With no reasonable suspicion that THIGPEN was armed or dangerous, JOHN DOE OFFICER 31 patted THIGPEN down and frisked him. Defendant Officer went through THIGPEN's pockets and also searched his car.

265.    After failing to find any contraband or weapons, Defendant Officer let THIGPEN go without issuing any citations.

266.    Upon information and belief, the incident lasted around twenty minutes.

267.    Defendant Officer subjected THIGPEN to a suspicionless stop, frisk, and unlawful search based on his race and/or national origin.

**xvi.    Keith Riggins**

268.    Plaintiff KEITH RIGGINS is a 47-year-old African-American man who resides in the South Austin of the City of Chicago. Plaintiff RIGGINS resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stops and frisks.

269.    In October 2014, RIGGINS was walking at the corner of Lemont Avenue and Fullerton Avenue in Chicago, Illinois. RIGGINS was on his way home from work at the Art Institute of Chicago.

270.    Without any basis to formulate reasonable, articulate suspicion that RIGGINS had engaged in or was about to engage in a crime, JOHN DOE OFFICERS 40 and 41 ordered RIGGINS to come over to their police car. JOHN DOE OFFICERS proceeded to question RIGGINS, asking him what he was doing, where he was walking from, and where he was going.

271.    With no reasonable belief that RIGGINS was armed or dangerous, JOHN DOE

OFFICERS 32 and 33 frisked RIGGINS and searched his bag and pockets.

272.    Defendant Officers ran RIGGINS's name through their police computer database to check for warrants. When the background check showed that Plaintiff RIGGINS was clean and had no outstanding warrants, JOHN DOE OFFICERS 40 and 41 advised RIGGINS to "get off the streets," and then let him go without issuing any citations.

273.    Upon information and belief, this incident lasted ten to fifteen minutes.

274.    JOHN DOE OFFICERS 40 and 41 subjected RIGGINS to a suspicionless stop, frisk, and unlawful search based on his race and/or national origin.

**xvii.    James Shinaul**

275.    Plaintiff JAMES SHINAUL is a 25-year-old African-American man who resides in a South Side neighborhood of the City of Chicago. Plaintiff SHINAUL resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

276.    In May 2015, Plaintiff SHINAUL was walking to the store near the corner of Kedzie Avenue and Ohio Street in Chicago, Illinois.

277.    Without any basis to formulate reasonable, articulate suspicion that SHINAUL had engaged in or was about to engage in a crime, JOHN DOE OFFICER 42 who was in plain clothes pulled up to SHINAUL in an unmarked police car.

278.    With no reasonable suspicion that SHINAUL was armed or dangerous, JOHN DOE OFFICER 34 handcuffed SHINAUL, frisked him and searched his pockets.

279.    After failing to find any contraband or weapons, Plaintiff SHINAUL was permitted to continue on his way to the store and received no citations.

280.    Upon information and belief, this incident lasted around five minutes.

281.    JOHN DOE OFFICERS 42 subjected SHINAUL to a suspicionless stop and frisk based on his race and/or national origin.

### xviii.    Brandon Buford

282.    Plaintiff BRANDON BUFORD is a 27-year-old African-American man who resides in the East Garfield Park neighborhood of the City of Chicago. Plaintiff BUFORD resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

283.    In June 2014, Plaintiff BUFORD was walking through an alleyway to visit his friend near the corner of Homan Avenue and Lexington Street in Chicago, Illinois.

284.    Without any basis to formulate a reasonable, articulable suspicion that BUFORD had engaged in or was about to engage in a crime, JOHN DOE OFFICER 43 approached BUFORD and asked him what he was doing in the area.

285.    With no reasonable belief that BUFORD was armed or dangerous, Defendant Officer frisked BUFORD and searched his pockets.

286.    After finding no contraband on BUFORD, Defendant Officer permitted BUFORD to continue walking to his friend's house and did not make an arrest or issue any citations.

287.    Upon information and belief, this incident lasted about seven minutes.

288.    Defendant officer subjected BUFORD to a suspicionless stop, frisk, and unlawful search based on his race and/or national origin.

### xix.    Melvin Thompson

289.    Plaintiff MELVIN THOMPSON is a 46-year-old African-American boy who resides in the Washington Park neighborhood of the City of Chicago. Plaintiff THOMPSON resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and

conduct stop and frisks.

290.    In August 2013, Plaintiff THOMPSON was walking with his two brothers to a store on the 6400 block of Vernon Avenue in Chicago, Illinois.

291.    Without any basis to formulate a reasonable, articulable suspicion that THOMPSON had engaged in or was about to engage in a crime, JANE DOE OFFICER 44 drove her car in front of Plaintiff THOMPSON and his brothers and told them to line up against her squad car.

292.    With no reasonable belief that THOMPSON was armed or dangerous, Defendant Officer handcuffed and frisked THOMPSON and his brothers and went into their pockets.

293.    Failing to find any weapons or contraband, JANE DOE OFFICER 44 allowed THOMPSON and his brothers go without making any arrests or issuing any citations.

294.    When asked why they were being stop, frisked and searched, Defendant Officer responded that THOMPSON and his brothers were walking in a high drug trafficking neighborhood, which happened to also be the neighborhood in which they lived.

295.    Upon information and belief, this incident lasted about twenty minutes.

296.    Defendant Officer subjected THOMPSON to a suspicionless stop, frisk, and unlawful search based on his race and/or national origin.

**xx.    Darion Beene**

297.    Plaintiff DARION BEENE is a 21-year-old African-American man who resides in the East Garfield Park neighborhood of the City of Chicago. Plaintiff BEENE resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

298.    In May 2015, Plaintiff BEENE was walking with a small group of friends near the

corner of Troy Street and Ohio Street in Chicago, Illinois.

299.    Without any basis to formulate a reasonable, articulable suspicion, JOHN DOE OFFICERS 45, 46, 47, and 48 drove up to the sidewalk in their police car, got out, and approached the group.

300.    With no reasonable belief that BEENE was armed or dangerous, Defendant Officers frisked BEENE and the people with him.

301.    Failing to find any contraband, Defendant Officers let the men go and no citations were issued.

302.    Defendant Officers subjected BEENE to a suspicionless stop, frisk, and unlawful search based on his race and/or national origin.

303.    In a separate incident in February 2015, Plaintiff BEENE was driving with his brother near the corner of Troy and Ohio in Chicago, close to BEENE's home.

304.    Without any basis to formulate a reasonable, articulable suspicion that BEENE had engaged in or was about to engage in a crime, JOHN DOE OFFICERS 49 and 50 pulled Plaintiff BEENE over in their squad car moments after BEENE dropped his brother off at the corner.

305.    Defendant Officers ordered BEENE to exit his vehicle and put his hands down on the ground. With no reasonable belief that BEENE was armed or dangerous, Defendant Officers frisked BEENE while he lay on the ground.

306.    Defendant Officers repeatedly asked BEENE if he was in a gang.

307.    Failing to find any contraband or weapons, Defendant Officers let BEENE go without issuing him any citations.

308.    Defendant Officers subjected BEENE to a suspicionless stop, frisk, and unlawful

search based on his race and/or national origin.

xxi. **Deandre Stewart**

309.    Plaintiff DEANDRE STEWART is a 20-year-old African-American man who resides in the South Austin neighborhood of the City of Chicago. Plaintiff STEWART resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

310.    Upon information and belief, over the past two years, Plaintiff STEWART has been unconstitutionally stopped or stopped and frisked on over three occasions in the Humble Park/East Garfield Park neighborhood where he lives while going about his daily life.

311.    In December 2014, Plaintiff STEWART was with a group of friends outside of his aunt's house on the 500 block of N. Kedzie Ave. in Chicago, Illinois.

312.    Without any basis to formulate a reasonable, articulable suspicion that Plaintiff STEWART had engaged in or was about to engage in a crime, JOHN DOE OFFICERS 51 and 52 pulled in front of the house and told everyone there to line up against a parked car.

313.    With no reasonable belief that STEWART was armed or dangerous, Defendant Officers patted STEWART and the other individuals down.

314.    After failing to find any contraband or weapons, Defendant Officers permitted STEWART and his friends to continue to hang out in front of STEWART's aunt's home without issuing them any citations.

315.    STEWART asked the Defendant Officers why they stopped and frisked him, and the Defendant Officers refused to provide a justification.

316.    Defendant Officers subjected STEWART to a suspicionless stop and frisk based on his race and/or national origin.

xxii.    **Lavester McWane**

317.    Plaintiff LAVESTER McWANE is a 21-year-old African-American man who resides in the East Garfield Park neighborhood of the City of Chicago. Plaintiff McWANE resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

318.    In the winter of 2014, Plaintiff McWANE was walking with three of his friends near the corner of Homan Avenue and Huron Street in Chicago, Illinois. The group of friends saw an individual being stopped and frisked by JOHN DOE OFFICERS 53 and 54 across the street, and stopped to watch.

319.    Without any basis to formulate a reasonable, articulable suspicion that McWANE had engaged in or was about to engage in a crime, JOHN DOE OFFICERS 53 and 54 came across the street and approached and stopped McWANE and his group of friends.

320.    With no reasonable belief that MCWANE was armed or dangerous, Defendant Officers patted MCWANE down and frisked him. Defendant Officers frisked McWANE's friends as well.

321.    After failing to find any weapons or contraband, Defendant Officers took McWANE and his friends' names down and let them leave. No citations were issued.

322.    Defendant Officers subjected McWANE to a suspicionless stop and frisk based on his race and/or national origin.

xxiii.    **Steve McAbee**

323.    Plaintiff STEVE McABEE is a 16-year-old African-American boy who resides in the Englewood neighborhood of the City of Chicago. Plaintiff McABEE resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

324.    Over the past two years, Plaintiff McABEE was subjected to numerous suspicionless stops or stops and frisks near his home by CPD officers while going about his daily life.

325.    On May 1, 2015, Plaintiff McABEE was walking home after stopping at a gas station near the intersection of 71st Street and Ashland Avenue in Chicago, Illinois.

326.    Without any basis to formulate a reasonable, articulable suspicion that McABEE had engaged in or was about to engage in a crime, JOHN DOE OFFICERS 55 and 56 pulled into the gas station parking lot in their squad car. Defendant Officers shouted "Don't move!" at McABEE and then ordered him to put his hands on their car.

