**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DARNELL SMITH, et al.,

                        Plaintiffs,

            v.

CITY OF CHICAGO, a municipal
corporation, et al.,

                    Defendants.

Case No. 15 C 3467

Judge Amy J. St. Eve

**CITY OF CHICAGO'S
<u>MOTION TO DISMISS THE AMENDED COMPLAINT AT LAW</u>**

Allan T. Slagel (ARDC No. 6198470)
Michael P. Sheehan (ARDC No. 6238081)
Gabriel Reilly-Bates (ARDC No. 6280979)
Jeffrey Schieber (ARDC No. 6300779)
TAFT STETTINIUS AND HOLLISTER LLP
111 East Wacker Drive
Suite 2800
Chicago, Illinois 60601
Telephone:    (312) 527-4000
Facsimile:    (312) 527-4011
Email:    aslagel@taftlaw.com
           msheehan@taftlaw.com
           gbates@taftlaw.com
           jschieber@taftlaw.com

### TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ........................................................................................................ 1

LEGAL STANDARD ................................................................................................... 3

ARGUMENT ................................................................................................................ 3

I.      Plaintiffs Lack Standing To Seek Equitable Relief. ........................................... 3

      A.      The Prior Stops And Frisks Do Not Confer Standing .............................. 4

      B.      Allegations Regarding The City's "Policy, Practice and/or Custom,"
             Standing Alone, Do Not Confer Standing. .............................................. 5

      C.      Plaintiffs' Allegations That They Will Be Improperly Stopped And
             Frisked In The Future Are Speculative And Attenuated. ........................ 5

      D.      Two Plaintiffs Lack Capacity To Sue Because They Are Minors. .......... 8

II.     Plaintiffs Fail To State Claims For Violation Of Federal Law Under The *Monell*
      Doctrine ................................................................................................................ 8

      A.      Plaintiffs Do Not Identify An Express Policy That Violates The Fourth Or
             Fourteenth Amendments. ......................................................................... 9

             1.      General Order G02-04 ("Prohibition Regarding Racial Profiling
                   and Other Bias Based Policing") ............................................... 9

             2.      Special Order S04-13-09 ("Contact Information System") .................... 10

             3.      General Order G04-03 ("Interrogations: Field and Custodial") .............. 10

      B.      Plaintiffs Have Not Pled Facts Suggesting That CPD Had A Widespread
             Practice Or Custom That Caused Their Injuries. ................................... 11

             1.      Plaintiffs Do Not Allege Facts Suggesting That City Policymakers
                   Had Actual Or Constructive Knowledge Of A Widespread Practice
                   Of Unconstitutional Stops And Frisks. ..................................... 11

                 (a)      Plaintiffs' Alleged Stops Did Not Create Awareness. .................. 11

                 (b)      The ACLU's January 2013 Memorandum Does Not
                        Demonstrate Awareness .............................................. 12

                 (c)      The March 2015 ACLU Report Does Not Demonstrate
                        Awareness. ................................................................. 13

(d)     Previous Lawsuits Do Not Create Awareness. .............................. 14

2.     Plaintiffs Do Not Allege Sufficient Facts To Establish That The City Was Deliberately Indifferent To Any Allegedly Unconstitutional Practice Of Stops And Frisks. ..................................... 15

(a)     The Recently Issued Orders Demonstrate That The City Has Been Proactive Rather Than Deliberately Indifferent. .......... 16

(b)     Plaintiffs Have Not Pled Facts Suggesting That The City Was Deliberately Indifferent In Its Training, Supervision, Or Discipline Of Police Officers.................................................... 16

(c)     Plaintiffs' Allegations That Supervisors Intended Unconstitutional Stops And Frisks To Occur Do Not Suggest Deliberate Indifference On The Part Of The City........... 18

(d)     The Other CPD Programs And De Facto Practices Identified By Plaintiffs Are Irrelevant To Their Claims............... 19

III.    Plaintiffs Fail To State A Claim For Violation Of The Equal Protection Clause............ 20

A.     The Amended Complaint Does Not Allege Discriminatory Effect. .................... 21

B.     The Amended Complaint Does Not Allege Discriminatory Purpose. .................. 22

IV.    Title VI Of The Civil Rights Act Does Not Apply To The City. .................................... 25

V.     The State-Law And Negligent Hiring And Supervision Claims Should Be Dismissed. ............................................................................................................................ 25

A.     Plaintiffs Fail To State Claims Against The City Under State Law. ................... 26

B.     Even If Plaintiffs Adequately Alleged The State-Law Claims, The Illinois Local Governmental And Governmental Employees Tort Immunity Act Bars The City's Liability. ...................................................................................... 27

1.     The Act Bars The City's Liability For Claims Based On The Execution Or Enforcement Of Laws........................................................ 27

2.     Many Of The Individual Plaintiffs' Claims Are Barred By The Act's One-Year Statute Of Limitations. ................................................. 28

C.     The Act Bars The City's Liability For Claims Based On Allegedly Negligent Hiring And Supervision. ...................................................................... 28

CONCLUSION................................................................................................................................. 29

ii

## TABLE OF AUTHORITIES

**Cases**

*Alexander v. Sandoval*,
    532 U.S. 275 (2001) ....................................................................................... 25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................. passim

*Auriemma v. Rice*,
    957 F.2d 397 (7th Cir. 1999) ......................................................................... 2

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*,
    520 U.S. 397 (1997) ....................................................................................... 15

*Bell Atlantic v. Twombly*,
    550 U.S. 544 (2007) ....................................................................... 3, 17, 23, 24

*Boston v. City of Chicago*, No. 86-C-5534,
    1998 WL 31532, at *8 (N.D. Ill. Mar. 28, 1988) ......................................... 5

*Brooks v. Ross*,
    578 F.3d 574 (7th Cir. 2009) ................................................................... 3, 27

*Brownmark Films, LLC v. Comedy Partners*,
    682 F.3d 687 (7th Cir. 2012) ......................................................................... 9

*Chavez v. Ill. State Police*,
    251 F.3d 612 (7th Cir. 2001) ....................................................... 20, 21, 22, 24

*Chriswell v. Village of Oak Lawn*, No. 11 C 00547,
    2013 WL 5903417 (N.D. Ill. Nov. 4, 2013) ......................................... 21, 22

*City of Canton v. Harris*,
    489 U.S. 378 (1989) ....................................................................................... 16

*City of Chicago v. Morales*,
    527 U.S. 41 (1999) ......................................................................................... 14

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ................................................................................. 4, 5, 6, 7

*Colwell Sys., Inc. v. Henson*,
    452 N.E.2d 889 (Ill. App. Ct. 1983) ........................................................... 26

*Connick v. Thompson*,
    131 S. Ct. 1350 (2011) ................................................................................... 16

*Czajowski v. City of Chicago,*
  810 F. Supp. 1428 (N.D. Ill. 1992) ........................................................ 17

*Davis v. City of Chicago,*
  219 F.R.D. 593 (N.D. Ill. 2004) ...................................................... 14, 15

*Dertz v. City of Chicago,* No. 94 C 542,
  1997 WL 85169, at *19 (N.D. Ill. Feb. 24, 1997) ........................... 14

*Doe v. Montessori School of Lake Forest,*
  678 N.E.2d 1082 (Ill. App. Ct. 1997) .................................................. 8

*Edwards v. Two Unknown Male Chicago Police Officers,*
  623 F. Supp. 2d 940 (N.D. Ill. 2009) .................................................. 16

*Ellis v. State of Illinois*, No. 91 C 8391
  1992 WL 332293 (N.D. Ill. Nov. 6, 1992) ......................................... 26

*Estate of Moreland v. Dieter,*
  395 F.3d 747 (7th Cir. 2005) .............................................................. 11

*Facebook, Inc. v. Teachbook.com LLC*
  819 F. Supp. 2d 764 (N.D. Ill. 2011) .................................................. 15

*Frake v. City of Chicago,*
  210 F.3d 779 (7th Cir. 2000) ................................................................ 9

*Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC) Inc.*,
  528 U.S. 167 (2000) .............................................................................. 4

*Gable v. City of Chicago,*
  296 F.3d 531 (7th Cir. 2002) ...................................................... passim

*Gen. Elec. Cap. Corp. v. Lease Resolution Corp.*,
  128 F.3d 1074 (7th Cir. 1997) ............................................................ 15

*Gernetzke v. Kenosha Unified School Dist. No. 1,*
  274 F.3d 464 (7th Cir. 2001) .............................................................. 18

*Goerlich v. Davis*, No. 91 C 1743,
  1991 WL 195772 (N.D. Ill. Sept. 25, 1991) ...................................... 26

*Hall v. City of Chicago,*
  2012 WL 6727511 (N.D. Ill. Dec. 28, 2012) ..................................... 10

*Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7,*
  570 F.3d 811 (7th Cir. 2009) ................................................................ 3

*Hanno v. Sheahan,*
  No. 01 C 4677, 2004 WL 2967442, at *13 (N.D. Ill. Nov. 29, 2004) ............................. 17

iv

*Hodges v. Pub. Bldg. Comm'n of Chicago*,
    864 F. Supp. 1493 (N.D. Ill. 1994) ............................................................................... 25

*Johnson v. Mers*,
    664 N.E.2d 668 (Ill. App. Ct. 1996) ............................................................................ 29

*Jones v. City of Chicago*,
    856 F.2d 985 (7th Cir. 1988) ........................................................................................ 17

*Jones v. Village of Villa Park*,
    784 F. Supp. 533 (N.D. Ill. 1992) ............................................................................... 27

*Klak v. Skellion*,
    741 N.E.2d 288 (Ill. App. Ct. 2000) ............................................................................. 8

*Latuszkin v. City of Chicago*
    250 F.3d 502 (7th Cir. 2001) ........................................................................................ 11

*Limes–Miller v. City of Chicago*,
    773 F. Supp. 1130 (N.D. Ill. 1991) ............................................................................. 14

*Logan v. City of Chicago*
    891 F. Supp. 2d 897 (N.D. Ill. 2012) .......................................................................... 22

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)......................................................................................................... 4

*Mayes v. City of Hammond*,
    442 F. Supp. 2d 587 (N.D. Ind. 2006) ........................................................................ 16

*McCauley v. City of Chicago*,
    671 F.3d 611 (7th Cir. 2011) ................................................................................ 19, 25

*McCormick v. City of Chicago*,
    230 F.3d 319 (7th Cir. 2000) .......................................................................................... 8

*McKleskey v. Kemp*,
    481 U.S. 279 (1987)...................................................................................................... 22

*Michael Nelson v. City of Chicago*,
    83-C-1168 (N.D. Ill.) .................................................................................................... 14

*Monell v. Department of Social Services of City of New York*,
    436 U.S. 658 (1978)............................................................................................... passim

*Montano v. City of Chicago*,
    535 F.3d 558 (7th Cir. 2008) ......................................................................................... 9

*Otero v. Dart*, No. 12 C 3148,
    2012 WL 5077727 (N.D. Ill. Oct. 18, 2012)............................................................ 6, 7

*Personnel Admin. of Mass. v. Feeney,*
    442 U.S. 256 (1979) ........................................................................... 23

*Phelan v. Cook Cnty.,*
    463 F.3d 773 (7th Cir. 2006) ............................................................ 11

*Portis v. City of Chicago,*
    347 F. Supp. 2d 573 (N.D. Ill. 2004) ............................................ 6, 7

*Quade v. Kaplan*
    No. 06 C 1505,
    2008 WL 905187, at *16 (N.D. Ill. Mar. 31, 2008)........................ 17

*Ramos v. City of Chicago,*
    707 F.Supp. 345 (N.D. Ill. 1989) ................................................... 12

*Reed v. City of Chicago*, No. 01 C 7865,
    2002 WL 406983 (N.D. Ill. Mar. 14, 2002)................................... 29

*Robinson v. City of Chicago,*
    868 F.2d 959 (7th Cir. 1989) ................................................. 4, 5, 6, 7

*Simack v. City of Chicago*, No. 02 C 3139,
    2003 WL 924335 (N.D. Ill. Mar. 6, 2003)................................... 6, 7

*Strauss v. City of Chicago,*
    760 F.2d 765 (7th Cir. 1985) .................................................. 14, 15, 16

*Suber v. City of Chicago*, No. 10 C 2876
    2011 WL 1706156 (N.D. Ill. May 5, 2011) .................................... 1

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009)............................................................................ 3

*United States v. Wooden,*
    551 F.3d 647 (7th Cir. 2008) ............................................................ 13

*Vodak v. City of Chicago,*
    639 F.3d 738 (7th Cir. 2011) ...................................................... 18, 19

*Wade v. City of Chicago,*
    847 N.E.2d 631 (Ill. App. Ct. 2006) .............................................. 27

*Woods v. Cole,*
    693 N.E.2d 333 (Ill. 1998) ............................................................... 26

**Statutes**

42 U.S.C. § 2000(d) ............................................................................................ 25

745 ILCS 10/1-101 ...................................................................................... 27, 28

745 ILCS 10/2-109 ............................................................................................ 27

745 ILCS 10/2-201 ............................................................................................ 28

745 ILCS 10/2-202 ............................................................................................ 27

755 Ill. Comp. Stat. § 5/11-1 ............................................................................... 8

**Rules**

Fed. R. Civ. P. 17(b)(1) ........................................................................................ 8

**INTRODUCTION**

This action began on April 20, 2015, when six plaintiffs filed a class action lawsuit on behalf of themselves and all other similarly situated individuals (the "Plaintiff Class") against the City of Chicago, Chicago Police Department Superintendent Garry McCarthy, and fourteen John Doe police officers. The plaintiffs alleged that on seven separate occasions, unknown Chicago Police Department ("CPD") officers stopped or stopped and frisked the plaintiffs without reasonable articulable suspicion. The plaintiffs claimed that these incidents resulted from a City policy, practice, and/or custom of unconstitutional stops and frisks in violation of various federal and state laws.

The plaintiffs attempted to state a claim pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), asserting that the City and Superintendent McCarthy (collectively and for the purposes of this Motion, the "City") "have implemented and are continuing to enforce, encourage and sanction a policy, practice and/or custom of unconstitutional stops and frisks" that violates the Fourth Amendment. In addition, the plaintiffs asserted that pursuant to that policy, practice, or custom, CPD officers often base stops and frisks on race and/or national origin, and not reasonable suspicion, in violation of the Equal Protection Clause. The plaintiffs also brought a claim against the City for violation of Title VI of the Civil Rights Act of 1964. In addition to these federal claims, the plaintiffs asserted against the City claims for violation of various Illinois laws.

On May 29, 2015, the City moved to dismiss the Complaint, identifying multiple deficiencies.[1] The parties appeared before the Court for a status hearing on June 1, 2015.

---

[1] Superintendent McCarthy contemporaneously filed a motion to dismiss the claims alleged against him in his individual capacity and is doing so again. To the extent Plaintiffs allege claims against Superintendent McCarthy in his official capacity, such claims are claims against the City and those claims are addressed by this motion. *See Suber v. City of Chicago*, No. 10 C 2876, 2011 WL 1706156, at *2 (N.D. Ill. May 5, 2011) ("official capacity allegations" against CPD superintendent "are redundant" when City is also a defendant). For purposes of this motion, the City accepts as true, without conceding for any other purpose, that Superintendent

Counsel for the plaintiffs there informed the Court that the plaintiffs wished to file an amended complaint, ostensibly to address the shortcomings identified in the City's motion to dismiss. The Court granted the plaintiffs leave to do so, and on June 22, 2015, the plaintiffs filed an amended complaint (the "Amended Complaint" or "Am. Compl.") [D.E. 22].

The Amended Complaint names an additional 29 persons as plaintiffs, bringing the total number of plaintiffs (the "Plaintiffs") to 35. Plaintiffs now seek relief against the City, Superintendent McCarthy, 110 John Doe CPD officers (the original Complaint named fourteen officers), and CPD Commander Glenn Evans (named for the first time in the Amended Complaint). The inclusion of the additional 29 plaintiffs' allegations regarding their encounters with CPD officers causes the Amended Complaint to span 713 paragraphs of allegations (the original Complaint was 186 paragraphs). Despite the additional volume of allegations and the inclusion of new parties, Plaintiffs' substantive allegations against the City (which, as in the original Complaint, are pled in five counts) remain the same. Accordingly, the Amended Complaint suffers from the same flaws identified in the City's motion to dismiss the original Complaint and must be dismissed.

*First*, Plaintiffs lack standing to bring claims for equitable relief because they face no concrete and imminent threat of future injury. Further, two plaintiffs lack legal capacity to sue because they are minors. *Second*, Plaintiffs' claims for violation of federal law against the City, which are based on *Monell*, fail because Plaintiffs have not (a) identified an express policy that caused their injuries, (b) pled facts suggesting that City policymakers were aware of a widespread practice or custom that caused their injuries, or (c) pled facts suggesting that City policymakers were deliberately indifferent to such a widespread practice or custom. *Third*, Plaintiffs' equal protection claim fails for the additional reason that they have not pled facts

McCarthy is a final policymaker for the City. *See e.g.*, *Auriemma v. Rice*, 957 F.2d 397, 399 (7th Cir. 1999).

