# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DARNELL SMITH, et al.,

               Plaintiffs,

      v.

CITY OF CHICAGO, a municipal
corporation, et al.,

               Defendants.

Case No. 15 C 3467

Judge Amy J. St. Eve

---

## PLAINTIFFS' RESPONSE IN OPPOSITION TO
## MOTIONS TO DISMISS THE AMENDED COMPLAINT AT LAW

---

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ..................................................................................................................... 1

LEGAL STANDARD ................................................................................................................ 2

ARGUMENT ............................................................................................................................. 4

I.      Plaintiffs Have Standing to Seek Equitable Relief. ........................................................ 4

II.     The Agreement That the City Reached With the ACLU Does Not Moot Plaintiffs' Claims. ........................................................................................................................... 9

III.    Plaintiffs Should Be Granted Leave to Amend the Complaint to Substitute the Parents of the Minor Plaintiffs as Plaintiffs. ................................................................ 12

IV.     Plaintiffs Sufficiently State Claims for Municipal Liability for Violations of Federal Law Under the *Monell* Doctrine. ..................................................................... 12

        A.      Plaintiffs have pled sufficient facts to show that a widespread custom or practice exists. ................................................................................................. 15

        B.      Municipal liability may also be based on the policies and indifference of McCarthy as a senior policy maker (Count 4). .................................................. 24

        C.      Plaintiffs have sufficiently pled violations of their rights under the Equal Protection Clause of the Fourteenth Amendment. ............................................. 26

V.      Title VI of the Civil Rights Act Applies to the Chicago Police Department and the City of Chicago. ............................................................................................................ 29

VI.     Superintendent McCarthy Should Not Be Dismissed as a Defendant. ........................... 31

        A.      There are no grounds to dismiss the official-capacity claims against the superintendent. ................................................................................................ 31

        B.      There are no grounds to dismiss the individual-capacity claims against the superintendent. ................................................................................................ 32

VII.    Plaintiffs State-Law Claims Should Not Be Dismissed. ................................................ 34

        A.      Plaintiffs have adequately pled their state law claims against the city. ............... 34

        B.      The Tort Immunity Act does not bar Plaintiffs' state law claims. ........................ 38

1.      Because Plaintiffs' claims are not centered on the enforcement of any law, the Tort Immunity Act does not apply. ..................................... 38

2.      Because Plaintiffs have pled extensive facts that establish that the Defendants have acted willfully and wantonly, the Tort Immunity Act does not bar Plaintiffs' claims............................................................ 39

3.      The one-year statute of limitations contained within the Tort Immunity Act does not bar Plaintiffs' claims. ......................................... 40

C.    The Tort Immunity Act does not bar claims for willful and wanton supervision of employees...................................................................... 40

CONCLUSION.................................................................................................... 42

# TABLE OF AUTHORITIES

**Cases**

*188 LLC v. Trinity Industies, Inc.*, 300 F.3d 730 (7th Cir. 2002) ...................................... 2

*Almaraz v. Haleas*, No. 07 C 6134, 2008 WL 4547222 (N.D. Ill. Apr. 25, 2008)...................... 31

*American Nurses' Association v. State of Illinois*, 783 F.2d 716 (7th Cir. 1986)........................ 28

*Arreola v. Godinez*, 546 F.3d 788 (7th Cir. 2008) .................................................... 4, 5

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................... 3, 24, 29, 33

*Atkins v. City of Chicago*, 631 F.3d 823 (7th Cir. 2011) ............................................. 17

*Barry Aviation Inc. v. Land O'Lakes Municipal Airport Commission*, 377 F.3d
     682 (7th Cir. 2004)....................................................................... 12

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................... 3, 29

*Bennett v. Schmidt*, 153 F.3d 516 (7th Cir. 1998)................................................... 27, 28

*Board of the County Commissioners of Bryan County, Oklahoma v. Brown*,
     520 U.S. 397 (1997)....................................................................... 13

*Boston v. City of Chicago*, No. 86-C-5534, 1988 WL 31532 (N.D. Ill. Mar. 28,
     1988) ................................................................................... 5, 7

*Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687 (7th Cir. 2012) ................................ 3

*Busse v. Motorola, Inc.*, 813 N.E.2d 1013 (Ill. App. Ct. 2004)....................................... 35

*Cash v. County of Erie*, 654 F.3d 324 (2d Cir. 2011) ............................................... 13, 14

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002)......................................... 3

*Chavez v. Illinois State Police*, 251 F.3d 612 (7th Cir. 2001) ....................................... 28, 33, 34

*Chelios v. Heavener*, 520 F.3d 678 (7th Cir. 2008)................................................. 34

*City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989)............................................... 13, 14

*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985) .................................... 27

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ................................................. 4, 5, 7

*Clark v. City of Chicago*, 595 F. Supp. 482 (N.D. Ill. 1984)........................................ 38

*Colwell System, Inc. v. Henson*, 452 N.E.2d 889 (Ill. App. Ct. 1983).........................................36

*Connick v. Thompson*, 131 S. Ct. 1350 (2011) .............................................................. 13, 14, 25

*Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983) ...........................................................40

*Davis v. City of New York*, 959 F. Supp. 324 (S.D.N.Y. 2013)..................................................30

*Deborah K. v. Sperlik*, No. 05 C 628, 2005 WL 3299804 (N.D. Ill. Nov. 30, 2005)..................41

*Dertz v. City of Chicago*, No. 94 C 542, 1997 WL 85169 (N.D. Ill. Feb. 24, 1997)...................21

*EEOC v. Harvey L. Walner & Assoc.*, 91 F.3d 963 (7th Cir. 1996)...........................................40

*Estate of Moreland v. Dieter*, 395 F.3d 747 (7th Cir. 2005)........................................................18

*Estate of Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509 (7th Cir. 2007) ............................ 3

*Federation of Advertising Industry Representatives, Inc. v. City of Chicago*,
    326 F.3d 924 (7th Cir. 2003) ....................................................................... 9, 10, 12

*Floyd v. City of New York*, 283 F.R.D. 153 (S.D.N.Y. 2012)................................................... 8, 9

*Floyd v. City of New York*, 813 F. Supp. 2d 417 (S.D.N.Y.), *on recons.*,
    813 F. Supp. 2d 457 (S.D.N.Y. 2011)............................................................................31

*Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013) ................................. 16, 21, 26

*Franklin v. City of Chicago*, 102 F.R.D. 944 (N.D. Ill. 1984)....................................................... 8

*Freeman v. Fairman*, 916 F. Supp. 786 (N.D. Ill. 1996) ............................................................34

*Friends of the Earth, Inc. v. Laidlaw Enviromental Services (TOC), Inc.*,
    528 U.S. 167 (2000).........................................................................................................12

*Gable v. City of Chicago*, 296 F.3d 531 (7th Cir. 2002).............................................................18

*General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F. 3d 1074
    (7th Cir. 1997)..................................................................................................................23

*Gentry v. Duckworth*, 65 F.3d 555 (7th Cir. 1995).....................................................................32

*Gibson v. City of Chicago*, 910 F.2d 1510 (7th Cir. 1990)............................................. 13, 16, 22

*Grieveson v. Anderson*, 538 F.3d 763 (7th Cir. 2008) ................................................................14

*Hafer v. Melo*, 502 U.S. 21 (1991) .............................................................................................32

*Hall v. City of Chicago*, 989 F. Supp. 2d 699 (N.D. Ill. 2013)............................................. 16, 18

*Hernandez v. Cremer*, 913 F.2d 230 (5th Cir. 1990) ..................................................... 8

*Hodges v. Public Building Commission of Chicago*, 864 F. Supp. 1493 (N.D. Ill. 1994) ................................................................................................................................... 30

*Hogan v. Smith*, No. CIV. 11-961, 2012 WL 1435402 (S.D. Ill. Apr. 25, 2012) ........................ 41

*Illinois Migrant Council v. Pilliod*, 540 F.2d 1062 (7th Cir. 1976) *on reh'g*, 548 F.2d 715 (7th Cir. 1977) ................................................................................ 6, 8

*Johnson v. Dossey*, 878 F. Supp. 2d 905 (N.D. Ill. 2012) .......................................... 36

*Johnson v. K-mart Corp.*, 723 N.E.2d 1192 (Ill. App. Ct. 2000) ................................. 36

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) ............................................. 32

*Jungels v. Pierce*, 825 F.2d 1127 (7th Cir. 1987) ....................................................... 31

*King v. City of Chicago*, 394 N.E.2d 22 (Ill. App. Ct. 1978) ...................................... 38

*Kliegman v. County of Humboldt*, No. CV 09-0006, 2010 WL 2382445 (N.D. Cal. June 10, 2010) ................................................................................................................. 10

*LaDuke v. Nelson*, 762 F.2d 1318 (9th Cir. 1985) ......................................................... 8

*Lavalais v. Village of Melrose Park*, 734 F.3d 629 (7th Cir. 2013) ........................... 3

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993) ............................................................................................... 3

*Levenstein v. Salafsky*, 164 F.3d 345 (7th Cir. 1998) .................................................. 2

*Lewis v. City of Chicago*, 496 F.3d 645 (7th Cir. 2007) ............................................. 13

*Ligon v. City of New York*, 288 F.R.D. 72 (S.D.N.Y. 2013) .................................... 7, 9

*Limes-Miller v. City of Chicago*, 773 F. Supp. 1130 (N.D. Ill. 1991) ....................... 21

*Listenbee v. City of Harvey*, No. 11 C 03031, 2013 WL 5567552 (N.D. Ill. Oct. 9, 2013) ....................................................................................................................... 14

*Luck v. Rovenstine*, 168 F.3d 323 (7th Cir. 1999) ...................................................... 25

*Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014 (7th Cir. 2013) ............................. 3

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................. 5

*Malone v. Shallcross*, No. 02 C 8126, 2003 WL 22176058 (N.D. Ill. Sept. 19, 2003) ................................................................................................................................... 32

*McCauley v. City of Chicago*, 671 F.3d 611 (7th Cir. 2011) ........................................................ 27

*McNeil v. Carter*, 742 N.E.2d 1277 (Ill. App. Ct. 2001) ............................................................. 35

*Michalowski v. Rutherford*, 82 F. Supp. 3d 775 (N.D. Ill. 2015) ................................................. 27

*Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978) ................................................................................................. 13, 17, 24, 34

*National Congress for Puerto Rican Rights v. City of New York*, 75 F. Supp. 2d 154 (S.D.N.Y. 1999) .............................................................................................. 8

*Otero v. Dart*, No. 12 C 3148, 2012 WL 5077727 (N.D. Ill. Oct. 18, 2012) ................................ 6

*Patton v. Chicago Heights*, No. 09 C 5566, 2010 WL 1813478 (N.D. Ill. May 3, 2010) ........................................................................................................... 41

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) .................................................................... 24

*Portis v. City of Chicago*, 347 F. Supp. 2d 573 (N.D. Ill. 2004) .................................................. 6

*Raines v. Byrd*, 521 U.S. 811 (1997) ........................................................................................... 4

*Ramos v. City of Chicago*, 707 F. Supp. 345 (N.D. Ill. 1989) ..................................................... 18

*Rawoof v. Texor Petroleum Co.*, 521 F.3d 750 (7th Cir. 2008) .................................................... 5

*Reed v. City of Chicago*, No. 01 C 7865, 2002 WL 406983 (N.D. Ill. Mar. 14, 2002) ........................................................................................................... 40

*Reese v. Chicago Police Department*, 602 F. Supp. 441 (N.D. Ill. 1984) .................................... 30

*Robinson v. City of Chicago*, 868 F.2d 959 (7th Cir. 1989) ................................................. 4, 5, 7

*Ross v. Mauro Chevrolet*, 861 N.E.2d 313 (Ill. App. Ct. 2006) ............................................ 35, 36

*Scherr v. Marriott International, Inc.*, 703 F.3d 1069 (7th Cir. 2013) .......................................... 5

*Scott v. City of Chicago*, 195 F.3d 950 (7th Cir. 1999) .............................................................. 17

*Selan v. Kiley*, 969 F.2d 560 (7th Cir. 1992) .............................................................................. 40

*Simack v. City of Chicago*, No. 02 C 3139, 2003 WL 924335 (N.D. Ill. Mar. 6, 2003) ........................................................................................................... 6

*Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006 (7th Cir. 2006) .......................................... 13

*Sotelo v. DirectRevenue, LLC*, 384 F. Supp. 2d 1219 (N.D. Ill. 2005) ....................................... 37

*Strauss v. City of Chicago*, 760 F.2d 765 (7th Cir. 1985) ........................................................... 21

*Suber v. City of Chicago*, No. 10 C 2876, 2011 WL 1706156 (N.D. Ill. May 5, 2011) .................................................................................................................................... 31

*Sulehria v. City of New York*, No. 13-CV-6557, 2014 WL 4101542 (E.D.N.Y. Aug. 18, 2014) ........................................................................................................... 30

*Tamayo v. Blagojevich*, 526 F.3d 1074 (7th Cir. 2008) ............................................................... 28

*Terry v. Ohio*, 392 U.S. 1 (1968) ................................................................................................. 20

*Thomas v. County of Los Angeles*, 978 F.2d 504 (9th Cir. 1992), *as amended* (Feb. 12, 1993) .......................................................................................................... 6

*Tierney v. Vahle*, 304 F.3d 734 (7th Cir. 2002) ............................................................................ 2

*Triad Associates, Inc. v. Chicago Housing Authority*, 892 F.2d 583 (7th Cir. 1989) .................... 2

*Troeckler v. Zeiser*, No. 14-CV-40, 2015 WL 1042187 (S.D. Ill. Mar. 5, 2015) ........................ 35

*United States v. Fordice*, 505 U.S. 717 (1992) ........................................................................... 31

*United States v. Maricopa County, Arizona*, 915 F. Supp. 2d 1073 (D. Ariz. 2012) ................. 30

*United States v. W. T. Grant Co.*, 345 U.S. 629 (1953) ............................................................. 11

*Van Meter v. Darien Park District*, 799 N.E.2d 273 (Ill. 2003) ................................................. 37

*Warth v. Seldin*, 422 U.S. 490 (1975) ........................................................................................... 5

*West v. Illinois State Board of Education*, No. 07 C 2994, 2007 WL 4162814 (N.D. Ill. Nov. 20, 2007) ...................................................................................... 32

*Williams v. Heavener*, 217 F.3d 529 (7th Cir. 2000) .................................................................. 34

*Willis v. Bell*, 726 F. Supp. 1118 (N.D. Ill. 1989) ..................................................................... 31

*Wilson v. Cook County*, 742 F.3d 775 (7th Cir. 2014) ............................................................... 16

*Woods v. City of Michigan City*, 940 F.2d 275 (7th Cir. 1991) .................................................. 25

*Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917 (7th Cir. 2004) ......................................................................................................... 24

*Yang v. Hardin*, 37 F.3d 282 (7th Cir. 1994) ............................................................................. 33

**Constitutional Provisions**

U.S. Const. amend. XIV, § 1. .................................................................................... 14, 27, 31

**Statutes**

42 U.S.C. § 1983 .................................................................................................... 12, 24, 25

42 U.S.C. § 2000(d) ...................................................................................................... 29

42 U.S.C. § 2000(d)-4a ................................................................................................. 29

745 ILCS 10/1-101 ...................................................................................................... 37

745 ILCS 10/2-201 ...................................................................................................... 40

745 ILCS 10/2-202 ...................................................................................................... 38

745 ILCS 10/3-108 ...................................................................................................... 41

**Rules**

Fed. R. Civ. P. 8(a)(2) ..................................................................................................... 3

Fed. R. Civ. P. 8(d)(2) .................................................................................................... 25

Fed. R. Civ. P. 12(b)(6) ......................................................................................... 2, 17, 22

Fed. R. Civ. P. 17(c)(2) ................................................................................................. 12

U.S. Dist. Ct. N.D. Ill., LR 7.1 ........................................................................................ 2

**Other Authorities**

*Restatement (Second) of Torts* (1965) .............................................................. 35, 36, 37

Thomas, Suja A., *The New Summary Judgment Motion: The Motion to Dismiss
     Under Iqbal and Twombly*, 14 Lewis & Clark L. Rev. 15 (2010)
     (symposium) ........................................................................................................... 3

**INTRODUCTION**

After decades of pervasive discriminatory use of unconstitutional stop and frisk practices by Chicago police officers, which the City of Chicago and its policymakers were aware of but failed to rectify, the ACLU published a report in March 2015, based on the City's own records and data, detailing just how widespread and discriminatory the City's stop and frisk policies are. In April, six of the named Plaintiffs, who each suffered violations of their constitutional rights at the hands of Chicago police officers due to the City's stop and frisk policy, filed this putative class action against the City and one of its policymakers seeking class-wide declaratory and injunctive relief, as well as individual damages claims against each officer who violated the Plaintiffs' rights.

After the City and Defendant Chicago Police Superintendent Garry McCarthy moved to dismiss the complaint, Plaintiffs voluntarily filed the Amended Complaint in June, adding hundreds of allegations detailing a large number of unconstitutional stops and frisks, often of the same Plaintiffs, all of whom were simply going about their daily lives when they were subject to the City's unconstitutional stop and frisk policy. The Amended Complaint demonstrates that CPD has a widespread practice or custom of stopping and frisking individuals without reasonable articulable suspicion that they are engaged in criminal behavior or that they are armed and dangerous, and based solely on their race or national origin. The Amended Complaint makes clear that the City and its official policymaker were aware of this pervasive unconstitutional practice and failed to rectify it, acting with deliberate indifference to the constitutional rights of those who would come into contact with Chicago police officers. It details the grounds for Plaintiffs claims against the City and Defendant McCarthy, and demonstrates that Plaintiffs are entitled to the relief they seek.

Despite the fact that the Amended Complaint makes Plaintiffs claims clear, and puts the defendants on notice of those claims and the grounds on which they rest, the City and Defendant McCarthy filed separate motions to dismiss that were virtual carbon copies of their motions to dismiss the original complaint. But Defendants' motions aren't actually motions to dismiss under 12(b)(6), at all. They are an attempt to litigate the merits of Plaintiffs' claims before Defendants have even answered the Amended Complaint, let alone provided the discovery Plaintiffs need to prove their claims. Defendants' arguments lack merit. Looking at the Amended Complaint as a whole, and ignoring the Defendants' attempts to litigate each separate fact alleged, the Court should deny Defendants' motions and allow the case to proceed.

## LEGAL STANDARD

"The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits." *Triad Assocs., Inc. v. Chicago Hous. Auth.*, 892 F.2d 583, 586 (7th Cir. 1989). In their Motions to Dismiss,[1] the City and Defendant McCarthy focus on factual arguments and attempt to test the merits of Plaintiffs' claims, placing a burden on Plaintiffs to prove facts supporting their claims for relief. The City even goes as far as attaching documents not specifically referenced in the Amended Complaint[2] that bring in factual matters outside of

---

[1] Defendants' separate motions violate both Local Rule 7.1 and this Court's Minute Entry on June 25, 2015, which provided that "Defendants are given up to 30 pages for their memorandum in support of any motion to dismiss." Defendants are represented by the same counsel and make similar and sometimes identical arguments. There is no basis for them filing separate motions. If they needed additional pages to make their arguments, they should have requested leave of the Court.

[2] Under Rule 12(b)(6): "If . . . matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." The Seventh Circuit has cautioned that there is a "'narrow exception' to the general rule" that consideration of extraneous material requires conversion, which is "aimed at cases interpreting, for example, a contract." *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) (quoting *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998)); *see also Tierney v. Vahle*, 304 F.3d 734, 739 (7th Cir. 2002) (explaining that "the scope of the exception . . . is uncertain; perhaps it is or should be limited to cases in which the suit is on a contract or the plaintiff, if he has not attached, has at least quoted from, the document later submitted by the defendant"). As sister Circuits have stressed, "[c]onsideration

the pleadings to bear on the Motions to Dismiss. Defendants seek to impose a burden on Plaintiffs that is almost indistinguishable from that used when a court decides a motion for summary judgment. *See* Suja A. Thomas, *The New Summary Judgment Motion: The Motion to Dismiss Under Iqbal and Twombly*, 14 Lewis & Clark L. Rev. 15 (2010) (symposium). This is improper. Plaintiffs' burden at the pleading stage is only to allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Meeting that burden requires only that the Plaintiffs provide a "short and plain statement of the claim showing that [he] is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Court does not apply a heightened pleading standard to civil rights claims, including *Monell* claims. *See, e.g.*, *Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) ("In a civil rights case alleging municipal liability, a federal court may not apply a heightened pleading standard more stringent than the usual Rule 8(a) pleading requirements.") (citing *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coord. Unit*, 507 U.S. 163, 165 (1993)). Plaintiffs simply must give Defendants "fair notice of what the . . . claim is and the grounds upon which it rests," so as to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The Court must accept all well-pleaded factual allegations as true and view them in the light most favorable to the plaintiff. *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013); *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1027 (7th Cir. 2013).

---

of extraneous material in judging the sufficiency of a complaint is at odds with the liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2), which requires only that the complaint contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154-55 (2d Cir. 2002). While Plaintiffs refer to one written policy of the CPD in the Amended Complaint, that policy is not "central to [their] claim[s]," City Mot. to Dismiss 9 n.5; McCarthy Mot. to Dismiss 4 n.2 (both citing and quoting *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012)). Plaintiffs do not allege that any written policy of the CPD is unconstitutional. Defendants' attachments are improper, and should be disregarded.

As demonstrated in the Amended Complaint and below, Plaintiffs have more than met their burden at this stage in the litigation. The Amended Complaint alleges facts that, accepted as true, state a plausible claim for relief against Defendants for the misconduct alleged.

## ARGUMENT

**I.      Plaintiffs Have Standing to Seek Equitable Relief.**

In *Arreola v. Godinez*, 546 F.3d 788, 795 (7th Cir. 2008), the Seventh Circuit cautioned that courts should "look at the case as a whole" when deciding questions of standing. Thus, a court should not pick apart the various components of a case "to separate the claims for which the plaintiff will be entitled to relief from those for which he will not. If the court becomes too enmeshed in the plaintiff's entitlement to relief, it will stray beyond the standing inquiry into the merits." *Id.* The Seventh Circuit found that the district court in *Arreola* "made just this error when it found that Arreola 'lacked standing to pursue injunctive relief.'" *Id.* This Court should be careful not to travel down this same path, as the City suggests.

In *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983), invoked by the City, the parties agreed that the equitable claims and the compensatory claims could be severed, and the plaintiffs in *Robinson v. City of Chicago*, 868 F.2d 959, 961-62 (7th Cir. 1989), on which the City also relies, settled their individual claims for compensatory damages, leaving only the claims for equitable relief. Neither case parallels this case, which seeks both compensatory and equitable relief and where none of the claims have been severed or settled. Looking at this case as a whole, the Court can easily find that Plaintiffs have adequately alleged standing to pursue their claims. The City's motion to dismiss should thus be denied.

