# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DARNELL SMITH, et al.,      )
        )
      Plaintiffs,     )
        )    Case No. 15 C 3467
      v.      )
        )
CITY OF CHICAGO, et al.,     )
        )
      Defendants.    )

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On June 22, 2015, Plaintiff Darnell Smith, along with thirty-three other named Plaintiffs, brought the present Amended Complaint, individually and on behalf of a class of all others similarly situated, against Defendants City of Chicago, Chicago Police Superintendent Garry McCarthy, and John Doe Chicago police officers alleging violations of their constitutional rights in relation to the Chicago Police Department's stop and frisk policies and practices. *See* 42 U.S.C. § 1983. Plaintiffs also bring claims under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and state law. Before the Court is Defendant Superintendent Garry McCarthy's motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6) and Defendant City of Chicago's motion to dismiss under Rules 12(b)(6) and 12(b)(1).[1]

For the following reasons, the Court grants in part and denies in part the City's motion to dismiss, and grants in part and denies in part Defendant McCarthy's motion to dismiss. The

---

[1] Although the City brings the present motion under Rule 12(b)(6), one of its arguments is that Plaintiffs do not have standing to bring their claims for injunctive relief – a claim that federal courts review under Rule 12(b)(1). *See Remijas v. Neiman Marcus Group, LLC,* 794 F.3d 688, 691 (7th Cir. 2015).

Court grants Plaintiffs leave to amend their allegations to substitute the parents of the minor plaintiffs as named Plaintiffs because, under Illinois law, a minor lacks the legal capacity to initiate proceedings in his own name, but instead, must appear by guardian, guardian ad litem, or next friend. *See Klak v. Skellion,* 317 Ill.App.3d 1092, 1095, 251 Ill.Dec. 694, 741 N.E.2d 288 (1st Dist. 2000); Fed.R.Civ.P. 17(b)(1).

## LEGAL STANDARDS

### I. Federal Rule of Civil Procedure 12(b)(6)

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.,* 761 F.3d 732, 736 (7th Cir. 2014). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under the federal notice pleading standards, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570). "In reviewing the sufficiency of a complaint under the plausibility standard, [courts] accept the well-pleaded facts in the complaint as true, *Alam v. Miller Brewing Co.,* 709 F.3d 662, 665-66 (7th Cir. 2013), and draw "reasonable inferences in favor of the plaintiffs." *Teamsters Local Union No. 705 v. Burlington No. Santa Fe, LLC,* 741 F.3d 819, 823 (7th Cir. 2014). The relevant question at the motion to dismiss stage is not whether the plaintiff will ultimately prevail on the merits, but

whether the complaint is sufficient to cross the federal pleading threshold. *See Skinner v. Switzer,* 562 U.S. 521, 529-30, 131 S.Ct. 1289, 179 L.Ed.2d 233 (2011). Also, a plaintiff need not anticipate and overcome affirmative defenses in his complaint unless he alleges sufficient facts that establish any such affirmative defenses. *See Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.,* 782 F.3d 922, 928 (7th Cir. 2015); *see also O'Gorman v. City of Chicago,* 777 F.3d 885, 889 (7th Cir. 2015) ("A complainant can plead himself out of court by including factual allegations that establish that the plaintiff is not entitled to relief as a matter of law.").

## II.     Federal Rule of Civil Procedure 12(b)(1)

Rule 12(b)(1) allows a party to raise as a federal court's lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). Because standing implicates the Court's subject matter jurisdiction, the Court reviews the City's standing arguments under Rule 12(b)(1). Under Rule 12(b)(1) "the district court must accept as true all material allegations of the complaint, drawing all reasonable inferences therefrom in the plaintiff's favor, unless standing is challenged as a factual matter." *Remijas v. Neiman Marcus Group, LLC*, 794 F.3d 688, 691 (7th Cir. 2015) (citation omitted). The party invoking federal jurisdiction bears the burden of establishing the required elements of standing. *See Johnson v. U.S. Office of Personnel Mgmt.,* 783 F.3d 655, 661 (7th Cir. 2015).

## BACKGROUND

In their Amended Complaint, the named Plaintiffs allege that Defendants have implemented and continue to enforce, encourage, and sanction a policy, practice, or custom of unconstitutional stops and frisks of Chicago residents by Chicago Police Department ("CPD") officers. (R. 22, Am. Compl. ¶ 2.) Plaintiffs assert that pursuant to this widespread practice,

CPD officers often have used and continue to use race and/or national origin as the determinative factors in deciding to stop and frisk individuals – instead of reasonable suspicion pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny – and that the victims of this profiling are principally African-American and Hispanic males. (*Id.* ¶ 3.) Also, Plaintiffs allege that CPD's widespread practice has flourished as a result of, and is directly and proximately caused by, policies, practices, or customs that the City and its final policymakers, including Superintendent McCarthy, have devised, implemented, and enforced. (*Id.* ¶ 4.) As such, Plaintiffs maintain that the City and Superintendent McCarthy have acted with deliberate indifference to the constitutional rights of those who would come into contact with CPD officers by: (a) failing to properly screen, train, and supervise CPD officers; (b) inadequately monitoring CPD officers and their stop and frisk practices; (c) failing to sufficiently discipline CPD officers who engage in constitutional abuses; and (d) encouraging, sanctioning, and failing to rectify the alleged unconstitutional practices. (*Id.* ¶ 4.) Furthermore, Plaintiffs assert that as a direct and proximate result of this widespread practice, CPD officers have subjected hundreds, if not thousands, of City residents, particularly African-American and Hispanic males, to unconstitutional stops and frisks. (*Id.* ¶¶ 5, 459, 462.)

Plaintiffs assert that they are all African-American or Hispanic men who reside in and/or visit minority neighborhoods where CPD officers allegedly conduct the unconstitutional stops and frisks. (*Id.* ¶¶ 59, 445.) They state that "[a]s long as the CPD engages in its policy, practice, or custom of suspicionless stops and frisks, the named Plaintiffs are, and will remain, at high risk of being illegally stopped and frisked again by the CPD." (*Id.* ¶ 59.) In addition, Plaintiffs explain that CPD officers have repeatedly stopped and frisked many of them. (*Id.*) Plaintiffs

allege, for example, that the same group of CPD officers unlawfully stopped one of the named Plaintiffs three times on the same day in the same neighborhood. (*Id*. ¶ 186.) The named Plaintiffs seek compensatory and punitive damages for themselves, as well as an award of attorneys' fees and costs. (*Id*. ¶¶ 6, 59.) Further, the named Plaintiffs seek to represent a certified class for the purpose of obtaining injunctive and declaratory relief. (*Id*. ¶ 6.) Specifically, they seek a class-wide judgment declaring that the alleged widespread practice violates the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment. (*Id*.)

