**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DARNELL SMITH, DARREN NATHAN, GREGORY DAVIS, MARK NEVILLES, ARACELI FONTANEZ, as Parent and Next Friend of HECTOR FONTANEZ, a minor, MARCELL DAVIS, ANTHONY POLK, CALVIN JACKSON, CARL N. MCCORD, TIMOTHY THIGPEN, MELVIN THOMPSON, REBECCA SANDERS, as Parent and Next Friend of STEVE MCABEE, a minor, HERBERT DYER, JR., SHANTAY JOHNSON, ARTHUR MOTON, EDGAR MARSHALL, JR., MICHAEL SANDERS, RASHAWN LINDSEY, and SIDNEY BELL, individually and on behalf of a class of all others similarly situated; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No.: 1:15-cv-3467 Honorable Andrea Wood |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| CITY OF CHICAGO, a municipal corporation, et al., | ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR**
**MOTION FOR RULE 23(B)(3) CLASS CERTIFICATION**

Plaintiffs, individually and on behalf of a class of all others similarly situated, in response to the City of Chicago's opposition brief and in further support of their motion for class certification, state as follows:

# TABLE OF CONTENTS

I.  Prefatory Statement .................................................................................................. 1

II. Overview of the City's Opposition Brief .................................................................. 1

III. The City's "Factual" Discussion ............................................................................ 2

  A.  The City's Claim that Contact Cards Cannot be Reliably Used to Identify
      Unconstitutional Stops is Baseless and Self-Serving .......................................... 3

  B.  The City's Claim that Plaintiffs did not Identify Seizures Misrepresents the Evidence ..... 7

      1.  Three Types of Police-Citizen Encounters ................................................... 8

      2.  Application of the Exclusionary Filters ........................................................ 9

      3.  The City's Misdirection ................................................................................ 9

  C.  Accepting the City's Arguments on the Reliability of Contact Cards would be a Grave
      Injustice. ............................................................................................................ 10

  D.  In Response to the City's "Facts" ..................................................................... 12

      1.  McCarthy's Refrain: Stop the "right people" and "put your hands" on them ............. 12

      2.  Strategic Subjects List ................................................................................ 13

      3.  Contact cards document "misses" .............................................................. 14

      4.  CPD's training is not "robust" .................................................................... 15

IV. Argument ................................................................................................................ 16

  A.  Alternative Rule 23(b)(3) Classes for Loitering and No Narrative ................... 17

      1.  The Loitering Groups .................................................................................. 17

      2.  The No Narrative Group .............................................................................. 22

  B.  Plaintiffs' Proposed Classes Satisfy All Rule 23 Elements ............................. 23

      1.  The Class Definitions are Based on Objective Criteria and Qualifying Class Members
          are Ascertainable .................................................................................... 23

          a.  Investigatory Stops are Ascertainable .............................................. 23

      b.    The Class Definitions are not Overbroad ................................................ 26

      c.    Alternative Class Definitions Would Not be Fail-Safe ........................... 28

   2.    Common Questions Predominate over Individualized Issues ....................... 29

      a.    Whether a Seizure Occurred ................................................................. 29

      b.    Whether there was Reasonable Articulable Suspicion............................ 30

      c.    Whether a Stop was Caused by an Unconstitutional Policy ..................... 31

      d.    Whether a Stop was Racially Motivated .................................................. 35

         i.    Plaintiffs Present a Viable Equal Protection Claim............................. 36

        ii.    Individualized Issues Do Not Predominate ........................................ 40

      d.    Whether There are Damages.................................................................. 42

   3.    The Class Representatives' Claims are Typical of the Class ....................... 44

      a.    Hector Fontanez, Jr............................................................................... 44

      b.    Rashawn Lindsey ................................................................................. 46

      c.    Steve McAbee...................................................................................... 46

   4.    Class Treatment is the Superior Mechanism to Manage this Case............................. 47

C.   Alternatives to Certification of the Class as a Whole ...................................... 47

   1.    Certification of the Loitering Groups under Rule 23(b)(3)........................... 47

   2.    Certification of the No Narrative Group under Rule 23(b)(3).................... 48

   3.    Certification of Issues under Rule 23(c)(4). ............................................... 48

## TABLE OF AUTHORITIES

**CASES**

*Amador v. Baca,* 299 F.R.D. 618 (C.D. Cal. 2014) ................................................................. 42

*Amador v. Baca*, No. CV-10-1649 SVW, 2014 WL 10044904 (C.D. Cal. Dec. 18, 2014) ......... 42

*Barkman v. Wabash, Inc.*, *85 C 611, 1988 WL 5039 (N.D. Ill. Jan. 20, 1988)* .......................... 48

*Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360 (7th Cir. 2015) ............................................... 22, 33

*Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875 (Pa. Super. Ct. 2011), *aff'd*, 106 A.3d 656 (Pa. 2014), *cert. denied*, 136 S.Ct. 1512 (2016) ............................................................................ 6

*Brown v. Board of Education*, 347 U.S. 483 (1954) ................................................................. 35

*Butler v. Sear, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013) ................................................... 50

*Casale v. Kelly*, 257 F.R.D. 396 (S.D.N.Y. 2009) ................................................................... 42

*Chavez v. Ill. State Police*, 251 F.3d 612 (7th Cir. 2001) ........................................................ 36

*Daniel v. Cook Cty.*, 833 F.3d 728 (7th Cir. 2016) ................................................................. 37

*De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225 (7th Cir. 1983) ................................... 44

*Doe v. Guardian Life Ins. Co.*, 145 F.R.D. 466 (N.D. Ill. 1992) .............................................. 48

*Driver v. Marion Cty. Sheriff*, 859 F.3d 489 (7th Cir. 2017) .................................................... 34

*Floyd v. City of New York*, 283 F.R.D. 153 (S.D.N.Y. 2012) ..................................................... 4

*Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013) ............................................ 40

*Floyd v. City of New York*, No. 08 Civ. 1034, 2008 WL 4179210 (S.D.N.Y. Sept. 10, 2008) .... 39

*Gentry v. Sevier*, 597 F.3d 838 (7th Cir. 2010) ...................................................................... 30

*Hudson v. City of Chicago*, 242 F.R.D. 496 (N.D. Ill. 2007) ................................................... 34

*In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015) ........................................................ 28

*In re Stericycle, Inc.*, No. 13 C 5795, 2017 WL 635142 (N.D. Ill. Feb. 16, 2017) ................. 6, 21

*Jaime S. v. Milwaukee Public Schools*, 68 F.3d 481 (7th Cir. 2012) ......................................... 25

*Kohen v. Pca. Inv. Mgmt. Co.*, 571 F.3d 672 (7th Cir. 2009) ..................................... 26

*LaPorta v. City of Chicago*, 277 F. Supp. 3d 969 (N.D. Ill. 2017) .............................. 37

*Lippert v. Baldwin*, No. 10 C 4603, 2017 WL 1545672 (N.D. Ill. Apr. 28, 2017) ...................... 24

*McCaster v. Darden Rests., Inc.*, 845 F.3d 794 (7th Cir. 2017) ................................... 28

*McReynolds v. Merrill Lynch*, 672 F.3d 482, 489 (7th Cir. 2012), *abrogated on other grounds by Phillips v. Sheriff of Cook Ct.*, 828 F.3d 541 (7th Cir. 2016) ......................................... passim

*Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910 (7th Cir. 2003) ................................... 49

*Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299 (1986) ..................................... 43

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012) ....................... passim

*Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015), *cert denied* 136 S.Ct. 1161, 194 L.Ed. 2d 175 (2016) ................................................................................ 24, 25, 43

*Mulvania v. Sheriff of Rock Island County*, 850 F.3d 849 (7th Cir. 2017) ................................. 43

*Oshana v. Coca–Cola Co.*, 472 F.3d. 506 (7th Cir. 2006) ......................................... 27

*Parko v. Shell Oil Co.*, 739 F.3d 1083 (7th Cir. 2014) ........................................... 26

*Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979) ........................................ 38, 40

*Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992) ............................................ 44

*Siebert v. Severino*, 256 F.3d 648 (7th Cir. 2001) .............................................. 43

*Smith v. City of Chicago*, 143 F.Supp.3d 741 (N.D. Ill. 2015) ................................ 31, 36

*Stinson v. City of New York*, 282 F.R.D. 360 (S.D.N.Y. 2012) ............................ 6, 7, 28, 47

*Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014) ............................... 26, 27

*Swanson v. City of Chetek*, 719 F.3d 780 (7th Cir. 2013) ......................................... 36

*Tyson Foods Inc. v. Bouaphakeo*, 136 S.Ct. 1036 (2016) .................................... 26, 43

*U.S. Parol Comm'n v. Geraghty*, 445 U.S. 388 (1980) ........................................... 48

*United States v. Barlow*, 310 F.3d 1007 (7th Cir. 2002) ..................................... 38, 41

*United States v. Black*, 675 F.2d 129 (7th Cir. 1982) .................................................... 8

*United States v. Johnson*, 910 F.2d 1506 (7th Cir. 1990) ............................................... 8

*United States v. Shields*, 789 F.3d 733 (7th Cir. 2015) ................................................. 8

*Wagner v. NutraSweet Co.*, 95 F.3d 527 (7th Cir. 1996) ............................................ 44

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ............................................... 18

*Washington v. Davis*, 426 U.S. 229 (1976) .............................................................. 40

*White v. Williams*, 208 F.R.D. 123 (D.N.J. 2002) ..................................................... 42

*Wilson v. Tinicum Township*, 1993 WL 290205 (N.D. Ohio Aug. 4, 1993) ............................. 42

*Young v. Cty. of Cook*, No. 06 C 552, 2007 WL 1238920 (N.D. Ill. Apr. 25, 2007)............. 33, 34

## RULES

Fed. R. Civ. P. 23(a) ........................................................................... passim

Fed. R. Civ. P. 23(b)(3) ........................................................................ passim

Fed. R. Civ. P. 23(c)(4)........................................................................ 1, 54

## I.     Prefatory Statement

Plaintiffs respectfully request that this Court grant their motion for class certification in its entirety as all requirements of Rule 23(a) and (b)(3) have been satisfied. In opposition to Plaintiffs' motion, the City only challenges the class definition and the elements of commonality and predominance. Each of these challenges fail, however, as the class is ascertainable and common questions surrounding the unlawfulness of the City's stop and frisk practice predominate. Notably, the City does not challenge numerosity or superiority, as there are tens of thousands of individuals who have been harmed by its unconstitutional practices and class treatment is the superior method of adjudicating their claims. Further, the City does not directly challenge the adequacy or typicality requirements. Accordingly, Rule 23(b)(3) certification of the putative class is appropriate in this case.

However, even if this Court declines to certify the proposed class as currently defined, Plaintiffs would request that the Court redefine the class to include all stops for gang and narcotics loitering and, separately, to include all those whose contact cards contain no narrative. As will be discussed below, these particular groups are uniform and do not present any individualized issues. As a further alternative, if this Court is not inclined to certify any class pursuant to Rule 23(b)(3), Plaintiffs would request that the common issues concerning the constitutionality of the Chicago Police Department's policies and practices be certified pursuant to Rule 23(c)(4), as the efficiency and consistency gained by answering these questions once warrants class treatment.

## II.     Overview of the City's Opposition Brief

What stands out most from the City's opposition brief is its refusal to accept responsibility for the consequences of its stop and frisk policy. Instead of being accountable for the police department's policies and practices, its leadership, and its deliberate indifference to the civil rights

of minority residents, the City has conjured a series of disingenuous defenses to defeat certification and deny its victims a remedy. As perhaps the most notable example, the City submits that the contact cards at issue in this case—those which were prepared by CPD officers, reviewed by CPD supervisors, and written pursuant to CPD policies—are inherently unreliable and therefore cannot be used for purposes of class certification. Rather than accepting responsibility for the unconstitutional stops documented on its contact cards, the City conveniently claims the cards are incomplete, or wrong, or misleading, or unreliable—anything other than what they actually say.

The same state of denial pervades the City's brief. Instead of acknowledging its widely-publicized and well-documented mistakes of the past, the City will do whatever it takes to avoid making reparations to the victims of its stop and frisk practice. However, in ruling on this important issue, this Court has the broad discretion to hold the City accountable, or at the very least, provide the victims with an opportunity to seek a remedy.

### III. The City's "Factual" Discussion

The City's factual discussion is most notable for what it does not say. (Doc. 318 at 5-23). Most importantly, The City does not deny the existence of a stop and frisk policy during McCarthy's tenure; it does not deny that tens of thousands of stops were made without reasonable articulable suspicion; and it does not deny that those who were subjected to unlawful detentions suffered harm as a result. Lori Lightfoot, the chair of the City's Police Accountability Task Force ("PATF"), recently said that former CPD Superintendent Garry McCarthy "still sincerely believes that stop-and-frisk, stopping everything that moves without legal justification, without meeting the constitutional restrictions, is appropriate."[1] And for his part, McCarthy plainly acknowledged that

---

[1] Ex. 1, Fran Spielman, *Lightfoot condemns Emanuel's 'us-vs.-them' style of government*, Chicago Sun-Times (May 9, 2018, 10:12 AM), https://chicago.suntimes.com/news/lightfoot-condemns-emanuels-us-vs-them-style-of-government/.

