**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DARNELL SMITH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 15-cv-03467 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION AND ORDER**

In this putative class action, Plaintiff Darnell Smith and eighteen other individuals have

sued Defendants City of Chicago ("City"), Chicago Police Superintendent Gary McCarthy, and

approximately 60 named and unnamed Chicago Police Department ("CPD") officers for alleged

violations of their rights pursuant to the Fourth Amendment to the United States Constitution, as

set forth in the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1 (1968).[1] Specifically,

Plaintiffs allege that the CPD has a policy and practice of conducting unconstitutional

investigatory stops. Each of the named Plaintiffs claims that because of that policy and practice,

one or more CPD officers subjected him to a non-consensual investigatory stop without

reasonable suspicion. Now before the Court is Plaintiffs' motion to certify a class under Federal

Rule of Civil Procedure 23(b)(3).[2] For the reasons explained below, Plaintiffs' motion for Rule

---

[1] In *Terry*, the Supreme Court held that under the Fourth Amendment, police officers are permitted to conduct a brief investigatory stop (or *Terry* stop) only upon reasonable suspicion that an individual has committed, is committing, or is about to commit a crime. *See also United States v. Williams*, 731 F.3d 678, 683 (7th Cir. 2013).

[2] The only motion before the Court at this time is Plaintiffs' motion for class certification under Rule 23(b)(3), the vehicle by which Plaintiffs seek compensatory and punitive damages on their own behalf and on behalf of the class. Plaintiffs have indicated that they also intend to file a motion for class certification under Rule 23(b)(2), in which they will request declaratory and injunctive relief. The Court

23(b)(3) class certification is denied as to all six proposed classes. The Court also declines to certify an issues-only class pursuant to Federal Rule of Civil Procedure 23(c)(4).

## BACKGROUND

In their Sixth Amended Complaint, Plaintiffs allege that Defendants have implemented, applied, and continued to enforce a policy or custom of unconstitutional stops and frisks of Chicago residents by the CPD, which have been conducted without the reasonable articulable suspicion required by the Fourth Amendment. (Sixth Am. Compl. at Law ("SAC") ¶ 3, Dkt. No. 177.) Plaintiffs are 19 individuals who allege that they reside in or visit neighborhoods where the CPD has conducted these unconstitutional stops and frisks, and some of them claim to be victims themselves. (*Id.* ¶¶ 12–30.)

For example, Plaintiff Rashawn Lindsey is a 21-year-old African-American man who resides in the Englewood neighborhood in Chicago. (*Id.* ¶ 28.) One night, Lindsey was wearing a hooded sweatshirt and walking through his neighborhood with two African-American friends. (Pls.' Mot. for Rule 23(b)(3) Class Certification ("Pls.' Mot.") at 2, Dkt. No. 277.) Two CPD officers approached Lindsey and his friends from behind and ordered them to "put your hands up." (*Id.*) The officers then handcuffed the three individuals to one another, frisked them, and searched their pockets. (*Id.*) Finding nothing, the officers then ran each of their names through the dispatch system. (*Id.*) After the names came back clear, the officers released the three individuals, telling them, "You must be the good ones." (*Id.*) Smith, Lindsey, and the other named plaintiffs seek to represent themselves and the "many thousands of victims" of unconstitutional stops and frisks by CPD officers. (*Id.* at 7.) Defendants include the City, CPD

---

previously issued an order providing for consideration of Plaintiffs' proposed Rule 23(b)(3) class before the proposed Rule 23(b)(2) class.

Superintendent McCarthy and CPD officers Anthony Gemignani, Michael Callahan, Roy Mazzanti, Adolfo Garcia, Kris Stipanov, Mario Cruz, Nicholas Cordova, Thomas Laurin, Patrick Kelly, Daniel Schmit, Anthony Rosen, and Gerardo Vega. (SAC ¶¶ 31–34.)

Key to Plaintiffs' putative class definition is the CPD's use of Contact Information Cards ("contact cards"). According to CPD Special Order S04-13-09 ("Special Order"), the Chicago Police Department used contact cards to document investigatory stops and enforcement of the City's Gang and Narcotics-Related Loitering Ordinances. (Pls.' Mot. Ex. 19.) Officers do not create a contact card if the interaction results in a citation or arrest. (*Id.* at 22.) The Special Order instructs police officers to document the facts and circumstances of an investigatory stop—including the facts establishing reasonable, articulable suspicion to stop an individual—on contact cards. (*Id.* Ex. 19.) Each contact card includes a series of check boxes where the officer may indicate the "type of contact" with the individual, such as "traffic related," "crime victim," "suspicious person," or "other." (*Id.* at 17.) Each contact card also has a blank box where the officer may indicate the race of the encountered individual. (*Id.*) In addition, each contact card provides several blank lines for the officer to write a narrative about the interaction. (*Id.*)

Based on the CPD's contact-cards system, Plaintiffs seek to represent two putative classes:

> (1) Fourth Amendment Class: All persons subjected to an investigatory stop by the Chicago Police Department at any time since April 20, 2013, which resulted in the creation of a contact card; and

> (2) All ***African-Americans and Hispanics*** subjected to an investigatory stop by the Chicago Police Department at any time since April 20, 2013, which resulted in the creation of a contact card.

