IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DARNELL SMITH, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | No. 15-cv-03467 |
| v. ) | |
| ) | Judge Andrea R. Wood |
| CITY OF CHICAGO, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Darnell Smith and the other named plaintiffs in this putative class action ("Plaintiffs") have sued the City of Chicago ("City"), Chicago Police Superintendent Gary McCarthy, and various other named and unnamed Chicago Police Department ("CPD") officers (collectively, "Defendants") for alleged violations of the Fourth Amendment to the United States Constitution, as explained in the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1 (1968).[1] Specifically, Plaintiffs allege that the CPD has a policy and practice of conducting unconstitutional investigatory stops without reasonable suspicion. To assist in defining their proposed classes, Plaintiffs' rely on the CPD's use of Contact Information Cards ("contact cards") to document investigatory stops and enforcement of the City's Gang and Narcotics-Related Loitering Ordinances by police officers. Plaintiffs retained three expert witnesses to assist them in sorting through more than three million contact cards produced in discovery by the CPD and defining their class. Defendants ask the Court to exclude the testimony of all three experts. (Dkt. No.

---

[1] In *Terry*, the Supreme Court held that under the Fourth Amendment, police officers may conduct a brief investigatory stop (or *Terry* stop) but only with reasonable suspicion that an individual has committed, is committing, or is about to commit a crime. *Terry*, 392 U.S. at 27; *see also United States v. Williams*, 731 F.3d 678, 683 (7th Cir. 2013) (citing *Terry* for the proposition that "[p]olice officers may detain a suspect for a brief investigatory stop if they have a reasonable suspicion based on articulable facts that a crime is about to be or has been committed" (internal quotation marks omitted)).

315.) Also before the Court are the City's motion for sanctions for one expert's purported failure to disclose his methodology pursuant to Federal Rule of Civil Procedure 26(a)(2)(B)(i) (Dkt. No. 327), and Plaintiffs' cross-motion for sanctions pursuant to 28 U.S.C. § 1927 (Dkt. No. 344). For the reasons set forth below, Defendants' motion to exclude Plaintiffs' expert witnesses is granted in part and denied in part, while both the City's motion for sanctions and Plaintiffs' cross-motion for sanctions are denied.

## BACKGROUND

In their Sixth Amended Complaint, Plaintiffs allege that Defendants have implemented, applied, and continued to enforce a policy or custom of unconstitutional stops and frisks of Chicago residents by the CPD, which have been conducted without the reasonable articulable suspicion required by the Fourth Amendment. (Sixth Am. Compl. at Law ("SAC") ¶ 3, Dkt. No. 177.) Plaintiffs allege that they reside in or visit neighborhoods where the CPD has conducted these unconstitutional stops and frisks, and some of them claim to be victims themselves. (*Id.* ¶¶ 12–30.) In this putative class action, Plaintiffs seek to represent themselves and the "many thousands of victims" of unconstitutional stops and frisks by CPD officers. (Pls.' Mot. for Rule 23(b)(3) Class Certification ("Pls.' Class Cert. Mot.") at 7, Dkt. No. 277.)

Consistent with CPD Special Order S04-13-09 ("Special Order"), the CPD has used contact cards to document investigatory stops and enforcement of the City's Gang and Narcotics-Related Loitering Ordinances. (Pls.' Class Cert. Mot., Ex. 19.) Officers do not create a contact card if the interaction results in a citation or arrest. (Pls.' Class Cert. Mot. at 22.) Plaintiffs here retained three expert witnesses to assist them in sorting through more than three million contact cards produced by the CPD. Plaintiffs' first expert, F. Eli Nelson, is a data analyst who used keywords and Boolean logic to search and sort through the contact cards; for example, Nelson

identified certain cards as documenting "Unconstitutional Stops" and filtered out cards he perceived as documenting "non-stops" and "Potentially Permissible Stops." (*Id.* at 48–49.) Plaintiffs offer their second expert, Timothy J. Longo, Sr., as a police-practices expert. (*Id.* at 53.) Longo reviewed over 10,000 contact cards randomly-selected from those identified by Nelson as "Unconstitutional Stops" and, after reviewing the narrative section of each card, purports to have confirmed whether the police officer indeed made an unconstitutional stop. (*Id.* at 53–55.) Finally, Plaintiffs' third expert, Andrew J. Cook, is a statistician who opines that Longo reviewed enough individual contact cards to support a 95% confidence level in Nelson's methodology. (*Id.* at 55.)

