2017

# The Consultant's Second Semi-Annual Report

## Investigatory Stop & Protective Pat Down Agreement

*March 5, 2018*

RE:  SECOND REPORTING PERIOD OF 2016
BY:  HON. ARLANDER KEYS (RET.)

JAMS | 71 S. Wacker Drive, Suite 3090, Chicago, IL 60606

# Table of Contents

EXECUTIVE SUMMARY ........................................................................................................3

   THE FIRST REPORTING PERIOD ........................................................................................3

   THE SECOND REPORTING PERIOD ....................................................................................5

   PERIOD 2 KEY POINTS STATISTICAL SUMMARY ("KPS") ..................................................9

      *Total Stops Counts* ..................................................................................9

      *All Stops Counts – PSO2 Report, Table 1* ................................................9

      *All Groups Stops Counts – PSO2 Report, Table 2* ..................................11

      *All Groups Stop Count by District* ........................................................11

      *Total Protective Pat Down Counts* ........................................................12

      *Pat Downs Across Groups and Police Districts* ......................................13

      *All Group Pat Down Hit Rates* ..............................................................14

      *All Group Pat Downs + Enforcement Actions* ........................................15

      *All Group Search Count* ........................................................................15

      *All Group Enforcement Actions ("EAs")* ................................................16

   CONSULTANT'S NARRATIVE SUMMARY OF THE PERIOD 2 KPS ........................................17

PART I. INTRODUCTION ....................................................................................................24

   OVERVIEW OF THE CONSULTANT'S SECOND SEMI-ANNUAL REPORT ..............................24

   IMPORTANT DISTINCTIONS ............................................................................................26

   TERRY STOPS ................................................................................................................27

   PROTECTIVE PAT DOWNS ..............................................................................................30

   FOURTH AMENDMENT EXCEPTIONS TO THE PROBABLE CAUSE REQUIREMENT FOR SEARCHES ..................................31

      *Consent to Search* ................................................................................32

      *The Plain Touch Doctrine* ....................................................................32

   IMPORTANT CHANGES IN PERIOD 2 ..............................................................................33

   THE VERSIONING SYSTEM ............................................................................................34

      *The ISR Workflow* ................................................................................35

      *The Integrity Unit & Auditing Protocols* ..............................................43

PART II. THE QUALITATIVE ASSESSMENTS & ANALYSIS ..................................................45

   AUDITING & SUPERVISORY REVIEW ..............................................................................45

   THE AGREEMENT'S AUDITING & SUPERVISORY REVIEW TERMS ......................................49

   THE CPD'S POLICY VERSION OF THE AUDITING & SUPERVISORY REVIEW DIRECTIVES ........51

      *The Period 2 Bi-Annual Investigatory Stop Auditing Report* ..................54

      *Daily Audits* ........................................................................................55

      *The Monthly Captains' Audits* ..............................................................60

      *Special Project Audit: Arrest Reports* ..................................................63

   CIVILIAN & INTERNAL COMPLAINTS ..............................................................................66

   RE-TRAINING, ENHANCED SUPERVISION AND DISCIPLINE ..............................................71

   COMMUNITY POLICING INITIATIVES ..............................................................................72

      *The October 18th Updates* ....................................................................73

      *November 6th Updates* ..........................................................................75

      *Consultant's Thoughts* ..........................................................................78

Implicit Bias Training ...........................................................................................................80
Period 2 Qualitative Assessment Determinations...................................................................81

**PART III. THE QUANTITATIVE ASSESSMENTS & ANALYSIS** ...........................**85**

The Statistical Reports for Period 2 ........................................................................................87
The Post-Stop Outcomes Report ............................................................................................88
   *Descriptive Models* ..............................................................................................................91
   *Statistical Models*...............................................................................................................122
Ecological Analysis Report...................................................................................................140
   *Introduction*........................................................................................................................140
   *Data Source & Methodology* ............................................................................................144
   *Key Points* ..........................................................................................................................145
   *The Expert's EA2 Report Conclusions* ............................................................................153
Analysis of Coded Single Version ISR Narratives, Second Period Technical Report...............154
   *Overview*.............................................................................................................................154
   *ISR Data Source: Single Version ISRs* ...........................................................................156
   *The Coded Legal Narratives Analysis Process* ...............................................................158
   *SVR2 Report Addendum*...................................................................................................181
Analysis of Multiple Version ISR Records and Coded Narratives Technical Report..............190

**PART IV. CONSULTANT'S CONCLUSIONS, OBSERVATIONS & RECOMMENDATIONS** .....................**192**

ISR Data Files for Period 2 ..................................................................................................192
ISR Status Codes & Their Importance ..................................................................................198
CPD Internal Policy Directives Related to Accountability...................................................205
   *Civilian and Internal Complaints* ....................................................................................205
   *CPD's Auditing Protocols & Review System* ...................................................................205
   *The Consultant's Review Process*.....................................................................................206
   *Auditing Problems*.............................................................................................................207
   *Auditing Recommendations*...............................................................................................209
Coded Legal Narratives Assessment of the ISRs with Multiple Version Records ("MVRs")..................213

**PART V. PROBABLE CAUSE STOPS V. TERRY STOPS**...........................................................**215**

**PART VI. CONCLUSION** ...........................................................................................................**219**

**ACKNOWLEDGEMENTS**...........................................................................................................**221**

# EXECUTIVE SUMMARY

In the written report that follows, the Undersigned – in his role as Consultant for the parties to the Investigatory Stop and Protective Pat Down Settlement Agreement of 2015 ("Agreement"), Exhibit 1 – makes public the process of his review and assessment of investigatory stop report ("ISR") data that reflects the investigatory stop and protective pat down practices and policies of the Chicago Police Department ("CPD") during the *second reporting period of Calendar Year ("CY") 2016* (*i.e.*, July 1, 2016 thru Dec. 31, 2016) (referred to herein as Period 2). This ISR data is subject to the terms of the Agreement (Exhibit 1), the central aim of which is to ensure that the CPD's stop and frisk practices comply with all applicable laws.

## The First Reporting Period

The Agreement took effect on January 1, 2016. Thus, the first six-month reporting period covered CPD's stop and frisk activity from January 1 through June 30, 2016, also known as the First Reporting Period ("Period 1"). In the Consultant's First Report, issued on March 23, 2017, the CPD's stop and frisk policies and practices for Period 1 (January 1, 2016 thru June 30, 2016) were reviewed by the Consultant and designated experts for multiple reasons, including the need to advise the parties and the public on the implementation of the Agreement and the progress made by the CPD to effectuate the terms of the Agreement. With the aid and counsel of the designated experts, along with feedback by the parties, the Consultant reviewed a statistically representative sample of ISR data from Period 1 to determine whether CPD officers were making lawful stops and frisks and whether statistical analysis of the Consultant's legal determinations reflected any unlawful disparate impact between the CPD's stop and frisk

policies and practices and the ethnic and racial composition of detainees, when viewed in the aggregate (rather than as individual stops and frisks).

In the First Report, the Consultant also determined that the Illinois Civil Rights Act ("ICRA") expressly authorizes the ACLU to challenge the CPD's stop and frisk policies and practices to determine whether CPD's stop and frisk policies and practices have an unlawful disparate impact on racial and ethnic minorities. Accordingly, because the Agreement expressly incorporated ICRA as an applicable law, the Consultant determined that ICRA must guide his legal and statistical review of the ISR data.

The Consultant also indicated in his First Report that he could not make any conclusive disparate impact findings for Period 1, because, in the review of the ISR Data, he identified a need for the CPD to keep and produce all versions of the ISRs, not just those that were finalized by supervisors. In other words, because CPD's stop and frisk policy, pursuant to the terms of the Agreement, now holds officers accountable for articulating reasonable suspicion for every stop and frisk in every submitted ISR, a series of corrective actions and supervisory reviews is sometimes necessary before an ISR is finalized for review by the Consultant. During the first review period, the Consultant discovered this fact, and realized that he and his designated experts needed to review not only the final ISRs, but also every ISR generated by a police officer in any and every version.

There were two primary reasons for this finding: (1) the Agreement requires the Consultant to determine whether supervisors are correctly reviewing the stops and frisks of subordinates; and (2) each ISR generated represents a unique stop made by police officers, such that an accurate count of how many stops and frisks, along with related searches, occurs during

any given reporting period, depends upon seeing all ISR records, not just those that represent the final and last report by the CPD regarding any given stop and/or frisk. Thus, the Consultant advised the City and CPD to reconfigure the ISR Database to keep track of ISR Versions, which they promptly did and implemented before the second reporting period began on July 1, 2016. Based on the absence of all versions, of all ISRs generated and submitted for supervisory review in Period 1, the Consultant determined that the statistical results of his legal review of the Period 1 ISRs was not complete for purposes of assessing whether the CPD was in substantial compliance with the Agreement.

## The Second Reporting Period

The Second Reporting Period began on July 1, 2016 and ended on December 31, 2016 ("Period 2"). This report, the Second Report of the Consultant, addresses the ISR data documenting all stops and frisks that occurred during Period 2.

Unfortunately, although the ISR data from Period 2 contains all versions of every ISR generated during Period 2, the Consultant and his experts discovered new, unforeseen information from review of the versioning system data and the CPD's internal audits of that data, which also began on or about July 1, 2016, at the start of the second reporting period. This new information revealed that each version of the ISRs now contains a series of status codes, each of which is designed to indicate where in the review process the ISR is at any given time (since the ISR Database is live and always changing). In other words, these status codes indicate when an Officer submits an ISR for review, when that review is concluded and the determination made by the reviewing supervisor – either approval and finalization (in which

case there is only one record for the unique ISR number) or rejection and further review (in which case there are multiple records associated with the unique ISR number).

The designated experts used the unique ISR numbers to count the total number of stops made for Period 2; they did not use event numbers nor did they use or investigate differences in UFE or Report Status Code fields. After the experts sorted the ISRs by whether there was a single "record" or multiple "records" associated with each unique ISR number, the statistically representative sample was randomly drawn within these two categories, namely, the "single-version records" ("SVRs") and "multiple-version records" ("MVRs"). Altogether for Period 2 there were 51,538 total unique ISR numbers in the electronic file produced by the City and CPD ("City") in the January 5, 2017 Main File ("2017 Main File"), which contained all ISRs generated for calendar year ("CY") 2017.

Among these 51,538 total ISRs, the designated Experts identified 50,723 ISRs in which the subject of the stop ("detainee") was a member of one of the three ethno-racial groups being studied, namely African-American (sometimes referred to herein as "Black"); Hispanic (identified as "White" Hispanic by CPD); and Caucasian (identified as "White" by CPD). After the experts identified only those generated between July 1, 2016 and December 31, 2016 (Period 2), the sorting into SVRs and MVRs was done.

From the total of 50,723 ISRs involving detainees in one of the three population groups, the Experts further identified 48,831 ISRs in the full-set of records in which only one record was associated with the unique ISR number identified in the January Main File. When only one, single record was associated with the ISR, the Experts determined that there was only a single "version" of the stop (and any post-stop outcomes) documented in the ISR. The Experts were

then able to determine that there were 1,884 out of the 2,707 MVRs in which the detainee belonged to one of the three groups being studied.

From there, statistically representative samples were randomly drawn from the SVRs and then separately for the MVRs. Among the 48,831 SVRs, the Experts identified 3,600 uniquely numbered ISRs for the representative sample, among which 3,508 ISRs were actually sampled (after duplicate ISRs were discovered and dropped). Among the remaining MVRs, the Experts identified 176 unique ISR numbers for the representative sample. All 176 were actually reviewed by the Consultant, after the Experts and CPD identified the last version of each MVR and stacked all versions in a new file produced in September 2017 (the "September 2017 File").

Representative sampling, based on the distinction between the SVRs and MVRs in the ISR data, was necessary, because the Versioning System put into place by the CPD at the start of Period 2, at the Consultant's request, distinguishes between SVRs and MVRs. Single-version record ISRs, by virtue of the fact that there is only one record associated with the ISR number, can only be stops made and reported that were approved by a supervisor on the first try (and/or requests by the officer to cancel a mistakenly generated ISR that supervisors approved without further documentation needed). Multiple-version record ISRs, on the other hand, by definition, include more than one record associated with the unique ISR number.

The way the Versioning System is structured requires additional records to be created only when an ISR is rejected by a reviewing supervisor based on a deficiency noted in the ISR as submitted for review. These deficiencies and rejections may or may not be substantive errors – the UFE and/or Report Status Codes identify the type of deficiency and the corrective action being taken – but the main point, here, is simply that an ISR with more than one record

associated with it is a multiple-version ISR, and that tells the Consultant and Experts that a CPD supervisor reviewed the ISR and found that it had or has a deficiency of some kind. That distinction is important when sampling the ISRs for the Consultant's coded legal narratives review. Consequently, throughout this report, the Consultant will discuss the significance of the SVRs and the MVRs as they relate to the substantive legal and statistical determinations called for by the terms of the Agreement. The designated Experts have also employed this nomenclature and analyzed the ISR data accordingly (see Appendices A-D).

The implementation and effectuation of the Agreement has been a work in progress with a steep learning curve for all involved. Thus, the public should be aware that, to the extent that the Consultant's First and/or Second Reports identify unresolved factual, legal and/or statistical issues, these will be addressed and resolved in due course.

Before moving to Part I of this report, the Consultant wishes to highlight some statistical results from Period 2, which *describe* how the CPD's stop and frisk policies and practices were conducted in late 2016. To dispel any misconceptions that one might draw from the statistics, the Consultant must make clear, from the outset, that he is unable to conclude, *one way or the other*, whether the CPD's stop and frisk policies and practices have an *unlawful* disproportionate (disparate) impact upon – or statistically causal relationship to -- racial and ethnic minorities in Chicago.

The Key Points Summary of statistical results, which follows, should not be interpreted or read as establishing that CPD's stop and frisk practices are or are not unlawful. That determination has not yet been made. Rather, these key statistical points are summarized for the sole purpose of giving the Parties and the public a glimpse of what the much longer technical

reports assess.   In other words, the following Key Points Statistical Summary ("KPS") merely seeks to *describe in a factual way what happened from a big picture perspective*; it is not intended to be interpreted or read as a statistical analysis that can be used to assess unlawful disparate impact one way or the other.

Following the KPS is a second summary presented in a narrative format, in which the Consultant groups the key statistical results by subject matters which are relevant to the legal stop and frisk analysis.  Although there may appear to be some overlap in the numbers being highlighted, this narrative review of the statistical results is provided to give the reader a snapshot of some of the important issues discussed in the report that follows.

# Period 2 Key Points Statistical Summary ("KPS")

## Total Stops Counts
The relevant total stops counts are:

- The **ALL Stops Count** ("all stops count") includes ALL stops made by CPD, regardless of stop type (*e.g.*, Terry stops or probable cause/on-view stops) and not limited to the three ethno-racial groups studied.
- The **ALL GROUPS Stop Count** ("all groups stop count") includes stops made by CPD within each of three ethno-racial groups:  Black non-Hispanics; Hispanics; and White non-Hispanics.

Some of the key results are descriptive only and are referred to sometimes as gross impacts; these results are summarized and analyzed, below.

## All Stops Counts – PSO2 Report, Table 1
- In Period 1, the total *all stops count* was 54,701; and, in Period 2, it was 51,538.
- The *all stops count* decreased in Period 2, by 3,273 stops.
- Consultant's Figure 1, below, shows the *all stops* number made by police officers during Period 2.  As shown, stops (both types) of civilians in the Black non-Hispanic group

outnumbered stops of other racial and ethnic groups by a significant margin.[1] These numbers can be stated proportionally, as a percentage difference, in Figure 1, for each group and as a combined group or *all stop count*.

Consultant's Figure 1. Review Periods 1 & 2 Comparisons between numbers of stops among three ethno-racial groups, with corresponding proportions stated as percentages, relative to all stops counts.

| All Group Stop Counts: Number & Percentage of All Stop Counts | Period 1 | | Period 2 | |
|---|---|---|---|---|
| | Number | Percentage | Number | Percentage |
| Black non-Hispanics | 38,361 | 70.13% | 36,451 | 70.73% |
| Hispanics | 11,557 | 21.13% | 9,969 | 19.34% |
| White non-Hispanics | 4,198 | 7.67% | 4,303 | 8.35% |
| All Other | 585 | 1.07% | 815 | 1.58% |
| TOTAL | 54,701 | 100% | 51,538 | 100% |

- During Period 2, there were 36,451 stops (of both types) made by police officers of persons that officers identified as Black and non-Hispanic ("BNH group"), which comprised 70.73% of *all stops.* Descriptive results from Period 1 were similar for the BNH group (70.13%).

- Speaking again only in descriptive terms, the numerical *proportion of BNH detainees increased by .60%,* from 70.13 to 70.73 percent, in Period 2.

- The *proportional percentage of White non-Hispanics*, however, *also increased* during Period 2, by a larger number, from 7.67 to 8.35 percent.

- *Only the proportional share of stops* involving **non-Black Hispanics decreased** with the stop rate decrease, from 21.1 to 19.3 percent.

---

[1]**Consultant's Figure 1**, excerpted from Table 1 of the PSO2 Report, **measures** the **differences** in the **all stops count** between *each of the two reporting periods*, so far, *and as compared to* **the all stops count** *across both reporting periods*; Figure 1 does not measure the relative differences between only the three groups being studied, but rather measures the differences city-wide, relative to the all stops count. Instead, **Consultant's Figure 2**, excerpted from Table 2 of the PSO2 Report, below, **measures** the number and proportion of stops made of one group versus another group (among the three groups studied), relative to the *all **groups** stop count*.

## All Groups Stops Counts – PSO2 Report, Table 2

The relative numerical and proportional differences between the three groups, relative only to each other, are measured in relationship to the ***all groups stop count***, not the all stops count. The all groups stop count for Period 1 was 54,116 and for Period 2 was 50,715. For these results, see Consultant's Figure 2, below, excerpted from Table 2 of the PSO2 Report.

- From Figure 2, one can observe that, among the three groups studied, police officers stopped persons identified as Black and non-Hispanic about 71.86% of the time, as compared with an 8.48% rate for members of the WNH group.

CONSULTANT'S FIGURE 2. ALL GROUPS STOP COUNT BY GROUP AS A PERCENTAGE OF THE WHOLE, EXCERPTED FROM TABLE 2, IN THE PSO2 REPORT.

| *All Groups Stop Count Proportional Representation* | Number of Stops | Percentage of All Group Stop Count | All Group Stop Count | |
|---|---|---|---|---|
| *Black non-Hispanic* | 36,446 | 71.86 | 50,715 | 100 |
| *Hispanic* | 9,966 | 19.65 | 50,715 | 100 |
| *White non-Hispanic* | 4,303 | 8.48 | 50,715 | 100 |
| *Totals* | 50,715 | 100% | N/A | N/A |

- In Period 2, **the *all groups stop* count was 50,715**, which comprised **98.4 percent** of all ISRs submitted.

## All Groups Stop Count by District

Table 2, in the PSO2 Report, also breaks down the **all groups stop count** proportionally among the three groups and by police district number, as was done for the Period 1 ISR results.

- From Table 2's results, one can observe that the highest total number of stops made of all three groups, combined, occurred in District 11 (6,667).[2] Notably, 88.87% of the 6,667 stops in District 11 were made primarily of African-Americans in the BNH group (5,925); stops of persons in the

---

[2]As explained elsewhere in the reports, this number does not mean that 6,667 unique individuals were stopped in District 11, because the same individual may have been stopped more than once during the reporting period; however, each time an individual is stopped (whether they have been stopped before or not), a unique ISR number is created representing the unique stop event.

WNH and Hispanic groups were 6.72% (WNH-448 stops); and stops of Hispanic persons were 4.41% (Hispanic-294 stops) of the total.

- The second highest *all group total stops count* among the police districts was in District 10, where 3,763 stops were made among the three groups. This number is nearly half of the numbers posted by District 11.

- The third, fourth and fifth highest *all group total stop counts* were all very close in size to the numbers posted by District 10 (but not District 11), ranging from 3,740 in District 9, to 3,374 in District 15, and 3,336 in District 7.

- In 4 of these 5 police districts, the largest percentage of stops were made of persons identified as Black and non-Hispanic (*e.g.*, Districts 7, 10, 11, 15). *Only in District 9* was the proportionate number of stops made *higher for Hispanics* than for Black non-Hispanics. There, 2,100/3,740 stops involved a detainee identified as Hispanic and non-Black (56.15%) compared to 1,313 stops of persons identified as Black and non-Hispanic (35.11).

## Total Protective Pat Down Counts

### All Group Total Pat Down Count

The **_all group total pat down count_** descriptively quantifies the number and proportion of protective pat downs that police officers made of detainees identified as members of one of the three ethno-racial groups being studied.

- *Between Periods 1 & 2, the all group total pat down count declined significantly. In Period 2, the total number of pat downs for the three groups was 14,945; but in Period 1 it was more than 3,000 pat downs higher, or 18,364.*

- Stated in proportional terms, the decrease in the number of pat downs can be quantified as a four (4) percent decline between Periods 1 (34 percent of stops resulted in a pat down) & 2 (30 percent of stops resulted in a pat down). *This result is statistically significant*, suggesting the difference in proportions between Periods 1 & 2 is not likely due to just chance, because this result would vary less than 1 in 1000 times if the same calculations were performed.

## Pat Downs Across Groups and Police Districts

When the total numbers of pat downs for the three groups, combined, and for each group, city-wide, are broken down by groups across the 22 police districts, certain descriptive inferences appear suggesting that race and ethnicity, as well as district context, influence the likelihood that a member of these groups will be patted down vs. not patted down.

- The high/low pat down counts for Periods 1 & 2 across the 22 police districts remained fairly consistent. The fewest number of pat downs occurred in District 1 and the most pat downs occurred in District 7. *See* Table 5, PSO2 Report.

- The number of pat downs among police districts, however, continues to vary. A detained civilian, of any race or ethnicity in the three groups, if stopped in District 7 (on the lower south central side of Chicago), would have about an equal chance (1/2 or 50%) of being patted down, based on the average proportion of investigatory stops with pat downs. Whereas, by contrast, someone from the three groups would have only a 9.4 percent chance of being patted down if stopped in District 16 (on the northwest side of Chicago).

These average proportions, however, are not entirely helpful because they average out the large numerical and proportional disparities between the three groups in some of the police districts.

- For example, in District 7, the chances of being patted down if one was a WNH were lower than if one were BNH. The proportional share of pat downs in Table 5, for District 7, are deceiving, but the raw numbers speak for themselves. During Period 2, there were 19 stops and pat downs of WNH detainees compared to 1,644 of BNH detainees and 34 of Hispanic detainees.

The overall proportions for the three groups, however, reflect that ethno-racial group matters.

- Looking at the totals cited in the bottom line of Table 5, one can see a disparity in the number of pat downs based on race and ethnicity. Whereas about one-third of stopped non-Hispanic Black civilians (29.9 percent) and Hispanic civilians (32.8 percent) were patted down during Period 2, only about one-sixth (1/6th) of stopped White non-Hispanic civilians (18.2 percent) were suspected as presenting a danger to a police officer based on the presence of a weapon or firearm (assuming the justification for a protective pat down motivated the police officer when conducting the pat down).

The coded narratives review from the *single-version* ISR samples bears out the notion that police officers were, in fact, reporting legitimate protective pat downs for legitimate reasons.

- In cases where the detainee did not consent to the pat down, the overall rate of justified pat downs for Period 2 was 87.11 percent; and, the group specific rates of non-consensual,

justified pat downs were: 91.18 percent for White non-Hispanics; 85.5 percent for Black non-Hispanics; and 91.6 percent for Hispanics.

## All Group Pat Down Hit Rates[3]

- A significantly higher fraction of pat downs yielded weapons/firearms during Period 2 (3.5 percent) than in Period 1 (2.5 percent).

- Table 8 in the PSO2 Report shows that pat downs in Districts 7 and 11 produced the greatest number of weapons/firearms overall, with 52 each. **These two districts each contributed one-tenth of all recovered weapons in the entire city.**

- By focusing on the three groups, the descriptive results show that **pat downs of White non-Hispanic detainees were most likely to produce weapons/firearms (4.2 percent)**. It is not clear from the descriptive statistics the reason for this result.

- In comparison, pat downs of Hispanic detainees were the least likely to result in a weapon/firearm (3 percent) and the hit rate for weapons from pat downs of Black non-Hispanics was about 3.5 percent – which is the same number as the average hit rate for all three groups during Period 2.

- The Period 2 hit rates for each group has shifted from Period 1, where pat downs of Black non-Hispanics were least likely to produce a hit for weapons (2.3 percent); followed by Hispanics (2.9 percent). Pat downs of White non-Hispanics were also the most likely to produce a weapon/firearm in Period 1, however, with a 4.1 percent hit rate.

The Consultant observes that the biggest shift in the pat down hit rate, however, has occurred with respect to Black non-Hispanics.

- The proportional difference for White non-Hispanics and Hispanics between Periods 1 & 2 was only one-tenth of a percent (WNH=4.1 vs. 4.2 percent; Hispanics = 3.0 vs. 2.9 percent).

- However, the shift in the pat down hit rate between Periods 1 & 2 for Black non-Hispanics reflects an increase of slightly more than a full percentage point or 2.3 percent in Period 1 to 3.5 percent in Period 2. This increase appears to be the reason why the

---

[3] The "hit rates" refer to the number of times a police officer discovers a weapon or firearm – or something the officer believed to be a weapon or firearm but proved to be something else, such as drugs or other contraband – as a result of the protective pat down.

overall hit rate from pat downs between Periods 1 & 2 rose from 2.5 to 3.5 percent and is statistically significant.

The reason for the CPD's increase in officers' ability to accurately identify Black non-Hispanic detainees who need to be patted down because they are carrying weapons/firearms during Period 2 is unknown. It is also not clear why such an increase in accuracy did not impact all White non-Hispanic or Hispanic detainees.

## All Group Pat Downs + Enforcement Actions[4]

- The proportion of stops where police did not pat down the detainee and there was no enforcement action ROSE in Period 2 by 7 percent from 43 percent in Period 1 to 50 percent in Period 2. This finding is consistent with the independent findings that the number and percentage of pat downs were down, as were the number of enforcement actions that followed from stops (see below). The descriptive statistics for the four possible combinations of outcomes for pat downs +/- enforcement actions is detailed in Table 4 of the PSO2 Report.

## All Group Search Count

The PSO2 Report examined all stops for the three groups and counted the number of searches by police district and ethno-racial group. These results appear in Table 9 of Appendix A. The searches were counted using the checked boxes marked by police officers in the 50,715 ISRs pertaining to the three groups. Despite inconsistencies in the boxes checked, the experts were able to determine that:

- There were 7,002 searches of a non-custodial nature conducted during Period 2 following a stop of any type.[5] Proportionally, this means that a search followed a stop in 13.8 percent of all ISRs for Period 2;
- Black non-Hispanics were searched in 14.2 percent (5,168) of all stops;
- Hispanics were searched in 13.3 percent (1,324) of all stops;
- White non-Hispanics were searched in 11.9 percent (510) of all stops.

---

[4]*See* discussion by experts, who are criminal justice scholars, regarding the importance of studying the pat down but no enforcement action outcome for purposes of assessing the equitable provision of procedural justice and the legitimacy of police practices regarding stop and frisk, Section 8.4.7, PSO2 Report, Appendix A.

[5]The type of stop did not influence whether the search was counted or not. In the PSO2 Report, the legitimacy of the search also was not an issue. The purpose of the all group search count was simply to ascertain how many times a police officer documented a search. Note, however, that Table 9 includes 17 searches from District 31, which includes the two international airports in Chicago, and falls outside city limits. *See, e.g.,* Table 19, PSO2 Report, Section 8.4.5.

Focusing on the variation of search rates across police districts,

- Districts 7 and 11 reappear, as in the stop and pat down rate results, as leaders in the number of searches and searches that produce weapons and firearms;
- District 11 had the highest number of searches; and District 1 had the fewest;
- Districts 7 and 11 also had the highest numbers of weapons-producing searches, as well.

Weapons hit rates, however, varied among the three groups.

- White non-Hispanics were less likely to be found with a weapon if searched compared to Black non-Hispanics. Only 2.6 percent of searches of WNHs, when compared to searches of BNHs (5.4 percent), produced weapons;
- Hispanic search hit rates were 4.3 percent;
- The overall search hit rate for Period 2 was 5.0 percent.

The search hit rates also varied based on location. In districts where at least 30 searches took place, weapons hit rates ranged from 3 to above 8 percent.

Because the coded ISRs in the sample set of records analyzed in the SVR2 Report and MVRs Report did not provide enough searches to assess, the Consultant cannot compare the frequency with which CPD officers conducted searches to the legitimacy rates for those searches.

## All Group Enforcement Actions ("EAs")

- During Period 2, there were 14,066 enforcement actions which followed from the all group total stop numbers (*e.g.*, 50,642 stops, weighted).

  The decline in the number of enforcement actions in Period 1 (17,425) was statistically significant.[6] Stated differently, there were a significantly lower fraction of stops, which resulted in any enforcement action (28%), during Period 2 than during Period 1 (32 percent) by a margin of four (4) percent.

---

[6]*See, e.g.*, Appendix A, Table 4 (Period 1 Descriptive Statistics).

## Consultant's Narrative Summary of the Period 2 KPS

In the following section, the Consultant wishes to summarize some of the statistical results from his personal examination of a statistically representative sample of the ISRs from Period 2. These results are based on aggregated ISR data. This means that the results paint a picture of how a representative sample of all the stops and frisks made by CPD, between July 1 and December 31, 2016, looked together as a whole. These statistics do not, therefore, address individual stops and frisks or individual treatment issues.

Moreover, the specific conditions creating these statistical results must always be observed, because without these specific conditions, the same results are not possible. For example, as will be shown below, the CPD can be proud of the statistic that nearly 95% of all ISRs reviewed by the Consultant in the statistically representative samples show that the stops and frisks made during Period 2 were properly reported as articulating reasonable articulable suspicion for Terry stops.

One must understand, however, that the ISRs are typically after-the-fact articulations of the facts observed when the police officer made the decision to detain someone for investigation and/or pat down the detainee based on the presence of (a) suspected weapon(s) or firearm(s). The articulated facts, like the observations of them, are always subjective and subject to imperfect memory, because human beings are performing them and investigative decisions are and must often be made in a split second. As such, any reviewer, including the Consultant, must take the facts as presented/articulated in the ISR as true and make legal assessments about them on that basis. There is simply no reason (without other evidence to the contrary, as might be the case if a particular stop is challenged and a body camera or video tape is reviewed) to assume

that the ISRs which are being reviewed by the Consultant in the aggregate are not, by and large, accurate renditions of the factual circumstances on the street when the stops under review were made. Indeed, given the large number of stops being individually reviewed and then aggregated statistically, the results being observed in this report, and others, are quite likely to reflect general "truths" about CPD's stop and frisk policies and practices.

That said, for individuals who were involved in the approximately five percent (5%) of ISRs reviewed in which the Consultant found the stop to be legally unjustified, the individual experience is no less concerning. For these individuals, and those who represent their interests, the Consultant wishes to point out only that the Agreement, and the reports being issued based on it, are not intended to address sometimes legitimate complaints of individuals if and when they are stopped or frisked without lawful justification. This Agreement and the assessments made pursuant to it are intended to examine aggregate results which address whether the CPD's stop and frisk policies and practices have a disparate impact on African-Americans and/or Hispanics, the two largest groups of civilians in Chicago belonging to historical "minority" groups residing in Chicago.

The following statistical results from Period 2 show that CPD officers during Period 2 were making lawful stops and frisks most of the time.

## Investigatory Stops

- The most encouraging news is that, during Period 2 (July 1 to December 1, 2016), Chicago police offers were, in fact, conducting an overwhelmingly large number of legitimate, lawful, and justified investigatory stops. Additionally, among the protective pat downs and searches reviewed in the data, which followed from these Terry stops, the statistical results show that most were justified.

- Based on representative samples of ISRs from Period 2, which the Consultant personally reviewed,[7] he determined that the following proportions of stops and frisks were justified based upon the narrative remarks of police officers in the ISRs.[8]

- In nearly 95 percent of all ISR samples reviewed by the Consultant, *where an investigatory stop was made*, the police officer articulated a factual basis for stopping

> **NEARLY NINETY-FIVE PERCENT (95%) (WEIGHTED NUMBER) OF ISRS SUBMITTED BY CHICAGO POLICE OFFICERS PROPERLY DOCUMENTED FACTUAL JUSTIFICATIONS FOR INVESTIGATORY STOPS OF AFRICAN-AMERICANS, HISPANICS/LATINOS, AND CAUCASIAN CIVILIANS DURING PERIOD 2.**
>
> *In nearly 95 percent of all ISR samples where an investigatory stop was made of a civilian, identified by Chicago police officers as African-American ("Black non-Hispanic"); Hispanic or Latino ("Hispanic non-Black"); or Caucasian ("White non-Hispanic"), the Consultant determined that the police officer made the right call (i.e., correctly assessed that the facts provided a reasonable basis to suspect that the person stopped had been, was, or was about to be involved in criminal activity.*
>
> *Investigatory Stops of these three ethno-racial groups comprised 98.4 percent of all Investigatory Stop Reports submitted by CPD for Period 2.*

---

[7]Readers should note that the Consultant was unaware of the race, ethnicity and gender of the detainee, as well as the place (police district) where the stops and post-stop outcomes took place, as documented in the sample ISRs. The legal determinations were made "blind" – so to speak – so that no implicit bias might influence the results.

[8]Although some may argue that the written reports of police officers cannot always be assumed completely accurate, the Consultant must assume, for purposes of the Agreement and his legal narratives review, that the officer can be taken at his or her word about what did or did not occur in the ISRs submitted by them, because there is no way for the Consultant to assess the credibility of the facts documented in an ISR. Instead, internal accountability measures have been structured so that the CPD's supervisors can assess credibility and legitimacy based on their expertise and oaths of office.

the civilian involved, which provided the officer with reason to suspect that a crime had been, was, or was about to occur.[9]

- On the other hand, when viewed from a slightly different perspective, the same set of statistics describes a less rosy picture. For example, during Period 2, there were 36,446 stops made by police officers of Black non-Hispanic civilians out of a total of 51,538 for all civilians, regardless of race or ethnicity, within the City's limits. This means that BNH civilians comprised 70.73% of all stops (both investigatory and on-view) made during Period 2.

  • By contrast, during the same time period, CPD stopped Hispanics 9,969 times, representing 19.34 percent of all stops made city-wide, of any race or ethnicity; and, comparatively, CPD stopped only 4,303 civilians whom they identified as White and non-Hispanic or a mere 1.58% of the total number of stops made.

  • Given that each of these three ethno-racial groups comprises roughly one-third each of the total population in Chicago, the disparity between these stop counts warrants further analysis. .

> **During Period 2, CPD stopped BNH civilians 36,446 times out of a total of 51,538 overall, city-wide stops, which comprised 70.73% of all stops made during Period 2.**
>
> During the same time period, CPD stopped Hispanics 9,969 times, representing 19.34 percent of all stops made city-wide, of any race or ethnicity.
>
> Comparatively, CPD stopped only 4,303 civilians whom they identified as White and non-Hispanic or a mere 1.58% of the total number of stops made.

- Related to the total stop count numbers, alone, the statistical findings from Period 2 continue to show a downward trend in the number and rate of stops between Periods 1 & 2 (*e.g.*, 6.3 percent decrease in the all stop count). This decrease cannot be explained by small increases in the number and percentage of stops made within the three ethno-racial groups, where stops increased by 0.6% for BNHs; and 7.7 to 8.3% for WNHs. Only the proportional share of Hispanics stopped declined over time by about 2 percent (from 21.1 to 19.3 percent). The 6.3 percent decrease in the all stop count, therefore, cannot be explained by these changes. Some other factor, not observed in the data or statistical

---

[9]Although probable cause stops were included in the original sample of 3,600 ISRs, after the Consultant's review, he determined that 1,358 of these 3,600 ISRs were probable cause stops. Therefore, when assessing the rate of justified investigatory stops, the experts relied only upon the 2,150 stops that the Consultant coded as investigatory stops. *See, e.g.*, Appendix C.

study, apparently contributed to the decline in overall stops. It is not clear at this time why there was a decline; but, it is important to remember that these statistics describe the stop counts from CY 2016, rather than CY 2017.

Among the three predominant ethno-racial groups, police officers stopped persons identified as BNH civilians about 71.85 percent of the time, as compared with 8.48 percent of the time for members of the WNH group and 19.65 percent of the time for Hispanics.

## Protective Pat Downs

- A protective pat down is authorized as an EXCEPTION to the Fourth Amendment's probable cause requirement for a full-blown search of a civilian who is seized by government officials for any reason. The protective pat down is considered a "limited search," whereby police officers are authorized to lightly pat down or frisk the outer clothing of a detainee if the officer has a reasonable factual basis to suspect that the detainee has or could obtain possession of a weapon or firearm.

Justification for non-consensual protective pat downs of African-American, Hispanic or Caucasian civilians, made in the context of investigatory stops, was articulated in 87.11 percent of the ISRs submitted by police officers and approved by CPD on the first try in 323 ISRs reviewed by the Consultant for Period 2.

*Within the three ethno-racial groups representing the majority of all pat downs, the rate of non-consensual, but justified pat downs documented in these 323 investigatory stops was: 91.18 percent for White non-Hispanics; 85.5 percent for Black non-Hispanics; and 91.6 percent for Hispanics.*

- Based on the overriding interest in officer safety, the United States Supreme Court, almost 50 years ago, in 1968, authorized police officers to conduct these limited searches, called pat downs, for protective reasons. This authority is given, however, only when the facts create such a reasonable suspicion. When the facts warrant a reason to believe that the officer is in harm's way, the pat down is justified – regardless of whether a weapon or firearm is recovered from the limited search/frisk/pat down. When the facts

do not warrant such a reasonable belief, the pat down is unjustified – again, regardless of whether a weapon or firearm is recovered from the pat down.

The Consultant's review of post-stop outcomes from *investigatory stops* also reflected that CPD officers know how to articulate RAS for the protective pat down in the majority of cases. Again, the Consultant must assume the truthfulness of the officer's description of the facts surrounding the encounter that warranted the pat down.

## Non-Consensual, Protective Pat Downs[10]

- In 323/371 ISR samples reviewed by the Consultant in which *an investigatory stop was made* **AND** a police officer conducted a non-consensual, protective pat down of a detainee (identified as a member of one of the three ethno-racial groups by the officer), or – stated differently – in 87.11 % of these 371 ISRs, the police officer correctly documented the facts providing RAS/justification for the pat down. In other words, ISR samples from Period 2 reflected that 87.11% of civilians in the three groups, who police officers patted down after making an investigatory stop, were justified, as documented.

- Looking just at the proportion of justified, non-consensual pat downs following from an investigatory stop within each of the three ethno-racial groups, the descriptive numbers are higher for White non-Hispanics (91.18%) than the three-group average, and the proportion for Black non-Hispanics (85.5%) is lower. For Hispanics, the proportion was 91.6 percent.

- These figures – despite being based on small numbers – reflect that CPD's efforts to train its police officers on how to properly document protective pat downs have improved.

---

[10]In cases where detainees gave consent to be patted down by the officer, the question of justification for the pat down does not arise because consent automatically justifies the limited search.

[Noting this mean that the or ignored the he reviewed, pat downs unjustified and not suspicion. seem like a small reflect large who were subject of personal liberty

improvement does not Consultant has overlooked statistic that, in the ISRs approximately 13% of the conducted were based on reasonable Thirteen percent may proportion but it can numbers of individuals to unlawful deprivations for no good reason].

> In 12.89 percent (48) of the ISRs reviewed by the Consultant where a non-consensual pat down took place, police officers failed to document facts sufficient to justify the protective pat down; and in 39 of those 48 cases, the detainee was African-American, whereas in only 2 of the 48 cases was the detainee White and non-Hispanic.  There were 7 detainees who were Hispanic.

- In fact, this high occurred in the rate of justification initial, *first* ISR submitted by police officers during the *first* year of the Agreement.  These statistics are good news for the City, CPD and all Chicagoans.  They are, however, intricately connected to the context in which they arise, as explained below.

On the other hand, speaking descriptively, the proportion of unjustified PPDs proved higher for African-Americans (Black and non-Hispanic) detainees (14%) than for Caucasian detainees (White and non-Hispanic) (9%).  Again, as explained by the statistical experts, however, the weighted numbers of investigatory stops where an unjustified protective pat down took place are small, because in most cases the detainees consented to the pat down.  Thus, not much can be learned by the Period 2 analysis. Future reporting periods may need to identify larger samples to avoid this problem. Moreover, despite the small numbers, 48/371 of the ISRs contained investigatory stops with non-consensual, unjustified pat downs; stated differently: 12.89% overall, among the three groups, were – in fact—not documented in such a way as to justify the pat downs based on the facts reported by the officers.  In 39 of these 48 ISRs, the detainee was Black and non-Hispanic, but in only 2 of the 48 cases was the detainee White and non-Hispanic. There were 7 detainees who were Hispanic.

# Part I.  Introduction

## Overview of the Consultant's Second Semi-Annual Report

This is the Consultant's Second Semi-Annual Report; and, as such, it covers the CPD's efforts to satisfy the terms of the Agreement during the second reporting period of 2016 (*i.e.*, July 1 to December 31, 2016).   Having reviewed and analyzed the data produced by the CPD distilling its investigatory stop and protective pat down activity from Period 2, as well as the CPD's departmental and district-level audits of the same, and investigations related to all civilian and internal stop and frisk related complaints for the 2016 calendar year, the Consultant can attest that the investigatory stop and protective pat down reforms required by the Agreement are being taken seriously by the Department, as is evident in the many ways it has responded to the obligations imposed upon it. The reasons for this finding are set forth in Parts II, III, and IV of this report.

During the past two years, the undersigned, in his role as the Consultant to the Investigatory Stop and Protective Pat Down Settlement Agreement (the "Agreement"), has witnessed members of the Chicago Police Department ("CPD") endeavor to balance their sworn duty to enforce the law with the equally important duty to follow the law when enforcing it; and seen the City of Chicago ("City") and American Civil Liberties Union of Illinois ("ACLU") – collectively the "Parties" – endeavor to collaborate in good faith to bring the written terms of the

Agreement to life.[12]  The Parties' endeavors have been characterized by one clear purpose:  to implement effective policing reforms to ensure that CPD's stop and protective pat down practices are lawful, legitimate, and procedurally just.[13]

The Agreement is not a product of litigation, nor is it compelled by a court-enforced consent decree; instead, it is a voluntary settlement of disputes and exists to avoid the burden, delay and expense of litigation.  Thus, this Agreement, and the obligations it imposes on the City and CPD have been voluntarily assumed.

In Chicago, there is no consent decree that requires the CPD to satisfy any specific requirements related to stop and frisk policies and practices;[14]  and the Consultant is not a consent decree monitor with law enforcement authority and powers.  Consent decree monitors, such as those appointed by the federal courts in Baltimore, Cleveland, Cincinnati, New York

---

[12]The City of Chicago is represented by Chicago's Corporation Counsel, Edward Siskel and First Assistant Corporation Counsel, Jane E. Notz; the ACLU is represented by Benjamin Wolf, Legal Director; and Karen Sheley, Director, Police Practices Project.  A copy of the Agreement is included herein as Exhibit 1.

[13]Throughout this report, the term "protective pat down" is used to describe a "limited search" by a police officer of a detained (temporarily stopped) civilian based on a reasonable articulable suspicion ("RAS") that the civilian is carrying a concealed weapon or firearm.  Although Illinois and the City of Chicago permit a civilian to carry a concealed weapon lawfully, the civilian still can be patted down for protective purposes based on RAS that he/she poses a threat of bodily harm to the officer or nearby persons.

[14]The 2016 investigation of the CPD by the United States (U.S.) Department of Justice ("DOJ") resulted in a critical report, issued on January 21, 2017, regarding the CPD's excessive force policies and practices.  Significantly, the CPD's policies and practices related to stop and frisk were not investigated or made part of the DOJ's Report. The DOJ did not officially report its reasons for limiting the scope of its investigation to excessive force, but timing was most certainly a factor.  Prior to the announced investigation in late 2015, the parties finalized the Agreement, which set in motion comprehensive reform efforts by the CPD that were already in place or nearly finalized and ready for implementation on January 1, 2016, when the DOJ began its investigation.  Moreover, the Agreement's provisions aligned with the reporting requirements of then-also-recently enacted Illinois law, also due to take effect on January 1, 2016.  The parties' successful (if not entirely smooth) roll-out of the Agreement's reform efforts on January 1, 2016, apparently provided the DOJ with sufficient confidence in the advisory oversight, periodic assessments and analysis of CPD's stop and frisk data by the Consultant and designated experts.

City and Seattle, operate as agents of the federal courts with the enforcement power of a federal court to support their determinations. In those cities, the police departments have or have had very specific benchmarks to satisfy based on written plans of compliance set forth in the respective consent decrees, which are continuously monitored by designated members of large monitoring teams.  In those cities, consent decree monitors can dictate to police departments the specific accountability requirements and threshold standards for compliance with the law. The Consultant's role, pursuant to Section V. of the Agreement, is not to dictate, but to counsel, recommend and, if called upon, to decide issues of fact and law.  The Parties appointed the Consultant, a retired federal judge, to serve as a counselor and advisor to them during the course of the Agreement.   As an advisor to both parties, the Consultant can issue advisory opinions; facilitate the agreements already negotiated; and sometimes, if necessary, mediate disagreements to broker compromises which may be necessary to avoid cessation of the agreement.

Review and assessment of the data reported herein could not have proceeded without the invaluable aid and input of the designated experts – all of whom are nationally recognized for their expertise in their respective fields of criminal justice, civil rights law, police practices, and social science statistics.  These experts were selected by the Parties for appointment by the Consultant, and are reimbursed for their work by the City of Chicago, pursuant to the terms of the Agreement.

## Important Distinctions

The scope of the Agreement is limited.  It covers:  (1) temporary, investigatory stops of civilians whom the police officer reasonably suspects have committed, are committing or are about to commit a crime; and (2) "limited searches" for weapons or firearms, now known as protective pat downs, which arise from a police officer's additional, independently based,

reasonable suspicions that the person who is being temporarily detained for investigation might possess a concealed weapon or firearm and therefore present a threat of danger or harm to the police officer or nearby persons. It does not cover searches or seizures governed by the Fourth Amendment's probable cause requirement. The following discussion is intended to elucidate the important distinctions between the investigatory stops and protective pat downs subject to the Agreement, and the other types of stops and searches, which are not.

## Terry Stops

The Agreement's focus on *investigatory* stops and *protective* pat downs means that the Fourth Amendment's *exception to the* probable cause requirement applies. The United States Supreme Court announced this exception nearly 50 years ago in *Terry v. Ohio*, 392 U.S. 1 (1968). The primary exception carved out from the Fourth Amendment probable cause requirement, by a majority of the Justices in the *Terry v. Ohio* case is known today as a Terry Stop or investigatory stop. Any time a police officer intentionally stops and detains a civilian for official reasons, the stop constitutes a "seizure" within the meaning of the Fourth Amendment; and, the investigatory stop is no exception to that general rule. However, in the *Terry v. Ohio* decision, the U.S. Supreme Court recognized that there are instances where police officers merely want to stop a person to investigate reasonably suspected criminal activity, but do not yet have probable cause to take the person into physical custody (*i.e.*, arrest the person). Fourth Amendment seizures based on probable cause to arrest differs from seizures based on reasonable suspicion that the person stopped "may" have been, "may" be, or "may" be about to commit a crime. The difference can be described in terms of *duration, purpose and scope*.

*First*, regarding duration, an investigatory stop is limited to a brief, not necessarily physical, detention, no longer than necessary to confirm or dispel the suspicion(s) of the police officer making the stop; whereas a custodial stop is, by definition, one in which the person who is seized is taken into physical custody for an indefinite length of time. In the case of an investigatory stop, the duration of the stop depends upon the questions the police officer needs to answer based on the factual circumstances justifying the temporary detention for questioning; but, in the case of a custodial stop, the duration is not at issue because the officer has probable cause to arrest the person based on observed or known facts justifying physical custody.

*Second*, regarding purpose, although a Terry stop is a Fourth Amendment seizure, because the purpose of the stop is *limited to investigation* (based on questioning the subject) rather than taking physical custody), the police officer only needs factual justification sufficient to make his or her suspicion of criminal activity *reasonable rather than probable*. Stated differently, the Terry stop exception to the Fourth Amendment's rule that a police officer can only seize a person (and therefore deprive them of personal liberty to move about unrestrained by the government) if the facts provide probable cause for the detention, is based on a practical recognition that a law enforcement officer's reasonable suspicion that the person stopped has, is, or is about to commit a crime is sufficient to temporarily detain the person for investigative questioning, even if the police officer's reasonable suspicion proves to be unfounded after further investigation and the detainee is released without any resulting enforcement action being taken.

*Third*, regarding scope, the difference again can be stated in terms of degrees. The Terry stop is temporary (rather than potentially permanent), limited in terms of time (brief) and

purpose (investigative questioning), and justified by a lower threshold of suspicion, namely, the "reasonableness" test rather than the law of probabilities. As a result, the factual circumstances giving rise to the stop need only be articulated by the police officer, rather than be those which are sufficient to prove that all the elements of a crime have been, are, or will be committed by the detainee.

There is one other key difference between the Terry stop and a seizure in which a custodial arrest is made and that concerns the scope of and justifications for the officer to search the detainee for weapons, firearms and contraband. In the *Terry v. Ohio* case, the U.S. Supreme Court recognized that once a person is detained be an officer, that person, having been reasonably suspected of criminal activity, may pose a threat of harm to the officer who seeks to merely question the detainee without taking full physical custody of the person (*i.e.*, custody implies physical restraint that permits the officer to secure the detainee and remove any possible threat of harm by the detainee during the ensuing investigative questioning). Consequently, the *Terry* decision created a second exception to the "search" requirement of the Fourth Amendment, which requires officers to have probable cause for a full-blown search of the detainee's person or possessions.

In a Terry stop situation, a police officer is given authority to conduct a protective pat down of the subject's outer clothing to determine, by plain touch, whether the detainee has possession of a weapon or firearm which could be used to harm the officer during the investigative questioning. Such a pat down is defined by its purpose: protection. Thus, the level of suspicion that justifies it is limited to reasonable suspicion based on facts which can be articulated by the officer. The pat down is not justified if the officer merely suspects that the

detained person has possession of drugs or other non-dangerous contraband. If such a suspicion is present, the officer needs probable cause to conduct a full-blown search.

The protective pat down should not be used as a bridge for gaining probable cause to search inside the subject's clothing for drugs if, in fact, there are no grounds to suspect the detainee is in possession of a weapon or firearm that can endanger the life of the officer or nearby persons. That means that officers cannot use the plain touch of a protective pat down to feel for plastic bags inside a coat; it can only be used to detect weapons or firearms, and if plain touch provides probable cause to believe the detainee does, in fact, possess a weapon or firearm, then the officer is authorized by Terry to reach inside the clothing or possessions of the detainee to search for dangerous weapons or firearms that could be used to harm the officer or nearby persons.[15]

## Protective Pat Downs

The Terry Court also carved out from the Fourth Amendment another exception related to a "limited search." The limited search is known today in common terms as a protective pat down or "frisk" – terms which will be used interchangeably in this report. A frisk is a limited

---

[15]Note, here, that police officers with probable cause can also search a detainee for contraband, such as illegal drugs. But, in the case of the Agreement, which is at issue in this report, the Parties only agreed to review and assess protective pat down activity. Consequently, as discussed above and elsewhere in this report, the only type of search the Consultant is concerned with in the CPD's ISR data is the kind that flows from the protective pat down. The justification given in Terry for creating the protective pat down exception to the Fourth Amendment's probable cause requirement is, therefore, controlling in terms of the type of items the Consultant is concerned with when assessing what, if anything, the police officer "finds" from the limited search known as a protective pat down. In other words, the protective pat down is justified by reasonable suspicion (rather than probable cause) only because the threat of danger to the law enforcement officer is considered to be an overriding public concern that trumps the individual's liberty interest and constitutional right to be free from a public, governmental search of one's physical person. Thus, the protective pat down is justified only by the reasonable suspicion that the detainee is in possession of a weapon or firearm. Any plain touch from the protective pat down which gives probable cause to suspect contraband other than firearms or weapons is problematic when it comes to justifying a full-blown search that results in the officer reaching inside the outer clothing of the detainee to pull out illegal drugs in a plastic "baggie" or something that is clearly not a weapon or firearm.

search of a person's outer clothing to determine whether the subject **of an investigatory stop** is concealing a weapon or firearm which the police officer conducting the investigatory stop reasonably believes poses an imminent threat of danger or harm to the officer or nearby persons. Thus, the term "frisk" applies only to the limited search actions which follow from an investigatory stop. It does not apply to more intrusive searches authorized by the probable cause requirement of the Fourth Amendment. The Terry decision (and the many cases since which have attempted to elucidate its parameters) requires the law enforcement officers to have an independent, reasonable justification for suspecting that the detainee possesses a concealed weapon or firearm after the stop is made.

More intrusive search activity -- that which does more than pat down the outer clothing of a subject) -- which follows from a *Terry* stop is NOT automatically justified by the same set of facts justifying the investigatory stop (*i.e.*, facts establishing RAS); nor by the independent set of facts establishing RAS for the protective pat down. A more intrusive search requires its own independent probable cause. In short, to fall within the *Terry* exception, the more intrusive search must be limited to one that flows directly from evidence obtained by plain touch from the protective pat down or some other extenuating circumstances which occur during the protective pat down giving the officer probable cause to search inside the outer clothing of the detainee.

## Fourth Amendment Exceptions to the Probable Cause Requirement for Searches

There are, however, a few exceptions to the probable cause requirement for these more invasive searches. The most common exceptions that appear in the CPD data are consent and the plain touch doctrine, so discussion here will be limited to those two.

## Consent to Search

Consent given by the detainee is an overriding exception to the Fourth Amendment's probable cause requirement. Thus, where such consent is obtained, the police officer need not articulate reasonable suspicion to pat down the subject based on a reasonable fear of imminent harm from concealed weapons or firearms. Moreover, where consent to search exists, probable cause does not need to be present. Thus, it goes without saying that a police officer who obtains consent to conduct a search from a detainee is authorized by the detainee to reach inside this person's clothing or effects for any reason or no reason at all.

Concerns about coercion or coerced consent, based on the fact that police officers carry firearms, which create an imbalance between the power of a law enforcement officer and unarmed civilian, are axiomatic. Although the ISRs are self-reported actions and subject to the veracity of the reporting police officers, none of the investigatory stop reports *reviewed by the Consultant* from the randomly drawn sample ISRs submitted during Period 2 contain sufficient factual indicia to warrant such a conclusion.

## The Plain Touch Doctrine

The "plain touch doctrine" is the second exception to the probable cause requirement for a more intrusive search, and it is often present during investigatory stops where protective pat downs ensue. The plain touch doctrine exception is based on a police officer's ability to discern, based on professional training and experience, what a concealed weapon or firearm feels like. Based on this experience, the police officer is presumed to have probable cause authorizing the officer to reach into the outer (or inner) clothing of the subject to retrieve the object believed to be a weapon or firearm. Principled enforcement of the plain touch doctrine, however, is not realistic and therefore subject to abuse by officers who are willing to report that the objects they

touched during the pat down felt like a weapon or firearm, even though the object – once removed, turned out to be anything but a weapon or firearm. In other words, the law presumes that a police officer conducting a protective pat down can claim, based on experience and the plain touch doctrine, that nearly any felt object justifies a more intrusive search and authorizes an officer to reach inside the outer (or inner clothing) of a detainee to remove the felt object. This presumption does not dissipate if the object removed from the detainee turns out to be contraband (lawful or unlawful) or drugs (lawful or unlawful). It also does not depend on the weapon or firearm, if one is retrieved, being lawfully or unlawfully possessed.[17]

## Important Changes in Period 2

Without the Agreement, the CPD's stop and frisk reform efforts would look very different than they do today, because important changes have taken place since August 5, 2015, when the parties entered into the Agreement. The Consultant discussed some, but not all of these changes, in the First Semi-Annual Report ("First Report"), issued on March 23, 2017.[18] While the reforms that were implemented during the first reporting period ("Period 1") were essential to the roll out of the ISS Policy, even more vital reforms were rolled out and took effect during the second reporting period ("Period 2") of the Agreement (July 1 to December 31, 2016). The most important changes are discussed below.

---

[17]In this regard, during his review of the ISR sample narratives, the Consultant noticed many cases where the object suspected as a weapon or firearm, when retrieved by a search, turned out to be cell phones or oversized wallets.

[18]The Consultant's First Report is incorporated herein by reference. *See, e.g.,* the Parties' respective websites, https://www.cityofchicago.org/content/dam/city/depts/dol/supp_info/TheConsultantsFirstSemiannualReport032317.pdf; and https://www.aclu-il.org/sites/default/files/wysiwyg/the-consultants-first-semiannual-report-3-23-17.pdf

## The Versioning System

Full implementation of the Versioning System to the ISS Database is a critical example of a vital change which took place at the start of Period 2, based on a discovery during Period 1. During Period 1, the Consultant determined, based on review of monthly ISR data reports, that the "records of review by police district supervisors" (Section II.3. (b)(i)) did not appear in the data produced.[19] By this discovery, the Consultant identified an undetected and unintentional database design; but, to their credit, the City and CPD promptly corrected the problem, once notified, by modifying the ISR database to archive every version of each ISR. The result of this modification process is known now to the Parties and the Consultant as the "Versioning System," which took effect on June 16, 2016, shortly before the start of the second review period/Period 2.

With the Versioning System in place on July 1, 2016, at the beginning of Period 2, the CPD's monthly data reports produced ISR data for the Consultant to review not only the final versions of the "approved" ISRs, but also additional "versions" of (or internal notifications regarding administrative deficiencies with) the ISRs, which a supervisor directed the ISR author to make after review. The Versioning System, however, is complicated and, although it defies

---

[19]The data produced for Period 1 did not permit the Consultant to review all records related to the Investigatory Stop Report ("ISR") submitted by police officers during that period. Specifically, when district supervisors identified deficiencies (either substantive or procedural/administrative) in submitted ISRs during daily reviews, the deficiencies noted by the supervisors on the deficiency review notification forms, as well as the supervisor's comments instructing the ISR's author to take corrective actions or to explain the basis for the deficiency, were not originally nor readily made available for the Consultant's review. Without all versions of the Period 1 ISRs, the Consultant did not have a basis upon which he could make the legal determinations required by the Agreement, as indicated in the First Report, pp. 76-80.

easy explanation, the Consultant will set forth below his understanding of how it works, because it is foundational for understanding the Consultant's auditing system analysis.

## The ISR Workflow[21]

For Period 2, the Versioning System not only allowed the Consultant to verify that all submitted ISRs were identified and counted by the designated Experts, but also to ensure an accurate legal review of ISR samples, as well as a comprehensive statistical assessment and analysis process. Additionally, the Versioning System also permitted the CPD's internal auditors, specially trained executive officers, to perform other necessary functions required by the Agreement and CPD's stop and frisk policies and directives in Special Order 04-13-09.

In general, CPD now maintains data records of all ISRs submitted by police officers, both those which were immediately "approved" by district-level source unit supervisors (typically with the rank of Sergeant) who reviewed them, and those which were identified as deficient in some way by a supervisor on review. If immediately approved by a supervisor, after submission, the ISR is archived as a single version record (SVR).

Conversely, if identified as deficient, then the ISR is either sent back to the submitting officer for correction or modification, or sent to the newly created Integrity Section/Unit ("IU"), which is part of the Bureau of Organizational Development, for a "deficiency review" by executive officers.[22] If sent to the IU for a second review, the same review and return for correction process begins again, unless the Integrity Unit "finalizes" the ISR by either approving it or rejecting it (without return to the ISR author). The Versioning System keeps track of all

---

[21]This description is taken from CPD's ISR Workflow Chart (Exhibit 7). .

[22]The term "Integrity Unit" (or "IU") is also sometimes interchangeably referred to by the parties and the Consultant as the "Integrity Section."

these movements and changes. Thus, when an ISR is "finalized" there may be only one version of an ISR (referred to in this report as a single version ISR record or "SVR") or there may be more versions of the same ISR (a multiple version or multiple record ISR or "MVR"), which is stored in the "Archive" files of the ISS Database with an archive code attached (ARC).

The good news is that all of these versions are now fully accessible to CPD's reviewing auditors, investigators and supervisors, and were produced to the Consultant and experts for assessment and analysis. The not so good news is that the compilation of such records, as well as the Consultant's review and analysis, has proved extraordinarily complicated and time-consuming. Moreover, the results of the review and analysis (as well as the CPD's daily and monthly audits) show that not all ISRs are being submitted ("PRE"), reviewed by a supervisor (SUB); and corrected (DEF) in a timely manner.

The Consultant's observations and comments in this regard are not meant to suggest that the CPD engage in significantly more documentation of its work flow processes, but are offered only to highlight some of the improvements to its current reporting system that the Consultant believes would enable the CPD to produce better results on these issues. Because the CPD must assure the Consultant that all investigatory stops and protective pat downs are being reported on ISRs, submitted for supervisory review, and finalized (with or without corrections), the Consultant needs to convey that, in future reporting periods, he will be paying more attention to the status codes reported in the auditing records for each period. Because the Versioning System and ISR workflow provide a foundation for future analysis of the ISR data, a more specific assessment of how the system operates, as the Consultant understands it, is

offered below. When an ISR is submitted for review, a supervisor can take one of the several actions discussed below.

*First*, if the ISR is submitted for cancellation (CNL) because the officer made a mistake, then the supervisor can approve the cancellation (CNL/ARC) or reject the cancellation and place the ISR in a "deficiency review" status by sending a "deficiency review notification" to the officer. The DRN should identify the deficiency and instruct the officer to take corrective measures. If the request to cancel the ISR is rejected and the identified deficiency cannot be corrected, the supervisor must then send the ISR to the Integrity Unit to sign off on the rejection and place the ISR in a final rejection status (deficiency review rejection final).

*Second*, if the ISR is submitted for supervisory review (SUB), then the ISR can be approved and finalized with an "APR" status code and then archived (APR/ARC); OR the ISR can be rejected as having one or more deficiencies that require correction or modification of the ISR by the submitting officer. In the latter case, the reviewing supervisor will assign one of various status codes to the ISR and attach a DRN to the ISR. If the identified deficiency is based on a substantive error (*e.g.*, failure to articulate the legal basis for a stop, protective pat down or search; or lack of alignment between a hard-copy ISR submission and the ISR submitted digitally to the ISR database), the supervisor can do one of two things: return the deficient ISR to the police officer to correct the deficiency, if possible, in which case a "DEF" code is assigned for "deficiency rejection"; or forward the deficient ISR to the Integrity unit to determine whether correction is possible, in which case the source unit supervisor assigns a status code of "REV," which stands for "deficiency rejection review." If the Integrity Unit agrees with the source unit supervisor, then the deficient ISR is finalized as a "deficiency rejection review final" or "FIN" and

archived as such. If the Integrity Unit does not agree with the source unit supervisor, then the deficient ISR is assigned a "DEF" status code and either returned to the submitting officer for correction or modification with a DRN identifying the deficiency, or sent back with an email to the source unit supervisor with instructions.

*Third*, if the ISR is submitted for supervisory review (SUB), and the source unit supervisor identifies an "administrative" deficiency of a non-substantive nature (*e.g.*, "a clerical mistake or simple omission"), then an REJ status code is assigned and the supervisor returns the ISR to the author for correction and resubmission. Once corrected, the process repeats itself and all status codes can be assigned to the new or second "version" of the ISR.

At no time does the automated ISR database assign a new ISR number to a previously submitted ISR. Instead, once an ISR is submitted and assigned a status code, a copy of the original submission is immediately archived (ARC), while the originally submitted ISR is returned for correction, forwarded for review, or finalized as approved, rejected, or cancelled. Thus, each "version" of the originally submitted ISR retains the same ISR number, no matter how many versions are created during the correction, review and finalization process.

There are many fine points to commend about the Versioning System created by CPD, but the one point of focus for this Report must be on the adept way that it permits the CPD to identify ISRs not yet submitted by police officers for supervisory review, but rather placed on "hold" by being "saved" for later submission. These saved (but not cancelled) ISRs are assigned the status code of "PRE" for preliminary when they are saved in the automated database. Because the ISS Policy requires police officers to submit all ISRs generated for investigatory stops and protective pat downs during their tour of duty by the end of that tour, the fact that

the Versioning System generates ISR data which, when reviewed or audited, permits one to identify by the date and time stamp of the ISR whether the officer timely submitted it in compliance with ISS policy, is an important achievement integral to the CPD's goal of achieving substantial compliance with the terms of the Agreement.

The preliminary ("PRE") status ISRs are of special interest to the Consultant – just as they appear to be to the Captains performing the district and area level monthly audits. For the Consultant's part, the reason for this special interest is related to obtaining accurate and complete stop and protective pat down numbers for each reporting period. It is imperative for the CPD going forward to devise a way to prevent ISRs from lingering in a saved or preliminary status without being submitted for supervisory review in a timely manner (*e.g.*, by the end of an officer's tour of duty, pursuant to CPD policy).[24]. The Consultant must be confident that all ISRs, which are generated during a particular reporting period, have been submitted to and reviewed by a CPD supervisor prior to the Consultant's legal review of the statistically representative sample of ISRs.

Therefore, the City and CPD would be well-advised to ensure that all ISRs produced for future periods do not have a PRE status code, indicating that the report has not yet been submitted for review, or an SUB status code, indicating that it has not yet been reviewed by the supervisor and finalized or rejected and referred back to the officer for correction or forwarded to the IU for further review. Ideally, all ISRs would be finalized as approved (APR) or rejected

---

[24]The Consultant is aware that the CPD's "tour of duty" policy is a strict deadline. Although the Consultant agrees with the City and CPD that "realistically" not every ISR can satisfy this requirement, the tour of duty standard is an express provision in the CPD's Special Order 04-13-09, Section VII. B. 4 and VIII. B (Exhibit 2), which the Consultant is not free to disregard.

(FIN) by the end of each reporting period, so that the Consultant could code and analyze the ISR data based on the CPD's final determinations. Because this finality is not realistic, the Consultant strongly urges the City and CPD to ensure that at least the first level of review has been completed. If that minimal threshold is met, then the Consultant can approach the legal determinations of disparate impact and substantial compliance from that perspective.

CPD auditors appear to be attuned to the significance of ensuring a timely ISR workflow, because the auditing reports chronicle the efforts of executive officers to, more or less, encourage officers to submit timely ISRs. Indeed, in the section of this Report where the CPD's auditing systems are discussed, the Consultant notes that the CPD's executive officers (typically, Captains) paid particular attention to the number of ISRs in the monthly district and area audits in which ISRs appeared in a PRE status; and, in those reports, many Captains appeared to be making a visible effort during Period 2 to encourage district supervisors to motivate their police officers to move the ISRs in PRE status through the process of submission and supervisory review in recognition of the fact that ISS Policy requires submission of ISRs by the end of each police officer's tour of duty. A comparison of certain districts where a higher number of preliminary status ISRs existed in July 2016 with monthly audit reports from December 2016 of those same districts show that the CPD Captains were mostly successful, with a few exceptions.

Of equal interest to the Consultant are the ISRs submitted and approved by supervisors for cancellation and then archived without ever being finalized (CNL/ARC), as well as the ISRs rejected, as submitted, due to one or more substantive deficiencies that supervisors and the Integrity Unit determined could not be corrected, and archived as finalized rejections (with a

status code of "FIN"). During the legal narratives review of ISRs in the representative sample randomly drawn by the statistical experts, the Consultant discovered very few that were rejected and finalized with an "FIN" status code. Indeed, when the Consultant asked the statistical expert to search for and determine the total number of ISRs with FIN codes for Period 2, the number found was one-hundred and eleven (111) out of 51,538 ISRs. This means that the CPD determined that ISRs with substantive deficiencies could be corrected (and presumably were modified) in all but approximately 0.22% of reviewed ISR cases.

Considering the importance of knowing how many ISRs were rejected for not stating RAS for investigatory stops and protective pat downs, it is fair to suggest that the CPD auditors continue to pay close attention during the monthly audits to the number of ISRs in the "PRE" and "FIN" status, as well as those ISRs in "DEF" status that have not yet been corrected by police officers, despite having been sent "deficiency review notifications" (DRNs) with orders to correct and resubmit the ISRs, earlier in the month.

Unfortunately, the Consultant has no way to determine whether the ISRs that were noted as uncorrected in one month carried over into subsequent months or were part of a prior month's numbers. However, this may be one of the things that the Integrity Unit may want to pay close attention to in future reporting periods. The investigatory stop and protective pat-down numbers, which are tabulated by the Consultant's statistical experts for every reporting period, are greatly affected by non-finalized ISRs, and if the identified issues are substantive and related to failure to articulate RAS or probable cause, but an officer does not correct the deficiency after a designated period of time, then the CPD may want to consider automatic final

rejections (FIN status), rather than allow these ISRs to languish.[25]  Because the audits, like the Consultant's narrative reviews, are based on randomly drawn **representative samples**, even a few ISRs in this category, when extrapolated to the entire ISR database for the reporting period, could equal hundreds of stops.

The Versioning System has produced all ISR data being created, all of which show that the ISS policy is being actualized in practice, even if specific aspects of the policy have not yet been fine-tuned to provide the level of consistency and uniformity that one might hope for in future reporting periods.  This data serves as the basis upon which the Consultant can ultimately validate that CPD's supervisory review and auditing methods are, in fact, operational and functioning in the ways required by CPD's own ISS Policy.

Although the positive effects of implementing the new "Versioning System" Database cannot be overstated in terms of the clarity it provides to the Consultant and the statistical experts when reviewing the ISR data, nonetheless, implementation of the ISR "workflow" of the Versioning System is still a work in progress.  Review of the CPD's supervisory review and auditing reports, for example, reflects that various members of the CPD, both those officers submitting ISRs and those officers reviewing them, do not possess a uniform and consistent understanding of the various status codes and review processes necessary to submit, review and finalize an ISR.

---

[25]In fact, during the Consultant's review of the MVRs, it was noted that a number of the randomly drawn sample ISRs were not finalized, but remained in a "deficiency review" status, having been returned to the submitting officer for correction, but not yet having been resubmitted for review.

## The Integrity Unit & Auditing Protocols

The voluntary nature of the Agreement means that the CPD is not obligated to satisfy any specific obligations related to accountability, other than those which it has already imposed upon itself in the ISS Policy, as set forth in Special Order 04-13-09 (rev. July 2017).[26] The ISS Policy establishes internal accountability system requirements for CPD staff, but these requirements arise as a function of the internal departmental policy, not state or federal law. Thus, the CPD is only required to satisfy the provisions of the Agreement calling for the CPD to establish and implement methods for "continuous police district supervisory review" of ISRs; methods for district and departmental auditing of the ISRs and supervisory reviews; a civilian and internal complaint system; and a "corrective measures" system that provides enhanced training, supervision, and – if necessary – discipline for violations of applicable laws and CPD directives related to the ISS policy or other CPD orders.

The Consultant's role when assessing the accountability provisions of the Agreement is therefore limited, because the issue is not about compliance (i.e., whether the CPD's accountability system "substantially complies with" an external legal standard), but rather validation. Validation involves assessment only of whether: (1) the accountability system

---

[26]*See* Special Order 04-13-09, attached as Exhibit 2. The CPD website also has a specific statement regarding its commitment to accountability. This accountability statement reflects the dual objectives of legitimacy and procedural justice contained in the ISS and identifies three (3) important objectives, namely: (1) Public Confidence (Civilian Complaint System); (2) Police Officer Confidence (Civilian and Internal Complaint System); and (3) Accurate Management Information (Auditing of ISR data and Complaint System). With regard to the management objective, there are two goals: (a) to assess departmental responsiveness to the community; and (b) to identify areas of improvement related to policy, practices and training. See https://home.chicagopolice.org/inside-the-cpd/accountability/

designed and implemented is consistent with internal ISS Policy directives; and (2) the accountability system, as designed and implemented, is actually functioning in the way that the ISS Policy directs. It does not, like compliance, require factual or legal analysis of qualitative measures, as the provisions in the Agreement related to the ISRs do.

With regard to the accountability provisions, specifically those related to auditing protocols, the Consultant's role is simply to "[r]eview and validate CPD's policies, practices, and orders regarding investigatory stops and protective pat downs, including but not limited to, … CPD's method of supervisory review of investigatory stops and protective pat downs, and CPD's method of auditing investigatory stops and protective pat downs."[27]

To that end, the Consultant validates that, during the development of the accountability system described by the ISS Policy, the City and CPD worked together with the ACLU, as well as the Consultant and Police Practices Expert, to create auditing protocols that would bring the Department into compliance with the nation's best police practices. Thus, qualitative measures were considered and adopted on the front-end of the Auditing System's design and purpose; and, notably, the CPD went further than the Agreement's provisions required when it designed the accountability system provisions, which are specified in more detail within the Investigatory Stop System Policy and directives.[28]

---

[27]*See* Agreement, Exhibit 1, Section V.2. (a).

[28]*See* Special Order 04-13-09, Exhibit 2, Section VIII.

# Part II.  The Qualitative Assessments & Analysis

In Part II, the Consultant will discuss the qualitative assessments he made of the ISR data, which covers:  Auditing & Supervisory Review; Civilian & Internal Complaints; Corrective Action & Discipline; Community Policing Initiatives; and Implicit Bias Training.

## Auditing & Supervisory Review

The Consultant commends the CPD for some impressive achievements in 2016, most notably its implementation of a new auditing system at the start of Period 2 (July 1, 2016).[36] The auditing system designed and put into place by CPD for Period 2 makes use of new forms and protocols to enable police district and department-level supervisors to review the investigatory stops and frisks of subordinates being made for legal and procedural compliance with ISS Policy (and by extension the Agreement).[37]   The Consultant has reviewed the auditing files that CPD produced in July 2017 (some of which are sampled) from the entire data set of 50,717 ISRs submitted by police officers and reviewed by district-level during Period 2.[38]

---

[36] The Agreement, by its terms, appears to contemplate a lag time between the effective date of the Agreement's terms and the establishment of an auditing system and protocols in Section II.3, wherein it is agreed that by January 1, 2016, CPD was only required to "establish and enforce policies providing for continuous district level supervisory review and quarterly or semi-annual department-level audits" of CPD's investigatory stop and protective pat down practices.  Indeed, the CPD's Investigatory Stop System Policy, memorialized by mutual consent and agreement of the parties to this Agreement, as required by the same subsection (3), in Special Order 04-13-09, and specifically in Section VIII.C.3., was established and being enforced on and after the effective date of the Agreement.

[37]*See* Exhibit 2 (S04-13-09, I.K.)

[38]The City and CPD produced one-third of all audits performed during Period 2, which totaled 1,350 individual .pdf files and 3,847 individual records.  Review of these files, however, revealed that the December Audits were overlooked.  When those files were produced, the total number of auditing records is approximately 4,000.

In general, the Consultant's review of the three audits performed by CPD during Period 2, reflects that the CPD's auditing and supervisory review processes, which aim to satisfy the accountability objectives of the Agreement, is well underway. Validation of these processes, however, requires something more than recognition that such processes have been designed, implemented and are being enacted on a daily, monthly and bi-annual basis. Validation also means that the auditing and supervisory review processes are achieving their intended objective of ensuring that police officers' stop and frisk practices conform and "substantially" comply with ISS Policy and all applicable laws.

The Consultant cannot yet fully validate that the auditing systems and supervisory review practices and protocols that CPD put into place during Period 2 are achieving the accountability objectives required by the Agreement. Specifically, the presence of an unknown number of ISRs still showing up in a preliminary status at the end of each month in the second reporting period reflects that not all ISRs are being submitted for supervisory review in a timely manner (*i.e.*, by the end of the ISR author's tour of duty). Moreover, because the stops and frisks related to those un-submitted ISRs have not been reviewed for legal (and thus substantial) compliance with applicable laws and internal CPD policies by a reviewing supervisor, the Consultant is unable to conclude that the primary objectives of the auditing and continuous supervisory review provisions have been fully achieved.[39] The specific reasons for these findings are set forth below.

---

[39] Because the parties have not yet defined substantial compliance, nor indicated that they cannot agree on a definition so that the Consultant can determine its meaning on his own, according to Section IV.1-3. of the Agreement, the Consultant cannot apply an undefined standard or measure to fully validate the audits at this time.

In Section II of the Agreement, the parties developed a game plan for the CPD designed to create accountability for unlawful stop and frisk police practices. This game plan created accountability both internally and externally to the Department. The internal accountability strategy involved formation of an internal auditing and supervisory review accountability system for ISRs. The external accountability involved designating the Consultant and experts, and permitting the ACLU, to periodically review and assess the CPD's internal policies and practices with regard to investigatory stops and protective pat downs – specifically regarding the ISR Database.

The internal accountability plan is what the Consultant reviewed for Period 2. The internal accountability systems prescribed by the Agreement include:

- "continuous district-level supervisory review" to determine whether the ISRs submitted by police officers "state legal grounds for the investigatory stop and/or any protective pat down;"

- "quarterly or semi-annual department-level audits of CPD's investigatory stop and protective pat down practices;" which include documentation of (a) civilian and internal complaints relating to investigatory stops and/or protective pat downs; (b) narrative sections of a statistically representative sample of individual ISRs; and (c) records of supervisory corrections or rejections of ISRs.

Significantly, these terms were designed with two purposes:

- To ensure that CPD's investigatory stop and protective pat downs policies and practices do not promote biased policing; and

- To identify through continuous review at the district-level and regular auditing at the department-level those police officers who repeatedly fail to document investigatory stops and/or protective pat downs, or who conduct investigatory stops and/or protective pat downs without the requisite reasonable suspicion.

The CPD's ISS Policy directives, as written, set out to satisfy the terms of the Agreement by calling for three types of audits to be performed by executive officers trained to ensure compliance with all applicable laws. These three audits include: (1) investigations of civilian and internal complaints & corrective actions and disciplinary measures; (2) daily audits of a statistically representative (10%) sample of district-level ISRs submitted for supervisory review; and (3) monthly captains' audits of Chicago's 22 police districts.[40] In addition to the audits identified, the IU initiated a fourth audit, which was not required by the Agreement or CPD policy. This audit was, instead, a special project initiated by Captain Karyn Murphy, who commands the IU, based on her observations that some ISRs were part of arrests where the officers mistakenly filed only arrest reports, rather than also documenting the stop that led to the arrest with an ISR. The special project arrest audit during Period 2 therefore involved examination and evaluation of arrest reports to determine whether police officers making arrests were sometimes failing to create and submit an ISR.

In Period 2, most of these four types of audits were performed by Executive Officers, typically holding the rank of Captain, who are assigned to one of the 22 police districts and/or one of the three main areas of Chicago (*e.g.*, North, South or Central) within the Bureau of Patrol. Some monthly audits were completed for tactical units within the Bureau of Organized Crime, as well.

---

[40]Based on the Consultant's personal review of the approximately 4000 auditing records produced to the Consultant for review, it appears that executive officers also include in their monthly reports any and all assessments and/or information regarding ISRs generated and submitted by non-police district personnel from time-to-time. Examples of such assessments include monthly reports from the three Area Commanders within the Bureau of Patrol, reporting on ISR activity by tactical team officers assigned to various police districts, and Bureau of Organized Crime Commanders, reporting on ISR activity by police officers assigned to the Gang Violence, Narcotics and Vice/Forfeiture Divisions.

According to CPD policy, after completion of monthly audit reports, the Executive Officers forwarded the monthly reports to the newly developed Integrity Unit, which is part of the Bureau of Organizational Development. Development of the IU was a Period 2 Initiative intended to provide oversight for the CPD's newly established accountability systems. The Consultant believes that creation of the IU is sure to produce lasting and constructive change within the Department. The IU is staffed by specially trained officers, who perform the random daily audits of finalized, approved ISRs. The civilian and internal complaint audits, as well as the special project arrest audits, were performed by the IU. Captain Murphy, who leads the IU, is also the key figure in the Department charged with the responsibility of training supervisors and officers, as well as reporting to top level commanders about the progress of and any issues with the ISR workflow process and auditing reports. She is also the author of the Bi-Annual Auditing Reports submitted by the City and CPD to provide detailed information about the internal results of each audit.

The Consultant's review of the Bi-annual Auditing Report for Period 2, produced to the Consultant on or about May 17, 2017, together with a sample set of documents representing the four-types of audits completed during and for Period 2, indicates that all audits conducted by CPD during the period were carefully designed and supervised with the intent of satisfying the substantial compliance obligations of Sections II and IV of the Agreement. The results of these four audits appear in the Bi-Annual Auditing Report for Period 2.

## The Agreement's Auditing & Supervisory Review Terms

The Agreement sets forth two accountability goals for the CPD related to stop and frisk activity: continuous district-level supervisory review, and quarterly or semi-annual department-

level audits. The Agreement then creates a "validation" check on the CPD by requiring the Consultant to review and then validate that the Department's auditing protocols and results are consistent with these two auditing goals for two (2) consecutive reporting periods (a one-year time frame) before the Agreement's terms are considered satisfied. In general, the Agreement requires CPD "police district supervisors" and "CPD headquarters staff to assess and address, by "establishment of re-training, enhanced supervision, or discipline[,]" any and all police officer performance issues related to "unlawful" stop and frisk activity OR violations of "CPD policies or procedures governing these practices."[41] More specifically, the Agreement requires district supervisors to create and maintain "records of supervisory corrections or rejections of Investigatory Stop Reports and, by implication, also records of the ISRs that police officers submit to them.[42]

Inherent in this requirement is the imperative for the CPD to preserve for review any and all ISRs submitted by police officers, any records of supervisory review of complaints associated with them, and any audits of such reports by CPD headquarters staff. In this regard, the Consultant can validate that such preservation practices are in place and that all necessary records are currently being stored as archived data within the ISR Database, including automated audits beginning on or about October 11, 2016 forward, as well as civilian and internal complaints and reviews of such complaints filed on or after January 1, 2016. Prior to these dates, the CPD endeavored to preserve records in paper files located at CPD headquarters. Samples of all relevant auditing paper files have been produced to the Consultant to "review and validate,"

---

[41]*See* Exhibit 1, Agreement, at II.3. a. - b.

[42]See Exhibit 1, Agreement, at II.3. b. (i) - (ii).

as well as copies of all civilian and internal complaints for calendar year ("CY") 2016. After review of both the auditing and complaint files (both paper-based and automated digital files), the Consultant finds that there is no issue with regard to compliance with the preservation aspect of this requirement.

Section II of the Agreement, however, appears to have as its primary objective that the CPD manage a consistent and *uniform system* of auditing and supervisory review. This objective exists to ensure that CPD supervisors and auditors identify problematic policing practices that occur on individual and departmental officer levels. At a departmental level, unlawful actions of multiple individual officers, which occur on a customary basis, may take on the quality and character of an unwritten department-level policy.

The Agreement's accountability provisions seek to short-circuit illegitimate police practices on both an individual and departmental level. As indicated in the introduction to this report, the Agreement's provisions, when compared with the ISS Policy directives in S04-13-09, reflects that the CPD adopted far more stringent requirements for accountability than the Agreement generally required.

## The CPD's Policy Version of the Auditing & Supervisory Review Directives

The CPD's Policy directives, which are required by the Agreement, set forth very specific procedural and documentation responsibilities that must be adhered to by supervisory staff in order to ensure that the terms of the Agreement and applicable stop and frisk law are being followed by police officers. In this regard, CPD Policy, as set forth in S04-13-09, requires, among other things, that supervisors must review and ensure that all ISRs are properly completed and

conform to Department policy, and that the forms be approved or rejected by the end of their tours of duty.

For ISRs that are disapproved or rejected for: (1) failure to document the justification for a stop, frisk and/or search;(2) improper justification for the stop, frisk and/ or search; (3) the hard copy of the submitted ISR does not match the electronic version entered into the ISR Database, or (4) the ISR was submitted in error because the officer's action did not require the submission of an ISR, the supervisor must personally inform the officer of the reason for the disapproval or rejection and complete an Investigatory Stop Report Deficiency Notification. In such cases, the supervisor must include in the Deficiency Notification the action that was taken to address the deficiency, such as reviewing the policy with the officer, recommending training or the initiation of progressive discipline, if warranted, which Deficiency Notification is forwarded to the Integrity Unit. If the rejection is based on non-substantive deficiencies, such as typographical errors, or incomplete fields in the Investigatory Stop Database, the supervisor is instructed to correct the error and to resubmit the ISR by the end of the officer's tour of duty, unless a subsequent interview with the officer reveals that the stop and/or frisk was not justified or that the ISR should not have been completed, in which case, the ISR must remain in rejected status for clearance by the Integrity Unit.

Similarly, executive officers (typically officers with the rank of "Captain") are charged with the responsibilities of ensuring that supervisors are timely and properly reviewing and approving all submitted ISRs by conducting monthly internal audits and reporting their findings to the Commanding Officers of the various Bureaus which oversee the officers who are submitting ISRs. Executive Officers appear to be authorized to take appropriate and corrective

actions regarding ISR deficiencies and supervisory reviews if and when such deficiencies are found from the monthly Captains' Audits.

The Integrity Section/Unit ("IU") is part of the Bureau of Organizational Development and is charged with the responsibility of auditing the auditors. The Integrity Section currently performs this duty by performing three types of audits: (1) IU draws a random sample of at least ten percent (10%) of the "continuous" supervisory reviews of ISRs placed into finalized, approved (APR) status on a daily basis; (2) IU draws a random sample of at least ten (10%) of the Monthly Captains' Audits from the Bureau of Patrol,[45] which includes Chicago's Three Areas (Central, North and South) and twenty-two (22) police districts (*e.g.*, Districts 1-12, 14-20, 22, 24 & 25). The auditing reports also show that the IU also reviews ISRs generated and submitted by police officers who work in other CPD Bureaus, as well, such as the Bureau of Organized Crime ("BOC"). The BOC has three main divisions dedicated to: Gang Investigation; Narcotics; and Vice and Asset Forfeiture

The CPD's inauguration of its current supervisory review and auditing system is a good start toward satisfying the objectives of accountability reflected by Section II of the Agreement. The validation requirement of Section II in the Agreement, together with the other duties of the Consultant delineated in Section V, however, seems to require the Consultant to do more than rubber stamp the supervision and auditing efforts of the CPD as having been set into motion and

---

[45]There are no police districts designated by the numbers 13 or 23, for reasons not relevant here. Although there are two additional districts within the Bureau of Patrol with numerical designations where ISRs are generated, District 31 refers to the "out of city" areas, which include the two international airports within Chicago city limits. Stop and frisk actions taken within District 31 are not part of the Consultant's review and analysis. *See, e.g.*, Appendix A, PSO2 Report, p. 14, n.6. *See also* Appendix B, Ecological Analysis Report (maps).

substantially completed for Period 2 on a department-wide basis.  Validation, as a concept and by definition, suggests more than that.  Instead, it seems to ask the Consultant to attest that the auditing and supervisory review processes are valid, such that they substantially conform not only to the practice of doing these accountability checks, but also enforcing the accountability required by them.

In other words, the Consultant is concerned that the auditing documents do not reflect that the corrective actions, which are sometimes being ordered, have been taken or what the results of these corrective actions were.  Perhaps the Consultant is asking too much from the auditing records and supervisory review documents requested.

In response to this observation, during the 30-day review and comment period the City and CPD agreed to augment initiatives already under way to provide follow up notice to Captains which have not submitted documentation indicating that corrective actions, which had been directed during the previous month, had been taken.  The City and CPD also agreed to discuss the feasibility of technological changes to the ISR Database which could help the IU track unresolved corrective action *directives.*

## The Period 2 Bi-Annual Investigatory Stop Auditing Report

An examination of the Period 2 Bi-Annual Report, prepared by the Integrity Unit in conjunction with the Consultant's review of the auditing documents, reveals the following information.  The sample auditing records for the three types of audits performed in Period 2 were produced on a disk containing 1,350 separate PDF files, which constituted a random sample of 1/3 of all audits performed during the second review period.  Among these 1,350 files were 3,847 individual records.  Upon closer examination, the Consultant discovered that the

auditing data from December was missing. Because all audits were performed in the month subsequent to the month in which the ISR data was submitted, and the CPD included audits of June 2016 ISRs, a month that fell outside Period 2, it appeared that the exclusion of December 2016 records was merely an oversight. The CPD promptly produced the December auditing record samples when notified of the oversight. After organizing these records, some of which were scanned copies of paper files with handwritten notes,[46] the Consultant observed the following facts and trends.

## Daily Audits

The following facts regarding continuous district level supervisory review have been established.

1. The time period for submitting and reviewing ISRs is the end of an officer's "tour of duty."
2. District supervisors are usually Sergeants.
3. Supervisory review is consistent with the ISR Workflow Summary. [47]In general, district supervisors review ISRs for RAS justifying the Terry stop and/or protective pat down for the purpose of approving or rejecting the ISR.
4. Where a supervisor identifies deficiencies, those are noted in the Deficiency Review Notification forms ("DRNs"). The DRN forms are automated, so they are archived in the ISR database.
5. If a deficiency can be corrected, then the ISR and DRN are sent to the police officer.
6. If a deficiency cannot be corrected, then the ISR + DRN are sent to the IU for "deficiency rejection review."

---

[46]In a letter dated October 6, 2016, the City informed the Consultant that automation of CPD's auditing system began on or about October 10, 2016, which fell approximately half-way through Period 2. However, from January 1, 2016 to approximately October 10, 2016, the Department maintained its auditing records the old-fashioned way: in hard-copy paper files, sorted in physical filing cabinets at CPD Headquarters.

[47]*See* ISR Workflow Summary, attached hereto as Exhibit 7.

7. IU makes independent determinations. If IU determines that an ISR is deficient and correctable, it sends the ISR + new DRN to the officer for correction OR back to the supervisor by email (if the supervisor had questions).

8. If IU determines that the ISR is deficient + uncorrectable, it notes the finding + corrective actions taken on the DRN, which is then archived in the ISR database.

Between January 1 and October 1, 2016, reviewing supervisors placed 406 ISRs in DRN status. The Bi-Annual Report indicates that the IU reviews all ISRs placed in deficiency review rejection; and, in Period 2 that number was 148.

With regard to the daily audits, the Bi-Annual Report shows that the Integrity Unit randomly reviewed 6,074 of the 51,047 ISRs placed in "Approved" status by reviewing supervisors and determined that 937 (11.9) percent of them were deficient for various reasons. Of that number, 290 were determined to be administratively deficient and 647 were found substantively deficient. The 647 substantive deficiencies they either failed to state RAS for the investigative stop and/or pat down; failed to state probable cause for a related search; or should not have been completed because the stop was based on probable cause. The Bi-Annual Report for Period 2 also noted that the total number of ISRs placed in an approved status, but later found deficient by reviewing supervisors, reflected a three (3) percent increase in Period 2, as compared with Period 1.

The Bi-Annual Report does a good job of reporting what the CPD did well for its first full auditing review period. The Consultant is impressed with the quantity of work done by the CPD's IU, and the many executive officers who strove to launch the auditing system and follow the protocols set forth in the CPD's ISS Policy directives. Nonetheless, the Bi-Annual Report

does not mention what the CPD did not do as well during Period 2.[48]   As the first auditing review period, the Consultant did not expect the IU to report that all auditing and supervisory review processes went as smoothly as intended.  The sheer quantity of auditing work and supervisory review efforts was enough, by itself, to impress the Consultant – especially given that the CPD is one of the largest municipal police departments in the nation and was attempting to launch a completely unprecedented level of accountability for documentation never before required of its police officers.

However, future Bi-Annual reports should indicate the deficiencies or defects in the supervisory review and auditing system that are still present as the CPD, understandably, seeks to refine it to meet all policy objectives.  For example, the monthly captains' audits reflect that some police districts have higher clearance rates than others – sometimes by wide margins.  Future auditing reports might make police district comparisons and provide more details regarding the numbers of PRE, SUB, DEF, and FIN ISRs that remain on the books at the end of the next review period.

During the Consultant's review, the following patterns of deficiency related to compliance with the Agreement and/or CPD Policy directives appeared frequently enough to raise red flags.  For example, the Bi-Annual Report for Period 2 did not indicate how many corrective actions were ordered by supervisors during initial or subsequent reviews of

---

[48]The Consultant acknowledges that IU reported that of the 148 ISRs that were placed in deficiency review reject status for Period 2, it identified 6 supervisors who repeatedly approved ISRs in error and 6 officers who repeatedly submitted deficient ISRs.  The IU also specified that additional training for these officers was provided on 02/28/17 for two supervisors and on 03/08/17 for the remaining 4 supervisors and 6 officers.  This is the kind of auditing report the Consultant would expect to find as part of the daily or monthly audits, but such detail is usually lacking.

submitted ISRs, by district, per month or for Period 2; nor did it indicate how many corrective actions – once ordered – had been taken by the officers who authored the deficient ISRs. Additionally, and perhaps of most concern to the Consultant, the Bi-Annual Report says nothing about the timeliness – or lack thereof – of the ISR submissions, supervisory reviews, and correction processes for Period 2.

As noted, the IU did, however, specifically note that there were 6 supervisors and 6 officers who were recommended for additional training based on repeated patterns of submitting deficient ISRs and/or approving deficient ISRs. These officers received training in early 2017 based on the repeated deficiencies. The IU's examination of repeated errors by officers and supervisors with respect to deficient ISRs reflects that IU's objective is to comply with Section II.3. (b)(ii) of the Agreement, namely, to determine the rate of error and to shore up identified failures to document that would violate Section II.3(b)(ii). Moreover, review of the "entire ISR history" of officers and supervisors with repeated mistakes is a good start to tracking patterns of unlawful behavior.

Although the IU represents to the Consultant that it has a method for following up on department members who have been identified as needing further training, the Consultant urges the CPD and IU to take a close look at what mechanisms it has in place and/or could put into place which would automate the follow-up process to ensure that no one slips through the cracks. The Consultant does not purport to know how to do the IU's job and will not presume that he knows how to do it better; but, the lack of evidence that IU has a consistent follow-up plan for tracking officers/supervisors who repeatedly violate the CPD's internal directives and the spirit of the Agreement, beyond initiating research and checking the ISR history of

officers/supervisors after spotting a few deficient ISRs, is of concern. A more automatic and uniform system that alerts IU each month when matches are made between deficient ISRs and star numbers may be more effective and efficient. Short of a computerized solution, IU might also try to simply flag certain officers for follow-up auditing studies; in other words, rather than looking backward at history, IU could look forward to see if the corrective actions, enhanced supervision or additional training took hold.

With regard to the timeliness issue, in particular, the Consultant has two concerns which need to be addressed by the IU in future reporting periods: (1) the frequency of ISRs which remain in preliminary (PRE) status and are not submitted for review in a timely manner (*i.e.*, within or by the end of the reporting officer's tour of duty); (2) the number of ISRs submitted for review which remain in a non-reviewed but submitted (SUB) status by the end of the supervisor's tour of duty; and (3) the clearing rate for ISRs placed in deficiency review which remain uncorrected by officers once supervisors send them back for corrections.[49]

Focusing on the clearing rate issue first: until such a clearing rate can be established, the Consultant and his experts have no way to assess (qualitatively or quantitatively) how many ISRs have been left in a non-finalized status within each reporting period and – more importantly – how many of these ISRs grow stale because of the time between the actual stop and frisk and the review, correction or corrective action being taken. For the accountability provisions to have any real educational effect, let alone disciplinary backbone, the CPD must

---

[49]The IU did address its review of records of supervisory corrections and/or rejections of ISRs to identify officers who failed to properly conduct or document Terry stops and frisks. *See* Bi-Annual Report at 5. However, this is a different issue than the one the Consultant highlights above regarding the clearing rate for ISRs returned to police officers to make corrections and resubmit the revised versions of the originally deficient ISRs.

endeavor to finalize all ISRs submitted during each respective reporting period – minimally by the end of the reporting period, so that the Consultant and designated experts can assess this data qualitatively and quantitatively in the most accurate and complete manner.

Moreover, the CPD's supervisors need to review and make deficiency review determinations regarding submitted ISRs promptly – by the end of their tours of duty, as required by CPD policy -- so that officers can learn from their mistakes in as timely a manner as possible. For example, the Consultant reviewed an ISR in the auditing sample data where the stop was made in the first reporting period, but not reviewed until five (5) months later, during the second reporting period. The determination from the supervisor's review, once made, was to approve the Officer's request to cancel the ISR as one generated in error. While the result of the delay in this particular case was harmless, what if the request to clear the ISR for error could not be approved because the ISR reflected a "bad stop" or a "bad pat down"? The inordinate delay in this example would deprive the officer of the benefit of having learned from his or her honest mistake at or near the time it was made. The delay also might prevent more honest mistakes, which otherwise might not be made during the intervening 5-month period.

The Consultant is quite aware that management of this process is a large-scale task that may require the allocation and expenditure of more personnel and financial resources. Dedication to the accountability obligations, however, may produce the most lasting reforms, the importance of which cannot be overstated.

## The Monthly Captains' Audits

With regard to the monthly audits, the CPD requires, pursuant to Special Order S04-13-09, that Executive Officers (district captains) conduct monthly internal audits, by reviewing

random samples of ten (10) percent of all ISRs submitted by officers during any given month. To satisfy this provision, the IU needed to train additional executive officers to perform these duties. The IU trained twenty-seven (27) executive officers on July 28, 2016 and another twenty (20) executive officers on November 10, 2016. The Captains conducting these audits were directed to make findings regarding ISR deficiencies observed and to calculate the status code results from each district and area within the Bureau of Patrol and/or in other Bureaus where ISRs are issued. The Captains were also required to document the corrective actions taken.[50]

The Captains' Monthly Auditing reports are submitted to the commanding officers of the districts and are reviewed by the Integrity Unit. In cases where the Integrity Unit finds that an Executive Officer's audit was deficient, it takes corrective action, including counseling the Executive Officer and/or requiring that the audit be revised and resubmitted.

Overall, the Consultant is impressed with the monthly captains' audits, both in terms of the volume of work performed as well as the detail provided in some of the audits reviewed. Although there is a fairly wide qualitative spectrum between some Captains' audits and others on a monthly basis, in general almost all of the monthly audits reflect consistent attempts to quantify the status codes for ISRs in every given month of Period 2; to cross-check their math with the math of district supervisors; to identify trends regarding deficiencies; to advise district

---

[50]The Agreement does not specifically require CPD to perform monthly audits of each police district or Chicago Area (*e.g.*, Central, North and South); but, the Department's ISS Policy does; in fact, Section VIII. C.3. d. of Special Order 04-13-09 directs Executive Officers (typically officers holding the rank of Captain) to conduct monthly internal audits of ISRs to ensure compliance with the directive; it also requires captains to submit a report of their findings to their commanding officers, among which include (but are not limited to) one of three Chicago Area Commanders, as well as the Deputy Chief of the Bureau of Patrol.

officers of corrective measures; and to educate district supervisors on how to assess ISRs more accurately.

Most of the Captains' audits also reflect a consistent use of similar formats, from the overall Area Summaries, which break down the numbers for each police district in the various categories of interest, to the use of an ISR spreadsheet, wherein problem ISRs are listed with narrative remarks, dates, supervisory review determination codes and status codes. A fair number of monthly reports also include graphs and tables with extensive detail about ISR activity at the beat and even "watch" levels.

Other Captains' audits, however, were poorly organized, provided scant information and detail, were handwritten and did not appear to take the report seriously in comparison to the higher quality audit reports just discussed. The Consultant recommends that the IU emphasize the importance of consistency and uniformity in the types of information they need to measure and report to the CPD commanders and to the Parties to satisfy the compliance provisions of the Agreement in future reporting periods. Specifically, the Consultant encourages IU to emphasize and prioritize the clearing of "PRE" and "DEF" status ISRs, both of which appear to be moving too slowly through the process.

The monthly audit protocols require Captains to: (1) list the ISRs reviewed; (2) list which ISRs reviewed were deficient and why; and (3) list corrective actions ordered or what the Captain did to address the deficiencies. The Consultant observed that there is a fairly wide range between the audits performed by different executive officers regarding the quantity of the information provided in the reports, as well as the quality of the information reported (*e.g.*, whether they are typed or have handwritten notes; whether the reports note trends, patterns,

and statistics regarding improvements and problems over time; and, most importantly, whether the reports identify deficient ISRs, untimely ISRs, uncorrected ISRs and un-submitted ISRs – all of which need to be moved through the ISR workflow.

## Special Project Audit:  Arrest Reports

In the Bi-Annual Report, the Integrity Unit reports that it has reviewed all arrest reports associated with gun and robbery charges that were submitted during the reporting period, to confirm that an ISR was completed, if appropriate.  It determined that, of the 2,720 arrest reports reviewed, ISRs should have been issued, but were not, in 303 arrests. To perform these monthly audits, Executive Officers were specially trained in the protocol directives in the ISS Policy.

The arrest reports audit is well-conceived, although not required by the Agreement or internal policy.  Most notable about it is the way IU utilized its "Access data base" to deduce when corrective actions were and were not taken with regard to ISRs which should have been, but were not, issued in gun and robbery charges (serious felony offenses where accurate reporting seems vital).   Captain Murphy is to be commended for proactively investigating potential ISR deficiencies within the context of arrest reports, especially because it reflects how well she understands CPD's new reporting policy and the requirements of applicable laws (*i.e.*, ISRs must be issued now for enforcement actions taken as a result of the investigatory stop).[52]

---

[52]She is also, no doubt, quite involved in the success of the IU's new website – ASKISR – launched in July 2016.   In addition to her regular duties, which clearly included a large auditing workload as of July 2017, she also leads various training initiatives, such as the one she noted in her Bi-Annual Report: "A Refresher and Further Guidance Regarding Investigatory Stops" (*Id.*, at 4).   This training undoubtedly has her signature on it, as the Department's training of 12,000 officers did.

Consultant's Thoughts & Recommendations

The CPD is required to conduct both police district level and police department level audits to assess whether the ISRs submitted on a daily basis reflect that CPD officers' stop and frisk practices – and district level supervisory reviews of those ISRs – are complying with the internal directives of the ISS Policy and all applicable laws. Additionally, the Agreement requires CPD Headquarters staff to perform quarterly or bi-annual audits of all the district level supervisory review and auditing reports for each reporting period.

Having reviewed the auditing files produced to the Consultant for Period 2, the Consultant can attest that the CPD is performing continuous supervisory reviews on a district and departmental basis, as well as bi-annual auditing reports. However, the word "validation" means more than simply witnessing that the process of auditing is being done. Although the Consultant is not charged with the duty to audit the auditors in a substantive way (by second guessing the auditor's determinations), the validation provision of the Agreement does require the Consultant to assess whether the objectives of the auditing processes are being satisfied.

The Consultant's review of the Integrity Unit's auditing files, concerning three types of audits performed during Period 2, reflects that the CPD's auditing and supervisory review processes, which aim to satisfy the accountability objectives of the Agreement, appear to be well underway. Validation of these processes, however, requires something more than recognition that such processes have been designed, implemented and are being enacted on a daily, monthly and bi-annual basis. Validation also means that the auditing and supervisory review processes are achieving their intended objective of ensuring that police officers' stop and frisk practices conform and "substantially" comply with ISS Policy and all applicable laws.

The Consultant is unable to validate that all of the auditing systems and supervisory review practices and protocols, which CPD put into place during Period 2, are fully achieving the accountability objectives required by the Agreement. Specifically, the presence of an unknown number of ISRs still showing up in preliminary status at the end of each month in the second reporting period reflects that not all ISRs are being submitted for supervisory review in a timely manner (*i.e.*, by the end of the ISR author's tour of duty). Moreover, the stops and frisks represented by ISRs generated but never submitted, which were still in a preliminary status at the end of Period 2 cannot be counted for purposes of the total stop count in the technical PSO Report for statistical purposes, and could not be reviewed by the Consultant as part of the legal narratives review, or the CPD's auditors for that matter, regarding legal (and thus substantial) compliance with applicable laws and internal CPD policies.

After review of the records provided in the auditing sample, the Consultant recommends that the CPD consider an additional improvement upon its already commendable start to the auditing process. Specifically, the Consultant suggests that the CPD require executive officers to document the monthly audit reports in the same manner, using the same method. For example, although the CPD already provides the executive officers with standard templates (electronic fields that when printed look like pre-printed forms) for their monthly audits, further direction requiring executive officers to document the same quantity and quality of information would prove helpful to the CPD's efforts to create a climate of accountability that is uniform and consistent across the entire Department. Moreover, such uniformity and consistency would aid the Consultant and designated Experts to more readily and accurately compile the auditing data, since doing so in Period 2 proved to be quite time-consuming given

that the auditing documents provided reflected different approaches to the auditing requirements and different quality levels in terms of the types of information documented.

In response to this recommendation, during the 30-day review and comment period, the CPD agreed to systematize the way that executive officers complete their monthly audit reporting responsibilities by developing new reporting templates, which incorporate "best practices" thus far from other monthly audits, for all executive officers to use when completing their monthly audit reports. The Consultant appreciates the CPD's willingness and flexibility to respond to this suggestion, as it will provide him with the ability to give the Parties a more detailed assessment of auditing results in future reporting periods. Period 3 review begins.[53]

## Civilian & Internal Complaints

The terms of the Agreement require the CPD to document civilian and internal complaints relating to investigatory stops and/or protective pat downs conducted by police officers and provide that the Consultant is to review those files during every reporting period.[54]

CPD's Bureau of Internal Affairs ("BIA") provides the Integrity Unit with documentation regarding any civilian or internal complaints that are determined to be related to investigatory stops and/or protective pat downs, which the Integrity Unit reviews for purposes of making recommendations regarding improvements, corrective actions and ways to diminish the number

---

[53] Again, because the parties have not yet defined substantial compliance, nor indicated that they cannot agree on a definition so that the Consultant can determine its meaning on his own, according to Section IV. of the Agreement, the Consultant cannot apply an undefined standard or measure to fully validate the audits at this time.

[54] *See, e.g.*, Exhibit 1, Agreement, Section II. 3. b. (iii) and Section V. 2. c.

of complaints received regarding investigatory stops. Although this reporting period is limited to actions taken during the period July 1, 2016 through December 31, 2016 in all other respects, because of the way in which civilian complaints are filed, documented, investigated, reported and closed, which sometimes overlap more than one reporting period, it is necessary to consider some complaints that, while investigated and closed during the applicable reporting period, were filed during an earlier reporting period.

In this regard, the CPD has furnished to the Consultant a list of all civilian complaints filed against police officers relating to investigatory stops and/or protective pat downs between January 1, 2016 and December 31, 2016, which includes some of those that were filed between January 1, 2016 and June 30, 2016 and reported by the Consultant in the First Period Report, some of which were pending investigation at the time of that report.[55] To be clear, these files do not purport to encompass all civilian complaints filed against police officers, but only those that were determined by the Bureau of Internal Affairs to be related to investigatory stops and/or protective pat downs, which are the only ones covered by the Agreement. These files contain the complaint numbers, dates of the complaints, allegations of the complaints (with the names of the complainants, officers against whom the complaints were filed, if known, and any known witnesses, redacted). They further show the efforts made by the investigators to contact the complainants, the extent of the investigations conducted and the findings and recommendations made in each case.

---

[55]Although it appeared that the civilian complaints submitted to and reviewed by the consultant were only those filed with the Bureau of Internal Affairs, CPD has informed the Consultant that the complaints included all complaints relating to stop and frisk that were filed with BIA and the Independent Police Review Authority ("IPRA"), the agency charged with investigating alleged police misconduct, including excessive force complaints. IPRA was disbanded in September 2017 and replaced by the Civilian Office of Police Accountability ("COPA").

The Consultant reported that, for Period 1, there were fifty-one (51) stop-and-frisk-related civilian complaints filed with the Bureau of Internal Affairs between January 1, 2016 and June 30, 2016, all of which the Consultant reviewed. There were six (6) complaints that were included in the reports, which were filed shortly after June 30, 2016, but were not considered, because they fell outside the first reporting period, for a total of fifty-seven (57) complaints. Nine (9) of the complaints filed during the first reporting period were listed as "pending investigation" on March 23, 2017, when the Consultant issued his final First Report.

During Period 2, the CPD reports that there were twenty-eight (28) civilian complaints filed that were identified as "*potentially*" related to an investigatory stop and/or protective pat down, for a total of eighty-five (85) complaints filed for CY 2016, between January 1 and December 31. The disposition descriptions used by the CPD to show how it handled these 85 civilian complaints are: "Closed/No Conversion" (meaning that the complaints were closed because the investigating officers were unable to obtain sworn affidavits from the complainants averring that the complaints were true); "Closed/Final" (where the complaint was investigated and a finding was made that the allegations were unfounded or that discipline of the officer was not warranted); and, "Administratively Closed" (based on a determination by BIA command staff that the complaint was not suitable for investigation).[56]

As the Consultant indicated in the First Report, most of the 51 civilian complaints filed during the first reporting period (excluding the 6 complaints filed after Period 1 ended on June

---

[56]Administrative closures are usually because the allegations in the complaint, if true, did not describe a violation of law or Department policy. In appropriate "Administratively Closed" cases, the command staff may refer the complaint to CPD's Human Resources division for further action, such as counseling.

30th) which related to investigative stops and/or protective pat downs, alleged that one or more police officers stopped and/or frisked the complainants without legal justification and/or were rude towards them after the stop. Some complainants alleged that they were asked for their identifications, for no reason.

In all of the 51 cases reviewed during the First Reporting period, the assigned investigators contacted or attempted to contact the complainants; but, according to the investigation reports, the complainants either listed invalid addresses or telephone numbers, did not respond to subsequent certified letters, or indicated that they did not wish to proceed with their complaints when they were contacted. The BIA, therefore, found that, pursuant to Illinois law, the overwhelming majority of these 51 complaints were "unfounded," because the complainants failed or declined to sign sworn affidavits in support of their complaints.

The Consultant has personally reviewed the complaint descriptions of the 28 civilian complaints filed against police officers between July 1, 2016 and December 31, 2016, along with Summary Report Digests describing those complaints and their dispositions. Consistent with the findings made in the First Report, the Consultant finds that the overwhelming majority of the complaints filed during Period 2 were closed, because the investigating officers were unable to obtain sworn affidavits from the complainants averring that the allegations in the complaints were true. In this regard, Illinois law (50 ILCS 725/ 3.8) requires that anyone filing a complaint against a sworn peace officer must have the complaint supported by a sworn affidavit. Thus, of the 28 complaints reviewed, 24 were closed because, although the investigating officers invariably went to great lengths (telephone calls first, when telephone numbers were listed on the face sheet of the complaint, followed by home visits, followed by certified letter with return

receipts requested) in efforts to get complainants to cooperate, they either did not respond or, when contacted, indicated that they were not interested in pursuing their charges.

Twenty-six (26) of the complaints reviewed by the Consultant alleged harassment and misconduct by police officers because of various conduct, such as being stopped, sometimes repeatedly, without justification, handcuffed, verbally abused, use of profanity, being strip-searched for drugs, a threat to plant drugs on the complainant, and improper pat downs and searches of persons and vehicles without justification. In twenty-four (24) of the 26 alleged harassment complaints, the complainants either failed to respond to the telephone call(s) and/or personal home visit(s) by the investigating officers, or they failed to follow-up with certified letters sent to the address listed in the complaint. In short, in 24 of the 26 complaints alleging police harassment, the complainant refused to give a signed affidavit when contacted by an investigating officer or the complainant indicated that he/she did not wish to proceed with the charges.

Four (4) complaints were closed as "not sustained" and/or "no disciplinary action warranted" after investigations, including one complaint alleging racial profiling. In several of these cases, however, police officers went beyond what the Illinois statute requires. For example, even when the investigating officers were unable to contact the complainant, if the complaint identified the accused officer or the complaint contained enough information for the investigating officer to determine the identity of the accused officer, the investigating officer pulled the ISRs issued by that officer on the alleged date in the complaint to determine whether the claimant's description of the alleged encounter could have actually occurred (*e.g.*, such as whether the officer was on duty in the described area on the alleged date and time), by

comparing the complainant's version of the alleged encounter, based on the allegations of the complaint, with the narrative descriptions in the ISR, as articulated by the officer in the ISR.[57]

## Re-training, Enhanced Supervision and Discipline

Section II.3. c. of the Agreement provides for the establishment of re-training, enhanced supervision or discipline for officers who engage in unlawful investigatory stops and/or protective pat downs or who violate the CPD's policies or procedures governing these practices, and that written documentation of such actions must be done. As reported in the Consultant's First Report, and as emphasized by Police Superintendent Johnson during one of the training sessions attended by the Consultant, innocent mistakes are expected, for which no disciplinary actions will be taken. However, for those officers who repeatedly or intentionally engage in such misconduct, swift punishment will be imposed.

In response to the Consultant's inquiry regarding disciplinary actions taken against police officers related to investigatory stops during the July 1, 2016 to December 31, 2016 reporting period, the CPD reported that, working with the Bureau of Internal Affairs, the Integrity Unit conducted an audit of all the civilian and internal complaints filed during the reporting period that had been identified as potentially related to investigatory stops. It reported, and produced documents showing, that it initiated four (4) internal complaints against police officers related to investigatory stops and /or protective pat downs pursuant to its

---

[57]After the ACLU reviewed this observation in the draft version of this report, it suggested that the Consultant encourage the CPD to take these pro-active responses every time a complaint is filed (*i.e.*, particularly with respect to pulling ISRs submitted by the identified officers to compare stories). Although the Consultant certainly would never dissuade officers from going the extra mile for civilians, such practices need to be adopted by the CPD's commanders if the Department considers these actions to be good policy. This is not something the Consultant wishes to make a formal recommendation at this time.

Summary Punishment Action Request System (SPARS), which is authorized for "Less Serious Transgressions." In addition, fifteen (15) Department members were identified as needing further training, twelve (12) of whom received the additional training and three (3) of whom retired or otherwise left the Department

## Community Policing Initiatives

At the conclusion of the First Report and pursuant to Sections V.2.b. and V.2.f. of the Agreement, the Consultant offered several recommendations to the City and the CPD related to community involvement in future policing reform efforts, all of which the Consultant felt were needed to ensure that its policies and practices comply with state and federal laws and the provisions of the Agreement. The Consultant's recommendations were not drawn from thin air, but were based on observations and analysis from an exhaustive review of thousands of ISR records (in which police officers describe the stops, protective pat downs and searches executed during the First Review Period) and coded results describing various deficiencies/problems gathered from those reviews.[58]

The City and CPD reported that some of the Consultant's proposed recommendations were already being implemented, while others were rejected, with explanations regarding why they could not be accepted. Several of the Consultant's recommendations from the First Report,

---

[58]The Consultant was ably assisted in this regard by Matthew Barge, Esq., a nationally-known police practices expert, who has served and continues to serve as consultant and/or monitor to several large-city police departments pursuant to separate federal court consent decrees, and who participated in the review of the officer training materials, which were approved by the Consultant, and attended some officer training sessions.

however, were adopted, with some modifications. Foremost among the Consultant's recommendations were that:

CPD proactively engage in community involvement by soliciting volunteers in each police district to serve as liaisons between the district commanders and community organizations and to participate in weekly meetings, where any issues of concern within Chicago's neighborhoods, are discussed with local community organizations. All police officers also are required to attend implicit bias training and the CPD must proactively engage in dialogue with the communities they serve through community policing initiatives.

By way of an update, the City recently sent two letters to the Consultant summarizing the City and CPD's efforts to incorporate the Consultant's recommendations, which have been identified above, and the modifications made to them. The first letter is dated October 18, 2017; and, the second letter is dated November 6, 2017. The update letters describe the City's overall plans to increase community involvement in policing efforts and to restore trust between Chicago civilians and police officers, including the Community Policing Advisory Panel ("CPAP" or "Panel") initiatives and recommendations.

## The October 18th Updates

In its first letter, dated October 18, 2017, the City described the mission of CPAP, which was commissioned by Superintendent Johnson in August, 2016.[59] The CPAP is a group whose members include prominent current and former public officials, academicians and various community representatives. The Panel's mandate is to develop a strategy for police-community

---

[59]*See, e.g.,* Letter from City of Chicago Corporation Counsel's Office, by First Assistant, Jane E. Notz, to the Consultant, dated 18 October 2017 (hereinafter "City's Letter of 10/18/17"), attached hereto as Exhibit 3.

engagement and involvement by creating an action plan with concrete steps intended to restore trust between police officers and community members by inviting involvement and collaboration with reform efforts related to shared interests.

On August 9, 2017, the CPAP released a 21-page document with draft recommendations for public review and comment.[60] Consistent with its mandate, the CPAP's draft report acknowledges that the Panel drew upon community feedback to develop the draft recommendations by organizing several presentations, a number of "Community Conversations" and requesting feedback through multiple surveys of residents and other stakeholders in various neighborhoods within Chicago.

The Panel's draft recommendations, while broad and comprehensive, included several specific recommendations consistent with the spirit of the Consultant's recommendations in his First Report, such as:[61]

- building trust with the community by engaging the community in all aspects of policing, see Draft, pp.6-7;
- involving Chicago's youth, pp.7-8;
- developing community policing strategies tailored to individual districts, rather than "top down" strategies, pp. 8-9;
- structuring and staffing CPD's community policing program and monitoring its performance, pp.10-13;
- training officers on community policing and training community residents and stakeholders to be effective partners with police, pp. 13-15; and

---

[60]*See* Exhibit 3 (with CPAP's Draft Recommendations appended thereto).

[61]The City advised that some of the recommendations made in the Consultant's First Report were already underway at the time of the recommendation and that other recommendations, such as modifying the affidavit requirement for civilian complaints to provide anonymity when reporting apparent unlawful police conduct were not feasible, given state law or collective bargaining agreement constraints.

- implementing a system to provide mutual problem-solving accessibility between the CPD and other City Departments, pp. 15-17.

The CPAP's draft recommendations were finalized in a 33-page "Report of the Superintendent's Community Policing Advisory Panel," which Superintendent Johnson adopted, publicly announced, and released on November 2, 2017.[62]

## November 6th Updates

In the second letter, dated November 6, 2017, the City advised the Consultant that three additional reform efforts by the City of Chicago are underway. These three reform efforts can be summarized as follows.

- *First*, Mayor Emanuel recently announced that more than $3 million dollars of his proposed 2018 budget will be allocated to enhancing community policing efforts, including hiring new staff, enhancing training across the department and expanding district and youth advisory councils in every police district.

- *Second*, the City's newly-created Civilian Office of Police Accountability ("COPA"), which became responsible on September 15, 2017, for all civilian and internal complaints regarding search and seizure (including investigatory stops and protective pat downs), recently announced that community access to public computers at Chicago Public Libraries ("CPL") will be made available for civilians, who do not have access to personal computers, to report civilian complaints related to unlawful policing.

- *Third*, the COPA has advised the City's law department and the CPD that it will increase its commitment to using the override provisions for the affidavit requirements related to civilian complaints.[63]

---

[62]*See* Report of the Superintendent's Community Policing Advisory Panel, with the final 33-page Report of the Panel, attached hereto as Exhibit 4.

[63]*See, e.g.*, Letter from the City of Chicago Corporation Counsel's Office, by First Assistant, Jane E. Notz, to Consultant, dated 6 November 2017 (hereinafter "City's Letter of 11/06/17"), attached hereto as Exhibit 5. *See also* Exhibit 3, City's Letter of 10/18/17, at 4 (citing to information and web addresses regarding the affidavit requirement and override provision, namely: COPA's website: www.chicagocopa.org/faqs/ and www.copadeve.wpengine.comp/wp-content/uploads/2016/17/COPA-Rules-and-Regulations.pdf; as well as Section 2.4 and 2.41 of COPA's Rules and Regulations, attached as Exhibit 6).

Creating trust within communities is essential to community involvement.  In communities plagued with violence, on the one hand, and distrust of police officers, on the other hand, fear of reprisals will continue to enforce a code of silence within residential neighborhoods unless something is done to help civilians who want to report crimes, by other civilians or by police officers, to do so anonymously.

Apparently, COPA recognizes that many complainants may not follow up on their complaints and sign the affidavits required under Illinois law and CPD collective bargaining agreements, because complainants are required to sign them and attest, under penalty of perjury, that the contents are true.  Sworn affidavits are necessary for a civilian complaint to be investigated by the CPD.  Although there are legitimate reasons for such affidavits, most complaints, once filed, cannot be investigated because complainants do not or refuse to sign affidavits.  The Consultant is pleased to learn that COPA recognizes that it may need to increase its use of the affidavit override provision when appropriate.

The Consultant observes, however, that the affidavit override provision does not appear to be designed for use in the typical stop and frisk/search complaint case.  Thus, Section 2.4.1 of COPA's Rules and Regulations provides that its' Chief Administrator must seek an affidavit override from the Chief of the Bureau of Internal Affairs, but only after having been unable to obtain the required sworn affidavit after 30 days from the date that the complaint was filed.  In this regard, the Chief Administrator must first review the evidence gathered during the preliminary investigation and consider such factors as the nature and seriousness of the alleged misconduct; the credibility, reliability and accuracy of the information in the complaint, based on his or her knowledge of the facts and circumstances; and, the degree to which the alleged

misconduct concerns the integrity of the officers involved or otherwise may undermine public confidence in the Department. Assuming that the Chief Administrator believes that all of these factors weigh in favor of the complainant, the Chief Administrator must then provide the Chief of the Bureau of Internal Affairs with ***objective, verifiable evidence*** in support of the allegations; only if the Chief of the Bureau of Internal Affairs concurs with that opinion will (s)he execute the required sworn affidavit, allowing the investigation to proceed. Based on review of the civilian complaints reviewed for Period 2, which were closed because of the absence of sworn affidavits, the Consultant doubts that the Chief Administrator could have persuaded the Chief of the Bureau of Internal Affairs to issue the required sworn affidavit in any of them.

The ACLU believes that, notwithstanding the state law affidavit requirement, the City of Chicago, under the home rule provisions of the Illinois Constitution of 1970, has the power to override that requirement by Ordinance, since the state statute does not expressly preempt the City's home rule authority in that regard, citing *Palm v. 2800 Lake Shore Drive Condo Assn.*, 988 N.E.2d 75, 81 (Ill. 2013); *Peters v. Springfield*, 57 Ill.2d 142 (Ill. 1974); and *Kadzielawski v. Bd. Of Fire and Police Comm'rs of the Village of Skokie*, 551 N.E.2d 331, 336 (Ill. App. 1st Dist. 1990). Having reviewed the cases cited above, the Consultant believes that the ACLU's argument has some appeal. However, because this argument was raised for the first time during the 30-day review and comment period for the draft version of this report, and the City has not been given an opportunity to respond to it, the Consultant can only suggest that the feasibility of such an ordinance be considered; a formal recommendation cannot be issued at this juncture.

## Consultant's Thoughts

The City asserts that, through CPAP and other initiatives, it has demonstrated its commitment to increasing community involvement to help heal police-community relations and improve problem solving by recognizing that building trust and collaboration with the community requires comprehensive and thoughtful planning and implementation.[64] The Consultant agrees that the CPD has made great strides in its efforts to reform its policies and practices and public image within the past two years. There are many hard-working, dedicated men and women within the Department who are devoted to these reforms, who have had many of the ideas presented and described above, and who are doing something about them which will, no doubt, make a lasting and significant impact in Chicago communities for the better.

One additional recommendation from the Consultant, however, may prove helpful for the Department's consideration. The Consultant agrees with the City's acknowledgement that "comprehensive and thoughtful planning and implementation" are necessary; however, such planning only goes so far if consistency over time is lacking. The Agreement and Illinois law ushered in a new age of legal reporting requirements that required the CPD to not only reform certain deficient reporting policies and practices related to search and seizure (Illinois law) and stop and frisk (the Agreement), but also – in essence – to recreate itself.

An unquantifiable amount of energy, resources and time ("effort") have gone into restructuring and recreating the CPD's ISR reporting systems and auditing processes, specifically discussed in this report. An equally unquantifiable amount of effort by CPD personnel, City lawyers and staff, and community leaders and retained experts, in various fields

---

[64] *See, e.g.,* Exhibit 3 (City's Letter of 10/18/17, at 3).

related to criminal and procedural justice, has been expended to launch the various community policing initiatives.

The efforts most pertinent to the Consultant's assessments under the terms of the Agreement, however, involve CPD's department-wide training programs, such as the Procedural Justice ("PJ") 3 implicit bias training that was scheduled for January 2018. Although the Consultant's words of recognition of and commendation for the named and unnamed members of the CPD who are part of these efforts may be lost in the pages of this report when read by the general public and/or media, the Consultant hopes that this praise is not lost on each and every individual who should claim such praise. The many individuals within the CPD and City law department who are involved in educating and training police officers, auditing vast amounts of ISR records, and making sure that the crucial information technology systems are functioning properly (among a host of other actions) have been invaluable in terms of preventing the CPD's past from becoming prologue. Many of these individuals will never be known by name to the Consultant or the public, but the Consultant is quite aware that all of the efforts identified in this and other reports issued by him, require the commitment of these individuals working as a team to succeed.

Nevertheless, the City and CPD's present leadership must take care to ensure that a consistent and uniform adherence to the system protocols currently being designed and launched is enforced in future reporting periods, even those in which they may not play a part. Two of the primary visionaries of this Agreement, Mr. Stephan Patton and Mr. Harvey Grossman, are no longer participating in the processes set up by their visionary and tireless efforts over the last decade to reach consensus and avoid the litigation that this Agreement puts

behind the parties. The current leadership must make plans for ensuring that their work and the work of the many who have contributed to this effort are not simply sound and fury. Simply put, if the parties are not committed to creating defined objectives with adherence to real accountability mechanisms that will not fundamentally change over time, even with the inevitable succession of leadership, then the Agreement is much ado about nothing. The Agreement is not a consent decree, so benchmarks and strict guidelines are not written into it. If good faith agreements, rather than court-imposed judgments with law enforcement power, are to succeed, the parties need to be serious about consistency as a primary objective going forward.

To achieve that consistency there must be defined objectives which make accountability a priority. Accountability requires clear understandings that discipline can and will be used, when appropriate, to ensure that certain rules govern conduct. The Consultant acknowledges that the CPD's stop and frisk policy, as enumerated in SO4-13-09, requires compliance with all applicable laws, including the Fourth Amendment, and that CPD has written policies governing progressive discipline for actions violating any provisions of its policy. However, the Consultant hopes to see documentary evidence in future reporting periods of the types of corrective actions being ordered and the follow-up efforts made to ensure that corrective actions recommended by supervisors are actually being enforced and not simply articulated in the audits.

## Implicit Bias Training

With regard to the Consultant's recommendation regarding implicit bias training, the Consultant notes that, at the time the First Report was issued, the CPD already had in place a three-part training program in Procedural Justice ("PJ3"), developed by CPD commanders,

together with nationally recognized experts for the CPD. In fact, PJ3, as the third and final part of this training, is devoted exclusively to the role that implicit bias may play in policing. This training makes use of nationally recognized best practices in policing and draws upon the expert resources on implicit bias and implicit bias training noted in the Consultant's First Report.

In this regard, it bears noting that, in May 2017, the Consultant and representatives of the parties, as well as Mr. Barge, the police practices expert, attended a preview of PJ3 at the Chicago Police Academy, under the direction of Deputy Chief Keith A. Calloway, Director of Training and Education, as well as the Training Division Commander, Daniel J. Godsel. The Consultant can attest that the PJ3 preview of the implicit bias training, which CPD officers were scheduled to receive in January 2018, is consistent with the Consultant's recommendations from the First Report and national best practices standards in the field of criminal and procedural justice training for police officers.[65]

## Period 2 Qualitative Assessment Determinations

The City and the CPD have worked hard during Period 2 to provide the Consultant and experts with the ISR data and all other documents and information needed to make the qualitative assessment determinations required by the Agreement in Sections I, II, III, and IV.

---

[65]Indeed, Mr. Barge provided the Consultant with the following written comments with his observations regarding this training:

"... I was favorably impressed by the substance of the training and the seriousness and enthusiasm of the trainers in this area. Having been developed with Professor Tracey Meares at Yale, who is highly respected in the field of police reform and civil rights and was a member of President Obama's Task Force on 21st Century Policing, I have a good sense and confidence of the training curriculum. I was also impressed by the time commitment that the Police Department is putting into this initiative--it is no small feat to get the whole department through multiple phases of the training."

This hard work can be seen in every area discussed in Part I of the Second Report – from auditing and supervisory review of ISRs, to investigation of civilian and internal complaints and corrective actions and/or discipline where warranted, to community policing initiatives, to the impressive implicit bias training that is currently underway.  There are many reasons to commend the CPD on its Period 2 reform actions, and a few of them deserve special mention.

*First*, the Versioning System modifications to the ISR Database represent a huge step forward in terms of providing the Consultant with a way to assess all ISR data submitted by police officers, reviewed by supervisors and audited by executive officers pursuant to the ISS policy directives in SO4-13-09.   The system is incredibly complicated, as designed, but it works.  The inner workings of the system are apparent in the auditing reports by executive officers during Period 2.  Many of these monthly reports and daily kept spreadsheets are quite detailed and thorough, complying with (and sometimes exceeding) the ISS Policy directives, as well as the terms of the Agreement.  Given that the CPD did not have an internal auditing and supervisory review system, let alone comprehensive reporting requirements, at the end of 2015, the fact that the Department has moved from nearly zero, to where it now stands, is a great feat.

Unfortunately, there is a visible lack of uniformity and consistency among the monthly reports; in particular, not all police districts and other ISR-reporting units and personnel are meeting the same high standards set by others within the Department.  If the lack of uniformity and consistency were merely superficial, the Consultant would not find fault.  However, after careful review of the approximately 4000 pages of internal auditing documents that CPD produced to the Consultant, pursuant to his request in early 2017, the Consultant has some concerns about the following topics.

1. Police officers in many districts, as well as within special units and tactical teams outside the Bureau of Patrol, are failing to submit ISRs generated within the review period in a timely manner. In this regard, the Consultant points out that CPD's policy requires that the ISR be submitted by the end of the officer's tour of duty. The Consultant recognizes that this may be a difficult standard with which to comply given the many duties of police officers; and, thus, the Consultant is not going to fault some or even most officers for failures to satisfy this time line. However, it is quite apparent that some or even many officers fail to submit ISRs within a reasonable time frame for supervisory review. In particular, monthly audit reports by the executive officers consistently and routinely list multiple ISRs in a preliminary ("PRE") status from the month prior to the auditing report's submission to IU. In fact, it is clear from the January 2017 monthly captains' audits, that there were at least 89 ISRs, created to document stops made during Period 2, which were still in a PRE-status *after the end of Period 2*.

2. District-level supervisors, charged with the duty to review submitted ISRs to ensure compliance with internal policy directives and all applicable laws, are also failing to complete initial, first-level reviews in a timely manner. In this regard, the Consultant notes that these reviews also are to be completed by the end of a supervisor's tour of duty. Again, fault will not be assigned for any failure to meet this stringent standard, especially in the first full review period in which the auditing and supervisory review system was in full-swing; however, the data reviewed for Period 2 leaves no doubt that supervisors from every police district are sometimes, if not often, failing to complete review of submitted ISRs within a reasonable time frame. The timeliness failures of supervisors in this regard range from merely citable to egregious. Citable failures include a number of instances where the monthly captains' audits report ISRs generated in the month prior still sitting in submitted status without an initial review to those waiting to be approved for cancellation. Egregious examples of untimely review include ISRs submitted during Period 2 which were not reviewed until Period 3 or even Period 4 – over a year after the stop was made that gave rise to the ISR.

3. Police officers also are failing to correct ISRs that are sent back to them by supervisors and/or the IU for correction or modification in a timely manner. It appears that the tour of duty directive still applies to ISRs in a deficiency review/DEF-status, but some officers are not complying with that directive. In fact, during the Consultant's personal review of the 176 multiple-version ISRs in the sample set identified for the coded legal narratives review, it became apparent that the last version of some multiple-version ISRs was one in a DEF-status, awaiting

correction or modification by the ISR author. Review of the date and time stamps on these last versions in DEF-status revealed that the timeliness directive is not being complied with in too many cases.

That said, after having reviewed the auditing reports and other supervisory review documents, the Consultant has no doubt and can attest that the IU and many CPD officers are, in fact, endeavoring to comply with all ISS policy directives, as well as the terms of the Agreement, by engaging in supervisory review of ISRs submitted by police officers (and other members of the Department), auditing the ISRs submitted and supervisors' reviews on a daily, monthly and bi-annual basis, and going above and beyond the call of duty to investigate civilian and internal complaints related to the ISRs.

Nevertheless, the ISR data from Period 2 raises more questions than it answers with regard to the obligations of the Agreement. Some of these questions have been discussed in the preceding paragraphs. The bottom line is that the Consultant cannot validate the CPD's auditing and supervisory review processes, in accordance with Section IV.2 of the Agreement, because the questions raised highlight potential concerns about whether the ISR data produced in Period 2 was assessed correctly by the Consultant and designated experts, based on a number of status codes which indicate that the ISRs in the January 2017 Main File, as well as the identified representative sample, may not have been submitted for review or, although submitted, actually reviewed by a supervisor, prior to identification of those ISRs as part of the representative sample. If those status codes were apparent from the January 2017 Main File, then the designated experts were not able to read the files to obtain such information in the format in which those files were produced. The Consultant wishes to assure the Parties and the Public that efforts will be made to ensure that this disconnect does not occur in future reporting

periods because the CPD's IT personnel and the designated Experts are working together to develop solutions that will avoid such results going forward.

Because of this technical difficulty, at least another – and perhaps several – data reporting periods will be necessary before any kind of determinations by the statistical experts can be generated regarding the ultimate issues raised by the Agreement, namely: substantial compliance with ICRA, which is based on how the statistical results play out with respect to statistical causation, disparate impact, and the Consultant's coded legal narratives from the sampled ISRs.

In the meantime, all legal questions related to defining and measuring the standard for substantial compliance with ICRA, in the Agreement, Section IV.3., as well as how to measure unlawful disparate impact, are scheduled to be negotiated and (hopefully) resolved before the ISR data for CY2017 is statistically analyzed.

## Part III.  The Quantitative Assessments & Analysis

In Part III of this report, the Consultant will summarize the quantitative assessments and analyses performed by the statistical experts for the second reporting period.  This section involves quantitative concepts which are based on numbers derived from written ISRs and codes assigned to specific data points which are relevant to the qualitative assessments and legal analyses in Parts I and II of this report. At the outset, a few comments regarding the statistical reports are necessary for a better understanding of the reports.

*First*, the statistical reports discussed here are extremely technical and difficult to interpret without much study and expertise.  The Consultant is not a statistical expert;

however, given the duties assigned to him by the Parties to the Agreement in Section V., the Consultant has done his best to provide an interpretation of the statistical reports. Before issuing his draft of this report to the Parties for their review, the Consultant sent a copy of his draft report to the Experts to review and validate his interpretation of their technical reports. The Experts did, in fact, review and validate the Consultant's interpretation of their technical reports in the draft version of this report. In response to the Parties' comments and objections to their technical reports, the Experts did not made any *substantive* changes to their technical reports; and, therefore, the Consultant has not made any changes to his interpretation of these reports either. Nonetheless, to the extent that there are perceived inconsistencies in the Consultant's interpretations of the statistical reports, the Experts' reports are controlling.

*Second*, those reading this report also should be aware that the Parties may disagree with the statistical methodology (models) and portions of the statistical analyses reported in one or more of the four technical reports, which are discussed in the following pages and appended to this report.[66] Such disagreements are common, even in the context of a good faith agreement, such as the one governing the reforms called for by the Agreement. These disagreements, to the extent they were deemed relevant by the Consultant and Experts, were discussed with the Parties prior to the issuance of the First Period Report; and, to the extent relevant, those disagreements have been considered and factored into the Experts' technical reports. Those disagreements, however, have not influenced the independent judgments of the statistical experts, who have been designated to complete their studies only for input to the Consultant.[67]

---

[66]*See, e.g.*, Appendices A-D.

[67]Having chosen and designated the Experts for appointment by the Consultant, at the outset of this Agreement, the Parties are well-aware of the Experts' responsibility to remain independent and neutral on all issues

These Experts are therefore neutral, as is the Consultant, with regard to any and all factual and legal issues discussed in this report.

*Finally*, in addition to the designated, neutral Experts, both parties have retained -- whether paid or unpaid – their own respective experts, who have reviewed and, in some instances, questioned some of the findings/conclusions of the designated Experts.  It is not unusual for experts to disagree with the opinions and methodologies of other experts in the same field.  In fact, it is quite common (even expected) for experts to advocate for the positions of the party by whom they are retained. By contrast, the *mutually chosen* and designated Experts are not beholden to either party or the Consultant; and, to the extent that the Experts' statistical opinions, methodologies and results are (or may be) inconsistent with the positions of either Party, the Consultant accepts the opinions of the designated Experts over those of the Parties' retained experts.  The Consultant has considered the oral and written responses of the designated Experts to the Parties' comments; and he finds no reason to disagree with their conclusions and findings, including their chosen methodologies and logic.[68]

## The Statistical Reports for Period 2

The Experts have completed their nearly year-long statistical assessments and analyses of the ISR data from Period 2.  That work and the statistical results from it are discussed in four

being examined.  Thus, the Parties' disagreements with the results have not had nor will they have any bearing on the statistical results reported in the technical reports or in the Consultant's independent analysis of them.

[68]The designated Experts' responses to the Parties' comments are even *more* technical than the technical reports, themselves, so rather than attempt to paraphrase them, the Consultant has attached them to this report as Appendix E.

(4) technical reports, which are appended to this report. The four technical reports, by category and in order presented, include:

1. The Post-Stop Outcomes Analysis for the Second Period, dated March 3, 2018 ("PSO2 Report"); Appendix A.
2. The Ecological Analysis of Monthly Stop Data for the Second Period, dated March 3, 2018 ("EA2 Report"); Appendix B.[69]
3. The Analysis of Coded Single Version ISR Narratives (with Addendum) for the Second Period, dated March 3, 2018 ("P2-SVRs Report"); Appendix C.
4. Analysis of Coded Multiple Version ISR Narratives for the Second Period, dated December 12, 2017 ("P2-MVRs Report"); Appendix D.

## The Post-Stop Outcomes Report

In the broadest terms, the Post-Stop Outcome Analysis Report for Period 2 ("PSO2 Report") describes what happened when Chicago police officers stopped a civilian during Period 2. The results of this report are based on the ISR data files produced by the CPD to the statistical experts.[70]

More specifically, the PSO2 Report covers two subjects: (1) measurable changes in the statistical results from Period 1 to Period 2; and (2) how race and ethnicity are linked to post stop outcomes in Period 2.[71] The first subject, measurable changes and comparisons, employ statistical models that describe changes in terms of *gross impact* results. The second subject, race and ethnicity relationship links to outcomes of interest, employ sophisticated, analytical

---

[69]For Period 2, the experts folded the summary report of violent arrest data and arrest data into the Ecological Report 2, rather than creating individual reports on those issues.

[70] *See, e.g.*, PSO2 Rpt., Section 8, pp. 12-13 (technical description of source data). Understanding the source for these files and the data in them is critical to the Part III analysis of the statistical results. A discussion of this data source appears in more detail in Part IV.

[71]*See* PSO2 Rpt., at 6.

models (for purposes of this report "statistical models") that reflect **_net impact_** results after taking account of other factors. These two subjects sometimes overlap when simple statistical models gauge the gross impacts of changes between Period 1 and Period 2.

With regard to both subjects, the focus of the statistical studies completed address the question of whether the race or ethnicity (sometimes referred to as the "ethno-racial" characteristics) of the civilian who was stopped is related to the stop (or post-stop outcome like a protective pat down or a search).[72] Thus, the PSO2 Report assesses the descriptive (raw numbers and proportions) and statistical (analytical inferences based on statistical formulas) results related not only to the stops made, but also to the outcomes from those stops.

The outcomes of interest -- what happens after the stops -- in Period 2 include:[73]

- Whether a protective pat down occurred and, if so, whether the officer discovered a weapon or firearm. Answers to these questions are required by the Agreement.

- Whether a search took place as a result of the protective pat down. The Agreement only covers searches which follow directly from the protective pat down; it does not cover search activity which occurs independently of the protective pat down (e.g., searches based on plain view and/or custody).

- Whether a protective pat down occurred during a stop where no enforcement action resulted. This outcome is studied because investigatory stops without enforcement actions must be reported by the CPD based on the Agreement.

---

[72]These relationships can be shown by looking at the statistical results. The science behind statistics and how they can make such things visible is beyond the scope of the Consultant's task at hand. For this report, it must suffice to say that the statistical results reported in the following pages can and do show a relationship or "link" between the race and ethnicity of the person stopped as well as the ethnic and racial composition of the community neighborhoods where the stop happened.

[73]Notably, the Agreement does not require CPD to report probable cause stops without enforcement actions and Illinois reporting laws do not require the CPD to report those stops either. This fact is of concern for a number of reasons, but most relevantly to Period 2 reviews because the ISR data from Periods 1 and 2 includes both investigatory and probable cause stops, with no apparent way to distinguish between them without individual review of each ISR.

The quantitative results related to the stops and post-stop outcomes appear in two varieties:  a) descriptive (**gross** impact) results; and (b) statistical (**net** impact) results. [74] Descriptive results simply look at the relationship (a.k.a., links or connections) between race and ethnicity and the stops and/or post-stop outcomes.  The statistical tests look at the gross impacts in light of how other factors relevant to the stop or post-stop outcome affect overall results and yield the net impact results of race and ethnicity on the stop or post-stop outcome.[75] Where net impacts of race and ethnicity are "statistically significant" – that is, unlikely to be due to just chance fluctuations in the data or likely to occur less than one in ten thousand tests – then the experts can ask the most important question, namely, whether the statistical results show a correlational or a causal relationship between race and ethnicity and the stop and/or post-stop outcomes of interest. In just a few instances when comparing outcomes across Periods 1 and 2 statistical significance is considered, even though additional factors are not taken into account, the purpose is to try to identify changes over time that might be meaningful.

---

[74]Statistical science uses the words "effect" and "impact" to mean something different than the law means when using those words.  When reading the discussion regarding the statistical results, one must remember that effect simply means what it normally connotes and impact does too.  These terms are not used in the technical reports, nor in this section of the Consultant's Report, to describe a conclusion that has legal significance.

[75]Stated differently, these more technical results are achieved using highly sophisticated statistical models which put boundaries around the descriptive results using "control factors" which test whether the race or ethnicity of the person stopped and/or the racial or ethnic qualities of the place where the person is stopped is linked to the stop and/or post-stop outcome.  If the results are positive, they are called "net impacts" of race or ethnicity, or racial or ethnic community composition. The connections creating the relationship are considered on their own, without taking other factors into account – in other words, without placing any conditions or "what ifs" on the result.

After the descriptive (gross impacts) results are summarized, the Consultant will summarize the statistical (net impacts) results. These statistical tests factor in and consider more than the descriptive results. As will be discussed, gross impact results are often used to create and justify public policy, but to be legally relevant, the net impact results identifying robust causal links between race and ethnicity and the CPD's stop and frisk practices must be shown. With that broad overview as context, discussion of the most important descriptive and statistical results from the PSO2 Report will proceed.

## Descriptive Models

Discussion begins with the total, city-wide stop counts from Period 2 and then focuses on the total stop count results for the three ethno-racial groups studied, city-wide, and then within each of the 22 police districts. Specific descriptive numbers are not provided for the police activity within the 275 police beats, in this report or in Appendix A; but, they are considered and factored into the statistical models discussed in this part of the report.

### Period 2 Total Stops Counts

The Period 2 stops counts results are measured first by the number of unique stops in the ISR data. This measurement is based on the unit of the stop, not the individual stopped. ISRs are generated with unique ISR numbers which cannot be replicated. For each ISR, one stop event of a single individual is reported, along with any post-stop outcome information. Single individuals may have been stopped multiple times during the period of review, so the number of stopped civilians is not known, because the unit of measurement is the stop itself. In other words, the total stop count is related to the number of unique individual ISR numbers in the ISR data, not the number of unique individuals who were stopped.

During Period 2 there were a total of 51,538 stops made by Chicago police officers within Chicago's city limits, which do not include the two international airports. This number of stops includes both investigatory stops and stops made based on probable cause for on-view violations of the law.[76] By contrast, during Period 1, Chicago police officers made 54,701[77] stops of civilians within City limits, compared with 51,538[78] during Period 2. Although the total number of stops decreased by 3,163, the relative proportions/percentages of stops made of civilians within the three ethno-racial groups studied remained approximately the same.

## Total Stop Counts for Three Groups

Assessment of the Period 2 data reveals that Chicago police officers stopped a total of 50,723 civilians *from the three population groups* chosen for the statistical studies in this reporting period, namely, individuals whom CPD officers identified, using CPD race and ethnicity codes, as African-American, Hispanic/Latino, or White.[79] The experts use different codes in their

---

[76] Unfortunately, for Periods 1-3 there has been no way to distinguish between the two stop types being reported in the ISRs, because the City and CPD designed the ISR forms for a multi-purpose use, namely, to report stops to the State of Illinois and to report investigatory stops for purposes of assessment according to the terms of the Agreement.

Because the presence of probable cause stops can only be determined post-stop by individual review of the narrative remarks in the ISRs, the Coded Legal Narratives Technical Report is the only one where a distinction between investigatory stops and probable cause stops is made, because the Consultant made those determinations during his coded review process of the sample ISRs. Because the presence of probable cause stops has a statistically significant impact on the numbers reported for each period, the Consultant recommended that the CPD pay close attention to ways to separate the probable cause stops, so the CPD adopted a new ISR Form for use in Period 4, in which officers will check a box to indicate if the stop was based on an on-view violation or other probable cause. For Period 2, however, the PSO2 report must assess all stops made without regard to the stop type or basis for the stop.

[77]*See, e.g., Id.,* p. 18 (8.4.1.1 (referencing Tables 1, 2, and 4 from PSO1)).

[78]The PSO2 reports a total stop count of 51,538 of all racial and ethnic groups in Chicago for Period 2. Focus on the three most populous groups, which are the subjects of this study, brings the total count to 50,715 (after excluding 8 errors from district 41 and 815 detainees who were identified by police officers as members of a different ethno-racial group). *See, e.g.,* PSO2, pp. 14-15 (Tables 1 and 2), 14 (Table 2).

[79]The total number of stops during Period 2 was 51,538, but the total number of stops just of the three groups studied was 50,723. This means that in 815 of the total 51,538 stops, CPD officers identified the subject of the stop as a member of another minority group. These other racial and ethnic groups identified in the U.S. Census from 2010 have not been included in the statistical analysis because their numbers, as well as their proportional

technical reports based on the method used by the U.S. Census Data from 2010 ("U.S. Census data") and the necessity of distinguishing between mixed-race and mixed-ethnicity populations using that data. The experts divide the three groups into "Black Non-Hispanic"; "White Non-Hispanic" and "Hispanic (white)," based on the predominant populations recognized by the U.S. Census data. [80]

Of the 50,723 stops involving civilians in the three groups studied, *identified by CPD police officers[81] as* African-American, Hispanic/Latino, or White:

- African-Americans (Black Non-Hispanics) were stopped 36,451 times;
- Hispanic/Latino (Hispanics) were stopped 9,969 times; and
- Whites (White Non-Hispanics) were stopped 4,303 times.

For Period 2, these numbers mean that the ***proportional number of stops*** of:

- Black Non-Hispanics comprised 70.73% of all the stops made by Chicago police officers.
- Hispanics comprised 19.34% of all the stops made by Chicago police officers.

representation in the overall population, are not large enough, relative to the number of models with predictors that were taken into account, to provide meaningful statistical results for purposes of this report. The Consultant in no way intends to convey the impression that the constitutional rights of or the ISR reports submitted involving these civilians are not equally important.

[80]For purposes of this report, the Consultant must use the codes assigned by the statistical experts in referring to the members of each group studied, because to do otherwise would further complicate the application of the statistical results to the factual and legal issues being discussed in this report. To be clear, African-American civilians are coded as "Black Non-Hispanics"; Caucasian or White (identified as White, of any ethnicity but non-Hispanics) are coded as "White Non-Hispanics); and Hispanics (of any nationality who are identified by CPD officers as White, rather than Black) are coded as "Hispanics." From time to time, the Consultant will also use the initials "BNH," "H," or "WNH" to refer to Black Non-Hispanics, Hispanics, and Whites Non-Hispanic, respectively.

[81]CPD has its own set of codes to classify detainees by racial and ethnic characteristics. These determinations are subjective – as they must be – and do not necessarily align with how the detainees identify themselves or report their ethno-racial identity in the U.S. Census data.

- Stops of White Non-Hispanics comprised 8.35% of all the stops made by Chicago police officers.

CONSULTANT'S TABLE 1. STOP COUNT AND PERCENTAGE COMPARISONS BETWEEN PERIOD 2 AND PERIOD 1.[82]

| | P2 TOTAL STOP #S | P2 PERCENTAGES BASED ON 3-GROUP TOTAL COUNT | P1 TOTAL STOP #S | P1 PERCENTAGES BASED ON 3-GROUP TOTAL COUNT | PERCENTAGE DIFFERENCE BETWEEN P1 AND P2 |
|---|---|---|---|---|---|
| TOTAL 3-GROUP STOP #S | 50,715[83] | 98.42%[84] | 54,116 | 98.9%[85] | (6.3%)[86] |
| BNH | 36,451 | 70.73% | 38,361 | 70.1% | 0.6% |
| WNH | 4,303 | 8.35% | 4,198 | 7.7% | 1.1% |
| Hispanic | 9,969 | 19.34% | 11,557 | 21.1% | (1.8%) |

As explained, these numbers are descriptive only and show gross impacts, which do not consider any or all of the other factors which vary from stop to stop and district to district where the stop occurs. These other unexamined factors can and probably do influence the numbers reported here, but what those factors are and how much they influence the result cannot be determined without using more stringent analytical tests (models) which "control" for those factors and make "all other things equal" – so that the identified factors being

---

[59]Source: PSO2 Rpt. (Tables 1 and 2).

[83]*See, e.g., Id.*

[84]*See, e.g.,* Id.

[85]*See, e.g.,* Id.

[86]*See, e.g., Id.*

controlled (controls or weights) do not influence the factor of interest being tested relative to the outcome.

To better assess the factors which are known to influence and play a role in the stop outcomes for members of the three racial and ethnic populations in Chicago being studied, the experts used the updated data from the American Community Survey ("ACS") for 2011-2015 to assess the socio-economic and demographic factors or "predictors" for the geographic areas where the stops were made during Period 2, as reported by police officers in their submitted ISRs. The ACS tracks and updates changing population numbers within the City of Chicago based on census results, as well as other demographic information related to the geographic, residential areas of census participants. The experts used the ACS to distill the factors that vary from place to place ("variables") and to compare the descriptive, gross impact results listed in Consultant's Table 1, with these variables using controls and more stringent analytical tests for the variables. One such test compared the gross impact numbers to the population numbers within the 22 police districts and 275 police beats within those districts.

From these comparisons, which appear in detail in the Ecological Technical Report, attached as Appendix B, it is clear that the proportion of stops and post-stop outcomes between the three groups *remains consistent* between the first and second reporting periods, even though the actual number of stops fell by about 3,401.[87] Thus, since each of the three groups studied continue to make up roughly one-third each of the Chicago population, it *is still fair to say that African-Americans were stopped at rates much higher than their proportional representation in the general*

---

[87]*See, e.g., Id.*, p. 8 ("About 3500 fewer … stops took place in the last half of the year as compared to the first half").

*City-wide population, while Hispanics/Latinos and Whites were stopped at rates much lower than their proportional representation.* The changes represented by the increased number of White Non-Hispanics and Black Non-Hispanics, and the decreased number of Hispanics does not change the overall proportional determination.

### Area & Police District Stop Count Results by Race & Ethnicity

During Period 1, the Consultant provided a summary of the statistical results on stop counts by race and ethnicity for each of the 22 police districts. In this Second Report, the Consultant will do the same but put these numbers in the contexts of the three (3) CPD Areas, which are part of the CPD's overall structure for reporting and command.

## AREA NORTH

Consultant's Figure 2.[88]  Period 2:  CPD Area North-- Number of all stops by race & ethnicity of detainee and percentages relative to race & ethnicity of other detainees stopped within each police district.[89]

| Area North | Black NH | | White NH | | Hispanic | | Totals |
|---|---|---|---|---|---|---|---|
| *Total Stops* | N | % | N | % | N | % | 20,393/50,715[90] |
| District 11 | 5925 | 88.87% | 448 | 6.72% | 294 | 44.48% | 6667 |
| District 14 | 328 | 33.06% | 111 | 11.19% | 553 | 55.75% | 992 |
| District 15 | 3374 | 94.72% | 80 | 2.25% | 108 | 3.03% | 3562 |
| District 16 | 381 | 24.60% | 737 | 47.58% | 431 | 27.82% | 1549 |
| District 17 | 173 | 19.27% | 209 | 23.27% | 516 | 57.46% | 898 |
| District 19 | 718 | 53.15% | 332 | 24.57% | 301 | 22.28% | 1351 |
| District 20 | 404 | 45.65% | 203 | 22.94% | 278 | 31.41% | 885 |
| District 24 | 894 | 50.97% | 354 | 20.18% | 506 | 28.25% | 1754 |
| District 25 | 1195 | 43.69% | 293 | 10.71% | 1,247 | 45.59% | 2735 |

For those reading this report who are familiar with the names of Chicago's various neighborhoods, Area North contains the following communities:  Humboldt Park; East and West Garfield Park; parts of Lincoln Park and Austin; Edison Park; Norwood Park; Jefferson Park; Forest Glen; Portage Park; Dunning; North Park, Albany Park, Irving Park, Avondale; Uptown; Garfield Ridge; Rogers Park; West Ridge; Lincoln Square; and Edgewater.

---

[88]The Consultant will analyze these numbers and percentages in Part III of this report.  For now, however, it is important to point out that the percentages represented in Consultant's Tables 2, 3, and 4, are percentages relative to the total number of stops within the three ethno-racial groups being studied, which is 50,715, and not the city-wide total stop count of 51,538.  These percentages are also relative only to the total number of stops within the three groups and do not relate at all to actual population numbers within the three groups city-wide, nor the residential groups within each police district.

[89]These statistics are derived from the PSO2 Report, Appendix A, pp. 13-14 (Table 2).

[90]The total stop count of 50,715 for the three ethno-racial groups being studied in this report is lower than the total number of Period 2 stops, or 51,538, because 815 of the stops in the Period 2 total include members of ethno-racial groups not studied for this report, and 8 records were associated with district 41 (an error).

## Area North

Consultant's Table 3. CPD Area Central for Period 2: Number of all stops by race & ethnicity of detainee and percentages relative to race & ethnicity of other detainees stopped within each police district.

| Area Central[91] | Black NH | | White NH | | Hispanic | | Totals |
|---|---|---|---|---|---|---|---|
| **Total Stops** | N | % | N | % | N | % | **18,462** |
| **District 1** | 456 | 73.91% | 99 | 16.05% | 62 | 10.05% | 617 |
| **District 2** | 2932 | 96.54% | 62 | 2.04% | 43 | 1.42% | 3037 |
| **District 3** | 1543 | 98.09% | 13 | 0.83% | 17 | 1.08% | 1573 |
| **District 8** | 1489 | 52.82% | 357 | 12.66% | 559 | 18.55% | 2819 |
| **District 9** | 1313 | 35.11% | 327 | 8.74% | 37 | 1.52% | 3740 |
| **District 10** | 2783 | 73.96% | 96 | 2.55% | 884 | 23.49% | 3763 |
| **District 12** | 903 | 46.17% | 183 | 9.36% | 870 | 44.48% | 1956 |
| **District 18** | 768 | 79.42% | 122 | 12.62% | 77 | 7.96% | 967 |

The local neighborhoods/communities within these eight (8) police districts are known variously as the Loop, Near South Side, Douglas, Oakland, Fuller Park, Grand Boulevard, Kenwood, Washington Park, Hyde Park, the South Shore, Woodlawn, parts of Englewood not in Area South, Garfield Ridge, Archer Heights, West Elsdon, Gage Park, Clearing, West Lawn, Ashburn, Armour Square, Fuller Park, McKinley Park, Bridgeport, New City, the Near and Lower West Sides, North and South Lawndale, Humboldt Park, West Town, the Near and Lower West Sides, East and West Garfield Park, Lincoln Park and the Near North Side.

---

[91]There are five (5) special units which operate in Area Central within all police districts and who have police officers assigned to them who issue ISRs, namely Units 189, 192, 196, 193 and 393. *See, e.g.*, IS00003386. These ISR numbers are reported, the Consultant believes, as part of the total numbers for each police district. If the Consultant's belief in this regard is erroneous, he welcomes correction by the CPD.

# Area South

Consultant's Table 4. CPD's Area South for Period 2: total stops by race and ethnicity with percentages relative to the three ethno-racial groups studied.

| Area South[92] | Black NH | | White NH | | Hispanic | | Totals |
|---|---|---|---|---|---|---|---|
| **Total Stops** | N | % | N | % | N | % | **11,795** |
| **District 4** | 2,382 | 79.06% | 72 | 2.39% | 559 | 18.55% | 3,013 |
| **District 5** | 2,363 | 96.76% | 42 | 1.72% | 37 | 1.52% | 2,442 |
| **District 6** | 1,955 | 97.95% | 31 | 1.55% | 10 | 0.5% | 1,996 |
| **District 7** | 3,220 | 96.52% | 44 | 1.32% | 72 | 2.16% | 3,336 |
| **District 22** | 900 | 91.09% | 74 | 7.49% | 14 | 1.42% | 988 |

The local community/neighborhood names within each of these five far south-side neighborhoods are: South Shore, Avalon Park, South Chicago, Burnside, South Deering, East Side, Hegewisch, Roseland, Pullman, West Pullman, Riversdale, Chatham, Greater Grand Crossing, Auburn Gresham, West Englewood, parts of Englewood not in Area Central, Mount Greenwood, Beverly, Morgan Park, and Washington Heights.

---

[92] There are also two special units, Units 212 and 312. These special units apparently operate within Area South with police officers who are not assigned to any particular police district, but who issue ISRs within the five police districts which are part of Area South. These officers report to the Area South Commander, but the ISRs they issue within the police districts are presumably reported as part of the district's ISRs each month, even though the monthly captain's audit reports for each month appear to segregate the number of ISRs issued by the Unit and District which issued them. Again, if the Consultant's assumption in this regard is erroneous he welcomes correction by the CPD.

## Period 2 Post-Stop Outcome Results

There are five (5) specific post-stop outcomes examined. For each of the five outcomes, the stop is assumed and the outcome listed is the subject of the statistical study.

1. Is a pat down conducted or not?
2. If a pat down is conducted, is a weapon found?
3. Is a search conducted or not?
4. If a search is conducted, is a weapon found?
5. What are the chances that the stopped citizen experienced a pat down combined with no enforcement action vs. no pat down and no enforcement action.

For each of the five outcomes, the experts sought to provide a descriptive context to explain simple race and ethnicity differences and district differences. Although statistical tests are (usually) not applied, these descriptive differences between ethno-racial categories represent an important part of the examination. For each outcome, the relevant questions are the same:

- **The race question.** Controlling for all relevant factors observed in the data that are *not of interest* ("observed covariates"), is there a statistically significant *net difference* on outcome scores between (1) non-Hispanic Black civilians and non-Hispanic White civilians? Because the covariates are controlled, the results for each of the five outcomes yield a *net effect*. These net effect results represent *correlational* links/relationships between the race and ethnicity variables and each of the five outcomes of interest.

- **The ethnicity question.** Controlling for observed covariates, is there a statistically significant net difference on outcome scores between White Hispanic civilians and non-Hispanic White civilians? Or, a net difference between outcome scores between Black Non-Hispanics and Hispanic civilians, after controlling for observed covariates.

- **Ethnic and racial composition of the surround.** Observed covariates of interest are naturally occurring within each of the 22 police districts within Chicago and within each of the more than 200 beat-within-district contexts. The geographic context of the stop is referred to as the "surround" by the statistical experts. The question they ask here is whether, controlling for other beat features (independent variables) and independent detainee and stop features, does the

racial or ethnic composition of the beat, itself, significantly influence the outcome in question?

With respect to these three questions, there are three key points[93] to take-away from the descriptive analysis in the PSO2 Report:

- There have been changes over time between Period 1 and 2 concerning the gross impact results for the outcome variables. These changes are summarized below in Consultant's Table 2.

- Racial disparities persist when predicting whether a protective pat down takes place.

- For example, the racial disparity persisted during stops involving a protective pat-down, where no enforcement action ensued. That is, Black non-Hispanic detainees were more likely to experience a pat down with no enforcement action than were White non-Hispanic detainees. There was no statistically significant change with regard to Hispanics (White, non-Black).

## Changes between Periods 1 & 2

The changes between Periods 1 & 2 related to the post-stop outcomes reflect changes in the raw numbers, as well as changes in probabilities and proportions for certain stop outcomes.

---

[93]The following statistical numbers and results have been gleaned from the Technical PSO Report for Period 2. These numbers and results will be organized by the "Takeaway Lessons" that appear in the PSO2 Report, section 4.2, p. 7.

## Overall Changes to Outcome Variables[94]

**CONSULTANT'S TABLE 2. CY 2016 PERIOD 1 TO PERIOD 2 DIFFERENCES**

| Outcomes of Interest | Period 1 | Period 2 | Percentage Changes[95] |
|---|---|---|---|
| Stops | 54,116 | 50,715 | (6.2%) |
| Pat Downs | 18,364 | 14,945 | (4.4%) |
| Stop + Pat Downs[96] (%) | 34% | 30% | (4%) |
| Pat Downs + "Hit" | X | 940/6.3% | N/A |
| Pat Downs + Weapon/Firearm | 465/2.5% | 517/3.5% | 1% |
| Pat Downs + Drugs | X | 280/1.9% | N/A |
| Searches | 9,595/17.7% | 7,002/13.8% | (3.9%) |
| Searches + "Hit"[97] | X | 1,313/18.8% | N/A |
| Searches + Weapon/Firearm | X | 348/5.0% | N/A |
| Searches + Drugs | X | 1,022/14.6% | N/A |
| Any Enforcement Action Taken[98] | 17,425/32.2% | 14,066/27.8% | (4.4%) |

The most important findings related to these changes from Period 1 to Period 2 are as follows. In terms of probabilities,

➢ Stops were less likely to involve a pat down and less likely to involve a search in Period 2.

➢ In Period 2, recovery of weapons/firearms proved more likely when a protective pat down took place.

---

[94] *See generally* PSO2 Report, at 17-19, and Table 3.

[95] These noted percentage changes are statistically significant, which means that they are unlikely to be due just to chance fluctuations *except* for the percentage change in stops, which is just noted descriptively Percentages in parentheses indicate negative numbers

[96] *See, e.g.,* PSO2 Report, at 17, n.9.

[97] *See, e.g.,* PSO2 Report, at 20, n.14 ("the numbers for this variable were taken from the ISR form checkbox "was a weapon or contraband discovered as a result of the search?" Items included, in addition to weapons, firearms, and specific drugs such as cannabis, heroin, cocaine, and other items such as drug paraphernalia, other, other controlled substance, alcohol, and stolen property).

[98] *See, e.g.,* PSO2 Report, at 20, n.15 ("this indicator was based on the check box on the ISR form 'Any enforcement action taken?' Specific actions officers could have checked were: arrest, personal citation, administrative notice of violation, or other"). *See also Id.,* at 19, note (b) to Table 3.

In terms of proportionality:

> ➢ The percentage of weapons recovered from protective pat downs during Period 2 increased to 3.5% from 2.5%; but,

> ➢ The percentage of enforcement actions ("EAs") resulting from stops "declined significantly" in Period 2 (e.g., falling from 32% in Period 1 to 28% in Period 2); and

> ➢ The proportion of stops generating neither a pat down nor any enforcement action was higher in the second half of the year (i.e., 50 percent vs. 43 percent).

Racial disparities reflected in the Period 1 gross impact/descriptive results persisted in Period 2

when predicting whether a pat down took place.   For example:

- Black non-Hispanic detainees were **more likely** to experience a protective pat down compared to White non-Hispanic detainees.

- Black non-Hispanic detainees also were **more likely** to be subject to a protective pat down than White non-Hispanic detainees during investigatory stops which did not result in any enforcement action.

In terms of probabilities:

- stops were less likely to involve a protective pat down;

- stops were less likely to involve a search;[99]

---

[99]As noted previously in this report, when the term "search" is analyzed statistically, it refers only to police officer search outcomes which **flowed directly from** (and were based on probable cause obtained from) the protective pat down, not search outcomes which simply **followed** a protective pat down and/or search outcomes which took place after the investigatory stop.  The search outcomes described in the post-stop outcomes analysis are, therefore, limited to search activity based on probable cause the police officer obtained while conducting the protective pat down by plain touch or confession from the subject or some other articulated factor justifying a more invasive search of the subject (or subject's belongings etc.), governed by the Fourth Amendment, rather than the Terry exception doctrine.

The search outcomes that are not analyzed and included in Dr. Taylor's post stop outcomes report are generally those which resulted from the police officer taking custody of the subject ("custodial searches") after the investigatory stop was made.  Custodial searches depend upon factors (ranging from administrative transport to arrest) that establish probable cause for the officer to seize, rather than temporarily detain, the subject.  Those determinations might have nothing to do with either the protective pat down, if one occurred, or the factors the officer believed established reasonable suspicion of criminal activity justifying the investigatory stop. Consequently, custodial searches fall outside the Agreement's scope and, thus, were eliminated from Dr. Taylor's post-stop outcome analysis, just as they have been eliminated from his analysis in Period 2.

In terms of proportionality:

- stops in which protective pat downs occurred dropped proportionally by 4% between Period 1 and Period 2, which proved to be statistically significant (i.e., the chances that the drop in the proportion of stops with a pat down from the first half of 2016 to the second half of the year was due to just random fluctuation was less than one in ten thousand).

- stops in which protective pat downs were conducted were more likely to produce a weapon (e.g., 3.5% of protective pat downs produced weapons in Period 2, compared to 2.5% in Period 1; resulting in a 1% increased over a 6-month period).

### Areas with NO Changes in Period 2 from Period 1

To understand what changed, one needs to first understand what did not change (at least significantly) between Periods 1 and 2.

- The relative frequency of the three key ethno-racial groups did not change much.[100]  This means that:

- In Period 2, the three groups studied represented 50,723 out of 51,538 cases in the full set of ISRs or 98.4 percent of all stops made.

- In Period 1, there were 54,116 stops of the three groups studied.

The extreme variation between stop numbers and the numbers from each ethno-racial group studied continued in Period 2, as can be seen in Table 2 of the PSO2 Report, p. 14-15, and also illustrated by the Consultant's Tables 2, 3, and 4, above, which group the descriptive gross impact results by CPD Areas and within the police districts.

---

[100] *See* PSO2 Report, p. 13-14 (Table 1).

## Areas of Change between Periods 1 and 2

The main changes appear in the overall descriptive statistics for the post-stop outcome variables, namely, changes in:

- the total number of ISRs submitted;
- the number of pat downs and pat down hits for weapons/firearms;
- the number of pat downs with enforcement actions delivered; and
- the number of stops with a protective pat down, but no enforcement action[101]

CONSULTANT'S TABLE 6: PERIOD 2 POST-STOP OUTCOME DIFFERENCES

| Outcome Changes | Period 2 | Period 1 | Percentage Change |
|---|---|---|---|
| ISRs | 50,715 | 54,116 | (6.3) |
| Protective Pat Downs | 14,945 | 18,364 | (4) |
| Protective Pat Down Hits | 517 | 465 | +2.5 |
| PPD + Enforcement Actions (EAs) | 14,066 | 17,425 | (32.2) |
| Stop + PPD + NEA | | | |

A summary of the total numerical changes appears for the three ethno-racial groups studied, only, along with the proportional change, if any, in Consultant's Table 6, above. Each of these post-stop outcome results are statistically significant, which means they are not likely to be due to mere chance. While the cause for these changes is unknown, the experts opine that the drop in the number of pat downs is not necessarily informative because the total number of

---

[101]Note that the number of searches did not change significantly from Period 1 to Period 2, nor did the hit rates for searches.

stops is also down noticeably (50,715 to 54,116). But, the experts also qualify as "of more interest" when it comes to the quantitative difference in these gross impact results:[102]

- The proportion of stops with pat downs dropped in Period 2 -- down 4 percent from 34% in Period 1 to 30% in Period 2. This statistically significant result is "interesting" given the gross impact results regarding hit rates below.

- Protective pat downs during Period 2 yielded 1% more weapons/firearms and 1.9% more drugs or contraband than in Period 1. The change is statistically significant, but the reason is not known.

The main take-away point is that the proportion of stops **without** pat downs and enforcement actions was higher in Period 2 (50%) than Period 1 (43%), reflecting a 7% lower stop + pat down + enforcement action or stop + pat down or stop + enforcement action. This finding is consistent with the other independent findings that pat down numbers were lower in Period 2, as were enforcement actions.

Protective Pat Downs
PERIOD 2 TOTAL COUNTS BY CPD AREAS
The following tables were created from Table 5 of the PSO2 Report to give the parties and readers an idea of how the descriptive results for protective pat downs break down by the Three CPD Areas. The North Area of Chicago is presented first, followed by the Central and South Areas.

---

[102]*See* Appendix A (p. 18).

# Area North

CONSULTANT'S TABLE 7. PERIOD 2 TOTAL PAT DOWN COUNT BY CPD AREA NORTH, POLICE DISTRICT & ETHNO-RACIAL GROUP.

| Area North | Black NH | | White NH | | Hispanic | | Totals |
|---|---|---|---|---|---|---|---|
| **Total Pat Downs** | N | % | N | % | N | % | 5,089/14,945[103] |
| **District 11** | 1,301 | 21.96 | 62 | 13.84 | 63 | 21.96 | 1,426/21.39 |
| **District 14** | 105 | 32.01 | 28 | 25.23 | 176 | 31.83 | 309/31.15 |
| **District 15** | 1,019 | 30.20 | 20 | 25.00 | 38 | 35.19 | 1,077/30.24 |
| **District 16** | 26 | 6.82 | 58 | 7.87 | 61 | 6.82 | 145/9.36 |
| **District 17** | 50 | 23.44 | 49 | 23.44 | 168 | 32.56 | 267/29.73 |
| **District 19** | 179 | 24.93 | 44 | 13.25 | 77 | 25.58 | 300/22.21 |
| **District 20** | 83 | 20.54 | 28 | 13.79 | 49 | 17.63 | 160/18.08 |
| **District 24** | 291 | 32.55 | 78 | 22.03 | 168 | 33.20 | 537/30.62 |
| **District 25** | 365 | 30.54 | 60 | 20.48 | 443 | 35.53 | 868/31.74 |
| **Total #s** | 3,419 | | 427 | | 1,243 | | 5,089/14,945 |

# Area Central

CONSULTANT'S TABLE 8. PERIOD 2 TOTAL PAT DOWN COUNT BY CPD AREA CENTRAL, POLICE DISTRICT & ETHNO-RACIAL GROUPS.

| Area Central | Black NH | | White NH | | Hispanic | | Totals |
|---|---|---|---|---|---|---|---|
| **Total Pat Downs** | N | % | N | % | N | % | 4,945/14,945 |
| **District 1** | 112 | 24.56 | 16 | 16.16 | 10 | 16.13 | 138/22.37% |
| **District 2** | 440 | 15.01 | 12 | 19.35 | 6 | 13.95 | 458/15.08% |
| **District 3** | 592 | 38.37 | 6 | 46.15 | 5 | 29.41 | 603/38.33% |
| **District 8** | 284 | 19.07 | 79 | 22.13 | 273 | 28.06 | 636/22.56 |
| **District 9** | 477 | 36.33 | 89 | 27.22 | 855 | 40.71 | 1,421/37.99 |
| **District 10** | 685 | 24.61 | 23 | 23.96 | 418 | 47.29 | 1,126/47.29 |
| **District 12** | 169 | 18.72 | 22 | 12.02 | 177 | 20.34 | 368/18.81 |

---

[103] *See, e.g.,* Appendix A, pp. 21-23, Table 5.

| District 18 | 157 | 20.78 | 22 | 20.44 | 16 | 18.03 | 195/20.17 |
| TOTALS #s | 2,916 | | 269 | | 1,760 | | 4,945/14,945 |

# Area South

CONSULTANT'S TABLE 9. PERIOD 2 TOTAL PAT DOWN COUNT BY CPD AREA SOUTH, POLICE DISTRICT & ETHNO-RACIAL GROUPS.

| Area South | Black NHs | | White NHs | | Hispanics | | Totals |
|---|---|---|---|---|---|---|---|
| *Total Pat Downs* | N | % | N | % | N | % | /14,945 |
| District 4 | 911 | 38.25 | 27 | 37.50 | 203 | 36.31 | 1,141/37.87% |
| District 5 | 824 | 34.87 | 10 | 23.81 | 12 | 32.43 | 846/34.64% |
| District 6 | 825 | 42.20 | 11 | 35.48 | 3 | 30.00 | 839/42.03 |
| District 7 | 1,644 | 51.06 | 19 | 43.18 | 34 | 47.22 | 1697/22.56 |
| District 22 | 332 | 36.89 | 13 | 17.57 | 5 | 35.71 | 350/35.43 |
| TOTALS #s | 4,536 | | 80 | | 257 | | 4,873/14,945 |

If one scans Consultant's Tables 7, 8, and 9, several facts become quickly apparent.

CONSULTANT'S TABLE 10. AREA-LEVEL COMPARISONS OF PAT DOWNS BY NUMBER & ETHNO-RACIAL GROUPS[104]

| | BNHs | WNHs | Hispanics | Total 3-Groups |
|---|---|---|---|---|
| *North* | *3419* | *427* | *1243* | *5089* |
| *Central* | *2916* | *269* | *1760* | *4945* |
| *South* | *4536* | *80* | *257* | *4873* |
| | | | | |
| *Totals:* | *10,871* | *776* | *3260* | *14,907* |

From Consultant's Table 10, directly above, the color red represents the highest numbers, green the second highest numbers, and purple the lowest numbers. At a glance, it is clear that at

---

[104]Table 5, from the PSO2 Report, provides totals which average out to be 38 stops higher for all three groups; this is because the experts include pat downs within District 31, which is outside the City's limits. The Consultant has excluded the District 31 stops for purposes of the illustration in Consultant's Table 10.

an Area-wide level, the MOST pat downs of BNHs occurred in Area South (4,536); and, the FEWEST pat downs of BNHs occurred in Area Central (2,916). The MOST pat downs of WNHs occurred in Area North (427); and the FEWEST number of pat downs in Area South (80). For Hispanics, the FEWEST number of pat downs occurred in Area South (257); and the MOST pat downs occurred in Area Central (1755).

Significantly, the descriptive numbers for pat downs in Consultant's Table 10 reflect historical patterns of ethno-racial residential segregation in Chicago. This is not as apparent when looking merely at the police districts. One must look more closely at the individual communities which are part of each police district and then how those communities create the stitching for the social fabric of the three CPD Areas. In other words, ethno-racial residential segregation may not be visible by Area *per se*, but may be observable within the individual communities and neighborhoods within police districts which make up the three CPD Areas.

Consultant's Table 9 makes visible what is already known to those who are familiar with Chicago's residential areas: racial and ethnic residential population numbers track socio-economic patterns within Chicago – many of which have a long history and are deeply embedded within the fabric of the local community. The de facto segregation is not area-wide, per se, but rather may be based on the socio-economic features of the individual community areas/neighborhoods within each police district and within each CPD Area.

How the CPD's stop and frisk practices respond to these visible, if not easily quantifiable facts, raise the questions addressed by the Agreement and Part II of this report.  In support of this observation, the Consultant will now summarize a few of the quantifiable facts from the PSO2 Report, Table 5:

1. The MOST protective pat downs occurred in District 7, Area South (1,697) – the Englewood, West Englewood and Greater Grand Crossing communities.

2. The FEWEST pat downs occurred in District 1, Area Central (138) – *the Loop, Near South Side and Douglas communities.*

3. WNHs experienced the FEWEST number and LOWEST proportion of pat downs of all three groups and in all three areas by a wide numerical margin as compared to both BNHs and Hispanics.

4. BNHs experienced the MOST pat downs and LARGEST proportion of pat downs of all three groups also by a wide numerical margin.  Although the number of BNHs and Hispanics patted down in Area North and Area Central are roughly proportional looking at the numbers (within approximately 500 pat downs), the starkly disparate (gross impact) number of pat downs in Area South to BNHs creates a visible numerical disparity between the number of BNHs and Hispanics who were patted down, overall and city-wide, during Period 2.  This disparity gives one pause because, again, gross population numbers for the City of Chicago are roughly equal, with each group's members representing approximately one-third.

The total numbers and proportional representation of pat downs involving members of the 3-groups in each police district during Period 2 look like this:

**TABLE 5 NUMBER OF PAT DOWNS AND PROPORTION OF INVESTIGATIVE STOPS WITH PAT DOWNS: BY DISTRICT, AND ETHNORACIAL GROUP WITHIN DISTRICT.**

| Ethnoracial group | Number of pat downs | | | | Percentage of investigatory stops with pat downs | | | |
|---|---|---|---|---|---|---|---|---|
| | White NH | Black NH | Hispanic | Total | White NH | Black NH | Hispanic | Total |
| District | | | | | | | | |
| 1 | 16 | 112 | 10 | 138 | 16.16% | 24.56% | 16.13% | 22.37% |
| 2 | 12 | 440 | 6 | 458 | 19.35% | 15.01% | 13.95% | 15.08% |
| 3 | 6 | 592 | 5 | 603 | 46.15% | 38.37% | 29.41% | 38.33% |
| 4 | 27 | 911 | 203 | 1,141 | 37.50% | 38.25% | 36.31% | 37.87% |
| 5 | 10 | 824 | 12 | 846 | 23.81% | 34.87% | 32.43% | 34.64% |
| 6 | 11 | 825 | 3 | 839 | 35.48% | 42.20% | 30.00% | 42.03% |
| 7 | 19 | 1,644 | 34 | 1,697 | 43.18% | 51.06% | 47.22% | 50.87% |
| 8 | 79 | 284 | 273 | 636 | 22.13% | 19.07% | 28.06% | 22.56% |
| 9 | 89 | 477 | 855 | 1,421 | 27.22% | 36.33% | 40.71% | 37.99% |
| 10 | 23 | 685 | 418 | 1,126 | 23.96% | 24.61% | 47.29% | 29.92% |
| 11 | 62 | 1,301 | 63 | 1,426 | 13.84% | 21.96% | 21.43% | 21.39% |
| 12 | 22 | 169 | 177 | 368 | 12.02% | 18.72% | 20.34% | 18.81% |
| 14 | 28 | 105 | 176 | 309 | 25.23% | 32.01% | 31.83% | 31.15% |
| 15 | 20 | 1,019 | 38 | 1,077 | 25.00% | 30.20% | 35.19% | 30.24% |
| 16 | 58 | 26 | 61 | 145 | 7.87% | 6.82% | 14.15% | 9.36% |
| 17 | 49 | 50 | 168 | 267 | 23.44% | 28.90% | 32.56% | 29.73% |
| 18 | 22 | 157 | 16 | 195 | 18.03% | 20.44% | 20.78% | 20.17% |
| 19 | 44 | 179 | 77 | 300 | 13.25% | 24.93% | 25.58% | 22.21% |
| 20 | 28 | 83 | 49 | 160 | 13.79% | 20.54% | 17.63% | 18.08% |
| 22 | 13 | 332 | 5 | 350 | 17.57% | 36.89% | 35.71% | 35.43% |
| 24 | 78 | 291 | 168 | 537 | 22.03% | 32.55% | 33.20% | 30.62% |
| 25 | 60 | 365 | 443 | 868 | 20.48% | 30.54% | 35.53% | 31.74% |
| 31 | 5 | 27 | 6 | 38 | 35.71% | 57.45% | 42.86% | 50.67% |
| Total | 781 | 10,898 | 3,266 | 14,945 | 18.15% | 29.90% | 32.77% | 29.47% |

The bottom line of Table 5 from the PSO2 Report is copied as Consultant's Table 11.

**CONSULTANT'S TABLE 11. NUMERICAL AND PROPORTIONAL TOTALS FOR THREE ETHNO-RACIAL GROUPS FROM TABLE 5.**

| Period 2 – Descriptive Totals Protective Pat Downs | BNH | % | WNH | % | H | % | Total all groups/average rate of pat downs for Period 2 |
|---|---|---|---|---|---|---|---|
| Totals | 10,898 | 29.90 | 781 | 18.15 | 3,266 | 32.77 | 14,945/29.47 |

Taking these totals, one can determine based on proportions alone that, during Period 2, Black non-Hispanics had a 29.92 % chance, *if stopped*, of being pat down, or a bit less than 1 out of 3 times if stopped. Hispanics' chances of being pat down were 32.8% *if stopped*, and White non-Hispanics' chances were 18.2% *if stopped.*

Using the last percentage to the far right of each column in Table 5 of the PSO2 Report, one can determine the probabilities in each police district, *just among those who are stopped in the first place,* of receiving a pat down.[105] In Table 5, one can observe that the highest chance *any person in one of the three ethno-racial groups* had of being patted down *if they already had been stopped,* occurred in District 7, where about 1 in 2 (50.9%) of those stopped got patted down. However, overall, on a city-wide basis, the last line of Table 5, reproduced as Consultant's Table 11, shows that *among those stopped* Hispanics were most likely to be patted down among the three groups of stopped

---

[105] *See also* Appendix A, PS02 Rpt., Table 6.

persons (32.8%), followed by Black non-Hispanics (29.9%) and then White non-Hispanics (18.2%).

More significant, however, than the proportional numbers are odds ratios. "Odds are always about the chances of [this versus that]. **Odds are different from proportions** because proportions are just about the chances of this, not the chances of [this versus that].[106] Odds ratios are more descriptive than proportions because they focus on the likelihood of one categorical outcome – being pat down versus not being pat down – rather than the odds of being pat down in a context where the odds of any outcome may or may not be possible.

To obtain the odds, the proportion patted down is divided by the proportion not patted down for each group. For example, taking the total numbers set forth above for each group in Consultant's Table 11, the city-wide probability, for a White non-Hispanic civilian *who already had been stopped*, of being patted down were 18.2 percent. This means that the average chance of not being patted down for any given White non-Hispanic civilian *who already had been stopped* were 81.8 percent. The math for the odds looks like this for those already stopped: WNHs odds = 18.2/81.8 or .182/.818 = .22. Comparatively, the average, city-wide odds of (pat down vs. no pat down) for Black non-Hispanics who already have been stopped was .427; and, for Hispanics, it was 0.488.[107] Focusing *just* on those who *already* have been stopped, the difference between the odds of a White non-Hispanic being pat down at .22 are vastly less than the odds of being pat down, on average, in the City of Chicago, if one is a Black non-Hispanic (.427) or a Hispanic

---

[106]*Id.*, Appendix A, p. 23.

[107] *See Id.*

civilian (.488). Moreover, it appears that the odds are highest, on average among those who already have been stopped, for Hispanics.

Can one learn the actual difference in the odds, between two groups (e.g., BNH vs. WNH), of a certain outcome? Yes. But one does not just subtract the odds, e.g., .488 - .22. Rather, one uses division to calculate the *ratio* of the two odds (e.g., BNH/WNH= .488/.22).

$$\frac{\text{Odds of H or BNH [patted down v. not patted down]}}{\text{Odds of WNH [patted down v. not patted down]}} =$$

Odds Ratio of [BNH or H vs. WNH] getting [patted down v. not patted down]

The following odds ratio calculations are based on the numbers from PSO2 Report Consultant's Table 6, see below:

**TABLE 6. PATTED DOWN VS. NOT PATTED DOWN: PROPORTIONS AND ODDS, BY ETHNO-RACIAL GROUP, BY PERIOD**

| Period 2 | White-NH | Black-NH | Hispanic |
|---|---|---|---|
| Proportion patted down (a) | 0.182 | 0.299 | 0.328 |
| Proportion not patted down (b) | 0.818 | 0.701 | 0.672 |
| Odds of being patted down / not patted down [ (a) / (b) ] | 0.222 | 0.427 | 0.488 |
| **Period 1** | | | |
| Odds of being patted down / not patted down | 0.304 | 0.536 | 0.531 |
| Change, from Period 1 to Period 2, in odds of [being patted down vs. not patted down] | 0.732 | 0.796 | 0.919 |

The contrast in odds ratios between Hispanics and Black non-Hispanics who already have been stopped versus White non-Hispanics who already have been stopped is stated below.

- **HISPANICS:** [H Odds/WNH Odds] = OR = .488/.222 = 2.194 or 119 percent. This means that, *among those already stopped*, Hispanics odds of being pat down v. not pat

down were 119 percent higher or 2.19 times more likely than the odds of the same outcome for WNHs during Period 2.

- **BLACK NON-HISPANICS:** [BNH odds/WNH odds] = .427/.222 = 1.917. Translated, means that, *among those already stopped*, BNHs odds of being pat down vs. not pat down were 92 percent higher than WNH odds for the same set of outcomes.

The odds of being patted down versus not being patted down were roughly equal for Black non-Hispanics and Hispanics, because the odds ratio is close to 1, which means that the two groups have about equal chances of [this v. that] happening. For example: [Hs Odds/BNHs odds] = OR = .488/.427 = 1.144 or 14.4% higher odds, among those already stopped, of [a pat down vs. no pat down] for Hispanics than for BNHs, on average, during Period 2.

Comparisons between odds ratios for Periods 1 and 2 track the same rise and fall of the pat down numbers and ratios. Table 7 from the PSO2 Report is replicated here to show the odds ratio differences.

TABLE 7. ODDS RATIOS DEPICTING ETHNO-RACIAL DIFFERENCES IN ODDS OF GETTING VS. NOT GETTING PATTED DOWN AMONG THOSE ALREADY STOPPED: BY PERIOD

| Period | Second half of 2016 (Period 2) | First half of 2016 (Period 1) |
|---|---|---|
| Comparison of odds (odds ratio) | OR | OR |
| Black NH vs. White NH | 1.917 | 1.765 |
| Hispanic vs. White NH | 2.194 | 1.749 |
| Hispanic vs. Black NH | 1.144 | 0.991 |

The experts explain that, over the course of CY2016, speaking only descriptively, the "roots of this increasing disparity" between White non-Hispanics and the other two groups are based in the *larger drop in the number* of White non-Hispanics who were patted down in Period 2, than the relative numerical drop for Black non-Hispanic and Hispanic civilians. *See, e.g.,* PSO2

Report, Table 6. Because White non-Hispanics had the lowest odds ratio for being patted down, this group served as the denominator for the odds ratio calculations; that fact, combined with the larger numerical drop, increased the size of the disparity.

The public policy significance of this odds ratio discussion is not that these ethno-racial odds differences are statistically significant, because they are not – despite looking stronger in Period 2 than in Period 1.  Rather, the significance is simply to show that the Black/White disparity on pat down rates seen in Period 1 continued to track upward in Period 2 and bears watching in future reporting periods to see if a statistically significant pattern emerges.  The same holds for the Hispanic/White disparity.

## Pat Down Hit Rates

The following descriptive results are new for Period 2 and thus do not have comparison results from Period 1.

- There were 517 pat downs that produced weapons or firearms based on a total number of 14,945 within the three groups.  Translated, this represents an average 3.5% rate of recovery among the three groups of stopped civilians within the 22 police districts.

- BNHs carried 385/517 recovered weapons.

- Hispanics carried 99/517 recovered weapons.

- WNHs carried 33/517 recovered weapons.

- Pat downs in Districts 7 and 11 produced the greatest number of weapons, 52 each.  These two districts each contributed one-tenth of all recovered weapons city-wide.

- The fewest number of pat downs producing weapons (2) took place in District 16, on the northwestern edge of Chicago, excluding O'Hare International Airport (which is not considered to be within city limits).

- "Speaking just descriptively, pat downs of WNHs were MOST LIKELY to yield weapons (4.2% of the time); whereas, pat downs of Hispanics were LEAST LIKELY to yield weapons (3% of the time).

- The statistical disconnect is also applicable to the odds ratio of being patted down if one is a BNH versus the intermediate hit rate for weapons. Although the ordering of the three ethno-racial groups on pat down weapons hit rates shifted between BNHs and Hispanics at the low end between Periods 1 and 2, the point is still the same: the probability of being pat down if one is BNH or Hispanic is much higher than one would expect given the low hit rates.

## Searches

The total number of searches during Period 2 was 7,002 out of 50,715 stops, which means that police officers conducted searches in 13.8 percent of the time when a member of one of the three groups studied was detained. This proportion of stops with searches proves to be lower than the 17.7 percent rate for Period 1 and is statistically significant (so the drop unlikely to be due just to chance).

Because these search results were assessed based on the only measure available for quantification, namely, the check boxes in the ISR, these numbers depend entirely on the police officers' accuracy and integrity when reporting such post-stop outcomes. Moreover, these statistics relate to all searches except those where the experts were able to identify a custodial enforcement action. Thus, these numbers do not slice narrowly enough for purposes of a statistical disparate impact study based on the terms of the Agreement, because the Agreement only authorizes the Consultant to make findings related to search activity which is related to the protective pat downs, not search activity which merely occurs post-stop but pre-custodial enforcement action.

Descriptive statistics are, nonetheless, available for all searches marked by the check boxes for Period 2 in Tables 9-10 of the PSO2 Report. The number of searches are grouped by

police district and ethno-racial group in Table 9 and by hit rates for weapons per district and ethno-racial group in Table 10.  These tables show that, during Period 2, the highest number of searches took place in District 11 (1,247) and the fewest in District 1 (61).  Of these, BNHs were most frequently searched in District 11 by a stark margin of 1,096 to 93 for WNHs and 58 for Hispanics.  In District 1, the numbers are much smaller, but still reflect a disparity with Black NHs searched 47 times, and WNHs and Hispanics searched 6 and 8 times, respectively. Of course, the number of searches for each ethno-racial group depends in part on how many in each group were stopped in a district; those stop differences not shown.

## Search Hit Counts

During Period 2, in about 1 of 6 searches (1,313/7,002), the search yielded something of interest to the officer such as firearms, weapons, drugs, contraband, or "other" related things such as drug paraphernalia, a controlled substance other than cannabis, heroin and cocaine, alcohol, and stolen property.[108]

As was true with weapons-producing pat downs, the highest weapons-from-searches hit rates occurred in Districts 7 and 11 and varied by ethno-racial group.   Yet, UNLIKE the result showing that weapons were more likely (4.2%) to be recovered when WNHs were pat down, *searches of WNHs* city-wide *were LESS LIKELY to produce weapons* with a recovery rate of only 2.6 percent for Period 2.  In comparison, searches of BNHs and Hispanics were more likely to yield a weapon (5.4 percent of the time) than searches of WNHs.[109]  The hit RATE for

---

[108] *See, e.g.*, Appendix A, p. 20, n.14

[109] *See, e.g.*, Appendix A, Tables 9 and 10.

searches also varied by location. In districts that had at least 30 searches, the weapons hit rates ranged from 3 to above 8 percent.

## Enforcement Actions

During Period 1, the Consultant and experts focused on whether enforcement actions followed from investigatory and probable cause stops in cases where the ISR documented that the subject of the stop was a racial or ethnic minority. The same descriptive models and tests used in Period 1 are repeated in Period 2. The enforcement action data is relevant because the Agreement, but not Illinois state law, requires CPD to report investigatory stops where an enforcement action takes place.

CPD recorded four types of enforcement actions during Period 2: arrests, administrative notices of violation ("ANOVs"); personal citations; and "other." Table 11 in the PSO2 Report shows the distribution of stops where one of these types of enforcement took place.

TABLE 11 FREQUENCIES OF DIFFERENT ENFORCEMENT ACTIONS

| | PERIOD 2 | | PERIOD 1 | |
|---|---|---|---|---|
| Types of enforcement actions | N | Percent | N | Percent |
| | | | | |
| ANOV (administrative notice of violation) | 4,514 | 31.93 | 5,141 | 29.48 |
| ARR (arrest) | 6,137 | 43.40 | 8,037 | 46.09 |
| OTH (other) | 2,996 | 21.19 | 3,386 | 19.43 |
| PSC (personal service citation) | 492 | 3.48 | 861 | 4.94 |
| | | | | |
| Total | 14,139 | 100 | 17,425 | 100 |

Note. Period 2 - July-December 2016; Period 1 = January-June 2016.
Note. For Period 2, this descriptive total **excludes** 73 cases where there was a discrepancy between the overall check box for any enforcement action and specific actions. That is, the ISR check box "any enforcement action taken" was *not* checked 73 times when a box for a specific enforcement action *was* checked. More specifically, 70 times when "other" was checked as the enforcement type code, one time when arrest was checked, one time when violation was checked, and one time when personal citation was checked the overall enforcement check box indicated no rather than yes for any enforcement action taken.
In keeping with the logic rule that the overall check box receives a higher priority than the subsidiary check boxes, the 73 cases where there is a discrepancy are not shown here, but rather are set to missing. In statistical models using this outcome, or this outcome combined with a pat down, these 73 cases will be set to missing.
For Period 1, this descriptive total **excludes** 11 stops where a specific enforcement action was checked but the overall "any enforcement action taken" box was **not** checked. In ten of those instances the action was other and in one instance it was personal citation. In statistical models using this outcome, or this outcome combined with a pat down, these 11 cases were set to missing on the outcome.

Speaking just descriptively, as a proportion of all enforcement actions, arrests were down some and ANOVs were up some compared to Period 1.

Table 11 shows that there were 14,139 enforcement actions taken in Period 2 where police officers checked a box indicating that fact, as compared to 17,425 in Period 1. Table 12 breaks down the number of enforcement actions of any type, as well as relative proportions, according to the three groups studied and police districts in which those enforcement actions were taken. Overall, city-wide stops of BNHs resulted in enforcement actions of some kind 29 percent of the time during Period 2, compared to 20 percent for WNHs. Chances of an enforcement action occurring during a stop were relatively speaking quite high in a small number of districts,

Districts 1, 7, 11 and 22, where at least a third of stops included an enforcement action. This figure contrasts with three other police districts where less than one-fifth (1/5th) of stops were linked to a specific enforcement action (14, 16, 24).

Finally, and most relevantly, there is one categorical outcome that the Consultant and experts have chosen to study for all reporting periods, and that is the relative likelihood of being stopped and patted down with or without an enforcement action being taken. For this categorical outcome, there are four possible results: Stop Only (no pat down, no enforcement action); Stop + PPD (protective pat down), but NEA (no enforcement action); Stop + EA (enforcement action), but no PPD; and Stop +PPD +NEA.[110] The procedural justice literature, according to the criminal justice experts, validates the concern that *being in a stop and patted down, where no enforcement action results (e.g., Stop + PPD + NEA)*, namely pat down-no enforcement types of stops, are thought to have potentially corrosive impacts on civilian views of police legitimacy.[111]

This categorical outcome and its four possible scenarios are considered and discussed in depth by the experts in the PSO2 Report in Section 8.4.7 through 8.4.7.3. In this regard, the most important descriptive results from Period 2 are as follows.

- EAs were LESS FREQUENT in Period 2, dropping from 36 percent in Period 1 to 30 percent in Period 2.

- With the focus just on stops where no enforcement took place, the drop in the type of stop thought to be most corrosive from a procedural justice perspective was statistically significant and, therefore, unlikely to be due just to chance. The statistical significance finding, however, unfortunately cannot pinpoint the precise cause for the change. In Table 13 of the PSO2 Report, the experts show that if the focus is only on stops where no

---

[110]*See, e.g.,* Appendix A, Section 8.4.7. n, 22.

[111] *See, e.g.,* Appendix A (citing procedural justice study by Tyler, Fagan, & Geller, 2014).

enforcement actions took place, then the proportion of stops where civilians were patted down before being released was LOWER in Period 2.  In general this is a positive result (qualitatively) but it is not yet clear whether all three ethno-racial groups benefited equally from this drop, or will benefit equally from this drop if it continues in Period 3.

- Table 14 shows counts and proportions for all stops where pat downs but no enforcement action took place by police district and ethno-racial group.  Again, the outcome varies both by location and group.

- Overall, among those stopped, BNHs were patted down without an enforcement action more at a higher proportional rate (22%) than WNHs (14%), although Hispanic civilians had the highest rate of such outcomes (25%).   This finding appears to be consistent with the descriptive results regarding pat downs and pat down hit rates generally.

- The most interesting test the experts ran involves a descriptive comparison, for each ethno-racial group, between the overall stop proportions and the proportion of stops with pat downs but no enforcement.  Table 15 reflects the results of that study. The explanation of how the benchmark works is better left to the experts.

- The main results from the test, however, show that, for Period 2, BNHs contributed to 72% of stops, without regard to stop outcome. They were also stopped and patted down, without any enforcement action being taken, 72 percent of the time.  This figure is closely comparable to the figures for Period 1, as well.  Stated differently, BNHs contributed the same "share" to both stops, and stops with pat downs but no enforcement action.

- By contrast, WNHs ethno-racial "share" of stops with pat downs but no enforcement action was smaller than their ethno-racial "share" of all stops when the outcome was not factored. In other words, WNHs comprised 8 percent of all stops, but only 5 percent of all stops with a pat down but no enforcement action.  This contrast is replicated in Period 1.

- The most significant result concerns Hispanics.  In Period 2, their "share" of stops with pat downs and no enforcement action was 14% higher than their "share" of all stops. In Period 1, by contrast, for this group these two types of shares were equal. So there was a 14% increase in their share of stops with pat down but no enforcement relative to their share of all stops, This is just a descriptive result. It is also just a proportional increase, not a numerical or statistical one, because the number of all stops and all stops with a pat down but no enforcement action were actually lower in Period 2 than in Period 1.  *See* Table 15, Appendix A.

## Statistical Models
### Introduction

There were three important changes made to the statistical models used to obtain net impact results for Period 2.  These changes are minor, but the experts believe that they serve to

clarify results, bring models into alignment with the best and most recent policy scholarship in this area, and respond to some concerns raised about Period 1 models.[112]  These changes also squarely place the statistical analyses performed within the parameters of other studies performed in New York City and Philadelphia, where police department stop and frisk practices have been challenged as having an unlawful disparate impact on historically underrepresented minorities, such as African-Americans and Hispanics.

The three changes made to the statistical models used to assess the Period 2 ISR can be summed up as follows:

1.  The geographic or "spatial unit" for measurement is no longer the 22 police districts.  Instead, the Period 2 statistical models assess stops and post-stop outcomes using the 275 "beats" (patrol areas) within each of the twenty-two (22) police districts of the City of Chicago.[113]

2.  Period 2 models include **spatial demographic predictors** (*i.e.*, factors, independent variables, covariates etc.), which are present at the beat level, to bring the statistical results into closer alignment with the statistical models used in NYC and Philadelphia.

3.  Where feasible, the two main statistical models, drawn from independent random samples of fifty percent each of the ISR data from the full set of reports, account for the **clustering of stops** within *multiple* geographic layers.  Specifically, stops can be grouped together within beats, and then further grouped by beat-level within the police districts where multiple beats are located.[114]

---

[112]To short-circuit concerns raised by the parties during telephone conversations, the Consultant can assure the parties that the experts have made minor changes to the models in order to improve them based on their own independent analyses; these changes/improvements do not necessarily reflect the views of any other independently retained experts; rather, they have been made to show that the statistical study of disparate impact in Chicago cannot be aligned perfectly with the statistical studies conducted in New York City ("NYC") or in Philadelphia.  *See, e.g.*, PSO2 Rpt., Section 8.3.

[113]*See Id.*

[114]*See Id.*

Close attention to the geographical surround is integral to the formation of statistical models examining the net impact of a municipal police department's stop and frisk police practices.[115] The statistical models chosen and used for Period 1 used Chicago's police districts as the unit of measurement for city-wide net impact results, because ISR information regarding beat-level stops and post-stop outcomes within these police districts could not be assessed for a number of reasons. Without such information, the experts found it unwise to include district features as predictors in their models, because there were too few districts (only 22) to use as the basis for measurement.[116] The Period 1 statistical models therefore could only focus on random variation across districts, and deemed it unwise to include district-level predictors. This fact distinguished the Period 1 models from those used in other cities such as New York City ("NYC") and Philadelphia.

Fortunately, for Period 2, beat-level demographic data were compiled and included in analyses by the experts. Different police districts have anywhere from nine to seventeen beats within them, for a total of 275 beats. It is feasible to include contextual predictors at the beat level, since the number of units is sizable enough to meet model assumptions in mixed effects regression models. Thus, for Period 2, compiled beat-level data permitted the experts to include beat-level contextual predictors in their statistical models, which permitted them to capture the

---

[115] As the experts explain, beat-level contextual predictors permit them to capture the demographic structure of the community within which the stop took place. A comprehensive list of independent variables (called covariates) has been constructed using the ACS data to provide a descriptive context for the statistical results in the PSO2 Report. These covariates are listed in Table 16. These covariates are contextual predictors and have been re-allocated to measure the activity within 275 police beats (not the 22 police districts) so that the descriptive statistics measure stop and post-stop outcome frequency using the 3-group total stop number of 50,715, not the total stop count for Period 2 of 51,538.

[116]*See Id.*

impacts of the demographic structure of the community within which the stop took place.[117] Inclusion of beat-level geographic/contextual predictors moves the Period 2 statistical models into closer alignment with those used in NYC and Philadelphia.[118]

In plain English, this means that the statistical results for Period 2 will describe beat-level similarities and connections with outcomes that link to the demographic features of these smaller spatial units within Chicago. Comparisons between the three main "Areas" of Chicago (North, Central and South) and the twenty-two (22) police districts will not be made. Instead, the geographic "spatial unit of measurement" will be the approximately 275 beats (patrol areas) within these 22 police districts.[119]

Results are organized by the two types of statistical models used: regression models and caliper matched propensity score models. Each set of models tests outcomes with no selection process and outcomes with selection process.

Outcomes of Interest

Selection processes are situations where the outcome studied can only be observed if something prior takes place. These outcomes are, thus, dependent on more than one thing or "variable." Outcomes without selection processes can be observed in situations that do not

---

[117] *See, e.g.,* PSO2 Rpt., Section 8.5.

[118] The experts in the PSO2 Report explain the similarities and differences between the statistical models being used in Chicago for Period 2 and those used in NYC and Philadelphia better than the Consultant can summarize in this section of the report. For more information regarding the changes to the models, readers are referred to PSO2 technical report, p. 16. Arguably, the Period 2 models used here more closely approximates the unique data features present in Chicago, than those used for Period 1; but, more importantly, these models incorporate structural demographic data from Chicago, which is inextricably interwoven with the way Chicago structures its police force.

[119] Although a beat level analysis has been contemplated from the outset of the Agreement, various data production limitations have complicated and delayed this level of statistical review.

require a prior condition. In other words, non-conditioned outcomes are outcomes where a prior selection process is not logically needed. The three outcomes with no selection process include:

No Selection Process Outcomes

- Whether a pat down took place
- Whether a search took place
- Whether a pat down occurred in a stop in which no enforcement action took place.

Conversely, outcomes which logically require a preceding condition are considered "categorical outcomes," because they can be observed only under certain preceding, logical conditions. These categorical outcomes are referred to by the experts as outcomes with selection processes. These two outcomes include:

Selection Process Outcomes

- Whether the detainee, if patted down, produced a weapon; and
- Whether a detainee, if searched, produced a weapon;

MODEL FEATURES

The selection and non-selection process outcomes are examined using different types of statistical models. Further, where possible, for each *specific* outcome, two different types of statistical models were used. Regardless of the outcome considered, all models sought to consider different classes of and combinations of classes of predictors:

- **Detainee Predictor**: uses only stop level predictors to determine impacts of race and ethnicity of detainee on the outcomes (e.g., pat down, search, stops + pat down, but no enforcement action).
- **Beat Predictor**: uses only contextual predictors with lower statistical power and thus should be interpreted with extreme causation where non-statistically significant findings resulted. Of key interest here are impacts of the racial and ethnic composition of the beat where the stop took place on the outcomes of interest.

- **Combined Predictor**:  uses both stop level and contextual predictors.  Here, both the racial and ethnic characteristics of the detainee and the surrounding area where the stop took place are examined.

*See* Section 8.5 of the PSO2 Report.

Propensity score matching models ("PSM") use the exact same set of predictors used in the multiple regression models, except that race or ethnicity necessarily gets treated differently in that (1) the contrast only involves two of the three groups; the third group not involved in the contrast is dropped; (2) the three level models use the same predictors in the regression model, *EXCEPT the race or ethnicity contrast in question, to predict that racial or ethnic contrast.*

*PSM models, therefore, create propensity scores for race and ethnicity without use of the predictor of race or ethnicity to drive the result.*  For example, the PSM regression models create propensity scores using *observed covariates*, such as propensity of a detainee to be, for example, BNH, given:

- Detainee features such as age, race, ethnicity and gender;
- Stop features like time, day of the week, and month; and
- Surround features of the beat where the stop took place, including residential stability, socio-economic status, predominance demographics related to race and ethnicity.

With these propensity scores, a matching mathematical formula/algorithm finds one detainee who is WNH, whose propensity score is closest to the contrasting racial or ethnic detainee being matched.  After the match, only the WNHs detainees matched are kept for purposes of running the PSM models, using the three level mixed effects logistic regression analysis (to determine race/ethnicity, context and combined effects) to predict the outcome in question, such as:  the propensity score for a BNH or H to be in a pat down vs. a WNH.

Separate PSM models were used for each of the two key contrasts: WNHs vs. BNHs; and WNHs vs. Hispanic detainees. The third categorical outcome of interest, namely, stops with a pat down but without an enforcement action, was tested using a PSM model with a series of multinomial mixed effects logistics.

## Outcomes with No Selection

The outcomes with no selection process include:

- protective pat downs;
- searches; and
- stops with a pat down but without an enforcement action.

As stated, for these non-categorical outcomes, three-level regression models are used to determine the racial and ethnic disparities, if any, during Period 2.

The first two non-categorical outcomes of interest are examined using just stops by beat, and then just stops by district. The results from the third non-categorical outcome is not reported unless results show racial or ethnic predictor discrepancies.

Impacts of detainee race and ethnicity, and beat-level racial and ethnic composition, appear in Table 18 of the PSO2 Report. [120] Detailed results are shown only for detainee-level and beat-level race and ethnicity. Additional contextual/surround predictors are not shown at the stop level in this report.

---

[120]Regression model diagnostics explanations appear in Section 9.1.2 of the PSO2 Report. "These discrepancies suggest potential concerns about the model in that it does not fit the data as well at the higher end of the predicted probabilities." *See, e.g,* Appendix A, Figure 2, Section 9.1.2.

Regression Models-Binary Outcomes
PAT DOWNS

Results from the Regression Models used to assess two, randomly drawn samples of pat down data from Period 2, show a significant net impact of detainee race on the chances of being patted down.

1. **Race & Ethnicity Predictors**:  The regression models with binary outcomes produced the following statistically significant results on the chances of being patted down based on race or ethnicity of the detainee:

   - *Race*:  **results show a _significant net impact of detainee race_ which influences the chances of being patted down.**  Controlling for other beat and stop factors and for random variation across beats and districts, **BNHs detainees' chances of being [patted down vs. not patted down] were 29% higher in the first random sample (OR = 1.296), and 52% higher in the second random sample (OR=1.52).**  In both samples, these disparities proved statistically significant. Again, this means that a black-white disparity like this would occur just due to chance variation less than one time in one-thousand.

   - *Ethnicity*:  **results, however, show a _statistically significant impact related to detainee ETHNICITY in only one but not both random samples_.**  In the second random sample, **Hispanic detainees' odds of being [patted down vs. not patted down\, compared to the odds for White non-Hispanic detainees, proved statistically higher (OR = 1.22)**.  However, in the second sample, the difference was not statistically significant (OR = 1.06).

2. **Contextual Predictors:**  When contextual predictors were added, namely, those describing the predominance of race and ethnicity (70% or more) within certain police beats, the following results surfaced:
   - *Ethnicity: pat downs proved to be more likely in more predominantly Hispanic locations in both random samples (e.g., areas where Hispanic residential population numbers exceeded 70%).*  In fact, with each additional percentage increase in the number of Hispanics in the surround, the odds of getting [patted down vs. not patted down] increase proportionally by around one percent (OR=1.01, Sample 1; OR=1.008, Sample 2].  These odds ratios are statistically significant for both random samples.

- *Race*: pat downs proved to be more likely in more predominantly BNH locations in only one of the two random samples. In Sample 2, where the BNH residential predominance of the surround did not have a significant and positive impact on pat down chances, the discrepancy could be explained.

In sum: the contextual predictors show that, when focusing just on consistent results across both random samples, pat downs were significantly more likely if (a) the detainee was BNH rather than WNH; and (b) the stop took place in a more predominantly Hispanic police beat.

SEARCHES

Among the stops involving searches during Period 2, the experts began by removing all searches involving a custodial arrest or administrative transport situation because the Agreement does not cover examination of these search types. This removal dramatically reduced the volume of searches examined by roughly two-thirds in each random sample. For example, in Sample 1, prior to removal there were 3,427 searches among 25,325 stops. After removing stops with arrests (n=3,040), only 1,012 searches remained among 22,285 stops.[121] The corresponding numbers in the second random sample were: all searches: 3,558/25,315 stops, reduced to 1,049 searches among 22,227 stops after removing searches based on custodial arrests (n=3,088). Therefore, after removing searches in custodial arrest stops, only about four to five percent of all stops included a search.

The experts explain the rationale for dropping searches related to custodial, transport situations in Section 9.2 of the PSO2 Report. This explanation comports with the Consultant's

---

[121]Note that the total number of stops involving searches will not match the descriptive total shown in Table 3, because models using beat predictors exclude stops taking place outside city limits (District 31).

interpretation of the Agreement and CPD policy. The main point here is that only searches which occurred prior to a police officer's decision to arrest the detainee and take custody are examined because these searches required independent justification, in general, and specifically in cases of searches which follow from a protective pat down – which are of exclusive interest under the terms of the Agreement.

## Caliper Matched Propensity Models

### PROTECTIVE PAT DOWNS

Table 19 in Section 9.1.3.1 of the PSO2 Report shows key results from the model predicting a pat down using just matched racial and ethnic stops, both in terms of predicted probability ratios and odds ratios, for BNHs vs. WNHs. Table 21 shows the results from the three level mixed effects PSM model using only matched Hispanic and WNH detainees. In both Tables 19 and 21, statistically significant disparities appear in both random samples.

- BNHs: The predicted pat down probability scores were significantly higher for BNHs than WNHs by approximately 5 to 7 percent. *The predicted pat down rate in the two samples was 4.8 percent and 7.3 percent higher than for WNHs or 26.4 vs. 21.7 percent in Sample 1; and 26.1 vs. 18.8 percent in Sample 2.*
- Hispanics: The predicted pat down probability scores showed statistically significant differences between Hispanic and WNH detainees. *In Sample 1, there was a predicted 3 percent difference (23.7 % for Hispanics vs. 20.7 for matched WNHs. In Sample 2, there was a 7.2 percent difference, with a predicted pat down rate of 25.7% for Hispanics vs. 18.5% for matched WNHs.*

**In sum**: in both samples using PSM models, both Black non-Hispanic and Hispanic civilians were significantly more likely to be patted down compared to the stop-matched White non-Hispanic civilians. These differences were unlikely to have arisen from chance variation in the data.

It is important to note here, that diagnostic tests indicated that the "caliper matching protocol used to select matched cases did a good job of removing bias between the two groups on the observed covariates." *See, e.g.,* Appendix A, Section 9.1.3.2, Figure 3. The implication is that selection bias (among police officers), bias which might be linked with observed covariates, is not a concern as an alternate explanation for the gross impact disparities between these groups. However,"[s]ensitivity to ***unobserved selection bias***," is "still a potential concern as an alternate explanation."

In other words, the results from Sample and Sample 2 show significant impacts of race on pat down outcome. In both samples, selection bias, a bias linked with other variables in the models, is *not* a viable alternative explanation for the difference. But, in Sample 1 the diagnostic tests indicate that unobserved selection bias *remains* as a *potential* alternative explanation of the differences observed. There may have been something else going on during the stop and pat down: some feature of the detainee, the stop itself, the stop context, or all three, that was not captured by the variables used here, that might be "behind" the significant race differences observed, at least in Sample 1. In Sample 2 unobserved dynamics did not seem as viable as an alternate explanation.

Summary for Protective Pat Down Statistical Models

### BNH V. WNH PAT DOWNS

The following list summarizes the most important contrasts between Black non-Hispanics and Hispanics vis-à-vis White non-Hispanics related to protective pat downs during Period 2.

1. Regression Models:  BNH detainees were more likely than WNH detainees to receive a pat down.  This result is statistically significant.

2. PSM Models:  BNH detainees were significantly more likely to be patted down than comparable WNHs.  Predicted differences in pat down rate ranged from 5-7 percent depending upon the sample.

3. Diagnostic tests quelled potential concerns about police officer selection bias of detainees based on observed covariates, but police officer selection based on unobserved covariates (implicit bias based on unobserved factors) remained a statistically noticeable concern, at least in one sample.

### HISPANIC V. WNH PAT DOWNS

1. Regression Models:  Significant differences between pat down rates appeared only in Sample 2.

2. PSM Models:  Comparable Hispanic detainees were significantly more likely to be patted down than comparable WNH.  The predicted difference in pat down rates was 3 percent in Sample 1 and 7 percent in Sample 2.

3. Diagnostic tests took care of selection concerns related to observed covariates, but not unobserved covariates.

Searches

The number of searches in the data base that were not custodial was too small to assess statistically. For more information regarding this determination, the reader is directed to Section 9.2 of the PSO2 Report.

Pat Downs vs. No Pat Downs when Stop Involves No Enforcement Actions

In Section 9.3 of the PSO2 Report, the experts analyzed four categorical outcomes: all possible combinations of pat down vs. no pat down and enforcement action vs. no enforcement action. Discussion of the results centered on contrasting two of these categories: pat down and no enforcement action versus no pat down and no enforcement action. Statistical Results appear in Table 24. Three factors linked consistently to the higher chances of detainees experiencing a pat down versus no pat down in stops where police took no enforcement actions: race of detainee, ethnicity of detainee, and ethnic composition of the stop context. Again, these impacts (which are net impacts) apply only to stops where no enforcement action took place.

The following results use White non-Hispanic stops as the comparison group or denominator.

1. Black non-Hispanic detainees had significantly higher relative risks of experiencing a pat down on a city-wide basis. This is a statistically significant result. Their relative risk is 44 percent higher in the first sample and 63 percent higher in the second sample.

2. Hispanic detainees also had significantly higher relative risks of experiencing a pat down in both samples. Their relative risk was 23 percent higher in the first sample and 37 percent higher in the second sample.

3. If any civilians in any of the three ethno-racial groups were involved in a non-enforcement action stop, and were in more predominantly Hispanic beats (specific geographic locations where 70% or more of the population is reportedly Hispanic, based

on ACS updates from 2011-15), then they were more likely to be patted down. This finding is also statistically significant in both samples. In fact, for each additional percentage point the Hispanic residential composition increased, the relative risks of a pat down also increased commensurately (in a 1:1 or 1 percent to 1 percent ratio).[122]

When alternate analytic modeling approaches were applied to determine whether the statistically significant net impact results were correlational or causal, the following results were derived.[123] In short, the results showed that detainee race mattered when assessing the differences between net impacts of race in the stops where enforcement actions and pat downs did or did not take place, but the beat-level predictors did a poor job of predicting if the stop involved a pat down but no enforcement action. In other words, the alternate analytics confirm that detainee race is relevant generally to STOP TYPE (whether it involves a pat down and an enforcement action or not).

Outcomes with Selection Processes

Pat downs with Hits

Stops where pat downs resulted in hits for weapons were analyzed statistically using a single level (or "flat") model. The selection portion of the model estimated whether someone was selected for a pat down, while, simultaneously, the main portion of the model predicted whether the pat down generated a weapon. Table 25 of the PSO2 Report shows the statistical relationship between pat downs and weapon recovery from them. Results tell a simple story.

- In each sample, in every model variety, neither detainee race nor ethnicity, nor racial or ethnic composition of the beat (using the SDPs) significantly affected whether the pat down generated a weapon.

---

[122]*See, e.g.,* Appendix A, Section 9.3.1 and Table 24.

[123]The specific alternate analytic tests and how these tests were conducted, including use of the beat-level SDPs (predictors) is explained in Section 9.3.2 of the PSO2 Report.

- The odds ratio associated with being Black and non-Hispanic, rather than White and non-Hispanic, indicated about 15-17 percent LOWER ODDS of a hit versus no hit for weapons. But this impact always proved highly *nonsignificant*, meaning it could just be chance variation.

- In short, once the contributions of race and ethnicity of the detainee or of the beat to officers' deciding to pat down *in the first place* are taken into account, there were no additional racial or ethnic disparities in whether the pat down resulted in a weapon.

## Key Points Summary for PSO2 Report

The results of the analyses in the PSO2 Report are summarized by the following key points, discussed in Section 11 of the PSO2 Report.

### CHANGES BETWEEN PERIODS 1 AND 2
#### VOLUME

The number of stops made in Period 2 declined by 6.3 percent from Period 1. This is just a descriptive result. The experts specifically comment that the reason for this shift is unknown, but they provide various contextual possibilities in Section 11.1.1.1 of the PSO2 report.

#### PAT DOWNS

The fraction of stops with pat downs declined from 34 percent in Period 1 to 30 percent in Period 2. This 4% decline is statistically significant. Whether a 4% decline is significant from a public policy or legal standpoint deserves discussion, because gauging the practical significance requires finding the reason for the decline in relative chances that a detainee would be patted down. Finding that reason is beyond the scope of the experts' current PSO2 Report but could be examined as a subject of the PSO Report for Period 3. The experts offer some possible contextual reasons, but stress that the causes of the pat down drop between reporting periods in 2016 remain unknown, and that uncertainty "hinders discussion of the practical and policy significance of the shift." *See, e.g.,* PSO2 Report, Section 11.1.1.2.

## PAT DOWN WEAPON RECOVERY & NON-RECOVERY

A statistically significant higher rate of pat down weapon recovery in Period 2 appears when Period 2 results are compared to Period 1 results, because the hit rate from pat downs rose from 2.5 percent in Period 1 to 3.5 percent in Period 2. Although a higher pat down weapon recovery rate may be a positive result for the CPD, "uncertainty clouds interpretation" of this result because there is no identifiable cause for this shift.

When the non-recovery rate of weapons from pat downs is examined, results show that this non-recovery rate dropped only slightly, from 97.5 percent in Period 1 to 96.5 percent in Period 2. The cause for only a slight decrease in this rate may also be of equally clear practical and policy significance, but – again – the PSO2 Report did not address this subject to tease out reasons for the decline, although such efforts are possible for the third reporting period if the parties choose to pursue that course of action.

## ENFORCEMENT, NO ENFORCEMENT & NO ENFORCEMENT + PAT DOWN

The fraction of stops resulting in some type of enforcement action dropped from 32 to 28 percent. This is a statistically significant result. However, the practical and policy significance is unclear because, again, the reasons for the drop are unknown. Is it a good thing that stops are less likely to result in some type of enforcement? Or, is it a bad thing, suggesting that police are making even more unnecessary investigative stops? The answer is not clear. Similar uncertainty surrounds the statistically significant increase from 43 to 50 percent of stops in which the officer both did not conduct a pat down and did not take an enforcement action.

Consistent Results in CY2016

The statistical analyses of CY2016 ISR data show that two results are consistent:

1. The relative ethno-racial mix of detainees remains about the same. In both reporting periods, considering only the three ethno-racial groups studied, about 70 percent of the civilians who were detained by Chicago police officers were identified as Black non-Hispanics, about 20 percent were identified by police officers as Hispanic, and only 10 percent were identified as White non-Hispanic. Given that the overall population of Chicago is roughly one-third each of these three groups, there is an unanswered question regarding the reason for this stark disparity.

2. The volume of stops within certain police districts remains relatively the same. Districts with a large number of stops in Period 1 had a similarly large number in Period 2. The same result is obtained for police districts with a small number of stops. This consistency is referred to as "geographical stability" and the results from CY2016 did not surprise the experts, based on the large geographic area covered by each police district and what social scientists know generally about communities with high crime rates.

Ethno-racial Links in Period 2

Two results from Period 2 are emphasized as key points.

1. **Black non-Hispanic detainees were more likely to be patted down, after controlling for other factors, than were White non-Hispanic detainees.** This is a statistically significant result in both samples, which provides confidence, but alternate analytics models do not show that the relationship is necessarily causal, because "unobserved covariates" may provide an alternate explanation for the results (see Table 20, PSO2 Report, Appendix A).

2. **Among stops where no enforcement action took place, Black non-Hispanic detainees were more likely to be patted down than White non-Hispanic detainees.** This result is also statistically significant in both samples, using the main regression models (see Table 24, PSO2 Report, Appendix A). For reasons discussed in the technical report, the net impact results here are "probably best interpreted as a net correlational (not causal) impact." This result replicates the also "robust" link between the race of the

detainee and stops with pat downs but no enforcement actions. However, the study completed for Period 2 did not have as an objective learning whether the size of each of these two links remained the same over the course of CY2016, nor whether the links were stronger or weaker across reporting periods. Nevertheless, the links prove to be consistent for CY2016.

## Limitations of the PSO2 Report

There are several limitations with the study completed for the PSO2 Report, as there are with any effort of this magnitude, because time does not permit an exhaustive dissertation on the subjects discussed here. The PSO2 Report uses a statistical framework that gauges three types of ethno-racial links with outcomes: gross impacts, net impacts, and discriminating between net impacts that were correlational and/or causal. This is the most that could be done given the following limitations of the study.

1. **The most important limitation of the current analysis, for public policy purposes, is that the framework used to complete the statistical analyses for Period 2 "does not clearly cross reference with policy concerns about disparate impact and disparate treatment" (see Section 11.3, PSO2** Report, Appendix A, citing to a study done by Ayres, 2002, 2010). That said, *specifically for the context of the types of post stop outcomes examined here,* the experts are not aware of accepted scholarship that does this kind of cross-referencing.[124]

2. The scope of the current effort is limited by the time lag between the moment when stops and post-stop outcomes are made and reported by CPD officers and the time when the reports of those police practices are reviewed and analyzed by the Consultant and experts. The statistical analyses completed for the PSO2 Report is based on archival reports. The accuracy link between the information reported in the ISRs and what actually happens on the streets of Chicago is not knowable from a statistical point of view. "Lacking a systematic and expensive ride along program with trained observes, and observed connections between on-the-street actions and archival reports, this

---

[124]The experts note that White and Fradella (2016: 18-35) begin that discussion in a general way around stop and frisk issues, but further development is needed.

limitation will remain." If such a system were implemented, strong correspondence between the written reports and observed encounters might bear out. But, without such a system, the time lag remains a potential limitation of the results reported in the PSO2 Report.

3. Alternative Analytics are used but each analysis here could be subjected to more extensive diagnostics to determine whether the results are more or less causal or correlational.

4. The results seen in the PSO2 Report are specific to the predictor sets used. Different predictors could result in different observed impacts.

# Ecological Analysis Report

## Introduction

The purpose of the ECOLOGICAL ANALYSIS OF MONTHLY STOP DATA REPORT FOR PERIOD 2 ("Ecological Analysis" or "EA2" Report) is to: (1) describe stop prevalence rates on a monthly basis, over time, at the police district and city-wide levels by race and ethnicity; and (2) employ statistical models to explain differences in stop rate disparities among the three racial and ethnic groups in the study, namely, African-Americans (Black non-Hispanics); Caucasians (White non-Hispanics); and Hispanics/Latinos (Hispanics) who are identified as White and not Black) non-Blacks. The descriptive results are supplemented with district-level maps in the technical report. These maps display the spatial arrangement of stop rates for all months in the study period.

In laypersons' terms, this means that the Ecological Analysis, as summarized here, aims to do two things:

(1) describe, for each race and ethnicity in the three groups, (a) the number of stops ("stop counts") made by CPD *within* each of the 22 police districts and in the City overall for Period 2, and (b) the stop rates for the same;[125] and

(2) Transform the stop counts into statistical stop rates "after benchmarking them against" three factors, namely:  (a) violent arrests[126] from the month prior to the stops counted for each ethno-racial group; (b) total arrests[127] from the month prior for each ethno-racial group; (c) age-weighted data reflecting each district's total population; and

(3) Examine the relationship between ethno-racial-specific arrest counts (violent and non-violent), in a police district, in the previous month, and the ethno-racial-specific stops counts in that same district in the month following.  In other words, the experts looked at the ratio of later stops to earlier arrests.  This comparison was done to examine "whether stop rates . . . exceed what we would predict from knowledge of the crime rates of different racial [and ethnic] groups."[128]

The overall goal is to describe the extent to which stop counts and stop rates of Black non-Hispanics and Hispanics differ from White non-Hispanics.   The specific goal is to measure these descriptive and statistical ethno-racial differences in stop counts and rates; and, using those measurements, analyze whether the ethno-racial differences are statistically significant (i.e., unlikely due to mere chance) with respect to specific "benchmarks" – factors specific to each race and ethnicity.  With regard to the violent arrest and arrest benchmarks, the experts

---

[125]Notably, the Period 2 ecological analysis does not specifically describe differences within beats within districts, nor does it compare differences across districts.  The focus of the Period 2 ecological analysis is to measure differences within districts.  To that extent, the experts employ the predominance models used in the other technical reports to make statistical inferences about the racial and ethnic differences between beats where the residential populations of particular beats within districts are determined to be predominantly (70% or more) Black non-Hispanic, Hispanic or White non-Hispanic. *See, e.g.*, Appendix B, pp. 4-5.

[126]Violent arrest counts include the sum of homicides, robberies, and aggravated assaults. See Appendix B, p. 13.

[127]Total arrests are those made for any kind of criminal offense not included in the definition of violent arrests in footnote 3, above. *Id.*, p. 14.

[128]*See, e.g.*, Appendix B, p. 5 (quoting from a study performed by Gelman, Fagan and Kiss in 2007, at 815).

found that using the two benchmarks interchangeably alters the meaning of the resulting stop rate like this:

- The **total arrests benchmark** examines stop rates as the number of investigatory stops produced per "X" (number) many **earlier** total *arrests*.

- The **violent arrests benchmark** examines stop rates as the number of investigatory stops produced per X many **earlier** *violent arrests*.

The rationale for using both benchmarks is this: police officers who arrest someone for a violent crime arguably exercise less discretion than an officer who arrests someone for non-violent crimes. Since the number of non-violent arrests is predicted to make up most of the total arrests (both violent and non-violent), the total arrest number, as a benchmark, has more officer discretion built into it; while, by contrast, the violent arrest number has less.

The central question that the statistical analyses seek to answer is whether those ratios of (later stops/earlier arrests) are different for the three groups. Stated differently:

> *At the district level, are arrests earlier producing more stops later for Black non-Hispanics, as compared to White non-Hispanics; and for Hispanics, as compared to White non-Hispanics.*

The designated experts express the opinion that statistical "models using violent arrests as [a] benchmark are the most reliable" of the three benchmarks indicated, because the violent arrest model "provide[s] estimates that align with differentials observed in other recent stop and frisk research."[129]

---

[129]*See, e.g.*, Appendix B, p. 4. To address concerns raised by the parties regarding the use of the violent arrest benchmark for the ecological analysis conducted for Period 1, the experts have "attempted to address the limitations of using violent arrests as an exposure measure by using spatial Empirical Bayesian smoothing." *Id.*, pp. 7-8.

One clarifying point is made with regard to the breakdown of stops within districts: the results reported in the ecological analysis track stops by counts and rates based on where the stop and arrest took place. No assumptions are made about the contribution of residents in each district to either the arrest or stop counts. This is true for all the technical reports and statistical results summarized in the Consultant's Second Report. Arrestees can be arrested in districts where they do not live, and detainees can be stopped in districts where they do not live. It is well known, for example, that criminal offenders travel, sometimes substantial distances, to commit crimes like selling drugs or buying drugs. How much information the stop rates carry about residents in locations where crime or violent crime is committed is unknown. A similar lack of knowledge afflicts crime rates and arrest rates.[130]

Finally, statistical analyses were performed with descriptive stop counts and rates using one benchmark that is not specific to race or ethnicity, namely, the age-and-then-gender weighted populations at the beat-level where the stop was made. To clarify, the **entire** population of each district is weighted by the gender and age breakdown of those stopped during RP2. This measure is **not** ethno-racial-specific. And, it is **not** limited to the three groups. The rationale for using the benchmark of detainee age assumes, in light of criminological knowledge on the age-crime curve that a larger youthful population will result in more stops because this population is known to have higher rates of criminal participation.

---

[130]*See, e.g.*, Appendix B, p. 6 (citing various studies, including one by Dr. Taylor from 2015, pp. 48-52).

## Data Source & Methodology

The Ecological Analysis is based on a total of 51,248 ISRs from Period 2.[131] These ISRs are located in the January 2017 Main File of ISRs, which was cross-checked against the CPD's Master List of ISRs from Period 2.

The methodology used to obtain the following statistical results is explained in technical terms on pages 7-10 of the Ecological Analysis Report. It will not be summarized here, except to say that certain changes were made to the approach used to obtain the results in Period 2 from the approach used in Period 1. These methodological changes respond to objections by both parties to the statistical studies performed in Period 1. Although changes were made, the independence of the results from both review periods remains in-tact because the Consultant has independently reviewed these results and directed the designated experts to remain neutral and to choose the models they believe, based on their own professional expertise, are best suited to obtain the most accurate results, without regard to the advocacy of the parties and their retained experts.

---

[131]The experts acknowledge in the Ecological Analysis Report, p. 4, that this number differs from the total number of ISRs reported in the PSO2 Report, Table 1 (*i.e.*, 51,538), but do not explain the complete difference, referring only to the exclusion of 18 stops with missing district information and 86 stops that occurred outside City limits in Districts 31 and 41.

## Key Points

The Ecological Analysis of ISRs from Period 2 (July 1 to December 31, 2016) revealed the following statistical results which are key to the overall assessments to be made by the Consultant pursuant to Section V of the Agreement.

### ANY and ALL Stop Rates: Descriptive Results

### ALL STOP RATES

- The monthly stop rates ("MSRs") for all civilians stopped of any race or ethnicity ("ALL stop rate"), during Period 2, was 3.15 per 1,000 residents.

- District-level monthly stop counts and rates per 1,000 population are shown in the Ecological Analysis Report, Appendix B (to this report) and within Appendix B (as appendix W to the EA2 Report).

### ANY MONTHLY STOPS RATE

- The monthly stop rates of the three ethno-racial groups ("ANY stop rate"), during Period 2, followed the ALL stop rate trend. A breakdown by month during the last six-months of 2016 (Period 2) appear in Table 1 (page 11) and Figure 1 (line graph, page 12) shows that significant declines in stop rates for each of the three groups appeared between October and December 2016 (e.g., declines of 46% for Hispanics; 28% for Black non-Hispanics; and 41% for White non-Hispanics).

- The MSRs for the entire six months in Period 2, for each of the groups from highest to lowest were: (1) BNHs at 7.23 per 1,000 residents; (2) Hispanics at 3.7; and (3) White non-Hispanics at 0.82.

- Comparison of MSRs over time, from the last six months of 2015 to the last six months of 2016 (Period 2) – hereinafter "over time" – reflect an extremely large decline in the stop rates for each group. The declines in these stop rates, from highest to lowest, over time were: (1) 81 percent for Black non-Hispanics; 79 percent for Hispanics; and 82 percent for White non-Hispanics.

VIOLENT ARRESTS BENCHMARK FOR **ALL** STOPS RATE

Violent arrests include the sums of homicides, robberies, and aggravated assaults. *See* Appendix B, p. 13. The "ALL stop rate" includes the three ethno-racial groups plus all other civilians who were stopped during Period 2. Thus, the stop and violent arrest counts also use these four groups, rather than simply the three groups generally compared. When referring to the ALL stop rate, the ALL (or "City-Level") Stop Counts, which appear in Figure 1 (page 12) are used. The ALL Violent Arrest Counts appear in the EA2 Report as Appendix AA (page 72).[132] The violent arrests benchmark, when used as the denominator to calculate the "all stop rate" (using the "all stop count" as the nominator), shows the following results. Keep in mind that the ALL stop rate includes the three groups as well as all other civilians stopped and/or arrested for violent crimes.

Figure 3 displays city-level ethno-racial, specific total stop rates per *100* previous months' **violent arrests**. The denominator in Figure 3, therefore reflects the total number of violent arrests per group in the month prior to the one in which the members in those three groups were stopped by police officers. The denominator in Figure 3 does **not** represent the racial and ethnic residential population where the stop was made, as was true in Figure 2.

- Overall, about 3,400 stops per 100 violent arrests occurred in July 2016. That stop rate peaked at 3,827 in September, before decreasing steadily through December and bottoming out at 2,893 per 100 violent arrests the month prior.

---

[132]The ALL stop rates are summarized, here, on a city-wide basis. The experts include district-level counts and rates for all benchmarks, but those are not summarized in the DRAFT Key Points Summary at this time. For example, District-level monthly stop rates per 100 previous month's violent and arrests are shown in Appendix B (in an appendix therein identified as Appendix C).

- Each ethno-racial group demonstrated a unique pattern of stop rates over time, when the denominator was violent arrests from the previous month. For example, stop rates for Black non-Hispanics and Hispanics peaked during the summer months, while stop rates for White non-Hispanics actually decreased (from 2,420 in July to 1,934 in September). In general, stops of Black non-Hispanic and Hispanic groups decreased and leveled off from October through December.

- Out of all three groups, stop rates of non-Hispanic Blacks most closely mirrored the ALL stop rate trend when violent arrests from the previous month were used as the denominator or benchmark variable. The experts opine that this result is not surprising because Black non-Hispanics made up about 70 percent of all stops both in the total number of ISRs for Period 2 (51,248 for the Ecological Analysis Report and 51,538 for the PSO2 Report).

- The experts also note that there is an "interesting" result showing Black non-Hispanic and Hispanic stops rates proving closely comparable from August through October (the summer or warmer months in Chicago), but divergent in the month before (July 2016) and the months after that (i.e., October to December (the Fall or cooler months in Chicago).

- The experts offer the opinion, however, that results from Period 2, "may represent an encouraging shift in ethno-racial stop differentials because the Period 2 differentials are smaller than they were in Period 1. This is a *descriptive* result, however, because the statistical significance of the difference in impact between Periods 1 and 2 (CY2016) was not tested.

## TOTAL/ALL ARRESTS BENCHMARK FOR ALL STOP RATE

Total arrests refer to arrests for non-violent crimes and violent crimes, combined. The ALL arrests count includes arrests of civilians in any racial or ethnic group, not just the three majority groups. The ALL arrests count is used as a benchmark for the ALL stop rate, and thus is the denominator for the calculation of the stop rate; the ALL stop count is the numerator. *See, e.g.,* Figure 1 and Appendix CC (page 77) to EA2 Report, Appendix B to this report. The result of this calculation is the "TOTAL or ALL arrests benchmark ALL stop rate." A line graph of stops per previous months' 100 total arrests is shown in Figure 4.

- The first result that is noteworthy is that for all four groups (the three groups in the study and any other civilians), the ratios of stops per total arrests (Figure 4) are substantially smaller than the ratios of stops per 100 violent arrests (Figure 3).

- Across just the three groups (the ANY stop rate trend line), the ratio of stops per previous month's total arrests began at 121 in July and peaked at 136 in September. It then decreased steadily through December, with an ultimate low of 101 per 100 previous arrests. Again, as seen when violent arrests were used as the benchmark, the ratio of stops to arrests of Black non-Hispanics most closely followed the ANY trend line. In fact, the alignment was so close that both trend lines are almost indistinguishable at select points of the time series.[133]

- The ratio of stops to arrests for Hispanics most greatly exceeded the general trend. By the month of October, the Hispanic stop ratio was 163, compared to the ANY ratio (all three groups combined) of 135. That disparity decreased throughout the remaining months, such that – by December – the Hispanic stop to arrest ratio was 110, compared to 101 for the ANY rate.

- The ratio of stops to arrests for White non-Hispanics were comparatively lower than the general trend overall, the ANY stop rate, as well as in comparison to each of the two other ethno-racial groups. Similar to Figure 3, Figure 4 shows that the WNH stop ratio decreased in the summer months, demonstrated an uptick in October (131), and then decreased again to 89 in December.

### DISTRICT LEVEL MONTHLY STOP RATES

Next, the police district-level monthly stop rates for the three groups being studied or "ANY stop counts/rates" will be descriptively summarized here.[134] The ANY stop and arrest counts and rates are located in Appendices BB and DD of the EA2 Report, attached as Appendix B to this report.

---

[133]The Consultant notes, as an aside, that the overall three group counts in other reports, such as the PSO2 and SVR2 Reports, show similar alignment between the median rates for the three groups and the Black non-Hispanic rates in different stop and post-stop outcome models (*e.g.*, the hit rates for pat downs).

[134]Those numbers and analyses are contained within the technical EA2 Report, Appendix B. *See, e.g.*, District-level monthly stop rates per 100 previous month's total arrests are shown in Appendix B (in an appendix therein identified as Appendix C).

ALL & ANY Stop Rates:  Statistical Results

### ANY STOP COUNTS USING VIOLENT ARREST EXPOSURE VARIABLES

Using models of stop counts benchmarked against earlier violent arrests showed that stop rates of Black non-Hispanics exceeded those of White non-Hispanics by 82% during Period 2. See Table 3, ER2 Report, page 19, 21).  That effect was significant while controlling for changes over time, district socioeconomic status, district residential stability, and district racial composition.

- This means that, at an "*areal* level," the rate at which earlier violent arrests produced later investigatory stops proved higher when the group in question was Black and non-Hispanic, as compared to White and non-Hispanic.  This significant racial difference appeared in Period 1, as well (where earlier violent arrests produced later investigatory stops).[135]

- Stops benchmarked against earlier violent arrests also were significantly less likely in predominantly Black non-Hispanic communities, as well as socioeconomically affluent communities.  The effect of ethnicity, however, did not reach statistical significance.[136]

- Comparisons, over time, between the size of the race and ethnic effects on the stop rates also indicated that the ratio of Black non-Hispanic stops per violent arrests exceeded

---

[135]*See, e.g.,* Appendix B, p. 5 and p. 6 (explaining that ethno-racial-specific "areal rates" are created when models use the same race and ethnicity combination for both the stop count and arrest count when those counts are transformed into stop rates by one of the arrest variables used as a benchmark).

[136]In response to the Consultant's question about this result, the experts made the following clarification to the Ecological Report:

> In other places in the report we caution about the drawbacks associated with investigating the impact of a district level variable given that we have *only about two dozen districts*; thus, one must be careful not to believe that a lot can be learned from this finding, even though the result also appeared in Period 1 *unless* the reader is cautioned that this linkage is potentially problematic because we are working with only 24 districts.

> Random effects with 24 districts – fine. Fixed effects, like an impact of a percent Black non-Hispanic variable – lots of concern.

> Again, this finding is included because some of the parties are interested in it, but the most recent scholarship cited in the Ecological Report for Period 2 cautions against reliance on it.

those of White non-Hispanics by 125 percent.[137]  The Hispanic stop ratio exceed that of Whites by 29 percent.  This is almost a 100% difference between race and ethnicity effects between Black non-Hispanics and Hispanics, although results reflect that both groups had stop rates based on violent arrest benchmarks which were significantly higher than White non-Hispanics over time. See ER2 Report, page 20.[138]

### ANY STOP COUNTS USING TOTAL ARREST EXPOSURE VARIABLES

Using models with ethno-racial, specific total arrest count as the exposure/benchmark variable, differences emerged from the results obtained when using "spatially smoothed violent arrests."  *See, e.g.*, EA2 Report, page 22 and Table 4.

- The statistical results for BNHs were significant, showing that race had an impact on the expected stop rates per total arrests.  In the total arrest model, the rates were 15 percent higher than for WNHs (as compared to 82 percent higher in violent arrest models).

- The statistical results for Hispanics were also significant, showing that ethnicity had an impact on the expected stop rates per total arrests.  In the total arrest model the rates were 14 percent higher than for White non-Hispanics.

- Both of these statistically significant results remained even when controlling for time, racial composition, socioeconomic status, and residential stability.

- The effect of stop counts in adjacent districts became statistically irrelevant when the noted controls were added.

- Over time, stop counts per total arrest demonstrated a significant negative trend.

- In stark contrast to the violent arrest models, none of the community structural correlates demonstrated an effect on expected stop rates.

- The effect of socioeconomic status has an inconsistent, but negative effect on stop counts across models.

---

[137]These effects are from the last six months of RP1. They should be compared to the 82% black and non-significant Hispanic effect from RP2 to make the point about changes in stop disparities over time.

## STOP COUNTS USING AGE-THEN-GENDER WEIGHTED POPULATION EXPOSURE VARIABLE

Parallel models were then run using the age-weighted and gender-weighted district population as the exposure measure. This is not an ethno-racial specific variable. In Table 5 of the EA2 Report, the stop counts are regressed against ethno-racial predictors and the spatial lag of the outcome. Then, age-weighted and gender-weighted population is used as the exposure variable. The results from Table 5 show that:

- Expected stop rates of Black non-Hispanics significantly exceeded the reference group of WNHs by 1,086 percent.

- Expected stop rates of Hispanics also significantly exceeded the reference group of WNHs by 89 percent.

- These significant, predicted rate differentials remained even when controlling for additional correlates included in Model C.

- Structurally, racial composition and socioeconomic status were critical predictors of stop counts per weighted population. Specifically, for every one-unit increase in the proportion of Black non-Hispanic residents where the stop took place, there was an associated 75 percent DECREASE in the rate of expected stops.[139]

- Socioeconomic status was also associated with decreases in expected stop rates. For every one-unit increase in the socioeconomic status of a certain police district, stop counts decreased by 53 percent. The results of Models D and E reflect these results.

### District-level Comparisons

## BLACK NON-HISPANIC STOP RATES

- Throughout much of the six-months of Period 2, stop rates for Black non-Hispanics appeared to be highest in the "Central" (called West by the experts, Austin, Garfield Park) and South Areas of the City. See, e.g., Appendix B, page 16. For example, the 7th, 9th, 10th, 11th,

---

[139]The population denominator for this RP2 (age and gender weighted) is different from the population denominator in RP1 (young population, unweighted).

and 15th districts scored in the middle to highest quantiles from July through December 2016. However, another cluster of districts with higher stop rates appear on the Northside of the city in the 16th, 18th and 19th Districts.

- By contrast, the lowest stop rates were clustered on the south side of the City in the 3rd, 6th, 8th and 22nd Districts, with spikes in the 4th District (October and December) and 5th Districts (September), which reached the middle quantile in select months.

- The lowest stop rate for Black non-Hispanics in any select month during Period 2 were the 12th; 20th and 1st Districts.

WHITE NON-HISPANIC STOP RATES

The spatial arrangement of White non-Hispanic stop rates demonstrated substantial consistency over time. For Period 2, the 1st, 2nd, 12th, 14th, 17th and 19th Districts were located in the lowest two quantiles of the stop rate distributions, while the stop rates in the 22nd District were in the lowest quantile for all months during Period 2.

Sandwiched between the 22nd District, and the aforementioned police districts where stop rates were low for WNHs, was a ribbon of districts falling within the City's middle to highest quantiles of stop rates. Despite monthly variations between districts, stop rates were highest in these districts: the 4th, 5th, 6th, 7th, 9th, 10th, 11th, 15th and 25th.

HISPANIC STOP RATES

For Period 2, there were four (4) police districts with stop rates within the top two quantiles: the 7th, 9th, 11th and 15th Districts. For the last three months of Period 2, the 6th District also appeared to have stop rates in the highest quantile; and for 5/6 months (July thru November), the 12th District also appeared in the highest two quantiles. Elevated rates also emerged in the 1st District (September and October), as well as in the 19th, 20th and 24th Districts in the North area of the City (particularly in July, August and December).

In two general areas of the City, namely, Areas North and South, the stop rates for Hispanics was generally low. To the North, Districts 14, 16 and 17 consistently scored within the lowest two quantiles for Period 2. At times, the 1st and 18th Districts emerged within the lowest quantile. To the South, District 22 demonstrated the lowest stop rates for Hispanics during Period 2, although the 8th District had low stop rates in every month except November. Sporadically, the following districts appeared in the low quantiles: the 2nd, 3rd, 4th, 5th and 6th Districts.

## The Expert's EA2 Report Conclusions

(1) Overall stop rates for ALL groups continued to decrease from the first to the second reporting period.

(2) The downward trend was visible when calculated per 1,000 residents, per 100 violent arrests of the previous month, and per 100 total arrests of the previous month.

(3) Within the three ethno-racial groups, the downward trend in stop counts was evident when comparing the average monthly rates of Period 2 to an equivalent time during Period 1. For example, over time, stop rates for each of the three groups per population dropped by 79% for Hispanics, 81% for Black non-Hispanics, and 82% for White non-Hispanics, compared to the average monthly rates for Period 1.

(4) Statistical inferences from these three descriptive findings were made using mixed effects negative binomial models, in which ethno-racial stop counts were regressed against ethno-racial, temporal, and demographic structural indicators. Counts were transformed to rates using three denominators: (a) spatial Empirical Bayesian smoothed violent arrests from the previous month; (b) total arrests from the previous month; and (c) age-then-gender weighted total population.

(5) Statistical inferences/results varied by the denominator used as the benchmark. Specifically, the size of the race and ethnicity difference between stop rates for detainees depended upon the benchmark. This variation was expected given overall higher stop counts for BNH vs. WNH and H vs. WNH groups.

(6) The benchmark differentials, however, mean different things. Although the meaning from these differences is not yet clear, "in all cases, with all three denominators, the BNH vs. WNH rate differentials always prove statistically significant. This significance pattern suggests that the disparities are consistently observed."

(7) "Simply put, if the question is does the choice of denominator for constructing stop rates affect the conclusion that a statistically significant disparity exists between WNH and BNH stop rates, the answer is an emphatic no." *See, e.g.*, EA2 Report, page 30.

The experts prefer the violent arrest benchmark for several reasons explained in the Ecological Analysis Report (pp. 30-31). They caution, however, that the stop rate based on this benchmark should not be interpreted to mean that the person arrested for a violent crime in a previous month within a certain district will be the same during the next month. The denominator, and the numerator, and therefore each specific rate, are all properties of the locale itself, because these are ECOLOGICAL INDCIATORS.

- In sum, ethno-racial effects remain statistically important in the prediction of stop counts.

- Stops of Black non-Hispanics significantly exceeded those of White non-Hispanics, regardless of the type of stop rate constructed. On the other hand, stop counts of White non-Hispanics and Hispanics were "statistically indistinguishable."

- Stop counts reflected that stops were less likely to occur in districts which were predominantly Black and non-Hispanic and in districts with high socio-economic status.[140]

## Analysis of Coded Single Version ISR Narratives, Second Period Technical Report

### Overview

---

[140]*See supra* Note 121.

The "Single Version Records Coded Legal Narratives Analysis" Technical Report for Period 2 (SVR2 Report"),[141] presents findings about both the base rate of and the racial disparities associated with investigatory stop reports ("ISRs") by Chicago police officers during the second half of 2016 ("Period 2"). These findings are based on a sample set of 3,508 ISRs with only one, single record associated with the ISR ("SVRs"). These 3,508 sampled SVRs, were randomly drawn from 48,831 ISRs in the full-set of records for the three ethno-racial groups (50,715) with only a single version. The sample set of 3,508 single version ISRs are considered according to the following features: whether the stop made was investigatory or based on probable cause; whether investigatory stops were justified by reasonable articulable suspicion (RAS); whether a pat down, if it occurred in the context of **either an investigatory or probable cause stop** ("stop type") was justified by RAS (because an independent factual basis establishing RAS is needed to conduct a protective pat down); and whether a search related to a protective pat down, if it occurred in the context of either stop type, was justified by probable cause.[142] The Consultant determined, during his coded legal narratives review, that 2,150 -- about two-thirds (61 percent) -- of the stops in the SVR sample of 3,508 ISRs were Terry stops, and 1,358 -- one-third (37 percent) --were probable cause stops.[143]

The SVR2 Report is divided into two parts: the main report and an addendum. The main SVR2 Report focuses solely on the 2,150 investigatory stops and post-stop outcomes from

---

[141] *See, e.g.*, Appendix C.

[142] A roughly similar but somewhat different analysis was conducted of sampled stops for the first half of 2016 (Taylor & Johnson, 2017). The difference is based on the set of questions the Consultant used to code the sampled ISRs and is explained in the SVR2 Report, Appendix C, Section 12 (appendix A to SVR2 Report).

[143] Fifty five reports (1.6 percent) were citizen encounters, two were erroneous, and 3 were other.

those stops; probable cause or "on view" stops are excluded.[144] There is also, however, an addendum to the SVR2 Report, which appears in Section 10 of that report. This addendum was added when the Consultant advised the experts that, for purposes of analyzing the protective pat downs and other related post stop outcomes reported for Period 2, the sampled ISR data for all stops – including probable cause stops – needed to be included in the models, because all protective pat downs, regardless of stop type, are covered by the terms of the Agreement.

In other words, although the Agreement only covers one type of stop made by police officers, namely Terry stops, it covers all protective pat downs, without regard to what type of stop was made before the pat down was made. Thus, although statistical analysis of the stops must be limited to ISR records in which only Terry stops are present, statistical analysis of the pat downs (and any subsequent, related searches) must assess the full set of sampled ISR records, regardless of stop type. Statistical analysis of pat downs and subsequent related searches are presented twice, once with just Terry stops, and again in Section 10 with Terry stops and probable cause stops considered together.

## ISR Data Source: Single Version ISRs

The ISRs examined for the SVR2 Report are not based on the full-set of 51,538 stops of all civilians during Period 2, nor from the 50,715 ISRs from Period 2, in which members of the three groups were identified as detainees ("50,715 three group ISRs"). The ISRs examined for

---

[144]Exclusion of the probable cause stops is possible because the SVR Report focuses only on data from the randomly drawn, statistically significant sample ISRs coded by the Consultant as part of his legal narratives review. Exclusion of the probable cause stops is necessary because the Agreement's terms limit the Consultant's review to these three subject areas. Stops made based on observed violations of the law ("on-view" stops) are justified by probable cause and fall outside the Agreement, even though CPD is required to document on-view stops in the ISR based on requirements imposed by Illinois law.

the SVR2 Report are limited to the 48,831 ISRs identified from the 50,715 three group ISRs (hereinafter, simply, "group ISRs"), where only one, single record was associated with the uniquely numbered ISR in the group ISRs. These single record group ISRs are referred to by the Consultant and his experts as "single version ISRs" ("SVRs"). In other words, when referring to the full-set of SVRs, the Consultant and experts mean the 48,831 ISRs, from the group ISRs (50,715). From the full-set of SVRs (48,831), the experts identified a statistically representative sample of 3,600 ISRs, using a random sampling method (described and explained in Section 5 of the SVR2 Report). After duplicate ISR numbers were discovered, the sample size was reduced to 3,508 SVRs.

## SVR2 Main Report

The main report considers only 2,150 of the 3,508 SVRs.[145] This smaller sample was used because, through the coded legal narrative analysis process, described below, the expert identified only 2,150 investigatory stops, as coded by the Consultant, among the SVRs; 1,358 SVRs involved probable cause, on-view stops. For the reasons explained above, the segregation of the 2,150 SVRs was necessary to examine the legitimacy of the Terry Stops, apart from the probable cause stops, for purposes of the statistical analysis required by the Agreement.

## Addendum

The main report was completed prior to the recognition by the experts being informed that, because the Agreement required statistical assessment of the Consultant's coded narrative determinations for all protective pat downs, related searches and post-stop outcomes, an

---

[145]Five of the 2,155 SVRs were dropped because district numbers were above 25 or were missing.

addendum needed to be added with statistical assessments based on all 3,508 SVRs. This addendum, and the change to the statistical results from including the protective pat downs and other post-stop outcomes that followed from the 1,293 probable cause stops, appears in Section 10 of the full SVR2 report.[146] It is described separately in this summary by the Consultant under the heading of "Addendum."

## The Coded Legal Narratives Analysis Process

The 3,508 sample SVRs were randomly drawn from the full-set of SVRs to serve as representative, stand-ins, for that larger number of records. The SVRs sample serves a single purpose, namely, for the Consultant to **qualitatively** review, assess and analyze. This qualitative process is known as the "coded legal narratives" review (alternatively, assessment, analysis, and determinations). The Consultant's coded legal narratives review is where legal determinations are made about stops made by police officers of civilians and, if also made, "post stop outcomes" such as protective pat downs ("pat downs") and related searches, which officers document in the ISRs. These legal determinations assess whether the stops and frisks reported by police officers comply with applicable legal standards and CPD policy for stops and frisks. Codes, approved by the parties, have been designed by the Consultant and experts, to symbolize these qualitative determinations. From these codes, assigned by the Consultant to various data points in the ISRs during the coded legal narratives review, the statistical experts can quantify the AGGREGATE results of the Consultant's legal determinations for each and every one of the ISR samples. This quantification process is the first stage of the statistical analysis and is

---

[146] *See* Exhibit 3, at page 11 in Appendix C (Second Period Coded Single Version ISR Narratives Report).

described as the descriptive results. These descriptive results quantify the Consultant's determinations for 3,508 individual ISRs and present these quantified results as aggregate numbers. From these aggregated, descriptive numbers, statistical analysis can proceed.

To be clear, because this is a very important concept for those who doubt the power of statistical analysis, the 3,508 SVRs, in which individual stops and "post-stop outcomes" (such as pat downs and searches and related, relevant events) were documented by CPD during Period 2, are a **representative** sample set of ISR data personally reviewed by the Consultant. By using the sampling process, the qualitative, legal determinations made by the Consultant, using his legal expertise in determining the legal legitimacy of the stops and frisks based on his "eyes-on" review of the sampled ISRs, can be quantified, in aggregate, with statistical results.

This process involves creating codes, which the Consultant assigns to the relevant data points in the sample. These codes, approved in advance by the parties, represent qualitative determinations which are then quantified by the statistical experts, to create aggregate, quantitative results that reflect the qualitative, legal determinations made with respect to the stop and frisk data in the SVRs sample. These results are considered merely descriptive, at the first phase of the statistical analysis, because they simply tally the results and present them as simple numbers, proportions/percentages, and odds ratios. From the descriptive results, statistical analysis can proceed. The statistical analysis of the SVRs sample is highly technical and not easy to summarize in laypersons' terms. This is why the Consultant, in this summary of the SVR2 Report, will focus mainly on the descriptive results. In future reporting periods, if and when the statistical analysis reflects findings that have legal significance, then the Consultant will report these findings and explain the basis for them.

Methodology

During Period 2, Chicago police officers stopped civilians within the City limits 51,538 times. This number represents the **total all-stops count** for Period 2; and, it is based on the number of uniquely numbered ISRs submitted by police officers between July 1 and December 31, 2016.[147] Among these 51,538 total stops, there were 50,715 ISRs identifying the detainee as a member of one of the three ethno-racial groups that are part of this statistical study, namely: African-Americans ("Black non-Hispanics" or "BNH")); Hispanics and/or Latinos (non-Black "Hispanics" "NBH") and Caucasians ("White non-Hispanics" or "WNH"). These 50,715 ISRs constitute an equal number of stops and, thus, represent the **total 3-group stop count** for purposes of the SVR2 Report. Among these 50,715 ISRs, 48,831 of them had only one, single record associated with the ISR number (hereinafter "single record ISRs").[148] The single record ISRs are, at various times, referred to by the Consultant and experts as "single version records" ("SVRs"), because only one version of the ISR exists in the form of the single record submitted to the ISR database.

---

[147]As discussed previously in this report, the unit of measurement for a stop is the unique ISR number generated when a police officer reports the stop. If an investigatory stop occurs, but the police officer does not report it (or the relevant facts about it) in an ISR, then the stop **apparently** does not exist in the ISR database (at least insofar as the Consultant and experts can ascertain currently). The ISRs, counted by each unique ISR number, are the only source of data by which the Consultant and experts can perform the quantitative and qualitative assessments required by Section V of the Agreement. Thus, for reasons discussed elsewhere in the Consultant's Second Report, **the CPD's obligation to submit every ISR generated for every review period, by the end of the review period, is imperative to the Consultant's review process**.

[148]This number of single version ISRs is taken from the PSO2 Report, Section 4, at p. 6. The SVRs made up most of the total stops for Period 2 (94.8 percent). The remaining 2,707 (5.2 percent) of the stops were documented in ISRs with multiple records associated with the ISR number. These multiple records are known to the parties and Consultant and experts as "multiple version records" or "MVRs," which are addressed in the "Analysis of Multiple Version ISR Records and Coded Narratives" Technical Report, Appendix D. The CPD expected this group to be comprised of 2,714 records, but the designated experts have conducted their analysis using the number they had of 2,707 MVRs.

Initially, the experts identified twelve hundred (1200) ISRs from the full set of single version ISRs (48,831) for each ethno-racial group studied, creating a sample or sub-set of 3,600 SVRs for the Consultant to assess for compliance with legal standards and code for the statistical analyses. These codes represent quantifiable results of a qualitative legal analysis by the Consultant, who personally examined all 3,600 SVRs ("Coded Results"). The Coded Results reported in the SVR2 Report, however, are based on 3,508 (unweighted n) records, not 3600, for reasons not relevant here, as explained in the technical report.[149] Exhibit 2 from the SVR2 Report, reproduced here, shows the number of sampled records, before and after weighting, by ethno-racial group.

---

[149]Because the ISR file had already been merged with the charge file, some duplicate ISR records were created and sampled. These duplicate records were dropped from the 3,600. *See* Appendix C, Section 5.

**EXHIBIT 2. SAMPLED RECORDS, BEFORE AND AFTER WEIGHTING, BY ETHNO-RACIAL GROUP**

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|
| Ethnoracial group | Code | N in Period 2 ISRs (July - December 2016) | As percent of original ISRs (3 groups only) | N of sampled and coded ISRs | Percent of sampled and coded ISRs | Sampling weight applied (weight = [% of original records / % of sampled records] | N of sampled and coded ISRs, after weighting | Percent of sampled and coded ISRs, after weighting |
| Black non-Hispanic | BNH | 36,337 | 70.79% | 1,197 | 34.12% | 2.075 | 2,483.4 | 70.79% |
| White non-Hispanic | WNH | 4,508 | 8.78% | 1,149 | 32.75% | 0.268 | 308.1 | 8.78% |
| Hispanic | HISP | 10,484 | 20.43% | 1,162 | 33.12% | 0.617 | 716.5 | 20.43% |
|  |  | ======== | ===== | ===== | ===== | ===== | ===== | ===== |
| Total |  | 51,329 | 100.00% | 3,508 | 100.00% |  | 3,508 | 100 |

Source: CPD ISR data, July-December 2016
Note. Period 2, July-December 2016. Beyond the three ethno-racial groups of interest, there were 605 additional records (1.16 percent) not considered.
Note. Numbers for "N in Period 2 ISRs" will differ slightly from the numbers in the Period 2 post stop report, because these samples were drawn before verifying the full set of ISR numbers in the file against CPD's master list of verified ISRs for Period 2. The numbers from the Period 2 post stop report are 36,451 for Black non-Hispanic, 4,303 for White non-Hispanic, and 9,969 for Hispanic, yielding a total of 50,723. The additional 815 detainees from other ethno-racial groups, which are not part of this analysis, bring the total number of ISRs in the full set to 51,538.

A random sampling procedure, determined by the experts, generated these 3,508 selected records.[150] Because the 3,508 ISRs in the SVR sample were randomly selected from the actual, but also varying, number of ISRs where the detainee information indicated membership in one of the three ethno-racial groups, each sampled ISR record "stands in for" some number of ISRs in the set of 48,831 single version ISR records within the full-set of 50,715 ISRs identifying

---

[150]The protocols for the sampling procedure are explained in more detail in Section 5 of the SVR2 Report, Appendix C.

members of the three ethno-racial groups. As a representative sample, each of the 3,508 ISRs serves as a representative for an unknown number of additional ISRs not appearing in the SVR sample, but which statistical science tells us exist in the full-set of records. Therefore, if statistically significant differences appear in the sample ISRs between pairs of the three different ethno-racial groups, with respect to a stop or post-stop outcome of interest, then the significance of the difference supports the statistical inference that sizable differences also are most likely present in the full set of ISRs from which the sampled cases were drawn. [151]

Based on the codes assigned by the Consultant during the legal narratives review of the 3,508 sample SVRs, the experts have determined that only about two-thirds (61 percent) of sampled stops were investigatory (Terry) stops, because a little more than one-third (37 percent) were probable cause or on-view stops. [152] This means that the **all group stop count**

---

[151] In inferring back from the sampled records to the full set, statistical significance of a difference between groups in the sample tell us a difference in the full set of records exists between groups. But, because of the normal sampling error introduced through the sampling process, we do not know the exact size of that difference in the full set of records. We know, with a high probability, the difference probably exists, i.e., it is not zero. And we can make a scientific guess about the range of values within which the value of that difference will most likely be found in the full set of records. A "high probability" means that, assuming certain assumptions hold, at least 95 times out of 100 we will be right in guessing the range of values where the actual value of the difference in the full set of records will be found.

[152] Unfortunately, for Period 2, there was no way to draw the random sample for the coded legal narratives review only from the SVR **investigatory stops**, because the ISRS in use during Period 2 did not direct police officers to distinguish between stops made for investigatory purposes and those made based on probable cause. Based on the Consultant's recommendations during Period 1, the CPD has modified its ISR Form, which took effect at the beginning of Period 4 (July 1, 2017), to make such a distinction. For Period 2 and Period 3, however, the current practice of representative sampling permits accurate estimation of the number of investigatory stops in the full set of 48,831 SVR ISRs for the 3-groups.

Just as this SVR2 Report considers only SVRs, its focus is similarly limited to investigatory, not probable cause stops. That additional limitation, for the reasons discussed above, reduces the total number of SVRs assessed by the experts to 2,150 out of the 3,508 non-duplicated SVR sample ISRs (originally identified as 3,600) – all of which the Consultant actually reviewed and coded.

**results** from the SVR2 Report are based on only 2,150 of the 3,508 sampled ISRs. [153]   The good news is that 2,150 ISRs is still a sufficiently large enough sample to retain the "statistical power" necessary to find "statistical significance" and net impact results for differences of about five percent or larger.[154]  Exhibit 4, below, is excerpted from the SVR2 Report, and it shows the total number of investigatory stops in the sampled and coded SVRs, which involved members of each respective, ethno-racial group.

**TECHNICAL SVR2 REPORT, EXHIBIT 4. NUMBER OF SAMPLED AND CODED RECORDS BY ETHNO-RACIAL GROUP: TERRY STOPS ONLY**

|            | N     | Percent |
|------------|-------|---------|
| White NH   | 713   | 33.16   |
| Black NH   | 754   | 35.07   |
| Hispanic   | 683   | 31.77   |
|            |       |         |
| Total      | 2,150 | 100     |

Note. Period 2 (July-December 2016) sampled and coded ISRs. Probable cause stops, civilian encounters, errors, and stops outside city not shown. Unweighted data.

For Period 2, the sampled and coded records were linked to demographic data from the U.S. Census 2011-2015 American Community Survey ("ACS"). [155]  This demographic data was used to create "indicators" that, when included in the quantitative analyses, provide estimates

---

[153] The "all group stop count" represents the total stop count for all three groups when those stops happened in police districts in the City's jurisdiction; it is not taken from the larger total "all stop count" for all civilians stopped during Period 2.

[154] The experts have determined that when all 2,150 sampled stops are included, there is sufficient statistical power to detect a significant five percent difference, which is adequate to make the statistical determinations called for by the Agreement.  If analyses use just a sub-set of sampled records, however, statistical power diminishes and that fact is noted. "Statistical power" refers to the chances the analyses will find a statistically significant difference between groups of records if there really is such a difference in the data.

[155] Indicators for the 2011-2015 American Community survey, compiled into micro-neighborhoods called census block groups, were recompiled into CPD beats-within-districts. For details see Appendix A in the Ecological Report. These data provide the most recent and most comprehensive estimates available for the entire residential population in each police district.

for the racial composition, ethnic composition, socioeconomic status, residential stability, and youth population. *See, e.g.,* "Geographic context" predictors in Exhibit 6, SVR2 Report (listing as descriptive statistics the stop basis and predictors). Sometimes racial composition, percent African American and non-Hispanic; and ethnic composition percent Hispanic, were captured with simple percentages of the residential population within each of the 275 police beats within Chicago's city limits. Other times, the experts used different theoretically based categorical racial and ethnic composition variables indicating when a particular beat's residential population was 70 percent or more African-American and Non-Hispanic vs. lower than 70 percent; 70 percent or more Hispanic/Latino vs. lower than 70 percent; and 70 percent or more White non-Hispanic vs. lower than 70 percent.[156]

Three Outcomes of Interest

Three investigatory stop outcomes are examined in the SVR2 Report:

1. Legitimacy of the investigatory stop (i.e., did the police officer have RAS)
2. Legitimacy of the protective pat down (i.e., did the police officer have an independent factual basis providing RAS)
3. Legitimacy of a search based on the protective pat down results (i.e., did the protective pat down give the police officer probable cause to search)

The first two outcomes, the stop and pat down, are legitimate as investigatory procedures if based on facts that provide the officer with an independent RAS for the stop and another one for the pat down. These factual bases for RAS must be "articulated" in the narrative

---

[156]In the Ecological report (Appendix A), for technical reasons, the experts compiled the census data to the district level rather than the beat-within-district level as was done for the current report.
Where feasible, the experts conducted models that recognized the clustering of stops within beats, and, simultaneously, the clustering of beats within districts.

fields of the ISRs completed by the officers. The third outcome, a search, is legitimate, for purposes of the review being conducted by the Consultant, only if it is based on probable cause derived from the protective pat down. The factual basis establishing probable cause must also be articulated in the legal narrative fields of the ISRs. For each outcome, the codes assigned by the Consultant generated a score which the experts quantified and analyzed statistically. These outcome scores serve as the basis for the descriptive, gross impact results and the statistical, net impact results described below within the context of the three outcomes of interest.

In the following paragraphs, four (4) questions are raised by the experts in response to the coded responses of the Consultant to the 2,150 SVRs assessed as investigatory stops and further assessed for protective pat downs and searches. Where relevant, the Consultant will make observations about the experts' findings in the SVR2 Report, which may not appear in the technical reports. The experts' questions appear in the context of the three outcomes of interest to this report, namely: stops, pat downs and searches.

INVESTIGATORY STOPS

The legitimacy of an investigatory stop is determined by whether the police officer who made the stop documents it properly in an ISR by articulating the factual basis that provided the officer with reasonable suspicion to temporarily detain the subject of the stop in a section of this report referred to as the "legal narratives" field. Check boxes are also provided in the ISR, which provide the officer with boilerplate justifications for investigatory stops which must be checked, as well. In many cases, the boxes checked or unchecked were inconsistent with the articulated narrative describing the facts that gave the officer reason to suspect the detainee of criminal behavior. In such cases, the Consultant prioritized the narrated remarks over the check

boxes, but noted where there were inconsistencies using the questions set forth in the Survey Monkey Questionnaire.

QUESTION

What fraction of the stops from the SVRs appears to be legally justified? In other words, what percentage of the total number of investigatory stops were legally justified by RAS? This is just a descriptive question, and does not involve statistical inference.

ANSWER

- Based on the coded analysis of the SVRs in the sample, about 5.8 percent of stops were in the "bad stop" category. [157]
- The best guess is between seven percent and five percent of all the SVR investigatory stops for the period were "bad stops."
- Based on the coded analysis of the SVRs Period 2 sample data, 94.2 percent were legally justified (i.e., "good stops"). [158]
- The best guess is between 93 percent and 95 percent of all the investigatory stops for the period were "good stops."

QUESTION

For the investigatory stop outcome, how do the Period 2 fractions of good stops to bad stops on a city-wide basis compare to the respective fractions obtained during Period 1? This too is just a descriptive question.

ANSWER [159]

---

[157]*See* Exhibit 5, SVR. This number is based on a weighted sample. When weighted, the sample results accurately reflect the relative presence of records from each of the three key ethno-racial groups in the full set of stops for the period.

[158]*See* Appendix C, Section 8.1.1.

[159]The answer to the second question should be interpreted with caution because coding used a different form for the second half of 2016 compared to the first half, and because information for the second half of the year was presented in a different way. More specifically, in Period 2 the information received for coding did not include race, gender, or district. In short, coding was done "blind" on these issues. Therefore, answers to Question 2 simply describe differences, and do not address whether the differences are statistically significant, that is, whether they represent more than just random variation across the two timeframes.

For the entire set of investigatory stops for Period 1, the best estimate was that between 91.99 and 93.75 percent were good stops. [160] The corresponding best estimate for Period 2 was 93.2 to 95.2 percent. Because the two ranges overlap, the fraction of properly premised investigative stops was the same in the second half of the year compared to the first half. In the sample, the percent of bad stops was higher for Black non-Hispanic detainees (6.1 percent), lower for Hispanic detainees (5.3 percent), and even lower for White non-Hispanic detainees (4.8 percent). This descriptive difference is examined more closely later.

## CONSULTANT'S OBSERVATIONS

These numbers are good news for the City and CPD, especially for a police department of nearly 12,000 members in its first full year seeking to comply with the terms of the Agreement. The Consultant commends the Department for adhering to the legal requirements for investigatory stops in such a high percentage of individual cases. These city-wide percentages, however, address only one of several important questions that the Agreement asks the Consultant and statistical experts to answer. The question answered by the estimated overall 93 percent- 95 percent good stop rate, for example, is simply whether – at the level of individual stops – police officers have and can articulate the factual basis present at the time the stop was made which gave the officer reasonable suspicion that the person being stopped had been, was, or was about to be involved in a crime.

---

[160]This best estimate is based on a statistical property of the sample mean, called the 95 percent confidence interval. It is a range rather than a number because the uncertainty introduced by the process of scientific sampling must be recognized.

The individual stop level question does not address the underlying question of disparate impact: does the observed bad stop rate of 5 percent in the sample differ significantly, that is, do some of the three groups score significantly differently on this? If they did, this would suggest a statistically significant disparate impact. In other words, the overall good stop rate is great news for the Department overall, but it does not provide an answer to the disparate impact question, namely, whether there is a statistically significant, unlawful disparate impact on African-Americans and/or Hispanics/Latinos within the 5 percent of sampled stops that were not legally justified.

**QUESTION**

Are there fractional differences across the three ethno-racial groups of stopped civilians examined -- Black Non-Hispanic, White Non-Hispanic, and Hispanic civilians – related to the proportion of stops which were not legally justified?

**ANSWER**[161]

**Yes, in the sample itself** there are observed differences between the three groups. As mentioned above, the percent of bad stops was higher for Black non-Hispanic detainees (6.1 percent), lower for Hispanic detainees (5.3 percent), and even lower for White non-Hispanic detainees (4.8 percent). If we compare the Black non-Hispanic percentage (6.1) to the White non-Hispanic percentage (4.8), we can say that in the sample the Black non-Hispanic detainees' chances of being in a bad stop were about 28 percent higher. [162]

---

[161]Answering this question does involve statistical inference, that is, deciding whether the discrepancies observed represent just random noise in the sample data, or, instead, reflect some substantial differences in the entire set of records from which these samples were drawn. Differences across ethno-racial groups on outcomes are considered before and after controlling for factors describing either the stop context or the stopped civilian. Before controlling for these other factors, the results are describing **gross** ethno-racial impacts. After controlling for these other factors, the results are describing **net** ethno-racial impacts.

[162]This Period 2 Black/White bad stop ratio is LOWER than the 2.33 ratio reported for Period 1. The ratio also drops when comparing Hispanics to White non-Hispanics (Period 1 reported 1.37 and Period 2 reported 1.11). The experts state that the decrease in the proportion of stops without proper legal justification is

This describes an observed difference in the sample when these two groups are contrasted. **But these differences are not meaningful when we infer back to the full set of investigatory stop records**. [163] In other words, we cannot be sure, once we take the error necessarily introduced by the scientific process of sampling records that, in the full set of investigatory Period 2 SVRs the three groups differ on the proportion of bad stops.

QUESTION

The third question, about functional differences in the bad stop rates can be reframed ecologically to focus on the race or ethnicity of the beats where the stops take place. The question becomes: for each outcome, does the fraction of events that were properly premised, in legal terms, differ depending upon whether the police beat where the stop occurred is predominantly Black non-Hispanic in residential composition or not? The same contrast can be investigated for beats that are predominantly Hispanic or not in residential makeup.

ANSWER

The answer to this question is explained in detail in Section 8.1.3 of the SVR2 Report. Here, the following statements serve to summarize the most important findings. These findings were significant with respect to gender and age, but not race and ethnicity.

---

"descriptively intriguing" but caution that the results should not be tested for statistical significance because the methods for assessing and coding the Period 2 data differed from the methods used to code the Period 1 data based on changes to the ISR data for Period 2.

**Consultant's Observations.** The experts do not offer an explanation for the decrease in the proportion of bad pat downs in Period 2 for the three groups. However, it stands to reason that the completion of training from Period 1 on the proper justification for investigatory stops, as well as the implementation of the supervisory review and auditing protocols directed by CPD's new internal ISS Policy may have something to do with the decrease in the disparities in the bad stop rate.

[163] *See* Section 8.1.3, p. 17 in SVR report: "If just detainee race and ethnicity are entered, the contrast with White non-Hispanic detainees was still non-significant."

.

*RACE & ETHNICITY*

No connection between the legitimacy of the stop and the race and ethnicity of the detainee, nor between the racial or ethnic composition of the beat where the stop took place, surfaces from the statistical models used to assess gross and net impacts of this variable on the investigatory stop outcomes reported in the sample ISRs from Period 2. Regardless of whether the key beat ethno-racial variables are entered on their own or with other predictors, and regardless of whether detainee race and ethnicity are entered on their own or alongside other predictors, legitimacy of stop did not connect significantly to any of the race or ethnicity variables. This suggests there may be no difference on this outcome either across these groups of detainees, or across these different types of beat, when considering the full set of SVR stops for the period.

The gross impacts (descriptive results using unweighted data) are as follows. The stop justification percentages are similar for each of the three groups when examined separately (with unweighted data). For Period 2, the statistical results show that investigatory stops of detainees were justified: 95.2 percent of the time for White non-Hispanics; 94.7 percent of the time for Hispanics (94.7 percent); and 93.9 percent of the time for Black non-Hispanics. Conversely, the proportion of unjustified stops rises from least to greatest in the opposite order for the three groups.

The net impacts (statistical results using weighted data) of race and ethnicity were estimated in models that were run controlling for data clustered by beat with two predictors: race and ethnicity. Section 8.1.3 of the SVR2 Report describes the way these tests were run with these features included in them.

In all models, the results showed that there was no pattern of statistical significance for ethnicity or race of the detainee, nor for the racial or ethnic composition of the beat related to whether a stop was or was not justified. In other words, race and ethnicity did not influence the stop justification outcomes in Period 2.

*GENDER & AGE*

In the statistical models run to test net impacts of race and ethnicity, the only two factors that proved consistently influential were: the detainees' genders and the detainees' ages. The predicted probabilities of the following results are statistically significant.[164]

**Gender**

Investigatory stops of male detainees had significantly higher chances of being in a good stop versus a bad stop than did women. This impact appeared in all models.

Only five (5) percent of stops involving male detainees were unjustified, but about ten (10) percent of stops involving females were unjustified. Stated differently, in the full set of ISR records from which the sample data was drawn, "it is likely that stops of females had lower chances of being" in a good stop versus a bad stop.

This gender disparity is "highly statistically significant" which means that chances are less than one in one-thousand that this is not a real difference in the full set of Period 2 ISRs. This significant net impact of gender as an influence on whether a stop is justified or not is new for Period 2. For the first half of 2016, gender did not influence the stop justification outcomes.

---

[164]See Appendix C (SVR2 Report), Ex. 8 and p. 18.

**Age**

Age was the only other consistently significant factor that influenced whether a stop was justified or not. Stops of older detainees were significantly less likely to be justified. For each additional year of age, the odds that the investigatory stop would be justified by RAS versus not justified by RAS went down about 3 percent.

- In Period 1, the age link to stop premise was observed going in a similar direction, but the connection was not statistically significant.
- During Period 2, the predicted probabilities that an investigatory stop would be **unjustified**, generated from the full model, also can be mapped by police district.[165]

## Protective Pat Downs: Terry Stops Only

As explained in the Overview to this summary, the protective pat down results from the statistical analysis changed when the experts assessed the coded results using the full sample of 3,508 ISRs, which included pat downs that followed from a probable cause stop, rather than simply the 2,150 ISRs reflecting Terry stops. The pat down results using the full sample are described in Section 10 of the SVR2 Report. However, because both sets of results are available, the Consultant will include both sets of results here. The results from the analysis of coded pat downs based only on the 2,150 Terry stops is as follows.

**QUESTION**

What fraction of the pat downs from the SVRs appears to be legally justified? In other words, what percentage of the total number of protective pat downs were legally justified by RAS?

---

[165]*See, e.g., Id*., Exhibit 9.

ANSWER

- The overall good pat down rate for Period 2 was 87.11 percent. [166]  The rate of justified pat downs is based only on pat downs of non-consenting detainees.
- The ethno-racial specific good pat down rate was 91.18 percent for White non-Hispanics; 85.5 percent for Black non-Hispanics and 91.6 percent for Hispanics.
- Speaking descriptively, the proportion of **un**justified pat downs proves higher for Black non-Hispanic detainees (14.5 %) than for White non-Hispanic detainees (8.82%).
- But, statistical models with weighted data testing whether this difference is significant when considering the entire set of records, found it was not. So it is not clear if these disparities in the unjustified pat down rates are meaningful when thinking about the full set of records. [167]
- Overall, 48 percent of those who were patted down agreed to it.  Speaking descriptively, the percentage of consents to pat downs was higher for White non-Hispanic detainees (54 percent) than for the other two groups (47-48 percent each).[168]

The full post stop outcome report describes the pat down rate for all types of stops during the period. Focusing just on Terry stops, it shows the following descriptive information about pat down rates. Thirty-three percent of the SVR sample included a protective pat down.  That percentage varied depending on race and ethnicity of the detainee:

- Although 36 percent of Hispanic detainees were pat down, only 21 percent of White non-Hispanic detainees had a similar experience.
- Black non-Hispanic detainees were patted down 33 percent of the time.

The distribution of the protective pat down by race and ethnicity appears in Exhibit 11 from the SVR2 Report, reproduced below:

---

[166]This good pat down rate is the fraction of (good pat downs / all pat downs) but only when considering non consenting detainees.

[167]The statistical models had very few cases of unjustified pat downs of non-consenting detainees in the sample. Although this is a good thing from a policies and practice perspective, it created modeling challenges according to the experts.

[168]*See, e.g.,* SVR2 Report, Section 8.2.2.

EXHIBIT 11 COUNT AND PROPORTION PATTED DOWN BY ETHNO-RACIAL GROUP

| Did officer conduct a protective pat down? | | Race/ethnicity of detainee | | | |
|---|---|---|---|---|---|
| | | White NH | Black NH | Hispanic | Total |
| No | N | 152 | 1,046 | 268 | 1,466 |
| | Column % | 79.38 | 66.84 | 63.69 | 67.33 |
| Yes | N | 39 | 519 | 153 | 711 |
| | Column % | 20.62 | 33.16 | 36.31 | 32.67 |
| Total | N | 191 | 1,564 | 421 | 2,177 |
| | Column % | 100 | 100 | 100 | 100 |

Note. Period 2 (July-December 2016) sampled and coded ISRs. Only investigative (Terry) stops shown. Probable cause stops, civilian encounters, errors, and stops outside city not shown. Weighted data.

The legitimacy of a protective pat down, however, must be assessed with regard to whether the detainee gave the officer consent prior to the pat down. Exhibit 12 shows that, in about half of all cases, the detainee gave consent, therefore obviating the need for the Consultant to determine whether the facts and circumstances of the investigatory stop gave the officer an independent RAS to conduct the pat down.

**EXHIBIT 12. CASES WITH PROTECTIVE PAT DOWN: CONSENT**

| Was the pat down based on consent? | | Race/ethnicity of detainee | | | |
|---|---|---|---|---|---|
| | | White NH | Black NH | Hispanic | Total |
| No | N | 18 | 272 | 81 | 371 |
| | Column % | 46.26 | 52.4 | 52.82 | 52.15 |
| Yes | N | 21 | 247 | 72 | 340 |
| | Column % | 53.74 | 47.6 | 47.18 | 47.85 |
| Total | N | 39 | 519 | 153 | 711 |
| | Column % | 100 | 100 | 100 | 100 |
| Note. Period 2 (July-December 2016) sampled and coded ISRs. Only investigative (Terry) stops shown. Probable cause stops, civilian encounters, errors, and stops outside city not shown. Weighted data. Records only shown if a protective pat down occurred | | | | | |

Now compare Exhibit 13 from the SVR2 Report, which shows the very small numbers of stops where pat downs proceeded without the detainees' consent.

**EXHIBIT 13. PAT DOWN BASIS AND ETHNO-RACIAL GROUP: NON-CONSENTING DETAINEES RECEIVING PAT DOWNS ONLY**

| Does the ISR establish the RAS basis for the protective pat down? | | Race/ethnicity of detainee | | | | |
|---|---|---|---|---|---|---|
| | | White NH | Black NH | Hispanic | | Total |
| No | N | 2 | 39 | 7 | | 48 |
| | Column % | 8.82 | 14.5 | 8.4 | | 12.89 |
| Yes | N | 17 | 232 | 74 | | 323 |
| | Column % | 91.18 | 85.5 | 91.6 | | 87.11 |
| Total | N | 18 | 272 | 81 | | 371 |
| | Column % | 100 | 100 | 100 | | 100 |
| Note. Period 2 (July-December 2016) sampled and coded ISRs. Only investigative (Terry) stops shown. Probable cause stops, civilian encounters, errors, and stops outside city not shown. Weighted data. Records only shown if (a) a protective pat down occurred and (b) detainee did not consent to the pat down. | | | | | | |

The experts indicate that it will be difficult to obtain statistically significant differences on bad pat down rates among non-consenting detainees with numbers this small.

### QUESTION

For the pat down outcome, how do the Period 2 fractions of good pat downs to bad pat downs on a city-wide basis and for the three ethno-racial groups, compare to the respective fractions obtained during Period 1 (the first half of 2016)? This too is just a descriptive question.[169]

### ANSWER

This question cannot be answered for one reason, and should not be answered for a second reason. Period 1 analyses of pat down basis did not separate consenting from non-consenting detainees. [170] In addition, because here multi-version stop reports were not included in these samples, that changes, albeit only slightly, the composition of the Period 2 as compared to the Period 1 sample subjected to legal coding.

### QUESTION

Are there fractional differences across the three ethno-racial groups of stopped civilians examined -- Black Non-Hispanic, White Non-Hispanic, and Hispanic civilians – related to the proportion of pat downs which were legally justified?

### ANSWER

---

[169]The answer to the second question should be interpreted with caution because coding used a different form for the second half of 2016 compared to the first half, and because information for the second half of the year was presented in a different way. More specifically, in Period 2 the information received for coding did not include race, gender, or district. In short, coding was done "blind" on these issues. Therefore, answers to Question 2 simply describe differences, and do not address whether the differences are statistically significant, that is, whether they represent more than just random variation across the two timeframes.

[170]*See* Section 9.3 in Period 1 Legal Narratives Report.

Yes, but only in the sample, not in the full set of single version stops. See Exhibit 13, above.

These differences, when tested with statistical models, fail to confirm there are differences

between groups in the full set of stops from which the sample was drawn.[171]

QUESTION

The third question, about fractional differences across ethno-racial groups, can be reframed ecologically so that it becomes: for each outcome, does the fraction of events that were properly premised, in legal terms, differ depending upon whether the police beat where the stop occurred is predominantly Black non-Hispanic in residential composition or not? The same contrast can be investigated for beats that are predominantly Hispanic or not in residential makeup.

ANSWER

The statistical analyses of pat down legitimacy classified stops into four groups: (A) justified pat

down, no consent; (B) unjustified pat down, no consent; (C) pat down with consent; (D) no pat

down. While all these groups were simultaneously considered by the statistical models, of key

interest is whether racial or ethnic composition of the beat affected the chances that a stop

would fall into group B vs. group A, that is, bad pat down of non-consenting detainee vs. good

pat down of non-consenting detainee.

- It did. According to the models, the "predicted probability that the pat down [of a non-consenting detainee] would be improperly justified was significantly higher when it occurred in a police beat that was 70 percent or more Black non-Hispanic in residential composition." [172] The predicted chances a stop would involve an unjustified pat down involving a non-consenting detainee was a little over three percent in a predominantly Black non-Hispanic beat as compared a little under one percent if the beat was less than 70 percent Black non-Hispanic in makeup.

- Because this net impact was significant, it suggests a disparity that applies to the entire set of investigatory stops in the full set of Period 2 data.

---

[171]*See* Section 8.2.3 in Single Version Legal Narratives Report, Appendix C.

[172]*See*, *e.g.*, Appendix C, Section 9, p. 35.

Nonetheless, this disparity "merits extremely cautious interpretation for several reasons."

- *First*, because the number of sampled records is very small because the rate of properly justified pat downs was generally high, based on codes assigned by the Consultant to the sample SVRs.

- *Second*, because this analysis does not control for features of nearby beats, so its significance could be due, in part, from the concentration effects of adjacent beats with similar race predominance characteristics.

Given the small difference in predicted probabilities, some may question the practical significance of the disparity. However, looking ahead to Periods 3 and 4, where the sample sizes can be determined with these questions in mind, it may be possible to learn more about this issue by shifting the sampling strategy.

For example, the experts suggest that ISRs with investigatory stops and pat downs could be oversampled; or, ISRs from particular geographic locations can be oversampled to increase the number of sampled records in certain locations. Of great interest to the Consultant is the idea that more attention be paid to race adjacency effects to better gauge how much of the disparity connection arises from concentration effects.

Searches:  Terry Stops Only

### Question

What fraction of the searches from the SVRs sample appears to be legally justified by probable cause?

### Answer

Coded reports yielded few searches beyond a protective pat down that lacked probable cause.

Questions 2, 3 and 4 are answered as:  The low base rate of unjustified searches precluded looking for racial disparities in rates of unjustified searches.

## Summary

Legal assessments were completed on equal size random samples of Black non-Hispanic, White non-Hispanic, and Hispanic civilian investigatory (Terry) stops made by Chicago Police Department officers during the last half of 2016 and reported in only one report version. Interest in this report centers on whether detainee race and ethnicity, and/or racial and ethnic composition of the locale where the stop occurred, affected three outcomes: whether the stop itself was properly premised on reasonable articulable suspicion (RAS); whether a pat down of non-consenting detainees, if it occurred, was properly premised on RAS; and whether a non-consent search, if it occurred, was properly premised on probable cause. Legal assessment of sampled investigative stop reports (ISRs) generated outcome scores. Only single version ISRs were considered here. Multiple version ISRs were investigated in a separate report on changes in ISRs over versions.

Because a different coding protocol was used for this reporting period (July-December 2016) as compared to the first reporting period (January-June 2016), comparisons of the outcomes across the two periods are not informative. The different coding protocol used in this period compared to the earlier one, along with the exclusion of multiple version investigatory stop reports in Period 2 from this analysis, create plausible alternate explanations for any discrepant findings observed between the two periods.

Pat downs of non-consenting detainees were more likely to lack RAS if the pat down took place in a beat where 70 percent or more of the residents were Black and non-Hispanic. The difference in the predicted probabilities that the pat downs would be unjustified are small numerically because unjustified pat downs are rare events. Nevertheless, this rare event, a "bad"

pat down, does appear to be differentially distributed across predominantly Black vs. non-predominantly Black police beats. The finding only appears in some models, is based on extremely small numbers of stops in key cells, and does not control for adjacency effects, so it is not known at this time how robust it is.[173] Finally, this finding shifts if the model uses both probable cause and investigatory stops together.

Regarding searches and search justifications, the extremely low number of investigatory stops in the coded sample of SVRs, especially of searches which were done only pursuant to the protective pat down, made it impossible to say anything definitive about the influence of race or ethnicity on the search outcome, both with respect to the detainee and the context of the search. The most significant findings from the SVRs analysis were:

- The rates of good investigatory stops city-wide remain very high (estimated at approximately 93%-95%).
- The rates of bad pat downs of non-consenting detainees city-wide remain generally low.
- A statistically significant impact of ecological racial composition does suggest a disparity on the likelihood that a pat down would be improper; that relationship, however, warrants cautious interpretation for several reasons.
- The SVR data does not permit statistical examination of potential links between race or ethnicity and the legitimacy of searches following from investigatory stops during the second review period.

## SVR2 Report Addendum

In Section 10, an addendum to the SVR2 Report, the experts repeat key descriptive and statistical results for pat downs and searches which follow from Terry Stops and then add those which follow from probable cause stops.   The following bullet points summarize those results.

---

[173]*See* Appendix C, SVR2 Report, Section 8.2.4.

The results will not track the question and answer format used for the statistical results from Terry stops, above.

Pat Down Prevalence Rates

OVERALL BOTH STOP TYPES

- Using a weighted sample of 3,461 ISRs[174]police officers reported that 909 pat downs took place during Period 2.

- **Overall.** When all stops were considered, the overall pat down prevalence rate, for all three groups combined, without regard to consent, was 26.3 percent. See Appendix C, Ex. 21 (compare to Ex. 11, assessing only investigatory stops, 33 percent of all those within the three groups who were part of Terry stops were patted down).

- **Among Three Groups.** The pat down prevalence rate varied among the three groups when all stop types were considered. When all stops were considered, the total pat down prevalence rate, without regard to consent, was: 30.35 percent for Hispanic detainees; 26.27 percent for BNH detainees; and 16.81 for WNH detainees. Compare Ex. 11 (for pat downs following only investigatory stops, the prevalence rate among the groups was: 36% (H); 33% (BNH) and 21 (WNH)).

All Stops by Consent vs. Non-Consent

- The prevalence rate for pat downs following both stop types is divided between pat downs were the detainee consented and those where there was no consent. See Exhibits 22 & 23, Appendix C, Addendum (Section 10).

- **Consent.** The consenting pat down rate, among detainees who were patted down, was 50.7 percent. See Ex. 22. This rate is based on 461 consenting detainees from a total of 909 detainees who were patted down. [175] Among the three groups, presented in order of greatest to least, the consenting pat down prevalence rate among those patted down, was: 53% for WNH detainees (32); 52% for Hispanic detainees (110); and 50 percent for

---

[174]The unweighted number of cases, includes only investigatory and probable cause stops, dropping citizen encounters, stops outside the city, and errors. See fn. 3, supra. This leaves 3,448 unweighted cases (2,155 Terry stops; 1,293 probable cause stops. The number of cases reported for analysis, however, will diverge from this number. When the weights are "turned on" the weighted number of cases will diverge somewhat from the sampled number of cases.

[175] Weighted numbers reported here.

BNH detainees (324). See Id. These numbers and proportions can be contrasted with Ex. 12, assessing pat downs of consenting detainees involved in a Terry stop. Notably, consent obviated the need for an RAS determination, so these numbers can be viewed as legitimate pat downs.

**Consultant's Observation**: The ordering of consenting pat down **rates** among those patted down <u>does not align with</u> the **numbers** of detainees who consented to pat downs; there, the ordering from greatest to least is: BNH, Hispanic, and WNH. This is because the sample is weighted to align with the overall number of stops made in each of the three groups. Because more BNH detainees exist, followed by Hispanic detainees, in the full sample of both stop types (3,461), the numbers of detainees patted down (909 overall) had to be weighted before proportional representation could be calculated.

- **Non-consent.** The overall, three group, non-consent rate among those patted down was 49.29 percent. This rate is based on 448/909 pat downs. [176] *See* Ex. 22. Among the three groups, the rate of non-consenting among patted down detainees was, from greatest to least: 49.84 (BNH); 48.27% (H) and 46.56% (WNH). These rates are based on the weighted number of non-consenting detainees who were patted down in both types of stops, which was: 24 (WNH); 322 (BNH); and 103 (H). Id. These numbers also can be contrasted with Ex. 12, where the pat down occurred without consent in the context of an investigatory stop: 18 (WNH); 272 (BNH); 81 (H). Ex. 12.

**Consultant's Observation**: From these comparisons, one can see that the number of pat downs without consent, resulting from **just probable cause stops** in the full set of 909 pat downs, per group, from least to greatest were: 6 WNHs; 22 Hispanics; and 50 BNHs.

OVERALL UNJUSTIFIED (NO-RAS) PAT DOWNS WITH AND WITHOUT CONSENT

- Turning to the results based on the coded legal narratives assessing the legitimacy or legal basis for the pat downs, one can compare Exhibit 13 for pat downs following from

---

[176] Weighted numbers are reported here, as well.

investigatory stops only with Exhibit 23, which represent the results for pat downs following from both types of stops.

- Focusing on the pat down justification question for non-consenting pat downs in both stop types, the following results can be observed in Exhibit 23. Among non-consenting detainees who received a pat down, the unjustified pat down prevalence rate considering all three ethno-racial groups together, **from both stop types** was 15.2 percent. In contrast, in that same group, those patted down without their consent, 84.8 percent of those in that same group had a pat down determined to be legally justified by the Consultant in his coded legal narratives review.

- By comparison, the non-consenting, unjustified pat downs prevalence rate for all three groups following from **just Terry stops** was 12.89 percent (2 (WNH); 39 (BNH); 7 (H) for a weighted total of 48 detainees), whereas the pat down prevalence rate for justified pat downs from Terry stops was 87.11 percent (17 (WNH); 232 (BNH); 74 (H)).

**Consultant's Observation**: Among those patted down without their consent, the prevalence rate for unjustified pat downs <u>declined </u>when stops of both types were assessed, **from 87.11 percent (Terry stops ONLY) to 84.8 percent (Terry + Probable Cause stops).** In other words, the addition of 1,358 probable cause stops had the effect of increasing, for the group of detainees patted down without their consent, the prevalence rate of justified (good) pat downs by 2.31 percent across the three ethno-racial groups of detainees. The experts note that this is not surprising given the nature of a probable cause stop (i.e., an observed criminal violation). The experts also note:

> For each ethnoracial group, the percent of that group experiencing an improperly premised protective pat down, to which the detainee is not consenting, is quite close to the corresponding percentage seen when only investigatory stops are examined (see Ex. 14). For each ethnoracial group, the percent of the group in category B (unjustified non-consensual pat down) is within ½ of a percent of the corresponding group percentage when only investigatory stops are examined."

*See, e.g.*, SVR2 Report, Section 10.1.1.1., at pp. 40-41.

FEWER words are better when trying to understand what is being said here. If one takes each ethno-racial group of detainees **separately**, and examines the percent within each group receiving an unjustified pat down for which consent was not given, that percent does not shift much if probable cause stops are added in with Terry stops. The experts go on, however, to opine that "caution" is advised if one seeks to contrast the number of justified pat downs with the number of unjustified pat downs "given the extremely small number of cases for each group" in the unjustified pat down category. *See*, *Id.*, at p. 41.

### Three Group Unjustified Pat Down Comparisons

To see the breakdown of unjustified pat downs for each of the three groups see Exhibit 23 compared to Exhibit 13. The overall unjustified pat down rate increased when both stop types were considered, from 12.9 to 15 percent. When each group's rate of unjustified pat downs was examined considering both stop types, regardless of consent, the rate was still highest among BNH detainees and lowest among WNH detainees. However, for BNH detainees, despite having the highest overall rate among the three groups, the rate of unjustified pat downs **declined** when probable cause stops were considered (16.1 percent with just Terry stops and 14.5 percent with probable cause stops). By contrast, although WNH detainees had the lowest overall rate of unjustified pat downs, when both stop types were considered (11.4 percent), the prevalence of unjustified pat downs actually INCREASED for WNH detainees when both stops, as opposed to just Terry stops, was considered (rising from an unjustified pat down rate of 8.8 percent for Terry stops to a both stop type unjustified pat down rate of 11.4 percent).

FOUR CATEGORIES OF PAT DOWN OUTCOMES WITH AND WITHOUT CONSENT

The Consultant's observations of Exhibits 24 and 14, compared, have already been noted with respect to outcome category B, where an unjustified protective pat down occurs, without consent. Here, the Consultant only notes that, when stops of both types are considered, Exhibit 24 shows that of 3,461 total (weighted) stops observed, there were 2,552 (weighted) stops in which no protective pat down occurred, or well over two-thirds of all stops for Period 2. Compare this number with 2,177 (weighted n) ISRs in Exhibit 14. There, the experts found that 1,466 (weighted n) of the 2,177 (weighted n) did not contain a protective pat down, again over two-thirds of all investigatory stops made. This quantitative analysis comports with the Consultant's visual memory of the 3,600 ISRs he coded from the full sample of records identified from Period 2.

> This observation, that very few pat downs were being made after stops occurred, is relevant to the next section of the SVR2 Report regarding searches as post-stop outcomes, because the only kind of search the Agreement authorizes the Consultant to assess for justification, as well as for statistical disparities, is the search that follows directly from the protective pat down. If the protective pat down is unjustified by RAS for a weapon or firearm, then the search conducted pursuant to it – even if justified by probable cause gained from the unjustified pat down – is suspect.[177]

## Statistical Models

According to the experts, adding the probable cause stops to the statistical analysis of the coded legal narratives for pat downs "seems to dilute one of the key contrasts seen earlier." *See, e.g.*, Attachment C, Section 10.1.2. The key contrast at issue is illustrated in Exhibit 25, where

the experts tested whether the percentage of stops resulting in unjustified pat downs of non-consenting detainees differed noticeably between stops inside versus outside predominantly Black non-Hispanic beats. With just Terry stops examined, the predicted probability of unjustified pat downs in predominantly BNH beats was 3.2 percent, compared to a mere predicted probability of 0.9 percent for stops occurring in non-predominantly BNH beats. *See, e.g.*, Ex. 18. However, when probable cause stops were added with the Terry stops, that contrast was significantly diluted, showing barely a predicted one percent difference (2.4% vs. 1.3%).

When statistical models were run to test for significance, none of the models revealed a significant impact of detainee race or ethnicity, nor of beat racial or ethnic composition on the likelihood that a non-consenting detainee who was patted down experienced an unjustified pat down versus a justified pat down when the probable cause stops were considered.

As the experts stated in the SVR2 Report:

> In short[,] the significantly higher relative risk in a predominantly Black non-Hispanic police beat that a non-consenting detainee would experience an improperly premised versus a properly premised apt down, seen when only investigatory stops are considered, disappears when probable cause stops are added in with investigatory stops.

*See* Appendix C, Section 10.1.2., at p. 43.

## Searches "Beyond" A Protective Pat Down

At the outset of this last section summarizing the SVR2 Report on the coded legal narratives sample, the Consultant wishes again to make clear that the only searches he coded and assessed for purposes of this report are those which followed directly from a protective pat down. All other search types (*e.g.*, custodial, administrative transport, or those occurring in

stops where there was no protective pat down) are not covered by the Agreement and, therefore, are not considered here. In this last section summarizing the Addendum, the findings related to consensual searches are addressed first, following by the descriptive and statistical results, if any, from all searches studied.[178]

## Consensual and Non-Consensual Searches

### DESCRIPTIVE RESULTS

- Descriptively speaking, the non-consenting search rate appears to be twice as high in beats that are predominantly Hispanic in makeup compared to beats at are neither predominantly Hispanic nor predominantly Black non-Hispanic in makeup. This descriptive disparity surfaces in a broader overall context of extremely low non-consenting search rates.

- When predominantly Hispanic beats are removed from the model, the contrast between non-consenting search rate in predominantly Black non-Hispanic beats versus beats where the residential population is less than 70 percent Black and non-Hispanic, reveals that: Descriptively speaking, the search rate appears to be higher in beats that are predominantly Black and non-Hispanic in residential makeup compared to beats that are neither predominantly Hispanic nor predominantly Black non-Hispanic in residential composition.

### STATISTICAL RESULTS

However, in Section 10.2.2., when statistical models were run, there were no statistically significant findings that showed a gross or a net impact of race or ethnical beat composition that contributed to the chances of being in a non-consensual search if one were detained and

---

[27]In Section 10.2.1.2, the experts describe the process of excluding searches in the SVRs that are not covered by the Agreement. The Consultant is satisfied that the statistical results do not contain properly excluded searches. Thus, the following finding by the experts should be considered by the parties.

searched in a predominantly Black non-Hispanic or predominantly Hispanic beat. In the full set of relevant stops, there was no difference.

## JUSTIFIED SEARCHES

When both stop types were considered, there were 152 (161 weighted number) out of 3,448 (3,461 weighted number) stops that involved a search and a protective pat down (or 4.4 percent unweighted; and 4.6 weighted). These percentages are quite close to those obtained when only the Terry stops were examined for searches that occurred after the protective pat down (4.6 unweighted and 5.2 percent weighted).

In Section 10.3 of the SVR2 Report, based on the coded narratives, that searches, which were not excluded and were not a product of consent, were justified as having probable cause for each ethno-racial group in the following proportions:

- 93 percent for WNH detainees (3.7 out of 4 cases weighted)
- 87.5 percent for BNH detainees (58 out of 66 cases weighted)
- 87.2 percent for Hispanic detainees (21 out of 24 cases weighted)

Statistical models run on these numbers showed highly non-significant effects when detainee and beat-level predictors were added. Furthermore, when the predominance theory was tested, for Hispanic beats, 85 percent of weighted search cases appeared to be "soundly grounded in probable cause" (14 out of 16) compared to 94.9 percent of searches in non-predominant Hispanic beats that were not predominantly Black non-Hispanic. A similar proportion of good searches appeared in predominantly BNH beats when predominantly Hispanic beats were removed from the model. Those results showed that 86 percent of searches

in predominantly BNH beats "appeared soundly grounded in probable cause" (53 out of 61) compared to 95 percent for beats where the residential population was not predominantly BNH or Hispanic.

## UNJUSTIFIED SEARCHES

Again, as was the case when only Terry stop searches were examined, the overall sample of both stop types contained **too few cases of stops including unjustified searches that followed a pat down** to measure descriptively or statistically. *See, e.g.*, Appendix C, Section 10.3.4.

## Analysis of Multiple Version ISR Records and Coded Narratives Technical Report

For the Second Report covering Period 2 the Analysis of Multiple Version ISR Records and Coded Narratives Technical Report ("MVRs Report") is described by the Experts as a "versioning report" because it does not statistically analyze the coded legal narratives. The reasons for that are explained in the technical report, which appears as Appendix D to this report.

The coded ISR sample data from the multiple version records during Period 2 reflect a very high rate of good stops and pat downs with RAS; this is because the last version of the sampled record, which reflects supervisor directed modifications to the original ISR, were coded, rather than the original ISR in the sample. This was done based on the statistical experts' need to compare findings from last, final versions of ISRs in Period 1 with last, final versions of ISRs in Period 2. For reasons discussed in the MVR technical report, as well as the Consultant's main report, the MVRs did not contain final versions of the ISRs, nor was this

approach the best one to use for assessing the "good stop" and "good pat down" rates for officers based on the initial ISRs. To the extent possible, adjustments will be made for Period 3; however, if the MVRs produced by CPD for Period 3 remain in an non-finalized form, there will be limitations to the statistical experts' ability to compare the results from the SVRs, which are finalized as approved, and the MVRs, which may or may not be finalized, either as approved or rejected stops and frisks.

The codes used by the Consultant to make legal assessments, and the results from the compilation of those codes appear in Section 10, Appendix D. The discussion in this report is descriptive and straightforward and therefore does not need further elucidation by the Consultant.

A few comments about the MVRs technical report, however, are warranted.

1. Although the originally submitted version of the 176 sample ISRs were reviewed and any changes made in each subsequent version also were observed and coded by the Consultant, the RAS determination called for by Question 20 of the Survey Monkey acted as a filter for coding the MVRs. Thus, if the Consultant determined that the legal narrative in the last version of the ISR sample articulated RAS for the stop or protective pat down, then the Consultant did not answer the remaining questions in the Survey Monkey related to MVRs that did NOT articulate RAS.

2. In other words, because most sampled and coded multi-version ISRs did not reveal a problem with RAS determination, the numbers of ISRs coded on the questions after the initial multiple version question, Question 20, are quite small. Given those small numbers of coded records for questions later in the multi-version question series, links between the race and ethnicity of the detainee or the ethno-racial predominance of the beat can be merely described for the first question, Question 20, not statistically analyzed. For questions following Question 20, given the small numbers of ISRs in which the Consultant found an RAS problem that was not or could not be corrected, links between detainee or beat race and ethnicity also can be merely described, not statistically analyzed.

3. Consequently, the coded results from the MVR samples cannot represent (that is, be extrapolated to) the full data set of 2,707 records from main January File from which all the ISRs were assessed. Any comparisons between the MVRs Report's results and the

PSO2 Report's results would be unwise, because there are no statistically significant disparate impact findings from the *statistical, net impact, results* with robust, causal connections to unlawful police policies or practices related to stop and frisk.

# Part IV. Consultant's Conclusions, Observations & Recommendations

At the risk of being unduly repetitive, but in order to emphasize the extreme importance of having in place a mechanism for collecting, producing, and storing the information necessary to assess compliance with the terms of the Agreement, the Consultant offers the following concluding observations and recommendations. The observations and recommendations offered relate to: (1) the ISR data files for Period 2; (2) the ISR status codes; (3) CPD's internal policy directives about accountability; and (4) results from the Consultant's coded legal narratives review and analysis of the statistically representative ISR samples for the single-version records (SVRs) and multiple-version records (MVRs).

## ISR Data Files for Period 2

The data source for all ISR data reviewed and assessed by the Consultant and designated Experts ("Experts") is the ISR Database. In the ISR Database, there are a number of sub-directories/files in which different types of information documented in and related to the ISRs is stored. When Period 2 ended on December 31, 2016, at midnight, the City and CPD had produced all ISR data for each month of the calendar year ("CY") 2016 (*i.e.*, for Periods 1 and 2) in a digital/electronic format (*e.g.*, a set of computer disks or "CDs"), as required by the Agreement.

Nonetheless, because introduction of the Versioning System, at the start of Period 2, created more than one record for some ISRs (if printed in hard copy form), the CPD designed a "status code" system to identify whether the ISR had been approved as submitted (in which case there was only one/single record and one/single version of the ISR) or rejected when submitted (in which case there would be two/multiple records of the ISR because a "deficiency review notification" or "DRN" would be created in the ISR Database and associated specifically with the unique ISR number).

In some instances, where the ISR was rejected by the reviewing supervisor, the ISR number would not only be associated with multiple "records" (the submitted ISR + the DRN), but also associated with a new "version" of the ISR, itself, containing corrections directed by the supervisor in the DRN.[179]  This new version of the ISR would maintain the same unique ISR number, but it would appear as an additional (*i.e.*, "multiple") "record."  Thus, when the Consultant and Experts refer to single and multiple-version records, this is the logic behind that nomenclature.

---

[179] When an ISR contains a deficiency identified by a supervisor during review and is "rejected", the "REJ" status-code assigned to the ISR automatically generates a "deficiency review notification" ("DRN") in the ISR Database, which means that a second "record" is associated with the ISR.  Thus, "multiple-version records" always contain a DRN or second "record," even if a second "version" of the ISR is never completed by the ISR author.

The DRN identifies the deficiency to the ISR's author and a copy is sent to the Integrity Unit ("IU").  In some cases, the ISR is returned to the ISR officer to correct (if the deficiency is procedural) or to clarify (if the deficiency is based on an inconsistent statement or omission of facts in the narrative portion of the ISR).  However, in some cases, the ISR is simply rejected because it fails to articulate reasonable suspicion ("RAS") for the Terry stop, the protective pat down (or both) and/or probable cause for a search related to the PPD.  This is because the deficiency found in the ISR cannot be "corrected" or "modified" by clarifying with the ISR author the facts and circumstances surrounding the stop that the officer believed justified it (and any post-stop outcomes flowing from it).  In a few cases, however, supervisors do not send the ISR back to its author to correct or modify; instead, they send the deficient ISR to the Integrity Unit, where higher ranking officers review the rejection and determine whether to finalize the ISR as rejected (not correctable) or to override the rejection and send it back to the officer who authored the ISR for correction or modification.  Either way, the DRN and any subsequent communications and determinations regarding the ISR create multiple records and often multiple versions of the same ISR.

The Consultant and Parties agreed that the City would reproduce all ISR data from CY2016 on or about January 5, 2017 ("January Main File"), to ensure that the Experts had all ISRs from Period 2, even those which still may have been in a "review" status at the end of the period.   Upon review, the Experts observed that the January Main File was accompanied by additional related files of ISR data from the entire calendar year of 2016 (*i.e.*, both Periods 1 and 2). One of the files, which can be described as the "primary file," contained 106,239 uniquely numbered ISRs for both Periods 1 and 2.

As noted in Table 1 of the Post-stop Outcomes Report for Period 2 ("PSO2 Report"), there were 54,701 ISRs generated in Period 1 and 51,538 in Period 2.  The Experts were able to break down these numbers by race, ethnicity, gender, age, and the location of the stop, using the primary file in concert with two later provided files, a master list of ISR numbers, along with the number of versions of each, and a stacked multiple version file that listed each version of each MVR.  The other two initially-provided related files contained information relating to the status-codes (changes) for each ISR if changes were made, and charge codes, if the stop resulted in a charge.  If so, then the Experts could link the information in these other two files, the charges file and the changes file, with the primary file, but uncertainty arose about confidently identifying the final version of each multi-version ISR.

Upon request, the CPD later provided (September 2017) two essential files, both of which addressed the Experts' uncertainty, as follows.  *First*, a master list of ISRs identifying numbers containing the number of versions for each ISR allowed Experts to extract with confidence all single version ISRs for the period.  *Second*, this master file was accompanied by another, additional file that provided, for each multiple version ISR, all versions of each multiple

version ISR stacked one behind another.  This format in the additional files allowed the Experts to extract with confidence the last version of each multiple version ISR generated during Period 2.  Consequently, the ISR stop count in the Expert reports for Period 2 depends entirely upon the number of uniquely numbered ISRs in the primary file, as matched to and listed by CPD in their later provided master list. [180]

The Consultant and Experts have proceeded on the assumption that the total number of uniquely numbered ISRs reflects the total number of stops CPD officers made during Period 2; but, these totals do not reflect the number of unique individuals who may have been detained

---

[180]In tabulating the total number of stops for Period 2, the Experts did not consider any other information, such as event numbers (indicating, *inter alia*, the number of unique persons stopped within a single stop event); or ISR-status codes (indicating, *inter alia*, timeliness, cancellation errors, supervisory review determinations).  This means that if there were approved cancellation records (uniquely numbered ISRs) in the primary sub-file, which were essentially reports of the same stop reported in another uniquely numbered, but completed and submitted ISR, then the Experts included both the approved cancellation and the submitted ISR in these numbers.  The same is true if preliminary ("PRE") or "saved" status ISR numbers (those not yet submitted to a supervisor for review) appeared uniquely in this primary sub-file.  In other words**, no exclusions of any ISR records were made in determining the TOTAL counts.**  Later, as indicated in the Experts' technical reports, certain ISRs were excluded if the detainee's race or ethnicity did not match that of the three groups being studied; and/or if, after the Consultant completed his eyes-on review of the two samples, *duplicate ISR numbers* were discovered of the same stop event, as was the case in the single-version records sample (changing the sample size from 3,600 (all reviewed) to 3,508).

during these stops, because some detainees were stopped more than once during the reporting period.[181]  *See, e.g.,* PSO2 Report, at 6 (App. A).[182]

From the 51,538 ISRs identified as Period 2 stops in the January Main File, the Experts retained all single version records identified by CPD in the later-provided master list, that is, the "single-version records" ("SVRs").  In this January Main File, 94.8 percent of the final count stops were stops that resulted in the CPD officers writing up only *one version* of the [factual observations related to] the stop." *See, e.g.,* PSO2 Report, at 6 (App. A). These SVRs, if printed in hard-copy form, would contain only one record.  There are only two situations in which the ISR Database creates *only* a single version record: (1) when the ISR, submitted by the police officer who authors it, is immediately approved by a reviewing supervisor (*i.e.,* because the facts asserted in the ISR, by the officer who authored it, justify the Terry Stop and any post-stop actions, such as a protective pat down ("PPD") or related search); and (2) when the ISR author cancels it and the reviewing supervisor approves the cancellation.   In both instances, the ISR submitted is approved by the source unit supervisor (typically, with the rank of a Sergeant)

---

[181]Note, here, that the total stop number includes all persons who were detained, without distinguishing between race, ethnicity, gender or age.  Thus, even though the Consultant directed the Experts – at the outset of the Agreement -- to focus the statistical study on African-American, Hispanic (White) and Caucasian (White) detainees, due to the fact that they each comprise roughly one-third each of the overall Chicago population, the total stop number of 51,538 includes all detainees, of all races and ethnicities who were detained in Period 2.  In Table 1 of Post-Stop Outcomes Report for Period 2 ("PSO2 Report"), at page 14, however, the Experts make clear that the number of detainees who did not fall into one of these three sub-groups ("3 sub-groups") was only 815/51,538.   In other words, 50,723/51,538 detainees were identified by one of these 3 sub-group racial or ethnic identifiers.  The PSO2 Report, therefore, uses the base number of 50,723 to analyze, not the larger total number of 51,538.  Table 1 of the PSO2 Report also breaks out the total number of ISRs by race and ethnicity for both Periods 1 and 2.  *See* Appendix A, at page 14.

[182]For the reasons described earlier, this assumption may have been erroneous if, in fact, the primary file contained approved cancellations.  The Experts, however, do not think this is the case, because the only ISRs pulled were those that matched the master list provided in September.  This assumption can be checked going forward.

(status code = "APR") and finalized within the ISR Database without any further "versions" or "records" created.[183]

During Period 2, the Experts used the later provided master list of ISRs from the CPD, in conjunction with the later provided stacked file (which contained all versions of all multiple version ISRs), to identify and retain just the last version of each MVR. This resulted in 2,707 MVRs; these MVRs were then appended to the SVRs, resulting in a full set of 51,438 ISRs with unique numerical identifiers.

By virtue of the fact that the MVRs, in the full set of ISR records for Period 2, contain more than one version of the stop (and thus multiple records), the existence of more than one version is the way the Consultants distinguished between single version, approved and finalized ISRs (those from Period 2 that were exactly like the ISR data that the CPD produced for Period 1 and represented to be part of the Period 1 ISR data reviewed, coded and statistically assessed from Period 1) and the multiple version ISRs being produced for the first time in Period 2, due to the advent and implementation of the CPD's new Versioning System to the ISR Database on or about July 1, 2016. The MVRs gave the Consultant, as intended, a way to identify the number of stops made by police officers that CPD's supervisors reviewed and found deficient in some way on the first try. One (but not the only) purpose of the versioning system was to help the

---

[183]The Consultant and Experts assume, because they have not been otherwise advised by CPD, that the 51,538 ISRs did not include ISRs approved for cancellation because such records would have been archived to avoid double counting of the same stop event and would not have been included in the later provided master list of ISRs. The important point here is that no ISR number is ever duplicated; each ISR generated has its own unique number, even if it is later cancelled and archived. That means that, when officers need to cancel an ISR based on an error and start over by generating a new ISR, the new ISR has its own unique number. The Consultant and Experts assumed that the ISRs produced to them were de-duplicated before they were produced (*i.e.*, with cancelled ISRs weeded out beforehand). If this is not the case, then the CPD should advise the Consultant and Experts of this fact.

Consultant assess and address how well the Department's training of its nearly 12,000 members during Period 1 had taken hold with respect to these officers' ability to articulate RAS for a stop and frisk, if the facts and circumstances of the stop supported it. Another purpose (again not the only one) was to assess how well the training of supervisors had taken hold with respect to identifying unjustified stops and frisks, based on the facts and circumstances articulated by the ISR author for making the investigatory stop and/or protective pat down and related search. A third purpose of the MVRs was to provide a way to efficiently and effectively assess the number of ISRs submitted, in the aggregate, that CPD's internal and "continuous supervisory review" identified as substantively deficient with regard to the legal justification asserted for the stop and, then, compare that number with the number of ISRs in the representative sample that the Consultant coded as unjustified during his eyes-on legal review of the narratives.

## ISR Status Codes & Their Importance

During Period 1, the Consultant found that he could not make the determinations called for by the Agreement with regard to whether the CPD was or was not in substantial compliance with all applicable laws and CPD policies regarding stop and frisk practices because: (1) the ISR Data for Period 1 did not reflect the supervisory review and, in some cases, modification processes required by the Agreement's terms; and (2) without access to ISR Data regarding modifications, the Consultant's eyes-on review of a sample set of ISRs from Period 1 was incomplete.

The Consultant understands that the incomplete review of Period 1 data was not intended by any party; but, instead, appears to be the result of learning how to implement the Agreement to satisfy the goals stated therein. The CPD quickly designed a revised "Versioning

System" to satisfy the Consultant's requests and provide him with the necessary versions of modified ISRs for Period 2. Nonetheless, for Period 1, without such versions available to him, the Consultant necessarily determined that he could not make any definitive conclusions for Period 1 (January 1, 2016-June 30, 2016), with respect to either the policy compliance issues or the legal and statistical issues.

For Period 2, the good news is that the data produced by the CPD regarding policy compliance with accountability and supervisory review requirements of the Agreement was sufficient to analyze and make findings regarding overall compliance. Unfortunately, but for different reasons, the Consultant has determined that the legal and statistical questions related to unlawful disparate impact, under the laws applicable to the Agreement, cannot be answered yet. There are two reasons for this result.

*First*, the Parties have disputes about the legal standards and statistical models that the Consultant and Experts must use to assess the ISR Data. Although attempts were made to negotiate and resolve the legal issues before the Agreement was signed; the Parties could not reach an Agreement until the Consultant decided whether ICRA authorized a disparate impact statistical study; thus, the definition of substantial compliance under ICRA was left open. Having made the finding during Period 1, in the First Report, that ICRA provides a private right of action authorizing disparate impact claims against government bodies like the City, the path was cleared for further negotiation on the unwritten term in the Agreement regarding ICRA.

*Second*, the Parties' disagreement about the statistical models chosen for the analysis of ISR data results by the designated Experts has evolved since the First Report was issued on March 23, 2017. Those disagreements, along with continued negotiation of the legal questions,

is scheduled for further discussions among the Parties, the Experts (including those retained individually by the Parties) and the Consultant in April, 2018. At that time, the Consultant hopes to resolve all outstanding issues so that he can make the determinations called for in Section V of the Agreement in the next, Third Report, which will cover the entire calendar year of 2017.

In retrospect, the status codes have proven to be vital (not just relevant) pieces of information about each ISR, because these codes reveal how the Versioning System is working, not only in terms of timeliness related to officers' submission and supervisors' review (*e.g.*, "continuous supervisory review") of the ISRs, but also the actual numbers of stops, protective pat downs, and related searches; whether the pedestrian or traffic stop represented by the uniquely numbered ISR was "saved" but never submitted by a police officer to a first-line supervisor for review; submitted for review but never actually reviewed by a supervisor; and/or submitted and reviewed. These status codes also reveal whether the stops written up in the ISRs that were submitted and reviewed were approved as lawful (and finalized by the supervisor for archival storage) or whether the stops/ISRs were rejected as deficient (for administrative or substantive reasons) and sent back to the police officer for corrective action to be taken and/or sent to the IU.

The Consultant erroneously assumed, prior to and during the Period 2 review, that the CPD's new versioning system, along with production of all versions of the Period 2 ISRs, would fix the problem identified in Period 1. It did not. Instead, all involved in the process of assessing the ISR data learned that the status codes, which identify different versions by their decision and timing status within the ISR Database, is essential for determining which version of each

ISR was the final or last version in existence at the time the ISR data files were produced to the Consultant and Experts for review, assessment and analysis.

At a minimum, the Consultant and designated experts must be able to identify the last version of each ISR to assess and analyze the ISR data for disparate impact, if any, on detainees who belong to one of the three groups of detainees being studied. Ideally, the last version would be the final version and reflect the CPD's best decisions about how to classify and treat street officer stops and frisks. However, the Consultant, for the reasons discussed elsewhere in this report, realizes that such a feat is unrealistic, and thus has asked for what he needs, rather than what he envisioned at the start of the first reporting period.[184]

The date when the City and CPD produced the 2017 Main File appears to be a snapshot of the ISR Database at the moment in time when the "query" or request was made to run the file for production. The problem with capturing a snapshot of the ISR Database is that the Database is "live" and all the ISR information within it is constantly changing based on new ISRs being generated (by stops being made); others being modified to correct administrative deficiencies or to clarify facts; and still more being approved or cancelled (presumably as duplicates), finalized and archived for retention and storage.

Ideally, on the last day of the review period, every ISR generated during that six-month time frame would have been submitted to a supervisor for review and a decision made by the

---

[184]By this statement, the Consultant does not wish to imply that he has the authority to rewrite Sections VII or VIII of the CPD's Special Order 04-13-09 and ignore the timeliness requirement, which requires ISRs to be submitted and reviewed within an officer's tour of duty. Rather, the Consultant simply observes that there is no language in the CPD policy regarding the finalization of an ISR under review for a deficiency within the reviewer's tour of duty.

supervisor regarding whether it articulates RAS or not for the stop that the ISR's author made and reported in the ISR. Unfortunately, the Consultant's Period 2 review of the CPD's internal auditing reports indicate that this ideal scenario was not what occurred. Instead, from the auditing records produced from Period 2 for the Consultant's review, it is evident that a fair number of ISRs remained in a "preliminary" status at the end of each month during Period 2. The significance of the PRE-status ISRs cannot be overstated for two reasons.

*First,* when a six-month reporting period is completed, any ISRs still in a preliminary status means that the police officer who generated the ISR placed it in a saved and, perhaps, incomplete status. One might reasonably expect to find a handful of ISRs from any reporting period in a PRE-status when a final report from that period is run a few days after the reporting period ends, because there may have been stops made and ISRs generated for those stops that were, in fact, saved, but not yet submitted (despite the tour of duty deadline required by CPD's SO4-13-09, Section VII.), because the Officer became ill or was injured and could not complete the report, or due to some other unforeseen but excusable circumstance. However, one would not expect to find 749 PRE-status ISRs in the 2017 Main File from Period 2.[185]

---

[185]Indeed, the Consultant and designated experts did not find these 749 PRE-status ISRs, because the way the 2017 Main File was produced did not permit the experts to cross-reference individual ISR numbers with their respective status codes, given that these status codes were contained in one-sub file and the unique ISR numbers were contained in another. Instead, the City and CPD, during the 30-day review and comment period, checked their files and now represent that this was the actual number present at the end of Period 2. The Consultant does not need further verification of this number, but accepts the City and CPD's representation, because the actual number, at this point, is not as important as the principle. Going forward, the presence of such a large number of PRE-status ISRs will prevent the Consultant from making the determinations called for by the Agreement.

*Second,* by definition, a PRE-status ISR means that the police officer who generated it did not submit it for supervisory review by the end of his or her tour of duty.[186] This was not a random or infrequent occurrence. Quite a few of the 22 police districts, including ISRs generated in the last month of Period 2 (December 2016), contained preliminary status ISRs, which means that those ISRs had been saved by police officers (in a complete or incomplete status) and never submitted for supervisory review. This is a troubling fact because, apart from whether the tour of duty timeliness requirement is too strict to be realistic and enforceable, memories fade over time, and the point of timely submission is not only to capture a snapshot of a police officer's best and most accurate memory of the stop event at the time it is made, but also to permit the officer's supervisors to review the factual basis for the stop, the procedures the officer used to make it, and to provide corrective and constructive feedback, if necessary, to ensure that future stops like the one made do not suffer from identified deficiencies. In short, the goal of the Agreement is to see the rate of lawful stops increase over time based on the use of best practices in making stops and frisks. If the timeliness component of this system is ignored by permitting officers to save ISRs indefinitely, then memories become stale and the educational opportunity is lost.

The Consultant decided not to try to quantify the actual numbers of ISRs in a PRE-status for Period 2 or to identify the particular police districts or areas where ISRs were reported as untimely based on the monthly audit reports submitted by Captains from these districts/areas. These problems could not have been foreseen, but the City and CPD are now

---

[186]Notably, there were also approximately 338 SUB-status ISRs in the 2017 Main File. The SUB-status code indicates that, although the police officer submitted the ISR representing the stop and any other post-stop outcomes, like a frisk, for the supervisor to review, the supervisor did not review the ISR by the end of the tour of duty or by the end of the reporting period.

aware of what happened, and the Consultant has been assured that various initiatives have been employed to address this issue in future reporting periods.  The Consultant, therefore, expects the Third Report to address progress being made by CPD to ensure that ISRs generated based on actual stops and post-stop outcomes (*e.g.*, frisks and full searches) are submitted, reviewed, and placed into a final version status as soon as practical, so that they do not become stale and unreviewable for internal auditing purposes or for the period end reviews by the Consultant for purposes of analyzing statistical results for purposes of the Agreement.

After having completed two reporting periods with an eyes-on review of two statistically representative samples (*of ten (10%) of all ISRs submitted within each of the three ethno-racial groups of detainees being studied*), the Consultant has a far greater appreciation for the inordinate amount of time and attention to detail it takes for police officers, supervisors and commanders to document stops and frisks, review them, provide supervision and mentoring regarding them, analyze them for substantive and uncorrectable deficiencies and then design, implement, and train a police department with over 12,000 members on how to use such a new system.  In addition, the auditing and accountability structures set up by the CPD over the past two (2) years are working effectively.  It is the Consultant's view that the City and the CPD are, in fact, taking the Agreement very seriously, by conscientiously attempting to satisfy its own (quite strict) internal policy for stop and frisk practices, as well as satisfy the Consultant's requests and the ACLU's concerns related to review and oversight of the Department's efforts.  This was especially true during Period 2, as the U.S. Department of Justice made continued and extensive document requests from the CPD to complete their investigation and prepare their public report, issued in January 2017.

# CPD Internal Policy Directives Related to Accountability

## Civilian and Internal Complaints

The Consultant has reviewed all documents requested regarding the CPD's compliance with the Agreement's terms related to civilian and internal complaints. These documents, for the reasons expressed in the main report, reflect conscientious and serious investigation, to the extent this is possible, of all civilian and internal complaints filed during Period 2.

## CPD's Auditing Protocols & Review System

The Agreement requires the Consultant to review and validate the CPD's auditing systems put into place during the second reporting period. Although the concept of validation does not, in the Consultant's view, involve second-guessing the CPD's auditors, to have meaning, the validation process must review and assess the thoroughness and accuracy of the audits being done. At this time, the Consultant cannot substantially validate the CPD's auditing protocols and system, even though the efforts made in a very short period of time are genuinely impressive.

Although the Agreement, itself, does not require specific auditing protocols apart from "continuous supervisory review" and quarterly or bi-annual departmental auditing reports by CPD Headquarters staff, the CPD's own internal stop and frisk policy, Special Order 04-13-09, does. Based on the detailed requirements and goals of the CPD policy, as well as the objectives of the Agreement, the Consultant has reviewed the auditing records produced, at his request, by CPD and makes the following observations and recommendations.

## The Consultant's Review Process

The Consultant personally examined and reviewed over 4000 documents provided as a sample of the auditing records from CPD's Period 2 audits, which included sample records from the IU's daily ISR audits (which are based on a ten percent (10%) representative sample from each day's final, approved ISRs); the EO's Monthly Audits; and a special audit of arrest reports. Review of the auditing records related to the IU's Daily ISR Audits indicates that CPD is complying with the term of the Agreement that requires "continuous supervisory review" of ISRs by CPD Headquarters staff.

However, the daily audits, alone, are not sufficient to satisfy all accountability obligations related to ISRs, as set forth by the Agreement and the CPD's policy directives in SO4-13-09. The CPD understands this fact because, prior to and during Period 2, the Department trained a number of executive officers (primarily holding the rank of Captain) to complete monthly audits for every police district and other area unit within the Department which issues ISRs. These monthly audits are referred to as "Monthly Captains' Audits" within the Department. The CPD also authorized the IU to issue Bi-Annual Auditing Reports to the Consultant to document all efforts being taken within the Department to review, assess and, if necessary, investigate and hold accountable officers who submit ISRs which indicate a pattern of unjustified stops and frisks. As discussed in previous sections of this report, the IU's Bi-Annual Auditing Report for Period 2 indicated that, where isolated, good-faith mistakes were made, corrective actions were directed and, if necessary, enhanced supervision and training ensued. Finally, the CPD reported that its IU initiated a special project audit during Period 2

related to arrest reports submitted during this time period; the goal of this audit was to ensure that arrest reports were not being used as a substitute for ISRs.

Documentation from these three audits, together with the Bi-Annual Report, were submitted in a timely manner to the Consultant for his review and satisfy the Consultant that acceptable progress by the City and CPD is being made with regard to the accountability requirements of the Agreement and CPD's internal stop and frisk policies regarding the Investigatory Stop System, ISRs, and CPD's general stop and frisk practices.

The Consultant is aware, however, that the CPD had very little infrastructure for internal auditing and accountability prior to the Agreement's implementation, and despite a commendable start toward implementing a comprehensive and wide-reaching accountability system, the CPD's new auditing systems, along with the various forms created to perform them, were initiated for the first time at the outset of Period 2, and Rome was not built in a day (or in one-reporting period). Some work remains to be done, as indicated in the following pages of this report addressing the auditing reports from Period 2. That said, the Consultant wants to emphasize that, the CPD's creation of the Integrity Section/Unit ("IU") and the work being done by Captain Karyn Murphy, who is in charge of that Unit, demonstrates how seriously the CPD is taking its various obligations to monitor ISR activity and the officers and supervisors who are involved.

## Auditing Problems

Nonetheless, review of the Monthly Captains' Audits reflects two general problems, which the Consultant believes the CPD and IU need to address in future reporting periods. First, the timeliness of police officers' ISR submissions, supervisory reviews of submitted ISRs,

and finalization of ISRs in the ISR Workflow System (Exhibit 7), because the auditing documents reviewed show that the CPD is not always in compliance with the "tour of duty" requirement in S04-13-09.

The Consultant suggests that the CPD, together with the other Parties, discuss ways to ensure that the timeliness issues are resolved as soon as practically possible. Second, the Consultant is gratified by the CPD and IU's response to his draft recommendation encouraging the Department to take steps to facilitate a uniform and consistent presentation of the information contained in the Monthly Captains' Audits by the executive officers from each of the 22 police districts.

The initiatives suggested (creating a new "best practices" template for use in writing the reports, along with enhanced training) are a good start; however, the Consultant would like to see the Department do more than discuss the "feasibility" of technological enhancements to the ISR Database which would allow the IU to track the progress of the ISR Workflow on a real-time basis; monitor the status of directives and corrective actions; and, in general, facilitate the timeliness requirements discussed above. Such technological improvements could also be utilized by the executive officers to write their reports in an efficient manner so that they can attend to their other law enforcement duties.

The Consultant understands that such changes cannot be made overnight and certainly not in ways that will affect the monthly audits which have already been completed for CY 2017 (Periods 3 and 4), which will be the subject of the Consultant's Third Report. However, for Period 5, which is currently in process, and certainly for Period 6, the Consultant hopes to learn of and see specific proposals for addressing these two concerns.

The auditing process was new for the CPD during Period 2 and the Consultant is aware that the auditing process is cumbersome for such a large police department and will take time to become as efficient and effective as it needs to be to satisfy the accountability goals of the Agreement. Thus, the Consultant has chosen not to report the comprehensive analysis of various districts' auditing reports and results for Period 2, even though such an analysis was quite informative on a number of levels. The Consultant will continue to require production of auditing records for future reporting periods until the terms of the Agreement are substantially met.

## Auditing Recommendations

Based on the Consultant's review of the CPD's auditing records (*e.g.*, the Daily Reviews of Approved ISRs; the Monthly Captains' Audits; and the Special Project Audit of Arrest Records), as well as the Bi-Annual Auditing Report for the Second Review Period, the Consultant has several observations and recommendations for the City and CPD going forward, which relate to the accountability goals of the Agreement, as well as the Consultant's need for a more uniform, consistent presentation of the information in the auditing reports.

### Daily ISR Audits

During the Second Period, the Integrity Section/Unit ("IU") performed daily audits of ISRs placed into an approved status. These audits were based on a randomly drawn sample of ten (10) percent or more of the approved ISRs. The Consultant assumed during his review that the daily ISRs in approved status were single version records, if only because any actions other than approval and finalization of a submitted ISR (unless the approval is of a cancellation, which also only requires one record) will create a second and, perhaps, multiple record(s).

Thus, the Consultant has and will assume that the IU's randomly drawn sample of daily audits will focus only on ISRs placed into a final, approved status by reviewing supervisors and that such audits will contain only ISRs that are SVRs.

During review of the daily ISR audits from Period 2, the Consultant did not identify any major concerns from the spreadsheets and information created by IU summarizing the results from its audits. In his draft of this report, the Consultant, did, however, express a desire for more information about the process used by the IU to select the samples of approved status ISRs to be reviewed randomly on a daily basis. The Consultant also suggested a few ideas to consider in making sure that the broadest possible cross-section of ISRs appeared in the daily auditing samples. In its responsive comments to the draft version of this report, the CPD represented that the current method of sampling ten (10) percent of the ISRs placed in an approved status after initial submission is random in that it ensures proportional representation in the daily random draw of ISRs, relative to the number of approved ISRs that a police district generates, no matter how large or small a particular district may be in relationship to others. Nonetheless, the CPD also represents that it is in the process of designing a new method of random sampling, which also will ensure the most representative and broad-based draw of ISRs that are approved and finalized on a daily basis.

The Consultant looks forward to learning about and seeing the new system in the near future, because it will be important, over time, for the CPD to provide the Consultant with documentation that validates the IU's random selection processes to ensure that the IU's auditors are able to perform eyes-on reviews of ISRs that are representative of the entire Department's reporting practices. In other words, the representational quality of the ISRs

depends on the methods used to randomly select ISRs for auditing review, just as it does when

the experts identify the random sample numbers of ISRs for the Consultant's coded legal

narratives review.

1. **Daily Non-Approved ISRs**. To strengthen accountability for ISR practices more closely in time to when the actual stops and pat downs are being made, for those ISRs which are not immediately approved, the Daily ISR Audits may need to be expanded to include a randomly drawn sample of ISRs which are NOT approved.  This expansion seems particularly warranted in the case of ISRs which have a preliminary (PRE) status and/or a submitted (SUB) status (for initially submitted, SVRs) after a 24-hour period has passed.  The Department's ISS Policy requires ISR turn around within an officer and a supervisor's tour of duty.  The tour of duty directive is not being satisfied by police officers authoring ISRs nor by supervisors reviewing them; that much is clear from the monthly captains' auditing reports.  To move the Department closer to achieving such compliance with its own policy directives, the Consultant recommends that the IU perform a daily ISR audit of ISRs in a PRE-status, as well as those in a submitted (SUB) status with only SVRs.

2. **PRE-status ISRs.**  ISRs in a PRE-status are saved, not submitted, reports of stops and stop-outcomes.   Thus, the CPD needs to make every effort to ensure that PRE-status ISRs do not remain in a saved status beyond the tour of duty or, at a minimum, beyond the last day of the reporting period.   A special audit focusing on PRE-status ISRs might help move these ISRs into at least a SUB-status.

3. **SUB-status ISRs**. ISRs with only one record associated with the ISR number in a SUB-status appear to be ISRs that a supervisor has not yet reviewed.   The Consultant's review of the monthly audits revealed that there are a fair number of such ISRs in SUB-status every month, which means that supervisors, as well as officers, are not complying with the tour of duty directive.  Indeed, the January 2017 File contained 338 SUB-status ISRs for Period 2 which were counted as single-version records but were not finalized and approved ISRs.   A special audit focusing on a random sample of SUB-status ISRs which are SVRs might increase accountability for supervisors having problems with moving these ISRs through the workflow process.

## Monthly Captains' Audits

The auditing system put into place during Period 2, as designed, is a good one.  It appears

to seek comprehensive, department-wide accountability on various command levels for the ISRs

issued by police officers in each of the twenty-two (22) police districts and also the three main

areas of Chicago, known as Areas North, Central and South. Some of the auditing records reviewed also appear to track ISR activity by non-district personnel, as well as from police officers who are assigned to the Bureau of Organized Crime and the Bureau of Patrol (where the 22 districts report).

In general, the Consultant recommends that the CPD and IU discuss how to identify and follow-up with officers and supervisors who are not complying with the auditing protocols already established, if not also with new protocols that CPD may adopt based on these or other recommendations. Review of the monthly captains' audits seemed to indicate that, although some officers were being instructed to comply and on how to comply with the ISR reporting requirements, there was little or no indication in the auditing reports that follow-up was done to ensure that these instructions were carried out. In the future, special project audits may need to be developed for purposes of determining timeliness compliance as well as corrective action compliance.

With regard to accountability improvements to the auditing reports, the Consultant recommends that CPD consider the following:

1. List ISR numbers for the PRE, SUB (SVR) status ISRs that remain outstanding at the end of each month;
2. List beat numbers and the number of ISRs submitted, cancelled, approved, rejected etc. for each beat (as some districts, areas, and monthly captains' auditing reports already do);
3. List police officer and supervisor star numbers next to ISRs listed as outstanding and not finalized at the end of each month in the monthly reports, to permit identification of officers who are not complying with CPD policy directives;
4. Require signatures of all commanders up the chain of command to demonstrate serious review of the ISR monthly reports and information in them;
5. Create electronic "flags" or "alerts" at various levels of review to identify ISRs that remain in a status-code of PRE, SUB or in an uncorrected DEF-status after a certain length of time, but most certainly before the end of the reporting period. The Consultant also

encourages the CPD to consider identifying the chronology of different versions of the same ISR, such that non-finalized MVRs that exist at the end of a reporting period can be flagged by the Experts on review.

The Consultant does not intend that these recommendations be read as criticisms of the CPD's auditing system or its efforts to comply with the terms of the Agreement; rather, these recommendations are offered to initiate further conversations about how the existing system can be made better to create more confidence in and facility with the accountability measures already being taken by the CPD.

## Coded Legal Narratives Assessment of the ISRs with Multiple Version Records ("MVRs")

The Consultant's summary of the MVRs Technical Report ("Versioning Report") was brief because the report indicated too many statistical issues and very few findings of any significance for the qualitative/legal analysis at this time.  Nonetheless, the Consultant wishes to offer a few observations of his own, based on his eyes-on review of the 176 MVRs.

For the Period 2 coded legal narratives review, the designated experts identified 176 ISRs from a total of 2,707 in the January 2017 Main File, in which there were multiple records associated with those 176 unique ISR numbers.   The Consultant's review of the 176 multiple version ISRs reveals that police officers are still recognizing RAS in over 90% of the cases reviewed.  However, the Consultant must bring attention to some of the more common issues that he observed while reviewing the multiple version ISRs for this report, most of which relate to supervisory review.  Only three cases are cited, but they are representative of the more common issues observed by the Consultant.

1. <u>Example No. 1</u>: the stop was made on 9/19/16 for loitering by an unemployed musician. It was administratively rejected on 9/20/16 by the supervisor, with no reason stated, but with a simple question mark (?). The ISR author re-submitted the ISR only 2-½ hours later, with no changes made. The supervisor then approved it six days later, on 9/26/16, without comment. *Consultant's Question:* Why was the ISR rejected upon the initial review?

2. <u>Example No. 2</u>: the officer arrived on the scene in response to a "person with a gun" dispatched call (one person pointing a gun at another). A consensual protective pat down was conducted, with no search beyond the protective pat down, according to the checked boxes. The ISR was administratively rejected with the comment "search beyond a protective pat down-yes." It was re-submitted later that day, adding that "Also subject had a bulge in his pocket which may have been a weapon. Turned out to be a cigarette case and his cell phone." The officer also checked the boxes for a consensual search beyond a protective pat down. *Consultant's Questions:* Why did the supervisor suggest that there was a search beyond the protective pat down? Did the patrol officer belatedly remember that there was a bulge? Did the officer obtain consent for the protective pat down and/*or* the search beyond the protective pat down?

3. <u>Example No. 3</u>: the officer justified conducting a protective pat down of a known drug dealer observed in a hand- to-hand transaction by observing that the known drug dealer "could have passed a handgun used for protection during sales of narcotics." The supervisor administratively rejected the ISR with the notation: "Please re-read your narrative and make corrections." The ISR was re-submitted 19 days later, showing in the checked boxes that no protective pat down was conducted, and deleting the pat down language from the narrative, whereupon it was approved. *Consultant's Questions:* Was there or was there not a protective pat down? Does the mere possibility that the detainee "could have" passed a handgun during the observed hand-to-hand transaction justify a pat down? Was the patrol officer's observation that a handgun could have been passed during this drug transaction based on his experience that drug dealers always pass handguns to buyers during drug transactions? Why did it take almost three weeks for the patrol officer to realize that he/she did not conduct a pat down?

In addition to these *three examples*, the Consultant reviewed several ISRs in which the only administrative rejection messages were the words or letters: "see me"/ "fix"/ "?"/ "C"; although such limited comments may be understood by some patrol officers, these comments do

not provide the officers much educational value; nor do they provide the Consultant with any assurances that the patrol officers or the reviewing supervisors involved understand and are properly applying the standards on stop and frisk that they were trained to do.

The Consultant emphasizes that his review of the 176 multiple version ISRs revealed that the overwhelming majority of the reports are well-written and the supervisors' comments upon review are appropriate. The versioning system was well-conceived and implemented. Moreover, the Consultant's citing of and comments on the few ISRs cited above are not meant to detract from his overall impression that the system works well, but only to point out how some of the reviewers could do a better job of educating, by their own reviews and comments, the patrol officers whose work they are responsible for reviewing.

# Part V.  Probable Cause Stops v. Terry Stops

During the first three reporting periods, the ISR Forms that CPD officers were using to document stops and frisks did not differentiate between stops made for RAS (investigatory/Terry), which are covered by the Agreement, and stops made for probable cause ("PC" or "PC stops" also known as "on-view violations"), which are not covered by the Agreement. The Agreement authorizes the Experts to randomly draw a statistically representative sample from the full set of ISRs for each reporting period; it also authorizes the Consultant to review each ISR sample, one-by-one, to identify whether there was legal justification for the stop, as well as any protective pat down and/or related search, which may have occurred subsequent to it.

Although the Consultant's "eyes-on" review of the statistically representative sample ISRs, randomly drawn by the Experts, assesses individual stops and frisks, it is not intended to call out individual officers or challenge individual stop events; rather, the point is to aggregate the statistically representative sample ISRs (without regard to the star numbers or names of the officers, or the names and identification information of the detainees) by the codes that the Consultant assigns to them. These codes are assigned for one purpose, and one purpose only: to identify and sort the ISRs by the determinations that the Consultant made regarding the following issues: (1) whether the stop was investigatory or on-view; (2) whether the officer articulated facts and circumstances justifying the officer's reasonable suspicion to make the stop ("RAS"); (3) whether the officer conducted a protective pat down subsequent to the stop and, if so, articulated additional facts and/or circumstances providing RAS to believe the detainee possessed or had access to a weapon or firearm which created a risk of harm to the officer or a nearby person; and (4), if so, whether a related search, which flowed from the protective pat down, was justified by probable cause obtained by plain touch during the protective pat down.

In all other factual situations, the Consultant codes the results as they are and the Experts then segregate the ISRs that fall into the relevant categories from those that do not. All ISRs that do not fall into one or more of the four categories identified above are not statistically analyzed. Thus, the Experts' Coded Legal Narratives Report contains the most accurate picture of CPD's stop and frisk activities during the reporting period, because when the data is aggregated, it provides a big-picture of what happened during the time period on a large (macro) scale.

This big picture is possible because every ISR in the sample is a *statistical representative* for a larger number of ISRs with similar factual data (*e.g.*, race, ethnicity, gender, and age of detainee; time and place of stop; type of post-stop outcomes, if any; etc.). In other words, each ISR in the sample stands in for a larger number of identical ISRs. Using the theory of statistical representation, the Experts can extrapolate the statistical results from the sampled data and apply it to the full set of ISR records to infer certain facts about all the records.

The problem encountered during Periods 1 and 2 with making these coded determinations was that the CPD officers submitting the ISRs did not identify the type of stop they were making (*i.e.*, RAS or PC). Instead, the ISR Form left the determination solely to the Consultant during the coded legal narratives review. Although this was a manageable task, the Consultant realized in Period 1 that nearly one-third of the randomly drawn sample contained probable cause stops. This created some concerns because, to be statistically representative, there must be a sufficient number of sample ISRs in the subject categories to be analyzed in the statistical studies by the statistical models. Without sufficient data of Terry stops, for example, the coded legal narrative review process would be for naught.

To remedy this potential problem, the Consultant recommended in the First Report that the CPD create an additional "check box" on the ISR Form asking officers to determine whether the stop being made was based on PC or RAS, and after that to articulate the basis for that stop type in the legal narrative section. The Consultant made other recommendations related to the probable cause stops, but the check box proposal was the only one it agreed to implement. It did so promptly, and by the beginning of Period 4, which began on July 1, 2017, a new ISR Form, with the checkbox for PC stops, had been added and implemented. In other words, the ISR

Database for Period 4 sorted ISRs by stop type, so that the CDs produced to the Consultant and Experts each month after Period 4 began contained ONLY Terry stops (with or without post-stop outcomes of any kind) and PC stops where a PPD ensued. In the case of the PC + PPD ISRs, the Consultant agreed that, although the PC data would be kept in the mix for purposes of ensuring the capture of all Terry stops, the PC stops would not be studied and assessed, either legally or statistically, because PC stops are not covered by the Agreement. This means that, because PC stops are not covered, their production as part of the review set for the next reporting period will not be construed as an agreement by the parties to use or analyze the PC stops for any purpose other than delineation of the number of PC stops vs. Terry stops during Period 4 (July 1, 2017-Dec. 31, 2017), based on the (a) CPD's assessments indicated in the PC check box; (b) multiple-version records of ISRs where supervisory review comments in DRNs and/or revised versions of ISRs indicate a change from one stop type to another; and (c) Consultant's coded legal narratives review determinations of the ISRs in the representative sample (which will now include both PC and Terry stops for Period 4 only).

The Consultant appreciates the City and CPD's willingness to backtrack on this issue, despite the tremendous amount of time and effort by the CPD to remove the PC stops from the mix, beginning in Period 4. For the reasons stated above, this data is vital to keep the statistical analysis on track. Hindsight is always 20-20; and, the Consultant – like the parties – learns new information as this Agreement evolves and needs to make adjustments when certain facts come to light.

# Part VI.  Conclusion

Recently, the Chicago Police Department and all those who reside within the City of Chicago, most especially his family, have had to mourn the death of Commander Paul Bauer of the 18th District, who was killed in performing his law enforcement duties, while pursuing an armed and dangerous suspect.   Many kind words have been published and spoken about Commander Bauer.  The Consultant was not fortunate enough to have met him, but a few words, here, seem appropriate and necessary given the subject matter of this report and the goals set forth in the Agreement.

Although the City and CPD have been criticized (and at times condemned) for its stop and frisk practices over the past decade, particularly during the past few years, the tragic loss of Commander Bauer highlights the extraordinary bravery and courage of all police officers, who sacrificially put their lives on the line every day to serve and protect the citizens of the City of Chicago.   The Fourth Amendment seeks to balance the constitutionally given rights of individual freedom and privacy with the government's equally legitimate and oftentimes overriding interest in law enforcement.   Commander Bauer, on the day and at the time of his death, was one of so many men and women who have fallen in the line of duty while seeking to stop a person suspected of criminal activity who was armed and dangerous.  The stop that Commander Bauer sought to make that day, just like the stops reviewed and analyzed in this report, was governed by the Fourth Amendment.

This incident highlights the fragile balance that the Fourth Amendment seeks to strike and the often unclear contours of the decisions that police officers must make every day about whether to stop a civilian based on reasonable suspicion that a crime has, is, or is about to be

committed, and – if necessary – to frisk (*e.g.*, pat down and/or search) that suspect. The split second decisions that police officers often must make in exercising their sworn duties to serve and protect Chicago's civilians are more than tough; they are always consequential; and, they should not be subject to quick, careless or excessive judgment by those who are not trained to understand the complexities of the law or law enforcement duties.

The Consultant takes very seriously the responsibility entrusted to him to be fair, impartial, and focused on every detail and every interest of every party, including those of civilians subject to the stops and frisks being made. This is important work and the decisions, observations and recommendations, as set forth above, have been made with the attention, care and deliberation the Parties and public deserve and expect from the Consultant.

The Chicago Police Department has come a long way in its attempts to alleviate the concerns raised by the ACLU in March of 2015, as well as continued concerns identified over the past two years, as the Agreement has been implemented. Although there is still much work that remains to be done to achieve the objectives of the Agreement, the Consultant can say, having been involved with the Parties since the signing of the Agreement, that both Parties have demonstrated continued commitment to good faith cooperation, as an alternative to unduly expensive and time-consuming litigation.

The Consultant again commends the ACLU, Corporation Counsel's Office and CPD officials, as well as the men and women of the Chicago Police Department, for their dedication and efforts in carrying out the terms of the Agreement. Based on recent conversations with the Parties, the Consultant believes that he and the Parties are in agreement as to how to proceed

with the work still to be done regarding the reporting and auditing issues, and addressing the statistical data issues identified for future reporting periods.

# Acknowledgements

The Consultant wishes to thank the designated experts for another job well done. In particular, the two lead social science experts – senior expert, Dr. Ralph Taylor, Ph.D., who is Professor of Criminal Justice at Temple University; and Dr. Lallen T. Johnson, Ph.D, Assistant Professor of Criminology & Justice Studies at Drexel University, have gone above and beyond the call of duty during the review of CPD's investigatory stop reports ("ISRs") from Period 2. The four (4) technical reports appended to the Second Report emphasize a few of the most significant statistical results these experts found from their statistical assessment and analysis of the ISR data from Period 2. These reports represent tireless efforts by Dr. Taylor and Dr. Johnson, as well as sophisticated scholarship of the highest caliber.

The Consultant also wishes to thank the police practices expert, Mr. Matthew Barge, Esq., for his assistance in helping the Consultant evaluate the sufficiency of the "Procedural Justice Training" ("PJ"), which CPD began during Period 2 and will complete during Period 5, in CY2018. The training conducted and completed thus far, known as PJ1 and PJ2, adequately addressed the Consultant's recommendations from Period 1 related to the need for implicit bias training. Mr. Barge's expertise, derived from witnessing and aiding in many large municipal police departments' efforts to address issues of procedural justice, continues to provide the

Consultant with valuable insight regarding the issues that he must determine under the Agreement.

Last, but not least, the Consultant wishes to thank his Law Clerk, Ms. Robin Washburne Cozette, J.D., for her valuable assistance to him in all aspects related to his assessment of data, analysis of legal and statistical issues, and drafting of the Second Report.

Dated at Chicago, Illinois, this 5th Day of March, 2018.

Respectfully Submitted,

Hon. Arlander Keys (Ret.), Consultant.