

# THE THIRD REPORT ASSESSING THE CHICAGO POLICE DEPARTMENT'S COMPLIANCE WITH THE INVESTIGATORY STOP & PROTECTIVE PAT DOWN AGREEMENT

*The Investigatory Stop Report ("ISR") data from CY2017 continues to reflect areas of non-compliance with the Chicago Police Department's Stop & Frisk Policy and the Fourth Amendment to the United States Constitution. Compliance determinations regarding disproportional racial and ethnic impacts from CPD's stop and frisk practices still cannot be made based on problems with the underlying ISR data.*

*Hon. Arlander Keys (Ret.), Consultant*

*October 17, 2019*

## TABLE OF CONTENTS

**INTRODUCTION** ..................................................................................................................................**4**

CY2017 ISR DATA REVIEW SUMMARY ...................................................................................................4

**A NOTE FROM THE CONSULTANT** ......................................................................................................**6**

TO THE PUBLIC...................................................................................................................................6

TO THE MEN & WOMEN OF THE CHICAGO POLICE DEPARTMENT ...............................................................11

*Training Initiatives*....................................................................................................................12

*Trust Issues* ...........................................................................................................................13

*Conversations with CPD Officers & Squad Car Ride-Alongs* ............................................................14

CONCLUDING THOUGHTS......................................................................................................................16

**PART I.     EXECUTIVE SUMMARY** .......................................................................................................**17**

THE AGREEMENT...............................................................................................................................17

*Historical Overview of ISR Data: CY2016-17*.............................................................................18

*The Unknown Cause(s) for the Dramatic Decline in Stops* .............................................................20

*Black Non-Hispanics Consistently Subject to 71-72% of All Stops*...................................................20

KEY LEGAL QUESTIONS ......................................................................................................................22

KEY OBSERVATIONS FROM THE CONSULTANT'S REVIEW & ASSESSMENT OF THE CY2017 ISR DATA & DOCUMENTATION................26

**PART II.  THE AGREEMENT:  REQUIRED POLICIES & PROCEDURES**..........................................................**31**

OVERVIEW OF THE AGREEMENT'S HISTORY & PURPOSES........................................................................32

THE TERMS OF THE AGREEMENT ........................................................................................................37

THE CONSULTANT'S DUTIES...............................................................................................................38

THE CHICAGO POLICE DEPARTMENT'S OBLIGATIONS ..............................................................................39

**PART III.  ASSESSMENT OF THE DEPARTMENT'S COMPLIANCE WITH STOP & FRISK POLICIES, PROCEDURES &
PRACTICES** ...................................................................................................................................**40**

THE CONSULTANT'S INTERPRETATION OF THE POLICY DIRECTIVES ...........................................................40

THE IMPACT OF THE ISR WORKFLOW ("PROTOCOLS") ...........................................................................42

THE CONFLICT BETWEEN ISR WORKFLOW PROTOCOLS & CPD POLICY .....................................................46

*As Written* ..............................................................................................................................46

*As Applied*...............................................................................................................................47

*As Misapplied* .........................................................................................................................47

THE INTEGRITY SECTION'S ROLE & RESPONSIBILITIES............................................................................52

THE ROLE OF REVIEWING SUPERVISORS & EXECUTIVE OFFICERS.............................................................54

SUPERVISORY REVIEW METHODS .......................................................................................................56

COMMON SUPERVISORY REVIEW ERRORS & ISR EXAMPLES ...................................................................57

*Misapplication of the Administrative Rejection Code for ISRs with RAS Deficiencies* ........................59

*Non-Transparent Comments by Reviewing Supervisors in ISRs Rejected for Administrative Errors* ..................65

*Approval of Multiple-Versions ISRs Often Conflicts with the Fourth Amendment* ..............................74

*Substantive Changes to the Original ISR* ...................................................................................75

*Inconsistent ISRs Erroneously Approved*....................................................................................77



*Questionable Stop Types & Protective Pat Downs* ............................................................................80

AUDITING METHODS & PROBLEMS.........................................................................................................83

*District Level Monthly Audits*.......................................................................................................84

*Department-Level/Integrity Section Audits*...............................................................................86

CIVILIAN AND INTERNAL COMPLAINTS.......................................................................................................90

TRAINING, RE-TRAINING, ENHANCED SUPERVISION AND DISCIPLINE ............................................................92

*Re-Training and Training Initiatives* ...........................................................................................93

*Progressive Discipline* .................................................................................................................96

**PART IV. ASSESSMENTS OF THE CY2017 ISR DATA** ................................................................. **97**

THE IMPACT OF UNDERREPORTED PROBABLE CAUSE STOPS................................................................97

THE IMPACT OF UNREPORTED ISR DATA IN ARREST REPORTS .....................................................101

THE IMPACT OF CHECK BOX ERRORS IN THE ISRS................................................................................103

**PART V.  LEGAL ANALYSIS** ....................................................................................................... **116**

FOURTH AMENDMENT JUSTIFICATION ................................................................................................116

ADVERSE DISPARATE IMPACT..............................................................................................................119

CONCLUDING THOUGHTS......................................................................................................................120

**PART VI. RECOMMENDATIONS** ................................................................................................ **121**

ISR FORM REVISION RECOMMENDATIONS ..........................................................................................121

CHECK BOX RECOMMENDATIONS .......................................................................................................121

NARRATIVE REMARKS ..........................................................................................................................122

ISR WORKFLOW REPORT STATUS CODES ............................................................................................123

TOUR OF DUTY RECOMMENDATIONS ..................................................................................................123

MULTIPLE-VERSION ISRS ....................................................................................................................124

STATISTICALLY REPRESENTATIVE SAMPLES...........................................................................................125

EXPAND THE SCOPE OF SPECIAL AUDITS OF ARREST REPORTS.............................................................125

EXECUTIVE OFFICER & INTEGRITY SECTION RECOMMENDATIONS........................................................126

CITY OF CHICAGO & CPD RECOMMENDATIONS ..................................................................................127

**PART VII. CONCLUSION** ........................................................................................................... **130**

ACKNOWLEDGMENTS............................................................................................................................132

THE PARTIES & RETAINED EXPERTS......................................................................................................134

**GLOSSARY OF FREQUENTLY USED ACRONYMS AND TERMS** ................................................. **136**

# INTRODUCTION

In the following pages, the undersigned, in his role as a Consultant to the City of Chicago ("City"), Chicago Police Department ("CPD" or "Department") and the American Civil Liberties Union ("ACLU") of Illinois (collectively "the parties"), will report to the parties and the public certain findings that he made from his review and assessment of investigatory stop reports ("ISRs"), and other documents completed by the CPD during the twelve months of calendar year ("CY") 2017, pursuant to the INVESTIGATORY STOP AND PROTECTIVE PAT DOWN SETTLEMENT AGREEMENT. *See, e.g.,* Exhibit 1 (Agreement). Before turning to these assessments, the Consultant will summarize the findings of fact and conclusions of law he made from his review of the underlying ISR data and related documents, and also speak directly to and address members of the public, as well as the men and women of the Chicago Police Department, regarding some of the underlying social policy issues that give rise to the Agreement and this report.

## CY2017 ISR Data Review Summary

During personal review of the nearly eight thousand (8,000) sample ISRs produced from CY2017, as well as thousands of auditing reports by executive officers within the Department's Integrity Section and twenty-two police districts, the Consultant made numerous anecdotal observations regarding CPD's compliance with the Fourth Amendment, as well as the terms of the Agreement. Some of the observations that are made in the following report criticize the lack of oversight by the Department, based on the failure of some CPD supervisors and executive officers to ensure that Fourth Amendment standards were followed by their subordinate police officers on the streets of Chicago during the stops and frisks performed in 2017. In the end, the Department must assume a collective duty for its officers as its agents. Other observations made in this report indicate that an unknown number[1] of officers within the Department failed to follow the Department's Special Order 04-13-09 ("stop and frisk policy" or "protocols") when reporting and reviewing such stops and frisks, in compliance with the terms of the Agreement. Again, the Department must bear responsibility for these results, because the Agreement does not task the Consultant with identification of individuals within the Department, but rather with identification of problems within the Department that the Department must remedy in its efforts to hold its own members accountable. Finally, in Section IV of the report, the Consultant explains that the CPD did not comply with the Fourth Amendment or the terms of the Agreement, because

---

[1]The number of officers who made mistakes in one regard, or the other, is unknown because the parties agreed that the Consultant's coding and analysis of the underlying data would be blind regarding the number and identity of such officers, as well as the police districts and beats from which the ISRs he sampled originated. Thus, the Consultant does not and cannot imply or impute Department-wide wrongdoing based on the actions or inactions of its officers who reported, misreported or failed to conduct stops and frisks. If the parties wish to discover the number of unique individuals implicated by the practices described that violated the Agreement, the un-redacted data can provide those answers.



there was an "unknown quantity" of missing ISR data in the production he and the designated statistical experts spent well over a year attempting to analyze and track down. This missing data undermined the statistical results for the data that was produced.

To be clear, the Consultant is not implying that the Department, as a whole, intentionally or knowingly withheld relevant information from the ISR production, nor that its non-production of other relevant ISR data, identified in Section IV, was known by relevant officials at the time of the CY2017 ISR data production.[2] Indeed, hindsight is 20-20, and often one does not know what one needs to know until after-the-fact. Nonetheless, although the mistakes made may not reflect *department-wide* failures by multiple individuals, the Department as a whole must assume responsibility for each of its members and must work to correct the problems identified in this report.[3]

---

[2]The ISR data that was not produced falls into three categories: (1) data that was never created because officers wrote arrest reports, instead, omitting to write and submit an ISR per CPD protocols; this fact was discovered during the CPD's special audit of arrest reports; (2) protective pat down information of an unknown quantity that may have been related to probable cause stops that were not reported in ISRs during Period 3, due to a then-existing (unwritten and unknown to the Consultant) departmental policy directive to cease reporting probable cause stops until the probable cause check box was added in Period 4; and (3) various information lost as the result of mistakes made by police officers and instructions by supervisors regarding the complicated maze of check boxes in the ISR forms, as described in Section IV, all of which appear necessary for statistical data analysis of the full-set of all ISR data and are used to statistically aggregate the data for purposes of the ecological analysis of monthly stop data.

[3]In the Consultant's prior two reports, the designated statistical experts wrote lengthy and complex statistical reports analyzing the underlying ISR data reviewed and coded by the Consultant to determine legal compliance under the Fourth Amendment, as well as other applicable laws. The statistical analysis from CY2017 resulted in no less than six (6) technical reports and took well over a year to complete. By agreement of the parties, five of the six technical statistical reports are not included in the analysis of this report or appended hereto.



# A NOTE FROM THE CONSULTANT

In the Note that follows, the Consultant will recount conversations that he has had with various community groups in Chicago, as well as with members of the CPD. During these conversations, the Consultant made observations that are relevant to the legal and social policy concerns that led to the Agreement and have sustained it over the course of the past four years, despite many personnel changes among the parties and in the Department. Because these concerns are the reason for this report, the Consultant believes that they should be given priority of place.

## TO THE PUBLIC

Shortly after the Agreement became effective in January 2016, the Consultant met with a number of high school students in the Auburn-Gresham neighborhood on the South Side of Chicago, to hear about their experiences with and attitudes toward Chicago police officers. As indicated in his First Report, these students reported perceptions that Chicago police officers act as an occupying force, rather than a source of protection, in their neighborhoods.

Earlier this year, almost three years after those initial meetings in 2016, and in response to a request from the parties, the Consultant once again participated in meetings of two community organizations – one located in the Uptown neighborhood on the North Side of Chicago and the other located in the Austin neighborhood on the far West Side of Chicago. Unlike the student meetings in 2016, the participants in both community groups were mostly adults, African-American men who appeared to range in age from their late teens (18 or older) to their 50's and, perhaps, 60s. During these meetings, the Consultant answered questions about his work, as it pertains to the Agreement, in reviewing and assessing the CPD's stop and frisk policies and practices, and listened to meeting participants tell about their experiences with and attitudes toward Chicago police officers *since the Agreement took effect* in CY2016.

Most disheartening to the Consultant, as he listened to these stories, was that, three years after the Agreement's effective date, some participants continued to express the feeling that police officers are not in their neighborhoods to serve and protect them, but to control them; and that, although there are many crimes being committed in their neighborhoods, they are reluctant to report crimes that they witness, because their distrust of police officers runs so deep. In fact, many of the participants said that, most of the time, they tend to walk rapidly in the opposite direction when a police officer approaches, but they dare not run away, for fear of the consequences of looking suspicious.

The Consultant, an African-American male, has lived and worked in the City of Chicago and its neighboring suburbs for more than 50 years. Based on his personal



experiences, as well as his understanding of the experiences of other African-Americans whom he has known over the years, he can confidently say that, *historically*, many African-American children are taught from a very early age not to consider any police officers as friendly, but rather to avoid and fear police officers as being antagonistic to their best interests, even if they are law abiding, doing nothing wrong, minding their own business, and located in their own neighborhood when approached. In the not too distant past, the mere act of African-Americans walking or driving in neighborhoods in which they did not predominate was enough to justify stopping them to inquire as to their reasons for being there, and to suggest that they were up to no good. This message sticks with a child and youth and is often not changed by personal experiences with police officers as an adult. Indeed, this is the same message conveyed to the Consultant by the students and male adults that the Consultant met with at the Community meetings in 2016 and, again, earlier this year, in 2019. The statements of community members, and the Consultant's personal experiences, are also supported by a daily barrage of news reports of police officer and African-American interactions throughout the country, over decades. This is not to suggest that things have not improved under the current leadership of CPD, because they have, but only to offer the rationale for the negative attitudes among many African-Americans toward police officers.

Unfortunately, the fears that make individuals with dark skin want to walk or run away when they lock eyes with or spot a police officer is the same fear that creates suspicion in the minds of police officers, and makes these individuals look guilty in the eyes of the police officer. Those fears, as well as actions such as of running away (or avoiding or walking quickly or trying to hide or evade questions, or fumble and act nervous) have the effect of providing a factual, reasonable basis for police officers to suspect criminal wrongdoing. A nervous twitch or a move in the wrong direction can work to confirm for a police officer, who is also afraid (perhaps based on societal fears of people with dark skin), that the subject is dangerous – even if he or she is not, in fact, dangerous. A myriad of societal codes and words and actions or non-actions by subjects work to confirm for police officers, who are gauging the reasonableness of their suspicions by the assumed truth of their implicit prejudices, that their perspective reflects the truth of any given situation. Those same codes, words, and actions, however, confirm for African-Americans that police officers, no matter what their skin color, are to be feared and avoided.

Suspicions that start with the color of the subject's skin and work down from there, are not reasonable under the Fourth Amendment if there are no other objective facts and circumstances to suggest criminal activity *in the moment and at the time of the stop.* Perhaps African-Americans' fear is unjustified with some police officers, also, but it is the social history of police and African-American civilian relationships that are a backdrop for the current crisis of confidence on both sides.

Social scientists in the last decade have asked questions and performed studies that have elicited statistical evidence to show that there is "attentional bias" in police officers when they see black faces – bias that scientists now know is rife with implicit racial bias "driven by stereotypic associations that [officers] are not even aware are operating on



[them]" but are based on the false equivalence between being African-American or Black and being a criminal.[4]

In general, social scientists have "shown that black faces are much more likely to capture the attentional systems of those who have been induced to think about crime than those who have not. It is as if the existing stereotype association between blacks and crime renders these faces more perceptually relevant and therefore worthy of being seen."[5] This is why someone running away from a police officer who has dark skin (or appears black) is often characterized by police officer reports as suspicious or described as a "fleeing felon" rather than someone who is in danger and needs protection.[6] The irony, then, is that African-Americans are taught from a very young age to disappear so that they are not seen by police, yet attention bias makes them more visible than less.[7]

Although the Consultant expected the younger participants in his most recent community meetings to tell him that their experiences with police officers were similar to those of the Auburn-Gresham area high school students, he was somewhat surprised by the equal level of distrust that *older* participants also expressed having of Chicago police officers. The older participants, who appeared to be in their 40s and 50s, had different criminal histories, but the same experiences with and attitudes toward police officers.

Some participants admitted to being former gang members who grew up in disadvantaged neighborhoods, ran afoul of the criminal justice system, paid their debts to society and have now returned to their neighborhoods. These men expressed to the Consultant that they now only want to lead safe and productive lives and to be left alone; but, due to their former criminal involvement, they are subject to constant and intense scrutiny by police officers, even though they no longer participate in criminal activities, nor behave in a manner that would give police officers reason to suspect them of doing so.

By contrast, other participants from the two groups, of various ages, claimed that they have never belonged to a gang and never told police officers that they are or have been gang members; but, nonetheless, police officers have stopped them, asked for their names and entered their names into the gang member data base, maintained by the CPD. Consequently, these participants related that their membership in the gang database (as opposed to gangs)

---

[4] *See, e.g.,* BIASED, by Jennifer L. Eberhardt, Ph.D., at 60 (Penguin Random House 2019).

[5] *Ibid.*, at 60-61.

[6] *Ibid.*, at 60-61.

[7] *Ibid.,* at 60. In her recent book titled "BIASED," Dr. Eberhardt observes that: "[t]he increased visual attention to black faces that the "crime prime" generates is reminiscent of the phenomenon of "high visibility," a theme in Ralph Ellison's 1950s American Classic: INVISIBLE MAN. Ellison described the Black American predicament as one where black people are visually registered only with the aid of cultural stereotypes that function to distort their image. These stereotypes lead blacks to be the subject of gaze, then block them from being fully seen. It's a paradox of peril: High visibility is accompanied by invisibility." *Ibid.*



subsequently draws close scrutiny by police officers and is never ameliorated by subsequent interactions with these officers – interactions they say demonstrate a continual lack of criminal involvement. Instead, they are stopped and automatically patted down, whenever they are observed by police officers on the street, even though they are doing nothing to draw the kind of attention that provides reason to suspect them of criminal wrongdoing. When patted down, these non-gang member men also strongly believe that officers are searching for drugs, not weapons – neither of which they are found to possess during the pat downs.

This is now an age of reform in the City of Chicago and Chicago Police Department; the City's new administration has shown remarkable speed and progress in fast-tracking the police reform efforts connected with this Agreement; and, the Consultant has observed the sea change in levels of cooperation between the parties to this Agreement, as a result. Indeed, the parties have opted not to file any objections to the draft of this report, issued to them on July 19, 2019, which the Agreement permits. Rather, the parties mutually decided to work together to address some of the issues raised in this report and alerted the Consultant to that fact on October 1, 2019.

Consequently, the Consultant feels confident in saying to members of the public that they can and should trust that, from this point in time, moving forward, there are many well-intentioned, committed individuals standing by ready to help communities solve the problems and resolve the tensions between them and Chicago police officers. New police officer recruits have been trained and now patrol the streets of Chicago, along with seasoned veteran officers, as mentors, whom the Department has selected because they have not participated in the wrongs that community members have experienced and perceive to be ongoing. Thus, members of the public and various communities need not permit themselves to become victims of unlawful behavior by other community members or by CPD officers, but they must speak out and join the large segment of the Department that wishes to change the course of police and community relationships to ensure that all applicable laws are enforced.

The Consultant realizes that his confidence in the Fourth Amendment's *Terry* Standard[8] and the CPD was not widely shared by some meeting participants. Some participants expressed that they are aware of the *Terry* Standard, but **it means nothing in their world**. Police officers, they said, do whatever they want to do and lie about their reasons for the stops and pat downs when they complete the ISRs. Indeed, some who attended the meetings recounted incidents where they were patted down, but when officers did not find weapons or firearms, these pat downs invariably became full-blown searches of their pockets and possessions, because they were looking for drugs – which they did not find. During these searches, several participants in both groups complained about being

---

[8]The *Terry* Standard arises from a decision by the United States ("U.S.") Supreme Court decision in *Terry v. Ohio*, 392 U.S. 1 (1968), which created an exception to the probable cause requirement for police officers to search and seizure civilians for law enforcement reasons. *See, e.g.,* Part V.



disrespected by police officers, by their use of profanity and their personal property being strewn around and not retrieved, with no apology or explanation for the search by police officers, when nothing illegal was found.

One teenager recounted being chased in an alley by an unmarked squad car, which he initially mistook as being occupied by civilians, rather than police officers. He was on his way home from school. When he attempted to flee from the pursuit, the car struck his bicycle from behind and he was knocked to the ground. One of the police officers pulled his revolver and put it in his face, searched him, and threw his school books to the ground. After using profanity, the officer left without offering the teen any explanation for the chase, detention and search.

When the Consultant asked meeting participants whether they had availed themselves of the protections offered by the State of Illinois, regarding pat down receipts, and/or their right to file complaints with the City of Chicago's Civilian Office of Police Accountability ("COPA"), participants expressed that they had no confidence that filing complaints, or using pat down receipts, to challenge unjustified stops and/or frisks would result in any changes being made.[9] Most indicated to the Consultant their beliefs that nothing would be done if they complained and that doing so would only lead to more problems with the offending officer(s) or fellow officer(s), once the complaint was identified as coming from them.

The Consultant begs to differ. As the following report will make clear, in Part III, since the Agreement took effect, the Consultant's review of the Civilian and Internal Complaint Investigations by the Department, and the response by COPA, appears to reflect legitimate and comprehensive investigations and responses to meritorious complaints. Although the affidavit requirement for complaints, mandated by Illinois law, continues to raise problematic issues for civilians, who fear retaliation by police officers, the Department and COPA have endeavored to make filing complaints less onerous and intimidating by, for example, permitting complaints to be filed using computers in public libraries, rather than requiring the person filing the complaint to personally appear at CPD police district officers or headquarters to fill out forms.[10]

---

[9]When asked if officers provide them with receipts after a pat down, pursuant to Illinois law, so that they can challenge the reasons for the pat down if they choose to do so, the participants said that if they ask police officers for a stop receipt, they are cursed, laughed at and refused.

[10]As noted in previous reports, the affidavit requirement for filing civilian complaints and moving those complaints to the level of investigation is still problematic because complaining civilians do fear retaliation by CPD officers who patrol their neighborhoods, if and when these officers are identified as the source of their complaints. In previous reports, the Consultant recommended that the Department work to find ways for complainants to report wrongdoing by its members anonymously or safely. Although the Department has acknowledged the problematic nature of the affidavit requirement (which requires the complainant's signature so that investigating officers can interview the complainant and obtain verification of the facts stated in the complaint and others that need to be documented), the affidavit requirement is mandated by Illinois law, applicable collective bargaining agreements, and Department directives, and administered by



Indeed, based on the documents reviewed from CY2017 that the Department produced to the Consultant, it appears that the Department, in coordination with the City's COPA, is substantially complying with the terms of the Agreement, in this regard. The Consultant, therefore, encourages members of the public to avail themselves of the Civilian Complaint procedures set forth on the Department's website, as well as that of COPA.[11] Community members are encouraged by the Consultant, to avail themselves of the institutional means to complain, report, and solve their problems.

The Agreement has established internal, departmental accountability systems to ensure that unjustified stops and/or frisks are identified and officers performing them are corrected (and disciplined if these mistakes occur repeatedly). If community members experience or observe unjustified police conduct, they must report it to the Department so that the accountability systems put into place have a chance to work.

## TO THE MEN & WOMEN OF THE CHICAGO POLICE DEPARTMENT

No one wants to question the lawfulness and legitimacy of police officers' actions and words, least of all the Consultant, who, based on firsthand experience as a United States Marine Corps Sergeant at the height of the Vietnam War and a U.S. Magistrate Judge for two decades, understands the kind of bravery, discipline and personal sacrifice required by career-long public servants. The men and women of the CPD put their lives on the line every day to serve and protect others, sometimes with tragic consequences seen all too often in the daily news. Thus, the task assigned to the Consultant by the Agreement – to review and assess ISRs and other documents for purposes of determining whether their exercise of stop and frisk as a law enforcement tool is actually complying with other laws, or breaking them – is not one that is taken lightly.

Indeed, the Consultant would like nothing more than to report that the Department's efforts to comply with the Agreement have produced ISR data which reflects substantial compliance with the Agreement's terms. But, much of the ISR data reviewed reflect incomplete or inconsistent articulations of RAS; while related ISR data, in the form of supervisory review notes, comments, and auditing reports, reflect a number of additional problems that will be addressed in detail in the following report.

---

COPA. *See, e.g.*, Exhibit 13 (City of Chicago Civilian Office of Police Accountability Rules and Regulations, Effective September 15, 2017). Thus, the Department cannot act, by itself, to eliminate or modify the affidavit requirements, set forth in Section 2.4.1., of Exhibit 13. The Affidavit Override Provision in Section 2.4.1., provides some relief in exceptional cases, but COPA must pursue it and the request must pass through two levels of review.

[11]For example, digital media files (videos, photos, audios) related to a complaint can be sent to COPA-Info@chicagocopa.org. COPA's online complaint form takes about 30 minutes to complete. The online form is just one of several ways that community members may register a complaint against a member or members of the Chicago police department.

The only way for the Department to be free from the strictures of the Agreement is to prove that the CPD's members, by and large, conduct legitimate, lawful and procedurally just investigatory stops and frisks on a daily basis. The only way to prove that is to adhere rigorously to the documentation directives and protocols advanced by the Department in its written policies, as supported by the comprehensive and expensive training being provided on a regular basis.

## Training Initiatives

Beyond more accurate and transparent reporting of stops and frisks, with enforcement of Department accountability policies, what, then, will heal the divisions between police and African-American and Hispanic community members? The answers are emerging and the parties are dedicated to finding the solutions over the coming days and years. The Consultant's considered view is that only a renewed and continued commitment by the Department and its members to this Agreement will result in real change.

For example, the procedural justice training initiatives that the Department put into place, one of which the Consultant observed as a preview, were geared toward helping officers respond to community members as human beings and not as "subjects." More of such training and supervisory observations and feedback to officers about how they are doing in terms of their interactions with non-criminal members of the community may go a long way toward stemming the tide of resentment and mistrust that is currently festering in some disadvantaged minority and crime-ridden Chicago neighborhoods.

Having personally observed this training, together with representatives of the parties and the police practices expert, the Consultant believes this training may be effective at reducing unintended bias by well-intentioned police officers. Hopefully, such training will minimize the influence of the inescapably human, unconscious biases that may have developed in the minds of some of CPD's officers and its institutional policies, through no fault of their own, with the goal of reducing biased-based policing decisions.

The Department has also begun implicit bias training for all members of the Department, training that the Consultant observed. The dynamics of implicit bias apply to both police officers and community members. No one is exempt. Although community members are not receiving implicit bias training, at the level of individual stops and frisks, there are ways to minimize the influence of implicit bias by police officers through consistent and conscientious professional training. CPD has invested many resources to initiate implicit bias training, for all members of the Department, in conjunction with professional trainers who are part of the Anti-Defamation League. Through this regular, ongoing training, CPD hopes to equip its members and sworn police officers, new and old, with the best training available to help its members and police officers become conscious of implicit biases that may be interfering with their professional training about the types of facts and behavior that provide reasonable suspicion to stop and frisk.



## Trust Issues

The Consultant realizes that his meetings with the community members and the perspectives they shared, as described, are not necessarily indicative of how other Chicago community groups or individuals may feel about police officers, particularly individuals who are members of the Chicago Police Department. He also realizes that, like the ISR narrative remarks provided by police officers describing their perceptions of the stops and frisks they conduct, the "truth" of the stop and frisk depends upon the perspective(s) of those who experienced (viewed) and are relating it.

Nonetheless, based on the experiences described by the community meetings participants, it is clear that some community members lack trust in their neighborhood police officers; and, these feelings and perceptions of distrust affect their attitudes toward police officers, their unwillingness to report unjustified conduct by police officers toward them (based on fear of retaliation and harassment), and their unwillingness to assist police officers in fighting crime in their neighborhoods.

When the attitudes and feelings of a significant segment of any community reflect anger, fear, and distrust of police officers, whether justified or not, then a police department and its members cannot expect the community to assist police in the investigation and reporting of observed criminal behaviors. Such attitudes and feelings, instead, result in decisions to walk (or run) away from approaching police officers as quickly as possible and creates a *civilian code of silence* that rivals the *police code of silence* that some have accused the Department of maintaining, whether true or not.

Community meetings and efforts to reach out to restore trust between beat patrol officers (many of whom are new recruits and do not have any past history with residents in particular neighborhoods), are a good first step toward alleviating the deep-seated distrust that has emerged from decades of stop and frisk that appears to have had no reasonable basis – if community members decide to participate fully in them; but, the Consultant's time spent with community members indicates that it will not be sufficient, by itself to eradicate the feelings of fear, humiliation and shame experienced by generations (measured in decades) of civilians, some of whom are merely children.

In the Community Relations Initiatives taken by Superintendent Johnson, community trust in police officers is a high priority. This trust, however, will not be gained simply by improved personal interactions and communication strategies, nor by the excellent implicit bias and other training being provided to department members. This trust will be gained only when the public is assured that police officers *within the Department* are being held accountable for unlawful, illegitimate and procedurally unjust actions *by the Department*.

For the CPD's part, the Consultant also believes that part of the solution regarding the tensions between its members and some of the City's minority community members can be found by the Department and its members practicing humility when performing their law



enforcement duties related to stop and frisk. As recounted by community members, being patted down on the street in public is a very humiliating experience. In all areas of the City, but especially areas where civilians have been adversely and disproportionately impacted by historical stop and frisk practices that appear to have been unjustified, the Consultant believes that if police officers would explain the facts as they see them in real-time to the subjects stopped and frisked, these explanations could have a diffusive effect.

Perhaps, it is being a bit Pollyannish, but the Consultant believes that real-time explanations of police rationales, at the time that the stop and frisk is being made, to the individuals who are being subjected to the stop and/or frisk, as well as self-acknowledgement that the stop and frisk can be embarrassing, could help the individuals being stopped and frisked, as well as other observing community members, understand why police officers suspect them and need to investigate their suspicions. This real-time dialogue may result in less defensive postures by civilians and less resentment all the way around. Apologies or even courtesies for mistaken suspicions, when appropriate, would go a long way toward changing the perception of police officers as an occupying force, with no respect for the humanity of the person stopped and/or frisked, to one where police officers, even if mistaken, are seen as human beings, who are simply trying to do their job to serve and protect those in the community from harm.

## Conversations with CPD Officers & Squad Car Ride-Alongs

As some of the men and women of the Chicago Police Department know, the Consultant has met with CPD members and commanders on two separate occasions since the Agreement took effect – once in early 2016 and the second time earlier this year, in 2019. In the most recent ride-along that the Consultant participated in with Bureau Chief Fred Waller of the CPD, they visited several police districts on the South Side of Chicago, meeting with the Commanders and Executive Officers of those districts, as well as some of the police officers assigned to beats within those districts.

Much has changed in these three years within the Department related to the Agreement's required ISR documentation policies, procedures and practices, as well as technological advancements that enable the Department to identify criminal activity, not only by police officers' on-the-scene observations, but also by strategically placed computer observation cameras that permit police officers to observe criminal activity in real-time from remote locations. However, because the ISRs covered by the Agreement focus on police officers' personal observations of suspected criminal activity, the Consultant will summarize what he learned from his conversations with CPD officers and commanders both during his earlier and later visits.

During both visits, it was clear that these department members understand the limitations placed upon them by the Fourth Amendment's probable cause exception, namely,



the *Terry Standard,* and the need to document their actions.[12]   These members spoke candidly on both occasions about their awareness that an officer cannot stop and frisk based only on mere suspicion that someone, even someone whom they know was recently released from prison, on a weapons' violation, may be carrying a firearm or other weapon.  Indeed, there are instances where police officers believe, based on their familiarity with the past conduct of an individual, that the individual is *likely* involved in criminal activity and/or unlawful possession of a weapon or firearm.  However, they realize that, unless they have more than a mere suspicion, they cannot engage in pro-active policing by use of stop and frisk unless they are relatively sure they have facts (other than prior knowledge) to back up their decision.  Such officers are concerned about being called out and disciplined for making an error of judgment.

In response to these expressed frustrations, the Consultant can only reiterate what the Department's training has already made clear:  Fourth Amendment laws (not the Agreement or the ACLU alone) require police officers to document the justification for their stops and/or frisks with facts and circumstances that provide a reasonable basis to suspect criminal activity by a subject apart from a hunch, hearsay, or what officers may perceive to be personal knowledge, but may instead be personal and implicit bias.  Personal conversations with reviewing supervisors after the ISRs are submitted will not satisfy the terms of the Agreement or the Fourth Amendment's Terry Standard.  The articulation requirement of the Terry Standard exception, which permits stop and frisk as an exception to the probable cause requirement of the Fourth Amendment, depends upon documentation, based upon the terms of the Agreement.

Police officers do not have to be right, but their suspicions do need to be reasonable. In other words, the Terry stop and frisk exception to the Fourth Amendment already gives law enforcement officers the right to be wrong, so long as they are reasonable, when they make a stop and/or frisk based on suspected criminal activity.  To permit police officers to stop and frisk without documenting the factual justification for their suspicions (at the level of another police officer's sense of what is reasonable based on reported facts and circumstances), would not give individuals any civil rights to be free from unreasonable suspicions by police officers.

Stop and frisk is a discretionary law enforcement tool that presumes that there is time to make a reasonable judgement about the facts and circumstances before deciding to detain or pat down someone based on criminal suspicion(s).   In many of the ISRs reviewed by the Consultant, it did not appear that standard stop and frisk situations presented risks of harm to the officer or someone else.  Therefore, sober judgment and discretion in selecting whom to frisk is advised, if the police department truly wishes to earn the respect and confidence of community members.

---

[12]As discussed in Part V, the *Terry Standard* arises from the case of *Terry v. Ohio*, 392 U.S. 1 (1968).



The real and present danger posed by subjects suspected of possessing (or being able to possess) weapons or firearms during a Terry stop or detention raises difficult, fact sensitive questions about whether officer safety is an end that justifies whatever means are necessary to stay safe. Officers cannot operate as if the ends (officer safety) always justify the means when it comes to protective pat downs; because, they don't. More attention to the articulation requirements for RAS related to the need to protect oneself would go a long way.

## CONCLUDING THOUGHTS

The following pages of this report will undoubtedly stir up some controversy within the Department about the proper role and accountability review methods used by *some* police district-level source supervisors (typically those holding the rank of Sergeant) and some executive officers (typically those holding the rank of Captain). The Consultant acknowledges that there is a risk that CPD officials may perceive that this report is making a mountain out of a mole hill and focusing too much on details that have little to do with the real world. The Consultant begs to differ, because the duties and obligations assigned to him pursuant to the Agreement require the careful and considered analysis presented herein, which necessarily requires the level of detail presented here.

The Consultant knows that CPD officials have a tremendous amount of work to do with respect to their law enforcement duties, and are perhaps short-staffed, while performing many thankless tasks, for the benefit of many within the City of Chicago, even while the City is in the midst of serious crime problems that require personal sacrifice, dedication and bravery. Certain facts, however, must be addressed and confronted by the Department. The Consultant hopes that any controversy, rather than devolving into defensiveness, will be seen and accepted as constructive criticism and an opportunity for dialogue and problem-solving.

As with all efforts to improve an institution's performance, progress does not always proceed in a straight line. Indeed, such progress may stall when it encounters complexities and difficulties that could not or were not foreseen once the work began. The complexities and difficulties attendant to such a large scale effort – one that involves thousands of police officers, several hundred thousand subjects, and too many documents to count – have so far not appeared to deter nor otherwise cast doubt on the Department's commitment to comply with the Agreement's terms. Nonetheless, problems have been and continue to be observed in the ISR data produced by the CPD from Periods 3 and 4 of 2017. These problems are serious and must be reported, just as the parties must continue to work to address them in the coming months and years.



