

**THE CONSULTANT'S FIRST SEMIANNUAL REPORT ON THE INVESTIGATORY STOP AND PROTECTIVE PAT DOWN AGREEMENT FOR THE PERIOD JANUARY 1, 2016 – JUNE 30, 2016**

"To find out what happens when you change something, it is necessary to change it." Box, Hunter and Hunter, Statistics for Experimenters (1978). Submitted by Honorable Arlander Keys (Ret.), Consultant. March 23, 2017.

# Table of Contents

Table of Contents .................................................................................................................. 1

OVERVIEW ............................................................................................................................ 5

EXECUTIVE SUMMARY ......................................................................................................... 7

The Consultant's Role in The Agreement ...................................................................... 12

The Consultant's Report Does Not Address the Issues Investigated by the United States Department of Justice ............................................................................................................................. 13

The Scope of the Consultant's First Semi-Annual Report ............................................. 13

The Consultant's Observations During the First Reporting Period ................................ 16

Consultant's Community & Police Interactions ....................................................... 16

CPD Ride-Along Observations .................................................................................. 16

Chicago Community High School Visit ...................................................................... 17

The Consultant's Take-Away Thoughts .................................................................... 18

Key Points Summary ........................................................................................................... 20

Consultant's Historical Review of CPD Data 2014-15 ................................................... 20

Demographics & Stop Counts .................................................................................. 20

Descriptions of Stop Counts for 2014-15 ................................................................ 20

Consultant's Analysis .............................................................................................. 23

The CPD's Transition from the Contact Card System to the Investigatory Stop Reporting System .......... 25

Population by District, Race & Ethnicity for 2014-15 ................................................... 26

Statistical Experts' Executive Summaries & Key Points ...................................................... 28

Coded Legal Narratives Report (Appendix A) .......................................................... 28

The Statistical Significance of the Bicycle/Sidewalk Stops Results .......................... 29

Descriptive Results .................................................................................................. 33

RAS for Pat Downs ................................................................................................... 34

Patterns of Pat Downs and Pat Down Basis by Districts .......................................... 36

Probable Cause to Search Pursuant to a Protective Pat Down ................................ 36

Searches that follow from Pat Downs ...................................................................... 37

The Post-Stop Outcomes Report ("PSO Report") (Appendix B) .................................... 37

Pat downs ................................................................................................................ 39

Pat downs during a stop in which no enforcement action was delivered ................ 42

Searches and Ethnicity ............................................................................................ 43

Searches Resulting in Weapons or Firearms or Both ............................................... 45

Types of Enforcement Actions (EAs) ....................................................................... 46

Geography ............................................................................................................... 47

Interpretation .......................................................................................................... 47

ANALYSIS OF STOP PREMISES ................................................................................ 48

Ecological Analysis of Monthly Stop Data Report (Appendix C) ................................... 48

Executive Summary ................................................................................................. 48

Data and Methodology for Results .......................................................................... 48

Key Points ............................................................................................................... 50

Violent Arrests Report (Appendix D) ............................................................................ 51

Arrests Report (Appendix E) ......................................................................................... 52

Concluding Remarks........................................................................................................................52

Applicable Laws ......................................................................................................................... 55
The Agreement ...............................................................................................................................56
    *The Fourth Amendment*..............................................................................................................56
    *The Fourteenth Amendment*.......................................................................................................62
    *The Illinois Civil Rights Act of 2003* ............................................................................................64

Historical Background ................................................................................................................ 66
The ACLU's Stop & Frisk Advocacy...................................................................................................66
    *The ACLU's March 2015 Stop & Frisk Report*...............................................................................67
    *The Impact of the Illinois Pedestrian and Traffic Stop Statistical Study Act of 2003, 625 ILCS 5/11-212*
    *(2003)*...........................................................................................................................................69

The Agreement ........................................................................................................................... 71
Two Core Purposes of the Agreement..............................................................................................74
Substantial Compliance with the Agreement ...................................................................................76
    *The "Versioning" System Problem* ...............................................................................................76
    *Reconstruction Efforts* ................................................................................................................79
    *The Investigatory Stop System*....................................................................................................80
    *The Contact Information System Is Replaced* ..............................................................................81
    *The ISR system* ...........................................................................................................................83
    *Police Training* ............................................................................................................................86
Supervision & Auditing....................................................................................................................88
    *Supervisory Review Processes*......................................................................................................88
    *Consultant's Observations* ..........................................................................................................97
    *Civilian Complaints* ....................................................................................................................98
    *Re-training, Enhanced Supervision & Discipline* .........................................................................99
    *Agreement Implementation Issues*............................................................................................100
    *Summary*...................................................................................................................................103
Substantial Compliance with Applicable Laws................................................................................104
    *Legal Compliance with The Illinois Civil Rights Act of 2003* ......................................................107
    *Legal Compliance with the Fourth Amendment* ........................................................................117

Statistical Results ..................................................................................................................... 118
Introduction ..................................................................................................................................121
The Coded Narratives Technical Report .........................................................................................122
    *The Sampling Strategy*...............................................................................................................122
    *The Coding Process* ...................................................................................................................123
    *Investigation Limitations* ..........................................................................................................126
    *Descriptive Study Results*..........................................................................................................131
    *Probability Analysis*..................................................................................................................131
    *Gross Race Impacts*...................................................................................................................133
    *Gross Impact Analysis #1 (bicycles excluded)* ...........................................................................137
    *Gross Impact Analysis #2 (bicycles included as bad stops)*.........................................................138
    *Descriptive Conclusions* ...........................................................................................................139
    *Net Race Impacts for Stops*.......................................................................................................139
    *Consultant's Observations*........................................................................................................140
The Post-Stop Outcome Analysis Report ........................................................................................141
    *Introduction* .............................................................................................................................141

Background ............................................................................................................... 143
ISR Data ................................................................................................................ 143
Six Outcomes ........................................................................................................ 143
Two Questions ...................................................................................................... 144
Methodology ............................................................................................................. 144
Statistical significance .......................................................................................... 144
Correlation vs. Causation .................................................................................... 145
Scope of The Statistical Study ................................................................................... 147
Individual Stop Counts ......................................................................................... 147
CPD Individual Event Codes ................................................................................ 147
CPD Race & Ethnic Codes and Counts, All ISRs, Jan.-June 2016 ...................... 149
Sampling Strategy ................................................................................................. 149
Outcome Variables ..................................................................................................... 150
Dependent outcomes ............................................................................................ 150
Categorical Outcome ............................................................................................ 151
Post-Stop Outcomes Results ................................................................................ 152
Descriptive results ................................................................................................ 153
By District ............................................................................................................. 153

Pat Down Outcomes ............................................................................................... 156
Descriptive results by District, Race & Ethnicity ..................................................... 157
Numerical Counts ................................................................................................ 157
Proportional Representation ............................................................................... 157
Age, Gender & Time ............................................................................................. 158
Stop Type .............................................................................................................. 159
Pat Down Hit Rates .................................................................................................... 159
Number of weapons recovered ........................................................................... 160
District Specific Results ............................................................................................. 160
Pat Downs + NEA Outcomes ................................................................................ 160
Numerical .............................................................................................................. 165
Gender .................................................................................................................. 167
NEA Pat Down Hit Rates ............................................................................................ 168
Two Police Districts' Outcome Results ................................................................ 168
District 6 ................................................................................................................ 168
District 7 ................................................................................................................ 169
Consultant's Observations ......................................................................................... 169
Search Outcomes ................................................................................................. 170
Descriptive Results ..................................................................................................... 172
Numerical Results:  All Searches ........................................................................ 172
Non-custodial Searches ....................................................................................... 173
Searches ..................................................................................................................... 173
Hit Rates ............................................................................................................... 173
Non-Custodial Arrest Searches ........................................................................... 174
Non-Enforcement Actions .................................................................................... 174
Consultant's Summary of Key Statistical Post-Stop Outcomes Findings ................ 174
Pat Downs ............................................................................................................. 174
Searches ................................................................................................................ 175
Enforcement Actions ............................................................................................ 175

Pat Down + NEA ....................................................................................................................176
Consultant's Conclusions .....................................................................................................177

## The Ecological Analysis Report ........................................................................ 180

Methodologies Used ............................................................................................................182
Results.................................................................................................................................184
*Monthly Stop Counts and Rates* .......................................................................................184
Model Series with Violent Arrests Exposure Variable .........................................................186
*Model A*.............................................................................................................................187
*Model B*.............................................................................................................................187
*Model C*.............................................................................................................................187
*Models D and E*.................................................................................................................188

## The Violent Arrests Report........................................................................... 189

Monthly Violent Arrests Counts for Jan. 1, 2014 to April 30, 2016 ......................................190
Monthly Violent Arrests Rates for Jan. 1, 2014-April 30, 2016 ...........................................191
*Blacks*...............................................................................................................................191
*White Hispanics* ...............................................................................................................192
*Whites*..............................................................................................................................192
*Consultant's Observations*...............................................................................................192

## The Arrests Report Analysis ......................................................................... 196

Monthly Arrest Counts and Rates........................................................................................196
*All Races and Ethnicities* ...........................................................................196
Thematic Maps of Chicago Police Districts ..........................................................................198
*Police Districts with Highest and Lowest 20 Percent of Black NHs Arrest Rates* ................198
*Police Districts with Highest and Lowest 20 Percent of White Arrest Rates* ......................199
*Police Districts with Highest and Lowest 20 Percent of Hispanic-White's arrest rates* ......199

## The Consultant's Recommendations................................................................ 199

Community and Officer Recommendations ..........................................................................200
*Implicit Bias Training* .......................................................................................................200
*Community Involvement*...................................................................................................204

## Investigatory Stop System Recommendations ................................................... 205

*ISR Form Revisions*...........................................................................................................205
*Stops* ...............................................................................................................................207
*Pat downs* ........................................................................................................................207
*Searches*...........................................................................................................................209
*Database*...........................................................................................................................211
*Auditing Reports & Related ISRs*.......................................................................................213
*Civilian Complaints* ..........................................................................................................214

# OVERVIEW

In August 2015, the City of Chicago ("City"), Chicago Police Department ("CPD") and the American Civil Liberties Union ("ACLU") of Illinois (collectively, the "parties"), entered into the "Investigatory Stop and Protective Pat Down Settlement Agreement" ("Agreement").[1] In this Agreement, in which the CPD maintained its belief that it's policies and practices relating to investigatory stops and protective pat downs are compliant with the law, the parties "have agreed to work together to ensure and validate that CPD's policies and practices relating to investigatory stops and protective pat downs fully comply with applicable law, including the United States and Illinois Constitutions and the Illinois Civil Rights Act ("ICRA")," to "avoid the burden, inconvenience and expense of litigation."[2]

The Agreement was signed by City of Chicago Corporation Counsel, Stephen R. Patton, and former Chicago Police Department Superintendent, Garry F. McCarthy, on August 5, 2015, as well as by the former Legal Director of the American Civil Liberties Union of Illinois, Harvey Grossman, on August 6, 2015. The signatories to the Agreement jointly selected the undersigned, a retired United States Magistrate Judge, to serve as an independent, neutral "Consultant" to the Agreement and to fulfill certain duties described in the Agreement.[3] Since the Agreement was signed, Edward Siskel has been appointed Corporation Counsel, Eddie T. Johnson has been appointed Superintendent of the Chicago Police Department,

---

[1] The Agreement, by its terms, is between the parties. However, because of the important individual rights at the core of the Agreement, as well as the need of the public to understand those rights, the Agreement provides that the Consultant's Report and Recommendations to the parties also be made available to the general public (after a 30-day review and comment period for the parties to file any objections to the report and an additional 30-day period for the Consultant to make changes to the report based on the comments and objections, if any, received from the parties). The Consultant furnished the parties with his draft report and recommendations on January 13, 2017, to which the parties responded on February 21, 2017. The Consultant has duly considered the comments and objections to the draft report filed by the parties in this final report.

[2] A copy of the Agreement is attached to this report as Exhibit 1. Throughout this report, the terms "investigatory stop and protective pat down" and "stop and frisk" will be used interchangeably.
[3] The Consultant acknowledges the work of Robin Washburne Cozette, for her valuable assistance as a Law Clerk, reviewing documents, performing research, communicating with the parties and the experts, and for her assistance in drafting this report.

and Benjamin S. Wolf now serves as Legal Director of the ACLU of Illinois. Two attorneys also have played, and continue to play, lead roles as counsel with respect to the Agreement, namely:  Jane E. Notz, First Assistant Corporation Counsel for the City of Chicago, and Karen Sheley, Director, Police Practices Project for the ACLU.

The Agreement also authorizes the Consultant to "seek the advice and assistance of police practices and statistical experts," who are familiar with the relevant factual and legal issues.  Pursuant to that authority, and by agreement of the parties, the Consultant has appointed the following individuals to assist him: Matthew Barge, Esq., Partner & Co-Executive Director of Police Assessment Resource Center ("PARC"), who serves as a police practices expert; Dr. Ralph B. Taylor, Professor, Department of Criminal Justice, Temple University, who serves as the lead statistical expert; and Dr. Lallen T. Johnson, Assistant Professor, Department of Criminology & Justice Studies, Drexel University, who was appointed, in early 2016, to assist Dr. Taylor in the performance of his statistical analyses and written reports to the Consultant.

In the following sections of this report, the undersigned, as Consultant, will review the historical genesis of the Agreement, as well as its terms, the implementation process, and the changes that the CPD has made in response to the Agreement since it became effective on January 1, 2016.  These changes have included not only revising the CPD's stop and frisk policy in Special Order S04-13-09 (rev. 10/15; 01/16; 03/16 and 06/16), but also revising the CPD's police practices on an administrative and practical level.

The change to police practices can be seen by the roll out of the Investigatory Stop Reporting System ("ISRS"), a new system by which CPD officers provide a host of basic information on individual stops and frisks.  Using the CPD's new Investigatory Stop Report ("ISR"), all information about stop and frisk activity on the streets of Chicago for the first reporting period has been analyzed in this report.

Regrettably, the Consultant cannot provide an in-depth look at the CPD's accountability obligations under the Agreement, such as its internal auditing functions and treatment of

civilian complaints. That information was not available on those subjects during the first reporting period. When the Consultant requested an update from the City, in September 2016, the City responded comprehensively, providing updates and documentation regarding how the CPD has progressed with its auditing obligations under the Agreement, how civilian complaints are being investigated, and how police officers are being re-trained and mentored.

The Consultant will provide a closer look at the accountability provisions of the Agreement and how the CPD has responded to them in the next report, which will cover the second reporting period of July 1, 2016-December 31, 2016. Because the CPD had just begun to set up its accountability structures necessary to supervise, monitor and report compliance obligations in July of 2016, those topics are more appropriately addressed in the second report.

Consequently, this report will focus primarily on the ISR data from the first reporting period and the auditing reports and civilian complaints reviewed only briefly.

# EXECUTIVE SUMMARY

## The Consultant's Overarching Thoughts About Stop & Frisk in Chicago

During the past several decades, police departments in some large cities have turned with increasing frequency to the practice of "stop and frisk" as a crime fighting tactic to combat the challenges posed by random, wide-spread violence, the easy access and availability of guns, and the proliferation of drugs and violent street gangs. The use of stop and frisk practices is also designed to protect the lives of police officers. In Illinois, where concealed-carry laws allow guns to be hidden from view, protective pat downs can save lives. Despite these legitimate reasons for the use of stop and frisk tactics by law enforcement officers, members of racial and ethnic minorities have turned with increasing

frequency to the courts to assert legal challenges involving procedural justice concerns regarding the use of such tactics by police officers.[4]  Where stop and frisk is used expediently, rather than deliberately, the civil rights of racial and ethnic minorities, who are most often the subjects of such stops and frisks, are often sacrificed for the sake of law enforcement interests.

A great deal of national media, government, and public attention has been given to the police practice known as "stop and frisk" during the last several years.[5]  The City of Chicago ("City") and the Chicago Police Department ("CPD") seem to be at the center of the media attention with respect to police use of stop and frisk, as well as issues of excessive force, violent crime rates, and other civil rights concerns regarding racism and the role that "implicit bias" may play in police practices.

Undeniably, Chicago – and some of its neighborhoods in particular – continue to wrestle with the damaging effects of violent crime.  Individuals of all backgrounds, stations,

---

[4]The federal courts are reluctant to rely on statistics alone to satisfy the evidentiary burdens that constitutional claims require to prove violations.  For example, the Consultant is advised that there is not yet any statistical evidence showing a causal connection or statistically significant correlation between the *frequency* with which police officers stop and frisk criminal suspects and any decrease in crime rates.   There is, however, statistical data and analytical studies showing strong correlations between the disproportionate ("disparate") effects of stop and frisk on individuals belonging to minority racial and ethnic groups.

A recent news report, dated January 4, 2017, by Coleen Long, of the Associated Press, is a case in point. *See* "New York City Has Fewest Shootings Incidents" (reported by numerous national news agencies).  In this article, the journalist cites statistics, which purport to show that, for 2016, New York City recorded the fewest number of shooting incidents ever; and, the homicide rate narrowly missed its lowest number since the record low for homicides was set more than two decades ago.  This dramatic reduction in shooting and homicide rates is remarkable given statistical evidence that police officers in New York are now making "fewer low-level arrests" and have "greatly reduced their use of stop and frisk."   According to the news report, New York City Police Department ("NYPD") officials said "they've found the right combination of technology and data collection, police strategies and community engagement."  Chief Dermot Shea, Deputy Commissioner for Operations, is also on record as stating: "This is what 21st century policing looks like, it's data driven, it's smarter, it's more effective, . . . [a]nd here's the important part:  It works."

[5]The word "stop" refers to the "temporary detention" of a civilian (who need not be a U.S. Citizen), in a public place, by a police officer, which is initiated for the sole purpose of investigating suspected criminal activity.  The word "frisk" refers to a "protective pat down" during which the stopped civilian is briefly "frisked" by the police officer due to (1) a reasonable suspicion that the detained person is "armed and dangerous" and (2) for the purpose of confiscating possible weapons or firearms concealed on or near the detained person.

ideologies, and viewpoints can assuredly agree that ensuring public safety is a primary concern of any community.

There are some who believe that recent increases in crime have been caused by lower rates of law enforcement, particularly with regard to the frequency of police officer stop and frisk activity. These individuals say that the high-profile, negative media attention that the CPD has received in recent years, and the increased public scrutiny that has come with it, has dramatically reduced the incentives for officers to be proactive in their day-to-day work. They argue that the reduced number of stops of individuals is a clear indicator of officers engaging in "de-policing," and that the confluence of decreasing stops and increasing crime mean that CPD officers not performing as many stops is causing increased crime.

Others say that increasing crime is instead attributable to the substantial erosion of public trust and confidence in the police, especially in some of Chicago's neighborhoods and among certain of Chicago's diverse populations. They contend that crime is up, because community members, distrustful because of recent high-profile incidents and historical experiences, are less willing than ever to cooperate and partner with the police -- which leads to the CPD being less likely to get information from the necessary victims, witnesses, and informants to solve crimes and arrest the perpetrators of violence. According to this line of thought, it is possible that decreases in stop volume is a good thing, to the extent that police officers are making fewer "bad" or unnecessary stops, and that it is instead the dearth of community confidence – especially in those communities most affected by violent crime – that has led to more crime.

A separate, but related issue, is whether the lower stop rates are attributable to the more detailed documentation requirements imposed on the CPD for its stop and frisk activities, beginning January 1, 2016, not only by the terms of the Agreement between the City, the CPD and the ACLU, but also by the State of Illinois in new legislation which applies to all law enforcement agencies, including the CPD. News media and various law enforcement officials who are (and have been) involved in the current debate about the CPD's reforms to

its stop and frisk policies and practices, pursuant to the Agreement and the new Illinois law, suggest that the lower stop rates are attributable to the amount of time it takes police officers to document all the information required for each individual stop of a civilian required by the new ISR. The Consultant has heard time estimates ranging from 10-15 minutes, based on police officer interviews he personally conducted, to 40-45 minutes, based on news media reports from other CPD officials and outside sources.

At the outset of this report, the Consultant must explain his views regarding this documentation time issue to the parties and the public. With due regard to the experience level of individual officers, their familiarity with how to use the new ISR system efficiently and effectively, and the individual circumstances of each street stop (which can involve complex factual situations which take longer to document than more simple stops), the amount of time necessary to adequately document an investigatory stop and/or frisk, for the important purpose of ensuring compliance with the Fourth Amendment, is neither a waste of law enforcement resources in time, energy, or attention. The individual civil rights of civilians who are detained by police officers is every bit as important as the public interest served by police officers, in detecting and deterring criminal activity which endangers the safety of the public and the police officers who serve to protect it.

Balancing the constitutional liberties of individuals with vital law enforcement interests can be very difficult. There are surely times when police officers strongly suspect, based on experience, that someone with a criminal record of violent crime is likely to be engaged in criminal activity or is carrying a concealed weapon, firearm or contraband; but, these officers also know that the suspected individual is not doing anything even remotely criminal, at the time, which means that the police officer cannot legitimately stop and frisk that individual. This is a vexing quandary for police officers, who are publicly assailed both for not stopping criminals in crime-infested neighborhoods when violent crime rates go up, and also publicly assailed for making too many stops and frisks which violate the civil liberties of minorities, in the same crime-infested neighborhoods.

No doubt, to many police officers and community members, the investigatory stop and frisk legal standards may seem to require adherence to an ideal: namely, the requirement that suspicion be reasonably based on articulable facts, rather than on gut instinct (hunch) derived from years of street patrol experience. The practical realities confronting some police officers on the streets can be far from ideal. In some areas of Chicago, for example, there are dangerous situations, in which the need to respond using split-second reflexes does not afford the time to deliberate. In these instances, a police officer's need to think before acting to make a stop and frisk can --and sometimes does -- seriously affect performance of their law enforcement duties.

In the majority of stop and frisk reports reviewed personally by the Consultant for this report, however, police officers did not report perilous situations requiring split second timing; rather, most stops and frisks were made in the context of routine, non-serious criminal code and ordinance violations or traffic stops, which afforded more than enough time to rationally assess the factual basis for the investigatory stop and protective pat down, before any law enforcement action was taken. These stops also afforded more than enough time to document the stop adequately to ensure a record for Fourth Amendment compliance purposes, pursuant to the terms of the Agreement, as well as Illinois law, for the equally important purpose of protecting the stopped civilian's individual liberty rights.

The Consultant is mindful of the authority that police officers have to exercise the discretion afforded to them by the law and courts to detain individuals upon reasonable suspicion that they have, are, or will soon be engaged in criminal activity. The ability of police officers to do so undoubtedly assists officers and the CPD in proactively and affirmatively fighting crime. At the same time, this authority is not unlimited. The Fourth Amendment limits this authority. There is no way to get around this limitation because the drafters of the Constitution built our free democracy upon the belief that the power of the state to enforce the laws had to be limited by individual civil rights. Those Fourth Amendment limitations are, for the CPD's purposes, now reflected in specific terms by the Agreement and the new Illinois law, as well as the CPD's Special Order S04-13-09 detailing the specific practices for stop and frisk in Chicago.

The Consultant is also mindful that officers engaging in too many stops premised on inadequate or flimsy grounds, and which do not reveal any criminal activity, may well reinforce the sense that some in the community have that the police do not treat them fairly or respectfully. Indeed, the question of whether officers are appropriately stopping individuals is at the heart of the Agreement.

## The Consultant's Role in The Agreement

Striking the balance between law enforcement interests in preventing crime and civil rights advocates' interests in protecting individual liberties is at the heart of the Agreement. The Consultant's role is to oversee the implementation of a voluntary Agreement between the ACLU and City of Chicago that, he believes, recognizes the legitimacy of the competing views or explanations of what might be contributing to public safety in the city currently, while at the same time making findings and determinations necessary to help the parties implement the Agreement.

In his attempt to facilitate a balance of these interests by the parties to the Agreement, there are times when the parties have authorized him, as needs dictate, to assume a quasi-judicial role by making findings and determinations regarding the facts and the law (including a synthesis of statistical results generated by the CPD's stop and frisk data), for purposes of permitting the parties to move forward with their efforts to ensure and validate that the CPD's stop and frisk practices are fully compliant with applicable laws and consistent with the CPD's reformed stop and frisk policies. To the extent that the Consultant makes definitive findings and determinations, as well as recommendations for change, in this report or any future reports, those definitive conclusions are not legally binding on the parties unless they agree to be bound by them. This is why the authority to make factual and legal determinations is "quasi" judicial, and this is why the Consultant's role is advisory and not like the role that a Consent Decree Monitor must play.

## The Consultant's Report Does Not Address the Issues Investigated by the United States Department of Justice

The Agreement is a voluntary settlement, not a consent decree. In most other city police departments challenged with identified civil rights issues regarding stop and frisk police practices, the U.S. Department of Justice has initiated an investigation, like the one just completed in Chicago, and then filed a lawsuit in federal court seeking to enforce the law by way of a Consent Decree.

The narrow, but important, issue of the CPD's investigatory stops and protective pat downs ("frisks") is not related to the CPD's use of excessive force, addressed by and the subject of other investigative reports issued during the past year, by the Mayor's "Police Accountability Task Force" and the U.S. Department of Justice. Only the subject of investigatory stops and frisks falls within the expressed intentions and, thus, purview of the undersigned's authority or duties to the parties under the terms of the "Investigatory Stop and Protective Pat Down Settlement Agreement" ("Agreement"), pursuant to which this report is being written.[6]

## The Scope of the Consultant's First Semi-Annual Report

This report focuses only on the facts related to the first reporting period of the Agreement, which ran from January 1 to June 30, 2016. Any facts or occurrences, including ongoing efforts to implement the Agreement, which occurred outside this time period are not discussed in any detail in this report, nor are any findings or determinations, which the

---

[6]Important to note is that any activity, audits, changes, civilian complaints, decisions, documentation, re-evaluations, reviews, revisions, policies, protocol and/or procedures which were added, amended, changed, deleted or disputed (by the parties), are not substantively addressed in this report, because they were not provided to the Consultant, either during or immediately after (or in relative proximity to) the conclusion of the June 30, 2016 reporting period for legal compliance assessment and review and subsequently the statistical analysis outlined in the Agreement. Thus, although the Consultant may refer to activity and documents, among other procedures, which the parties provided to the Consultant voluntarily or by request of the Consultant, during the period of July 1 through December 31, 2016, the subject matter of these occurrences will not be evaluated to determine substantial compliance for the first reporting period.

parties have authorized the Consultant to make, regarding matters which transpired after June 30, 2016, made.

In this regard, there are two purposes for this report: (1) to advise the City and ACLU of the determinations made by the undersigned regarding observations, review and analysis of the CPD's newly revised and reformed stop and frisk policies and practices; and (2) to inform the public about the City and CPD's stop and frisk reform efforts and progress during the first reporting period.

The Agreement is an optimal way to make progress in the area of civil rights regarding police stop and frisk practices to achieve the goal of procedural justice shared by the CPD and the communities it serves. Indeed, the Agreement represents how the seemingly unresolvable social and constitutional problems regarding stop and frisk can be resolved through alternative dispute resolution, rather than litigation.

As a voluntary settlement, the Agreement depends entirely on good faith and a collective will, by all parties, to "ensure" that the policies and practices of the CPD, relating to investigatory stops and protective pat downs comply with applicable law. Applicable law, in the context of this Agreement, includes the United States and Illinois Constitutions and the Illinois Civil Rights Act of 2003.

The Agreement is comprehensive, requiring not only significant substantive and procedural changes, but also substantial improvements in officer and supervisory training and accountability when it comes to stops and searches of subjects by the CPD. Having worked with the parties as they developed and agreed to the training materials, as CPD conducted the classroom training sessions, and as the parties resolved issues relating to both when they arose, the Consultant is confident that the Agreement is a sound framework for ensuring law enforcement that is safe, effective, and constitutional in the City of Chicago.

The Agreement, by which the parties seek to institute deep and enduring police reforms related to stop and frisk practices, will provide change in Chicago.  Still, Rome was not built in a day.  Large institutional changes, such as those proposed, implemented and being rolled-out by the parties to the Agreement, are never easy to implement quickly. The parties anticipated as much in the Agreement, which is why a series of six-month long "reporting periods" have been designed in which the parties and the Consultant can take stock of which terms in the Agreement have been complied with and which ones still require more work. At the conclusion of the data review and analysis for each reporting period, a written report by the Consultant will be issued publicly, such as this one, after due consideration of and input from the parties and appointed experts.

One last comment is necessary before the report's findings and conclusions begin.  The Consultant has determined to make no definitive findings on the two substantial compliance determinations called for by the Agreement, namely, whether the CPD has substantially complied with the terms of the Agreement; and whether the CPD has substantially complied with its legal obligations under the U.S. and Illinois Constitutions and the Illinois Civil Rights Act of 2003. *See* Agreement, IV. The primary and most important reason for this decision to refrain from making conclusive findings on the first reporting period's ISR data is related to its ***unknown reliability***.

This is a problem of psychometrics (tests and measures).  It is not a problem of confidence or trust in the City or the CPD to document, preserve or produce accurate and scientifically reliable data.  To the contrary, the Consultant does not attribute intentional wrongdoing to the CPD for the technical problems, explained in detail later in this report, which make the data of unknown reliability and adequate scientific quality, from which to generate absolutely accurate statistical results.  Without knowing if scientific reliance can be placed on this data, the Consultant is not able to rely on it for making legal determinations either.

The adjective "unknown" is the key to the conclusion that the underlying ISR data cannot be relied upon to generate accurate enough statistical findings to support the legal compliance determinations called for by the Agreement.  In other words, the Consultant is

not saying that the ISR data produced by the CPD is completely unreliable or untrustworthy or without use, but only that he is unable to rely upon it for purposes of the legal and statistical review of the data, which is required to make the substantial compliance determinations identified in the Agreement.

# The Consultant's Observations During the First Reporting Period

## Consultant's Community & Police Interactions

In an effort to gain a better understanding of the issues facing both police officers and the inner-city residents whom they serve, the Consultant spent three days in several different Chicago police districts where crime rates are high. On two separate days, the Consultant accompanied Deputy Chief of Patrol, Fred L. Waller on his tours of duty, traveling in a patrol car and observing investigative stops being made and reports of these stops being filed, both by the officers on the street and in the district stations. On the third day, the Consultant visited a charter high school on the Far South Side of Chicago. The Consultant's experiences in both instances were quite enlightening.

## CPD Ride-Along Observations[7]

During the two days spent with Deputy Chief Waller, the Consultant had conversations with CPD commanders and other top district officials, including police officers who are assigned to patrol duty. During these conversations, the Consultant observed that a police officer's job on the streets of Chicago is fraught with danger and is not an easy or enviable one; and that the police officers with whom the Consultant spoke were not strangers to danger.

---

[7]The Chicago Police Department's "Ride-Along Program facilitates the CPD's partnership with the community by affording individuals the opportunity to personally observe patrol operations. This program is primarily designed for district law enforcement operations. Requests for a ride-along in units other than district law enforcement will also be considered. The program will allow community residents, government leaders and officials, members of professional organizations, educators, members of other law enforcement agencies, and persons conducting research by the Department to be considered for approval to participate in the Ride-Along Program." *See* Special Order S02-05-01 (effective 30 May 2014).

Some officers complained about the current public backlash against the entire CPD for the bad acts of just a few individuals.   Fearing personal and professional backlash, individual police officers explained that, as a result of the Agreement, which gives the parties and Consultant access to police officers' names, star numbers, and other information regarding their conduct and position, they now feel that they could be targets of a civil rights investigation every time they fill out a stop and frisk report for investigating suspected crime on the streets.  The rank and file officers also confessed that, because CPD supervisors are now responsible for enforcing the terms of the Agreement by daily and continuous review, they may be subject to discipline for mistakes, even though many of them were not fully trained at the time of these conversations.

Some of the police officers who spoke with the Consultant explained that they view the new documentation requirements under the Agreement as a way not only for the Consultant, but also for the ACLU, to review their work, as well as obtain information about individual police officers in order to file lawsuits against them.  These officers also confided that the additional documentation requirements imposed by the Agreement (they did not mention Illinois law) take up time that they can no longer spend performing their crime-fighting duties. One officer told the Consultant that he spends extra time on the stop reports because he is concerned that if he doesn't "get the paperwork right," then he may face possible discipline – not for doing his job improperly, but for failing to fill out the paperwork correctly.

## Chicago Community High School Visit

The charter school that the Consultant visited emphasizes the importance of making right choices and staying out of the criminal justice system.   During the course of his visit to the high school, the Consultant had conversations with students who attend the school about their rights under the Fourth Amendment and the Agreement and their experiences with and attitudes toward police officers.

The Consultant learned that some students thought that they could be arrested for simply refusing to give their name to a police officer when asked for it.   One student stated that he believed that their names were being requested so that they could be called in for a lineup when future crimes were committed in their neighborhood, and the police wanted someone to take the blame.

Other students expressed genuine surprise when they learned that the law gives them the right to remain silent; and that if they have done nothing wrong, the law also permits them to walk or drive down the streets of their own neighborhood (or elsewhere), and assemble in a group for any or no particular reason, without being stopped by a police officer and being subjected to a pat down.   Sadly, others told the Consultant that they have come to expect such treatment as a way of life.

Most of the students expressed resentment of police officers, who are seen more as an occupying force than a source of protection in their neighborhoods.  This is why, the students explained, when police officers draw near, they often choose to hastily walk away in the opposite direction, rather than engage them in consensual conversations.

## The Consultant's Take-Away Thoughts

The Fourth Amendment's guarantee of liberty applies to many aspects of a person's life, including a person's right to assemble with others in a public place and to travel in public at any time of the day or night, without interference by law enforcement officers, subject only to the law.   Thus, unless a police officer reasonably suspects a person of unlawful behavior (*i.e.,* a crime), that person has the right to freely move about and travel in the public way without being "stopped" (seized) or searched by a police officer.

An individual's Fourth Amendment right to move freely about in public also includes the right to walk away from a police officer who is approaching, for any reason or no reason,

unless the police officer exercises the authority to stop the individual and communicates the message to the individual that he or she is not free to leave. This means that a police officer cannot base the decision to initiate an investigatory stop on the fact that a person walks away when the officer approaches; that fact is not relevant unless and until the police officer asserts the authority of his or her law enforcement power by ordering the person to stop.

Investigatory stops are typically the first interaction between a police officer and a civilian in Chicago. How the daily interactions involving investigatory stops, and if necessary frisks, are being played out on the streets has resulted in a number of Chicago's communities exhibiting the kind of fear and mistrust that the students at the charter school expressed, as well as the resentment and misunderstanding police officers confessed.

Clearly, the lines of communication between some community members and the CPD's police officers have broken down. It is, indeed, a sad day when children believe that they can be forced to submit to governmental control when they have done nothing wrong, and appear to have accepted such treatment as a way of life. Unless the lines of communication between police officers and those they have sworn to serve and protect are re-established, the opportunities that may still exist to voluntarily create an allied force to combat crime in Chicago may be lost.

The terms of the Agreement are limited to investigatory stops and frisks. The Agreement does not address the problem of violent crime or any other procedural justice issues that currently exist in the City of Chicago. However, changes implemented based on the Agreement's terms have unlimited potential and can go a long way toward bridging the chasms of misunderstanding and mistrust between civilians and police officers. A better relationship between the Chicago Police Department and the community that it serves can engender the kind of trust and confidence that inspires individuals and communities to partner with CPD to solve neighborhood problems and transform approaches to fighting crime to truly community-based approaches.

Like all effective reform efforts, however, these goals can only be achieved by a daily and consistent system designed to educate, train, monitor, discipline and validate police officers in the performance of their duties

# Key Points Summary
## Consultant's Historical Review of CPD Data 2014-15[8]

### *Demographics & Stop Counts*

Data produced to the Consultant by the CPD show that, between January 1, 2014 and December 31, 2015, Chicago police officers made *1,321,506 million stops* in Chicago. During this two-year period, the City of Chicago had an *approximate population of 2,695,598 million* individuals. *See* U.S. Census for 2010 (numbers which are tracked using the *2010 – 2014 American Community Survey 5-year estimates*).

**U.S. Census Data CY 2010**
http://www.census.gov/quickfacts/table

Total Population: 2,695,598 million

➢ **Racial Groups:**

- African-American/Black = 32.9%
- Hispanics/Latino = 28.9 %
- Caucasians/Whites =31.7%

### *Descriptions of Stop Counts for 2014-15*

The number 1,321,506 (hereinafter approximately "1.32") million stops refers to the *total number* of individual stops made by police officers during the two-year period. It *does not count the number of discrete individuals who were stopped*. This means that the 1.32

---

[8]The historical data of CPD stop and frisk activity is not subject to the Agreement and will not be further analyzed in this report. It is being cited only for the purpose of providing a factual context for the data reported during the first six months of 2016, as called for by the Agreement, and to compare the 2014-15 data to the data generated during the first six months of 2016.

million stops for the two-year period, may – and almost assuredly does – reflect stops made of the *same individual* by a police officers on more than one occasion

These 1,321,506 million stops were made in situations where the individuals were not found to be breaking any law,[9] because, prior to 2016, the CPD did not record or keep data about investigatory stops they made ***unless*** the subject of the stop was released without further enforcement action. In short, a stop was only included in the 1.32 million figure when the subject of that stop was released without CPD taking any enforcement action.

The approximate 1.32 million stops for 2014-15 also includes members from ***all racial/ethnic groups*** used by the U.S. Census Report for 2010.[10] Although the ethno-racial classifications used by the government to categorize populations in census reports are generated by individuals who voluntarily self-report their race and ethnicity to the government, the ethno-racial classifications assigned to stopped civilians are assigned by the police officer making the stop, who reports the race and ethnicity of the subject based on subjective perceptions.

### Ecological Data

Total stops from Jan. 2014 – Dec. 2015:

1,321,506 million

Total stops by race/ethnicity:

- Black: 943,746 = 71.41%
- White: 123,545 = 9.35%
- Hispanic: 225,273 =17.05%

The CPD has its own set of internal stop "codes" for police officers to use when reporting the race or ethnicity of the stopped civilian. All races and ethnicities used by the U.S. government for its census reports are included for possible use in the CPD codes.

---

[9] This number reflects the number of stops, not the number of individuals stopped. Instead, the number 1,321,506 million stops represent the number of times a stop was made, thus permitting the possibility that a number of these total stops could have been made of the same individuals.

[10] The concepts of "race" and "ethnicity" are social constructs used to refer to various characteristics that can be observed among groups of people who share those characteristics. For purposes of this report, these concepts and terms are often linked by common context. Similarly, the terms "African-American" and "Black"; "Caucasian" and "White"; and "Hispanic" and "Latino" are linked by social context and will be used interchangeably in this report to describe general characteristics of the groups of people to which they refer.

The CPD's own internal orders and directives have consistently required police officers making the stop to subjectively assess the race or ethnicity of the stopped civilian and to report this fact on a "contact card," along with other relevant identifying information such as the stopped individual's name, address, and other descriptions of physical appearance. See Exhibit 3 ("contact card" exemplar). The CPD's policy and practice of requiring officers to subjectively identify and assign a race or ethnicity code to the person stopped is a standard, nationally recognized, police practice which comports with legal prohibitions against "racial profiling," which would result if police officers were routinely asking stopped subjects to identify themselves by their race or ethnicity, rather than by their names.

Thus, in the approximately 1.32 million stops reported for the two-year period between 2014-2015, the total number of individuals stopped by race and ethnicity does not equate to the actual number of individuals within each race or ethnicity who were actually detained by a Chicago police officer. Instead, the total number stopped individuals in each racial and ethnic group for the time period represents only the number of times the subject of the stop *was identified as* Black or Hispanic or White.

 This means that the **943,746** stopped individuals who police officers coded as "**Black non-Hispanic**" between 2014-15 does not necessarily represent that police officers stopped 943,746 distinct individuals who are Black and non-Hispanic during this time-period.  It does mean that the CPD stopped individuals who they identified as Black, Non-Hispanics 943,746 times, even if some of those stopped were actually the same individual stopped multiple times for different reasons.

| 2014-2015 | Black Non-Hispanic | 943,746 Stops |
|---|---|---|

The same analysis applies to the stop numbers for individuals identified as "Hispanic" by police officers.  The U.S. Government distinguishes those who identify themselves as Hispanic, according to their ethnicity,

by race, as well, depending on the level of aggregation.  Thus, for the population data tables appearing in the U.S. Census Report for 2010, as well as the ACS estimates for 2010-2014, ethnic populations are tracked separately depending on whether they self-identify as White, as Black or as Hispanic

| 2014-2015 | Hispanic Whites | 225,273 Stops |
|---|---|---|

The experts concluded that the CPD stopped 123,545

| 2014-2015 | White Non-Hispanic | 123,545 Stops |
|---|---|---|

White Non-Hispanics during the 2014-15 period, using the same rationale with respect to race and ethnicity.

Because the Agreement also identifies gender as a factor the Consultant should track statistically, the following statistics were also compiled from the 2014-15 historical data, for purposes of providing a factual context for the data results from 2016, which will be reported next in the Consultant's "Key Statistical Points Summary."

## Total stops by race/ethnicity and gender for 2014-15:

➢ **Women**

- Black women: 175,417 = 13.28%
- White women: 34,126 = 2.58%
- Hispanic women: 36,188 = 2.74%

➢ **Men**
- Black men: 768,001 = 58.12%
- White men: 89,364 = 6.76%
- Hispanic men: 188,989 = 14.3%

## *Consultant's Analysis*

Clearly, the numerical disparity stands out when comparing the number of stops where CPD reported the subject to be Black as opposed to White and Non-Hispanic, or Black as opposed to Hispanic.  From the two-dimensional statistical disparity represented by these "flat" numbers, one might infer from those numbers that there is something going on in Chicago with regard to the number of Black individuals being stopped compared to White individuals.   Furthermore, if that same person looked at the population numbers from the U.S. Census Report in 2010, that factual inference might appear even stronger, because

census data shows that the City of Chicago is predominately populated by two races and one ethnic group, comprising a clear majority: African-Americans/Blacks (32.9%), Hispanics/Latinos (28.9%) and Caucasians/Whites (31.7%).[11]

To make such inferences would not lead to an accurate picture of what the CPD's stop and frisk police activity really looked like during 2014-15, for several reasons. Putting aside the important fact that the total 1.32 million stops reported do not describe the number of individuals stopped, but rather only the number of times a police officer submitted a contact card reporting that a civilian stop had been made, which did not lead to any enforcement action, the flat stop count numbers associated with each ethno-racial identifier also do not tell us how many distinct individuals from each of the three identified groups were stopped.

Thus, comparisons between these historic stop counts and the general population numbers are not productive. Put differently, despite roughly equivalent numbers in the population among the Black, Hispanic and White racial groups, the CPD's historical stop data from 2014-15, when compared with those roughly equivalent proportions, do not show that Chicago police officers stopped Blacks and Hispanics, to investigate suspicions of crime, at a disproportionately higher rate than they stopped their White counterparts. The historical stop data merely shows that a disproportionate number of stops were made by police officers in which the officer identified the subject as Black. More will be said on this point later in this report.[12]

---

[11]Although there are other racial and ethnic minorities who reside in Chicago, at the time of the 2010 Census Report, the population numbers for those groups were not statistically significant for purposes of the analysis to be done by the Consultant.

[12] The Consultant is aware of the theory that these disparities exist because these groups commit more crimes than whites, which necessitates more police activity in their neighborhoods, which – in turn – leads to more stops. The Consultant can only report what the historical data shows as to the number of stops, not the reasons for the disparities, because the CPD was not required by law, prior to 2016, to keep the data necessary to ask and answer such cause and effect questions.

Fortunately, the CPD no longer uses the contact card system to report street stops, thanks to the Agreement and the new Illinois law which followed in its wake to require more comprehensive documentation from police officers when a stop is made. Thanks to these new reporting requirements, the Consultant can report (with the aid of his experts) the total stop numbers for the first six months of 2016 (as well as the entire year of 2016) based on the number of distinct individuals stopped, as well as the number of total stops made by CPD.

## The CPD's Transition from the Contact Card System to the Investigatory Stop Reporting System

Unfortunately, municipal police departments do not operate with unlimited monetary or personnel resources; so, the CPD's former "Contact Information System," although electronic since 2003, utilized antiquated data preservation and recording methods, which were still being used in 2014-15. The CIS system, and the CPD's stop and frisk policy prior to January 1, 2016, does not permit the Consultant or his experts access to the factual details in the preserved data, which are needed to determine the number of distinct individuals stopped rather than the simple total number of stops for 2014-15.

For purposes of assessing the CPD's compliance obligations under the Agreement, as well as the new Illinois law, the City and CPD have made the expenditure of resources necessary to develop a 21st Century digitized, electronic database with comprehensive and efficient reporting protocols for police officers to use when documenting street stops and frisks. This new system, the Investigatory Stop Reporting System ("ISRS"), is capable of producing stop and frisk data from police officers' ISRs from which the experts, and thus the Consultant, can determine how many distinct individuals of the three population groups studied in the report, were actually stopped, frisked, searched, as well as the number of individuals of each race and ethnicity who were subject to an arrest, ANOV or other enforcement action; who were carrying a concealed (illegal) weapon or firearm or contraband when frisked and/or searched; and both when and where the stop, protective pat down and/or search took place.

These kinds of factual details allow the Consultant and experts to provide a fairly clear picture of how police officers are applying CPD's new stop and frisk policy, memorialized in Special Order S04-13-09 (rev. Jan., March, and June 2016), on the streets of Chicago. The ISR utilized for these reports also contains a "narrative remarks" section, which is comprised of blank lines making up half of an 8-1/2 x 11" piece of paper, when printed. This narrative remarks section is provided for police officers to articulate the reasons for stopping the subject of the report in their own words. Although the ISR also contains numerous check boxes to help officers report the facts relevant to the Department and the law, the narrative remarks section, which is not *expressly* required by law or the Agreement, gives police officers a chance to describe facts and/or circumstances apparent to the officer at the time of the stop which are not reduced to a check box.

Often, these facts and circumstances are key indicators that the police officer's suspicion of criminal activity, which led to the stop, was reasonable and justified. In cases where the stop is challenged legally, such a narrative could, in fact, help police officers justify their decisions; and, even if mistakes were made, these narratives can provide evidence that the mistakes were honest ones. In short, the Agreement makes the CPD's stop and frisk practices transparent to the public and subject to heightened accountability for the purpose of ensuring that those practices comply with applicable laws at the same time that officers strive to protect the public and ensure the safety of officers and civilians.

[See page 31 for Population by Police District, Race & Ethnicity for 2014-15]

## Population by District, Race & Ethnicity for 2014-15

In the chart below, the total population numbers for each of the 22 Chicago Police Districts is represented, by the 3 ethno-racial populations studied in the report. In the first column to the left, the Police District Number is represented. To the right, immediately following each District Number, the columns represent (in order), the total population within each police district; the number ("n") of individuals who reside in that district who are Non-Hispanic Blacks (third column); Non-Hispanic Whites (fourth column), and Hispanic Whites (fifth column). The percentage mark indicators within the third through fifth columns, which appear to the immediate right of the numbers ("n") listed for each of the three groups, indicates the percentage that the specific "n" of each race or ethnicity

represents within the total population number in the second column.   As noted, these figures have been derived from the 2010-2014 American Community Survey ("ACS") 5-year estimates.  The ACS estimates are the most reliable source of data research available during the decades between official U.S. Census Reports.

Demographic Data for NH-Blacks; NH-Whites; and Hispanic Whites:  total populations by district numerically and proportionally.  Source:  2010-2014 ACS 5-year estimates.

| District | Total Population | Non-Hispanic Black | | Non-Hispanic White | | Hispanic White | |
|---|---|---|---|---|---|---|---|
| | | n | % | n | % | n | % |
| 01 | 66,892.31 | 14,041.27 | 0.21 | 33,549.59 | 0.50 | 2,490.29 | 0.04 |
| 02 | 95,630.35 | 66,394.72 | 0.69 | 17,433.95 | 0.18 | 1,398.86 | 0.01 |
| 03 | 77,971.52 | 70,749.88 | 0.91 | 3,116.26 | 0.04 | 477.09 | 0.01 |
| 04 | 119,666.33 | 71,742.78 | 0.60 | 10,388.31 | 0.09 | 27,284.22 | 0.23 |
| 05 | 72,595.07 | 68,169.90 | 0.94 | 1,328.48 | 0.02 | 1,355.10 | 0.02 |
| 06 | 91,107.70 | 88,248.38 | 0.97 | 557.97 | 0.01 | 202.13 | 0.00 |
| 07 | 65,605.88 | 61,949.65 | 0.94 | 680.95 | 0.01 | 450.83 | 0.01 |
| 08 | 251,794.57 | 51,488.12 | 0.20 | 49,713.14 | 0.20 | 65,583.64 | 0.26 |
| 09 | 164,896.15 | 18,075.52 | 0.11 | 24,199.83 | 0.15 | 55,055.40 | 0.33 |
| 10 | 108,162.54 | 35,080.31 | 0.32 | 3,557.54 | 0.03 | 47,715.57 | 0.44 |
| 11 | 72,019.95 | 60,530.65 | 0.84 | 2,042.70 | 0.03 | 2,862.99 | 0.04 |
| 12 | 130,218.96 | 23,373.85 | 0.18 | 54,226.37 | 0.42 | 23,064.01 | 0.18 |
| 14 | 119,469.87 | 8,713.17 | 0.07 | 54,465.13 | 0.46 | 34,851.57 | 0.29 |
| 15 | 59,222.22 | 54,952.00 | 0.93 | 1,204.39 | 0.02 | 700.38 | 0.01 |
| 16 | 205,425.45 | 2,412.22 | 0.01 | 137,839.95 | 0.67 | 27,794.91 | 0.14 |
| 17 | 148,769.15 | 4,569.70 | 0.03 | 56,824.22 | 0.38 | 38,788.37 | 0.26 |
| 18 | 120,920.44 | 9,663.68 | 0.08 | 89,884.64 | 0.74 | 4,884.76 | 0.04 |
| 19 | 207,214.75 | 12,397.16 | 0.06 | 155,615.04 | 0.75 | 15,926.09 | 0.08 |
| 20 | 87,091.97 | 9,721.25 | 0.11 | 48,555.96 | 0.56 | 9,431.75 | 0.11 |
| 22 | 102,757.72 | 62,059.04 | 0.60 | 35,035.05 | 0.34 | 2,083.96 | 0.02 |
| 24 | 141,400.08 | 24,571.12 | 0.17 | 62,280.52 | 0.44 | 20,075.24 | 0.14 |
| 25 | 200,237.89 | 32,764.69 | 0.16 | 28,236.19 | 0.14 | 57,812.31 | 0.29 |

*See chart
*Source: 2010 – 2014 American Community Survey 5-year estimates. Because census features do not always align with administrative features, such as police districts, they used an "areal interpolation" technique to estimate demographic counts for each district. As such, the experts have excluded all population associated with the 31st distric*

# Statistical Experts' Executive Summaries & Key Points

## *Coded Legal Narratives Report (Appendix A)*

### Executive Summary

To determine whether the Agreement had its desired effect over the first six months of 2016, the Consultant must report the statistical results from his legal examination of the narrative remarks sections in a "statistically representative" sample of 4,233 ISRs.[13] This sample set was randomly drawn from the full set of 54,116 ISRs submitted by CPD officers during the relevant period.[14] The Consultant's legal examination of the narrative remarks in these 4,233 representative ISRs was intended to assess whether each of the ISRs reviewed complied with the Fourth Amendment standards for investigatory stops and protective pat downs, for purposes of assessing, statistically, whether the CPD had complied with this legal requirement pursuant to the terms of the Agreement.

The Consultant's legal assessments assigned various codes for the statistical experts to use for their statistical tests. *See* Appendix A to the Coded Narratives TECHNICAL Report (appended to this report as Appendix A). The key statistical results and the Consultant's findings regarding them are as follows.

---

[13]These 4,233 ISRs were culled from a total sample of 4,250, which were randomly drawn from the full set of ISR data produced by the CPD for the Consultant's review and legal assessment. The remaining 17 ISRs were duplicates (which was understandable given that the CPD officers submitting them were not fully trained when the reporting period began, on January 1, 2016, in how to use the new electronic reporting system).

[14]The full set of ISR data produced by CPD to the Consultant included 54,701 records. Only 54,116 records (98.9 percent) were used for the statistical analysis in this report, because this report, and the statistical studies produced for it, focus on the three most populous racial/ethnic groups in Chicago, although there are others. These three groups are: White non-Hispanics, White Hispanics, and Black non-Hispanics. See Post-Stop Outcomes Report, p. 30 (for further explanation).

## Good Stops v. Bad Stops

- Overall, the ISR data from the first reporting period shows a good stop rate between 90 and 94 percent based on the Consultant's independent review of the narrative remarks sections and the codes assigned to reflect Fourth Amendment compliance. See Appendix A, p.24-25.

- This good stop rate, viewed in isolation, certainly represents an excellent start by the CPD to documenting investigatory stops, during the first reporting period, especially given that: (1) officers were required to comply with new and rigorous reporting requirements under the terms of the Agreement and Illinois law; (2) most officers were using a new, fully electronic reporting system they had not been trained yet how to use; and (3) had not been trained with regard to the CPD's own newly revised stop and frisk policy, set forth in writing in Special Order S04-13-09.

- However, in the remaining 6-10 percent of the stops made, which were coded as bad stops by the Consultant, Black Non-Hispanic and Hispanic civilians were *significantly more likely* (in statistical terms) to find themselves in a bad stop when compared with stopped White non-Hispanic civilians. Appendix A, p.24-25.

- The link between race and the probability of being in a bad stop (even though the statistical test which yielded the link controlled for age, gender, ethnicity, and district context) **may not be caused by race differences *per se*,** *but rather by unobserved variables not tested by the statistical model used.*

- Whether the link between racial differences and being in a good vs a bad stop is significant or not depends on how a subset of probable cause stops are considered, namely, whether the 66 bicycle on the sidewalk ordinance violations are dropped from the sample because they were coded as plainly "on-view" violations; or, whether these 66 stops, when re-introduced to the 3,125 investigatory stops in the sample set, after all coded probable cause stops were dropped, are treated as "good stops" or "bad stops." *See* Appendix A at section 8.5.5 starting on p. 4.

> **Even after taking race and ethnicity differences, and other factors including district location into account, two districts, Districts 3 and 10, stood out. They had significantly lower fractions of good stops than predicted.**

## *The Statistical Significance of the Bicycle/Sidewalk Stops Results*[15]

---

[15]The legal significance of the bicycle/sidewalk stop results is included as an addendum to this report, because the Consultant is not making any determinations regarding the first reporting period data, nor have

The parties, as well as the public, may wonder why the Consultant will spend so much time discussing the legal and statistical significance of a very small group of 76 stops involving the violation of Chicago's ordinance prohibiting persons over the age of 12 from riding their bicycles on public sidewalks. *See* Chicago Muni. Ord. 09-52-020 (b) (2009). The answer is as follows.

- During the coding process, the Consultant discovered an unanticipated large number of "on-view" violations involving municipal codes and ordinances, rather than investigatory stops.

- In the 4,233 records that the Consultant coded, there were 857 stops (20.2 percent) which involved on-view violations rather than investigatory stops.

- The discovery of so many probable cause stops created a number of complicated legal and statistical analytical problems, which the Consultant needed to solve.

- One problem involved how to reconcile the also large number of stops involving "suspected" violations of municipal codes and ordinances, which required the police officer to stop the civilian to investigate, before a determination of violation could be made. There were an unknown number of such stops, which the Consultant coded as "investigatory stops," despite narrative remarks that – more or less – made that determination a close call.

- The "stop types" involving these close calls between "on-view" violations (hereinafter referred to as "probable cause stops") and "investigatory stops" involved a variety of municipal codes and ordinances including, but not limited to: traffic violations; curfews and truancies; drinking alcohol on the public way; public urination; selling loose cigarettes; loitering; panhandling; solicitation; and riding a bicycle on the public sidewalk over the age of 12 years.

- The majority of traffic code violations involving a moving vehicle were coded as probable cause stops because they were observed by the police officer and not

---

the parties authorized the Consultant to make legal assessments regarding probable cause stops. In fact, the City and CPD have advised the Consultant that such stops are no longer being reported or produced pursuant to this Agreement as of January 1, 2017, the beginning of the Third Reporting Period. As such, any views by the Consultant on the legal ramifications of these probable cause stops is, at best, advisory. However, because this data was produced and analyzed by the Consultant, the addendum is included for consideration by the parties, along with a signed, final copy of this report.

usually susceptible to doubt which would lead to a need to question the driver.[16] The Consultant did not ask the statistical experts to count the number of traffic stops that were coded for probable cause.

- The other largest number of ISRs involving probable cause stops appeared to include the bicycle/sidewalk ordinance violations. The Consultant did not initially ask the statistical expert to count these stops either.

- Instead, the Consultant directed the statistical experts to drop all 857 ISRs from the sample and analyze only the ISRs coded as investigatory stops.

- The experts ran their statistical tests and came up with a set of results based on 3,128 stop records involving investigatory stops. See Appendix A, at 17, Table 5 (4,233 – 857 = 3,128). As indicated in Table 5, the number of records for each of the three ethno-racial groups studied was approximately the same, just as these groups are represented in the Chicago population generally.

- The descriptive studies performed, as described in Appendix A, reflect that there was nothing unexpected from the results which would suggest that the Consultant re-examine his decision to drop all the probable cause stops.

- Rather, the Consultant remembered that not *ALL* bicycle/sidewalk stops had been coded as probable cause stops, but *MOST* of them had been so plainly "on-view" violations that, like the traffic stops, there was no question that they were not investigatory stops.

- The large number of probable cause stops *produced to the Consultant for legal review of the narratives* led to a set of questions about the CPD's *actual* reporting protocols in its revised stop and frisk policy, S04-13-09.

- Some of these questions involved the reflections on the difference between probable cause stops and investigatory stops, which is included in this report *because so many probable cause stops were part of the first reporting period data and required the Consultant to consider such questions when coding the data.* The Consultant's duty is to report to the public what he observed from the data produced to him, and he intends to do just that.

- The bicycle/sidewalk stops were identified as a "stop type" that, while usually an on-view violation, could – in some cases – involve investigatory issues that did not concern violation of the ordinance *per se*.[17]

---

[16]The Consultant did not ask the statistical expert to count the number of traffic stops he coded for probable cause; this observation is made based on memory and impression only.

[17] For example, one of the ten ISRs involving "bicycles" and "sidewalks" were coded as "investigatory" – not because the bicyclist was over 12 years old and caught riding on a sidewalk, but because the bicycle rider hit a pedestrian; a second ISR involved a situation where a person riding a bike on the sidewalk was

- The Consultant directed the statistical expert to identify the bicycle/sidewalk stops in the data and 76 were produced for closer examination.

- As it turns out, 66 of the 76 were coded as plainly on-view violations of the bicycle/sidewalk ordinance. They had been dropped as part of the 857-probable cause stops, before the experts' first statistical analysis was performed.

- The overwhelming majority of the subjects in those 66 stops were also White.

- The Consultant decided to test whether the re-introduction of the 66-probable cause stops to the 10 coded as investigatory would make a statistical difference. The analytical difficulty in doing this involved the issue of how to treat the stops once re-introduced. In other words, should the 66 stops be placed in the good stop bucket or the bad stop bucket.

- To avoid any appearance of partiality, the Consultant directed the expert to run the statistical tests both ways: with the 66 bicycles "in" as "good stops" and with the 66 bicycles "in" as bad stops. This resulted in the additional two statistical studies with bicycles/sidewalks "in" as opposed to "out" of the representative sample.

- When the 66 bicycles were added back to the sample of 3,128 stops, the number of stops standing in as "representative" for the full data set increased to 3,376 (with a corresponding decrease to the number of probable cause stops by 66 or 791).

- The result of this focused study produced what the Consultant believes are statistical results and analysis by Dr. Taylor which is not only sophisticated, but quite clearly valuable to the scholarship in this area – both in the area of criminal justice statistics, and also criminal justice and civil rights laws.

- The Consultant submits that the statistical results from Investigatory stop outcomes examined can change dramatically based on whether: (1) a particular stop type, within the probable stop category, is *included or excluded* from the sample data; and (2) the class of probable cause stops being included in the sample data is treated as a "good" or a "bad" stop.

---

"approaching several unknown subjects and engaging in short conversations at a narcotic "hot spot" (known to police officers as a place involving numerous narcotics arrests); and, a third ISR involved the stop of a civilian who was removing a "bicycle" rack from a "sidewalk" with permission of an Alderman.

## *Descriptive Results*

The numbers behind the race/ethnicity effect on good versus bad stops are explained in

the Coded Narratives Technical Report at p. 26. (Appendix A). *See* especially Table 11,

which is divided into thirds.

- The top third describes when bicycle/sidewalk stops are included, but classified as bad stops.
- The middle shows what happens when bicycle/sidewalk violations are included but classified as good stops.
- And the bottom third shows the numbers when bicycle/sidewalk violations are excluded.

- When bicycle sidewalk violations are excluded (bottom third of table), the Black non-Hispanic percent bad stops are 8.2 percent compared to a White non-Hispanic percent bad stops of 3.5 percent. The absolute difference is 4.7 percent. The relative difference is that the Black percent bad stops is 2.3 *times* greater than the White percent (8.2/3.5=2.3).

- When the bicycle/sidewalk violations are re-introduced to the sample investigatory stop data as *bad stops* the Black percent bad stops goes up to 9.55 percent and the White percent bad stops goes up to 5.8 percent. The absolute difference is now 3.7 percent. But now the relative difference is that the Black percent bad stops is only 1.6 *times* greater than the White percent (9.55/5.8=1.6).

- In other words, the statistical effect of adding just 66 stops, where the majority of those stops involved White individuals, and treating those stops as "bad stops" (putting them in the bad stop bucket, if you will), dilutes the statistical probability of being in a bad stop for Blacks. This means that when the 66 bicycle/sidewalk stops are not dropped from the sample data, but rather treated as "bad stops," the statistical results do not yield a "statistically significant" probability that Blacks are more likely to be in bad stops than Whites.[18]

---

[18]The Consultant cannot predict how reintroducing the entire set of 857 stops (20.2 percent) (which included the 66 bicycle/sidewalk stops when initially dropped) would affect the overall statistical results. The Consultant can commit that the microcosm of variables involving race, ethnicity, age, gender, and geography (location of the stop), are all important to determining statistical issues regarding the ethno-racial effects of that particular stop type. Such statistical evidence could prove essential to analyzing the legal compliance issues, such as disparate impact, as well as treatment, under ICRA and the other constitutional laws which apply to this Agreement. statistical results look like. Thus, when all the ISRs involving a particular "stop type" (e.g., based on probable cause) or subset of a stop type (such as bicycle/sidewalk ordinance violations) are focused on for statistical assessment, the influence of all the factors (variables) which were part of those stops, can and do influence whether the race/ethnicity "effect" is statistically significant.

- These differences in percent bad stops have implications for whether the race difference is statistically significant or not. When the statistical models are completed on these numbers, and other factors are taken into account, *the impact of the Black versus White difference, which is statistically significant if bicycle/sidewalk violations are excluded, is no longer statistically significant if bicycle/sidewalk violations are included as bad stops*. (See Tables 14, 16 and 17, Appendix A.)[19]

> **The impact of the Black versus White difference, which is statistically significant if bicycle/sidewalk violations are excluded, is no longer statistically significant if bicycle/sidewalk violations are included as bad stops**

This one numerical difference, in other

> **Small numbers can make a big difference**

words, shows how crucial it is to account for every single stop and label these stops properly as investigatory or probable cause from the outset.  It also shows how just 66 stops out of a sample of 4,233, and a full set of 54,116 can make a statistically significant difference.

## RAS for Pat Downs

In Section 9 of the Coded Legal Narratives Technical Report, the experts examine the relationship between the factual basis provided by police officers in the legal narratives for the pat down and the variables/factors of race and ethnicity, before and after controlling for other factors, such as civilian age and gender, as well as district context.  Because some stopped civilians were selected to receive a pat down, and others were not, analyses of the pat down basis need to take that into account.

Determination of whether the pat down occurred depended on CPD officers' checking the appropriate box, not simply on whether the narrative remarks section indicated that a pat

---

[19] Interestingly, although not surprisingly, given that most of the 66 bicycle/sidewalk stops involved White NHs, the race effect linked to the probability of being in a bad stop for a Black NH remains statistically significant if the 66 bicycle/sidewalk violations are included as good stops under a "greater includes the lesser" theory.

down occurred.  This is because officers in the first reporting period were still not always clear about whether the pat down was for protective purposes or whether the term "pat down" was used to refer to an "administrative search" pursuant to transport.

- Three outcomes were possible with respect to pat downs, based on the codes used to assess legal compliance with the Fourth Amendment.  Here, it is important to note that an independent basis (set of facts) needs to be articulated in the narrative remarks for the higher level of intrusion on a civilian's liberty beyond the temporary detention for questioning.  Often, police officers did not articulate this independent factual basis apart from the original facts offered to justify the stop.

- The three outcomes studied were:
    - Pat down + RAS-yes
    - Pat down + RAS-no
    - No pat down

- The descriptive results for these three outcomes were:
    - Pat down + RAS-yes = 1,055
    - Pat down + RAS-no = 92
    - No pat down = 2,131

- Across the three racial/ethnic groups, the total results for the three outcomes were:

    - Pat down + RAS-yes =
        - 794 Black NHs;
        - 210 Hispanics;
        - 51 White NHs.

- Pat down + RAS-no =
    - 75 Black NHs;
    - 11 Hispanics;
    - 6 Whites

- No pat down =
    - 1,457 Black NHs
    - 478 Hispanics
    - 196 White NHs

From this data, it appears that there were far fewer stops without pat downs than with pat downs; but, where pat downs were given, they were given more often to Black NHs.  The

good pat down rate, like the good stop rate, appears to be far higher than the bad pat down rate for the CPD.

## Patterns of Pat Downs and Pat Down Basis by Districts

Table 10 displays the descriptive statistics showing the number of pat downs per district. Like the number of stops, the pat down count varies widely across the city, ranging from around 10 in Districts 1, 2 and 18, to over 100 in District 9.

Figure 11 shows the number of stops where a bad pat down occurred (RAS-no). The numbers range from zero (Districts 5, and 22) to 8 (Districts 9, 11 and 19).

Specific findings include:

- Stopped women are less likely to be frisked than men, but if a stopped civilian of either gender is patted down, then women are more likely to be improperly pat down. This is a net impact finding which is statistically significant ($p < .05$). *See* Table 21, p. 50.[20]

- Also, out of 3,372 stops (including the 66 bicycle/sidewalk stops or 3,310 + 66), 2,361 did not involve a pat down. Of the 1,011 stops where a pat down occurred, 936 were of men and only 75 were of women.

- At the district level, there may be a link between race of civilians stopped and the predicted probability that a pat down will be bad. See Appendix A, Figure 13, p. 52-53. Descriptively, the predicted probabilities of being in a bad stop appeared higher in districts with a higher proportion of stopped Black non-Hispanic civilians. Appendix A, p. 52.

## Probable Cause to Search Pursuant to a Protective Pat Down

In the sample of 3,310 stop (excluding the 66 bicycle/sidewalk stops), searches were conducted 15.5 percent of the time (n=512).

- Of these 512 searches, 67 percent (323) were not related to an investigatory stop:

---

[20] The important point here is that the significant net gender impact is based only on seven properly premised pat downs of women. *Id.*, p.51.

- o 316 searches were incident to arrest
- o 27 searches were incident to transport

- In an additional 44 searches, or 8.6 percent of the 3,310 stops which were related to investigatory stops, the narrative remarks were coded as providing insufficient information to gauge whether the search was premised on probable cause (i.e., by plain touch during the pat down). Appendix A, p. 54.

- 125 searches, after deducting the 367 searches identified from the total 512, 125 searches remained (or 24.4 percent of the total 512). Police officers conducted these 125 searches pursuant to investigatory stops; and, CPD officers properly checked the search box on the ISR Form.

- From these 125 searches, 120 of them (96 percent) were correctly premised on probable case derived from the pat down.

- In only 5 of the searches (4% of the 125), did the Consultant conclude during coding that the search was not based on probable cause (improperly premised). Based on this extremely low number (n=5), the experts could not assess a race/ethnicity effect on improper search outcomes.

## *Searches that follow from Pat Downs*

In 1,011 investigatory stops, which resulted in a pat down, there were 18.8 percent of these Stop + Pat Down cases also involved a search. In other words, in 190 ISRs that the Consultant coded, there was a Stop + Pat Down + Search recorded.

# The Post-Stop Outcomes Report ("PSO Report") (Appendix B)
Executive Summary

- The Post-Stop Outcomes Report ("PSO Report") (Appendix B) examines whether a statistically significant effect from the factors of race, ethnicity and/or gender can be statistically observed in the post-stop outcomes recorded by officers in the ISRs (*i.e.,* a protective pat down, search, arrest, ticket, or other result from the temporary stop for questioning). The experts derived the PSO Report results from the 54,701 ISRs submitted by police officers during the reporting period ("full data set").

- Very generally, the statistical results from the PSO Report show correlations between gender, race and ethnicity on the frequency with which stops and frisks are

made by the CPD on a city-wide basis, as well as within police districts, some of which are strong and others which are not as strong.

- The PSO Report also provides important descriptive data about numbers of stops, and the likelihood of various post stop outcomes in those stops, organized by district, race/ethnicity category, and race/ethnicity category within district.

- The strongest correlative data to emerge from the statistical studies performed for the PSO Report, however, involve stops where a police officer performed a pat down, but the individual was subsequently released without any enforcement action occurring as a result of the stop or the pat down ("non-enforcement action" stop).

    o In the non-enforcement action/pat-down study, the data indicated that:

        1. *A very strong, large and statistically significant link emerged between being Black, being pat down, and being in a stop that did not result in an enforcement action* <u>when compared to</u> *being White non-Hispanic, and being patted down, without an enforcement action taken.*

        2. There was also *a very strong, large and statistically significant correlation (link) between being Hispanic and being pat down in a stop which did not lead to an enforcement action* <u>when compared to</u> *being White non-Hispanic, and being patted down, without an enforcement action taken.*

        3. Both of these were city-wide findings.

- Two major findings of race or ethnicity impacts appeared.

    1. Compared to stopped White Non-Hispanics, stopped Hispanics and stopped Black Non-Hispanics were both significantly more likely to receive a pat down from officers.

    2. If the focus shifts just to stops where officers imposed no sanctions -- no arrest, no citation, no administrative notice, etc. – Hispanics and Blacks were still significantly more likely to receive a pat down.

    3. Both of these are city wide findings.

- Even though the immediately above findings take into account numerous factors of the person stopped and the stop context, careful diagnosis of model features suggest the effect of race or ethnicity on such outcomes may not be due to those factors *per se*, but rather to other features of stops.

The other key points from the PSO Report are as follows.   Much more, however, can be gleaned from reading the PSO Report at Appendix B, and for those interested in the details, the Consultant encourages closer examination of the five statistical reports appended to this report (Appendices A-E).

## Pat downs

- Police officers conducted pat downs of stopped civilians 18,364 times between Jan.1-June 30, 2016, during the 54,116 stops of civilians in the three major ethno-racial groups in the City of Chicago.  This means that police officers conducted pat downs in slightly more than one-third (1/3) of the stops initiated.[21]

- Because protective pat downs are the only type analyzed for this Agreement, the issue of how many concealed, illegally carried weapons or firearms were confiscated from these protective pat downs is relevant.
    - From the 18,364 stops involving a protective pat down (based on the police officer's assertion of independent facts justifying reasonable suspicion that the stopped subject possessed or had access to a dangerous weapon or firearm), 465 weapons or firearms were discovered.[22] *See* Table 11.
    - The number of recovered firearms/weapons varied from a low of 2 in District 20 to a high of 59 in District 7.

- Black NHs were involved in 70.9 percent of stops between January 1 and June 30, 2016; they also were involved in about the same portion of pat downs, 73 percent. The total number of pat downs for the period, appearing in Table 9 of the PSO Report, were as follows:

    - Whites = 977
    - Black NHs = 13,377
    - Hispanics = 4,010

[21] Stops not involving civilians in one of the three largest ethno-racial groups – White NHs, Black NHs, or Hispanics – are not considered in the numbers here. There were 585 stops not involving civilians in one of these three groups.

[22] The Consultant notes that the ISR Form does not provide a checkbox for the police officer to indicate whether the confiscated weapon or firearm turned out to be *legally* carried and concealed under Illinois law (as opposed to illegally carried and concealed).  Thus, the statistical experts could not determine how many of the 465 items recovered were illegal.  Nonetheless, from the police officer's point of view, any weapon or firearm, regardless of the subject's legal right to possess it, is a danger during the investigatory stop and, therefore, justifies the protective pat down.

- Overall, the number of pat downs varied geographically from a high of 2,377 in District 7, to a low of 162 in District 1(the Loop).

- Within police districts, the ***highest pat down counts*** (more than 1000) ***of Black Non-Hispanics*** occurred, in descending order, in the following districts:

  - District 7:           2,327 pat downs
  - District 11:          1,339 pat downs
  - District 6:           1,197 pat downs
  - District 4:           1,101 pat downs
  - District 3 and 15:    1,074 pat downs

- Within police districts, ***the lowest pat down counts*** (fewer than 100) ***of Black Non-Hispanics*** occurred, in ascending order, in the following districts:

  - District 16:    34
  - District 17:    44
  - District 20:    77
  - District 14:    82

- These pat down numbers are obviously related to the demographic composition (population numbers by race and ethnicity) in each police district.  Although general population numbers may be less useful for assessing legal compliance issues of disparate impact, they can be very useful for descriptive comparisons.
- To see the probability, expressed as a proportion, *among stopped civilians* of being patted down in a particular police district, by race and ethnicity, as well as overall, regardless of race or ethnicity, see Table 10.

- Table 10 shows that in two police districts, Districts 6 and 7, the chances of any *stopped* civilian receiving a pat down hover around 1 out of 2 stops (49 percent of stops in these districts were associated with a pat down).  In other words, there is almost a 50/50 chance of being patted down if stopped by a police officer in Districts 6 and 7.  This statistic may not come as news to the CPD or to those who live in Districts 6 and 7, where the population of those two districts is predominantly African-American.

| District Numbers | Race & Ethnicity Identifiers | Population | Pat Downs |
|---|---|---|---|
| 6 | Totals | 91,107.70 (100%) | 1,226 (100%) |
| | Black NHs | 88,248.38 (96.8%) | 1,197 (97.6%) |
| | White NHs | 557.97 (0.6%) | 19 (1.5%) |
| | Hispanic Whites | 202.13 (0.2%) | 10 (0.8%) |
| 7 | Totals | 65,605.88 (100%) | 2,377 (100%) |
| | Black NHs | 61,949.65 (94.4%) | 2,327 (97.9%) |
| | White NHs | 680.95 (1%) | 25 (1.05%) |
| | Hispanic Whites | 450.83 (0.7%) | 25 (1.05%) |

- Stops of Hispanics (11,557) made up 21 percent of all stops. They contributed in that proportion (4,010 out of 18,364 or 22 percent) to all the pat downs.

- Nonetheless, there were some districts where numbers of pat downs of Hispanics exceeded or were greater than the pat downs of Black Non-Hispanics (Table 9).
  - In Districts 9 (266 more), 25 (195 more), 17 (161 more) and 14 (145 more), more than 100 more pat downs were conducted on stopped Hispanics than on stopped Black Non-Hispanics;
  - In Districts 12 (difference = 4 more pat downs of Hispanics) and 20 (difference = 23 more pat downs of Hispanics), the numbers of pat downs of Hispanics and Black Non-Hispanics were essentially equal with a difference of less than 25.
  - 
- When comparing Hispanics to Blacks rather than Whites to Blacks, the numerical disparity is often less pronounced. Across all the districts, the number of pat downs of Hispanics averaged 426 fewer per district compared to Black non-Hispanic pat downs in the same districts. When White Non-Hispanics' pat downs in a district were compared to Black Non-Hispanics' pat downs in the same district, they averaged 564 fewer.
- Further, the White non-Hispanic to Hispanic contrast in pat down counts was smaller than either of the above comparisons. Across all the districts, the number of pat downs of White non-Hispanics averaged 138 fewer than the number of pat downs of Hispanics in the same districts.

- Given the above, it is not surprising that when **net** differences in pat down likelihoods were examined in statistical models, significant differences surfaced between White non-Hispanic versus Black non-Hispanic pat down likelihoods. After taking other factors into account, White non-Hispanics were predicted to be significantly less likely to be patted down than Black non-Hispanic stopped civilians.
- The **gross** difference in observed probabilities of getting patted down between Blacks and Whites, and between Hispanics and Whites, was about 12 percent in both cases (Table 10). About 35 percent of stopped Black non-Hispanic civilians, and 35 percent of stopped Hispanic civilians, were patted down. This compared to about 23 percent of stopped White non-Hispanic civilians who were patted down.

## *Pat downs during a stop in which no enforcement action was delivered*

- Among the 18,361 pat downs, conducted during the reporting period, police officers conducted a total of 13,444 of them without subsequently enforcing any laws. So, 73 percent of pat downs happened in stops where officers delivered no enforcement action.

- No assumptions are made about whether officers in these situations *could* have delivered an enforcement action, but simply chose not to.

- All that the Consultant and experts are trying to do is gauge the roles of race or ethnicity, in stops where there was no enforcement action, in perhaps contributing to what may have been experienced as a more intrusive stop because a pat down was involved. Such considerations are important from a procedural justice perspective and for police community relations.

- In stops where police officers delivered no enforcement action, *both* significant **net** race and net ethnicity impacts appeared. Black non-Hispanic stopped civilians were patted down significantly more often than White non-Hispanic stopped civilians in these situations, as were Hispanic stopped civilians.

- The **gross** difference between White non-Hispanics and the other two groups in these stops on this outcome was about eight to nine percent when all stops were considered. This happened in stops with White non-Hispanics about 17 percent of the time. It happened to stopped Hispanics about 25 percent of the time and to stopped Black non-Hispanics about 26 percent of the time.

- How often a stop involved both a pat down and no enforcement varied across districts. In some districts (6, 7) it happened in more than a third of stops. In other districts (1, 18) it happened in between 10 and 15 percent of stops.

- The likelihood of this outcome for each of the three ethno-racial groups roughly matched each group's stop share when all stops were considered. That said, White non-Hispanics were slightly under represented on this outcome relative to their stop share, and Black non-Hispanics were slightly over-represented. See Table 23.

- Although this outcome has four categories given all possible combinations of pat down vs. no pat down and enforcement action vs. no enforcement action, statistical analyses concentrated on contrasting the ethno-racial correlates of receiving a pat down when considering only stops with no enforcement action. Based on the procedural justice literature, such pat downs represent a higher level of officer intrusiveness in the stop.

- When the focus shifts just to stops with no enforcement actions, White non-Hispanics are less likely to receive a pat down, descriptively speaking. Considering just these types of stops, only 23 percent of White non-Hispanics received a pat down whereas 36 percent of Hispanics in these types of stops received same and 38 percent of Black non-Hispanics received same.

- With the focus restricted just to stops with no enforcement action, pat down probabilities again varied across districts. See Table 24. Pat down probabilities were above 50 percent for these types of stops in Districts 6 and 7. They were below 25 percent in districts 1, 2, 16 and 18.

- White Non-Hispanics' representation in the subset of no enforcement action stops with pat downs is one third less than their proportional representation in the set of all no enforcement action stops.

## Searches and Ethnicity

The most stringent statistical analyses conducted found that Hispanic stopped citizens, as compared to White non-Hispanic stopped citizens, were more likely to be searched, after controlling for other factors.

**Black Non-Hispanics**

- During the first period, police officers conducted 9,595 searches of stopped civilians within the racial/ethnic groups studied.  City-wide, 9,595 searches within the three most populous groups in Chicago translates into one search for every five to six stops.  *See* Table 13.

- Within police districts, the largest number of searches took place in District 11, where over 1,000 stopped Black non-Hispanic civilians were searched.  The next largest number of searches took place in District 7, where 896 Black Non-Hispanics were searched.  In no other police districts did the search numbers exceed 598 (District 15), and only in six districts did the search total exceed 400 (e.g., Districts 3,4, 5, 6, 10, 15).

## Hispanic Whites

- The largest number of searches of stopped Hispanic civilians took place in District 9, where there were 318.
- The smallest number of searches of stopped Hispanic civilians took place in District 5, where there were only 3.
- In six of the 22 police districts, there were 10 or fewer searches of stopped Hispanic subjects (e.g., Districts 1, 2, 3, 5, 6, and 22).
- In three of the 22 police districts, there were between 11 and 20 searches of stopped Hispanic subjects (e.g., Districts 7, 15, 18).
- In five of the 22 police districts, there were stops ranging from 60-96 searches (e.g., Districts 4, 11, 14, 19 and 20).
- Thus, in fourteen (14) of the 22 police districts, there were fewer than 97 searches of stopped Hispanic civilians for the first six months of 2016.
- In the remaining eight (8) of the 22 police districts, where the highest number of searches took place, the numbers range from 100 to 318, but only three of the districts have search totals over 200, namely District 10 (201), District 25 (286) and, as noted, District 9 (318).

## White Non-Hispanics

- The search tally for White Non-Hispanics was quite low.  The total number of searches for this group were only 727 out of the total 9,595 which occurred post-stop for the first period.

The highest search rate for this group occurred in District 16, where there were 101 searches.  The lowest search rate for this group was 3, in District 2.

## City-Wide Results

- Looking across districts for all stopped civilians, total district searches after an investigatory stop was made ranged from 95 (District 18) to 1,313 (District 11). The typical (median) district had 393 searches during investigatory stops. Unremarkably, in District 18, 71/95 searches were conducted of Black Non-Hispanics; and, in District 11, 1145/1313 searches were conducted of Black Non-Hispanics. Similarly, in District 18, 10/95 searches were conducted of White Non-Hispanics; and, in District 11, 76/1313 searches were conducted of White Non-Hispanics.

    o In other words, in District 11, where the highest number of searches were made, the group with the largest proportion of searches were Black NHs; and the group with the lowest number of searches were White NHs.
    o Similarly, in District 18, where the lowest city-wide number of searches were made, Black NHs – again – were the group with the highest number of searches post-stop; and, White NHs – again – were the group with the lowest number of searches post-stop.
    o Thus, the number of searches does not always tell the full story; sometimes, even where the numbers are small, the racial and ethnic differences may follow the same pattern seen where the numbers are much larger.

- Proportionally, however, across the entire city for each of the three groups of stopped civilians, about one in five or one in six were searched (17.3 percent of stopped White non-Hispanics; 18.1 percent of stopped Black non-Hispanics, and 16.7 percent of stopped Hispanics; see Table 14). Thus, the city-wide averages are not particularly useful for examining ethno-racial differences between post-stop outcomes within police districts or between districts.

## *Searches Resulting in Weapons or Firearms or Both*

- Chicago police officers found 313 "weapons" from searches between January 1st and June 30th. Descriptively speaking, that hit rate was closely comparable across the three groups studied. *See* Appendix B, Table 16.
- The picture shifts if the hit rate for weapons from searches is calculated based on ISRs where police officers also "checked a box" on the ISR form indicating (documenting) that a search had also taken place. In other words, where the search was properly documented, the number of weapons discovered *decreased* to 263. *See Id.,* Table 17.
    o In other words, the number of searches generating a hit for weapons, if limited to the searches which were properly documented as searches (rather

than those where the consultant inferred a search from the narrative remarks alone) was 263.

- o By reducing the search + hit numbers, this increases the actual "hit rate" to about 2.7 percent overall (compared to the 6/10th of a percent from the 313 ISRs where the Consultant coded that a search and a hit had taken place).
- o The hit rate was roughly equal in this study across the three groups studied.

- Finally, the picture shifts a third time if stops resulting in an arrest are removed when calculating search hit rates. *See Id.,* Table 18.
  - o After dropping all custodial searches (coded as custodial by the Consultant where police officers also checked the box indicating a search), there were only 24 searches generating a hit for weapons/firearms out of 2,640 searches (with no arrests). This translates to a hit rate of 9/10th of a percent. *Compare* Table 15 with Table 18.

> **Chicago police officers searched and found weapons or firearms 24 times during the 2,640 investigatory stops which did not lead to an arrest.**

Stated differently, Chicago police officers searched and found weapons or firearms 24 times during the 2,640 investigatory stops which did not lead to an arrest.

## Types of Enforcement Actions (EAs)

- The enforcement actions studied for the Consultant's first report included arrests, administrative notices of violation (ANOVs), personal service citations (PSC) or a category referred to as "other" because these were the only types of enforcement codes being used by the CPD in the first reporting period data.
- During the period, there were 17,425 total enforcement actions in 54,116 investigatory stops, among which there were:

  - o 8,037 Arrests
  - o 5,141 ANOVs
  - o 3,386 Other
  - o 861 PSCs

- Table 21 breaks down these enforcement action numbers by district, race and ethnicity.

- Police engaged in the fewest enforcement actions in District 14 (235), and the most in District 11 (2,238).
- In District 11, there were 2,021 stops which led to an enforcement action against Black NHs subjects; 94 stops leading to enforcement actions against White NHs subjects; and 123 stops against Hispanics.
- In District 14 there were more stops with enforcement actions involving Hispanic stopped civilians (153) as compared to Black (48) or White (334) non-Hispanic civilians who were stopped.

- From Table 21, it appears that: Stopped civilians in the Loop area, District 1, were the most likely to be targeted for enforcement. In District 1, about 42 percent of the stops resulted in an EA. In this location, in each ethno-racial category, roughly 42 to 44 percent of those who were stopped received some type of enforcement action. City-wide, slightly over a quarter of stopped White non-Hispanic civilians received some type of enforcement action by the stopping officer (28 percent). The corresponding proportion for stopped Black non-Hispanic civilians was around a third (33 percent). The proportion for stopped Hispanic civilians was between these two (31 percent).

## Geography

Even after taking model factors and the general pattern of district differences into account, there were a couple districts that were still significantly discrepant on at least one outcome (pat down). In each random half of the data, there were two districts where the predicted chances of a pat down were significantly discrepant from the overall pattern (Figures 6, 8). The implication is that more pat downs were occurring in these two districts than were anticipated by the features used in the models to predict down occurrence, and by the overall pattern of pat downs across all districts.

## Interpretation

- All of these findings should be interpreted, in a social science frame, as correlational rather than unambiguously causal in nature. This interpretation is suggested after careful diagnoses of how the statistical models used actually performed.

## ANALYSIS OF STOP PREMISES

- The majority of investigative stops, somewhere around 90 percent, appear to be sufficiently premised or "good" stops.
- Stops of non-Hispanic Black civilians, compared to those of non-Hispanic White civilians, were less likely to be "good" stops. This is a statistically significant difference by race on this outcome after controlling for other factors. As explained above, this significant difference can become non-significant depending on the treatment of bicycle/sidewalk violations.
- "Good" stops are predicted to be less likely to occur, even after taking numerous factors into account, in a couple of districts. The reasons are not clear at this time.
- All of these findings should be interpreted, in a social science frame, as correlational rather than unambiguously causal in nature.

# Ecological Analysis of Monthly Stop Data Report (Appendix C)

## Executive Summary

The purpose of the Ecological Analysis of Monthly Stop Data Report ("Ecological Analysis") was to: 1) describe stop prevalence rates on a monthly basis, over time, at the police district and city-wide levels by race and ethnicity;[23] and 2) employ statistical models to explain differences in stop rate disparities among the three racial and ethnic groups of interest: Non-Hispanic Blacks, Non-Hispanic Whites, and Hispanic Whites.

## Data and Methodology for Results

- Stop data were derived from the Contact Cards in use by the CPD from January 1, 2014 to December 31, 2015, and the ISRs in use from January 1, 2016 to June 30,

---

[23]Future statistical studies are planned by the appointed experts for ISR data produced by the CPD to the Consultant, during the Second and Third Reporting Periods (*e.g.,* July 1, 2016 to June 30, 2017). In these studies, the experts intend to organize data at both the district and beat levels to obtain more precise information about statistical patterns relevant to the analysis.

2016 (to the present time). *See* Chicago Map, Exhibit 7 (indicating stop counts by race and ethnicity, per district, from January 1, 2014 through June 30, 2016).

- These total stop counts by district, race, and ethnicity are merely descriptive. These are raw totals based on the number of contact cards reporting stops made (not individuals stopped) from January 1, 2014 to December 31, 2015, and the number of ISRs reflecting total stop records (not individuals stopped) from January 1, 2016 to June 30, 2016, as well.[24]

- The Consultant recognizes that the types of stops being made by the CPD between January 1, 2014 and December 31, 2015 were different, depending upon the CPD's policy choices, as reflected in Special Order S04-13-09; and he also recognizes how the CPD's stop policy has changed as the result of the Agreement and new Illinois law since January 1, 2016

- For purposes of clarity and, in response to questions by the parties, the Consultant's experts have broken down the historical data from 2014-2015 into four discrete time periods, which reflect the four different policy regimes in place during those periods. As indicated and shown by the Ecological Analysis in Table 8, at 44, in particular, the statistical results tabulating *stop rates* by race and ethnicity do not appear to be dependent upon or significantly changed by any influences from the changing policies of the CPD regarding stop types, during the relevant period. *See, e.g., Id.* at 43. ("[t]aken together, both the time-regime and pooled models suggest that the race effect prevails independent of policies and procedures guiding the collection of investigatory stop data.").

- Table 8 in the Ecological Analysis Report is new. The Consultant directs the parties and their experts to review this table for the clarifications they seek.[25]

    o A few remarks about the benchmark variables chosen for the ecological analysis are in order. The Consultant did not decide which benchmark variables to use on his own, nor did he direct his experts to simply pick

---

[24] Although the current Investigatory Stop System permits the experts to determine the number of individuals stopped, in addition to the number of stops made, this statistical analysis was not possible from the beginning of the first reporting period, for technical reasons not relevant here. The Consultant's Second Semi-Annual Report will include an analysis of the actual number of individuals stopped, as well as the number of actual stops made from July 1, 2016 to December 31, 2016.

[25]For a tutorial on "statistical significance" *see* pp. 11-12 of the Ecological Analysis Technical Report.

random variables to study.  The open-exchange of ideas that undergirds this Agreement produced, instead, several lengthy dialogues between the appointed experts and various subject matter experts who were independently retained by the parties after the execution of the Agreement.

- o The Consultant gave the parties and their experts multiple opportunities, including at the comments stage of this report, to advocate for and persuade the appointed experts, of their views.

- o The three selected benchmarks used here – violent arrests, total arrests, and young population – were all agreed to by all the parties' experts following the exchange.

- o The appointed experts, however, were recommended by the Parties appointed by the Consultant to give independent input to the Consultant, based on their own expertise, so that the Consultant can independently and fairly assess the statistical evidence and make legal compliance findings which are as free from political influence and advocacy as possible.  This was the parties' intent and so it is now the Consultant's intent with regard to the statistical results.

- o That said, the Consultant has accepted and will adopt the statistical input that the appointed experts have decided to provide in the five Technical Reports appended to this report.

- o Consequently, the three benchmarks used on page 44 of the Ecological Analysis represent the findings of the Consultant with regard to the proper stop rates to use for assessing the first reporting period stop data, in light of the 24-month historical stop data.

- o The Consultant, however, is relying on his experts for input; he is not relying on Appendix C to make any conclusive determinations for this report.  Nor is the Consultant adopting the historical data as relevant to any statistical results required or authorized by the terms of the Agreement.  It is provided at the request and behest of the parties.

## *Key Points*

The ecological analysis of CPD stop data from January 1, 2014 to June 30, 2016 (pooled data) revealed the following:

### Stop trends

- First, the clearest discrepancy in stop rates is between stops of non-Hispanic White vs. non-Hispanic Black civilians.

- Second, the size and direction of that discrepancy depends on both the benchmarking variable used and the geography used.
- Third, the district-level discrepancy with significantly higher stop rates for Black as compared to White non-Hispanics using the violent arrest variable is robust in some ways, but may be fragile in other ways.
- Fourth, the problems associated with interpreting the ecological analyses in this study are not worse, here, than they are in other studies with ecological models, when examining potential racial and ethnic disparities in stops.

**Statistical models**
1. The most conceptually focused models that best addressed the benchmarking problem translated stop counts into rates per previous month's violent arrests. These indicated that, all other relevant factors considered, stops of Non-Hispanic Blacks in the average district in the average month exceeded those of Non-Hispanic Whites by about 40%. Hispanic ethnicity showed no statistical effect on stop counts.
2. Models which translated stop counts into rates per previous month's total arrests predicted Non-Hispanic Black and Hispanic stops to be *less* than those of Non-Hispanic Whites, which is contrary to existing scholarship.
3. Models which translated stop counts into rates per non-ethno-racial-specific young population produced the biggest racial disparities, finding that predicted stops of Blacks would exceed predicted stops of Whites by a factor of 9.

**Limitations**
1. Current statistical models do not account for the likelihood that district stop counts are likely associated with adjacent districts.
2. A few high stop count cases may exert an overly strong influence on model results.
3. Extremely low monthly counts on the violent arrest benchmarking variable in some districts may be problematic in ways not yet fully understood.
4. Statistically, beats as opposed to districts, may prove to be a preferred unit of analysis.
5. Initial diagnostics suggest quite serious problems with all of these ecological models. It is not yet clear if these can be fixed.

# Violent Arrests Report (Appendix D)

**Executive Summary**
1. Across all races and ethnicities, violent arrest counts for the first four months of 2016 increased by 4 percent when compared to the same four months in 2015 (901 to 937).
2. When comparing the first four months of 2015 and the same period in 2016, the unweighted average monthly arrest rate for Non-Hispanic Blacks increased 1.9 percent (2.08 up to 2.12 per 10,000 residents).
3. The unweighted average monthly arrest rate for Non-Hispanic Whites increased 15.9 percent when comparing the first four months of 2015 (.11 per 10,000 residents) to that of 2016 (.128 per 10,000 residents).

4. The first four months of 2016 saw a 13.5 percent increase in the unweighted average monthly arrest rate of Hispanics, compared to the same period in 2015 (.78 up to .885 per 10,000 residents).

# Arrests Report (Appendix E)

Executive Summary

1. When considering all races and ethnicities and comparing the first four months of 2016 to the first four months of 2015, all arrests dropped from 38,853 to 29,336, for a 24.4 percent reduction.
2. When considering just Non-Hispanic Blacks in the first four months of 2015 and the same period in 2016, the unweighted monthly all arrests rate dropped from 82.45 per 10,000 residents to 62.32 per 10,000 residents—a decrease of 24.4 percent.
3. The unweighted monthly average all arrests rate for Non-Hispanic Whites dropped 24.5 percent from the first four months of 2015 (rate = 9.22) to the first four months of 2016 (rate=6.96).

The Hispanic all arrests unweighted monthly average dropped from 40 for the first four months of 2015 to 29.95 for the first four months of 2016. This represented a 25 percent drop between these.

# Concluding Remarks

There are essentially four questions that statistical science can help the parties to the Agreement answer:

1. Are all stops made being recorded?
2. If police officers record a stop, is it documented accurately?
3. If a stop is recorded, but later changed based on supervisory review, does it matter statistically?
4. Is the CPD distinguishing between stops being made and recorded to investigate/temporarily detain a civilian for questioning from stops being made to enforce the law, based on probable cause? (*i.e.,* is it based on an "on-view" violation or RAS?)

The Agreement assumes that the answers to Questions one and two are yes (but the statistical experts believe that they cannot be answered without observational studies). Whether observational studies should be conducted to determine compliance with the

Agreement is an issue the Consultant will address with the parties for future reporting periods.

### Question No. 1.

A few observations regarding Question No. 1 need to be made, however. These observations are not intended as an answer to the question. Rather, these comments are made only to highlight the importance of having one and validating it for the public. The Agreement does not provide any means for the Consultant to determine if all investigatory stops are being recorded. Presumably, through auditing, the CPD Headquarters Commanders will be able to determine the answer to that question. The Consultant is aware that the new Illinois law requires utilization of car cameras and body cameras, so perhaps the State of Illinois will be able to answer that question for the stops being reported to it. The only types of stops with which the Consultant is concerned will not be reported in a comprehensive and accurate way involve the probable cause stops. This is because neither the Agreement nor Illinois law currently requires CPD officers to document stops for this reason *if they do not lead to* "a frisk, search, summons or arrest" under Illinois law. Thus, the CPD's decision to drop probable stops from the investigatory stop data being reviewed and analyzed pursuant to the Agreement is understandable, especially because these probable cause stops must be reported to the State of Illinois and thus will be accounted for and reviewed accordingly. To be clear, probable cause stops are not covered by the Agreement, and for that reason the Consultant's comments below may be taken with a grain of salt, but he feels constrained to make them.

The probable cause stops where police officer discretion is exercised not to enforce the on-view violation giving the officer probable cause to make the stop, is of concern to the Consultant. The statistical results from the PSO Report indicate that, out of the total set of over 54,000 stops, there were only 17,436 stops where a police officer delivered some type of enforcement action. The Consultant is not able to track statistically or otherwise how many probable cause stops were made in the full set, nor in the sample data, because the CPD did not include charge or stop codes for the First Reporting Period. This has been changed for the Second Reporting Period based on the need to have such charge codes for a

number of reasons that will be explained in the Consultant's Second Semi-Annual Report. Thus, the Consultant cannot determine precisely how many probable cause stops were made without an ensuing enforcement action.

During the Consultant's review of the ISR Narratives, he observed many situations where police officers stopped a person based on observation of a minor code or ordinance violation, but then exercised discretion not to enforce the law, which gave the officer probable cause to stop. Although there is no direct statistical evidence to support this observation, the statistical results related to the high number of pat downs with no resulting enforcement action is a clue that police officers use a fair amount of discretion when enforcing the law.

*For example,* In Tables 10 and 22 of the PSO Report, the experts found that a total of 13,444 pat downs where no enforcement action was delivered; and 4,917 pat downs where an enforcement action was taken. Therefore, in 18,361 stops, police officers conducted a pat down.

- This means that, in slightly less than one-third (1/3) of all the stops made during the first six months of 2016, police officers conducted a pat down of the stopped civilian.

- The number of pat downs in each district, for each of the three racial/ethnic groups, appears in Table 9. The number of pat downs ranged from a high of 2,377 in District 7, to a low of 162 in District 1(the Loop).
- From those 18,361 stops involving a protective pat down (presumably based on independent RAS for a concealed weapon or firearm), the CPD recovered only 465 weapons or firearms.

Although there is an important public interest in ensuring that police do not over-criminalize minor violations and create criminal records where none are necessary for serving the public interest, the Consultant believes that there are legitimate reasons to be concerned about the lack of comprehensive document requirements for probable cause stops that do not result in an enforcement action.

**Question No. 3.** The Versioning System redesign of the ISS database should answer this question. Based on the absence of originally submitted ISRs and supervisory comments regarding them during the first reporting period, this determination could not be made.

**Question No. 4**. The Consultant finds, based on observations of and reported answers from the CPD, that the statistical results from the identified sample of 4,233 randomly drawn ISRs from the full set of 54,116 stops indicates that the answer to question number 4 was not being answered before the stop was made by police officers on the street who submitted these ISRs, nor by supervisors reviewing the ISRs, in the majority of cases reviewed by the Consultant.

The CPD and all parties are now aware of this issue and are making progress in rectifying it for the Third Reporting Period. Although identified as an issue during the Second Reporting Period, the parties opted to wait for the statistical reports to be completed before making a determination about whether to separate probable cause stops from investigatory stops in the data produced to the Consultant for review. Based on the efforts the CPD has advised the Consultant it is taking in this regard, as well as the CPD's stated intention to adopt the Consultant's recommendation regarding the addition of a check box to identify the stop as probable cause or investigatory, the Consultant believes that the answer to Question No. 4 will be "yes" for stops being made in 2017 going forward.

# Applicable Laws[26]

Because history is prologue, and context is essential, the Consultant begins with some introductory remarks relevant to the important issues which are applicable to the Fourth

---

[26]Although the parties to the Agreement are represented by lawyers, and presumably need no introduction to the legal history of the constitutional principles to be discussed herein, most of the audience to which this report is directed are not lawyers and may not be schooled in the law or constitutional principles. For that reason, and at the risk of oversimplification, the Consultant explains in the first section of this report, in common language to the extent possible, the precipitating factors that led to the Agreement and how the constitutional law sets the stage for the parties' efforts to reform police policies and practices related to stops and frisks in the City of Chicago.

Amendment standards governing stop and frisk practices, especially as they regard historical minorities.[27]

## The Agreement

The Agreement requires the CPD to establish and maintain stop and frisk policies and practices that comply with all U.S. and Illinois laws, which protect racial, ethnic and gender minorities from discrimination.  One law, the Illinois Civil Rights Act of 2003 ("ICRA"), protects individuals within Illinois from being subject to governmental policies and practices which are administered or utilized in ways that create a discriminatory effect and, thus, an impact on racial and ethnic minorities.   In the next few pages, the Consultant will discuss the applicable laws and explain how and why they are so important to the Agreement

### *The Fourth Amendment*

There is an inherent tension between governmental authority and personal liberty, which the Fourth Amendment seeks to buffer.  The tension can be seen by the fact that the Fourth Amendment is worded as a prohibition directed to the government which makes "[t]he right of the people" of foremost concern. The Fourth Amendment to the United States Constitution states:

> *The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.*  U.S. Constitution, Amend. IV.

---

[27] "**Minority,**" is a term defined by the Encyclopedia Britannica as: a culturally, ethnically, or racially distinct group that coexists with but is subordinate to a more dominant group. As the term is used in the social sciences, a subordinate social status is the chief defining characteristic of a minority group. As such, minority status does not necessarily correlate to population.  Sometimes, one or more so-called minority groups may have a population many times the size of the dominating group, as was the case in South Africa under apartheid (c. 1950–91).

The U.S. Constitution, nonetheless, establishes the government's authority to make and enforce laws.  Law enforcement officers are given the power by government to conduct investigations, to make arrests, and occasionally to use lethal force in the line of duty.  These powers must be exercised within the parameters authorized by law.

Fourth Amendment rights "belong in the catalog of indispensable freedoms."  *Brinegar v. United States*, 338 U.S. 160, 180 (1949) (J. Jackson, dissenting).  History teaches that a legitimate government's most effective law enforcement tool is the power of search and seizure; to identify, stop, and prevent criminal conduct.  History likewise teaches that an arbitrary government's most effective weapon of terrorism is the uncontrolled power to deprive individuals of the fundamental right to be free from government search and seizure.

In a dissenting opinion written in 1949, United States Supreme Court Justice Robert Jackson eloquently articulated this sobering truth:

> *[a]mong deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual, and putting terror in every heart. . . One need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the human personality deteriorates and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police. Brinegar, 338 U.S. at 181.*

Unlike other constitutional rights, an individual's freedom from unreasonable search and seizure cannot be protected before it is deprived.

> *Since the law officers are themselves the chief invaders, there is no enforcement outside of court. . . Only occasional and more flagrant abuses come to the attention of the courts, and then only those where the search and seizure yields incriminating evidence and the defendant is at least sufficiently compromised to be indicted. . . The innocent too often finds no practical redress. Brinegar,* 338 U.S. at 181.

Moreover,

> *. . . any effective interference with freedom of the press, or free speech, or religion, usually requires a course of suppressions against which the citizen can, and often*

*does, go to the court and obtain an injunction (a "stop order" against the unwarranted behavior of the government). Other rights, such as that to an impartial jury or the aid of counsel, are within the supervisory power of the courts themselves. Such a right as just compensation for the taking of private property may be vindicated after the act in terms of money.*

*But an illegal search and seizure usually is a single incident, perpetrated by surprise, conducted in haste, kept purposely beyond the court's supervision, and limited only by the judgment and moderation of officers whose own interests and records are often at stake in the search. There is no opportunity for injunction or appeal to disinterested intervention. The citizen's choice is quietly to submit to whatever the officers undertake or to resist at risk of arrest or immediate violence.*

*And we must remember that the authority which we concede to conduct searches and seizures without warrant may be exercised by the most unfit and ruthless officers, as well as by the fit and responsible, and resorted to in case of petty misdemeanors as well as in the case of the gravest felonies.*
*Brinegar,* 338 U.S. 182.

As such, the tension embodied in the Fourth Amendment is between the protection of individual liberty and the legitimate law enforcement interests of states, and police officers as agents of the state, to protect individuals and communities from harm and crime. Indeed, because the Fourth Amendment attaches to all individuals, and not just most or many individuals, the Constitution also recognizes the importance of ensuring that a few individuals are not consigned to give up their Fourth Amendment rights disproportionately to that of the many in exchange for the community's protection. Indeed, the cost of doing so devalues the constitutional rights that establish and protect a free society.

## The Terry Stop & Protective Pat Down Rule

In 1968, in the landmark case of *Terry v. Ohio*, 392 U.S. 1 (1968), the United States Supreme Court broke ranks with long-standing precedents which established probable cause as the Fourth Amendment benchmark against which all stops and frisks by police officers were judged. Prior to the decision in *Terry*, a police officer needed probable cause to believe that a crime had been, was, or was about to be committed before an individual

could be stopped in public or frisked for suspected weapons. *See Brinegar v. U.S.*, 338 U.S. 160, 175 (1949).

> *The rule of probable cause is a practical, nontechnical conception. In dealing with probable cause, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Probable cause exists where the facts and circumstances within the officers' knowledge and of which they have reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed. See Id.*

In *Terry*, however, the U.S. Supreme Court announced a new rule governing Fourth Amendment police conduct during an investigatory stop (hereafter "Terry stop") and protective pat down ("frisk") for weapons. A "Terry stop" complies with the Fourth Amendment if an officer conducts "a brief, investigatory stop" and "has a reasonable, articulable suspicion that criminal activity is afoot." *Id.* at 30. "Articulable" simply means that the police officer must be able to identify, using words, the facts that led to the decision to stop. "Brief" means that the detention must be temporary; but, the precise length of time for a "brief" detention depends on the "totality" of the facts and circumstances of the particular situation. *See, e.g., United States v. Hernandez*, 473 U.S. 531 (1985).[28]

Thus, in *Terry*, and for the nearly fifty years since then, a police officer's decision to detain a person without his or her consent has been deemed constitutional under the Fourth Amendment if the decision is based on a "reasonable suspicion" that the person being stopped is or has been involved in criminal activity.

---

[28]Many police agencies have adopted an informal "20-minute rule" on Terry stops. Under the 20-minute rule, if after conducting a Terry stop, probable cause to arrest is not developed, then the suspect is released. Detentions beyond 20-minutes are typically justified if the delay is caused by the actions of the suspect, such as lying to an officer who is attempting to corroborate a suspicious story (*e.g.,* subject claims to have borrowed the car from a relative, but cannot provide a complete name and address of the relative). *See* "Terry Stop Update" by Steven L. Argiriou, Senior Legal Instructor, Federal Law Enforcement Training Center (www.fletc.gov). "However, delays caused solely by police conduct (such as waiting 90 minutes for a drug detection dog to arrive from across town for a 'walk by') are usually held against the police and will not justify delaying a suspect on a Terry stop." *See, e.g., United States v. Place*, 462 U.S. 696 (1983).

Later decisions from the Supreme Court interpreting "reasonable suspicion" have clarified an important, related principle: that a "reasonable suspicion," although something less than probable cause or a "preponderance of the evidence" is more than a mere "hunch" that someone is "up to no good," without any identifiable facts to support the suspicion. *U.S. v. Sokolow,* 490 U.S. 1 (1989).[29]

The most significant difference between probable cause and reasonable suspicion is the vantage point from which the standard is applied. Specifically, probable cause is tested using an objectively reasonable person standard, whereas reasonable suspicion is tested using a reasonable police officer in the position of the officer who is making the stop or conducting the protective pat down and/or search standard, based on the totality of the circumstances confronting the police officer at the time the stop or frisk is made. *See Terry,* 392 U.S. at 21-22. Both standards, however, require that the suspicion be associated with the individual who is subject to the law enforcement action. *See Ybarra v. Illinois,* 444 U.S. 85, 91 (1979).

Since *Terry*, federal courts have also established a number of factors tending to establish a "reasonable suspicion" that justifies a Terry stop; these factors, when taken together into a "totality of the circumstances" will withstand a Fourth Amendment challenge. *See* Terry, 392 U.S. at 21-22. Such factors include, but are not limited to, a combination of the following:

- the hour of the day,
- unusual presence in a high crime area;
- unusual dress based on the area or weather;

---

[29]A "hunch" or "mere suspicion" based on a "gut" instinct, even if that instinct has been developed from years of policing experience and personal knowledge of the person being observed or area patrolled, does not justify detaining a person, even briefly and temporarily for investigation, without that person's consent, because the Fourth Amendment protects an individual's civil right to move about freely in public without governmental interference unless there is a good reason for doing so. A police officer may, however, engage a citizen in a purely voluntary conversation (*i.e*., "May I speak with you a moment? Do you need any help? How long have you been here?"), so long as the person is and feels free to end the conversation at any time and go on his or her way without restrictions. *See*, *e.g*., Argiriou, *supra* note 10.

- unusual actions;
- unusual smells (such as the "odor of marijuana") or sounds;
- personal knowledge of a suspect; and/or
- statements by a suspect and/or information from witnesses.

*Id.*

Reasonable suspicion is also the standard for assessing investigatory stops of vehicles in Illinois. *See, e.g., People v. Hackett,* __ Ill.2d __, 971 N.E.2d 1058 (July 6, 2012). Thus, violations of the Illinois Traffic Code are also routinely articulated by police officers as the basis for making an investigative stop.

To be clear, Terry stops do not describe stops based on probable cause, nor those instances where a police officer initiates the stop because observable criminal behavior gives the officer the grounds to initiate a law enforcement action. Consequently, a Terry stop is made only when the behavior observed gives the police officer a reason to suspect that the person is engaged in criminal activity.

Although being pat down can be publicly embarrassing, insulting, and personally uncomfortable, the *Terry* decision constitutionally permits police officers to frisk any person in public, at any time, if the officer can point to at least one fact, or combination of facts, which signals that the person stopped might have a weapon or access to one and poses a threat of harm to the police officer or those nearby. *See Terry,* 392 U.S. at 30. To justify the protective pat down, the facts articulated by the police officer must be sufficient to create a reasonable suspicion, which is judged by a "reasonable officer" standard.

The Reasonable Articulable Suspicion (hereinafter "RAS") for the protective pat down requires an additional level of facts from those articulated for making the investigatory stop; the protective pat down requires the police officer to articulate additional, specific facts describing the basis for the officer's suspicion that the stopped subject possesses a weapon or firearm. This means that the police officer cannot simply articulate one set of

facts justifying both the investigatory stop and the protective pat down.  Stated differently, the RAS needed to justify the investigatory stop is related to the criminal activity suspected; but, the RAS required for the protective pat down must be narrowly tailored to the danger posed by RAS that the subject of the Terry Stop is in possession of or possible possession of a weapon or firearm which could endanger the police officer or others.

Thus, in the narrative remarks section of a stop report, a police officer is required by the Fourth Amendment case law to articulate in words the particular suspicion that supports the officer's belief that the subject of the stop has a weapon or firearm.  This particular articulation is a second layer or higher level of RAS than is needed for the investigatory stop, and will presumably be based on additional facts than the RAS for the stop.

Additionally, the protective pat down rule does not authorize a search inside a stopped subject's clothing unless, by plain touch, the police officer has determined that a weapon or firearm is likely present.  Then, and only then, does the plain touch rule create *probable cause* to reach inside the outer clothing of a stopped subject to recover the suspected weapon or firearm.

## The Fourteenth Amendment

The Fourteenth Amendment gives to the citizens of each State the rights guaranteed to all individuals by the Federal Government, providing a floor for constitutional and civil rights, but not a ceiling. The Fourteenth Amendment to the U.S. Constitution states in Section I:

> *All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. See* U.S. Constitution, Amend. XIV.

The fifty states, through their own constitutions, can provide more civil rights to their citizens, but not less.  Thus, the Fourteenth Amendment is the great equalizer, granting to

all "citizens" of the United States the "equal protection of the laws," without regard to race, national origin, gender, or religion, and, namelessly, without regard to which State in the "Union" a citizen of the United States lives.

The term "investigatory" assumes that what is searched for may *or may not be* found. Yet, individuals, especially those of racial and ethnic minorities, complain that they are stopped too often for such investigations that prove to be unfounded. Accordingly, the Agreement is designed to probe whether, in fact, individuals of some communities, backgrounds, or characteristics are disproportionately affected by stop activity – including whether some individuals are more subject to stops lacking sufficient factual evidence to justify the suspicion.

If the data shows that racial and ethnic minorities are being singled out for more stop and frisk investigations than their white counterparts, then there is a legal question as to whether such frequency and/or methods for such stops and frisks have a statistically significant on those minorities. If such "significance" is found in the data, then the law, as discussed below, provides a legal remedy for violations of constitutional rights under the Fourth and Fourteenth Amendments when intentional discrimination can be shown.

The Fourth Amendment's protections, stated as prohibitions against the use of governmental power, have been extended to the States through the Fourteenth Amendment, by the U.S. Supreme Court in *Mapp v. Ohio*, 367 U.S. 643 (1961). Similarly, the standards for judging whether a search or seizure undertaken without a warrant is "unreasonable" also apply to the States through the Fourteenth Amendment. *See Kerr v. California,* 374 U.S. 23 (1963).

Claims of racial and ethnic discrimination have been made seeking to prove wide-scale discriminatory impact from police department stop and frisk policies and practices, but the federal courts generally have not permitted claims to succeed under either the Fourth or the Fourteenth Amendment based *only* on statistical evidence.

Instead, the courts require evidence of intent or discriminatory purpose to prove that a governmental institution has violated the Fourth and/or Fourteenth Amendment. The rationale for requiring evidence of intent or purpose rather than, or in addition to, statistical inference is fairly clear: intent is still the touchstone for constitutional liability upon which an inference of unconstitutional discrimination is based. *See, e.g., Washington v. Davis,* 426 U.S. 229 (1976) (statistics show disparate impact, not disparate treatment, and the equal protection guarantee is concerned only with the latter). *See also Anderson v. Cornejo,* 355 F.3d 1021, 1023-24 (7th Cir. 2004) (statistical evidence establishing disparate racial impact from application of policy not enough to establish equal protection violation without evidence that policy was intended to discriminate).[30] *See also Chavez v. Illinois State Police,* 251 F.3d 612 (7th Cir. 2001) (rejecting a claim that a statistical disparity in traffic stops is enough, by itself, to establish racial profiling).

Discriminatory intent or purpose, as required by the Fourteenth Amendment for individual cases of discrimination alleging disparate treatment, continues to be required by federal courts as the primary evidence of discriminatory purpose by a governmental entity. Such intention and purpose still must be grounded in more than statistical inferences showing correlations, rather than causation. If institutional intent and purpose is not expressed in the wording of governmental legislation or policies, then such evidence must be clearly apparent in the application of governmental policies in practice. *See generally Anderson,* 355 F.3d at 1024.

## The Illinois Civil Rights Act of 2003

As indicated, the doctrine of federalism permits the fifty states to create laws for their own citizens which have the effect of granting more individual rights than the U.S. Constitution.

---

[30]African-American women with United States citizenship, who allegedly were subjected to non-routine searches by employees of the United States Customs Service at the airport following their arrival on international flights, brought a "Bivens Action" against the United States, the Customs Service, and approximately 70 current or former Customs employees, asserting that the searches violated the equal protection component of the Fifth Amendment's due process clause because they were based on their race and sex.

The rule is that states may create more rights for their citizens; they simply cannot legislate anything less than the federal government provides under the U.S. Constitution. Illinois law apparently has created more rights than the Fourth and Fourteenth Amendments under the Illinois Civil Rights Act of 2003 ("ICRA"), by prohibiting state governments from using its power in a way that has a "discriminatory effect" on any person based on their race, color, or national origin.

ICRA, 740 ILCS 23/5 (2003, states, in relevant part,

> *Section 5.  Discrimination prohibited.*
> *(a)      No unit of State, county, or local government in Illinois shall:*
> *(1)  exclude a person from participation in, deny a person the benefits of, or subject a person to discrimination under any program or activity on the grounds of that person's race, color, or national origin; or*
> *(2)  utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, or national origin.*

The existence of ICRA is legally significant to the stop and frisk analysis in this report, because it permits an assessment of whether CPD's municipal policies and practices have a disparate impact based on race or ethnicity, without any concerns about whether there is evidence of intentional discrimination or purpose at an institutional level.  In this way, the Consultant and the experts are permitted to focus on the "effects" of the CPD's police practices, without concern about the intent requirements under federal case law.

To achieve substantial compliance under ICRA, for example, the CPD's data will need to show that the stops and frisks being made by CPD police officers do not have a disparate impact on racial and/or ethnic groups; and that racial and or ethnic discrimination is not reflected by a disproportionate number of unlawful stops and frisks of racial and ethnic minorities.

If the results of that assessment and analysis show that a racial or ethnic disparity exists, then the Consultant is required to find and report that the CPD is not substantially in compliance with applicable laws and report this fact to the public, making

recommendations to the CPD and the parties regarding how to achieve such compliance. Once the CPD is found to be in substantial compliance for two consecutive reporting periods, the Agreement and its terms will have been satisfied and the CPD will be released from its obligations thereunder.

# Historical Background

## The ACLU's Stop & Frisk Advocacy

For several years prior to the signing of the Agreement, the long-time and revered former Legal Director of the ACLU of Illinois, Harvey Grossman, advocated for a change to the CPD's sidewalk stop and frisk policies and practices. For example, in a letter dated January 15, 2013, addressed to the Mayor of Chicago, the City's Corporation Counsel and the CPD's Superintendent of Police, Mr. Grossman argued that the "need for stop and frisk monitoring" had become a constitutional imperative in the City of Chicago based on Fourth Amendment "civil liberties concerns[,]" because sidewalk stops and frisks, "as with all police practices that rest largely on officer discretion" create "a great danger of bias, conscious or otherwise, resulting in racial disparity in who is stopped and frisked." *See, e.g.,* Exhibit 5 (Letter from H. Grossman/ACLU to City, dated Jan. 15, 2013).

To guard against the danger of biased policing during sidewalk stops and frisks, the ACLU urged the City and CPD to adopt "the best practice in contemporary law enforcement" by mandating: (1) officer documentation of all sidewalk stops and frisks; (2) supervisory review of that documentation, including whether there was reasonable suspicion for the stop; (3) a database of all stop and frisk documentation which could automatically identify patterns raising civil liberties concerns; and (4) disclosure of this data to the public, subject to appropriate redactions. *See* Exhibit 5, at 3. "Such monitoring policies" wrote the ACLU, "can advance efficient department management of officers, government accountability and transparency, and public trust in and cooperation with law enforcement." *Id.*

In response to these letters, as well as other factors, the CPD began to revise its stop and frisk policy over the course of 2014, most notably by eliminating police officer reports of Civilian Encounters (*i.e.,* consensual stops involving mere conversation rather than investigation).

However, the ACLU's continued review of CPD's sidewalk stops during the summer of 2014 continued to raise concerns about the constitutionality of CPD's stop and frisk practices under the Fourth and Fourteenth Amendments to the U.S. Constitution, as well as the Illinois Constitution and Illinois Civil Rights Act of 2003. This review led to the "Stop & Frisk in Chicago" report by the ACLU, issued in March 2015, which in turn provided the genesis for this Agreement.

## *The ACLU's March 2015 Stop & Frisk Report[31]*

In its March 2015 report, the ACLU alleged that the CPD's stop and frisk policies and practices were racially discriminatory and offered a statistical impact study as evidence of its claims. Based on the following claims and assertions, and the ACLU's notice to the City that it intended to file a lawsuit challenging CPD's policies and practices, the parties began the negotiations that led to the Agreement, which was finalized on August 6, 2015.

- **More than 250,000 investigatory stops that did not lead to an arrest were made in Chicago during the Summer of 2014** (*i.e.*, May 1-August 31, 2014). *See* ACLU Report, p.2, 10.[32]

---

[31]The Consultant wishes to make clear that he is referencing this report for the limited purpose of putting into context the factors that led to the parties' negotiations that culminated in the Agreement. The assertions in the report, including the numbers and percentages cited therein, have not been verified by the Consultant nor are they relevant to the Consultant's deliberations herein. The Consultant's report and recommendations are based solely on the documents submitted by the CPD to the Consultant and the experts, and the reasonable interpretations of those documents, with the assistance of the experts. The assertions and views expressed in the March, 2015 report by the ACLU do not necessarily reflect the views of the Consultant and should not be interpreted as such.

[32]Comparing the total number of stops made (250,000+) to the estimated total number of people living in Chicago (2,684,481), the ACLU estimated that, "Chicagoans were stopped more than four times as often as those who lived in New York City," with an estimated population of 8,405,837, during a similar investigation in 2011. *See* ACLU Rpt., at n.5.

- **African-Americans were "disproportionately subjected to stops when compared to their white counterparts"**. Black Chicagoans were subjected to 72% of all stops, yet constitute[d] just 32% of the city's total population." *See Id*., p. 8, and n.12 (not including "dispersal" stops).

- **The City's recordkeeping practices were factually inadequate and its oversight procedures legally insufficient**. Specifically, "Chicago's data collection and oversight of stop and frisks" was: (1) "out of step" with other major U.S. cities and increasingly did not conform to the "best practices" for police policy and procedure, outlined by the United States Department of Justice; and (2) insufficient to "reflect[] the full picture of what is happening on the streets of Chicago" because the CPD did not maintain "a single database of all stops" made by police officers (*i.e.*, contact cards did not record stops leading to arrests or other enforcement actions) and no database existed which contained a record of frisks. *See Id*., p.13.

- **The reasons given by police officers for making investigatory stops were either unlawful or insufficient to justify the stop**. ACLU review of the narrative remarks section of the contact cards indicates that a large percentage of stops made of racial and ethnic minorities were not justified by reasonable suspicion in violation of the Fourth Amendment to the U.S. Constitution, or failed to provide enough information to justify the stop. *Id*., p. 6-8.

- **Inadequate recordkeeping policies and procedures prevented adequate supervision of police officers**. Without records of all investigatory stops and protective pat downs, including those leading to an enforcement action such as an arrest, CPD supervisors did not and could not assess the legality of police conduct by individual officers for purposes of internal accountability or public disclosure. *Id*., p. 14-15.

- **Failure to record protective pat down data precluded counts for weapon recovery from suspects stopped by police officers.** CPD's failure to require police officers to record when and how they performed a protective pat down pursuant to an investigatory stop meant that CPD had no records of how many weapons were recovered. *Id*., p. 15.

- **Determining whether officers are engaged in biased policing requires an adequate recordkeeping system.** The CPD's inadequate recordkeeping system created a "barrier to determining whether officers are engaged in biased policing." *Id*., p. 12.

- **The CPD's history of unconstitutional stops and frisks has damaged the community relationship** between police officers and the communities they have sworn to serve and protect, making that mission harder to fulfill. *Id*., p. 11-12.

## The Impact of the Illinois Pedestrian and Traffic Stop Statistical Study Act of 2003, 625 ILCS 5/11-212 (2003)

In March 2015, when the ACLU released its report, the Illinois General Assembly began debate on Senate Bill 1304, which proposed amendments to the Illinois Pedestrian and Traffic Stop Statistical Study Act of 2003, 625 ILCS 5/11-212 (2003), which has the stated purpose to "deter and detect any bias-based policing."  The stated purpose of SB 1304 was similar, in that it intended, among other things, to add the requirement that state and local law enforcement agencies begin to collect and document information related to all street stops made of *pedestrians* (as well as traffic stops) which resulted in "frisks, searches, summons and arrests."[33]  On August 12, 2015, the Governor of Illinois signed Senate Bill 1304 into law as Public Act 099-0352, known popularly as the "Police and Community Relations Improvement Act," and codified at 540 ILCS 727/1 *et. seq.* (the "Act" or "new Illinois law").

This Act amended several Illinois statutes concerning local police operations and procedures, including Section 11-212 of the Illinois Vehicle Code, 625 ILCS 5/11-212 ("Illinois Traffic Statistical Study Act") and Section 107-14(b) of the Code of Criminal Procedure, 725 ILCS 5/107-14(b).  The new Illinois law also adds the requirement that police officers issue a stop receipt for pedestrians who are frisked and searched as part of all investigatory stops.

Like the Agreement, the Act took effect on January 1, 2016.  Thus, *the CPD's reform efforts, during the interim period between August 2015 and January 1, 2016, were directed toward compliance with both the terms of the Agreement and Illinois law*.  With respect to pedestrian stops and frisks, the terms of the Agreement are mirrored, in large part, by Illinois law. There are two significant differences between the Agreement and Illinois law, however, but only one of them is relevant to the analysis in this report.

---

[33]The amendment expressly states that there is no requirement to collect data for a pedestrian stop that does not include a "frisk, search, summons or arrest."

The first difference is that Illinois law adds the requirement that CPD provide "stop receipts" or investigatory stop receipt forms to persons whom police officers frisk in public, without regard to whether the person stopped is a pedestrian or the driver of a vehicle. A frisk, under Illinois law, requires the police officer to issue an investigatory stop receipt containing information regarding the reason for the stop, as well as the police officer's name and badge number. This difference will not be analyzed in the Consultant's report, because the issuance of a receipt for frisks is not a term negotiated by the parties to the Agreement.

The second difference between the Act and the Agreement is that the Agreement maintains the requirement that the CPD report and document *all* investigatory stops and *all* protective pat downs and/or related searches; whereas, there is no requirement under the Act to collect data for a pedestrian stop that does not include a frisk, search, summons, or arrest. In other words, the Agreement holds the CPD accountable for reporting and recording data of all investigatory stops, even if they do not lead to a protective pat down, search, arrest or other enforcement action. Reporting multiple types of investigatory stop practice is new for the CPD officers, not only because the form on which the stop is reported has changed, but also because it expands the kinds and number of stops police officers must document and report. One would expect the number of stop events to rise, not fall, but that did not happen during the first six months of 2016. Indeed, the number of investigatory stops declined precipitously. That issue will be addressed later in this report.

This second difference is relevant to the investigatory stop count data and thus the statistical analysis in this case. By requiring the CPD to keep records of investigatory stops that do not lead to enforcement actions, the Agreement ensures that the number of stops reported to the Consultant for consideration are higher for statistical assessment and analysis than the numbers that CPD will report to the State of Illinois for its statistical studies. This stop count difference will, in turn, affect the statistical ratios and analysis of the stop counts with regard to any "disparate impact" results from the data, regardless of whether one is looking for a racial, ethnic or gender impact.

70

Beyond numbers, however, there is a legal and social policy implication at the heart of this difference.  In Chicago, the ACLU wants to know whether the numbers reflect biased policing when stops and frisks are made.  In Illinois, by focusing on data that collects information about post-stop enforcement outcomes, the state can more readily assess whether the number of stops and frisks made have any correlation to the number of arrests and other enforcement actions made.  By measuring crime rate statistics with stop and frisk statistics, the State of Illinois apparently hopes to gain some empirical data about whether stops and frisks have any statistically significant impact on crime rates. The important difference between the Agreement and the Act is that, whereas Illinois may be able to collect empirical data to answer the latter question, the Agreement permits the Consultant to collect data from the CPD which answers both the disparate impact question for individuals as well as the general deterrence impact of stops and frisks on crime rates.

# The Agreement

The Agreement's terms, which are relevant to the discussion in the remainder of this report are paraphrased as follows:

> **Section I.  Data Collection.** "CPD will document all investigatory stops and all protective pat downs, including those that lead to an arrest, an Administrative Notice of Violation ("ANOV"), or other enforcement action, into an electronic digitized database."
>
> Police officers are required to include the following information on every stop and frisk report:
> - the name and badge number of the officers who conducted the investigatory stop and/or protective pat down;
> - the race and gender of the person stopped (as subjectively observed);
> - all factual reasons for the stop;
> - the location (including the address, beat, and district), date and time of the stop;
> - whether a pat down or other search was conducted; whether there was consent for the same or whether the pat down and search were conducted "by other means";

- whether contraband was found as a result of the pat down or search, and, if so, the type and amount of contraband seized;[34] and,
- the enforcement outcome of the stop, including "a record of the violations, offenses, or crimes alleged or charged." (emphasis added).

**Section II. Training and Supervision.** All training and supervision policies and procedures are to be in writing and provided to the Consultant and ACLU for their review and comment, prior to their finalization.

All CPD officers must receive training in best police practices for making Fourth Amendment investigatory stops and frisks, as well as how to record and submit all information relevant to those stops and frisks, pursuant to the CPD's revised stop and frisk policy, Special Order S04-13-09.[35]

The parties intended for Special Order S04-13-09 to take effect on January 1, 2016.

S04-13-09 provides for:

- "continuous district-level supervisory review" to determine whether the ISRs submitted by individual police officers "state legal grounds for the investigatory stop and/or any protective pat down"; and,

- "quarterly or semi-annual department-level audits of CPD's investigatory stop and protective pat down practices", which shall include:

- CPD documentation of civilian and internal complaints relating to investigatory stops and/or protective pat downs;

- narrative sections of a statistically representative sample of individual ISRs;

- records of supervisory corrections or rejections of ISRs to identify officers who repeatedly fail to document investigatory stops and/or protective pat downs, or who conduct investigatory stops and/or protective pat downs without the requisite reasonable suspicion;

---

[34]The Consultant notes that the parties did not use the terms "weapon or firearms" in Section I of the Agreement to delineate that the legal justification for a protective pat down is based on independent facts beyond those justifying the investigatory stop, which provide reasonable suspicion that the stopped subject possesses or has access to weapons or firearms creating a threat to officer safety or nearby persons. The term "contraband" can be construed to include weapons and firearms, but it is typically used to refer only to drugs or narcotics. The Consultant does not interpret the Agreement to limit the documentation requirements in Section I to confiscation of contraband to the exclusion of weapons or firearms, because the remaining provisions of the Agreement adopt the CPD's Special Order S04-13-09, which properly limits protective pat downs to frisks for weapons or firearms, even if by plain touch an officer develops probable cause to search the subject for concealed contraband.

[35] The terms of the Agreement required such training to be completed for all CPD officers and supervisors by March 1, 2016. The CPD did not satisfy this deadline, instead completing training on May 27, 2016. The ACLU agreed to all delays to training; thus, there are no failure to comply issues with respect to the later completion date for training.

- Establish written documentation and procedures for re-training, enhanced supervision, or discipline for officers who "engage in unlawful investigatory stops and/or protective pat downs or who violate CPD policies or procedure governing these practices.

* * *

**Section IV. Compliance with the United State and Illinois Constitutions and ICRA.**

All reported investigatory stops and protective pat downs must fully comply with the United States Constitution, the Illinois Constitution, and ICRA,[36] but for purposes of the Agreement, if the CPD's stop and frisk policies and practices substantially comply with the terms of the Agreement, then the CPD is released from its obligations under it. The Consultant must make these substantial compliance determinations and report progress made toward and satisfaction of them in reports issued to the parties and the public on a bi-annual basis.

**Section V. The Consultant.** The Agreement defines the Consultant's duties as:

- reviewing of the CPD's use of stop and frisk policies and practices, which includes supervisory review and auditing procedures put into place as a result of the Agreement for the purpose of police officer accountability to applicable laws;

- recommending changes to CPD's policies, practices and orders to ensure compliance with the United States and Illinois Constitutions and the Illinois Civil Rights Act ("ICRA");

- reviewing any documents necessary to assess the CPD's program of stop and frisk, including civilian complaints and disciplinary files, as well as observing community and police interactions;

- reviewing on a semi-annual basis a statistically representative sample of the narratives of stops to assess whether they establish reasonable suspicion, and review data to determine whether there is a disparate impact on ethnic and racial minorities and/or women from the CPD's policies and practices;

- publishing written reports and recommendations on a semi-annual basis to the parties and the public with assessment of the legal and statistical compliance issues related to whether the CPD has substantially complied with the Agreement.

---

[36] The new Illinois law, P.A. 99-352, does not apply to this Agreement, except insofar as it contains similar reporting requirements to those enumerated by the Agreement.

*See* Agreement, Exhibit 1.

## Two Core Purposes of the Agreement

In the Fourth Preamble of the Agreement, the parties have "agreed to work together to ensure and validate that CPD's policies and practices relating to investigatory stops and protective pat downs (hereinafter "CPD's stop and frisk policies and practices") fully comply with applicable law." *See, e.g.,* Agreement, Fourth Preamble.  The laws expressly identified as applicable to the CPD's stop and frisk policies and practices include the U.S. and Illinois Constitutions and the Illinois Civil Rights Act of 2003, 740 ILCS 23/5 (2003)), as well as the following guidance, provided by the U.S. Department of Justice:

> *In making routine or spontaneous law enforcement decisions, such as ordinary sidewalk and traffic stops, Chicago Police Department officers may not use race, ethnicity, national origin, religion, gender, gender identity, sexual orientation, marital status, parental status, or military discharge status, except that officers may rely on the listed characteristics in a specific suspect description.*

*See, e.g.,* Agreement, II.2; IV.  Ensuring and validating that CPD's stop and frisk policies and practices substantially comply with all applicable laws is the first core purpose of the Agreement.  See Agreement, IV.

The second purpose expressed involves the parties' mutual intention (both when the Agreement was signed and now) for CPD to substantially comply with all terms to the Agreement, which involve not only the legal obligations at the heart of the Agreement, but also the CPD's internal reform efforts related to accountability and transparency.  To this end, the Agreement requires the CPD to:

- Revise its General Orders and directives (SO4-13-09), to require police officer documentation of all investigatory stops and frisks, including those that lead to an arrest, an Administrative Notice of Violation ("ANOV"), or other enforcement action, into an electronic digitized database. Agreement, I.1 (itemizing specific factual data to collect and maintain at I.1. (a)-(l).

- Provide training for officers and supervisors directed at ensuring that investigatory stops are conducted only where there is reasonable suspicion of criminal conduct and that protective pat downs are performed only where there is reasonable suspicion that the person stopped is armed and dangerous.

- Provide new classroom and electronic (e-module) training (with enhanced training through roll-calls and other additional methods) with respect to the electronic, digitized database required for all stop and frisk documentation required by the terms of the Agreement in Section I.1, as well as the new amendments to Illinois law, namely P.A. 99-352 (formerly SB 1304).

- Issue new or revised General orders and/or other directives, where appropriate, by December 31, 2015, to comply with the January 1, 2016 effective date of the new Illinois law and the Agreement.

- To complete classroom training of its officers and supervisors with respect to these new or revised General Orders and/or other directives, by March 1, 2016.

- To allow the ACLU, together with the appointed Consultant and experts, access to certain data regarding the CPD's stop and frisk policies and practices, for the purpose of (a) compliance determinations (set forth in detail) with the terms of the agreement, as well as all applicable laws, to be made independently by the Consultant, with input from appointed subject-matter experts (statisticians and police practices experts), as well as consideration of the parties respective views and written submissions, after review of all relevant data; and (b) transparency with the public regarding the above by means of the Consultant's semi-annual report and recommendations to the parties.

In short, the Agreement requires the Consultant to make findings with respect to: (1) Substantial Compliance with the terms of the Agreement; and (2) Substantial Compliance with all applicable laws, primarily ICRA, before the City and CPD – despite never making an admission of legal liability -- is released from its accountability obligations under the Agreement to the ACLU. The Consultant will address the compliance obligations with regard to the terms of the Agreement, first, and applicable law, second.

# Substantial Compliance with the Agreement

In Section IV.2 of the Agreement, the parties require "substantial compliance" with the "requirements" of "this agreement" and indicate that substantial compliance occurs so long as "any violations of its requirements are neither systemic nor serious." This provision further states, "[i]f a serious violation occurs CPD shall be in substantial compliance if it promptly identifies the violation and develops and implements a timely and appropriate remedy that results in compliance." Agreement, IV.2.

The Consultant interprets Section IV.2. as the benchmark provision for determining whether the CPD is or is not in "substantial compliance" with the Agreement. According to the plain meaning of this provision, the CPD is not in substantial compliance with the Agreement if: (1) a serious or systemic violation occurs; (2) it fails to promptly identify the violation; (3) it does not develop or implement a "timely" and "appropriate remedy"; that (4) "results in compliance." In other words, the CPD is presumed to be in substantial compliance with the Agreement unless the facts demonstrate that a serious or systemic violation has not been "promptly identified" by the CPD and, if identified, addressed by development or implementation of a "timely" and "appropriate remedy."

## The "Versioning" System Problem

Although certainly unanticipated, the Consultant identified a "serious" violation of the Agreement in late March 2016 and brought it to the CPD's attention. At that point, because the violation was identified by the Consultant, the presumption of substantial compliance for the CPD disappeared. To the CPD's credit, once the violation was identified, it began the development and implementation of a new ISS database, known to the parties as the "Versioning System." This new system represents an "appropriate remedy" that the Consultant anticipates will at least improve the CPD's chances of achieving substantial compliance for the Second Reporting Period (July 1, 2016 – Dec. 31, 2016).

Despite the CPD's good faith efforts and a willingness to resolve the issue once it was brought to its attention, the new system was not developed or implemented in a "timely" manner. The failure to satisfy the timeliness requirement of Section IV.2 was not intentional; it was unavoidable, given the time constraints placed on the CPD toward the end of the First Reporting Period, when the DOJ investigation was also in full-swing, which required exceptional expenditures of CPD "member-power" to address. Unfortunately, the redesigned ISS database could not be implemented until July 1, 2016, after the ISR data for the first six months of 2016 had been produced to the Consultant for substantial compliance review.

In early 2016, the Consultant (rather than the CPD, itself) identified a violation of the requirement in Section I.1 of the Agreement, which requires the CPD to "document all investigatory stops and all protective pat downs, including those that lead to an arrest, an Administrative Notice of Violation ("ANOV"), or other enforcement action, into an electronic digitized database." (*Id.,* emphasis added). Additional provisions in the Agreement, such as Section III.1. and III.6., also were violated in a "serious" way. Although "serious," the consultant has no reason to believe that these violations were intentional for two reasons.

The CPD did, in fact, document all stops and frisks and submit them "into an electronic digitized database" [onto ISRs]. The violation stemmed not from a refusal to comply with the literal requirement in Section I.1 of the Agreement, but apparently from the CPD's initial failure to understand the type of data the Agreement required the Consultant to have in order to be able to satisfy the duties assigned to him by Section V of the Agreement. For example, the original ISR documentation, submitted by street patrol officers, regarding their street stops and frisks, appeared to be missing because most of the monthly ISR data produced to the Consultant for review included only the "approved" versions of the ISRs.

The Consultant learned, after bringing this matter to the CPD's attention, that, in fact, this observation was partly correct, because the CPD's original design of the ISS database, set into motion on January 1, 2016, to archive the data required by the Agreement, only

archived the last "version" of any given ISR. This meant that for ISRs which were in the process of being reviewed, but not yet "finalized" by the supervisor, the original ISRs were accessible and produced to the Consultant. Those ISRs had a "status" code of "PRE." However, for ISRs which had been reviewed by supervisors, the finalized versions of those ISRs invariably appeared with the code "APR" for "Approved." The "approved" code, however, did not mean, during the first reporting period, that the ISR was perfect as submitted; rather, the APR code meant that the supervisor had finalized the ISR review and "approved" that version for archiving. (Exhibit 8).

The problem with this system was that it did not permit the Consultant to access or assess either the originally submitted ISR from the street patrol officer, prior to supervisory review, nor did it permit the Consultant to see the "process" or "versions" of the ISR prior to final approval for the archived data. The failure to foresee and plan to produce all versions of every ISR was, in the Consultant's view, a "serious" violation of Section 1.1 of the Agreement, as the term "serious" is intended to be interpreted; it is also a violation, the Consultant believes, of Section III.1 and III.6, given the duties assigned to the Consultant in Section V.

To the CPD's credit, once apprised of the Consultant's concerns and need for the various versions of the ISRs, an intentional and systematic effort was made to reconfigure and redesign the ISS Database to remedy the identified issues. The CPD also attempted to capture and reconstruct the missing ISR versions for the Consultant's review. These remedial efforts began immediately after the Consultant met with members of the CPD and the City's legal counsel in April, 2016 and were ongoing through early August, 2016, when the City and CPD announced that a new "versioning" database was in place as of July 1, 2016, for the second reporting period, and that it had "reconstructed" 2,527 ISRs from the first reporting period, which had been modified during supervisory review. At that time, the CPD was unable to give assurances, with any degree of certainty, that those ISRs represented all of the ISRs that were not approved upon their initial submission or that they contained all of the information required by the Agreement.

Recently, in response to the Consultant's expressed concerns about the accuracy of the reconstructed ISRs, Deputy Chief Jonathan Lewin, who oversees all aspects of technology for the CPD, submitted an affidavit, dated February 21, 2017, in which he described the reconstruction process and pursuant to which he discovered 2,662 IRSs (135 more than were discovered during the first reconstruction) that were not approved by supervisors upon their initial submission.  This is out of a total of 54,701 ISRs submitted to supervisors by officers.  With all due respect to Deputy Chief Lewin and Officer Joseph Candella, of his staff, both of whom worked extremely hard and cooperatively in providing thousands of documents to the Consultant for review over the entire period covered by this report, the contents of the ISRs, not just their numbers, constitute the most important barometer of the performance of both the officers and the supervisors.

*Second,* to the CPD's credit, once the Consultant identified this "serious" violation, the CPD did, in fact, "develop[] and implement[] a timely and appropriate remedy that result[ed] in compliance" with Sections 1.1, and III.1. and 6., of the Agreement.  However, this remedy, which involved reconfiguration of the ISS Database to include all "versions" of the ISRs, could not be completed before the end of the first reporting period, by June 30, 2016.

## Reconstruction Efforts

Although the CPD endeavored in good faith to reconstruct the earlier versions of each ISR submitted for the first reporting period, the CPD initially was unable to vouch for the accuracy of the reconstruction effort. The reason for this inability is because the CPD had not designed the ISS database to archive the original ISR data once a new version of the ISR was created.  Thus, for all ISRs where a supervisor directed a police officer to modify the original report, only the final version of the ISR, which the supervisor approved and finalized, was accessible.  These finalized ISRs were the data produced to the Consultant for review; not the original, unmodified versions.

Despite the delay in the reconstruction efforts, the Consultant would have taken additional time to review the reconstructed data if the CPD had been able to unequivocally ensure that the reconstructed ISRs represented every modified ISR and every version of that ISR during the first reporting period. To their credit, the CPD officials making the representations to the Consultant in August, 2016 honestly admitted that those assurances could not be made with absolute certainty, because the original database was not designed to archive ISR data which had been modified by subsequent review by a supervisor. A lack of storage space in the originally configured ISS database was cited as one reason for the original design.

## *The Investigatory Stop System*

The "Investigatory Stop System" ("ISS") represents a categorical shift in the types of stops being recorded and reported. The CPD designed the ISS in direct response to the heightened reporting requirements set forth in the Agreement, as well as the Agreement's call for the establishment and implementation of revised General Orders and directives necessary to bring CPD's stop and frisk police policies and practices into substantial compliance with all applicable laws and to reflect the "best police practices" in the criminal law enforcement field.

### CPD's Stop & Frisk Policy (Special Order S04-13-09)

As required by Section II of the Agreement, the CPD issued Special Order 04-13-09 ("S04-13-09") to establish its new stop and frisk policy and introduce the Investigatory Stop System.[37] S04-13-09 included new directives and forms, as well as newly designed training in nationally

---

[37]From time to time, S04-13-09 is revised to incorporate the Department's change in policy, as well as additions or deletions to it. A series of revisions have taken place since the Agreement was signed, all of which have been authorized by the parties and approved by the Consultant. Unless noted in this report, these revisions are not significant for purposes of the analysis. The various revisions to SO4-13-09, however, can be found in Exhibit 4.

recognized best practices for stop and frisk policing, consistent with "the following guidance provided by the U.S. Department of Justice ("DOJ"):

> *In making routine or spontaneous law enforcement decisions, such as ordinary sidewalk stops, Chicago Police Department officers may not use race, ethnicity, national origin, religion, gender, gender identity, sexual orientation, marital status, parental status, or military discharge status, except that officers may rely on the listed characteristics in a specific suspect description."*

> *See* Agreement, II.2, Exhibit 1.

The DOJ's policy statement is reflected in the three goals outlined by the CPD in S04-13-09. These three goals can be summarized as: (1) prohibiting biased policing, in general, and racial profiling, in particular; (2) strengthening "the police-community relationship" by ensuring legitimacy and procedural justice when conducting stops and frisks; and (3) safeguarding both individual liberties and public safety.

## The Contact Information System Is Replaced

The Investigatory Stop System replaces the former "Contact Information System," ("CIS"). Prior to January 1, 2016, the CPD's data on Terry stops and frisks was limited to the information police officers recorded on "contact cards" which were stored in the "Contact Information System." An exemplar of a contact card is attached to this report as Exhibit 3. Police officers used the contact cards only when they made a Terry stop that did not result in any post-stop outcome, such as a protective pat down for weapons, a search pursuant to that pat down and/or any other enforcement action, such as an ANOV, ticket or arrest. In other words, Chicago police officers used contact cards to record basic vital information about the persons they stopped, and then released, without taking any further investigatory or enforcement actions.

## A Digitized, Electronic Reporting System

The Agreement ushered in the ISS, which made the CIS and contact cards obsolete. The ISS not only changed the types of stops Chicago police officers are now required to report and

document, but also how those stops are documented, and how those documented reports are reviewed, assessed, and maintained by the CPD.  To implement the changes to Special Order 04-13-09, CPD issued a number of new "forms" or data instruments to capture information about the stops themselves and the post-incident review by supervisors.[38] These new reports include the Investigatory Stop Report ("ISR"); the Investigatory Stop Report Deficiency Notification; and the Investigatory Stop Report Oversight Observation Report.  The CPD also issued an Investigatory Stop Pocket Guide and an Investigatory Stop Report Flow Chart.  *See* Exhibit 8.

The ISR Flow Chart describes the path an ISR takes from the time a police officer submits it, through the supervisory review process, to the time when it is approved or rejected. *See* Exhibit 8.

In addition to this flow chart, the CPD has created a written outline, which describes the path of supervisory review of an ISR once it is submitted by the police officer to the point where it is finalized or "approved" and/or rejected as deficient because it fails to comply with applicable law, including CPD policy as described in S04-13-09.  To summarize the processes illustrated in Figure 2, however, the Consultant offers the following description of how the ISS works and the ISR's role within it. *See* Exhibit 8.

This outline and flow chart are practical tools for officers and community members to see how the ISS Database and CPD stop and frisk policy is designed to ensure that the use of stop and frisk tactics by individual officers, as well as the entire CPD, is transparent and monitored for compliance with applicable laws.

---

[38]The only paper form now generally in use is the Investigatory Stop Receipt for protective pat downs. However, the receipt is not required by the Agreement, but by the Act, pursuant to the new Illinois law.  The receipt is given to the subject of a pat down (whether protective or administrative) by the police officer, unless there is an arrest.  However, the Consultant is not required by the Agreement to assess this police practice; and, no more will be said on this point.

## The ISR system

The ISR currently in use by the CPD ("ISR II") functions as the single most important source of information in the ISS system for tracking the quantitative and qualitative stop and frisk practices of its police officers. *See* ISR II, Exhibit 12.  The ISR is where police officers record the data required by the Agreement and Illinois law, namely: (1) the subject's gender and race; (2) the reasons for the stop; (3) the date, time and location of the stop; (4) whether or not a pat-down or frisk was performed and if so, the reasons for the pat-down or frisk and whether the subject granted consent; (5) whether contraband was found; (6) whether other searches were conducted, with or without consent; (6) the disposition of the stop; (7) and any violations, offenses or crimes charged as a result of the stop.

The Illinois Act requires data to be recorded on a "uniform pedestrian stop card"; however, the CPD has designed the ISR in such a way as to comply with both Illinois law and the Agreement.

ISR II has undergone a change since the Agreement's effective date. The first version of the ISR ("ISR I"), which was implemented with the Agreement, was utilized for the first two months of 2016.  *See* Exhibit 4B. ISR I made use of three narrative remarks sections for police officers to describe the RAS supporting the stop, the additional RAS to support the protective pat down, and the probable cause, if any, to search the subject for a weapon or firearm detected by plain touch during the frisk.  In this way, the original ISR mirrored the law and cued police officers that additional facts were necessary to satisfy each successively more intrusive action after the stop.

The three narrative remarks sections were suggested by the police practices expert and included by the parties as a way to help police officers mindfully report the separately required factual basis to establish a reasonable suspicion for the Terry stop from the protective pat-down, and if conducted, the search, based on probable cause.  In other

words, with each increasing level of restraint on personal liberty, the law, as indicated, requires a separate justification for the restraint; thus, the ISR Form included separate sections for these factual justifications to be articulated.

Unfortunately, investigatory stop numbers began to drop precipitously immediately after January 1, 2016, and officers blamed the length and details required by the ISR as part of the reason for these decreased numbers (despite a rapid rise in the violent crime rate). Based on police officers' assertions that ISR I, with its three narrative remarks sections, required a burdensome length of time to complete, and was responsible for the drop in the number of stops being made during the first two months of 2016, the City and CPD requested that the ACLU agree to revise ISR I to include only one narrative remarks section, with addition of checkboxes to make clear to officers that a protective pat down and search incidental to it required additional facts to be justified. The City and CPD's position was that one narrative remarks section was sufficient to indicate the factual basis for RAS with regard to the stop, pat down and search; whereas, three blank sections made the ISR too lengthy to complete.

The ACLU agreed to revise ISR I, with modifications to the checkboxes, so the Consultant approved it and ISR II, with the single narrative remarks section became effective on March 1, 2016. ISR II has been in use since that time. *See* Exhibit 11.

For reasons that are more apparent at this juncture, than they were on March 1, 2016, the Consultant believes that approval of the parties' agreement to implement ISR II, rather than ISR I, with deletion of the additional two narrative remarks sections, should have been delayed until after review of the first reporting period data. Upon review of the ISR sample narratives, the Consultant found that many police officers failed to articulate the separate, particular facts necessary to justify a protective pat down and then again the facts establishing probable cause for the incidental search from the first articulation of facts articulated to support the investigatory stop.

The three narrative sections were intended to cue and discipline the officers in how to report the requisite facts necessary to articulate RAS; and, the Consultant respectfully disagrees that the separate sections were impractical, either facially or in practice. The ISR is an electronic, pre-populated screen which accepts digital inputs and moves quickly from field to field. It is not a manual paper form. Thus, the idea that the three narrative sections made the ISR "two-pages" rather than one mischaracterizes how police officers are asked to input information.

The Consultant believes, contrary to officers' perceptions, that the problem with the ISRs using three rather than one narrative remarks sections is (and was) that officers were not comfortable with separately articulating justifications for each stage of the interaction, even though that is what is legally required. Thus, when the City and CPD asserted that officers felt as if they were repeating the same information in each narrative remarks section, the message was that the officers only had one set of facts to offer, even in cases requiring particularized facts for each stage of the intrusion on the stopped individual's liberty. The same information cannot possibly perfectly justify a stop, a frisk, and a search in every situation. Thus, by removing the additional narrative remarks section, the parties essentially made the police officers' legal burden to establish RAS, from the Consultant's point of view, even harder, because it placed upon the officers the responsibility to articulate clearly, in writing, the separate facts for the stop, the pat down and the search in a single narrative; rather than being able to jot down a few facts in each section to support the pat down and/or the search separately from the investigatory stop.

Chicago police officers now use the Investigatory Stop System ("ISS") to record the "who, what, when, where and how" facts from every stop and/or frisk made of both vehicles and pedestrians. An outline, provided by the CPD, reflecting the step by step process used by the CPD for reporting stops and frisks and incidental searches, as well as the submission and supervisory review process for each ISR, appears at Exhibit 8. A flow chart illustrating that process appears at Exhibit 8.

## Police Training

The City and CPD presented proposed final written training materials to the Consultant, his experts and the ACLU on December 16, 2016, but after deliberation and discussion, the Consultant agreed to allow the ACLU and the police practices expert to recommend further revisions to the written training materials. The recommended changes were circulated, adopted by the CPD, and circulated to the Consultant, experts and ACLU for final approval. The Consultant approved these written training materials. Classroom training began on January 18, 2016.

The Consultant, along with the police practices expert, Mr. Barge, and representatives of the parties, attended two of the classroom training sessions and observed the training. During the first training session, the Consultant and his police practices expert observed a number of presentation styles and discussion points that needed to be improved.

For example, despite use of the written training materials, which the parties, expert and Consultant had approved, the CPD's instructors presented the materials in ways that emphasized the burdens imposed by the new documentation requirements, rather than the benefits of detailed data and transparency for the CPD. In one important respect, the instructors failed to emphasize the need for police officers to adhere to long-established constitutional imperatives. In this regard, some of the questions asked by the officers – and some of the answers given – could have been construed as complaints that the Agreement's documentation requirements were really **new** and were being forced upon them by the ACLU, rather than actually being required all along by the Fourth Amendment.

During the first training session, it also appeared that some officers were left wondering what would happen to them if they made a mistake when providing information about a stop. Specifically, police officers expressed concerns about both what the Department was now expecting of them and what they could expect if a supervisor or subsequent reviewer of the new

ISR data instrument believed that the ISR had been incorrectly completed or that the information entered on the form did not establish the requisite legal standard for a stop and/or frisk. The Consultant shared these observations with the CPD after the first observed classroom training session, and the CPD accepted the recommendations for improvement.

In April 2016, the Consultant, representatives of the parties and the expert observed a second classroom training session at CPD Headquarters. This session proceeded in a far more direct and effective manner; made use of all recommendations from the prior session, including the use of small group break-out sessions for police officers to discuss their concerns in a more personal way with CPD supervisors, as well as to engage in role play exercises. The Consultant, party representatives and expert agreed that the second observed session was greatly improved. This second session also appeared to substantially comply with the goals for training set forth in the Agreement.

Specifically, the CPD's trainers appeared to be focused on the approved, written training materials, and the Department made use of a number of recommended enhancements to the classroom training format suggested after the first training session. In particular, the CPD adopted the suggestion that the large group of officers break out into smaller groups to discuss certain topics and participate in role playing and situation-based exercises to permit a more personalized learning experience.

The Consultant observed, however, that the police officers' responses to questions and other comments during the large group sessions continued to reflect continuing confusion about the difference between probable cause and reasonable suspicion legal standards. One specific source of confusion related to when a pat down was permitted, and specifically how to differentiate between the need to initiate a protective pat down for weapons, as opposed to an administrative pat down necessary before transporting someone in a squad car. Some officers believed that ISR information was necessary when the nature of the pat down was administrative, which is permitted by the CPD by internal departmental policy for the safety of officers who need to transport a person taken into custody or who agree to provide safe travel on

a consensual basis, even though the grounds for the initial stop did not involve reasonable articulable suspicion.

The Consultant further observed that some police officers continued to verbalize and express a physical sense of frustration, anxiety, and skepticism generated by not knowing what, if any, disciplinary actions would result and for what types of mistakes.  Despite the assurances by CPD trainers, supervisors, and the Superintendent of Police, Eddie T. Johnson, himself, that officers would not be disciplined for "honest mistakes," doubt lingered in the minds of many officers, as well as the Consultant, about what the consequences would be for violations of the new documentation requirements.

Nonetheless, the classroom instructors conveyed the important message that all officers would be mentored and trained during the roll- out of the new CPD policy, even if these assurances did little to assuage the doubts of the officers in the audience, as reflected by their continued comments, body language, and self/small-group talk.

# Supervision & Auditing

## Supervisory Review Processes

Section II.3 (a) of the Agreement requires the CPD to establish policies providing for continuous district-level supervisory review and quarterly or semi-annual department-level audits of its investigatory stop and protective pat down practices.  Subsection (a) mandates that these policies include continuous review by police district supervisors of all ISRs to determine whether they state legal grounds for the stop and/or pat down.

During the Consultant's observation of the second classroom training session, it became apparent that the "deficiency review notification process" established by the CPD's ISAR, as outlined in S04-13-09, was not being documented in the monthly ISR data reports produced by the CPD to the Consultant on a monthly basis.

The absence of this information alerted the Consultant to other deficiencies in the documentation being stored in the ISAR database that he requires to assess the CPD's full compliance with the terms of the Agreement and applicable laws. When the Consultant brought this deficiency concern to the CPD's attention, it promptly addressed the concern and rectified the most important deficiency for the second reporting period, namely the need for documentation regarding IRSs reviewed by supervisors which were modified for any reason prior. The ISR data produced during the first reporting period, however, does not represent the full history of the ISRs submitted by police officers, but rather only the final, supervisor-approved versions were being maintained and produced. This oversight in designing the ISAR databased could not be rectified during the first reporting period, so the ISR data being reviewed for compliance is consequently incomplete.

After several lengthy conversations with top command officials in the CPD, as well as the parties, the Consultant learned that, when the CPD created the ISAS Database to implement the Agreement on January 1, 2016, it did not "archive" the full history of every ISR, but rather only preserved the final version of the ISR, after a supervisor had reviewed it.

This oversight by the CPD regrettably led to a number of problems that hindered the Consultant's review and analysis of the entire first reporting process. Without the original ISRs, the Consultant was not able to determine whether the extensive classroom training for all but exempt CPD members had taken hold within the rank and file of the CPD; nor was the Consultant able to analyze the original ISR data to create statistical results, based on it, to determine whether street patrol officers are complying with applicable laws at the point of the stop and frisk. Additionally, by producing only the final "approved" versions of the ISRs, the CPD essentially only permitted the Consultant to conclusively determine how well the supervisors were reviewing the ISR data submitted to them.

When the Consultant asked whether the original ISRs could be retrieved and produced, the CPDs information technology experts initially indicated that neither the originally submitted ISRs, nor the written supervisor comments and reviews of them, could reliably be accessed or produced by

the CPD at that time. Since then, the CPD's top technology experts have endeavored commendably to reconstruct the missing ISR data for the Consultant's review. However, while the Consultant has no reason to believe that the missing ISR data was due to anything more than an honest mistake, he also can think of no good explanation for the CPD's failure to recognize that compliance under the Agreement would require the ISS database to be designed in such a way as to preserve the original ISR and all subsequent versions of it, in addition to the deficiency review notifications, if any, generated by the supervisor and/or other reviewers. All versions of the ISRs are important in assessing whether officer and supervisor training has taken or is taking hold.

Regardless, the CPD did not maintain these crucial records in its database for the first reporting period. Instead, only the last, finalized version for each stop made had been saved, which was submitted to the parties, the experts and the Consultant. Thus, ISRs modified by the submitting police officer pursuant to the direction of or mentoring by reviewing supervisors, could not be produced to the Consultant in the monthly data files of ISR data for the first reporting period. Consequently, the reconstructed files submitted to the Consultant after June 30, 2017, simply are not timely for review. Further explanation of the significance of this fact is discussed below.

During subsequent discussions in May 2016 with the CPD's information technology experts about possible fixes to the ISS database, the Consultant requested that the CPD make the earlier versions of these ISRs available. However, he was advised that the ISS database did not, at that time, include the historic versions of the ISRs for the first reporting period (*i.e.*, the history of the ISRs from the time they were submitted by the officers and any changes made, through the entire review process).

Nonetheless, the CPD acted promptly to rectify the mistake once the Consultant made the CPD aware of it. To correct the error, the CPD rebuilt the ISS database to serve the purpose that the Consultant and his experts described, namely that he and his experts be able to examine the ISRs that the supervisors had reviewed, as originally submitted by the officers, and to follow them through the review process. The CPD now assures the Consultant that the new software system, now known internally as the "Versioning System" has been developed for the ISS database,

which permits the Consultant, as well as supervisors and others, to review and track all versions of every ISR submitted, as of July 1, 2016, the beginning of the second reporting period.

In short, the CPD's database for storing and producing the ISR data now allows the Consultant, or anyone else seeking to review the ISRs, to trace the path of the ISR from the time it was written and submitted to the time of supervisory approval or rejection. Any mentoring, re-training, enhanced supervision or discipline for failure to comply with the Department's policy is also observable. Compliance with the accountability terms in the Agreement is essential under all the terms of the Agreement, so the Consultant is reassured that the ISR data for the second reporting period will not be similarly deficient.

Realizing the importance of the historic data to the Consultant's review, the CPD made its best efforts to reconstruct the original ISRs and supervisor reviews of all ISRs for the first reporting period, but it was not entirely successful. The reconstruction process utilized by CPD resulted in an estimate of no more than 2,527 reconstructed ISRs which were allegedly modified in some way rather than approved immediately after they were submitted by police officers. Although these ISRs were produced to the Consultant and his experts on August 8, 2016, CPD officials in charge of the reconstruction efforts were unable to assure the Consultant, with any degree of certainty, that the reconstructed files completely captured all information recorded; nor could they validate that the 2,527 files represented *all* ISRs where a supervisor reviewed and made changes or comments on the originally submitted ISRs.

Recently, in response to the Consultant's indication that he had serious reservations about the extremely high percentage of ISRs that showed that patrol officers correctly found RAS initially, on February 21, 2017, Deputy Chief Jonathan Lewin, who heads the CPD'S Information Services Division, submitted an affidavit in which he set forth the process used to recreate any earlier versions of ISRs that were not initially approved by supervisors during the first reporting period. This process determined that 2662 ISRs fell into this category, rather than 2527. The fact that the latest reconstruction resulted in the discovery of 135 additional ISRs, which were not approved upon their initial submission raises concerns about the accuracy of the reconstruction process. Having met with Deputy Chief Lewin and Officer Candella, on more than one occasion,

and observed how forthcoming both were in providing requested information, the Consultant commends both for their diligence and hard work in this case. In this regard, the Consultant has no reason to doubt that they performed the job of attempting to reconstruct the history of the ISRs to the best of their abilities. However, because the trail of the ISRs, from initial submission by the officers through the supervisory chain, including supervisors' comments, is so critical in assessing the performance of the officers and supervisors under the Agreement, the Consultant must give little weight to the reconstruction effort.

The Consultant does not know whether the 2,527 or 2662 reconstructed ISRs from the first reporting period data, produced for his review and legal assessment, constitute the *only* stop reports, which were initially deficient in some way, at the time they were submitted by the police officer before supervisory review. One reason for this unknown reliability issue, is based on the Consultant's independent review of the 4,250 sample ISRs. For example, much of the ISR data from this period, reviewed by the Consultant, contained numerous errors, ranging from duplicate entries, to inconsistent entries in the check boxes (for example, the 173 ISRs noted by Dr. Taylor in his post-stop outcome report at note 6, where the check box indicating that contraband was recovered from a search had been checked, but the box indicating that a search had been conducted was not).

It would be naïve to believe that nearly the entire CPD police force somehow correctly submitted 52,174 ISRs (54,701 less 2,527) or 52,039 (54,701 less 2,662) from the beginning, without any hiccups in the form of supervisor reviews, comments, mentoring, etc., let alone deficiency notifications. The fact that many of the officers were not trained on the new procedures until one month prior to the end of the reporting period lends further credence to the Consultant's view.

Because of the importance of reviewing the original and any subsequent supervisory changes and comments made to the individual ISRs during the review period, the Consultant is unable to determine whether the supervisory review process is in compliance with Section II.3 (a) of the Agreement.

## Auditing Process

The Agreement contemplates that the CPD will provide for re-training, enhanced supervision or discipline of police officers who engage in unlawful stops and/or frisks or who violate CPD's practices or procedures governing its policies. The Agreement also, by implication, provides that these same measures will be taken with regard to supervisors who allow individual officers to engage in unlawful practices.

The CPD took responsibility for the auditing process for supervisor reviews, as required by Section II.3(b) of the Agreement. However, this process did not begin until July 2016, after the end of the first reporting period. Thus, the Consultant's comments regarding this material are not intended to provide a substantive review of the CPD's newly formed auditing practices and procedures. Instead, he offers the following comments to simply inform the parties and the public that the CPD's efforts to comply with Section II.3(b) are ongoing.

In this regard, the Consultant asked the Corporation Counsel (as CPD's representative) to submit a position statement describing the supervisory review process, pursuant to which a memorandum was submitted on October 6, 2016. The memorandum, which included various forms that are utilized by CPD to document each step of the supervisor review process, was very helpful and the information contained therein (and in the attached documents) is summarized as follows:

Pursuant to Special Order S04-13-09 (issued on June 10, 2016), district supervisors (usually sergeants) are responsible for reviewing and approving or rejecting all ISRs submitted by officers before the end of their tours of duty. *See* S04-13-09 (rev. 6/16). If upon review, the supervisor determines that an ISR does not articulate RAS for the stop/pat down, he/she so informs the officer and completes an ISR Deficiency Notification Form ("DNF"). The DNF, which is accessed through the ISR database and on which the supervisor documents the deficiency, can be issued for any reason (*e.g.*, from erroneous submission of the ISR to failure to articulate RAS for the action taken).

Once completed, the supervisor attaches the DNF to the deficient ISR and sends it back to the officer who submitted it to make corrections or perform other actions noted on the DNF by the supervisor.  Subsequently, unless an interview with the officer who submitted the ISR reveals that the stop, pat down or search was not justified or that an ISR should not have been completed, the submitting officer cannot resubmit the ISR; and, it will remain in rejected status for clearance by the Integrity Section of Crime Control Strategies.

Once the DNF is completed and signed by the supervisor, it is scanned and emailed to the Integrity Section.  The Integrity Section then reviews the ISR and makes its own determination regarding whether it complies with CPD policies or is deficient, the decision of which is transmitted to the officer and the supervisor through the automated database.

In some cases, such as when the reviewing supervisor has indicated on the DNF that he/she is uncertain about the proper disposition of the ISR, the Integrity Section will email its findings directly to the supervisor.  In cases where the Integrity Section concludes that the ISR is deficient, the supervisor uses the automated DNF to record the corrective action taken, and any information recorded, including notes by the supervisor as well as the reviewing member of the Integrity Section.  These documents are then archived in the ISR database.

The CPD represents that, between January and October, 2016, reviewing supervisors placed 406 ISRs in "Deficiency Rejection Review" status in the ISR database, meaning that supervisors determined that they could not be corrected. Other than the names, rank, star number(s) and district, of the officer(s) involved in the stop/pat down, the name and address of the civilian involved and date and time of the incident, the rest of the DNF form is completed by the supervisor checking boxes, which are self-explanatory, followed by space for a narrative concerning the action taken.

Thus, consistent with the representations made to the Consultant by the City and CPD, it appears that the prior problems faced by CPD in not being able to preserve all versions of ISRs for the Consultant's review have now been resolved; and, beginning July 1, 2016, all versions of IRSs

(from the initial submission by officers, through the supervisory review process) are now being maintained and will be available for review for the next reporting period.

Although the Consultant is buoyed by the progress that CPD has made since the end of the first reporting period, especially with regard to rectifying the problems with its ISS database, this significant oversight (or lack of foresight) casts all the data from this period into doubt. Thus, despite many good faith efforts and hard work on the part of many CPD officials and the parties, the tremendous progress made by the CPD to implement and roll out the Agreement is not sufficient, in light of the database error, to find that the CPD achieved substantial compliance with the supervisory review terms of the Agreement during the relevant time period.

With regard to the quarterly or semi-annual audit requirements set forth in Section ll.3 (b), the Agreement specifically provides that these audits are to be conducted independently, by headquarters staff. These auditing requirements are very similar to those imposed on the Consultant by Section V.2. (d) of the Agreement. Indeed, pursuant to that section of the Agreement, the Consultant identified to the parties the randomly selected ISRs that he was reviewing so that all would be reviewing the same sample.

The CPD has attempted to satisfy its auditing obligation in two ways: (1) internal auditing of a random sample of ISRs placed in approved status every day; and (2) outsourcing its major audit of the sample ISR narratives, identified and reviewed independently by the Consultant, to a private law firm.

## Integrity Section Daily Audits

The Integrity Section Commander, Captain Karyn Murphy, reports that she has reviewed all ISRs that reviewing supervisors determined could not be corrected and which were placed in "Deficiency Rejection" status in the ISR database, and by randomly sampling 10% of all ISRs placed in "Approved" status in the database each day. By doing these reviews, the Integrity Section has identified a number of police officers and reviewing supervisors who have

repeatedly submitted deficient ISRs or repeatedly approved them in error. The Integrity Section has informed the Consultant of this fact and continues to monitor these officers and mentor them in the proper procedures. The Integrity Review Section has assured the Consultant that it has and will continue to review the entire ISR history of any officer where corrective action is warranted.

As of October 6, 2016, the Integrity Section had reviewed 4,909 approved ISRs, and determined that 580 were deficient. In these 580 cases, the Integrity Section used Investigatory Stop Audit Reports ("ISARs") to record its findings that an ISR was approved in error and to notify the officer and the reviewing supervisor of the error.

The CPD has not reported the number of ISARs it issued during the January 1--June 30, 2016 reporting period, if any. However, as of October, 2016, no corrective actions had been taken or recommended with respect to the submitting officers because the CPD policy, for the time-being and during the roll out of the Agreement, is that the Integrity Section will not discipline or punish officers for honest mistakes. The Integrity Section commander assures the Consultant that all mistakes made thus far have been deemed honest mistakes.

## Jenner & Block ISR Narratives Audit

As emphasized above, Section II. 3 (b) of the Agreement specifically provides that the audits described therein are to be performed by CPD headquarters staff. Although not stated, the reason for this requirement could be to determine whether headquarters staff are adequately trained in carrying out their supervisory roles under the Agreement.

The City and CPD retained the Jenner & Block law firm, on a pro bono basis, to perform an audit of the statistically representative sample identified by the Consultant for his legal assessment of the ISRs from the first period. The City and CPD advised the Consultant that this audit was supplemental to, not in place of, the CPD's independent obligation by CPD Headquarters to conduct regular audits of ISR data. *See* "Integrity Section Semi-Annual Audits" and "Integrity Section Daily Audits," *supra*. The purpose for this supplemental audit was to obtain more information, not less, about the first reporting period data. Jenner & Block issued a

report, dated October 3, 2016, with its auditing results and observations. A copy of this report was delivered and reviewed by the Consultant.

That said, the Consultant must make clear that he has not relied on this report, nor can he, in performing his own independent duties related to the examination, assessment and analysis of the identified "statistically representative sample" of ISRs. At most, the Jenner & Block report may be informative in helping the CPD make necessary adjustments to its policies and practices, in addition to those that the Consultant will recommend based on the statistical reports of the independent experts.

## Consultant's Observations

With respect to the Integrity Section's Audits, the Consultant finds that the CPD has taken proactive steps designed to identify circumstances in which members should have, but did not, complete ISRs by, for example, reviewing all arrest reports associated with gun and robbery charges that were submitted from June through August, 2016 to ascertain whether ISRs were completed, if necessary. Based on its review of 1184 of such cases, the Integrity Section has been able to determine that, in 187 arrests, an ISR should have been completed, but was not. In these 187 cases, both the officers and reviewing supervisors have been notified, through use of the ISR Oversight Observation Report, of the Integrity Section's' findings. The supervisors in these cases have been directed to use the ISR Oversight Observation Report to report the corrective actions taken, in writing, to the Integrity Section. *See* City's Memorandum dated October 6, 2016, Exhibit 2.

The Consultant recognizes the CPD's good faith efforts to comply with the Supervision and Auditing provisions of the Agreement, as set forth above. The automated ISR audit trail is impressive. The Consultant must point out, however, that the efficacy of the district-level ISR reviews must depend, in large part, on what documented information is available to support them. In this regard, the Consultant does not doubt that the ISR database, since July 1, 2016, has undergone important transformations; and, to the extent that it now captures the information

necessary for the Consultant to review and validate the ISRs and all facets of the Investigatory Stop System, the Consultant believes that the CPD can achieve substantial compliance with the supervising and auditing provisions of the Agreement going forward. However, this report is limited to analyzing CPD's performance during the period from January 1 through June 30, 2016, so the improvements made since then, unfortunately, cannot be considered.

## *Civilian Complaints*

In the Agreement, Section II.3.b.iii., the CPD is required to document civilian and internal complaints relating to stops and frisks conducted by police officers. The Department has furnished to the Consultant a computer printout showing the complaint descriptions of 57 complaints filed with the Bureau of Internal Affairs, six of which were filed after June 30, 2016 and one that, while filed within the time period of the review, did not describe the basis of the complaint (# 1079624). Also, 37 Summary Report Digest forms were submitted, 25 of which were filed during the review period, and most of which related to the same complaints as those listed on the computer printout. The Consultant will consider only the complaints that were filed during the review period, January 1, 2016 through June 30, 2016.

These documents show the complaint numbers, dates of the complaints, allegations of the complaints (with the names of the complainants, officers allegedly involved, if known, and any known witnesses, redacted). They also show the extent of the investigations conducted, if any, and the resolutions reached in the cases.

In summary, most of the complainants charged that one or more police officers stopped and/or frisked them without legal justification and/or were rude towards them after the stop. Some complainants alleged that they were asked for their identifications, for no reason. Investigators contacted or attempted to contact the complainants in all of the cases reviewed but, according to the investigation reports, the complainants either listed invalid addresses or telephone numbers, did not respond to subsequent certified letters or indicated that they did not wish to proceed with the complaints when contacted.

The overwhelming majority of the cases were concluded as "unfounded," pursuant to state law, (50 ILCS 725/ 3.8 (b)) when the complainants did not sign sworn affidavits in support of the complaints, which is required by law. A relatively few were investigated and determined to have no merit after the officer (s) involved denied the allegations, gave their explanations for the conduct, which showed that no misconduct occurred or because the complainants' allegations themselves, if believed, did not constitute misconduct.

Six of the cases are listed as "administratively closed", which, according to the City, means that they were referred to CPD's Human Resources division for further action, such as counseling. Five of these complaints involved female complainants in which the officers allegedly were verbally abusive and inconsiderate of the complainants, and the sixth involved the alleged mistreatment of a minor.

Nine complaints filed during the review period remained in "pending investigation" status as of early October, 2016. The Consultant has been given assurances that none of the complaints involved the same accused officer as was complained of in other complaints.

## Re-training, Enhanced Supervision & Discipline

Section II.3 (c) of the Agreement provides for the establishment of re-training, enhanced supervision or Discipline of officers who engage in unlawful investigatory stops and/or protective pat downs or who violate the CPD's policies or procedures governing these practices, and that written documentation of such actions must be done. As set forth earlier in this report, during the two classroom training sessions attended by the Consultant, as well as during his ride along with Chief of Patrol Waller, some of the officers were noticeably, and understandably, concerned about what would happen to them if they made mistakes in deciding when or if to make a stop or execute a pat down or if the ISR forms were filled out incorrectly. The short answer expressed at that time, and subsequently by former interim Police Superintendent Escalante and current Police Superintendent Johnson, both during the training sessions and subsequently in joint videos, one of which the Consultant viewed, was that innocent mistakes

were expected and would not result in any adverse actions; but, intentional misconduct would not be tolerated and would result in swift punishment.

According to the CPD, the Integrity Section has identified approximately 15 Department members who have either repeatedly submitted deficient ISRs or have repeatedly approved ISRs in error and are, therefore, in need of re-training or enhanced supervision. This enhanced training and supervision was expected to occur before the end of 2016. Thus-far, there have been no deficiencies relating to the stop and frisk policy wherein an officer is believed to have engaged in intentional misconduct, so no discipline has been imposed.

## *Agreement Implementation Issues*

Starting on January 1, 2016, all police officers were required to report investigatory stops and frisks using the new investigatory stop forms required by the Agreement (as well as Illinois law), but, as stated above, many of them were not fully trained on how to comply with Illinois law or the Agreement's terms. Indeed, the Agreement, itself, by providing that CPD would have until March 1,2016 to complete the training of its officers--even though their compliance with the new directives were mandated as of January 1, 2016-- appears to have contemplated that many of the supervisors and officers would not have been fully trained at the time that they were being held accountable.

As it turned out, only about 4600 of the almost 12, 000 non-exempt police officers to be trained were actually trained by the March 1, 2016 deadline set forth in the Agreement, and the entire force was not fully trained until May 27, 2016. Consequently, during the past year, the Consultant, the experts and the parties have witnessed a number of problems resulting from the CPD's need to implement the Agreement (and Illinois law) at a point in time before the CPD members and officers responsible for complying with it had a fair chance to do so. In particular, the investigatory stop and frisk policy established by the CPD to satisfy its obligations under the Agreement and Illinois law required police officers to know how to document stop and frisk practices on a new form, using a new, digitized electronic system.

Prior to January 1, 2016, CPD officers were using contact cards, which did not require nearly the amount of information or detail that the new investigatory stop report forms require.

Due to the delays in finalizing the written training materials and CPD policy during the Fall of 2015, the CPD could not complete its classroom training for all non-exempt police officers on how to use the Investigatory Stop System until May 27, 2016, only one month before the end of the first reporting period. Thus, the stop and frisk data reported by CPD from January 1, 2016 thru June 30, 2016, do not fully reflect a completely trained police force.

This fact is significant for a number of reasons. *First*, the failure to train the police officers by March 1, 2016, as the parties intended when they drafted the Agreement, meant that the Consultant's review of CPD data for the first six months of 2016 did not permit an examination of the original ISR forms submitted to determine if training had taken hold. *Second*, without knowing whether the training in new procedures had taken hold within the rank-and-file membership of the CPD, the Consultant could not assess the data for compliance with applicable laws, CPD policy, or the terms of the Agreement. *Third*, the Consultant's review generated results being used for the statistical analysis in this report that, although scrupulously valid as a matter of statistical science, reflects merely a work in progress rather than a snapshot of stop and frisk practices on the streets of Chicago from January 1 through June 30, 2016.

The work in progress involved a number of moving parts. Not only were CPD members not yet fully trained, but also: (1) the classroom training formats were being revised on the fly by the CPD based on feedback from the Consultant and his police practices expert after personal observations; (2) the forms that the officers were using to submit information about the investigatory stops and frisks had to be re-formatted and re-issued on March 1, 2016; and, most significantly, out of all the information being reported and maintained by the CPD and produced to the Consultant for review of monthly data reports, critical pieces of information were missing.

The computer database designed to keep and maintain these records in one place to make them, among other purposes, transparent and accessible to the Consultant, his experts, the parties and the general public, required the generation of "deficiency review notifications" by reviewing supervisors when any ISRs submitted contained any type of error, be it administrative, procedural or legal.

The monthly data reports from the CPD did not contain any deficiency review notification data. Moreover, the monthly data reports did not archive the supervisors' comments regarding the deficiencies with the ISRs and notes of corrections, if any, made to correct these deficiencies. In this regard, and as set forth above in the supervisory review section, the monthly data reports being generated for the first reporting period contained only the last version of the ISR reviewed by a CPD supervisor before it was finalized for submission to the ISS Database and downloaded for the Consultant's review.

Despite the hard work and efforts of CPD officials in attempting to "reconstruct" the forms that were not approved by supervisors at the time they were initially submitted, without any comments or changes, the Consultant simply cannot give a great deal of weight to the reconstruction efforts in view of questions regarding the accuracy and completeness of the reconstructed forms and other factors. One of the other factors is the unusually high percentage of forms on which officers "got it right" the first time (more than 90%) even though many of them did not receive training on the Agreement's requirements until one month prior to the end of the reporting period.

The Consultant has been given assurances by the City and CPD that, beginning July 1, 2016 and going forward, the monthly data reports have included and will continue to include all versions of the ISR reports, from the initial submission by the police officer to their final approval by a supervisor, archived as originally submitted if changes are made to them by supervisors for any reason, and submitted to the Consultant and experts for analysis and review. The Consultant anticipates that the second report will offer more detail in all regards.

Because the Consultant could not be assured that the missing data had been accurately and completely reconstructed, he did not review or code the reconstructed ISRs for compliance with the Fourth Amendment legal standards for stop and frisk as part of the data set sent to the appointed statistical experts for analysis. Thus, the data results from the statistical analyses do not include information from these reconstructed ISRs. As a result, the underlying data which has been legally and statistically analyzed for this report is fundamentally incomplete. Without the complete data, the statistical results from the first reporting period data should be viewed

with skepticism – not because the statistical models or analysis are flawed - but, rather, because without all relevant versions of the ISRs, the Consultant's legal assessment of the ISRs for Fourth Amendment compliance was necessarily incomplete.

The missing versions of the originally submitted ISRs, however, was not the only problem with the originally designed ISS database. An equally serious omission involved missing data related to the supervisory comments made to police officers, which prompted the officers to make the modifications to the original ISRs and created the various "versions" discussed above. Without access to these comments, the Consultant was unable to assess, in accordance with the duties assigned by Section V.2 of the Agreement, whether supervisory review accurately identified legal compliance or other procedural problems in the ISRs and provided the requisite level of enhanced training, mentoring and/or discipline necessary to comply with the terms of the Agreement. Without access to the supervisor comments, the Consultant had no way of knowing or assessing compliance issues related to supervisors' ability (or willingness) to make appropriate legal compliance determinations, track the success rate for training objectives, and report violations, if and when they occurred, to the CPD's new Integrity Unit.

## Summary

Unfortunately, despite the prompt and timely attention given to this matter, the CPD did not have sufficient time, personnel or resources to reconfigure, reconstruct and redesign the ISS database and the first reporting period data by the end of the first reporting period, on June 30, 2016. Without the originally submitted ISRs, and all versions of the same, including supervisory comments, the Consultant was not able (1) "to conduct an independent analysis and review of CPD's investigatory stop and protective pat down practices" to ensure "substantial compliance" with the requirements of the Agreement and ICRA and compliance with all other applicable laws, during his review of the "statistically representative sample" of ISR narratives; or (2) determine that the CPD, despite the identification of the serious violation and prompt remedy of it for the second reporting period, achieved "substantial compliance" with the terms of the Agreement for the first reporting period.

The Consultant does not view his role under the Agreement as being limited to simply reviewing the stop reports as they are submitted by the CPD and making determinations as to whether they are supported by the officers' reasonable suspicion, as articulated by him/her, regardless of the number of times they were submitted, reviewed, modified or found deficient upon supervisory review before the officer finally got it right. If such were the Consultant's standard of review, then he would be required to find that the officers got it right more than 90% of the time, notwithstanding the fact that many of the officers had not been trained on the law and the Agreement's requirements at the time of their submissions. Again, with all due respect to Deputy Chief Lewin, such a finding would simply defy logic or common sense. The disparity between the results of the first reconstruction effort and the most recent one (2527 v 2662) lends even more credence to the Consultant's concerns about the accuracy of the reconstruction efforts. *See* also "The Versioning" and "Reconstruction Efforts" sections of this report, *supra*.

## Substantial Compliance with Applicable Laws

To date, no agreements on the standards for substantial compliance with ICRA have been reached. In this event, the Agreement directs the Consultant to "review the data and determine such standards after considering the respective views and submissions of the parties." Agreement, IV.3. *See also* Agreement, VI.4. ("'[a]ny dispute as to the meaning or interpretation of this agreement will be resolved first by the Consultant"). The parties do not agree on the standards for "substantial compliance" in general, with regard to the terms of the Agreement, nor with applicable laws, especially with regard to ICRA. This means that the Consultant must decide these questions and report his determinations to the parties and the public in this report. Pursuant to the direction provided in Section IV.3. of the Agreement, the parties have submitted their respective views on these issues to the Consultant. After careful and due consideration, the Consultant has made the following interpretations and determinations.

The phrase "substantial compliance" does not appear in the Agreement until Sections IV.2. and 3. Surprisingly, the first use of the phrase "substantial compliance" refers to "this

agreement" not the law, and it focuses attention on "any violations *of its [the agreement's] requirements*." Agreement, IV.2. More on that point later. The next time the Agreement uses the phrase "substantial compliance" is in Section IV.3. Here, the descriptive adjective "substantial" is used to define the CPD's obligations regarding "compliance with ICRA." Here, for the first time in the Agreement, the parties indicate that an "agreement" or "meeting of the minds" has *not yet been reached* regarding the "standards" which apply to the "compliance" obligations for the CPD under ICRA. The other two sources of law applicable to the Agreement, the U.S. and Illinois Constitutions, are not identified in Section IV.3. as being in dispute. Only the "substantial compliance" standards governing ICRA are culled out.

The interpretative question raised by the introduction of the adjective "substantial" mid-way through the Agreement in Section IV, is complicated by the parties' decision to use it to refer to the CPD's obligations with respect to both the Agreement's contractual terms and ICRA's legal standards. The complication stems from two facts, namely (1) that, in a section of the Agreement addressing legal compliance obligations, the parties drop in "substantial" compliance obligations with the contractual terms of the Agreement; and (2) that, despite the general "compliance with" recitation applying to all three source laws in sub-paragraph 1, the parties then get really specific in sub-paragraph 3, isolating ICRA, by reference only to that statute, for "deferred consideration" by the parties on "standards for substantial compliance" regarding that statute.

Several questions are raised by Sections IV.2. and IV.3. First, do the parties intend for the CPD to be bound by a different compliance standard with respect to ICRA than they do for the other constitutional source laws? Second, "what does substantial compliance mean?"

Regarding the first question, the Consultant's reading of the Agreement indicates that the parties do not intend for "compliance" to differ from the "substantial compliance." The root word "comply" in Section IV. is used interchangeably throughout the Agreement with "compliance," "fully comply" and, it appears, "substantial compliance" in Section IV. Certainly, with regard to both the contractual obligations of the Agreement and ICRA, in

Sections IV.2 and IV.3, one could argue that the parties become more specific regarding the parties' intentions.  Thus, subsections 2 and 3 of Section IV do merit some attention, and these subsections could support an argument that the "degree or extent" of the substantial compliance obligations related to the terms of the Agreement and ICRA are different from those intended for the other applicable laws.  But, to make that determination, the Consultant would need to ignore clear inclusion of ICRA, for purposes of the legal compliance obligations, in the other sections of the Agreement, in which only the word "comply" or "compliance" or "fully comply" is used.

The Consultant believes the better reading of the Agreement, as drafted, is to reject an interpretation that compliance and substantial compliance mean different things, because the parties simply cannot intend to impose contradictory or conflicting duties on the CPD.  Instead, the Consultant interprets the single reference to "substantial compliance" with ICRA, in Section IV.3., to mean only that, at the time the Agreement was signed, the parties agreed on the compliance standards under the constitutional source laws, but they did not agree on the legal standards that govern ICRA.[39]  Accordingly, the Consultant interprets the Section IV.1. reference to "compliance" to carry the same meaning as "substantial compliance", given the overall requirements of the Agreement and the structure and context of subparagraphs 1 and 2.

Section IV.3. does not answer the substantive question, but it does indicate *who* will answer it.  The parties agreed that "the ACLU and the City" would "work together to seek agreement" on the meaning of "substantial compliance with ICRA."  The parties also agreed that, if they could not agree, then "the Consultant will . . . determine such standards" after two conditions have been met: (1) the Consultant must review "the data" and (2) the

---

[39]Notably, although Section IV.2 requires "substantial compliance" with the Agreement, and Section IV.3. indicates an intention by "the ACLU and the City" to work together to seek agreement on standards for substantial compliance with ICRA" which, if unsuccessful, gives the Consultant the duty to determine "such standards after considering the respective views and submissions of the parties," the parties do not use the phrase "substantial compliance" to define the "compliance" necessary for the U.S. and Illinois Constitutions. *See* Agreement, IV.1.

Consultant can make this determination only "after considering the respective views and submissions of the parties."

To date, the parties have not agreed on the standards for substantial compliance with ICRA, and they have agreed to seek guidance from the Consultant on this matter for this report, with knowledge that the Consultant has reviewed "the data" and considered their "respective views and submissions." Agreement, IV.3.

## *Legal Compliance with The Illinois Civil Rights Act of 2003*

The Consultant finds that ICRA authorizes an assessment of legal compliance using both disparate impact and disparate treatment theories, when determining whether CPD's stop and frisk policies and practices "have the effect of subjecting individuals to discrimination because of their race, color, or national origin."  See, e.g., 740 ILCS 23/5 (2003).  There are two bases in the law which support this determination: (1) the legislative history from passage of ICRA in 2003; and (2) the U.S. Supreme Court's decisions.[40]

### Disparate Impact & ICRA

In 2001, five of the nine sitting Justices of the U.S. Supreme Court issued a decision, in *Alexander v. Sandoval*, 532 U.S. 275 (2001), holding that the Title VII regulations promulgated under § 602 of the Act "validly proscribe activities that have a disparate impact on racial groups, even though such activities are permissible under § 601" of the Act, do not authorize a private (individual) right of action to challenge policies and practices which, when applied, have a "discriminatory effect" on minorities, by using a *disparate impact theory* of liability. *Id.*, at 283-84.  In 2003, the Illinois legislature appears to have exercised its right to grant its citizens more rights than federal law by enacting the

---

[40]From the outset of this analysis, so that there is no misunderstanding about the Consultant's findings on the critical issues of disparate impact and disparate treatment, the Consultant wishes to make clear that these findings are *limited* to whether they are **viable** theories, and not whether the statistical results presented in this report are sufficient to prove either theory.  To the contrary, because of the questions regarding the *unknown* reliability of certain data, on which such findings would be made, the Consultant is unable to determine, one way or the other, how the statistical results from the data should be interpreted.

Illinois Civil Rights Act of 2003, which provides a private right of action to claim that a government's policies or practices create a "discriminatory effect" against historically recognized minorities.

(i)    Legislative History of ICRA

The legislative history of ICRA appears to confirm that members of both the Illinois House and Senate, during debates on the bill, saw ICRA as the means to restore a private right of action to Illinois citizens for conduct previously actionable under Title VII regulations promulgated under § 602 of the Act, prior to the *Sandoval* decision.  During debates on the passage of the Illinois Civil Rights Act of 2003, statements from the sponsor of the legislation, as well as a Chicago area Senator, indicate that one purpose of the ICRA was to restore a private right of action (*i.e.,* the right of an individual or class of individuals) to use "disparate impact" as a theory of discrimination. *See* 93d Ill. Gen. Assembly, House of Representatives Proceedings, Apr. 3, 2003, at 1 ("this Bill will create a parallel state remedy to . . . the federal cases that were brought under Section 601 of the Civil Rights Act.") (statement of sponsor Rep. John Fritchey); 93d Gen. Assembly, Senate Proceedings, May 13, 2003, at 140 ("With respect to the disparate impact, we are reinstating, essentially, thirty years of federal law.") (statement of Sen. Don Harmon).

The Consultant finds this legislative history persuasive evidence that ICRA authorizes the Consultant to consider, during the course of the Agreement, whether the CPD has complied with the terms of ICRA by assessing whether the CPD's stop and frisk policies and practices have a disparate impact on minorities.  In other words, the Consultant finds that ICRA authorizes the ACLU to challenge, if necessary, the application of CPD's stop and frisk policy if the statistical evidence generated, pursuant to this Agreement, shows that police officers are applying this policy in a way which has "the effect of subjecting individuals to discrimination because of their race, color, or national origin." *See, e.g.,* 740 ILCS 23/5 *et. seq.* (2003).

### (ii)    The *Inclusive Communities* Case

The Consultant's interpretation of ICRA also is supported by a recent decision by the U.S. Supreme Court in *Texas Dept. of Housing and Community Affairs v. Inclusive Communities Projects Inc.,* --U.S.--, 135 U.S. 2507, 2518 (June 25, 2015) ("*Inclusive Communities*"). Disparate impact theories for proving illegal discrimination have been recognized by courts when the text of a law or statute refers to the "consequences of actions and not just to the mindset of actors," and "where that interpretation is consistent with statutory purpose." *See, e.g., Id.,* at 2518.  In ICRA, the Illinois legislature identifies illegal conduct by the manner in which state, county and local government actors "utilize" the "criteria or methods of administration" to practically apply laws, policies and/or rules, when such application has "the effect of subjecting individuals to discrimination because of their race, color, national origin, or gender."  *See* 740 ILCS 23/5 (a)(2) (2003).

When government actors use legal criteria or methods in a way that results in a discriminatory effect, then ICRA is violated.  Thus, even if Senator Harmon's statement supporting passage of ICRA, as noted in the legislative history, did not expressly authorize the use of "disparate impact" as a theory of discrimination, the *Inclusive Communities* decision would do so.  The Consultant respectfully submits that ICRA is a model of legislative intent to make illegal the "consequences of actions and not just. . . the mindset of actors." *Id.,* at 2518.

### (iii)    The *Yick Wo v. Hopkins* Case

The *Inclusive Communities* decision, although recent, arose in the context of a governmental policy and action involving the Fair Housing Act, not law enforcement. However, the Inclusive Communities decision cites to and relies on legal principles established long ago, namely, that when a law has either the specific purpose or "the necessary tendency" to be "enforced . . . in the manner" where it will have "the effect of" achieving a "prohibited result," then it should not be validated by the law. *Yick Wo v. Hopkins,* 118 U.S. 356, 374 (1886) (enforcement of local ordinance by sheriff denied 200

Chinese laundries application for exemption, but granted all but one application for exemption by Caucasian laundries found to deprive applicants of liberty, in violation of the Fifth Amendment's Due Process Clause).[41]

The *Yick Wo* case did, however, arise in the context of a law enforcement decision by a municipal sheriff who applied a San Francisco ordinance which, as written, expressed a legitimate business and governmental interest in regulating laundries "for the public safety," but when applied, denied exemptions to 200 Chinese laundries, but only one Caucasian laundry. *Id.*, 118 U.S. at 373. The effect of this application was not merely to regulate local laundries for the public safety, but, rather, to prohibit Chinese laundries from doing business in San Francisco. *Id.*

Thus, although the San Francisco ordinance had a legitimate purpose, the manner in which it was applied by a government actor created an observable disparity between the number of Chinese laundries affected and the number of similarly situated Caucasian laundries affected. This effect proved discriminatory in violation of the Fourteenth Amendment, because the sheriff's application of the ordinance created a racial disparity. *See Yick Wo,* 118 U.S. at 373.

The Court in *Yick Wo* did not analyze whether the sheriff had the conscious (or unconscious) intent or purpose to discriminate against Chinese laundries; nor did the Court require evidence that the sheriff applied the ordinance to deny exemptions to Chinese laundries because of race. Instead, a constitutional violation was found simply by looking at the disparate impact of the ordinance's application together with the purpose for it (*i.e.,* the public interest in safety), and comparing the effect of the ordinance with its

---

[41]Although statistical science did not produce statistical studies or percentages for use in the *Yick Wo v. Hopkins* case, the Court described what a disparity recognized by plain observation can mean when the disparity disproportionately impacts a minority, but not a non-minority. *Yick Wo,* 118 U.S. at 374. Modern statistics can show "observable" factors by mathematics on a larger and smaller scale than is perceptible by plain observation.

purpose.  Because the effect of the ordinance, as applied, did not align with the legitimate purpose it was intended to serve, the Court found the application of the ordinance unconstitutional.

## Disparate Treatment v. Disparate Impact

The easy argument against over-reliance on *Yick Wo v. Hopkins*, and other cases like it, is that, while *Yick Wo* broadly stands for the proposition that discrimination can occur not only from the express text or stated intent of a law or official action, but also from what the law actually does or how it is actually enforced, the Supreme Court, in a series of more-recent decisions (*e.g., Washington v. Davis*, 426 U.S. 229 (1976); *Village of Arlington Heights v. Metropolitan Housing District*, 429 U.S. 252 (1977)) have "made it clear that official action will not be held unconstitutional solely because it results in a racially disproportionate impact."  *See Arlington Heights,* 429 U.S. at 264–65.  Instead, those cases stand for the proposition that to be unconstitutional (under the Fifth Amendment in *Davis* and the Fourteenth Amendment in *Arlington Heights*), there must be evidence not only of a discriminatory effect or disparate impact on minorities, but also evidence establishing that "a discriminatory purpose has been a motivating factor in the decision."  *Id.* at 265–66.

The Consultant's rejoinder is that, while it is true that *Davis* and *Arlington Heights* stand for the proposition that disparate impact alone, without sufficient evidence of discriminatory purpose, is not sufficient to establish an equal-protection violation under the Fourteenth Amendment, the issue, for the Agreement, is not whether disparate impact is a viable theory under the Fifth or Fourteenth Amendment.  The issue raised by the Agreement (which has its genesis in the ACLU's March 2015 Report) is whether a disparate impact theory of liability is viable under ICRA, which is an independent source for legal liability, apart from the Fourteenth Amendment.

The *Inclusive Communities* Court did not depart from the holdings in *Davis* and *Arlington Heights.*  Neither of those cases dealt with interpretation of a statute which supported the disparate impact claim.  *Inclusive* Communities validates that disparate impact is a viable

theory of liability "where that interpretation is consistent with statutory purpose." *See 135 U.S. at 2518.* The Consultant finds, for the reasons set forth below, that ICRA, like the statute interpreted in *Inclusive Communities,* authorizes a disparate impact as well as a disparate treatment theory of liability; and, to proof of discrimination using a disparate impact theory does not require direct or circumstantial evidence of discriminatory purpose or intent in the mindset of government actors.

## Prima Facie Case

Currently, to establish a legal violation based on disparate impact requires statistical science, not simply common sense.  Statistical evidence, alone, however, is not sufficient to prove a disparate impact case.  "[A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Inclusive Communities,* 135 U.S. at 2523*.*  A "*robust causality* requirement ensures that racial imbalance ... does not, without more, establish a *prima facie* case of disparate impact and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (citing *Wards Cove Packing Co. v. Antonio, 490 U.S. 642, 653 (1989) (internal citations omitted),* superseded by statute on other grounds, 42 U.S.C. § 2000e-2(k)).[42] "Without adequate safeguards at the *prima facie* stage, disparate-impact liability might cause race to be used and considered in a pervasive way and would almost inexorably lead governmental or private entities to use numerical quotas, and serious constitutional questions then could arise." *See Id.,* 135 U.S. 2523.

"In contrast to a disparate-treatment case, where a 'plaintiff must establish that the defendant had a discriminatory intent or motive,' a plaintiff bringing a disparate-impact claim challenges practices that have a 'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale." *Inclusive Communities,* 135 U.S. at 2513 (quoting *Ricci v. DeStefano,* 557 U.S. 557, 577 (2009)).   Thus, for a plaintiff to challenge the discriminatory effect of a government policy or practice, based on its

disparate impact on minorities, there must be evidence of: (1) a disproportionate adverse effect; and (2) a practice (or an applied policy) that causes this disproportionate adverse effect; and (3) factors which make an "otherwise . . . legitimate rationale" for the practice (or applied policy) "unjustified."

The Consultant believes that *Inclusive* Communities can be interpreted as teaching that, to establish a *prima facie* case of disparate impact, a plaintiff must allege facts at the pleading stage which: 1) identify a specific policy or practice;[43] 2) demonstrate statistical disparity;[44] and 3) establish a "robust" causal relationship between the policy/practice and the disparity. The disparity must be substantial or significant; and the disparity must be of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity. *Inclusive Communities,* 135 U.S. at 2518.

### (iv)    Causation Defined

To avoid "expansive" interpretations of disparate impact liability, which might "inject racial considerations" where there are otherwise none there, the plaintiff has a threshold "limitation," recognized by *Inclusive Communities,* at the pleading stage. *See Inclusive Communities,* 135 S.Ct. at 2523. This limitation is not the requirement that the plaintiff assert and prove intentional animus or discriminatory purpose behind the challenged policy or practice, but rather a "robust causality requirement" ensuring that "[r]acial imbalance . . . does not, without more, establish a *prima facie* case of disparate impact" by

---

[43] A specific practice is needed; merely showing discretion is not enough. *See Wal-Mart Stores, Inc. v. Dukes*, --U.S. --, 131 S. Ct. 2541, 2555-56 (2011). Plaintiff must isolate and identify specific practices responsible for "observed statistical disparities" by documenting the combined use of subjective criteria with "more standard rules or tests." *See, e.g., Watson v. Fort Worth Bank and Trust*, 487 U.S. at 994 (1988).

[44] To constitute actionable disparity under Title VII, the Second Circuit looks to a statistically significant disparity of two standard deviations in a normal distribution or approximately 5 percent (p<.05). *See Smith v. Xerox Corp.*, 196 F.3d 358, 368 (2d Cir. 1999), overruled on grounds not relevant here (on business necessity defense) by *Smith v. City of Jackson, Miss.,* 544 U.S. 228, 240 (2005). *See also Meacham v. Knolls Atomic Power Laboratory,* 461 F.3d 134, 140 (2006) (also overruling *Smith*), even though it recognizes that "[t]here is no minimum statutory threshold requiring a mandatory finding that a plaintiff has demonstrated a violation of Title VII." *Waisome v. Port Auth. of N.Y. & N.J.,* 948 F.2d 1370, 1376 (2d Cir. 1991) (internal quotations omitted).

protecting "defendants from being held liable for racial disparities they did not create." *Id.,* 135 U.S. at 2523.

Once this *prima facie* case is made, the defendant must be given "leeway" to offer a valid justification for the identified policies and/or practices causing the disparity. *Inclusive Communities,* 135 U.S. at 2522. To prevail, the plaintiff must show either that (1) there is no legitimate rationale for the disparity because the justification is "artificial, arbitrary and unnecessary," or (2) an available alternative . . . practice that has less disparate impact and serves the [government's] legitimate needs" – if possible – in a "race-neutral" manner. *Id.* at 2518, 2524 (citing *Ricci, supra* at 578).

Thus, while there is no requirement in a disparate impact case to isolate race, ethnicity or any other prohibited factor, by itself, as the sole influence or cause for the challenged policy or action, *Inclusive Communities* indicates that a disparate impact theory of liability does not preclude such evidence as incompatible with the statistical showing of disparity necessary to show "discriminatory effect," based on application of the challenged policy or practice. *Id.,* 135 U.S. at 2518, 2525.

Significantly, while there is also no requirement under a disparate impact theory to show evidence of or prove intentional animus or discriminatory purpose, "[r]ecognition of disparate-impact liability . . . plays a role in uncovering discriminatory intent," in that it permits the fact-finder to observe "unconscious prejudices and disguised animus that escape easy classification as disparate treatment." *Inclusive Communities,* 135 U.S. at 2522.

The concern expressed by the ACLU in its comments regarding the standards to be used for assessing legal compliance under ICRA is that, if the focus of the statistical studies performed, pursuant to the Agreement, are focused on race or ethnicity, alone, as the reason for the CPD's "programmatic use of stop and frisk," (the policy and practice specifically identified by the Agreement), then the "unconscious prejudices and disguised animus" that may be in play when CPD's policies are practiced on the streets of Chicago,

may "escape easy classification as disparate treatment" and remain unrecognized and, thus, unaddressed and without remedy.

For the reasons discussed in the preceding paragraphs, the Consultant is aware of this concern, but does not believe it justifies discounting the appointed experts' models related to net race/ethnic impacts, or any other models or tests used for this first report. If there is continued disagreement between the parties, after this report is issued, and, as the results from the second reporting period's data emerge, the Consultant is more than willing to facilitate a negotiated resolution to the types of statistical models and tests to be used with respect to that data.

To the extent that ICRA's statutory language uses the words "effect of subjecting individuals to discrimination," the Consultant believes that the Illinois legislature also authorized discriminatory treatment theories, for which individuals and/or classes of individuals have a right of action. In such cases, individuals using a disparate treatment model, and classes of individuals may proceed using a pattern or practice disparate treatment model. Disparate treatment models/theories are generally based on the Equal Protection Clause of the Fourteenth Amendment, and these theories require proof of intentional or purposeful discrimination.[45]

The federal courts recognize the use of statistical evidence as a necessary and proper method of proof in disparate impact, as well as disparate treatment cases. In both types of cases, statistical science is able to mathematically analyze data to show whether a numerical "disparity" exists between one group of people versus another, based on an institutional or governmental application of a challenged policy or practice.

---

[45]The equal protection clause of the Fourteenth Amendment is "only concerned with disparate treatment," not with disparate impact, according to the Seventh Circuit. *Anderson v. Cornejo,* 355 F. 3d 1021, 1024 (7th Cir. 2005) (citing *Washington v. Davis*, 426 U.S. 229 (1976)).

The Consultant recognizes that the disparate impact and disparate treatment models are different; and, the evidence needed to prove discrimination using a disparate impact theory is not the same as the evidence needed to prove disparate treatment.

Disparate treatment cases (both individual and pattern and practice) require evidence of intent or discriminatory purpose as the reason causing the policy to be applied to minorities in a discriminatory or "disparate" way. Disparate impact theories do not require a showing of intention or purpose, per se; rather, to prove a "discriminatory effect" by showing the disparate impact on minorities caused by a challenged policy or practice, there must be (1) statistical evidence showing a statistically significant disparity between the way the policy or practice is administered or utilized with respect to minorities; and (2) evidence which shows a "robust causation" between the policy or practice and the resulting disparity; and (3) the absence of a valid reason for applying the policy in a manner which creates the disparity or evidence that the valid reason can be achieved through less disparate means.

To reiterate: merely showing that a policy causes a disparate effect on legally protected minorities is not enough to show discrimination, using a disparate impact model. To prove legal discrimination by showing disparate impact, the policy, which produced the disparity when applied, must either: (1) lack a valid justification (*i.e.,* in the case of law enforcement, a valid public interest), which explains the reason for the disparity (in which case public policy is responsible for the choice between civil liberties and law enforcement interests), or (2) be susceptible to adjustment in a way to reduce the adverse impact of the policy on the identified minorities.

## Summary

The Consultant recognizes that the evidence needed to prove discrimination using a disparate impact theory is not the same as the evidence needed to prove disparate treatment, on either an individual or a class basis. Disparate impact theories test whether a

116

challenged policy or practice has a discriminatory "effect" by measuring the statistical disparity with the asserted justifications for application of the policy which produced the disparity to see if the justifications explain the disparity or can be adjusted to reduce the adverse impact of the policy on the identified minorities.   Disparate treatment cases, however, require proof of intentional animus or purposeful discrimination in addition to statistical proof of disparities created by the application of a challenged policy or practice. Disparate treatment cases fall into two categories:  individual cases and class action cases, which allege that a business, institution or governmental policy or practice, when applied, created a "disparate effect" on the protected class of individuals, resulting in actionable discrimination under the Fourteenth Amendment's Equal Protection Clause.  In the Seventh Circuit, there is case law indicating that the Equal Protection Clause is only concerned with disparate treatment and requires a showing of intent.  *See Anderson v. Cornejo,* 355 F.3d 1021, 1024 (7th Cir. 2005).  Thus, it appears that only statutes, such as ICRA, which expressly authorize the use of disparate impact theories to prove liability will be actionable in Chicago.  To challenge the CPD's stop and frisk policies and practices under the U.S. or Illinois Constitutions, it appears that only a disparate treatment theory, in one of its two recognized forms, is available.

## *Legal Compliance with the Fourth Amendment*

The ISRs, which the Consultant assessed to determine Fourth Amendment compliance issues under the Agreement, were coded for the statistical experts' use in running statistical tests to obtain factual data about CPD's stop and frisk practices related tot he new written policy in S04-13-09.  Based on these coded narratives, the statistical experts concluded that the CPD's *city-wide* rate of "good stops" fell somewhere between 90 and 94 percent.   This would be an excellent start to the Agreement's compliance requirements; but before the Consultant may find substantial compliance with the Fourth Amendment, the underlying data must prove to be of known, scientific reliability which will produce accurate statistical results.

All findings made by the Consultant must be based on his confidence in the scientific accuracy of the underlying ISR data. The legal compliance determination rests on the assurance that the identified statistical sample set of 4,250 ISRS were "randomly drawn" and "representative" of the entire ISR data set of 54,701 for the first reporting period. If the Consultant were to simply drop in 2527 or 2,667 newly reconstructed ISRs, to the random sample, this would destroy the scientific basis upon which the statistical experts can assure the Consultant that the ISRs reviewed accurately represent the full set of stops made. Thus, even though the City urges the Consultant to give credit to the CPD for the over 90% good stop rate during the first reporting period, the Consultant respectfully submits that to use these statistical results to find Fourth Amendment compliance would be improper, for the reasons set forth elsewhere in this report. To summarize, the Consultant is unable to determine whether the CPD has substantially complied with the Fourth Amendment's requirements for the first reporting period, because there is an unknown reliability/validity problem with the underlying ISR data.

# Statistical Results

The statistical experts have provided the Consultant with five technical reports analyzing the ISR data produced by the CPD for the first reporting period. The five reports, by category and in order presented, include:

1. Coded ISR Narratives Technical Report for January 1 – June 30, 2016, dated January 6, 2017 ("Coded Narratives Report"); Appendix A.

2. Analysis of CPD Post-Stop Outcomes during Investigatory Stops, January through June 2016, dated January 6, 2017 (Post-Stop Outcomes Report or "PSO Report"); Appendix B.

3. The Ecological Analysis of Monthly Stop Data for January 1, 2014-June 30, 2016, dated December 20, 2016 ("Ecological Report"). Appendix C.

4. Summary Report of Violent Arrest Data, January 2014-April 2016, dated December 13, 2016 ("Violent Arrests Report"). Appendix D.

5.        Summary Report of Arrest Data, January 2014-April 2016, dated December 13, 2016 ("Total Arrests Report"); Appendix E.

The parties disagree as to the relevance of one or more of the reports prepared by the statistical experts. The point of disagreement appears to be whether they exceed the purposes of the Agreement, which is confined to the City and CPD's stop and frisk policy. The parties jointly recommended the appointment of the statistical experts, both of whom have extensive backgrounds in criminal and procedural justice issues. The experts are well versed in analyzing issues relating to stop and frisk and, after reviewing the Settlement Agreement, and further conversations with the Consultant, Dr. Taylor advised the Consultant of the need for all five reports in order to effectively assess whether the Agreement was having its intended effect during the first reporting period, which, in turn, relates to the compliance issue. In addition to the neutral experts recommended by the parties, the parties retained their own experts, all of whom conferred with the neutral experts, on several occasions, in an attempt to reach agreements on the standards that the Consultant would use in determining the substantial compliance issue. Reasonable minds may disagree with the neutral experts' choices of reports to utilize, but the Consultant defers to them in their choices.

The Consultant is not a statistician. Admittedly, the five statistical reports are very technical, but the experts who prepared them have attempted to simplify them to the best of their abilities in the introductions to the reports. The experts have done an excellent job in compiling these five reports based on the data that was submitted by the CPD and in attempting to simplify, to the extent possible, the contents, of the findings of their reports. Therefore, the Consultant believes that it would be a disservice to the readers of this report not to include the experts' explanations regarding the methodologies they used in arriving at their conclusions even though some of their explanations in this regard may be complex. Some may argue that even with the Consultant's attempt to simplify the experts' reports, the statistical data is still too complex for most people to understand. In addition, the Consultant, after numerous conferences with the experts, will attempt to further simplify them in this report. Based on comments by the parties, the Consultant has decided to delete some of his *personal* comments and observations regarding what the statistics show and to allow the respective reports to speak for themselves.

Although the Parties may disagree as to the relevancy of one or more of these reports and whether they go beyond the scope of the Agreement, the Consultant has carefully reviewed the Agreement and its purpose and has concluded, after discussions with the experts, that all five of these reports are relevant.

Each of these five reports contain different statistical results and serve different statistical purposes. Those purposes are discussed in the following pages in the five sections labeled by each specific report's name. Although some of the numbers and percentages cited in these reports may appear to be, and are, repetitive, the same numbers are cited in different reports for different reasons and test different statistical models.

The appointed experts submitted the five statistical reports to the Consultant as input for the compliance determinations that Section V.2. (a)-(f) of the Agreement requires. In the event that there are any perceived (or real) conflicts between the results reported by the Consultant and those asserted by the experts in their technical or statistical reports, the experts' reports control the statistical results. The Consultant's analysis of the statistical results, as interpreted in this report, controls only for purposes of the legal and practical recommendations involving compliance issues under the Agreement. Any statistical analysis of the statistical results offered by the Consultant, which appears in this report, but is not contained by reference to or in one of the five reports, is subject to review and comment by the parties. However, the Consultant's interpretation of the statistical results reported in one or more of the five expert reports controls, so long as the actual statistical result is stated correctly in the text of this report and does not prove to be in conflict with the statistical facts or results stated by the experts in their technical reports.

The Consultant's duty, as set forth by Section V.2. (d)-(e) is to "review" the CPD's ISR data to "assess" and "determine" whether a "statistically representative sample" of ISR narratives "state sufficient facts to establish the requisite reasonable suspicion" for the

120

investigatory stops and protective pat downs described therein (id. at (d)), and to "determine whether the standards for substantial compliance set forth in Section IV.2. have been met (id. at (e)). Section IV.2, as the parties are aware, states that: "CPD shall be in substantial compliance with this agreement if any violations of its requirements are neither systemic nor serious."

The substantial compliance determination belongs solely to the Consultant, based on his review and assessment not only of the law but also the statistical results obtained from examination and analysis of the ISR data. Interpretation of the statistical results is necessary for making the substantial compliance determination regarding whether the CPD's stop and frisk policy is, in practice, conforming to all applicable laws and CPD General Orders, such as SO4-13-09. The substantial compliance determination requires the Consultant to interpret whether "any violations" of the Agreement's terms are "systemic"; only by assessing and interpreting the statistical evidence can the Consultant make that kind of determination. Nonetheless, to assure the parties that the Consultant has dutifully exercised all due diligence and thoughtfully considered the statistical details, at least one of the statistical experts has carefully reviewed all statements and numbers relied upon by the Consultant for his interpretations of their statistical results, as written in this report; and, they have both assured the Consultant that the factual and statistical material upon which his interpretations are based, as cited herein, align completely with the findings and results contained in the five expert reports.

## Introduction

The results from the complete set of ISR data for the first six months of 2016 reveals that Chicago police officers stopped a total of 54,116 civilians from the three population groups chosen for the statistical studies in this reporting period, namely, individuals whom CPD officers identified, using CPD race and ethnicity codes, as African-American, Hispanic/Latino, or White; this left 585, from the total 54,701 ISRs submitted from January 1 to June 30, 2016, who were identified as members of other minority groups. Some racial and ethnic groups identified in the U.S. Census from 2010 have not been included in the

statistical analysis because their numbers, as well as their proportional numbers in the overall population, are not large enough, relative to the number of predictors models take into account, to provide meaningful statistical results for purposes of this report. The Consultant in no way intends to convey the impression that the constitutional rights of or the ISR reports submitted involving these civilians are not equally important.

That said, of the 54,116 stopped civilians identified as African-American, Hispanic/Latino, or White, African-Americans made up 38,361 of them (just under 71%); Hispanic/Latino 11,557 (about 21%), and Whites 4,198 (about 8%). As stated earlier, these three groups made up roughly one third each of the City's population as of the 2010 Census, so it is fair to say at the outset that African-Americans were stopped at rates much higher than their proportional representation in the general City-wide population, while Hispanics/Latinos and Whites were stopped at rates much lower than their proportional representation.

## The Coded Narratives Technical Report

The Coded Narratives Report statistically analyzed the codes assigned by the Consultant to a representative random sample of ISR narratives, randomly drawn from the complete data set of 54,116 of these ISRs that included individuals from the three racial and ethnicity groups being studied.

### The Sampling Strategy

Based on the total number of 54,116 ISRs involving members of one of the three racial or ethnic groups studied, a representative random sample was drawn of 4,250 ISRs from all police districts city-wide. To better compare the three ethno-racial groups, an equal number was sampled from each group. (When statistical models were run, the three groups were re-balanced to reflect their relative contribution in the full set of ISRs.) The sample was identified by the experts for the Consultant's review of the ISR narratives, as required by the Agreement. Because 17 of the 4,250 ISRs were duplicates, they were

eliminated, making the total analyzed for all purposes in the Coded Narratives Report 4,233.  The experts' findings in the Coded Narratives Report are based on statistical results derived from these 4,233 coded ISR narratives.

## The Coding Process

The data set being used by the Consultant to assess and analyze the CPD's policies and practices as of January 1, 2016, is comprised of individual records of individual stops by individual police officers.  To do any kind of statistical analysis of the CPD's stop and frisk data, someone needed to examine each and every ISR narrative in the sample to determine if the stop and/or frisk/search satisfied the requisite legal standards.

This Agreement is charting new pathways in a number of ways, and the coding system devised by the Consultant is no exception.  Although hindsight will serve the Consultant well during his review of the sample data from the second reporting period, when the first review began in early July of 2016, there was no single set of codes or coding methods from which to draw upon as an example of how to do the work.

In this case, the Consultant designed, to the best of his legal ability, a coding system that fairly reflected his judgments based on his judicial experience, of whether each individual ISR submitted and reviewed, adequately or inadequately articulated facts that gave the police officer reasonable suspicion for the stop, and any other protective pat down or search, based on probable cause, conducted as a result of that stop.  These kinds of individual, commonsense judgments are made by police officers and those who judge their actions every day; and, the Consultant's review of these ISRs applied the same discretion and judgment he used to issue warrants as a federal judge.

In general, the Consultant has learned, through the process of working with the statistical experts on this report, that empirical coding approaches can help describe outcomes and reduce inconsistent results, but empirical science can never replace the role of individual human judgment. To assess whether the individual narratives by police officers articulated

reasonable suspicion for their Terry stops, protective pat downs and/or searches, the variable of human, albeit flawed, judgment is essential.

"The Constitution does not require prescience,"[46]nor does it require the Consultant, in this case, or the police officers making Terry stops and frisks, to perfectly code or report every stop or pat down encounter in an ISR.  However, the Constitution does require articulation of the factual reasons for the stops, just as it requires the Consultant to articulate and "show his work" – so to speak.  Judgments can differ about the same set of facts; and the statistical numbers can cut one way or the other based on a myriad of variables and methods for testing those variables; but, nothing substitutes for good faith and common sense.  In general, those were the tools used to code the first reporting period data.

As required by the Agreement, the Consultant disclosed to the parties, for their review prior to public release of this report, the 4,233 randomly selected ISRs that he examined. In the interest of transparency, the Consult also disclosed the codes used to assess the stop, pat down and search types, along with the justifications articulated for them, for the sample set of ISR narratives.  Those codes and explanations for them are discussed in the Coded Narratives Report, Appendix A.

The Consultant meticulously examined the narratives and the checked boxes on each ISR form, uploaded electronic versions of his RAS findings and other codes as to each of them, and shared these files with the statistical experts. Reasonable minds might disagree as to whether some of the ISRs should have been coded differently.  However, the parties selected the Consultant based on their confidence in his judgment.  Therefore, the Consultant has not disclosed how he assessed each individual ISR using these codes.  The coded stop and post-stop outcomes are identified by the experts in their reports using

---

[46] *See Anderson v. Cornejo*, 355 F.3d 1021, 1024 (7th Cir. 2005).

professionally accepted social science and statistical science standards; and, these results have been reviewed by the parties before being released to the public. However, the legal conclusions, which are reflected by the codes assigned to the stop and frisk sample data of 4,233 ISRs, upon which the statistical results in the coded narratives analysis are based, were made solely by the Consultant.

Although the Consultant has complete confidence in the experts' findings and analysis of the data on which they based them, it must be noted that, like the analysis of any other factual scenarios, statistical analysis necessarily depends on the credibility of the factual information on which the analysis is made. In this regard, and for the reasons set forth above, the Consultant has serious concerns about whether the ISRs that were submitted during the first reporting period, and on which the experts performed their analysis, can be relied on to show that the training of the police officers is taking hold. The ISR narrative remarks reviewed show a great deal of confusion in those regards; and, the reconstructed files produced by the CPD to the Consultant in August 2016, in an attempt to remedy the ISS database issue for the first reporting period, simply are not reliable.

These are issues that can be resolved in future reporting periods with targeted training; adherence to best police practices; and vigilant monitoring of ISR data. The Consultant is confident that representatives of both the City and CPD recognize these problems and are making good faith efforts to correct them. Indeed, the City and CPD have assured the Consultant that, as of July 1, 2016, CPD has made the necessary changes in its database to ensure that all versions of the ISRs by the officers are included for review.

The fact is, however, that the reliability of the information on which the Consultant and statistical experts rightfully relied, in performing the coding and statistical analysis, was seriously compromised by the failure of the CPD to anticipate that the Consultant would need to review the original ISRs submitted by police officers, as well as every subsequent version of an ISR corrected or modified by a reviewing supervisor after submission. With

that *caveat,* the Consultant *w*ill begin his discussion of the sophisticated and highly intricate analyses performed by the experts.

## *Investigation Limitations*

Every investigation has limitations. So, too, has this one. The statistical results from data analysis of the ISRs are bounded by the following limitations.

*__Reports not observed interactions__.* When police officers write an ISR to describe the who, what, when, where, why and how facts, they tell a story which is inescapably personal and particularly based on their own biases and perceptions. The "narrative remarks" section of the ISR reports submitted by CPD police officers cannot offer more or less than their own observed interactions with the civilian whom they stopped. Consequently, the ISRs are subjective in the sense that they reflect the police officer's personal perception of the stopped subject's race or ethnicity, which is not necessarily the same as the race or ethnicity the subject self-reported in the CY 2010 U.S. Census, or in the 2010-14 American Community Survey. These subjective assessments are unavoidable, and there is no clear answer for how to align the race and ethnicity codes of the CPD police officers for stopped subjects with subject-reported data in the census data. In short, an ISR is limited by the biases and perceptions of its author who self-reports in light of the facts and circumstances that existed at the time the Terry stop, pat down and/or search was conducted.

It would be unfair, however, to characterize the racial and ethnic identifications made by police officers as being biased, simply because they are subjective. Race and ethnicity are social constructs, and the labels used to identify other human beings by skin color, national origin or some other ethnic context, are always a product of subjective perceptions, normalized over time by communal acceptance of those perceptions. Thus, legally actionable bias may or may not be present in the police officer's subjective perception that someone is Hispanic, since Hispanic's skin colors vary just as someone who is Hispanic can perceive themselves to be White or Black. The point is not that there is subjective "bias" in terms of how the race or ethnicity of the person stopped is identified; the point is that bias,

when coupled with arbitrary actions that cannot be justified by facts and common sense, when acted upon by a police officer with the power of the government (and a gun), is prohibited by law.

*Archival records in their final form.* When a supervisor's daily review of ISRs submitted by street patrol officers reveal that one or more ISRs by one or more police officers on duty that day did not comply with the law or CPD policy, the supervisor's comments about that ISR and the corrective actions taken by the supervisor with respect to the ISR, and the police officer who submitted it, were not recorded or kept by the ISR database implemented on January 1, 2016, when the Agreement took effect. Without a paper trail of which originally submitted ISRs did not comply with applicable laws or CPD policies, the Consultant was left to review only the finalized ISRs, appropriately coded as "approved" by the CPD supervisors. Moreover, and for the reasons explained earlier, the reconstructed ISRs are not reliable to show either that the supervisors or the patrol officers have been properly trained.

Consequently, the Consultant cannot report how many of the sampled ISR records, which are the basis for the data analysis in this report, represent an initial vs. a modified ISR. Any inferences, factual or legal, drawn from the data results contained in this report must, therefore, be limited by recognition that these results are the product of ISR data that cleared at least one supervisor's review for legal and administrative compliance issues.

*Focus just on three racial/ethnic groups*. The data results and related findings in this report concentrate on the three most predominant race/ethnicity combinations of residents found in the City of Chicago: white non-Hispanic civilians, black non-Hispanic civilians, and white Hispanic civilians (hereafter "white Hispanic civilians" are referred to as just Hispanic/Hispanics or Hispanic civilians/individuals). Persons who belong to other racial/ethnic groups are not part of this statistical study. Therefore, the reported data

results shed no light on how police interact with those other racial/ethnic groups during investigatory stops. The report makes no assumptions about how CPD officers interact with these other racial and ethnic groups. Patterns described here apply just to the three groups investigated.

*Coding of narratives was not race/ethnicity blind*. The race/ethnicity of the stopped citizen was known when the sample ISR narrative fields were being coded for legal compliance. It is possible that decisions about whether a stop or a pat down was justified could have been different if the race/ethnicity of the stopped citizen was not known. However, the Consultant believes that the race/ethnicity code for each ISR narrative was not considered in making legal assessments.

*Patterns observed apply only to investigatory stops*. The data results which reveal patterns apply only to Terry stops. Any stops reported by police officers on ISRs asserting facts sufficient to establish probable cause were disregarded by the Consultant for purposes of the present analysis.

*Patterns might change if additional factors taken into account.* Some of the data results discussed in this report gauge a "net effect" or a "net impact" or a race, ethnicity, or gender variable. The goal is to gauge the impact on an outcome due *solely* to race or ethnicity or gender differences. That is, if the analysis isolates, as best as it can, the influence of just a race difference, or just an ethnicity difference, or just a gender difference, on the outcome in question, after the influence of other factors has been removed. The influence on the outcome of race differences alone or ethnicity differences alone, after controlling for these other factors, is called a "net effect" or "net impact."

A second, but related, question is whether a "net" impact is a "statistically significant" result. The models that estimate a "net" impact not only describe the size of that impact. They also gauge, through an accepted scientific process called significance testing, whether that net impact is noticeable in the full set of records. This process allows the Consultant to extrapolate from the 4,000 plus coded records back to the full set of ISRs, *even though the latter were not coded.* If a "net impact" of a predictor like race is "statistically significant" it means the effect of race, in the *full set of ISRs, including the ones not coded*, has a greater than 95 percent probability of being noticeable. This means that if the entire scientific process described here – the sampling, the coding, the analyses and so on – were repeated 100 times with 100 independently drawn samples from these data, 95 times out of 100 the results for that predictor would indicate a noticeable net impact of that predictor. [47]

The 95 percent probability of being right recommended by the statistical experts goes along with a 5 percent chance of being wrong. If the chances are that 95 replications out of 100 would show a noticeable net impact of race, then there could be five (5) replications of the study suggesting *no* noticeable net impact of race in the full set of records. In other words, if all this was done over again 100 times, there would be a 5 percent error rate, or the probability of being wrong about what is happening with the *full* set of records would be 5 percent. For many social scientific purposes, this is an acceptable rate of making this type of mistake. So, when a statistical result concerning a net impact is described as "p<.05" this means that the probability of this type of error is less than 5 percent. If a net impact is described as "p<.001" then the chances of this type of error are less than 1/10th of a percent. [48]

---

[47] More technically, 95 times out of 100, the upper and lower bounds of the confidence intervals would not include zero, and the "true" net impact of that variable would lie within those upper and lower bounds.

[48] Experts selected this error rate after conducting analyses to be sure they would not be overlooking sizable differences.

The correlation or connection (link/relationship) between race/ethnicity and an observed behavior by police officers, which is referred to as an "outcome" in the reports, is also a statistical inference derived from the statistical power of the results. There are stronger and less strong correlational net impact results in the five reports. But, the statistical data results cannot describe the connection or link with precision; instead, factual and legal inferences from the connections and links must be deduced by ruling out links between the observed behavior and other legally justifiable factors and/or factors that the Consultant does not wish to analyze in this report. In other words, if the race connection persists when one takes additional factors into account, then one can conclude that the difference in outcomes (*i.e.,* the racial disparities being observed when race and the observed behavior are tested), is not the result of those additional factors (such as age or gender or the district in which the stop was made. One cannot, however, conclusively say that the observed outcome is the result of race or ethnicity unless it was statistically possible to factor out every other plausibly relevant variable.

*City-wide v. District Contexts.* The Consultant directed the statistical experts to analyze the data, first and foremost, on a city-wide basis, without respect to police district/neighborhood contexts. The specific geographic locations of the City are very important to the analysis of CPD stop and frisk police practice, as well as the substantial compliance consideration. To examine the connection and/or link between race or ethnicity on the observed police behavior – the stop decision and the post-stop pat down (if any) – in isolation from other known factors, the statistical experts factored out the age and gender of the stopped individual, as well as the police district (area of Chicago) where the stop took place. The limitations to note are that the study outcomes reported here might change if additional, fewer or different factors had also been taken into account.

*Intra-racial/ethnic group variations not considered.* Each of the three racial/ethnic groups of stopped citizens examined in this report has an extremely diverse membership. In fact, CPD makes use of mixed-race and mixed-race/ethnicity codes to describe the race and

ethnicity of the individuals stopped based on their subjective observations. No reported mixed-race or mixed race/ethnicity Terry stops were sampled for analysis in this report.

## Descriptive Study Results

A "Descriptive Study" is one that produces numbers results showing the gross impact of how the variable of interest in the study (*e.g.,* race/ethnicity/gender etc.) is linked to the outcome in question (*i.e.,* the probability of being in a good or a bad stop). Gross impact numbers capture the influence of the key variables without an attempt to "control for" (*i.e.,* rule out) other factors (*e.g.,* district context) which could also influence (or be used to predict) the outcomes. Gross impact *descriptions* often but not always use "un-weighted" data to describe different scores of different groups on the outcome, because there are no "controls" or "weights" placed on any of the variables in the raw data set (*i.e.,* no controls are placed on the data to tell the statistical formula how to quantify the data).

## Probability Analysis

After statistical models have been completed taking several predictors into account, results can be reported two ways. On the one hand we report whether the net impact of the race or ethnicity or gender difference on its own is statistically significant. On the other hand we can report the differences across the same groups in the predicted scores on the outcomes. All statistical models use weighted data. After a statistical model has been conducted, the predicted results refer to *modeled* rather than *observed* gross impacts.

To determine gross impacts, the statistical study conducted for this report made use of a "probability" analysis to "gain a closer appreciation of" the "patterns of impacts" – if any – on race, ethnicity and gender from Chicago police officers' stop and frisk practices during the first reporting period. The rationale for conducting a probability analysis is based on the "outcome of interest" in the study. In this study, the outcome of interest is whether the variables of race/ethnicity/gender have a statistically significant relational link to the

probability/likelihood or chance of being in a good stop or a bad stop, based on the sample data.

To determine predicted probabilities, the first step was to determine the actual number of good stops and bad stops in the coded ISRs. The experts took all 4,233 ISRs coded samples, dropped the 923 ISRs coded for probable cause, and examined only the remaining 3,310 ISRs coded as Investigatory Stops. Further tabulation showed that there were 3,128 good stops out of a total 3,310 ISRs with RAS (rather than PC) determinations. That left only 182 bad stops in the ISR sample. Based on that small number, the Consultant and the experts determined that a probability study using the 5 percent statistical significance marker would most clearly detect whether the probabilities of being in a good or bad stop were more or less likely for each race/ethnicity and/or gender group studied.

Because this was a descriptive study to determine the gross impacts of race/ethnicity and gender, the data was not weighted, which means that the experts did not "control" for any individual variables within each ISR to reach the result obtained. Thus, when interpreting the results reported below, it must be kept in mind that the "predicted probability" attributed to a stated variable, such as race, cannot be viewed in isolation from other variables associated with race that contribute to that predicted probability. This means that the predicted probabilities reported in this section of the report are merely descriptive in that they show a correlation between the variable examined, such as race, and the outcome of interest, such as the likelihood of being in a good or a bad stop. A correlation does not indicate a causal relationship.

*Gross Race Impacts*

Gross impacts of race or ethnicity differences were examined three different ways for this report.[49] Gross impacts can be reported as simple descriptions as well as in terms of predicted probabilities after statistical models have been run.

- The first analysis examines only the investigatory stop data (which included both good and bad stop codes), by excluding all ISRs which were coded as non-investigatory probable cause stops (*i.e.,* the 66 bikes-on-sidewalk stops coded as PC were in this excluded subset).

- The second analysis examines the investigatory stop data ***plus*** the 66 bikes-on-sidewalks stops coded for probable cause, but excludes all other probable cause stops. In the second analysis, the 66 bikes-on-sidewalk stops are treated as bad stops (no-RAS) because they lack justification as an investigatory stop (*i.e.,* they are not investigatory in nature), not because they lacked justification as probable cause stops.

- The third analysis treats the 66 bikes-on-sidewalk stops as good stops to measure the statistical difference between treating investigatory stops justified by RAS as a derivative form of probable cause stops using a "greater includes the lesser" rationale based on the assumption that these two types of stops both exist at different points on a reasonableness spectrum.

After dropping all ISRs coded for probable cause, the Consultant realized that one type of stop, the ordinance violations involving civilians over the age of 12 riding bicycles on the sidewalks, had been almost exclusively coded for probable cause, because these stops involved obvious "on-view" violations. Because most, if not all, of the other ISRs involving ordinance violations were treated as investigatory stops, the Consultant decided to treat all

---

[49] The Consultant did not intend to conduct three (3) alternative analyses. However, the challenges posed by how to code and treat the probable cause stops in the statistical analysis resulted in several mid-course corrections, which in turn led to the three alternative approaches reported below. The Consultant would like to take credit for intentionally designing such an intriguing statistical study; but he cannot. Instead, the alternative results reported below came about based on the Consultant's (overabundance of) caution and desire to be consistent in how the ISRs were coded. One of the many benefits of being a Consultant, instead of a Judge, is the freedom to be transparent about the deliberative process when doing so is of value. One specific value of revealing the Consultant's deliberations when conducting this statistical study is showing the parties and the public how dramatically the statistical results can shift based on the inclusion or exclusion of a very small number of stops to one side of the good stop/bad stop equation or the other.

ordinance-related/pedestrian stops as investigatory to be consistent.[50] He then directed the expert to include all bicycles on sidewalk stops by doing a word search of all the sample ISRs.[51]

The result of that word search turned up 76 stops: 66 had been coded for probable cause and 10 had been coded for RAS. The 10 RAS stops included 3 that did not involve ordinance violations, and 7 that did (cases where narrative did not articulate facts establishing probable cause to stop the subject). Based on this information, without knowing the race/ethnicity or gender of the subjects stopped, the Consultant decided to include the bicycle stops coded "1" for probable cause in the Terry Stop sample.

The expert included the 66 probable cause stops, but because the Consultant did not direct him to change the probable cause code of "1" to a "0" (to the contrary, because the Consultant indicated a desire to never change the codes originally assigned to the ISRs), the expert took that directive to mean that he should include the 66 bicycle stops on the bad stop side of the equation because good stops were coded "0" for RAS-found (RAS-sufficient/good stops etc.); whereas, all the bad stops had numbers assigned to them for the various particular reasons the Consultant found them to be bad stops.

At this point in the process, the Consultant still did not know how many bicycle stops there were, nor what variables were associated with them (race, ethnicity, gender etc.). Not until the expert informed him that the inclusion of the 66 bicycle stops as bad stops had

---

[50]Although the Consultant truly wanted to assign probable cause codes to many of the other ordinance violations in the data sample, he determined early in the coding process that to do so would eliminate half of the ISRs, if not more. Accordingly, the Consultant erred on the side of treating most of the ISRs, where an ordinance violation was the reason for the stop, as investigatory stops where an RAS determination was made.

[51] Narrative fields were searched for "sidewalk" plus any of the following "bicycle", "bike", or "cycle". Numerous records where the stopped individual was in the street or a public right of way were not included.

counterintuitively altered the result of a statistically significant net race impact, did the Consultant ask the expert to look at the individual variables in the 66 bicycle stops.

As reported, 27 of those 66 stops involved White NH civilians, 23 of whom were males; 23 involved Hispanics, 22 of whom were males; and 16 of those stops involved Black NH civilians, all of whom were males.  Given that there were only 182 bad stops before these 66 stops were included, the Consultant directed the expert to give him the racial and ethnic breakdown of the other 182 investigatory stops where RAS was not found (for any reason). Those numbers were as follows:  89 Black NH; 54 Hispanic; and 39 White NH.  By including an additional 27 "bad stops" (because they had been coded as "1" for probable cause rather than "0" for RAS) to the White NH column, the number of White NH bad stops became 66; and by adding 16 bad stops to the 89 Black NH column, the number of Black NH bad stops became 105.  Because the proportional numbers of bad stops within each racial group changed so significantly, the decision to include the 66 bicycle stops had the effect of diluting the net race impact of Black NH civilians having a higher likelihood/probability of being in a bad stop.

If one thinks in terms of percentages, then the figures (using unweighted data) change. For example, if the 66 bicycle PC stops are excluded, the percentage of White non-Hispanic stops that were bad was 3.5 (39 out of 1,107 White non-Hispanic stops; 3,310 total). Adding in the 66 PC bicycle stops and coding them as bad jumped the percentage of White non-Hispanic stops that were bad sizably, up to 5.8 percent (66 out of 1,134 white stops; 3,376 total).

Percent bad black stops jumped as well, but not as much.  If the 66 stops are excluded, the percentage of Black non-Hispanic stops that were bad was 8.2 percent (89 out of 1,084 Black non-Hispanic stops; 3,310 total).  If the 66 stops are included and coded as bad, the percent of Black non-Hispanic bad stops increases from 8.2 to 9.5 percent (89 up to 105 out of 1,100 Black non-Hispanic stops; 3,376 total). So, the difference between the two groups

135

in their respective percentages of bad stops has diminished some (8.2-3.5=4.7 percent difference; down to 9.5-5.8=3.7 percent difference).

The value of that result led the Consultant to look closely at the legal reasons for treating probable cause and RAS as derivatives of the same "reasonableness" standard under the Fourth Amendment; and, for the reasons stated elsewhere in this report, the Consultant believes there is a strong case to be made for rejecting that idea and treating the two stops as categorically different, especially for purposes of assessing disparate impact based on discretionary law enforcement decisions to stop and frisk.

Aware, however, that many members of the legal bar may disagree with this analysis, the Consultant directed the expert to treat the sixty-six (66) probable cause bicycle stops as good stops rather than bad stops and run the statistical analysis again, for the third time. Not surprisingly, given what was now known about the composition of the race variables in those 66 stops, adding 27 (unweighted) more good stops to the White NH column did not materially alter the statistical significance of the net race impact results from those that were obtained when those 66 results had been dropped for probable cause.  This is because the 27 were added to a number that was already large, 1,068, driving it up to 1,095 (unweighted data).  With the probable cause <u>bicycle stops out</u>, the percentage of bad stops is 3.5 percent for White NHs and 8.2 percent for Black NHs. With the probable cause bicycle stops in <u>and treated as good stops</u>, the percentage of bad stops is 3.4 percent for White NHs and 8.1 percent for Black NHs. The bottom line from this analysis is that no matter whether one includes the 66 bicycle stops and treats them as good stops, or excludes those stops, one still finds a statistically significant racial disparity.

*Gross Impact Analysis #1 (bicycles excluded)*

## Race & Gender:

The statistical results continue to show that the race/ethnicity/gender groups were ordered as follows, based on the highest to lowest average predicted probabilities of being in a bad stop. See Coded Narratives Report, Table 19.

1. Black non-Hispanic Males (8.3 percent)
2. Black non-Hispanic Females (5.4 percent)
3. Hispanic Males (4.9 percent)
4. White non-Hispanic Males (3.6 percent)

The above figure shows, for each of the six groupings based on gender/race/ethnicity, the average predicted probability that that group would be involved in a bad stop. Race/ethnicity effects are shown because, moving from left to right, the male and female average for an ethno-racial group increases. Gender effects are shown within each ethno-racial group because the average for women is lower than the average for men.

## Districts:

These predicted probabilities incorporate differences in the police district-level averages on the outcome. In other words, the likelihood that a stop would be bad varied across different police districts. The probability study takes all the bad stops and creates an average predicted probability, for each district, that stops there would be bad. This variation is taken into account when other predictors of the outcome are considered.

Further, the predicted probabilities generated by the statistical model can be organized by district (Figure 8). These show, based on district context and all the other factors used to predict good stop vs. bad stop, that the chances of a bad stop happening varied markedly across different districts. The average predicted probability of a bad stop was about 5.2

percent. Three districts had average predicted probabilities that were at least two percentage points above this: Districts 4, 10, and 3.  The latter district was the only one where the average predicted probability of a bad stop exceeded 10 percent.  Two districts were at least two percentage points below the average: Districts 19 and 24.

Not only did Districts 10 and 3 have high predicted average probabilities of bad stops. These two districts also had significantly higher *actual* proportions of bad stops than the model predicted.  Bad stops happened in each of these districts, on average, significantly more frequently than the model predicted. This deviation from the model predictions occurred with the bicycle sidewalk violations in and treated as good, or with those stops excluded.

### *Gross Impact Analysis #2 (bicycles included as bad stops)*

In the second gross impact analysis, the statistical experts examined the effects on predicted probabilities of being in a bad stop when the 66 bikes-on stops were included in the investigatory stop sample of 3,310 (excluding all probable cause stops, including bikes), changing the total sample size to 3,376 stops.

## Race & Gender:

In Analysis #2, the gross impacts of gender, race and ethnicity are considered. The pattern is similar to but different from what was shown when bicycle violations were excluded. The probabilities of a bad stop grow higher as one shifts from White NH to Hispanic to Black NH individuals, and the bad stop probabilities are higher for men than women. The average predicted probability for a White NH male of being in a bad stop increases by almost half, from about 3.6 percent to a little over 6 percent. The average predicted probability of a Black NH male of being in a bad stop increases slightly less than two percent, from 8.3 percent to 9.9 percent; but, the increase as a proportion of the first number is much smaller for Black NH than it was for White NH stops (.061/.036 = 69 percent increase for White NH; .099/.083=19 percent increase for Black NH).  The pattern of predicted chances of a

bad stop across the six different groups is almost identical to the pattern seen when sidewalk bicycle violations were excluded.

## Descriptive Conclusions

Descriptively, there is a gross impact, a "relationship" between race, ethnicity and gender, and the probability of being in a good or bad stop. A similar pattern of group differences in average predicted probabilities appears under all three scenarios for treating bicycle sidewalk violations. The six race/ethnicity/gender groups are ordered similarly, from low to high average predicted probability of a bad stop, under these different scenarios. Further, under some of these scenarios, the *difference* between the White NH male vs. Black NH male predicted probabilities shifts somewhat.

## Net Race Impacts for Stops
The net race impact results can be summarized as follows.

- When contrasting Non-Hispanic Whites vs. Blacks, there is a statistically significant net race impact on the likelihood of an unjustified investigatory stop ("bad stop"). This shows up in two of the three statistical analyses done. In statistical terms, this means that among stopped non-Hispanic civilians, a significant net impact of race on whether a stop was justified emerges. *The statistical significance tells us that this difference likely applies to the full set of ISRs for the six-month period, not just the coded ones.* Statistical significance for this study was set at 5 percent.

- The significant net race impact occurs under the following two scenarios: bicycle sidewalk violations coded as non-investigatory stops because they were based on probable cause are excluded; or, if included, probable cause stops involving the bicycle-sidewalk ordinance are treated as good stops. When included, but treated as bad stops, the influence of the bicycle stops dilutes the net race impact resulting in a net race effect that does not achieve statistical significance. This result means that there is probably no noticeable net race impact in the full set of ISR records.
- In other words, it matters in this study whether the probable cause stops are treated as "good stops" (RAS-yes) or "bad stops" (RAS-no). When the 66 bikes-on stops are treated as bad stops, then the net race impact is diluted and the net race impact results lose their statistical "significance." When the 66 bikes-on stops are treated as good stops, then the net race impact retains its statistical significance in nearly

the same proportion to the significance finding that results when those 66 bikes-on stops are excluded, based on their probable cause code, with all the other ISRs excluded, because they too were coded as based on probable cause, rather than RAS.

- The significant net race impact applies to male non-Hispanics of all ages; but it may not apply to female stopped non-Hispanic individuals. The results of this study from the full set of samples did not show with certainty that non-Hispanic Black women, controlling for all other factors, have higher chances than non-Hispanic White women of being in a bad stop.

- For stopped male non-Hispanics, the size of the net race effect is about five to six percent. That is, controlling for all other factors, including district context, the predicted impact of being a Black instead of a White non-Hispanic increases the predicted chances of a bad stop by about five to six percent. Although a five to six percent shift sounds small, bear in mind that the overall predicted probabilities of bad stops are relatively low to begin with. So, in that context, these are marked changes based on the predicted impact ascribable to just the race variable.

## Consultant's Observations

The Consultant does not suggest that the parties or the public rush to judgment based on these or any other numbers being reported. Generalizations about these data will not produce much, if any, clarity about what was really happening on the streets of Chicago during the first six months of 2016 regarding the CPD'S current stop and frisk policies.

There are a number of reasons that have been discussed in this report for sounding this cautionary note, not the least of which is the fact that the ISR data reviewed and coded by the Consultant, which were then relied on by the statistical experts, were most likely edited versions of the original ISRs submitted by street patrol officers.

Nonetheless, there is much that can be gleaned from the statistical analysis of this data which is useful going forward, both for public policy-making purposes (gross net impacts), as well as the continued roll-out of this Agreement (net impacts). Thus, without the statistical results to measure the efforts of the CPD's attempts to bring its policies and practices into compliance with state and federal law and the Agreement, it would be too

easy to look at these raw numerical disparities and conclude, based on generalized guesswork, that police bias is the cause.

Police bias is not necessarily the cause of these disparities, as the following statistics, interpreted by the statistical experts, will show. Indeed, in several of the areas of concern in which statistical results were analyzed, the experts concluded that, while there appeared to be a "correlation" between the described actions of police officers and the race/ethnicity/gender of the individuals stopped, analysis of the statistics did not show that those factors were the "cause "of the actions taken.

# The Post-Stop Outcome Analysis Report

## *Introduction*

This section of the report focuses on what happens after a police officer stops a civilian to investigate.  Here, statistics, rather than legal principles, are being used to evaluate law enforcement practices after the Terry stop, pat down and/or search is made, because empirical evidence is uniquely suited to identify patterns of institutional, rather than individual, behavior.

In broad terms, the statistical analysis from the Post-Stop Outcomes ("PSO") Report, written for and on behalf of the Consultant by Dr. Taylor and Dr. Johnson (the "experts"), provides numerical results which pertain to the connection, if any, between the actions taken by police officers after the investigatory stop was made and the primary factors of interest to the Agreement, namely:  race, ethnicity and gender.

These results have important practical and policy implications for the procedural justice reforms subject to the Agreement. The goal of the Agreement is to bring the CPD's stop and frisk policy and practice into compliance with applicable laws.  To this end, empirical evidence helps the Consultant and the parties monitor progress toward this goal.

The Consultant is not a statistical expert; nonetheless, the parties have authorized the appointment of the experts to aid him with the duty assigned to him by the Agreement. This duty includes the task of reviewing the CPD's stop and frisk data from January 1 through June 30, 2016 (the first reporting period) and analyzing the statistical results from the experts' examination of this data, for purposes of assessing whether the CPD has substantially complied with the obligations set forth under the Agreement.

To this end, the Consultant will now discuss the results of the experts' PSO report, and analyze those results in a way that the Consultant understands them. Hopefully, this summary of the experts' statistical findings will provide a framework for review and understanding of the more complicated, technical reports completed by the experts, which are appended to this report.

Any expectation that this report will provide evidence to dispel or prove disparate impact or treatment theories with regard to the CPD's stop and frisk policy and/or practices is misplaced. Instead, the statistical results reported here begin to draw a picture, perhaps, of certain patterns of CPD police practice and behavior that can be verified by the number of times the six identified outcomes of interest occurred to members of the three racial and ethnic groups studied.[52]

As illustrated, the type of question asked, outcome searched for, study used and chart shown to present the statistical results determines the lens through which the particular facts observed can be seen. There are many lenses for the observed facts. The statistical experts have provided but a few of these.

---

[52]Questions of who is stopped where are addressed in the "Ecological Reports" which are analyzed in subsequent sections of the Consultant's report.

## Background

### ISR Data

The PSO Report analyzes the 54,116 ISR records generated by the CPD during the period January 1 through June 30, 2016. The PSO report addresses the racial and ethnic patterning of post-stop outcomes. Here, the PSO Report provides statistical results for six "outcomes of interest" and two questions about what happens after a stop has been initiated, for which the Consultant sought answers or statistical results.

### Six Outcomes

There are six (6) specific post-stop outcomes examined. For each of the six outcomes, the stop is assumed and the outcome listed is the subject of the statistical study.

1. Is a pat down conducted or not?

2. If a pat down is conducted, is a weapon found?

3. Is a search conducted or not?

4. If a search is conducted, is a weapon found?[53]

5. Is any enforcement action delivered or not?

6. What are the chances that the stopped citizen experienced a pat down combined with no enforcement action vs. no pat down and no enforcement action?

For each of these six outcomes, the results are presented descriptively and statistically. Descriptive results provide numerical context for race and ethnicity differences on the outcomes. Statistical results seek to gauge the link between a variable of interest, such as race of the stopped person, and an outcome, that is due *just* to that race variable. They do this by controlling for other factors. If the "net impact" of race proves statistically significant, this means that the net impact of the race variable is noticeable.

---

[53]Concerns appeared with the contraband indicators in the data themselves. More specifically, there were 173 cases where the search checkbox completed by police indicated that no search took place, but police also indicated that some type of contraband was recovered as part of a search. Given such a sizable number of discrepancies, search hit rate analyses focusing just on contraband seemed ill-advised.

## Two Questions

To obtain statistical results for each of the six outcomes, the experts asked the same two questions when testing the data: controlling for all factors observed in the data that are *not of interest* ("covariates"), is there a statistically significant difference between (1) non-Hispanic Black civilians and non-Hispanic White civilians; and (2) Hispanic civilians and non-Hispanic White civilians? Because the covariates are controlled, the results for each of the six outcomes yielded net effect/impact results. These net effect results represent correlational links or relationships between the variables of interest in the specific model (test) used and the particular outcome of interest in the model study.

# Methodology

## Statistical significance

The term "significance," when paired with the word "statistical," means something different for the post stop outcomes report than it did in the Coded Narratives Report. There, if something was "significant," then the link between that variable and the outcome, after controlling for other factors, was likely to be noticeable in the *full* set of ISRs. That is, significance permitted informed guesses about what was happening *even in the non-coded* ISRs. The experts, thus, could analyze the full set of ISRs for each outcome investigated. However, rather than do that, they chose to separate the ISRs into two random samples and analyze each independent sample of records separately. Thus, there is still a sample, and statistical significance describes whether the net impact of a factor is noticeable in the full set of records. Statistical significance also allowed the experts to make inferences from the sample ISR data set to the full set of ISR records.

Statistical significance means the same thing in the post stop outcomes report, as it did when discussing the coded narrative data. Yet, since the experts were analyzing two independent random samples, when they found a statistically significant net impact of a predictor in *both* random samples, that duplicated result provided *more* assurance that the

net effect of that variable was noticeable.  This noticeable effect in the sample led the experts to conclude that the net impact of the predictor also suggested a noticeable impact in the full set of records, which was not dependent on the particular mix of records included in one sample or another.   Stated differently, statistical significance in the post stop outcomes report means that the suggested conclusion of a noticeable impact is more "robust" (*i.e.,* the significant finding has been replicated).

As explained earlier in the section describing statistical significance and the coded narratives analysis, the statistical significance level used is "p < .05."  The significance level means that, if 100 representative random samples were drawn and the same analyses were conducted, using the same protocol, then the noticeable net impact would occur at least 95 times out of 100.

## *Correlation vs. Causation*

Like law, quantitative social science does not promise certainty. Instead, it gauges likelihoods, odds and probabilities of certain outcomes taking place, and how those are affected by predictor variables. Also like law, many quantitative social science studies do not commonly produce evidence of direct causation. Thus, social science researchers, even though they may find a sizable and statistically significant link between a predictor, like race, and an outcome variable, like being patted down, and even though they may control for some other factors that might link to both the predictor and the outcome, like age, they still cannot be sure that race is *causing* the outcome. This is because race could still be connected to other factors, either included in the set of other predictors used in the model, or outside of the model. If those connections with other factors exist, then those other factors, and not race, could be partly or entirely responsible for the observed impact of race on the outcome. Researchers call this a "problem of selection on observed covariates."

Once a model has been completed, researchers have ways of "diagnosing" the degree to which this might be problematic. If those diagnostics indicate this type of selection might

be operating, then the link between the predictor, like race, and the outcome, like being patted down, is interpreted as "correlational" and not "causal." It is not interpreted as causal because the roles of other non-race factors could be causally relevant instead.

Even if the links with other factors can be ruled out through the social scientist's diagnostics, there is another potential problem. There could be *unmeasured* factors that link to race and the outcome not included in the ISR form or in the models used, which is known as "selection on unobserved covariates." Put simply, there are unknown unknowns that could be playing a causal role, and theses unknowns may be linked both to race and the outcome.

For some types of models, researchers can gauge the extent to which this concern is potentially problematic. If the diagnostics suggest it is, then, again, the interpretation of the race-outcome link is best considered correlational rather than causal, because the "real" cause might arise in part from these un-measured factors.

The experts attempted, for the models reported here, to conduct diagnostics informing them about the extent to which the two selection problems noted above were problematic or potentially problematic. To the extent that the diagnostics revealed concerns or potential concerns, the experts adjusted their interpretation of a net impact of a race or ethnicity or gender variable accordingly, shading toward a "correlational" rather than "causal" interpretation as these concerns grew. By way of preview, almost all of the models the experts ran pointed to some degree of concern with one or another type of selection. Further, they were not able, either due to time constraints or to the nature of the models run, to fully assess both of these types of selection problems for all models.

# Scope of The Statistical Study

## *Individual Stop Counts[54]*

At the outset, it is important to understand that the term "stop" in this section of the report refers to each ISR record where at least one individual was stopped by a police officer; and, the number is based on the number of ISR records submitted, not the number of unique individuals who were subject to a single stop.

To phrase it more simply, the number of stops, frisks, and searches refer to a single ISR record, where a police officer reported stopping one individual during the relevant time period. This reference to an individual does not differentiate between unique individuals with unique names and addresses. Instead, the individual stop count is based on the number of times any individual was stopped.

## *CPD Individual Event Codes*

Additionally, the stop, pat down and search counts referenced by the PSO report also contain "event numbers," which is the way the CPD organizes stops in its database. The event number describes the point in time when a stop was made. A single event code can describe the stop of a single individual or many individuals.

In stop events where multiple individuals are detained, even if a stop event was determined to be of a type that did not fall within the scope of the Agreement (*e.g.,* probable cause stops), the statistical experts counted and reported each individual stop

---

[54]Unfortunately, during the first month of the first reporting period, January of 2016, some CPD officers created some duplicate ISRs for the same stop. Although this duplication error meant that the Consultant reviewed a fair number of ISRs related to the same stop event, during his review of the sample ISR narratives, this error was understandable because the ISR system was new and not all police officers were trained in how to use the system and submit ISR reports electronically until May 27, 2016. The duplicate records were not removed from the total of 54,701 records by the experts, because to have done so would have meant that the Consultant could not ensure that all stops that took place were analyzed within each event number. In the future, one way to remove duplicate records would be to randomly sample one stop within an event number.

within a single stop event, as well as each pat down or search.  When a particular stop event included multiple persons, resulting in the temporary detention of more than one individual, each individual in the single stop event should have been recorded by a police officer using a unique ISR number and a stop event number unique to the multiple person detention event.  The unique ISR number identifies the individual stopped and counts the stop; the stop event number allows the CPD, as well as those reviewing the ISR data, to connect the individual stop to a single "event" so that the stop narratives can be "related" and understood in context.  In multiple person stop events, the stop event number is the same for all persons who were part of the stop.

Conversely, in other cases, where a stop event included only one individual, that individual may have been subject to multiple stops during the relevant period by one or more Chicago police officers.  For each stop in which the individual was a subject, a unique ISR number should have been issued for each and every stop event.

During the reporting time period, 54,701 ISR records were submitted by Chicago police officers.  In 424 of these records, the event number was missing.  The experts created a work-around by generating a "proxy event number," which was based on a match to different records taking place in the same district, on the same day, at the same time, and with the same responding first officer. [55]  With either the real or proxy event numbers in place, the experts were able to determine the number of individuals stopped per event.  The distribution for this calculation appears in Table 2 of the PSO Report.[56]  The number of

---

[55]The experts created a variable to capture whether a "proxy" event number was generated, and by using this variable in their model, they were able to control for the fact that event numbers were missing for some records.

[56] There are many "Tables" and "Figures" presented in the Post Stop Outcomes Report ("PSO Report").  Those tables and figures are referred to by the Consultant in this report, but they are not replicated here.  The parties and the public will need to refer to the expert reports to see the tables and figures discussed.  When referring to "Table __" or "Figure __" in this section of the report, the Consultant is referring to the PSO Report, Appendix B.

individuals who were part of a single event ranged from 1 to 21, but over half of the total stops made involved 3 or fewer individuals stopped.

## CPD Race & Ethnic Codes and Counts, All ISRs, Jan.-June 2016

As stated earlier, this report only studies the effects of CPD stop and frisk practices on three racial and ethnic groups residing in Chicago: Black non-Hispanics, Hispanics and White non-Hispanics. These three groups were chosen, according to the latest U.S. Census Data figures from 2010, because they each constitute roughly one-third of the City of Chicago's population and constitute 98.9 percent of the ISR records for the period.

Table 3 in the PSO Report reflects the actual number of ISR records and percentage of total stops for each racial and ethnic group which the CPD tracks. As shown there, the total number of individual stops being analyzed changes from 54,701 to 54,116 when the three groups are isolated from the total data set. The 54,116 number is the one that will be used for the remainder of the calculations reported.

## Sampling Strategy

Statistical scholarship analyzing police stops and post stop outcomes, outside the context of this Agreement, demonstrates considerable disagreement on best practices for methodologies, research designs, and analytic choices. Consequently, as noted above, the experts adopted an approach that allows checking for consistent results across two different random samples and two different analytic approaches.

Here, the experts chose two statistical models for each outcome of interest and tested two independent models on two separate random halves of the ISR data. More specifically, to test for net effect, the experts randomly divided the full data set of 54,116 ISR records to

create two randomly drawn samples; then, they tested each sample with each of the two models chosen.  The two models chosen vary between outcomes based on the experts' research regarding which models had the best "fit" to the questions being asked and the outcomes being studied.

## Outcome Variables

### *Dependent outcomes*

Some outcomes are dependent upon another particular outcome *already* taking place. Two outcomes are dependent upon another outcome taking place.  For example, whether a weapon is found from a pat down depends upon the pat down being conducted.   Whether a weapon is found from a search depends on a search being conducted. When a weapon is found after a pat down or search has taken place, this is called a "hit" and the number or fraction of times it occurs is known as the "hit rate."

Table 5 provides key, descriptive statistics for the dependent variables that have only two possible categories: something either did or did not happen. One outcome is categorical: the combination of pat down patterns and enforcement action patterns. Counts by category for that outcome appear in Table 6.

Table 9 provides counts of pat downs by district, race and ethnicity and totals those numbers.  Table 10 provides corresponding proportions of cases receiving a pat down.

As shown, in 18,364 of the 54,116 stops, the police officer delivered a pat down to the stopped individual (about one third of all stops).  Within districts, the number of pat downs ranged from a high of 2,377 in District 7 (Englewood) to a low of 162 in District 1 (the Loop).  Whereas 19.6 percent of stops in the Loop resulted in a pat down, 49.4 percent of stops in Englewood resulted in a pat down.

Table 11 provides counts of how many actual weapons or firearms (non-contraband) were recovered as a result of officers patting down stopped civilians. For the period, the recovered weapons total was 465. As shown, the number of weapons recovered varied from a low of 2 in District 20 to a high of 59 in District 7.

Table 13 indicates the number of searches conducted by district, race and ethnicity and totals those numbers city-wide. As shown, police officers conducted 9,595 searches of stopped citizens. This number amounts to an average search to stop ratio of 1:5 or 1:6 stops which included a search. Within the Black non-Hispanic group, the largest number of searches took place in District 11, with 1,145 reported on ISRs. Within the Hispanics group, the largest number of searches took place in District 9, with 318 total recorded.

Table 14 provides the proportions of stopped individual who were searched, for each race and ethnicity by district. In Table 14, it appears that in each of the three ethno-racial groups the proportion of stopped individuals who were searched was roughly equal in each district' the city-wide rate of 1:5 or 1:6 searches: stops was/were about what one could expect in any police district for the reporting period.

## Categorical Outcome

The only categorical outcome studied concerns whether a stopped civilian was subject to a pat down and, if so, whether an enforcement action followed from this pat down (without regard to whether a weapon was found or not). In Table 6, the statistical results for the 4 possibilities inherent in this outcome are reported. Table 6 shows that, out of a total 54,116[57] stops during the first period:

---

[57] There were 11 ISRs where the ISR check box "Enforcement action taken yes/no" was checked "no" but officers indicated that some type of enforcement action (10 instance, other; 1 instance, PSC) occurred. In cases where the data were internally inconsistent, the variable shown here, which depends in part on whether an enforcement action was taken, was coded to missing.

- There were 23,236 stops where no pat down and no enforcement action occurred

- There were 13,444 stops where a pat down but no enforcement action occurred;

- There were 12,508 stops where there was no pat down but an enforcement action did occur;

- There were 4,917 cases where a pat down and an enforcement action occurred.

## *Post-Stop Outcomes Results*
### Enforcement Actions

The Consultant directed the experts to examine enforcement outcomes because discriminatory impact may be observed in the data by looking at stops and post-stop outcomes, where discretion is exercised.

Close examination of enforcement outcomes is necessary, because neither Illinois law, nor the Agreement, expressly require the CPD to document stops made for probable cause that do not result in a frisk, search, summons or arrest (Illinois law) or are not characterized by a police officer as an investigatory stop, because the criminal behavior observed is on-view rather than merely suspected. The Agreement, by its terms, only covers stops based on RAS, whether enforced or not; but, the Agreement does not purport to cover on-view probable cause violations at all unless they result in a frisk, search, summons or arrest.

### Non-Arrest Enforcement Actions

The CPD recognizes four (4) types of enforcement actions that can result from a Terry Stop: (1) administrative notice of violation ("ANOV"); (2) arrest ("ARR"); (3) personal service citation ("PSC"), also known as a "ticket; and (4) other ("OTH"). The frequency with which

152

these four enforcement actions were taken during the reporting period appears in Table 17. There were 17,425 total enforcement actions (Tables 5, 17) from the full data set of 54,116 records.  Of these 17,425 actions, 8,037 (46.09 percent) were arrests; the other 9,388 actions (53.88 percent) were "non-arrest" enforcement actions such as: administrative notice of violations (ANOVs); personal service citations (PSCs); or "other" (OTH).

From the 9,388 non-arrest enforcement actions meted out, during the first reporting period, there were: 5,141 administrative notices of violation ("ANOVs" or administrative violations); 3,386 undefined actions lumped together under the dubious term of "other" ("OTH"); and 861 personal service of citation notices ("PSC").  *See* Table 17.  Clearly, the lion's share of non-arrest enforcement actions fell into either the ANOV or OTH categories.

## Descriptive results
### Numerical

Table 18 shows the number of enforcement actions (all types) by district and race/ethnicity.  From Table 18, it is apparent that the fewest number of enforcement actions were taken in District 14, and the most were taken in District 11.  The number of enforcement actions in a particular police district is only significant, for purposes of the analysis in this report, in relationship to the number of stops being made in each district by race and ethnicity.  Those results must be stated as proportional representations, and they appear in Table 18, as well.

## By District

Table 19 shows the counts and proportions of stops plus pat downs plus no enforcement actions by district and ethnicity.  It shows that the rate or proportion of stops with pat downs which do not result in subsequent enforcement actions is lower in the Loop (District 1), that it is in Englewood (District 7), despite and approximately equal total population.  It

also shows that stopped White NHs and Hispanic Whites were stopped, patted down, and released without an enforcement action at a rate in excess of their demographic residential proportion in the Englewood neighborhood, because the White NH population represents only 1% and the Hispanic White population represents less than 1% of the total in that district.  With respect to the number of individuals stopped who received enforcement actions in each police district, it appears that there is an "unobserved" variable (statistically speaking) related to "visibility" as a factor in whether an individual is pat down after a stop, but then released without an enforcement action.  See Table 19 (counts and proportions of stops + pat downs + no enforcement action by district, & ethnicity).

The visibility factor can be observed by inference from a comparison between Table 19 and the population statistics from the American Community Survey from 2010-14 (5 year estimates) for two police districts in Chicago: Loop, District 1, (which contains residential, business, consumer and tourism traffic at virtually all hours of the day and night), and Englewood, District 7, (where fewer individuals who do not reside or work there, will be present due to the socio-economic conditions in that area). *See* Exhibit 10.  In other words, pat downs without subsequent enforcement actions may be more likely to occur in less publicly visible areas, or where the number of bystanders and passersby is not as high.

The Loop area may be the most public and visible area in Chicago.  Legal infractions of a serious and non-serious nature do occur there.  However, it is not surprising to see that the rate or proportion of stops with pat downs which do not result in subsequent enforcement actions is lower in the Loop (District 1), than it is in Englewood (District 7), despite an approximately equal total population.  It is also not surprising to see that stopped White NHs and Hispanic Whites were stopped, patted down, and released without an enforcement action at a rate in excess of their demographic residential proportions in the Englewood neighborhood, because the White NH population represents only 1% and the Hispanic White population represents less than 1% of the total.  Fewer numbers mean that

154

White NHs and Hispanic Whites are thus much more visible than Black NH residents, who comprise 94% of the residential population in Englewood.

## White Civilians + EAs

The police districts where the White non-Hispanic proportions of those stopped, who were subjected to enforcement actions at a rate at least 5 percent higher than either of the other two groups, were Districts 3 and 6. *See* Table 18.

In both of these districts, however, the *number* of stops involving White NHs, who received enforcement actions, was quite low – 20 or fewer. *See* Table 18. Similarly, in both of those districts, the number of stopped Black non-Hispanics receiving an enforcement action was quite large, over 900.

To determine whether other factors correlate with the disparity between the rates with which Blacks and Whites receive enforcement actions, the experts will need to look more closely at the data at the police beat levels. Beat levels, in contrast to police district levels, provide a more acceptable number of ecological units for considering disparities. This study will be done in the second report.

## Black Civilians + EAs

The police districts where stopped Black NHs received at least five percent more enforcement actions than White non-Hispanic or Hispanics, were: Districts, 5, 7, 11, 12, 15, and 22. Only in District 12 were the enforcement stops for each group over 30 in number.

## Hispanic Civilians + EAs

The police districts where stopped Hispanics had enforcement probabilities at least five percent higher than each other group were 2, 16, 17, 18, and 19. In the last four districts, there were sizable numbers of stops with enforcement, 30 or more, for each ethno-racial group. The present statistical study did not identify specific features or variables driving this higher enforcement rate among Hispanics in these districts, but identification of these features becomes an interesting, and potentially important, question.

## Proportional Representations

Results from Table 18 show that stopped civilians in District 1 (Loop) were most likely to receive an enforcement action with an EA rate of 42.7 percent. For each ethno-racial group in District 1, the proportion of stops linked to some type of enforcement action was right around this percentage.

City-wide, the overall proportion of stops resulting in an enforcement action of any kind was 32.2 percent for the three racial and ethnic groups studied. Stopped civilians who were White received an enforcement action in 28.3 percent of their stops; stopped Black NH civilians received an enforcement action in 33.1 percent of their stops; and Hispanic stopped civilians received and enforcement action in 30.8 percent of their stops. In short, there appears to be rough equivalence between the number of times members from each racial and ethnic group receive an enforcement action if they were subject to a Terry Stop.

## Pat Down Outcomes

The first outcome of interest studied involved whether a net effect of race or ethnicity could be observed from stops where a pat down was conducted after the stop.

# Descriptive results by District, Race & Ethnicity

## *Numerical Counts*

In about one-third of all stops (54,116), the police officer conducted a pat down (18,364). The number of pat downs occurring in each district, for each of the three racial/ethnic groups, appears in Table 6. The number of pat downs ranged from a high of 2,377 in District 7 (Englewood), to a low of 162 in District 1 (Loop).

## *Proportional Representation*

Within each district, the proportion of each racial/ethnic group receiving a pat down appears in Table 7. Based on the numbers in Tables 6 and 7, the experts reached several conclusions.58

*First*, "the chances that a stopped civilian would be patted down appears to depend on the race/ethnicity of the stopped citizen." See PSO Report, p. 21 (noting 1/3 of Black and Hispanic civilians are pat down versus ¼ of White civilians). For example, it appears in some districts that a higher proportion of Black civilians received a pat down (*e.g.,* District 19), and in others that Hispanic civilians were the most likely to be patted down (*e.g.,* District 18). In other districts, however, it appears that the chances of being pat down were comparable for members of the three racial/ethnic groups (*e.g.,* District 12). Table 7.

---

58Both conclusions are subject to the following caution: these numbers do not control for the population numbers for each racial and ethnic group residing in the districts noted. In other words, these thoughts are not about the relative racial or ethnic volume of stopped civilians relevant to resident population. They are just about, among those stopped, how the fractions receiving a pat down vary depending upon the race or ethnicity of the civilian. In other words, the proportions represented here are based on interactive comparisons and contrasts between the racial and ethnic composition of each person patted down in a particular district for the time period in question.

*Second*, "the chances of receiving a pat down depended" upon the district in which one is stopped.  For example, in some districts (*e.g.,* 16, 18), "police patted down in around one of six or seven" stops.  In other districts (*e.g.,* 3, 4 and 9), the pat down rate was around one in three stops.  In a small number of districts (2), the "pat down rate hovered around one out of every two" stops (*e.g.,* Districts 6, 7). PSO Report, p. 21.

## Age, Gender & Time

The experts also looked at whether the odds of being patted down increased or decreased as a function of age, gender and various times during the year by month, day and time.  Although gender is a subject of interest in the Agreement, the examination of age and time will be treated as descriptive only.

**Gender:**  Males chances of being patted down, compared to women's chances were, depending upon the sample, anywhere from 210 percent - 240 percent higher and this net gender impact was significant.

**Age:**  For age, when compared with Juveniles (under age 18), stopped individuals ages 18-25 were significantly more likely to be patted down. Citizens older than 36 were significantly less likely to be patted down compared to Juveniles.  PSO Report, p. 48.

**Time:**  Remarkably, time – calendar month; day of the week; and hour of the day – seem to matter for statistical significance, as well.   The results suggest that during the more publically visible times of the year, week and day, the odds of being patted down are far less than they are during months, days and times when the expectation of public presence and thus *visibility* is greater. Strictly speaking, the reference point for these comparisons would be stops happening on a weekday in January between midnight and 3 AM.  PSO Report, p. 49.

The odds of being patted down seem to wane in the Springtime months of April, May and June. Results show that the odds were about 15 percent lower in April; 22 percent lower in May; and 30 percent lower in June, relative to stops in the reference group. *Id.*

Weekends, rather than weekdays, also proved to have a statistically significant bearing on the odds of being patted down. The models showed that a civilian has a significantly higher chance of being patted down on the weekend, by about 10-14 percent, than during a weekday. *Id.*

The time of day is also statistically significant. Using a reference time between midnight and 3 a.m. and 6 a.m. the experts found that pat downs were significantly *more* likely to occur. But, relative to the reference time, pat downs were significantly *less* likely to occur between 9 a.m. and midnight.

## Stop Type

The type of stop made was also found to play a role in the odds of being patted down. The odds increased if a citizen was subject to a traffic stop (in a vehicle), as compared to a pedestrian stop. For traffic stops, the odds of a pat down were significantly higher, anywhere from 38-51 percent higher, depending on the sample.

# Pat Down Hit Rates

The question being asked in this study was whether police officers found a weapon or firearm as a direct result of the pat down conducted.

## Number of weapons recovered

The statistical results in Table 32 show that, for the period in question, police officers found 465 weapons/firearms city-wide for the entire 6-month reporting period.  Only 465 weapons were recovered, after making 54,116 stops, and conducting 18,364 pat downs. This is a 2.5 percent weapon hit rate from pat downs (465/18,364).

# District Specific Results

The number of weapons found in each district varies from a low of 2 (*e.g.,* District 20) to a high of 59 (*e.g.,* District 7).  *See* Table 8.

## Pat Downs + NEA Outcomes
### Rationale for Study

The rationale for conducting this statistical analysis in the context of pat downs is plain: public perception, real or imagined, is that racial and ethnic minorities are singled-out and targeted for pat downs at a significantly higher rate than their white counterparts. Experts, reviewing some scholarship, pointed out "situated accounts of police citizen interactions highlight that pat down and release does occur and that it does bother citizens … Such interactions contribute to tension between inner city Black residents and police" and to be patted down and released may strike many racial and ethnic minorities as simply being hassled by police. PSO Report, p. 13.

In addition, from a procedural justice perspective the experts note that other scholars point out how such an outcome reflects "'degree of police intrusion during … stops" is an intrusiveness that, depending on the circumstances, is potentially corrosive to the perceived legitimacy of police among minorities. *See* PSO Report, p. 14.

The Agreement asks the Consultant and his experts to examine the ISR data to determine if, in fact, the statistical evidence reflects that the CPD's stop and frisk policies and practices have a disparate impact on the basis of race, ethnicity or gender. The Agreement also asks the Consultant to discern what if any factors lead to such results.

It stands to reason that both of the following statements could be true:

- good stops (legally justified) can be made for bad reasons (as a pretext for racial or ethnic bias, implicit or otherwise, where discretion ordinarily would be exercised);

- bad stops (legally unjustified) can be made for good reasons (good faith misperception of the facts based on belief that criminal activity was or is occurring or about to occur).

It is axiomatic that, if a protective pat down is legally justified, then the facts creating RAS of a weapon and, thus, danger, provide the only reason necessary for the action. Similarly, if a protective pat down is legally unjustified by RAS, then there can be no good reason for doing so, because RAS did not exist before the pat down was made.

The next set of statistics tests whether and, if so, how many stops (without regard to whether they were coded as good or bad stops) were made during the first six months of 2016 that included a pat down without a hit for weapons and without any enforcement action. In cases where a pat down is conducted, but yields no weapon or contraband, and the investigatory stop, itself, results in no enforcement action ("NEA"), pretext for the stop along the lines of racial or ethnic profiling *may* be at work.[59] To be clear, the Consultant

---

[59]Law Enforcement advocates sometimes argue that minorities are subject to more pat downs in crime-infested areas because minorities commit a larger number of crimes with weapons than whites. The Consultant is unaware of any statistical studies to prove that theory. Civil rights advocates, conversely, sometimes argue that the higher pat down rate is due to implicit racial and ethnic bias, which is embedded in our society and communities on an institutional and individual level. The Consultant is unaware of any categorical statistical studies or scholarship to prove this theory either.

has no reason to believe that the pat down statistics are the result of either racial or ethnic profiling by the CPD officers.

The Consultant directed the experts to examine these types of stops to determine whether the statistical results from this examination differ significantly from those where an enforcement action is taken. The experts found the following. In their main and more rigorous modeling approach[60], and in their alternative analytic approach, they observed sizable and significant net impacts of both race and ethnicity on this outcome. More specifically, focusing just on stops where no enforcement action was delivered, Black NH civilians as compared to White NH civilians, and Hispanic as compared to White NH civilians, had markedly higher chances of receiving an enforcement action. The Blacks and Hispanics had odds of [receiving vs. not receiving a pat down, when considering just stops with no enforcement], that were about 40 percent higher.

The experts began the study with an expectation, based on past policing literature, that for black stopped citizens, the odds ratio would be higher than it would be for white stopped citizens. In fact, it was. Given the potentially corrosive nature of these types of police interactions, depending on context, this pattern is an important one to address. When an investigatory stop of an individual is made by an officer, the deprivation of personal liberty is real and has consequences totally apart from whether a law is enforced or not. In this regard, the Consultant directed the experts to focus on one key area of concern to the parties, namely, the stops made where a pat down occurred but no enforcement action resulted.

During the first reporting period, there were 18,364 pat downs, among which 1,033 involved a search, as well as a pat down, and 12,414 pat downs which did not result in any

---

[60] This model was able to control for variations in district context in a more satisfactory manner.

162

subsequent enforcement action. *See* Addendum 1 to PSO Report. Conversely, 2,318 stops involving only a pat down and 2,599 stops, involving both a pat down and a search, resulted in an enforcement action. This number means that police officers suspected or witnessed criminal activity 13,444 times, made a stop based on this suspicion or an on-view observation, and -- once the stop was made -- developed a further suspicion of the presence of a weapon or firearm on or near the stopped individual and conducted a pat down, but did not recover a weapon or firearm.

This number also means that 13,444 times a civilian in Chicago was deprived, albeit temporarily, of their Fourth Amendment right to move about freely in public without interference by law enforcement agents, not only once, at the time of the stop, but twice, at the time of the stop and when the police officer decided to conduct a pat down. Despite the intrusion to liberty interest from the stop and intrusion of a physical, personal nature, either no evidence of criminal wrongdoing was found, or – if it was – the crime was not serious enough to enforce.

Without reviewing all 13,444 stops, it is not possible to report whether the reasons articulated by the police officers amounted to RAS for the stop, let alone for the decision to pat down. But, a police officer's decision to pat down deprives an individual of more liberty than the temporary detention. Thus, it must be justified by additional facts indicating the presence of a weapon or firearm if it is conducted during an investigatory stop.61

If a pat down is conducted based on probable cause to make the stop, the deprivation of liberty resulting from the stop is still real. Probable cause to detain and to pat down does

---

61As indicated in other parts of this report, the CPD has an internal administrative policy which permits pat downs prior to transporting an individual in a squad car for the protection of the officers. The rationale is basically the same: police officer safety is paramount when a weapon or firearm on the person being transported could result in danger to the officer.

not eliminate the loss of liberty to the person being stopped.  Thus, the outcome of the stop + pat down is of great interest to the Consultant.

As reported in Table 20, and in the sections describing the expert's statistical results based on race, ethnicity and gender studies, it appears that 9,828 times, Black non-Hispanic civilians were subject to the stop + pat down + NEA sequence. This means that, in slightly over 73 percent of all the stops which included a pat down, but did not result in any enforcement action, the subject was Black.

The discussion can be expanded to include statistics involving proportional representation, for each ethno-racial group, in two sets of stops: all stops with no enforcement actions (NEA), and, of the latter, the subset also included pat downs (PD + NEA). When each group's relative contribution to the latter (PD + NEA) is contrasted with its contribution to the former (NEA), one can learn whether, among stops with no enforcement action, certain groups of citizens were more or less likely to be patted down. When all stops were considered, White Non-Hispanic citizens were under-represented in the pat down stops, and Black Non-Hispanic citizens were somewhat over-represented. White Non-Hispanics' representation in the subset of no action stops with pat downs is one third less than their proportional representation in the set of all no enforcement action stops. Black Non-Hispanics' representation was about four percent higher in the non-enforcement stops with pat downs than it was in the set of all non-enforcement stops.

This descriptive report is not intended to make any qualitative findings regarding whether these stop+ pat down+ NEAs were justified or not.  Nor is it intended to criticize the CPD for using the discretion not to enforce the law given to them by their law enforcement authority.  The descriptive report *is* intended, however, to cast light on the disparity between the number of times a Black civilian is subject to such actions without a law enforcement action being taken.  The cause of such a large disparity remains to be seen.

One more descriptive result needs to be reported here.  Counts of civilians who were patted down during a stop where no enforcement action resulted appear, in Table 21 of the PSO Report, and are organized both by district and by race/ethnicity.  From Table 21, one can see that the largest number of stop + pat down + NEAs occurred in Districts 4, 7, 9, and 11 (over 1000 times each); whereas, the least number of times this sequence occurred was in District 1, the Loop, with 104 *See* Table 18 (42.7 percent of stopped civilians in the Loop were subject to an enforcement action).

Non-enforcement action results matter because 13,444 stops occurred where a pat down or a search and a pat down occurred, but no enforcement action resulted.  Although some of these cases may have involved RAS for a weapon or firearm, which turned out to be possessed legally, under Illinois' concealed carry gun law, there are far more NEA + pat down or pat down/search stops than there are hits for weapons or firearms.

This number represents nearly 25 percent of all the stops made for the entire reporting period during which the police officers involved did not recover a weapon or firearm after the pat down and, in 1,033 cases, also from the search. While the Consultant realizes that crime fighting is an inexact science, and that reasonable suspicions may prove to be wrong and unfounded, this number seems high, especially in the context of heightened awareness and increased training on the importance of making good stops and frisks.  On the one hand, the violent crime rate supports the high rate of protective pat downs, and, if warranted by plain touch, searches; but, on the other hand, the non-enforcement rate that follows these pat downs does not indicate that the CPD had much success getting weapons and firearms off the streets during the first half of 2016.Statistical Results

## *Numerical*
## Race & Ethnicity

In Table 21, counts of citizens who, during a stop, were patted down by police, but who did not receive any enforcement action from the officer, are organized by both district and by

race and ethnicity.  Proportions of non-enforcement stops associated with a pat down are also shown in this table, separately by district and ethno-racial group.

The total number of NEA pat downs for the six-month reporting period was 13,444/51,116 stops.  Of these 13,444 NEA pat downs, 9,828 involved black non-Hispanic citizens, which is more than 10 times the corresponding number for stopped white non-Hispanic citizens. The fraction of non-enforcement action stops where a pat down was delivered varied across districts. The proportion is over half in districts 6 and 7. It is around one fifth in districts 1 and 2.

The discussion can be expanded by looking at proportional representation, for each ethno-racial group, in two sets of stops: all stops with no enforcement actions (NEA), and, of the latter, the subset that also included pat downs (PD + NEA). When each group's relative contribution to the latter (PD + NEA) is contrasted with its contribution to the former (NEA), one can learn whether, among stops with no enforcement action, certain groups of citizens were more or less likely to be patted down. As was seen before when all stops were considered in, White Non-Hispanic citizens were under-represented in the pat down stops, and Black Non-Hispanic citizens were somewhat over-represented. White Non-Hispanics' representation in the subset of no action stops with pat downs is one third less than their proportional representation in the set of all no enforcement action stops. Black Non-Hispanics' representation was about four percent higher in the non-enforcement stops with pat downs than it was in the set of all non-enforcement stops.

At the request of the consultant, the experts ran a model to learn whether these gross race and ethnicity impacts were statistically significant. They were, for both race and ethnicity. In each sample, focusing just on stops where no enforcement actions took place, the chances that the stopped civilian would be [patted down vs. not patted down] were at least *forty percent higher in both samples for Black NH vs. White NH.* They were at least *sixty*

*percent higher for Hispanics compared to White NH for both samples.* These models controlled for district context, and were highly significant in both samples. Results clearly show that, among stops where no enforcement actions occur, compared to White non-Hispanics, the members of the other racial/ethnic groups were significantly more likely to be patted down.

## *Gender*

Results (PSO Report, Table 49, 50) showed a significant net gender impact. In stops where no enforcement took place, males' chances of [being patted down vs. not] were about 2.5 *times* higher, in both samples.

Note now a potential inconsistency in the statistical results from the coded narratives report and the post stop outcomes report.   In the coded narratives report, the experts found that men were more likely to be patted down than women; but, if a woman was patted down, she was significantly more likely to be subject to a bad pat down than a man. But there were only 7 of these. In the post-stop outcomes report, by comparison, males were again far more likely to be pat down than women, but – in contrast perhaps – these pat downs were also more likely to result in no enforcement action.

Thus, it appears from the post-stop outcome analysis that men, as well as women, might have been subject to a statistically significant number of "bad" pat downs if all the records in the first reporting period had been examined before dropping any of the probable cause stops.

This observation again highlights the vital importance of how the probable cause stops, which were dropped from the coded narratives analysis, but not from the post-stop outcomes analysis (and any pat downs that resulted from them) have affected, and will continue to affect, the statistical data, if the parties cannot come up with a more precise

way to record these stops and pat downs, if any, which separates and distinguishes them from Terry stops and frisks.

# NEA Pat Down Hit Rates

The focus now shifts to descriptively examining how NEA pat down rates compare with weapon hit rates by district, race and ethnicity, for purposes of illustrating just how many pat downs are conducted where no weapon or firearm is confiscated by the police officers. See Table 8 (counts of weapons/firearms recovered from pat downs by district).

The residential demographics of Districts 6 and 7 are primarily African-American. District 6 has a 97% African-American population; District 7 has a 94% African-American population.

- In District 6, the weapon hit rate was 29 (28 blacks and 1 Hispanic)

- In District 7, the weapon hit rate was 59 (54 blacks and 5 whites)

- In District 6, there were 1,226 pat downs (1,197 blacks; 10 Hispanics; 19 whites)

- In District 7, there were 2,377 pat downs (2,327 blacks; 25 Hispanics; 25 whites)

- In District 6, there were 853 stopped civilians w/pat down +NEA (837 black; 8 each for Hispanic and white)

- In District 7, there were 1800 stopped civilians w/pat down +NEA (1,762 blacks, 18 whites and 20 Hispanics).

## *Two Police Districts' Outcome Results*

Combining the statistics from these previous Tables results in a fairly stark picture for Districts 6 and 7.

### *District 6*
Total PDs All Groups: 1,226
Total NEA PDs All Groups: 853

   ☐  Black NH: 837

□     Hispanic: 8

□     White NH: 8

Total Weapons (only) Hit Rate: 29

□     Black NH: 28

□     Hispanic: 1

□     White NH: 0

### *District 7*

Total PDs All Groups: 2,377
Total NEA PDs All Groups: 1800

□     Black NH:  1762

□     Hispanic: 20

□     White NH: 18

Total weapons (only) hit rate: 59

□     Black NH: 54

□     Hispanics: 0

□     White NH: 5

## Consultant's Observations

Districts 6 and 7 are two of the police districts where the most violent crimes occurred in 2016.  The percentage of all pat downs in each district that resulted in no enforcement action being applied is over 69 percent for District 6, and over 75 percent for District 7.

In view of these statistics, the non-enforcement action pat down rates versus the enforcement actions pat down rates is curious.  Some good Terry stops which result in good protective pat downs will end up without a hit for weapons or firearms, and thus no enforcement action being taken, for legitimate reasons.  But, the number of these NEA +

pat downs in the first reporting period data is 13,444 and, from those contacts, 9,828 involved Black civilians.[62]

One might argue that those stopped in the 9,828 cases would not have wanted to have the law enforced against them, so there is no cause for complaint; but, this argument ignores the fact that a protective pat down, in public, by a law enforcement officer asserting authority and power feels like an enforcement action the individual being patted down; and, for many racial and ethnic minority men and women, the relative power imbalance can feel degrading and embarrassing, especially when it occurs in broad daylight in front of friends, family and neighbors. Thus, even if released in the exercise of a police officer's discretion, with no attendant enforcement action given, the harm has already been done, because those viewing such actions may believe that the subject has done something criminal or something to warrant suspicion of criminal activity, even if the person has done nothing unlawful.

The hit rate numbers for weapons and firearms, although expected to be low based on other statistical data from other cities where hit rates have been assessed, were exceptionally low in the first reporting data. As reported, there were only 465 hits for weapons and/or firearms out of a total of 18,364 pat downs, which is about a 2.5% hit rate in a city that experiences serious gun-related crimes almost every day, in essentially the same neighborhoods.

### Search Outcomes

The number of searches reported here is derived from the check boxes on the face of the ISR reports. Thus, if a police officer checked the box that a search was performed, then it

---

[62] Table 23 in the PSO Report indicates that the total number of pat downs in stops without an enforcement action were 13,444. However, Addendum 1 to the PSO Report cites two figures for NEA + pat down <u>and</u> NEA + pat down/search which equals 13,447.

was counted, without regard to the type or purpose for the search. This means that the large number of custodial and transport type searches that appeared in the narrative remarks are being counted for purposes of this report, even though the Agreement purports to cover only investigatory stops and frisks, and only searches incidental to those actions.

The reporting of custodial searches is not, however, related to police officers' lack of understanding regarding the Fourth Amendment's requirements or the factual distinctions between search types, as the Consultant first thought; and, thus, this particular issue is not one that suggests the need for more training. The issue appears to have arisen because the CPD centralized police officers' reporting obligations under Illinois law and the Agreement to the ISR and the ISS Database.

This centralized process for reporting similar, sometimes but not always overlapping information, appears to be the reason why the data produced by the CPD to the Consultant contains far more information than the Agreement intended to be analyzed. Thus, the Consultant has recommended that the CPD include new check boxes on the ISR to permit police officers to clarify the type of stop, pat down and search being made, at a minimum for record keeping purposes, which will facilitate its respective reporting obligations under Illinois law, on the one hand, and the Agreement, on the other hand.

Nonetheless, all statistical analyses of the search outcome were conducted on records after removing those stops where an arrest and a search took place. The Consultant directed the experts to make this distinction, so that the parties might have a better picture of what the statistical results would have looked like if the CPD had distinguished more precisely between searches conducted under *Terry* and other search types not covered by the Agreement (for which officers may have independent probable cause), such as those where arrests took place. Because CPD officers routinely search a person or vehicle after taking a

171

civilian into custody (aarrest) and before transport of the arrested subject, dropping files where an arrest + search took place seemed to be the simplest way to get a closer approximation of investigatory search numbers for this report.  This approach dramatically reduced the volume of searches examined by roughly two-thirds (much as dropping the search records coded as "custodial" in the coded narratives report did); and, based on other mismatched checkbox information provided by police officers, precluded statistical analysis regarding search hit rates for contraband and weapons.  *See* Table 4.

## Descriptive Results

### *Numerical Results:  All Searches*

During the first reporting period, police officers conducted 9,595 searches in 54,116 stops.63 This means that, in all districts and all three groups, city-wide, one out of every 5 or 6 stops resulted in a search of some kind.  The numbers by district and racial/ethnic groups appear in Table 10.

The largest number of searches of stopped Black non-Hispanic civilians took place in District 11, where there were over 1,000 searches during the six-month period.  Contrast that number with the 318 searches of Hispanic civilians in District 9, the largest number of Terry searches performed on members of this ethnic group.  In many districts, however, the number of searches for a specific racial/ethnic group were quite low, resulting in proportions that should not be given much, if any, weight.

---

[63] There were 173 ISRs where the search checkbox completed by police indicated that no search took place, but police also indicated that some type of contraband was recovered as part of a search.  PSO Rpt., p. 40, n.6. Regardless of search hit variables, if no search check box was checked, then no search was the code assigned and no search was counted.  The parties expressly asked the Consultant to consider the check boxes in addition to the narrative remarks.  Where there was a conflict between the check box and the narrative, the Consultant assigned a "no search" code.

## Non-custodial Searches

The counts and proportional representation of Terry searches (excluding custodial searches), by district, race and ethnicity, appear in Table 12. As noted, the proportion of searches for all districts, roughly one search for every eighteen (18) to twenty (20) stops, is roughly the same for the three racial/ethnic groups.

# Searches

The ISR data indicates that the majority of searches occurred in stops where an enforcement action was carried out; but there are 1,644 searches that appear to fall into the non-enforcement action category, as well. An arrest is an enforcement action; and, the search records where an arrest was the outcome of the stop were tabulated, so that they could be dropped to determine the number and ratio of non-custodial searches not incident to an arrest (2,640) for the statistical inference tests related to race, ethnicity and gender. *See* Table 40.

## Hit Rates
### Searches + Weapons/Firearms (only) Outcomes

### All Searches
The next outcome investigated involved searches where only weapons were found. Unfortunately, the number of searches in the total set of ISR records for the period, where police officers checked the search box and the weapon only box, were too small for analytic models. After removing custodial searches incident to arrest, and considering only cases where officers also checked the search box, an extremely low number of searches resulted in weapons being discovered. Given those extremely low numbers and the large number of covariates involved in the models used here, this outcome was not analyzed.[64]

---

[64] In sample 1, only 10 searches produced a weapon or a firearm or both after removing searches incident to arrest. In sample 2, the number was 14 after the removal. See PSO Rpt., p. 86.

### *Non-Custodial Arrest Searches*

As was the case for weapons only recovery from searches as an outcome of interest, there are no results to report for the discovery of weapons or contraband, because there were not enough search records to analyze after the custodial search records were dropped. Overall hit rates for searches were not analyzed because, as noted earlier, there were significant discrepancies between individual search yields with contraband indicators and the overall search conducted indicator.  Given that discrepancy, which amounted to fifteen percent of the records, and the guiding analytic principle of keying outcomes so they were consistent with the overall check boxes, it seemed inadvisable to analyze non-weapon search hit rates. This matter will be explored more fully, and different types of resolutions to this mismatch will be considered, in the next reporting period.

### *Non-Enforcement Actions*

In Table 40, one can see that a combined 2,640 searches were not related to an arrest and, as noted, appear to fall within the non-enforcement action category.

Slightly over one third of the non-arrest-linked searches, 37 percent, occurred in stops where another type of enforcement action took place.   But, almost twice as many non-arrest-linked searches took place in stops where no enforcement action was recorded. *See* Table 40. This latter group made up slightly less than two thirds of the non-arrest searches (63 percent).  *See Id*.

## Consultant's Summary of Key Statistical Post-Stop Outcomes Findings

### *Pat Downs*

The strongest pattern revealed by the post-stop outcome report analyses is a significant net connection between race and whether a pat down occurred, and between ethnicity and

whether a pat down occurred. Each of these impacts is probably best interpreted as correlational rather than causal, given the results of diagnostics performed on the models used. Nevertheless, each link proved robust across multiple analytic approaches used by the experts, and was replicated in each type of model across two independent random samples of data. Given this pattern, this may be the sturdiest link seen between race and the different outcomes examined.

## Searches

The search outcome results indicated a <u>significant net ethnicity link</u> but ***<u>no significant net race link</u>***. Since the diagnostics on the net ethnicity link suggested some concern, it is probably a correlational rather than causal link. But the link did surface in the model that most severely tested the link, and the link appeared in both random samples.

This means that there is some relationship between the observed variable of ethnicity, specifically – being Hispanic – and being the subject of a search. The strength of that relationship is strong enough to be statistically significant, so there is confidence that ethnicity is a factor that influences the outcome of being searched. But other factors linking to both ethnicity and this outcome may be playing a role in "driving" this connection.

## Enforcement Actions
### Ethnicity

Ethnicity linked to the probability that an enforcement action would be taken by a police officer. The net link of ethnicity with this outcome was significant across both analytic approaches, and in this sense is solid. Further underscoring the reliability of this link is that it appeared in both independent samples of records. In other words, Hispanics were the subject of stops that led to enforcement actions far more often than their White counterparts. Again, diagnostics of models suggested some concerns, so this link too is best

viewed as correlational rather than causal because other factors may be playing a role in driving this link.

## Race

The net race connection was not as strong, but it still correlates with the outcome. In other words, there is a net race connection to being stopped and subject to an enforcement action, but this connection did not appear on every test run, as was the case for ethnicity.

# Pat Down + NEA

The last outcome examined was, for lack of a better term, the "pat down with no enforcement action" outcome. To determine statistically whether race, ethnicity and gender had any effect or relationship to this outcome, the experts tested two kinds of stops against each other: NEA + pat down v. NEA + no pat down, while controlling for the other types of stops (enforcement + pat down; enforcement but no pat down).

The procedural justice scholarship clearly implies that a stop with a pat down but no enforcement actions taken is more intrusive (deprives individuals of liberty interests under the Fourth Amendment) than a stop with no enforcement and a pat down. This is because pat downs can be humiliating and escalate the conflict between police officers and community members. Thus, it is important to understand the role and impact that the factors of race, ethnicity and/or gender may play in contributing to the selection of individual subjects for a pat down, especially when no enforcement action results (and thus, presumably, no weapons or actionable contraband are found).[65] A better understanding of the correlation between race, ethnicity and/or gender and NEA pat downs has potential to reduce community perceptions of institutionally engrained law

---

[65] As mentioned earlier, there are no data on how often CPD officers might be encountering actionable contraband but deciding *not* to take any enforcement action.

enforcement bias, regardless of whether those perceptions are grounded in observed officers' actions on the street.

The bottom line is that, in stops where no enforcement actions were taken by police, Black and Hispanic stopped civilians had much higher odds of being patted down than did stopped White non-Hispanic civilians. These "much higher odds" can also be characterized as "extremely large and significant net impacts" of both race and ethnicity on the outcome of being patted down without an enforcement action. In other words, during the first reporting period, a black or Hispanic citizen was 40 percent more likely than a White non-Hispanic citizen to be [pat down and released vs. not pat down and released] by a police officer in Chicago, the release suggesting there was no evidence of criminal wrongdoing or weapon/contraband possession.

Given the potentially corrosive nature of police interactions revolving around pat downs, this pattern of non-enforcement needs to be studied in light of the reasons being given for conducting the pat down. As seen in the table above for Districts 6 and 7, the "empty handed rate" for pat downs can go up to and above 70 percent in some districts.

## Consultant's Conclusions

Several of the raw numbers in the Ecological Report need to be highlighted. Although they may not necessarily jump out as significant, they tell an important story. *First,* 38,361 stops were made of an individual whom the police officer identified as Black and non-Hispanic. The 38,361 number is significant because it represents 70.13 percent of all stops made for the first reporting period.[66] This is a disproportionate number of the whole

[66]Notably, this number is not too far off from the statistic cited by the ACLU in its March 2015 "Stop and Frisk in Chicago" report, namely, that for the 4-month period of May 1 through August 31, 2014, nearly 72 percent of all stops recorded were made of Black individuals, despite a population ratio of only 32 percent city-wide.

number, especially given that Black non-Hispanics comprise only approximately 32 percent of the population, according to the latest U.S. Census Data figures from 2010.

*Second,* 18,364 pat downs were made, but only 465 guns were found from those pat downs.   Had each of the 18,364 pat downs been made for "protective" Terry-type frisk purposes, the 465 weapons hit rate would likely have been even lower than the procedural justice literature led the experts to expect.

However, as discussed in other sections of this report, the ISR data given to the Consultant and experts by the CPD contained stop, pat down and search "types" that do not fall within the limited scope of Terry-type stops and frisks.  As a result, the statistics reported here are necessarily general and non-specific because it proved impossible for the Consultant and experts to separate and count the numerous different types of stops and frisks reported by police officers.

That said, the analysis conducted related to non-enforcement actions sheds some light onto just how low the pat down hit rate really is in Chicago.  Out of 18,364 pat downs, 13,444 of them resulted in no enforcement action. Thus, it is fair to say that:

(a) the 465 weapons were found in the 4,917 pat down enforcement actions taken stops; this means that in 9.4 percent of stops with pat downs and enforcement, officers discovered a weapon;[67]

(b) in 13,444 of 18,361 pat downs (all types) the police officer came up empty handed – This means that city-wide, 73.2 percent of pat downs did not lead to the officer recording an enforcement action;

---

[67]The "pat down enforcement number" represents the last category of the categorical outcome reported in Table 6, PSO Report. This number should not be confused with the 17,425 enforcement actions of all types reported in Table 20 of the PSO report. *See* also PSO Report, Table 5.

(c) The total number of recorded searches, 9,595, yielded weapons in 263 instances. [68] This makes a stop-with-weapons hit rate of 2.7 percent. If the focus shifts just to the 2,640 stops *without* an arrest, only 24 of *these* stops generated weapons, for a stop-with-weapons hit rate of 0.9 percent. Presumably, the Terry-type search is one that is conducted only after a weapon is discovered by "plain touch" during the protective pat down or is in "plain view" during the investigatory stop.  Based on this theory, it appears that between 465 pat downs during stops leading to at least one weapon, and 263 searches during stops leading to at least one weapon, minus the 41 stops where both the pat down and the search generated at least one weapon, there were only a total of 687 stops with at least one weapon, firearm or otherwise, found; this is 1.3 percent of the 54,116 stops during the first six months of 2016.

The ISR form does have places for officers to report what types of contraband were discovered during their pat downs. The problem is that these data do not align with the overall indicator that a weapon or something else was found. There were 465 pat downs where officers recorded finding a weapon.  It is simply not feasible to say much more about pat down outcomes beyond what already has been said about weapons, at this point, because the way the officers recorded the data using the existing checkboxes does not permit the experts to discern what, besides weapons, was recovered.

Nonetheless, just the 465 weapons hit rate result from pat downs is sobering given that there were a total of 18,364 stops with pat downs.  To start with, the number of stops has decreased dramatically since the end of 2015, when there were over 60,000 stops in November and December alone (despite those two months being the lowest stop rate months for the 2015 calendar year).  This decrease occurred in the context of not one, but two, new reporting requirements, one from the State of Illinois and one from the Agreement. These numbers also cannot be explained away by police officers' feedback that the reporting requirements imposed by the Agreement and/or Illinois law create an undue

---

[68] The number of weapons is slightly higher because ten times a search was conducted where officers found both at least one firearm and at least one weapon.

burden on their ability to perform law enforcement duties or the Agreement's requirements related to accountability and increased transparency to the public.

The following set of numbers have been combined by the Consultant, not the experts, for illustration purposes.  Consider the following three sets of numbers in Tables 6, 8 and 20.

**Table 6:**  Counts of pat downs by district, race and ethnicity

**Table 8:**  Counts of weapons/firearms only recovered from pat downs, by district, race and ethnicity

**Table 20:**  Counts of stopped citizens receiving pat down but no enforcement action, by district, race and ethnicity.

These tables, which appear in the Key Points Summary, illustrate that the CPD and its officers either (a) lack focus or understanding on the difference between a protective pat down to locate weapons and a pat down done for administrative reasons (*e.g.,* transport); or (b) lack the ability to identify those persons in possession of illegal weapons/firearms and contraband.

As noted, the total pat down count done by the experts found 18,364 pat downs for the first reporting period.  This number was derived by tabulating the boxes checked by records submitted for review.  The total count does not reflect the coded narrative determinations made by the Consultant with regard to whether the asserted pat down was protective or administrative.  The Consultant noticed a lot of confusion by officers in the narratives regarding the difference between a protective pat down, which is limited to a plain touch investigation of a subject's outer clothing for weapons, and an administrative pat down conducted pursuant to CPD policy before an individual in custody, suspected of a crime, or merely a civilian can be transported in a police squad car.

# The Ecological Analysis Report

The "Ecological Analysis of Monthly Stop Data, January 2014-June 2016" ("Ecological Report"), serves as a numerical baseline for the Consultant's Report, because it assesses the CPD's investigatory stop data (to the extent it existed prior to the effective date of the Agreement) for stop counts and rates, during the 30 month period from January 1, 2014 to June 30, 2016, without the interference of questions related to legal justification, stop types, data errors, subjective judgments, and implicit bias. All of those issues are put aside in the Ecological Report, so that the numbers can tell their own story.

The Ecological Report does, however, employ three statistical models to address two questions of interest to the parties:

**History.** How have things changed over time? Have the rates at which Chicago police officers stopped Non-Hispanic Blacks, Hispanic Whites, and Non-Hispanic Whites shifted over time? How have the total number of stops, and the sub-set total of stops for the three identified groups, varied during the 30-month period?

**Potential racial/ethnic disparities.** During the 30-month study period, have members of the three groups experienced "disparate treatment" – meaning, have they been treated differently by CPD officers? Specifically, for members of each race/ethnicity, using the prior month's specific local crime rate attendant to the particular racial or ethnic group being examined, is the ratio of stops made in the months studied higher for one or more groups compared to the other(s)?

The results found in response to the second question above can be contextualized. Does the CPD data studied reflect the same results found in past research in other cities. Numerous works have found that ratios of stops relative to earlier arrests are higher for Non-Hispanic Black[s] than for members of the other two groups. Some studies also have found that stop-relative-to-arrest ratios are higher for Hispanics than their White counterparts.

These two questions have been answered descriptively and by statistical inference models, so the Ecological Report provides gross/overall disparity results, as well as net impact results, for race, ethnicity and gender. When reporting gross disparities, the experts took care to control for district level, temporal and demographic variation on the predictor side.[69] This then allowed them to *describe* the size of the link between the key ethno-racial variables and the outcome. Further, as with the individual level data, those net connections were tested for statistical significance. If a net link proved statistically significant, it was deemed sizable. [70] Despite these precautions, the experts warn the Consultant that there are big red flags associated with the answers and results reported to the second question. The Consultant understands these big red flags to mean that the answers provided in the Ecological Report are "provisional" which means that they are only possible answers, but more work remains to be done to ascertain how strong the correlations, if any, are between the variables of interest to the parties (race and ethnicity) and the outcomes examined.[71]

## Methodologies Used

The appointed experts have done an excellent job of simplifying the explanation of the various statistical methods (methodologies) they used to answer the two questions posed above. The Consultant therefore refers the parties and the public to the explanations provided by them in the Ecological Report, pp. 6-10, Appendix C, for a complete

---

[69] The experts warn that an important limitation of the ecological models is this: tests for spatially auto-correlated outcomes have not yet been run. If district level counts on the outcome correlate spatially, then that would represent an important unobserved factor that has not yet been taken into account by the models reported here.

[70] The experts advise that the interpretation of statistical inference in these ecological models is different than it was when the tests applied to individual records. There the statistical inferences allow the reader to infer *from* the sample data *to* the population of records. The situation here with the ecological records is a bit different. The experts already *are* analyzing the population of records, not a sample. Therefore, the inference from significance here is simply that the size of the net link is noteworthy.

[71] The experts advise that with these ecological data, it was not feasible to examine gender impacts. The key denominator here is race/ethnic specific arrest rates, and there are too few women arrested in a district in a month to create specific, reliable, non-zero denominator values.

understanding of how the results reported below came about.  To provide just enough context for the reported results, the Consultant will make only a few remarks.

The experts have noted that they are accepting as true two previously "untested" assumptions in the Ecological Report.  The first is that the race/ethnicity specific arrest counts for violent crime for the month prior to the month being studied "serve as rough proxies for the race/ethnicity-specific volume of serious criminal activity" in any given police district (or other locale chosen) for the indicated time period.  The second is that violent crime arrest counts for the prior month can affect or even "direct police investigatory stop practices."  This assumption bears mentioning because in this study, unlike in a previous study done in 2007 by several noted social scientists, investigatory stops are not classified by crime type by the CPD.  Thus, specific stop types cannot be linked to specific arrest categories.  To the extent that stop purposes do not line up with investigating violent crimes, this assumption may be in error for these models using the violent crime denominator.

Nonetheless, the experts identified three models and a work around solution (notwithstanding "external benchmarking" objections by other noted social scientists (Ridgeway and McDonald)), which uses "race/ethnicity-specific violent arrest counts, race/ethnicity-specific counts of total arrests, and population between the ages of 15 and 29 (regardless of race or ethnicity) as the "external benchmarks." *See* Eco. Rpt., pp. 7-8, 10, Appendix C.[72]

In their Ecological Report, the experts indicate that they "favor the violent arrest count," over the total arrests count or the youth population benchmarks, for two reasons: (1) because violent arrests, compared to non-violent arrests, allow for "less officer discretion"; and (2) "[l]ess officer discretion means a lower likelihood that police bias, if *. . .* present, could . . . influence both arrest . . . and later stop counts." *See* Eco. Rpt., p. 9, Appendix C.  The Consultant agrees with this rationale; indeed, it comports with the general observation made in this report that where police officers have discretion to stop, frisk, search, arrest or

---

[72]That said, the experts proceeded (albeit warning the Consultant and others to do so with "***extreme*** caution" (emphasis in original)) to statistically gauge racial/ethnic disproportionality in total stops rates from an ecological perspective. *See* Eco. Rpt., p.8, Appendix C.

to otherwise enforce the law, there appears to be a wide range of practical outcomes reflected in the ISR narratives, which create various statistical outcomes, some of which have proven to be statistically significant indicators of net race and ethnicity impacts.

# Results

## *Monthly Stop Counts and Rates*

Table 1, in the Ecological Report, displays monthly stop counts and rates for the City of Chicago from January 2014 to June 30, 2016, for all races and ethnicities.  The Consultant appreciates the value that the historical stop count data from CY 2014 and 2015 provides for purposes of comparison to the stop and frisk data, beginning on January 1, 2016, going forward under the Agreement; but, the parties must recognize that this data is not like the stop data from 2016, because the stop records from those two years contain dissimilar stop types ranging from consensual contacts or "citizen encounters" in 2014, to stops made for probable cause, even though, by CPD order, those stops did not result in an enforcement action of any kind.   Although the Consultant and others have observed similar types of stop data in the ISR records for the first reporting period, the Consultant must observe the duties set forth by the terms of the Agreement strictly.  Those terms only call for an assessment and analysis of investigatory stops and protective pat downs.  Thus, although the Consultant necessarily had to go beyond the scope of his enumerated duties for this report, to deal with non-investigatory stops, pat downs and searches in the 2016 ISR data, that extension of review is not authorized for the historical stop data by the Agreement. Therefore, for purposes of the Consultant's Report, the discussion will be limited to the stop counts for 2016.

In that regard, the Consultant has created Figure 1, a map of Chicago's police districts, in which the total stop counts for all races and ethnicities, along with the race and ethnicity-specific total stop counts for each of the three groups studied, appears in the police district area where they occurred.



*Consultant's Figure 1. Stop Distribution by Race & Ethnicity per District: Jan. 1 – June, 30, 2016.*

*Source: Table 1, Ecological Report, Appendix C.*

185

Table 1 in the Ecological Report provides stop counts calculated by the experts. The stop counts are the product of calculating the ratio of city stop counts to the race/ethnicity specific population (source: 2010-14 ACS), multiplied by 1,000. *See* Eco. Rpt., p. 11. This means that stop rates reflect the number of expected stops per 1,000 residents of a given race and ethnicity studied during the relevant time period.

As reported, the grand total of stops from January 1, 2014 to June 30, 2016 was 1,371,567; and the stop count total for 2016 was 54,701 for the first six months. The experts have observed in the Ecological Report that, during the first reporting period for 2016, the average monthly stop rate for Blacks, computed as stops per 1,000 resident non-Hispanic Blacks was 7.51; for Hispanics was 4.37 per 1,000 resident Hispanics; and for Whites was 0.80 per 1,000 resident Non-Hispanic Whites.

A few other observations of the 2016 monthly stop count numbers and rates are in order. *First*, the Consultant notes that the "all" stop rate total for the first six months of 2016 (3.34) is actually lower than the single stop rate for the month of September 2015 (19.34) and October 2015 (19.80) – the last two full months of the former CPD Superintendent's tenure. *Second*, despite much lower stop count numbers for the first six months of 2016, as compared to those with dissimilar stop data from 2014 and 2015, the stop counts and rates for 2016 climbed slowly and steadily from March 1, 2016, when the new CPD Superintendent assumed his post, through the end of May. This increase is reflected in the "all" stops counts and rates, month-over-month, as well as within the specific three groups studied, with a *de minimis decrease dip* in the stop counts for June 2016.

## Model Series with Violent Arrests Exposure Variable

As indicated, the statistical inference model favored by the appointed experts is the one where they use race/ethnic specific violent arrests as the exposure variable. This approach "effectively transformed stop counts into rates of stops/violent arrests" in the month prior to the month in which the outcome appeared. *See* Eco. Rpt., p. 19, Appendix C. The experts used five (5) different models in the series where the violent arrests count served as the exposure variable/external benchmark. Because this is the favored benchmark, the

186

Consultant will limit the remainder of his analysis regarding the Ecological Report to these five models.

## Model A

Model A indicated that Black stop counts were expected to exceed White stop counts by 28 percent across all 22 districts across the entire 30-month period from February 1, 2014 to June 30, 2016. This finding is statistically significant because it surpasses the odds of mere chance or a probability less than 1 out of 1,000 or p<.001. The assumption/theory tested was whether violent arrest counts of Blacks, in the immediately preceding month, produced a higher number of Black stops the next month in the same location. The theory is that more documented crime in a certain area involving individuals of one race would lead to increased police presence, investigation and law enforcement the following month. The results of Model A revealed that the Black stop count was predicted to be 28% higher than the predicted white stop count across districts within the study period. *See* Eco. Rpt., App. C.

## Model B

Model B incorporated the added time effects, using two measures explained in the Ecological Report. The results from Model B showed that, while the statistically significant net ethnicity effect for Hispanics relative to Whites disappeared (with a predicted stop count 7 percent lower than Whites but with a probability greater than five percent or p>.05), the net race effect for Blacks remained statistically significant. *See* Eco. Rpt., p. 20, App. C. The result can therefore be stated as follows: In Model B, "controlling for time and ethnicity, expected stop counts of Non-Hispanic Blacks were 37 percent greater than those of Non-Hispanic Whites." *Id.*

## Model C

Model C retained the time effects variable along with the race and ethnicity variable; it also controlled for community demographic structure, adding in residential stability, socio-economic status, and the percentage of Non-Hispanic Black residents within each police

district.  The result: "[c]ontrolling for time, ethnicity, and demographic structure, [net] race effects remained." Eco. Rpt., App. B.  Specifically, Model C predicted an almost 38 percent greater stop count for Black residents than White residents in an average police district in an average month.[73] *Id.,* p. 19.  In this model, the experts note that residential stability and socio-economic status appeared to be statistically irrelevant to predicting stop counts.  The same was true for racial composition.

## *Models D and E*

In Models D and E, more "robust" controls for time effects were used by substituting new variables not relevant to the Consultant's analysis of these models.  Model D demonstrated significant net race effects.  The stop counts for Blacks were predicted to be 39 percent higher than those of Whites.  However, Model D continued to show that ethnicity remained statistically non-significant.  When "structural correlates" from Model E were added, the "[d]istrict racial composition did not emerge as a significant predictor of stops."  This result appeared to create substantive modeling concerns for stop counts.

The experts conducted additional analyses of Model E which are shown in Table 4 of the Ecological Report.

By limiting the analysis to district-months with three (3) or more violent arrests for a single racial/ethnic group, as opposed to the full sample, Model E produced "somewhat larger predicted" Black stop counts (54% greater than white stop counts, as compared to 39% greater before); and, the ethnicity impact was also statistically significant, with Hispanic stop counts exceeding whites by 66%.  The relevance of this analysis is that it showed that ethnicity impacts became statistically significant when district-months with less than 3 violent arrests were dropped.  However, when the district-month < 3 violent arrests was dropped, 62 percent of cases from the full model were lost.  "Stated differently, 62 percent of district-months had fewer than 3 violent arrests of any given racial or ethnic group." *See* Eco. Rpt., p. 21, App. C.  Finally, Table 4 also shows that the size of racial/ethnic

---

[73]There is no such thing as an "average" district or "average" month; the average is a construct created by a formula taking into account all the variables from the 30-month time period results in the 22 police districts.

net impacts may be dependent upon the "arrest threshold set for inclusion in the models." This means that "[a]s the minimum number of violent arrests increases, the predicted stop counts of Blacks and Hispanics (White) increase relative to their White counterparts."

# The Violent Arrests Report

The Violent Arrests Report contains descriptive results; it is, therefore, intended only to describe what has happened, not why it happened.[74] As stated in the Violent Arrests Report, the violent arrests counts and rates reported describe monthly violent arrests patterns, city-wide and within specific police districts, for *serious violent crimes* (*e.g.,* homicides (murders); robberies; and aggravated assaults).  The violent arrests counts and rates show a picture of changes in arrests for violent crimes from January 1, 2014 through April 30, 2016, by race and ethnicity, with total counts and rates on a city-wide and specific police district level.

There are 22 police districts in Chicago and 77 community areas (neighborhoods). This report does not describe neighborhood violent arrests counts or rates.  That level of detail will be provided in the Consultant's second report covering the last six months of 2016. The Violent Arrests Report also contains maps of arrest rates for the three racial and ethnic groups studied for all months in the study in all police districts except the 31st District, which includes O'Hare Airport.  Those maps are not reproduced in the Consultant's report but may be reviewed in the appended Violent Arrests Report.  *See* Violent Arrests Report, Appendix D.

---

[74]The Report is derived from arrest report data kept and produced by the CPD to the experts for purposes of the statistical analysis in the Consultant's report.  Although stops leading to arrests were not recorded by the CPD for any year prior to 2016, the Agreement, as well as Illinois law, now require such reports.  Thus, for 2016, the violent arrests numbers are derived directly from the ISRs.  However, to create an historical baseline for purposes of comparison, the experts and CPD information technology staff were able to recreate the arrest numbers for calendar years ("CY") 2014-2015 from other data stored by the CPD.  Thus, in Table 1 of the Violent Arrests Report, the monthly violent arrest counts and rates appear beginning January 1, 2014 through April 30, 2016.  The Consultant and his experts were not able to include May and June numbers through 2016 in this report for technical reasons.  Those numbers will be included in the Consultant's second report, along with the remaining violent arrest counts and rates for 2016.

To be clear, when the "All" violent arrests rate or count is referenced, the Consultant and experts mean that *all ethnicities and races subject to an arrest for a violent crime are included*. When the Consultant refers to a race or ethnicity specific violent arrest rate or count, then those numbers are based only on the totals within the identified group.[75]

## Monthly Violent Arrests Counts for Jan. 1, 2014 to April 30, 2016

The Violent Arrests Report submitted by the experts includes Table 1, a numerical breakdown of all violent arrests in Chicago from January 1, 2016 through April 30, 2016 (Appendix D). Across all races and ethnicities, a total of 7,667 arrests for violent crimes occurred in Chicago from January 2014-April 2016. Annually, 3,702 occurred in 2014, 3,028 in 2015, and 937 for the first four months of 2016 (the 1st Qtr. plus 1 month).

In the Violent Arrests Report, the experts statistically analyzed the violent arrest counts and report a 30 month-over-month drop in the total percentage of arrests for violent crimes by all races and ethnicities, as well as within the three racial and ethnic groups studied. Specifically, they found that the total "All" violent arrest count dropped 18.2 percent from 2014 to 2015. Although the Consultant and experts have not been able to calculate the total violent crime arrest counts for the entire CY 2016, tabulations for the first 4 months of 2016 show a slight increase of four (4) percent in the total violent arrest count between the first four months of 2015 and 2016 (*i.e.,* 901 total violent crime arrests between Jan. 1-Apr. 30, 2015 and 937 in 2016).

---

[75]The violent arrest counts and rates are limited to Hispanic Whites and do not include Hispanic Blacks. Although this distinction is made in the U.S. Census Data, as well as the American Community Survey 2010-14 surveys that follow the census data changes during the intervening decade between official Census reports, the CPD uses only one code to designate Hispanic or Latino ethnicity. The arrest data from the CPD reflected a very small number of Hispanics who were identified as Black versus White, so those records were dropped from the Hispanic-specific violent arrests counts and rates for this report. The "All" counts and rates, however, include those records, along with all other racial and ethnic groups identified by CPD in its arrest data for the indicated time periods.

# Monthly Violent Arrests Rates for Jan. 1, 2014-April 30, 2016

The monthly violent arrests *rates* are based on the arrest counts; they reflect the "number of expected arrests" based on calculating the number of violent arrests of each racial and ethnic group being studied relative to the actual number of individuals who self-report as Black, Hispanic and White, within the City of Chicago.  Technically speaking, violent arrest rates are calculated as the ratio of race/ethnicity-specific arrests to the race/ethnicity-specific population.  After that ratio is identified, the ratio is multiplied by 10,000.  This formula results in arrest rates which can be interpreted as the number of expected arrests, normalized for every 10,000 residents of said racial/ethnic group studied.  The respective population denominators are derived from the American Community Survey ("ACS").[76]

In the following chart, Consultant's Figure 2, the Consultant has analyzed the numbers provided in the experts' Violent Arrests Report to obtain the *average annual* violent arrest rates for all racial and ethnic groups (*i.e.,* the city-wide total average or "All" rate), as well as for Blacks, Whites and White Hispanics.  As shown, the average annual violent arrest rate for Blacks exceeds that for All groups in each calendar year studied, whereas the violent arrest rates for Hispanics fall slightly below or approximately at the average All rate.  The violent arrest rates for Whites are marginal in all years and significantly below the violent arrest rates for Blacks and the combined average rates for All groups.

## *Blacks*

The statistical experts have analyzed the arrest rates in a different way.  They find that "[a]mong specific races and ethnicities for each year and the four-month period January-April of 2016, Non-Hispanic Blacks demonstrated the highest within-year average monthly arrest rates" of the three racial/ethnic groups:  2.88 for every 10,000 residents in 2014; 2.30 for every 10,000 residents in 2015; and 2.12 for every 10,000 residents in the first four months of 2016.  The experts also state in the Violent Arrests Report that the "un-

---

[76] The American Community Survey for 2010-14 variables were used as denominators.  For Black NHs: Total = 880,066; for White NHs:  Total = 980,789; for Hispanic-whites:  Total = 469,978. *See* Exhibit 6.

weighted monthly arrest rates for this group show an average monthly violent arrest rate which *dropped 20.1 percent from 2014 to 2015.* However, when comparing just the first four months of 2015 with the first four months of 2016, "the un-weighted average monthly arrest rate for this group increased 1.9 percent" (from an average violent arrest rate of 2.08 in the first 4 months of 2015 to an average violent arrest rate of 2.12 in 2016).

## White Hispanics

For Hispanics, the statistical experts found that the within-year average monthly arrest rates were somewhere between the Blacks rate and the Whites rate for the same period, reflecting a rate of 0.97 per 10,000 in 2014; 0.88 per 10,000 in 2015, and 0.89 per 10,000 in 2016. The experts then calculated the "un-weighted average monthly arrest rate" between 2014 and 2015; and, they found that it declined 9.3 percent; whereas, they found an increased monthly violent arrest rate of 13.5 percent (up from .78 for 2015 to .885 in 2016) when comparing the first 4 months of 2015 with the first 4 months of 2016.

## Whites

In the Violent Arrests Report, the experts found that "within-year average monthly arrest rates of Non-Hispanic Whites were the "lowest of the three groups" studied. The statistical results indicated an average monthly arrest rate of 0.18 in 2014; 0.15 in 2015; and 0.13 in the first four months of 2016. Based on these un-weighted violent arrest rates, the experts found that the violent arrest rate for Whites fell 16.7 percent from 2014 to 2015, but it increased 15.9 percent by comparing the first 4 months of 2015 with the first 4 months of 2016 (up from an average arrest rate of .11 in 2015 to .128 in 2016).

## Consultant's Observations

The experts offered an analysis showing that violent arrest rates decreased 18.2 percent city-wide ("All") from 2014-2015. The city-wide increase of 4 percent, observed by the experts when comparing the first 4 months of 2015 and 2016, is relatively inconsequential given the racial and ethnic disparities seen in the overall violent arrest rate annualized monthly averages from 2014-15. One can see that the largest overall drop in the violent

arrest rate occurred within the Black population between 2014 and 2015, whereas the violent arrest rate for White non-Hispanic ("NHS") dropped only slightly, and the Hispanic Whites violent arrest rate remained nearly the same.

The violent arrest counts and rates are based on objective analysis of CPD data from January 1, 2014 to April 30, 2016. As such, these numbers describe the CPD's violent arrests over an historical time-frame. One thing is clear from these numbers: the violent arrest rates for Blacks have fallen since 2014 in each month of the succeeding year; and, despite dips in February in both 2015 and 2016, have been fairly steady at around 2.25 percent for the last two years. *See* Consultant's Figures 1, 2 and 3.

While the same slight increase in violent arrest counts can be seen within the Hispanic Whites and White NHS population groups, the violent arrest rates for these two groups do not reflect the same pattern. By contrast, the violent arrest rate for Hispanics Whites, has increased year over year by almost 100 percent in some months. For White NHS, the story is different as well. Despite a steep decline from a 3-year high of .29 in October 2014 to .08 in January 2014, the arrest rate for White NHS has remained fairly even, at around .13 per 10,000 until April 2016, when it rose to around .15 per 10,000.
The following graphs illustrate some of these numbers.

*Consultant's Figure 1. Total city-level violent arrest rates for White Hispanics for the first 4. months of CY 2014-16*



| | 2014 | 2015 | 2016 |
|---|---|---|---|
| April | 0.79 | 0.98 | 0.79 |
| March | 1.02 | 0.91 | 1.14 |
| February | 0.61 | 0.59 | 0.7 |
| January | 0.91 | 0.64 | 0.91 |

Note: These numbers are taken from Table 1 of the Violent Arrests Report, Appendix D.

*Consultant's Figure 2. Total city-level violent arrest rates for Black NHs for the first 4-months of CY 2014-16. (Please note that the last figure in the February, 2016 column is 1.93, not 1.78)*



| | 2014 | 2015 | 2016 |
|---|---|---|---|
| April | 2.85 | 2.14 | 2.21 |
| March | 2.86 | 2.14 | 2.25 |
| February | 2.43 | 1.81 | 1.78 |
| January | 2.47 | 2.24 | 2.1 |

Note: These numbers are taken from Table 1 of the Violent Arrests Report, Appendix D.

194

*Consultant's Figure 3.  Total city-level violent arrest rates for White NHs for the first 4-months of CY 2014-2016.*



*Note:  These numbers are taken from Table 1 of the Violent Arrests Report, Appendix D.*

The Consultant cannot draw any reasonable statistical inferences from these numbers because the CPD cannot produce the actual arrest rates for each police district, for each category of crime (vis-à-vis crime codes, for example), or for each racial and ethnic population group in this study.

The Ecological Analysis Report provides total counts of stops and arrests for the entire first half of 2016, unlike the individual "ALL arrests" and "Violent Arrests" reports.  The ecological numbers speak for themselves.  Particular months in 2015 show increased counts and rates based, perhaps, on political realities in Chicago during those months.  Other months, such as November and December 2015, reflect massive declines in all counts and rates, including arrests and violent arrests.  More relevantly, on January 1, 2016 (and for the next 60 days thereafter), the rates for arrests, violent arrests, stops, frisks, searches, and enforcement actions dropped dramatically from the already lower numbers at the end of 2015.

However, there is one bright spot with regard to the counts and rates reported in the Ecological Report. By focusing simply on the months between March 1, 2016 and June 30,

2016, the end of the first reporting period under the Agreement, one can observe that, since March 1, 2016, the total number of stops, arrests, and violent arrests have gradually risen for all racial and ethnic groups and within police districts where most of the violent crime has occurred, coming off very low numbers in February 2016.

# The Arrests Report Analysis

The "Summary Report of Arrest Data, January 2014-April 2016" (Appendix E) parallels the "Summary Report of Violent Arrests Data, January 2014-April 2016" (Appendix D), which was just discussed. The Arrests Report, however, provides descriptive counts and rates for all arrests, including non-violent arrests, so the Consultant will refer to the arrests described in the Arrests Report as "All" arrests when referring to the rates and counts therein.

The Arrests Report specifically includes: (1) city-wide counts and rates of arrests by race and ethnicity, by month, for the 28-month period studied (January 1, 2014-April 30, 2016); (2) police district counts and rates of arrests for the same three racial and ethnic groups and time period; and (3) "quantile" (twenty percent increments from 0-100) thematic maps of arrest rates for Black NHs, White NHs and Hispanic-whites for the first four months of the Calendar Years between 2014-2016.

## Monthly Arrest Counts and Rates

In Table 1 of the Arrests Report, one can see that from January 1, 2014 through April 30, 2016, across all races and ethnicities, the All arrests count was 270,837. Annually, this total arrests count number breaks down into the following numbers by year:

### All Races and Ethnicities

> ➢ 2014: 128,568
> ➢ 2015: 112,933

➢ 2016: 29,336 (only first 4 months)

Among races and ethnicities, Table 1 also shows *monthly arrest rates* (per 10,000 residents for each calendar year from 2014-15, and for the first four months of 2016. The experts analyzed the CPD's available data and report that Black NHs demonstrated the highest within-year average monthly arrests rates of the three groups studied. Consultant's Table 1 illustrates this pattern:

*Consultant's Table 1. Within-year arrests rates by race & ethnicity per CY 2014-15 and first 4-months of 2016.*

|  | Black NH | White NH | Hispanic-white |
|---|---|---|---|
| CY 2014 | 91.39 | 10.32 | 42.91 |
| CY 2015 | 79.52 | 9.26 | 38.65 |
| 2016 (4 mo.) | 62.36 | 6.96 | 29.95 |

*Source: Table 1, Arrests Report (Appendix E).*

As can be seen by these rates, over the full two-year period from 2014-15, arrest rates generally declined month-over-month for each of the three groups studied, and continued to drop during the first four months of 2016 off the highs from 2014. The Arrests Report contains line graphs, Figures 1 and 2, which display the All arrests monthly arrest counts and rates for all races and ethnicities, as well as the arrests rates among the three racial and ethnic groups studied.[77]

The line graph in Figure 2 shows a fairly consistent arrest rate, over time, for White NHs and Hispanic-whites, with only slight variation in the Hispanic-whites rates and virtually no change in the White NHs rates during the 28-month period, taken as a whole. Conversely, the Black NHs arrests rates reflect sensitivity to changes (not examined in this report) over time and remains consistently much higher than the rates for White NHs and Hispanic-whites – both alone and in combination. For example, monthly changes in the Black NH's

---

[77] The All arrests rate is computed by adding together all arrests, not only in the three groups studied, but also for all other races and ethnicities where an arrest occurred.

arrest rates ranged between a low of 24.81, in December 2015, to a high of 44.57, in July 2014.

The monthly arrest counts follow the same trend as the stop counts, both city-wide for all races and ethnicities, as well as among the three racial and ethnic groups studied in this report. The sensitivity to change, reflected in Figure 2 of the Arrests Report, is also evident among arrests of Black NHs and in the All arrests rates. The disparity between the arrest rates for Black NHs and White NHs, versus those for Hispanic-whites and White NHs is also starkly higher, both alone and in combination.

## Thematic Maps of Chicago Police Districts

The thematic maps included in the Arrests Report are used to display arrest data associated with Chicago's 22 police districts (not including District 31, in which O'Hare Airport is situated). Each map contains arrest data coded by five (5) "quantiles" or twenty-percent increments. In other words, in police districts with arrest rates for the race or ethnicity specified in the lowest 20 percent overall, the lightest grey shading will appear. In police districts where the arrest rates are highest for the identified group, the darkest shading appears. Each map is separated by the race or ethnicity reported and the month and year in which those rates were assessed.

### *Police Districts with Highest and Lowest 20 Percent of Black NHs Arrest Rates*

In general, the highest monthly all arrests rates for Non-Hispanic Blacks cluster in the districts surrounding The Loop, West Side, and the 16th district. In the western section, such areas include the 11th district, as well as the 9th, 10th, and 12th which also score in the higher quantiles. The lowest rates of arrests can be found, at times, on the South Side (2nd, 4th, 5th, and 22nd Districts) and North Side (14th, 17th, 20th, and 24th Districts).

### Police Districts with Highest and Lowest 20 Percent of White Arrest Rates

White NH's arrest rates which appeared in the top two quantiles cluster on the West and South Sides of Chicago. Police districts with relatively lower rates (below the 40th percentile) border Lake Michigan and also include the 22nd district on the South Side.

### Police Districts with Highest and Lowest 20 Percent of Hispanic-White's arrest rates

Arrest rates in the highest quantile for Hispanic-whites are clustered districts on the West and South Sides of Chicago. On the West Side, these police districts include the 11th and 15th districts. On the South Side, they include the 6th and 7th Districts. Those two hot spots of arrest rates are consistent throughout all months of data mapped, except for February and March 2016, for the 15th District, and February 2014 for the 6th District. The lowest arrest rates cluster on the North Side, generally, and most commonly in the 22nd District, on the South Side.

# The Consultant's Recommendations

Section V.2.b. of the Agreement gives the Consultant the duty to "[r]ecommend to the parties changes to CPD's polices, practices, and orders regarding investigatory stops and protective pat downs that are reasonable and necessary to comply with the law, including the United States Constitution, the Illinois Constitution, and ICRA." Section V.2.f. adds that the Consultant's Report and Recommendations "will also identify any further practices, policies and other measures that the Consultant recommends are needed to ensure that CPD investigatory stop and protective pat down practices and policies are in compliance" with applicable laws and the Agreement. A reasonable interpretation of these two provisions is that the Consultant may recommend changes to existing CPD policies, practices and orders and "identify any further practices, policies or other measures" which

the Consultant believes are "needed to ensure" compliance with the law and the Agreement.

The Agreement, Section V.2.b. states that, before making these recommendations public, the "Consultant shall consult with the parties" and that the parties may file comments and objections to the recommendations during a 30-day review period specified for the filing of objections to the Consultant's overall report. "The Consultant will then have 30 days to make any revisions to the Report and recommendations before making it public." Id. On January 13, 2017, the Consultant served the parties with his preliminary report, which included the proposed recommendations. Thereafter, on February 21, 2017, the City and the CPD filed objections to some of the Consultants recommendations. Although the Agreement allows the Consultant to make recommendations, there is no requirement that such recommendations be followed by either party, and no negative connotation should be drawn from the failure to do so. The Consultant's recommendations are based on his knowledge of the CPD's current data base, review of the more than four thousand ISR's and the deficiencies/problems noted therein confronting both supervisors and patrol officers in distinguishing between probable cause and reasonable suspicion, and a genuine desire to provide police personnel with the best opportunity to comply with the Agreement. During meetings with the parties subsequent to the forwarding of the proposed recommendations, the City and the CPD accepted some of the recommendations, with some modifications, noted that they had already or were in the process of implementing others and explained why others could not be accepted, for various reasons, both practical and political. Rather than re-writing the voluminous proposed recommendations completely, they are set forth below (except those that the Consultant agrees are problematic and/or outside of the Agreement), followed by short commentaries.

# Community and Officer Recommendations

## *Implicit Bias Training*
The Consultant's use of the phrase "implicit bias" in this report should not be construed as an accusation that police officers, or any other group of individuals, are racist, outwardly

biased, or that they set out to intentionally discriminate against any other group because of their race or ethnicity. To the contrary, the Consultant firmly believes that nearly all Chicago Police officers are committed to performing their jobs by treating all individuals with whom they come in contact in a fair and equal way, regardless of their race or ethnicity.

A good deal of academic literature has focused on the issue of implicit bias, the point being that all of us--whether we are doctors, lawyers, judges, teachers, or police officers--have subconscious bias which we bring to our professions and which we must strive to overcome. This includes individuals who are expressly committed to values of fairness and equality. All individuals are products of environment and culture – a culture in which the association between Black individuals and crime, and increasingly Hispanic and Latino individuals and crime, is prevalent, longstanding, and capable of influencing behaviors without our conscious awareness of it. In this way, implicit bias is not limited to police officers, as a profession, or even White police officers versus Black/Hispanic civilians, but affects us all, as human beings, including minority police officers and the members of the racial and ethnic minorities being highlighted in this report.

Presumably, what human beings strive for, however, is to have awareness of subconscious biases, so that affirmative and conscious decision-making might override those implicit associations and reactions. This is especially true for police officers, who are entrusted with awesome law enforcement powers and who must deal daily with individuals of all racial and ethnic backgrounds, many of whom they have never met prior to their interactions in tense and urgent circumstances.

The Consultant notes that the written classroom training materials related to the stop and frisk policies and practices of the CPD, set forth in S04-13-09 discuss the imperative to avoid racial profiling and biased policing; the training sessions observed by the Consultant made mention of such issues and cautioned police officers to be mindful of how they perform their stop and frisk duties. The Consultant is also aware that the CPD provides implicit bias training as part of its non-stop and frisk policing education. The parties did

not agree to include implicit bias training in the terms of the Agreement, nor in the stop and frisk training sessions the Consultant observed.   This is regrettable, because this issue warrants in-depth, sustained, and comprehensive treatment, including role-playing exercises, in the context of the stop interactions that this report addresses, where police officers must make quick decisions based on limited information – the very type of circumstances in which literature suggests that individuals may be most affected by subconscious mental shortcuts.

Given the importance of the issue of implicit bias, the Consultant believes that the parties should meet and confer regarding how best to coordinate the CPD's other implicit bias training with specific training related to stop and frisk police practices.  The Consultant believes that the CPD should outsource this implicit bias training to someone or a group other than fellow police officers.  There are several such groups that are able to provide such training.

For example, in California, a Stanford University group has issued a report indicating that their implicit bias trainings of the Oakland Police Department "apply social psychological research in procedural justice, which shows that people care as much about how they are treated during the course of an interaction as they do about the outcome of that interaction." *See, e.g.,* Stanford-SPARQ, *Strategies for Change,* Chapter 5, p. 37 (June 2016) (describing process in Oakland, California, where SPARQ is helping the Oakland Police Department use "high quality, evidence-based officer training to reduce racial disparities in policing").   Moreover, implicit bias research "shows that many racial disparities are not intended or even conscious, but rather arise from unintended and subtle cognitive tendencies." *Id.*  The leadership and top commanders of the Oakland Police Department, for example, are currently offering trainings on both the reduction of racial disparities in policing and implicit bias to sworn police officers.

Stanford's SPARQ program is not the only group able and willing to help local police departments train officers and supervisors in how to make the unconscious more conscious.  The U.S. Department of Justice, for example, has implemented its own implicit

training curriculum for federal law enforcement officers and U.S. Attorneys. In fact, since 2010, the Department of Justice's Office of Community Oriented Policing Services has worked with state and local law enforcement to train over 2,600 law enforcement officers at both the line and supervisor level in its implicit bias program known as Fair and Impartial Policing. *See* Department of Justice Announces New Department-Wide Implicit Bias Training for Personnel (June 27, 2016) at *www.justice.gov/opa.*

It might also be possible for the CPD to augment such training with an add-on that might create a higher level of buy-in among CPD officers and at the same time rely on and incorporate their expertise about how and why improper stops start, and/or lead to improper outcomes, from a judicial perspective. Results to date have flagged a good number of stops where outcomes were not as expected; for example, where the stopped civilian was patted down but model indicators suggest should not have been, given the factors used to predict this outcome. It has also flagged an even larger number of stops where things went properly once the stop was underway. If a small set of diverse ISRs could be examined that capture "good" and "bad" outcomes, and be accompanied with record information and perhaps dash cam video, this could create a vehicle for getting small groups of officers to share thoughts. What happened here and why? What factors do you think the officer was considering in this situation? What are the key choice points here? What did the officer do right? What might he/she have done differently? Such a training/debriefing protocol might help strengthen officers "muscle memory" about engaging in alternate actions during stops, and provide important insights to the Consultant clarifying what specific things officers think about during a stop as they decide on one course of action vs. another.

The CPD needs to send a clear, consistent, and believable message to Chicago residents that implicit bias, both institutional or individual, will not be tolerated within the CPD, by CPD members when there is evidence that this bias affects the application of stop and frisk policies by police officers or manifests itself in police practices toward minorities or certain genders (be they male, female or transgender) in the communities they have sworn to serve and protect. This message is probably not one which can be verbalized by a

supervisor in a roll call or communicated in a mass email.  Instead, it must also be demonstrated through targeted implicit bias training by specialists outside the CPD who are trained to understand the verbal and non-verbal cues which trigger implicit bias to the extent that this bias unconsciously controls one's behavior.

At the moment, unfortunately, political rhetoric can get the best of introducing officers to proven skills and techniques – which other professionals around the country receive and are benefiting from – to overcome the ingrained cultural association that may unknowingly and unintentionally influence decision-making.  The leadership of the CPD and the City needs to pro-actively and positively reinforce rank-and-file, sworn police officers, who step up to accept the opportunity to articulate a new procedural justice message to their peers and within the police districts they patrol.

The City and CPD's response to this recommendation is that it has in place a comprehensive procedural justice training program, which includes instruction by one of the experts affiliated with one of the sources identified by the Consultant and which includes implicit bias training for all officers.

## *Community Involvement*

In view of the negative attitudes toward police officers held by many civilians in the City of Chicago, the Consultant recommends that CPD solicit volunteers from the ranks of its police officers in each district to serve as liaisons between the district commanders and community organizations. These liaisons would meet, on a weekly basis, to discuss any issues of concern (local crime, civilian complaints). Additionally, perhaps once a month, the district commander (and even the Superintendent) could meet with these groups to discuss any issues and possible solutions. In this regard, by feeling that they have vested interests in participating in such meetings and that their concerns are being considered from the top, the members of the community might more readily assist police officers in preventing and solving crimes.

It should be noted that community involvement differs from community engagement. Engagement suggests police officers interacting with the community on occasion, when it does not otherwise interact with core operational duties. Involvement, on the other hand, entails community at the neighborhood level having a direct say in how their communities are policed.  During the classroom training sessions attended by the Consultant, based on some of the questions posed by the trainees and some of the answers given, there appeared to be an "us" versus "them" mentality among some of the officers, rather than a collective agreement to "work together" with members of the community, as well as the ACLU, to solve problems.  Based on his meetings with police officers during his two Ride-Along observations with CPD commanders, and his community meeting with local high school students, the Consultant's observations in this regard were reinforced.  Through true community involvement, on a personal level, commanders would send the message that they and all of Chicago's diverse communities are in it together, for a common purpose, and that it must be a collaborative effort.

The City and the CPD's response to this recommendation is that they recently inaugurated the Community Policing Advisory Panel, charged with developing a strategy for police-community engagement and involvement.  This panel is made up of a former mayor of a major city, the Deputy mayor, an alderman and Deputy Chief of the CPD, academicians and various community representatives. The panel has already held meetings, which included community organizers, youth leaders and rank and file police officers.

# Investigatory Stop System Recommendations

## *ISR Form Revisions*

The Consultant is aware that some within the CPD believe that the current ISR form is too long and that it takes too long for officers to complete, so any recommendation that more information be included on the form is bound to be controversial.  The Consultant has observed officers, in training, entering information about a hypothetical stop during officer training.  Even when navigating the system for the first time, most officers appeared to

complete the process quickly and with relative ease.  It can be surmised that, as officers become familiar with where various items are located within the ISR database system, they will be able to enter information with ever greater ease, speed, and efficiency.  If the anecdotal reports that it takes some officers 45 minutes to complete a report are to be believed, this should set the occasion for supervisors to intervene and provide officers remedial training on navigating the electronic stop system or writing clear, concise stop narratives.

Further, the Consultant is skeptical of suggestions that more time spent on filling out stop forms has caused higher crime.  Other American cities have long required officers to document stops in the same manner – and have seen both stop activity and crime go down in the face of those documentation requirements.  In New York City, "[b]etween 2004 and June 2012, the NYPD conducted over 4.4 million *Terry* stops." *Floyd v. City of New York*, 959 F. Supp. 2d 540, 558 (S.D.N.Y. 2013).  The number of stops rose from 314,000 in 2004 to 686,000 in 2011.  *Id.* at 573.  During that period, NYPD officers needed to complete, by hand, an extensive, two-page pen-and-paper form for each stop.  *Id.* at 559; *see* Tim Cushing, "Former Police Chief Defends NYPD?'s 'Stop and Frisk' Program, Because It Has a Checklist," [TechDirt.com](TechDirt.com) (Apr. 29, 2013) (providing a copy of NYPD's UF-250 form).  During roughly the same period, crime was down by more than 17 percent.  New York State Division of Criminal Justice Services, Office of Justice Research & Performance, "New York State Crime Report" at 2 (Sep. 2013), *available at* [http://www.criminaljustice.ny.gov/crimnet/ojsa/indexcrimes/NYS%20Crime%20Report%202012.pdf](http://www.criminaljustice.ny.gov/crimnet/ojsa/indexcrimes/NYS%20Crime%20Report%202012.pdf).  Thus, in New York, where reporting requirements were just as substantial and reporting *more* onerous than in Chicago because it was necessarily manual rather than electronic, stop activity went down and crime went down.

Although CPD has built a dynamic, electronic database system with the aim of allowing the Department to capture important information about all stops efficiently and effectively, the Consultant observes that there may be opportunities going forward for making it even more user-friendly.  Specifically, the ISR system now provides a display of all of the fields or data points that may be relevant to a given stop, with an officer needing to navigate among

them to provide information responsive to elements implicated by a particular stop.  For example, although not every stop interaction involves a frisk, all of the check boxes and information fields for information about the frisk are displayed in the ISR system for each stop, requiring officers to navigate around them when they do not apply.

## *Stops*

There are a number of technical recommendations that the Consultant has identified based on the review of thousands of individual ISR forms.  Specifically, on the ISR Forms used to report individual stops:

### Recommendation No. 1

**Add one section** for the police officer submitting the ISR, in which check boxes appear **to identify the stop type** as either: (a) an investigatory stop; or (b) on-view violation; or (c) combination stop (probable cause supports stop subject to verification.

### Recommendation No. 2

For **Investigatory Stops**, categorize the stop type as follows: (1) investigatory-pedestrian; (2) investigatory-vehicle; (3) investigatory-gang/narcotics related; (4) investigatory-witness statement; (5) investigatory-civilian complaint/domestic disturbance.

### Recommendation No. 3

Under the check box for **On-View Stops**, categorize the stop type as follows: (1) probable cause:  on-view pedestrian code or ordinance violation; (2) probable cause:  on-view traffic code or ordinance violation (statutory); (3) probable cause: on-view felony.

## *Pat downs*

On the ISR Forms used to report individual pat downs:

- Add one checkbox for police officers **to identify the pat down type,** based on the purposes for which it was conducted, as one or more of the following: (i) protective (based on suspicion of weapons); or (ii) administrative (to transport a subject or witness); (iii) custodial (pursuant to arrest); (iv) probable cause (any kind);

- Add one check box for reviewing supervisors to indicate acceptance or rejection of the police officer's characterization of the pat down based on the narrative remarks in the ISR.

- Add three blank lines for reviewing supervisors to indicate: (i) the factual basis for the disagreement, based on the narrative remarks section or other information in the ISR; and (ii) the specific type of pat down determined by the supervisor from the narrative remarks.

### Rationale:

- Review of the sample narratives indicated that police officers do not clearly understand that, although the act of a pat down, or "frisk" as it is sometimes called, is always the same, the reasons for doing it are not.

- The Agreement only applies to pat downs conducted for protective purposes. Protective pat downs are justified when the officer is investigating, by plain touch frisk of the subject's outer clothing, whether the subject is in possession of a weapon or firearm, which creates an officer safety issue.

- Pat downs conducted in other factual contexts, despite being the same act of frisking the subject's outer clothing, conducted for the same officer safety purposes, to look for a weapon or a firearm, are not covered by the terms of the Agreement because they do not occur within the factual context of a Terry Stop made to investigate the officer's suspicions of criminal activity. Administrative pat downs for purposes of the transport of an individual fall within this category and, the Consultant believes, are not intended to be assessed or statistically analyzed for purposes of the Agreement.

### Consultant's Comments:
Although the experts caution that the statistical results are only "preliminary" (PSO Report, 7.6, p. 86), the descriptive results provide raw numbers that are unquestionably disturbing. The descriptive results show that there were 13,444 stops where a civilian was patted down by a police officer but no enforcement action ensued. In 9,828 of these cases, the stopped civilian was Black. In only 706 cases was the civilian White, and in 2,910 cases, the stopped civilian was Hispanic. These findings mean that, during the first six months of

2016, a Black civilian who was stopped and patted down was 10 times more likely to be released without any enforcement action than a White civilian.

This outcome has not been significantly explored in previous "stop question and frisk research" (PSO Report, 3.2.2, p. 11). Thus, the Consultant recommends that the parties address this question with intention and serious deliberation. It appears that, when White civilians are patted down after a stop, it is 10 times more likely to occur in the context of an enforcement action than when Black civilians are stopped.

Recommendation No. 4 is also being made because the total number of NEAs where a pat down occurred is 13,444 out of 54,116 stops. Reduced to a percentage, this post-stop outcome result means that, in slightly over 40 percent of all stops during the first half of 2016, Chicago police officers made stops and conducted frisks with virtually no tangible results in terms of legal enforcement or hit rates for weapons or firearms (legal or illegal possession) (see PSO Report, 4.8.3, p. 21-22 (finding only 465 weapons/firearms recovered from pat downs, city-wide, all races and ethnicities). One wonders, therefore, about the 94 percent final approval rate for these ISRs by reviewing supervisors (presuming that the 94 percent good stop, good pat down rate for the sampled ISRs is, in fact, statistically representative and can be extrapolated to the full data set).

## Searches
### Recommendation No. 1

On the ISR Forms used to report searches add checkboxes for police officers to identify:
     *(a)* whether the search conducted by the officer was of:
1. The subject's person
2. The subject's personal possessions
3. A vehicle in which the subject was present at the time of the stop;
4. A private, rather than public, location

     *(b)* whether the search conducted by the officer was taken pursuant to:
1. A protective pat down for weapons, based on the plain touch doctrine;

2. A protective pat down for weapons, based on the subject's self-initiated, voluntary consent to search;
3. A protective pat down, based on the police officer's request for consent to search;
4. A protective pat down for weapons, based on verbal admission by the subject that weapons or contraband were in the personal possession of or in proximity to the subject;
   a. An administrative pat down for purposes of transport;
   b. A custodial situation existing at the time of arrest or detention subsequent to the arrest and based on probable cause;
   c. Plain View

Rationale: The ISR narratives reviewed by the Consultant described multiple factual contexts listed in 1-8 above, in which police officers used the word "search" to describe the post-stop action/outcome asserted. However, there are only two types of searches which the Consultant is obligated to assess for contractual and legal compliance purposes, according to the specific terms of the Agreement:

a) Searches of the subject
   1. Conducted as an incident of or pursuant to a Terry stop,
   2. Followed by a protective pat down for weapons, based on plain touch providing probable cause to search the outer clothing of the subject.
b) Searches of the subject's personal possessions
   1. Conducted as an incident of or pursuant to a Terry stop;
   2. Based on RAS to believe that a concealed weapon or firearm was within reach of the subject; or
   3. Based on probable cause to believe the same as #2; or
   4. Plain View

To ensure that the ISR data produced to the Consultant for future reporting periods contain only those ISRs where the police officer asserts that the search conducted falls within the scope of the Agreement, the Consultant respectfully recommends that the CPD require police officers to specifically articulate the particular search type and purpose for the search by including the check boxes described above.

This recommendation is based on the Consultant's personal review of the sample ISRs and narrative remarks sections during the first reporting period. In the opinion of the

Consultant, too many of the written narratives lacked sufficient information to make the required determinations and/or checked the box for search on the front of the ISR form, but described a custodial search, or even what appeared to be an administrative pat down for the purpose of transporting the individual.  In short, many police officers do not yet understand how to articulate, in their written narratives, the facts relevant to the legal determinations which need to be made under the Agreement.

Although the CPD might also conduct regular report-writing classes to teach officers how to describe the factual and legal basis for their actions with sufficient particularity, in lieu of adding more check boxes, the Consultant believes that check boxes are, at least at this point in the Agreement, the more efficient, less time-consuming route to take to educate the police force on what the Agreement requires to achieve substantial compliance.
With regard to all of the Consultant's recommendations concerning the proposed changes to the ISR, the City and the CPD believe, contrary to the Consultant that they are unnecessary and would only complicate things.  In view of the complaints by some police officers about the amount of time it takes to complete the form in its present form, it was not surprising that the addition of any check boxes to the form would cause an outcry.  Again, the Consultant is totally convinced that his suggested additions to the form would result in resolving many of the issues observed from his review of the IRS forms, where the main problem appeared to be related to officers' confusion about the difference between probable cause and the articulation of reasonable suspicion, both for stops and patdowns/searches, which was one of the reasons for the Consultant's inability to find compliance with the Agreement during the first reporting period.

## Database
### Directory Files

In the current ISS Versioning System Database, CPD should create a Directory for each six-month reporting period by dates, and within each reporting period directory, create two subdirectories with two file folders in each subdirectory, as follows:

1. **For Original ISRs/Police Officer Reports**: In subdirectory 1: store all original ISRs designated as Terry Stops; and in subdirectory 2: store all original ISRs designated as Non-Terry Stops.

2. **For Finalized ISRs/Supervisory Reviews:** In subdirectory 3: store all finalized ISRs designated as Terry Stops (based on supervisor's final determination, regardless of whether original ISR designation accepted or rejected); In subdirectory 4: store all finalized ISRs designated as Non-Terry Stops (same limitations).

## Monthly Data Reports

1. In the Monthly ISR Data Reports ("data dumps") produced pursuant to the Agreement to the designated individuals for use by the Consultant and his experts, include only the ISR information related to Terry Stops, protective pat downs, and searches made incident to the Terry Stop or protective pat down. Use the current reporting period directory, sub-directories and identified files to sort this information for purposes of production under the terms of the Agreement.

2. Do not purge the Non-Terry Stop, non-protective pat down, and unrelated search information. Instead, store such information with the relevant directory, sub-directory and files for every month in the reporting period, until the termination of the Agreement.

3. Access to the Non-Terry stop, non-protective pat down (frisk), and non-related search ISRs and all information contained in them should be accessible to the Consultant, appointed experts, parties, and other designated individuals who have cause for or a demonstrated right to review them. Production of such information to the Consultant, upon request, should be expedited unless there is due cause for delay.

4. The City and the CPD responded that they are in the process of determining the best method for providing the Consultant with data pertaining to investigatory stops only, which may involve a modification of the ISR form going forward. They are also amenable to working with the Consultant and his experts to ensure that they are

readily able to link the ISRs with any related ISR Deficiency Notifications.

## Auditing Reports & Related ISRs

1. First, and foremost, the CPD is required under the Agreement to perform its own audits of all documents and police policies and practices.  Hiring outside counsel to perform the ISR narrative samples review is understandably tempting, especially when such services are offered *pro bono* by experienced, former prosecutors with substantial life and professional experience to contribute to the review and audit report.

2. The Agreement does not, in the Consultant's view, call for and require the CPD to perform an audit of the statistically representative sample of ISR narratives identified by the Consultant for each review period simply to tax its commanders with more paper work.  The requirement exists for reasons presumably associated with the need for the CPD to hold itself and its members accountable for compliance with CPD stop and frisk policy and adherence to applicable laws.  It also exists to ensure that rank and file police officers are, in fact, supervised and mentored by other police officers.

3. All written auditing reports generated by or for the CPD, for purpose of assessing compliance with the terms of the Agreement, should be produced to the Consultant concurrently with submission to any other party, entity or individual immediately upon completion.

4. All written auditing reports should include a separate report for the benefit of the Consultant and designated experts which lists any and all ISR numbers subject to the Audit, even if those ISRs were not part of the statistically representative sample of ISRs identified to the CPD by the Consultant and his experts during or for any prior reporting period.  The ISR list should be organized by reporting periods and months within those periods.

5. Additionally, copies of any other related written correspondence, determinations, or other forms related to the various versions of the

> listed ISRs, if any, also should be copied and attached to the auditing reports, along with a cover letter explaining their relevance to the underlying audit.

The City and the CPD responded that the review performed by the Jenner & Block law form was in additional to, not instead of the audits required to be done by Headquarters staff.  As corrected in the body of the report, this was a misunderstanding on the part of the Consultant.  Captain Karyn Murphy's Integrity Section conducted the appropriated review.

## *Civilian Complaints*

One look at the state of civilian complaints filed with the CPD for police officer actions during the first reporting period demonstrates that most challenges by subjects asserting the lack of probable cause for a stop are futile without a witness who is willing not only to sign the complaint and an affidavit swearing to the facts contained in it, but also is willing to be questioned by a uniformed CPD member.  From the look of most civilian complaints filed and investigations conducted during the first reporting period, the willingness of witnesses to step forward and be identified is extremely rare.  Yet, without such witnesses, no charges or discipline can be brought against a police officer, and the officer's word stands that probable cause existed for the stop.  The investigation necessarily stops there. One way for the CPD to make a statement to the neighborhood communities that it is serious about holding its own members accountable for bad acts, is to create neighborhood citizen groups who will volunteer to help witnesses sign and attest to the facts asserted in civilian complaints protesting any and all perceived police misconduct in their neighborhoods.  Members of these neighborhood groups would be recognized and legitimized by the CPD top commanders and provided with resources to ensure that witnesses to the complaints would not be intimidated by the police officers named in them or by others in the department during or after the investigation.

The City and the CPD responded that there are State law and collective bargaining requirements related to the requirement that a civilian complaint against a police officer be supported by a sworn affidavit. This requirement has been unfavorably commented upon by both the Police accountability Task Force and the DOJ in their reports. The City and the CPD are addressing this issue through increased use of a provision in the collective bargaining agreement that allows for override of that provision, as well as other measures.

# CONCLUSION

The Consultant wishes to commend the many individuals whose tireless efforts and good faith negotiations led to the Agreement, as well as its implementation. In particular, the Consultant acknowledges the foresight and courage of those who decided to negotiate this Agreement rather than engage in litigation. In particular, the following individuals deserve recognition: Mayor Rahm Emanuel, former Corporation Counsel, Stephen R. Patton, and First Assistant Corporation Counsel, Jane E. Notz, along with the ACLU's former Legal Director, Harvey L. Grossman, current Legal Director Benjamin Wolf, and Police Practices Project Director, Karen Sheley. The Consultant also commends Superintendent of Police, Eddie T. Johnson, Deputy Chief Jonathan Lewin, Captain Karyn Murphy, and Officer Joseph Candella, for their good faith and cooperation during the first year of the Agreement.

The Consultant believes that his inability to find substantial compliance with the terms of the Agreement during the first reporting period is not due to bad faith on the part of the CPD or the City, but is, rather, a result of unforeseen difficulties that are inherent in any large institutional reform effort, such as the Agreement. The public should not interpret this finding of non-compliance as a vote of no-confidence in the CPD, the parties or the process. In fact, the Consultant fully expects to find compliance regarding a number of terms in the Agreement in the near future, based on the work already being done by the CPD, during the second and third reporting periods. That work and those compliance efforts will be addressed in the Consultant's next report.

Dated at Chicago, Illinois, this 23rd day of March, 2017
Respectfully Submitted,

*Arlander Keys*

Hon. Arlander Keys (Ret.), Consultant