327.    With no reasonable belief that McABEE was armed or dangerous, Defendant Officers patted McABEE down and searched through his pockets.

328.    Defendant Officers ran McABEE's name through their police computer database. After his name came back clean and Defendant Officers failed to find any contraband or weapons during their stop, frisk and search, McABEE was let go and no citations were issued.

329.    Upon information and belief, this stop and frisk lasted about thirty minutes.

330.    Defendant Officers subjected McABEE to a suspicionless stop and frisk based off of his race and/or national origin.

331.    In a separate incident, Plaintiff McABEE was walking to his sister's house near the intersection of 49th Street and Drexel Avenue in Chicago, Illinois.

332.    Without any basis to formulate a reasonable, articulable suspicion that McABEE had engaged in or was about to engage in a crime, JOHN DOE OFFICERS 109 and 110 pulled up to McABEE in their squad car and told him to "come here."

333.    With no reasonable belief that McABEE was armed or dangerous, Defendant

Officers patted McABEE down and searched through his pockets.

334.    After not finding any weapons or contraband, Defendant Officers let McABEE go

and no citations were issued.

335.    Defendant Officers subjected McABEE to a suspicionless stop, frisk, and

unlawful search based on his race and/or national origin.

**xxiv.    Jonathan Jackson**

336.    Plaintiff JONATHAN JACKSON is a 49-year-old African-American man who

resides in a South Side neighborhood of the City of Chicago. Plaintiff JACKSON resides in

and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop

and frisks.

337.    In March 2015, Plaintiff JACKSON was driving near the intersection of 82nd

Street and Woodland Avenue in Chicago, Illinois.

338.    Plaintiff JACKSON is a national spokesman for the Rainbow/PUSH Coalition, a

professor at Chicago State University, and the son of civil rights activist Jesse Jackson.

339.    Without any basis to formulate a reasonable, articulable suspicion that JACKSON

had engaged in or was about to engage in a crime, JOHN DOE OFFICERS 57 and 58 pulled

Plaintiff JACKSON over.

340.    After asking why he was pulled over, JOHN DOE OFFICERS 57 and 58 told

JACKSON that they pulled him over because there were reported shootings in the area.

341.    When JACKSON identified himself, Defendant Officers let JACKSON go

without issuing any citations.

342. Defendant Officers subjected JACKSON to a suspicionless stop based on his race and/or national origin.

## xxv. Arthur Stringer

343. Plaintiff ARTHUR STRINGER is a 58-year-old African-American man who resides in the Chatham neighborhood of the City of Chicago. Plaintiff STRINGER resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

344. In January or February 2015, Plaintiff STRINGER was driving family members to their home near the intersection of 70th Street and Lawrence Avenue in Chicago, Illinois. STRINGER's passengers were all African-American males.

345. Without any basis to formulate a reasonable, articulable suspicion that STRINGER had engaged in or was about to engage in a crime, JOHN DOE OFFICERS 59 and 60 who were in an unmarked car pulled STRINGER's car over.

346. With no reasonable suspicion that STRINGER was armed or dangerous, Defendant Officers ordered him to exit the car, handcuffed him, and patted him down for weapons. Defendant Officers also frisked the passengers and searched the car.

347. After failing to find any weapons or contraband, Defendant Officers let STRINGER go and no citations were issued.

348. Upon information and belief, the entire stops, frisk, and search took about thirty minutes.

349. Defendant Officers subjected STRINGER to a suspicionless stop, frisk, and illegal search based on his race and/or national origin.

**xxvi.    Stop and Frisk Incident Involving Commander Glenn Evans**

350.    Plaintiff DARION BEENE is a 21-year-old African-American man who resides in the East Garfield Park neighborhood of the City of Chicago. Plaintiff BEENE resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

351.    Plaintiff LAVESTER McWANE is a 21-year-old African-American man who resides in the East Garfield Park neighborhood of the City of Chicago. Plaintiff McWANE resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

352.    Plaintiff DEANDRE STEWART is a 20-year-old African-American man who resides in the South Austin neighborhood of the City of Chicago. Plaintiff STEWART resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

353.    On and before May 28, 2014, and at all relevant times, Defendant GLENN EVANS was a Chicago Police Officer employed by the Defendant CITY OF CHICAGO Police Department.

354.    Defendant EVANS was a Commander who held a supervisory position within the CITY OF CHICAGO Police Department.

355.    On and before May 28, 2014, and at all relevant times, when Commander EVANS was engaging in the complained of conduct, he was acting under color of law and in the course of his employment as a City of Chicago Police Officer.

356.    On May 28, 2014, Plaintiffs BEENE, McWANE, and STEWART were at a barbeque at the corner of Kedzie and Ohio in Chicago.

357.    Upon information and belief, the owner of a local store was selling hotdogs, a bag of potato chips, and cans of pop for one dollar, and around a dozen people were in line to buy food.

358.    Upon information and belief, without any basis to formulate a reasonable, articulable suspicion that BEENE, McWANE, or STEWART had engaged in or were about to engage in a crime, Chicago Police Commander GLENN EVANS and JOHN DOE OFFICERS 61 through 71, et al. pulled up to the barbeque in numerous squad cars and two police vans. Commander EVANS and Defendant Officers ordered everyone in line at the barbeque to stand up against the wall. Upon information and belief, they also rounded up other individuals in the general area as well.

359.    Plaintiff STEWART was handcuffed.

360.    With no reasonable belief that BEENE, McWANE, or STEWART were armed or dangerous, Defendant Officers patted them down and went through their pockets.

361.    Upon information and belief, after aggressively yelling at all the individuals to line up on the street and patting them all down, Commander EVANS told younger police officers at the scene that this was how the Chicago Police Department conducted frisks in that west side neighborhood of Chicago.

362.    After Defendant Officers failed to find any contraband or weapons on Plaintiffs BEENE, McWANE, or STEWART, Defendant Officers issued citations them, as well as many other individuals who were in line at the barbeque or in the general area, for allegedly blocking traffic and/or the sidewalk.

363.    Plaintiffs BEENE, McWANE, and STEWART were not arrested.

364.    Upon information and belief, Plaintiffs' tickets and/or charges were later

50

dismissed which was indicative of their innocence.

365. Upon information and belief, the entire stop and frisk incident lasted about thirty minutes.

366. Commander GLENN EVANS and JOHN DOE OFFICERS 61 through 71, et al. subjected Plaintiffs BEENE, McWANE, and STEWART to a suspicionless stop, frisk, and unlawful search based on their race and/or national origin.

### vi. Shantay Johnson

367. Plaintiff SHANTAY JOHNSON is a 24-year-old African-American woman who resides in Chicago, Illinois. Plaintiff JOHNSON resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

368. On January 2015 day at around noon, Plaintiff JOHNSON was standing outside a store at the intersection of Kedzie Avenue and Ohio Street in Chicago, Illinois.

369. Without any basis to formulate a reasonable, articulable suspicion that JOHNSON had engaged in or was about to engage in a crime, undercover JOHN DOE OFFICERS 89 and 90 pulled up in an unmarked police car and stopped JOHNSON.

370. With no reasonable belief JOHNSON was armed or dangerous, Defendant Officers put handcuffs on JOHNSON, pressed her against the police car, and frisked her. Defendant Officers also went through JOHNSON's pockets.

371. JOHNSON was arrested and charged with disorderly conduct. The charges against her were eventually dismissed.

372. Upon information and belief, the entire incident lasted about fifteen minutes.

373. JOHN DOE OFFICERS 89 and 90 subjected JOHNSON to a suspicionless stop, frisk, and unlawful search based on her race and/or national origin.

51

xxvii.     **Arthur Moton**

374.     Plaintiff ARTHUR MOTON is a 49-year-old African-American man who resides in the West Pullman neighborhood of the City of Chicago. Plaintiff MOTON resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

375.     In May or June 2014, Plaintiff MOTON was walking through an alleyway between 94th Street and 95th Street in Chicago, Illinois. He was headed to a nearby store and used the alley as a shortcut.

376.     Without any basis to formulate a reasonable, articulable suspicion that MOTON had engaged in or was about to engage in a crime, JOHN DOE OFFICER 91 approached MOTON, told him to put his hands up, and ordered him to lean up against the squad car.

377.     With no reasonable belief that MOTON was armed or dangerous, Defendant Officer patted MOTON down and went through his pockets.

378.     Failing to find any contraband, Defendant Officer permitted Plaintiff MOTON to continue on his walk to the store without receiving any citations.

379.     Upon information and belief, the entire stop and frisk took about fifteen minutes.

380.     JOHN DOE OFFICER 91 subjected Plaintiff MORTON to a suspicionless stop, frisk, and unlawful search based on his race and/or national origin.

xxviii.     **Dudley Burns**

381.     Plaintiff DUDLEY BURNS is a 57- year-old African-American man who resides in a South Side neighborhood of the City of Chicago. Plaintiff BURNS resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

382.     In March 2015, Plaintiff BURNS was walking past the train station near the

intersection of Halsted Street and Vincennes Avenue in Chicago, Illinois, where he began to cross the street.

383.     Without any basis to formulate a reasonable, articulable suspicion that BURNS had engaged in or was about to engage in a crime, uniformed JOHN DOE OFFICERS 92 and 93 pulled up to BURNS in their unmarked police car and immediately asked him, "Where's the crack?"

384.     Plaintiff BURNS told Defendant Officers he did not know what they were talking about and was insulted by the question.

385.     With no reasonable belief that BURNS was armed or dangerous, Defendant Officers forced BURNS against the door of their unmarked police car and patted him down.

386.     After failing to find any weapons or contraband, Defendant Officers let Plaintiff BURNS go without issuing any citations.

387.     JOHN DOE OFFICERS 92 and 93 subjected Plaintiff BURNS to a suspicionless stop, frisk, and unlawful search based on his race and/or national origin.

**xxix.     Edgar Marshall, Jr.**

388.     Plaintiff EDGAR MARSHALL, JR. is an African-American man who resides in a West Side neighborhood of the City of Chicago. Plaintiff MARSHALL resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks,

389.     On September 2, 2014, Plaintiff MARSHALL was driving near the intersection of Hirsch Street and Central Avenue in Chicago, Illinois. MARSHALL was driving from the XSport Fitness health club back to his home.