2

suggesting that the City's actions had a discriminatory effect or that the City acted with discriminatory intent. *Fourth*, Plaintiffs' Title VI claim fails because the City is a municipality, and thus not a federally funded "program or activity," and accordingly cannot be liable under Title VI. *Finally*, Plaintiffs' state-law claims fail because (a) Plaintiffs fail to state cognizable claims, and (b) the City is immune from liability for such claims under the Illinois Governmental and Governmental Employees Tort Immunity Act.

## LEGAL STANDARD

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). "[L]egal conclusions[, or t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" should be disregarded. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). Instead, the Court must determine whether the Amended Complaint's "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ARGUMENT

### I.      Plaintiffs Lack Standing To Seek Equitable Relief.

A plaintiff seeking equitable relief has standing if he or she is "under threat of suffering 'injury in fact' that is concrete and particularized." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). "[T]he threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Id.* Plaintiffs here do not—and cannot—meet this "irreducible constitutional minimum" for their equitable relief claims. *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Accordingly, Plaintiffs' requests for (i) class certification pursuant to Rule 23(b)(2), (ii) a declaratory judgment, and (iii) an order of injunctive relief should be dismissed with prejudice.[2]  *See Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC) Inc.*, 528 U.S. 167, 185 (2000) (plaintiffs must have standing for each form of relief sought).

### A.    The Prior Stops And Frisks Do Not Confer Standing.

Plaintiffs claim that they were improperly stopped and frisked in the past.  *See* Am. Compl. [D.E. 22] at ¶¶ 62-433.  But "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (internal quotations and citation omitted).  In *Lyons*, as here, the plaintiff sought an injunction barring certain police conduct (the use of chokeholds).  *See id.* at 99-100.  That the *Lyons* plaintiff "may have been illegally choked by the police" in the past "[did] nothing to establish a real and immediate threat that he would again be stopped . . . [and] illegally choke[d]" in the future.  *Id.* at 105.  Instead, "standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of chokeholds by police officers."  *Id. See also Robinson v. City of Chicago*, 868 F.2d 959, 966 (7th Cir. 1989) (plaintiff lacked standing to challenge policy of detaining misdemeanor arrestees pending search of fingerprint database because "even if the police were to detain others for investigation . . . the possibility that [plaintiff] would suffer any injury as a result of that practice is too speculative").[3]  As explained below, Plaintiffs do not and cannot show that they are likely to suffer future injury as a result of improper stops and frisks.

---

[2] Should the Court disagree, the City reserves its right to raise further arguments against class certification at the appropriate time.

[3] The same standard applies to requests for declaratory relief.  *See Robinson*, 868 at 966 n.5.

**B.    Allegations Regarding The City's "Policy, Practice and/or Custom," Standing Alone, Do Not Confer Standing.**

Much like the plaintiffs in *Lyons* and *Robinson*, Plaintiffs allege that the City has implemented, enforced, and sanctioned a "policy, practice and/or custom" that results in constitutional violations. *Compare* Am. Compl. at ¶ 2 *with Lyons*, 461 U.S. at 105-06 (noting "[t]he additional allegation . . . that the police . . . routinely apply chokeholds" and the allegation that "the City authorized the use" of the chokeholds) *and Robinson*, 868 F.2d at 966 (noting allegation "that the City had a written policy authorizing" conduct in question). But "the fact that [Plaintiffs have] alleged the existence of an official municipal policy—which would imply that the violation is systemic, not isolated, in nature—is of no consequence: the existence of a municipal policy, in and of itself, is no indication that the named plaintiff[s] will be harmed by it." *Boston v. City of Chicago*, No. 86-C-5534, 1988 WL 31532, at *8 (N.D. Ill. Mar. 28, 1988). *See also Lyons*, 461 U.S. at 106 (allegation that "the City authorized the use" of chokeholds "did not indicate why Lyons might be realistically threatened by police officers who acted within the strictures of the City's policy"). Thus, the existence of an allegedly unconstitutional City policy—in and of itself—is insufficient to confer standing.

**C.    Plaintiffs' Allegations That They Will Be Improperly Stopped And Frisked In The Future Are Speculative And Attenuated.**

Perhaps recognizing that allegations about past conduct and the existence of a policy do not confer standing, Plaintiffs assert that they are likely to be subjected to improper stops and frisks in the future. *See* Am. Compl. at ¶ 57 (Plaintiffs "have been and likely will be again victims of the CPD's policy, practice and/or custom"); ¶ 59 (Plaintiffs "are, and will remain, at high risk of being illegally stopped and frisked again"); ¶ 479 (Plaintiffs "fear being stopped and frisked under the current policy" and "seek to stop the CPD's current practice in order to relieve themselves of this constant apprehension"); ¶ 489 (same). Such allegations—about "risk" and "fear" of future violations—are too speculative and attenuated to confer standing.

5

For example, in *Otero v. Dart*, No. 12 C 3148, 2012 WL 5077727 (N.D. Ill. Oct. 18, 2012), the plaintiff challenged the Cook County Sherriff's policy of holding acquitted defendants pending a warrant check. This Court explained that "[e]ven if Otero had alleged that he may personally be subjected to the Unlawful Detention Policy in the future[,] . . . such allegations would be highly speculative and too attenuated to establish standing. . . . Speculation about a possible chain of future events does not establish standing." *Id.* at *5 (compiling cases). Similarly, in *Simack v. City of Chicago*, No. 02 C 3139, 2003 WL 924335 (N.D. Ill. Mar. 6, 2003), the plaintiffs went so far as to claim that they "will continue to panhandle and that *they will be arrested* for some misdemeanor crime while doing so." *Id.* at *4 (emphasis added). Even so, they lacked standing to pursue injunctive relief regarding CPD bonding procedures because "[t]hese possibilities . . . are speculative rather than real or immediate." *Id. See also Portis v. City of Chicago*, 347 F. Supp. 2d 573, 576 (N.D. Ill. 2004) (plaintiffs lacked standing to seek equitable relief challenging alleged City practice of prolonged detentions following non-custodial ordinance violations because "[t]he argument that they would again fall victim to wrongful incarceration . . . for some misdemeanor in the future amounted to speculation").

Plaintiffs face the same insurmountable problem. To have standing, they must show that they are "in immediate danger of again being" improperly stopped and frisked. *Robinson*, 868 F.2d at 966. To do so, Plaintiffs need to allege "either (1) that *all* police officers in [Chicago] *always* [improperly stop and frisk] any citizen[4] with whom they happen to have an encounter. . . or (2) that the City ordered or authorized police officers to act in such manner." *Lyons*, 461 U.S. at 106 (emphasis original). Plaintiffs make neither "incredible assertion." *Id.*

---

[4] Though Plaintiffs allege that they are all either African-Americans or Hispanics, they seek certification of a class "consisting of all persons who have been or will be subjected by CPD officers to Defendants' policy, practice and/or custom of stopping or stopping and frisking persons in the absence of reasonable, articulable suspicion." Am. Compl. at ¶ 53.

In fact, the Amended Complaint suggests just the opposite. Plaintiffs do not identify a CPD policy that directs, orders, or even authorizes CPD officers to unconstitutionally stop and frisk African-Americans or Hispanics (or anyone else). To the contrary, the Amended Complaint alleges (albeit conclusorily) that the improper stops and frisks are the result of the City's neglect or, at most, tacit support. *See, e.g.*, Am. Compl. at ¶ 4 (alleging that City acted with "deliberate indifference" by failing to train, monitor, and discipline CPD officers and by "encouraging, sanctioning and failing to rectify the CPD's unconstitutional practices"). Without a mandatory policy to fall back on, Plaintiffs must allege that "*all* police officers in [Chicago] *always* [improperly stop and frisk] any citizen with whom they have an encounter." *Lyons*, 461 U.S. at 106 (emphasis original). They do not—and cannot—do so. Where substantial individualized discretion is involved—*e.g.*, the decision to apply chokeholds in *Lyons* and the decisions to arrest in *Robinson*, *Otero*, *Simack*, and *Portis*—the risk of being subjected to future illegal conduct dissipates. Accordingly, Plaintiffs do not allege that there is a "real and immediate danger that the alleged harm will occur" to them again, since they do not—and cannot—know whether hypothetical future officers would improperly stop and frisk them. *Lyons*, 461 U.S. at 102.

The City asserted this same argument in its motion to dismiss the original complaint. In their Amended Complaint (and as explained above), Plaintiffs have not alleged—because they cannot allege—that they are "in immediate danger of being stopped and frisked again." *Robinson*, 868 F.2d at 966. Instead, Plaintiffs attempt to substitute volume where substance is required: while the original complaint identified six plaintiffs and seven incidents, the Amended Complaint is brought by 35 Plaintiffs and identifies 52 incidents. Volume, however, does not cure the fundamental deficiencies in Plaintiffs' claims for equitable relief. *See Portis*, 347 F. Supp. 2d at 575 ("In class actions, if none of the named plaintiffs representing the class meets the

standing requirement, none of the plaintiffs may seek relief on behalf of himself or herself, or any other member of the class."). Plaintiffs' claims for equitable relief should be dismissed.