An Article III standing inquiry "focuses on whether the plaintiff is the proper party to bring this suit." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). To satisfy Article III's standing requirement, a party must establish: (1) an injury in fact; (2) a causal connection between the

injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 756 (7th Cir. 2008). "[T]o establish injury in fact when seeking prospective injunctive relief, a plaintiff must allege a 'real and immediate' threat of future violations of their rights." *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1074 (7th Cir. 2013). When the plaintiff's standing is challenged on a motion to dismiss, the court must accept as true all material allegations of the complaint and must construe the complaint in favor of the plaintiff. *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

The City does not dispute that the Plaintiffs have standing to seek compensatory relief for damages for their individual claims, nor does the City dispute the second or third elements of the Article III standing inquiry for their claims against the City. The City simply and erroneously asserts that Plaintiffs have not adequately alleged a real and immediate threat of future violations of their rights. City of Chicago's Mot. to Dismiss Am. Compl. 3-8 (hereinafter "City Mot. to Dismiss"). As demonstrated below, the Amended Complaint adequately alleges that Plaintiffs have standing to seek declaratory and injunctive relief.[3]

There are two critical differences between the Plaintiffs' claims here and the claims made by the plaintiffs in *Lyons*, *Robinson*, and *Boston v. City of Chicago*, No. 86-C-5534, 1988 WL 31532, at *8 (N.D. Ill. Mar. 28, 1988), and each of these differences is enough to establish standing to seek equitable relief. First, the plaintiffs in *Lyons*, 461 U.S. at 105-108, *Robinson*, 868 F.2d at 960-61, 964, and *Boston*, 1988 WL 31532, at *8, only alleged one past violation of

---

[3] Plaintiffs' have not yet moved to certify the putative class, and standing is "an antecedent legal issue" that the court should resolve prior to addressing class certification. *See Arreola*, 546 F.3d at 794. The Court should thus disregard the City's request that the "Plaintiffs' request[] for [] class certification pursuant to Rule 23(b)(2) . . . be dismissed with prejudice." City Mot. to Dismiss 4.

their constitutional rights.[4] Here, in contrast, numerous named Plaintiffs have each alleged that they were *repeatedly* subjected to unconstitutional stops and/or frisks by Chicago Police, all while they were engaged in completely lawful activity.[5] Thus, this case is entirely distinguishable from each of the cases on which the City relies because numerous Plaintiffs have each alleged multiple past violations of their constitutional rights, and the "possibility of recurring injury ceases to be speculative when actual repeated incidents are documented." *Thomas v. Cnty. of Los Angeles*, 978 F.2d 504, 507 (9th Cir. 1992), *as amended* (Feb. 12, 1993) (internal quotation omitted). *Accord Illinois Migrant Council v. Pilliod*, 540 F.2d 1062, 1067 (7th Cir. 1976) *on reh'g*, 548 F.2d 715 (7th Cir. 1977) (plaintiffs had standing where they complained of repeated actions by INS officials in stopping members of plaintiffs' class without

---

[4] The other cases on which the City relies also alleged only one prior injury. *See Otero v. Dart*, No. 12 C 3148, 2012 WL 5077727 (N.D. Ill. Oct. 18, 2012); *Simack v. City of Chicago*, No. 02 C 3139, 2003 WL 924335 (N.D. Ill. Mar. 6, 2003); *Portis v. City of Chicago*, 347 F. Supp. 2d 573 (N.D. Ill. 2004).

[5] Am. Compl. ¶¶ 62-88 (alleging two separate suspicionless stops and frisks of Plaintiff Darnell Smith, once when he was standing in front of his own residence, and another while he was on the front porch steps of a neighbor's residence), ¶¶ 89-101 (alleging two different suspicionless stops of Plaintiff Gregory Davis, once when he was in his car waiting for his daughter's mother, and once four months later, when he was in his car leaving his residence), ¶¶ 130-162 (alleging two separate suspicionless stops and frisks of Plaintiff Herber Dyer, Jr., once when he was waiting to cross the street to go to the grocery store, and another when he was leaving a liquor store a block away from his home), ¶¶ 177-200 (alleging four suspicionless stops and frisks of Plaintiff Christopher Locke, once when he was taking photographs for a college class, and three separate stops on the same day, two months after the first stop, when he was walking in the neighborhood at various times of the day), ¶¶ 212-219 (alleging five separate suspicionless stops and frisks of Plaintiff Marcell Davis over the course of five months, each time in front of his own home while talking to family and friends), ¶¶ 235-259 (alleging three suspicionless stops and frisks of Plaintiff Carl McCord over the course of two months, when he drove to get food, go to church, and to a friend's house), ¶¶ 297-308 and ¶¶ 350-366 (alleging three separate suspicionless stops and frisks of Plaintiff Darion Beene, once while walking, once while driving, and once at a barbeque), ¶¶ 309-316 and ¶¶ 350-366 (alleging four separate suspicionless stops and frisks of Plaintiff Deandre Stewart while going about his daily life, including once outside of his aunt's house, and once at a barbeque), ¶¶ 317-322 and ¶¶ 350-366 (alleging two separate suspicionless stops and frisks of Plaintiff Lavester McWane when he was walking down the street with his friends and when he was at a barbeque), ¶¶ 323-335 (alleging two separate suspicionless stops and frisks of Plaintiff Steve McAbee, once while walking home and once while walking to his sister's house), ¶¶ 396-409 (alleging two separate suspicionless stops and frisks of Plaintiff Michael Sanders during the same month, once when he was standing in front of his aunt's residence, and once when he was sitting in his parked vehicle on the same street).

legal cause and in conducting illegal searches and seizures of dwelling places and factories); *Ligon v. City of New York*, 288 F.R.D. 72, 81 (S.D.N.Y. 2013). The threat of future violations of their rights by the City is thus both real and immediate, and equitable relief will prevent these future injuries.

Second, unlike the plaintiffs in *Lyons*, 461 U.S. at 108, *Robinson*, 868 F.2d at 966, and *Boston*, 1988 WL 31532, at *8, the Plaintiffs' risk of future injury does not depend on them being arrested for unlawful conduct, so they cannot avoid future injuries simply by obeying the law. Plaintiffs have each alleged that they were subjected to suspicionless stops and/or frisks based on their race and/or national origin while they were going about their daily lives—walking home, driving to church, standing in front of their own homes or the homes of friends or relatives.[6] Even assuming that Plaintiffs will conduct themselves in a lawful manner, they face a

---

[6] *Supra* n.5; *see also* Am. Compl. ¶¶ 102-110 (alleging suspicionless stop and frisk of Plaintiff Jeff Coleman when he was a passenger in car driven by a friend), ¶¶ 111-121 (alleging suspicionless stop and frisk of Plaintiff Phillip Overton when he was walking to a convenience store to buy groceries after work), ¶¶ 122-129 (alleging a suspicionless stop and frisk of Plaintiff Marque Ross when he was walking out of a convenience store), ¶¶ 163-168 (alleging a suspicionless stop and frisk of Plaintiff Mark Nevilles when he was walking to a local store), ¶¶ 169-176 (alleging a suspicionless stop and frisk of Plaintiff Anthony Brown when he was walking home from an Alcoholics Anonymous meeting), ¶¶ 201-211 (alleging a suspicionless stop and frisk of Plaintiff Hector Fantanez when he was riding his bike by his father's house), ¶¶ 220-227 (alleging a suspicionless stop of Plaintiff Anthony Polk when he was driving), ¶¶ 228-234 (alleging a suspicionless stop and frisk of Plaintiff Calvin Jackson when he was walking with his girlfriend to a gas station), ¶¶ 260-267 (alleging a suspicionless stop and frisk of Plaintiff Timothy Thigpen when he was driving to his work vehicle), ¶¶ 268-274 (alleging a suspicionless stop and frisk of Plaintiff Keith Riggins when he was walking home from work), ¶¶ 275-281 (alleging a suspicionless stop and frisk of Plaintiff James Shinaul when he was walking to a store), ¶¶ 282-288 (alleging a suspicionless stop and frisk of Plaintiff Brandon Buford when he was walking to visit a friend), ¶¶ 289-296 (alleging a suspicionless stop and frisk of Plaintiff Melvin Thompson when he was walking to a store with his brothers in their own neighborhood), ¶¶ 336-342 (alleging a suspicionless stop of Plaintiff Jonathan Jackson when he was driving), ¶¶ 343-349 (alleging a suspicionless stop and frisk of Plaintiff Arthur Stringer when he was driving some family members home), ¶¶ 367-373 (alleging a suspicionless stop and frisk of Plaintiff Shantay Johnson when she was standing outside a store), ¶¶ 374-380 (alleging a suspicionless stop and frisk of Plaintiff Arthur Moton when he was walking to a local store), ¶¶ 381-387 (alleging a suspicionless stop and frisk of Plaintiff Dudley Burns when he was crossing the street), ¶¶ 388-395 (alleging a suspicionless stop and frisk of Plaintiff Edgar Marshall, Jr. when he was driving home from the gym), ¶¶ 410-417 (alleging a suspicionless stop and frisk of Plaintiff Rashawn Lindsey when he was walking home from school), ¶¶ 418-425 (alleging a suspicionless stop and frisk of Plaintiff

realistic threat of being subjected to unlawful police practices, just like the plaintiff in *Franklin v. City of Chicago*, 102 F.R.D. 944, 948 (N.D. Ill. 1984), did.[7] The Amended Complaint thus adequately alleges standing to seek equitable relief.

Finally, the allegations of the widespread policy, practice, and/or custom of unlawful suspicionless stops and frisks, Am. Compl. ¶¶ 434-473, make it likely that Plaintiffs will be harmed again in the future. *See Pilliod*, 540 F.2d at 1067 (plaintiffs had standing to seek injunctive relief because they showed a specific pattern of conduct, akin to an explicit policy, demonstrating a reasonable likelihood of future harm). As alleged in the Amended Complaint, Chicago Police initiated more than 250,000 stops that did not lead to arrest during a four month period in 2014. Am. Compl. ¶ 447. Seventy-two percent of these stops were of African-Americans. *Id.* at ¶ 444. These suspicionless stops and frisks occurred with much greater frequency in minority communities in Chicago, *Id.* at ¶ 445, and, in non-minority communities, African-Americans were subject to a disproportionate number of suspicionless stops and frisks, *Id.* at ¶ 446. Widespread constitutional abuses are caused by the City's policies, practices, and/or customs. *Id.* at ¶¶ 458-470. These allegations distinguish this case from the cases on which the City relies that did not contain such allegations. Based on the allegations in the Amended Complaint, it is not "mere speculation and conjecture" that Plaintiffs will again be subjected to

---

Sidney Bell when he was walking home with his girlfriend), ¶¶ 426-433 (alleging a suspicionless stop and frisk of Plaintiff Calvin Jackson when he was walking with a friend to another friend's house).

[7] *Accord Floyd v. City of New York*, 283 F.R.D. 153, 169 (S.D.N.Y. 2012) (holding that plaintiffs had standing to seek injunctive relief in stop and frisk case); *Hernandez v. Cremer*, 913 F.2d 230, 234-35 (5th Cir. 1990) (explaining that the INS stop in question inflicted an injury which "did not result from an individual's disobedience of official instructions and [the plaintiff] was not engaged in any form of misconduct"); *LaDuke v. Nelson*, 762 F.2d 1318, 1326 (9th Cir. 1985) (finding standing because "the members of plaintiff class do not have to induce a police encounter before the possibility of injury can occur. . . . The class members are subject to constitutional injury based on . . . completely innocent behavior."); *National Congress for Puerto Rican Rights v. City of New York*, 75 F. Supp. 2d 154, 161 (S.D.N.Y. 1999) ("The fact that plaintiffs were stopped while engaging in everyday tasks further illustrates a realistic risk of future harm.")

violations of their rights. The frequency of unconstitutional stops of African-Americans and Hispanics by Chicago Police creates a likelihood of future injury, and establishes Plaintiffs' standing to seek injunctive relief. *See Floyd*, 283 F.R.D. at 169; *Ligon*, 288 F.R.D. at 81.

Here, the allegations of repeated unconstitutional stops and/or frisks of numerous individually named Plaintiffs while they were going about their daily lives is enough to establish that there is a real and immediate threat that they will again be subject to unconstitutional stops and/or frisks by Chicago Police.[8] Additionally, the frequency with which the stop and frisk policy is employed city-wide makes the threat of additional future illegal stops and/or frisks likely.

## II. The Agreement That the City Reached With the ACLU Does Not Moot Plaintiffs' Claims.

The City cites *Federation of Advertising Industry Representatives, Inc. v. City of Chicago*, 326 F.3d 924, 929 (7th Cir. 2003), for the proposition that "mootness arises when, as here, a challenged [policy or practice] is repealed during the pendency of litigation, and a plaintiff seeks only prospective relief." City Supp. Auth. in Supp. of Mot. to Dismiss 5. The case, however, does not help the City. It "recognize[s] that a defendant's change in conduct cannot render a case moot so long as the plaintiff makes a claim for damages." *Federation*, at 929. Here, Plaintiffs have sought damages. Am. Compl. ¶¶ 104-05 (Prayer for Relief).