## ANALYSIS

## I. Mootness

The City argues that Plaintiffs' claims for prospective, injunctive relief are moot based on an August 2015 settlement agreement between the City and the American Civil Liberties Union of Illinois ("ACLU"). *See Jackson v. Clements,* 796 F.3d 841, 843 (7th Cir. 2015) ("for federal courts to retain jurisdiction over a case, there must be an 'actual, ongoing controvers[y],' and the absence of one renders a case moot and deprives the court of subject matter jurisdiction.") (citation omitted). To clarify, on August 6, 2015, the City entered into an Investigatory Stop and Protective Pat Down Settlement Agreement ("Agreement") with the ACLU. Prior to the Agreement, specifically in March 2015, the ACLU published a report regarding its investigation into the CPD's practice of stop and frisk. (Am. Compl. ¶ 441.) The ACLU found that for half of the CPD's stops (based on the sample analyzed), the police officer did not record legally sufficient reasons to establish reasonable suspicion. (*Id*. ¶ 442.) In addition, the ACLU concluded that a large percentage of Chicago police officers did not record any reasons for the

stops – even though the CPD requires that officers do so – and that these stops made without sufficient cause violate the Fourth Amendment guarantee against unreasonable searches and seizures. (*Id*.) In collecting and analyzing data, the ACLU reviewed Chicago police officers' "contact cards" that the officers are required to fill out to justify their stops. (*Id.* ¶ 440.)

In its motion to dismiss, the City maintains that under the Agreement, it has committed to changing many of the CPD policies and practices that Plaintiffs challenge in the present lawsuit. Accordingly, the City argues that the Agreement is fatal to the named Plaintiffs' equitable claims brought pursuant to *Monell v. Department of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), because Plaintiffs challenge procedures that no longer exist. In support of its argument, the City relies on *Federation of Adver. Indus. Representatives, Inc. v. City of Chicago,* 326 F.3d 924, 929 (7th Cir. 2003), which states in relevant part, "[a] question of mootness arises when, as here, a challenged ordinance is repealed during the pendency of litigation, and a plaintiff seeks only prospective relief." The Seventh Circuit in *Federation* further explained, "we have repeatedly held that the complete repeal of a challenged law renders a case moot, unless there is evidence creating a reasonable expectation that the City will reenact the ordinance or one substantially similar." *Id*. at 930. Also, the *Federation* decision states that "a defendant's change in conduct cannot render a case moot as long as the plaintiff makes a claim for damages." *Id*. at 929.

Here, the City did not repeal a challenged ordinance, but entered into a settlement agreement with the ACLU promising to correct past misconduct by March 1, 2016. (R. 34-1, ACLU Agmt. ¶ 3.) Under these circumstances, a Northern District of California district court case in which the defendant relied upon Seventh Circuit case law is instructive. Specifically, in

*Kliegman v. County of Humboldt,* No. 09 CV 0006 NJV, 2010 WL 2382445, at *3 (N.D. Cal.

June 10, 2010), the defendant county argued that based on its settlement agreement with the

United States Department of Justice ("DOJ") in relation to certain ADA compliance issues, the

plaintiff's claims were moot. The district court, referring to the *Federation* decision and

*Chicago United Industries, Ltd. v. City of Chicago,* 445 F.3d 940, 947 (7th Cir. 2006), reasoned

as follows:

> These cases stand for the proposition that injunctive claims become moot
> after the challenged government misconduct has ceased or has been corrected.
> But Defendant attempts to extend these cases much further – to situations where
> the government has promised to correct its misconduct, but before the
> government has actually corrected its misconduct. Defendant's argument, while
> creative, goes too far.
>
> In both *Federation of Advertising Industry Representatives,* 326 F.3d 924,
> and *Chicago United Industries*, 445 F.3d 940, the court found the plaintiff's
> claims were moot because the government misconduct that was challenged had
> actually ceased or had been corrected. In *Federation of Advertising Industry
> Representatives,* the challenged ordinance was *repealed* during litigation and the
> Seventh Circuit held that the plaintiff's challenges to this ordinance, where the
> plaintiff only sought prospective relief, were therefore moot. 326 F.3d at 929-30.
> In *Chicago United Industries,* the plaintiff contractor sued for injunctive relief
> against the defendant city after the city terminated its contracts with the plaintiff
> and instituted a three-year bar, suspecting fraudulent billing by the plaintiff. 445
> F.3d 940. After the suit was filed, the government *ceased and corrected* its
> challenged conduct by reinstating the cancelled contracts, rescinding the
> debarment, adopting a new rule that authorizes a pre-debarment hearing, and
> promising the court that the plaintiff would be entitled to a full evidentiary
> hearing if termination or debarment proceedings are again instituted against the
> plaintiff. *Id.* at 946-47. The Seventh Circuit held that the plaintiff's request for
> injunctive relief was moot and vacated the injunction. *Id.* at 948-49 (explicitly
> noting that the plaintiff's request for damages was not moot).

*Kliegman,* 2010 WL 2382445, at *3 (emphasis in original). The Northern District of California

judge thus concluded that the DOJ settlement agreement, alone, did not moot the plaintiff's

equitable claims because there was no evidence that the defendant had actually complied with

the settlement agreement. *See id.* at *4. The *Kliegman* court's decision – that relies on Seventh Circuit case law – is persuasive based on the similarities between the circumstances in that case and those presented here.

The Court notes that the City entered into the Agreement with the ACLU in August 2015, which was after Plaintiffs had filed their Amended Complaint and the City had filed the present motion to dismiss. In any event, at this procedurally posture, the Court views Plaintiffs' factual allegations as true and all reasonable inferences in their favor. Thus, whether the City now promises to comply with the August 2015 Agreement – without more – does not moot Plaintiffs' claims for prospective relief at this juncture, keeping in mind that "[t]he requirement that a case have an actual, ongoing controversy extends throughout the pendency of the action." *Stotts v. Community Unit Sch. Dist. No. 1,* 230 F.3d 989, 990 (7th Cir. 2000). Last, Plaintiffs seek compensatory damages, which are not rendered moot by the City's Agreement. *See Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.,* 532 U.S. 598, 608-09, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) ("so long as the plaintiff has a cause of action for damages, a defendant's change in conduct will not moot the case."). The Court therefore denies this aspect of the City's motion to dismiss and turns to the City's related argument that the named Plaintiffs do not have standing to seek equitable relief.

## II.     Article III Standing

Although the City does not dispute that Plaintiffs have standing to seek compensatory damages for their individual claims, it argues that Plaintiffs lack standing to seek equitable relief based on the CPD's past misconduct. Article III "[s]tanding requires that the plaintiff establish an 'injury in fact' caused by the defendant and redressable by the court." *J.P. Morgan Chase*

8

*Bank, N.A. v. McDonald*, 760 F.3d. 646, 650 (7th Cir. 2014). To establish Article III standing, a plaintiff must show that "(1) it has suffered an actual or imminent concrete and particularized 'injury in fact'; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Cabral v. City of Evansville, Ind.*, 759 F.3d 639, 641-42 (7th Cir. 2014).