"[w]e used the heavy-handed tactics that people accuse of doing."[2] So how can the City deny a remedy? It raises two primary factual defenses, neither of which have any merit.

### A. The City's Claim that Contact Cards Cannot be Reliably Used to Identify Unconstitutional Stops is Baseless and Self-Serving.

The City contends that its own contact cards are unreliable. In particular, the City claims that "all the facts and circumstances necessary to make a liability determination under the Fourth Amendment cannot be gleaned from the narrative section of the contact card alone." (Doc. 318 at 47). The City's argument is directly contradicted by CPD's written policies as well as the City's own custom and practice of using contact cards to assess the constitutionality of stops.

CPD's written policies establish a two-tiered system designed to ensure that contact cards document __all__ factors supporting reasonable articulable suspicion. Pursuant to CPD Special Order S04-13-09, officers are required to document in the narrative section, ***"[t]he circumstances giving rise to the Investigatory Stop and all of the factors that support reasonable, articulable suspicion in order to temporarily detain an individual for investigation*** . . . ." (Doc. 282-40 at V.A.2) (emphasis added)[3]. Supervisors, in turn, are "responsible for ensuring that officers properly document in the narrative section of the Contact Information Card all reasonable, articulable suspicion that justify the investigatory stop." (*Id.* at V.C.1.a.1). In the event documentation is lacking, the supervisor is required to "return the card back to the preparing sworn member to complete and properly enter the card into the Contact Card Database." (*Id.* at V.C.1.c). Thus, pursuant to CPD's own policies, officers are required to document all factors supporting reasonable articulable suspicion in the narrative section of the contact cards, and supervisors are

---

[2] Ex. 2, Fran Spielman, *McCarthy fires back at Lightfoot for saying he never should have been hired,* Chicago Sun-Times (May 9, 2018, 3:22 PM), https://chicago.suntimes.com/news/mccarthy-fires-back-lightfoot-hired-emanuel-laquan/.

[3] Citations to exhibits filed with Plaintiffs' motion for class certification are cited as "Doc. 277-__" if they were unredacted, and "Doc. 282-__" or "Doc. 283-__" if they were filed under seal.

required to ensure this is properly done before the cards are entered into the system. As a result, Plaintiffs and this Court are entitled to the baseline presumption that a contact card, once entered into the system, contains a full recitation of the facts and circumstances justifying a stop.

The City, of course, would have this Court presume that its systemic problem is merely one of documentation, as opposed to civil rights abuse. (Doc. 318 at 47). It's a specious argument, and one which conveniently ignores the history and context of CPD's stop and frisk policy. As detailed in Plaintiffs' motion, CPD has a history of civil rights abuse, specifically with respect to the Fourth and Fourteenth Amendments. (Doc. 277 at 9-12). Notwithstanding, the City hired Garry McCarthy—someone with his own history of civil rights abuse—to serve as the leader of its police force. (*Id.* at 12-15). As would be expected (or intended), McCarthy implemented the same stop and frisk system that had already been declared unconstitutional in New York and New Jersey.[4] (*Id.*) In particular, officers were deployed into minority-populated communities, subjected to a *de facto* quota for contact cards, and repeatedly directed to stop the "right people" and "put hands" on them. (*Id.* at 16-34). Beyond that, CPD officers operated under two unconstitutional policies––racial profiling and gang and narcotic loitering—which, as will be discussed below, significantly impacted who they stopped and why. (*Id.* at 34-41). And, on top of it all, with deliberate indifference to the foreseeable consequences of its policies and practices, CPD did not provide its officers with adequate training on search and seizures or racial profiling. (*Id.* at 41-48). Contrary to the City's contention, its failures are not limited to poor documentation.

---

[4] In its opposition brief the City claims that Plaintiffs' effort to tie McCarthy to *Floyd v. City of New York* is "misplaced" because the *Floyd* case was filed in 2008, two years after McCarthy left NYPD. (Doc. 318 at n.2). It is actually the City's argument which is misplaced. The class period in *Floyd* began with January 31, 2005, and thus covered approximately 20 months under McCarthy's leadership. 283 F.R.D. 153, 160 (S.D.N.Y. 2012).

The statistics fall right in line. During McCarthy's tenure, CPD engaged in tens of thousands of investigatory stops without reasonable articulable suspicion; minorities felt the disparate impact. Under McCarthy, minorities made up 90 percent of all contact cards while the CPD's primary target, African-American males, constituted 57 percent. (*Id.* at 6). Additionally, minorities received 96 percent of contact cards issued for loitering, 92 percent of contact cards for innocuous activity such as jaywalking or riding a bicycle on a sidewalk, and 90 percent of contact cards issued during traffic stops—which, Plaintiffs submit, are statistics that are impossible to justify with any race-neutral explanation. (*Id.* at 6). And, notwithstanding tiny minority populations in certain majority-white districts, contact cards issued to minorities still far and away exceeded those issued to whites. (*Id.* at 6-7). The City's effort to chalk these statistics up to poor documentation is either grossly naïve or willfully disingenuous.

Further revealing the insincerity of the City's argument is that in every other context outside of this litigation CPD consistently relies upon a facial review of its reports to determine whether a stop was based on reasonable articulable suspicion. First, CPD supervisors review the face of Investigatory Stop Reports ("ISRs"), which are the successor to contact cards, to ensure that the narrative section properly provides "Reasonable Articulable Suspicion that justifies the Investigatory Stop . . . ." (Ex. 3, Chicago Police Dep't, Special Order S04-13-09, *Investigatory Stop System* (eff. Jan. 1, 2016), at VIII.C.1.b.1.a.). Second, pursuant to the City's settlement agreement with the ACLU, Judge Arlander Keys has been vested with authority to review the content of ISRs to "assess whether the narratives state sufficient facts to establish the requisite reasonable suspicion for the investigatory stop and for any protective pat down." (Doc. 277-91 at 7). As Judge Keys correctly observed:

> [A]ny reviewer, including the Consultant, must take the facts as presented/articulated in the ISR as true and make legal assessments about them on that basis. There is simply

> no reason (without other evidence to the contrary, as might be the case if a particular stop is challenged and a body camera or videotape is reviewed) to assume that the ISRs which are being reviewed by the Consultant in the aggregate are not, by and large, accurate renditions of the factual circumstances on the street when the stops under review were made. Indeed, given the large number of stops being individually reviewed and then aggregated statistically, the results being observed in this report, and others, are quite likely to reflect general "truths" about CPD's stop and frisk policies and practices.

(Ex. 4, Hon. Arlander Keys (Ret.), Consultant, *The Consultant's Second Semi-Annual Report Investigatory Stop & Protective Pat Down Agreement* (Mar. 5, 2018), at 167 ("Keys Rep. II")). And finally, CPD's "Integrity Unit"—which is responsible for oversight and accountability—itself relies upon the content of CPD reports to assess the constitutionality of investigatory stops. (Doc. 282-44 at 16:22–17:1; 42:6–11; 44:4–5).

Given that CPD and others consistently rely upon the content of contact cards (or ISRs) to determine the constitutionality of stops, the City's contention that the cards are unreliable for purposes of this case is duplicitous and should be rejected by this Court. *See In re Stericycle, Inc.*, No. 13 C 5795, 2017 WL 635142, at *9 (N.D. Ill. Feb. 16, 2017) ( "it would be more than troubling to deny class certification because of a lack of organization on [defendant's] end"). Indeed, the City's stance is reminiscent of one rejected just a few years ago by the Pennsylvania courts and failed to attract interest in the Supreme Court in a class action over wage and hour violations. There, endorsing the view of the trial court, the state's superior court observed "[i]t is unusual in the extreme for [Wal–Mart], who relies on their records for business purposes to contend that although required by law to be created and maintained, their records are so unreliable that they cannot constitute prima facie proof of their contents." *Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 945 (Pa. Super. Ct. 2011), *aff'd*, 106 A.3d 656 (Pa. 2014), *cert. denied*, 136 S.Ct. 1512 (2016).

The City's effort to distinguish *Stinson v. City of New York* on this basis is similarly misguided. In *Stinson*, a class of plaintiffs alleged that the New York Police Department was

engaged in a widespread pattern and practice of issuing tickets to individuals without "probable cause" (which, in New York, is the same as "reasonable cause"). 282 F.R.D. 360, 363 (S.D.N.Y. 2012). The plaintiffs sought certification under both Rule 23(b)(2) and (b)(3), and the district court granted the motion. *Id.* The City argues that *Stinson* is distinguishable because there the class members consisted of individuals whose tickets were dismissed based on a judicial determination that the summonses lacked reasonable cause. But the City fails to point out that the probable cause determination was based upon a ***_facial_*** review of the tickets. *Id.* at 365. In other words, there were no trials or evidence or interviews or discovery to determine whether the tickets in *Stinson* were constitutional. Rather, the determination of constitutionality was based upon the facial review of the tickets and a class was certified accordingly. The same can be done here.

In summary, the City's two-tiered system is specifically designed to ensure that contact cards fully detail all factors supporting reasonable articulable suspicion and the City and others, including Judge Keys, consistently make judgments based upon a facial review of the cards. Thus, the City's argument that the narratives in its contact cards cannot be reliably used to assess the constitutionality of stops for purposes of this case is baseless.

### B. The City's Claim that Plaintiffs did not Identify Seizures Misrepresents the Evidence.

Throughout the City's brief it claims that Plaintiffs failed to assess whether the encounters documented on contact cards reflect Fourth Amendment seizures, as opposed to some other type of encounter. This is flagrant misrepresentation. Not only were "non-stops" identified and filtered out through Plaintiffs' methodology, but the City's argument grossly exaggerates the role of "consensual encounters." Before reviewing Plaintiffs' filtering methodology, some background is required.

### 1. Three Types of Police-Citizen Encounters

Based upon United States Supreme Court precedent, the Seventh Circuit has repeatedly recognized that there are only three categories of encounters police have with citizens: (1) consensual encounters; (2) temporary detentions or seizures; and (3) arrests or citations. *United States v. Shields*, 789 F.3d 733, 743 (7th Cir. 2015); *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir. 1990); *United States v. Black*, 675 F.2d 129, 133 (7th Cir. 1982). The present case is focused on the second category, investigatory stops. Plaintiffs have excluded the other two categories.

Arrests and citations were easily excluded because they are documented on different reports, *i.e.*, arrest reports or tickets, not contact cards. (Doc. 283-40 at II.4.; Doc. 282-40 at IV.5.). That leaves consensual encounters, which are slightly more nuanced, but have nevertheless been excluded from the class. Beginning on April 3, 2014, CPD did not write contact cards for consensual encounters. (Doc. 282-40 at I.C.). Therefore, based upon CPD's own policy, it must be presumed that all contact cards from the class period of 4/3/14 - 12/31/15 document investigatory stops.[5]

During the remaining class period, 4/20/13 - 4/2/14, CPD's policy gave officers the *option* of documenting consensual encounters on contact cards (Doc. 283-43 at IV.A.1.), but it was not something that was pushed by CPD and it does not appear that many officers embraced the option to fill out additional paperwork. (Doc. 283 at 40:10 – 41:16). Nevertheless, filters were applied to the entire class period to capture and exclude consensual encounters.

---

[5] The City's expert, Stephen Parker, agrees that after April 3, 2014, it is fair to presume a contact card documents a seizure. (Doc. 318-12 at p. 16).

### 2. Application of the Exclusionary Filters

The multi-phased work flow methodology developed by The Claro Group was discussed at length in Plaintiffs' motion, Eli Nelson's expert report, and now in Plaintiffs' opposition to the City's *Daubert* motion.[6] (Doc. 277 at 48-43; Doc. 277-7 at 18-26). As part of that process, non-investigatory stops—namely consensual encounters, arrests, and citations ("ANOVs")—were identified and excluded from the analysis using a series of keyword and Boolean logic queries. (Doc. 277-7 at 18). The queries were continually refined through multiple levels of random sampling and evaluation, and then subjected to semi-final testing, final testing, and validation. (*Id.* at 18-19). The end result is that the filters effectively excluded non-stops. Indeed, according to the City's own expert, consensual encounters were only 1.3 percent of the inspection sample, which is well within the scientifically acceptable 5 percent margin of error. (Doc. 318-12 at Tbl. 1). And, for the 4/20/13 – 4/2/14 time-period during which officers were given the option of documenting consensual encounters on contact cards, the City's expert only identified 37 consensual encounters in total, which was 0.7 percent of the sample set. (*Id.* at Tbl. 2). As a result, consensual encounters are a virtual non-factor; all that remains, and the only thing at issue, are investigatory stops.