Alternately, Plaintiffs request certification of four narrower classes:

> (3) Fourth Amendment Class: All persons who were encountered by the Chicago Police Department for enforcement of the ***Gang and Narcotics Loitering***

***Ordinance*** at any time since April 20, 2013, which resulted in the creation of a contact card;

(4) All ***African-Americans and Hispanics*** who were encountered by the Chicago Police Department for enforcement of the ***Gang and Narcotics Loitering Ordinance*** at any time since April 20, 2013, which resulted in the creation of a contact card;

(5) All persons subjected to an investigatory stop by the Chicago Police Department at any time since April 20, 2013, which resulted in the creation of a contact card that contains ***no narrative***; and

(6) All ***African-Americans and Hispanics*** who were subjected to an investigatory stop by the Chicago Police Department at any time since April 20, 2013, which resulted in the creation of a contact card that contains ***no narrative***.[3]

On behalf of the proposed classes, Plaintiffs seek compensatory and punitive damages.

As another alternative, Plaintiffs seek certification of particular issues under Rule 23(c)(4), including "[w]hether the CPD's General Order on racial profiling and/or Special Order on gang and narcotics loitering are unconstitutional," "[w]hether CPD's policies and practices for investigatory stops were intended to target minorities," and "[w]hether CPD policymakers were deliberately indifferent to the known or obvious consequences of their actions in the context of investigatory stops." (Pls.' Reply Brief in Support of Their Motion for Rule 23(b)(3) Class Certification ("Pls.' Reply") at 49–50, Dkt. No. 332.)

## DISCUSSION

As a preliminary matter, the Court first addresses Defendants' motion for leave to file a surreply to Plaintiffs' motion for class certification and Plaintiffs' motion for leave to file a sur-surreply. (Dkt. Nos. 347, 350.) The decision whether to grant a motion for leave to file a surreply

---

[3] In Defendants' surreply, they argue that Plaintiffs have waived their request for certification of the four narrower classes by failing to propose them in their original motion and instead raising them for the first time in their reply brief. The Court finds this argument unpersuasive, however, as under Rule 23(c), the Court has authority to alter or amend a class certification order defining the class and the class claims, issues, or defenses at any time before entry of final judgment. Fed. R. Civ. P. 23(c).

is a matter of the Court's discretion. *Johnny Blastoff, Inc. v. L.A. Rams*, 188 F.3d 427, 439 (7th Cir. 1999). Allowing the filing of a surreply may be appropriate to allow a party to respond to new arguments made in a reply brief. *See Univ. Healthsys. Consortium v. UnitedHealth Grp., Inc.*, 68 F. Supp. 3d 917, 922 (N.D. Ill. 2014). In this case, Plaintiffs proposed the four narrower classes and sought certification of particular issues under Rule 23(c)(4) for the first time in their reply brief. Therefore, the Court in its discretion previously granted Defendants leave to file a surreply to respond to Plaintiffs' proposals. (*See* Dkt. No. 378.)

In their own request for leave to file what would essentially be a sur-surreply, Plaintiffs contend that the City's arguments in its surreply are "largely regurgitations of the same arguments in its response brief" while simultaneously claiming that "there are representations in the City's brief that Plaintiffs would need to address," with no further explanation. Plaintiffs also assert that as the moving party, they should have the final world. The Court finds Plaintiffs' position unpersuasive and, in its discretion, denies Plaintiffs' request to file yet another brief in response to Defendants' surreply. As Plaintiffs themselves recognize, "this Court has more than enough briefing on this matter to fully and fairly adjudicate the issue," and "at some point, briefing must end." (Pl.'s Opp'n to Def. City of Chicago's Mot. for Leave to File a Surreply at 1–2, Dkt. No. 350.)