Based on their experts' testimony, Plaintiffs proposed six potential classes for certification under Federal Rule of Evidence 23(b)(3):

> (1) Fourth Amendment Class: All persons subjected to an investigatory stop by the Chicago Police Department at any time since April 20, 2013, which resulted in the creation of a contact card;
>
> (2) All ***African-Americans and Hispanics*** subjected to an investigatory stop by the Chicago Police Department at any time since April 20, 2013, which resulted in the creation of a contact card;
>
> (3) Fourth Amendment Class: All persons who were encountered by the Chicago Police Department for enforcement of the ***Gang and Narcotics Loitering Ordinance*** at any time since April 20, 2013, which resulted in the creation of a contact card;
>
> (4) All ***African-Americans and Hispanics*** who were encountered by the Chicago Police Department for enforcement of the ***Gang and Narcotics Loitering Ordinance*** at any time since April 20, 2013, which resulted in the creation of a contact card;
>
> (5) All persons subjected to an investigatory stop by the Chicago Police Department at any time since April 20, 2013, which resulted in the creation of a contact card that contains ***no narrative***; and

(6) All *African-Americans and Hispanics* who were subjected to an investigatory stop by the Chicago Police Department at any time since April 20, 2013, which resulted in the creation of a contact card that contains **no narrative**.

(*Id.* at 57; Pls.' Reply Brief in Support of their Mot. for Rule 23(b)(3) Class Certification at 17, Dkt. No. 332.) For reasons explained in a prior Memorandum Opinion and Order, this Court denied Plaintiffs' motion for certification of the proposed Rule 23(b)(6) class. (Dkt. No. 388.) In so ruling, the Court indicated that Plaintiffs could not use their proffered expert testimony to support their claim to have identified a subset of contact cards that reflect unconstitutional stops. The Court now expounds on that determination in ruling on the pending motions to exclude the expert testimony and for sanctions.

## DISCUSSION

### I.     The City's Motion to Exclude Expert Testimony

Federal Rule of Evidence 702 governs the admissibility of expert evidence in federal court. It provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under this rule, expert testimony must not only assist the trier of fact, it must also demonstrate sufficient reliability. *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). "[T]he district court serves as a 'gatekeeper' whose role is to ensure that an expert's testimony is reliable and relevant." *Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 409

(7th Cir. 2014). The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* laid out four factors by which courts may evaluate the reliability of expert testimony: (1) whether the expert's conclusions are falsifiable; (2) whether the expert's method has been subject to peer review; (3) whether there is a known error rate associated with the technique; and (4) whether the method is generally accepted in the relevant scientific community. 509 U.S. 579, 593–94 (1993). This list is neither exhaustive nor mandatory and, ultimately, reliability is determined on a case-by-case basis. *Textron, Inc.*, 807 F.3d at 835. The proponent of the expert testimony bears the burden of demonstrating that the expert testimony satisfies the *Daubert* standard. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

    A.    **F. Eli Nelson**

The Court first considers Nelson's proposed testimony. Nelson is the director of The Claro Group, LLC, a data analytics firm experienced in analyzing large quantities of data for litigation purposes. (Pls.' Class Cert. Mot. at 48; *see also id.* Ex. 7.) Nelson and his associates used keywords and Boolean[2] search logic to search through more than three million contact cards produced by the CPD and identify certain contact cards as "Unconstitutional Stop Candidates." (Pls.' Mot. at 48–49.) Nelson sorted these contact cards into various categories based on "contact type (*e.g.*, loitering, public drinking etc.)." (*Id.* at 49.) He then applied filters to exclude "non-stops," which he defined as encounters that were consensual or resulted in a citation or arrest, and "Potentially Permissible Stops," which he defined as encounters where the officer may have had a reasonable articulable suspicion. (*Id.*) Nelson also applied a "Cautionary Exclusion Filter,"