# PART I.  EXECUTIVE SUMMARY

This is the Third Report by the Consultant assessing the Chicago Police Department's ("CPD" or "Department") compliance with the INVESTIGATORY STOP & PROTECTIVE PAT DOWN SETTLEMENT AGREEMENT ("Agreement").   In the following pages, the Consultant will report to the parties and the public the assessments he made that are related to the question of whether the Department's investigatory stop and protective pat down policies and practices during calendar year ("CY") 2017 were legally justified and substantially complied with the terms of the Agreement. The reported assessments that follow are based on the Consultant's personal review of CPD's monthly investigatory stop report ("ISR") data, as well as the Department's supervisory review and auditing documents from the period January 1 to December 31, 2017.   Where applicable, the reported factual and legal assessments are combined with targeted recommendations for the Department to consider as it moves forward in the attempt to comply with the terms of the Agreement.  The Consultant hopes that these recommendations will aid the City of Chicago, Chicago Police Department and the ACLU continue the important work of reforming the CPD's stop and frisk policies and practices to achieve substantial compliance with all applicable laws, as well as the Department's internal, written policy directives, according to the terms of the Agreement.

In this Executive Summary, the Consultant will limit discussion to the key factual findings from his sixteen month review and assessment of the CY2017 ISR data and related documents.  This section of the report is not intended to substitute for the more detailed analyses of the facts and law presented in Parts I-V of this report regarding the Department's overall compliance with the Agreement's terms, its own stop and frisk policy or the applicable laws that govern the CPD's stop and frisk practices and this Agreement.

## THE AGREEMENT

The Agreement that the parties negotiated during the summer of 2015, which took effect on January 1, 2016, was intended to ensure that the Department's institutional, programmatic use of stop and frisk as a law enforcement tool is legally justified and does not adversely and disproportionately impact the two minority groups, African-Americans (hereafter interchangeably referred to as "Black", "Black non-Hispanics" or "BNH") and White Hispanics ("Hispanics"), whose members comprise two-thirds of Chicago's population. [13]

---

[13] The terms African-American and "Black" or "Black Non-Hispanic" will be used interchangeably throughout this report. The nomenclature "Black" and "non-Hispanic" or "White Hispanic" is driven by census data definitions of race and ethnicity, as well as the codes used by CPD to identify the race and ethnicity of the subjects (persons) who are stopped and frisked.  The Agreement, however, does not seek to address individual harms to minority group members or individual errors in conducting or reporting stops and frisks by department members.



Consistent with this purpose, the terms of the Agreement are aimed at ensuring that CPD's members transparently document all stops and frisks, and CPD's supervisors continuously review the performance of police officers in conducting and reporting these stops and frisks, so that they can flag mistakes made by officers who do not comply with the law or internal department policy directives. The Agreement's terms also require the department and district-level executive officers to regularly audit the ISRs submitted by police officers and reviewed by supervisors to provide the kind of oversight which ensures compliance with the stated goals and terms of the Agreement.

## *Historical Overview of ISR Data: CY2016-17*

The Agreement is *not intended to reduce the number of stops being made* by Chicago police officers; it is simply intended to ensure that all stops (and protective pat downs) are conducted lawfully and legitimately. Nevertheless, during the first two years of the Agreement (CY2016-17), the number of stops dropped dramatically from the number of stops made in the two years prior to its implementation (CY2014-15). From January 1, 2014 through December 31, 2015, CPD reported making **1,321,506 *million* stops**;[14] but, in the two years since the Agreement's implementation, from January 1, 2016 through December 31, 2017, police officers reported making only **213,689 *thousand* stops** – a decline of *over 80% overall*.[15] Among the three most populous ethno-racial groups (*e.g.,* "three ethno-racial groups of interest"), there were **213,606 *thousand stops*.** *See, e.g.,* CONSULTANT'S TABLE 1.

---

[14]In the two years prior to the Agreement (January 1, 2014-December 31, 2015), police officers documented stops using the Department's former "contact card system" (which reported all civilian encounters, but did not include any probable cause stops or investigatory stops where an enforcement action took place).

[15]Note, here, that these stop counts are based on a definition of "stop" that includes investigatory stops (made based on facts and circumstances the officer believed provided reasonable suspicion of criminal activity) and probable cause stops (made based on observed – "on view" – violations of the law). The definition of stop, as used and measured by these numbers, does not include voluntary civilian encounters (*e.g.,* instances where a civilian approaches an officer or an officer approaches a civilian to discuss a matter that does not involve investigation of the civilian who is engaged by the officer in conversation – or otherwise).



### CONSULTANT'S TABLE 1. COMPARISON OF STOP COUNTS BEFORE & AFTER THE AGREEMENT.

*Descriptive Results Comparing Pre-Agreement v. Post-Agreement Ethno-racial Specific Stop Counts*

| Race & Ethnicity Specific Stop Counts Pre & Post Agreement | CY2014-15 Pre-Agreement | CY2016-17 Post-Agreement |
|---|---|---|
| All Stops Total | 1,321,506M | 216,258 |
| Three Groups Stop Total | 1.292,554M | 213,689 |
| BNH Stops | 943,476 | 153,506 |
| *BNH % Share* | 71.41% | 71.8% |
| White Stops | 123,545 | 17,156 |
| *White % Share* | 9.35% | 8.1% |
| Hispanic Stops | 225,273 | 43,027 |
| *Hispanic % Share* | 17.05% | 20% |

*Source: Updated Appendix A (CY2017 Ecological Analysis of Monthly Stop Data & CY2017 Post-Stop Outcomes Report)*

While this decline in stop counts seems significant, there are no factual data from which one can reasonably infer that the Agreement played any role, let alone a significant one, in the stop count declines. There are also no factual data from which one can reasonably infer that there is any correlation between the number of stops being made and crime rates. Indeed, there have been a number of other developments in the City of Chicago that corresponded with the timing of the decline in stop numbers, which may also have played a role.[16] Thus, any conjecture about the approximate correlation between the timing of the Agreement's implementation and the dramatic decline in stops would be pointless, because there is no evidence (statistical or otherwise) to support an inference that the advent of the Agreement is responsible for the decrease in the number of stops, just as there is no evidence that the decline in the numbers (and rates) of stops is linked to higher crime rates since those stop counts and rates dropped. The Consultant, therefore, will not speculate about the cause(s) for the decrease in the number of stops.

Notwithstanding the dramatic decline in stop counts, the proportional share of stops among the three ethno-racial groups studied remained consistent and relatively unchanged; and, noteably, the proportional representation of the subjects who are stopped continues to

---

[16]Many significant events in the City of Chicago in the last half of CY2015 and CY2016 took place, not the least of which were the enactment of Illinois law, which also imposed stricter data requirements on law enforcement agencies, including the CPD, as well as the U.S. Department of Justice investigation into allegations of excessive force by police officers, which resulted in the Consent Decree approved earlier this year.



reflect disparities along racial and ethnic lines. In fact, review of the descriptive statistics from CY2016 and CY2017, the four periods of ISR data examined thus far, reveals that the proportional representation of stops made and the racial and ethnic composition of subjects who were stopped is almost exactly the same as it was when the stop counts were over 80% higher in the two-year period from January 1, 2014 to December 31, 2015, which preceded the effective date and implementation of the Agreement. *See infra* Consultant's Table 1. Thus, both before and after the Agreement, roughly seven out of ten (7 out of 10) stops involved BNH subjects and roughly one out of five (1 out of 5) involved Hispanic subjects. Stated differently, while more than 70% of all stops involving Black-Non-Hispanic subjects continued to be made, about 20% of all stops were made of White Hispanic subjects and less than 10% of all stops were made of White Non-Hispanic subjects. *See, e.g.,* CONSULTANT'S STATISTICAL TABLE 1.

## *The Unknown Cause(s) for the Dramatic Decline in Stops*

A reduction in stop counts says nothing about the quality or effectiveness of CPD's public safety efforts, nor does it equate with higher crime rates, a failure to police (non-policing), or the influence of the new and more rigorous documentation requirements for police officers related to their stop and frisk reporting policies and procedures. Although some may say that the decline in stop counts and rates is linked to one or more of these subjects, there is no statistical evidence for any of these propositions, either on a national level (based on research done in other American cities such as New York, Oakland, and Seattle, for example), nor is there any in Chicago, as far as the Consultant knows. The Agreement does not ask the Consultant to determine whether any of the theories cited above, or any presumed links between stop and frisk and those theories are more or less true. Because the Consultant has no basis for commenting, he, therefore, declines to do so further, except to say that, in Chicago, other factors with equal or greater influence than the Agreement were at work when stop counts began to drop in the second-half of CY2015 and into CY2016. These other factors may have contributed to the dramatic decline in stop counts, but it does no good to speculate about it now.

## *Black Non-Hispanics Consistently Subject to 71-72% of All Stops*

From CONSULTANT'S TABLE 1, one can see that Black Non-Hispanic subjects comprise 71-72% of all subjects stopped for the four-year period beginning January 1, 2014 through December 31, 2017, regardless of the number of stops Chicago police officers have made.[17]

---

[17]The Consultant observes, however, that this consistent proportionality also seems to appear, but to a lesser extent, in the relative share of stops made of Hispanic White subjects and White subjects, in the sense that Hispanic subjects are stopped more frequently than White subjects. Hispanic Whites are stopped somewhere in the range of 17-20 percent of the time; but, Whites are subject to stops less than 10% of the time, somewhere in the range of 8-9 percent of the time. Interestingly, with regard to the comparison between Hispanic White and White detainees, the relative differentials between stop numbers have increased since the Agreement took effect, rather than decreased, as the overall numbers for all races and for all three groups have



During the first two years of the Agreement, the CPD reported 153,506 stops of BNH subjects. By contrast, the CPD's data reflects that police officers made 943,476 BNH stops during the two-years prior to the Agreement. Comparing the two-years before with the two years after the Agreement, the difference between those two time periods reflects a *numerical decrease* of nearly 89% since January 1, 2016; however, **the proportional representation of BNH group members whom police officers detained remained essentially the same**. So, even as the overall number of stops have decreased, BNH subjects still make up essentially the same percentage of people stopped.

Focusing only on the two years since the Agreement began, one sees another interesting fact. In CY2016, CPD stopped 74,812 BNH subjects; and, in CY2017, CPD stopped 78,694 BNH subjects. These numbers represent an increase of 3,882 subjects, or about 5.2% more stops of BNH subjects in CY2017, the second year of the Agreement, over the first year CY2016 total of 74,812, within the BNH racial group.

In CONSULTANT'S TABLE 2, one can see that, since the Agreement took effect, the overall stop counts have remained relatively steady for the past two years, for all ethno-racial groups except one: BNH subjects were stopped about 5% more in CY2017 than they were in CY2016; and, the overall numerical difference in the number of stops, is almost entirely due to the increase in stops of BNH subjects (with a *de minimis* increase in WNH stop counts and decrease to Hispanic stop counts).

---

done. In the two-years prior to the Agreement, the relative difference was about 8%, whereas the difference was about 12% post-Agreement.



CONSULTANT'S TABLE 2.

*Comparing Differences: Ethno-racial Specific Stop Counts CY2016 to CY2017.*

| | CY2016 | | CY2017 | # Difference 2016:2017 | Average Proportional Representation | % Difference 2016:2017 |
|---|---|---|---|---|---|---|
| *All Stops* | 106,239 | < | 110,019 | +3,780 | 100% | Est. 3.5% ^ |
| *BNH Stops* | 74,812 | < | 78,694 | +3,882 | | Est. 5.2%^ |
| *White NH Stops* | 8,501 | < | 8,655 | +154 | | -- |
| *Hispanic Stops* | 21,526 | > | 21,501 | (-25) | | -- |

Sources:  UPDATED Appendix A (CY2017 Ecological Analysis of Monthly Stop Data & CY2017 Post-Stop Outcomes Report); Consultant's Table 1 (id., Third Report at 20); and Ecological Analysis of Monthly Stop Data Reports for Periods 1 & 2 of CY2016 (See, e.g., Consultant's First and Second Semi-Annual Reports).

# KEY LEGAL QUESTIONS

The laws applicable to this Agreement are the Fourth and Fourteenth Amendments to the United States ("U.S.") Constitution, and a related Illinois law, the Illinois Civil Rights Act ("ICRA") of 2003.  The Fourth Amendment question, of primary importance to the Agreement's stakeholders (*i.e.,* the parties and public, alike), is whether the investigatory stops and protective pat downs made of any civilian in Chicago is justified by reasonable, articulable suspicion ("RAS").  The legal questions arising under the Fourteenth Amendment and ICRA are whether Chicago police officers stop and/or frisk persons, whom they perceive to be Black and Hispanic (historical and legally protected racial and ethnic minorities), more frequently than those whom they perceive to be White; and, if so, why?

The first part of this question is easy to answer:  Chicago police officers stop more people whom they identified as Black and non-Hispanic in vastly greater numbers and proportions than any other racial or ethnic group.  Indeed, the difference in the number of stops made of BNH persons is consistently more than 50% larger than the number of stops made of persons identified as White and Hispanic and 65% larger than the number of stops made of persons identified as White and non-Hispanic.

The second part of this question, asking *why* the stop count disparity is so large, is not so easy to answer.  Indeed, the Agreement arose and exists to answer it.  The why question involves seeking answers about whether more frequent stops and frisks translate not only into racially and ethnically *disproportional* impacts, but also disproportionate impacts that



are *adverse* to those group members, as compared to the impacts (measured in terms of disproportionality and adversity) from such practices on White Non-Hispanic group members.

Many legal and statistical facts remain unknown, at this time, *in part* because the CPD's ISR data is not yet collected, maintained and produced in ways sufficient to answer these questions.[18] One fact is certain: the answer to the second question is *not* because Blacks make up comparatively more of the population. The racial and ethnic makeup of Chicago is divided into nearly three equal parts, with Black non-Hispanic, Hispanic and White non-Hispanic persons each comprising about one-third of Chicago's total population.[19]

Counting the number of stops made in any given time period does not answer the question. Stop counts only describe how many stops were made in any given time period; stop counts cannot describe how many *individuals* of any one race or ethnicity were stopped, because the same people may be stopped multiple times.[20] Thus, it would not be fair to presume that simply because more than 70 percent of all stops include a person identified as Black (BNH) means that more than 70 out of every 100 BNH persons in Chicago are stopped by police officers.

It is a fact that, in the two years before and after the Agreement began, for every 100 stops made by police officers, over 70 included someone whom they identified as BNH. By contrast, police officers stopped persons they identified as White and non-Hispanic only about 8 to 10 times for every 100 stops made. Persons identified as Hispanic, but White, fared better than persons identified as Black, but they were also stopped more frequently

---

[18]However, the Consultant must acknowledge that a number of questions regarding the statistical methods used to assess this data have also been called into question by the parties, for various reasons, during the writing of this report. Thus, the Consultant cannot, at this time, report some of the statistical results from the CY2017 technical reports.

[19]Census Data from CY2010, updated by the American Community Survey of 2015-16, indicates that other population groups represent less than one percent of Chicago's total population and less than one percent of all stops made by CPD in any six-month reporting period or calendar year.

[20]ISRs are not counted by the number of unique individuals stopped by police; they are counted by the unique ISR number that is electronically assigned when the officer documents the stop by generating the electronic investigatory stop report. Each ISR has a unique identification number that is never replicated nor duplicated and a unique stop event number. The stop event number is replicated in cases where more than one person is stopped (detained) by one or more police officers at the same time, for roughly the same reasons. The stop (whether it is investigatory in nature and brief or whether it is based on probable cause and leads to a longer detention – even custody based on arrest) of *any* individual is assigned a unique ISR number, even if the same unique individual is stopped ten times every day.



than White persons who were not identified as Hispanic, posting stop numbers that range between 18 to 21% of all stops made in the time periods examined.

Indeed, it is altogether possible that police officers stop the same individuals who are identified as Black and non-Hispanic multiple times – but, less frequently, stop the same people whom they identify as White, whether they are perceived as Hispanic or not. Presumably, police officers who walk – or patrol in squad cars – the same beat every day know some of the people who live and work in those neighborhoods.  They may also know which people in those neighborhoods have committed crimes in the past or have been identified by others as suspected of criminal activity, allowing them to make more factually-informed judgments with respect to whether those individuals are again presently engaged in such activity, so it may be fair to say that some percentage of these stop counts involve stops of the same people.

Ultimately, however, the number of unique individuals of each race and ethnicity who are stopped is not the focus of concern for the parties, nor the Agreement.  Context is the key to understanding what the numerical differences mean. Defining the context for these numbers is the first step to determining that meaning, and whether the differences between numbers are meaningful, as a matter of law and social policy, to the compliance determinations that need to be made, pursuant to the Agreement.

Patience will be required by all involved when the important questions continue to be asked, with only partial answers provided, because the theoretical models for the law and statistical science in the context of stop and frisk practices appear to be particularly difficult to sort out, possibly because the Fourth Amendment questions inherent to every stop and frisk regarding the question of legal justification cannot be easily extricated from those regarding disparate impact.

Clarity, however, is needed from the statistical results because a central purpose of the Agreement is to identify whether the stop and frisk policies and practices of Chicago police officers have a disproportionately adverse effect on minorities and are unjustified by a legitimate rationale.  *See, e.g., Texas Dep't of Housing & Cmty. Affairs v. Inclusive Communities*, 135 S. Ct. 2507, 2521 (2015).[21]  That question cannot be definitively answered at this time, because the answer depends fundamentally upon having ISR data that can be relied upon to produce accurate statistical results.

---

[21]As discussed elsewhere in this report, another purpose of the Agreement is to determine whether the stops and frisks made of members in the three groups are justified by the Fourth Amendment and, if not, whether there are additional disparities that arise from being subject to unjustified (bad) stops and/or frisks.



The Illinois Civil Rights Act ("ICRA") prohibits local government law enforcement agencies, such as the CPD, from subjecting "***any person*** to discrimination on the grounds of race, color, national origin or gender, and utilizing criteria or methods of administration that have the effect of subjecting ***individuals*** to such discrimination." *See, e.g.,* 740 ILCS 23/5 (2003). The Consultant's interpretation of ICRA is that it permits private individuals and groups of individuals to challenge local law enforcement agencies' policies and practices as having an adverse, disparate impact, because those policies and/or practices discriminate on the basis of race, color, national origin (ethnicity) or gender.

The Fourteenth Amendment to the United States (U.S.) Constitution (and its Illinois constitutional equivalent) provides similar legal protections to U.S. citizens, in that it guarantees equal protection of the laws by prohibiting states from denying it. As interpreted by a long history of jurisprudence, the equal protection of the laws extends without qualification, regardless of race or ethnicity or gender, to local government agencies such as the CPD.

As identified in the Agreement, the Fourteenth Amendment and ICRA are two of the three applicable laws with which CPD must comply. Thus, the CPD's legal compliance obligations include the responsibility to ensure that its stop and frisk policies and practices do not have a "'disproportionately adverse effect on [historically-protected] minorities' and are otherwise justified by a legitimate rationale." *See, e.g., Inclusive Communities*, 135 S. Ct. at 2513 (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)).

The third law that applies with pervasive force to all aspects of the CPD's compliance obligations regarding its stop and frisk practices is the Fourth Amendment to the U.S. Constitution. Well-established legal standards govern governmental searches and seizures of persons, and the various exceptions to it, including police officers' investigatory stops and protective pat downs. *See Terry v. Ohio*, 392 U.S. 1 (1968) ("*Terry*"). This report details the legal evidentiary standard that justifies a *Terry* stop and frisk, and types of stop and frisk conduct which is unjustified in light of these legal standards.

CPD's police officers and the Department, as a whole, must ensure that all individual stops and frisks made by its police officers, when reviewed separately and in the aggregate, are justified by reasonable, articulable suspicion ("RAS"), as required by the Fourth Amendment. To honor these legal compliance obligations, and in compliance with specific terms of the Agreement calling for revisions to CPD's documentation and reporting obligations, among other things, related to stop and frisk policies and practices, the CPD has implemented written policy directives in Special Order 04-13-09. *See, e.g.,* Exhibit 2 (SO4-13-09, as revised 06/16 (Ex. 2A) and 07/17 (Ex. 2B)).



## KEY OBSERVATIONS FROM THE CONSULTANT'S REVIEW & ASSESSMENT OF THE CY2017 ISR DATA & DOCUMENTATION

To effectuate the Agreement's terms, the CPD has revised its policy for preliminary investigations, which include investigatory stops and protective pat downs, as well as search activity related to the pat downs, in Special Order 04-13-09. This policy ("stop and frisk policy" or "CPD's policy") contains a number of directives related to the documentation of stops and frisks in ISRs, as well as supervisory review processes and protocols. These procedures and protocols will be the subject of much analysis in this report because, at a fundamental level, the Agreement's collection and documentation requirements for stop and frisk data depend upon strict adherence to these policy directives. As shown, in a number of the ISRs reviewed and illustrated in this report as examples, the failure of some police officers and reviewing supervisors to properly document the reported stops and frisks, and of executive officers at both the district and department levels to comprehensively audit those reports (ISRs), has led to what appears to be a broad-based failure by Department members to accurately report all ISR data.

The nearly 8,000 ISR samples and hundreds of other documents (data) from CY2017 that the Consultant personally reviewed made a strong impression – one that revealed two fundamental problems with the Department's approach to dealing with the ISR requirements imposed by the Agreement. The source of both problems lies in the ISR Workflow Protocols that the Department developed after the policy directives in SO4-13-09 were negotiated and approved by the parties and the Consultant prior to the Agreement's implementation.

The first problem is that the Workflow Protocols, by design, permit ISRs with substantive RAS deficiencies to be returned to police officers and changed in contravention of Department Directives, Exhibit 2 (SO4-13-09, Section VIII), and in violation of the Fourth Amendment's articulation requirement. The second problem is that these same Protocols are susceptible to misapplication because they contain ambiguous language. This permits reviewing supervisors to characterize police officers' failures to articulate RAS (by leaving certain facts out of the narrative remarks section) and/or neglecting to check "a box" or "the right box" in the ISR) as a "simple omission" that permits them to reject the ISR for administrative reasons.

With respect to the second problem, this report will demonstrate how the misinterpretation and/or misapplication of the administrative rejection ("REJ") report status code by reviewing supervisors is not a mere technicality. Its prevalent misuse by reviewing supervisors, and the acquiescence of this misuse by executive officers, at both the district and department levels, has resulted in widespread disregard of the basic and express accountability and transparency requirements set forth in SO4-13-09 and, although unexpressed in the Agreement, certainly called for by the supervisory review and auditing terms in Section II. Both CPD's policy directives and the Agreement require supervisors who



identify submitted ISRs with substantive, RAS-related deficiencies to reject them as substantive, not administrative errors; and, department policy ensures that police officers and supervisors will be held accountable by requiring the supervisor to complete a Deficiency Review Notification Report ("DNR"). The importance of the DNR to the threshold accountability requirements of department policy is reflected by the electronic reporting system, which clearly prioritizes by making its completion mandatory when a substantive rejection code is entered (either "DEF" or "REV") and making the forwarding of this DNR to the Integrity Section "automatic."

The need for supervisors to not only complete, but also to sign, these reports, further underscores the importance the Department's policy directives place on the DNR. Thus, when supervisors bypass the DNR requirement by interpreting "simple omission" in the ISR Workflow Protocols – not as a typographical error or an oversight regarding a checkbox that does not relate to RAS, the inference is that accountability (and the transparency) that comes with completion of a DNR and rejection of an ISR on substantive grounds is something these supervisors want to avoid, for themselves, and for their subordinate officers. These supervisory methods, alone, would be sufficient to find that the Department failed to comply with its policy directives and, by extension, also the Agreement's terms; but, there is more.

District and department-level executive officers also appear to have, thus far, avoided confronting the frequent misuse of the REJ rejection code to return ISRs with substantive deficiencies to police officers for changes that result in approved multiple-version ISRs by auditing only ISRs in an approved status. The only exception to this single-focus audit, again at both the district and department-levels, is the mandatory review of ISRs placed into a deficiency rejection review status ("REV") and forwarded to the Integrity Section without being returned to the officer who authored it. These rejected ISRs are, by all accounts, reports of stops and frisks that would never be justified under any set of facts or circumstances. Based on the Consultant's review of three reporting periods of MVR sample data, he can confidently say that ISRs placed into an "REV" report status are few and far between. Thus, the auditing of only approved ISR samples by the department's executive officers has had the effect of acquiescence to a serious policy violation – one that has not been identified or remedied promptly by the Department and thus requires a finding of non-compliance under Section IV.2 of the Agreement.

The legal compliance determinations called for by the Agreement, however, still cannot be made, based on the inability of the underlying ISR data produced to generate a sufficiently complete picture of CPD's stop and frisk practices. The ISR data, as reviewed by the Consultant, does provide a partial picture of CPD's stop and frisk practices, however, and establishes that an unknown quantity of ISR data was never reported (*i.e.,* certain Probable Cause stops from Periods 3 and 4; ISR data never documented that appears in two special audits of arrest reports; and inconsistent ISRs that call into question the credibility of the ISR authors, among other things. Based on these (and other) ISR data issues, the Consultant respectfully declines to make any legal determinations on this record.



Nonetheless, given the importance the parties have placed on having some guidance about how the Consultant interprets the open legal questions regarding adverse disparate impact under federal and state law, as well as the need to explain the basis for his determination that the return and resubmission process for ISRs with RAS-deficiencies violates the Fourth Amendment, the Consultant will venture to make some of his views about the law related to disparate impact known, in the hope that these opinions will help guide the experts, as well as the parties, in assessing the statistical results and information about the ISR data, as it currently exists, to better understand the Department's current stop and frisk practices.

During his review of the ISR data and related documents from CY2017, the Consultant observed that CPD police officers, supervisors and executive officers were violating various policy directives, set forth in Special Order 04-13-09, as revised pursuant to the terms of the Agreement. These policy violations include, but are not limited to:

1. Implementation of an ISR Workflow Protocol Policy which conflicts with and reflects serious misinterpretations of:
   a. The Fourth Amendment; and
   b. CPD's Policy directives for rejection of ISRs with substantive, Fourth Amendment articulation errors; and
   c. Section III. b.3., among others, in the Agreement.
2. Misapplication of the administrative rejection code by some reviewing supervisors to reject ISRs with RAS-errors;
3. Misdirection by executive officers to supervisors during monthly audits regarding proper procedures for rejecting substantively deficient ISRs, in which officers do not factually justify their conduct;
4. Failure by the Integrity Section to initiate an audit of ISRs placed into an REJ report status, despite evidence that supervisors and executive officers were improperly using this code to return substantively deficient ISRs to officers for correction and resubmission, without completion of a DNR;
5. Untimely reporting of stop and frisk activity by officers (not within the tour of duty);
6. Untimely supervisory review of submitted ISRs (not within the tour of duty)
7. Improper and unlawful stop and frisk practices by police officers, despite adequate department-wide training;

8. Lack of transparency by reviewing supervisors when identifying substantive deficiencies in the comments sections of ISRs improperly rejected for administrative error, by using arcane codes and symbols;

9. Lack of accountability for reviewing supervisors when ISRs with such conduct are observed during executive officer and Integrity Section audits;

10. Authorizing and allowing police officers to change checked boxes in the ISR from the original submission to the last submission, where there are no facts to indicate that the original articulation was erroneous.

Before turning to a fuller discussion of these policy issues, the role of the Agreement is a subject that should be clarified in light of the recent approval of the Chicago Consent Decree. The Agreement is not impacted by or inconsistent with the Chicago Consent Decree between the State of Illinois with the City of Chicago and Chicago Police Department, recently approved by the U.S. District Court for the Northern District of Illinois (Dow, J.) ("Chicago Consent Decree").

The investigation that led to the decree did not address stop and frisk matters, in large part because of the prior existence of this Agreement, because its focus was on the use of excessive force policies and practices by the CPD. The Agreement, unlike the Consent Decree, is a voluntary settlement of long-standing disagreements about whether selection of subjects for investigatory stops and protective pat downs (known colloquially as "stops and frisks") by CPD's police officers produced unlawful racial and/or ethnic disparities, with adverse impacts on members of two-thirds of Chicago's population, namely African-American and Hispanic groups.

The Agreement's terms were intended to shed light on those disputes and to shift the paradigm from one that settled such disputes by litigation to one that prioritized good-faith compromise, cooperation and alternative dispute resolution of the many, layered issues that create such disputes. Thus, the Agreement's terms were negotiated with the understanding that each party would continue to cooperate with each other, until the goals and purposes of the Agreement are satisfied. In general, the goals and purposes of the Agreement include:

1. Non-biased police practices when selecting and detaining civilian subjects during preliminary investigations;

2. Accountability by CPD and its members to the parties and the public for lawful and legitimate use of law enforcement authority when conducting investigatory stops and protective pat downs; and

3. Transparency by CPD members when documenting and reporting all investigatory stop and protective pat down activity; and reviewing supervisors and executive officers when reviewing submitted investigatory stop reports for legal and policy compliance.

One of the Agreement's distinguishing characteristics is that the Department drives its own reforms by designing them, implementing them, overseeing them, and making



changes, where necessary, to ensure that the goal of substantial compliance with all applicable laws is achieved. In the Agreement, the parties acknowledge that the Department did not admit to any wrongdoing related to its stop and frisk policies and practices prior to signing the Agreement. Instead, the Department entered into the Agreement as a pro-active measure to ensure continued compliance with applicable laws.

The benefit of the Agreement, in contrast to a consent decree, is that it gives the parties a certain measure of flexibility to respond to the feedback of the Consultant, who reviews the ISR data for the purpose of advising the parties and recommending changes that will, if necessary, help the Department to achieve substantial compliance with the terms of the Agreement. As a cooperative venture, the Agreement does not impose penalties upon the Department for non-compliance with agreed-upon benchmarks, but it does require public reports, like this one, so that there is a measure of public accountability for its reform efforts. To ensure that the public is fully apprised of those efforts, through the end of CY2017, the Consultant respectfully submits this report for consideration.

## PART II. THE AGREEMENT: REQUIRED POLICIES & PROCEDURES

*The Investigatory Stop System is one of the ways the Chicago Police Department, as part of and empowered by the community, ensures that we protect the public, preserve the rights of all members of the community, and enforce the law impartially. Adherence to this policy allows the Department to serve all citizens equally with fairness, dignity, and respect, and to uphold our pledge to not use racial profiling and other bias-based policing.*

*See, e.g., Special Order 04-13-09, Section III.A. (Exhibit 2).*

The Agreement's terms are intended to ensure that CPD's policies and practices relating to investigatory ("*Terry*") street stops[22] and protective pat downs ("*frisks*")[23] comply with all applicable laws, including the Fourth and Fourteenth Amendments to the United States ("U.S.") Constitution, the Illinois Constitution, and the Illinois Civil Rights Act ("ICRA"). The changes that the Department implemented, pursuant to the Agreement, are designed to create more accountability and transparency amongst Chicago police officers with respect to stop and frisk practices – both in the manner in which investigatory stops and frisks are conducted, as well as the manner in which they are reported in investigatory stop reports ("ISRs").

Review and assessments of the ISR data,[24] by the Consultant and designated experts, and the written findings contained in this report that are related to those assessments,

---

[22]An "investigatory stop" is the preliminary investigation of a person, who police officers reasonably suspect of criminal behavior, in a public (not private) location. To be lawful, the Fourth Amendment requires the police officer to articulate the facts and circumstances that the officer observed at the time the decision to stop was made, which justify the stop and/or pat down. *See, e.g., Terry v. Ohio*, 392 U.S. 1, 27-30 (1968).

[23]In this Report, the term "frisk(s)" includes both protective pat downs and searches related to those pat downs. *See, e.g., Terry,* 392 U.S. at 27-30. *See also* Timothy M. Ison, FOURTH AMENDMENT—OFFICER SAFETY AND THE PROTECTIVE AUTOMOBILE SEARCH: AN EXPANSION OF THE PAT-DOWN FRISK, 74 J. CRIM. L. & CRIMINOLOGY 1265, 1266 N. 9 (1983) ("A pat down frisk is a protective search to locate weapons that may be immediately used [by] the officer. A *Terry* search of an individual is generally restricted to a limited search of the outer clothing of the suspect. Only upon feeling an object that reasonably could be a weapon can the officer intrude under the clothing or into the pockets of the suspect."). Where the term "protective pat down" is used, by itself, the Consultant is specifically referring to the *limited search* of patting down the outer clothing of the subject. By contrast, a *related search* is distinct from a limited, protective pat down. A related search occurs subsequent in time to and as a direct result of the police officer's plain touch of the subject's outer clothing during the PPD. The Plain Touch Doctrine stands for the proposition that a police officer's pat down experience provides probable cause for an unlimited search inside the subject's clothing to retrieve the object(s) thought to be a weapon or firearm. Because the Agreement covers all protective pat down activity, the Consultant interprets the Agreement's terms to cover related searches. Related Searches may, hereafter be referred to variously as a "search"; "related search"; or as part of a "frisk" – which, by definition – includes the PPD.

[24]Reference to "data" in this report includes all of the following documentation (unless specifically described otherwise):



provide the basis for holding the Department accountable to the public. However, the CPD also revised its official stop and frisk policy directives, pursuant to the Agreement, to establish accountability systems within the Department. These include the design and provision of non-biased policing training initiatives, continuous district and department-level supervisory reviews of the ISR data, and systematized auditing of ISRs by executive officers within the Department. As the Consultant has indicated in prior reports, the revised policy directives that are set forth in Special Order 04-13-09 (rev. 06/16; and 07/17), if adhered to, should result in substantial compliance by the Department with the purposes and terms of the Agreement.

## OVERVIEW OF THE AGREEMENT'S HISTORY & PURPOSES

As implemented on January 1, 2016, the Agreement resulted in a number of significant police practices reforms. These were memorialized as revisions to the Department's Special Order 04-13-09, which governs all preliminary investigations by CPD[25].

The Agreement required various changes to how CPD documents information about the stops that it conducts, by requiring revisions to SO4-13-09. The revisions made by CPD discontinued use of the hard copy (paper) Contact Information Card and hard copy Juvenile Contact Information Card, introducing in its place the use of the Investigatory Stop System ("ISS"), for the documentation of Investigatory Stops, Protective Pat Downs, or other searches from stops, and the enforcement of the Gang and Narcotics-Related Loitering Ordinance. *See, e.g.,* Exhibit 6. The ISS also introduced the use of the hard copy Investigatory Stop Report ("ISR"); the ISR Database; the Investigatory Stop Receipt (CPD-11.912);[26] and Investigatory Stop Report Deficiency Notification ("DNR") (CPD-11.914). *See, e.g.,* Exhibit 9A-B. Investigatory Stop Reports (ISRs), therefore, can take two forms: the hard copy ISR

1. Aggregate ISR data from monthly data productions and the CY2017 "Main File";
2. Representative samples of **submitted** ISRs in single ("SVR") and multiple-version ("MVR") form;
3. Supervisory review notes and comments of rejected ISRs in the MVR sample;
4. DNRs and Oversight Observation Reports
5. Monthly Captains' audit reports (electronically stored) (all data)
6. Integrity Section daily audit reports (sampled, in paper form);
7. Special audits of UUW and Robbery arrest reports (samples);
8. ISR workflow protocols (interpreting SO4-13-09, Section VIII.C.); and
9. Civilian and internal complaints and investigations.

[25]Preliminary investigations include investigatory stops and protective pat downs (also referred to as limited searches and "frisks" and are characterized as discretionary law enforcement actions, rather than actions mandated by observed violations of the law (*e.g.,* stops based on probable cause).