390.     Without any basis to formulate a reasonable, articulable suspicion that MARSHALL had committed or was about to commit a crime, JOHN DOE OFFICER 94 pulled

MARSHALL over in an unmarked police car.

391.    With no reasonable belief that MARSHALL was armed or dangerous, Defendant

Officer ordered MARSHALL to exit his vehicle and put his hands on top of his own car.

Defendant Officer then proceeded to pat MARSHALL down.

392.    MARSHALL told Defendant Officer that he believed he had been pulled over

based on racial profiling and that his Fourth Amendment rights were being violated.

393.    Defendant Officer told MARSHALL that he was pulled over because one of his

headlights was out.

394.    After failing to find any weapons or contraband, Defendant Officer issued

MARSHALL a traffic ticket for the broken headlight and permitted him to continue on his way.

The ticket was later dismissed indicative of MARSHALL's innocence.

395.    JOHN DOE OFFICER 94 subjected Plaintiff MARSHALL to a suspicionless stop

and frisk based on his race and/or national origin.

**xxx.    Michael Sanders**

396.    Plaintiff MICHAEL SANDERS is a 40-year-old African-American man who

resides in the Englewood neighborhood of the City of Chicago. Plaintiff SANDERS resides in

and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop

and frisks.

397.    In June 2014, Plaintiff SANDERS was standing with a group of friends in front of

his aunt's apartment building at 18 N. Lorel Avenue in Chicago, Illinois.

398.    Without any basis to formulate a reasonable, articulable suspicion that SANDERS

had engaged in or was about to engage in a crime, JOHN DOE OFFICERS 95 and 96 pulled up

to the apartment and ordered SANDERS and his friends to put their hands up and then onto their

squad car. Defendant Officers handcuffed SANDERS and everyone in the group he was with.

399.     With no reasonable belief that SANDERS was armed or dangerous, Defendant Officers patted him down and searched his pockets. Defendant Officers did the same to the rest of the group.

400.     Failing to find any weapons or other contraband, Defendant Officers left without issuing any citations.

401.     Upon information and belief, the entire stop and frisk incident took about fifteen minutes.

402.     JOHN DOE OFFICERS 95 and 96 subjected Plaintiff SANDERS to a suspicionless stop, frisk, and unlawful search based on his race and/or national origin.

403.     In a separate incident in June 2014, which also occurred near 18 N. Lorel Avenue in Chicago, Illinois, Plaintiff SANDERS was sitting in his parked van when a Chicago police car drove past him.

404.     Without any basis to formulate a reasonable, articulable suspicion that SANDERS had engaged in or was about to engage in a crime, JOHN DOE OFFICERS 97 and 98 turned their police car around, stepped out, and approached SANDERS with their guns drawn.

405.     Defendant Officers asked SANDERS what he had been smoking, and SANDERS responded that he had not been smoking anything.

406.     With no reasonable belief that SANDERS was armed or dangerous, Defendant Officers made him leave his van, handcuffed him, frisked him, and searched his pockets. They also searched the van. Defendant Officers placed SANDERS in the back of the police car while they carried out their search.

407.    After finding no contraband or weapons on SANDERS or in his van, Defendant Officers let him go without issuing any citations.

408.    Upon information and belief, the stop, frisk, and search lasted approximately fifteen minutes.

409.    JOHN DOE OFFICERS 97 and 98 subjected Plaintiff SANDERS to a suspicionless stop, frisk, and unlawful search based on his race and/or national origin.

**xxxi.    Rashawn Lindsey**

410.    Plaintiff RASHAWN LINDSEY is a 21-year-old African-American man who resides in the Englewood neighborhood of the City of Chicago. Plaintiff LINDSEY resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

411.    On April 18, 2015, 18-year-old high school student Plaintiff LINDSEY was walking home from school with his cousin and a friend at the intersection of Marquette Road and Carpenter Street in Chicago, Illinois.

412.    Without any basis to formulate a reasonable, articulate suspicion that LINDSEY had engaged in or was about to engage in a crime, JOHN DOE OFFICERS 99 and 100 pulled over to the side of the street, got out of their unmarked car, and approached LINDSEY, his cousin, and friend as they walked.

413.    Upon information and belief, Defendant Officers had apparently ordered LINDSEY to put his hands up; however, because of the local automobile traffic, LINDSEY did not hear the order and continued walking. Defendant Officers then screamed orders at the boys more loudly and threatened to use a taser on LINDSEY, his cousin, and friend. The boys heard the orders and immediately complied by putting their hands up.

56

414.    With no reasonable belief that LINDSEY was armed or dangerous, Defendant Officers handcuffed LINDSEY, frisked him, and searched through his pockets. They did the same to the other boys with him.

415.    After failing to find any weapons or contraband, Defendant Officers let LINDSEY and the other individuals go and no citations were issued.

416.    Defendant Officers never told LINDSEY why he was initially stopped.

417.    JOHN DOE OFFICERS 99 and 100 subjected Plaintiff LINDSEY to a suspicionless stop, frisk, and unlawful search based on his race and/or national origin.

**xxxii.    Sidney Bell**

418.    Plaintiff SIDNEY BELL is a 54-year-old African-American man who resides in a West Side neighborhood of the City of Chicago. Plaintiff DAVIS resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

419.    In March 2015, Plaintiff BELL was near the intersection of Kilbourn Avenue and Monroe Street in Chicago, Illinois. BELL and his girlfriend were walking home after stopping at a local store.

420.    Without any basis to formulate a reasonable, articulate suspicion that BELL had engaged in or was about to engage in a crime, JOHN DOE OFFICERS 101, 102, 103, 104, 105, and 106 pulled their squad cars over in front of BELL and his girlfriend, exited their vehicles, and approached them with guns drawn.

421.    With no reasonable belief that BELL was armed or dangerous, Defendant Officers patted BELL down and went through his pockets. BELL's girlfriend was not frisked.

422.    After failing to find any weapons or contraband, Defendant Officers let BELL and his girlfriend go without issuing any citations.

423. Defendant Officers told BELL that they had stopped him because someone reported that there were "suspicious people" in the neighborhood.

424. Upon information and belief, the entire stop, frisk, and search lasted about ten minutes.

425. JOHN DOE OFFICERS 101, 102, 103, 104, 105, and 106 subjected Plaintiff BELL to a suspicionless stop, frisk, and unlawful search based on his race and/or national origin.

**xxxiii. Calvin Jackson**

426. Plaintiff CALVIN JACKSON is a 55-year-old African-American man who resides in the Englewood neighborhood of the City of Chicago. Plaintiff JACKSON resides in and/or visits neighborhoods where CPD officers are and/or have been deployed and conduct stop and frisks.

427. In June 2013, Plaintiff JACKSON was walking with his female friend Ritta Harris near the intersection of 103rd Street and Wentworth Avenue. They had just left a local store and were on their way to a friend's house.

428. Without any basis to formulate a reasonable, articulate suspicion that JACKSON had engaged in or was about to engage in a crime, JOHN DOE OFFICERS 107 and 108 who were in plain clothes pulled in front of JACKSON and Ritta Harris and told them to stop.

429. Defendant Officers told JACKSON that he was stopped because of a report that people were fighting in the area.

430. With no reasonable belief that JACKSON was armed or dangerous, Defendant Officers patted him down and searched his pockets.

431. After finding no weapons or illegal contraband, Defendant Officers let JACKSON go and issued no citations.

58

432.     Upon information and belief, the stop, frisk, and search lasted about ten minutes.

433.     JOHN DOE OFFICERS 107 and 108 subjected Plaintiff JACKSON to a suspicionless stop, frisk, and unlawful search based on his race and/or national origin

**B.   CPD's History of a Policy, Practice and/or Custom of Suspicionless Stops and Frisks**

434.     The CPD has a history of conducting suspicionless stops and frisks which traces back to sweeps of high-crime neighborhoods in the 1980s. A review of how *Terry* stops have been used in Chicago demonstrates a persistent problem—inadequate training, supervision and monitoring of law enforcement in minority communities.

435.      In the early 1980s, the Chicago Reporter found that more than 100,000 citizens were arrested for "disorderly conduct" during sweeps of high-crime neighborhoods. These arrests were usually preceded by a stop and frisk. These cases almost never resulted in convictions because the police generally did not show up in court to defend the arrest. An ACLU lawsuit successfully challenged this practice and, as a result, disorderly conduct arrests and their accompanying stops and frisks plummeted. *Michael Nelson v. City of Chicago*, 83-C-1168 (N.D. Ill.).

436.     These unnecessary stops and arrests alienated African-American and Hispanic communities in Chicago.  In the 1990s, organized *Terry* stops re-emerged under the "gang loitering ordinance." That ordinance—later struck down by the U.S. Supreme Court—resulted in more than 40,000 arrests over 18 months of enforcement. *See City of Chicago v. Morales*, 527 U.S. 41 (1999). Massive numbers of people were arrested and searched, often without a legally justifiable reason, for refusing to follow dispersal orders. In reality, the ordinance was a method for stopping and searching young men of color.

437.     In the early 2000s, unwarranted stops and searches were still commonplace. In

59

2003, the ACLU filed a lawsuit on behalf of Olympic Gold medalist Shani Davis and several others, challenging a series of humiliating stop and frisk searches by Chicago police. *See* Complaint for Plaintiffs, *Davis v. City of Chicago*, 219 F.R.D. 593 (N.D. Ill. 2004), (No. 03 C 2094), 2003 WL 23800673.

438. Data collected in connection with that suit showed a pattern of unjustified stops and searches, resulting in the unnecessary detention of young people, mostly young people of color. As a result of the *Davis* lawsuit, the Chicago police made changes to their policy of stopping and searching on the streets, including a requirement to record why stops occur.

439. The manner in which the City implemented the recordkeeping has proved insufficient. Today, Chicago's reliance on unconstitutional stop and frisks has increased dramatically.