### D.     Two Plaintiffs Lack Capacity To Sue Because They Are Minors.

Capacity to sue is determined "by the law of the individual's domicile." Fed. R. Civ. P. 17(b)(1). Plaintiffs Fantanez (the only Hispanic plaintiff) and McAbee allege that they are domiciled in Illinois; Plaintiff Fantanez alleges that he is twelve years old while Plaintiff McAbee alleges that he is sixteen years old. *See* Am. Compl. at ¶¶ 23, 201 (Fantanez), 36, 323 (McAbee). Accordingly, Plaintiffs Fantanez and McAbee are minor plaintiffs under Illinois law. *See* 755 Ill. Comp. Stat. § 5/11-1 ("A minor is a person who has not attained the age of 18 years."). Plaintiffs Fantanez and McAbee therefore lack capacity to bring their claims because "a minor does not have the legal capacity to initiate, pursue or maintain legal action in her own name." *Klak v. Skellion*, 741 N.E.2d 288, 290 (Ill. App. Ct. 2000). *See also Doe v. Montessori School of Lake Forest*, 678 N.E.2d 1082, 1089 (Ill. App. Ct. 1997) ("When minor plaintiffs are injured, they cannot initiate the legal proceeding, but must appear by a guardian, guardian *ad litem*, or a next of friend."). Accordingly, the claims of Plaintiffs Fantanez and McAbee should be dismissed.

## II.    Plaintiffs Fail To State Claims For Violation Of Federal Law Under The *Monell* Doctrine.

In Counts 1, 2, and 4, Plaintiffs seek to hold the City liable for alleged misconduct undertaken pursuant to an official policy or practice. To state a *Monell* claim, Plaintiffs must allege that the City (1) has an express policy that, when enforced, causes a constitutional deprivation; (2) has a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage within the force of law and causes a constitutional deprivation; or (3) caused a constitutional injury through the actions of a person with final policymaking authority. *See McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). Plaintiffs' claims are premised on the first two grounds:

8

(1) an express policy and (2) unofficial but widespread practice. To hold the City liable under either of these theories, Plaintiffs must show not only a policy or practice but also the "requisite causation"—*i.e.*, that "the policy or custom was the 'moving force' behind the constitutional deprivation." *Montano v. City of Chicago*, 535 F.3d 558, 570 (7th Cir. 2008); *see also Monell*, 436 U.S. at 692 (city is liable only when its policy "causes" or "inflicts" the injury); *Frake v. City of Chicago*, 210 F.3d 779, 781 (7th Cir. 2000) (policy must "directly cause[]" the harm). For the reasons below, Plaintiffs do not allege facts sufficient to establish an unconstitutional express policy or unconstitutional widespread practice, much less a causal link between the policy or practice and the alleged violations of Plaintiffs' rights.

**A.      Plaintiffs Do Not Identify An Express Policy That Violates The Fourth Or Fourteenth Amendments.**

Plaintiffs parrot the *Monell* elements by claiming that City "policies, practices and/or customs" caused their injuries. *See*, *e.g.*, Am. Compl. at ¶¶ 6, 459. Plaintiffs identify or implicate three current CPD policies that they apparently believe are deficient, but they fail to allege facts suggesting that any of the policies are unconstitutional or that the policies caused a deprivation of their rights under the Fourth or Fourteenth Amendments.

**1.      General Order G02-04 ("Prohibition Regarding Racial Profiling and Other Bias Based Policing")**

Plaintiffs cite General Order G02-04 in Paragraph 461. A copy of G02-04 is attached as Exhibit A.[5] G02-04 prohibits "racial profiling" and "other bias based policing." G02-04 (Ex. A) at § II.A. It also requires that these anti-racial profiling policies be incorporated into the basic recruit training program and all in-service training regarding courtesy and demeanor. *See id.* at

---

[5] Attachment of General Order G02-04 and the other orders is proper and does not convert this motion into one for summary judgment. *See Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) ("It is well settled that in deciding a Rule 12(b)(6) motion, a court may consider documents attached to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to his claim.") (internal quotations and citation omitted).

§ V.A-B.  Plaintiffs concede that G02-04 is "a facially neutral policy."  Am. Compl. at ¶ 450.

G02-04 therefore cannot be an "express policy" that caused any violation of Plaintiffs' rights

under the Fourth and Fourteenth Amendments.

### 2.      Special Order S04-13-09 ("Contact Information System")

Plaintiffs also cite Special Order 04-13-09, which sets forth the procedures for

investigatory stops, including the completion of contact cards.  *See* Am. Compl. at ¶ 440 ("Under

current CPD policy, Chicago police officers are required to justify their stops on 'contact

cards.'").  A copy of S04-13-09 is attached as Exhibit B.  S04-13-09 provides: "A peace officer,

after having identified himself as a peace officer, may stop any person in a public place for a

reasonable period of time when the officer reasonably infers from the circumstances that the

person is committing, is about to commit or has committed an offense."  S04-13-09 (Ex. B) at §

II.  Further, S04-13-09—like G02-04—prohibits "racial profiling or other bias-based policing

when conducting Investigatory Stops."  *Id.* at § III.D.  S04-13-09 also requires officers to record

"all of the factors that support reasonable, articulable suspicion in order to temporarily detain an

individual."  *Id.* at § V(A)(2).  Judge Leinenweber has already found that S04-13-09 complies

with the Fourth Amendment.  *Hall v. City of Chicago*, 2012 WL 6727511, *8 (N.D. Ill. Dec. 28,

2012) (J. Leinenweber).  As S04-13-09 does not authorize or direct an officer to stop individuals

without reasonable suspicion, and expressly prohibits race-based stops, it cannot be an "express

policy" that caused Plaintiffs' alleged injuries.

### 3.      General Order G04-03 ("Interrogations: Field and Custodial")

Also at issue based on the allegations of the Amended Complaint is General Order G04-

03.  A copy of G04-03 is attached as Exhibit C.  G04-03 provides (1) guidelines for field

interrogations, including requiring "reasonable articulable suspicion" for investigatory stops, and

(2) instructions for conducting a "protective pat down when there is reasonable suspicion that the

person is armed and dangerous."  G04-03 (Ex. C) at §§ III-V.  As G04-03 does not authorize or

direct an officer to stop or frisk individuals without reasonable suspicion, or based on the individual's race, it cannot be an "express policy" that caused Plaintiffs' alleged injuries.

**B.      Plaintiffs Have Not Pled Facts Suggesting That CPD Had A Widespread Practice Or Custom That Caused Their Injuries.**

To establish a widespread practice or custom claim under *Monell*, Plaintiffs must allege "facts tending to show that the City was aware of the [allegedly unconstitutional] behavior of the officers, or that the activity was so persistent and widespread that the City should have known about the behavior." *Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001). Practices are widespread when they are "so pervasive that acquiescence on the part of the policymakers was apparent and amounted to a policy decision." *Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006). Additionally, Plaintiffs "must show that City policymakers were deliberately indifferent as to [the practices'] known or obvious consequences." *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002). To the extent Plaintiffs allege that the CPD officers had a widespread practice of engaging in unconstitutional stops and frisks, Plaintiffs have failed to allege sufficient facts showing that the City policymakers (a) knew or should have known of the practice, or (b) acted in a deliberately indifferent manner.

**1.      Plaintiffs Do Not Allege Facts Suggesting That City Policymakers Had Actual Or Constructive Knowledge Of A Widespread Practice Of Unconstitutional Stops And Frisks.**

**(a)      Plaintiffs' Alleged Stops Did Not Create Awareness.**

Plaintiffs identify 52 allegedly unconstitutional stops that occurred during a nearly two-year period. *See* Am. Compl. at ¶¶ 62-433. The mere fact that multiple incidents allegedly occurred is insufficient to suggest a widespread practice of unconstitutional stops and frisks. *See Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) ("But the number of pepper spray incidents [totaling 218 incidents over a three year period], without more, does not establish that pepper spray was being routinely misused or that the jail's . . . policy was being violated.").