---

[8] Nothing in the City's "supplemental authority" filing establishes that Plaintiffs or the Plaintiff Class do not or will not continue to face the very real and immediate threat of being stopped in violation of their Fourth and Fourteenth Amendment rights. The "supplemental authority" is not a court order, nor does it have any mechanism for enforcement by anyone, let alone by Plaintiffs. In fact, on page 8, clause VI, bullet 3, of the City's Investigatory Stop and Protective Pat Down Settlement Agreement, the agreement between the City and another entity makes clear that "[a]ny party may terminate this agreement at any time." City Supp. Auth. in Supp. of Mot. to Dismiss, Ex. A, p. 8, ¶ VI(3). Unless and until the Court enters a consent decree or judgment in Plaintiffs' favor, Plaintiffs face a real and immediate threat of being unconstitutionally stopped and/or frisked, and dismissing their claims with prejudice will deprive them of any legal recourse.

Moreover, to reach the result it did in *Federation*, the Seventh Circuit reasoned "we have repeatedly held that the complete repeal of a challenged law renders a case moot, unless there is evidence creating a reasonable expectation that the City will reenact the ordinance or one substantially similar." *Federation*, at 930. While that expectation might appropriately accompany legislative action repealing an unconstitutional law, a voluntary agreement like the one the City has proffered here, subject to unilateral abrogation, ought not receive the same treatment.

In addition, *Federation* stands for the proposition that injunctive claims become moot after the challenged government misconduct has ceased or has been corrected. Here, as was the situation before another district court, "Defendant attempts to extend these cases much further— to situations where the government has promised to correct its misconduct, but before the government has actually corrected its misconduct." *Kliegman v. Cnty. of Humboldt*, No. CV 09-0006, 2010 WL 2382445, at *3 (N.D. Cal. June 10, 2010). That court concluded, "Defendant's argument, while creative, goes too far." *Id*. In *Kliegman*, a city asserted mootness on the basis of a settlement agreement with the U.S. Department of Justice. The court held that the:

> settlement agreement alone does not moot Plaintiff's action. First and most important, Defendant does not indicate whether it has actually complied with the DOJ settlement agreement, nor does Defendant provide the status of its compliance with the agreement. The promise to correct Defendant's challenged violations alone is insufficient to moot Plaintiff's injunctive claims.

*Id*. at *4.

Plaintiffs submit that the same rationale applies here. The Investigatory Stop and Protective Pat Down Settlement Agreement between the City, the Chicago Police Department, and the ACLU (hereinafter, "Agreement") does not make it absolutely clear that the City will terminate its practice or custom of unconstitutional stops and frisks permanently. Most notably, and most strikingly, the Agreement states: "*Any party* may terminate this agreement at any time."

City Supp. Auth. in Supp. of Mot. to Dismiss, Ex. A, p. 8, ¶ VI(3) (emphasis added). This provision, standing alone, gives the City the power to return to its old ways "at any time." Although other aspects of the Agreement also fail the test for mootness, this critical provision alone provides a sufficient basis for this Court to reject the Defendants' mootness argument.

In addition, the Agreement has no enforceability mechanism, only a "consultant" agreed to by the parties to monitor compliance. None of the Plaintiffs in this case would have standing to show violation of the Agreement and obtain a remedy. Nor is the Agreement subject to the jurisdiction of a court. Other terms of the Agreement are vague, conclusory, and/or do not actually address the unconstitutional conduct on a permanent basis. For example, the Agreement states that, absent unilateral abrogation, it "shall remain in effect until June 30, 2017." *Id.* Even if implemented fully, the Agreement ends less than two years from now, contingent upon "a finding by the Consultant of substantial compliance." *Id.* What such a finding must conclude is not reasonably certain, nor is the conduct that constitutes "substantial compliance" likewise well defined.[9] The Agreement further adds simply that the ACLU and the City will "work together to seek agreement on standards for substantial compliance with ICRA" at some point after June 30, 2016. The alleged agreement to "work together" at some remote time in the future for an ill-defined "compliance with ICRA" simply does not meet the heavy burden imposed by law on a party asserting mootness to demonstrate that the challenged practice has ended and will not reoccur. *Cf. United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953) (establishing that the test

---

[9] Substantial compliance is addressed in the agreement as follows: "CPD shall be in substantial compliance with this agreement if any violations of its requirements are neither systemic nor serious. If a serious violation occurs, CPD shall be in substantial compliance if it promptly identifies the violation and develops and implements a timely and appropriate remedy that results in compliance." Thus, violations not regarded as systemic are permitted, which is a lower bar than Plaintiffs seek in this action. Plaintiffs further suggest that this definition does not make it absolutely clear that the injunctive relief Plaintiffs seek will not re-occur. Indeed, what counts as a "serious violation" is not addressed in the Agreement. Further, this clause places the discretion on how to remedy the violation on CPD, which is committing the wrongs in the first place.

for mootness is a stringent one, and treating such voluntary action as moot, would "leave '[t]he defendant . . . free to return to his old ways.'") (footnote omitted). Instead, only "if subsequent events made it absolutely clear" and a party has borne the "'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again" may mootness be considered. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quotation omitted). Defendants have not met that standard here. Moreover, because Plaintiffs seek damages, mootness is not applicable. *Federation*, 326 F.3d at 929.

III.   **Plaintiffs Should Be Granted Leave to Amend the Complaint to Substitute the Parents of the Minor Plaintiffs as Plaintiffs.**

The City argues that the claims of two Plaintiffs, Hector Fanatez and Steve McAbee, should be dismissed because they lack the legal capacity to sue as minors. City Mot. to Dismiss 8. Rather than dismiss these two individuals, Plaintiffs ask this Court for leave to amend the complaint to substitute the minors' parents, Araceli Fanatez and Rebecca Sanders, respectively, as the parents and next friends of the minors, as plaintiffs. *See* Fed. R. Civ. P. 17(c)(2). *See also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). Leave is liberally granted absent a determination that amendment would be futile in preventing dismissal of the complaint. *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004). These substitutions will not prejudice any party and are not substantive changes to the allegations. Plaintiffs request that this Court consider all of the briefing and arguments even as to the minor Plaintiffs at this time, pending the substitution of the proper plaintiffs.

IV.   **Plaintiffs Sufficiently State Claims for Municipal Liability for Violations of Federal Law Under the *Monell* Doctrine.**

At the heart of Plaintiffs' suit is a 42 U.S.C. § 1983 claim against the City. For a municipality to be liable under § 1983, a plaintiff must prove that action pursuant to municipal

policy caused the alleged constitutional violation. *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 691 (1978). Defendants' arguments focus on the question of whether Plaintiffs' have adequately alleged an "official municipal policy."[10] Official municipal policy can take three forms: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007).

In cases alleging a municipality's failure to train, supervise, monitor, and/or discipline police officers, a municipality can be held liable when its officials have been "deliberately indifferent" to the constitutional deprivations that are caused by and that are likely to be caused by that failure. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989); *Gibson v. City of Chicago*, 910 F.2d 1510, 1519-23 (7th Cir. 1990). Deliberate indifference may be inferred where "the need for more or better supervision [or training] to protect against constitutional violations was obvious," but the policymaker "fail[ed] to make meaningful efforts to address the risk of harm to plaintiffs." *Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (quotation marks omitted); *see also Connick v. Thompson*, 131 S. Ct. 1350, 1359-61 (2011); *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029-30 (7th Cir. 2006) (a municipality shows deliberate indifference if it fails to provide further training after learning of a pattern of constitutional violations by the officers).

Drawing from the Supreme Court decisions in *Connick* and *Canton*, federal courts have repeatedly held that official municipal policy rises to the level of deliberate indifference if the following three conditions are met:

---

[10] Defendants do not argue that there is not a direct causal link between the municipal custom or policy and the constitutional violation. *See Bd. of the Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404-07 (1997). Rather, they argue that there is no custom or policy adequately alleged at all.

> (1) [the] policymaker knows "to a moral certainty" that its employees will confront a given situation; (2) either [the] situation presents employees with [a] difficult choice that will be made less so by training or supervision, or there is a record of employees mishandling [the] situation; and (3) [a] wrong choice by employees will frequently cause [the] deprivation of constitutional rights.

*Cash*, 654 F.3d at 334 (citations omitted); *see also Connick*, 131 S. Ct. at 1361; *Canton*, 489 U.S. at 396. Each of these is a question of fact, based on the evidence developed in discovery and presented on a motion for summary judgment or at trial. At the pleading stage, a claim of liability pursuant to the *Monell* doctrine requires a plaintiff to plead facts allowing the inference that the violation of the plaintiff's constitutional rights resulted from "official municipal policy." *See Listenbee v. City of Harvey*, No. 11 C 03031, 2013 WL 5567552, at *3 (N.D. Ill. Oct. 9, 2013). As demonstrated below and in the Amended Complaint, Plaintiffs have sufficiently stated claims of municipal liability under *Monell*.

The Amended Complaint alleges that the City, under a widespread custom or practice that amounted to an official policy, and its agent Defendant Garry McCarthy, Chicago Police Superintendent, in his official capacity, made official policy or acquiesced in existing practices that violated Plaintiffs' rights under both the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Am. Compl. ¶¶ 434-473. Although Plaintiffs will have to present evidence demonstrating the existence of an official municipal policy or practice that caused and that will continue to cause constitutional injuries in order to survive summary judgment, *see Grieveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008), they are not required to do so in their complaint or on a motion to dismiss. Accordingly, the Court should deny Defendants' motions to dismiss, and permit this case to proceed so that the parties can take discovery on the merits of these claims.

**A.** **Plaintiffs have pled sufficient facts to show that a widespread custom or practice exists.**

The Amended Complaint alleges sufficient facts to demonstrate that the City had and has practices and customs that are so persistent and widespread as to practically have the force of law. Am. Compl. ¶¶ 434-490, 495-498. The City's response to these allegations is to focus on whether its other polices, not in issue, are unconstitutional or violate Plaintiffs' constitutional rights, and on factual arguments that are inappropriate in a motion to dismiss. The City's motion only serves to demonstrate why its Motion should be denied.

The City attaches three general orders of the Chicago Police Department, two of which are not cited or referenced in the Amended Complaint, and argues that Plaintiffs "identify or implicate" these policies, but "fail to allege facts suggesting that any of the policies are unconstitutional or caused a deprivation of their rights." City Mot. to Dismiss 9-11. *See also* McCarthy Mot. to Dismiss 3-4. The content of the general orders are irrelevant to the City's Motion, and the City's argument misses the point: Plaintiffs' claims do not rely on what is contained in the written policies of the Chicago Police Department. Rather, Plaintiffs' claims rely on unwritten policies of the CPD: actions, practices and customs that constitute official municipal policy, although they are not expressed in general orders, and conflict with the face of express policies of the CPD. By focusing on irrelevant general orders of the CPD, the City attempts to divert the Court's attention away from the "official municipal policy" that is at the heart of Plaintiffs' claims.

To show the existence of a widespread custom or practice under *Monell*, a plaintiff must plead facts that show that the municipality was aware of the behavior, or that the behavior was so widespread that the City should have been aware of it, and that the City or its policymakers were "'deliberately indifferent' as to [the widespread practice's] known or obvious consequences."

*Hall v. City of Chicago*, 989 F. Supp. 2d 699, 708 (N.D. Ill. 2013) (citations omitted); *see also Gibson*, 910 F.2d at 1519-23 (official inaction in the face of a known or obvious consequence of the custom or practice constitutes a deliberate choice that may be properly thought of as a city policy or custom that is actionable under § 1983). Further, "allegations with respect to the pervasive nature of the alleged constitutional violations [a]re sufficient to establish that the practice was widespread enough to impute constructive knowledge to the City." *Hall*, 989 F. Supp. 2d at 708. *See also Floyd v. City of New York*, 959 F. Supp. 2d 540, 660 (S.D.N.Y. 2013) (finding that the NYPD was liable under a *Monell* theory based on "practices so persistent and widespread as to practically have the force of law" in part because statistical evidence showed that there were a high percentage of contact cards filled out by NYPD officers that did not identify a suspected crime which would have legally justified the stop or stop and frisk).

Although the Seventh Circuit "has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice," it plainly has suggested that more than three incidents are necessary. *Wilson v. Cook Cnty.*, 742 F.3d 775, 780 (7th Cir. 2014). Plaintiffs' Amended Complaint pleads significantly more than three incidents of the customs or practices of stopping and/or frisking African-Americans and Hispanics based on their race or national origin, without reasonable articulable suspicion to believe that they had committed or were in the process of committing a crime, and without a reasonable belief that they were armed and dangerous. Am. Compl. ¶¶ 62-433, 440-451. Additionally, Plaintiffs have pled sufficient facts to show that the City and its officials were aware of, and even encouraged, the widespread custom or practice of stopping and frisking African-Americans and Hispanics based on their race or national origin and without reasonable articulable suspicion that they had committed or were about to commit a crime, or reasonable suspicion that they were armed and dangerous. Am.