In its motion to dismiss, the City focuses on the first standing element arguing that Plaintiffs have not adequately alleged a real and immediate threat of future constitutional deprivations. The City relies on the Supreme Court's decision in *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.E.2d 675 (1983), in which the *Lyons* Court held that "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief," if it is "unaccompanied by any continuing, present adverse effects." *Id*. at 102 (citation omitted). In *Lyons*, the Supreme Court concluded that the plaintiff's allegations regarding police officers subjecting him to an illegal choke-hold during a traffic stop prompted by the plaintiff's unlawful conduct did not establish an imminent threat based on the assumption that the plaintiff would not commit any such misconduct in the future. *See id.* at 97-98.

Plaintiffs' allegations are distinguishable from *Lyons* because Plaintiffs have alleged that they were engaging in innocent, lawful conduct – not unlawful conduct – prior to the alleged suspicionless stops and/or frisks, such as walking home from the grocery store, standing in front of their own homes or the homes of friends, or taking digital photographs for a college course. (Am. Compl. ¶¶ 131-36, 179-82, 213-16, 311-15, 479.) In addition, Plaintiffs have alleged ongoing constitutional violations pursuant to an unconstitutional policy or practice in tandem with allegations that CPD officers repeatedly subjected them to unconstitutional stops and frisks,

which leads to the reasonable inference of the likelihood that CPD officers will unlawfully stop and frisk Plaintiffs in the future. *See Allee v. Medrano,* 416 U.S. 802, 815, 94 S.Ct. 2191 (1974) ("Where, as here, there is a persistent pattern of police misconduct, injunctive relief is appropriate."); *Illinois Migrant Council v. Pilliod,* 540 F.2d 1062, 1067 (7th Cir. 1976) ("Because plaintiffs have shown a specific pattern of conduct, akin to an explicit policy, they have demonstrated a reasonable likelihood of future harm, justifying their request for injunctive relief."); *see also Thomas v. County of Los Angeles*, 978 F.2d 504, 507 (9th Cir. 1992) (allegations of being "repeatedly subject to police brutality and harassment" are "significant as the 'possibility of recurring injury ceases to be speculative when actual repeated incidents are documented.'") (citation omitted). Accordingly, Plaintiffs' claims for injunctive relief have facial plausibility based on their allegations of an unconstitutional practice and repeated misconduct by CPD officers. *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

On a final note, despite the City's arguments to the contrary, the Court's decision in *Otero v. Dart,* No. 12 C 3148, 2012 WL 5077727, at *5 (N.D. Ill. Oct. 18, 2012), where the Court concluded that the plaintiff did not have standing to bring a claim for equitable relief, is readily distinguishable. In *Otero*, the plaintiff claimed that the defendants had a policy and practice of unlawfully detaining free citizens after the citizen was found not guilty or otherwise acquitted. Under these circumstances, the plaintiff no longer had a personal stake in prospective, equitable relief in relation to the alleged unlawful detention policy because he had been released from the Cook County Jail. As discussed above, the named Plaintiffs in the present matter have

sufficiently alleged ongoing constitutional violations based on the repeated unconstitutional stops and frisks under the alleged unlawful policy, which does not depend on whether they were detainees in the Cook County Jail as in *Otero*. The Court therefore denies the City's motion to dismiss based on standing.

## III.    Monell Claims

Next, the City argues that Plaintiffs have failed to sufficiently allege their municipal liability claims under *Monell* in relation to their Fourth Amendment and Fourteenth Amendment claims alleged in Counts I, II, and III. To recover under *Monell*, Plaintiffs must eventually establish that (1) they suffered a deprivation of a constitutional right; (2) as a result of an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority, that was (3) the cause of his constitutional injury. *See King v. Kramer*, 763 F.3d 635, 649 (7th Cir. 2014). Also, Plaintiffs must show an official policy or custom that was the direct cause or moving force behind the deprivation of their constitutional rights. *See Pyles v. Fahim,* 771 F.3d 403, 409-10 (7th Cir. 2014).

In the Amended Complaint, the named Plaintiffs base their Fourth Amendment and Fourteenth Amendment Equal Protection Clause *Monell* claims on the City's and Superintendent McCarthy's acts and omissions in relation to: (1) failing to properly screen, train, and supervise CPD officers; (2) inadequately monitoring CPD officers and their stop and frisk practices; (3) failing to sufficiently discipline CPD officers who engage in constitutional abuses; and (4) encouraging, sanctioning, and failing to rectify the alleged unconstitutional practices. (Am. Compl. ¶¶ 4, 5, 48, 56, 434, 440, 459-479.) Plaintiffs not only base their *Monell* claims on a

widespread unofficial practice, but also on Defendant Superintendent McCarthy's deliberate acts as a decision-maker with final policy-making authority.  (*Id.* ¶ 48.)

In relation to failure to train and supervise claims, under "limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson,* 563 U.S. 51, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011).  Under this standard, a local government's failure to train must amount to the deliberate indifference of the rights of the citizens whom the officers encounter.  *See id.* (citing *Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).  "Deliberate indifference" is a term used in both Eighth Amendment claims and constitutional actions against governmental entities.  *See Farmer v. Brennan,* 511 U.S. 825, 841, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).  Specifically, "deliberate indifference serves under the Eighth Amendment to ensure that only inflictions of punishment carry liability."  *Id.*  On the other hand, the "term was used in the *Canton* case for the quite different purpose of identifying the threshold for holding a city responsible for the constitutional torts committed by its inadequately trained agents."  *Id.*  (citation omitted).  Proof of deliberate indifference in the context of a failure to train case "can take the form of either (1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations by its officers."  *Sornberger v. City of Knoxville, Ill.,* 434 F.3d 1006, 1029-30 (7th Cir. 2006).

Accepting Plaintiffs' allegations as true and all reasonable inferences in Plaintiffs' favor, not only have Plaintiffs alleged enough factual details regarding their failure to train and supervise claim under the federal pleading standards, they have alleged sufficient facts that the

12

City and Defendant McCarthy acted with deliberate indifference under *Sornberger*. *See Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). More specifically, Plaintiffs have alleged that through the widespread practice of suspicionless stops and frisks, the City and its agent Defendant McCarthy have acted recklessly in implementing, allowing, and acquiescing to existing unconstitutional practices. (Am. Compl. ¶¶ 2, 4, 459, 470, 475-76.) Plaintiffs also allege that although fully aware that the work of a police officer demands extensive training, superior judgment, and close supervision, the City and Defendant McCarthy failed to properly screen, train, and supervise CPD officers knowing that such failures would result in Fourth and Fourteenth Amendment violations. (*Id.* ¶¶ 460, 463.) Plaintiffs, for example, allege that despite the need for training in relation to the general police order prohibiting racial profiling, Defendants failed to properly train police officers regarding the legal and factual bases for conducting lawful stops and frisks, as shown by Chicago police officers unlawfully stopping and frisking an inordinate number of Hispanic and African-American men in minority neighborhoods. (*Id.* ¶¶ 461, 478.)