### 3. The City's Misdirection

Given the above discussion, it is difficult to understand how the City claims that Plaintiffs failed to identify investigatory stops. (Doc. 318 at 35-38). It appears the City's argument is based on a fundamental misunderstanding, or more likely, an intentional effort to misdirect this Court.

Throughout its brief, the City characterizes contact cards as "multi-purpose" (*Id.* at 12, 13, 36), which is quite an overstatement given that they were only "multi-purpose" for the 4/20/13 – 4/2/14 time-period, and even then, they only served two purposes—documenting investigatory

---

[6] Ex. 5, App. G to Expert Report of F. Eli Nelson, a Graphic Depiction of the Work Flow Methodology.

stops and consensual encounters (the latter of which was an option). But what is most astounding is that the City is now claiming there is a fourth category of police-citizen encounters which has never before recognized by any court. According to the City, "[c]ontact cards were used to document encounters other than investigatory stops, including . . . dispersals under the gang or narcotics loitering ordinances." (*Id.* at 14). The Supreme Court, however, has only recognized three types of police-citizen encounters and "dispersals under the gang or narcotics loitering ordinances" is not one of them. In other words, there is no fourth bucket of encounters as the City would have this Court believe. Rather, gang or narcotic loitering dispersals are either investigatory stops or consensual encounters; and, as will be discussed below, the City has already answered the question: they are investigatory stops. The City's effort to interject a fictional category of police-citizen encounters into this important discussion is improper, and more than anything else, speaks to the lengths that the City will go to in order to avoid responsibility.[7]

### C. Accepting the City's Arguments on the Reliability of Contact Cards would be a Grave Injustice.

The City's argument concerning its contact cards should be rejected. CPD's two-tiered policy plainly requires that officers and supervisors document all facts and circumstances relating to a police-citizen encounter on a contact card. Yet, for purposes of this lawsuit, the City claims there is no way to reliably determine whether its contact cards reflect an investigatory stop and, if so, whether the stop was constitutional. One can be certain that if CPD's documentation was favorable, the City would elevate those documents as if they were written in stone. But since they are unfavorable, the City claims they are not worth the paper they're written on.

---

[7] Notably, the City's expert claims that he had "insufficient information" to determine the character of 5,313 of the contact cards he reviewed. (Doc. 318–12 at Tbl. 1). He does not describe how or why the information is insufficient, but one can be sure that his erroneous belief that there is a fourth category of encounters significantly impacted his analysis. Indeed, 2,692 of the encounters which Parker claims he has "insufficient information" about are loitering encounters, and thus, investigatory stops. (*Id.* at Tbl. 5).

This Court should recognize the City's argument for what it is, a charade. But additionally, this Court should recognize that "plausible deniability" was CPD's plan all along. Contact cards more than doubled under McCarthy from 335,864 before he got there, to 715,892 in 2014. (Doc. 277 at 24). CPD was plainly aware of its own statistics and, especially given the constant emphasis on increasing contact cards, any responsible leader would be concerned that officers were padding their numbers by conducting stops without reasonable articulable suspicion. CPD, however, never bothered to look. Under CPD's Special Order, audits of the contact card system were required to be conducted on a "regular" or "yearly" basis. (Doc. 283-40 at V.D; Doc. 282-40 at VI.B). Remarkably, during McCarthy's 4 ½ year tenure, CPD did not conduct a single audit of its contact card system. (Doc. 282-47 at ¶ 69). This is no coincidence, as McCarthy was well-aware that a legitimate audit of contact cards would reveal the massive volume of unconstitutional stops. But by never looking at what it knew to exist, the City could maintain plausible deniability.

A prime example of CPD's willful ignorance involves frisks. McCarthy not only directed the practice of "putting hands on people," but a central tenant of stop and frisk is to uncover guns by whatever means necessary. (Doc. 283-19) ("I don't want our officers to become complacent with, stop a guy and do a contact card. We need to be looking for a gun on every stop"); (Doc. 283-25 at 13) ("[J]ust keep putting your hands on him. Sooner or later you will catch him with a gun."). Yet, CPD did not require its officers to document frisks in its contact card database.

> The Chicago Police Department's order on contact cards does not require officers to record when they frisk or pat down a civilian. Also, officers are not required to record all facts establishing reasonable suspicion that the subject is armed and dangerous. If a stop and frisk does not lead to criminal charges, no judge will ever review whether it was lawful. And since stops and frisks occur on the street, without proper documentation, supervisors cannot assess whether they are lawful. Supervisors thus have no opportunity to review the constitutionality of these frisks, and there is no disclosure of this information to the public.

11

(Doc. 277-24 at 16). The motivation is transparent. CPD knew that unconstitutional searches were being conducted on a widespread basis; it is better for CPD that they not be documented.

### D.  In Response to the City's "Facts"

The City does not dispute most of the factual discussion in Plaintiffs' motion. It offers no response to: (i) the massive spike in contact cards after McCarthy's appointment; (ii) the existence of a contact card production standard or *de facto* quota; (iii) the statistics revealing the disparate impact on minorities; or (iv) the number of unconstitutional directives issued by McCarthy and other command-level CPD personnel. With respect to the few factual issues the City does dispute, its arguments lack credibility.

### 1.  McCarthy's Refrain: Stop the "right people" and "put your hands" on them

The City claims that McCarthy's constant refrain to "put hands on people" was not a directive to do just that, but instead it was "figurative" for "getting out of the car and talking to people." (Doc. 318 at 8-9). This is far-fetched. Putting hands on people and talking to people are two very different things, and ultimately, the trier of fact can decide whether the City's explanation holds water. Clearly, though, the phrase "put your hands on people" in the context of deploying officers for the purpose of finding guns was reasonably interpreted by officers as a literal directive.

The same is true for McCarthy's emphasis on stopping the "right people." In its brief, the City contends that stopping the "right people" is not profiling because the "right people are the 'potential criminals.'" (Doc. 318 at 9). But this is the very definition of profiling and it is troubling that the City *still* does not understand that. All investigatory stops require reasonable articulable suspicion, and one cannot constitutionally target "potential criminals" or stop the "right person" without first observing evidence of criminality.

12

The problem with using generalized notions of criminality in the context of routine and spontaneous law enforcement activity is obvious. It casts too wide of a net and sweeps up innocent people who are not engaged in any criminal activity. The City's explanation concerning the exchange between McCarthy and Deputy Chief Terrence Williams further underscores the point. In Plaintiffs' motion, they refer to a discussion at a CompStat meeting where McCarthy asked Williams why his contact cards on Beat 0211 were so low, to which Williams explained that, "[w]e are targeting male blacks age 14–19 running in groups of 2–5 together – and they do not live on [the beat]." (Doc. 277 at 3). On its face, this is racial profiling. But the City actually tries to defend Williams' comment by claiming that he was "seeking people who matched the description of the offenders." (Doc. 318 at 9–10). In support, the City refers to an offender description in the CompStat report, but does not provide the entire description; Plaintiffs will:

*African-American; male; age 14-24; 5'4" - 6'1"; 130 - 180 lbs.*

(Doc. 282 at 14-20). Contrary to the City's contention, this is not a description of an offender; this is a description of hundreds or thousands of individuals, the vast majority of whom are innocent.[8] That the City does not recognize this as racial profiling is extremely alarming.

### 2. Strategic Subjects List

The City offers a similarly disingenuous argument when defending McCarthy's statement concerning the Strategic Subjects List ("SSL"). As detailed in Plaintiffs' motion, the SSL is a list of individuals CPD believes are most likely to be offenders or victims of violent crime. The SSL policy is the subject of current controversy, both in terms of its efficacy and application. The RAND Corporation studied the SSL and issued a report challenging its efficacy and noting a

---

[8] The beat at issue is within the Douglas community area, which has a population of 20,323 and is 70.7 percent African-American. (Ex. 6, CMAP, *Community Data Snapshot – Douglas*, generated using data from U.S. Census Bureau, Ill. Env't Prot. Agency, and Ill. Sec'y of St. (last updated June 2017), http://www.cmap.illinois.gov/documents/10180/126764/Douglas.pdf).

heightened correlation between the SSL and contact cards. (Ex. 7, J. Saunders, et al., *Predictions put into practice: a quasi-experimental evaluation of Chicago's predictive policing pilot*, 12 J. of Experimental Criminology 347, 362-63 (Aug. 12, 2016)). This is concerning for two reasons.

First, most of the people CPD listed on the SSL are African-American. The most recent publicly available iteration of the SSL names 207,842 African-Americans, which is 25 percent of the African-American population in the City. (Ex. 8, J. Prior Decl. at ¶¶ 5-6). And even more telling is that 56 percent of all African-American men ages 20-29 in the City of Chicago are on the list.[9] Second, while being on the list is not supposed to provide a basis to conduct an investigatory stop, in practice, it does. CPD's Special Order provides that "[p]lacement on the SSL is not a factor for consideration of reasonable articulable suspicion or probable cause . . . ." (Doc. 283-29, *see also* Doc. 283-6 at 145:18–21). Nevertheless, McCarthy is on record in saying otherwise:

> Just to be clear, the Strategic Subjects List scores represent the percentage they are more likely to be involved in a shooting or murder, either as the offender or as the victim. This is articulable reasonable suspicion. These are good reasons to stop people and issue the Contact Cards.

(Doc. 283-30 at 10). When the leader of the police force is telling command-level personnel that simply being on the SSL provides a constitutional basis to stop someone, it is no surprise that, according to the RAND study, 77 percent of individuals on the SSL had at least one contact card over the year following implementation of the policy, with an average of **8.6 cards**. (Ex. 7 at 362).

### 3. Contact cards document "misses"

The City raises four arguments in response to Plaintiffs' statement that contact cards document "misses." As the City correctly points out, there are limited exceptions to Plaintiffs' characterization, such as when an officer may not develop probable cause for an arrest during a

---

[9] Ex. 9, Yana Kunichoff, The Contradictions of Chicago Police's Secretive List, ChicagoMag (Aug. 21, 2017, 8:44 AM), http://www.chicagomag.com/city-life/August-2017/Chicago-Police-Strategic-Subject-List/.

lawful stop or elect not to take enforcement action—which, to be fair, Plaintiffs mentioned in their motion. (Doc. 277 at 4). But the larger point is that the sheer volume of contact cards—2.8 million during McCarthy's 4½ year tenure—is probative of a widespread pattern and practice of unconstitutional stops, not the limited exceptions raised by the City. Perhaps more to the point, is that the characterization of contact cards as "misses" is not just Plaintiffs' characterization as numerous City witnesses, as well as Judge Keys, all agree that contact cards are generally written in situations where individuals are not found to be breaking the law. (Doc. 277-3, Keys Rep. at 21; Doc. 282-43, Lipman Dep. at 139:11–15; Doc. 282-42, Wysinger Dep. at 90:1–8; 90:21–92:2; Doc. 282-44, Murphy Dep. at 191:12–17; Doc. 282-45, Patterson Dep. at 224:17–22). The City conveniently discounts the testimony of its own witnesses in favor of its new narrative.

### 4. CPD's training is not "robust"

Plaintiffs' motion discusses the woefully inadequate post-Academy training provided to CPD officers on search and seizure and racial profiling. (Doc. 277 at 41-46). As part of that discussion, Plaintiffs point to findings from the ACLU, the PATF, and the DOJ—all of which resoundingly conclude that CPD's training is deficient. The City, however, claims that "[h]ad Plaintiffs, the PATF, or the DOJ taken the time to actually review CPD's training related to investigatory stops, they would have found a *robust* training program . . . ." (Doc. 318 at 20) (emphasis added).

The City's condemnation of those who have reviewed and offered opinions on CPD's training program, including its own Police Accountability Task Force, demonstrates the City's unwillingness to recognize and confront its problems. As the PATF found, "there is a general absence of a culture of accountability within CPD, largely because no one in top leadership has taken ownership of the issue." (Doc. 277-4 at 96). Further, the City's effort to defend its training

15

misses the mark. The City first cites to Academy training, which Plaintiffs do not even criticize, and post-2016 training, which is not even at issue for this class. The only arguably relevant training cited by the City is a single video on "street stops" viewed by Officer Mazzanti in September 2012—a video that Plaintiffs specifically pointed out in their brief because it is the only instance of search and seizure training provided to any of the 12 officers at issue during McCarthy's tenure. (*see* Doc. 277 at 44). And with respect to racial profiling, rather than admit there was no training at all, the City tries to deflect the issue by pointing out that officers were given "Procedural Justice and Police Legitimacy" training. What the City fails to mention, however, is that only Parts I and II of the Procedural Justice training have been completed and that "implicit bias" training is not provided until Part III.[10] (Doc. 282-43 at 237:24–238:6; Doc. 277-4 at 49).