## I.      Class Certification

The Court now turns to Plaintiffs' motion for class certification. Federal Rule of Civil Procedure 23 permits individual plaintiffs to sue as representatives of an aggrieved class but nonetheless imposes upon the Court a gatekeeping function for all class actions. *See* Fed. R. Civ. P. 23. The district court has broad discretion to determine whether to certify a class action. *See Mira v. Nuclear Measurements Corp.*, 107 F.3d 466, 471 (7th Cir. 1997). To be certified, a

proposed class must first satisfy all four requirements of Rule 23(a): (1) the class must be so numerous that joinder of all members is impracticable ("numerosity"); (2) there must be questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class ("typicality"); and (4) the representative parties must fairly and adequately protect the interests of the class ("adequacy"). Fed. R. Civ. P. 23(a). And where certification is sought under Rule 23(b)(3), as is the case here, the plaintiffs must also show that questions of law or fact common to the members of the proposed class predominate over any questions affecting only individual class members and that a class action is the superior method of resolving the controversy. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

Moreover, "[o]n issues affecting class certification . . . a court may not simply assume the truth of the matters as asserted by the plaintiff." *Id.* "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rather, plaintiffs seeking class certification must affirmatively demonstrate their compliance with the rule—they must be prepared to prove that there are in fact sufficiently numerous plaintiffs and common questions of law or fact, for example. *See id.* Class certification is proper only if a court, after a "rigorous analysis," determines that the Rule 23 requirements have been satisfied. *Id.* at 350–51 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). Thus, "[p]laintiffs bear the burden of showing that a proposed class satisfies the Rule 23 requirements, but they need not make that showing to a degree of absolute certainty." *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 377 (7th Cir. 2015).

## A. Numerosity

Rule 23(a)(1) requires a showing that the class is "so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). While the rule does not require any specific minimum number of plaintiffs, the Seventh Circuit has recognized that a class of 40 members is generally considered sufficient. *See Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 859 (7th Cir. 2017). Plaintiffs here have put forward evidence demonstrating that each of their six proposed classes has potentially thousands of members. For the purposes of the present analysis, the Court focuses on Class 6, which is likely the smallest of Plaintiffs' proposed classes. If the smallest proposed class satisfies the numerosity requirement, the other classes necessarily do as well.

Plaintiffs' proposed Class 6 consists of "[a]ll African-Americans and Hispanics who were subjected to an investigatory stop by the Chicago Police Department at any time since April 20, 2013, which resulted in the creation of a contact card that contains no narrative." Plaintiffs retained F. Eli Nelson of the Claro Group, LLC, a data analytics company, to analyze the 471,339 contact cards from April 20, 2013 through December 30, 2015 contained within the CPD's Contact Information Database. (Pls.' Reply at 29.) According to Nelson, 2,154 of those contact cards contain no narrative. (*Id.* at 22.) Nelson also represents that of the 471,339 contact cards from the relevant period, 69% indicate that the individual was black, and 19% indicate that he was Hispanic. (*Id.* at 23.) Those numbers suggest that approximately 1,895 (88% of 2,154) of the contact cards document a police encounter with an African-American or Hispanic individual and contain no narrative. Therefore, even assuming some overlap between the contact cards (*e.g.*, a single proposed class member who had multiple encounters with police officers that resulted in the creation of a contact card), Class 6 easily clears the numerosity hurdle. And again, if Class 6,

which is likely Plaintiffs' smallest proposed class, is sufficiently numerous, the other classes must be as well. Therefore, the Court finds that all six of Plaintiffs' proposed classes meet Rule 23(a)'s numerosity requirement.

### B. Commonality

Turning to commonality, Rule 23(a)(2) requires that there be questions of law and fact common to the class. To satisfy the commonality requirement, the claims of the proposed class members "must depend upon a common contention that is capable of class-wide resolution." *Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 434 (7th Cir. 2015). The determination of the truth or falsity of the common contention must "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350.

Plaintiffs in this case have identified their proposed class members based exclusively on contact cards. According to Plaintiffs, all individuals identified on a contact card on or after April 30, 2013 suffered the same injury—the violation of their Fourth Amendment right against unreasonable seizure by Defendants. But to demonstrate such an injury, a plaintiff must make two showings: (1) that he was actually seized—here, subjected to a *Terry* stop by a Chicago police officer—and (2) that the seizure was unconstitutional—here, because the officer who stopped him did not have reasonable suspicion that the plaintiff committed a crime or was about to do so. *See Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000); *Terry*, 392 U.S. at 16. These are both fact-intensive, highly individualized inquiries, which are not well-suited for common resolution. *See Riffey v. Rauner*, 910 F.3d 314, 319 (7th Cir. 2018) (finding lack of commonality where "the question whether damages are owed for many, if not most, of the proposed class members can be resolved only after a highly individualized inquiry." (internal quotation marks omitted)).