---

[2] Boolean search logic "combine[s] words and phrases using the words AND, OR, NOT (known as Boolean operators) to limit, broaden, or define [the] search." Shauntee Burns, *What is Boolean Search?*, New York Public Library (February 22, 2011), https://www.nypl.org/blog/2011/02/22/what-boolean-search. Searchers may also use quotation marks around a specific phrase to find results that contain that exact wording. *Id.*

which he based on "terms and phrases indicating a stop was potentially permissible or otherwise made it difficult to definitely state the stop was unlawful."[3] (*Id.* at 50.) After filtering the contact cards in this manner, Nelson labeled the remaining 368,436 contact cards as "Unconstitutional Stops." (*Id.* at 54.) Finally, Nelson divided the Unconstitutional Stops into six subcategories: (1) loitering (in a hot spot), (2) loitering (not in a hot spot), (3) suspicious person, (4) responding to call, (5) matches description, and (6) no narrative. (*Id.* at 55.) Plaintiffs constructed and proposed their Rule 23(b)(3) classes based on Nelson's searches and categorizations.[4]

The City argues that Nelson is unqualified and his methodology is insufficiently reliable to determine whether a contact card documented an unconstitutional stop.[5] Plaintiffs respond that they only relied on Nelson's testimony to identify ***presumptively***, not conclusively, unconstitutional stops. This is a distinction without a difference, however. As a general rule, an expert may not offer legal opinions or conclusions that will determine the outcome of a case. *Jimenez v. City of Chi.*, 732 F.3d 710, 721 (7th Cir. 2013) ("When an expert offers an opinion relevant to applying a legal standard such as probable cause, the expert's role is limited to describing sound professional standards and identifying departures from them." (internal quotations omitted)). And that is what Nelson purports to do here. Moreover, he claims to do so

---

[3] Examples of such terms and phrases include "Cannabis," "Disturbances/Weapons," "Gambling," "Littering," and "Public Drinking."

[4] To be clear, Plaintiffs' counsel instructed Nelson as to what filters to use in his methodology; Nelson merely conducted the searching and sorting. (Def. City of Chicago's Mot. to Exclude F. Eli Nelson, Timothy Longo, and Andrew Cook ("City's Mot. to Exclude") Ex. A at 166, Dkt. No. 315-1.)

[5] Nelson has a law degree and practiced as an assistant district attorney between 1998 and 2000. However, Nelson has never worked on any civil rights cases during his career and has not practiced criminal law since 2000. Nor has he reviewed the law on investigatory stops since then. And Nelson himself admits that he cannot state conclusively whether any particular narrative describes an investigatory stop because "the sort of individualized scenario-by-scenario analysis . . . it's just not as much in my wheelhouse." (City's Mot. to Exclude Ex. A at 235–236.) Accordingly, Plaintiffs do not offer Nelson's testimony based on his ***legal*** expertise; instead, Plaintiffs enlisted Longo as an expert witness to opine on the constitutionality of police conduct.

with no more information or context than what he found on the individual contact cards. Accordingly, the Court excludes Nelson's testimony to the extent that he claims his analysis reveals whether and when a *Terry* stop or constitutional violation occurred.[6]

In excluding Nelson as an expert witness, however, the Court leaves open the possibility that Nelson may be able to testify as a summary witness. Federal Rule of Evidence 1006 permits a party to use a summary, chart, or calculation to prove the content of voluminous writings that cannot be conveniently examined in court. Fed. R. Evid. 1006. A summary witness serves this purpose by evaluating the voluminous writings and summarizing them to aid the factfinder. *See, e.g.*, *United States v. Pree*, 408 F.3d 855, 869 (7th Cir. 2005) (permitting IRS agent to summarize government's evidence about defendant's tax evasion); *E. Trading Co. v. Refco, Inc.*, No. 97 C 6815, 1999 WL 59979, at *2 (N.D. Ill. Feb. 2, 1999) (permitting witness to summarize more than 14,000 pages of material). "When a summary witness simply testifies as to what [a party's] evidence shows, he does not testify as an expert witness." *Pree*, 408 F.3d at 869.