[26] Investigatory stop receipts are not required by the terms of the Agreement and, although required by Illinois law and referred to from time-to-time, do not constitute a binding obligation upon the Department for purposes of the Agreement.



and the electronic ISR, which is retained in the ISR database. CPD Policy requires all sworn members who complete a hard copy version of the ISR to enter the data documented therein into the ISR Database by the end of their respective tours of duty.[27]

In addition to the mechanism that officers use for documenting investigatory stops and protective pat downs, the Agreement also required changes in the types of data collected and reported by officers. *See, e.g.,* Exhibit 1 (Agreement, Section I). Prior to the Agreement, protective pat downs and related searches were not reported, and neither were stops that led to enforcement actions, such as an Administrative Notice of Violation ("ANOV"), personal service citation ("PSC") or arrest. Now, based on the Agreement's terms, CPD must report these actions, even if the officer's observed violation of the law provided probable cause for the stop.[28]

These changes have been instrumental in transforming the police department from one that relied solely on hard-copy paper forms, without any measurable outside accountability, to one that is committed to accountability and transparency and the digital, electronic documentation of street stops and frisks. Indeed, *if adhered to by CPD members*, compliance with applicable laws and departmental directives regarding stop and frisk practices will ensure that the Department is released from its obligations under the Agreement in short order.

While it may appear from the contents and tone of this report that not much progress has been made by the Department, since the Agreement took effect, decidedly that is not the case. The Department has made a number of significant changes, such as expansion of the ISR data collection and supervisory review processes, described above, which have led to immense progress in the public accountability and transparency obligations of the Department being met and advanced.

These two sets of changes represent major shifts in police policy and public accountability that cannot be underestimated by anyone with a serious interest in police and community relationships and the goal of non-biased police stop and frisk practices. Thus, while this report concludes that ultimate compliance determinations on the legal questions at issue cannot be made, the fact that there is a process in place, pursuant to the Agreement,

---

[27]Digital entry of ISRs into the electronic ISR database is widely accessible via computers that are now installed in all CPD squad cars and/or within every police district precinct office, so the need to use hard copy ISRs, because the electronic system is not functioning properly, should be a rare occurrence.

[28]The only stop type that is not covered by the Agreement or Illinois law is the probable cause stop that does not result in a frisk, search, summons, issuance of a citation or ANOV or lead to an arrest. These probable cause stops are made based on observed violations of the law, and they permit police officers to exercise discretion, in the execution of their law enforcement authority, not to enforce the law after the stop is made. This type of stop, for the reasons discussed later in this report, is problematic for a number of reasons that relate to collecting all relevant investigatory stop and protective pat down data, pursuant to the Agreement.



for uncovering ISR data problems and the underlying police practices that are being reported, is a major step forward for the City of Chicago.

The overarching purpose of the Agreement is to ensure that CPD's policies and practices related to the investigatory stops and protective pat downs are conducted consistent with the following guidance provided by the U.S. Department of Justice:

> *In making routine or spontaneous law enforcement decisions, such as ordinary sidewalk and traffic stops, Chicago Police Department officers may not use race, ethnicity, national origin, religion, gender, gender identity, sexual orientation, marital status, parental status, or military discharge status, except that officers may rely on the listed characteristics in a specific subject description.*

*See, e.g.,* Exhibit 1 (Agreement, Section II.2).[29]   This purpose is acknowledged by the Department in the revisions it made to its investigatory stop and protective pat down policy, in Special Order 04-13-09, pursuant to the Agreement, by stating:

> *Department members will not engage in racial profiling or other bias based policing when conducting investigatory stops as delineated in the department directive entitled "Prohibition Regarding Racial Profiling and Other Bias-Based Policing". General Order 02-04.*

*See, e.g.,* Exhibit 2 (SO4-13-09, Section III.E.). (Emphasis in original).

This purpose also has been reinforced consistently in various training materials written by the Department for its members, including initial Department-wide training that occurred after the Agreement took effect in January 2016. *See, e.g.,* Exhibit 7A (iii) (CPD's Training Materials (08 Jan. 2016), page 4).   Indeed, the CPD's earliest written training materials indicate that it understood that the "new policy" reflected in SO4-13-09, as revised in January 2016, would have "positive outcomes" including:

1. Collection of data corroborating unbiased policing;
2. Accountability;
3. Transparency;
4. Protection of individual officers from legal action;[30]

---

[29]The CPD's own policies regarding investigatory stops and frisks also express this purpose.  *See, e.g.,* Exhibit 2B (Special Order 04-13-09 (rev. 07/17), Section III. A-B., Policy (*e.g.,* pledging not to use racial profiling and other bias-based policing; and, comport with the policy and procedures of SO4-13-09 "to ensure appropriate conduct when interacting with members of the public")).

[30]In consideration for its agreement, the ACLU agreed not to file or join as a party any lawsuit challenging CPD's policies or practices relating to investigatory stops and/or protective pat downs while this Agreement remains in effect. *See, e.g.*, Exhibit 1 (Agreement, VI.2.).



5. Training and Supervision;
6. Changed Public Perception of Police;
7. Compliance with the U.S. Constitution, the Illinois Constitution and the Illinois Civil Rights Act.

*See, e.g.,* Exhibit 7A. (Chicago Police Department Training Materials, dated 08 January 2016 ("CY2016 TM"), at 11). For example, in the training materials from CY2016, which introduced the Agreement between the parties to members of the CPD, the author(s) of these written materials indicates, as follows:

> *According to the Agreement, there will be an independent evaluation of our practices and procedures regarding investigatory stops. While the evaluation will not change the way that we conduct investigatory stops, which are based on reasonable suspicion, it will change the way that we document them... [T]he Chicago Police Department is committed to increasing transparency and building trust with our communities.*

*Id.* (CY2016 TM at 2).

To ensure internal department accountability (*i.e.,* that police officers performing stops and frisks on Chicago streets remain accountable to the law and CPD policy directives), the Agreement provides for continuous, district-level supervisory review and quarterly or semi-annual department-level audits of all investigatory stops and frisks. *See, e.g.,* Exhibit 1 (Agreement, Section I & II. 3). The Agreement's terms provide a roadmap for supervisors, as well as police officers, to be accountable for the lawfulness and legitimacy of reported stops and frisks **in measurable, document-driven ways, which can be evaluated over-time.**

According to the Agreement, the duty to evaluate the CPD's stop and frisk practices and reporting obligations belongs to the Consultant in the first instance, because, ultimately, the Agreement tasks the Consultant with answering the question of whether the Department is holding its members accountable for the compliance obligations imposed by applicable laws and the Agreement. To fulfill this duty, the Consultant must examine the CPD's internal accountability structures, such as supervisory review of ISRs and the auditing methods of executive officers, as well as investigations of civilian and internal complaints and the sufficiency of training and corrective actions within the Department.[31]

---

[31]At the present time, statistical analysis of the Consultant's qualitative observations of the CPD's supervisory review and auditing methods, civilian and internal complaint investigation results, and other policy-related questions is not subject to statistical analysis (*e.g.,* the error rate of reviewing supervisors when assessing whether ISRs submitted by police officers are justified by the Fourth Amendment and/or Departmental directives regarding proper review processes). Whether the Agreement can be interpreted to include such statistical analysis is an open question that the parties and Consultant may need to discuss for future reporting periods, given the findings made in this report.



Accountability to the public is an important part of the Agreement. This accountability is not self-executing, however. It requires transparency by police officers when they document (by articulating in writing) the factual basis for the investigatory stops and frisks in the Investigatory Stop Reports ("ISRs"); and transparency by supervisors in the written comments required when they reject submitted ISRs because the officer's articulation of factual justification for the stop and/or frisk is not sufficient to comply with Fourth Amendment standards and/or CPD's policy directives in SO4-13-09. Without such transparency, the Consultant cannot validate whether the ISRs, as submitted, are credible reports of the actual stop and frisk conduct on the streets of Chicago, nor can he validate the supervisory review methods established for holding police officers accountable to applicable laws and policy directives.

Transparency by a police officer is apparent when the original ISR submitted by an officer documents the stop and/or frisk in a procedurally correct manner, without inconsistencies, and in a manner such that any subsequent version(s) of the ISR do not result in material changes to information provided. Transparency by a unit supervisor is apparent when an ISR being rejected for a substantive, RAS-related deficiency is identified in plain English using the correct report status code and the correct supervisory review format for communicating the RAS-error to the officer (as well as to any subsequent reviewers (such as the Consultant) and/or CPD auditors).

To be clear, transparency does not require an officer to be absolutely correct with respect to the stop and/or frisk. The law requires any officer to base a stop or a frisk on reasonable suspicion, but it does not require that the suspicion turn out to be well-founded or absolutely accurate for that stop to be justified. That is, so long as an officer can clearly articulate facts and circumstances that would lead a reasonable officer to conclude that criminal activity has been, is, or will soon occur, the extent to which this suspicion is validated or affirmed after the stop occurs does not change the fact that the stop was justified. Thus, transparency in the area of stops and frisks relates to the Department's ability to document information about officer activities, supervisory review of those activities, and instances where initial documentation has been flagged by supervisors for deficiencies.

These requirements appear to be a stumbling block, not only for rank-and-file street patrol officers, but also for some of the Department's reviewing supervisors and executive officers. When stops and frisks are being reported and reviewed, officers and/or supervisors need to be accountable for their actions. Since the Agreement took effect, the Consultant has identified a number of problems that required the Department to make changes to the ISR database, the way the database produces ISR data for review and assessment, and the manner in which ISRs are being audited by executive officers and, with this report, the manner and methods of supervisory review.[32] The identified problems stem from

---

[32]In Period 1, for example, the Consultant identified a problem with the ISR Database, which required CPD to make changes to the database (hereafter the "versioning system modifications"). These changes were necessary to preserve the original ISRs submitted by police officers with the present sense articulations of RAS



misinterpretations and misapplications of the Department's Policy by various members of the Department.

This critical point has been the subject of department-wide training, refresher training and individual training. Thus, there is no good reason why the CPD's ISR data from Periods 3 and 4 of CY2017 continues to be problematic. As discussed in the following pages, the CPD has misinterpreted its Policy by implementing the ISR Workflow Protocols, which does not, in the Consultant's view, comport with the Fourth Amendment's articulation requirement, a plain reading of the Policy or the terms of the Agreement. In particular, some district-level supervisory review comments lack sufficient transparency to be audited by the Department, let alone validated by the Consultant. Without transparency, the Department cannot hold its members accountable for compliance with the law, and the Consultant cannot report and validate that such accountability is taking place within the Department to members of the public.

## THE TERMS OF THE AGREEMENT

The terms of the Agreement are broad. They do not provide the functional, step-by-step guidance that CPD's policy directives do. However, one of the Agreement's most distinguishing characteristics is that it gives the Department the primary role in designing its own reforms and complying with them. The consideration for such flexibility given by the Department to the ACLU and the City, was that it would remain accountable to its own revised stop and frisk policy directives in Special Order 04-13-09; to the other parties to the Agreement; and to the Consultant. *See, e.g.,* Exhibit 1 (Agreement, Section V.).

A number of specific terms, however, were negotiated and agreed upon. For example, in Section I., the Agreement requires CPD to document all investigatory stops *and* protective pat downs, including those that lead to an arrest, an administrative notice of violation ("ANOV"), or other enforcement action. Prior to the Agreement, CPD did not document or collect data about protective pat downs, but now they do. Also, prior to the Agreement, the Department did not document stops that led to enforcement actions, such as those resulting in a ticket, citation (*e.g.,* administrative notice of violation or "ANOV") or arrest. Thus, the Agreement expanded the types of stop and frisk data that CPD was required to document, collect and preserve.[33]

---

for the stop and/or frisk, as well as the notes and comments by reviewing supervisors related to the ISRs, for production and review by the Consultant and experts, pursuant to the terms of the Agreement. In Period 2, the Consultant identified, among other things, another serious problem related to non-production of ISRs in a preliminary ("PRE") or saved status that police officers generated, indicating that a stop and/or frisk had been made, but had not submitted during the review period or for the production of ISRs from the review period for the Consultant's review and assessment.

[33]Although the Agreement only covers investigatory stops and protective pat downs (and, if related, searches conducted pursuant to those pat downs), amendments to Illinois law, which took effect on the same



This accountability requires the Department to be pro-active in a number of ways. *First*, the Department must provide to the Consultant all ISR data, as well as any other data or documents necessary to ensure and validate that CPD's policies and practices relating to investigatory stops and protective pat downs fully comply with applicable law. *See, e.g.,* Exhibit 1 (Agreement, Fifth Preamble). *Second*, to the extent certain documents are not provided but requested, the Department is also required to give the Consultant, the experts, and the ACLU access to these materials. Comprehensive production of ISR data and relevant documents associated with the data and data processing of it, as well as complete access to the Department's data, is an absolutely necessary prerequisite for ensuring substantial compliance with the Agreement's terms.

Last, but not least, the Fifth Preamble to the Agreement was one of the first and most important terms of the Agreement. In it, the parties agreed to **work together** to ensure compliance with the Agreement's terms. The stated intention to work together in good faith is juxtaposed against the agreement to forego litigation in federal and/or state courts regarding the parties' disputes.

## THE CONSULTANT'S DUTIES

The Agreement assigns the following three principal duties to the Consultant: to **review** stop and frisk data for compliance with applicable laws and Departmental policies; to **report, in writing,** the results of his review and assessments to the parties (in draft form) and (in final form) to the public; to **recommend** changes to CPD's stop and frisk policies, if reasonably necessary to effect compliance with the law; and to **validate**, if possible, the CPD's supervisory review and auditing methods (presumably not only as devised, but also as implemented (and enforced) to ensure accountability and transparency within the Department. *See, e.g.,* Exhibit 1 (Agreement, § V).

---

day as the Agreement, require CPD to produce additional data related to probable cause stops and searches beyond a protective pat down. *See, e.g.,* Traffic and Pedestrian Stop Statistical Study Act ("TPSSS"), 625 ILCS 5/11-212 (amended by Public Act 99-352 on August 12, 2015 to add requirements for data collection for "all frisks, searches, summons and arrests" for pedestrians, as well as for traffic stops). The Consultant understands that the ISR Forms were and have been designed to collect data for purposes of its reporting obligations under both the Agreement and the TPSSS.

The ISR, therefore, contains data required by the State of Illinois, as well as the Agreement. *See Id.* At the time the TPSSS was amended to include data collection for pedestrian stops, the Illinois law was scheduled to automatically sunset on July 1, 2019; but, on June 21, 2019, the Governor of Illinois approved Public Act 101-0024 (based on House Bill 1613), repealing the sunset provision and making the data collection requirements of the TPSSS applicable to both traffic and pedestrians through March 2022.

The Agreement directs the Consultant to review relevant data and documents, including but not limited to:

1. The method of supervisory review and auditing investigatory stops and protective pat downs. (*See Id.* § V. 2. (a)).
2. Civilian complaints and disciplinary files. (*See Id.*, at V.2. (c));
3. The narrative sections from a statistically representative sample of ISRs to determine whether police officers articulated the Fourth Amendment legal requirement of reasonable suspicion for the investigatory stop and/or any protective pat down. (*See Id.,* at V.2. (d));
4. Aggregate ISR data from each review period to determine compliance by the CPD with Section IV.2 of the Agreement (*e.g.,* whether a serious and systemic violation of the Agreement's terms exists and was not identified or remedied in a timely manner by the CPD) (*See Id.,* at V.2. (e)); and, by reference to Section IV. 2.; and,
5. Aggregate ISR data from each review period to determine substantial compliance by the CPD with all other terms in the Agreement, including but not limited to Section IV.3, prohibiting violations of ICRA, which prohibits the CPD from engaging in stop and/or any protective pat downs or related searches that disparately impact racial and ethnic minority groups. *See, e.g., Id.,* Section V.).

In his written reports, the Consultant also must describe and interpret the results set forth in the statistical reports from the designated experts, who provide input regarding their statistical assessments and analysis of the underlying ISR data, as well as the digital codes the Consultant assigned identifying his Fourth Amendment determinations for each of the ISR samples. This report, and the findings and recommendations in it, are intended to identify and to make recommendations to the Department to aid it in its attempt to remedy the observed violations of its stop and frisk policies and practices identified herein.

## THE CHICAGO POLICE DEPARTMENT'S OBLIGATIONS

The terms of the Agreement require compliance by CPD members with the written directives in Special Order 04-13-09, which constitutes the Department's official, written policy for preliminary investigations (*e.g.,* investigatory stops, detention of subjects based on reasonable suspicion, protective pat downs for weapons and/or firearms, and searches related to protective pat downs that are justified by probable cause generated from plain touch of the subject's outer clothing during the protective pat down – collectively referred to as "frisks"). CPD policy also governs the documentation requirements for ISRs, and the responsibilities of supervisors and executive officers for ensuring that department members comply with internal department directives, as well as applicable laws, when reviewing and auditing ISRs, training officers, and investigating civilian and internal complaints.



# PART III. ASSESSMENT OF THE DEPARTMENT'S COMPLIANCE WITH STOP & FRISK POLICIES, PROCEDURES & PRACTICES

## THE CONSULTANT'S INTERPRETATION OF THE POLICY DIRECTIVES

Words matter in a contract, as do the absence of words. The words used to describe "the action taken to address a deficiency" in the policy do not list any examples that include correcting the investigatory stop report. Rather, all listed actions refer to correcting the police officer based on the identified deficiency, by policy review, training, and if necessary, progressive discipline. *See, e.g.,* Exhibit 2 (S04-13-09, VIII.C.1.d. (2) (a) - (b), NOTE). By contrast, the language and structure of the policy in subsection (2) can be contrasted with subsection (3), which does direct reviewing supervisors to "[i]nstruct the preparing sworn member to address the error and resubmit the [ISR] by the conclusion of the sworn member's tour of duty."

Taken as a whole, the policy seems to indicate that supervisors are not to return to police officers any rejected ISRs based on the four deficiencies listed in Section VIII.C.1.d. (2) (a) - (d), including those that fail to articulate RAS. Instead, reviewing supervisors are to complete a Deficiency Rejection Notification Report ("DNR"), which is automatically generated by the CPD's current electronic ISR Database when reviewing supervisors reject a submitted ISR, based upon a substantive, RAS-related deficiency such as at least two of the four identified in Section VIII., and – when completed – is then automatically forwarded to the Integrity Section.

The DNR serves as a tool for the Department's executive officers, as well as the Integrity Section to correct the officer who performed an unjustified stop and/or frisk. *See* Exhibit 9A. The DNR not only requires reviewing supervisors to have a personal conversation with the reporting officer, but also to provide *enhanced supervision* (presumably by monitoring future stop and frisk practices and reports to ensure that the same mistakes are not made again); *refresher training* (because department-wide general training and/or the assigned shift-roll-call training apparently did not sink in the first time); and/or *progressive discipline*.

The Consultant's interpretation of the NOTE to Section VIII is that:

1. The DNR is a valuable, formal method of internal departmental-level accountability for district-level ISR auditing and supervisory review methods; it is the tool, identified by CPD policy, chosen as the means by which the Commanding Officer of the Integrity Section is notified, by source-unit supervisors (or others acting in their stead), when ISRs with substantive RAS deficiencies (errors) are submitted by police officers. *See, e.g.,* Exhibit 2 (SO4-13-09, Section VIII. C. 1.d. (2) (a)-(d) NOTE).



2. The Policy requires reviewing supervisors to forward *all* DNRs to the Integrity Section Commander. Indeed, the Consultant has been advised that the ISR database, as designed, automatically generates a DNR for all ISRs identified as substantively deficient (based on the rejection status codes assigned to them) and electronically forwards all completed DNRs to the Integrity Section. The Consultant also interprets the Policy to *require* the Integrity Section to look at *all* DNRs received, since one of the Integrity Section's jobs is to review ISRs that are rejected for lack of legal justification (RAS) or submitted in error and finalize them.[34]

The Department has the obligation, with regard to review and assessment of ISR data, to enforce its own policy directives. *See, e.g.,* Exhibit 1 (Agreement, Section II. 3.) The Consultant's review of the supervisory reviews and auditing reports do not indicate that such enforcement is occurring on either a department or district-level. In this regard, it is not clear whether the Commander of the Integrity Section, to whom the Department has assigned its enforcement obligations, has the authority to do more than suggest and remind district-level Captains, who serve as executive officers and audit ISR workflow, to enforce the policy directives.

A written policy (internal directive) is only effective as enforced. Thus, while the CPD has, in fact, *successfully established* written policies and procedures that comply with the terms of the Agreement, it has also, in some instances, *failed to enforce* such policies in identifiable and measurable ways. *See, e.g.,* Exhibit 1 (Agreement, Section II. 3.) (CPD "shall *establish and enforce* policies providing for continuous *district-level supervisory* review and quarterly or bi-annual *department-level audits* of [its] stop and frisk practices") (emphasis added)). It should go without saying that adherence to internal directives by the members of CPD making, reporting and reviewing street stops and frisks is an imperative. Yet, such *adherence to the internal directives set forth in Special Order 04-13-09 (rev. 7/17)*, regarding supervisory review and auditing methods and purposes, *appears to be lacking in a significant number of ways. See, e.g.,* Exhibit 2 (SO4-13-09 (rev. 7/17), Section VIII.C.1.d. (1) - (2) (a)-(d), and NOTE).

Nowhere in the CPD's written policy is a reviewing supervisor authorized to return an ISR to an officer when the officer failed to articulate reasonable suspicion supporting the decision to stop the subject for a preliminary investigation (investigatory stop) and/or

---

[34]In response to questions from the Consultant, the City and CPD concede that the Integrity Section does *not look* at every DNR associated with ISRs that are placed into a deficiency rejection status (with a "DEF" report status code); these ISRs have been rejected for a failure to articulate RAS, even when the DNRs are forwarded to the Integrity Section, as required by CPD policy. *See, e.g.,* Exhibit 13 (Letter from T. Dixon, City of Chicago Law Department, to the Consultant, dated October 30, 2018, at page 11, point 4) (*hereafter*, "City's Letter of 10/30/18").



perform a protective pat down during the stop – even if the stop was brief and temporary, as required by the Fourth Amendment.

To be reasonable, the suspicion must be based on facts and circumstances confronting the officer *at the time the stop was made*. "Analytical hindsight" and post-ISR submission reasoning by the officer and/or post-submission discussion with the reviewing supervisor, who then directs the officer to make changes not indicated by the original ISR, is not expressed as a goal of the Policy, nor does the Policy indicate that reviewing supervisors should emphasize approval of the ISR over proper identification and rejection of illegitimate and unlawful stop and frisk conduct, as reported in the original ISR. This method of ISR reporting and review cannot and should not be permitted. *See, e.g.,* Exhibit 2 (SO4-13-09, II.D.).

## THE IMPACT OF THE ISR WORKFLOW ("PROTOCOLS")[35]

Much of the remaining sections of this report will be devoted to describing and explaining the ways in which the ISR Workflow Protocols (reprinted below), both as written and as applied, have tended to undermine the integrity and credibility of the ISR data on which the Consultant's assessments, as well as the statistical results contained in this report, depend. As will be repeated, time and again, throughout this report, without such reliability, the underlying ISR data produced and any statistical results reported here that are based upon it cannot be relied upon by the parties or the public to answer outstanding legal or statistical questions. Instead, the unknown reliability of the underlying ISR data, once again, requires a finding that legal determinations regarding compliance simply cannot be made. Determinations regarding CPD's supervisory review and auditing methods, however, *can be* made.

One of the Consultant's duties in assessing whether the CPD has complied with the terms of the Agreement is to determine whether CPD's supervisory review and auditing methods can be validated. *See, e.g.,* Exhibit 1 (Agreement, Section V.2. (a)). With all due respect to the source-unit supervisors and executive officers who interpret and apply CPD's stop and frisk policy, the Consultant cannot validate the CPD's methods because, *as written*, the ISR Workflow Protocols, created for their use in interpreting the Policy, violate the Agreement, in Section IV.2., and CPD's Policy, in Section VIII. In addition, during the Consultant's review of the MVR samples, he observed numerous instances where some supervisors and executive officers misapplied the very Protocols that already misinterpret CPD Policy, by using administrative rejection codes to return ISRs with substantive

---

[35]In addition to the ISR Workflow Protocols, there is a letter from the City Law Department describing the ISR Workflow Protocols in terms of how they function, *and* how the ISR database is operated when using them, *see* Exhibit 10 (Letter dated October 30, 2018).



deficiencies, thereby creating multiple levels of non-compliance with the Agreement's terms and the Fourth Amendment.

Thus, when the Department established the Protocols as the working policy for reviewing supervisors to manage ISR workflow, the misinterpretation of the Policy (and the Fourth Amendment's articulation requirements for officers) embedded within those Protocols, invalidated CPD's supervisory methods. Additionally, during the Consultant's review of the multiple version ISR samples, he observed that most of the rejected ISRs with RAS/Fourth Amendment justification errors were characterized as administrative errors by an unknown number of reviewing supervisors, in contravention of CPD Policy and the Protocols. Thus, the Consultant cannot validate that the CPD's supervisory review methods substantially comply with the terms of the Agreement. As outlined, the ISR Workflow Protocols, set forth below, instruct Source-Unit Supervisors in the review methods to employ when errors are identified in submitted ISRs. *See, e.g.,* Consultant's Figure 1 (ISR Workflow Protocols), Exhibit 3 (including ISR Workflow Flow Chart). In the opinion of the Consultant, these Protocols are based on an erroneous interpretation of how the Investigatory Stop System was designed to function, at the level of initial supervisory review of ISRs, based on the provisions of Special Order 04-13-09.



CONSULTANT'S FIGURE 1.

## ISR WORKFLOW

1. **PRELIMINARY (PRE)**
   a. When an author begins an ISR and saves it, it will appear in "Preliminary" status.
   b. After saving, the author then may submit it, or may do so at another time[,] *before the end of the author's tour of duty.*

2. **SUBMITTED FOR CANCELLATION (SCN)**
   a. If an author creates an ISR in error, including in cases where the author accidentally creates a duplicate ISR, the author may submit that ISR for cancellation. Only ISRs in Preliminary status may be submitted for cancellation.
   b. ISRs that have been submitted for cancellation are sent to the Source Unit Supervisor to approve the cancellation.
   c. If the supervisor approves the cancellation of an ISR, it will appear in 'Cancelled" (CNL) status. If a supervisor finds a cancellation is not warranted, the supervisor will place the ISR into Deficiency Rejection Review (REV) status.

3. **SUBMITTED (SUB)**
   a. After completing the ISR, the author submits the ISR for review by a Source Unit Supervisor.
   b. After reviewing the ISR, the supervisor must place the report in one of the following statuses: Approved, Administrative Rejection, Deficiency Rejection, or Deficiency Rejection Review.
   c. *The supervisor must complete the review by the end of his or her tour of duty.*

4. **APPROVED (APR)**
   a. Approved ISRs are those reports submitted by the author and approved by the Source Unit Supervisor.



(Continued)

5. **ADMINISTRATIVE REJECTION (REJ)**
    a. Administrative Rejections are those ISRs rejected by the Source Unit Supervisor for an error such as a clerical mistake or simple omission.
    b. The supervisor returns the ISR to the author for correction and resubmission.
    c. Once corrected, the author resubmits the ISR to the supervisor for review.
    d. After reviewing the ISR, the supervisor must place the report in one of the following statuses:  Approved, Administrative Rejection, Deficiency Rejection, or Deficiency Rejection Review.
    e. The ISR is Archived (CLD/ARC) in its form before any corrections [are] made.
6. **DEFICIENCY REJECTION (DEF)**
    a. Deficiency Rejections are those ISRs rejected by the Source Unit Supervisor for a substantive error, such as where the author has not articulated reasonable articulable suspicion for the investigatory stop or any protective pat down, or has not articulated probable cause for any search,; or the hard copy does not match the submitted electronic version.
    b. The supervisor returns the ISR to the author for correction and resubmission.
    c. Once corrected (if possible), the author resubmits the ISR to the supervisor for review.
    d. After reviewing the ISR, the supervisor must place the report in one of the following statuses:  Approved, Administrative Rejection, Deficiency Rejection, or Deficiency Rejection Review.
    e. The ISR is archived in its [original] form before any corrections [are] made.
7. **DEFICIENCY REJECTION REVIEW (REV)**
    a. If a Source Unit Supervisor determines that an ISR (including an ISR that has been corrected and resubmitted) fails to state reasonable articulable suspicion for the investigatory stop and/or any protective pat down or probable cause for any search, or that the ISR was created in error, the supervisor must place the ISR in Deficiency Rejection Review.
    b. The Integrity Unit [/Section] reviews all ISRs placed in a Deficiency Rejection Review.
    c. After reviewing an ISR placed in Deficiency Rejection Review, the Integrity Unit may:
        i. Determine the ISR is consistent with Department policy and place it an Approved Status.
        ii. Determine that the ISR is deficient but correctable and place it in Deficiency Rejection status.  The ISR will be returned to the author for correction and resubmission to his or her Source Unit Supervisor.
        iii. Concur with the Source Unit Supervisor that the ISR is substantively deficient and cannot be corrected.  In these circumstances, the Integrity Unit [/Section] will place the ISR in Deficiency Rejection Review Final (FIN).



## THE CONFLICT BETWEEN ISR WORKFLOW PROTOCOLS & CPD POLICY
### *As Written*

As written, the ISR Workflow Protocols misinterpret the provisions of CPD Policy set forth in Section VIII.C.1.d. 2 (a) - (d), because the Protocols distinguish between two types of RAS errors and treat those two types of errors differently.[36]  The difference is observed when a police officer submits an ISR, indicating that the officer did not have Fourth Amendment justification, as articulated in the narrative remarks section and/or the checked boxes, for the stop and/or frisk.

Under CPD Policy, a reviewing supervisor is instructed to reject the ISR and complete a DNR; but, under the ISR Workflow Protocols, the supervisor is permitted to *return the original ISR,* with two of the four identified deficiencies in the Policy that require rejection, to the officer for correction of the identified Fourth Amendment justification error*, and to resubmit the corrected ISR,* as a new version to the reviewing supervisor (hereafter, the "return and resubmission" process).   As written, the return and resubmission process contained in the Protocols has the effect of violating the Fourth Amendment and, therefore, cannot be validated as complying with applicable law or the terms of the Agreement.[37]

The Consultant does not read the terms of the Agreement or CPD's policy provisions to authorize the Department to treat ISRs where officers have "failed to articulate" RAS differently from ISRs where the officer "failed to state" RAS; nor does the Policy indicate that the two types of rejections should have different consequences.  For both, the DNR is required, and CPD Policy expressly states that the supervisor must indicate in the DNR which corrective actions were taken to address the deficiency that are *related to the officer, not the ISR* that was submitted.

The ISR workflow, on the other hand, presumes that corrections can be made to the RAS-deficient ISR, as well, in cases where the deficiency was simply a failure to articulate the facts and circumstances justifying the stop, rather than a case where no facts and circumstances justified the actions taken (*i.e.,* a "failure to state" justification).  Thus, the ISR Workflow Protocols that require supervisors to do so conflicts with the provisions of CPD

---

[36]The ISR Workflow Protocols may have been created  as a tool to help reviewing supervisors manage the ISR workflow, but they have been used as a way to bypass many of the most essential requirements of CPD Policy and the Agreement, including the DNR requirement.

[37]There are a number of serious problems with the ISR Workflow Protocols, all of which are reflected in the layers of multiple-version ISR data that the Consultant and his experts have been busy unpacking.  Some of these problems were identified in the Second Report.  The remainder are addressed in this report, because the full import of the return and resubmission process for substantively deficient ISRs can be seen with greater clarity in the larger number of MVRs (642) from Periods 3 and 4.



Policy. *See, e.g.,* Consultant's Figure 2, below, comparing the directive in the policy versus the protocols in the workflow interpretation of the policy.

Consultant's Figure 2. Comparing CPD Policy Directives & ISR Workflow Protocols Re: Fourth Amendment Standards.

| CPD Policy Directives | Return of ISR – Yes or No? | | | | ISR Workflow Protocols |
|---|---|---|---|---|---|
| 1. Failure to document justification | ← | NO | *Yes* → | | 1. Failure to articulate RAS |
| 2. Improper justification | ← | NO | NO → | | 2. Fail to state RAS |
| 3. Failure to submit a hard copy of the ISR that matches the digitally input electronic ISR | ← | NO | *Yes* → | | 3. Hard copy does not match submitted electronic version of ISR |
| 4. Erroneous submission of an ISR (that should not have been written) | ← | NO | NO → | | 5. ISR created in error |

*Sources: Exhibit 2 (SO4-13-09, Section VIII). Cf. Exhibit 3 (ISR Workflow Protocols)*

## As Applied

Beyond the semantic difference in the choice of words used to describe the situation where a police officer fails to articulate justification in the ISR, the **effective difference** is that the ISR policy does not contemplate return of any ISR with an RAS-related deficiency; whereas, the ISR workflow protocols not only contemplate it, but require it. The effective difference is significant, because it permits police officers to rearticulate with "analytical hindsight" the facts and circumstances that justified the stop and/or frisk reported, after a supervisor has reviewed the original ISR and identified a substantive error, at best, and coached or instructed the officer in how to change the ISR so that it can be approved, at worst.

*If the Integrity Section* does not review all DNRs forwarded based on identified RAS-errors, and **cannot assure** that it will review all DNRs forwarded, *then how can it* **ensure** that it has identified officers who repeatedly fail to document stops and/or frisks or who conduct such stops and frisks without RAS? *See, e.g.,* Exhibit 1 (Agreement, II.3. (b)(ii)).

## As Misapplied

The Protocols not only conflict with CPD Policy and applicable Fourth Amendment standards, as written and applied, but they are also being prevalently *misapplied* by an



unknown number of source-unit supervisors who are rejecting ISRs with substantive RAS deficiencies as administrative errors by using the REJ report status code. Use of the REJ code appears to be a favored tool for rejecting ISRs that failed to articulate RAS, as noted in the monthly audit reports of one executive officer who routinely included instructions, in his monthly audit reports, to his source-unit supervisors to make use of the REJ report status code to reject ISRs with deficiencies as a means of moving them through the workflow to obtain approved status.

In summary, once the RAS-deficient ISR is labeled as an REJ, it effectively flies under the radar of any kind of review or auditing process of any kind apart from the source unit supervisor who assigned it and the officer who received the returned ISR. Thus, by assigning an REJ code, rather than a DEF code (which would allow return of the ISR, but also require completion of a DNR), some source unit supervisors by-pass the DNR requirement and effectively avoid scrutiny by non-district reviewers, both inside and outside the CPD, and thus the accountability required by the Agreement.

## The Consequences

Misapplication of the REJ report status code has several consequences, the implications of which support several hard-to-avoid inferences of misconduct by some reviewing supervisors and executive officers.

1. During his review of the MVR samples, the Consultant observed that misuse of the administrative rejection status code was quite prevalent among the representative samples. Misuse of the REJ code for ISRs with Fourth Amendment justification errors appears to reflect a misplaced emphasis by some supervisors and executive officers on ensuring that ISRs are moved through the workflow in a timely manner for the purpose of being approved and finalized, rather than reviewed to determine if the stop and/or frisk was conducted properly. Stated differently, it appears that, in some police districts, the emphasis by some supervisors (Sergeants) and some executive officers (Captains) is on writing the ISRs correctly, rather than training their officers to conduct them properly.

2. Instead, when using the REJ code, supervisors are permitted to make notes or instruct officers in a space on the returned ISR for "comments." This comments section is expressly recognized by the Special Order as a means for conveying administrative errors to officers (*e.g.,* identification of a typographical or grammatical error, or failure to include the name of the second or assisting officer, or the address of the subject) and instructing them on how to correct it. *See, e.g.,* Exhibit 2 (SO4-13-09, Section VIII. C.1.d. (3) ("…document the corrective action taken in the comments section within the Investigatory Stop Database.").