### i.      ACLU's March 2015 Report and Statistics

440. Under current CPD policy, Chicago police officers are required to justify their stops on "contact cards." Supervisors are required to review the facts and circumstances of each individual stop, correct the officer, and if necessary, recommend training or discipline to officers who have failed to provide a legal justification for a stop.

441. In March 2015, the ACLU published a report regarding its investigation into the CPD's practice of stop and frisk and the statistics were alarming.

442. The ACLU found that for half of the CPD's stops (based on the sample analyzed), the officer did not record legally sufficient reasons to establish reasonable suspicion. The ACLU also found that a large percentage of Chicago police officers did not record the reasons for the stop, even though the department requires that officers do so. These stops made without sufficient cause violate the Fourth Amendment guarantee against unreasonable searches and

seizures.

443.    In many narrative fields, the officers stated that they stopped people for reasons unrelated to a suspicion of a crime.

444.    A review of the contact card database for the four-month period of May through August 2014 indicates that African-Americans are disproportionately subjected to stops when compared to their white counterparts.  African-American Chicagoans were subjected to 182,048 stops and frisks. This meant African-Americans were the targets of 72% of all stops, despite constituting just 32% of the city's population.

445.    Also, there are more stops per capita in minority neighborhoods. For example, in the minority district Englewood there were 266 stops per 1,000 people, while in the predominately white district Lincoln/Foster there were 43.

446.    The difference in stop rates among different races also occurs outside minority communities. In Chicago's predominantly white police districts—Near North, Town Hall, and Jefferson Park—the disparity between African-American population and percentage of stops is even more blatant than city-wide data. For example, although Jefferson Park's African American population is just 1%, African Americans make up almost 15% of all stops.

447.    Most shockingly, there were more than 250,000 stops that did not lead to an arrest in Chicago for the time period of May 1, 2014 through August 31, 2014. Comparing stops to population, Chicagoans were stopped at a far higher rate than New Yorkers at the height of New York City's stop and frisk practice in 2011.

448.    In 2014, there were 93.6 stops in Chicago per 1,000 people (between the months of May-August 2014). By contrast, in 2011, at the height of New York City's stop and frisk practice, there were 22.9 stops per 1,000 people.

61

449. A review of the contact card database for the four-month period of May through August 2014 indicates that Hispanics are also disproportionately subjected to stops when compared to their white counterparts.

450. Defendants have applied a facially neutral policy, the written anti-racial profiling policy, to Plaintiffs, and similarly situated individuals, in an intentionally racially discriminatory manner.

451. This CPD practice can be exemplified in other policing practices in the City as well. In May 2015, the Tribune documented that "in Chicago, 84 percent of the [DUI] roadside checks [over the past several years] were scheduled in areas populated mostly by minorities while roadways in areas with more DUI-related crashes that are predominantly white are checked less often, or not at all." Austin, a police district on the West Side, had 10 checkpoints between February 2010 and June 2014. Jefferson Park, a Northwest Side district, had none — even though Jefferson Park had four times as many alcohol-related accidents on local streets. During that span, three of the Chicago's five predominantly white districts hosted no roadblocks, but each of the 13 districts that are mostly black or Latino had at least five.

452. Upon information and belief, CPD officers are also under pressure to conduct an increasing number of stops and frisks. Upon information and belief, the stop and frisk reports are tracked and evaluated at the CPD's CompStat meetings where commanders are questioned about their precinct's crime statistics. CompStat focus gives CPD officers a strong incentive to make and document stops because an officer's numbers suggest productivity.

453. At one CompStat meeting, Defendant McCARTHY was quoted by the Chicago Tribune stating that "[e]verything will improve if [police officers] get out of the cars and put our hands on people. Make sure your officers are doing this, making out contact cards, and make

sure we are stopping the right people at the right times and the right places."

454.     Through the first 10 months of 2014, officers filled out more than 600,000 contact cards, which exceeds the previous year's total of 516,000 and is far more than the 379,000 written in 2011, when Defendant MCCARTHY took office.

455.     CPD officers are not required to fill out contact cards during "voluntary" interactions with citizens nor if an investigatory stop leads to an arrest. Thus, the amount of stops and frisks performed by police is projected to be significantly higher.

456.     Public accounts provide further evidence of unlawful stops and frisks which lack the reasonable suspicion required by the Fourth Amendment and reveal intent to discriminate on the basis of race.  In January 2013, the ACLU wrote a memo to Chicago Mayor Rahm Emanuel, Defendant McCARTHY and the City of Chicago's Corporation Counsel about the importance of monitoring Chicago's stop and frisk policy.

457.     Despite receiving numerous requests by various organizations to conduct stop and frisks within the bounds of the Constitution, the CITY OF CHICAGO and its final policymakers have repeatedly and consciously failed to take appropriate action.

**C.  CPD's Suspicionless Stop and Frisk Practice is a Direct and Proximate Result of Defendants' Policies, Practices and/or Customs**

458.     The Fourth Amendment prohibits police officers from conducting stops and frisks without a reasonable, articulable suspicion of criminal conduct; frisking persons without a reasonable belief that they are armed or presently dangerous; searching and seizing persons without probable cause; or using excessive force in the course of policing activities. Additionally, the Equal Protection Clause of the Fourteenth Amendment bars police officers from targeting individuals for stops and frisks on the basis of race or national origin.

459.     The pervasive unconstitutional practices of the CPD are a direct and proximate

result of policies, practices and/or customs devised, implemented, enforced and sanctioned by the City and its policymakers, including Superintendent MCCARTHY, and their confederates whose identities are presently unknown, with the knowledge that such policies, practices and/or customs would lead to violations of the Fourth and Fourteenth Amendments. Those policies, practices and/or customs include: (a) failing to properly screen, train and supervise CPD officers, (b) failing to adequately monitor and discipline CPD officers, and (c) encouraging, sanctioning and failing to rectify the CPD's custom and practice of suspicionless stops and frisks.

### i. Chicago's failure to properly screen, train and Supervise CPD Officers

460.    Although fully aware that the work of the CPD demands extensive training, superior judgment and close supervision, the City and Superintendent MCCARTHY failed to properly screen, train and supervise CPD officers, knowing that such failures would result in Fourth and Fourteenth Amendment violations.

461.    Pursuant to CPD General Order G02-04, Superintendent MCCARTHY was required to implement numerous training requirements concerning the written CPD policy prohibiting racial profiling. Upon information and belief, Defendants have failed to properly train and supervise CPD officers, including supervisors, concerning the legal and factual bases for conducting stops and/or frisks that comply with the Fourth and Fourteenth Amendments in an effective manner.

462.    The inadequate screening, training and supervision of the CPD is a direct and proximate cause of the CPD's rampant unconstitutional stops and frisks. As a direct and proximate result of the Defendants' failure to screen, train and supervise CPD officers, tens of thousands of people have been subjected to unlawful stops and frisks, many times simply because of their race and/or national origin. By failing to properly screen, train and supervise

64

CPD officers, the City, Superintendent MCCARTHY, and other City policymakers have acted recklessly and with deliberate indifference to the constitutional rights of those who would come into contact with the CPD.

**ii. Chicago's failure to monitor and discipline CPD officers**

463. The CPD's widespread abuses are also a direct and proximate result of the failure of the City and Superintendent McCARTHY to properly and adequately monitor, discipline and take necessary corrective action against CPD officers who engage in, encourage or conceal unconstitutional practices. Among other things, these Defendants knowingly, deliberately and recklessly have failed:

    a. to take appropriate disciplinary action and corrective measures against CPD officers who have engaged in suspicionless stops and frisks;

    b. to adequately monitor CPD officers who have incurred a substantial number of civilian complaints, even in instances where the number of complaints should have triggered monitoring under established departmental guidelines;

    c. to devise and implement appropriate oversight, disciplinary and remedial measures in the face of extensive evidence that no charges are brought against the overwhelming majority of persons stopped and frisked by CPD officers;

    d. to conduct adequate auditing to determine if the stop and frisks conducted by CPD officers comply with the CPD's written policy prohibiting stop and frisks that are not based upon reasonable suspicion and use race and/or national origin as the determinative factor in initiating police action;

    e. to take sufficient, if any, steps to curb CPD officers' non-compliance with departmental directives requiring that contact cards be completed for each stop and frisk;

    f. to take sufficient corrective and remedial action against CPD officers who provide fabricated, false, or impermissible justifications for stops and frisks; and

    g. to take sufficient corrective, disciplinary and remedial action to combat the so-called "blue wall of silence," wherein CPD officers regularly conceal or fail to report police misconduct, *inter alia*, in sworn testimony, official reports, statements to the Independent Police Review Authority (IPRA), the Internal Affairs Division, and in public statements.

464.    The City and Superintendent McCARTHY failed to properly and adequately monitor, discipline and take necessary corrective action against CPD officers, knowing that such omissions would lead to Fourth and Fourteenth Amendment violations. By such acts and omissions, the City and McCARTHY have acted recklessly and with deliberate indifference to the constitutional rights of those who would come into contact with the CPD.

### iii.    Encouraging, sanctioning and failing to rectify the CPD's suspicionless stops and frisks

465.    With the knowledge that such acts and omissions would create a likelihood of Fourth and Fourteenth Amendment violations, the City and its policymakers, including Superintendent McCARTHY, also have encouraged, sanctioned and failed to rectify the CPD's abusive and unconstitutional practices.

466.    Upon information and belief, Defendants the City and its policymakers, including Superintendent McCARTHY, have enacted and enforced formal and/or unwritten "productivity standards" or de facto quotas of a certain number of stops and frisks and specific types of arrests per month for each CPD officer. Upon information and belief, in their efforts to satisfy the productivity standards, CPD officers have engaged in widespread suspicionless stops and frisks of individuals.

467.    Upon information and belief, Defendants the City and its policymakers, including Superintendent McCARTHY, have also used a program called the Violence Reduction Initiative (VRI) to encourage Chicago police officers to carry out its widespread and pervasive policy of stops and frisks, with disregard for the fact that large numbers of those stops and frisks are not based on constitutionally sufficient grounds.