11

To the contrary, equally important to the numerator is the denominator. *See Ramos v. City of Chicago*, 707 F. Supp. 345, 347 (N.D. Ill. 1989) ("alleging six incidents of police brutality over a ten year period in a city as large as Chicago with a police force in excess of 10,000 members is unremarkable, and in no way indicates a policy or custom"). Plaintiffs allege that, during a four month period in 2014, 182,048 African-Americans were stopped and frisked. *See* Am. Compl. at ¶ 444. Allegations that 52 out of hundreds of thousands of stops and frisks during a two-year period were unconstitutional are insufficient to establish "a persistent and widespread practice." *Gable*, 296 F.3d at 538 (allegation that three vehicle owners were wrongfully told that their vehicles were not in a lot to which over 181,000 vehicles were towed insufficient to establish a widespread practice). Moreover, Plaintiffs allege no facts suggesting that City policymakers knew or should have known about the 52 incidents. Accordingly, the incidents involving Plaintiffs cannot establish that City policymakers knew or should have known of a widespread practice of improper stops and frisks targeting African-Americans and Hispanics.

> **(b)** **The ACLU's January 2013 Memorandum Does Not Demonstrate Awareness.**

Plaintiffs allege that a January 2013 ACLU memorandum "about the importance of monitoring Chicago's stop and frisk policy" put City policymakers on notice about the allegedly unlawful stop-and-frisk practice. Am. Compl. at ¶ 456. But that memorandum did not assert that CPD officers had a widespread practice of unconstitutional stops and frisks or that CPD officers were targeting African-Americans or Hispanics in stops and frisks: rather, it recommended that CPD make changes to its policies for *recording information* concerning stops and frisks. Moreover, as Plaintiffs acknowledge, CPD responded affirmatively to the ACLU's request by amending S04-13-09 in April 2014 to enhance information collection. *See id.* at ¶ 473.

12

(c)     **The March 2015 ACLU Report Does Not Demonstrate Awareness.**

Next, relying on the ACLU's March 2015 Report, Plaintiffs assert that the "ACLU found that for half of the CPD's stops (based on the sample analyzed), the officer did not record legally sufficient reasons to establish reasonable suspicion." Am. Compl. at ¶ 442. Critically, Plaintiffs do not allege (and the ACLU did not find) that the officers involved in those stops actually lacked reasonable articulable suspicion—a necessary element of a Fourth Amendment violation. *See*, *e.g.*, *United States v. Wooden*, 551 F.3d 647, 648 (7th Cir. 2008) ("*Terry* and its successor hold that a stop supported by articulable suspicion is 'reasonable' under the fourth amendment."). Thus, at most, Plaintiffs have alleged facts tending to suggest improper recordkeeping, which does not violate the Fourth Amendment. *See Iqbal*, 556 U.S. at 681 (if allegations do "not plausibly establish" claims, particularly where there are "more likely explanations," complaint must be dismissed). Similarly, as discussed *infra* in Section III.A, though the ACLU Report (and by virtue of their reliance on it, Plaintiffs) states that African-Americans (and, to a lesser extent, Hispanics) were stopped at higher rates than individuals of other races, it does not state or even suggest that African-Americans or Hispanics were more likely to be *improperly* stopped.

In any event, the City received the March 2015 ACLU Report on April 14, 2015—after all but five of the incidents alleged in the Amended Complaint. *See* Am. Compl. at ¶¶ 261 (alleging that Plaintiff Thigpen was stopped and frisked on April 15, 2015), 276 (alleging that Plaintiff Shinaul was stopped and frisked in May 2015), 298 (alleging that Plaintiff Beene was stopped and frisked in May 2015), 325 (alleging that Plaintiff McAbee was stopped and frisked on May 1, 2015), 411 (alleging that Plaintiff Lindsey was stopped and frisked on April 18, 2015). Thus, even if the ACLU Report suggested facts tending to show a widespread practice of unconstitutional stops and frisks (it does not), it does not and cannot show that the City's policymakers knew or should have known of this practice before they received the report.

13

**(d)**     **Previous Lawsuits Do Not Create Awareness.**

Finally, Plaintiffs assert that three prior federal cases put City policymakers on notice of a widespread practice of unconstitutional stops and frisks. *See* Am. Compl. at ¶¶ 435-37. But the existence of a lawsuit cannot establish awareness: "People may file a complaint for many reasons, or for no reason at all. That they filed complaints does not indicate that the policies that [Plaintiffs] allege[] exist do in fact exist and did contribute to [their] injur[ies]." *Strauss v. City of Chicago*, 760 F.2d 765, 769 (7th Cir. 1985).

In any event, the lawsuits relied on by Plaintiffs are inapposite to their claims. The first, *Michael Nelson v. City of Chicago*, 83-C-1168 (N.D. Ill.), concerned, by Plaintiffs' own characterization, arrests for "disorderly conduct." Am. Compl. at ¶ 435. It accordingly could not have put City policymakers on notice of any practice of engaging in unconstitutional stops and frisks. The same is true of *City of Chicago v. Morales*, 527 U.S. 41 (1999), which, again by Plaintiffs' own characterization, dealt with a gang loitering ordinance, not stops and frisks. *See* Am. Compl. at ¶ 436. Only the third case, *Davis v. City of Chicago*, 219 F.R.D. 593 (N.D. Ill. 2004), involved allegations that the plaintiffs had been improperly stopped and frisked. *See* Am. Compl. at ¶ 437.

*Davis*, however, arose "out of four allegedly unlawful, unrelated stops and searches," 219 F.R.D. at 595; this is an insufficient number of incidents to suggest a practice sufficiently widespread that City policymakers knew or should have known of it. *See Dertz v. City of Chicago*, No. 94 C 542, 1997 WL 85169, at *19 (N.D. Ill. Feb. 24, 1997) (five alleged incidents insufficient to establish widespread practice); *Limes–Miller v. City of Chicago*, 773 F. Supp. 1130, 1137 (N.D. Ill. 1991) (five alleged discriminatory appointments in five years cannot establish a widespread practice). Moreover, the incidents alleged in *Davis* occurred between 1999 and 2003, while the incidents at issue here occurred between 2013 and 2015. *See Davis*

14

Amended Complaint [D.E. 16 in Case No. 1:03-cv-02094 (June 24, 2003)] at ¶¶ 15-30.[6]  The Seventh Circuit has held that the passage of a significantly shorter time can vitiate awareness. *See Strauss*, 760 F.2d at 768, n.4 ("Police departments that earlier had in fact been guilty of the sorts of practices that Strauss charges might have remedied the alleged policies by the time of plaintiff's injury *four years later*, so that no such custom could have proximately caused the injury.") (emphasis added).  Given that Plaintiffs allege that the CPD changed its policies since *Davis* was filed, *see* Am. Compl. at ¶ 473, *Strauss*'s logic applies here and *Davis* does not suggest awareness.

> **2.     Plaintiffs Do Not Allege Sufficient Facts To Establish That The City Was Deliberately Indifferent To Any Allegedly Unconstitutional Practice Of Stops And Frisks.**

As explained, Plaintiffs have not pled sufficient facts to show the City's policymakers knew or should have known of a widespread practice of improper stops and frisks.  But even if they were able to do so, they must also plead facts demonstrating that City policymakers were deliberately indifferent to that practice.  *See Gable*, 296 F.3d at 537.  Deliberate indifference in the context of a *Monell* claim means that "'a reasonable policymaker [would] conclude that the plainly obvious consequences' of the City's actions would result in the deprivation of a federally protected right."  *Id.* (*citing Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 411 (1997)).  Plaintiffs offer no facts suggesting as much here, and their claims must consequently be dismissed.

---

[6] The Court can take judicial notice of the pleadings in *Davis* without converting this motion into one for summary judgment.  *See Gen. Elec. Cap. Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081-82 (7th Cir. 1997) (courts can take judicial notice of proceedings in other courts); *Facebook, Inc. v. Teachbook.com LLC*, 819 F. Supp. 2d 764, 771 (N.D. Ill. 2011) (courts may do so at motion to dismiss stage).

(a)     **The Recently Issued Orders Demonstrate That The City Has Been Proactive Rather Than Deliberately Indifferent.**

Plaintiffs recognize that CPD recently made changes to its directives relating to investigatory stops and frisks.  *See* Am. Compl. at ¶¶ 438, 473.  That CPD has updated its directives demonstrates that the City is not deliberately indifferent to alleged racial profiling or unconstitutional stops.  Rather, the City is taking affirmative steps to establish policies that prevent constitutional violations.  *See*, *e.g.*, *Strauss*, 760 F.2d at 768, n.4 (recognizing that police department may change their policies overtime to remedy constitutional concerns).

(b)     **Plaintiffs Have Not Pled Facts Suggesting That The City Was Deliberately Indifferent In Its Training, Supervision, Or Discipline Of Police Officers.**

Insofar as Plaintiffs' *Monell* claim against the City is predicated on CPD's alleged failure to train, supervise, and/or discipline its officers, Plaintiffs have not alleged sufficient facts to satisfy the high standard for such a claim.