Compl. ¶¶ 465-470. Finally, the Amended Complaint alleges sufficient facts to state a claim that the City failed to train, supervise, monitor, and discipline CPD officers with deliberate indifference to the constitutional deprivations that were caused by and that were likely to be caused by those failures. Am. Compl. ¶¶ 434-473.

The City parses each individual allegation in an apparent attempt to test whether each separate allegation *on its own* has merit. City Mot. to Dismiss 11-20. However, the Court must look at the Amended Complaint as a whole to determine whether Plaintiffs have stated claims upon which relief can be granted. *See Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011); *cf. Scott v. City of Chicago*, 195 F.3d 950, 952 (7th Cir. 1999) ("Whether a complaint provides notice, however, is determined by looking at the complaint as a whole."). Taken together, rather than picked apart, the Amended Complaint adequately alleges an official municipal policy for which the City can be held liable under *Monell*, and the City's Motion to Dismiss should be denied.

Rather than concede that the Amended Complaint adequately alleges the elements of a claim for municipal liability under *Monell*, Defendants attempt to test the merits of Plaintiffs' claims. City Mot. to Dismiss 11-20. By trying to get this Court to focus on *the merits* of Plaintiffs' claims, Defendants run far afield from the Rule 12(b)(6) standard, which asks whether the Plaintiffs have stated a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Defendants' arguments on the merits of Plaintiffs' claims merely highlight the fact that the Amended Complaint plainly meets this standard.

First, the City relies on completely impertinent cases for their argument that "[t]he mere fact that multiple incidents allegedly occurred is insufficient to suggest a widespread practice." City Mot. to Dismiss 11. Contrary to the City's assertion, though, the court in *Estate of Moreland*

*v. Dieter*, 395 F.3d 747 (7th Cir. 2005), did not consider whether multiple incidents were sufficient to *allege* a widespread practice or custom. *Moreland* was decided on a motion for summary judgment, and the court there was deciding whether the evidence presented demonstrated that the sheriff there was aware of and indifferent to a pattern of violations of prisoners' rights. 395 F.3d at 759-60. *Gable v. City of Chicago*, on which the City also relies, was also decided on a motion for summary judgment, and the court there determined whether the plaintiffs had adduced enough evidence to show that a widespread custom existed. 296 F.3d 531, 538 (7th Cir. 2002). *Moreland* and *Gable* are entirely inapposite to the question of whether Plaintiffs have *alleged* sufficient facts to state a claim upon which relief can be granted. The Plaintiffs' allegations of multiple incidents of constitutional violations, Am. Compl. ¶¶ 62-433, along with their other allegations, ¶¶ 434-490, 495-498, adequately allege a widespread custom or practice that caused constitutional violations.[11] *See Hall*, 989 F. Supp. 2d at 708 (allegations that the constitutional violations are widespread are sufficient). These allegations must be accepted as true. Evidence proving that this policy or pervasive practice exists must wait until after the parties engage in discovery.

Next, the City argues whether other facts alleged in the Amended Complaint were enough, on their own, apart from the other facts alleged, to *demonstrate* awareness of the widespread practices or customs of unconstitutional stops and frisks, or to *establish* deliberate

---

[11] While *Ramos v. City of Chicago*, 707 F. Supp. 345 (N.D. Ill. 1989) *was* decided on a motion to dismiss, the allegations in the Amended Complaint of more than 50 incidents over the course of two years, Am. Compl. ¶¶ 62-433, far surpasses the number and frequency of incidents alleged there (six incidents over a 10-year period). Moreover, Plaintiffs here, unlike the plaintiff in *Ramos*, have additional allegations showing that widespread practices and customs exists. *See* Am. Compl. ¶¶ 434-490, 495-498. *Ramos*, decided based on the specific allegations in that case, is not even analogous to this case, and does not support dismissal of the Amended Complaint.

indifference. City Mot. to Dismiss 11-20.[12] Again, the City is focused on the wrong question. The question is *not* whether Plaintiffs have shown or proven that the City was aware of the widespread unconstitutional practices or customs, or that the City was, *in fact*, deliberately indifferent to the constitutional violations that were likely to results, and that did result. These are factual questions about the *merits* of Plaintiffs' claims. The question at this stage of the litigation is whether Plaintiffs have alleged sufficient facts to suggest that they are entitled to relief due to the misconduct alleged.

In another improper attempt to argue the merits of Plaintiffs' claims, the City claims that the ACLU report "did not assert that CPD officers had a widespread practice of unconstitutional stops and frisks or that CPD officers were targeting African-Americans or Hispanics in stops and frisks" and that the ACLU report simply showed that the CPD had a problem with its record keeping. City Mot. to Dismiss 12-13. The City's argument is essentially that its own records, upon which it can rely, are unreliable in the hands of anyone else. However, as alleged in the Amended Complaint, the ACLU's March 2015 Report highlighted that the CPD has failed for decades to train, supervise, and monitor stop and frisk practices in minority neighborhoods, and that hundreds of thousands of people—primarily African-Americans and Hispanics—were stopped each year by the CPD without legally sufficient justification as a result. *See* Am. Compl. ¶¶ 54, 440-450, 483, 485. The City's factual arguments to the contrary should be disregarded at this stage of the litigation, as Plaintiffs' allegations must be taken as true.

---

[12] Defendant McCarthy makes almost identical factual arguments about whether he was, in fact, on notice or aware of the pervasive unconstitutional practice of stopping and/or frisking individuals on the basis of their race or national origin, and without reasonable articulable suspicion that they had committed or were in the process of committing a crime, or reasonable articulable suspicion that they were armed and dangerous. McCarthy Mot. to Dismiss 7-9. Leaving aside the fact that Defendant McCarthy largely ignores the bulk of the allegations against him in the Amended Complaint, his factual arguments, like the City's, are improper at this stage of the litigation. Moreover, his denial indicates that he was unaware of records kept by the very Department he heads.

Once this case proceeds to the merits of Plaintiffs' claims, it will be shown that the data used in the ACLU's March 2015 Report came from the City of Chicago itself. Am. Compl. ¶¶ 440-57. Based on the allegations, the City itself possessed information demonstrating the existence of widespread practices and customs that violate the rights of Plaintiffs' and the plaintiffs' class. *Id.* Fully half the contact cards collected and maintained by the CPD recorded legally insufficient reasons for a stop under *Terry v. Ohio*, 392 U.S. 1 (1968), and its line of cases, and a large percentage recorded no reason for the stops at all. Am. Compl. ¶ 442. The contact card data created and controlled by the City plainly showed that African-Americans were disproportionately subjected to stops. Despite being only 32 percent of Chicago's population, they were the targets of 72 percent of the stops recorded in the City's contact cards. *Id.* at ¶ 444. Additionally, stops were concentrated in minority neighborhoods rather than white ones. *Id.* at ¶ 445. Even outside of minority neighborhoods, African-Americans were disproportionately targeted for stops—Jefferson Park's population is only 1 percent African-American yet African-Americans constituted 15 percent of the stops conducted there. *Id.* at ¶ 446. Shockingly, in a four-month period of 2014, a huge number of stops, 250,000, never resulted in arrest, which is unlikely to be the case if the stops were legitimately based on a reasonable, articulable suspicion of criminal activity. *Id.* at ¶ 447. The City had all this data *before* the ACLU published its analysis in March 2015, so the City's assertion that it was not or could not have been aware of this information prior to April 15, 2015,[13] City Mot. to Dismiss 13, is disingenuous. Deliberate indifference to the constitutional violations that were likely to occur because of a widespread practice can be shown by the City's failure to make effective use of the data available to it, and

---

[13] Again, a factual assertion contrary to the facts alleged in the Amended Complaint, is inappropriate for assessment at this stage of the litigation.

repeatedly turning a blind eye "to clear evidence of unconstitutional stops and frisks." *See Floyd*, 959 F. Supp. 2d at 659.

Finally, the City asserts that previous lawsuits challenging the CPD's unconstitutional stop and frisk policies, and related policies, "cannot *establish* awareness." City Mot. to Dismiss 14. Yet, the City cites to a case that does not stand for that proposition. *Id.* (citing *Strauss v. City of Chicago*, 760 F.2d 765 (7th Cir. 1985)). The court in *Strauss* dealt with a barebones complaint in which the plaintiff could not identify "a pattern of conduct or a series of acts violative of constitutional rights" that raised an inference of municipal policy other than "suggest[ing] that the police department's sustaining only six to seven percent of all registered complaints filed for 1977, 1978 and 1979 'must give rise to a reasonable man's suspicions that defendant Chicago's methods of review are weighted to discourage positive findings.'" 760 F.2d at 768.[14]

Further, the facts in *Strauss* are not analogous to the allegations in Plaintiffs' Amended Complaint here, which identifies numerous instances that made or should have made the City aware of a widespread practice or custom of unconstitutional stops and frisks by the CPD. Plaintiffs' allegations about prior lawsuits challenging stop and frisk practices in Chicago, Am. Compl. ¶¶ 435-439, in combination with the other facts alleged by Plaintiffs, are sufficient to allege that the City was or should have been aware of the likelihood that CPD officers would violate the constitutional rights of minorities in Chicago. *Strauss* is simply inapposite to the question of whether Plaintiffs' Amended Complaint states claims upon which relief can be granted.

---

[14] The other cases on which the City relies, like most of the cases it cites throughout its brief, were decided on motions for summary judgment, which are subject to a different standard than the one that applies to the City's Motion to Dismiss, and simply demonstrate why the City's Motion should be denied. *See Dertz v. City of Chicago*, No. 94 C 542, 1997 WL 85169, at *1, *19 (N.D. Ill. Feb. 24, 1997); *Limes-Miller v. City of Chicago*, 773 F. Supp. 1130, 1132 (N.D. Ill. 1991).

Following its repeated improper attempts to litigate the merits of Plaintiffs' allegations that the City was aware or should have been aware of the pervasive practice of unconstitutional stops and frisks, the City attempts to litigate the merits of Plaintiffs' plausible allegations that the City was deliberately indifferent to the constitutional rights of those who would come into contact with CPD officers. The Amended Complaint contains "factual allegations that the City knew of an obvious risk that it played a role in creating," yet did not rectify the conditions by which a likely injury would be inflicted. *See Gibson*, 910 F.2d at 1522 & n.20. Plaintiffs have alleged that the City failed to properly screen, train, supervise, monitor, and discipline CPD officers with deliberate indifference to the constitutional rights of those who would come into contact with CPD officers. Am. Compl. ¶¶ 452-490. The City ignores these allegations, focusing solely on the merits of particular allegations, completely ignoring the standard that applies to motions to dismiss under Rule 12(b)(6). As with its arguments about the merits of Plaintiffs' allegations of "knowledge" of the City or its policymakers of the widespread practice, the City's arguments about the merits of Plaintiffs' allegations of "deliberate indifference" must be disregarded on a motion to dismiss.

Plaintiffs' allegations describing the CPD's productivity standards, de facto quotas of stops and frisks per month, Defendant McCarthy's directive to CPD officers to "get out of the cars and put our hands on people, . . . and make sure we are stopping the right people at the right times and the right places," the Violence Reduction Initiative (VRI), and officers' practice or custom of failing to turn on dash cameras to prevent recordings of unconstitutional stops and frisks, Am. Compl. ¶¶ 452-69, in combination with the other allegations in the Amended Complaint, are sufficient to plausibly allege that the City and its policymakers were deliberately indifferent to the constitutional rights of those who would come into contact with CPD officers,

and the City's motion to dismiss should be denied. It is clearly plausible that encouraging CPD officers to saturate neighborhoods and stop and frisk as many people as possible, and rewarding such greater "activity" would lead to constitutional violations. Additionally, the alleged widespread practice of not turning on dash cameras or other surveillance equipment, accepted as true, states a plausible claim that the purpose of the practice is to facilitate the wider program of unconstitutional stops. *Id.* at ¶ 469.