Furthermore, Plaintiffs have adequately alleged that the City and Superintendent McCarthy were aware of the CPD's widespread practices, yet failed to take proper action in training and supervising Chicago police officers. In particular, Defendants had knowledge of the unconstitutional stops and frisks based on the CPD's decades-old history of conducting suspicionless stops and frisks, a 2003 lawsuit and the data collected therein, and the ACLU's actions and correspondence to the City on this subject. (Am. Compl. ¶¶ 434, 437, 438, 440-42, 456, 459-60, 463.) Plaintiffs also maintain that as a result of the widespread practice, there have

been a significant number of civilian complaints triggering Defendants' awareness and the need to effectively address the unconstitutional practice. (*Id.* ¶ 463.) Although the City has been proactive regarding certain procedures after the ACLU issued its report in March 2015, these actions do not vitiate Plaintiffs' allegations in which the Court can draw a reasonable inference that Defendants were aware of the alleged unconstitutional policies and practice prior the March 2015 report.

Moreover, the City's argument that Plaintiffs' *Monell* claims must fail because Plaintiffs have not identified an express, written policy that is unconstitutional on its face is misplaced because Plaintiffs' *Monell* claims rely on the unofficial stop and frisk policy articulated above. *See Rice v. Correctional Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012) (official custom may be established by widespread practice "although unwritten, is so entrenched and well-known as to carry the force of policy."); *Thomas v. Cook Cnty. Sheriff's Dep't,* 604 F.3d 293, 303 (7th Cir. 2010) (there are no "bright-line rules defining a 'widespread custom or practice.'"). Plus, Defendants can be liable for applying a facially neutral policy – like the City's written anti-racial profiling policy – to Plaintiffs in an intentionally racially discriminatory manner in violation of the Equal Protection Clause. *See Muckway v. Craft,* 789 F.2d 517, 519-20 (7th Cir. 1986) ("A law making no impermissible classification (a facially neutral statute) may violate the equal protection clause if it is applied in such a way to create an impermissible classification."); *see, e.g.*, *Floyd v. City of New York,* 959 F.Supp.2d 540, 570-71 (S.D.N.Y. 2013). Accordingly, Plaintiffs are not required to base their *Monell* claims on an express, written policy as the City suggests.

The remainder of the City's arguments concerning Plaintiff's *Monell* claims go to the merits of Plaintiffs' constitutional claims and not whether they sufficiently alleged their claims under the federal pleading standards. *See Hahn v. Walsh,* 762 F.3d 617, 632 (7th Cir. 2014) (courts do not "evaluate the veracity of the pleaded facts or the ultimate merits of the plaintiff's claim" on a motion to dismiss). As the Supreme Court teaches, in the context of a motion to dismiss, the question is "not whether [the plaintiff] will ultimately prevail, but whether his complaint was sufficient to cross the federal court's threshold." *Skinner,* 562 U.S. at 529-30 (internal citations and quotation marks omitted). The Court denies the City's motion to dismiss Plaintiffs' *Monell* claims.

## IV.    Equal Protection Claim

The City also moves to dismiss Plaintiffs' equal protection claim as alleged in Count II of the Amended Complaint. *See Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("Constitution prohibits selective enforcement of the law based on considerations such as race" and "the basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause."). In its motion, the City specifically argues that Plaintiffs have failed to sufficiently allege their equal protection claim because they have not properly alleged discriminatory effect or discriminatory purpose. *See Chavez v. Illinois State Police,* 251 F.3d 612, 635-36 (7th Cir. 2001) ("To show a violation of the Equal Protection Clause, plaintiffs must prove that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose.").

"The Equal Protection Clause of the Fourteenth Amendment protects individuals from governmental discrimination." *Swanson v. City of Chetek,* 719 F.3d 780, 783 (7th Cir. 2013).

"To establish a violation of the Fourteenth Amendment's Equal Protection Clause, a plaintiff must demonstrate that a 'state actor has treated him differently from persons [not in his protected class] and that the actor did so purposefully.'" *Xiong v. Wagner,* 700 F.3d 282, 295 (7th Cir. 2012) (citation omitted); *see also Swanson,* 719 F.3d at 783 ("The typical equal protection case involves discrimination by race, national origin or sex."). In other words, "[t]o establish liability for an equal protection violation, a plaintiff must establish that the defendant acted with a discriminatory purpose and discriminated against him because of his membership in an identifiable group." *Dunnet Bay Const. Co. v. Borggren,* 799 F.3d 676, 697 (7th Cir. 2015).

According to the *Chavez* decision, "to prove discriminatory effect, the plaintiffs are required to show that they are members of a protected class, that they are otherwise similarly situated to members of the unprotected class, and that plaintiffs were treated differently from members of the unprotected class." *Id*. at 636. The *Chavez* decision further states that "'[d]iscriminatory purpose' implies more than intent as awareness of consequences. It implies that the decisionmaker selected or reaffirmed a particular course of action at least in part 'because of' its adverse effects upon an identifiable group.'" *Id.* at 645 (citations and ellipses omitted). The Seventh Circuit has described the test outlined in *Chavez* as the prima facie case of discrimination under the equal protection clause. *See Brown v. Budz,* 398 F.3d 904, 916 (7th Cir. 2005) (quoting *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993)); *Williams v. Seniff,* 342 F.3d 774, 788 n.13 (7th Cir. 2003). It is well-established, however, that under the federal pleading standards, a plaintiff need not plead a prima facie case because it is an evidentiary standard, not a pleading requirement. *See Swierkiewicz v. Sorema,* 534 U.S. 506, 510, 122 S.Ct. 992, 152 L.E.2d 1 (2002); *Luevano v. Wal-Mart Stores, Inc.,* 722 F.3d 1014, 1028

(7th Cir. 2013) ("Neither *Iqbal* nor *Twombly* overruled *Swierkiewicz*, and it is our duty to apply the Supreme Court's precedents unless and until the Supreme Court itself overrules them.").