## IV. Argument

For the reasons that will be discussed below, Plaintiffs have satisfied all Rule 23 elements by a preponderance of the evidence and submit that the putative class should be certified as currently defined. However, in the event the Court declines to certify the proposed class in its entirety, Plaintiffs submit that the Court should re-define the class pursuant to Rule 23(c)(1) to include: (i) contact cards for gang or narcotics loitering; and (ii) contact cards with no narrative. Plaintiffs will begin by describing the contour of the proposed alternative classes and will follow with a discussion of the elements under Rule 23.

---

[10] What was included in the Procedural Justice training, however, is the fact that 94-97 percent of citizens are law abiding and do not commit crimes. (Doc. 282-43 at 263:18–24). Then how does the City justify stopping 70 percent of all young African-American males or putting 25 percent of the African-American population on the SSL? (Doc. 277-4 at 38; Ex. 8 at ¶¶ 5-6).

### A. Alternative Rule 23(b)(3) Classes for Loitering and No Narrative

None of the City's arguments in opposition to certification impact the Loitering or No Narrative groups as they are both uniform and do not involve individualized issues. Therefore, as an alternative to certification of the class as a whole, Plaintiffs propose the following:

> Fourth Amendment Loitering Class: "All persons who were encountered by the Chicago Police Department for enforcement of the Gang and Narcotics Loitering Ordinance at any time since April 20, 2013, which resulted in the creation of a contact card."

> Fourteenth Amendment Loitering Sub-Class: "All African-Americans and Hispanics who were encountered by the Chicago Police Department for enforcement of the Gang and Narcotics Loitering Ordinance at any time since April 20, 2013, which resulted in the creation of a contact card."

> Fourth Amendment No Narrative Class: "All persons subjected to an investigatory stop by the Chicago Police Department at any time since April 20, 2013, which resulted in the creation of a contact card that contains no narrative."

> Fourteenth Amendment No Narrative Sub-Class: "All African-Americans and Hispanics who were subjected to an investigatory stop by the Chicago Police Department at any time since April 20, 2013, which resulted in the creation of a contact card that contains no narrative."

#### 1. The Loitering Groups

Loitering is not a crime in the City of Chicago and is not a basis upon which to conduct an investigatory stop. (Doc. 283-6 at 93:12–22; Doc. 283-20 at 159:10–160:23). The City, however, has enacted a municipal ordinance which allows officers to disperse individuals engaged in "gang loitering" or "narcotics loitering" under certain circumstances (hereinafter "Gang and Narcotics Loitering Ordinance"). Importantly, gang and narcotics loitering are not themselves crimes; rather, they only become crimes if a person violates a dispersal order. (Doc. 277-83, Gang Loitering Code, at (e); *see also* Doc. 282-44 at 144:16–145:2; Doc. 283-20 at 166:14–167:11; Doc. 282-45 at 130:9–131:18).

Plaintiffs challenge the constitutionality of CPD's Special Order relating to the Gang and Narcotics Loitering Ordinance. (Doc. 283-33, Chicago Police Dep't, Special Order S10-02-03, *Gang and Narcotics Related Enforcement* (Nov. 13, 2013)). In particular, Plaintiffs submit that the Special Order is unconstitutional in that it requires officers to conduct investigatory stops before a dispersal order has been violated, or in other words, before a crime has been committed. Thus, the Special Order requires CPD officers to conduct investigatory stops in the absence of reasonable articulable suspicion. The Loitering Groups identified by Plaintiffs are particularly appropriate for certification because there are no individualized issues even implicated in the analysis. The only question is whether the Special Order is constitutional, the determination of which "will resolve an issue that is central to the validity of each one of the [loitering] claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The City makes two primary arguments in response.

First, the City argues that the Special Order does not itself direct officers to conduct investigatory stops, it only requires them to write contact cards. (Doc. 318 at 18). This is a distinction without a difference. By requiring officers to write contact cards for dispersals under the ordinance, CPD necessarily requires officers to conduct investigatory stops. (*See, e.g.,* Ex. 10, *Contact Information System, Most Frequently Asked Questions,* ¶ 8 (January 2015) (confirming that when an officer does a gang or narcotic dispersal they must "include the reasonable articulable suspicion for the initial stop)). CPD testimony is in complete accord.

**According to Deputy Chief Terrance Williams[11]:**

> Q. If an officer of CPD [observes] gang loitering . . . and that cop makes contact with the gang member and any other person engaged in loitering, that would be a stop?
> A. Yes.

---

[11] Deputy Chief is the fourth highest ranking position in CPD, behind Superintendent, Deputy Superintendent, and Chief.

(Doc. 283-6 at 218:4–10; *see also* 254:3–255:8 ("They're being detained . . .")).

**According to Deputy Chief Eric Washington:**

> Q. Where in the [gang and narcotics loitering] ordinance does it say that you're allowed to do a street stop?
> A. When you're stopping them for dispersal that's a street stop, sir . . . You have to stop them and engage them. That's a street stop . . . You do the street stop in order to give the dispersal order. You are stopping the people that you're going to give a dispersal order to.

(Doc. 283-20 at 215:10–14, 217:1–3).

**According to Officer Jon Patterson, Instructor with Education and Training Division:**

> [In discussing enforcement of the gang and narcotics loitering ordinance]
>
> Q. But that's a – going back to the three types of citizen encounters, that wouldn't be a consensual encounter, right?
> A. So I would classify that as an investigatory stop. ***
>
> Q. And would you classify it as an investigatory stop because the person who's stopped for enforcement of the ordinance is temporarily detained and not free to leave?
> A. Correct.

(Doc. 282-45 at 122:3–123:1). The testimony makes sense. When an officer confronts an individual on the street, takes all of their biographical information, and commands them to disperse with a warning that they will be subject to arrest if they fail to obey, this is not a consensual encounter. The City does not, and cannot, argue otherwise.

Next, the City argues that Plaintiffs "offer no evidence that every Loitering Stop involved enforcement of the Gang and Narcotics Loitering Ordinances." (Doc. 318 at 69). On a year-to-year basis across McCarthy's tenure, loitering cards accounted for 13-20 percent of all contact cards issued, or about 100,000 per year. (Doc. 277-12, *compare* 1 *with* 50). Given that ordinary loitering is not prohibited in Chicago and cannot form the basis for an investigatory stop, the City's

19

argument begs the question: what are all these loitering cards for? While Plaintiffs acknowledge that a *de minimis* number of loitering encounters could hypothetically be consensual, as discussed at length above, consensual encounters have been effectively removed from the analysis. Further, the broad suggestion that loitering encounters are anything other than done pursuant to the Gang and Narcotics Loitering Ordinance is baseless. Rashawn Lindsey is a perfect example.

The contact card narrative for Rashawn Lindsey says: "r/o's observed said loitering on a known narcotics sales spot. r/o's performed street interview." The City first challenges whether the encounter with Lindsey involved an investigatory stop in the first instance. (Doc. 318 at 25). Additionally, the City broadly claims that "none of [the class representatives'] encounters involve enforcement of the Gang and Narcotics Loitering Ordinances." (*Id.* at n.24). It appears the City neglected to read Lindsey's contact card. (Ex. 11, Lindsey Contact Card).



As emphasized in red, Lindsey's contact card plainly answers both of the City's concerns. It involved an "Investigatory Stop" and was done pursuant to the Gang and Narcotics Loitering Ordinance. The same is also true for Steve McAbee, another class representative. (Ex. 12, McAbee

Contact Card, 8.22.14). The fact that the City would argue otherwise shows a lack of candor, a lack of credibility, or both.

Reference to the "Contact Type" field in the graphic above raises an important point. Even if the City were correct in arguing that Plaintiffs offered no evidence that the loitering encounters were done pursuant to the Gang and Narcotics Loitering Ordinance, there is a simple and administratively feasible mechanism to definitively make that determination. *Stericycle*, 2017 WL 635142, at *9 (it would be "more than troubling to deny class certification" because of holes in the defendant's records provided there are alternative means to identify the class). In particular, every CPD contact card includes a "Contact Type" field with six possible checkboxes: (1) Traffic Related; (2) Crime Victim; (3) Suspicious Person; (4) Gang/Narc Related; (5) R.O.G.U.E.S. Offender; and (6) Other. (Doc. 282-41). At a later point during the class period, CPD added another checkbox for (7) Investigatory Stop. (Ex. 13, Nelson Decl. at ¶ 4). Although Plaintiffs submit that every contact card included the Loitering Groups involved an investigatory stop, as an alternative, the parties can use the checkboxes to definitively make that determination. Plaintiffs' analysis reveals the following:

- During the class period, there were 30,945 Loitering (In a Hot Spot) cards. (Doc. 277-7 at 26, Fig. 14). The City does not dispute that these were issued pursuant to the Gang and Narcotics Loitering Ordinance.

- During the same class period, there were 245,824 Loitering (Not in a Hot Spot) cards. Within that group, 123,818 are documented as Gang and Narcotics-Related Loitering, just like Mr. Lindsey's. (Ex. 13, Nelson Decl. at ¶ 6).

The City's contention that the Gang and Narcotics Loitering Ordinance "only applies to an unknown, but likely small, percentage of the encounters at issue . . ." is wishful thinking. At an absolute bare minimum, it applies to 154,763 encounters (30,945 + 123,818). Additionally, out of the same 245,824 "Loitering (Not in a Hot Spot)" cards, 35,888 are marked as "Investigatory Stop"

and 54,275 are marked as "Suspicious Person." (*Id.*) Because loitering is not a crime, the loitering cards marked "Investigatory Stop" were plainly made without reasonable articulable suspicion. And because encountering "suspicious people" involves investigative activity as opposed to consensual encounters, the analysis is the same—they are investigative stops made without reasonable articulable suspicion.[12]

In summary, the Loitering Groups are especially appropriate for certification because they challenge a uniform policy and rise or fall depending on the constitutionality of the CPD's Special Order. "If, on the merits, the district court were to determine that [the order is constitutional], then all of the class members' claims would fail in unison." *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 379 (7th Cir. 2015). In other words, the validity of each claim can be resolved in one stroke.

### 2. The No Narrative Group

While the No Narrative Group does not hinge on the constitutionality of a policy or practice, it is entirely uniform and is not impacted by any of the City's arguments. The No Narrative Group consists of 2,154 contact cards with zero information filled out under the narrative section. As discussed at length above, CPD policies set up a two-tier system requiring that all factors supporting reasonable articulable suspicion be documented in the narrative section on the card. When nothing is documented, it should be presumed that there was no reasonable articulable suspicion. The City did not squarely address the "no narrative" cards in its response brief, but one can reliably predict the City would claim it is simply a matter of poor documentation. To that point, Plaintiffs would respond with the fact that out of 1,790,943 contact cards written during the class

---

[12] The City defines a consensual or citizen encounter as "a voluntary interaction between a sworn member and a citizen that does <u>not</u> involve any suspicion of criminal activity." (emphasis added) (Doc. 283-43 at III.A.).

period, the reporting officer failed to document the subject's race on only one single occasion. The "poor documenter" defense simply does not hold up.

[For Class Period April 20, 2013 - December 30, 2015]

| RACE | 2013 | | 2014 | | 2015 | | Total | |
|---|---|---|---|---|---|---|---|---|
| | CONTACT CARDS | % | CONTACT CARDS | % | CONTACT CARDS | % | CONTACT CARDS | % |
| [Missing] | | 0% | | 0% | 1 | 0% | 1 | 0% |
| API | 4,960 | 1% | 6,515 | 1% | 5,248 | 1% | 16,723 | 1% |
| BLK | 324,150 | 69% | 514,596 | 72% | 431,189 | 71% | 1,269,935 | 71% |
| I | 528 | 0% | 607 | 0% | 516 | 0% | 1,651 | 0% |
| U | 1,624 | 0% | 2,497 | 0% | 2,345 | 0% | 6,466 | 0% |
| WBH | 2,611 | 1% | 3,393 | 0% | 3,076 | 1% | 9,080 | 1% |
| WHI | 52,879 | 11% | 69,114 | 10% | 54,832 | 9% | 176,825 | 10% |
| WWH | 84,587 | 18% | 119,170 | 17% | 106,505 | 18% | 310,262 | 17% |
| Grand Total | 471,339 | 100% | 715,892 | 100% | 603,712 | 100% | 1,790,943 | 100% |

(Doc. 277-7 at 13, Fig. 6).

## B. Plaintiffs' Proposed Classes Satisfy All Rule 23 Elements

Plaintiffs' motion analyzes each of the elements applicable to Rule 23(b)(3) certification. In its response, the City challenges Plaintiffs' class definition, as well as commonality and predominance. The City does not challenge numerosity or superiority, and it does not directly challenge adequacy or typicality although, as discussed below, it raises certain factual issues concerning the class representatives' encounters. In addition, throughout its brief, the City challenges the admissibility of Plaintiffs' experts' opinions and analysis, which Plaintiffs have fully addressed in its response in opposition to the City's *Daubert* motion.

### 1. The Class Definitions are Based on Objective Criteria and Qualifying Class Members are Ascertainable

The City argues that the proposed class definitions are unworkable because (i) investigatory stops are not ascertainable; (ii) the class definitions are overbroad; and (iii) redefining the classes will result in them being fail-safe. Plaintiffs will address each in turn.