Whether a person has been seized within the meaning of the Fourth Amendment depends on, "if, *in view of all the circumstances surrounding the incident*, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (emphasis added). "Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also *with the setting* in which the conduct occurs." *Id.* (emphasis added); *see also United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000) ("The [Fourth] amendment does not prevent all encounters between the police and citizens. It comes into play when a police officer uses physical force or a show of authority to restrain the liberty of a citizen."). The factfinder must weigh multiple factors to decide whether a seizure occurred, such as what the police officer did and said, the characteristics of the individual, and the setting of the interaction. *United States v. Smith*, 794 F.3d 681, 684 (7th Cir. 2015) ("Circumstances that suggest a seizure include 'the threatening presence of several officers, display of their weapons, physical touching of the private citizen, use of forceful language or tone of voice (indicating that compliance with the officers' request might be compelled), and the location in which the encounter takes place.").

For example, in *J.D.B. v. North Carolina*, 564 U.S. 261 (2011), the petitioner was a 13-year old student who was removed from his classroom by a uniformed police officer, escorted to a closed-door conference room, and questioned for at least 30 minutes. *Id.* at 265. In deciding whether a reasonable person in that situation would have felt free to leave, the Supreme Court found that the child's age was relevant to the analysis. *Id.* at 272. The Court explained that "a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go." *Id.* ("[Children] are more vulnerable or susceptible to outside pressures than adults . . . events that would leave a man cold and unimpressed can

overawe and overwhelm a lad in his early teens."). Here, Plaintiffs' proposed classes include individuals spanning a wide range of ages, including one as young as twelve years old. (*See* SAC ¶ 17.) Yet Plaintiffs do not take each individual's age into consideration before concluding that the individual was unconstitutionally stopped; instead, they rely solely on the fact that his or her name appeared on a contact card.

Recent case law is rife with other examples where the court's decision regarding whether a seizure occurred turned on often subtle factual distinctions. *Compare Yarbrough v. Alvarado*, 541 U.S. 652, 665 (2004) (finding no seizure where police officer "appealed to [the defendant's] interest in telling the truth and being helpful to a police officer") *with Huff v. Reichert*, 744 F.3d 999, 1006 (7th Cir. 2014) (finding seizure where police officer told defendant if he left, he would be arrested). For example, in *United States v. Burton*, 441 F.3d 509, 511 (7th Cir. 2006), the court decided that the defendant had been seized when police officers placed their bikes on either side of the defendant's car. The *Burton* court reasoned that "the police placed their bikes where they did in order to make sure that [the defendant] didn't drive away before they satisfied themselves that there was no criminal activity afoot." *Id.* But even an officer physically touching an individual might not constitute a seizure *per se*. *See, e.g.*, *Carlson v. Bukovic*, 621 F.3d 610, 620 (7th Cir. 2010) (holding that jury should decide whether officer's touch of plaintiff constituted a seizure because it "may have been so light and so momentary that it did not convey, to the objective observer, a demonstration of anything more than encouragement that she leave the area"). The case law illustrates the necessity of individualized inquiries into each police-civilian encounter.

In the same way, "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125.

Whether an officer had reasonable suspicion sufficient to support a *Terry* stop depends on "the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *United States v. Grogg*, 534 F.3d 807, 810 (7th Cir. 2008). Indeed, in *United States v. Arvizu*, 534 U.S. 266, 274 (2002), the Supreme Court explained, "We think it quite reasonable that a driver's slowing down, stiffening of posture, and failure to acknowledge a sighted law enforcement officer might well be unremarkable in one instance (such as a busy San Francisco highway) while quite unusual in another (such as a remote portion of rural southeastern Arizona)." For example, in *United States v. Williams*, 731 F.3d 678, 686 (7th Cir. 2013), the Seventh Circuit found that the police officer did not have a reasonable suspicion that the defendant had a gun even though the defendant had his hands near his waistband, avoided eye contact, and started to move away from the area upon the officer's arrival. Yet in *United States v. Richmond*, 641 F.3d 260, 262 (7th Cir. 2011), the court concluded that the police officer did have reasonable suspicion where he observed a "conspicuous bulge above [the defendant]'s waistband that was consistent with a revolver handle." These examples illustrate that determining whether a police officer had a reasonable suspicion to justify a stop is a complex, fact-intensive inquiry. Because the constitutionality of each class member's stop depends on the circumstances of the stop and the knowledge of the police officer, Plaintiffs cannot show that their proposed class satisfies the requirement of commonality. *See Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 375 (7th Cir. 2015) ("Cases in which low-level [employees] use their given discretion to make individual decisions . . . do not satisfy commonality because the evidence varies from plaintiff to plaintiff.").