Accordingly, the Court finds that Nelson's testimony is admissible to the extent it is offered only to summarize the textual contents of the contact cards—essentially, how many cards were identified from various keyword and Boolean logic searches.[7] *See United States v. Blount*, 502 F.3d 674, 680 (7th Cir. 2007) ("There is a difference between stating a legal conclusion and providing concrete information against which to measure abstract legal concepts."). If Plaintiffs

---

[6] For example, Nelson apparently concluded that, "[d]uring the class period, the CPD engaged in a minimum of 368,436 Unconstitutional Stops." (Pls.' Mot. at 54.) Such a legal conclusion is inadmissible.

[7] For example, Nelson could testify that 471,339 contact cards list dates between April 20, 2013 and December 2015, and 2,154 of that subset of contact cards have a blank narrative section. (Pls.' Reply Brief in Support of Their Motion for Rule 23(b)(3) Class Cert. at 29, Dkt. No. 332.) Similarly, Nelson could testify that he conducted a keyword and Boolean logic search consisting of "((call* or complaint* or person* or people) w/3 suspicious) and not ((complaint or observ* or saw or watched) w/4 (suspicious* or furtive or avoid*))" that identified 13,652 contact cards from the relevant time period. (Pls.' Mot. at 52; *id.* Ex. 7.)

elect to use him in that manner, Nelson must observe the limits of his role as a summary witness by testifying only as to the text of the contact cards and withholding his opinion about the constitutionality of the documented conduct.[8]

### B. Timothy J. Longo, Sr.

Plaintiffs offer Longo, their second expert witness, as a police practices expert. Longo has been involved in law enforcement since 1981 and served as the Chief of Police for the City of Charlottesville, Virginia from February 2001 until his retirement in May 2016. (Pls.' Mot. at 53; *see also id.* Ex. 26.) For this case, Longo reviewed 10,440 randomly-selected contact cards out of those identified by Nelson as "Unconstitutional Stops." (Pls.' Mot. at 54.) Based on the narrative section of each card, Longo decided whether the police officer sufficiently articulated a reasonable suspicion of criminality as required for a constitutional investigatory stop under *Terry*. (*Id.* at 53–54.) Ultimately, Longo concluded that 9,925 out of the 10,440 contact card narratives that he reviewed (or 95.5%) insufficiently articulated a reasonable suspicion of criminality and thus represented unconstitutional stops. (*Id.* at 54.)

As explained above, experts may not offer "opinions about legal issues that will determine the outcome of a case." However, "an opinion is not objectionable merely because 'it embraces an ultimate issue to be decided by the trier of fact.'" *Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 602 (7th Cir. 2011) (citing Fed. R. Evid. 704(a)). Rather, expert testimony regarding the reasonableness of police conduct may be admissible "in cases where specialized knowledge of law-enforcement custom or training would assist the jury in understanding the

---

[8] The district court reached a similar conclusion in *Cazares v. Frugoli*, No. 13 C 5626, 2017 WL 1196978, at *6–7 (N.D. Ill. Mar. 31, 2017). The *Cazares* court permitted an expert to provide statistical analyses showing that CPD officers under investigation for alcohol-related incidents were less likely to be reported when investigated by their fellow CPD officers, but prohibited the expert from providing a "qualitative opinion" regarding whether a "code of silence" existed within the CPD.

8

facts or resolving the contested issue." *United States v. Brown*, 871 F.3d 532, 537 (7th Cir. 2017).[9] In such scenarios, the expert's role must be limited to "describing sound professional standards and identifying departures from them." *Jimenez*, 732 F.3d at 721 (internal quotations omitted).

Here, Plaintiffs have not demonstrated that Longo's testimony should be admitted. As a preliminary matter, Plaintiffs have not shown that this case involves such factual complexity that specialized knowledge of police practices would be helpful to the jury. *See Brown*, 871 F.3d at 537 ("[E]veryday experience of lay jurors fully equips them to answer the reasonableness question when a case involves facts that people of common understanding can easily comprehend." (internal quotations omitted)). But more importantly, Longo's opinions on the sample contact cards consist of mere legal conclusions regarding the constitutionality of each underlying police-civilian encounter. Examples of these legal conclusions include, "Loitering and blocking sidewalk [*sic*] fails to set out articulable suspicion of imminent criminality," "Narcotic hotspot fails to set out articulable suspicion of imminent criminality," and "Gang membership coupled with designated zone and previous violent crime occurrence, absent more, fails to set out articulable suspicion of imminent criminality." (Pls.' Mot. Ex. 25:21); *see, e.g.*, *Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 4417257, at *6 (N.D. Ill. Aug. 19, 2016) (excluding expert testimony that defendant police officer had probable cause to arrest plaintiff for offering an impermissible legal conclusion). Longo's testimony is devoid of any explanation why or how he concluded that certain police officers did not have reasonable