3. When reviewing supervisors use the comments section to identify a substantive RAS deficiency, rather than the DNR, the comments section does not become a separate record associated with the ISR's unique number, as is true when a DNR



is completed after rejecting an ISR as deficient ("DEF") or in need of the Integrity Section's deficiency rejection review ("REV").

The ISR is then returned to the officer for correction (*i.e.,* to make changes to the check boxes and/or articulated basis for the stop and/or frisk) and resubmission as a new version and then final approval by the reviewing supervisor. This method avoids completing a DNR, and avoids identification of the original ISR as substantively deficient for purposes of collecting data about how many ISRs articulated the fact that stops and frisks were conducted without justification on the first try.

The return and resubmission process undermines the integrity and credibility of the ISR data, not only from a qualitative legal perspective, with respect to the Consultant's Fourth Amendment justification determinations (*i.e.,* the coded legal narratives review), but also with respect to the statistical experts' assessment of the aggregate ISR data used to provide input into whether the CPD's stop and frisk policies and practices do or do not substantially comply with ICRA.

## *Implications & Inferences*

There are several implications and inferences when supervisors reject an ISR for administrative rather than substantive reasons.

1. By assigning administrative rejection status codes to ISRs with substantive, rather than administrative deficiencies (and/or failing to identify substantive as well as administrative deficiencies, which warrants rejection of the ISR using the proper status codes), reviewing supervisors are permitted to avoid accountability and transparency for their actions and decisions, because a DNR is not required. Instead, only minimal comments are necessary in the ISR to permit return of the ISR to the officer to make the changes or corrections indicated by the reviewing supervisor.

2. This supervisory review method permits supervisors to reject ISRs in ways that do not appear as substantive rejections of subordinate officers' reports; and avoids potential scrutiny from executive officer level (and/or the Consultant's) review of a DNR. Indeed, unless the rejected ISR happens to be selected as part of the multiple-version ISR sample, the comments made in the comments sections fly under the radar of most auditors and reviewers, including the Consultant, who cannot review all the unique ISRs, numbering in the tens of thousands of records that are submitted each reporting period.

What harm is there if the ISR can be returned to the officer for correcting using either the DEF or REJ status code? Plenty.

1. A DEF report status code is assigned to the unique ISR within the ISR database and is reported to the Consultant and experts each month. As such, the number



of DEF status ISRs can be quantified as part of the Consultant's assessment of whether the CPD's supervisory review methods are, in fact, being complied with by its supervisors (because compliance with CPD's written policy would, in effect, be substantial compliance with the Agreement, because it would reflect that proper legal determinations are being made on a regular basis by most supervisors).

2. A DEF report status code signals that the supervisor knows that there has been a substantive RAS error and goes on record, officially and on paper, as identifying that error. Such identification requires written articulation by the supervisor that is forwarded to the Integrity Section. Thus, this determination is subject to *internal, departmental accountability*, if not also accountability to the Consultant (who reports his independent findings to the public) and the other parties.

   a. This accountability requires a level of transparency by the supervisor in his/her documented articulation of the RAS error identified, which includes documenting that appropriate corrective measures were ordered by the supervisor and taken by the officer, to ensure that the same mistake does not happen again.

   b. **The DNR also requires the signature of the supervisor.** In this way, the DEF report status code (similar to the REV status code) ensures that CPD supervisors are enforcing the law within the Department, as well as outside the Department.

3. A DEF report status code, unlike the REJ code, requires completion of the DNR, as indicated above. An REJ code only requires comments to be digitally entered into the ISR database, which are possibly never reviewed or seen by anyone other than the reporting officer.

4. A DEF report status code, because it requires a DNR, also permits executive officers to identify and track which officers and supervisors repeatedly fail to document RAS and/or fail to make justified stops and frisks. This function of the DEF code, in combination with the automated DNR, does lead to progressive discipline.

Progressive discipline, rather than something to be avoided, is an internal, departmental enforcement tool for the benefit of its members, members of the public and, ultimately, the Department, itself. The Department has been given the opportunity to use it, at its own discretion, during the life of the Agreement, to make early detections of officers and supervisors who are not complying with applicable laws and/or Department directives. Surely the Department would want to know which members (if any) repeatedly fail to comply with the law when they attempt to enforce the law. If detected early enough, such members may benefit from progressive discipline and the other interventions at the Department's disposal to protect the welfare of the officer, the Department, and members of the public with whom the officer will come into contact.

The Consultant has not attempted to identify the number or identifies of the source unit supervisors who are engaging in misapplication of the Protocols by using the REJ code,



because identification of CPD members who make repeated errors, such as this, is a duty that belongs to the Integrity Section, pursuant to Section II.3.b.(ii). The Consultant's duty is simply to bring this matter to the Department's attention and to determine whether the problem is serious enough to undermine the other compliance efforts being made by other police officers, supervisors, executive officers and members. Indeed, it is sufficient to undermine those efforts.

CPD policy does not require the use of report status codes to indicate the types of rejections being made by supervisors, but the ISR Workflow Protocols do. This conflict poses a number of problems for the Consultant's review and assessment of the underlying ISR data. Some of these problems were discussed earlier in this report, but there are several additional points that need to be discussed here.

1. Improper use of the administrative rejection code also permits the supervisor to return the ISR to the officer to make changes to both the check boxes that were marked and/or the narrative remarks that were written in the original version of the ISR submitted by the officer.

    a. Although the original ISR remains archived in its original form, pursuant to data protocols, the officer is permitted to create a new version of the ISR for the same stop and/or frisk, by adding or deleting check marks indicating whether the stop and/or frisk took place, the justification for those actions, and whether the subject gave consent for them.

    b. The officer is also permitted to add to or delete words from the narrative remarks to show that the conduct asserted in the second version of the ISR was justified by RAS.

2. In some cases, this return and resubmission process of ISR versions occurs more than once, up to as many as seven times, all with what appears to be the aim of approving the ISR, rather than correcting the officer for a mistake and moving on. This use of the versioning system appears to delay the turn-around time for clearance and finalization of ISRs by months and sometimes close to a year. The tour of duty requirement in CPD's policy is, therefore, clearly disregarded by such a system.

3. It is no wonder, then, that officers fail to return such ISRs in a timely manner when, in reality, they cannot remember what facts supported the reasonable suspicion that their original ISR lacked.

4. Moreover, it strains credulity to believe that any officer could remember the facts and circumstances surrounding a stop and/or frisk conducted weeks, let alone months prior to the return of an ISR for correction.



The Consultant does not believe that giving officers a second chance to correct or modify an original statement in the ISR submitted, is proper – as a matter of law. In fact, given the existence of the deficiency rejection review notification ("DNR"), *return of the ISR to correct or modify does not serve any educational purpose that the DNR, itself, does not cover. Indeed, the only purpose for returning an ISR for correction appears to be to ensure that it is approved.*

Even if such a return and resubmission process did align with the Fourth Amendment's requirements concerning articulation (which the Consultant respectfully submits that it does not), this rationale for the system would not bear up under the facts observed in the data. Multiple month time lags and violations of the tour of duty requirement, by police officers who failed to submit their ISRs in a timely manner, do not reflect honest mistakes; and, even if they did, having more time does not appear to have produced better results (even setting aside credibility issues regarding fading memories). The ability of officers to correct and modify prior, contemporaneous statements about the stop and/or frisk, at the prompting of a reviewing supervisor, does nothing more than shield from review and assessment the number of ISRs that officers write containing legal justification errors.

The following point has been made, but it warrants repetition: the only time that CPD Policy permits ISRs to be returned for correction and resubmission are in cases of administrative error. Even the ISR Workflow Protocols, which themselves violate CPD Policy, do not permit a reviewing supervisor to reject a substantively deficient ISR that lacks proper articulation of RAS, for administrative reasons.

## THE INTEGRITY SECTION'S ROLE & RESPONSIBILITIES

CPD has tasked its Integrity Section with conducting general oversight of all of the Department's investigatory stop and protective pat down practices. This includes, among other things, auditing officer ISRs and the review of those ISRs by executive officers in CPD's districts.

The Integrity Section, which is housed within the Bureau of Organizational Development, is commanded by Captain Karyn Murphy. As indicated previously by the Consultant, in his First and Second Reports, Captain Murphy and the Integrity Section have been out in front, leading almost every aspect of the Department's efforts to comply with the terms of the Agreement, since it took effect.

A brief description of the activities performed by the Integrity Section is provided below.

- Development of written training materials related to the Investigatory Stop System and ISR workflow processes.



- Initiating refresher training (where needed), for individuals and groups of officers related to proper stop and frisk practices and policy requirements.
- Daily audits of ISRs placed by supervisors into an approved status, as well as ISRs that are rejected for failure to state justification for stops and frisks, including the associated DNRs that are completed.
- Oversight of the monthly captains' audit reports, which includes substantive reviews of the ISR audits, as well as training and development of forms and procedures, as recommended by the Consultant.
- Identification of officers who repeatedly submit ISRs with substantive deficiencies, and supervisors whose ISR review determinations are consistently wrong. Recommendation of corrective actions (including progressive discipline, when warranted) for identified officers and supervisors, as well as follow-up to ensure that such actions are completed.
- A special audit of arrest reports for robbery and unauthorized use of a weapon ("UUW") to determine whether ISRs should have been written, but were not.
- Review and auditing of internal and civilian complaints and investigation that relates to investigatory stops and frisks and/or any ISR activity.
- Writing bi-annual auditing reports, as required by Section II. b. 3.(i), in the Agreement, which are produced to the Consultant for his review and assessment of each six-month reporting period.

During the initial roll-out of the Agreement, the Integrity Section also helped create an internal *Ask ISR* online system for police officers to use when questions regarding the Investigatory Stop System arose. The *Ask ISR* system remains in place, and the Integrity Section staff fields many questions each day and responds to them within a 24-hour period. The Integrity Section Commander and her staff have taken on additional responsibilities since the Agreement took effect, such as the special audits of arrest reports. This special audit provides valuable information and data; and, the Consultant commends Captain Murphy for initiating and conducting it.

The importance and breadth of the work performed by the Integrity Section would be a daunting task for any division within the CPD; but, the addition of transparency and timeliness policy directives for the ISR data, as well, makes the job of the Integrity Section one that requires respect by the Consultant and the public. Descriptions of the commendable work completed and undertaken by the Integrity Section have filled a number of pages in prior reports; and, at least one more page in this report is warranted.

The Integrity Section's actions, during the four review periods of CY2016 and CY2017, reflect its high level of dedication to the Department and to the success of this Agreement. For instance, the auditing and oversight responsibilities of the Integrity Section and its Commander, as acknowledged in the prior two reports by the Consultant, are extensive, and there is no doubt that the Integrity Section is well-managed and doing a great deal of work (with what appears to be a relatively small number of staff). Based on the number of ISRs audited as part of the Integrity Section's daily review of approved ISRs, as reported in the Bi-



Annual Auditing Reports, as written by Captain Murphy and submitted to the Consultant for his review, it appears that managing the sheer amount of daily ISR workflow by the Chicago police department members must be monumental.

This is why, in the Consultant's view, patience is warranted, at least in the case of the Integrity Section, for any errors described in this report, or others. Such errors appear to be no more than a lack of foresight and/or oversight, and more probably the result of the inevitable delays and institutional obstacles attendant to institutional reforms of such importance and on such a large scale. Although inevitable, institutional obstacles, such as a resistance to change by some members of the police department, who are not eager to put into place and/or comply with the reforms required by the Agreement, produce delays in the Department's institutional commitment to achieving substantial compliance with the Agreement.

Therefore, the Consultant is reluctant to be overly critical in this report of the Integrity Section's actions or inactions during the CY2017 review periods. Nevertheless, recent review of the ISR sample data has led to the conclusion that there are a number of discrepancies in the way that the police districts are currently interpreting CPD's written policy directives for supervisory review and executive officer audits and oversight that must be attributed, at least in part, to the Integrity Section.

No matter how well-intentioned its efforts may have been, the Integrity Section is the enforcement arm of the Department for ISR workflow, and, thus, where the errors that have been or will be described in this report must be addressed. Although reasonable minds can, and often do, differ when matters of interpretation arise, it is the duty of the Consultant to point out not only what he sees as both the misinterpretation of CPD's policy provisions, in Section VIII.C., by the ISR Workflow protocols, but also the misapplication of those protocols by some reviewing supervisors and executive officers. The Agreement gives the Consultant the responsibility to interpret the provisions of the policy and the terms of the Agreement and to assess the data and make recommendations.

## THE ROLE OF REVIEWING SUPERVISORS & EXECUTIVE OFFICERS

In Sections I and VII of the Policy, the Department gives police district supervisors from each unit ("source unit supervisors") the responsibility to review, train and hold accountable subordinate police officers for the proper use and entry of ISRs.[38] Source-unit

---

[38]The Agreement requires police district supervisors to conduct "[c]ontinuous review . . . of all individual Investigatory Stop Reports to determine whether they state legal grounds for the investigatory stop and/or any protective pat down." *See, e.g.,* Exhibit I (Agreement, Section II. 3. (a)). The Agreement contemplates that such review will include "records of supervisory corrections or rejections" of ISRs for the purpose of permitting CPD headquarters staff, during regular audits, to identify any officers who "repeatedly fail to document [ISRs]" and/or "conduct investigatory stops and/or protective pat downs without the requisite



supervisors are also responsible for advising and training officers on how to **conduct** justified stops and frisks, not simply how to **write and submit** ISRs that will be approved. These duties are shared collectively with executive officers, who typically hold the rank of Captain, at the police district or special-unit level.[39] Executive officers are assigned the responsibility to monitor ISR workflow and conduct monthly audits of the ISRs reviewed, in order to ensure timely processing of them, by the Policy. *See, e.g.,* Exhibit 2 (SO4-13-09, VIII. C.3.).

The Policy places particular emphasis on the process that source unit supervisors are to use when ISRs are submitted with one or more of the following four (4) substantive deficiencies, each indicating that the stop and/or frisk reported in the ISR lacks justification, credibility or relevance. ***CPD Policy does not differentiate between types of RAS errors*** when it comes to rejections that are based on:

1. Failure to document justification for an Investigatory Stop, Protective Pat Down, or other search; or
2. Improper justification for an Investigatory Stop, Protective Pat Down, or other search;
3. [Failure to] [s]ubmit[] [a] hard copy of the [ISR] that . . . match[es] the electronic version submitted in the Investigatory Stop Database; and
4. [Submission of an ISR] in error, because the [o]fficer's actions did not require the submission of an [ISR].

*See, e.g.,* Exhibit 2 (SO4-13-09, Section VIII. C. 1.d. (2) (a)-(d) and NOTE).

CPD policy instructs reviewing supervisors to complete an Investigatory Stop Report Deficiency Notification ("DNR") for all ISRs rejected for one of the four reasons enumerated (above), and forward the DNR to the Integrity Section Commander. *See, e.g.,* Exhibit 2 (SO4-13-09, Section VII. C. 1.d. (1)-(2) (a)-(d), NOTE). The policy also instructs supervisors on how to complete the DNRs and what is required when completing them.

> *When completing the Investigatory Stop Report Deficiency Notification, supervisors will include the action that was taken to address the deficiency, such as reviewing the policy with the member, recommending training, initiating progressive discipline where warranted, etc.*

---

reasonable suspicion" that is required by the Fourth Amendment's exception to the probable cause requirement announced in *Terry v. Ohio,* 392 U.S. 1 (1968).

[39]CPD members who are assigned to special units and tactical teams who write ISRs, but who do not report to police district commanders and their executive officers, are responsible for submitting ISRs to the executive officers designed for their units (*e.g.,* the Bureau of Organized Crime and Bureau of Detectives each have units that report to executive officers designated by the Commanders within those Bureaus).



*See, e.g.,* Exhibit 2 (*Id.,* NOTE). DNRs are to be forwarded to the Commander of the Integrity Section, pursuant to this Policy. *Id.* However, the CPD's automated, electronic ISR database now takes care of that task by automatically generating the DNR for completion and then automatically forwarding an electronic copy to the Integrity Section Commander.

## SUPERVISORY REVIEW METHODS

The CPD's policy and the terms of the Agreement are intended to enable supervisors and executive officers to work together with the Integrity Section to identify unjustified stops and frisks and to hold police officers who made them (or, in cases of supervisory review error, the supervisors who reviewed them) accountable for the mistake. Nonetheless, at the outset of the Agreement, the Department often conveyed a clear message to its members, namely, that "honest mistakes" would not result in discipline, but, instead, would be an occasion for further education, enhanced supervision or more training. Only intentional, unjustified conduct would be subject to progressive discipline.

While reviewing ISRs in a multiple-version form, where supervisory notes and comments were visible (due to rejections of the original ISRs), the Consultant discovered many instances where supervisors appeared to eschew Department directives to transparently document all reasons for rejecting an ISR, as well as the admonitions to hold police officers accountable for a failure to articulate and/or state RAS in the ISRs they submitted, by rejecting these ISRs, per CPD policy, using a "deficiency rejection" (DEF) or "deficiency review rejection" (REV) report status code. Instead, rather than squarely addressing the RAS deficiencies in the ISRs presented to them for review, by rejecting them on substantive grounds and completing the auto-generated DNR that accompanies such rejections, supervisors often chose the path of least resistance by opting to reject such ISRs using the administrative rejection (REJ) report status code.

As discussed and illustrated in the ISR examples, set forth in the following pages, supervisors who used review methods that employed the administrative rejection code for ISRs that contained RAS errors, rather than adhering to policy directives and the Protocols defining RAS errors, effectively bypassed the DNR completion requirement. Based on both the policy directives and the Protocols, administrative rejections (signified by the supervisor assigning an REJ report status code to the rejected ISR) do not require a DNR, but instead only a comment by the supervisor in the rejected and returned ISR; but, substantive rejections for RAS errors (signified by the supervisor assigning a DEF or REV status code to the rejected ISR) auto-generates a DNR that the supervisor must complete as part of the rejection. The DNR requires a supervisor to transparently document the reason for the rejection and sign that report. But, an administrative error only requires the supervisor to make a mark as small as a "." (a dot) in the comments section of the ISR database to permit return of the ISR to the reporting officer for correction and resubmission as a new (multiple) version.



The Agreement assigns the Consultant the duty to validate the CPD's supervisory review and auditing methods as part of his compliance determinations. During the current review periods, the Consultant found many examples in the ISR data and related auditing documents that reflect conscientious and thoughtful work by supervisors and executive officers. However, many of the ISRs and related records reviewed from Periods 3 and 4 *do not reflect the type of supervisory review and auditing methods that will achieve or advance the CPD's goal of attaining substantial compliance with the terms of the Agreement.*

## COMMON SUPERVISORY REVIEW ERRORS & ISR EXAMPLES[40]

The following discussion details the problematic supervisory review and auditing methods using some ISR examples from the MVR samples from Periods 3 and 4 that were reviewed by the Consultant.[41] Common supervisory errors are observed, but others were noted, as well.

During review of the ISR sample data with multiple-versions, where supervisory notes and comments were attached and could be reviewed, the Consultant observed what appear to be a number of commonly made violations of CPD policy, which reflects misinterpretation of Fourth Amendment standards, CPD policy directives in Special Order 04-13-09, Section VIII (as revised in Period 3 and subsequently in Period 4), and the ISR Workflow Protocols. Specifically, reviewing supervisors are rejecting ISRs for supposed administrative reasons, even though the issues (sometimes identified and sometimes not) are actually substantive, Fourth Amendment articulation errors.

By labeling ISRs with substantive RAS-related deficiencies as administrative rejections (using the REJ report status code), reviewing supervisors (and the executive officers who audit them) are able to bypass the DNR requirement, avoiding any need to be transparent to possible review within the Department by the Integrity Section or outside the Department, by the Consultant or other parties to the Agreement. In doing so, supervisors effectively fly under the radar of any kind of review or auditing process of any kind apart from the source unit supervisor who rejected the ISR and the police officer who received it when returned. In short, some source unit supervisors appear to be assigning REJ codes to

---

[40]The Consultant recognizes that the next few pages contain (with specific illustrations from actual ISRs) the same ideas discussed earlier in this report regarding misapplication of the ISR Workflow Protocols. These points, however, bear repeating because they are a central part of the Consultant's assessments and observations from his review of the ISR sample data.

[41]Because this information contains personal identification and other sensitive information, every effort has been made to maintain confidentiality, so that only the Consultant and his staff will be able to identify the particular example by its unique ISR number and the time-frame and sample type from which it was selected.



avoid scrutiny by non-district reviewers, both inside and outside the CPD, as well as the accountability required by the Agreement.

This supervisory review method allows ISRs to be corrected and changed, rather than sent through the Departments' chosen internal accountability process, using DNRs, which compromises transparency and the integrity of the underlying ISR data. When an ISR is rejected for administrative reasons using the REJ code, the supervisor is not required by the automated CLEAR system to complete a DNR, as they are when substantive deficiency rejection codes, such as DEF or REV, are used (for failures to articulate (DEF) or failures to state (REV) justification for the reported stop and/or frisk.

Examples of common errors included:

1.  Misapplication of the administrative rejection code for ISRs where the police officer failed to articulate RAS in the narrative remarks and/or made a mistake in checking or leaving unchecked one of the boxes related to the stop type and stop basis, or the protective pat down and pat down basis, or search beyond the pat down and the basis for it;
2.  Supervisory notes in the comments section of rejected and returned ISRs where arcane and sometimes coded remarks were inserted which did not transparently reflect the reason for the supervisor's rejection;
3.  Timeliness issues regarding reviewing supervisors' tolerance for ISRs submitted beyond the submitting police officer's tour of duty, as well as tour of duty issues related to the supervisors' tardy review of a submitted ISR;
4.  Time lags between the dates when ISRs in a second or subsequent (multiple) version were resubmitted and/or reviewed;
5.  Approval of ISRs returned without the changes/corrections to deficiencies in the original ISR that supervisors identified; and/or approval of ISRs in which officers made substantive changes to the RAS articulations made in the original ISR (either in the boxes checked or left unchecked or in the narrative remarks); and
6.  Return of ISRs "per the officer's request" in contravention of CPD policy.

Each of these numbered problems are commented upon and illustrated, below, by ISRs that were reviewed as part of the representative sample sets by the Consultant. [42]

---

[42]Although real facts from the ISR samples reviewed are being used for the purpose of illustrating the observed violations of CPD Policy, care has been taken to omit all names and unique ISR numbers, even from the parties' view. Moreover, The Consultant will not identify the members of the Department holding supervisory and executive officer positions (even for himself), who were involved in the errors illustrated by the ISR examples set forth in this report. Additionally, the Consultant agreed, for purposes of this report, not to attempt to assess a supervisory error rate, determined by statistical or descriptive analysis, based on the observed errors in the sample ISRs.



## *Misapplication of the Administrative Rejection Code for ISRs with RAS Deficiencies[43]*

Many of the ISR samples in a multiple-version report status that the Consultant reviewed from both Periods 3 and 4 illustrate recurrent misuse of the REJ (administrative error) report status code by reviewing supervisors. The misuse appeared not only as a response to the original/first submitted version, but also to subsequently resubmitted versions of the ISR until a final or last version was approved. Frequently, these RAS deficiencies were *actually identified by the same supervisor who rejected the ISR using the administrative rejection/REJ status code*. These supervisors were not only assigned to patrol units within the Bureau of Patrol, but some of these supervisors also were located within special units and/or tactical teams and reported to the Bureau of Detectives and/or the Bureau of Organized Crime.

CONSULTANT'S ISR EXAMPLE NO. 1 illustrates the type of problems that the CPD's district-level officers and supervisors, and to a more limited extent, the executive officers who conduct audits of the ISR workflow (including those in the Integrity Section), seem to have had in Periods 3 and 4 with being transparent in the documentation and review of ISRs.

The main problem in ISR Example No. 1 is that the reviewing supervisor recognized that the narrative lacked sufficient factual detail to articulate RAS for the investigatory stop. However, rather than identifying that error as a substantive deficiency rejection (DEF), the supervisor identified the problem as merely administrative by using the REJ status code.

### Consultant's Figure 1 (ISR Example 1)

**Narrative Remarks (Original**): Above was detained and positively identified by victim [name] and [name] as the person who took their property without consent.

**Supervisor's Message [Comment Box]:** "more detail"

**Supervisory Review Report Status Code (Original):** "REJ" (administrative rejection)

**Narrative Version 2:** R/O's responded to robbery in progress call. *Above matched the description given by OEMC. Above was located at [address]* and was detained and positively identified by victim [name] and [name] as the person who took their property without consent.

**Supervisory Review Report Status Code (Version 2):** Approved

---

[43]These examples are only a few of the **many** ISRs in the representative sample of 642 multiple version ISRs that were reviewed by the Consultant for Fourth Amendment justification. The representative nature of each ISR sample, which stands in for multiple other ISRs in the full-set of records, means that each of these sample illustrations could potentially represent hundreds or even thousands of other ISRs with similar problems.



This ISR raises several important points:

1. The supervisor's misuse of the REJ code violates CPD policy (and the objectives of the Agreement), because the officer's failure to articulate the description of the person identified by the witness. The police officer's indication that the subject "matched the description" provided by OEMC is not factually specific enough to articulate RAS justification for the investigatory stop of this particular subject. That kind of error is not an administrative error that constitutes a "simple omission" – as the Consultant interprets that term in CPD's policy.

2. By using the REJ status code for a failure to articulate RAS, the reviewing supervisor bypassed the CPD's policy requiring completion of a DNR. In doing so, the supervisor avoided the built-in accountability mechanism established by the Department to keep track of ISRs with Fourth Amendment deficiencies (regardless of one's interpretation about whether a failure to articulate versus a failure to state RAS can or cannot be corrected).

   a. The DNR, unlike the comments box at the bottom of an ISR, is an independent, separate and formal record, unlike the comments box at the bottom of the ISR.
   b. Thus, it can be counted and serves as a transparent record for auditing the number and unique identity of the police officers who submitted ISRs with substantive RAS errors (either because they do not understand how to write an ISR or because the reported stop and frisk was unjustified).

3. The DNR also instructs the supervisor to articulate, in writing, the details of the personal conversation between the supervisor and the officer, if and when the ISR is returned to the officer, so that there is a record, signed by the reviewing supervisor, supporting the (a) changed ISR articulation of what transpired during the stop and/or frisk; and (b) corrective action taken with respect to the police officer.



**Consultant's ISR Example No. 2** is noteworthy for a number of procedural and substantive reasons.[44] This example is graphed in three ways below (*e.g.,* Graphs 2-A, 2-B, and 2-C), and is intended to illustrate three *procedural problems* with this ISR.

### GRAPH 2-A: PROCEDURAL PROBLEMS.

**Original:**
July 9, 2017

- No Stop Type/basis
- PPD - NO
- Search - NO

→ REJ →

**Version 2:**
July 10, 2017

- No Stop Type/Basis
- PPD-Yes
- PPD Consent-Yes
- Search - No

→ REJ →

**Version 3:**
January 28, 2018

- No Stop Type/Basis
- PPD-Yes
- PPD Consent - Yes
- Search - NO

**Narrative Remarks**

R/Os observed driver and passenger in moving vehicle without seat belts and performed traffic stop. Name check revealed passenger with servicable warrant; passenger was arrested.

**Narrative Remarks**

Same Narrative + (1) Warrant from Cook County; (2) Warrant verified by LEADS; and (3) Custodial Search

**No Changes**

As shown, the procedural problems include the following:

---

[44]In the following pages, Consultant's ISR Example 2, will be assessed in three different ways, illustrated by Graphs 2-A, 2-B and 2-C. This ISR is discussed at length, not because it represents a uniquely egregious example of non-conforming police officer reporting or supervisory review methods, but because it represents an example of many routine or common errors that the Consultant observed during his review of the ISR sample narratives.



1. This ISR went through the return and resubmission process three times, generating three versions of the officer's articulation regarding Fourth Amendment justification for a protective pat down and/or a search; however, even in the finalized version that the supervisor approved, it is still not clear whether the officer performed a protective pat down and a search beyond the pat down, or whether there was only a pat down or only a search. The supervisor approved it, even when the officer resubmitted it 6 months later with no changes or corrections having been made, despite identified substantive errors in the second set of comments.

2. Additionally, this ISR went through three (3) versions and (2) resubmissions over a period of approximately *6 months*. The time lag between the original submission and the final version is simply too long for the Consultant to believe that the police officer could accurately correct a narrative articulation and/or check boxes based on memory of the facts and circumstances surrounding the post-stop activity.

3. The narrative remarks section of the ISR indicates that the officer made a traffic stop based on probable cause (an observed, on-view violation of traffic laws), which *did not* evolve into an additional, investigatory detention beyond the time necessary to enforce the traffic laws. Nonetheless, the probable cause check box, added to the ISR in Period 4, is not checked and neither is the investigatory stop box.[45]

In Consultant's Graph 2-B, below, ISR Example 2 is illustrated for the substantive review process errors *i.e.*, the errors that are not simply procedural. As shown, the reviewing supervisor's first comment is insufficiently clear and thus difficult for reviewers (inside or outside the Department) to understand the reason for the rejection. Graph 2-B also illustrates a significant time lag between the police officer's submission of the ISR and the supervisor's review – a review that CPD policy also directs should be done within the supervisor's tour of duty.

---

[45]Thus, for purposes of the aggregate data review by the statistical experts, there is no check box to use to identify this ISR as an investigatory stop or one made for probable cause, for purposes of quantifying the number of investigatory stops, rather than simply counting all stops made for the review period based on submitted ISRs. Until the CPD officers utilize the check boxes for stop types, the statistical experts will need to quantify the number of stops and the stop rates by use of all ISRs submitted based on all stops, rather than the subset of stops involving preliminary investigations.



## CONSULTANT'S GRAPH 2-B: SUPERVISORY REVIEW COMMENTS & TIME LAGS

Original - Narrative Remarks:  R/Os observed driver and passenger in moving vehicle without seat belts and performed traffic stop.  Name check revealed passenger with servicable warrant; passenger was arrested.

- Report Status Code: Administrative Rejection (REJ)
- Supervisory Review Comment(s): "w"

Version 1 - [July 10, 2017]

Narrative Remarks: [Same as original] + Warrant from Cook County with verification by LEADS and custodial search.

- Report Status Code: REJ
- Supervisory Review Comment(s): "beyond a protective pat down 'yes' because of the custodial search"

Version 2- [January 28, 2018]

Narrative Remarks: [Same as original and 2nd version -- NO CHANGES]

- Report Status Code:  Approved (APR)
- Supervisory Review Comment(s): None



In Graph 2-C, below, additional layers of error in ISR Example 2 are identified.

### CONSULTANT'S GRAPH 2-C:  SUBSTANTIVE PROBLEMS IN CHECK BOXES



**The Consultant's Observations:**

*Original ISR*

- In review of the original ISR, the Supervisor uses only a "w" to identify the deficiency in the ISR that justified the administrative rejection.  Although the police officer may know what "w" means, after a personal conversation with the supervisor, the Consultant does not (nor, presumably, would any other auditor or reviewer inside the Department).  One can guess, based on the entire 3-version ISR that "w" stands for serviceable warrant, but what does that mean?  The second version of the ISR does not elucidate that coded comment.

*Second ISR Version*

- The resubmitted, subsequent version of the ISR, however, does not change anything in the narrative related to a serviceable warrant, but instead unchecks the box indicating that no protective pat down was conducted and adds a check mark to indicate that a protective pat down was conducted with consent.  The officer does not articulate that a PPD was conducted (with or without consent) in the narrative.

- The supervisor did not indicate that the original ISR suffered from any substantive deficiencies related to box marked "no" for PPD; yet, the officer decided to change the check box anyway, without adding any articulation to the narrative remarks about this change.

- The supervisory review comment does not provide enlightenment. The supervisor's comment in response to resubmitted version number 2, rather than question why the officer suddenly remembered patting down the subject, *directs the officer to check the box for "search beyond a protective pat down" because the officer added facts in version number 2's narrative indicating that a custodial search was performed.*

*Third ISR Version*

- Despite the supervisor's instruction in the comments section to the officer regarding the correct box to check, the officer took an additional 6 months and 18 days to resubmit version number 3 – 28 days past the end of Period 4 – without making any changes to the check box indicating "search beyond a protective pat down" box (of the subject's person).  The same supervisor then *approved* the third version of the ISR, *without comment.*

## Non-Transparent Comments by Reviewing Supervisors in ISRs Rejected for Administrative Errors

In the comments sections to ISRs rejected using the administrative rejection status code (REJ), the Consultant was often unable to determine the basis for the supervisor's rejection, because the comments made were in the form of codes, such as "x" or even a "." (a dot or period), or ambiguous, arcane words, such as "fix".

The clear impression from seeing so many of these codes in the comments was that, often the police officer who received the returned ISR understood the code and made one or more corrections to the ISR and/or ISR narrative, after which the reviewing supervisor (often the same person but sometimes someone with a different user number) finalized and approved the corrected version of the ISR.  However, during the coded review process, there was no way for the Consultant to interpret the code or the response to the code, without reading every single check box and every word in every single additional version submitted.



Other times, distinctly different, yet still arcane, codes were inserted in the comments by supervisors after each version of the ISR was resubmitted, indicating that the officer did not seem to understand the coded message either, because nothing changed in the ISR from the original to the last version.  Nonetheless, in almost every instance, the unchanged ISR was approved.

The practical effect of supervisors misusing the REJ status code is a lack of overall transparency.  Indeed, this misuse of the code allows supervisors to bypass the DNR accountability process and to not detail the reasons for their rejections of the ISR. Additionally, this kind of process does not permit the Consultant to determine whether the supervisory review process is working as intended and prevents validating the supervisory review methods necessary for the Department to comply with its policy directives.

Another impediment to fulfilling the purpose of educating officers in legitimate and lawful stop and frisk practices exists, as well, because the use of arcane and coded comments by supervisors in their review of ISRs – largely indecipherable to anyone other than the supervisor – may impede some police officers from understanding the content and, prevent the correction the supervisor indicates, as reflected by a number of ISRs reviewed where changes that were directed were not made in subsequent version(s), even though the ISR was approved anyway.

The lack of transparency by reviewing supervisors, who used the comments section of the ISR (rather than a DNR) to identify the reason for rejecting the ISR for administrative reasons, using the REJ report status code, was apparent when comments were actually more like codes, as illustrated in the following examples in Consultant's Table 3, below.



CONSULTANT'S TABLE 3. NON-TRANSPARENT COMMENTS BY REVIEWING SUPERVISORS

| Codes | Coded Messages |
|---|---|
| Xxx | 63 Team Please |
| x (lower case) | RWOC |
| . | R |
| .. | "click box" |
| / | PO/ "per po request"[46] |
| \ | "Same as the other one" |
| * | "nothing" |
| c (lower case) and C (upper case) | "FIX" |
| "see me" | "narrative type O" |
| "change to other" | "info" |
| "resubmit" | "PYR" |
| "UNCHECK BOX" | ","[47] |

These coded messages seemed to produce certain results, so it appears that the police officers understood the supervisor's meaning, even if that meaning was not transparent or decipherable to the Consultant when reviewing the MVR samples. For example, in Consultant's Table 4, below, the following phrases appear many times in the MVR samples.

---

[46]While it may seem unreasonable to prohibit supervisors from returning ISRs submitted based on the personal requests of the officers who wrote them, the ISR system is designed to prevent changes from being made to the originally submitted ISRs for a reason: there is a concern that if such changes were permitted by officers after-the-fact (*i.e.,* after the initial real-time reporting was completed) based on hindsight or other factors, then the ISRs would not reflect what really happened. Although the ISR system archives all originally submitted reports, such that the original always exists unchanged, even if subsequent ISR versions are created, the no-changes rule suggests that return of ISRs upon the police officer's request should not be permitted for any reason, just as supervisors should not return ISRs to officers for corrections or changes when they contain substantive RAS deficiencies.