468.    Upon information and belief, as part of the VMI program, Chicago police officers

66

are instructed to "post up" in a certain area and/or "saturate" a neighborhood while actively attempting to stop and frisk as many people as possible, ultimately amounting to a practice of creating an unconstitutional drag net of certain neighborhoods by the Chicago Police Department. Upon information and belief, Chicago police officers are told formally or informally that a larger gross number of stops or stops and frisks indicates greater "activity" by that specific police officer, and greater activity gives officers perks, such as more opportunities for overtime pay, choice of vacation days, better chances of promotion, and so forth. This creates the perverse incentive for officers to focus on VRI numbers in order to significantly supplement their income, to the detriment of normal police work and citizens' civil rights.

469. Upon information and belief, there is also a de facto policy and custom in the Chicago Police Department to take measures to ensure illegal or unconstitutional police activity, such as unconstitutional stops and frisks, are not recorded by police dash cameras or other surveillance equipment. Upon information and belief, dash cameras in police vehicles turn on once a police car's emergency equipment (e.g. police lights) are activated. Whenever police officers conduct a stop and frisk, they are generally required to turn on the emergency equipment so the interaction is recorded. This is particularly necessary and important when police officers are working from an unmarked police car so citizens are aware that they are dealing with a police officer. Upon information and belief, the Chicago Police Department has a de facto policy and custom where Chicago police officers often do not activate their emergency equipment during stop and frisk incidents, with the intent of denying citizens the opportunity to challenge an unconstitutional interaction.

470. As a direct and proximate result of the above policies, practices and/or customs, tens of thousands of people have been, and will continue to be, subjected to unconstitutional

stops, frisks, searches and seizures by CPD officers, sometimes in violent encounters, simply

because such individuals happen to be the wrong color, in the wrong place, at the wrong time.

Through such acts and omissions, the City and Superintendent McCARTHY have acted

recklessly and with deliberate indifference to the constitutional rights of individuals who would

come into contact with the CPD.

**D.  Recent Measures Are Inadequate and Insufficient to Eradicate, Curb or Deter the Suspicionless Stop and Frisk Policy**

471.    The Chicago Police Department refuses to keep sufficient data about its officers'

stops and frisks. For example, only stops are systematically recorded, but Chicago Police

Department policies do not require officers to note whether a frisk took place as well. This

administrative failure to record data on whether an arrest was made, whether a frisk was made,

and the results of a search makes it difficult for police supervisors, or the public, to identify

problem areas in order to make necessary policy changes.

472.    Contact cards are not required to be filled out if the stop leads to an arrest or an

ordinance violation. Currently, CPD officers do not identify on arrest reports whether a *Terry*

stop led to an arrest.

473.    In April 2014, the CPD changed its policy to limit contact cards to stops and the

enforcement of loitering ordinances. This measure has not sufficiently or adequately addressed,

much less irrevocably eradicated, curbed, or deterred the CPD's pervasive policy, practice and/or

custom of unconstitutional stops and frisks. Thus, despite these policy changes, Plaintiffs, and

hundreds of thousands of other individuals, continue to face the imminent likelihood of

becoming victims of the CPD's constitutional abuses in violation of the Fourth and Fourteenth

Amendments to the U.S. and Illinois Constitutions.

## COUNT 1 – Violations of the Fourth Amendment
**(Claims of All Named Plaintiffs and Class Members Pursuant to 42 U.S.C. §1983 Against
All Defendants for Violation of the Fourth Amendment)**

474.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

475.    Defendants City, Superintendent McCARTHY, and DOE OFFICERS 1-110 have implemented, enforced, encouraged and sanctioned a policy, practice and/or custom of stopping and frisking the members of the Plaintiff class without the reasonable articulable suspicion of criminality required by the Fourth Amendment. These constitutional abuses often are coupled with unconstitutional searches and seizures and, at times, excessive force.

476.    The CPD's constitutional abuses and violations were, and are, directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged and sanctioned by the City and Superintendent McCARTHY, including: (a) the failure to adequately and properly screen, train, and supervise CPD officers; (b) the failure to properly and adequately monitor and discipline CPD officers; and (c) the overt and tacit encouragement and sanctioning of, and the failure to rectify, the CPD's suspicionless stop and frisk practices.

477.    Each of the Defendants has acted with deliberate indifference to the Fourth Amendment rights of the named Plaintiffs and other members of the class. As a direct and proximate result of the acts and omissions of each of the Defendants, the Fourth Amendment rights of the named Plaintiffs and other class members have been violated. By acting under color of state law to deprive the named Plaintiffs and other class members of their rights under the Fourth Amendment, the Defendants are in violation of 42 U.S.C. § 1983, which prohibits the deprivation under color of state law of rights secured under the United States Constitution.

478.    The CPD targets African-American and Hispanic individuals for illegal stops and

frisks in areas where Plaintiffs reside and/or visit. Thus, a real and immediate threat exists that the Fourth Amendment rights of the named Plaintiffs and other class members will be violated by CPD officers in the future. Numerous named Plaintiffs have been stopped multiple times, often close to their homes, while going about their daily lives by CPD officers. Moreover, because Defendants' policies, practices and/or customs subject the named Plaintiffs and other class members to stops and frisks without any reasonable, articulable suspicion of criminality, and often on the basis of race and/or national origin, the named Plaintiffs and other class members cannot alter their behavior to avoid future violations of their constitutional and civil rights at the hands of the CPD.

479.    The Plaintiffs fear being stopped and frisked under the current policy. Stops, frisks, and illegal searches have taken place even when engaged in normal, everyday activities on or near their own property. The Plaintiffs seek to stop the CPD's current practice in order to relieve themselves of this constant apprehension.

480.    The named Plaintiffs and other members of the class have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from continuing the CPD's policy, practice and/or custom of unconstitutional stops and frisks, and the policies, practices and/or customs that have directly and proximately caused such constitutional abuses.

## COUNT 2 – Violations of the Equal Protection Clause
### (Claims of All Named Plaintiffs and Class Members Pursuant to 42 U.S.C. §1983 Against All Defendants for Violation of the Equal Protection Clause)

481.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

482.    Defendants City, Superintendent MCCARTHY, and DOE OFFICERS 1-110 have implemented and enforced a policy, practice and/or custom of stopping and frisking the named

Plaintiffs and members of the Plaintiff class without the reasonable articulable suspicion of criminality required by the Fourth Amendment and based solely on their race and/or national origin. These suspicionless stops and frisks have and are being conducted predominantly on African-American and Hispanic individuals on the basis of racial and/or national origin profiling. The CPD intentionally applies a facially neutral policy in a discriminatory manner. As a result, the CPD's policy, practice and/or custom of suspicionless stops and frisks violate the Equal Protection Clause of the Fourteenth Amendment.

483.    The ACLU analysis of the available stop and frisk data from police contact cards shows that CPD stop and frisk policy has had a discriminatory effect on African American and Hispanic communities. African Americans make up 32% of the City's population, but made up 72% of all stops. Minority neighborhoods had more stops per capita than white neighborhoods. In white neighborhoods, minorities are even more likely to be stopped than they are in minority neighborhoods.

484.    Upon information and belief, the CPD enacted this policy with a discriminatory purpose. Defendants pursued this policy precisely because of the adverse effects it had on the targeted group: African-American and Hispanic men. Defendant McCARTHY has made plain that the point of the stop and frisk program is to have police actively stop and frisk "the right people at the right times and the right places."

485.    Additionally, the City was deliberately indifferent to the unconstitutional acts committed by CPD officers through the stop and frisk program. Subordinates of the City carried out the policy at least in part because of the adverse effects it had on African American and Hispanic men, and a reasonable inference can be drawn that supervisors intended those effects to occur. By focusing on the "right people at the right time and the right places," the officers were

following a course of action which was inherently designed to adversely affect the target group, African-Americans and Hispanics, more than others. Despite frequent notice of racial disparities in stops, most compellingly in the ACLU statistical analysis of contact cards, the program remains fundamentally unchanged. Senior officials also have consistently failed to effectively discipline officers for proven violations. These factors show a deliberate indifference on the part of City officials over the unlawful consequences of the stop and frisk program.

486. The CPD's constitutional abuses were and are directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged, and sanctioned by the City and Superintendent McCARTHY, including: (a) the failure to adequately and properly screen, train, and supervise CPD officers; (b) the failure to adequately and properly monitor and discipline the CPD and its officers; and (c) the encouragement and sanctioning of and failure to rectify the CPD's use of racial and/or national origin profiling in making stops and frisks.

487. Each of the Defendants has acted with deliberate indifference to the Fourteenth Amendment rights of the named Plaintiffs and class members. As a direct and proximate result of the aforesaid acts and omissions of the Defendants and each of them, the Fourteenth Amendment rights of the named Plaintiffs and class members have been violated. By their acts and omissions, Defendants have acted under color of state law to deprive the named Plaintiffs and class members of their Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

488. Due to the CPD targeting African-American and Hispanic persons in areas where the named Plaintiffs and other class members reside and/or visit, a real and immediate threat exists that the Fourteenth Amendment rights of the named Plaintiffs and other class members will be violated by CPD officers in the future. Numerous Plaintiffs have already been stopped

multiple times, often near their homes, while going about their daily lives by CPD officers. Moreover, because Defendants' policies, practices and/or customs subject the named Plaintiffs and other class members to repeated stops and frisks without any reasonable, articulable suspicion of criminality, and often on the basis of race and/or national origin, the named Plaintiffs and other class members cannot alter their behavior to avoid future violations of their constitutional and civil rights at the hands of the CPD.

489.     The named Plaintiffs fear being stopped and frisked repeatedly under the current policy. Stops, frisks, and illegal searches have taken place even when engaged in normal, everyday activities on their own property. The Plaintiffs seek to stop the CPD's current practice in order to relieve themselves of this constant apprehension.

490.     The named Plaintiffs and other class members have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from continuing the CPD's policy, practice and/or custom of unconstitutional race and/or national origin-based stops and frisks, and the policies, practices and/or customs that have directly and proximately caused such constitutional abuses.

### COUNT 3 – Violations of Title VI of the Civil Rights Act
### (Claims of All Named Plaintiffs and Class Members Under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d), et seq. Against the City of Chicago)

491.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

492.     The law enforcement activities described in this complaint have been funded, in part, with federal funds.

493.     Discrimination based on race in the law enforcement activities and conduct described herein is prohibited under 42 U.S.C. § 2000(d), et seq. The acts and conduct complained of herein by the Defendants were motivated by racial animus, and were intended to

73

discriminate on the basis of race and/or had a disparate impact on minorities, particularly African-American males.