The City's "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).  Plaintiffs must show that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).  *See also id.* at 391 (noting that it will not "suffice to prove than an injury . . . could have been avoided if an officer had had better or more training").  "Moreover, to establish liability, the identified deficiency in the training program must closely relate to the ultimate injury." *Edwards v. Two Unknown Male Chicago Police Officers*, 623 F. Supp. 2d 940, 951 (N.D. Ill. 2009).

Similarly, "[p]roof that a supervisor was negligent or even grossly negligent in failing to detect or prevent constitutional violations is insufficient" to state a failure to supervise claim. *Mayes v. City of Hammond*, 442 F. Supp. 2d 587, 634 (N.D. Ind. 2006).  Rather, "[t]he

supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988). Additionally, the alleged failure to supervise "must be closely related to the ultimate injury," and Plaintiffs must establish that the failure to supervise actually caused the alleged constitutional violations. *Hanno v. Sheahan*, No. 01 C 4677, 2004 WL 2967442, at \*13 (N.D. Ill. Nov. 29, 2004).

Finally, "[a] custom of failing to discipline police officers can be shown to be deliberately indifferent if the need for further discipline is so obvious and disciplinary procedures so inadequate as to be likely to result in the violation of constitutional rights such that a jury could attribute to the policymakers a deliberate indifference to the need to discipline the police force." *Czajowski v. City of Chicago*, 810 F. Supp. 1428, 1439 (N.D. Ill. 1992). Further, "[t]o establish municipal liability, a plaintiff must prove not only a custom of failing to discipline, but also that the injury at issue was caused by the custom." *Quade v. Kaplan*, No. 06 C 1505, 2008 WL 905187, at \*16 (N.D. Ill. Mar. 31, 2008).

Rather than alleging such facts, Plaintiffs repeatedly assert that the City failed to "screen, train, or supervise" or "monitor and discipline" CPD officers. Am. Compl. at ¶¶ 4, 48, 459, 460-63. Such allegations are nothing more than a "'formulaic recitation of the elements of a cause of action . . .' devoid of 'further factual enhancement'" and accordingly must be disregarded. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557). Once this is done, there are no alleged facts suggesting that the City failed to train, supervise, or discipline its officers, much less alleged facts suggesting that the City was deliberately indifferent to the existence of a causal relationship between these alleged failures and the injuries Plaintiffs' claim. Accordingly, the failure to train, supervise and discipline claims must be dismissed.

17

> **(c)** **Plaintiffs' Allegations That Supervisors Intended Unconstitutional Stops And Frisks To Occur Do Not Suggest Deliberate Indifference On The Part Of The City.**

Finally, Plaintiffs allege that because "[s]ubordinates of the City carried out the policy [of unconstitutionally stopping and frisking African-Americans and Hispanics] . . . a reasonable inference can be drawn that supervisors intended those effects to occur,"[7] amounting to deliberate indifference. Am. Compl. at ¶ 485. This allegation starts from a false premise—as shown *supra* in Section II.A, the City does not have a policy of conducting unconstitutional stops and frisks. In any event, Plaintiffs make no effort to tie this allegation to City policymakers or even attempt to aver how "a reasonable inference" of supervisory knowledge can be made. At most, Plaintiffs cite the ACLU Report, but as explained *supra* in Section II.B.1.c, the City did not receive that report until after all but five of the 52 incidents alleged had occurred. Moreover, as explained *infra* in Section III.A, the ACLU Report does not suggest that CPD officers have engaged in a widespread practice of unconstitutional stops and frisks (as opposed to inadequate recordkeeping), let alone that City policymakers intended such practices.

In any event, Plaintiffs do not identify the "supervisors" who allegedly "intended those effects to occur," Am. Compl. at ¶ 485, much less plead facts to establish that these supervisors are City policymakers, as is required to hold the City liable under *Monell*. *Gable*, 296 F.3d at 537. Critically, a person is a policymaker only if he or she "'was at the apex of authority for the action in question.'" *Vodak v. City of Chicago*, 639 F.3d 738, 748 (7th Cir. 2011) (quoting *Gernetzke v. Kenosha Unified School Dist. No. 1*, 274 F.3d 464, 468-69 (7th Cir. 2001)).

Plaintiffs make no allegation that a person with such authority was deliberately indifferent to an unconstitutional practice. They assert that in a single incident involving three Plaintiffs, CPD Commander Glenn Evans "told younger police officers at the scene that this was

---

[7] To the extent Plaintiffs advance a theory of traditional *respondeat superior* liability, the Supreme Court has roundly rejected it: "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 692.

how the Chicago Police Department conducted frisks in that west side neighborhood of Chicago." Am. Compl. at ¶ 361. But Plaintiffs do not plead facts suggesting that Commander Evans was "at the apex of authority" (and therefore a City policymaker) for determining how stops and frisks should be performed. *Vodak*, 639 F.3d at 748. As for Superintendent McCarthy—the only CPD employee identified by Plaintiffs who even arguably qualifies as a policymaker—Plaintiffs allege that he told his staff that officers need to be "stopping the right people at the right times and the right places." Am. Compl. at ¶¶ 453, 485. This statement is "entirely consistent with lawful conduct—here an allocation of limited police resources"—and thus undermines rather than supports Plaintiffs' claim that Superintendent McCarthy endorsed, or even had knowledge of, an unconstitutional practice. *McCauley v. City of Chicago*, 671 F.3d 611, 619 (7th Cir. 2011).

### (d)    The Other CPD Programs And De Facto Practices Identified By Plaintiffs Are Irrelevant To Their Claims.

Finally, although the Amended Complaint includes allegations about DUI checkpoints and a "Violence Reduction Initiative" (VRI), as well as so-called "de facto" practices, Am. Compl. at ¶¶ 451, 466-69, the allegations do not suggest a causal connection between these purported programs and practices and unconstitutional stops and frisks. And without a causal link between the programs and practices and constitutional violations, Plaintiffs have not pled facts demonstrating that City policymakers would "conclude that the plainly obvious consequences of [these policies and programs] would result in the deprivation of a federally protected right." *Gable*, 296 F.3d at 537 (internal quotations and citation omitted). Thus, these programs and practices, if they even exist, are not relevant to Plaintiffs' claims.

First, Plaintiffs allege that CPD's DUI checkpoints are disproportionately sited in predominantly African-American or Hispanic areas. *See* Am. Compl. at ¶ 451. But no Plaintiff alleges that he or she was stopped at a DUI checkpoint; accordingly, the siting of DUI checkpoints is irrelevant to this action. Second, Plaintiffs' allegations about a "de facto policy

and custom where Chicago police officers often do not activate their emergency equipment during stop and frisk incidents, with the intent of denying citizens the opportunity to challenge an unconstitutional interaction," *id*. at ¶ 469, is likewise irrelevant; accepting the allegation as true, it suggests at best that CPD officers are concealing their conduct, not that they routinely stop individuals without reasonable articulable suspicion. Again, there is no causal relationship between the alleged policy or custom and a widespread practice of unconstitutional stops and frisks. The same is true of the VRI and the "de facto quotas" and "productivity standards" that Plaintiffs allege have resulted in suspicionless stops and frisks. See *id*. at ¶¶ 466-67. Plaintiffs stop well short of alleging that CPD has encouraged its officers to engage in suspicionless stops and frisks (instead of proactive police work). To the contrary, as explained, CPD directives expressly prohibit such conduct. Once again, therefore, Plaintiffs' allegations do not tie the VRI or the "quotas" and "standards," to unconstitutional stops and frisks. Accordingly, these allegations cannot be a basis for holding the City liable.

### III. Plaintiffs Fail To State A Claim For Violation Of The Equal Protection Clause.

To the extent that Plaintiffs assert a *Monell* claim based on an alleged violation of the Equal Protection Clause, that claim should be dismissed for the additional reason that their allegations are insufficient to establish an underlying constitutional violation. Plaintiffs allege that "CPD officers often have used, and continue to use, race and/or national origin, not reasonable suspicion, as the determinative factor in deciding to stop and frisk individuals." Am. Compl. at ¶ 3. *See also id.* at ¶ 482. To state a claim for violation of the Equal Protection Clause, Plaintiffs must allege that "[1] the defendants' actions had a discriminatory effect and [2] were motivated by a discriminatory purpose." *Chavez v. Ill. State Police*, 251 F.3d 612, 635-36 (7th Cir. 2001). Because the Amended Complaint offers nothing more than conclusory allegations on both prongs, the equal protection claim must be dismissed.