In its Supplemental Authority, the City points to its recently entered Investigatory Stop and Protective Pat Down Settlement Agreement with the ACLU as evidence that the City is not deliberately indifferent to the alleged widespread practice of unconstitutional stops and frisks. City Supp. Auth. in Supp. of Mot. to Dismiss 1. The City's "supplemental authority" is improper, as it presents factual material outside the pleadings to attempt to argue the merits of the allegations.[15] The "supplemental authority" also does not undercut the allegations in the Amended Complaint, but rather demonstrates that Plaintiffs' allegations concerning a widespread practice of unconstitutional stops and frisks exists, knowledge of this widespread practice, and deliberate indifference to the constitutional rights of those who would come into contact with CPD officers are plausible. That is all that is required for the Plaintiffs' to survive the City's motion to dismiss. After turning a blind eye for decades to the CPD's widespread unconstitutional stop and frisk practices, the City's "voluntary," non-binding, extrajudicial ex parte agreement with the ACLU does not demonstrate that the City has protected, is protecting, or will protect the constitutional rights of those who would come into contact with CPD officers. Whether the City is continuing to be deliberately indifferent to the constitutional rights of

---

[15] In *General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F. 3d 1074 (7th Cir. 1997), the Seventh Circuit held: "If a district court considers matters outside the pleadings, our procedural rules require that 'the motion shall be treated as one for summary judgment' under Fed. R. Civ. P. 56, Fed. R. Civ. P. 12(6). Under this converted motion, 'all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.'" *Id*. at 1080.

Chicago's citizens by, among other things, failing to enter into an agreement that is adequate and sufficiently enforceable is a fact question for a jury.[16]

When deciding a motion to dismiss, the Court "draw[s] on its judicial experience and common sense" when determining whether a claim is plausible. *Iqbal*, 556 U.S. at 679. The standard is whether the claim to relief is plausible on its face, not whether the defendant agrees with the plaintiff's decision to sue. *Id.* at 678. Despite what the City may prefer, Plaintiffs do not have to present evidence at this stage as if they were at trial. Plaintiffs have met their burden to overcome a motion to dismiss on the issue of a widespread custom. As stated above, and pled in Plaintiffs' Amended Complaint, a widespread custom or practice of blatantly unconstitutional behavior exists. The Amended Complaint alleges that the City failed to properly screen, train, supervise, monitor, and discipline CPD officers with deliberate indifference to the consequences of its failures, and the custom was the moving force for the constitutional violations. *See, e.g.*, Am. Compl. ¶¶ 5, 470, 473, 477, 487, 497. Thus, the City's motion to dismiss must be denied.

### B. Municipal liability may also be based on the policies and indifference of McCarthy as a senior policy maker (Count 4).

*Monell* also makes plain that officials "whose edicts or acts may fairly be said to represent official policy," may give rise to municipal liability under § 1983. 436 U.S. at 694. Municipal liability attaches "where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986). Thus, where "the execution of such a policy or custom results in the deprivation of citizens' rights and privileges, the municipality may be subject to liability under

---

[16] *See Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (holding that it was a fact question regarding whether the jail's actual practice (as opposed to its written policy) of repeatedly failing to follow proper procedures caused its employees to be deliberately indifferent to the inmate's serious health needs where supervisors of a jail medical facility knew of their employees' disregard for written policies and yet did nothing to ensure that they followed those procedures).

§ 1983." *Woods v. City of Michigan City*, 940 F.2d 275, 278 (7th Cir. 1991). *See also Connick*, 131 S. Ct. at 1359 ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.").

Applying these principals, and examining a contention by a county sheriff that "his status as a county decision-maker and the jail's caretaker" did not impose a "duty to ensure that detainees arrested without a warrant receive a probable cause hearing or gain release," and that the responsibility belonged to the arresting officer or the prosecutor, the Seventh Circuit found "unconvincing the sheriff's attempt to shrug off his federal constitutional responsibilities toward the detainees." *Luck v. Rovenstine*, 168 F.3d 323, 326 (7th Cir. 1999). Instead, the court held that the claim could proceed against the county because the plaintiff showed the detentions were a product of the sheriff's chosen course of action, which consisted of failing to monitor the situation and thereby demonstrating a "policy of deliberate indifference." *Id.* at 327.

Here, the Amended Complaint contains sufficient allegations to survive a motion to dismiss on this basis as well.[17] In addition to alleging a widespread custom with the effective force of law, Plaintiffs have alleged that one of the highest ranking policymakers, Superintendent McCarthy, is on record saying that the purpose of the program is to target the "right people." Am. Compl. ¶ 453. In combination with what the ACLU uncovered in its report, the "right people" can only mean African-American and Hispanic males. As pled, this has been particularly the case in minority neighborhoods where dragnet stop and frisk policies have resulted in tens of thousands of unconstitutional stops of Chicago residents. Am. Compl. ¶¶ 440-449. McCarthy's stated policy, as well as the other policies he enacted and/or enforces, Am. Compl. ¶¶ 466-468,

---

[17] This alternative ground for imposing municipal theory may be considered independently of other grounds. Under Fed. R. Civ. P. 8(d)(2), a pleading is sufficient if any of its alternative legal theories states a claim.

and his deliberate indifference to constitutional rights of those who come into contact with CPD officers, opens the door to municipal liability, separate and apart from the other allegations of official municipal policy. There was an obvious need, as demonstrated by records maintained by the CPD, for attention and re-training for the stop and frisk activities of Chicago officers that went unattended. Liability naturally follows.

In fact, in a case involving similar allegations in New York City, Judge Scheindlin held that municipal liability followed when subordinates followed a course of action that regularly and adversely affected minorities, while "senior officials were deliberately indifferent to those adverse effects in such a way that a reasonable inference can be drawn that those officials intended those adverse effects to occur." *Floyd v. City of New York*, 959 F. Supp. 2d 540, 665 (S.D.N.Y. 2013) (footnote omitted). Plaintiffs have alleged nothing less than was sufficient in that court. The motion to dismiss should be denied.

**C.      Plaintiffs have sufficiently pled violations of their rights under the Equal Protection Clause of the Fourteenth Amendment.**

The Amended Complaint alleges that in carrying out the stop and frisk policy, Chicago Police Department officers violated the 34 named Plaintiffs' constitutional rights. The City asserts that Plaintiffs have not stated a claim for violations of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.[18] But the Amended Complaint clearly alleges a pervasive practice of stopping and frisking African-Americans and Hispanics based on their race and/or national origin, in violation of the Equal Protection Clause. *E.g.*, Am. Compl. ¶¶ 3, 5, 56-57, 62-433, 462-68, 482, 484. The City's motion should thus be denied.

---

[18] The City does not contest Plaintiffs' allegations of violations of the Fourth Amendment. The Amended Complaint plainly states claims for violations of their constitutional rights under the Fourth Amendment. *Cf. Floyd*, 959 F. Supp. 2d at 565-70 (detailing Fourth Amendment requirements).

The Equal Protection Clause of the Fourteenth Amendment states that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The clause mandates that similarly situated individuals should be treated alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985). To state a *Monell* claim against the City for violation of their right to equal protection, Plaintiffs must simply "'plead[ ] factual content that allows the court to draw the reasonable inference' that the City maintained a policy, custom, or practice of intentional discrimination against a class of persons" to which they belong. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). The Amended Complaint contains allegations that Plaintiffs are members of a protected class, and that the City maintained an official municipal policy of suspicionless stops and frisks that had a discriminatory effect, and that was motivated, selected, or reaffirmed, at least in part, because of the policy's adverse effect on the protected class. *E.g.*, Am. Compl. ¶¶ 3, 5, 56-57, 62-433, 440-57, 462-68, 482, 484.

When alleging claims of racial discrimination, general allegations are ordinarily sufficient—intent is implied by a claim of racial discrimination. *See Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998); *Michalowski v. Rutherford*, 82 F. Supp. 3d 775, 795 (N.D. Ill. 2015). As with Plaintiffs' allegations of an official municipal policy of suspicionless stops and frisks on the basis of race and/or national origin, the City improperly attempts to litigate the merits of Plaintiffs' Equal Protection claim at the pleading stage. *See, e.g.*, City Mot. to Dismiss 22 (citing an absence of evidence as grounds for dismissal). The City's arguments demonstrate why its motion should be denied.

Discrimination claims are challenging to prove, and intentional discrimination is not always apparent. Plaintiffs clearly allege claims of discrimination based on their race and/or national origin, but all of the facts supporting their claims are not within their control or

possession. Requiring Plaintiffs to plead those unknown details before discovery would improperly deny Plaintiffs the opportunity to prove their claim. *Bennett*, 153 F.3d at 518, 519. To survive a motion to dismiss, Plaintiffs are not required to allege the specifics of how they were discriminated against, or prove the specific details that support their allegations of intentional discrimination, although such specificity certainly would be required at the summary judgment stage. *See Am. Nurses' Ass'n v. State of Illinois*, 783 F.2d 716, 727 (7th Cir. 1986) ("[A] complaint does not fail to state a claim merely because it does not set forth a complete and convincing picture of the alleged wrongdoing."). "In these types of cases, the complaint merely needs to give the defendant sufficient notice to enable him to begin to investigate and prepare a defense." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084-85 (7th Cir. 2008). The Amended Complaint plainly meets this standard.

In support of its motion, the City relies heavily on *Chavez v. Ill. State Police*, 251 F.3d 612 (7th Cir. 2001). City Mot. to Dismiss 20-22. However, *Chavez*, like most of the cases on which the City relies, was decided on a motion for summary judgment, not a motion to dismiss. *Chavez*, at 621. It stands for the principle that a plaintiff cannot depend on a statistical analysis alone if she wants the case to go before a jury after discovery has ended. *Id.* at 648. However, it does not close the courthouse door to a plaintiff using statistics to help establish her claim. Again, the question here is not whether Plaintiffs will be able to prove their claim that the City's stop and frisk policy violates the Equal Protection Clause, but whether the factual allegations in the Amended Complaint allows the Court to draw the reasonable inference that the City had a policy or practice of intentionally discriminating against African-Americans and Hispanics, the classes of persons to which Plaintiffs belong, in executing its stop and frisk policy.

For example, the Amended Complaint cites the ACLU's report to show the City's stop and frisk program had a discriminatory effect on African-Americans and Hispanics in Chicago. Am. Compl. ¶¶ 440-57. Plaintiffs' also each allege that they were targeted for suspicionless stops and frisks based solely on their race and/or national origin. *Id.* at ¶¶ 3, 5, 56-57, 62-433. The Amended Complaint also states facts that plausibly allege that the stop and frisk policy was animated, at least in part, by a discriminatory purpose. Superintendent McCarthy could scarcely have been clearer in demonstrating a discriminatory purpose when he stated: "Everything will improve if we get out of the cars and put our hands on people. Make sure your officers are doing this, making out contact cards, and make sure we are stopping *the right people at the right times and the right places*." *Id.* at ¶ 453 (emphasis added). Plaintiffs allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" for racial discrimination in violation of the Equal Protection Clause. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

V.      **Title VI of the Civil Rights Act Applies to the Chicago Police Department and the City of Chicago.**

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000(d). "Program or activity" is further defined as "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government" 42 U.S.C. § 2000(d)-4a. The Chicago Police Department is clearly a "department"

of a "local government," and Plaintiffs have alleged that the City and CPD receive federal funding. *See* Am. Compl. ¶¶ 47, 492.[19]

Importantly, the City does not claim that it does not receive federal financial assistance. *See* City Mot. to Dismiss 25. Instead, the City relies upon a non-binding case, over twenty years old, *Hodges v. Pub. Bldg. Comm'n of Chicago*, 864 F. Supp. 1493, 1505 (N.D. Ill. 1994), to assert that a city cannot be liable under Title VI because it is not a program or activity under the statute. *Id.* The City's argument misses the mark. Numerous courts have recently held that a municipality that receives federal funds may be liable for violations under Title VI. *See Davis v. City of New York*, 959 F. Supp. 2d 324, 365 (S.D.N.Y. 2013); *Sulehria v. City of New York*, No. 13-CV-6557, 2014 WL 4101542, at *3 (E.D.N.Y. Aug. 18, 2014) ("In this case, Sulehria alleges discriminatory conduct by Hoyte and Worrel, acting in the shoes of the City's Department of Social Services, that was blatantly discriminatory. The pleading of a cognizable injury causally connected to such conduct could support a claim under Title VI.") Alternatively, Defendant McCarthy is a properly-named defendant and the Title VI claim may proceed against him. *See United States v. Maricopa Cnty., Ariz.*, 915 F. Supp. 2d 1073, 1077-78 (D. Ariz. 2012) (allowing a Title VI claim to proceed against a defendant sheriff and dismissing the sheriff's office as a nonjural entity).