In any event, Plaintiffs have more than adequately alleged a plausible equal protection claim in relation to the purportedly unconstitutional stop and frisk policy. In particular, Plaintiffs alleged they are all African-American or Hispanic men who live in or visit minority neighborhoods where Chicago police officers target them and conduct suspicionless stops and frisks based on their race and or/national origin pursuant to the City's unconstitutional practice. (Am. Compl. ¶¶ 3, 5, 56, 59, 79, 88, 95, 101, 110, 121, 129, 150, 162, 168, 185, 200, 211, 227, 234, 250, 267, 274, 281, 288, 296, 302, 316, 322, 330, 342, 349, 366, 373, 380, 387, 395, 402, 417, 425, 433.) Moreover, Plaintiffs allege that the CPD has a history of suspicionless stops and frisks tracing back to the sweeps of high-crime neighborhoods in the 1980s and that this policy continues through the present day. (*Id*. ¶¶ 434-49.) They further maintain that data collected in connection with a 2003 lawsuit in which Olympic Gold medalist Shani Davis and others challenged a series of stop and frisk searches by Chicago police shows a pattern of unjustified stops and searches. (*Id*. ¶¶ 437-38.) Also, Plaintiffs assert that in March 2015, the ACLU published a report regarding its investigation into CPD's stop and frisk policies finding that for half of the stops conducted (based on a sample analyzed), the Chicago police officers did not record legally sufficient reasons to establish reasonable suspicion. (*Id*. ¶ 442.) According to Plaintiffs, a review of the data the ACLU gathered indicates that Chicago police officers disproportionately subject African-Americans and Hispanics to stops, as compared to white counterparts. (*Id*. ¶¶ 444-49.) Accepting these allegations as true and all reasonable inferences in Plaintiffs' favor, Plaintiffs have sufficiently alleged the *Chavez* discriminatory effect test

because they assert that they are members of a protected class, namely, African-American and Hispanic men, who Chicago police officers disproportionally stop and frisk – compared to their white counterparts – pursuant to an unlawful practice and policy.

Furthermore, Plaintiffs have sufficiently alleged discriminatory purpose or intent under the second *Chavez* requirement. Specifically, Plaintiffs have set forth allegations concerning the history of suspicionless stops and frisks in Chicago leading to the plausible inference that the City's policymakers reaffirmed this particular course of action and its adverse effect on African-American and Hispanic men in minority neighborhoods. *See Chavez,* 251 F.3d at 645. In addition, Plaintiffs assert that Chicago police officers are under pressure from policymakers to increase the number of stops and frisks they make, especially due to the stop and frisk reports that CPD supervisors track and evaluate. (Am. Compl. ¶ 452.) Based on this incentive to increase stops and frisks, Plaintiffs assert that Superintendent McCarthy, a final policymaker, made statements to the press that Chicago police officers need to get out of their cars and put hands on people to make sure they are stopping "the right people at the right times and the right places." (*Id*. ¶ 453.) Plaintiffs additionally point to data suggesting that since Superintendent McCarthy took office, Chicago police have stopped and frisked more Chicago residents. (*Id*. ¶¶ 454-55.) They also allege that despite the fact that Defendant McCarthy had knowledge of the police officers' misconduct, he encouraged this behavior and failed to rectify the abuses. (*Id*. ¶ 465.) In sum, Plaintiffs state that "[d]espite receiving numerous requests by various organizations to conduct stop and frisks within the bounds of the Constitution, the City of Chicago and its final policymakers have repeatedly and consciously failed to take appropriate

action." (*Id*. ¶ 457.)  These allegations of intent are facially plausible because, when viewed as

true, the Court can draw the reasonable inference that Defendants are liable for the alleged

misconduct.  *See Iqbal*, 556 U.S. at 678.  Therefore, the Court denies the City's motion to

dismiss Plaintiff's equal protection claim as alleged in Count II.

**V.      Official and Individual Capacity Claims against Defendant McCarthy**

In his motion to dismiss, Defendant McCarthy argues that the Court must dismiss the §

1983 constitutional claims brought against him in his official capacity because any such claims

are properly brought against the City of Chicago.  *See Kentucky v. Graham,* 473 U.S. 159, 165,

105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (Official capacity claims "represent only another way of

pleading an action against an entity of which an officer is an agent.").  The Court agrees,

especially because courts in this district have consistently treated *Monell* claims against a chief

of police or police superintendent as claims against the municipality that employs the police

chief.  *See, e.g., Gbur v. City of Harvey, Ill.,* 835 F. Supp. 2d 600, 639 (N.D. Ill. 2011); *Florek v.*

*Village of Mundelein*, No. 05 C 6402, 2010 WL 1335526, at *4 (N.D. Ill. Mar. 31, 2010); *Ryan*

*v. Mary Immaculate Queen Ctr.,* No. 95 C 3021, 1996 WL 420230, at *2 (N.D. Ill. July 22,

1996).  The Court therefore grants this aspect of Defendant McCarthy's motion to dismiss.

Defendant McCarthy additionally argues that the Court must dismiss Plaintiffs'

constitutional claims brought against him in his individual capacity because Plaintiffs fail to

allege that he was personally involved in the alleged constitutional deprivations.  To clarify,

because the doctrine of respondeat superior (blanket supervisory liability) does not apply to

actions filed under § 1983, a plaintiff must allege that an individual defendant, through his own

conduct, violated the Constitution.  *See Perez v. Fenoglio,* 792 F.3d 768, 781 (7th Cir. 2015).  A

supervisor, such as Defendant McCarthy, can be liable under § 1983 if he knows about the misconduct and either facilitates it, approves it, condones it, or turn a blind eye.  *See id.*; *Matthews v. City of E. St. Louis,* 675 F.3d 703, 708 (7th Cir. 2012); *Chavez*, 251 F.3d at 651.

Although Defendant McCarthy denies personal involvement in the approximately 50 individual incidents alleged in the Amended Complaint, Plaintiffs have presented sufficient factual allegations stating a claim for supervisory liability that is legally sound and plausible on its face, namely, that Superintendent McCarthy was aware of the police officers' unconstitutional stops and facilitated this conduct.  Construing the facts and all reasonable inferences in Plaintiffs' favor – as the Court must do at this procedural posture – they allege that Defendant McCarthy had knowledge of the unlawful stops and frisks based on the CPD's history of conducting suspicionless stops and frisks, the 2003 Shani Davis lawsuit and the data collected therein, and other actions taken by the ACLU.  (Am. Compl. ¶¶ 434, 437, 438, 440-42.)  Plus, Plaintiffs assert that Superintendent McCarthy put pressure on Chicago police officers to increase the number of stops and frisks giving the officers a strong incentive to make such stops because the officers' increased numbers would suggest productivity.  (*Id.* ¶¶ 452-53.)  Similarly, Plaintiffs contend that Superintendent McCarthy facilitated the alleged misconduct because he failed to set forth procedures to properly train police officers as to the legal and factual bases for conducting stops and frisks.  (*Id.* ¶ 461.)  Under the circumstances, Plaintiffs have sufficiently alleged a plausible claim for supervisory liability pursuant to the federal pleading standards.  *See Alexander v. United States,* 721 F.3d 418, 422 (7th Cir. 2013) ("the plausibility requirement demands only that a plaintiff provide sufficient detail 'to present a story that holds together.'")