#### a. Investigatory Stops are Ascertainable

The doctrine of ascertainability requires that a class be defined clearly and that membership in the class be based on objective criteria. *See* William B. Rubenstein et al., Newberg on Class

Actions § 3.3 (5th ed. 2015); Joseph M. McLaughlin, *McLaughlin on Class Actions: Law and Practice* § 4:2 (11th ed. 2014); *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015), *cert denied* 136 S.Ct. 1161, 194 L.Ed. 2d 175 (2016). Plaintiffs' putative class definitions comply with the requirements. Class members were either subjected to an investigatory stop resulting in a contact card or they were not. And the possibility that a *de minimis* number of consensual encounters snuck through Plaintiffs' filtering system does not render the class indefinite or unascertainable.

In *Lippert. v. Baldwin*, the district court certified a class of "all prisoners in the custody of the Illinois Department of Corrections with serious medical or dental needs." No. 10 C 4603, 2017 WL 1545672, at *1 (N.D. Ill. Apr. 28, 2017). The defendant objected to the class definition on ascertainability grounds, contending it was too indefinite and there was no way to determine which inmates had "serious medical or dental needs." *Id.* at *5. The court rejected the defendants' assertion and found that there were objective methods for determining which inmates had serious medical needs because there were records to identify inmates who had requested or received treatment for "presumably" serious medical conditions.[13] *Id.* at *7. Further, the court opined that class certification would not be precluded even if inmate files had to be reviewed on an individualized basis. *Id.* at *7. Just as a class of individuals with "serious medical and dental conditions" was ascertainable in *Baldwin*, the class definitions here are ascertainable because all the information to determine class membership is available from objective criteria on CPD's contact cards. This is especially true for the loitering and no narrative groups.

The City also contends that the class definitions "foreshadow the challenges this Court will ultimately face" if the class is certified. (Doc. 318 at 35). In doing so, the City improperly conflates

---

[13] Notably, the court in *Baldwin* appointed an expert pursuant to FRE 706, which can be done here too.

ascertainability with manageability. For purposes of ascertainability, the focus is on the class definition itself and not on whether it would be difficult to identify members of the class. *Mullins*, 795 F.3d at 658.[14] In focusing on the method of determining class membership in terms of ascertainability, the City urges this Court, in direct contravention to Seventh Circuit precedent, to look at the problem of administrative inconvenience "in a vacuum," and therefore adopt a reading of acsertainability which the Seventh Circuit has explicitly rejected. *Id.* at 663.

The primary case the City relies upon, *Jamie S. v. Milwaukee Public Schools*, is easily distinguishable. 668 F.3d 481 (7th Cir. 2012). There, the plaintiffs sought to certify a class of students who were purportedly entitled to special education services but did not receive them. The district court certified the class, but the Seventh Circuit reversed. In so doing, the court reasoned that the class was too indefinite because "a significant segment of the class (of unknown and unknowable size) comprises disabled students who may have been eligible for special education but were *not identified* and *remained unidentified.*" *Id.* at 495. (emphasis in original). In other words, the court correctly recognized that without knowing the baseline identities of the putative class members, it would require highly intensive individualized inquiries to identify who may be eligible to receive special education services. *Jaime S.* is far different from the present matter, where every individual who was stopped is identifiable by reference to CPD's contact cards.

Notably, the court in *Jaime S.* also observed that there was no "illegal policy" or systemic failure to identify disabled children for special education services. *Id.* at 498. Here, however, there are two unconstitutional policies at issue and a number of systemic practices that incrementally

---

[14] As the *Mullins* court noted, the concern about administrative inconvenience is better addressed by the explicit requirements of Rule 23(b)(3). 795 F.3d at 663. It further cautioned that "before refusing to certify a class that meets the requirements of Rule 23(a), the district court should consider the alternatives as Rule 23(b)(3) instructs, rather than denying certification because it may be challenging to identify particular class members." The Court noted that "district courts have considerable experience with and flexibility in engineering solutions to difficult problems of case management." *Id.* at 664.

influenced who CPD stopped and why. If the schools in *Jaime S.* had a practice of targeting certain children for exclusion from special education services, a written policy permitting the consideration of race in identifying eligible children, and a written policy directing the exclusion of certain children in the absence of legitimate grounds, the decision would have been different.

### b. The Class Definitions are not Overbroad

Next, the City argues that even if the class members are ascertainable, the class is overbroad because it "embraces a great many persons who do not have a valid claim against the City because their constitutional rights were not violated." (Doc. 318 at 39). The City misapprehends the law with respect to overbroad class definitions. The United States Supreme Court has acknowledged that certification is not contingent upon proof that all class members were injured. *Tyson Foods Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1049 (2016). As the Seventh Circuit observed in *Messner*:

> [A] class will often include persons who have not been injured by the defendant's conduct; indeed, this is almost inevitable because at the outset of the case many of the members of the class may be unknown, or if they are known still the facts bearing on their claims may be unknown. Such a possibility or indeed inevitability does not preclude class certification . . . .

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 823 (7th Cir. 2012); *see also Suchanek v. Sturm Foods, Inc*., 764 F.3d 750, 757 (7th Cir. 2014). The law is very clear that the determination of whether class members have a valid claim and are entitled to recovery is an issue to be determined <u>after</u> the class is certified. *Parko v. Shell Oil Co.,* 739 F.3d 1083, 1085 (7th Cir. 2014); *Kohen v. Pca. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009).

Additionally, the City's argument that the class definitions are overbroad misses the critical distinction between whether the class *possibly* includes members who were not harmed, which is permissible, versus including members who *could not have been* harmed, which is impermissible. *Messner*, 669 F.3d at 825. By way of example, in *Messner*, the Seventh Circuit noted that an

antitrust class could not be defined to include persons who purchased a product before the defendant possessed market power because those persons could not have been injured by the defendant's alleged abuse of market power. *Id.* at 824. But the same reasoning does not apply when class members *could have been* harmed. *Id.* In the case at hand, every putative class member was the subject of a contact card and, thus, *could have been* harmed as a result of a constitutional violation. The potential that some class members might not have been harmed does not preclude class certification.

The City's reliance upon *Oshana v. Coca–Cola Co.*, 472 F.3d 506 (7th Cir. 2006) is also misplaced. *Oshana* involved a putative consumer class consisting of "all individuals who purchased for consumption and not resale fountain Diet Coke in Illinois . . . ." *Id.* at 510. The Seventh Circuit found the class definition problematic because it "could include millions of customers, many of whom may not have been deceived by Coke's marketing" because they were aware that fountain Diet Coke contained saccharin and bought it anyway. *Id.* The class representative in *Oshana* also faced typicality problems because she claimed to have been deceived even though she admitted that she did not see any Coke advertisements and knew fountain Diet Coke was different from the bottled version. *Id.* As the Seventh Circuit later observed, the plaintiff in Oshana "appeared to be the only person in a million plus case that believed defendant deceived consumers by using different formulae in fountain and bottled soda products." *Suchanek*, 764 F.3d at 758.

This case is readily distinguishable from *Oshana*. There are not "millions" included in the putative class who could not have been harmed by Defendants' conduct. To the contrary, at this early certification stage Plaintiffs have already presented evidence that tens of thousands of individuals have suffered constitutional injuries at the hands of the CPD. Further, this Court should

not engage in any analysis of the merits at this stage, and if after discovery the Court determines that the class consists of individuals who have not been injured, the Court can revisit the issue, decertify the class, or exclude certain members. *Messner,* 669 F.3d at 826.

### c. Alternative Class Definitions Would Not be Fail-Safe

While the proposed class definitions may be broad on their face, Plaintiffs have nevertheless met the standard because they have presented a mechanism to identify qualifying class members. *See In re Nexium Antitrust Litig.*, 777 F.3d 9, 19 (1st Cir. 2015) ("At the class certification stage, the court must be satisfied that, prior to judgment, it will be possible to establish a mechanism for distinguishing the injured from the uninjured class members."). Alternatively, the Court can redefine the class more narrowly in the manner suggested by Plaintiffs in their motion:

> Fourth Amendment Class: "All persons subjected to an investigatory stop by the Chicago Police Department without reasonable articulable suspicion at any time since April 20, 2013, which resulted in the creation of a contact card."

> Fourteenth Amendment Sub-Class: "All African-Americans and Hispanics subjected to an investigatory stop by the Chicago Police Department without reasonable articulable suspicion at any time since April 20, 2013, which resulted in the creation of a contact card."

While the City argues that these definitions are "fail-safe," similar definitions were used by the Courts in *Floyd* and *Stinson*, which are highly analogous cases. And while the City is correct that *Floyd* certified a (b)(2) class, *Stinson* was (b)(3).[15]

Alternatively, in the event the Court determines that the current definitions are overbroad, and the above definitions are impermissibly fail-safe, other definitions are workable. *McCaster v. Darden Rests., Inc.*, 845 F.3d 794, 800 (7th Cir. 2017) ("[T]he problem of a fail-safe class 'can

---

[15] The City's effort to interject a fail-safe analysis into *Stinson* should be rejected. The City contends that the "fairness problem" underlying the prohibition of fail-safe classes was not present because the summonses (or tickets) were subject to judicial review. The *Stinson* court, however, redefined the class not because it was fail-safe, but to ensure that it was not overly-inclusive. 282 F.R.D. at 377.

and often should be solved by refining the class' definition rather than by flatly denying class certification on that basis.") (quoting *Messner*, 669 F.3d at 825). For instance, the Loitering and No Narrative Groups can be redefined pursuant to either Rule 23(b)(3) or Rule 23(c)(4) as set forth above (*supra*, § IV.A.). Similar definitions can be used for any of six Unconstitutional Stop groups identified through Plaintiffs' methodology.

In summary, the City's class definition arguments are extreme and stretch the bounds of the Seventh Circuit's requirements. Under the City's analysis, no class could ever be certified as it would either be overbroad because it includes uninjured members, and then if redefined to exclude uninjured members, it would become fail-safe. The tens of thousands victimized by the City's stop and frisk practice deserve an opportunity to seek a remedy. The class definition should facilitate, not encumber, that opportunity.

### 2. Common Questions Predominate over Individualized Issues

In anticipation of the City's predominance defense, Plaintiffs' motion thoroughly discussed how individualized issues have been minimized from the analysis. (Doc. 277 at 63-65). The City nevertheless retreads mostly old ground in arguing that individualized issues as to liability, causation, and damages predominate. Specifically, the City claims that the trier of fact would have to determine if: (a) a seizure occurred; (b) it lacked reasonable articulable suspicion; (c) it was caused by an unconstitutional City policy or practice; (d) it was racially motivated; and (e) it caused damages. Plaintiffs will take each in turn.

### a. Whether a Seizure Occurred

As discussed at length in both Plaintiffs' motion (Doc. 277 at 63-64) and this reply brief (*supra*, § III.A.), the police-citizen encounters at issue involve investigatory stops. Consensual encounters were not documented on contact cards for much of the class period (4/3/14 – 12/31/15),

and for the time-period when officers were given the *option* of documenting consensual encounters (4/20/13 – 4/2/14), those few contacts have been effectively identified and filtered out. Separately, the City has conceded that enforcement under the Gang and Narcotics Loitering Ordinance involves investigatory stops. As such, for the loitering groups, there are absolutely zero individualized issues on the question of whether a seizure occurred.

### b. Whether there was Reasonable Articulable Suspicion

Plaintiffs have largely addressed this issue as well. The City's claim that there are individualized issues as to whether a police-citizen encounter lacked reasonable articulable suspicion is based upon the disingenuous premise that "all the facts and circumstances necessary to make a liability determination under the Fourth Amendment cannot be gleaned from the narrative section of the contact card alone." (Doc. 318 at 47). The City's argument is literally the opposite of its Special Order, which requires that officers document "all of the factors that support reasonable, articulable suspicion" in the narrative section. (Doc. 282-40 at V.A.2.). And, as discussed above, the City and others routinely use contact cards (and their analogs) to make judgments as to the constitutionality of stops.

The issue then becomes one of reliably grouping potentially unconstitutional stops in an internally consistent manner so that a determination on the validity of the encounter type will resolve all claims within a group in one stroke. Plaintiffs' methodology has done exactly that. For instance, Plaintiffs would refer this Court to the Suspicious Person Group. Looking or acting suspicious is not by itself a constitutional basis to perform an investigatory stop. *Gentry v. Sevier,* 597 F.3d 838, 845 (7th Cir. 2010). Accordingly, all stops included within the Suspicious Person Group involve reference to a "suspicious person" and lack any further detail to support a potentially permissible stop. (Doc. 277-7 at 23-24). Ultimately, the stops within this group were

found to lack reasonable articulable suspicion at a rate of 97.5 percent, with a 99 percent confidence level. (Doc. 277 at 54). As a result, this Court can have an exceedingly high confidence level that a single decision as to the constitutionality of stopping a "suspicious person," without more, will dictate the validity of this group in one stroke.