The Court's conclusion here is consistent with the Supreme Court's holding in *Wal-Mart*, which rejected a proposed nationwide class of employees alleging racial discrimination by their

respective managers. 564 U.S. at 350. The *Wal-Mart* court reasoned: "Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury . . . gives no cause to believe that all their claims can productively be litigated at once. Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the **same supervisor**." *Id.* (emphasis added). In the same way, the mere claim by Plaintiffs that all class members have suffered a Fourth Amendment injury by a Chicago police officer cannot satisfy Rule 23(a)'s requirement of commonality. Plaintiffs' proposed class consists of hundreds of thousands of individuals who interacted with a multitude of police officers—indeed, Plaintiffs have already named nearly 60 police officers as Defendants.

Plaintiffs include a list of twelve questions that they contend are common to all members of the proposed classes. However, the commonality requirement is not met by simply raising common questions; rather, Plaintiffs must show "the capacity of a classwide proceeding to generate common **answers** apt to drive the resolution of the litigation." *Id.* (emphasis in original); *see also id* at 349 ("[A]ny competently crafted class complaint literally raises common questions. For example: Do all of us plaintiffs indeed work for Wal-Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get? Reciting these questions is not sufficient to obtain class certification."). Nor is it sufficient for Plaintiffs to allege that all proposed class members have suffered a deprivation of their Fourth Amendment rights, which could occur in a variety of ways. *See id.* (finding lack of commonality even though proposed class alleged violation of Title VII because the statute "can be violated in many ways— by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company"). As explained above, due to the fact-dependent inquiries that must be conducted for each class

member's Fourth Amendment claim, Plaintiffs' class cannot be certified because they have not

and cannot identify a common answer that will resolve all class members' claims "in one

stroke." *Id.*[4]

Plaintiffs attempt to circumvent the individualized inquiries required for each proposed

class member's Fourth Amendment claim by contending that the CPD's general policies

influenced all the individual police officers' behavior. In *Wal-Mart*, the Supreme Court

acknowledged that "significant proof that a [defendant] operated under a general policy . . .

conceivably could justify a class." 564 U.S. at 353; *see also Phillips v. Sheriff of Cook Cty.*, 828

F.3d 541, 551 (7th Cir. 2016) (recognizing that "an illegal policy might provide the glue

necessary to litigate otherwise highly individualized claims as a class" (internal quotations

omitted)). Because Plaintiffs propose six distinct classes, the Court addresses the applicable

policies associated with each class in turn.

### *Proposed Classes 1 and 2: Persons with a Contact Card*

To support their first two proposed classes, Plaintiffs label as a general policy a directive

from Chicago Police Superintendent McCarthy to increase the creation of contact cards. Because

the CPD did not have a written policy to this effect, Plaintiffs offer circumstantial evidence of

the policy's existence. Plaintiffs reference summaries from regular meetings among command-

level personnel, during which McCarthy presented rankings of how many contact cards had been

created in various districts across the City. Plaintiffs also include quotes by McCarthy and other

---

[4] Plaintiffs also claim that they have minimized individualized issues because their experts have "forensically categorized a[n]d analyzed" approximately 1.8 million contact cards from the class period and identified a subset of contact cards that reflect unconstitutional investigatory stops. However, Plaintiffs rely heavily on the expert testimony of F. Eli Nelson and Timothy J. Longo, Sr. to suggest that the contact cards they have isolated represent only unconstitutional stops. As will be explained in this Court's separate ruling granting Defendants' *Daubert* motion, Nelson and Longo's testimony may not be utilized for such a purpose.

higher-ups within the CPD, which emphasizes the importance of creating more contact cards and criticizes commanders and deputy chiefs whose districts did not have enough contact cards.

However, Plaintiffs' only argument that such a policy would be unconstitutional is a footnote stating, "Illinois law prohibits the use of quotas for traffic citations . . . . If it is illegal to use a quota or performance standard for the issuance of citations, it must also be illegal to use a quota or performance standard for issuance of contact cards." Plaintiffs cite no case law or other authority to support this inference, and the Court is not convinced that the comparison is apt. As the Seventh Circuit has made clear, a violation of state law does not necessarily equate to a violation of the Constitution. *See River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 166 (7th Cir. 1994) ("[T]he Constitution does not require state and local governments to adhere to their . . . promises. Failure to implement state law violates that state law, not the Constitution; the remedy lies in state court." (internal citation omitted)); *see also Kompare v. Stein*, 801 F.2d 883, 888 (7th Cir. 1986) ("[C]ertainly not all violations of state law rise to the level of constitutional tort. Many state statutes establish rights and procedures not required by the Constitution." (internal quotation marks and citations omitted)).