---

[9] For example, the Seventh Circuit has held that expert testimony is more helpful in an excessive force case that involves a gun, slapjack, mace, or some other tool because the jury may ask questions such as "what is mace? what is an officer's training on using a gun? how much damage can a slapjack do?" *Brown*, 871 F.3d at 537. By contrast, expert testimony will not be helpful in a case where the officer used only "their bare hands . . . the most primitive form of force." *Florek*, 649 F.3d at 602.

suspicion, nor does he explain what facts typically support reasonable suspicion based on his experience. *Compare United States v. Noel*, 581 F.3d 490, 497 (7th Cir. 2009) ("Had [the expert] provided some basis for this explanation, perhaps her testimony would have been of some use for the jury. But she did not do so. She, in essence, told the jury nothing more than, 'I am familiar with the definition of child pornography, and this meets that definition because I said so.'") *with Jimenez*, 732 F.3d at 721–22 (affirming admissibility of expert testimony about the steps a reasonable police officer would have taken to solve the crime but without opinions on whether the police officer actually had probable cause to arrest plaintiff) *and Blount*, 502 F.3d at 680 (affirming admissibility of expert who testified about how defendant could have used his gun to further his drug activities but did not comment on the defendant's actual intent to do so). Therefore, the Court excludes Longo's opinion about which contact cards represent unconstitutional investigatory stops.

### C. Andrew J. Cook

The Court next addresses Defendants' motion to exclude Cook's testimony. Like Nelson, Cook is a director at The Claro Group. (*Id.* Ex. 79.) He is trained as a labor economist and an applied econometrician, and he has over thirteen years of experience utilizing advanced statistical methodologies to evaluate economic and statistical issues. (*Id.*) Cook opines that Longo reviewed enough individual contact cards to support a 95% confidence level in Nelson's methodology, plus or minus a 5% margin of error. (*Id.*) In other words, Cook testifies that based on Longo's conclusions regarding the constitutionality of 10,440 randomly-selected contact cards, it is highly probable that Nelson's methodology reliably identified 368,436 contact cards documenting unconstitutional stops. (*Id.*)

As Cook concedes, he was retained for a narrow purpose: to review and opine on the accuracy of Nelson's methodology based on Longo's conclusions. However, the Court has already determined that Longo's opinions regarding whether various police officers acted constitutionally are inadmissible. And Cook does not contend that he conducted his own independent analysis of the underlying data. *Compare Cazares v. Frugoli*, No. 13 C 5626, 2017 WL 1196978, at *8–9 (N.D. Ill. Mar. 31, 2017) (excluding expert testimony offered solely to bolster another expert's testimony as duplicative and unhelpful) *with The Medicines Co. v. Mylan Inc.*, No. 11-cv-1285, 2014 WL 1516599, at *3 (N.D. Ill. Apr. 17, 2014) (permitting expert testimony that relied on another expert's testimony where first expert independently reviewed the data and formed his own opinion). Therefore, the Court excludes Cook's expert testimony, as it would not provide any assistance to the trier of fact.

## II. Defendant City of Chicago's Motion for Sanctions and Plaintiffs' Cross-Motion for Sanctions

The Court next turns to the City's separately-filed motion for sanctions based on Nelson's alleged violation of Federal Rule of Civil Procedure 26(a)(2)(B)(i). The relevant provision states:

> Unless otherwise stipulated or ordered by the court, th[e] disclosure [of expert testimony] must be accompanied by a written report—prepared and signed by the witness . . . . The report must contain . . . a complete statement of all opinions the witness will express and the basis and reasons for them . . . .

Fed. R. Civ. P. 26(a)(2)(B)(i). The purpose of written expert reports is "not to replicate every word that the expert might say on the stand," but rather to "convey the substance of the expert's opinion so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010) (internal quotations omitted).