[47]Here, the check box changed from PPD-Yes *without* consent to PPD-Yes *with* consent.



CONSULTANT'S TABLE 4. CODED SUPERVISORY REVIEW COMMENTS & MVR RESULTS.

| Coded Comment | Result |
|---|---|
| Change RD | Administrative rejection, no changes from original to last version; approved same day |
| "administrative rejection message" | Many misspellings, but not fixed on return and approved same day |
| Info | Administrative rejection; upon return, officer changed check boxes from no pat down to consensual pat down and changed caliber of the guns found |
| Change to other | No changes made to narrative or in check boxes, approved on second version |
| Please see Sgt. | Only change made was to check box for receipt given, yes. |
| . (just a period) | No changes made, approved second version |
| . (just a period) | Officer added only that subject refused receipt |
| See me | Nothing changed and approved second version |
| "uncheck box" | No box was specified; officer did not change anything on resubmitted version, which was approved. |
| X | No changes made, approved. |
| "As explained in person" | No changes made, approved. |
| Fix | No changes made, approved. |

## Substantive Changes to the ISR Based on Non-Transparent Supervisory Comments

There were other instances where the supervisor's comments did not make sense to the Consultant, but he observed that the comment resulted in a substantive change by the police officer in a second or subsequent version of the ISR to: (a) the check boxes pertaining



to the stop type; protective pat down; or search; and/or (b) the narrative.  Examples appear in CONSULTANT'S TABLE 5 (ISR Example 3 (A-D)), below.

CONSULTANT'S TABLE 5 (ISR EXAMPLE 3 (A-D)).  SUPERVISORY REVIEW COMMENTS RESULTING IN SUBSTANTIVE CHANGES TO CHECK BOXES OR NARRATIVE REMARKS SECTIONS.

| ISR Examples | Original ISR Check boxes & Narrative | Coded Comment | Report Status Code | Change to 2nd and /or Last ISR | Final Status of Last Version | Consultant's Note |
|---|---|---|---|---|---|---|
| Ex. A | Checked boxes: <br> ✓ Non-consensual PPD <br> ✓ "other reasonable suspicion of weapons" <br><br> Narrative Remarks: <br><br> No narrative remarks about PPD in original ISR | C (upper case) – *Original* <br><br> c (lower case) – *Second Version* | REJ | Added "bulge" to narrative remarks in 2nd Version, but *no change to PPD basis check box in 2nd Version)* <br><br> _____ <br><br> In 3rd version, *check box for bulge added to PPD basis*, and narrative remarks about bulge remained. | APR | • In the second and third version, the officer added "bulge" to the narrative and check box, but not in the original version. <br> • Supervisor's comments are not transparent to outside reviewers and resulted in substantive changes to the ISR. |
| Ex. B | Consensual PPD | Articulate facts supporting RAS for PPD in narrative | REJ | R/O DELETED the check boxes for PPD and consent to no PPD after supervisor advised to "uncheck box" | APR | |
| Ex. C | Consensual PPD | Articulate RAS for consensual PPD in narrative | REJ | Nothing changed from original to last | APR | Neither stop type box is checked on original or final; nor is absence of box identified |

| Ex. D | Non-consensual PPD | "enforcement action" | REJ | R/O added facts to narrative to justify PPD (facts related to bulge) in second version. Also added cited violations to enforcement action box. | APR | Non-consensual PPD was not justified by RAS in the original; supervisor identified an administrative deficiency, rather than the RAS deficiency; but, the officer corrected the RAS deficiency in second version because the ISR was returned. |
|---|---|---|---|---|---|---|

Enhanced supervision may involve coaching and identifying what the officer should have done, but did not do, but it should not involve changing the answer or adding more information to the answer. If the protective pat down, in this example, was not justified by the check box for bulge and/or narrative remarks (which it was not), then it should have been rejected as substantively deficient, recorded in that manner for data review and auditing, and a DNR should have been completed. The DNR's effect would be to correct the officer, not the ISR, by sending him/her for more training or to review the departmental directives, so that future errors of this kind would not be made – either with regard to the actual pat down conducted on the street or in writing the report about the pat down.

These types of mistakes are not the kind that can or should be fixed in hindsight in the data. If they continue to be fixed in this manner, then those actions undermine the intentions of the parties to the Agreement to ensure that police officers conduct legitimate and justified street stops and frisks. Fixing the paperwork only masks the problem; it does not remedy it.

Reviewing supervisors' indiscriminate use of the REJ code effectively puts their ISR review and comments beyond further review, because there is no separate audit of REJ rejections and no DNR as a separate record that is forwarded to the Integrity Section. Such coded messages cannot be interpreted by anyone else and appear to be an attempt to bypass the accountability and transparency goals and obligations set forth by the CPD policy, as well as the Agreement.

## Tour of Duty Requirement

CPD policy and the Agreement call for officers to submit ISR reports before the completion of their tour of duty. Indeed, the Department's Investigatory Stop System was designed to facilitate such real-time reporting and review. However, in many of the stops reviewed, ISRs were either not submitted or not reviewed within the required time period.



The tour of duty problem was identified by the Integrity Section in its Bi-Annual Audit Report for Period 3. *See, e.g.,* Exhibit 5A (P3 Bi-Annual Report, at pp. 5-6). At that time, the Integrity Section indicated that it had run "a status check on ISRs in a Preliminary ("PRE"), Deficiency Rejection ("DEF"), and Administrative Rejection ("REJ") status for 01 January 2016 through 30 June 2017" with the goal to "ensure that ISRs [were] being timely moved to a final status." *Id.* In the Bi-Annual Auditing Report for Period 4 (July 1 to December 31, 2017), the Integrity Section reported that it had taken initiatives to address the tour of duty/non-final status problems. *See, e.g.,* Exhibit 5B.

Those initiatives included a new monthly audit of ISRs in a non-final status, which began in September 2017. According to the Integrity Section, the new monthly auditing methods result in a second notice to commanders in police districts detailing the number of ISRs that remain in a non-final status.

In its Bi-Annual Audit Report for Period 3, the Integrity Section reported its belief that its efforts to train and move ISRs through the workflow in a timely manner had been successful. *See, e.g.,* Exhibit 5A (P3 Bi-Annual Report). In its Period 4 Bi-Annual Report, the Integrity Section further reported that, as of June 1, 2018, only 16 ISRs initiated in 2017 remained in a non-final status, and the results of its monthly audits show that the number of ISRs in a non-final status has progressively declined. *See* Exhibit 5B (P4 Bi-Annual Report, at p. 8).

On its face, the Integrity Section's identification of the tour of duty violations by supervisors who were not reviewing ISRs within their tours of duty or timely moving ISRs through the workflow and finalizing them may satisfy Section IV.2 of the Agreement for CY2018 ISRs, if the sample ISRs reviewed in Periods 5 and 6 of CY2018 substantially address the problems observed. The Consultant cannot yet comment on the effectiveness or success of these initiatives, in terms of present practices by CPD (for Periods 5 and 6 or CY2018), because that data has not yet been reviewed. It is clear, however, based on data from the preceding periods that many police officers within the CPD did not comply with the tour of duty requirement in CY2017. This conclusion is based not only on review of the monthly captains' audits, but also the ISR samples reviewed from CY2017.

The tour of duty requirement for submission and supervisory review is not just a technical or procedural requirement that can be ignored by the CPD. It is in the policy for a good reason. Memories fade. If the actual legitimacy of the stop and/or frisk and performance of an officer is to be assessed, then it must be assessed as near to the date and time of the stop and/or frisk as possible. If the assessment occurs much later, then the credibility of the reported data in the ISR is diminished.

During his review of ISR samples, the Consultant discovered many examples where police officers and supervisors violated the tour of duty requirement for the submission and approval (or rejection) of ISRs. Some of the examples were retrieved by the Consultant to illustrate in this report, but these examples were too numerous. So, it will suffice to simply



note that the time lags between the initial stops and submissions of ISRs to the supervisors for approval ranged from a few days to several months (in some cases up to nearly one year) later. The Consultant also observed that, not only was the tour of duty requirement for the initial submission of ISRs not being met, but also significant time lags existed, once the ISR was returned to the officer by the supervisor for correction of an identified deficiency. Moreover, the time lags observed were often accompanied by the supervisor assigning an administrative rejection report status code to a substantively deficient ISR.

This convergence of errors should concern the parties, because it reflects situations where *potentially unjustified stops and frisks go unnoticed within the proximate time that they occurred on the streets.* When such errors are permitted to remain unobserved for so long, there are a number of consequences and implications – two of which are key indicators of non-compliance with the Agreement's terms:

1. The officers making the unjustified stops and/or frisks lose the opportunity to be corrected and educated on proper conduct and/or procedure; and, thus, are more likely to repeat the mistake in the future.

2. Unobserved errors involving unjustified stops and/or frisks mean that the Integrity Section cannot monitor and track repeated errors by the officers who make them and/or the supervisors who erroneously classify such errors as merely administrative (and, thus, not subject to the accountability procedures attendant to completion of a DNR and/or eyes-on review by the Integrity Section of the ISR).

During the Consultant's review of ISRs that went through multiple versions, it became clear that, when supervisors used the administrative rejection code, more than likely it was being used *not to permit clerical errors or simple omissions to be corrected*, but, rather, *to permit officers to CHANGE their answers and explanations regarding justification for the investigatory stop and/or frisk in the ISR* – sometimes (quite often) at the explicit direction of the supervisor.

Thus, it appears that some of the district-level supervisors (and others of a similar rank and position) were not using the ISR process to: (1) assess the legitimacy of the stop and frisk, itself; (2) address substantive mistakes by officers as teachable moments; and/or (3) establish a basis, within the Department, for identifying officers who need more training or supervision to prevent future recurrence of Fourth Amendment violations. These are three of the Agreement's primary goals.

From these ISR examples, it is fairly clear that many of the submitted ISRs that supervisors rejected and returned to officers, after erroneously assigning an administrative rejection code for a substantively deficient ISR, were moved through the ISR workflow and finalized as approved, by the same supervisors who had rejected them. Sometimes these



Case: 1:15-cv-03467 Document #: 425-20 Filed: 01/31/20 Page 73 of 139 PageID #:40445

P a g e | **73**

ISRs were approved months after the ISR was initially returned, even when officers had not corrected the errors identified by supervisors from the original version.

### POLICE OFFICERS & REVIEWING SUPERVISORS

Additional examples, however, occurred where the ISR was promptly submitted and reviewed, but after the supervisor returned the ISR to the police officer, the police officer was responsible for the time lag, because the returned ISR sat waiting for the police officer to address the identified deficiencies. These time lags ranged from days to months – and, in one case, close to a year -- before it was returned to the supervisor. Moreover, in many cases, these ISRs were resubmitted without addressing the error(s) identified by the supervisor. Nonetheless, in many of these cases, the same supervisor who identified the original error APPROVED the resubmitted ISR the second time around. Although these ISRs appear as "multiple-version" ISRs, nothing in the ISR changed.

The practical and legal implications of time lags by police officers related to resubmitted ISRs are, arguably, more serious than those of reviewing supervisors, who need to move the ISR through the workflow and finalize it, because timing is everything when it comes to the credibility of the police officer's statements regarding his or her present sense impressions of the facts and circumstances which led to the decision to stop, detain and/or frisk the subject. However, if reviewing supervisors had a time-limit for finalizing resubmitted ISRs, it seems likely that they would exercise more oversight to ensure that returned ISRs were resubmitted within an officer's tour of duty, rather than many days, weeks or even months later.

### INTEGRITY SECTION

The Consultant observed that time lags were not isolated to police officers and source-unit supervisors who review ISRs. The Consultant also noted serious time lags by the Integrity Section. For example:

1. **ISR Example 5**. In ISR Example 5, the officer checked the pat down box YES and also checked the NO CONSENT box for the PPD, but there were no remarks in the narrative about a pat down. The first supervisor to review the ISR rejected it, using an REJ code for administrative error, but stated in the comments section that the officer needed to add that a pat down was conducted and the reason for it. The ISR was returned. Four Versions later, the officer maintained that a non-consensual pat down was conducted, but did not change the narrative remarks to add the reason. The second and third versions used an REV status code and attached a DNR. The last version, Version 4, was rejected as final by the Integrity Section, after a 4 month time lag.

   **ISR Example 6**. In ISR Example 6, there was a time lag of over eleven months between the date of the stop and submission of the original ISR and when the Integrity Section closed the ISR. Here, the final set of status codes indicated that the ISR was approved



in the UFE status column, but closed as FIN in the report status column. This appears to be inconsistent, given explanations by the CPD of its status codes. Regardless, there were a number of problems with this fifth version ISR, even though the CPD indicated only four versions in its summary table of the process for this ISR. [48]

These time delays by the Integrity Section illustrate additional problems in the way the CPD administers the ISR workflow. CPD's stop and frisk policy makes executive officers responsible for reviewing and finalizing the most important substantive deficiencies identified by supervisors (*i.e.,* those where the stop and/or frisk is deemed to lack RAS, under any set of facts or circumstances and/or when the hard copy of the ISR, documented contemporaneously with the stop and/or frisk, does not match the electronically submitted version created at a later time and date). In such cases, one presumes that the Integrity Section would want prompt and timely remediation and corrective actions to be taken to ensure that further stops and/or pat downs, like the one being submitted for deficiency rejection review, do not occur again. However, when more than a few days pass, the believability of a police officer wanes, because human memories fade and the ability to remember the facts and circumstances of the stop and/or frisk that are necessary to correct an ISR for failure to articulate RAS, becomes far more difficult.

## *Approval of Multiple-Versions ISRs Often Conflicts with the Fourth Amendment*

The Fourth Amendment's articulation requirement is tied to the facts and circumstances giving rise to reasonable suspicion for the stop, based on what the police officer observed *at the time* of the stop and/or frisk. The Department's policy directives acknowledge this requirement and expressly state that a police officer's articulation cannot be based on "analytical hindsight" by using *ex-post facto* narrative remarks in the ISRs – even if these observations were based on facts remembered by the officer after personal conversations with a reviewing supervisor.

The CPD's stop and frisk policy recognizes that a *failure to articulate* justification/RAS for the reported stop and/or frisk in the narrative remarks section requires *substantive, not*

---

[48]One issue is that the stop type boxes were never checked; and, indeed, the first administrative rejection requested clarification as to why the ISR was done, because the narrative indicated a consensual encounter. After the ISR was returned to the officer and resubmitted the second time, the narrative had changed, indicating that the stop was made based on probable cause for a curfew violation. The probable cause stop type box was not checked, either. The reviewing supervisor rejected the ISR, using an administrative rejection code and, in the comments section, required the officer to explain how the stop was a consensual encounter and returned the ISR to the officer. The officer changed nothing and resubmitted it to the supervisor. The supervisor rejected the third version as REV with a DNR, explaining that the officer who had authored the ISR had retired. Nothing changed on the fourth and fifth versions. Finally, the Integrity section approved the ISR and cleared it as an FIN *nearly one year later.*



*administrative,* rejection of the ISR and completion of a DNR. The express words used in subsections C.1.d. (1)-(2) (a)-(d) of SO4-13-09 (as revised in 06/16 and 07/17), require supervisors to reject ISRs for *failure to document* justification (RAS) and for *improper justification*. *See, e.g.,* Exhibit 2A and 2B. In the Consultant's view, this is not simply a semantic difference. Improper justification is a justification which is articulated that does not satisfy the RAS legal standard. A failure to document justification includes both an empty narrative remarks section, as well as a failure to articulate one or more facts necessary to establish RAS. Period. Both types of failures result in rejection, according to CPD policy; and, both of these rejections are contrasted with administrative deficiencies. Only where administrative deficiencies are indicated does CPD policy authorize the supervisor to return the ISR to the officer for corrections that constitute changes.

The CPD apparently does not share the Consultant's interpretation of its policy, in this regard; but, instead, the Department appears to be using a "failure to articulate" (in its ISR Workflow) as synonymous with "failure to document" justification (in CPD policy), because it believes that, *if some set of facts* creating a reasonable basis to suspect criminal activity by the subject *existed* at the time of the stop and/or frisk, *then* the officer's *failure to write those facts down can be "corrected" by returning the ISR* to the officer *to add* those unarticulated facts to the narrative remarks in the ISR. Again, reasonable minds may differ, but the Consultant suggests that the parties consider whether the CPD's current interpretation, reflected in divergent ways by its written ISR Workflow Protocols, on the one hand, and supervisory review methods, on the other hand, achieves the intended accountability required by the Agreement. If the goal of the Department is to build community trust and to substantially comply with the Agreement, then the credibility and integrity of the original ISRs submitted by police officers are vital prerequisites for achieving that goal.

The Consultant respectfully submits that, if the CPD's workflow protocols were to *limit final approval* of ISRs returned for *failure to articulate RAS* to those in which the new version resubmitted by the officer simply (1) added new facts to the narrative, and/or (2) checked an unchecked box to resolve an inconsistency with the written narrative, *then* such a practice, *arguably,* would be more credible. But, *when ISRs are returned and officers are permitted to correct* the original ISR **by changing or deleting** the checkboxes marked in the original (especially when not otherwise inconsistent with the narrative remarks in the original ISR), then the legitimacy of the workflow protocols permitting supervisors to return ISRs to officers for resubmission of a new version is questionable.

## Substantive Changes to the Original ISR

Equally troubling are instances where the written comments of supervisors in returned ISRs tell the officer to articulate certain facts not apparent in the first narrative or to change elements of the original ISR in a manner that the original narrative remarks tend not to support. In other words, supervisors are dictating information that the officer never provided.



It may be that personal conversations with an officer, outside the written ISR record, may give the supervisor more information – and that the conversation is simply being written down in the comments section. However, *an equally plausible inference is that the officer never actually **observed** the facts that were added to or changed in the subsequent version of the ISR that was approved, before the stop or frisk was conducted,* but instead were elicited by conversation with the supervisor after-the-fact. If the facts were never observed by the officer, then the officer could not have had RAS to make the stop and/or frisk.

Even in the most defensible set of circumstances – where the added facts existed and were observed by the officer at the scene of the stop and/or frisk, but the officer simply neglected to write them down (having forgotten the details, perhaps, because the ISR was submitted too long after the stop and/or frisk), or misinterpreted the facts, and, thus, articulated them incorrectly (*e.g.,* whether the subject gave consent for the stop or frisk) – the absence of the officer's articulation in the original ISR should nonetheless be documented and preserved in the data, as a substantive, RAS-related deficiency. CPD's Policy directives and the terms of the Agreement indicate that substantive ISR articulation errors require something more than simply correcting the ISR to reflect what "actually" occurred in hindsight. The something more is a DNR that initiates corrective actions with the officer, rather than simply the ISR.

The following table illustrates situations where the officer and/or reviewing supervisor's statements or actions raised questions regarding the credibility of the assertions and/or check boxes in the original and the final or last ISRs.

CONSULTANT'S 6 (ISR EXAMPLE 7). SKI MASK SUBJECT STOP.

| Original | Supervisor Comment | Changes Made | Consultant's Observations |
|---|---|---|---|
| No stop type box checked, indicates "on-view" only<br><br>✓ PPD<br>✓ No Consent x-search<br><br>Narrative remarks indicate "street stop" based on observation that subject was walking while wearing a ski mask.<br><br>This stop was made on March 5, 2017 at 11:11 a.m. [it was a Sunday] and officer stated that it was 51 degrees Fahrenheit at the time of the stop. | "in car camera checked yes" | In the second version, the check box for "in car camera checked yes" *was removed.* | RAS stop type box and basis for stop boxes were left unchecked. This is clearly a Terry stop, not one based on PC. The "on-view" box is checked, but observations of suspected criminal behavior amount to a *Terry* not a PC stop.<br><br>The supervisor's comment raises questions about what the officer was being asked about and to do, but the deletion of the check box indicates that it was to uncheck that box.<br><br>Moreover, this ISR has numerous RAS-deficiencies that were not identified, nor explained, let alone corrected.<br><br>Wearing a ski mask is not a crime. It is not a basis for RAS. And it is certainly not a basis for a non-consensual PPD, especially without other asserted facts indicating the presence of a weapon or firearm.<br><br>The name check was clear. This was an unjustified stop and PPD and should have been rejected outright as an REV with a completed DNR. But, it was rejected as an administrative error (REJ), focusing on the administrative error in the ISR, rather than the substantive errors related to the stop and PPD.<br><br>Corrective actions should have been taken with this officer and with this supervisor, but because REJ status ISRs are not audited, unless they happen to be drawn from the random sample of approved ISRs by the Integrity Section, these violations by these officers would not be identified or noted for corrective actions. |

## *Inconsistent ISRs Erroneously Approved*

In many of the multiple-version ISR (MVR) samples (as was also the case in the single-version ISR (SVR) samples), the Consultant observed inconsistencies between the check boxes of the form and the narrative remarks. For instance, on some ISRs, the check boxes



were marked, but there were no narratives to support the non-consensual pat down. In other ISRs, the justification boxes for the pat down were also unmarked, but the reviewing supervisor did not identify the RAS error. Instead, the supervisors zeroed in on an administrative deficiency for the rejection and then approved the ISR when it was resubmitted with the same inconsistency related to RAS.

Supervisors also appear to be approving ISRs that they should not because those ISRs contain material inconsistencies. A significant example are various ISRs where information provided in check boxes is inconsistent with the required narrative description.

In some ISRs that the Consultant reviewed, supervisors provided insufficient information about substantive deficiencies before returning ISRs to police officers to correct. For instance, the supervisor identified an administrative error, when the real error concerned a substantive error related to the PPD and lack of RAS; the changes made by the police officer to the second version did not make corrections to the substantive error, but instead simply deleted language about the sunglasses being pulled out of the subject's pocket and added an overgeneralized, insufficient reason for the pat down, namely "due to the high crime and robberies" that were "recently" observed in the area. This ISR should not have been approved. *See, e.g.,* Consultant's Table 7, ISR Example 8 (below).

CONSULTANT'S TABLE 7 (ISR EXAMPLE 8). SUNGLASSES STUDENT SUBJECT/UNJUSTIFIED PPD

| | Date | Narrative | Check Boxes | Report Status Code | Supervisor's Comments |
|---|---|---|---|---|---|
| Original | 07 Dec. 2017 | 1. OEMC Dispatch Call of suspicious persons "going into vehicles" and taking items out (including a wallet which was thrown into an alley); <br> 2. Subject who matched description of witness detained near area last seen. <br> 3. During field investigation of subject R/O observed a pair of sunglasses hanging out [of subject's] pocket. <br> 4. Subject told officer he "got the glasses from someone" and denied "going through several vehicles." <br> 5. R/O "performed a protective pat down and pulled the sunglasses out of his pocket." <br> 6. Subject refused to provide address. Name check clear. No items confiscated. | ✓ Investigatory Stop <br> ✓ Other | REJ | *"typo"* |
| RESUBMIT #1/Version 2 | 10 Dec. 2017 | All of the facts from the original remained, except phrase that officer "***pulled the sunglasses out of his pocket" (deleted***); <br><br> And, officer added: R/O performed PPD "due to the high crime and robberies" recently observed in area of stop. | ✓ Investigatory Stop <br> Other | APR | |



## *Questionable Stop Types & Protective Pat Downs*

In a number of ISR samples reviewed, the Consultant observed some questionable stop types and protective pat downs related to loitering by subjects on public streets and sidewalks that did not appear to be designated as gang or narcotics loitering hot spots. Some of these ISR examples are discussed below in ISR Examples 9 and 10.

The loitering activity observed by police officers, in both ISR Examples 9 and 10, below was legal and not subject to the Gang and Narcotics Loitering Ordinance or dispersal rules. *See, e.g.,* Exhibit 6 (CPD's Gang Loitering Ordinance Legal Bulletin #2012-02 (rev. 02/17)). Moreover, in these ISRs, it appeared that the police officer did not have RAS for the stop and/or subsequent PPD that ensued. In each example, not only was the articulated fact of loitering an unjustified basis for the stop, but there were additional assertions made to justify the stop and/or PPD that were not well-taken, such as: "officer safety reasons" for the PPD; gang tattoos or known gang membership for the stop and/or PPD; walking (quickly or not) or running away from a non-approaching police officer once the subject was observed; and "community concerns regarding suspicious people" without more. Many ISR examples were observed that fell into these categories but the following two illustrations will suffice.

### ISR Example 9: Legal Loitering, "Officer Safety Reasons" & Gang Membership

In this example, there are three questionable issues: legal loitering as a basis for the stop (and/or the subject's known membership in a gang), and the assertion that the protective pat down was conducted for "officer safety reasons" without any additional facts to demonstrate why the police officer suspected that the subject was armed and dangerous during the field investigation.

Original/First ISR

The ISR author, a subordinate police officer, included narrative remarks indicating that:

1. Assisted by a police district Commander, the R/O performed a street stop of two subjects, based on the Commander's stated observation that the two subjects were loitering.
2. The Commander "ordered" the subordinate police officer to write ISRs on both subjects.
3. The R/O stated in the original/first ISR that the subject (in the ISR sample being reviewed by the Consultant) was a "known gun offender and high ranking member" of a local Gang and "known to carry a weapon." The R/O indicated that a "name check was clear," but did not indicate whether the known gang and weapon possession



status of the subject was based on prior personal knowledge of the R/O or of the Commander, or whether the name check revealed this information.

4. In the original ISR, the R/O also indicated that the subject was patted down "for officer safety" with "negative results."

## Supervisory Review

1. The ISR was rejected by the reviewing supervisor for administrative reasons using an REJ report status code, two days after the stop was made and ISR submitted.
2. In the comments section of the ISR database, the source-unit supervisor remarked: "*Rewrite to better explain loitering on the sidewalk (not a crime) i.e., obstructing the public from using the sidewalk and intimidating.*"

## Second/Last Version

The changes made by the R/O to the second/last narrative remarks section include the following:

1. The word "ordered" was changed to "instructed," with regard to the Commander's direction to write an ISR.
2. The Commander's observation of the two subjects who were loitering was changed to include the facts that the source unit supervisor instructed the subordinate officer to include in the narrative remarks section, almost *verbatim*. The second version of the ISR states:

> *Commander stated he observed the two individuals loi[]tering and obstructing the sidewalk in an intimidating manner so as to hinder people from walking through at above location.*

## Consultant's Observations

1. Loitering is not illegal (as the source-unit supervisor correctly observed) and it does not justify an investigatory stop and/or detention unless the subject is in an officially designated gang hot spot and meets the other elements necessary under the Gang and Narcotics Loitering Enforcement Ordinance.

2. The R/O who authored the ISR and made the investigatory stop and protective pat down of the listed subject is not the CPD member who reportedly observed the behavior that led to the stop and frisk.

3. To be justified under the Fourth Amendment, the officer performing the stop and protective pat down must be the person who observes criminally suspicious behavior, per CPD Policy and well-established U.S. Constitutional Law.



4. If the Commander observed the conduct that the Commander believed justified the investigatory stop and protective pat down, then the Commander needed to write the ISR and submit it for review and auditing. By instructing his subordinate officer to make the stop, the Commander demonstrated not only a disregard for department policy and Fourth Amendment law, but he also set up his subordinate police officer to take the blame for an unjustified stop and/or frisk.

5. The source-unit supervisor, however, also contributed to the non-conforming and non-compliant actions reflected by this ISR, when he/she rejected the ISR for administrative, rather than substantive RAS-related reasons (as he/she should have done),[49] and instructed the subordinate officer on what to write in the second or last version so that the ISR could be approved as justified, even though simple loitering on public sidewalks, as the supervisor recognized, is not illegal, unless the place where the loitering occurs (by known gang members) has been designated a hot spot, per CPD Policy and City of Chicago Municipal Code.

6. The place where this stop occurred was not an officially designated gang hot spot; and the check boxes in the ISR to indicate that it was remained unchecked and/or indicated that it was not a stop that was related to the gang/narcotic related enforcement ordinance (in both the original/first and final/last ISRs).

7. The rationale given for the PPD was two-fold:
   a. "officer safety"
   b. The subject was a known gun offender, high-ranking member of a Gang, and known to carry a weapon.

This was an unjustified pat down for three reasons.

1. Use of the rationale that a subject was patted down for "officer safety (reasons)" is illegitimate and unlawful. To permit such a justification for a pat down would justify a pat down any and every time a police officer wanted to perform a limited search of a civilian to ascertain whether he/she carried *any* type of object underneath one's clothing, rather than because facts and circumstances OBSERVED or KNOWN to the police officer justified a reasonable suspicion that the subject possessed a concealed weapon and/or firearm.

---

[49]Notably, this second/last version of the ISR was not rejected a second time for administrative reasons due to the typographical error or misspelling in the word loitering – spelled "lo[**ii**]tering" in the second version, which is one of the legitimate uses of the REJ code, according to the ISR Workflow Protocols. Also notable is that the police officer's assertion that the stop receipt was refused was not challenged by the supervisor, even though the check box on the first and last ISR versions is marked "YES" that the stop receipt was given, presenting an inconsistency for internal documentation and reports to the State of Illinois on the question of stop receipts.



2. The articulation that the subject was a "known gun offender" who was also "known to carry a weapon" would have justified the PPD if the officer had indicated that he/she possessed this knowledge personally in his/her official capacity as a police officer, and indicated how such facts were known to this reporting officer, the same officer conducting the PPD. [50]

3. Being a member of a Gang, in-and-of-itself, is not a crime. Thus, the fact that this subject was a gang member is irrelevant to support the stop and the protective pat down. For police officers to associate gang membership with criminal activity that supports investigatory stops and protective pat downs, or any kind of detentions and searches that are not supported by concrete observations and information of specific law breaking, criminal behavior that is specific to the person who is subject to the law enforcement actions, is unreasonable.

---

### ISR Example 10: "Community Concerns Regarding Suspicious People"

Police officers "investigating a community concern regarding suspicious people in the area" observed the subject "loitering on his bicycle" in an alley. The officer stopped this subject when observed riding his bicycle on the sidewalk. The officer conducted a field interview of the subject, but did not issue a citation for violating the riding a bicycle on the sidewalk ordinance. The officer noted in the ISR that the subject spoke little English.

#### Consultant's Observation

This is one of the examples that the Consultant observed where the factual articulation of RAS for the stop was questionable.

## AUDITING METHODS & PROBLEMS

The Agreement requires the Department to audit ISRs submitted by police officers, in addition to the Consultant's duties to review and assess ISR data. The following points relate to the CPD's internal auditing methods for the ISR data from CY2017.[51] The audits include continuous district-level supervisory review and quarterly or semi (bi)-annual department-level audits of CPD's investigatory stop and protective pat down practices. Both district and department-level auditing methods are discussed below, with observations made based on

---

[50] The Integrity Section, itself, noted that such justifications were illegitimate, although plentiful, in the ISRs it sampled during the departmental audit.

[51]These internal, departmental audits are distinct from the Consultant's Coded Legal Narratives Review.



review of various auditing reports from CY2017 that were submitted to the Consultant for his review and assessment.

## District Level Monthly Audits

As indicated, CPD revised SO4-13-09 to comply with Section II of the Agreement, by revising its directives in Section VIII of the Policy. These policy directives established a command structure for continuous source-level supervisory review of ISRs submitted by subordinate officers, and oversight of all ISR stop and frisk conduct and reporting practices by executive officers at the police-district level. Additionally, other executive officers who command various special units that roam within the districts, with members who are not considered district personnel, but who write ISRs, are also subject to the directives in Section VIII.

## Executive Officer Audits

Executive Officers from each of the 22 police districts are assigned the task of completing district-level monthly audits of the investigatory stop and protective pat down practices and ISR workflow processes within their scopes of authority and oversight.[52] These executive officers are responsible for complying with the Department's Policy directives, and thus Section II of the Agreement, by submitting monthly reports to their

---

[52]The 22 police districts sit within three geographical areas ("Areas") within Chicago city limits. These three areas – North, Central and South – are also housed within the Bureau of Patrol. Within these three areas, a number of special units and tactical/mission teams operate by roving between and among districts within their areas. The monthly audit reports for the three areas appear to be completed by Lieutenants within the special units and/or tactical teams. For example, in Area North, Unit 313 is assigned to Gang Enforcement, and operates within the Bureau of Patrol. The monthly audit reports were prepared by a Lieutenant, sent to the Deputy Chief of Area North and then forwarded to the Chief of the Bureau of Patrol for approval. The same process appears to be in use in Areas Central and South, as well, for the special units assigned to the police districts within those areas.

The Bureau of Detectives also has special units which complete monthly audit reports. For example, in November of 2017, the Commander of the Central Investigations Division submitted a "negative response" after review of all ISRs submitted for Units 603, 606 and 608 for October 2017, per CPD policy which indicates that if less than 10 ISRs are submitted for any month, then an executive officer must submit a "negative response." This monthly audit report was sent to the Chief of the Bureau of Organizational Development, in which the Integrity Section is housed.

The Bureau of Organized Crime also has Divisions and Sections which submit monthly audit reports. In CY2017, there were three divisions within the Bureau of Organized Crime that submitted monthly audit reports: The Gang Investigations Division, which is part of the Intelligence Section; the Narcotics Division; and the Vice/Asset Forfeiture Division. These monthly reports appear to be performed by the commanders of each division and they are submitted to the Deputy Chief and Chief of the Bureau for approval.



Commanders for review (*e.g.,* "Monthly Captains' Audits").[53]  Executive Officers also have oversight responsibilities for ensuring that ISR reviews by source-unit supervisors and the ISR workflow generated by submitting subordinate police officers comply with all policy directives and applicable laws. *See, e.g.,* Exhibit 2 (SO4-13-02, Section VIII. C.3.).

Unlike the department-level audit reports prepared and submitted for the Consultant's review by the Integrity Section, the Monthly Captains' Audits are digitally input into the electronic ISR database.  Thus, *all audits* from each month from every district, area and special unit are produced for the Consultant's review.  Monthly audit reports from CY2017 were, thus, submitted from all twenty-two police districts within the Bureau of Patrol; the three Areas within the Bureau of Patrol and the special units and tactical teams that operate within these three areas; and other divisions within the Bureau of Detectives and the Bureau of Organized Crime.

Based on review of each monthly audit report submitted for CY2017, the Consultant observed that the source-unit supervisors from most (but not all) districts appeared to place an undue emphasis on ensuring that ISRs were returned to officers for correction, to be resubmitted for *approval.*  While admonitions by executive officers to supervisors that stress "the importance of timely review and submission" of ISRs is completely appropriate (given the frequency with which ISRs are not submitted within the officer's tour of duty, or are not reviewed within a reasonable time thereafter to provide timely feedback), some of the comments made by Captains in the monthly audit reports raise questions about the directions being given to supervisors by the districts' executive officers.

1. For example, in the first ten months of CY2017, at least one police district Captain reported that "*supervisors need to consistently correct the officer's deficiencies by utilizing administrative rejections*"; and,
2. While Captains of other police districts reminded supervisors "to ensure the ISR gets corrected and resubmitted for approval"; indicated to commanders that "no issues" were "discovered involving officers making errors in reporting"; found "general compliance with proper preparation of the ISRs"; and "did not observe any incorrectly completed reports."

Many of the monthly audit reports were overly pro forma – consisting of aggregate numbers of ISRs and their status in the chain of review, rather than a meaningful engagement with how officers performed.  Further, where the audits involved taking a sample of ISRs and assessing them for Fourth Amendment justification, the Consultant identified issues with the reviews being cursory and/or relying on a sample of approved ISRs (which apparently are

---

[53]The Integrity Section also, apparently, reviews these monthly reports for compliance with the Agreement, providing training, reminders to follow up on corrective actions ordered in DNRs, and designing the new monthly audit report templates (in accordance with the Consultant's recommendations in his Period 2 report).



the only report status executive officers review), rather than on ISRs that were initially identified as problematic (*e.g.,* ISRs in an REJ or DEF status).