494.    As a direct and proximate result of the above mentioned acts, the named Plaintiffs and members of the class have suffered injuries and damages and have been deprived of their rights under the civil rights laws. Without appropriate injunctive relief, these violations will continue to occur.

## COUNT 4 – 42 U.S.C. §1983— *Monell* – Unconstitutional Customs, Policies, and Practices (Individual Named Plaintiffs' Claims Against the City of Chicago and Superintendent McCARTHY)

495.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

496.    Defendants City and Superintendent McCARTHY have directly and proximately caused the CPD's policy, practice and/or custom of suspicionless stops and frisks in violation of the Fourth and Fourteenth Amendments, with deliberate indifference to the constitutional rights of Plaintiffs by devising, implementing, enforcing, adopting, sanctioning and ratifying a policy, practice and/or custom of: (a) failing to properly screen, train, and supervise CPD officers; (b) failing to adequately monitor and discipline the CPD and its officers; and (c) encouraging, sanctioning and failing to rectify the CPD's constitutional abuses.

497.    As a direct and proximate result of the aforesaid acts and omissions, Defendants City and Superintendent McCARTHY have each deprived Plaintiffs of their Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

498.    The acts and omissions of Defendants Superintendent McCARTHY and other City policymakers explained herein were intentional, wanton, malicious, reckless and oppressive, thus, entitling Plaintiffs to an award of punitive damages. In engaging in such conduct, Superintendent McCARTHY and City policymakers acted beyond the scope of their jurisdiction,

without authority under law, and in abuse of their powers.

**COUNT 5 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest**
**(Individual Claims of Darnell Smith & Darren Nathan against John Doe Officers 1 & 2)**

499.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

500.     The conduct of JOHN DOE OFFICERS 1 and 2 in stopping, frisking and searching Plaintiffs DARNELL SMITH and DARREN NATHAN on May 3, 2013, were performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, each of these stops and frisks were performed on the basis of racial and/or national origin profiling.

501.     As a direct and proximate result of such acts, JOHN DOE OFFICERS 1 and 2 deprived SMITH and NATHAN of their Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

502.     As a direct and proximate result of those constitutional abuses, Plaintiffs had suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

503.     The acts of JOHN DOE OFFICERS 1 and 2 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

**COUNT 6 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest**
**(Individual Claims of Darnell Smith against John Doe Officers 3 & 4)**

504.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

505.     The conduct of JOHN DOE OFFICERS 3 and 4 in stopping, frisking and searching Plaintiff DARNELL SMITH on October 9, 2014, was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin

profiling.

506.     As a direct and proximate result of such acts, JOHN DOE OFFICERS 3 and 4 deprived SMITH of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

507.     As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

508.     The acts of JOHN DOE OFFICERS 3 and 4 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 7 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
### (Individual Claims of Gregory Davis against John Doe Officers 5, 6, 7 & 8)

509.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

510.     The conduct of JOHN DOE OFFICERS 5 and 6 in stopping Plaintiff GREGORY DAVIS in July 2014, and the conduct of JOHN DOE OFFICERS 7 and 8 in stopping GREGORY DAVIS in October 2014, was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, each of these stops was performed on the basis of racial and/or national origin profiling.

511.     As a direct and proximate result of such acts, Defendant Officers deprived DAVIS of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

512.     As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

513.     The acts of Defendant Officers were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 8 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
### (Individual Claims of Jeff Coleman against John Doe Officers 9 & 10)

514.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

515.     The conduct of JOHN DOE OFFICERS 9 and 10 in stopping, frisking and searching Plaintiff JEFF COLEMAN in August 2014, was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

516.     As a direct and proximate result of such acts, JOHN DOE OFFICERS 9 and 10 deprived DAVIS of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

517.     As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

518.     The acts of JOHN DOE OFFICERS 9 and 10 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 9 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
### (Individual Claims of Phillip Overton against John Doe Officers 11 & 12)

519.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

520.     The conduct of JOHN DOE OFFICERS 11 and 12 in stopping, frisking and searching Plaintiff PHILLIP OVERTON in December 2013, was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

521.     As a direct and proximate result of such acts, JOHN DOE OFFICERS 11 and 12 deprived OVERTON of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

522.     As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

523.     The acts of JOHN DOE OFFICERS 11 and 12 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

## COUNT 10 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
### (Individual Claims of Marque Ross against John Doe Officers 13 & 14)

524.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

525.     The conduct of JOHN DOE OFFICERS 13 and 14 in stopping, frisking and searching Plaintiff MARQUE ROSS in April 2015, was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

526.     As a direct and proximate result of such acts, JOHN DOE OFFICERS 13 and 14 deprived ROSS of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

527.     As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

528.     The acts of JOHN DOE OFFICERS 13 and 14 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

**COUNT 11 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest**
**(Individual Claims of Herbert Dyer, Jr. against John Doe Officers 15, 16, 17, 18, and 19)**

529.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

530.    The conduct of JOHN DOE OFFICERS 15, 16, 17, 18 and 19 in stopping, frisking and searching Plaintiff HERBERT DYER, JR. in August 2014, was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

531.    As a direct and proximate result of such acts, JOHN DOE OFFICERS 15, 16, 17, 18 and 19 deprived DYER of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

532.    As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

533.    The acts of JOHN DOE OFFICERS 15, 16, 17, 18, and 19 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

**COUNT 12 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest**
**(Individual Claims of Herbert Dyer, Jr. against John Doe Officers 20 and 21)**

534.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

535.    The conduct of JOHN DOE OFFICERS 20 and 21 in stopping, frisking and searching Plaintiff HERBERT DYER, JR. in February 2015, was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin

profiling.

536.   As a direct and proximate result of such acts, JOHN DOE OFFICERS 20 and 21 deprived DYER of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

537.   As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

538.   The acts of JOHN DOE OFFICERS 20 and 21 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 13 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
### (Individual Claims of Mark Nevilles against John Doe Officers 22 and 23)

539.   Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

540.   The conduct of JOHN DOE OFFICERS 22 and 23 in stopping, frisking and searching Plaintiff MARK NEVILLES in April 2015, was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

541.   As a direct and proximate result of such acts, JOHN DOE OFFICERS 22 and 23 deprived NEVILLES of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

542.   As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

543.   The acts of JOHN DOE OFFICERS 22 and 23 were intentional, wanton,

80

malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

## COUNT 14 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
### (Individual Claims of Anthony L. Brown against John Doe Officer 24)

544.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

545.    The conduct of JOHN DOE OFFICER 24 in stopping, frisking and searching Plaintiff ANTHONY L. BROWN in September 2013, was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

546.    As a direct and proximate result of such acts, JOHN DOE OFFICER 24 deprived BROWN of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

547.    As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

548.    The acts of JOHN DOE OFFICER 24 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

## COUNT 15 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
### (Individual Claims of Christopher Locke against John Doe Officer 25)

549.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

550.    The conduct of JOHN DOE OFFICER 25 in stopping, frisking and searching Plaintiff Christopher Locke in May 2014, was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

551.    As a direct and proximate result of such acts, JOHN DOE OFFICERS 25

deprived LOCKE of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. §
1983.

552.     As a direct and proximate result of those constitutional abuses, Plaintiff has
suffered and will continue to suffer physical, mental and emotional pain and suffering, mental
anguish, embarrassment and humiliation.

553.     The acts of JOHN DOE OFFICER 25 were intentional, wanton, malicious,
reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 16 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
**(Individual Claims of Christopher Locke against John Doe Officers 26, 27, 28, and 29)**

554.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

555.     The conduct of JOHN DOE OFFICERS 26, 27, 28, and 29 in stopping, frisking
and searching Plaintiff Christopher Locke in August 2014, was performed under color of law and
without any reasonable suspicion of criminality or other constitutionally required grounds.
Moreover, this stop and frisk was performed on the basis of racial and/or national origin
profiling.

556.     As a direct and proximate result of such acts, JOHN DOE OFFICERS 26, 27, 28,
and 29 deprived LOCKE of his Fourth and Fourteenth Amendment rights in violation of 42
U.S.C. § 1983.

557.     As a direct and proximate result of those constitutional abuses, Plaintiff has
suffered and will continue to suffer physical, mental and emotional pain and suffering, mental
anguish, embarrassment and humiliation.

558.     The acts of JOHN DOE OFFICERS 26, 27, 28, and 29 were intentional, wanton,
malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

## COUNT 17 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
### (Individual Claims of Hector Fantanez against John Doe Officer 30)

559.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

560.    The conduct of JOHN DOE OFFICER 30 in stopping, frisking and searching Plaintiff HECTOR FANTANEZ on April 3, 2015, was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

561.    As a direct and proximate result of such acts, JOHN DOE OFFICER 30 deprived FANTANEZ of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

562.    As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

563.    The acts of JOHN DOE OFFICER 30 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

## COUNT 18 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
### (Individual Claims of Marcell Davis against John Doe Officers 31, et al.)

564.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

565.    The conduct of JOHN DOE OFFICERS 31, et al in stopping, frisking and searching Plaintiff MARCELL DAVIS in October, December, February, and twice in March 2015, was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

566.    As a direct and proximate result of such acts, JOHN DOE OFFICERS 31, et al deprived DAVIS of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. §

1983.

567.     As a direct and proximate result of those constitutional abuses, Plaintiff has

suffered and will continue to suffer physical, mental and emotional pain and suffering, mental

anguish, embarrassment and humiliation.

568.     The acts of JOHN DOE OFFICERS 31, et al were intentional, wanton, malicious,

reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 19 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
### (Individual Claims of Anthony Polk against John Doe Officers 32 and 33)

569.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

570.     The conduct of JOHN DOE OFFICERS 32 and 33 in stopping, frisking and

searching Plaintiff ANTHONY POLK in January 2015, was performed under color of law and

without any reasonable suspicion of criminality or other constitutionally required grounds.

Moreover, this stop and frisk was performed on the basis of racial and/or national origin

profiling.

571.     As a direct and proximate result of such acts, JOHN DOE OFFICERS 32 and 33

deprived POLK of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. §

1983.