20

**A.    The Amended Complaint Does Not Allege Discriminatory Effect.**

To plead discriminatory effect, Plaintiffs must allege "[i] that they are members of a protected class, [ii] that they are otherwise similarly situated to members of the unprotected class, and [iii] that [they] were treated differently from members of the unprotected class." *Chavez*, 251 F.3d at 636. The second and third elements can be satisfied either by "naming" persons who belong to an unprotected class and were treated differently "or through the use of statistics." *Id.* Plaintiffs do not identify any "similarly situated individuals of other races who were not" improperly stopped and frisked "under similar conditions." *Chriswell v. Village of Oak Lawn*, No. 11 C 00547, 2013 WL 5903417, at *11 (N.D. Ill. Nov. 4, 2013). And Plaintiffs fail to allege sufficient facts to establish deliberate indifference under the statistical method.

Plaintiffs rely solely on the statistics included in the ACLU Report, *see* Am. Compl. at ¶ 483, which, in turn, were derived from the ACLU's analysis of the CPD's "contact card database for the four-month period of May through August 2014." *Id.* at ¶ 444. Admittedly, the report suggests that African-Americans and, to a lesser extent, Hispanics, were stopped at a rate disproportionate to their representation in the City's general population. *See id.* at ¶¶ 444 -45, 448. But the report—like Plaintiffs—stops short of pleading facts that plausibly suggest that African-Americans or Hispanics are more likely to be subjected to *improper* stops. Moreover, the report provided no statistical data on frisks. These omissions are critical because Plaintiffs' claims are based on allegedly unconstitutional stops and frisks, not valid ones.

In particular, Plaintiffs claim that the report demonstrates that "for half of the CPD's stops (based on the sample analyzed), the officer did not record legally sufficient reasons to establish reasonable suspicion." *Id.* at ¶ 442. But neither the report nor Plaintiffs provide a racial analysis of the stops.[8] Instead, Plaintiffs leap from the first observation—that CPD officers did not record legally sufficient reasons to establish reasonable suspicion for half of the

---

[8] *See* ACLU of Illinois, Stop and Frisk in Chicago, http://www.aclu-il.org/wp-content/uploads/ 2015/03/ACLU_StopandFrisk_6.pdf (last visited May 15, 2015).

stops analyzed (that is, that the officers did not keep adequate records)—to a second and independent one—that African-Americans and Hispanics are more likely to be subjected to stops. *See id.* at ¶¶ 444-46, 449.

Missing is "any statistical evidence" that African-Americans or Hispanics are more likely than other racial groups to be subjected to *improper* stops and frisks. *Chriswell*, 2013 WL 5903417, at *11. Without such evidence, Plaintiffs' allegation that "suspicionless stops and frisks have and are being conducted predominantly on African-American or Hispanic individuals *on the basis of racial and/or national origin profiling*," Am. Compl. at ¶ 482 (emphasis added), fails to state a claim. *See Chriswell*, 2013 WL 5903417, at *11 (plaintiff's allegation that "the color of her skin prompted [the defendants] to pull her over" was too conclusory to support a racial profiling claim).[9] Accordingly, Plaintiffs' equal protection claim must be dismissed because Plaintiffs fail to allege that they were treated differently—*i.e.*, that they were *improperly* stopped and frisked at a disproportionate rate—than similarly situated individuals of other races.

### B. The Amended Complaint Does Not Allege Discriminatory Purpose.

Even if Plaintiffs had alleged that the City's conduct had a discriminatory effect (they did not), their equal protection clause claim would still fail because they have not alleged that the City "'acted with discriminatory purpose.'" *Chavez*, 251 F.3d at 645 (quoting *McKleskey v. Kemp*, 481 U.S. 279, 292 (1987)). "'Discriminatory purpose . . . implies more than . . . intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of . . . its adverse effects upon an identifiable group.'" *Id.* (quoting *McKleskey*, 481 U.S. at 298) (ellipses in original). Because Plaintiffs do not allege that the City acted with discriminatory purpose, their equal protection claims fail.

---

[9] Plaintiffs' allegations that a number of African-Americans (and a smaller number of Hispanics) have been subjected to improper stops and frisks do not remedy this problem. *See Logan v. City of Chicago*, 891 F. Supp. 2d 897, 906 (N.D. Ill. 2012) (plaintiff's failure to present evidence that an unprotected group was treated differently than the protected group was fatal to equal protection claim).

22

As an initial matter, Plaintiffs' assertions that the City acted with "deliberate indifference" or with "knowledge" that CPD policies would lead to constitutional violations must be disregarded. Am. Compl. at ¶¶ 459, 485, 487. In *Iqbal*, the Supreme Court explained that markedly similar allegations were "bare assertions . . . [that] amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim, namely that petitioners adopted a policy 'because of, not merely in spite of, its adverse effects upon an identifiable group.'" *Iqbal*, 556 U.S. at 681 (quoting *Twombly*, 550 U.S. at 555, and *Personnel Admin. of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). "As such, the allegations are conclusory and not entitled to be assumed true." *Id.*

Instead, the Court must scrutinize "the factual allegations in [plaintiffs'] complaint to determine if they plausibly suggest an entitlement to relief." *Id.* Here, Plaintiffs claim that the City's actions have resulted in African-Americans and Hispanics being disproportionately stopped and frisked relative to their representation in the general population of the City, *see* Am. Compl. at ¶¶ 444, 449, and that "there are more stops per capita in minority neighborhoods," *id.* at ¶ 445. Though allegations such as these may be "consistent with" Plaintiffs' claim of discriminatory intent, they do not "not plausibly establish" such intent, particularly where "more likely explanations" exist. *Iqbal*, 556 U.S. at 681. Indeed, in *Iqbal*, the Court noted that the September 11 attacks were perpetrated by Arab Muslims at the direction of an Arab Muslim whose followers were largely other Arab Muslims. *See id.* at 682. Accordingly, it was "no surprise" (and not an indicia of discriminatory intent) "that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims." *Id.* at 682.

The Amended Complaint suggests a similar relationship between the intent-neutral policy of reducing crime and a disproportionately high percentage of stops of African-Americans and

Hispanics.  *See* Am. Compl. at ¶¶ 452-53.  The Amended Complaint alleges that the City deploys police resources to high crime areas that are predominantly African-American and Hispanic to reduce crime.  *See id.* at ¶¶ 434-436 (discussing "a history of conducting suspicionless stops and frisks which traces back to sweeps of high-crime neighborhoods in the 1980s" in African-American and Hispanic communities in Chicago).  That police are disproportionately deployed to high crime areas, which happen to be African-American and Hispanic, is the most likely explanation why African-Americans  and Hispanics are stopped at disproportionately higher rates than other races.  Thus, "[a]s between the 'obvious alternative explanation' for the arrests and the purposeful, invidious discrimination [plaintiffs] ask[] [the Court] to infer, discrimination is not a plausible conclusion."  *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567).

Nor can Plaintiffs rely on the ACLU report to show discriminatory intent.  Even if that report was evidence of discriminatory effect (which it is not, as explained *supra* in Section III.A), the Seventh Circuit rejected the use of statistics to show discriminatory intent in *Chavez*, a case that—like this one—dealt with alleged racial profiling by the police.  *See* 251 F.3d at 647-48 ("statistics may not be the sole proof of a constitutional violation and neither Chavez nor Lee have presented sufficient non-statistical evidence to demonstrate discriminatory intent").

All Plaintiffs are left with is their bare allegation that, "[u]pon information and belief, the CPD enacted this policy with a discriminatory purpose."  Am. Compl. at ¶ 484.  According to Plaintiffs, "Defendants pursued this policy precisely because of the adverse effects it had on the targeted groups: African-American and Hispanic men."  *Id.*  This is not enough to state a claim.  Legal conclusions like this "must be supported by factual allegations," but Plaintiffs offer no facts suggesting discriminatory intent.  *Iqbal*, 556 U.S. at 679.  Instead, Plaintiffs point to Superintendent McCarthy's alleged statement that CPD officers need to stop and frisk "the right people at the right times and the right places."  Am. Compl. at ¶ 484.  As explained, this

statement is "entirely consistent with lawful conduct—here an allocation of limited police resources." *McCauley*, 671 F.3d at 619. Accordingly, it does not suggest discriminatory intent. Plaintiffs' equal protection claim should thus be dismissed for failure to plead facts plausibly suggesting discriminatory intent.

## IV.    Title VI Of The Civil Rights Act Does Not Apply To The City.

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any *program or activity* receiving Federal financial assistance." 42 U.S.C. § 2000(d) (emphasis added). As a municipality, the City "does not fit within the definition of 'program or activity' for purposes of Title VI." *Hodges v. Pub. Bldg. Comm'n of Chicago*, 864 F. Supp. 1493, 1505 (N.D. Ill. 1994). In particular:

> the City of Chicago still is not within the scope of Title VI's coverage. The City is not an 'operation' of 'a department, agency, special purpose district, or other instrumentality of a State or of a local government,' or of 'the entity of such State or local government that distributes such assistance,' or of any of the other entities enumerated in § 2000d–4a. Rather, the City is a municipality and, as such, it does not fit within the definition of 'program or activity' for purposes of Title VI.