The City also argues that Plaintiffs have not pled a prima facie case of intentional discrimination. *See* City Mot. to Dismiss 24-25. On the contrary, Plaintiffs have sufficiently pled that the discrimination against Plaintiffs was intentional and based upon Plaintiffs' race. *See* Am. Compl. ¶¶ 3, 53-57, 79, 88, 95, 101, 110, 121, 129, 150, 156, 162, 168, 176, 185, 200, 211, 219,

---

[19] While Plaintiffs did not name the Chicago Police Department separately because it does not enjoy separate legal existence independent of the City of Chicago, *see Reese v. Chicago Police Dep't*, 602 F. Supp. 441, 443 (N.D. Ill. 1984), if necessary to maintain their Title VI claim, Plaintiffs should be granted leave to name the Chicago Police Department as a defendant.

227, 234, 243, 250, 259, 267, 274, 281, 288, 296, 302, 308, 316, 322, 330, 335, 342, 366, 373, 380, 387, 395, 402, 409, 417, 425, 433, 434, 436, 440-53. The standard of proof for a Title VI claim, once this case reaches the merits, is the same as for a racial discrimination claim under the Equal Protection Clause of the Fourteenth Amendment. *See United States v. Fordice*, 505 U.S. 717, 732 n.7 (1992) ("the reach of Title VI's protection extends no further than the Fourteenth Amendment"); *Floyd v. City of New York*, 813 F. Supp. 2d 417, 456 (S.D.N.Y.), *on recons.*, 813 F. Supp. 2d 457 (S.D.N.Y. 2011). Accordingly, the Court should deny the City's motion to dismiss Plaintiffs' Title VI claim against the City for the same reasons stated above with respect to Plaintiffs' Equal Protection claims.

## VI. Superintendent McCarthy Should Not Be Dismissed as a Defendant.

### A. There are no grounds to dismiss the official-capacity claims against the superintendent.

Superintendent McCarthy seeks dismissal from this lawsuit, asserting that he is a redundant defendant given that Chicago itself is also named. McCarthy Mot. to Dismiss 6-7. In support he cites *Willis v. Bell*, 726 F. Supp. 1118, 1124 (N.D. Ill. 1989),[20] which relied on *Jungels v. Pierce*, 825 F.2d 1127, 1129 (7th Cir. 1987). As the *Willis* Court stated, *Jungels* "confirms the now familiar proposition that whenever a complaint names both a municipality and one of its officials sued only in his or her official capacity, '[a]ctually there is only one defendant—the City—not two.'" 726 F. Supp. at 1124. The *Jungels* Court, rather than dismiss the city officials who were represented by the same lawyers as the city itself, instead noted that

---

[20] McCarthy also cites two other decisions of this Court, neither of which are applicable. *Suber v. City of Chicago*, No. 10 C 2876, 2011 WL 1706156, at *2 (N.D. Ill. May 5, 2011), recognized the redundancy of naming the official and the city, but did not dismiss the official. *Almaraz v. Haleas*, No. 07 C 6134, 2008 WL 4547222, at *8 (N.D. Ill. Apr. 25, 2008), did dismiss some official-capacity defendants, but for entirely different reasons. Three of them no longer held the positions that had relevant responsibility, and one was too far removed from responsibility. They were not dismissed on the grounds asserted here by McCarthy and therefore it has no precedential value on the issue presented here.

suing both "makes no practical difference" because "the city is liable for the official actions of its senior policy-making official." 825 F.2d at 1129. *See also Malone v. Shallcross*, No. 02 C 8126, 2003 WL 22176058, at *3 (N.D. Ill. Sept. 19, 2003) (refusing to dismiss officials on that basis). Here, as well, it makes no practical difference. Moreover, McCarthy is not sued *solely* in his official capacity, so the redundancy principle discussed in *Willis* in not applicable.

Perhaps more importantly, Plaintiffs have not merely sought to hold Defendants liable, but have also sought injunctive relief. *See* Am. Compl. 104 (Prayer for Relief). For that reason, the *Jungels* treatment of the official-capacity defendant and the municipality as one defendant is inapplicable because Plaintiffs seek relief that "is injunctive and prospective in nature and the individual Defendants are directly responsible" for acting on that injunctive and prospective relief. *West v. Illinois State Bd. of Educ.*, No. 07 C 2994, 2007 WL 4162814, at *3 (N.D. Ill. Nov. 20, 2007). *Cf. Hafer v. Melo*, 502 U.S. 21, 25 (1991) (recognizing that officials may be sued in their personal capacities for relief in actions taken under color of state law that deprive a federal right, even without alleging a connection to governmental policy or custom). McCarthy does not qualify for dismissal.

### B. There are no grounds to dismiss the individual-capacity claims against the superintendent.

To satisfy the requirements to sue an official for personal responsibility for a Section 1983 violation, the conduct causing the constitutional deprivation must occur at the official's direction or with his knowledge and consent. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). When supervisors know about the misconduct and either "facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see," they retain personal responsibility. *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988) (citations omitted).

McCarthy denies personal involvement in any of the 52 incidents identified specifically in the Amended Complaint, McCarthy Mot. to Dismiss 7, but utterly ignores the documented allegations of more than 250,000 suspicionless stops of minority residents during a four-month period in 2014, amounting to 93.6 stops per 1,000 people throughout Chicago, as well as 266 stops per 1,000 in the Englewood district. Am. Compl. ¶¶ 447, 448, & 445. These departmental records, along with other factual allegations, provide strong enough averments to connect CPD officials, and McCarthy in particular, to knowledge and at least acquiescence to this unconstitutional and widespread practice. After all, "[o]missions can violate civil rights, and 'under certain circumstances a state actor's failure to intervene renders him or her culpable under § 1983.'" *Chavez*, 251 F.3d at 652 (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)).

McCarthy contends that the data, derived from the Chicago Police Department's own files, was unknown to him until brought to his attention by the ACLU in January 2013. McCarthy Mot. to Dismiss 8-9. That merely is a denial of the allegations and not grounds for dismissal from the lawsuit. *See Iqbal*, 556 U.S. at 696 (precedent does "not require a court at the motion-to-dismiss stage to consider whether the factual allegations are probably true. We made it clear, on the contrary, that a court must take the allegations as true, no matter how skeptical the court may be.").

The Amended Complaint makes plain that the department McCarthy heads puts officers "under pressure to conduct an increasing number of stops and frisks," tracks and evaluates reports of those stops, and considers stops to measure an officer's productivity. Am. Compl. ¶ 452. It connects these policies to McCarthy, as well as establishing that it was within his responsibilities to respond to the information derived from them. *Id*. at ¶¶ 453, 454 & 461. It indicates that public accounts and requests from various organizations provided further notice.

*Id*. at ¶¶ 456-457. The allegations establish enough to support knowledge and consent to ascribe responsibility to McCarthy. If, ultimately, the City is not responsible, then McCarthy is. *See Williams v. Heavener*, 217 F.3d 529, 532 (7th Cir. 2000) ("municipalities are not vicariously liable for their employees' constitutional torts").

In *Chavez*, which dismissed the training officer from the lawsuit and on which McCarthy relies, the plaintiff's pleadings demonstrated the training officer taught that "the use of race as an indicator [that a stop is warranted] is counterproductive," the opposite of the basis for the lawsuit. 251 F.3d at 653. No such exonerating pleading exists here.

## VII. Plaintiffs State-Law Claims Should Not Be Dismissed.

### A. Plaintiffs have adequately pled their state law claims against the city.

While a municipality cannot be held liable under 42 U.S.C. § 1983 on a *respondeat superior* theory, *Monell*, 436 U.S. at 691, the same is not true of state-law tort claims. *See, e.g.*, *Freeman v. Fairman*, 916 F. Supp. 786, 789 (N.D. Ill. 1996). Thus, to the extent the individual officers would be liable for a state law tort, the City and the officers' supervisors, like Defendant Commander Glenn Evans, may also be liable. Plaintiffs' allege sufficient facts to support their state law claims against each of the Defendant Officers, and allege that the City is liable for these claims.[21]

In order to plead an action for battery, a plaintiff must plead only a non-consensual touching of the person "that offends a reasonable sense of personal dignity." *Chelios v. Heavener*, 520 F.3d 678, 692 (7th Cir. 2008) (internal quotation omitted). "A claim of assault must include an allegation of a reasonable apprehension of an imminent battery." *McNeil v.*

---

[21] Defendant asserts that it is improper to list all of the state court claims in one count. If this Court is inclined to dismiss the state law claims on that basis alone, Plaintiffs would ask for leave to file a Second Amended Complaint to address this alleged impropriety and to split the state claims into their own separate counts.

*Carter*, 742 N.E.2d 1277, 1281 (Ill. App. Ct. 2001). Here, it is abundantly clear that each Plaintiff who was stopped and frisked[22] has pled sufficient facts to support assault and battery claims at this early stage of the litigation. By necessity, every frisk involves a touching of the person that is invasive to one's sense of privacy and intrusive to one's autonomy. Additionally, a common sense reading of the Complaint reveals that a reasonable inference can be made for each Plaintiff that he perceived the frisk was about to occur. Therefore, the assault and battery claims for Plaintiffs Darnell Smith, Darren Nathan, Jeff Coleman, Phillip Overton, Marque Ross, Herbert Dyer, Jr., Mark Nevilles, Anthony Brown, Christopher Locke, Hector Fantanez, Marcell Davis, Anthony Polk, Calvin Jackson, Carl McCord, Timothy Thigpen, Keith Riggins, James Shinul, Brandon Buford, Melvin Thompson, Darion Beene, Deandre Stewart, Lavester McWane, Steve McAbee, Arthur Stringer, Shantay Johnson, Arthur Moton, Dudley Burns, Edgar Marshall, Jr., Michael Sanders, Rashawn Lindsey, and Sidney Bell are sufficiently pled.

Illinois "follows the Restatement (Second) of Torts which defines invasion of privacy by intrusion upon seclusion as . . . "intentionally intrud[ing], physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns." *Troeckler v. Zeiser*, No. 14-CV-40, 2015 WL 1042187, at *2 (S.D. Ill. Mar. 5, 2015) (citing *Busse v. Motorola, Inc.*, 813 N.E.2d 1013, 1017 (Ill. App. Ct. 2004)). The tort consists of four elements: "(1) an unauthorized intrusion or prying into the plaintiff's seclusion; (2) an intrusion that is offensive or objectionable to a reasonable person; (3) the matter upon which the intrusion occurs is private; and (4) the intrusion causes anguish and suffering." *Johnson v. K-mart Corp.*, 723 N.E.2d 1192, 1196 (Ill.

---

[22] All but two named Plaintiffs were frisked during their unconstitutional stops. The Plaintiffs asserting assault and battery claims are: Darnell Smith, Darren Nathan, Jeff Coleman, Phillip Overton, Marque Ross, Herbert Dyer, Jr., Mark Nevilles, Anthony Brown, Christopher Locke, Hector Fantanez, Marcell Davis, Anthony Polk, Calvin Jackson, Carl McCord, Timothy Thigpen, Keith Riggins, James Shinul, Brandon Buford, Melvin Thompson, Darion Beene, Deandre Stewart, Lavester McWane, Steve McAbee, Arthur Stringer, Shantay Johnson, Arthur Moton, Dudley Burns, Edgar Marshall, Jr., Michael Sanders, Rashawn Lindsey, and Sidney Bell.