(citation omitted).  The Court thus denies Defendant McCarthy's motion to dismiss the

constitutional claims brought against him in his individual capacity.

## VI.    Title VI Claim

The City also moves to dismiss Plaintiff's Title VI claim as alleged in Count III of the

Amended Complaint arguing that because it is a municipality, it is not within the Title VI's

scope of coverage.  Title VI prohibits race and national origin discrimination in federally funded

programs.  *See Parker v. Franklin Cnty. Cmty. Sch. Corp.,* 667 F.3d 910, 917 (7th Cir. 2012)

(Title VI was "enacted pursuant to Congress' spending power [by] conditioning an offer of

federal funding on a promise by the recipient not to discriminate").  Specifically, Title VI

provides that no person shall, "on the ground of race, color, or national origin, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any program

or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  Title VI defines

"program" or "activity" as follows:

> (1)(A) a department, agency, special purpose district, or other instrumentality of a
> State or of a local government; or
>
> (B) the entity of such State or local government that distributes such assistance
> and each such department or agency (and each other State or local government
> entity) to which the assistance is extended, in the case of assistance to a State or
> local government[.]
>                                             ....
>
> any part of which is extended Federal financial assistance.

42 U.S.C. § 2000d-4a.

In the context of Title VI's definition of "program" or "activity," another judge in this

district concluded that the City of Chicago did not fall within the scope of Title VI's coverage

because the "City is not an 'operation' of 'a department, agency, special purpose district, or other

21

instrumentality of a State or of a local government,' or of 'the entity of such State or local government that distributes such assistance.'" *Hodges v. Public Bldg. Comm'n of Chicago,* 864 F. Supp. 1493, 1505 (N.D. Ill. 1994). The *Hodges* court further reasoned, "the City is a municipality and, as such, it does not fit within the definition of 'program or activity' for purposes of Title VI." *Id.*; *see also Goerlich v. Davis,* No. 91 C 1743, 1991 WL 195772, at *4 (N.D. Ill. Sept. 25, 1991) (although plaintiff "alleges that the city receives federal funds, he fails to make the required allegation of a relationship between his claims and any particular federally funded program.").

This reading of Title VI, namely – that the City, as a municipality, does not fall under the scope of Title VI's coverage – is persuasive, especially because in order "to bring a private action under Title VI the plaintiff must be the intended beneficiary of, an applicant for, or a participant in a federally funded program." *Doe v. St. Joseph's Hosp. of Fort Wayne,* 788 F.2d 411, 418-19 (7th Cir. 1986), *overruled on other grounds by Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487 (7th Cir. 1996). In other words, Plaintiffs have not, and cannot, allege that they were part of a federally funded program or activity for Title VI purposes under the circumstances in which they bring their claims. Accordingly, the Court grants the City's motion to dismiss Plaintiffs' Title VI claim as alleged in Count III of the Amended Complaint.

**VII. State Law Claims**

Defendants also challenge Plaintiffs' state law claims brought pursuant to the Court's supplemental jurisdiction. *See* 28 U.S.C. § 1367(a). In their Amended Complaint, the named Plaintiffs bring the following state law claims against "each and every Defendant, jointly and severally": (1) assault and battery; (2) trespass; (3) violation of the right to privacy; (4)

negligence; and (5) "violation of rights otherwise guaranteed under the Constitution and laws of the State of Illinois." (Am. Compl. ¶ 710.) Plaintiffs additionally allege false arrest and false imprisonment claims against Defendant John Doe Chicago police officers. (*Id.* ¶ 711.) Also, Plaintiffs bring negligent hiring, training, supervision, and retention claims against Defendant McCarthy and the City. (*Id.* ¶ 712.) The Court first turns to the City's motion to dismiss the named Plaintiffs' state law claims.

### A. The City's Motion to Dismiss

Unlike *Monell* liability, the City can be liable under the theory of respondeat superior in regard to the named Plaintiffs' state law claims based on the Chicago police officers' tortious conduct. *See Duran v. Town of Cicero, Ill.*, 653 F.3d 632, 637 (7th Cir. 2011). In its motion to dismiss, the City argues that it cannot be held liable for the John Doe police officers' alleged misconduct because it is immune under the Illinois Local Government and Governmental Employees Tort Immunity Act ("Tort Immunity Act."). *See* 745 ILCS 10/1-101, *et seq.* To clarify, in "order to protect public funds from being dissipated by damage awards in tort cases, the Local Government and Governmental Employees Tort Immunity Act was enacted to shield local public entities and public employees from liability for ordinary negligence committed during the exercise of their duties." *Mitchell v. Special Educ. Joint Agreement Sch. Dist. No. 208,* 386 Ill.App.3d 106, 111, 325 Ill.Dec. 104, 897 N.E.2d 352 (1st Dist. 2008) (internal citation omitted). The Court recognizes that the Tort Immunity Act provides affirmative defenses, *see Wilson v. City of Chicago*, 758 F.3d 875, 879 (7th Cir. 2014), and that the named Plaintiffs need not anticipate and overcome affirmative defenses in their Amended Complaint. *See Sidney Hillman Health Ctr.,* 782 F.3d at 928; *O'Gorman*, 777 F.3d at 889. That being said, the Court

turns to whether Plaintiffs have the alleged sufficient facts establishing any such affirmative defense or pleaded themselves "out of court by including factual allegations that establish that [they are] not entitled to relief as a matter of law." *O'Gorman,* 777 F.3d at 889.

### 1.      Statute of Limitations

In its motion, the City maintains that certain named Plaintiffs' state law claims are time-barred under the one-year limitations period of the Tort Immunity Act, Section 8-101, which states that "[n]o civil action ... may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced within one year from the date that the injury was received or the cause of action accrued." The Court agrees. Plaintiffs filed their original complaint on April 20, 2015, therefore, the state law claims in which approximately thirteen named Plaintiffs alleged that Chicago police officers unlawfully stopped and frisked them prior to April 20, 2014 are time-barred under the Tort Immunity Act. Plaintiffs' argument that the continuing violation doctrine allows them to get relief for time-barred acts is unavailing because the continuing violation doctrine pertains to federal Title VII employment discrimination claims. *See Barrett v. Illinois Dep't of Corr.,* ___ F.3d ___, 2015 WL 6143221, at *5 (7th Cir. Oct. 20, 2015) ("Under the 'continuing violation' doctrine, a Title VII plaintiff may recover for otherwise time-barred conduct that is part of a single, ongoing unlawful employment practice if at least one related act occurs during the limitations period."). Moreover, the facts of this lawsuit do not fit Illinois' continuing tort or continuing violation rule "where a tort involves a continuing or repeated injury [and] the limitations period does not begin to run until the date of the last injury or the date the tortious acts cease." *Feltmeier v. Feltmeier,* 207 Ill. 2d 263, 278m 798 N.E.2d 75, 278 Ill.Dec. 228 (2003). The Court grants the City's motion to dismiss in this respect.