While Plaintiffs submit that their methodology is reliable, if the Court finds that there are nevertheless individualized issues as to whether reasonable articulable suspicion exists within a given group, that concern evaporates in the context of the Loitering Groups. There, as discussed above, CPD officers conducted investigatory stops as part of enforcement under the Gang and Narcotics Loitering Ordinance. Plaintiffs are not challenging whether the stopped individuals were, in fact, engaged in gang or narcotics loitering. Rather, Plaintiffs are challenging the constitutionality of CPD's Special Order. There are zero individualized issues involved in this analysis. The Special Order is either constitutional or it is not.

### c. Whether a Stop was Caused by an Unconstitutional Policy

As the City correctly points out, the predominance analysis begins with the elements of Plaintiffs' *Monell* claims. (Doc. 318 at 44). Plaintiffs have established that *Monell* proofs involving CPD's express policies, widespread customs, and deliberate indifference predominate. The question raised by the City is one of causation, *i.e.*, whether Plaintiffs can show that the policies and practices caused the constitutional injuries at issue. To that end, Plaintiffs must have evidence that a policy or practice "was the direct cause or moving force behind the deprivation" of their constitutional injuries. *Smith v. City of Chicago*, 143 F.Supp.3d 741, 752 (N.D. Ill. 2015).

It is again important at the outset to point out that the City's causation argument does not apply to the Loitering Groups. The directives contained within CPD's Special Order for "Gang and Narcotics-Related Enforcement" are both the direct cause and the moving force behind the

31

investigatory stops at issue. The very reason CPD officers stopped people for gang and narcotics loitering was because the Special Order required them to do so. As a result, *Monell* causation is a non-factor for the Loitering Groups. Nor is it much of a much factor for the remaining groups.

The investigatory stops at issue in this case were the outcome of CPD policies and practices and the directives of CPD policymakers. Even if there was some level of discretion or individualization involved, investigatory stops under McCarthy were influenced by system-wide policies and practices, specifically, CPD's: stop and frisk practice; *de facto* contact card quota; practice of saturating minority-populated communities with untrained officers who were pressured to "put hands" on the "right people;" unconstitutional racial profiling policy; unconstitutional Special Order for gang and narcotics loitering; and deliberate indifference to civil rights exhibited by the City's decision to hire McCarthy, and CPD's failure to provide meaningful training, supervision, or accountability over its stop and frisk practice. The City's contention that individualized issues predominate on the issue of causation ignores the several recent Seventh Circuit rulings on this issue.

Since *Wal-Mart* was decided in 2012, the Seventh Circuit has carefully examined the question of when a "general policy" provides the glue to bind a class together. *McReynolds v. Merrill Lynch* involved a racial discrimination case where the plaintiffs challenged compensation decisions impacting African-American brokers. 672 F.3d 482, 489 (7th Cir. 2012), *abrogated on other grounds by Phillips v. Sherriff of Cook Ct.*, 828 F.3d 541 (7th Cir. 2016). The defendant contended that the compensation decisions involved individualized inquiries because they were subject to the discretion of 135 Complex Directors who were responsible for supervising 600 different branch offices all throughout the country. The plaintiffs, however, argued that two overriding Merrill Lynch policies exacerbated or influenced the decision-making process and,

therefore, provided the glue binding the claims together. The Seventh Circuit agreed with the plaintiffs, holding that the "incremental causal effect (overlooked by the district judge) of those company-wide policies—which is the alleged disparate impact—could be most efficiently determined on a class-wide basis." *Id.* at 490. The same is true here.

The City attempts to distinguish *McReynolds* by claiming that "Plaintiffs have not identified an unlawful CPD policy." (Doc. 318 at 70). That is not an accurate statement. Plaintiffs have identified two unlawful written policies in addition to the *de facto* quota and unlawful directives to perform stops in the absence of reasonable articulable suspicion.[16] Further, the City missteps in its effort to distinguish *McReynolds* by conceding that it "would be on point if CPD's policies authorized investigatory stops in the absence of reasonable articulable suspicion or condoned racial profiling . . . ." (Doc. 318 at 7). But that is exactly Plaintiffs' claim with respect to the Special Order for gang and narcotics loitering and the General Order on racial profiling.

The City's effort to distinguish *Bell* also fails. *Bell* involved a class claim against PNC Bank for its alleged failure to pay overtime wages and sought certification under Rule 23(b)(3). 800 F.3d at 371. The City tries to distinguish *Bell* by referencing its statement that in cases "in which low-level managers use their discretion to make individual decisions without guidance from an overarching company policy do not satisfy commonality because the evidence varies from plaintiff to plaintiff." (Doc. 318 at 71). The City misses the point. CPD investigatory stops under McCarthy were not made in a vacuum and "without guidance" from overarching CPD policies. Rather, Plaintiffs have specifically shown that CPD investigatory stops were in fact guided and influenced by CPD policies. This is especially true with the Loitering Groups. *See, e.g., Young v. Cty. of Cook*, No. 06 C 552, 2007 WL 1238920 * 7 (N.D. Ill. Apr. 25, 2007) ("When a class

---

[16] As in *McReynolds*, Plaintiffs need not prove the unconstitutionality at this certification stage; it is enough that there is a question of whether the policies had an "incremental causal effect" on CPD policing.

challenges a uniform policy or practice, the validity of that policy or practice tends to be the predominant issue in the ensuing litigation.").[17]

The cases relied upon by the City are distinguishable, non-binding, and unpersuasive. The City relies extensively on *Hudson v. City of Chicago*, 242 F.R.D. 496 (N.D. Ill. 2007), a case decided years before *Wal-Mart's* "general policy" discussion and the Seventh Circuit's interpretation in *McReynolds* and *Bell*. In *Hudson*, the district court denied certification of a putative class which alleged selective enforcement of Chicago's "Bridge Ordinance" on the basis that individualized issues predominated. But what was lacking in *Hudson* is present here. *Hudson* challenged all persons ticketed or arrested pursuant to the Bridge Ordinance for panhandling and, unlike here, did not present any mechanism for distinguishing between those encounters that were made with probable cause and those that were not. Further, *Hudson* did not involve the same high-level *Monell* policies and practices, the incremental effect of which is best determined on a class-wide basis. *McReynolds*, 672 F.3d at 490. Lastly, the plaintiffs in *Hudson* did not challenge the constitutionality of a uniform policy as Plaintiffs do here. At best, *Hudson* involved a selective enforcement challenge to a lawful ordinance.

The City's reliance on *Portis* and *Harper* is equally unavailing. Both cases involved class allegations challenging the length of detentions. Neither case, however, was hinged to a policy or practice; thus, the determination of reasonableness had to be made on a case-by-case basis. As the Seventh Circuit recently recognized, "[n]either *Portis* nor *Harper* preclude class certification in a case such as this one, in which the plaintiffs assert that the defendants' policy or practice caused them to be detained for an unconstitutionally unreasonable length of time." *Driver v. Marion Cty. Sheriff*, 859 F.3d 489, 492 (7th Cir. 2017). Here, Plaintiffs have identified common policies and

---

[17] Additional cases supporting this proposition are cited in Plaintiffs' motion. (Doc. 277 at 71-72).

practices, the incremental causal effect of which is best determined on a class-wide basis. *McReynolds*, 672 F.3d at 490.

### d. Whether a Stop was Racially Motivated

While admittedly more challenging than Plaintiffs' Fourth Amendment claims, the question of whether a stop was racially motivated in violation of the Equal Protection Clause of Fourteenth Amendment should nevertheless be resolved on a class-wide basis. The weight of this issue in many respects resembles the Supreme Court's landmark decision in *Brown v. Board of Education*—which, like here, was a class action alleging widespread violation of the Equal Protection Clause. 347 U.S. 483 (1954). In holding that segregation in the context of education deprived students of the protection guaranteed by the Fourteenth Amendment, the Court gave prominent consideration to the impact of segregation on African-American youth. In particular, it found that segregation "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." *Id.* at 494. Sixty-four years later, the same can be said about young minorities who are born and raised in underprivileged communities in Chicago. What feeling of inferiority might they have when they are stopped, searched, handcuffed, and assaulted by police officers for no other reason than the color of their skin? Respectfully, Plaintiffs would request that this Court give the same consideration as to the impact of discrimination on minority youth that the Supreme Court gave in *Brown v. Board of Education*.

In opposition to Plaintiffs' Fourteenth Amendment subclass, the City makes two primary arguments. First, the City argues that Plaintiffs have failed to establish their equal protection claims because they have not presented sufficient evidence of discriminatory effect or discriminatory

purpose. (Doc. 318 at 53-54). Second, the City argues that individualized issues preclude certification of the Fourteenth Amendment subclass. (Doc. 318 at 55).

### i.   *Plaintiffs Present a Viable Equal Protection Claim*

In arguing that Plaintiffs have failed to establish their equal protection claims, the City is asking this Court to improperly render a merit-based dispositive ruling which is not part of the class certification analysis. *Messner*, 669 F.3d at 811. But even following the City's detour, Plaintiffs have set forth a viable equal protection claim. As this Court recognized in denying the City's motion to dismiss, Plaintiffs have "more than adequately" alleged a plausible equal protection claim in relation to the City's stop and frisk policy. *Smith*, 143 F. Supp. 3d at 755-56. And since then, the evidence has only gotten stronger.

"The Equal Protection Clause of the Fourteenth Amendment protects individuals from governmental discrimination." *Swanson v. City of Chetek,* 719 F.3d 780, 783 (7th Cir. 2013). To establish liability for an equal protection violation, a plaintiff must show that the defendant's actions had a discriminatory effect and were motivated by a discriminatory purpose. *Chavez v. Ill. State Police*, 251 F.3d 612, 636 (7th Cir. 2001). "To prove discriminatory effect, the plaintiffs are required to show that they are members of a protected class, that they are otherwise similarly situated to members of the unprotected class, and that plaintiffs were treated differently from members of the unprotected class." *Id.* Discriminatory purpose implies "that the decisionmaker selected or reaffirmed a particular course of action at least in part 'because of' its adverse effects upon an identifiable group.'" *Id.* at 645 (citations omitted).

With respect to the first element, discriminatory effect, Plaintiffs can rely upon statistics provided they are relevant and reliable. *Id.* at 640. Here, Plaintiffs have produced a broad range of statistics in support of their position that CPD's stop and frisk practice has a discriminatory effect

on minorities. (Doc. 277 at 6-7, 24-25). Under McCarthy, minorities were the subjects of 90 percent of all contact cards; 92 percent of contact cards for innocuous activity such as jaywalking and bicycling on a sidewalk; and 96 percent of contact cards for loitering. (*Id.*) For traffic stops, which should be race neutral, minorities were the subjects of 90 percent of all contact cards. (*Id.*) And, in a profoundly telling statistic, minority drivers were searched approximately four times as often as white drivers, yet CPD's data shows that contraband was found on white drivers twice as often as on minority drivers. (Doc. 277-4 at 39). The best the City can say in response is that Plaintiff's statistical evidence is "woefully deficient"—which, more than anything, is consistent with the City's tendency to turn a blind eye to its problems. But regardless, Plaintiffs' statistics do not stand alone. Independent investigations by the Department of Justice and Mayor Emanuel's own Police Accountability Task Force strongly corroborate the data and reveal that minorities are, in fact, disparately effected by CPD's stop and frisk practices.[18]

**Findings from the PATF include:**

Racial bias is not a thing of the past. Rather, data establishes that CPD's use of force disproportionately affects people of color. The same is true for foot and traffic stops. These enforcement actions have deepened a widespread perception that police are indiscriminately targeting anyone and everyone in communities of color without making individualized determinations of reasonable suspicion of criminal conduct. (Doc. 277-4 at 35).

There is substantial evidence that people of color—particularly African-Americans— have had disproportionately negative experiences with the police over an extended period of time. There is also substantial evidence that these experiences continue today through enforcement and other practices that disproportionately affect and often show little respect for people of color. (*Id.* at 32).

---

[18] The reports issued by the DOJ and the PATF are admissible evidence. *See Daniel v. Cook Cty.*, 833 F.3d 728 (7th Cir. 2016) (DOJ report deserves "considerable weight"); *LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 989 (N.D. Ill. 2017) (finding that the "Mayor's statements and the contents of the City– commissioned PATF report constitute admissions of a party opponent under Fed. R. Evid. 801(d)(2)(D)" and provide "significant evidence").

African Americans have been particularly targeted in predominantly white neighborhoods. (*Id.* at 37).

**Findings from the DOJ include:**

We have serious concerns about the prevalence of racially discriminatory conduct by some CPD officers and the degree to which that conduct is tolerated and, in some respects, caused by deficiencies in CPD's systems of training, supervision and accountability. (Doc. 277-12, DOJ Rep. at 145).