But more importantly, even if the CPD had a policy that encouraged officers to write as many contact cards as possible, the existence of such a policy is not "the common answer that potentially drives the resolution of this litigation." *Bell*, 800 F.3d at 374 (certifying class of plaintiffs seeking overtime wages where plaintiffs demonstrated that defendant-employer had unlawful policy of denying overtime wages). As explained above, the resolution of this litigation depends on whether Plaintiffs were subjected to unconstitutional investigatory stops. The CPD's official policy on investigatory stops reflects the correct constitutional standard, instructing officers that they must "reasonably infer[] from the circumstances that the person is committing,

is about to commit, or has committed an offense." (Pls.' Mot. Ex. 19); *see also Wal-Mart*, 564

U.S. at 353 (recognizing that "Wal-Mart's announced policy forbids sex discrimination."); *Hall*

*v. City of Chi.*, 2012 WL 6727511, at *4 (N.D. Ill. Dec. 28, 2012) (holding that the Special Order

"is not a policy that permits officers to conduct seizures absent reasonable suspicion, unless

encounters are voluntary").

At best, Plaintiffs' argument can be construed as asserting that the CPD's use of quotas—

a facially neutral policy that encouraged officers to write more contact cards—resulted in an

increased number of unconstitutional stops. But their only evidence is a conclusory statement

that "Commanders . . . would call out their subordinates . . . and set production standards for

contact cards." (Pls.' Mot. at 22.) Whether the CPD's directive to increase contact cards actually

influenced individual police officers' motivations for conducting investigatory stops and the rate

at which this phenomenon occurred is completely unknown. *Compare Wal-Mart*, 564 U.S. at

354 (finding insufficient proof where plaintiffs' sociologist expert "could not calculate whether

0.5 percent or 95 percent of the employment decisions at Wal-Mart might be determined by

stereotyped thinking") *with Bell*, 800 F.3d at 375 (finding sufficient proof in the form of

affidavits from individual supervisors explaining that they denied overtime pay requests due to

company policy). Moreover, the Supreme Court has established that a police officer's ***actual***

motivation for making a stop is irrelevant to the reasonableness of the stop for purposes of the

Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions

play no role in ordinary . . . Fourth Amended analysis."). Accordingly, even if a police officer's

real reason for making an investigatory stop was to comply with the CPD's quota directive, the

stop may still be constitutional. *Id.* at 810; *see, e.g.*, *United States v. Taylor*, 596 F.3d 373, 377

(7th Cir. 2010) ("[Defendant]'s argument . . . that the traffic stop was a pretext for a drug

investigation, and that the primary objective is relevant in determining the reasonableness of a search and seizure . . . has been repeatedly rejected by the Supreme Court.").

Ultimately, Plaintiffs have not met their burden of offering significant proof that the CPD had a general policy that caused its officers to conduct unconstitutional investigatory stops.

### *Proposed Classes 3 and 4: Persons Whose Contact Cards Reflect Enforcement of the Gang and Narcotics Loitering Ordinance*

In constructing their third and fourth proposed classes, Plaintiffs argue that the CPD's Special Order on Gang and Narcotics-Related Loitering ("Loitering Special Order") operates as a general policy authorizing the individual police officers' unconstitutional behavior. The Loitering Special Order instructs officers who observe one or more gang members engaged in "gang loitering" in a designated "hot spot" to order the individuals to disperse, lest they be arrested. However, the Loitering Special Order likewise cannot serve as a "glue" linking the proposed class members' claims together.

Plaintiffs' contention that a contact card mentioning loitering provides irrebuttable proof of an investigatory stop finds no support in the record. The CPD policy setting forth the purpose of the contact-cards system states that the contact cards document "Investigatory Stops **and** the enforcement of the Gang and Narcotics-Related Loitering Ordinances," indicating that these are two distinct categories. (Pls.' Mot. Ex. 19 (emphasis added).) As further support for this interpretation, the Loitering Special Order does not instruct police officers to interview, detain, or otherwise stop suspected loiterers—rather, it instructs officers to order their dispersal.[5] (*Id.*)

---

[5] Plaintiffs include as an exhibit to their motion for class certification Timothy Longo's expert report, which quotes several contact card narratives in which the police officer appear to be enforcing the Loitering Special Order. Several of those contact-card narratives, which Plaintiffs assert represent unconstitutional stops, merely describe dispersal; for example, "7497422: Location Code 303 Sidewalk Above dispersed for narcotic loitering," and "3980192: Dispersed for loitering in Hot Spot 4." (Pls.' Mot. Ex. 25:21–22.)