Here, the City claims that Nelson's written report misrepresents his methodology. (Def. City of Chi.'s Mot. for Sanctions ("DMS") at 1–2, Dkt. No. 327.) The City contends that at his deposition on March 20, 2018, Nelson made additional misrepresentations about his methodology and referred to various documents that the City had requested on December 8, 2017 but Plaintiffs refused to produce until April 12, 2018. Subsequently, the City moved to reopen Nelson's deposition. (Dkt. No. 302.) The Court granted the request in part, ordering Nelson to sit for a second deposition limited to 90 minutes with a narrowed scope of examination. (*See* Dkt. No. 309.) At Nelson's second deposition on April 25, 2018, Nelson admitted that his report contained some inaccuracies. The City thus claims that it is entitled to reimbursement in the amount of at least $141,823,[10] which is the amount it expended in expert costs and attorneys' fees while attempting to replicate Nelson's results, requesting documents identified by Nelson during his March 20 deposition, seeking to reopen Nelson's deposition, conducting Nelson's April 25 deposition, and filing the instant motion. (DMS at 11–12.)

Plaintiffs in turn assert that Nelson's report comports with the requirements of Rule 26(a)(2)(B). (Pls.' Opp'n to City of Chi.'s Mot. for Sanctions and Cross-Mot. for Sanctions ("PCMS") at 3–5, Dkt. No. 344.) As to Nelson's alleged misrepresentations, Plaintiffs concede that Nelson made a mistake in his written report but point out that he promptly corrected the mistake when the City brought it to his attention. As to their document production, Plaintiffs contend that they justifiably withheld certain documents requested by the City (such as the draft queries that Nelson made prior to issuing his written report) under the protections for draft reports or disclosures afforded by Federal Rule of Civil Procedure 26(b)(4)(B).[11] Further,

---

[10] Defendant claims it expended between $141,823.33 and $179,473.

[11] Rule 26(b)(4)(B) provides that drafts of expert reports or disclosures are not subject to discovery, regardless of the form in which a draft is recorded.

Plaintiffs contend that although the City was permitted to reopen Nelson's deposition, the Court declined to award the City attorneys' fees or costs, and therefore the City should not be allowed to renew their argument for sanctions.[12] For their part, Plaintiffs request sanctions against the City for misrepresenting facts, ignoring the Rules, and misstating the law in the City's motion for sanctions. (PCMS at 12.)

Federal Rule of Civil Procedure 37 provides that a party may be sanctioned for its failure to make disclosures or to cooperate in discovery. Specifically, Rule 37(a)(3) provides that if a party fails to make a disclosure required by Rule 26(a), the other party may make a motion to compel disclosure and for appropriate sanctions.[13] Similarly, Rule 37(c)(1) provides that if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the Court may exclude that information or witness or impose other appropriate sanctions unless the Court determines that "the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "Whether a failure to comply with Rule 26(a) or (e) is substantially justified, harmless, or warrants sanctions is left to the broad discretion of the district court." *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 514 (7th Cir. 2011). "District courts possess wide latitude in fashioning appropriate sanctions." *Johnson v. Kakvand*, 192 F.3d 656, 661 (7th Cir. 1999); *see, e.g.*, *Metavante*, 619 F.3d at 762 (reviewing district court's ruling on motion pursuant to Rule 26(a)(2)(B)(i) for abuse of discretion). The Court addresses each party's request for sanctions in turn.

---

Rule 26(b)(4)(B) provides that drafts of expert reports or disclosures are not subject to discovery, regardless of the form in which a draft is recorded.

ty had not been prejudiced. (Dkt. Nos 309, 310.)

[13] Federal Rule of Civil Procedure 37(a)(5) provides that if the motion to compel is granted, or disclosure or discovery is provided after the motion is filed, the Court must require the party whose conduct necessitated the motion to pay the movant's reasonable expenses, unless the movant filed the motion before attempting in good faith to obtain the disclosure without court action, the opposing party's nondisclosure was substantially justified, or other circumstances make an award of expenses unjust.