After reviewing a number of these audit reports, the Consultant cannot conclude that these audits represent serious attempts to conduct substantive audits for purposes of holding district personnel accountable for Fourth Amendment errors when conducting stops and /or frisks. Nor do some executive officers appear to be holding source unit supervisors accountable for compliance with CPD policy in their monthly audits.

From his reviews of the monthly audits, the Consultant can validate that district-level auditing of ISRs is occurring, and that submitted ISRs are, for the most part, being sampled for auditing review. However, the Department does not appear to have a uniform "method" of auditing that can be validated. The Consultant understands that, since the Period 2 report was issued, the Department began efforts to encourage district-level executive officers to adopt new monthly audit report forms designed to provide more uniformity and consistency. Since those efforts began after the completion of Periods 3 and 4, in CY2017, the Consultant finds no fault in this regard for the Period 3 and 4 reporting cycles, but must continue to note that it was an issue.

The issues identified above should be addressed and discussed among the parties. Specifically, whether an emphasis by executive officers and supervisors on approving ISRs is misplaced, when the terms of the Agreement place an emphasis on lawful stop and frisk police *practices*, instead.

## Department-Level/Integrity Section Audits

In Section II.3., the Agreement requires CPD to establish quarterly or semi-annual department-level audits by department headquarters staff. This term of the Agreement is fulfilled by the Integrity Section, which completes bi-annual auditing reports that provide an overview of results from its audit of a ten percent (or more) sample of ISRs that are placed into an approved (APR) report status each day; a special audit of arrest reports to determine if officers should have written, but did not write, an ISR; and the reviews it conducts of all ISRs forwarded by reviewing supervisors labeled as deficiency rejection reviews (REV), along with the DNRs that are associated with them.

There are two types of audits conducted by the Integrity Section: (1) a review of ISRs placed into approved report status on a daily basis; and (2) a special audit review of arrest reports involving an incident for which an ISR should have been completed, but was not. The Integrity Section audits are not digitally input into the electronic ISR database, but are conducted by putting pen to paper and storing these paper audits in hard-copy files at CPD headquarters.

The Bi-Annual Audit Reports from Periods 3 and 4, provide statistical assessments from both the approved ISRs it audited, as well as the special arrests audit report. The take-



away point from the assessment of all audits, both by the Executive Officers and the Integrity Section is that there seems to be no explanation for why they are both auditing only the ISRs placed into an approved report status, when there appear to be so many ISRs rejected for administrative reasons, which contain substantive errors. Thus, unless ISRs in an "REJ" report status appear in the random sample of ISRs that have been approved erroneously, the substantive errors in these ISRs will go unnoticed and unreported; and, the officers and supervisors making such errors will not be corrected, nor will they be identified if repeated errors of justification for stop and frisk conduct occur. This type of conduct seems to be a violation of the Agreement, Section II. b. 3. (ii).

In the Bi-Annual Reports, the Integrity Section identifies the percentage of ISRs in approved status that were found to contain deficiencies that fell into administrative or substantive categories. This audit, and the calculations derived from it, appears to be the CPD's way of satisfying the Agreement, Section II. b. 3. (i), which requires headquarters' staff to review a statistically representative sample of the narrative remarks sections from ISRs submitted for stops and frisks during the review period.

The Consultant must, however, emphasize that in reporting – here – the percentage of justified stops and frisks the Integrity Section calculated from its audits of Period 3 and Period 4 ISRs, he is not validating that these numbers (or the methods used to obtain them) can or will be relied upon as the "true" number of justified stops and frisks occurring in CY2017. On the contrary, the Consultant is not reporting statistical results from his own review of the CY2017 ISR data precisely because that data was incomplete, raised numerous credibility issues, was not reported or reviewed properly by CPD police officers and supervisors, and was not completely or correctly audited by CPD's executive officers, including those within the Integrity Section.

More specifically, the Consultant's decision not to validate the numbers (set forth below) by the Integrity Section justification is because the justification rates cited by the Integrity Section are based only upon: (1) sample ISRs that were not scientifically drawn in a random (or consistently similar) manner; and (2) only sample ISRs that were approved and finalized by reviewing supervisors.

The Integrity Section's decision to audit only the ISR samples that were approved and finalized does not appear to go far enough. The Consultant observed that there were an unknown number of (but many) ISRs in the MVR samples that supervisors rejected and misidentified and/or mislabeled as administrative errors ("REJ" report status), because they contained substantively deficient RAS articulations for the reported stop and/or frisk. Without an audit of these rejected ISRs, the Integrity Section could be missing an unknown (and apparently large) number of ISRs that contain substantive RAS errors relevant to the justification determinations and percentages being cited.

Moreover, the Consultant also observed that there were a fair number of ISRs rejected by supervisors for identified RAS-errors, but were not yet finalized (in "DEF" report status)



and/or rejected ISRs that were finalized as unjustified (in "REV" report status), because the Department concluded that no set of facts and circumstances could be articulated to justify the reported stop and/or frisk. These numbers of unjustified stops and frisks do not appear to have been included in the Integrity Section's overall calculations and announced percentages, as indicated above, of justified stop and frisk activity.

Without an effort to report the numbers of both justified and unjustified stops and/or frisks from all ISRs submitted, the Consultant cannot validate the auditing methods or results obtained by the Integrity Section. The Integrity Section's numbers, however, are being reported so that the public can see the results of the Integrity Section's auditing reviews, and to show why these auditing methods cannot be validated by the Consultant.

### PERIOD 3

For Period 3, the Integrity Section reports that there was a 5% overall increase, as compared to Period 2, in the number of erroneously approved ISRs, within its audit of the sample ISR data that it reviewed. This 5% increase included 1,285 deficient ISRs that were identified from a sample of 6,322 approved ISRs, which were randomly drawn (as 13%) from a total of 50,175 ISRs, which were submitted *and approved* for Period 3. *See, e.g.,* Exhibit 5A. (Period 3 Bi-Annual Report, dated 25 Oct. 2017, pp. 1-3). The 5% increase was based on the 1,285 deficient ISRs that the Integrity Section identified in the sample of final and approved ISRs from Period 3. Among the 1,285 deficient ISRs, 194 contained administrative deficiencies (REJ)[54] and 715 containing substantive deficiencies for failure to state justification for the stop and/or frisk. Among those 715 substantive deficiencies, most were based on errors related to protective pat down justifications. Specifically, these ISRs stated only that "the protective pat down was conducted for officer safety reasons" – a statement that the Integrity Section found to be insufficient to state RAS, and to which the Consultant agrees.

Based on ISR workflow protocols, use of the word "state" rather than "articulate" means that these ISRs should have been rejected as deficiency reject reviews ("REV"), without returning the ISR to an officer for correction. This seems to mean that the Integrity Section found that 715 ISRs that supervisors approved included stops and frisks that could not be justified under any set of facts or circumstances. Based on the approved status, the Consultant presumes that many or even most of these 715 ISRs (many which involved protective pat downs) did not have a DNR completed or attached with the ISR.

If the Integrity Section's sample was truly representative (as randomly drawn), then its results reflect that approximately 89-90% of CPD's investigatory stops and/or protective

---

[54]The types of administrative errors listed in the bi-annual report include several that are, arguably, substantive and related to lack of RAS or other justification for the stop and/or frisk. *See, e.g.,* Exhibit 5A (Period 3 Bi-Annual Audit Report at p. 2 (failure to check a box); Exhibit 5B. (Period 4 Bi-Annual Report) (failures to check a box and distinguish RAS v. PC).



pat downs were justified during Period 3, leaving approximately 10-11% of the stops and/or pat downs unjustified by the Fourth Amendment. The Integrity Section does not offer any data related to the number or proportion of ISRs with subjects who were identified as a member of one of the three ethno-racial groups of interest. Without a truly random sample that is statistically representative, the Integrity Section's assessments may include some form of statistical bias that cannot be measured. Thus, the Bi-annual Auditing Report assessments cannot be relied upon by the Consultant.

### PERIOD 4

The Period 4 calculations by the Integrity Section do not cite to a percentage increase in the number of erroneously approved ISRs in the sample, but instead simply notes that 19% of the sample contained approval errors, as compared to the 20% in Period 3, which reflected a 1% drop overall. This assessment, however, is not based on equal numbers of ISRs in each sample, nor across periods.

In Period 4, the Integrity Section identified 54,466 ISRs in a final, approved report status. From this number, it randomly sampled approximately 14-15% or 7,984 ISRs. From these 1,533 deficient ISRs that were erroneously approved, there were 1,136 ISRs where the officer failed to state justification for the stop and/or pat down or probable cause for a search beyond a pat down. Among these unjustified stops and frisks, the *Integrity Section reports that most of the deficiencies related to the justifications given for protective pat downs.*[55] *Only 397 ISRs* examined by the Integrity Section in its Period 4 audit contained administrative errors. Although not discussed in the Period 4 Bi-annual Report, the CPD introduced a revised ISR form which included a check box for probable cause stops to be reported, pursuant to the recommendation of the Consultant in Period 1. Thus, for Period 4, no deficiencies were identified based on ISRs in which probable cause stops were reported.

Based on the Integrity Section's calculations, it appears that a little over 14% of the 1,533 deficient ISRs that were erroneously approved in Period 4 contained substantive justification errors related to RAS. Looking at these figures from the perspective of justification, this means that approximately 85-86% of the investigatory stops and/or protective pat downs during Period 4 were justified, but 15% or more were unjustified, as well.

Although an 85-86% justified stop and frisk count remains a commendable performance statistic for Period 4, it does, however, also reflect an additional increase of between 4-5% in the number of unjustified stops and frisks, over and above the total 10.5% of unjustified actions from Period 3 (which also represented an independent 5% increase

---

[55]The Integrity Section's finding that most deficiencies are related to justifications for protective pat downs is consistent with the Consultant's observations from the ISRs from Period 4, as well.



noted from Period 2).  Thus, according to the CPD's data, the percentage of justified stops and frisks appears to reflect a pattern of *increasingly unjustified* numbers of stops and frisks from Period 2 to Period 4.

## CIVILIAN AND INTERNAL COMPLAINTS[56]

The Agreement, in Section II. 3. b. (iii), requires the CPD to document civilian and internal complaints relating to investigatory stops and/or protective pat downs conducted by police officers. Section V. 2.c. of the Agreement provides that the Consultant is to review civilian complaints and disciplinary files regarding those complaints and disciplinary files. CPD's Bureau of Internal Affairs provides its Integrity Section with documentation regarding any civilian or internal complaints that are determined to be related to investigatory stops and/or protective pat downs, which the Integrity Section reviews for purposes of making recommendations regarding improvements, corrective actions and ways to diminish the number of complaints received regarding investigatory stops.

In this regard, the CPD has furnished to the Consultant a list of all civilian complaints filed with the Bureau of Internal Affairs ("BIA") against police officers relating to investigatory stops and/or protective pat downs, between January 1, 2017 and December 31, 2017, which it determined to be potentially related to investigatory stops and/or protective pat downs.  To be clear, these files do not purport to encompass all civilian complaints filed against police officers, but only those that were determined by the BIA to be potentially related to investigatory stops and/or protective pat downs, which are the only ones covered by the Agreement.  These files contain the complaint numbers, dates of the complaints, and allegations of the complaints (with the names of the complainants, officers against whom the complaints were filed, if known, and any known witnesses, redacted). They further show the efforts made by the investigators to contact the complainants, the extent of the investigations conducted and the findings and recommendations made in each case.

The disposition descriptions used by the CPD to show how civilian complaints were handled include: "Closed/No Conversion" (meaning that the complaints were closed because the investigating officers were unable to obtain sworn affidavits from the complainants averring that the complaints were true); "Closed/Final" (where the complaint was investigated and a finding was made that the allegations were unfounded or that discipline of the officer was not warranted); and "Administratively Closed" (used by the command staff of the BIA based on a determination that the complaint was not suitable for investigation,

---

[56]On September 15, 2017, the Civilian Office of Police Accountability ("COPA") took over the responsibility of receiving and registering all complaints filed against members of the Chicago Police Department from the Independent Police Review Authority ("IPRA").



usually because the allegations in the complaint, even if true, did not describe a violation of law or Department policy).

Consistent with the complaints filed during the first two reporting periods, most of the civilian complaints filed during the CY2017 reporting period, relating to investigative stops and/or protective pat downs, alleged that one or more police officers stopped and/or frisked the complainants without legal justification and/or were rude towards them after the stop. For example, some complainants alleged that: handcuffs were placed on them; they were stopped on the street and asked for their identifications; money was confiscated from their pockets; they and /or their vehicles were searched; and, they were generally disrespected during the stops – all for no good reason.

There were a total of *104 civilian complaints* filed against Chicago police officers in 2017 which the Bureau of Internal Affairs deemed to be related to investigative stops and /or protective pat downs. In most of the 104 cases reviewed by the Consultant, the assigned investigators contacted or attempted to contact the complainants, but, according to the investigation reports, the complainants either listed invalid addresses or telephone numbers, did not respond to subsequent certified letters or indicated that they did not wish to proceed with their complaints when they were contacted. A clear majority of the complaints were concluded as "unfounded", pursuant to State law, when the complainants failed or declined to sign sworn affidavits in support of their complaints, or "not sustained".

The Consultant reviewed the complaint descriptions of the 104 civilian complaints filed against police officers, between January 1, 2017 and December 31, 2017, along with Summary Report Digests describing those complaints and their dispositions. Consistent with his First and Second Reports, fifty-five (55) of the complaints filed during this reporting period were closed because the investigating officers were unable to obtain sworn affidavits from the complainants averring that the allegations in the complaints were true. In this regard, Illinois law (50 ILCS 725/ 3.8) requires that anyone filing a complaint against a sworn peace officer must have the complaint supported by a sworn affidavit.

Thus, of the 104 complaints reviewed, fifty-five (55) were closed because, although the investigating officers invariably went to great lengths (telephone calls first, when telephone numbers were listed on the face sheet of the complaint, followed by home visits, followed by certified letter with return receipts requested) in efforts to get complainants to cooperate, they either did not respond or (when contacted) indicated that they were not interested in pursuing their charges. Twenty nine (29) of the complaints were investigated and closed as "not sustained", eleven (11) in which the allegations were refuted by body worn cameras or in-car cameras. In four (4) cases, body worn cameras or in-car cameras supported the claims stated in the complaints. The allegations of one (1) complaint was referred to the Cook County States Attorneys' Office, and in three (3) cases, while the allegations of the complaints were not sustained, the officers were cited for not completing ISRs. Eleven (11) complaints, which were filed in November and December 2017, were still pending investigation as of December 31, 2017.



In five (5) cases, even when the investigating officers were unable to contact the complainant, if the complaint identified the accused officer or contained enough information for the investigating officer to determine, through CPD's *GPS Vehicle Location System*, the identity of the accused officer, the investigating officer pulled the ISRs issued by that officer on the alleged date to determine whether the claimant's description of the alleged encounter could have actually occurred – such as whether the officer was on duty in the described area on the alleged date and time – and comparison of the complainant's version of the alleged encounter with that described by the officer in the ISR.

Based on the facts indicated above, the Consultant finds that the Department appears to be in substantial compliance with the terms of the Agreement with respect to the handling of civilian and internal complaints.

## TRAINING, RE-TRAINING, ENHANCED SUPERVISION AND DISCIPLINE

In Section II. 3(c), the Agreement provides for the establishment of re-training, enhanced supervision or discipline for officers who engage in unlawful investigatory stops and/or protective pat downs or who violate the CPD's policies or procedures governing these practices, and that written documentation of such actions must be done.  As indicated in the Consultant's first two reports and emphasized by Police Superintendent Johnson during one of the training sessions attended by the Consultant, honest mistakes are expected, for which no disciplinary actions will be taken.  However, for those officers who repeatedly or intentionally engage in such misconduct, swift punishment will be imposed.

Every member of the Department's more than 12,000-member police force has been trained, not only at the Police Academy while recruits, but as an ongoing commitment by the Department to comprehensively instruct its members on the legal standards for stop and frisk, as well as practical strategies for avoiding and preventing bias-based policing and recognizing implicit bias where it exists.

The Consultant has personally attended a number of the Department's training sessions, both initially in CY2016, along with members of the police force who were being trained, as well as in sessions that were previewed by the Department for the Consultant and his police practices expert, prior to being conducted for department members.  These training sessions, along with the various written training materials produced for review, permit the Consultant to confidently report that all members of CPD should know how to conduct an investigatory stop and protective pat down and how to report one properly.

Additionally, supervisors have been trained specifically on how to conduct ISR reviews to ensure legal and policy compliance; and executive officers have been trained in the proper way to audit ISRs and write monthly audit reports.  Indeed, the predominant means for correcting officers who submit ISRs with substantive justification errors related to stop and frisk is re-training, refresher training and review of policy directives.



In fact, the Department's efforts to provide broad-based and comprehensive training that responds to the challenges that police officers face in the Twenty-First Century, is commendable, both in terms of the substance of its programming and the good faith and pro-active stance that the Department has taken.

## Re-Training and Training Initiatives

In Section II., the Agreement requires CPD to provide training for officers and supervisors directed at ensuring that investigatory stops are conducted only where there is reasonable suspicion of criminal conduct and that protective pat downs are performed only where there is reasonable suspicion that the person stopped is armed and dangerous. The Department is also required to train its officers how to use the electronic, digitized ISR database and apprise them of their responsibilities to record (collect) all relevant information for every investigatory stop and protective pat down, including but not limited to the list of data identified in Section I. The training policies and practices also must conform to the guidance provided by the U.S. Department of Justice, as indicated in Part II, so that CPD officers do not engage in discriminatory biases based on race, ethnicity, national origin, religion, gender, gender identify, sexual orientation, marital status, parental status, or military discharge status, except when describing a subject.

Out of all provisions and terms in the Agreement, the Consultant can validate that the CPD has excelled in its efforts to comply and, in fact, has complied with Section II., in terms of the training it has conducted and initiated for CPD members. The list of training events and the types of training that were done in CY2017 is long. From the initial, department-wide, comprehensive orientation training to the Investigatory Stop System, completed in five-months for nearly 12,000 member police force; to the more routine roll-calls and refresher trainings held throughout the year; to the responsive and individualized training required for members who have been identified making repeated mistakes; to the recently initiated implicit bias training that is being provided to department members, in a coordinated effort with the Anti-defamation League, *see, e.g.,* Exhibit 7D (1) (ADL Training Materials), the Department has met all expectations that the Consultant could have in this regard.

Training is only as worthwhile as the level of performance that it subsequently occasions. Whether the investments of time and resources necessary to provide these training opportunities have been effective at preventing violations of the law and/or department policy regarding stop and frisk practices is another matter. For the many reasons discussed in this report, the Consultant questions whether the excellent training with regard to how CPD members adhere to legal and policy directives has resonated with some officers and supervisors. Thus, special training sessions for source unit supervisors and executive officers who have been identified by the Integrity Section as those who need additional training and correction regarding proper ISR documentation procedures, police directives and/or applicable laws, are of particular relevance to the discussion in this report.



### *CY2017 Training Initiatives and Completed Training Courses*

As indicated above, CPD completed the initial department-wide training on its new Investigatory Stop System in May of 2016, in compliance with the terms of the Agreement in Section II.  Since then, the Department has initiated a number of other training refresher courses during roll-calls and at other times during in-person, one-on-one training sessions during CY2017.  *See, e.g.,* Exhibit 7A. (*e.g.,* CPD ISR Roll Call Training, Special Order S04-13-09:  Updates and Further Guidance on Investigatory Stops (Spring 2017); Bureau of Organizational Development – Integrity Section Roll Call Training Script (Spring 2017); and Talking Points for ISR Training).

### *E-Learning Module Introducing the Probable Cause Check Box*

Additionally, in the Spring of 2017, during Period 3, and prior to the Period 4 roll out, on July 1, 2017, of the changes in the ISR form to require officers, using checkboxes, to distinguish between investigatory stops and probable cause stops, the CPD Academy used the Department's ISR refresher training course materials to prepare an E-Learning module, made available to all Department members to coincide with that roll-out.  The E-Learning script and power point presentation used in the E-Learning module is attached as Exhibit 7A. The training materials used to prepare the E-Learning Module were derived from a refresher training course prepared by the Integrity Section entitled "A Refresher and Further Guidance Regarding Investigatory Stops" that addressed common mistakes, commonly asked questions and provided examples of ISRs with and without legal deficiencies. *See, Exhibit 7C.* These training materials were previously reviewed and validated by the Consultant's police practices expert, Mr. Matthew Barge.

### *Integrity Section In-Person ISR Refresher Training to Police Officers*

During CY2017, the Integrity Section reported to the Consultant that it had been providing in-person ISR refresher training during all three "watches" in the Third, Seventh, and Eleventh police districts.  The City reports that the CPD chose these districts because, in general, more ISRs are written there than in other districts.

### *Integrity Section In-Person ISR Refresher Training to Selected Supervisors*

The Integrity Section also reported that, in CY2017, it provided (and continues to provide) in-person ISR refresher training to supervisors within the Bureau of Patrol in districts other than the Third, Seventh and Eleventh districts.  In person training is also provided by the Integrity Section on request.  For example, over a two-day period in June 2017, the Integrity Section trained all supervisors assigned to the Bureau of Organized



Crime. This in-person training is, apparently, the Department's version of enhanced supervision to correct officers who make repeated errors regarding stop and frisk practices.

Moreover, the Integrity Section reported that it continues to receive questions about ISRs (and the stops and frisks that are being reported by them) via email through the "Ask ISR" system established during Period 1, as well as by telephone. The Integrity Section uses these inquiries as an opportunity to mentor Department members regarding ISR-related issues. In October 2017, the Integrity Section reported that it receives approximately ten (10) emailed questions each month and approximately fifty (50) questions by telephone each week. The Integrity Section noted an increase in the number of questions following the rollout of the revised ISR form and the E-module refresher training on 10 July 2017.

The Integrity Section further reported that it answers questions by Department members usually within one day and, if needed, after consultation with the Office of Legal Affairs. The talking points used by the Integrity Section at the in-person trainings to introduce Department members to the change to the ISR form, beginning in Period 4, highlight *common errors* identified during the Integrity Sections' daily audit of a ten percent sample of ISRs that are finalized as approved, without any return to the officers for correction of identified deficiencies.

Finally, the Integrity Section's Commander reports that common topics of inquiry are also common errors, among which the following are illustrative:

1. As a supervisor, how to address an ISR with a deficiency.
2. After the probable cause check box was added on July 10, 2017, whether an ISR needs to be completed for on-view probable cause stops such as curfew violations and school absentees;
3. Why the Integrity Section concludes that an ISR was approved in error;
4. "How to get an ISR out of a status that can no longer be accessed";
5. What to do with an ISR when the author is no longer with the Department;
6. When is an ISR required for a traffic stop?

## *Implicit Bias & Procedural Justice 1, 2 & 3 Training*

Additionally, although not part of the CY2017 training activity, the Department launched one type of training in CY2018, which deserves special mention. In 2018, the CPD partnered with the Anti-Defamation League to conduct implicit-bias training that is being provided to all members of the Department. This new partnership is an example of the pro-active programs being conducted by the Department to deter biased-based policing at all levels. The Consultant and police practices expert, Matthew Barge, personally attended previews of these ADL training sessions during the summer of CY2018. Overall, this training appears to be a positive step that will help CPD continue to ensure that its members conduct



and report lawful stops and frisks free of implicit biases that result in racial profiling, and will improve its policies and practices on an ongoing basis.[57]

## Progressive Discipline

The City reports that, during the first half of CY2017, CPD identified fifteen (15) members as needing further training, which took place in December 2017, and eighteen (18) additional members, during the second half of CY2017, for which training took place in June 2018. CPD reports that as of November 14, 2018, nine (9) of the 104 complaints from CY2017 had resulted in at least one (1) sustained finding of at least one (1) or more police officers and recommendations that the officer(s) be disciplined (a total of eighteen (18) officers associated with these nine (9) complaints). In addition, Summary Punishment Action Requests ("SPARs"), were instituted in five (5) instances (4 patrol officers and 1 Sergeant) related to failure to submit ISRs, when they should have submitted them.

---

[57]Attached hereto as Exhibit 7D is a memorandum from Mr. Barge to the Consultant, dated February 5, 2019, in which he commented on the training and offered his opinions as to how the training could be improved. The Consultant inadvertently failed to send copies of the memorandum to the parties when he received it.



# PART IV. ASSESSMENTS OF THE CY2017 ISR DATA

## THE IMPACT OF UNDERREPORTED PROBABLE CAUSE STOPS

The Department's decisions to not report PC stops in Period 3 and exclude PC stops that did not include PPD activity, is not being criticized by the Consultant as contrary to the Agreement, because the Agreement expressly covers only investigatory stops based on reasonable suspicion of criminal activity. Nonetheless, during review of the CY2017 ISR data, it became evident to the Consultant that reporting *all* probable cause stops is necessary, going forward, to assess *all* the investigatory stop and protective pat down activity covered by the Agreement. There are two reasons: (1) protective pat downs are covered by the Agreement, whether they occur following an investigatory (discretionary) stop or a stop made for probable cause (non-discretionary stop); and (2) even probable cause stops (*e.g.,* Traffic stops) may contain hybrid stop/detention activity, where *Terry*-type detentions ensue after the initial stop for probable cause is made; [58] and (3) officers sometimes make mistakes characterizing stops as based on PC *versus* RAS.

### Probable Cause Stops with PPDs

In general, all protective pat downs are covered by the Agreement, regardless of whether they occur pursuant to a stop made to investigate suspicions of criminal wrongdoing or a stop made based on probable cause, derived from observed criminal wrongdoing. Therefore, all stop data must be produced, reviewed and assessed by the Consultant and the statistical experts to make the determinations called for by the Agreement with respect to the protective pat downs. This does not mean that all stop data will be statistically assessed for purposes of determining Fourth Amendment justification questions related to reasonable suspicion, because only the stops made to investigate criminal activity – not those where criminal activity was observed – are covered by the Agreement. Why? Because the Agreement is concerned with discretionary police activity and decision-making, during which selection decisions are made about whom to stop, when, and for what reasons. *Terry* stops (made to investigate based on suspected criminal behaviors) and protective pat downs (limited searches of a subject's outer clothing for protective purposes only) are exceptions to the Fourth Amendment probable cause requirement and permit police officers to exercise their law enforcement authority in a discretionary manner. Because both the Terry stop and the protective pat down are justified by the same legal standard – the reasonable articulable suspicion (*e.g., Terry*) standard,

---

[58] The Department acknowledges these hybrid-type stops in its training materials and instructs officers to identify such stops in ISRs and include data about the RAS-detentions and/or protective pat downs, even when the initial stop was based on probable cause. *See, e.g.,* Exhibit 7A (iv).



CPD's ISR data regarding both types of police conduct are reviewed and assessed by the Consultant and experts.

## *Hybrid Stops = Probable Cause Stops + Ensuing Terry Detentions*

The probable cause stop data must be produced with the *Terry* stop data, however, not simply when there is a protective pat down that follows from the stop, but also when *Terry*-type detentions follow from the stop, as well. There are stop types that are of a hybrid nature, where the initial stop is based on either RAS or PC, but the initial detention is extended by new observations of additional facts or circumstances that turn the initial stop into something else. Traffic stops are a prime example of hybrid stops, where probable cause for minor traffic violations prompt the stop, but an investigatory or preliminary investigation ensues. The Department acknowledges this kind of hybrid stop in its training materials. Probable cause stops need to be reported so that the Consultant can meaningfully examine whether the stops and/or frisks reported in the ISRs comply with the Fourth Amendment. This meaningful examination is necessary based on errors, observed by the Consultant in his ISR sample reviews, by police officers and supervisors, alike, when distinguishing between PC and RAS stops, especially in Period 4, when the PC check box was part of the ISR.

During the CY2017 review, the Consultant observed that the Department directed its officers not to report PC stops in ISRs during Period 3. This fact is documented by many auditing reports at the district and department-level. The Consultant acknowledges that the shift in whether to report PC stops in Period 3 could have been due to the Consultant's recommendation to add the PC check box, which was contained in the draft of his First Semi-Annual Report, circulated to the parties at the end of January 2017, the first month of Period 3. The Consultant realizes that the Department, in response to the Consultant's concerns about the way PC stops might influence the RAS stop review and statistical assessments may have decided to stop reporting such stops until such time as the PC check box could be implemented at the beginning of Period 4 (July 1, 2017). Thus, the Consultant has no reason to believe that the CPD's decision to cease reporting PC stops was anything more than a good faith misinterpretation of the Consultant's recommendation.

In Period 4, when the PC checkbox took effect, the City advised the Consultant that the Department had determined that it would exclude PC stops that did not include a PPD, and make this selection based on which ISRs were marked as PC stops by officers using the PC checkbox introduced in Period 4, pursuant to the Consultant's Period 1 recommendation. The result of this shifting PC Policy, in the Consultant's view, is that some investigatory stops (without probable cause) that were misidentified by police officers as based on PC were not reported in the ISR database for either Period 3 or Period 4. The Consultant personally observed a number of such errors. While the Consultant understands that PC stops are not covered by the Agreement, to the extent that investigatory stops are inappropriately being considered as PC stops by police officers reporting or supervisors reviewing ISRs, these *Terry*-type stops are not being documented, and there is a significant risk that the



Department is functionally excluding from meaningful review a set of important Fourth Amendment encounters.

The reality is that the legal standards often leave police officers understandably confused. CPD policy and procedure, as well as the scope of the Consultant's obligation to ensure that the Department is substantially complying with its policy directives and applicable laws, should be aimed at ensuring that officers – many of whom simply want to do the right and required thing – are proceeding in the best way possible. Neither the parties nor the Consultant could have (nor did they) anticipate the implications and ramifications of the presence of PC stops in the ISR data when the Agreement took effect in Period 1. However, simply because this issue was unforeseen, at the outset, does not mean that changes cannot continue to be made to rectify this confounding problem. The Department's agreement to implement the PC check box recommendation was a good start. How the problem is ultimately resolved, for purposes of assessing the investigatory stop data, apart from the probable cause stop data that does not include protective pat downs, is a matter for future discussion.

Nonetheless, based on the CY2017 data review, and because PC stops were treated differently in different time periods, there may be serious ramifications for statistically assessing the aggregate ISR data and CPD's compliance with the Agreement. Without knowing how many PC stops were excluded from Period 3 or in Period 4, and without knowing how many of these stops were misidentified as PC stops in these time-periods (along with the details regarding race, ethnicity, gender, and other factors relevant to the stop and/or frisk), the Consultant cannot rely upon the coded legal narratives statistical results, to make Fourth Amendment determinations, nor on the statistical results from the aggregated, full-set of ISR data, to begin to attempt to assess legal questions related to racial and/or ethnic adverse disparate impact from CPD stop and/or frisk activity.[59]

In the following section, one example from ISRs reviewed by the Consultant illustrates that hybrid stop types must be produced for review by the Consultant, because officers and/or supervisors still do not always make the correct distinctions between PC stops and *Terry* Stops, which is why the PC checkbox is not a complete fix for the problems discussed.[60] These examples illustrate ISR reporting situations where police officers checked the PC stop box, but the narrative remarks indicated that a Terry-type stop and/or detention was part of the stop event and, thus, the RAS stop box should have been checked.

---

[59]The Consultant does not suggest or imply that anything the Department did or did not do with regard to reporting the PC stops was the result of bad faith. It may well be that the Department interpreted the PC check box recommendation to mean that the Consultant did not want PC stop data *produced* to him.

[60]This ISR example is only one of the many ISRs that the Consultant reviewed from the MVR samples, each of which represent problems with how officers are reporting stops and frisks and how supervisors (of various ranks) are reviewing and auditing them, based on policy directives.



CONSULTANT'S TABLE 8 (ISR EXAMPLE 11). NON-TRAFFIC PROBABLE CAUSE STOP IDENTIFICATION ERRORS BY SUPERVISORS.

| Probable Cause Stop Identification Errors By *Supervisors* | Consultant's Observations |
|---|---|
| FAQs | |
| *Original:* Theft of Service/Deceptive Practice Call, R/O interviewed subjects in room to determine they could not pay after credit card declined.<br><br>In the check boxes, the officer indicated a search of the person and effects based on consent; and the PPD box with consent is also checked.<br><br>    1. One Subject had an active warrant.<br>    2. Narrative remarks do not articulate a PPD.<br><br><br>*Take-Away Points:*<br><br>*Last/Final:* the PPD check box that was marked PPD-YES was deleted in the last/final ISR version to PPD-NO.<br><br>**Supervisory error directing R/O to check non-consensual PC stop box** | 1. Field Interview to determine subjects could not pay for hotel room necessary before an arrest could be made, so officer was correct in checking RAS box;<br>2. Reviewing supervisor erred in directing officer to check the PC box.<br>3. Narrative does not indicate PPD in original version and that error was not identified by the supervisor;<br>4. The supervisor erroneously approved the last/final version, even though the check boxes for non-consensual PPD were deleted without explanation. |

## THE IMPACT OF UNREPORTED ISR DATA IN ARREST REPORTS

In Period 2, when the CPD introduced its new auditing methods for assessing ISRs, the Integrity Section notified the Consultant that it had discovered a common problem with ISR data related to stops resulting in arrests for violent crime that should have been reported, but were not, in the ISR database, including PPD information. As a result, the Integrity Section announced that it would be performing a special audit of arrest reports in two categories (Unauthorized Use of a Weapon ("UUW") and Robbery). While the Consultant commends the Integrity Section for pro-actively identifying this common problem and investigating its impact on the ISR data review process, the current department policy appears to be that this unreported data is not later introduced to the ISR database, even though these special arrest report audits indicate that there are data points regarding ISR activity involving stops and frisks that apparently do not make it into the ISR database, including PPD information. Indeed, of the 18 arrest report samples reviewed by the Consultant, from CY2017, a little less than 40% included a PPD.[61]

As a practical matter, the Consultant observes that the failure by some number of police officers to write an ISR when an arrest follows from an investigatory stop and/or protective pat down is not an error that should commonly occur. The amount of training provided by the Department, together with the fact that the CLEAR system is able to pre-populate most of the fields in the ISR, simply by selecting a drop-down menu after completion of the arrest report, raises questions regarding why this is still a common error by officers. The Consultant would expect *all but the newest* recruits to understand, by now, the importance of creating ISRs and the proper method for doing so. *See, e.g.,* Exhibit 7A-7B.

The special audit of arrest reports raises a number of additional questions, as well, that, perhaps, should be considered by the parties, but have not yet been identified or

---

[61]In the case of the special audits of arrest reports, an Investigatory Stop Report Oversight Observation Report is used to document the Integrity Section's determinations. For CY2017, the City and CPD agreed to produce a sample of the special audits completed, on paper, by the Integrity Section. Based on a digital file with an audit arrest table identifying 363 records, dated 13 July 2018, the Consultant's statistical experts were able to randomly sample and identify 18 arrest report records (5%) from the Integrity Section's paper audit files.

These 18 arrest record files include cases where the Integrity Section's audits identified incidents where an ISR should have been written, but was not. The 18 arrest report audits underscore the continued need for the Consultant to review and assess all stops reported in ISRs, including those for probable cause, because stops made where there is an enforcement action, such as an arrest or a citation (administrative notice of violation), are required to be documented by the Agreement, if a *Terry* stop and/or protective pat down led to that action. Illinois law, conversely, only requires probable cause stops to be reported if an arrest results and/or there was a frisk or a search. Thus, the one stop type for which neither the Agreement nor Illinois law requires documentation is the on-view stop based on probable cause for an ordinance violation that leads to an ANOV or a citation (traffic stops notwithstanding) and does not include a protective pat down.



discussed.  For example, it is not clear why the CPD has identified only the UUW and Robbery category of arrests reports to audit, rather than all arrests that currently fall within the "violent arrests" definition.  The absence of ISR data from incidents where an ISR should have been written, but was not, because the police officer did not follow the training received, may be significant, both as a legal and statistical matter.