572.     As a direct and proximate result of those constitutional abuses, Plaintiff has

suffered and will continue to suffer physical, mental and emotional pain and suffering, mental

anguish, embarrassment and humiliation.

573.     The acts of JOHN DOE OFFICERS 32 and 33 were intentional, wanton,

malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 20 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
**(Individual Claims of Calvin Jackson against John Doe Officers 34 and 35)**

574.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

575.    The conduct of JOHN DOE OFFICERS 34 and 35 in stopping, frisking and searching Plaintiff CALVIN JACKSON in June 2013 was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

576.    As a direct and proximate result of such acts, JOHN DOE OFFICERS 34 and 35 deprived JACKSON of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

577.    As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

578.    The acts of JOHN DOE OFFICERS 34 and 35 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 21 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
**(Individual Claims of Carl McCORD against John Doe Officer 37)**

579.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

580.    The conduct of JOHN DOE OFFICER 36 in stopping, frisking and searching Plaintiff CARL McCORD on a date in November 2014 or December 2014 was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

581.    As a direct and proximate result of such acts, JOHN DOE OFFICER 36 deprived McCORD of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

582.    As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

583.    The acts of JOHN DOE OFFICER 36 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

**COUNT 22 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest**
**(Individual Claims of Carl McCord against John Doe Officer 37)**

584.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

585.    The conduct of JOHN DOE OFFICER 37 in stopping, frisking and searching Plaintiff CARL McCORD on a date in November 2014 or December 2014 was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

586.    As a direct and proximate result of such acts, JOHN DOE OFFICER 37 deprived McCORD of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

587.    As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

588.    The acts of JOHN DOE OFFICER 37 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 23 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
**(Individual Claims of Carl McCORD against John Doe Officers 38, et al.)**

589.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

590.    The conduct of JOHN DOE OFFICER 38 et al. in stopping, frisking and searching Plaintiff CARL McCORD on a date in November 2014 or December 2014 was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

591.    As a direct and proximate result of such acts, JOHN DOE OFFICER 38, et al. deprived McCORD of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

592.    As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

593.    The acts of JOHN DOE OFFICER 38, et al. were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 24 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
**(Individual Claims of Timothy Thigpen against John Doe Officer 39)**

594.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

595.    The conduct of JOHN DOE OFFICER 39 in stopping, frisking and searching Plaintiff TIMOTHY THIGPEN on April 15, 2015 was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

596.    As a direct and proximate result of such acts, JOHN DOE OFFICER 39 deprived

THIGPEN of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

597.    As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

598.    The acts of JOHN DOE OFFICER 39 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 25 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
### (Individual Claims of Keith Riggins against John Doe Officers 40 and 41)

599.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

600.    The conduct of JOHN DOE OFFICERs 40 and 41 in stopping, frisking and searching Plaintiff KEITH RIGGINS in October, 2014 was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

601.    As a direct and proximate result of such acts, JOHN DOE OFFICER 40 and 41 deprived RIGGINS of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

602.    As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

603.    The acts of JOHN DOE OFFICERS 40 and 41 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

## COUNT 26 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
### (Individual Claims of James Shinaul against John Doe Officers 42)

604.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

605.     The conduct of JOHN DOE OFFICER 42 in stopping, frisking and searching Plaintiff JAMES SHINAUL in May 2015 was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

606.     As a direct and proximate result of such acts, JOHN DOE OFFICER 42 deprived RIGGINS of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

607.     As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

608.     The acts of JOHN DOE OFFICER 42 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

## COUNT 27 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
### (Individual Claims of Brandon Buford against John Doe Officer 43)

609.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

610.     The conduct of JOHN DOE OFFICER 43 in stopping, frisking and searching Plaintiff BRANDON BUFORD in June 2014 was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

611.     As a direct and proximate result of such acts, JOHN DOE OFFICER 43 deprived BUFORD of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

612.     As a direct and proximate result of those constitutional abuses, Plaintiff has

suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

613.    The acts of JOHN DOE OFFICER 43 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

## COUNT 28 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
### (Individual Claims of Melvin Thompson against Jane Doe Officer 44)

614.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

615.    The conduct of JANE DOE OFFICER 44 in stopping, frisking and searching Plaintiff MELVIN THOMPSON in August 2013 was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

616.    As a direct and proximate result of such acts, JANE DOE OFFICER 43 deprived THOMPSON of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

617.    As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

618.    The acts of JANE DOE OFFICER 44 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

## COUNT 29 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
### (Individual Claims of Darion Beene against John Doe Officers 45, 46, 47, and 48)

619.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

620.    The conduct of JOHN DOE OFFICER 45, 46, 47, and 48 in stopping, frisking and searching Plaintiff DARION BEENE in May 2015 was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds.

Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

621.    As a direct and proximate result of such acts, JOHN DOE OFFICER 45, 46, 47, and 48 deprived BEENE of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

622.    As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

623.    The acts of JOHN DOE OFFICERS 45, 46, 47, and 48 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 30 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
**(Individual Claims of Darion Beene against John Doe Officers 49 and 50)**

624.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

625.    The conduct of JOHN DOE OFFICERS 49 and 50 in stopping, frisking and searching Plaintiff DARION BEENE in February 2015 was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

626.    As a direct and proximate result of such acts, JOHN DOE OFFICERS 49 and 50 deprived BEENE of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

627.    As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

628. The acts of JOHN DOE OFFICERS 49 and 50 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

**COUNT 31 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest**
**(Individual Claims of Deandre Stewart against John Doe Officers 51 and 52)**

629. Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

630. The conduct of JOHN DOE OFFICERS 51 and 52 in stopping, frisking and searching Plaintiff DEANDRE STEWART in December 2014 was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

631. As a direct and proximate result of such acts, JOHN DOE OFFICERS 51 and 52 deprived STEWART of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

632. As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

633. The acts of JOHN DOE OFFICERS 51 and 52 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

**COUNT 32 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest**
**(Individual Claims of Lavester McWane against John Doe Officers 53 and 54)**

634. Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

635. The conduct of JOHN DOE OFFICERS 53 and 54 in stopping, frisking and searching Plaintiff LAVESTER McWANE in the winter of 2014 was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required

grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

636.     As a direct and proximate result of such acts, JOHN DOE OFFICERS 53 and 54 deprived McWANE of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

637.     As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

638.     The acts of JOHN DOE OFFICERS 53 and 54 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

**COUNT 33 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest**
**(Individual Claims of Steve McAbee against John Doe Officers 55 and 56)**

639.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

640.     The conduct of JOHN DOE OFFICERS 55 and 56 in stopping, frisking and searching Plaintiff STEVEN McABEE on May 1, 2015 was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

641.     As a direct and proximate result of such acts, JOHN DOE OFFICERS 55 and 56 deprived McABEE of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

642.     As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

93

643.     The acts of JOHN DOE OFFICERS 55 and 56 were intentional, wanton,

malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 34 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
### (Individual Claims of Steve McAbee against John Doe Officers 109 and 110)

644.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

645.     The conduct of JOHN DOE OFFICERS 109 and 110 in stopping, frisking and

searching Plaintiff STEVEN McABEE on in the spring of 2015 was performed under color of

law and without any reasonable suspicion of criminality or other constitutionally required

grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin

profiling.

646.     As a direct and proximate result of such acts, JOHN DOE OFFICERS 109 and

110 deprived McABEE of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C.

§ 1983.

647.     As a direct and proximate result of those constitutional abuses, Plaintiff has

suffered and will continue to suffer physical, mental and emotional pain and suffering, mental

anguish, embarrassment and humiliation.

648.     The acts of JOHN DOE OFFICERS 109 and 110 were intentional, wanton,

malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 35 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
### (Individual Claims of Jonathan Jackson against John Doe Officers 57 and 58)

649.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

650.     The conduct of JOHN DOE OFFICERS 57 and 58 in stopping, frisking and

searching Plaintiff JONATHAN JACKSON on in March of 2015 was performed under color of

law and without any reasonable suspicion of criminality or other constitutionally required

grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

651.    As a direct and proximate result of such acts, JOHN DOE OFFICERS 57 and 58 deprived JACKSON of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

652.    As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

653.    The acts of JOHN DOE OFFICERS 57 and 58 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 36 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
**(Individual Claims of Arthur Stringer against John Doe Officers 59 and 60)**

654.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

655.    The conduct of JOHN DOE OFFICERS 59 and 60 in stopping, frisking and searching Plaintiff ARTHUR STRINGER in January or February of 2015 was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

656.    As a direct and proximate result of such acts, JOHN DOE OFFICERS 59 and 60 deprived STRINGER of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

657.    As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

658.     The acts of JOHN DOE OFFICERS 59 and 60 were intentional, wanton,

malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 37 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
**(Individual Claims of Darion Beene, Lavester McWane, and Deandre Stewart against Commander Glenn Evans and John Doe Officers 61 through 90)**

659.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

660.     The conduct of Commander GLENN EVANS and JOHN DOE OFFICERS 61

through 90 in stopping, frisking and searching Plaintiffs DARION BEENE, LAVESTER

McWANE, and DEANDRE STEWART on May 28, 2014 was performed under color of law and

without any reasonable suspicion of criminality or other constitutionally required grounds.

Moreover, this stop and frisk was performed on the basis of racial and/or national origin

profiling.

661.     As a direct and proximate result of such acts, Commander GLENN EVANS and

JOHN DOE OFFICERS 61 through 90 deprived BEENE, McWANE, and STEWART of their

Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

662.     As a direct and proximate result of those constitutional abuses, Plaintiff has

suffered and will continue to suffer physical, mental and emotional pain and suffering, mental

anguish, embarrassment and humiliation.

663.     The acts of Commander GLENN EVANS and JOHN DOE OFFICERS 61

through 90 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff

to an award of punitive damages.