*Id.* (citations omitted). *Hodges* dictates dismissal of the Title VI claim.

Moreover, in *Alexander v. Sandoval*, 532 U.S. 275 (2001), the Supreme Court held that Title VI prohibits only intentional discrimination. As explained *supra* in Section III.B, Plaintiffs have not pled facts suggesting intentional discrimination. As such, the Title VI claim would fail even if the City were a "program or activity" for Title VI purposes.

## V.    The State-Law And Negligent Hiring And Supervision Claims Should Be Dismissed.

Count 47 seeks to hold the City (and all other defendants) liable for assault and battery, trespass, violation of the right of privacy, negligence, and "violation of rights otherwise guaranteed by the Constitution and the laws of the State of Illinois" (collectively, the "state-law

claims"). Am. Compl. at ¶ 710. In the same count, Plaintiffs also charge the City with negligently hiring, screening, training, supervising, and retaining the John Doe officer defendants (the "negligent hiring and supervision claims"). *See id.* at ¶ 712. As shown below, Plaintiffs' state-law claims and negligent hiring and supervision claims against the City should be dismissed.[10]

### A.    Plaintiffs Fail To State Claims Against The City Under State Law.

Plaintiffs' state-law claims against the City allege no direct conduct on the part of the City and thus are necessarily based on the doctrine of *respondeat superior*. *See* Am. Compl. at ¶ 710. "Under the doctrine of *respondeat superior*, a principal may be held liable for the tortious actions of an agent which causes a plaintiff's injury, even if the principal does not himself engage in any conduct in relation to the plaintiff." *Woods v. Cole*, 693 N.E.2d 333, 336 (Ill. 1998).

The state-law claims against the City necessarily fail because Plaintiffs have not pled the facts needed to assert these claims against the individual John Doe officers. For example, Plaintiffs fail to state a claim for trespass against the John Doe officers because they do not allege that any of the officers committed "an invasion 'of the exclusive possession and physical condition of land.'" *Colwell Sys., Inc. v. Henson*, 452 N.E.2d 889, 892 (Ill. App. Ct. 1983) (quoting Restatement (Second) of Torts, ch. 7, at 275 (1965)). The other state-law claims (for assault, battery, violation of the right of privacy, negligence, and other unspecified violations of Illinois law) are equally deficient because Plaintiffs fail to plead facts supporting the requisite

---

[10] Plaintiffs' assertion of seven claims in one count is improper and warrants dismissal of these claims on this basis alone. *See Ellis v. State of Illinois*, No. 91 C 8391, 1992 WL 332293, at *2 (N.D. Ill. Nov. 6, 1992) (Grady, J.) (dismissing complaint setting forth a "myriad of federal and state constitutional, statutory and common law claims, all in one count"). Courts have interpreted Rule 10(b) to "require[] a separate count for each distinctive statutory and constitutional claim." *Goerlich v. Davis*, No. 91 C 1743, 1991 WL 195772, at *2 (N.D. Ill. Sept. 25, 1991).

elements for each distinct claim. Additionally, Plaintiffs fail to identify the provisions of the Illinois Constitution that the John Doe officers allegedly violated. Such generalized and bare allegations are insufficient to put the City on notice of Plaintiffs' claims.

**B.     Even If Plaintiffs Adequately Alleged The State-Law Claims, The Illinois Local Governmental And Governmental Employees Tort Immunity Act Bars The City's Liability.**

Under the Illinois Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/1-101, *et seq.* (the "Act"), the City "is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109. As shown below, the Act immunizes the John Doe officers and Commander Evans, and hence the City, from liability for the state-law claims.

**1.     The Act Bars The City's Liability For Claims Based On The Execution Or Enforcement Of Laws.**

Section 2-202 of the Act states: "a public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. Both investigation and arrest are conduct in "execution or enforcement" of a law. *See Wade v. City of Chicago*, 847 N.E.2d 631, 638 (Ill. App. Ct. 2006) (investigation); *Jones v. Village of Villa Park*, 784 F. Supp. 533, 535 (N.D. Ill. 1992) (arrest). Accordingly, to state a claim, Plaintiffs must plead facts suggesting the John Doe officers acted willfully or wantonly when they allegedly improperly stopped (or stopped and frisked) Plaintiffs. *See* 745 ILCS 10/2-202. Plaintiffs do so only in conclusory terms. *See* Am. Compl. at ¶¶ 508, 513, 518, 523, 528, 533, 538, 543, 548, 553, 558, 563, 568, 573, 578, 583, 588, 593, 598, 603, 608, 613, 618, 623, 628, 633, 638, 643, 648, 653, 658, 663, 668, 673, 678, 683, 688, 693, 698, 703, 708. Such allegations must be disregarded. *Brooks*, 578 F.3d at 581. Accordingly, the City is immune from liability and the state-law claims should be dismissed.

27

      **2.**    **Many Of The Individual Plaintiffs' Claims Are Barred By The Act's One-Year Statute Of Limitations.**

Section 1-101 of the Act states: "[n]o civil action . . . may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced within one year from the date that the injury was received or the cause of action accrued." 745 ILCS 10/1-101. Thus, any state-law based tort claims arising out of incidents that occurred prior to April 20, 2014 (for the Plaintiffs named in the original Complaint) and prior to June 22, 2014 (for the Plaintiffs named in the Amended Complaint) are time-barred. Accordingly, the state-law claims of the following named Plaintiffs are time-barred: Plaintiffs Smith and Nathan, Am. Compl. ¶ 64 (named in original Complaint; incident occurred on May 3, 2013); Plaintiff Overton, *id.* at ¶ 112 (original Complaint; December 2013); Plaintiff Brown, *id.* at ¶ 170 (Amended Complaint; September 2013); Plaintiff Locke, *id.* at ¶ 170 (Amended Complaint, May 2014); Plaintiff Calvin Jackson, *id.* at ¶ 229 (Amended Complaint; June 2013); Plaintiff Buford, *id.* at ¶ 283 (Amended Complaint; June 2014); Plaintiff Thompson, *id.* at ¶ 290 (Amended Complaint; August 2013); Plaintiff McWane, *id.* at ¶ 318 (Amended Complaint; winter 2014); Plaintiffs Beene, McWane, and Stewart, *id.* at ¶¶ 350-53 (Amended Complaint; May 28, 2014); Plaintiff Motion, *id.* at ¶ 375 (Amended Complaint; May or June 2014); Plaintiff Sanders, *id.* at ¶¶ 397, 403 (Amended Complaint; June 2014); and Plaintiff Calvin Jackson, *id.* at ¶ 427 (Amended Complaint; June 2013).

      **C.**    **The Act Bars The City's Liability For Claims Based On Allegedly Negligent Hiring And Supervision.**

The Act also precludes holding the City liable on Plaintiffs' negligent hiring and supervision claims. The Act provides that "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201. "The decision to hire or not to hire a police officer is an inherently discretionary act and, thus, is subject to the immunities contained in the Immunity

28

Act." *Johnson v. Mers*, 664 N.E.2d 668, 675 (Ill. App. Ct. 1996). Likewise, the Act bars the City's liability claims based on the negligent supervision of police officers. *See Reed v. City of Chicago*, No. 01 C 7865, 2002 WL 406983, at *3 (N.D. Ill. Mar. 14, 2002) (hiring, training, and supervision "require discretion, balancing of interests, and judgment calls" and thus cannot be a basis for liability under the Act). Accordingly, the Act immunizes the City from liability for the negligent hiring and supervision claims.

## CONCLUSION

As the Plaintiffs have failed to state any claims against the City, Counts 1-4 and 47 should be dismissed.

Dated: July 27, 2015                         Respectfully submitted,

                                             CITY OF CHICAGO

                                    By:  s/ Allan T. Slagel
                                         _____
                                         One of its Attorneys

Allan T. Slagel (ARDC No. 6198470)
Michael P. Sheehan (ARDC No. 6238081)
Gabriel Reilly-Bates (ARDC No. 6280979)
Jeffrey Schieber (ARDC No. 6300779)
TAFT STETTINIUS AND HOLLISTER LLP
111 East Wacker Drive
Suite 2800
Chicago, Illinois 60601
Telephone:      (312) 527-4000
Facsimile:      (312) 527-4011
Email:          aslagel@taftlaw.com
                msheehan@taftlaw.com
                gbates@taftlaw.com
                jschieber@taftlaw.com
12453419.5

29

**<u>LIST OF EXHIBITS</u>**

Exhibit A        General Order G02-04

Exhibit B        Special Order S04-13-09

Exhibit C        General Order G04-03