App. Ct. 2000). Those elements are adequately pleaded when Plaintiffs were stopped and intrusively frisked without any reason or just cause. Am. Compl. ¶¶ 68-75, 84, 106, 116-17, 126, 136, 153, 166, 174, 182, 195, 198, 205, 216, 224-25, 232, 239, 246, 255, 264, 271, 278, 285, 292, 300, 305, 313, 320, 327, 333, 346, 360, 370, 377, 385, 391, 399, 406, 414, 421, 430

For example, Plaintiffs Smith, Davis, Coleman, and Ross further assert that their actions for false arrest and false imprisonment are properly pled. In order to plead a claim for false arrest or false imprisonment, "a plaintiff must show that she was restrained or arrested by the defendant[s], and that the defendant[s] acted without having reasonable grounds to believe that an offense was committed by the plaintiff." *Ross v. Mauro Chevrolet*, 861 N.E.2d 313, 317 (Ill. App. Ct. 2006) (internal quotations omitted). Probable cause is the touchstone for both of these claims. *Johnson v. Dossey*, 878 F. Supp. 2d 905, 917 (N.D. Ill. 2012). Here, each of these four Plaintiffs has alleged that they were arrested and/or imprisoned without probable cause (in fact, without any cause at all). Am. Compl. ¶¶ 79, 88, 95, 101, 110, 129. Accordingly, Plaintiffs Smith, Davis, Coleman, and Ross have sufficiently stated their causes of action to survive the present motion to dismiss.

The City is correct that an action for trespass is oftentimes "an invasion 'of the exclusive possession and physical condition of land.'" *Colwell Sys., Inc. v. Henson*, 452 N.E.2d 889, 892 (Ill. App. Ct. 1983) (quoting *Restatement (Second) of Torts*, ch. 7, at 275 (1965))." City Mot. to Dismiss 26. However, another form of trespass, trespass to chattels or personal property, "'may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another.' *Restatement (Second) of Torts*, § 217. Harm to the personal property or diminution of its quality, condition, or value as a result of a

defendant's use can also result in liability." *Sotelo v. DirectRevenue, LLC*, 384 F. Supp. 2d 1219, 1229 (N.D. Ill. 2005) (citing *Restatement (Second) of Torts*, § 218(b)).

The following plaintiffs have sufficiently pled that the Defendant Officers entered upon their physical property without any lawful cause and interfered with Plaintiffs' use of the property:

1. Darnell Smith, *see* Am. Compl., ¶¶ 80-84;

2. Darren Nathan, *see* Am. Compl., ¶¶ 69-70;

3. Phillip Overton, *see* Am. Compl., ¶¶ 117, 119;

4. Herbert Dyer, *see* Am. Compl., ¶¶ 136, 153-154, 160;

5. Christopher Locke, *see* Am. Compl., ¶ 189;

6. Marcell Davis, *see* Am. Compl., ¶¶ 213-216;

7. Anthony Polk, *see* Am. Compl., ¶ 225;

8. Calvin Jackson, *see* Am. Compl., ¶ 232;

9. Carl McCord, *see* Am. Compl., ¶¶ 239, 246-247, 255;

10. Timothy Thigpen, *see* Am. Compl., ¶¶ 262-264;

11. Arthur Stringer, *see* Am. Compl., ¶ 346; and

12. Michael Sanders, *see* Am. Compl., ¶ 406

Although the City claims its employees, and by virtue of that, the City itself, are immune from liability under the Illinois Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/1-101, *et seq.*, City Mot. to Dismiss 27, "[u]nless an immunity provision applies, municipalities are liable in tort to the same extent as private parties." *Van Meter v. Darien Park Dist.*, 799 N.E.2d 273, 279 (Ill. 2003).

### B.    The Tort Immunity Act does not bar Plaintiffs' state law claims.

#### 1.    Because Plaintiffs' claims are not centered on the enforcement of any law, the Tort Immunity Act does not apply.

The city invokes to portion of the Tort Immunity Act that states "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. This section of the Act "does not afford qualified immunity from liability for all acts or omissions of a public employee while on duty, *but only for those connected with the actual execution or enforcement of a law*." *Clark v. City of Chicago*, 595 F. Supp. 482, 487 (N.D. Ill. 1984) (emphasis added). Further, "[w]hether a public employee is executing or enforcing a law at the critical time is 'a factual determination which in every case must be made in light of the circumstances involved.'" *Id.* (quoting *King v. City of Chicago*, 394 N.E.2d 22, 24 (Ill. App. Ct. 1978)).

Here, Plaintiffs are clearly asserting that the Defendant Officers were *not* engaged in enforcing any laws; in fact, Plaintiffs are claiming exactly the opposite. As pled, Defendant Officers were not investigating nor validly arresting any of the named Plaintiffs or proposed class members. Instead, Defendant Officers were using Plaintiffs' race and national origin to go on a fishing expedition in *hopes* of finding a law to "enforce." Am. Compl. ¶¶ 79, 88, 101, 110, 121, 128, 150, 162, 168, 176, 185, 200, 211, 219, 227, 234, 243, 250, 259, 267, 274, 281, 288, 296, 302, 308, 316, 322, 330, 335, 342, 349, 366, 373, 380, 387, 395, 402, 409, 417, 425, 433. As such, Plaintiffs assert that the officers were acting *ultra vires*, and thus do not come within the immunity claimed. The Tort Immunity Act does not apply here.

2. **Because Plaintiffs have pled extensive facts that establish that the Defendants have acted willfully and wantonly, the Tort Immunity Act does not bar Plaintiffs' claims.**

Even if the Tort Immunity Act did apply, Plaintiffs' Amended Complaint is replete with sufficient facts to allege that the Defendants acted willfully and wantonly in conducting the numerous stops (or stops and frisks). The sheer number of plaintiffs who have come forward with incidents of unconstitutional conduct on the part of the Chicago Police Department in this case alone establishes an "intentional or reckless disregard" for the rights of the Plaintiffs. With 34 named Plaintiffs in this action, and numerous Plaintiffs asserting multiple instances of misconduct, it is clear that Defendant Chicago Police Department Officers have been acting with a blatant disregard for minorities' and citizens' rights. Additionally, and bolstering the individual named Plaintiffs' stories of wrongdoing, the March 2015 report by the ACLU outlines shocking statistics that clearly support the conclusion that the Chicago Police Department routinely stopped Plaintiffs and others like Plaintiffs with no proper basis and with a complete disregard for the law. Am. Compl. ¶¶ 440-57.

Finally, within the Amended Complaint and under a separate subheading, each named Plaintiff has carefully, clearly, and sufficiently pled that their stop or stop and frisk was conducted without any reasonable basis or other legally permissible justification. Some of the Plaintiffs have even pled additional facts that indicate that the stops were hostile, with officers using threatening language and physical force. Am. Compl., ¶¶ 66-76, 82-84, 91-93, 97-100, 104-108, 113-119, 124-128, 133-148, 152-160, 165-167, 171-174, 180-184, 188-191, 194-195, 197-199, 203-209, 215-217, 222-226, 231-233, 238-240, 245-249, 252-257, 262-265, 270-272, 277-279, 284-286, 291-293, 299-301, 304-307, 312-315, 319-321, 326-328, 332-334, 339-341, 345-347, 358-364, 369-371, 376-378, 383-386, 390-394, 398-400, 404-407, 412-415, 420-423, 428-431. Thus, Plaintiffs have met their burden at this early stage of the litigation and have

sufficiently alleged plausible and colorable claims that all of the Defendants acted willfully and wantonly in conducting baseless stops (or stops and frisks).

### 3. The one-year statute of limitations contained within the Tort Immunity Act does not bar Plaintiffs' claims.

The filing of a lawsuit seeking class action status tolls the statute of limitations for every member of the putative class until there is a finding that class status is not warranted. *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 353-54 (1983). Moreover, because at least some named class representatives have alleged incidents within the statute of limitations, and all Plaintiffs have both alleged continuing fear of further violations and seek injunctive relief against future violations, the Complaint fits well within the statute of limitations. *See Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992) ("The continuing violation doctrine allows a plaintiff to get relief for a time-barred act by linking it with an act that is within the limitation period.") In those situations, courts treat a series of improper acts as "one continuous act that ends within the limitations period." *Id.* The continuing-violation doctrine applies as long as there is one viable charge within the limitations period. *EEOC v. Harvey L. Walner & Assoc.*, 91 F.3d 963, 969 (7th Cir. 1996). Twenty-eight named plaintiffs,[23] have alleged timely causes of action under Illinois law. In addition, Plaintiff Darnell Smith has alleged incidents both older and more recent stops within the statute of limitations. *See* Am. Compl. ¶¶ 80-88.

### C. The Tort Immunity Act does not bar claims for willful and wanton supervision of employees.

Section 2-201 of the Tort Immunity Act immunizes the City from suit for discretionary acts and decisions made by public officials. 745 ILCS 10/2-201. Despite the existence of *Reed v. City of Chicago*, No. 01 C 7865, 2002 WL 406983, at *3 (N.D. Ill. Mar. 14, 2002), numerous

---

[23] One Plaintiff, Calvin Jackson, is inadvertently named twice in the caption and opening paragraph. Thus, there are 34 total named paragraphs, with Calvin Jackson having more than one encounter with unconstitutional stops and frisks in June 2013.

subsequent Courts have held that supervision of employees is *not* discretionary. *See, e.g., Patton v. Chicago Heights*, No. 09 C 5566, 2010 WL 1813478, at *4 (N.D. Ill. May 3, 2010) ("But that conclusion [in *Reed*] overlooks the fact that the Immunity Act only comes into play where the employee's conduct involves *both* discretion and policymaking. Perhaps, the court may have satisfied itself that a policy determination was involved and did not address the requirement. But that is uncertain and the plaintiff in the instant case alleges a failure to properly train and supervise."); *Hogan v. Smith*, No. CIV. 11-961, 2012 WL 1435402, at *3 (S.D. Ill. Apr. 25, 2012) ("The act of training and supervision in question could easily be ministerial rather than discretionary.").

Further, even though Plaintiffs here pled *negligent* supervision, Plaintiffs' claim can survive if it meets the *willful and wanton* standard of section 3-108 of the Tort Immunity Act. *See Deborah K. v. Sperlik*, No. 05 C 628, 2005 WL 3299804, at *3 (N.D. Ill. Nov. 30, 2005) (holding that, even if plaintiff's complaint sounds primarily in negligence, the cause of action for negligent supervision may survive if the facts in the complaint meet the willful and wanton standard of § 3-108 of the Tort Immunity Act). Here, as extensively explained above, Plaintiffs have pled numerous facts to support the conclusion that City of Chicago police officers and acted willfully and wantonly. Am. Compl. ¶¶ 66-76, 82-84, 91-93, 97-100, 104-08, 113-19, 124-28, 133-48, 152-60, 165-67, 171-74, 180-84, 188-91, 194-95, 197-99, 203-09, 215-17, 222-26, 231-33, 238-40, 245-49, 252-57, 262-65, 270-72, 277-79, 284-86, 291-93, 299-301, 304-07, 312-15, 319-21, 326-28, 332-34, 339-41, 345-47, 358-64, 369-71, 376-78, 383-86, 390-94, 398-400, 404-07, 412-15, 420-23, 428-31, 434-39, 457. Plaintiffs have also sufficiently pled that the Defendant Officers' supervisors and policymakers have acted willfully and wantonly in their failure to

supervise and train their officers. Am. Compl. ¶¶ 460-70. Thus, Plaintiff's negligent supervision

claims should survive.

## CONCLUSION

Defendants' Motions to Dismiss should be denied for the reasons stated herein.

September 25, 2015                                   Respectfully submitted,

                                                    ROMANUCCI & BLANDIN, LLC

                                                    s/ Antonio M. Romanucci
                                                    Attorney for Plaintiff

Antonio M. Romanucci
Martin D. Gould
ROMANUCCI & BLANDIN, LLC
321 North Clark Street, Suite 900
Chicago, Illinois 60654
(312) 458-1000
(312) 458-1004 *facsimile*
Firm No. 35875

Robert S. Peck
CENTER FOR CONSTITUTIONAL LITIGATION, PC
777 6th Street NW, Suite 520
Washington, D.C. 20001
Ph: (202) 944-2874
Fax: (202) 965-0920

Rodney G. Gregory
THE GREGORY LAW FIRM
3127 Atlantic Blvd., Suite 3
Jacksonville, Florida 32207
Ph: (904) 398-0012
Fax: (904) 398-5131

*Attorneys for Plaintiffs and the Class*