### 2. Willful and Wanton Conduct

The City additionally argues that Plaintiffs have failed to properly allege their assault and battery, trespass, and violation of the right to privacy claims pointing to Section 2-202 of the Tort Immunity Act, which states that a "public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." *See* 745 ILCS 10/2-202.[2] The Tort Immunity Act defines willful and wanton conduct as:

> [A] course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property. This definition shall apply in any case where a "willful and wanton" exception is incorporated into any immunity under this Act.

745 ILCS 10/1–210. "Although willful and wanton conduct 'consists of more than mere inadvertence, incompetence, or unskillfulness,' it need not be an 'intentional act; rather, it may be an act committed under circumstances exhibiting a reckless disregard for the safety of others." *Chelios v. Heavener,* 520 F.3d 678, 693 (7th Cir. 2008). "Whether an officer acted in such fashion 'is normally a question of fact to be determined by the jury.'" *Id.* (citation omitted); *see also Robles v. City of Chicago*, 2014 IL App (1st) 131599, 10 N.E.3d 236, 240, 381 Ill.Dec. 151 (1st Dist. 2014) ("Whether a person is guilty of wilful and wanton conduct is a question of fact for the jury and should rarely be ruled upon as a matter of law.").

---

[2] Plaintiffs contend that Section 2-202 of the Tort Immunity Act does not apply in the first instance because the Chicago police officers' conduct was not connected with the actual execution or enforcement of the law, but instead was unlawful. Plaintiffs' argument is best left for summary judgment after the parties develop the record because "[w]hether a public employee is executing or enforcing a law at the critical time is 'a factual determination which in every case must be made in light of the circumstances involved.'" *Clark v. City of Chicago*, 595 F. Supp. 482, 487 (N.D. Ill. 1984) (citation omitted).

In their allegations, Plaintiffs have set forth extensive factual allegations that the Defendants acted willfully and wantonly, namely, that the police officers' conduct was intended to cause harm or exhibited reckless disregard for the safety of others.  Specifically, Plaintiffs allege that the Chicago police officers conducted stops and frisks without any reasonable factual or legal basis, but rather stopped them based on their race and national origin; that some of these stops resulted in arrests; and that during these stops, Defendant police officers used threatening language, racial epithets, and/or physical force.  (Am. Compl., ¶¶ 82-84, 91-93, 97-100, 104-08, 124-28, 133-48, 152-60, 165-67, 180-84, 188-91, 194-95, 197-99, 203-09, 215-17, 222-26, 238-40, 245-49, 252-57, 262-65, 270-72, 277-79, 284-86, 299-301, 304-07, 312-15, 326-28, 332-34, 339-41, 345-47, 358-64, 369-71, 376-78, 383-86, 390-94, 398-400, 404-07, 412-15, 420-23, 771.)

### 3.     Individual State Law Claims

Plaintiffs have also presented adequate factual allegations showing that their assault and battery claims are facially plausible allowing the Court to draw the reasonable inference that Defendants are liable for the purported misconduct.  *See Iqbal,* 556 U.S. at 678.  "Under Illinois law, battery is the 'unauthorized touching' of another that 'offends a reasonable sense of personal dignity.'"  *Chelios,* 520 F.3d at 692.  Assault involves intentional conduct that places the plaintiff in reasonable apprehension of an immediate battery.  *See McNeil v. Carter,* 318 Ill.App.3d 939, 944, 252 Ill.Dec. 413, 742 N.E.2d 1277 (Ill. 2001).  Here, Plaintiffs contend that, by necessity, every unconstitutional frisk involved an offensive, unauthorized touching of a person.  The Court agrees.  The circumstances described in Plaintiffs' allegations concerning the stops and frisks lead to the reasonable inference that Plaintiffs had a reasonable apprehension of

an offensive, unauthorized touching.  The Court denies the City's motion to dismiss Plaintiffs' assault and battery claims.

In addition, Plaintiffs have sufficiently alleged their invasion of privacy claim.  Pursuant to Illinois law, the common law claim of intrusion upon seclusion – which is a form of an invasion of privacy claim – includes the following elements: "(1) an unauthorized intrusion into seclusion; (2) the intrusion would be highly offensive to a reasonable person; (3) the matter intruded upon was private; and (4) the intrusion caused the plaintiffs anguish and suffering." *Cooney v. Chicago Public Sch.,* 407 Ill.App.3d 358, 366, 347 Ill.Dec. 733, 943 N.E.2d 23 (1st Dist. 2010).  Similar to their assault and battery claims, Plaintiffs' allegations that they were stopped and frisked without any reason or just cause sufficiently support the inference that the police officers' intrusions were physical, unauthorized, and highly offensive.  In addition, by virtue of the unlawful frisks, the police officers intruded upon Plaintiffs' physical boundaries and affairs.  *See Lovgren v. Citizens First Nat. Bank,* 126 Ill.2d 411, 416–17, 128 Ill.Dec. 542, 534 N.E.2d 987 (1989) (illegal search constitutes tort of intrusion upon seclusion).  As such, the Court denies the City's motion to dismiss this claim.

Under the circumstances, the Court would be hard-pressed to conclude that Plaintiffs failed to sufficiently allege their assault and battery and intrusion upon seclusion claims or that Plaintiffs pleaded themselves out of court by establishing an affirmative defense under the Tort Immunity Act as to these claims.  In so concluding, the Court notes that the City's arguments made for the first time in its reply brief are waived.  *See Darif v. Holder,* 739 F.3d 329, 337 (7th Cir. 2014).  The City, for example, has waived its argument that many Plaintiffs failed to state claims for assault and battery and invasion of privacy because they did not allege a lack of

consent. Likewise, the City has waived its argument about certain Plaintiffs' false arrest and imprisonment claims.

Next, Plaintiffs maintain that their trespass claims are not based on the trespass to the physical condition of land as the City argues, but concern the trespass to personal property. Under Illinois law, "an injury to or interference with possession, with or without physical force, constitutes a trespass to personal property." *See Sotelo v. DirectRevenue, LLC,* 384 F. Supp.2d 1219, 1229 (N.D. Ill. 2005) (citation and quotation marks omitted). In other words, "harm to the personal property or diminution of its quality, condition, or value as a result of a defendant's use can [] result in liability." *Id.*; *see also Kay v. Cook County*, No. 05 C 3015, 2006 WL 2509721, at *7 (N.D. Ill. Aug. 29, 2006) (citing Restatement (Second) of Torts § 218(b)).