Young people we spoke with individually and during community meetings told us many stories of officers who, while unwilling or unable to help them when they needed help, followed and "harassed" them as they went about their daily lives. Young people told us of being stopped and searched by police, handcuffed, and having background checks conducted before being let go, while doing everyday things like walking to the store. (*Id.* at 143).

Young black residents told us they are commonly stopped and suspected of engaging in criminal activity, or of being gang members, based solely on their appearance. As one resident told us, "they see you with [certain types of clothing] and they think you are a criminal. Wear dreads and you get stopped." (*Id.*)

While people in Chicago's downtown areas only rarely see this type of policing, this is how residents in certain segments of the City experience policing on a daily basis. (*Id*).

The evidence of discriminatory effect presented by Plaintiffs is resounding, even for purposes of class certification—which, again, is not a dress rehearsal for the merits. With respect to the second element—discriminatory purpose—Plaintiffs must show that a course of action was selected or reaffirmed "at least in part 'because of,' not merely in spite of, its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Importantly, the Seventh Circuit has recognized that evidence of a policy encouraging racial profiling, either actual or *de facto*, is relevant to show discriminatory purpose. *United States v. Barlow*, 310 F.3d 1007, 1012 (7th Cir. 2002). Plaintiffs have presented evidence of both actual and *de facto* policies that directly encouraged racial profiling.

First, CPD General Order G02-04 permits racial profiling by allowing officers to use race as a basis for law enforcement decisions. (Doc. 277 at 34-37). Numerous high-ranking CPD

personnel concede that CPD's General Order allows consideration of race for purpose of routine and spontaneous law enforcement action.[19] (Doc. 283-22, Tracy Dep. at 226: 1–5; Doc. 282-42, Wysinger Dep. at 43:13–45:18; Doc. 283-6, Williams Dep. at 100:14–101:1; 108:5–17; Doc. 282-44, Murphy Dep. at 130:7–12). Not only is the language of the General Order unconstitutional, but one can reasonably conclude that it is *intentionally* unconstitutional for the purpose of enabling discrimination. Indeed, the Department of Justice issued formal Guidance in both 2003 and 2014 condemning the type of language in CPD's General Order, yet, CPD continued to use the same archaic definition of racial profiling until after lawsuit was filed.[20] (*See* Doc. 277 at 35-36).

Relatedly, CPD's Special Order for gang and narcotic loitering enforcement encourages racial profiling. As part of their stop and frisk practice, CPD would look for people who they recognized as gang members or "looked the part," and would take cover under the Special Order to stop and harass them. And make no mistake about it, CPD knew full well that minorities were the targets of its loitering enforcement strategy—96 percent of all loitering stops were of minorities. (Doc. 277-12 at 50). *See Floyd v. City of New York*, No. 08 Civ. 1034, 2008 WL 4179210 (S.D.N.Y. Sept. 10, 2008) (concluding that NYPD engaged in indirect racial profiling by using criminal suspect data for routine and spontaneous law enforcement activity).

In addition to CPD's express policies, Plaintiffs have presented considerable evidence that CPD's *de facto* policies encouraged racial profiling. At the direction of CPD's centralized command, including Superintendent McCarthy, officers were strategically deployed to minority-populated areas, commanded to increase their contact card activity, told to target certain

---

[19] Routine and spontaneous law enforcement action is different than using race to match up an actual suspect description, in which case using race as an identifying factor is permissible.

[20] The City argues that the difference between the language in its General Order and that set forth by the DOJ is "merely semantic." (Doc. 318 at 17). But when high-ranking CPD personnel understand the order to permit the consideration of race as a factor for routine and spontaneous law enforcement activity, semantics matter.

demographics, given patently unconstitutional directives, and repeatedly instructed to "put hands on people." The very design of stop and frisk was to target and harass the "right people" so that they knew they could be stopped and searched at any point and for no reason at all. This course of action was taken at least in part "because of, not merely in spite of," the adverse impact on the targeted profile. *See Washington v. Davis*, 426 U.S. 229, 242 (1976) (an invidious discriminatory purpose may be inferred by the fact that a policy or practice "bears more heavily on one race than another").

Further, the City was well aware that McCarthy's stop and frisk practices in New York and New Jersey had disparate impacts on minority residents when it hired him. (Doc. 277 at 12-14). And with respect to NYPD's stop and frisk practice in particular, a judgment was entered against the City of New York for violations of the Equal Protection Clause of the Fourteenth Amendment. *Floyd v. City of New York*, 959 F. Supp. 2d 540, 660-64 (S.D.N.Y. 2013). By knowingly using the same stop and frisk policy that had already been determined to violate the Equal Protection Clause, it stands to reason that CPD's course of action was "at least in part because of, not merely in spite of," its effect on minorities. *Feeney*, 442 U.S. at 279.

### ii.    *Individualized Issues Do Not Predominate*

Without any legal support, the City contends that resolving Fourteenth Amendment claims on a class-wide basis would require "inquiry into the mindset of the officer involved in each individual encounter." (Doc. 318 at 58). That is not the law. Rather, as the Seventh Circuit has recognized, the "incremental causal effect" general policies have towards a discrimination claim "could be most efficiently determined on a class-wide basis." *McReynolds*, 672 F.3d at 490.

The City's reliance on *Barlow* is misplaced. *Barlow* involved an African-American plaintiff who sought to bar a criminal prosecution on the grounds that he was the victim of racial

profiling and selective enforcement. 310 F.3d at 1011. In his attempt to establish that the DEA was specifically targeting minorities, the plaintiff relied entirely on an expert affidavit which was strikingly unreliable. *Id.* Through a 10-day surveillance effort, the plaintiff's expert found that only two of 726 travelers were stopped by law enforcement, both of which were African-American. *Id.* From that single data point, the plaintiff's expert opined the DEA was racially profiling. *Id.* The court correctly concluded that the expert's report was unreliable and irrelevant, highlighting the small sample size, the limited surveillance period, and the fact that the two individuals were stopped by Amtrak police, not the DEA. *Id.* Factually, *Barlow* does not resemble this present case. However, from a legal standpoint, it actually supports certification of Plaintiffs' Fourteenth Amendment subclass.

First, *Barlow* recognizes that statistics can provide very useful evidence, noting that in some circumstances "statistics alone" can establish an equal protection violation. *Id.* Here, as discussed above, Plaintiffs statistical evidence is not only robust, but it is strongly corroborated by the PATF and DOJ findings. Second, *Barlow* recognizes that evidence of an actual or *de facto* policy encouraging racial profiling is relevant to show discriminatory purpose. *Id.* at 1012. *McReynolds* is especially instructive on this point. There, as discussed above, the plaintiffs filed a racial discrimination action against Merrill Lynch alleging that two company-wide policies exacerbated racial discrimination against African-American brokers. 672 F.3d at 489. In opposing certification, the defendant made the same argument the City does here—that "any discrimination . . . would result from local, highly-individualized implementation of policies rather than the policies themselves." *Id.* at 490. Moreover, the defendant argued that there could be race-neutral reasons that could influence compensation decisions that would have to be resolved on an individual basis. *Id.* at 489. The Seventh Circuit rejected these "highly-individualized" arguments

and held that an equal protection class could be certified because the disparate impact was ultimately attributable, at least in part, to the defendant's company-wide policy. *Id.* at 490.

The other case relied upon by the City, *White v. Williams*, 208 F.R.D. 123, 132 (D.N.J. 2002), is non-binding and also easily distinguishable. In *White*, the plaintiffs claimed that the defendants had a generalized practice of racial profiling on the Turnpike. There were no policies that encouraged racial profiling, there were no statistics establishing the plaintiffs' selective enforcement claim, and the enforcement stops at issue were in no way connected to unlawful stops. The opposite is true here. Plaintiffs have identified several actual and *de facto* policies encouraging racial profiling, cited to a host of statistics corroborating their theory, and have limited the Fourteenth Amendment subclass to stops that are unconstitutional in the first instance. The far more analogous and well-reasoned cases are *Casale v. Kelly*, 257 F.R.D. 396 (S.D.N.Y. 2009) (certifying Rule 23(b)(3) class against police for violations of Fourth, Fifth, and Fourteenth Amendments) and *Wilson v. Tinicum Township*, 1993 WL 290205 (N.D. Ohio Aug. 4, 1993) (certifying Rule 23(b)(3) class of minorities stopped and searched on I-95 without reasonable cause).

### d.  Whether There are Damages

Plaintiffs have proposed a presumed damage model in their motion for Rule 23(b)(3) certification. In support of its assertion that a presumed damage model is not appropriate, the City relies on a non-binding case from the Central District of California, *Amador v. Baca*, 299 F.R.D. 618 (C.D. Cal. 2014).[21] The Seventh Circuit, however, has held that presumed damages may be

---

[21] The City's claim that *Amador* was "reversed on other grounds" is not a fair characterization. (Doc. 318 at 60). The ruling cited by the City was reconsidered and reversed, in part because the district court held that individualized damages issues do not preclude class certification. *Amador v. Baca,* No. CV-10-1649 SVW, 2014 WL 10044904, at *9 (C.D. Cal. Dec. 18, 2014).

recoverable when substantive constitutional rights such as Fourth Amendment rights are infringed. *Siebert v. Severino*, 256 F.3d 648, 655 (7th Cir. 2001); *Hessel v. O'Hearn*, 977 F.2d 299, 301-02 (7th Cir. 1992); *see also Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 310-11 (1986) (recognizing that presumed damages may be appropriate "when a plaintiff seeks compensation for an injury that is likely to have occurred but difficult to establish").

Notwithstanding whether this Court accepts a presumed damages model for trial, the Court should reject the City's claim that individual damage issues predominate. It has long been recognized that the need for individual damages determinations at a later stage of the litigation does not itself justify the denial of certification. William B. Rubenstein, *Newberg on Class Actions*, § 4:54 (5th ed. Dec. 2016 Update). As the Supreme Court recently stated, when "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods*, 136 S.Ct. at 1045.

Similarly, in *Mulvania v. Sheriff of Rock Island County*, the Seventh Circuit reversed the district court's conclusion that certification was not appropriate because individual damages issues predominated. 850 F.3d 849, 859 (7th Cir. 2017). There, the plaintiffs challenged the jail's policy of requiring all female inmates to either wear white underwear or no underwear at all. *Id.* The district court concluded that common issues did not predominate because the damages would vary for individual class members based on factors such as how long a detainee was deprived of her underwear and whether she was on her menstrual cycle or pregnant. *Id.* The Seventh Circuit disagreed, finding that where damages must be assessed individually, district courts may "bifurcate the case into a liability phase and a damages phase." *Id.* (citing *Mullins*, 795 F.3d at 671).

43

### 3. The Class Representatives' Claims are Typical of the Class

The City contends that the Class Representatives' claims provide "illustrative examples of the individualized factual and legal issues presented by each encounter." (Doc. 318 at 23). While the City is unclear in its brief, it appears as though it is challenging Rule 23's typicality element. Typicality, however, is supposed to be "determined with reference to the defendant's actions, not with respect to particularized defenses [the defendant] might have against certain class members." *Wagner v. NutraSweet Co.,* 95 F.3d 527, 534 (7th Cir. 1996). Further, the typicality requirement can be satisfied even when there are factual distinctions between the claims of the named representatives and the class members. *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). Ultimately, a representative's claim is typical if it "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).

Here, Plaintiffs have demonstrated that the Class Representatives' claims arise out of the same polices and practice and are based on the same legal theories as the putative class members. (Doc. 277 at 65-68). The City's suggestion that there are too many unique issues involved in the Class Representatives' claims is not only unfounded, but the City's arguments on this point badly mischaracterize the record.

#### a. Hector Fontanez, Jr.

The City's challenge to the reasonableness of the stop on Hector Fontanez, Jr. reveals once again that the City does not understand racial profiling. Before stopping Fontanez, CPD officers Rosen and Vega received a report of "2 male Hispanics running from 2400 s christiana ave." (Doc. 283-45). The officers had no information regarding the "2 male Hispanics'" age, height, weight,

build, hair style, or clothing. (Doc. 283-37 at 72:3-24). Nor did the officers know what if any crime the "2 male Hispanics" committed or even what direction they were running. (*Id.* at 58:14-20). As the officers were driving their unmarked squad car, they saw Fontanez, a 12-year old Hispanic boy, riding his bike about a block away from where the "2 male Hispanics" were seen running. Notably, Fontanez was near his home in the predominantly Hispanic neighborhood known as Little Village, which has a population of 74,000, 84 percent of whom are Hispanic.[22] When the officers saw Fontanez, he was not committing any crime. (Doc. 283-37 at 83:2-4). Nevertheless, based on the description of the "2 male Hispanics running . . ." the officers stopped Fontanez and ordered him to get off his bike. Fontanez was then thrown up against a fence, handcuffed, and patted down. (*Id.* at 65, 68).