Indeed, several of the contact cards included by Plaintiffs in their proposed class offer no evidence of any police interaction beyond an order of dispersal. (Pl.'s Mot. Ex. 26:20–23 (*e.g.*, "Above dispersed for narcotic loitering," "303 sidewalk, above issued a gang dispersal," "Dispersed for loitering in Hot Spot 4").) And even the fact that some contact cards may contain information about the individual gathered by the police officer—indicating that the officer did more than just order the individual to leave—does not necessarily mean a seizure occurred. *See United States v. Drayton*, 536 U.S. 194, 201 (2002) ("Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means. If a reasonable person would feel free to terminate the encounter, then he or she has not been seized."); *Hall v. City of Chi.*, 989 F. Supp. 2d 699, 705 (N.D. Ill. Oct. 30, 2013) ("[A]n officer does not effect a seizure by asking for identification and writing down that person's information, if the identification is returned promptly."). Undoubtedly, ***some*** of the contact cards documented seizures in the form of investigatory stops, pat-downs, or field interviews. But ultimately, Plaintiffs have failed to show that the Loitering Special Order functioned as a general policy that caused individual CPD officers to violate individuals' constitutional rights.

<u>*Proposed Classes 5 and 6: Persons Whose Contact Cards Have No Narrative*</u>

Finally, Plaintiffs' fifth and sixth proposed classes consist of subsets of individuals whose encounters with the police resulted in contact cards with no narratives. Unlike Classes 1–4, Plaintiffs do not identify a general policy linking these two classes together. Nonetheless, Plaintiffs contend that because the CPD's policies and procedures require police officers to describe the factual basis for their reasonable suspicion on contact cards, a police officer's failure to do so definitively proves that he had no reasonable articulable suspicion.

The Court disagrees. First, Plaintiffs do not argue that the Fourth Amendment conveys a right to proper and complete documentation of police encounters, and the Court is not aware of any legal basis for such a claim. *See United States v. Nelson*, 385 Fed. App'x. 566, 568 (7th Cir. 2010)[6] (affirming district court's denial of motion to suppress despite "officers' failure to document in their reports many of the facts to which they testified"); *Moore v. City of Chi.*, 2011 WL 1231318, at *3 (N.D. Ill. Mar. 30, 2011) (considering officer's failure to fill out any paperwork documenting arrest as one piece of evidence suggesting an unreasonable seizure).

In addition, there are many possible explanations for why a contact card may be blank in the narrative section; for example, perhaps no investigatory stop occurred. As discussed above, the Court rejects Plaintiffs' theory that every contact card represents a *Terry* stop, because whether a seizure occurred depends on the specific facts of each encounter and requires an examination of the totality of the circumstances. Plaintiffs' filtering of contact cards with blank narrative sections cannot substitute for this inquiry. Another potential explanation is the police officer's negligence or recklessness in failing to complete the contact card after an entirely lawful *Terry* stop. While an officer's failure to fill out the contact card's narrative section after an investigatory stop may violate CPD policy, it does not necessarily follow that the officer has violated the Constitution. *See United States v. Brown*, 871 F.3d 532, 537 (7th Cir. 2017) ("[A] police officer's violation of departmental policy is completely immaterial on the question whether a violation of the federal constitution has been established." (internal quotations omitted)). And to the extent Plaintiffs suggest that blank narrative sections represent efforts by police officers to cover up their unconstitutional conduct, Plaintiffs have mischaracterized these

---

[6] *Nelson* is an unpublished Seventh Circuit order issued after January 1, 2007. Although not precedential, the order's reasoning is persuasive and provides a useful point of comparison here. *See* Fed. R. App. P. 32.1(a); 7th Cir. R. 32.1(b).

proposed classes as invoking the Fourth Amendment. *See Vasquez v. Hernandez*, 60 F.3d 325, 328–29 (7th Cir. 1995) (holding that the basis for a claim that the defendant violated the plaintiff's constitutional rights by covering up unconstitutional conduct lies in the First Amendment right of access to the courts).