According to the City, Plaintiffs violated Rule 26(a)(2)(B)(i), which requires expert witnesses to provide a report containing "a complete statement of all opinions the witness will express and the basis for them." Fed. R. Civ. P. 26(a)(2)(B)(i). But the mere fact that Nelson's report contained some inaccuracies does not render his report incomplete. *See Varlen Corp. v. Liberty Mutual Ins. Co.*, No. 13-cv-05463, 2017 WL 4278787, at *4 (N.D. Ill. Sept. 25, 2017) ("[The expert's] report complied with Rule 26(a)(2)(B)(i) because it did not make 'it impossible to tell what he might have been thinking about' . . ." (quoting *Meyers v. Nat'l R.R. Passenger Corp.*, 619 F.3d 729, 735 (7th Cir. 2010)). Indeed, even a written report that sets forth the expert's opinions in a "conclusory fashion" may be sufficient, so long as it "serves to 'set forth the substance of the direct examination.'" *Id.* (quoting *Jenkins v. Bartlett*, 487 F.3d 482, 488 (7th Cir. 2007)). As explained above, the purpose of Rule 26(a)(2)(B)(i) is to allow "attorneys, not experts in the fields at issue, to prepare intelligently for trial and to solicit the views of other experts." *Metavante*, 619 F.3d at 762. The City has not explained how the concerns raised with respect to Nelson's written report inhibited their ability to depose him effectively. To the contrary, the City does not dispute that at Nelson's second deposition, they questioned him about the "misrepresentations," which prompted Nelson to admit that there was an "incorrect" reference in his report that reflected "a mis-recollection on my part." (PCMS at 5.)

Moreover, even if Plaintiffs did violate Rule 26(a)(2)(B)(i) by producing Nelson's imperfect report, the Court declines to award the sanctions sought by the City. The City's request for sanctions relies primarily on its position that it is entitled to recover its expert costs and attorneys' fees "associated with attempts to replicate Nelson's results." (DMS at 11.) Prior to Nelson's first deposition, the City enlisted its own expert, George Socha, to reproduce Nelson's process and results based on Nelson's representations in his written report. Despite conducting

14

over 740 searches, Socha was ultimately unsuccessful and racked up considerable costs, which the City attributes to the deficiencies in Nelson's report. Although the City characterizes Socha's reverse-engineering experiments as "understandable," the Court is not persuaded that the City spent its resources wisely. Again, the City has not explained why any deficiencies with Nelson's report made Socha's $100,000 guessing game essential, either to the City's deposition preparations or to Socha issuing his own independent expert opinion. Therefore, the Court denies the City's request for costs and fees incurred due to Socha's numerous failed attempts to replicate Nelson's process and results.

Next, the City seeks $14,134 in attorneys' fees associated with requesting certain documents identified by Nelson during his March 20 deposition, moving to reopen Nelson's deposition, and deposing Nelson a second time. Plaintiffs concede that pursuant to court order, they ultimately produced additional documents and made Nelson available for a follow-up deposition. (PCMS at 4–5.) However, the City is not necessarily entitled to sanctions and attorneys' fees simply because they prevailed on their discovery motion. *See, e.g.*, *TIG Ins. Co. v. Giffin, Winning, Cohen & Bodewes*, No. 00 C 2737, 2001 WL 969037, at *1 (N.D. Ill. Aug. 24, 2001) (granting motion to strike and compel but denying motion for sanctions). Instead, even if a motion to compel disclosure or discovery is granted, the Court "***must not***" award payment if "the opposing party's nondisclosures, response, or objection was substantially justified; or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(ii)–(iii) (emphasis added).

Here, the Court finds that Plaintiffs' withholding of certain documents and initial refusal to participate in a second deposition was substantially justified and that an award of expenses would be unjust. Plaintiffs made good-faith arguments in their opposition to the City's motion.

15

*See United Food & Comm. Workers, Union, Local 546, AFL-CIO v. Ebro Foods, Inc.*, No. 92 C 2452, 1992 WL 245541, at *4 (N.D. Ill. Sept. 21, 1992) (denying successful party's motion for sanctions where unsuccessful party "asserted its position in good faith"). They explained that they produced every document shown to Nelson and only withheld those they considered privileged as "draft queries that were made in eventually arriving at his report," and pointed out that Nelson had already sat through a ten-hour deposition. (Tr. of Proceedings Held on 4/19/2018 at 9–10, Dkt. No. 310). Under the circumstances, the limited reopening of Nelson's deposition was a natural, perhaps even expected, outcome of the opposing parties' zealous representation of their clients' interests during the discovery process.