Specific attention has not been directed to the numbers and percentages of arrest reports where ISRs should have been written but were not.   However, more attention may be warranted to determine whether the effect of such missing data would have statistical significance related to the disparate impact questions.

The Consultant is not suggesting that CPD require officers who failed to write an ISR, along with an arrest report, do so retroactively, as this would permit ISRs to be written after-the-fact and in reliance upon often stale memories, rather than real-time documentation of recent observations and actions.  This is something that the Consultant found objectionable when observed during review of the MVR samples (as discussed earlier in this report). However, the CPD policy that directs officers not to submit an ISR based on the failure to write an ISR based on a stop involving RAS that led to an arrest is problematic. Such direction appears to be inconsistent with CPD's current interpretation of its policy, as stated in the ISR Workflow Protocols.

Apart from these inconsistencies in the way the CPD appears to treat ISRs that are submitted to the ISR database, the fact remains that *some information related to stops and frisks is not being documented and submitted to the ISR database*, particularly in the case of UUW and Robbery arrests.  This missing ISR data has implications for the statistical results regarding the aggregate (and potentially coded legal narratives review of the representative sample) ISR data, on a number of significant levels. Therefore, the parties might want to consider whether the CPD should begin to audit *all* arrest reports for violent crimes, not just those involving UUW and Robbery arrests, so that a more complete picture of how widespread the problem of unwritten ISRs truly is within the Department.

The Consultant does not want to make light of the fact that the Integrity Section undertook this special audit, on its own initiative, after recognizing that the failure to write an ISR when an investigatory stop led to an arrest was a common problem.  However, the Consultant questions why just two categories of arrest reports based on violent crimes, *i.e.,* UUW and Robbery arrest reports, were chosen for the special audit.  Certainly, if *Terry*-type data is present in these two categories of arrest reports, it may also be in other types of arrest reports, as well. [62]

---

[62]The Bi-Annual Reports from the Integrity Section's Special Audit of Arrest Reports involving two categories of violent crimes (*e.g.,* UUW and Robbery), show that approximately five percent (5%) of all arrest reports contained RAS based stops and/or frisks that should have been reported in ISRs, but were not.  Thus, the CPD's results from the special audit of these two categories of arrest reports raise important questions as to whether all arrest reports for violent crimes should be audited to ensure that all relevant *Terry* stop and



Although the prior contact card system did not require officers to write stop and protective pate down reports in ISR when an arrest was made, the Investigatory Stop System does; and, this system will have been in place for over three years when this report is finalized and issued to the public; so, it seems fair to *require officers to understand* their reporting duties in this regard, because these duties are made clear during continuous and extensive training at roll-calls, on-line, electronic training sessions, and in group training classes.

## THE IMPACT OF CHECK BOX ERRORS IN THE ISRs

Another serious problem observed by the Consultant during his review of the ISR data was a lack of integrity or wholeness that arises from inconsistencies between the checked boxes and the narrative remarks, as well as between the changes made to the check boxes from one version to the next. By integrity, the Consultant means that, when an officer changes the check boxes marked in the original ISR in a subsequent version, these changes undermine the reliability of the data points indicated by the check boxes in terms of believability/credibility (based on the narrative articulations of the officer) and transparency. Inconsistently-marked check boxes presenting conflicts with the articulated facts in the narrative sections of the ISRs also present a problem, both for the coded legal narratives review of the statistically representative samples, as well as for the statistical experts when assessing the aggregate ISR data.

Although the Consultant may be able to make professional judgment calls about inconsistencies between checked boxes and narrative remarks, for purposes of making Fourth Amendment determinations for the statistically representative ISR samples, the experts' statistical assessments and analyses are based on the checked boxes in the last or final ISR, rather than the first or original ISR. As the parties know, the statistical assessment of the aggregate data is based completely on the data points indicated by the checked boxes; the computer cannot read, assess or judge the articulated remarks of the officer, as the Consultant can during the coded legal review.

When reporting officers and supervisors make changes to the originally marked check boxes, or mistakenly leave check boxes blank, those actions and inactions have a statistically significant impact and influence on the statistical experts' assessment of the aggregate ISR data, as well, especially with regard to the majority of ISR data appearing in a single-version form. If a check box is not marked, then it is not counted; and, when check boxes are not counted, the stops, protective pat downs, and related searches they represent are not counted either. That means that, even if an officer asserts that the stop, pat down and/or search occurred in the narrative remarks section, the statistical experts have no way to assess that fact using the check boxes; and, because the experts' analysis of the aggregate

---

protective pat down data is electronically entered into the ISR database and produced to the Consultant for review and assessment.



data is based solely upon the check boxes, that data is lost when a check box remains blank. In other words, although the Consultant can note the inconsistency between a blank check box and a narrative remark and proceed with the analysis by making a judgment call or choice between the inconsistent data, the experts cannot.

By extension, the existence of blank check boxes in the multiple-version ISR samples poses a problem for the statistical assessments of aggregate data in a multiple-version form. Although the experts may be able to compile information, by using only the last/final version of each uniquely numbered ISR for the multiple-version records, the existence of blank check boxes is not limited to the original ISRs. In many cases observed, officers and supervisors were just as likely to uncheck a box in the last/final version as they were to leave a box unchecked in the original. Either way, data is either missing or the data asserted is at odds with other data in earlier versions.

The emphasis on inconsistencies in the check boxes (as well as between the check boxes and narrative remarks, for purposes of the Fourth Amendment review) is important both qualitatively and quantitatively, because the statistical analysis of disparate impact is based on the aggregated ISR data, because the legal determination requires *quantitative* evidence of impact, rather than *qualitative* evidence of justification. To make the quantitative assessments of the aggregate data, the experts must use a computer to read the data points that are necessary to compile the information about each stop and each post-stop outcome (*e.g.,* the number of pat downs, searches and other conduct of interest to the statistical study). The computerized process of reading data points is limited to the *quantification of specifically checked boxes* in each ISR. The computer cannot be programmed to make the *qualitative human judgments* necessary for assessing Fourth Amendment justification.

In general, inconsistencies between the checked boxes and the narrative remarks are a problem for a consistent statistical analysis of the aggregate data (for disparate impact determinations) and for the Fourth Amendment coded legal narratives review of the statistically representative ISR sample data. A certain margin of human error is always expected; however, the Consultant's personal review of the multiple-version ISR samples reveals that many of the observed inconsistencies are not simply the result of human error, honest mistakes, or differences between reasonable minds regarding whether a stop was made based on reasonable suspicion or probable cause.

The fact that the statistical assessments used for the disparate impact legal analysis are wholly dependent upon which boxes are checked in the ISRs means that, if the wrong check boxes are marked, then the statistical results and analysis of the aggregate ISR data does not reflect a true picture of CPD's stop and frisk practices for the review period. The versioning system modifications made to the ISR database in Period 2, along with the ISR Workflow Protocols (discussed elsewhere in this report) permit such changes to be made when ISRs are rejected using either an administrative rejection code or a deficiency rejection code and returned to officers for corrections. The result of such changes is that the original



ISR turns into a new version, often with new or deleted facts asserted in the narrative remarks sections, as well as different boxes checked regarding substantive stop and frisk conduct.

### *ISR Check Box Examples*

During review of the ISR samples, the Consultant observed problems with the way police officers and supervisors were using the check boxes for reporting and reviewing street stops and frisks. These check box problems fall into three general types: added and deleted check marks; blank check boxes; and changed check boxes.

### ISR Example 12. Added & Deleted Check Boxes

ISR Example 13, graphed and analyzed below, illustrates both the addition and deletion of check marks in the original ISR, which appears to be illegitimate, because this action contravenes CPD Policy directives regarding prohibition of analytical hindsight for post-hoc articulations of RAS and supervisor rejections of original ISRs that fail to articulate and/or state RAS and, by extension, violate the terms of the Agreement and applicable laws.



CONSULTANT'S TABLE 9 (ISR EXAMPLE 12). ADDED & DELETED CHECK BOXES.

| PERIOD 4 | DATE | CHECK BOXES | REPORT STATUS CODE | SUPERVISOR'S COMMENTS |
|---|---|---|---|---|
| ORIGINAL | 12 Nov. 2017 | ✓ PC Stop<br>✓ PPD-Yes<br>✓ PPD-Consent<br>✓ Search Beyond PPD-Effects-Yes<br>✓ Search Beyond PPD-Consent | DEF + DNR | *"The Pat down box is checked but there is no reason given as to why a pat down was conducted. Also [if] a pat down was conducted a receipt must be given to the subject. If no receipt was issued the reason why should be in the narrative."* |
| RESUBMIT#1/Version 2 | 16 NOV. 2017 | ✓ pc stop<br>✓ ppd-no<br>✓ search beyond ppd-person – yes<br>✓ search beyond ppd-effects-yes<br>✓ search beyond ppd-consent | APR | |

## Analysis:

The error in this ISR example relates to the police officer's decision to DELETE the checked boxes marked in the original ISR in the second version of the ISR. The original ISR indicated that:

- A protective pat down (PPD), with consent, had been conducted; and
- A search beyond the PPD ("SBPPD"), with consent, had been conducted of the subject's person.

BUT, in the second version of the ISR:

- The officer appears to have changed his/her mind about whether the post-stop outcome was a protective pat down of the subject or a search of the person.
- In ISR Version #2, the Officer unchecks the PPD-Yes box and leaves checked only the SBPPD of the person boxes, with consent.

## Consultant's Observations

- According to CPD Policy, in Section VIII., supervisors have a responsibility to REJECT the original ISR and complete a DNR, without returning it to the officer for correction and/or changes in a second or subsequent version.

- This ISR is an example where the reviewing supervisor *properly completes a DNR*, after identifying that the officer failed to articulate RAS for the protective pat down asserted in the first ISR submitted. However, this supervisor follows the ISR Workflow Protocols, which – as indicated earlier in this report – are flawed, because they instruct supervisors, like this one, to return the ISR to the officer for a second articulation of what happened on the scene, by using a substantive deficiency (DEF) status code.

- Here, the supervisor followed the ISR Workflow Protocols to the letter, but not Department policy directives; so the Consultant's critique is not related to the conduct of the supervisor, but rather of the Protocols, which led the supervisor (and officer) to engage in a return and resubmission process that was simply not consistent with the requirements of the Fourth Amendment.

- This ISR is also a rare example where the reviewing supervisor required more than the checked box for consent to establish *de facto* justification for the protective pat down. Instead, this supervisor commendably required factual articulation of RAS in the narrative remarks section, before being willing to approve the ISR, as originally submitted. Again, *the supervisor is to be commended for attention to such details*, although the parties have not asserted that protective pat downs with consent are unjustified for failure to articulate underlying RAS.

That said, the supervisor did not identify the substantive justification deficiencies in this ISR that the Consultant observes.

- For example, the officer articulates that there was a dual purpose for the detention of this subject, which involved not only on-view probable cause (public urination), but also a field interview regarding whether the subject had anything illegal in the subject's vehicle, as well as a search of the vehicle for



contraband based on the subject's response that he had "a little weed on him." The officer, however, did not indicate in the checked boxes that an investigatory detention occurred, but checked the PC stop box, instead.

- CPD's policy and training materials indicate that if a subject is stopped for probable cause, but detained for investigatory reasons, then the officer must check the box indicating that the subject was detained for RAS, not probable cause. *See, e.g.,* Exhibits 2A-2C and 7A (4).

- Although this PC stop is not based on a traffic violation, the same rationale applies: to document the Terry detention simply in the narrative remarks, but not also in the checked boxes, poses an analytical problem for the quantitative analysis being performed of the aggregate data. In this way, the checked boxes present a confusing set of choices for officers and supervisors who are given an either/or choice in terms of stop type by the current ISR form, rather than a set of choices that are flexible enough to permit assertion that the subject was detained on multiple grounds, some involving probable cause and others involving RAS.

  Similarly, in this ISR, the supervisor wanted to alert the officer who submitted it that there was a substantive justification error, as well as an administrative error regarding failure to check the PPD receipt box (to indicate whether state law had been complied with). Again, this supervisor deserves credit for prioritizing the substantive deficiency in terms of assigning a rejection code and completing the DNR for that substantive deficiency, rather than simply rejecting it on administrative grounds (which would have bypassed the DNR completion requirement in the CLEAR system). Many supervisors chose the REJ path, not the one chosen by this supervisor.

The ISR illustrated in Consultant's ISR Example 14, below, shows how police officers were able to uncheck the box in the original ISR indicating that there was no consent for the protective pat down (a box marked closer in time and nearer in memory to the actual pat down), and change the justification basis for the pat down, when challenged by the supervisor, by marking the "consent" check box. Such actions lack credibility, especially when the reviewing supervisor does not require additional explanation about why the officer's memory changed based on the supervisor identifying the RAS deficiency.

CONSULTANT'S TABLE 10 (ISR EXAMPLE 13).  DELETING THE NO-CONSENT FOR A PPD CHECK BOX.

| ORIGINAL | Date | Narrative | Check Boxes | Report Status Code | Supervisor's Comments |
|---|---|---|---|---|---|
| | 30 Jan. 2017 | PPD based on agitated behavior during field investigation and officer observed "various bulges throughout [subject's] clothing.  Knife recovered." | ✓ Investigatory <br> ✓ Stop <br><br> ✓ Actions indicative of violent behavior <br> ✓ Protective Pat Down <br><br> ✓ No-Consent for PPD | REJ | "RAS re pat down" |

| RESUBMIT #1/Version 2 | Date | Narrative | Check Boxes | Report status Code | Supervisor's Comments |
|---|---|---|---|---|---|
| | | Bulge observed in subject's right rear pants' pockets; appeared to be small weapon; a folding knife recovered. | ✓ Terry Stop <br> ✓ Actions Indicative of Violent Behavior <br> ✓ PPD <br><br> ✓ Consent for PPD | APR | |

## Consultant's Observations

1. This was a Landlord/Tenant dispute/OEMC Dispatch call which was a *Terry* Stop.
2. *Terry* Stop articulation of RAS was proper.
3. Misuse of REJ (administrative deficiency) report status code for an RAS deficiency re: level of detail in articulation, by the reviewing supervisor.
4. Officer was not instructed by supervisor in comments to change the check box from non-consensual PPD to a consensual PPD.

### ISR Example 14: Changing the Checkboxes from First to Last Version of ISR

*This ISR illustrates why changing the checked boxes from the original to the last version of the ISR can impact the statistical results of the aggregate ISR data.*

## Original ISR

1. In the original ISR, the R/O checked that he/she conducted a PPD without consent, with no search beyond the PPD.

2. The original narrative indicates that a traffic stop was made and the driver was arrested, a custodial search ensued.

3. The reviewing supervisor rejected the ISR, using a deficiency rejection (DEF) report status code, indicating that the police officer's narrative failed to include "specific and articulable facts to support PPD." A DNR was attached, but it was not signed by the reviewing supervisor, as required by CPD policy.

## Version 2

1. A second version of the ISR was resubmitted, adding to the narrative that a PPD was conducted because bulges in subject's clothing appeared to conceal a small weapon, and a folding knife was recovered. However, the check boxes changed from PPD *without* consent to PPD *with* consent.

2. The ISR was approved by the reviewing supervisor, despite the substantive change to the PPD check box regarding the subject's consent in the last (final) version of the ISR – changing the basis for the PPD to consent, thereby obviating the need to justify the PPD with an articulation of RAS in the narrative remarks section.



3.  However, it appears that, because a DNR was issued, the supervisor had a personal conversation with the officer, which resulted in the change to the narrative remarks and the check box regarding consent.

**Consultant's Observations**:

The Consultant questions whether the reviewing supervisor should be permitted to approve, as a FINAL VERSION, any resubmitted ISR where the changed check box, indicating no consent for the PPD in the original, is changed to CONSENT for the PPD, in the final version, without any explanation or comment about the justification for this change.

### ISR Example 15.  Changed v. Corrected Check Boxes ISR Examples

In the case of multiple-version ISR samples, the Consultant observed that the problems with added check boxes and blank check boxes lead to the same result:  changed check boxes from the original ISR to the last or final ISR.  Changing checked boxes is not the same as correcting inconsistencies between checked boxes and/or adding checks to boxes that have been overlooked inadvertently when those check boxes concern administrative data, not substantive justification data.  Adding checks to boxes for RAS-related conduct in a subsequent version of an ISR alters the original articulation of the facts asserted by the officer at a time most proximate to the actual stop and/or frisk.   This kind of *ex-post-facto*, analytical hindsight is simply not lawful Fourth Amendment conduct where it changes the police officer's original articulation of the facts.

During his review, the Consultant observed that, sometimes check box changes were made *apart from* the reviewing supervisor's identified deficiency and comments (simply because the ISR was returned and the officer had a second chance to check new boxes and/or uncheck others); and, sometimes, these changes were made at the suggestion or explicit direction of the supervisor.  In either case, the act of changing the answer rather than correcting the answer is an important distinction.  The table below illustrates several of the ISRs where this occurred.  An example of changed v. corrected check boxes is set forth below, in CONSULTANT'S ISR EXAMPLE 15.



CONSULTANT'S TABLE 11 (ISR EXAMPLE 15). CHANGED CHECKBOXES WITHOUT INSTRUCTION IN COMMENTS BY SUPERVISOR.

| Original ISR | Last/Final ISR | Consultant's Observations |
|---|---|---|
| ✓ PPD<br>✓ Consent for PPD<br><br>*No narrative remarks identifying a PPD with or without consent* | ✓ No boxes checked for PPD<br><br>*No narrative remarks re: PPD* | 1. Reviewing supervisor rejected for administrative error, and wrote "c" (lower case) in comments box. The reviewing supervisor had reason to question whether the officer performed a PPD because the check boxes and narrative remarks were inconsistent. However, the supervisor's arcane use of "c" (without more), along with misuse of the REJ report status code, reflects a lack of transparency by the reviewing supervisor.<br><br>2. The supervisor may have spoken with the officer personally, but what was said by the officer and the supervisor during that conversation is not documented and thus cannot be reviewed by a department auditor, nor by the Consultant.<br><br>3. Any number of reasons could explain the change in check boxes (*e.g.,* the officer/supervisor determined that the check boxes were wrongly checked; or, perhaps, that the officer conducted the PPD with consent, but there was no factual basis to support RAS for a weapon or firearm). Regardless, the changed checkboxes raise credibility questions about why the officer changed his/her mind about whether a PPD **with consent** occurred, or not, after the stop report was submitted. |

As illustrated in Consultant's Table 13, ISR Example 16, the CPD policy authorizes the return and resubmission of an ISR to an officer to *make corrections* that involve adding a check mark to a box, in the following kinds of circumstances:

1. The narrative describes that certain conduct took place; or
2. The narrative describes a pat down or a search, but the box checked is inconsistent with the narrative remarks. In that case, the supervisor may clarify with the officer which action took place and ask the officer to correct the ISR to make the check boxes consistent with the narrative.

Only in these two cases does a change to a check box equal a correction.



However, in Consultant's ISR Example 17, below, one observes that sometimes, an administrative rejection with a supervisor's request to change an administrative error turns into the police officer making not only a change to an administrative check box, but also a substantive change that affects whether a PPD and/or consent for such an action occurred or not. This type of action does not conform to CPD's limited authorization to make changes to check boxes for administrative errors such as typographical errors or simple omissions to check boxes where the narrative remarks support the addition of a check mark.

CONSULTANT'S TABLE 12 (ISR EXAMPLE 16). CHANGED CHECK BOX FOR SUBSTANTIVE PPD NOT ADMINISTRATIVE RECEIPT.

| ORIGINAL VERSION Checkboxes | SECOND VERSION Checkboxes | CONSULTANT'S COMMENTS |
|---|---|---|
| ✓ PPD<br>✓ Consent<br>    X=Receipt for PPD | X=no PPD<br><br>X= Receipt for PPD | 1. On review of the originally submitted ISR, the supervisor *asked the officer to check the receipt box for the PPD conducted and returned the ISR to the officer for correction. The officer resubmitted the ISR as a second version but deleted the PPD check box (as well as consent for the PPD), rather than checking the receipt for PPD box.*<br><br>2. This ISR raises a credibility question regarding whether a consensual PPD (or *ANY* PPD) occurred or did not occur.<br><br>3. It appears that a PPD was conducted, but the officer changed the check box in the last or final version, and it was approved by the supervisor.<br><br>4. Changing the check box substantively, like this, has serious implications for the statistical analysis of post-stop outcomes, where only the last or final version ISR checkboxes are assessed. |

## ISR Examples of Identified Inconsistencies between Check Boxes & Narratives Resulting in Changes to Narrative Remarks

### Consultant's ISR Example 17:

- **Original ISR**: The original ISR included checked boxes for a non-consensual protective pat down and a narrative articulation of the pat down, without giving any justification for it.
- **Second Version**: After the supervisor identified that fact and returned the ISR, the officer resubmitted a second or subsequent and last version of the ISR, changing the pat down from one without consent to one with consent, thereby obviating any further inquiry into the justification for it.

### Consultant's ISR Example 18

- **Original ISR**: Same facts as ISR Example 18, directly above, except:
- **Second Version**: Here, the officer changed the PPD check box from consensual PPD to NO PPD by unchecking/deleting the check box indicating that a pat down took place.

### Consultant's ISR Example 19

- **Original**: There was no mention of a pat down or a search in the narrative; and, no check boxes were marked. The supervisor rejected the original ISR using the administrative deficiency code/REJ and returned the ISR to the officer.
- **Second Version**: The officer added check marks to the PPD and consent boxes, as well as the SBPP-Person and consent boxes, to indicate that PPD and a Search Beyond the PPD of the SUBJECT occurred, both with consent, but did not add any narrative remarks. The check box for recovery of a weapon or firearm for the PPD was marked NO; and, for recovery of drugs or contraband for the search, also was marked NO. The supervisor approved the Second Version. (APR).

### Consultant's ISR Example 20

- **Original:** The same facts as in #19 above, but, on review, the supervisor makes a comment on the ISR telling the officer to *change the check box* (presumably to make the ISR consistent with the narrative remarks).
- **Second Version:** On resubmission by the officer, the check box is changed. The reviewing supervisor approved the second version of the ISR.

## Returns of ISRs "Per Police Officer's Request"

In many of the ISR samples reviewed, the Consultant observed that supervisors returned ISRs to police officers "per" the police officer's request. This kind of example does



not need much explanation. The ISR system is designed to prevent the ISR author from changing the report *after it has been submitted*. The only time a police officer *should* be able to request that an ISR be cancelled (in the case of, for example, a duplicate ISR generated for the same stop) is before it is submitted (*i.e.,* when it is in a saved or preliminary – PRE – status). Even in those cases, unless the supervisor authorizes a correction based on the supervisor's identification of a deficiency, the ISR should not be cancelled. According to CPD's policy in Section VIII., if the ISR author believes a mistake has been made in the ISR, as originally submitted, then the officer should personally alert the supervisor, but should not change the ISR. Therefore, when supervisors return an ISR "per the officer's request" – as indicated in the comments section, this action appears to violate CPD policy.

CPD has explained to the Consultant that, in some cases, such a request is made, because the officer realized that he/she had made a mistake, after the ISR was submitted. However, the CPD's written policy does not indicate that such a return is permissible, nor do the ISR Workflow Protocols. Moreover, presumably, the reason why an original ISR is archived in the form in which it is submitted, even when a supervisor decides to return it for correction, is to avoid the appearance that officers are changing their facts and reports after-the-fact, for reasons that are not as innocuous as simple negligence or mistaken memory. Thus, to return the ISR at the officer's request, without a reason indicating an administrative deficiency, still seems to be contrary to the CPD's original intent when its policy was drafted.

# PART V. LEGAL ANALYSIS

The CPD's stop and frisk policies and practices are governed by "all applicable laws" and, thus, all prevailing legal standards related to Fourth Amendment stop and frisk law enforcement activities. The Agreement also raises questions about whether CPD's stop and frisk policies and practices have had or are having an adverse disparate impact on Black and Hispanic subjects. The legal standards, as well as the open questions regarding those standards, and the Consultant's preliminary views about the law are set forth below.

## FOURTH AMENDMENT JUSTIFICATION

CPD's police officers and the Department, as a whole, must ensure that all individual stops and frisks made by its police officers, when reviewed separately and in the aggregate, are justified by reasonable, articulable suspicion ("RAS"), as required by the Fourth Amendment. The Consultant is charged by the parties to the Agreement to determine whether, in fact, CPD's current stop and frisk policies and practices comply with Fourth Amendment standards.

Over fifty years ago, in the case of *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court held that an officer may detain an individual on the street only if a reasonable officer, under the facts and circumstances present to the officer at the time, would suspect that the individual had been, is, or will soon be engaging in criminal activity. For an officer to conduct a frisk, the officer must have a reasonable suspicion that the individual is in possession of, or could immediately obtain, a weapon or firearm, thereby presenting a danger to the officer or bystanders. Indeed, the facts and circumstances that justify the police officer's actions must have been present not only before the decision to stop or pat down was made, but also within a proximate time and location to the time and place of the stop and/or pat down.

The rationale for the pat down is limited, just as the pat down conduct itself is limited, to a brief pat down of the outer clothing of the subject to determine whether weapons or firearms are concealed beneath the subject's clothing. The pat down is considered a limited search, distinguishable from those supported by probable cause to reach inside a subject's clothing or possessions (e.g., custodial arrest or administrative transport). If, by virtue of his/her professional law enforcement experience, a police officer determines, by plain touch of the outer clothing, that the subject is in possession of something that feels like a weapon or firearm, then this fact gives the officer probable cause to reach inside the subject's clothing and perform what the Consultant will refer to as a "related search."

A related search flows directly from the protective pat down, but it is based on probable cause, not reasonable suspicion. A related search *occurs subsequent in time* to the protective pat down, because the probable cause that justifies it flows directly from the



officer's plain touch of the subject's outer clothing during the limited search, namely, the protective pat down. [63]

The Fourth Amendment analysis that the Consultant must do for purposes of the Agreement requires the assessment of individual ISRs to determine whether individual stops and frisks are justified. This assessment is done so that a statistically representative sample of those ISRs, when assessed statistically, will give the Department, the parties and the public an idea as to whether the CPD's stop and frisk policies and practices are justified. The Consultant's Coded Legal Narratives Review is aimed at making those Fourth Amendment determinations.

Although only the statistically representative samples are assessed for Fourth Amendment compliance, inherent in this process is the parties' understanding and expectation that the results of the Consultant's determinations will be extrapolated to the full-set of aggregate ISR data to produce a general sense of whether the CPD's overall stop and frisk practices are justified, leading ultimately to a determination related to compliance. The Fourth Amendment questions, for the most part, are fairly straightforward. The disparate impact questions are not. In the context of police stop and frisk policies and practices, there seems to be an interrelationship between the Fourth and Fourteenth Amendments that is hard to tease out.

On the one hand, the Fourth Amendment strikes a balance between individual civil rights to be free from search and seizure by law enforcement officers, unless the seizure is supported by reasonable articulable suspicion or probable cause, and the need of police officers to investigate reasonably suspicious criminal behavior to carry out their criminal law enforcement duties. That balance, as the Consultant perceives it, is that the civil rights to freedom of movement and physical privacy must yield when criminal laws must be enforced. The Consultant does not perceive that balance to be otherwise simply because statistical evidence may show that police officers use selection criteria in ways that disproportionately result in members of minority groups being subjected to investigation more often than non-minority groups. The U.S. Supreme Court has said as much when it stated that racial disparities alone will not be sufficient to claim or prove adverse disparate impact without statistical evidence of robust causation between the challenged policy and/or practice and the adverse disproportionality of its impact upon legally protected minorities. *See, e.g., Texas Department of Housing and Community Affairs v. The Inclusive Communities Project*, 576 U.S. 576___, 135 S. Ct. 2507, 2512 (2015).

On the other hand, decades of civil rights jurisprudence has carved out a framework for understanding how disparate impact theories can ferret out institutionalized

---

[63]If probable cause exists to search the subject's person or effects before the protected pat down takes place and/or is observed during or after the protective pat down, but is unrelated to the act of performing the protective pat down, then it is not a related search that is subject to the Agreement or the Consultant's assessments.



discrimination that disparate treatment claims cannot, because intentional discrimination can rarely be proven, even when observed. Adverse disparate impact which results from implicit and institutionalized bias can infect police officers and police departments just as it can affect any human being or organization. By its very nature, implicit bias is unconscious and hard to recognize. This is why procedural justice and implicit bias training for police officers in police departments nationwide have become standard best police practices, and why the CPD has begun to train and retrain its members to recognize and appropriately deal with such issues. The Consultant has no doubt that the majority of CPD's members have every intention to do their jobs without racial or ethnic bias corroding their work. However, the facts remain that seemingly unexplainable disproportionate numbers of stops and protective pat downs have impacted civilians who are Black and non-Hispanic to a far greater extent than any other group in Chicago; and Hispanic civilians are also impacted disproportionately compared to White non-Hispanic civilians.

Are these disproportionalities the result of greater proclivities to criminal behavior by members of these two groups? Absolutely not. While more BNH males between the ages of 16-29, may be arrested for crimes than any other population group, and crime rates may be higher among impoverished neighborhoods where residents are predominately Black and non-Hispanic or Hispanic, there is no statistical evidence to show that members of one or more of the three groups have a greater, inherent proclivity to commit crimes. The question being asked is whether police officers are over-selecting members of BNH and Hispanic communities for observation and investigation, based on deployment levels to "high crime areas" while under-selecting and/or ignoring criminal behavior by Whites, such that many BNH and Hispanic group members are stopped and patted down for weapons or firearms

In general, since Period 1 in CY2016, the statistical results from the Consultant's Coded Legal Narratives Review processes have consistently reflected that, considering only the last version of the ISRs, most of the CPD's investigatory stops have been justified by the Fourth Amendment, even if the majority of those stops reflect disproportional disparities in the actual number of stops made that include BNH and Hispanic subjects. The statistical results regarding Fourth Amendment justification for investigatory stops, however, have not and cannot result in any compliance determinations, one way or the other, without more. On the one hand, ethnic and racial disparities, alone, are not unlawful in the context of law enforcement's Fourth Amendment authority to stop and frisk civilians who are reasonably suspected of criminal activity. On the other hand, a finding that the Department's stop and frisk practices substantially comply with the Agreement's terms, and all applicable laws, requires sufficient evidence that the ISR data producing these high rates of Fourth Amendment justification are accurate, complete, credible and transparent – on a number of levels that, at least through the end of Period 4 in CY2017, it did not have.

The same must be said with regard to protective pat downs. The statistical results from the Consultant's Fourth Amendment justification review of police officers' protective pat down activity, are only as good as the underlying data upon which they are based. For



the reasons discussed, the ISR data related to protective pat downs suffers from the same problems of accuracy, credibility, completeness and transparency. These observed problems in the ISR data reviewed has led the Consultant to conclude that the amount of unknown information from unknown numbers of probable cause stops with protective pat down data that went unreported (or underreported) cannot be quantified. For example, the fact that CPD's reviewing supervisors are able to return ISRs to police officers, to change the checked boxes marked in original ISRs regarding the pat downs, undermines any legal assessments of compliance that the Consultant could make from statistical results of the determinations he made of the ISR sample narratives from his coded legal narratives review process. Consequently, justification rates for stops and pat downs cannot be reported at this time.

## ADVERSE DISPARATE IMPACT

In addition to the Fourth Amendment issue, there is a second legal issue that the Consultant must address: the existence of an unlawful, adverse disparate impact with respect to CPD's stop and frisk activity. CPD's stop and frisk policies and practices must avoid any adverse disparate impacts on minority groups based on prohibitions in the Illinois Civil Rights Act ("ICRA").

In the Agreement, Section IV.3., the parties agreed that the Department is required to substantially comply with the provisions of ICRA. During the first review period in his First Semi-Annual Report, pursuant to the authority granted to him by the Agreement, the Consultant interpreted ICRA to authorize a disparate impact cause of action by private parties in Illinois challenging stop and frisk practices. This is not a legal ruling, because the Consultant operates as a Consultant, not a judge, and because this is a settlement agreement, not a lawsuit. However, for purposes of the review of ISR data and the legal determination of disparate impact called for by the Agreement, pursuant to ICRA, the Consultant's determination that disparate impact is a viable question for the Agreement, and the compliance determinations to be made, will guide this and any future analyses of the facts and law and any recommendations made by the Consultant.

In *Texas Department of Housing and Community Affairs v. The Inclusive Communities Project,* 576 U.S. 576__, 135 S. Ct. 2507, 2512 (2015), a case not involving stop and frisk, the U.S. Supreme Court signaled that statistical evidence (even if significant) of racial and ethnic disparities, alone, does not constitute unlawful disparate impact. Instead, the Court found that evidence of ethno-racial disparities must be accompanied by statistical results that establish *robust causation* that links the application or existence of the challenged policy or practice to the disproportional *and adverse* impact felt by members of the ethno-racial (legally protected) group. *See, e.g., Id. at* 2512.

The *Inclusive Communities* case is instructive (but not necessarily dispositive) on the issue of adverse disparate impact arising under federal law, but the parties to the Agreement dispute whether this case applies to claims of adverse disparate impact arising under Illinois



law and ICRA. The Consultant is unaware of any case law since *Inclusive Communities* that would further elucidate the holding therein relating to the lawfulness of stop and frisk practices when challenged as creating adverse disparate impacts on historically protected minority groups. Moreover, the legal questions presented by the Agreement, related to CPD's stop and frisk policies and practices, are complicated by the factual data in the underlying ISRs, data that has been seriously questioned by the Consultant, for the many reasons set forth in this report. Until the integrity of the ISR data can be validated as capable of producing accurate statistical results, the question of the applicability of the disparate impact issue remains open to debate.

## CONCLUDING THOUGHTS

Without question, the fact that legal determinations still cannot be made, based on the statistical results from the underlying ISR data, is a disappointing result, especially at this point in the Agreement's life cycle. No doubt the parties share this disappointment, because all involved in this Agreement have worked very hard for several years. The Consultant does not believe that these efforts have been in vain, simply because the desired results and outcomes hoped and strived for have not yet materialized.

The Consultant genuinely believes that if the Department is able to identify the members within its ranks who consistently fail to comply with its policy directives, and consider adoption of the Consultant's recommendations, set forth in Part VI, then the CPD can achieve substantial compliance with the Agreement in short order. In the meantime, the CPD must continue to work and progress on providing ISR data that comports with its own Policy, the terms of the Agreement, and, where indicated in this report, the Fourth Amendment.

# PART VI. RECOMMENDATIONS

The issues identified in this report reflect serious problems that prevent a finding of substantial compliance with the terms of the Agreement, and will continue to do so, until they are remedied. The remedies proposed by the Consultant in this recommendations section of this report are a beginning, not an end, to the discussions and deliberations that need to occur going forward.