### COUNT 38 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
**(Individual Claims of Shantay Johnson against John Doe Officers 89 and 90)**

664.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

665.     The conduct of JOHN DOE OFFICERS 89 and 90 in stopping, frisking and

searching Plaintiff SHANTAY JOHNSON was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

666.    As a direct and proximate result of such acts, JOHN DOE OFFICERS 89 and 90 deprived SHANTAY of her Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

667.    As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

668.    The acts of JOHN DOE OFFICERS 89 and 90 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 39 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
**(Individual Claims of Arthur Moton against John Doe Officer 91)**

669.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

670.    The conduct of JOHN DOE OFFICER 91 in stopping, frisking and searching Plaintiff ARTHUR MOTON in May or June of 2014 was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

671.    As a direct and proximate result of such acts, JOHN DOE OFFICER 91 deprived MOTON of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

672.    As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

673.    The acts of JOHN DOE OFFICER 91 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

**COUNT 40 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest**
**(Individual Claims of Dudley Burns against John Doe Officers 92 and 93)**

674.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

675.    The conduct of JOHN DOE OFFICERS 92 and 93 in stopping, frisking and searching Plaintiff DUDLEY BURNS in March of 2015 was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

676.    As a direct and proximate result of such acts, JOHN DOE OFFICERS 92 and 93 deprived BURNS of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

677.    As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

678.    The acts of JOHN DOE OFFICERS 92 and 93 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

**COUNT 41 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest**
**(Individual Claims of Edgar Marshall, Jr. against John Doe Officer 94)**

679.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

680.    The conduct of JOHN DOE OFFICER 94 in stopping, frisking and searching Plaintiff EDGAR MARSHALL, JR. in September 2, 2014 was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds.

Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

681.    As a direct and proximate result of such acts, JOHN DOE OFFICER 94 deprived MARSHALL of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

682.    As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

683.    The acts of JOHN DOE OFFICER 94 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 42 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
### (Individual Claims of Michael Sanders against John Doe Officers 95 and 96)

684.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

685.    The conduct of JOHN DOE OFFICERS 95 and 96 in stopping, frisking and searching Plaintiff MICHAEL SANDERS in June 2014 was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

686.    As a direct and proximate result of such acts, JOHN DOE OFFICERS 95 and 96 deprived SANDERS of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

687.    As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

688.    The acts of JOHN DOE OFFICERS 95 and 96 were intentional, wanton,

malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

**COUNT 43 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest**
**(Individual Claims of Michael Sanders against John Doe Officers 97 and 98)**

689.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

690.    The conduct of JOHN DOE OFFICERS 97 and 98 in stopping, frisking and searching Plaintiff MICHAEL SANDERS in June 2014 was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

691.    As a direct and proximate result of such acts, JOHN DOE OFFICERS 97 and 98 deprived SANDERS of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

692.    As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

693.    The acts of JOHN DOE OFFICERS 97 and 98 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

**COUNT 44 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest**
**(Individual Claims of Rashawn Lindsey against John Doe Officers 99 and 100)**

694.    Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

695.    The conduct of JOHN DOE OFFICERS 99 and 100 in stopping, frisking and searching Plaintiff RASHAWN LINDSEY on April 18, 2015 was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin

profiling.

696.     As a direct and proximate result of such acts, JOHN DOE OFFICERS 99 and 100

deprived LINDSEY of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. §

1983.

697.     As a direct and proximate result of those constitutional abuses, Plaintiff has

suffered and will continue to suffer physical, mental and emotional pain and suffering, mental

anguish, embarrassment and humiliation.

698.     The acts of JOHN DOE OFFICERS 99 and 100 were intentional, wanton,

malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 45 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
**(Individual Claims of Sidney Bell against John Doe Officers 101, 102, 103, 104, 105, and 106)**

699.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

700.     The conduct of JOHN DOE OFFICERS 101, 102, 103, 104, 105, and 106 in

stopping, frisking and searching Plaintiff SIDNEY BELL in March 2015 was performed under

color of law and without any reasonable suspicion of criminality or other constitutionally

required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or

national origin profiling.

701.     As a direct and proximate result of such acts, JOHN DOE OFFICERS 101, 102,

103, 104, 105, and 106 deprived BELL of his Fourth and Fourteenth Amendment rights in

violation of 42 U.S.C. § 1983.

702.     As a direct and proximate result of those constitutional abuses, Plaintiff has

suffered and will continue to suffer physical, mental and emotional pain and suffering, mental

anguish, embarrassment and humiliation.

703.     The acts of JOHN DOE OFFICERS 101, 102, 103, 104, 105, and 106 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 46 – 42 U.S.C. §1983—Unreasonable Search and Seizure/False Arrest
### (Individual Claims of Calvin Jackson against John Doe Officers 107 and 108)

704.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

705.     The conduct of JOHN DOE OFFICERS 107 and 108 in stopping, frisking and searching Plaintiff CALVIN JACKSON in June 2013 was performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

706.     As a direct and proximate result of such acts, JOHN DOE OFFICERS 107 and 108 deprived JACKSON of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

707.     As a direct and proximate result of those constitutional abuses, Plaintiff has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

708.     The acts of JOHN DOE OFFICERS 107 and 108 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff to an award of punitive damages.

### COUNT 47 – Violation of Rights Under Illinois Law

709.     Plaintiffs repeat and re-allege all paragraphs above as if fully set forth herein.

710.     By the actions described above, each and every Defendant, jointly and severally, has committed the following wrongful acts against the named Plaintiffs and other class members, which are tortious under the Constitution and laws of the State of Illinois:

102

    a.  assault and battery;

    b.  trespass;

    c.  violation of the right to privacy;

    d.  negligence; and

    e.  violation of rights otherwise guaranteed under the Constitution and the laws of the State of Illinois.

711.    In addition, by the actions described above, JOHN DOE OFFICERS 1 through 110, jointly and severally, have committed the following wrongful acts against Plaintiffs DARNELL SMITH (October 2014 incident), GREGORY DAVIS (July 2014 and October 2014 incidents), JEFF COLEMAN (August 2014 incident), and MARQUE ROSS (April 2015 incident), which are tortious under the Constitution and laws of the State of Illinois:

    f.  false arrest; and

    g.  false imprisonment.

712.    In addition, Defendants City and Superintendent MCCARTHY were negligent in their hiring, screening, training, supervision and retention of JOHN DOE OFFICERS 1 through 110.

713.    The foregoing acts and conduct of Defendants were a direct and proximate cause of injury and damage to the named Plaintiffs and other class members and violated the statutory and common law rights as guaranteed to them by the Constitution and laws of the State of Illinois.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the named Plaintiffs and other members of the class they seek to represent pray that the Court will:

(a) Issue an order certifying this action as a class action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure in the manner described above herein, with the named Plaintiffs as class representatives;

(b) Issue a class-wide judgment declaring that the CPD's policy, practice and/or custom of suspicionless stops and frisks challenged herein is unconstitutional in that it violates the Fourth and Fourteenth Amendments to the United States Constitution, Title VI, and the Constitution and laws of the State of Illinois, and that its implementation, enforcement and sanctioning by CPD officers is a direct and proximate result of the following policies, practices and/or customs of the City and Superintendent MCCARTHY:

    i.    failing to adequately screen, train and supervise officers;

    ii.    failing to adequately monitor the CPD and its officers and

    iii.    discipline those CPD officers who violate the constitutional rights of residents of the communities they patrol; and encouraging, sanctioning, and failing to rectify the CPD's unconstitutional stops and frisks.

(c) Issue an order for the following injunctive relief:

    i.    enjoining the CPD from continuing its policy, practice and/or custom of suspicionless stops and frisks;

    ii.    enjoining the CPD from continuing its policy, practice and/or custom of conducting stops and frisks based on racial and/or national origin profiling;

    iii.    enjoining the use of formal or informal productivity standards or other de facto quotas for arrests and/or stops and frisks by CPD officers;

    iv.    requiring the City, Superintendent McCARTHY and other City policymakers to institute and implement improved policies and programs with respect to training, discipline, and promotion designed to eliminate the CPD's policy, practice and/or custom of suspicionless stops and frisks;

    v.    requiring the City, Superintendent McCARTHY and other City policymakers to deploy CPD officers with appropriate and adequate supervision;

    vi.    requiring the City, Superintendent McCARTHY and other City policymakers to institute and implement appropriate measures to ensure compliance with departmental directives that CPD officers complete contact cards on each and every stop and frisk they conduct;

    vii.    requiring the City, Superintendent McCARTHY and other City policymakers to institute and implement appropriate measures to mandate that contact cards or other documentation be prepared and maintained in an up to date computerized

database for each stop conducted by an officer, regardless of whether the stop is followed by the use of force, a frisk, a search, or an arrest; and

    viii.    requiring the City, Superintendent McCARTHY and other City policymakers to monitor stop and frisk practices of the CPD, including periodically and regularly reviewing contact card forms and audits conducted of the CPD's stop and frisk practices to determine whether reported stops and frisks have comported with constitutional requirements.

(d) Award named Plaintiffs compensatory damages in amounts that are fair, just and reasonable, to be determined at trial;

(e) Award named Plaintiffs damages against Defendants Superintendent McCARTHY and John Doe Officers 1 through 14 to the extent that their liability is based upon reprehensible actions and/or inaction undertaken in their individual capacities, in an amount which is fair, just and reasonably designed to punish and deter said reprehensible conduct, to be determined at trial;

(f) Award all Plaintiffs, including the members of the class, reasonable attorneys' fees pursuant to 42 U.S. C.§ 1988;

(g) Award all Plaintiffs, including the members of the class, costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988; and

(h) Award such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

Respectfully Submitted,
ROMANUCCI & BLANDIN, LLC


_____/s Antonio M. Romanucci_____
Attorney for Plaintiff


Antonio M. Romanucci
Martin D. Gould
**ROMANUCCI & BLANDIN, LLC**
321 North Clark Street, Suite 900
Chicago, Illinois 60654
(312) 458-1000
(312) 458-1004 *facsimile*
Firm No. 35875

Robert S. Peck
**CENTER FOR CONSTITUTIONAL LITIGATION, PC**
777 6th Street NW, Suite 520
Washington, D.C. 20001
Ph: (202) 944-2874
Fax: (202) 965-0920
robert.peck@cclfirm.com

Rodney G. Gregory
**THE GREGORY LAW FIRM**
3127 Atlantic Blvd., Suite 3
Jacksonville, Florida 32207
Ph: (904) 398-0012
Fax: (904) 398-5131

***Attorneys for Plaintiffs and the Class***