Plaintiffs support their trespass to chattels claim by highlighting their allegations that certain police officers, who after frisking Plaintiffs, took their personal belongings, such as money and keys. (Am. Compl. ¶¶ 117, 119.) Plaintiffs do not allege that the police officer kept their personal belongings, but allege that on two occasions the officers threw their belongings to the ground. (*Id.* ¶¶ 136, 189.) Nonetheless, viewing these allegations and all reasonable inferences in Plaintiffs' favor, they have failed to sufficiently allege how the police officers' conduct harmed or diminished their personal belongings. *See Shea v. Winnebago Cnty. Sheriff's Office,* No. 12 CV 50201, 2014 WL 4449605, at *9 (N.D. Ill. Sept. 10, 2014) ("Damages are a required element to state a valid claim for trespass to chattels."). Without more details, Plaintiffs have failed to allege sufficient details under *Twombly* and *Iqbal* to state a claim based on the common law theory of trespass to chattels that is plausible on its face. *See Iqbal,* 556 U.S. at 678 ("naked assertions devoid of further factual enhancement" do not sufficiently support a

claim); *Brooks v. Ross,* 578 F.3d 574, 581 (7th Cir. 2009) ("some factual allegations will be so sketchy or implausible that they fail to provide sufficient notice to defendants of the plaintiff's claim."). The Court therefore grants the City's motion to dismiss Plaintiffs' trespass to chattels claim without prejudice.

The Court now turns to the City's arguments about Plaintiffs' negligent hiring and supervision claims. Specifically, the City argues that the Tort Immunity Act, Section 2-201, immunizes the City under the circumstances because the decision to hire police officers is discretionary. Section 2-201 states in its entirety: "Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201. For immunity to apply under Section 2-201, the City's actions must be "both a determination of policy and an exercise of discretion." *Van Meter v. Darien Park Dist.,* 207 Ill.2d 359, 365, 799 N.E.2d 273, 283 (Ill. 2003). Under this standard, "the Illinois state courts have determined that '[t]he decision to hire or not to hire a police officer is an inherently discretionary act and, thus, is subject to the immunities contained in the Immunity Act.'" *Doe v. Village of Arlington Heights,* 782 F.3d 911, 922 (7th Cir. 2015) (quoting *Johnson v. Mers,* 279 Ill.App.3d 372, 216 Ill.Dec. 31, 664 N.E.2d 668, 675 (2d Dist. 1996)). Indeed, Plaintiffs do not respond to the City's argument concerning their negligent hiring claim, therefore, the Court grants the City's motion to dismiss this claim.

Plaintiffs, however, address the City's arguments regarding their negligent supervision claims citing district court cases where the court concluded that the supervision of employees is

not discretionary under Section 2-201 of the Tort Immunity Act. *See Hogan v. Smith,* No. 11-961-GPM, 2012 WL 1435402, at *3 (S.D. Ill. Apr. 25, 2012) ("The act of training and supervision in question could easily be ministerial rather than discretionary."); *see also Patton v. Chicago Heights,* No. 09 C 5566, 2010 WL 1813478, at *4 (N.D. Ill. May 3, 2010); *but see Reed v. City of Chicago,* No. 01 C 7865, 2002 WL 406983, at *3 (N.D. Ill. Mar. 14, 2002). Based on Plaintiffs' allegations, the Court cannot determine whether the City's supervision of its police officers was both a determination of policy and an exercise of discretion. *See, e.g., Lane v. Dupage Cnty. Sch. Dist. 45,* No. 13 C 5386, 2014 WL 518445, at *4 (N.D. Ill. Feb. 10, 2014). Furthermore, because immunity is an affirmative defense, the City bears the burden of properly raising and proving it, which it has failed to do at this juncture. *See Van Meter*, 207 Ill.2d at 370 ("Because the immunities afforded to governmental entities operate as an affirmative defense, those entities bear the burden of properly raising and proving their immunity under the Act."). For these reasons, the Court denies the City's motion to dismiss Plaintiffs' negligent supervision claims.

The Court notes that Plaintiffs did not discuss their negligence claims nor their claims based on the "violation of rights otherwise guaranteed under the Constitution and laws of the State of Illinois" in their legal memorandum. Plaintiffs have thus waived these claims. *See Steen v. Myers,* 486 F.3d 1017, 1020-21 (7th Cir. 2007) (absence of discussion in legal brief amounts to abandonment of claims).

### B.      Superintendent McCarthy's Motion to Dismiss

In his motion, Superintendent McCarthy argues that he cannot be held liable for the John Doe police officers' alleged misconduct under the Tort Immunity Act. Defendant McCarthy

specifically points to Section 2-204 of the Tort Immunity Act, which states: "[e]xcept as otherwise provided by statute, a public employee, as such and acting within the scope of his employment, is not liable for an injury caused by the act or omission of another person." 745 ILCS 10/2–204; *see also Doe v. Village of Arlington Heights,* 782 F.3d at 920 (2-204 provides "public employees immunity from liability for injury caused 'by the act or omission of another person'"). Indeed, under Section 2-204, courts in this district have concluded that police superintendents cannot be held liable for a police officer's misconduct. *See Catchings v. City of Chicago,* No. 04 C 6110, 2006 WL 1371440, at *9 (N.D. Ill. May 15, 2006); *Saunders v. City of Chicago,* No. 86 C 5186, 1986 WL 9536, at *1 (N.D. Ill. Aug. 27, 1986); *Clark v. City of Chicago,* 595 F. Supp. 482, 487 (N.D. Ill. 1984); *Eiland v. Hardesty,* 564 F. Supp. 930, 934 (N.D. Ill. 1982); *Means v. City of Chicago,* 535 F. Supp. 455, 465 (N.D. Ill. 1982). Meanwhile, Plaintiffs do not address this argument in response to Defendant McCarthy's motion. The Court therefore grants this aspect of Defendant McCarthy's motion to dismiss.

Turning to Plaintiffs' negligent hiring, training, supervision, and retention claims, Defendant McCarthy asserts that any such cause of action must be brought against the police officers' employer, in this case, the City of Chicago. *See Van Horne v. Muller,* 185 Ill. 2d 299, 310, 235 Ill. Dec. 715, 705 N.E.2d 898 (1998) ("Illinois law recognizes a cause of action against an employer for negligently hiring, or retaining in its employment, an employee it knew, or should have known, was unfit for the job so as to create a danger of harm to third persons."). In fact, Plaintiffs allege that the Defendant John Doe police officers are employees of the City. (Am. Compl. ¶¶ 50, 51.) Again, Plaintiffs do not challenge Superintendent McCarthy's assertion that the City of Chicago is the John Doe police officers' employer. The Court thus grants

Defendant McCarthy's motion to dismiss Plaintiffs' negligent supervision, negligent hiring, training, supervision, and retention claim against him. Accordingly, the Court dismisses all of Plaintiffs' state law claims brought against Defendant McCarthy.

## CONCLUSION

For these reasons, the Court grants in part and denies in part Defendants' motions to dismiss.

**Dated:** November 9, 2015

ENTERED

_____
**AMY J. ST. EVE**
**United States District Court Judge**