Based upon these facts, the City challenges whether there was reasonable articulable suspicion for the stop. It should be evident to the City that "2 male Hispanics running" is far different from a Hispanic boy riding his bicycle. And without any further description of the "2 male Hispanics running," CPD simply was not at liberty to stop any Hispanic male in the vicinity, especially given that the stop occurred in a neighborhood largely populated by Hispanics. The Department of Justice summed it up best:

> In another case, an officer forcibly handcuffed a 12-year-old Latino boy who was outside riding a bike under his father's supervision. A plainclothes officer, responding to a report of "two male Hispanics running from" the area, detained the boy. According to the boy and his father, the officer approached the boy, ordered him to stop his bike, forcibly handcuffed him, pulled him off his bike, and placed him up against a fence. The boy reported he did not understand the man was a police officer or why he was being detained and told the officer he was only 12. According to the boy, the officer responded that the boy was "old enough to bang," meaning old enough to engage in gang violence. The boy's father approached the officer, explained that his son was only 12 years old, and asked what was going on. Records of 911 calls reflect a caller reporting that a plainclothes officer had a 12-year-old in handcuffs and was refusing to

---

[22] In 2014, Little Village had a population of approximately 73,000 with 16,500 people per square mile, making it one of the densest communities in Chicago. 84 percent of the population is Hispanic. *See* http://littlevillagecommunityportal.org/lv-community/today/.

say why. The officer placed the boy in the back of a police vehicle before eventually releasing him. The officer's only apparent basis for this detention was the boy's race, which is constitutionally unreasonable.

(Doc. 277-27 at 35).

### b. Rashawn Lindsey

With respect to Rashawn Lindsey, the City challenges whether he "was even subject to an investigatory stop at all." (Doc. 318 at 25). Plaintiffs already exposed the disingenuousness of the City's argument above (*supra*, § IV.A.1.), namely, that the contact card expressly provides that Lindsey was the subject of an investigatory stop for "Gang and Narcotics-Related Loitering. (Ex. 11, Lindsey Contact Card). But the stop is revealing for another reason too. The detaining officer, Kris Stipanov, has almost no recollection of the investigatory stop and for good reason—he has issued hundreds of dispersal orders and contact cards for alleged loitering in suspected gang or narcotics hot spots; *probably over 500*. (Doc. 318-57 at 100, 103). But while the encounter left no impression on Officer Stipanov, it left a burning one on Rashawn Lindsey. After he and his friends were unlawfully stopped and searched, the officers released them from handcuffs, telling them "you must be the good ones." (Doc. 283-36, Lindsey Dep. at 52:6-8).

### c. Steve McAbee

Just like with Rashawn Lindsey, the City challenges "whether McAbee was detained at all." (Doc. 318 at 27). The two encounters at issue with McAbee were documented by CPD as occurring on August 22, 2014 and December 19, 2014. Both encounters with Mr. McAbbe were *after* April 3, 2014, which is when CPD stopped documenting consensual encounters. (Doc. 282-40 at I.C.). For that reason alone, the City's argument falls flat. Additionally, however, a review of the contact cards at issue show that CPD's encounters with McAbee involve investigatory stops, not consensual encounters. On August 22, 2014, McAbee was stopped for "Gang and Narcotics-

46

Related Loitering," which, as discussed above, is an investigatory stop. (Ex. 12, McAbbe Contact Card). On December 19, 2014, McAbee was stopped for being a "suspicious person" who purportedly "matched [the] description of a call of [a] person tampering with cars . . ." (*Id.*) Clearly, this too was an investigatory stop and not consensual in nature. (Doc. 283-43 at III.A.) (defining a citizen encounter as "one that does not involve any suspicion of criminal activity").

### 4. Class Treatment is the Superior Mechanism to Manage this Case

The City does not challenge the element of superiority, nor could it. But Plaintiffs do want to reiterate the point made by the Court in *Stinson* in certifying a Rule 23(b)(3) class of unconstitutional stop victims:

> [W]ithout class certification, it is likely that the constitutional violations Plaintiffs allege would go unadjudicated, as many of the potential class members do not possess the knowledge or resources to prosecute a lawsuit, and the relatively small amount of damages suffered by each individual plaintiff decreases the possibility of individual lawsuits being filed.

*Stinson*, 282 F.R.D. at 383.

### C. Alternatives to Certification of the Class as a Whole

In the event the Court declines to certify the proposed classes as currently defined, Plaintiffs have submitted reasonable alternatives.

### 1. Certification of the Loitering Groups under Rule 23(b)(3)

As detailed in Section IV.A.1., *supra*, the Loitering Groups present no individualized issues and can be resolved in one stroke. For that reason, the City's arguments against certification simply do not apply. The City has admitted that all encounters under the Gang and Narcotics Loitering Ordinance involve investigatory stops as opposed to consensual encounters. And even if the Court is not persuaded on that point, it could limit the Loitering class to encounters on or after April 3, 2014, when both parties agree that all contact cards are presumed to document investigative stops.

Most important to the Loitering class is that Plaintiffs are not challenging the facts and circumstances of the particular stops, but rather the only thing at issue is the constitutionality of CPD's Special Order. The Seventh Circuit has consistently held that certification is appropriate under such circumstances.

### 2. Certification of the No Narrative Group under Rule 23(b)(3).

Plaintiffs also submit that the No Narrative group should be certified since there is no articulated basis at all for any of these encounters. As a result, they must be presumed to be unconstitutional.

### 3. Certification of Issues under Rule 23(c)(4).

As a further alternative, if this Court finds that Rule (23)(b)(3)'s requirements are not met, Plaintiffs would request that the Court certify particular issues as appropriate under Rule 23(c)(4).[23] Rule (23)(c)(4)(A) provides that "when appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). In *McReynolds*, the Seventh Circuit certified an issues class pursuant to Rule (23)(c)(4) for purposes of determining whether two of defendant's employment practices had a disparate impact on African-American financial advisers, even though individual trial issues would be necessary to determine damages. 672 F.3d at 492. Writing for the court, Judge Posner found that the greatest efficiency and fairness would be achieved by "carving at the joints" of the parties' dispute and resolving the issue of liability on a class-wide basis. *Id.* The Seventh Circuit has separately recognized the benefits of a Rule 23(c)(4) class:

---

[23] The City's contention that Plaintiffs did not "develop" their Rule 23(c)(4) request places form over substance. Plaintiffs' motion fully develops all the liability issues which would be appropriate for certification under Rule 23(c)(4) and simply presents Rule 23(c)(4) as an alternative to certifying the class as a whole. Further, this Court also has the discretion to utilize Rule 23(c)(4) *sua sponte. Barkman v. Wabash, Inc.*, 85 C 611, 1988 WL 5039, at *1 (N.D. Ill. Jan. 20, 1988) (citing *U.S. Parol Comm'n v. Geraghty*, 445 U.S. 388, 403 (1980)*); Doe v. Guardian Life Ins. Co.*, 145 F.R.D. 466, 478 (N.D. Ill. 1992).

> If there are genuinely common issues, issues identical across all the claimants, issues moreover the accuracy of the resolution of which is unlikely to be enhanced by repeated proceedings, then it makes good sense, especially when the class is large, to resolve those issues in one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings.

*Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911 (7th Cir. 2003).

Courts may also use Rule 23(c)(4) to single out issues for class treatment when the action as a whole does not satisfy Rule 23(b)(3). *See* Charles A. Wright et al., *Federal Practice and Procedure* §1790 (3d ed. 2005); *see also* 6 William Rubenstein et al., *Newberg on Class Actions* §18:7 (4th ed. 2002) ("Even cases which might not satisfy the predominance test when the case is viewed as a whole may sometimes be certified as a class limited to selected issues that are common, under the authority of Rule 23(c)(4)."). Accordingly, should this Court determine that Rule 23(b)(3)'s requirements are not satisfied, the Court should employ Rule 23(c)(4) to resolve common issues, including:

- Whether CPD has a policy or practice making investigatory stops without reasonable articulable suspicion;

- Whether CPD's policies and practices for investigatory stops were intended to target minorities;

- Whether the CPD's General Order pertaining to racial profiling permitted consideration of race as a factor in routine and spontaneous law enforcement activity;

- Whether CPD's Special Order on gang and narcotics loitering required CPD officers to perform investigatory stops in the absence of reasonable articulable suspicion;

- Whether CPD's General Order on racial profiling and/or Special Order on gang and narcotics loitering are unconstitutional;

- Whether CPD policymakers were deliberately indifferent to the known or obvious consequences of their actions in the context of investigatory stops;

- Whether CPD provided adequate training and supervision in the context of investigatory stops, racial profiling, and/or bias-based policing; and

- Whether the CPD had an adequate accountability system to redress problem issues or officers in the context of investigatory stops, racial profiling or bias-based policing.

The efficiency and consistency gained by answering these questions once, as opposed to at every individual trial, strongly supports class treatment pursuant to Rule 23(c)(4). As Judge Posner put it in *Butler*, "a class action limited to determining liability on a class-wide basis . . . will often be the sensible way to proceed." *Butler v. Sear, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013). Accordingly, should this Court decline to certify Plaintiffs' putative class pursuant to Rule 23(b)(3), it should certify the particular class issues that Plaintiffs request or as the Court deems appropriate, pursuant to Rule 23(c)(4).

Dated: May 30, 2018

Respectfully submitted,

Hart McLaughlin & Eldridge LLC

By:    /s/ Brian Eldridge
       One of the Attorneys for Plaintiffs
       and the Class

**HART MCLAUGHLIN & ELDRIDGE, LLC**
Steven A. Hart
Brian Eldridge
Kyle Pozan
John (Jack) B. Prior
121 W. Wacker Drive, Suite 1050
Chicago, Illinois 60601
Tel:    (312) 955-0545
shart@hmelegal.com
beldridge@hmelegal.com
kpozan@hmelegal.com
jprior@hmelegal.com

**ROMANUCCI & BLANDIN, LLC**
Antonio M. Romanucci
Martin D. Gould
321 N. Clark Street, Suite 900

50

Chicago, Illinois 60654
Tel:    (312) 458-1000
aromanucci@rblaw.net
mgould@rblaw.net

**CENTER FOR CONSTITUTIONAL LITIGATION**
Robert S. Peck
777 6th Street NW, Suite 520
Washington, D.C. 20001
Tel:    (202) 944-2874
robert.peck@cclfirm.com

**THE GREGORY LAW FIRM**
Rodney G. Gregory
3127 Atlantic Boulevard, Suite 3
Jacksonville, Florida 32207
Tel:    (904) 398-0012
rod@gregorylawfirm.net

## TABLE OF EXHIBITS

**EXHIBIT 1:**    Fran Spielman, *Lightfoot condemns Emanuel's 'us-vs.-them' style of government*, Chicago Sun-Times (May 9, 2018, 10:12 AM), https://chicago.suntimes.com/news/lightfoot-condemns-emanuels-us-vs-them-style-of-government/.

**EXHIBIT 2:**    Fran Spielman, *McCarthy fires back at Lightfoot for saying he never should have been hired,* Chicago Sun-Times (May 9, 2018, 3:22 PM), https://chicago.suntimes.com/news/mccarthy-fires-back-lightfoot-hired-emanuel-laquan/.

**EXHIBIT 3:**    Chicago Police Dep't, Special Order S04-13-09, *Investigatory Stop System* (eff. Jan. 1, 2016). **(FILED UNDER SEAL)**

**EXHIBIT 4:**    Hon. Arlander Keys (Ret.), Consultant, *The Consultant's Second Semi-Annual Report Investigatory Stop & Protective Pat Down Agreement* (Mar. 5, 2018).

**EXHIBIT 5:**    App. G to Expert Report of F. Eli Nelson, a Graphic Depiction of the Work Flow Methodology.

**EXHIBIT 6:**    CMAP, *Community Data Snapshot – Douglas*, generated using data from U.S. Census Bureau, Ill. Env't Prot. Agency, and Ill. Sec'y of St. (last updated June 2017), http://www.cmap.illinois.gov/documents/10180/126764/Douglas.pdf.

**EXHIBIT 7:**    J. Saunders, et al., *Predictions put into practice: a quasi-experimental evaluation of Chicago's predictive policing pilot*, 12 J. of Experimental Criminology 347, 362-63 (Aug. 12, 2016)).

**EXHIBIT 8:**    J. Prior Decl.

**EXHIBIT 9:**    Yana Kunichoff, *The Contradictions of Chicago Police's Secretive List*, ChicagoMag (Aug. 21, 2017, 8:44 AM), http://www.chicagomag.com/city-life/August-2017/Chicago-Police-Strategic-Subject-List/).

**EXHIBIT 10:**   *Contact Information System, Most Frequently Asked Questions*, ¶ 8 (January 2015). **(FILED UNDER SEAL)**

**EXHIBIT 11:**   Lindsey Contact Card. **(FILED UNDER SEAL)**

**EXHIBIT 12:**   McAbee Contact Card List. **(FILED UNDER SEAL)**

**EXHIBIT 13:**   F. Eli Nelson Decl.