As a final note, because Plaintiffs cannot satisfy the commonality requirement for their first, third, and fifth proposed Fourth Amendment classes, they also cannot do so for the accompanying Fourteenth Amendment classes (which are identical except that they consist of only black and Hispanic individuals from the Fourth Amendment classes). Having determined that Plaintiffs failed to prove commonality for any of their six proposed classes, the Court need not inquire into the remaining Rule 23(a) issues of typicality and adequacy, nor whether a class action is the superior method of adjudicating this dispute. *See Harper v. Sheriff of Cook Cty.*, 581 F.3d 511, 514 (7th Cir. 2009) (decertifying class for lack of commonality); *e.g.*, *Smith v. Sheriff of Cook Cty.*, 2008 WL 1995059, at *3 (N.D. Ill. May 6, 2008) ("Since the Plaintiffs have failed to demonstrate commonality and typicality the Court must deny the Motion for Class Certification and need not consider the other elements required by [Rule 23]."); *Penn. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 286 F.R.D. 355, 375 (N.D. Ill. 2012) ("[T]he Court concludes that plaintiffs have failed to show that common issues predominate. Certification as a Rule 23(b)(3) class is therefore not appropriate. For this reason, the Court need not consider Rule 23(b)(3)'s superiority requirement."). Therefore, the Court denies Plaintiffs' motion for Rule 23(b)(3) class certification.

## II. Certification of Issues Under Rule 23(c)(4)

Finally, Plaintiffs request as an alternative to Rule 23(b)(3) certification that a class be certified as to certain issues pursuant to Rule 23(c)(4). This provision of the Federal Rules of

Civil Procedure provides: "When appropriate, an action may be maintained as a class action with respect to particular issues." In deciding whether to certify an issues-only class, efficiency is the key consideration. *See* 7AA Wright & Miller, *Federal Practice and Procedure* § 1790 (3d ed. 2005) (explaining that issues-only class should not be certified where "noncommon issues are too unwieldy or predominant to permit the efficient management of the litigation"); *Clark v. Experian Info. Sols., Inc.*, 256 Fed. App'x. 818, 822 (7th Cir. 2007) (affirming denial of issues-only class certification where, "[b]ecause of the need for individualized findings in such a large class, little efficiency would be gained by certifying a class for only particular issues").[7] For example, the Seventh Circuit has repeatedly affirmed issues-only class certification where the common issue of liability and the individual issues of damages can be neatly severed. *See, e.g.*, *Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010) (affirming certification of issues-only class for question of product defectiveness); *Carnegie v. Household Int'l*, 376 F.3d 656 (7th Cir. 2004) (affirming certification of issues-only class for question of whether defendants violated Racketeer Influenced and Corrupt Organizations Act).

Plaintiffs contend that common issues related to the CPD's policies and practices are appropriate for class-wide resolution because these policies and practices caused each class members' individual damages. Plaintiffs propose common questions such as "[w]hether the CPD has a policy or practice making investigatory stops without reasonable articulable suspicion," "[w]hether CPD's policies and practices for investigatory stops were intended to target minorities," and "[w]hether CPD policymakers were deliberately indifferent to the known or obvious consequences of their actions in the context of investigatory stops." (Pl.'s Reply at 49–

---

[7] *Clark* is an unpublished Seventh Circuit order issued after January 1, 2007. Although not precedential, the order's reasoning is persuasive and provides a useful point of comparison here. *See* Fed. R. App. P. 32.1(a); 7th Cir. R. 32.1(b).

50.) These issues may indeed be common to Plaintiffs' proposed classes, as they potentially enable each class member to establish *Monell* liability against the City. However, the Court finds here that the common issues proposed by Plaintiffs are not the "essence of the dispute" in this case, *Saltzman*, 606 F.3d at 393. As explained above, liability for a Fourth Amendment violation cannot be established without proving that a stop occurred and that the police officer did not have reasonable articulable suspicion for the stop. In the end, the noncommon issues—the underlying facts of each police-individual encounter documented on each contact card—are too unwieldy or predominant to permit efficient management of an issues-only class.

A similar issues-only class was proposed and rejected by the district court in *Otero v. Dart*, 301 F.R.D. 276 (N.D. Ill. 2013). In *Otero*, the plaintiffs attempted to propose an issues-only class for similarly-situated former detainees at Cook County Jail, based on common questions of the "existence and constitutionality of Defendants' release procedures." *Id.* at 283 n.4. In declining to certify the class, the *Otero* court reasoned that proving an unconstitutional detention requires individualized inquiries into the length of an individual's detention and the potential justifications for the delay in that individual's release. *Id.* at 284. In the same way, Plaintiffs cannot prove an unconstitutional seizure without individualized inquiries into the totality of circumstances surrounding the creation of each contact card—they cannot simply point to certain CPD policies and practices.

Therefore, the Court denies Plaintiffs' request to certify a class for particular issues under Rule 23(c)(4).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for Rule 23(b)(3) class certification (Dkt. No. 277) is denied. In so ruling, however, the Court expresses no view on whether the

shortcomings of Plaintiffs' proposed Rule 23(b)(3) class would similarly preclude certification of a Rule 23(b)(2) class.

ENTERED:

Dated: May 29, 2019

_____
Andrea R. Wood
United States District Judge