Moreover, the City has not shown that it suffered any prejudice due to Plaintiffs' failure to produce the disputed documents. *See Raygoza v. Wexford Health Sources, Inc.*, 729 F. App'x. 466, 467 (7th Cir. 2018).[14] The City admits that as early as January 12, 2018, more than two months before Nelson's first deposition on March 20, it confronted Plaintiffs about their failure to produce the disputed documents—namely, documents relied upon or otherwise used in connection with the drafting of Nelson's report, Nelson's expert file, and any notes, memoranda, or writings prepared by Nelson. (DMS at 6–7.) On January 22, 2018, Plaintiffs made it abundantly clear that they did not intend to produce those documents. (*Id.* at 7.) Nonetheless, the City chose to proceed with Nelson's deposition. (*Id.*) Unsurprisingly, Nelson testified at his March 20 deposition about the existence of certain unproduced documents, such as his "incidental notes reflecting the results generated by changes to his process," "records regarding testing of his search filters," "records regarding internal testing of his process," and "records

---

[14] *Raygoza* is an unpublished Seventh Circuit order issued after January 1, 2007. Although not precedential, the order's reasoning is persuasive and provides a useful point of comparison here. *See* Fed. R. App. P. 32.1(a); 7th Cir. R. 32.1(b).

16

regarding alternative approaches that he and his colleagues tested." While the City argues that Plaintiffs should reimburse its attorneys' fees incurred making additional requests for the disputed documents, moving to reopen Nelson's deposition, and deposing him a second time, most if not all of those fees could have been avoided entirely had the City instead postponed Nelson's deposition and filed a motion to compel. Ultimately, these additional attorneys' fees are a direct result of the City's own decision to press forward with Nelson's deposition without first seeking to obtain the disputed documents. Therefore, the Court denies the City's motion for sanctions based on Nelson's allegedly unsatisfactory first deposition.[15]

Because the Court has otherwise denied the City's request for various costs and fees, the Court also denies the City's request for attorneys' fees associated with the instant motion for sanctions.

Finally, the Court turns to Plaintiffs' cross-motion for sanctions based on the City's unsuccessful sanctions motion. Plaintiffs accuse the City of "pursu[ing] a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound" in violation of Federal Rule of Civil Procedure 11 and "multipl[ying] the proceedings" in this case "unreasonably and vexatiously" as prohibited by 28 U.S.C. § 1927. According to Plaintiffs, the City's motion for sanctions mischaracterizes Nelson's report, misrepresents the procedural history of this case, and cites misleading case law. Although the City's motion for sanctions was ultimately unpersuasive, the Court does not find that the City's conduct "rise[s] to the level of impropriety that would warrant sanctions." *Blow v. Bijora*, 855 F.3d 793, 807 (7th Cir. 2017)

---

[15] Furthermore, although Rule 11 contains no explicit time limit for bringing sanctions motions, the Advisory Committee Notes to the rule state: "A party seeking sanctions should give notice to the court and the offending party promptly upon discovering a basis for doing so." *See also Kaplan v. Zenner*, 956 F.2d 149, 150 (7th Cir. 1992). Here, the Court observes that the City had an opportunity to request sanctions when it moved to reopen Nelson's deposition and again in its *Daubert* motion to exclude Nelson's testimony.

(affirming denial of sanctions despite "misgivings about the firm's judgment" and chastising party to "exercise better judgment in the future"). Therefore, the Court in its discretion denies Plaintiffs' cross-motion for sanctions against the City.

## CONCLUSION

For the foregoing reasons, Defendants' motion to exclude Plaintiffs' expert witnesses Eli Nelson, Timothy Longo, and Andrew Cook (Dkt. No. 315) is granted in part and denied in part. Specifically, Nelson will only be permitted to testify as a summary witness and not as an expert witness. Longo's expert testimony as to the existence of reasonable articulable suspicion or the constitutionality of an interaction based on his review of contact cards is excluded. Cook's expert testimony is excluded. The City's motion for sanctions (Dkt. No. 327) and Plaintiffs' cross-motion for sanctions (Dkt. No. 344) are both denied.

ENTERED:

Dated: September 30, 2019

_____
Andrea R. Wood
United States District Judge