## ISR FORM REVISION RECOMMENDATIONS

1. The parties should confer about changes to the ISR form that address:
    a. Various material ambiguities, *i.e.,* future language changes to the ISR Form which would prevent the ambiguities discussed in this report, namely, those that require officers to choose between checking the PC versus RAS stop boxes; and,
    b. The lack of a check box for custodial and/or administrative transport searches, as opposed to those that are related to the protective pat down and therefore occur "beyond the protective pat down."
2. The Consultant also recommends the addition of the following check boxes to the ISR Form (and beyond):
    a. Hybrid Stop (PC and RAS)
    b. Custodial Search
    c. Administrative Transport Search and/or Pat Down

## CHECK BOX RECOMMENDATIONS

3. The Consultant recommends that the CPD work with its computer programmers to find a way to:

    a. Lock the check Boxes after the original ISR is submitted so that when a supervisor labels the deficiency "administrative" (REJ) and returns it to the officers for correction of "simple omissions" (*e.g.,* the officer forgot to check the receipt box) or "clerical errors" in the narratives (*e.g.,* typos), the officers cannot CHANGE, DELETE or otherwise modify their real-time answer in the check boxes; and,

    b. In cases where the supervisor labels the ISR deficiency as a DEF (deficiency reject) because there is something wrong re: the stop type, PPD or search check boxes (or reasons for them), then the lock placed on the check boxes after submission can be removed ONLY if a DNR is also attached to the DEF indicating that the supervisor directed the officer to change, delete, or otherwise modify the check boxes related to RAS. In such cases, the DNR must



provide a justification by the supervisor for instructing the officer to do so; and, these DNRs must be reviewed by the Integrity Section.

4. If practicable, the CPD should ensure that the electronic, digital Investigatory Stop System be modified to lead police officers through a logical process when marking check boxes based on prior answers.

   a. A logical skip pattern will avoid officer errors related to checking boxes that are inconsistent with prior marks and ensure that all necessary check boxes are marked, avoiding the problematic return and resubmission process (and more paperwork) for substantive errors that are being mischaracterized as "simple omissions" regarding the check boxes.

   b. Also, if practicable, the electronic data entry system for ISRs should be set so that the ISR cannot be submitted unless the officer answers all relevant check boxes, including STOP TYPE (Terry or PC), as well as the basis for the Terry Stop.

## NARRATIVE REMARKS

5. The Department should ensure that police officers articulate the totality of the circumstances and all facts that support reasonable suspicion at the time the stop or frisk is made in the narrative remarks section and not simply by checking boxes. The narrative articulation requirement of the Fourth Amendment requires officers to go beyond the simple summation statements included in the check boxes.

6. During review of the ISRs, the Consultant noted that some supervisors are requiring officers to articulate the factual basis for the *consent* given by reporting officers, but some are not. The Consultant believes this is a good practice and encourages the Department to make this practice a mandatory directive for all reviewing supervisors, based on the feedback from community members, some of whom indicated that they are patted down on a regular basis. The Consultant acknowledges that there does not appear to be any law requiring such a directive.

7. With respect to the prior recommendation, the Consultant heard that various community members are not being given receipts when patted down, and they believe they are being patted down for drugs, not weapons or firearms. To support the assertion that the subject consented in the ISR, perhaps the CPD might direct police officers to advise subjects that consent is not mandatory and articulate that the subject has been advised that consent is not mandatory in the narrative remarks section.



## ISR WORKFLOW REPORT STATUS CODES

8. The Consultant recommends that CPD's use of the "SUB" report status code reflect **only** the original ISR submitted, rather than the original ISR submission and every other version of an ISR resubmitted. The use of just one "SUB" code to represent ISRs in different workflow statuses is confusing to the Consultant, so he can imagine that executive officers, who are charged with the duty to oversee the ISR Workflow, would also find this to be the case. The Department also should hold its members accountable. Thus, a change to using a chronological type of coding may work better. It is recommended that the CPD label each resubmitted ISR by a code such as RESUB1 or RESUB2, so that the Department, as well as the Consultant and experts, can more readily track when and how often these ISRs are resubmitted.

9. The Consultant recommends that the CPD use an electronic alert or flagging system to notify supervisors that an ISR returned for correction(s) to an officer has not been resubmitted in a timely (reasonable) manner. The parties can discuss what kind of time frame is reasonable, but the Consultant would suggest more than 24 hours after the return, an alert should be given to the supervisor.

## TOUR OF DUTY RECOMMENDATIONS

The tour of duty requirement appears to apply only to the time in which the original ISR must be submitted and the initial supervisory review must be completed. Thereafter, the timing requirements do not appear to be precisely articulated in writing, which has led to the time lags described in Parts II-IV of this report. For these reasons, the Consultant respectfully recommends that:

10. For any ISR submitted by an officer more than 24 hours after the date and time of the stop, the Consultant recommends that CPD utilize a computer program in the ISR database to automatically reject the ISR as a non-correctable deficiency review rejection final (REV/FIN) and require completion of a DNR by the source-unit supervisor and/or executive officer.

11. For hard-copy paper ISRs, the Consultant recommends that CPD supervisors reject all electronically input ISRs entered beyond the tour of duty, unless the reviewing supervisor has pre-authorized the extension of time. All extensions of time should be reasonable and justified by extenuating circumstances beyond the control of the officer and confirmed by the reviewing supervisor.

12. The Consultant further recommends that the Integrity Section develop a tour of duty violation notice (if electronically accessed, in a digital format, and/or in a paper format (for those without electronic access)). The development and use of a tour of



duty violation notice would create a paper trail for department auditors, as well as the Consultant and his experts, so that a precise rate of such violations could be established and the source (s) of such problems could be readily identified and remedied.

13. In situations where **repeated violations** are noted and documented by executive officers (and/or district and area commanders), the Consultant recommends that the Department, pursuant to Section II. 3. b. (ii), of the Agreement, develop a digital and electronic means of documenting and reporting the type of corrective action ordered, with validating signatures of the department member with repeated violations, and the department members holding this member accountable. This documentation should be electronically stored for security **and should go beyond the function of the DNR**, in which isolated errors are reported and corrected.

14. The Consultant recommends that the Department revise its Policy to define and quantify the term "repeated violations" so that all members are clear about the consequences and take the tour of duty (and other ISR workflow requirements) seriously.

   a. The Consultant further recommends that the types of corrective actions for substantive, RAS-related and/or justification deficiencies within ISRs be identified with relationship to the error types, so that officers are notified, in advance, of the consequences of non-compliance. For example, the Consultant recommends that the Department clearly state when progressive discipline will be ordered.

   b. Concomitantly, the Consultant recommends that the CPD clearly state, within its Policy, the types of non-compliance for which progressive discipline will be ordered, and clearly delineate the process for the imposition of such disciplinary actions, as well as the documentation requirements required to transparently report and validate the status (and/or completion) of such discipline, as a result.

## MULTIPLE-VERSION ISRS

Currently, the Department does not limit the number of versions a police officer may submit or a reviewing supervisor may request in an attempt to correct the original ISR's articulation of RAS and/or other identified errors. The current Investigatory Stop System policy directives, ISR Workflow Protocols and other ISR related documents also do not appear to limit the time in which ISRs must be finalized as rejected or approved. Accordingly, the Consultant respectfully recommends that the Department:



15. Limit the number of versions that a police officer can resubmit to correct administrative and substantive justification errors.
16. Limit the number of times a supervisor can return an ISR with identified deficiencies to a police officer for correction.
17. Prohibit the return of ISRs with identified substantive errors related to RAS and require immediate rejection and issuance of a DNR, whether the identified error concerns a failure to articulate or a failure to state RAS.
18. Revise CPD policy directives in SO4-13-09 to expressly state the time limits for finalization of ISRs by reviewing supervisors.

## STATISTICALLY REPRESENTATIVE SAMPLES

19. The Consultant further recommends that statistically representative ISR samples from all report statuses (APR, CNL, DEF, FIN, PRE, REJ and REV) be regularly audited, by a random selection process that results in true statistical representation.

20. The Integrity Section currently audits a sample of ISRs from those placed into an approved status by source-unit supervisors on a daily basis. It is the Consultant's considered opinion that the Integrity Section's current auditing methods should include review of ISRs placed into all report status codes, particularly the administrative rejection code (REJ).

## EXPAND THE SCOPE OF SPECIAL AUDITS OF ARREST REPORTS

21. To ensure that the amount of ISR data missing from the ISR database, based on the arrest report errors, is measured and quantified accurately, the Consultant recommends that more than just UUW and Robbery arrest reports be audited by the Integrity Section. Specifically, the Consultant recommends that all categories of violent crime currently being quantified for purposes of assessing the violent arrests benchmark be audited to determine the error rates regarding ISRs not being written where arrest reports are submitted.

22. The Consultant recommends that the CPD modify/revise its current policy directing officers not to write an ISR or submit this information to the ISR database, once the error with the arrest report is discovered. Acknowledging that *post-hoc* rationalizations and analytical hindsight are not permitted by CPD Policy or the Fourth Amendment, this information is nevertheless vital to an accurate and complete assessment of CPD's stop and frisk practices.

23. While the Consultant agrees that the reporting officer, who failed to write the ISR when submitting the arrest report (despite a fairly simple click of a button to complete the pre-populated pull-down menu that should suffice at the time of the stop and/or frisk), should not be the one to submit such information, it seems that



*the Integrity Section member auditing the arrest report could be assigned the task of completing a new form, submitted to the ISR database, with the relevant data points (e.g., stop type (investigatory stop/detention or PC) and/or protective pat down/related search, etc.),* so that the ISR database has all relevant data points, even if it does not have all officer articulations for Fourth Amendment assessments.

24. Limitations to the statistical assessments being done have resulted from the absence of what the Integrity Section reports is nearly a five (5) percent error rate among the UUW and Robbery arrests for Period 3, and only a slightly lower percentage of error for Period 4. To avoid these limitations, the Consultant recommends that the parties discuss whether CPD is able to isolate and set aside:

    a. The arrest codes for each stop;
    b. Data on the age, gender, race, ethnicity etc. of the subjects who were part of preliminary investigations, but later arrested; and
    c. The locations of such stops and/or frisks.

25. The Consultant recommends that arrest report ISR data be identified by executive officers and set aside, so that it may be included in the production of audits from the arrest reports – both in a full-set format; as well as in a sample audit format, so that the designated experts' can include the ISR data from these arrest reports in their analysis of the aggregate data, which would greatly improve the post-stop outcomes statistical analysis.

## EXECUTIVE OFFICER & INTEGRITY SECTION RECOMMENDATIONS

26. The Consultant further recommends that the executive officers within the various police districts, areas and special units, begin to audit all ISRs, regardless of the report status codes assigned by source-unit supervisors, particularly those being rejected using administrative (REJ) report status codes.

27. When auditing ISRs, the Consultant further recommends that the executive officers include the ethno-racial breakdown of subjects in the ISRs sampled and reviewed, not only for the entire district, as a whole, but by beat numbers. Such breakdowns would be helpful (especially if they reflected the percent of ISRs sampled based on the total contribution of SVRs and MVRs from each unit and/or beat within the district) for the statistical analysis.

28. The Consultant recommends that the Integrity Section Commander be given the authority to submit quarterly updates, in addition to Bi-annual Auditing Reports, for the specific purpose of reporting the number of ISRs rejected for RAS-errors, the report status codes assigned to these rejected ISRs, and the presence or absence of an associated DNR. This report should include updates on the number of SVRs rejected



for RAS-errors, as well as MVRs rejected for such errors. When reporting on this subject, the Consultant recommends that the Integrity Section audit all ISRs rejected using the administrative (REJ) rejection status code and include an estimate of how many ISRs with identified RAS-errors (whether identified by the supervisor or the executive officer) were rejected during the quarter using an REJ-status code, rather than a DEF or REV rejection code.

29. Further, with respect to Recommendation No. 28, the Consultant recommends that the Integrity Section create a log in each Quarterly and/or Bi-Annual Auditing Report that quantifies the number of police officers and/or supervisors from each police district who have been identified as making "repeated" errors in ISRs related to a failure to articulate and to state RAS for both investigatory stops and protective pat-downs, as well as those who have repeatedly mischaracterized stops as based on probable cause, by checking the PC check box, when the stops also reflected Terry-type detentions ("hybrid stops").

30. With respect to Recommendation Nos. 28 and 29, the Consultant further recommends that the Integrity Section perform a special audit of all supervisory reviews using the REJ rejection code to ascertain, based on the comments used for such rejections, whether supervisors are transparently articulating the basis for the rejection to police officers using plain English, or whether these comments are coded and indecipherable to those reviewing them based on the written comments. This special audit would ideally quantify the number of supervisory errors related to non-transparent comments and identify the number of supervisors who are using these kinds of review methods.

## CITY OF CHICAGO & CPD RECOMMENDATIONS

31. For future reporting period reviews and assessments, the Consultant recommends that the City and CPD produce all ISR data, for the next reporting period, at the time the Consultant's draft report is circulated to the parties during their 30-day review and comment period, so that designated experts can identify the representative samples needed to begin coding data without further delay for the next reporting period.

32. The Consultant further recommends that the parties consider restructuring the Agreement to permit the Consultant to issue staggered Quarterly, Semi-annual and Annual Assessment Reports, to permit him to more frequently provide his observations from review of the ISR data to the Department and other parties for their review and consideration. For example:

    a. Quarterly Reports could be issued based upon the Consultant's observations from his coded review of the ISR samples, before the statistical results regarding his coded answers are assessed by designated experts.



b. Quarterly Reports could also be issued based upon his review of the audit reports by executive officers in the police districts as well as the Integrity Section audits.

c. Bi-Annual Reports could be issued assessing the Quarterly results to make targeted recommendations, and – if available – begin assessment of finalized statistical reports based on his coded legal narratives review results.

d. Annual Reports could be issued addressing assessments from the Quarterly and Bi-Annual Reports and analyzing final statistical reports and assessments from the experts' analysis of the aggregated and full-set of ISR data from each prior 6-month review period.

33. Schedule an annual (or semi-annual) mediation (s) between the parties and all designated experts, together with the Consultant, to agree upon the key statistical results from the annual assessment of ISR data to report to the public in one report, along with legal conclusions regarding it. The policy compliance issues regarding the processing of ISR data and compliance with CPD's policy directives, and the terms of the Agreement regarding those directives, would be reported separately on a quarterly basis.

## AFFIDAVIT OVERRIDE RECOMMENDATION

In his discussion of civilian complaints, in Part III, above, the Consultant noted that a clear majority of the complaints filed in 2017 against police officers relating to stop and frisk activities were concluded as "unfounded" or "not sustained" because the complainants either failed to initially sign the complaint or declined to do so when contacted by investigators. This was also true for the first and second reporting periods. In this regard, Illinois law (50 ILCS 725/3.8) requires that anyone filing a complaint against a sworn police officer must support the allegations of the complaint with a sworn affidavit, attesting, under penalty of perjury, that the allegations are true. During his meetings with community members, the Consultant learned that some of them were concerned that if they filed complaints against offending police officers, disclosing their identities, they could be retaliated against by the offending officers or their fellow officers.

In his second report, the Consultant noted that Section 2.4.1 of COPA's Rules and Regulations provides that COPA may seek to override the affidavit requirement in appropriate circumstances. *See, e.g.,* Consultant's Second Semi-Annual Report, pp. 76-77. A review of the complaints filed in 2017 relating to stop and frisk shows that COPA sought and obtained authorization to investigate at least one complaint, even though it made several attempts to find the complainant, without success. The investigation involved interviewing and showing photographs of the complainant to the accused officer, as well as to other officers who were at the location and at the time alleged by the complainant. It also involved reviewing the time and attendance sheets of the officers assigned to the beat in which the



incident allegedly occurred, as well as a GPS search for the vehicles assigned to the beat before concluding that the complaint was not sustained. The investigation was thorough.

The Consultant commends COPA for its wisdom in determining that this case warranted investigation, even though the complaint was not signed, and the thoroughness of its investigation once it obtained permission to do so. The Consultant recommends that COPA continue to utilize the Affidavit Override provision of its Rules and Regulations in appropriate circumstances. *See, e.g., Exhibit 12.*

# PART VII. CONCLUSION

Police officers are sworn to uphold the law and to enforce it. Their word, both spoken and written, is their bond; and the Consultant takes care to credit what they say and what they do, in the ISRs that he reviews, and during his meetings and interactions with them in regard to this Agreement. There can be no question that Chicago Police Officers are vital to the well-being of every person in the City of Chicago and, without them to protect individuals from the dangers and harms that they, themselves, confront on a daily basis, the City and its residents would be in dire straits. The Consultant approaches his obligations with respect to the Agreement from that primary vantage point and takes that fact into consideration every time he reviews the narrative remarks of police officers in the ISRs. Such reviews are not for the purpose of finding minor discrepancies on which to call out the police officer, but to determine whether the report reflects that the officer's suspicion that led to the stop and or pat down was reasonable.

It is with this high regard and awareness of police officers' vital mission and their dedicated efforts to enforce the law, that the Consultant has undertaken the often difficult challenge of discerning and making factual and legal judgments about whether police officers have acted contrary to the law, based on their submitted investigatory stop reports, when they perform investigatory stops and protective pat downs.

Reasonable minds differ, when it comes to assessing whether the totality of the facts and circumstances surrounding the stop and/or frisk, as reported by the police officer, created a reasonable suspicion. The Agreement, however, is based on the notion that, although individual ISR determinations may be made differently by different reasonable minds, when all the ISRs are aggregated (averaged), reasonable minds making reasonable judgments, about the reasonableness of police officer determinations, from a large set of data, will coalesce to provide an overall, generally accurate, picture of whether CPD's stop and frisk policies and practices are justified or not (based on the Fourth Amendment) and/or have an adverse, disparate impact on Black and Hispanic minority groups, in contrast to civilians who are White and Non-Hispanic.

Readers should not interpret any determinations or statements made in this report, or the two that have preceded this one, as reflecting any kind of conscious bias or misunderstanding of the important role of Chicago police officers in this City. Instead, the judgments made – to the extent humanly possible – were determinations based only on the facts within the ISR data reviewed and, to the extent applicable, the law. They were made blind to the age, ethnicity, gender, race, rank, police district and beat, and any other identifying information related to the police officer who wrote and submitted the ISR, the supervisors who reviewed the ISRs and – to the extent possible – the executive officers who audited the ISRs. Similarly, these determinations were made in the same identification-blind manner with respect to the unique identities of the subjects identified in the ISRs, unless such identities were disclosed by the officer in the narrative report.



Therefore, the Consultant does not know whether the problems observed are the product of repeated misconduct by just a few police officers and reviewing supervisors and/or executive officers, from just a few of the Department's 22 police districts, special units and/or tactical teams; or, whether they were widespread and prevalent among many different CPD members from many different areas of the Department. Either way, the problems observed are serious. In order for the Department to ensure that its ISR data and the underlying stop and frisk conduct reported by its police officers reflect best police practices and conform with applicable laws, it must begin to clamp down on the data problems identified in this report and accept at least some of the recommendations made in Part VI, which reflect the Consultant's considered judgments about how to begin this process. The Department's leadership must also, in the Consultant's view, begin to take an active role in the oversight of the police districts' ISR workflow and make clear that corrective actions need to be taken with respect to *police officers* who do not conduct or report stop and frisk activity properly, not simply the ISRs that they submit.

Thus, while legal compliance determinations cannot be made at this time, because the underlying ISR data is not capable of producing reliable statistical results, the CPD's non-compliance with the policy directives regarding the reporting of ISRs by police officers, and the supervisory review and auditing methods regarding those ISRs, precludes a finding of substantial compliance at this time, pursuant to the Agreement, Section IV.2, as well as other terms. Regardless, the CPD's civilian and internal complaint process appears to be a model of integrity and diligence, and the Consultant applauds the City, CPD and COPA for consistent efforts in this important area of police reform during all four reporting periods since the Agreement took effect.

With that said, the Consultant is aware that this report does not convey a wealth of good news to the Department or the public regarding the CPD's efforts to achieve substantial compliance with the Agreement's terms and applicable laws. While the CPD's efforts to design and establish a Twenty-First Century data collection and reporting system for its members' stop and frisk law enforcement practices are still a work-in-progress, for the reasons reported, other efforts to design and implement training courses and programs that reflect the nation's best police practices, including training about the role of implicit bias and the need for procedural justice, have been consistent and excellent. Training, however, must be effective, not simply excellently designed and consistently offered. Based on the ISR data examined from CY2017, the Department has more work to do to ensure that the training being offered and ordered for its police officers and the source-unit supervisors who oversee their stop and frisk practices, sinks in and begins to be reflected in the ISR data that the Consultant is reviewing.

Without ISR data that satisfies a basic threshold of integrity (*e.g.,* completeness and credibility), no statistical assessments of this data will be of any *legally significant* value, even if the incomplete or less than credible underlying ISR data produces statistically significant results. The Consultant looks forward to working with the parties in a cooperative effort to



provide solutions to the problems enumerated herein that precludes his finding of substantial compliance.

## ACKNOWLEDGMENTS

The Consultant wishes to acknowledge the valuable contributions of the various individuals who have participated in the assessments made in this report, which is the Third Report by the Consultant to the parties of the Investigatory Stop and Protective Pat-down Agreement. These individuals include the Consultant's Law Clerk, legal counsel who represent each party, and subject matter experts, some of whom are designated to provide input to the Consultant, and others who have been specially retained by the parties, respectively, to provide advice and counsel to them, regarding the complex legal and statistical issues that have arisen.

After appointment as the Consultant to the Parties, in the summer of 2015, the Consultant selected Ms. Robin W. Cozette, *Esq.*, to serve as his Law Clerk in this matter. Since the inception of the Agreement, she has worked with tireless dedication, surpassing any expectations the Consultant (or anyone involved in this matter) could have had for her in her role as a law clerk, to provide valuable (and sometimes invaluable) legal and statistical advice and insight into the issues that are the subject of this and prior reports. Accordingly, the Consultant wishes to commend her for her distinguished work, which has included review and assessment of the data and statistical reports of the experts, observation of CPD training, consideration of and discussion with the parties and experts regarding their concerns and positions regarding legal, policy and statistical matters, and much of the preliminary drafting and analyses which appear in the Consultant's written reports.

Three subject matter experts have also been designated by the parties and appointed by the Consultant to provide expert analysis and input on statistical criminal justice and police practices issues. There are two criminal justice experts charged with the duty to provide independent statistical analysis and input of the investigatory stop report data and other materials reviewed by the Consultant; and, they are not influenced by the parties' respective, often divergent, views about the various issues that arise in evaluating the Department's compliance with the terms of the Agreement, although the parties' respective views are taken into consideration in some cases. These designated statistical experts are well-respected scholars in their respective fields, who have worked tirelessly and sacrificially to perform their duties to the Consultant.

Dr. Ralph Brecken Taylor, Ph.D., Professor of Criminal Justice at Temple University, was chosen by the parties at the outset of the Agreement to serve as the designated expert for statistical input to the Consultant, and was appointed by the Consultant to serve as the principal statistical and criminal justice expert for the Agreement. He is an accomplished author, with four decades of investigative research in the subject areas relevant to this Agreement. He has participated in a number of cases nationwide, similar to this one, where



consent decrees involving stop and frisk police practices have been at issue. As an educator, his work on this matter extends to educating the Consultant about very sophisticated statistical concepts, and his written reports reflect painstaking care to distill technical analyses into plain English for the Consultant, parties and public to understand. His ability to develop statistical models that fit the emerging and continually expanding work that the parties and Consultant asks him to do is remarkable, as is his patience, good humor, and practical approach to oftentimes vexing data processing issues. His work is sophisticated and represents cutting-edge work that has never been performed before, and his tireless efforts and dedication to this matter, which are often sacrificial, are very much appreciated by the Consultant.

Shortly after the Agreement became effective, Dr. Taylor recommended adding the expertise and input of Dr. Lallen T. Johnson, Ph.D., Assistant Professor of Justice, Law and Criminology, at American University, who has been given the primary responsibility of providing the Consultant and parties with analyses of the "ecological" underpinnings of the CPD's data, through statistical assessment of stop and pat down rates, benchmarked against arrest and violent arrest rates, across ethno-racial groups and geographic areas within the City of Chicago. Dr. Johnson's expertise in matters of ethnicity and race, as well as the ecological issues involving the unique demographics of Chicago, and his cogent written reports, have contributed much to the Consultant's understanding of the statistical data issues necessary to determine the legal questions presented by the Agreement.

Mr. Matthew Barge, *Esq.,* is the lead police practices expert. He serves as an advisor to the Consultant and to the parties on matters related to national best practices for policing. His work regarding this Agreement has thus far included (but is not limited to): review and comments regarding the revisions that CPD made to its written stop and frisk policy, prior to the Agreement's effective date, as well as the content and layout of the Investigatory Stop Report ("ISR") that the Department uses to report stops and frisks and various other policy issues that have arisen throughout implementation of the Agreement. Mr. Barge also has joined the Consultant in personally observing a number of the CPD's training sessions, from the initial department-wide training in early 2016 through the most recent implicit-bias prevention training, which is being provided to department members in partnership with the Anti-Defamation League. Mr. Barge also provides high-level legal counsel on matters pertaining to police practices issues that fall within his special expertise. In addition to his work for the Consultant, Mr. Barge has served as a federal court-appointed deputy monitor overseeing the consent decree involving police practices in Seattle, Washington, and, indeed, now serves as the federal court-appointed monitor overseeing a federal consent decree in Cleveland, Ohio. Mr. Barge is also currently serving as a subject matter expert on the federal monitoring team overseeing a federal consent decree in Baltimore, Maryland. Mr. Barge is a highly respected attorney and police practices expert and is involved with a number of projects involving national police practices and reforms, including the Policing Project at the New York University School of Law.



## THE PARTIES & RETAINED EXPERTS

The Parties are represented by the following individuals. The ACLU is represented by Ms. Karen Sheley, Director, Police Practices Program. Assisting Ms. Sheley are attorneys Kathryn Hunt Muse; Lindsay Miller; Rachel Murphy; and Sandy Brown. The City of Chicago is represented by Mark A. Flessner, Corporation Counsel; and Ms. Tyeesha Dixon, Deputy Corporation Counsel, Public Safety Reform, for the City of Chicago.

The Chicago Police Department also is represented by counsel for the City, as well as Ms. Charise Valente, in her role as General Counsel for the Department. A number of the Department's members also have participated in the discussions and production of data and other information from the CPD that is relevant to the Agreement. Specifically, Chief Jonathan Lewin, Bureau of Technical Services, provides high level technical assistance regarding the data production and processes related to the Agreement; and, Captain Karyn Murphy, Commander of the Integrity Section, within the Bureau of Organizational Development, is (and has been since the inception of the Agreement), the Consultant's key point of contact regarding the Department's implementation and enforcement of the Agreement's terms.

The retained experts, as distinguished from the designated experts, work for each respective party, not the Consultant. The retained experts are ***not designated*** to provide input to the Consultant; and, he is not influenced by them in his independent assessment of the facts, law or statistical results, during his reviews and assessments concerning the Agreement's terms. Rather, the parties' experts have been specially retained to provide statistical input to each party, respectively, regarding the complex legal issues relevant to the Agreement. The retained experts, like the designated experts, also are nationally respected scholars in the field of criminal justice and statistical analysis. The Consultant wishes to acknowledge the valuable contributions of the retained experts to the parties, especially with regard to the mediation held between the parties on April 13, 2018, regarding the legal standards of disparate impact, which involve complex and sophisticated statistical considerations and analyses. Certain materials, with written analyses, were provided to the Consultant by the parties, which their retained experts prepared, for his consideration of the legal and statistical issues. [64]

The ACLU's retained criminal justice/statistical experts include Dr. Aziz Huq, *Frank and Bernice J. Greenberg Professor of Law & Mark Claster Mamolen Teaching Scholar*, at the University of Chicago Law School; and, Dr. Sharad Goel, Assistant Professor of Applied Mathematics, Management Science & Engineering, Sociology and Computer Science, at

---

[64]These materials have been considered by the designated experts in the preparation of their statistical reports, so the Consultant need not address those materials directly in this report. Instead, the Consultant will rely exclusively on the sound judgment and input of the designated experts in addressing the statistical issues related to the legal determinations that he must make.



Stanford University; Amy Shoemaker, Ph.D. candidate, Stanford University; and Ravi Shroff, Ph.D. candidate, New York University.

The City's retained criminal justice/statistical experts are: Dr. Jens Ludwig, *McCormick Foundation Professor of Social Service Administration, Law and Public Policy* at the University of Chicago, who also serves as the Director of the Chicago Crime Lab; and, Dr. Justin McCrary, Professor of Law at Boalt Hall School of Law/University of California-Berkeley, who also serves as the Director of UC-Berkeley's Social Science Data Laboratory ("D-Lab").



DRAFT No. 2 of the Consultant's Third Report *(after review and oral comments by the parties)*

*Dated at Chicago, Illinois, this 17th day of October, 2019, and respectfully submitted by:*



_____

**Hon. Arlander Keys (Ret.), Consultant**

# GLOSSARY OF FREQUENTLY USED ACRONYMS AND TERMS

## AGREEMENT'S TERMS

1. **ISR: Investigatory Stop Report.** This is the document that police officers must use to report the stops, protective pat downs and searches that they conduct. Presently, the CPD uses this form to report all stop and post-stop outcome that both the State of Illinois and the Agreement require. Consequently, the name of this report is somewhat of a misnomer, because all stops are currently reported in this form, especially since Period 4, when the CPD added a check box for police officers to use when they want to report that the stop made was based on probable cause ("PC"), rather than RAS (see below).

2. **ISR Database:** The CPD maintains one central computer database at CPD Headquarters for all ISR data collected by police officers; and, all records related to stops and frisks reviewed and assessed by the Consultant are produced from this source.

3. **ISS: Investigatory Stop System.** This is the name of the document collection and reporting system devised by the CPD to report investigatory stop and protective pat down data electronically pursuant to the Agreement's terms. The ISS replaced the CPD's former "contact card" system, which used hard-copy paper forms to report street stops and voluntary civilian encounters, but not PPDs.

4. **ISR Workflow.** This term refers to the procedures, process and protocols that CPD uses to collect, report and review ISR data for purposes of the Agreement. There are a number of report status codes that have various acronyms that will be used repeatedly in this report.

    a. **APR: Approved.** This is a report status code used when CPD supervisors review an investigatory stop report ("ISR") (see below) submitted by a police officer and determine that the stop and/or frisk report contains the requisite probable cause ("PC") or reasonable articulable suspicion ("RAS") to justify the action(s) indicated.

    b. **ARC: Archived.** This code is used by CPD to designate when an ISR has been filed away in a secure location for production, if and when others wish to access the data. An ISR that has been archived has been stored in computer files and can be reproduced, as written and submitted by the police officer, and with all supervisory review notes and comments accessible for production in their original form.



c. **CLD: Cancelled.** This is also a report status code used by CPD's reviewing supervisors when they authorize a police officer to cancel the ISR report generated electronically by the Investigatory Stop System.

d. **DEF: Deficiency Review.** This report status code is used by supervisors when the police officer does not articulate the type or amount of facts necessary to establish that the suspicions that led to the reported stop and/or frisk were reasonable. The word "deficiency" signals that the ISR is defective because it is missing something – the RAS necessary to justify the reported investigatory stop and/or PPD; or, the probable cause arising from the officer's plain touch during the PPD to support related search activity.

e. **DNR: Deficiency Rejection Notification Report.**

f. **FIN: Final.** CPD supervisors use this acronym/code when they reject an ISR and this rejection determination is final.

g. **REJ: Administrative Rejection.** This status code is designed to be used by reviewing supervisors when the ISR submitted by the police officer contains a "simple omission" or administrative (procedural, as opposed to substantive) error, such as a "typo". Simple omissions are interpreted by the Consultant to be limited to missing check boxes that do not implicate the Fourth Amendment activity and/or justification determinations for such activity (*e.g.,* the name of a second officer).

h. **REV. Deficiency Rejection Review.** This status code is used when a reviewing supervisors identifies a reported stop and/or frisk that cannot be justified under any set of facts or circumstances and must be rejected without returning it to the police officer to make corrections.

5. **"Versioning System":** The CPD's term for the method used to collect, preserve and report ISR data in its ISR Database. ISRs that are rejected for reasons that require correction or changes by the submitting police officer, when returned by the officer after the correction is made, become "multiple-version" records. The returned ISR with the change is a new record and a new version of the original report that was rejected.

## LEGAL TERMS

1. **Fourth Amendment.** This federal constitutional provision provides all persons on U.S. soil the freedom to move about in public without government interference and a right of privacy in their person and possessions from search by government officials unless an impartial judge issues a warrant based upon -- or the law enforcement official



observes behavior that provides -- probable cause (factual evidence that establishes the probability of criminal behavior) to detain or search the person or person's possessions.

2. **Fourteenth Amendment.** This federal constitutional provision, in the context of this Agreement, provides all U.S. citizens the right to equal protection of the laws.

3. **ICRA: The Illinois Civil Rights Act of 2003.** This Illinois statute prohibits local government law enforcement agencies and agents, such as the CPD, from subjecting any person to discrimination on the grounds of race, color, national origin or gender, and utilizing criteria or methods of administration that have the effect of subjecting individuals to such discrimination." *See, e.g.,* 740 ILCS 23/5 (2003).

4. **PC: Probable Cause.** The evidentiary standard necessary for police officers to search and seize any person under the Fourth Amendment to the United States Constitution. A search includes any action by law enforcement officers to reach inside the clothing or possessions of a civilian to determine what may be concealed from view. A seizure includes any action by police officers to detain (interfere) with public freedom of movement by a civilian when that detention is not voluntary and/or consensual act by the civilian.

5. **PPD: Protective Pat Down.** A protective pat down is a limited search by a police officer of a civilian subject's outer clothing for the purpose of ensuring that the subject is not concealing a weapon or firearm that could be used to endanger the life of the police officer (or nearby persons) during the investigatory stop and/or field interview of the subject.

6. **RAS: reasonable articulable suspicion.** The evidentiary standard a police officer needs to justify making a street stop and/or frisk. The totality of facts and circumstances surrounding the stop and/or frisk, at the time and place it was made, determine whether a police officer's suspicions regarding a civilian subject are reasonable. The police officer must be able to articulate the facts and circumstances supporting the suspicion and, thus, the decision to stop and/or frisk in writing, in the Investigatory Stop Report ("ISR").

7. **Related Search: A search arising out of and/or directly from the PPD.** In regard to the Agreement's terms, only protective pat down activity is covered; but, because PPD activity can lead to a police officer obtaining probable cause to search inside a subject's clothing, based on the plain touch (legal) doctrine, the Consultant has interpreted the Agreement as covering searches that are "related to" the PPDs – in the sense that the probable cause obtained to conduct them is a product of what the police officer felt, by plain touch, during the PPD.



8. **Subject:** A civilian who is stopped, patted down or searched by a police officer (i.e., the "subject of the stop").

9. **Terry Stop:** An investigatory stop by a police officer of a civilian on the street or in a public place. An investigatory stop is one in which the police officer seeks to briefly detain a person to investigate suspicion(s) of criminal activity (past, present or future). This type of stop is called a "*Terry* Stop" because the constitutional authority for police officers to briefly detain a civilian to investigate (*i.e.,* conduct a field investigation or ask questions of the person stopped) is based on a decision by the U.S. Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968). In the *Terry* decision, the Supreme Court carved out an exception to the Fourth Amendment's probable cause requirement for situations where the police officer's seizure of a person is brief, and limited to the investigation of reasonable suspicions that can be articulated by the police officer.

## RACIAL AND ETHNIC TERMS USED

10. **BNH: "Black Non-Hispanic".** African-American or people of dark skin color identified by police officers as Black who are not of Hispanic ethnicity. The acronym "BNH" is used by the CPD officers to subjectively identify the race or ethnicity of the person they stop and/or frisk.

11. **HISPANIC:** A term used by the CPD (and U.S. Census) to describe the ethnicity or ethnic origins of individuals from Latin (South) America ("Latino").

12. **WNH: "White Non-Hispanic"** – an acronym used by the CPD to describe a civilian subject identified by police officers as having white skin who is not of Hispanic (Latino) ethnicity.