**City of Chicago v. Morales, 1998 WL 328342 (1998)**

1998 WL 328342 (U.S.) (Appellate Brief)
United States Supreme Court Petitioner's Brief.

CITY OF CHICAGO, Petitioner,

v.

Jesus MORALES, et al., Respondents.

No. 97-1121.
October Term, 1997.
June 19, 1998.

On Writ of Certiorari to the Supreme Court of Illinois

**BRIEF FOR THE PETITIONER**

BRIAN L. CROWE
Corporation Counsel
of the City of Chicago

LAWRENCE ROSENTHAL [*]
Deputy Corporation Counsel

BENNA RUTH SOLOMON
Chief Assistant Corporation
Counsel

TIMOTHY W. JORANKO
Assistant Corporation
Counsel
City Hall, Room 610
Chicago, Illinois 60602
(312) 744-5337

Attorneys for Petitioner

**\*i QUESTIONS PRESENTED**

1. Whether a loitering ordinance authorizing the arrest of persons who have disobeyed a police order to move on, given when a police officer has reasonable cause to believe that a group of loiterers contains a member of a criminal street gang, is impermissibly vague in violation of due process guarantees.

2. Whether, despite legislative findings about the deleterious effects of loitering by criminal street gangs, an ordinance that requires a group of loiterers containing criminal street gang members to obey a police order to move on abridges rights secured by the rubric of substantive due process.

In addition, in one of the briefs in opposition to the petition for certiorari, respondents presented one additional question not subsumed in the preceding questions:

3. Whether a loitering ordinance that makes it illegal for loiterers to disobey an order to disperse, issued when a police officer reasonably believes that a group of loiterers includes members of a criminal street gang, authorizes unreasonable seizures in violation of the Fourth Amendment.

### *ii  PARTIES TO THE PROCEEDING

The petitioner is the City of Chicago. The respondents are persons arrested under Chicago's Gang Loitering Ordinance: James Youkhana, Fernando O. Cota, Jose A. Merced, Roosevelt McMullan, Jr., Johnny R. Newsome, Anthony D. Cordero, Julio M. Barroso, Hermie J. Khamo, Lamont J. Jordan, Lisa Gonzales, Florentine Soto, Renee Goodwill, Tasha White, Sabrina Brown, Gregorio Guiterrez, Sandy Garvin, Raul Jimenez, Jr., Daniel Washington, Jose Renteria, Jesus Morales, Malcolm Ramsey, Neil Round, Christopher Lostroscio, Casey A. Mazeika, Karl T. Kelly, Jesse K. Paschke, Roy Delgado, Jr., Japheth Estrada, Jorge Lopez, Wladyslaw W. Jedrol, James J. Portway, Michael A. Horton, Paris Bryant, Wesley Saffold, Eric Jones, Roshindaj Bryant, Leroy Minley, Jr., Eric Warren, Charlie Monden, Joseph Dell, Tywan Durnell Riley, Eric Miller, Jerry Cunningham, Eric Dennis, Vernon Diggs, Deandre Fitzpatrick, Darryl Hall, Cornelius Holt, Jonathan Lewis, Seth Lewis, Steve Reynolds, Claude Ross, Dushone Scott, Michael Simmons, Chester Sparks, Clarence Taylor, Michael Taylor, Stacey Wilson, Gabriel Ruiz, Maximilano Orozco, Ricardo Florez, Anibal Hernandez, Pablo Estrada, Juan Cruz, Andres Feliciano, and Peter Quinones.

### *iii  TABLE OF CONTENTS

| | |
|---|---|
| QUESTIONS PRESENTED | i |
| PARTIES TO THE PROCEEDING | ii |
| TABLE OF AUTHORITIES | v |
| OPINIONS BELOW | 1 |
| JURISDICTION | 1 |
| CONSTITUTIONAL PROVISIONS AND ORDINANCE INVOLVED | 2 |
| STATEMENT | 3 |
| SUMMARY OF ARGUMENT | 9 |
| ARGUMENT | 13 |
| I. THE GANG LOITERING ORDINANCE IS NOT IMPERMISSIBLY VAGUE | 17 |
| A. The Gang Loitering Ordinance is Not Overbroad | 18 |
| 1. The Gang Loitering Ordinance Does Not Proscribe Speech, Assembly, Or Association | 18 |
| 2. The Gang Loitering Ordinance Is A Permisible Regulation Of Loitering | 24 |
| B. The Gang Loitering Ordinance Contains Appropriate Standards For Its Enforcement | 28 |
| 1. The Ordinance Provides Fair Notice Of What It Prohibits | 29 |
| 2. The Ordinance Does Not Authorize Arbitrary Or Discriminatory Enforcement | 33 |
| *iv  II. THE GANG LOITERING ORDINANCE DOES NOT OFFEND SUBSTANTIVE DUE PROCESS | 39 |
| A. The Gang Loitering Ordinance Appropriately Advances Legitimate Governmental Interests | 39 |
| B. The Gang Loitering Ordinance Does Not Create A Status Offense | 44 |
| III. THE GANG LOITERING ORDINANCE DOES NOT OFFEND THE FOURTH AMENDMENT | 46 |
| CONCLUSION | 50 |

### *v  TABLE OF AUTHORITIES

CASES:

| | |
|---|---|
| *Aptheker v. Secretary of State,* 378 U.S. 500 (1964) | 39-40 |
| *Arizona v. Evans,* 514 U.S. 1 (1995) | 2 |

**City of Chicago v. Morales, 1998 WL 328342 (1998)**

*Board of Airport Commissioners v. Jews For Jesus, Inc.,* 482 U.S. 569 (1987) .................................................. 18

*Board of Directors v. Rotary Club,* 481 U.S. 537 (1987) ... 20, 21

*Boos v. Barry,* 485 U.S. 312 (1988) .................................. 36

*Broadrick v. Oklahoma,* 413 U.S. 601 (1973) ................... 18, 23

*Brower v. County of Inyo,* 489 U.S. 593 (1989) .............. 47

*Brown v. Texas,* 443 U.S. 47 (1979) ................................ 35

*California v. Hodari D.,* 499 U.S. 621 (1991) .................. 13, 47

*Chandler v. Florida,* 449 U.S. 560 (1981) ....................... 42

*City of Dallas v. Stanglin,* 490 U.S. 19 (1989) ................ 10, 21, 22-24, 40

*City of Houston v. Hill,* 482 U.S. 451 (1987) ................... 18

*City of Milwaukee v. Nelson,* 149 Wis. 2d 434, 439 N.W.2d 562, cert. denied, 493 U.S. 858 (1989) ................ 49

*City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41 (1986) ................................................................................. 25

*City of Tacoma v. Luvene,* 118 Wash. 2d 826, 827 P.2d 1374 (1992) ........................................................................ 36, 45

*Clark v. Community for Creative Non-Violence,* 468 U.S. 288 (1984) ......................................................................... 20, 24

*Coates v. City of Cincinnati,* 402 U.S. 611 (1971) ............. 23, 29, 33

*Collins v. City of Harker Heights,* 503 U.S. 115 (1992) .... 40, 41

*Colten v. Kentucky,* 407 U.S. 104 (1972) ......................... 19, 29, 31, 37, 40

*Cox v. Louisiana,* 379 U.S. 536 (1965) ............................. 19

*Cox v. New Hampshire,* 312 U.S. 569 (1941) ................... 24

*Cruzan v. Director,* 497 U.S. 261 (1990) .......................... 42

*Day-Brite Lighting, Inc. v. Missouri,* 342 U.S. 421 (1952) 43

*DeVeau v. Braisted,* 363 U.S. 144 (1960) ........................ 37

*Finzer v. Barry,* 798 F.2d 1450 (D.C.Cir.1986), aff'd in part and rev'd in part sub norm. *Boos v. Barry,* 485 U.S. 312 (1988) ........................................................................ 36

*Florida v. Bostick,* 501 U.S. 429 (1991) ........................... 47

 **\*vi** *Florida v. Jimeno,* 500 U.S. 248 (1991) .................. 48

*Florida v. Rodriguez,* 469 U.S. 1 (1984) (per curiam) ....... 47

*Frisby v. Schultz,* 487 U.S. 474 (1988) ............................ 23, 24, 25

*Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490 (1949) ................................................................................. 19

*Gooding v. Wilson,* 405 U.S. 518 (1972) .......................... 17

*Grayned v. City of Rockford,* 408 U.S. 104 (1972) ............ 29, 30, 33

*Heller v. Doe,* 509 U.S. 312 (1993) .................................. 44

*Helton v. State,* 624 N.E. 2d 499 (Ind.Ct.App.1993), cert. denied, 117 5. Ct. 1252 (1997) ........................................... 35

*Hunter v. Bryant,* 502 U.S. 224 (1991) (per curiam) ......... 36

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group,* 515 U.S. 557 (1995) .............................................. 20

*Hynes v. Mayor and Council,* 425 U.S. 610 (1976) ........... 18

*Jackson v. State,* 634 N.E.2d 532 (Ind.Ct.App.1994) ....... 35

*Kernats v. O'Sullivan,* 35 F.3d 1171 (7th Cir.1994) .......... 48

*Kolender v. Lawson,* 461 U.S. 352 (1983) ....................... 11, 17, 29, 33-35, 43

*Lanzetta v. New Jersey,* 306 U.S. 451 (1939) ................... 32

*Lewis v. United States,* 445 U.S. 55 (1980) ...................... 37, 43, 46

*Members of the City Council v. Taxpayers For Vincent,* 466 U.S. 789 (1984) ........................................................... 25, 26, 42

*Michael M. v. Superior Court,* 450 U.S. 464 (1981) ......... 37

*Michigan v. Chesternut,* 486 U.S. 567 (1988) .................. 47

*Michigan v. DeFillippo,* 443 U.S. 31 (1979) ..................... 49

**City of Chicago v. Morales, 1998 WL 328342 (1998)**

*Michigan v. Long,* 463 U.S. 1032 (1983) .......................... 2

*Moore v. City of East Cleveland,* 431 U.S. 494 (1977) ...... 40

*New State Ice Co. v. Liebmann,* 285 U.S. 262 (1932) ........ 42

*New York v. Class,* 475 U.S. 106 (1986) .......................... 2

*New York v. Ferber,* 458 U.S. 747 (1982) ...................... 18, 22, 23

*Ohio v. Robinette,* 117 S. Ct. 417 (1996) .......................... 48

*Osborne v. Ohio,* 495 U.S. 103 (1990) ............................ 18

**\*vii** *Papachristou v. City of Jacksonville,* 405 U.S. 156 (1972) ....................................... 8, 9, 31, 38, 40, 42, 43, 46, 47

*Pennsylvania v. Labron,* 518 U.S. 938 (1996) (per curiam) .................................................................... 2

*People ex rel. Gallo v. Acuna,* 14 Cal. 4th 1090, 929 P.2d 596, 60 Cal. Rptr. 2d 277, cert. denied, 117 S. Ct. 2513 (1997) ..................................................... 24, 42

*People v. Gardeley,* 14 Cal. 4th 605, 927 P.2d 713, 59 Cal. Rptr. 2d 356 (1996), cert. denied, 118 S. Ct. 148 (1997) ... 35

*People v. Superior Court,* 46 Cal. 3d 381, 758 P.2d 1046, 250 Cal. Rptr. 515 (1988) ........................................ 30, 45

*Posters 'N' Things, Ltd. v. United States,* 511 U.S. 513 (1994) ...................................................................... 33

*Powell v. Texas,* 392 U.S. 514 (1968) .............................. 45, 46

*Regan v. Time, Inc.,* 468 U.S. 641 (1984) ........................ 23

*Reno v. Flores,* 507 U.S. 292 (1993) ................................ 39, 44

*Roberts v. United States Jaycees,* 468 U.S. 609 (1984) ..... 20, 25

*Robinson v. California,* 370 U.S. 660 (1962) .................... 45

*Roulette v. City of Seattle,* 97 F. 3d 300 (9th Cir.1996) .... 22

*Shapiro v. Thompson,* 394 U.S. 618 (1969) ...................... 39

*Shuttlesworth v. City of Birmingham,* 382 U.S. 87 (1965) . 23, 32, 33

*Shuttlesworth v. City of Birmingham,* 394 U.S. 147 (1969) ...................................................................... 19-20

*Smith v. Goguen,* 415 U.S. 566 (1974) ............................ 33

*State v. Armstrong,* 282 Minn. 39, 162 N.W.2d 357 (1968) ...................................................................... 30, 45

*State v. Walker,* 506 N.W.2d 430 (Iowa 1993) ................. 35-36

*Swank v. Smart,* 898 F.2d 1247 (7th Cir.), cert. denied, 498 U.S. 853 (1990) ........................................ 21-22

*Tennessee v. Garner,* 471 U.S. 1 (1985) .......................... 49

*Terry v. Ohio,* 392 U.S. 1 (1968) .................................... 35

*Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622 (1994) ...................................................................... 25, 26, 27

*United States v. Albertini,* 472 U.S. 675 (1985) ............... 24, 26

*United States v. Armstrong,* 517 U.S. 456 (1996) ............. 38

**\*viii** *United States v. Bourgeois,* 964 F.2d 985 (9th Cir.), cert. denied, 506 U.S. 901 (1992) .......................... 38

*United States v. Hensley,* 469 U.S. 221 (1985) ................. 36

*United States v. Mendenhall,* 446 U.S. 544 (1980) ........... 47

*United States v. O'Brien,* 391 U.S. 367 (1968) ................. 21, 24

*United States v. Salerno,* 481 U.S. 739 (1987) ................. 10, 18, 42

*United States v. Trent,* 718 F. Supp. 39 (D.Or.1989) ........ 38

*United States v. Turner,* 104 F.3d 1180 (9th Cir.), cert. denied, 117 5. Ct. 1566 & 1722 (1997) .......................... 38

*United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548 (1973) ......... 30

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489 (1982) .............. 10, 11, 17, 24, 29, 33, 34

**City of Chicago v. Morales, 1998 WL 328342 (1998)**

*Ward v. Rock Against Racism,* 491 U.S. 781 (1989) ......... 11, 25, 26, 27-28

*Washington v. Glucksberg,* 117 5. Ct.2258 (1997) ............. 12, 39, 40, 41, 43

*Waters v. Barry,* 711 F. Supp. 1125 (D.D.C.1989) ........... 49

*Wayte v. United States,* 470 U.S. 598 (1985) ................... 38

*Wiemerslage v. Maine Township High School District 207,* 29 F.3d 1149 (7th Cir.1994) ....................................... 30

*Young v. American Mini-Theatres, Inc.,* 427 U.S. 50 (1976) ... ............................................................... 42

CONSTITUTIONAL PROVISIONS, STATUTES, AND RULES:

U.S. Const. amend. I ........................................................ *passim*

U.S. Const. amend. IV .................................................... 2, 48, 49, 50

U.S. Const. amend. VIII .................................................. 45

U.S. Const. amend. XIV, § 1 ........................................... *passim*

18 U.S.C. § 922(g) .......................................................... 46

18 U.S.C. § 1961 ............................................................ 5

28 U.S.C. § 1257 ............................................................ 1

Ill. Const. art. I, § 2 ........................................................ 2

III. Const. art. VI, § 4(c) ................................................. 8

Ill. Sup. Ct. R. 315 ......................................................... 8

Ill. Sup. Ct. R. 316 ......................................................... 8

**\*ix** American Law Institute, *Model Penal Code* (1980) .. 41

MISCELLANEOUS:

Jeffrey S. Adler, *A Historical Analysis of the Law of Vagrancy,* 27 Criminology 209 (1989) ............................ 41

Carolyn Rebecca Block & Richard Block, *Street Gang Crime in Chicago* (Nat'l Inst. of Justice Dec. 1993) .......... 13

G. David Curry, Richard A. Ball & Scott H. Decker, *Estimating the National Scope of Gang Crime from Law Enforcement Data,* in *Gangs in America* (C. Ronald Huff ed. 1996) ........................................................................ 13

Robert C. Ellickson, *Controlling Chronic Misconduct in City Spaces: Of Panhandlers, Skid Rows and Public Space Zoning,* 105 Yale L.J. 1165 (1996) ........................ 15

Jeffrey Fagan, *Gangs, Drugs and Neighborhood Change,* in *Gangs in America* (C. Ronald Huff 2d ed. 1996) .......... 35

Robert Force, *Decriminalization of Breach of the Peace Statutes: A Nonpenal Approach to Order Maintenance,* 46 Tul. L. Rev. 367 (1972) ................................................... 41

Caleb Foote, *Vagrancy-Type Law and Its Administration,* 104 U. Pa. L. Rev. 608 (1956) ........................................ 41

Martin Sanchez Jankowski, *Islands in the Street: Gangs and American Urban Society* (1991) ................................ 35

Dan M. Kahan, *Social Influence, Social Meaning, and Deterrence,* 83 Va. L. Rev. 349 (1997) ............................ 15

George L. Kelling & Catherine M. Coles, *Fixing Broken Windows* (1996) .................................................... 15

Debra Livingston, *Police Discretion and the Quality of Life in Public Places: Courts, Communities and the New Policing,* 97 Colum. L. Rev. 551 (1997) .......................... 15

Tracey L. Meares, *Social Organization and Drug Law Enforcement,* 35 Am. Crim. L. Rev. 191 (1998) ............... 16

Rollin M. Perkins, *The Vagrancy Concept,* 9 Hastings L.J. 237 (1958) ................................................................ 41

**\*x** Wesley G. Skogan, *Disorder and Decline* (1990) ....... 15

**City of Chicago v. Morales, 1998 WL 328342 (1998)**

Jerome H. Skolnick & David H. Bayley, *Community Policing: Issues and Practices Around the World* (Nat'l Inst. of Justice 1988) ...................................................... 15

Irving A. Spergel, *The Youth Gang Problem: A Community Approach* (1995) .......................................... 35

Charles R. Swanson, Leonard Territo & Robert W. Taylor, *Police Administration: Structures, Processes and Behavior* (3d ed. 1993) ...................................................... 15

U.S. Department of Justice, *Attorney General's Report to the President: A Coordinated Approach to the Challenge of Gang Violence: A Progress Report* (April 1996) ........... 13

Samuel Walker, *The Police in America* (1992) ................. 15

James Q. Wilson & George L. Kelling, *Broken Windows,* Atlantic Monthly, Mar. 1982 ......................................... 15

### *1 OPINIONS BELOW

The opinion of the Supreme Court of Illinois (Pet.App.1a-19a) is reported at 177 Ill. 2d 440, 687 N.E.2d 53 (1997). The opinion of the Illinois Appellate Court in *City of Chicago v. Youkhana* (Pet.App.20a-36a) is reported at 277 Ill. App. 3d 101, 660 N.E.2d 34 (1995). The opinions of the appellate court in *City of Chicago v. Morales* (Pet.App.37a-38a) and *City of Chicago v. Ramsey* (Pet.App.39a-40a) are unreported. The opinion of the Circuit Court of Cook County in *City of Chicago v. Youkhana* (Pet.App.41a-59a) is unreported.

### JURISDICTION

The judgment of the Supreme Court of Illinois was entered on October 17, 1997. The petition for certiorari was filed on January 5, 1998. The jurisdiction of this Court is invoked under 28 U.S.C. § 1257. [1]

### *2 CONSTITUTIONAL PROVISIONS AND ORDINANCE INVOLVED

The First Amendment provides, in pertinent part: "Congress shall make no law ... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. The Fourth Amendment provides, in pertinent part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. The Due Process Clause of the Fourteenth Amendment provides in pertinent part: "nor shall any State deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV, § 1. The Chicago gang loitering ordinance is set out in the appendix to the petition for a writ of certiorari (Pet.App.60a-63a).

### *3 STATEMENT

The enactment of Chicago's gang loitering ordinance followed hearings before the Chicago City Council's Committee on Police and Fire exploring the problems that criminal street gangs present for the people of Chicago-in particular the problems created by public loitering by gang members. [2] At the hearings, witnesses described how criminal street gang members loiter as part of a strategy to organize as a group, recruit new members, claim territory, and antagonize rival gangs and others. Supp. R. I at 121, 125; Supp. R. II at 32. Further testimony explained the inadequacy of existing laws to address this problem. Residents may complain to police of illegal gang activity in progress, but once the police arrive, gang members and their cohorts will not commit any overt criminal act; instead, they will appear to be simply loitering.

City of Chicago v. Morales, 1998 WL 328342 (1998)

Supp. R. I at 50-51, 68, 79-80, 138-40; Supp. R. II at 33, 38. The testimony also showed that community residents are often afraid to file formal complaints, serve as witnesses, or take other steps necessary to prosecute criminal activity because of concerns for their own safety or the safety of their family members or property. Supp. R. I at 50, 52, 54, 69, 108-09, 135; Supp. R. II at 22-25, 37, 40. There was also testimony reflecting the need for a method of prosecuting gang members that does not require law-abiding persons to place themselves in harm's way by testifying, even if they are willing to do so. Supp. R. II at 24-25.

Perhaps most important, the testimony before the City Council disclosed that criminal street gangs are menacing and destructive regardless of whether their members are, at a particular moment, violating other laws. The intimidating presence of gangs itself has a palpable detrimental effect on a family's sense of well being, on the willingness of parents to allow their children outside, and **\*4** on the willingness of Chicago residents to remain in the City. Supp. R. I at 53, 62, 93, 95, 110, 132, 138; Supp. R. II at 167.

Based on this testimony, the City Council, in the preamble to the ordinance, made the following findings:
WHEREAS, in many neighborhoods throughout the City the burgeoning presence of street gang members in public has intimidated many law abiding citizens; and

WHEREAS, one of the methods by which criminal street gangs establish control over identifiable areas is by loitering in those areas and intimidating others from entering those areas; and

WHEREAS, members of criminal street gangs avoid arrest by committing no offense punishable under existing laws when they know police are present, while maintaining control over identifiable areas by continued loitering; and

WHEREAS, the City Council has determined that loitering in public places by criminal street gang members creates a justifiable fear for the safety of persons and property in the area because of the violence, drug-dealing and vandalism often associated with such activity....

Pet. App. 60a-61a. The ordinance provides:

> Whenever a police officer observes a person he reasonably believes to be a criminal street gang member loitering in any public place with one or more other persons, he shall order all such persons to disperse and remove themselves from the area. Any person who does not promptly obey such an order is in violation of this section.

Pet. App. 61a. "Loiter" is defined as "to remain in any one place with no apparent purpose." *Ibid.* The ordinance also contains a comprehensive and precise definition of "criminal street gang." Pet. App. 61a-62a.[3] **\*5** A violation of the ordinance is punishable by up to 6 months imprisonment, a $500 fine, and up to 120 hours of community service. Pet. App. 63a. It is a defense to a prosecution under the ordinance that "no person who was observed loitering was in fact a member of a criminal street gang." Pet. App. 61a.

During the hearings, representatives of the Departments of Law and Police informed the City Council that the Chicago Police Department would promulgate regulations for the ordinance that would guide its enforcement by the police. Supp. R. II at 185, 220. Chicago Police Department General Order 92-4 was later promulgated to govern enforcement of the gang loitering ordinance.

**City of Chicago v. Morales, 1998 WL 328342 (1998)**

The General Order permits enforcement of the ordinance only in areas of the City designated by a district commander because "the presence of gang members has a demonstrable effect on the activities of law abiding persons in the surrounding community." Pet. App. 68a. The Order also provides specific criteria and objective standards for defining criminal street gangs, and that such gangs will be identfied only on the basis of "specific documented and reliable information" such as crime pattern information, surveillance results, witness interviews, admissions of street gang members, or information from informants of proven reliability. Pet. App. 66a-67a. The Order further explains how membership in a criminal street gang can be established. The Order requires probable cause to believe that an individual is a member of a criminal street gang (Pet.App.71a-72a), and probable **\*6** cause, in turn, must be substantiated by the arresting officer's "experience and knowledge of the alleged offenders," and corroborated by "specific, documented, and reliable information," such as an individual's admission of membership, an individual's display of distinctive colors, tattoos, or markings not ordinarily worn by persons other than criminal street gang members, the use of distinctive signs or symbols, or statements by a witness of proven reliability or whose statements can be independently corroborated. Pet. App. 67a-68a. Only members of the gang crime section and other specially designated personnel may make arrests under the ordinance. Pet. App. 65a. [4]

After the ordinance became effective, numerous prosecutions of individuals for violating its proscriptions ensued, and various trial judges issued conflicting rulings on the constitutionality of the ordinance. In *City of Chicago v. Youkhana,* which became the first case to reach the Illinois Appellate Court, the defendants moved to dismiss the criminal cases against them on the ground that the ordinance was unconstitutional on its face. The circuit court granted that motion in a written opinion. Pet. App. 41a-59a.

On December 18, 1995, the appellate court affirmed. The court made four separate holdings of facial unconstitutionality on federal grounds: the ordinance infringes constitutionally protected rights of speech and assembly because it "gives the police power to order dispersal and arrest those who associate with gang members in public places" (Pet.App.26a); it is unconstitutionally vague because it "fail[s] to establish ... guidelines" for its enforcement (Pet.App.33a); it "unconstitutionally criminalizes a person's status" because it is directed at loitering by gang members (*ibid.*); and it "jeopardizes the rights **\*7** guaranteed under the fourth amendment" because it "seems to us to be a transparent attempt to avoid the probable cause requirement" (Pet.App.35a). Following that decision, on December 29, 1995, the appellate court consolidated all appeals the City had taken in other cases in which a trial court had declared the ordinance to be unconstitutional, and affirmed on the strength of *Youkhana* in an opinion captioned *City of Chicago v. Ramsey* (Pet.App.39a-40a). Also on that date, the appellate court consolidated all appeals from judgments of conviction under the ordinance, and reversed the judgments on the strength of the decision in *Youkhana* in an opinion captioned *City of Chicago v. Morales* (Pet.App.37a-38a). [5]

**\*8** The City filed petitions for leave to appeal to the Illinois Supreme Court from the appellate court's judgments. In addition, the City moved the appellate court to issue a certificate of importance in *Youkhana.* [6] On February 27, 1996, the appellate court issued the certificate of importance. On April 3, 1996, the Illinois Supreme Court granted the petitions for leave to appeal in *Morales* and *Ramsey,* and consolidated them with the *Youkhana* appeal.

On October 17, 1997, the Illinois Supreme Court affirmed the judgments of the appellate court on two grounds. First, the court concluded that the gang loitering ordinance was impermissibly vague. The court wrote that the ordinance fails to give persons fair notice of what conduct is prohibited by "mak[ing] criminal activities which by modern standards are normally innocent" (Pet. App. 9a (quoting *Papachristou v. City of Jacksonville,* 405 U.S. 156, 163 (1972)), and employs language-the term "loitering"-that "is inadequate to inform a citizen of its criminal implications" (Pet.App.9a). As for the ordinance's requirement that a police officer reasonably believe that a group of loiterers includes a member of a **\*9** criminal street gang, the court concluded that this "depends solely on the police officer's subjective evaluation of the facts

of the situation in light of his own experience." Pet. App. 12a. Similarly, the prerequisite that loiterers disobey an order to move on before they can be arrested failed to save the ordinance because "[m]erely adding the element of refusing to obey an order by police to disperse does not elevate the gang loitering ordinance to such a level that it provides adequate notice of proscribed conduct." Pet. App. 13a. The court also concluded that the ordinance permitted arbitrary and discriminatory enforcement by conferring "unfettered discretion in the police to determine whether a suspect's conduct has violated the ordinance." Pet. App. 15a.

Second, the court determined that the gang loitering ordinance offends substantive due process. Again relying on *Papachristou,* the court concluded that the freedom to loiter, while not expressly protected by the Constitution, is constitutionally protected as one of the "amenities of American life." Pet. App. 17a. The court also determined that a prohibition on loitering infringes the "right to travel," the "right of locomotion," the "right to freedom of movement," and "the general right to associate with others." Pet. App. 18a. This deprivation of constitutionally protected liberty was "utterly unreasonable," since it deprived "[p]ersons suspected of being in criminal street gangs ... of the personal liberty of being able to freely walk the streets and associate with friends, regardless of whether they are actually gang members or have committed any crime." *Ibid.*

SUMMARY OF ARGUMENT

Surely no one could doubt the magnitude of the problem that gang crime poses for many of our Nation's cities. And as the findings of the Chicago City Council make clear, part of that problem can be traced to the ability of street gang members and their cohorts to loiter with impunity. A collection of brazen, disorderly and visibly lawless **\*10** persons on the public ways intimidates residents, detracts from property values, and ultimately destabilizes communities. The gang loitering ordinance and similar laws give the authorities a way to address this type of civil disorder. Such laws achieve an important prophylactic objective as well-because when police officers can order gang members to move along, they can prevent crime before it occurs.

The Illinois Supreme Court invalidated the gang loitering ordinance on its face as impermissibly vague and inconsistent with substantive due process. Neither of these doctrines, however, prevents state and local governments from taking the modest yet important step of authorizing police officers to move loiterers along before they commit some other crime or otherwise harm their communities.

The first step in assessing a facial challenge to a law "is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494 (1982) (footnote omitted). This is the overbreadth doctrine, which permits facial invalidation of a challenged enactment only when it proscribes a substantial amount of conduct protected by the First Amendment. *E.g., United States v. Salerno,* 481 U.S. 739, 745 (1987). The gang loitering ordinance, however, is not directed at First Amendment rights of speech, assembly, or association. It concerns only "loitering," which the ordinance defines as "remain[ing] in any one place with no apparent purpose." Pet. App. 61a. Accordingly, this restriction on "loitering" will rarely, if ever, apply to protests, picketing, or other protected conduct, since such activities by their very nature will nearly always have an "apparent purpose." The ordinance instead will reach at most persons engaged in mere casual social interaction-those with no apparent purpose-and this Court has firmly rejected the notion that the Constitution secures any generalized right of "social association." *City of Dallas v. Stanglin,* 490 U.S. 19, 25 (1989). In any event, even if the gang **\*11** loitering ordinance were deemed on its face to regulate speech, assembly, or association, it would be permissible regulation of the time, place, and manner of such activities under the test announced in *Ward v. Rock Against Racism,* 491 U.S. 781 (1989).

City of Chicago v. Morales, 1998 WL 328342 (1998)

When a criminal law challenged for vagueness does not reach a substantial amount of constitutionally protected conduct, it will be upheld as long as it "define[s] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357 (1983). On the first prong of this test, no one who has been given a police order to move along could fail to understand what is required of him, and under our ordinance, no arrest can be made unless there is first a police order and then a refusal to comply with that order. Indeed, when it comes to providing notice to potential offenders, a law requiring disobedience of a police order before an arrest can be made is the antithesis of vague: people are told precisely what they must do to avoid arrest.

The second prong requires that the challenged law "provide explicit standards for those who apply them." *Hoffman Estates,* 455 U.S. at 498. The gang loitering ordinance contains express standards for its enforcement, since it requires disobedience of an order to disperse, and it permits officers to issue such an order only if the officer "reasonably believes" that a group of loiterers contains a member of a criminal street gang. In *Kolender,* the Court acknowledged that a loitering law would be valid if it authorized investigative stops based on "reasonable suspicion" because this standard provides "neutral limitations on the conduct of individual officers." 461 U.S. at 361. If "reasonable suspicion" is an appropriately neutral limitation on an officer's authority to detain loiterers, requiring an officer to have a reasonable basis to identify a loiterer as a gang member before issuing an enforceable order to move on is surely a permissible neutral **\*12** limitation as well. The concept of membership in a criminal street gang is not so amorphous that it precludes objectively based enforcement decisions; there are many objective indicia of membership in a criminal street gang, such as an individual's admissions, his display of distinctive signs or of symbols, the existence of information from a reliable informant, or the like. Moreover, the decision to target gang loitering itself was neither arbitrary nor discriminatory-gang loitering poses special problems, and thus appropriately became subject to special restrictions.

As for substantive due process, neither this Court's precedents nor principles of sound constitutionalism support a fundamental right to loiter. In fact, history and tradition point the other way-there is a considerable legacy in our country of regulating loitering. And when, as here, an enactment infringes no fundamental liberty, it need only be rationally related to a legitimate governmental interest. *E.g., Washington v. Glucksberg,* 117 S. Ct. 2258, 2271-72 (1997).

The gang loitering ordinance easily passes this test. It infringes the "liberty" to use the public ways only to a limited extent-even known gang members can loiter alone, and they can loiter with others as long as they move along when ordered. While the Illinois Supreme Court was troubled that the ordinance was not limited in its scope to persons loitering to engage in illegal activity, the mere potential for a prophylactic enactment to reach "innocent" conduct does not give rise to a substantive due process violation. Here, the City Council reasonably concluded that it was necessary to address a visibly lawless and destabilizing type of loitering on the public ways. The Council identified a particular circumstance in which loitering jeopardizes legitimate governmental interests and authorized the police to disperse loiterers in that circumstance. Because the authority to disperse loiterers in such circumstances is rationally related to legitimate governmental objectives, it does not offend substantive due process.

 **\*13** Finally, we address an alternate ground to invalidate the ordinance respondents have pressed-that it authorizes arrests on suspicion in violation of the Fourth Amendment. This submission is belied by the plain terms of the ordinance. Under the ordinance, no one can be arrested until they have disobeyed a police order; at that point, of course, an arrest is based on violation of a police order, not merely "suspicion." And there is nothing in the Fourth Amendment that prohibits an order to loiterers to move along. Such an order is not even subject to attack under the Fourth Amendment, since it does not physically restrain the person who receives it and hence is not a "seizure" subject to Fourth Amendment review. See, *e.g., California v. Hodari D.,* 499 U.S. 621, 626 (1991). In any event, there is nothing "unreasonable" within the meaning of the Fourth Amendment about granting the police authority to enforce an order to move on by arrest as long as the order itself is authorized by an otherwise valid police power measure.

### ARGUMENT

Criminal street gangs, as the Illinois Supreme Court recognized, "are an expanding cancer in our society and their illegal activities endanger the safety of many law-abiding citizens." Pet. App. 17a. [7] Among the problems posed by gangs are those engendered when gangs can loiter with impunity on the public ways. The findings of the Chicago City Council, which the Illinois Supreme Court did not question, explain that loitering by street gang members and their hangers-on poses at least two kinds of problems. First, although gang members blatantly **\*14** engage in drug deals and other crimes on the public ways in full view of neighborhood residents, they stand about pretending to be loitering innocently once the police arrive. Second, the very presence of a large collection of obviously brazen, insistent, and lawless gang members and hangers-on on the public ways intimidates residents, who become afraid even to leave their homes and go about their business. That, in turn, imperils community residents' sense of safety and security, detracts from property values, and can ultimately destabilize entire neighborhoods.

The Illinois Supreme Court correctly observed that "[m]any of the offensive activities the city claims the gang loitering ordinance will deter are already criminal acts." Pet. App. 19a. But surely it is no answer to law-abiding residents, who no longer feel safe when they go outdoors, to wait for someone to eventually be incarcerated as a result of a conviction on a serious felony charge-if proof beyond a reasonable doubt can be assembled from the testimony of witnesses willing to cooperate and able to remain alive until the time of trial. And even apart from whether loitering facilitates the commission of other crimes, it can destabilize communities as a consequence of the very presence of these menacing groups on the public ways. Loitering laws, by granting the police the authority to move a visibly lawless and often dangerous element away from law-abiding persons, thus provide an important alternative to more conventional and reactive policing-by moving gang members along, police officers can restore order to the streetscape and stop crime before it occurs. Without them, the police must wait for a breach of the peace, often having tragic consequences, and then hope that they can secure convictions. And by enabling the police to demonstrate control over the streetscape and the most lawless elements in the community, loitering laws make people feel safer, thereby reinvigorating neighborhoods.

The importance of loitering and other public order laws has been underscored by the emergence of community-oriented **\*15** policing and its theoretical underpinning-the "Broken Windows" thesis first advanced by Professors James Q. Wilson and George Kelling. These scholars observed that in the wake of the professionalization of policing in the 1950s and 1960s, law enforcement had stressed strategies based on investigating those crimes thought to be most serious, thereby overlooking the important function that public order maintenance served. See James Q. Wilson & George L. Kelling, *Broken Windows,* Atlantic Monthly, Mar. 1982, at 33-38. [8] The "Broken Windows" thesis is that crime is most effectively combatted when the police can address signs of visible disorder-including loitering-that destabilize communities and stimulate the commission of more serious crimes. See *id.* at 31-33. [9] As Professor Kahan has observed: "Norms of order are critical to keeping social influence pointed away from, rather than toward, criminality; the spectacle of open gang activity, vandalism, aggressive panhandling, and other forms of disorder transmits signals that cause both law-breakers and law-abiders to behave in ways conducive to crime." Dan M. Kahan, *Social Influence, Social Meaning, and Deterrence,* 83 Va. L. Rev. 349, 391 (1997) (footnote omitted). In light of these insights, commentators have repeatedly called for courts to provide greater leeway for state and local governments to address signs of chronic disorder on the streets. [10]

**\*16** These theories have been validated on the streets of Chicago. In the period of time during which the gang loitering ordinance was enforced (before the appellate court's decisions in this case), we estimate that some 45,000 orders to disperse were issued under the ordinance and obeyed, and nearly the same number of arrests were made of those who

failed to move on after being ordered to do so. Removing a visibly lawless element, whose very presence on the public ways was often viewed by rival gangs as an invitation to violence, had a substantial effect on the level of gang-related violence in Chicago. In 1995, for example, the last year in which the ordinance was enforced, gang-related homicide in Chicago dropped 26%, a considerably steeper decline than the 9% drop in the overall homicide rate that year. But in 1996, without enforcement of the ordinance, while the overall homicide rate fell another 4%, the level of gang-related homicide jumped 7%.[11] Perhaps it is just this simple: if fewer **\*17** gang members are loitering in public where they constitute an inviting target for their rivals, fewer of them-and innocent people nearby-will be shot to death.

Nevertheless, in the decision below, the Illinois Supreme Court found Chicago's ordinance to be impermissibly vague and inconsistent with substantive due process on its face because it does not exclude from its scope persons engaged in "innocent" activities. See Pet. App. 10a, 17a-18a. In our view, these holdings are inconsistent with the unquestioned power of legislatures to enact prophylactic laws that criminalize conduct, like standing around, that may be innocent in isolation, but that is unacceptably likely, under at least some circumstances, to give rise to substantive evils within the power of government to address. We now explain why this is so.

## I. THE GANG LOITERING ORDINANCE IS NOT IMPERMISSIBLY VAGUE.

Laws that are claimed to have been framed with insufficient precision can be attacked on their face under two different doctrines. First, the overbreadth doctrine permits facial invalidation of laws that impermissibly inhibit the exercise of First Amendment rights. *E.g., Gooding v. Wilson,* 405 U.S. 518, 521 (1972). Second, even a law that does not reach such protected conduct may be impermissibly vague because it fails to establish sufficient standards to guide the police and public. *E.g., Kolender v. Lawson,* 461 U.S. 352, 357-58 (1983). Accordingly, "a court's first task is to determine whether an enactment reaches a substantial amount of constitutionally protected conduct. If it does not, the overbreadth challenge must fail. The court should then examine the facial vagueness challenge ... and should uphold the challenge only if the enactment is impermissibly vague in all of its applications." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494 (1982) (footnote omitted). We thus turn to that two-part inquiry.

### \*18  A. The Gang Loitering Ordinance Is Not Overbroad.

"The general test of vagueness applies with particular force in review of laws dealing with speech." *Hynes v. Mayor and Council,* 425 U.S. 610, 620 (1976). The overbreadth doctrine excepts laws that implicate First Amendment rights from the general rule that only laws incapable of any valid application can be struck down on their face. See *United States v. Salerno,* 481 U.S. 739, 745 (1987). Even so, not every law that has the potential to reach conduct protected by the First Amendment is facially invalid. To the contrary, an enactment should not "be held invalid on its face merely because it is possible to conceive of a single impermissible application...." *City of Houston v. Hill,* 482 U.S. 451, 458 (1987) (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 630 (1973) (Brennan, J., dissenting)). Rather, to invalidate a challenged law on this basis, "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *New York v. Ferber,* 458 U.S. 747, 770 (1982) (quoting *Broadrick,* 413 U.S. at 615).[12] The gang loitering ordinance, as we now explain, passes this test.

### 1. *The gang loitering ordinance does not proscribe speech, assembly, or association.*

Respondents have claimed in this litigation that the gang loitering ordinance proscribes conduct within the ambit of the First Amendment's protection for speech, assembly, and association, and even convinced the state intermediate appellate court on this point (Pet.App.24a-27a). In fact, however, this ordinance is directed at loitering, pure and simple;

and loitering, at least as defined in this ordinance, does not qualify as speech, assembly, **\*19** or association within the meaning of the First Amendment.

First, the gang loitering ordinance is not directed at "speech"; indeed, the ordinance applies whether or not loiterers are speaking. The ordinance is concerned only with "loitering," which it defines as "remain[ing] in any one place with no apparent purpose." Pet. App. 61a. The guaranty of free speech simply does not embrace a claim of right to remain in any one place on the public ways-even if one's purpose is to talk to someone else. This Court held as much in *Colten v. Kentucky,* 407 U.S. 104 (1972). Colten was convicted of disorderly conduct because, while trying to intercede with a police officer on behalf of a friend who was getting a traffic ticket, he disobeyed a police officer's order to move on. The Court upheld his conviction, explaining: "we have little doubt that Colten's conduct in refusing to move on after being directed to move on was not, without more, protected by the First Amendment." *Id.* at 109. Our ordinance also punishes loiterers only when they have refused to move, and not on the basis of their speech. And, of course, the fact that people may speak to each other as they loiter does not confer upon their loitering a First Amendment immunity from regulation: "[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 502 (1949). Accord, *e.g., Cox v. Louisiana,* 379 U.S. 536, 555-56 (1965).

Nor does the ordinance proscribe freedom of assembly. The term "assembly" connotes a purposeful gathering and not one with "no apparent purpose." In fact, the Court has made clear that the right to assemble does not protect persons merely because they are standing in proximity to each other. Instead, an assemblage is protected under the First Amendment only when the gathering is itself a "method[ ] of expression...." *Shuttlesworth v.* **\*20** *City of Birmingham,* 394 U.S. 147, 152 (1969). In *Clark v. Community for Creative Non-Violence,* 468 U.S. 288 (1984), for example, the Court assumed that individuals who sought to sleep in a public park as part of a protest against homelessness could advance a First Amendment claim only because "the demonstration [wa]s expressive conduct protected to some extent by the First Amendment." *Id.* at 293 (footnote omitted). Similarly, in *Hurley v. Irish-American Gay, Lesbian and Bisexual Group,* 515 U.S. 557 (1995), the Court held that a St. Patrick's Day parade enjoyed First Amendment protection because people were to assemble as "a form of expression...." *Id.* at 568. This ordinance, however, will rarely if ever reach that type of assemblage. Public speeches, leafleting, demonstrations, picketing, and other expressive activities will almost always be outside the scope of the ordinance by its terms, since these activities will almost always have an "apparent purpose." After all, the entire point of such activities is to convey a message to others-only an unusually ineffectual demonstration will have no "apparent purpose." Indeed, neither of the state appellate courts construed the ordinance to reach demonstrations or other overtly expressive activities.

The final right that respondents have invoked, "freedom of association," is not expressly protected by the Constitution. For this reason, the right to associate is protected only in two senses: when undertaken for the purpose of engaging in activities otherwise protected by the First Amendment, such as "speech, assembly, petition for the redress of grievances, and the exercise of religion," *Roberts v. United States Jaycees,* 468 U.S. 609, 618 (1984), or when undertaken to engage in "intimate human relationships" that attend to the "creation and sustenance of a family-marriage; childbirth; the raising and education of children; and cohabitation with one's relatives," *id.* at 617, 619 (citations omitted). Accord, *e.g., Board of Directors v. Rotary Club,* 481 U.S. 537, 544 (1987). Thus, like assembly, association is entitled to constitutional protection only when individuals gather for a particular and **\*21** protected purpose. This ordinance infringes neither type of protected association. As we have just explained above, it is not directed at speech or assembly within the meaning of the First Amendment. As for intimate associative rights, there is little that is "intimate" about loitering in public. To the contrary, loitering in public plainly is not "the kind of private or personal relationship ... accorded protection under the First Amendment" because the right of "intimate association" does not extend to "activities carried on in the presence of strangers." *Rotary Club,* 481 U.S. at 547.

Indeed, this Court has held that laws that restrict the ability of persons to gather together in public, but that do not proscribe anything that can be characterized as primarily expressive activity, do not abridge rights of speech, assembly, or association. In *City of Dallas v. Stanglin,* 490 U.S. 19 (1989), this Court upheld an ordinance regulating youth dances even though it prevented older persons from attending dances with younger ones. The Court rejected the claim that "the Constitution recognizes a generalized right of 'social association,' " and concluded that the ordinance at issue "impinges on no constitutionally protected right." *Id.* at 25. The conduct regulated by the ordinance, the Court held, was simply not sufficiently expressive to be entitled to First Amendment protection. The Court wrote: "It is possible to find some kernel of expression in almost every activity a person undertakes-for example, walking down the street or meeting one's friends at a shopping mall-but such a kernal is not sufficient to bring the activity within the protection of the First Amendment." *Ibid.* Cf. *United States v. O'Brien,* 391 U.S. 367, 376 (1968) ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."). [13]

 **\*22** For their part, respondents have relied on the hypothetical possibility that the ordinance could occasionally be applied to persons who appear to the police to be loitering even though they are actually engaged in protected activity, such as a community organization's employee when counseling gang members. See, *e.g.,* Pet. App. 56a-57a. Plainly this hypothesis does not amount to substantial overbreadth. Persons providing counseling or engaged in other protected activities are a tiny fraction of all those the police will encounter standing in public, and those engaged in such activities will usually have a purpose apparent to any police officer. Surely a law directed at loitering is far more likely to be applied to persons engaged in the kind of casual social interaction the Court held to be unprotected in *Stanglin* than to someone engaged in gang outreach or similarly protected activities. Indeed, after the many thousands of arrests under the ordinance, this record reflects not a single instance in which anyone-including the 66 respondents-was arrested, or even ordered to move on, while engaged in political canvassing, planning a demonstration, providing religious or social counseling, or doing anything else protected by the First Amendment. [14]

As we explain above, merely being able to imagine a hypothetical application of a challenged enactment that would be impermissible does not make for substantial overbreadth. In *New York v. Ferber,* for example, the Court was quite clear on this point. While acknowledging that the child pornography statute at issue could conceivably **\*23** be applied to "some protected expression, ranging from medical textbooks to pictorials in the National Geographic," the Court refused to assume without proof that "these arguably impermissible applications of the statute amount to more than a tiny fraction of the materials within the statute's reach." 458 U.S. at 773. See also, *e.g., Frisby v. Schultz,* 487 U.S. 474, 488 (1988); *Regan v. Time, Inc.,* 468 U.S. 641, 651-52 (1984) (plurality opinion); *Broadrick,* 413 U.S. at 616-18. Here there is no reason to believe that anything other than the tiniest fraction of those subject to this ordinance will be engaged in counseling, canvassing, or other protected activities. [15]

Rather than finding that the ordinance would frequently reach persons engaged in protected advocacy activities, the state appellate court found it overbroad because it could proscribe the conduct "of innocent non-gang members," such as "someone waiting with a friend or a family member for a ride to the grocery store...." Pet. App. 26a-27a. But of course, the First Amendment is concerned with "speech" and other expressive activities, not innocence. As *Stanglin* makes clear, a variety of casual social interactions may be "innocent," but that does not **\*24** make them protected by the First Amendment. [16] A potential for application of this ordinance to "innocent" activity accordingly does not render it overbroad.

### 2. *The gang loitering ordinance is a permissible regulation of loitering.*

Even if the gang loitering ordinance reached activities that qualified as speech, assembly, or association, that would not seal its fate. As we explain above, a law is overbroad only when it "reaches a substantial amount of constitutionally *protected* conduct" (*Hoffman Estates,* 455 U.S. at 494 (emphasis supplied)), and, of course, not all speech, assembly, or association is constitutionally protected. To the contrary, there is ample power to regulate such activities. It has been clear since at least *United States v. O'Brien,* for example, that when " 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental restrictions on First Amendment freedoms." 391 U.S. at 376. Thus "[t]he First Amendment does not bar application of a neutral regulation that incidentally burdens speech...." *United States v. Albertini,* 472 U.S. 675, 688 (1985). It has also been clear since at least *Cox v. New Hampshire,* 312 U.S. 569 (1941), that the First Amendment permits reasonable regulation of the time, place, and manner of speech, public assemblies, and other forms of association. Accordingly, even laws that expressly proscribe entirely peaceful expressive conduct are frequently upheld. See, *e.g., Frisby v. Schultz,* 487 U.S. at 481-87 (prohibition on residential picketing); *Community For Creative Non-Violence,* 468 U.S. at 293-99 **\*25** (prohibition on sleeping in public park as part of a protest).

The test for evaluating incidental restrictions on speech and assembly "is little, if any, different from the standard applied to time, place, or manner restrictions." *Ward v. Rock Against Racism,* 491 U.S. 781, 798 (1989) (quoting *Community For Creative Non-Violence,* 468 U.S. at 298). Such laws are upheld when they are not based on the content of expression, when they are narrowly tailored to promote a substantial governmental interest, and when they leave open adequate alternative channels for communication. *E.g., Rock Against Racism,* 491 U.S. at 791-800; *Frisby v. Schultz,* 487 U.S. at 481-82. Essentially the same test governs laws claimed to infringe the right of association: "Infringement on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedom." *Roberts,* 468 U.S. at 623. The gang loitering ordinance satisfies this test.

First, the ordinance is content-neutral. "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 643 (1994). Legislation is accordingly content-neutral if it is "justified without reference to the content of the regulated speech." *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 48 (1986) (citations and internal quotations omitted). The gang loitering ordinance is classically content-neutral. The requirement that loiterers move on when ordered to do so has nothing to do with the content of the speech that may pass among them as they loiter-or even whether they are speaking at all-it is applicable to all who loiter in public. Like the ordinance prohibiting the posting of signs on municipal lightposts upheld in *Members of the City Council v. Taxpayers For Vincent,* 466 U.S. 789 (1984), this enactment is "neutral-indeed it is silent-concerning any **\*26** speaker's point of view...." *Id.* at 804. Instead, as the Chicago City Council made clear in the ordinance's preamble, the justification for the gang loitering ordinance flows from the devastating effect that loitering by criminal street gang members and their associates has on the people living nearby-people who fear for their own safety, their families, their property, their neighborhoods, and their businesses. And "a regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not on others." *Rock Against Racism,* 491 U.S. at 791.

Second, the ordinance is narrowly tailored to achieve important governmental interests. Surely no one could doubt the importance of the interests that the gang loitering ordinance is intended to serve. It exceeds by many orders of magnitude the types of governmental interests that have been held sufficient to support restrictions on First Amendment activity. See, *e.g., Turner Broadcasting,* 512 U.S. at 662-64 (promoting free and high quality competitive cable television service);

City of Chicago v. Morales, 1998 WL 328342 (1998)

*Rock Against Racism,* 491 U.S. at 796 (restricting volume of music at concerts in a public park); *Taxpayers For Vincent,* 466 U.S. at 807 (reducing visual clutter caused by signs).

The ordinance is also narrowly tailored to promote these interests. Narrow tailoring does not require the least restrictive means for promoting the government's interests. *E.g., Turner Broadcasting,* 512 U.S. at 662; *Rock Against Racism,* 491 U.S. at 798. Rather, a regulation is narrowly tailored if it "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* at 799 (quoting *Albertini,* 472 U.S. at 689). "So long as the means chosen are not substantially broader than necessary to achieve the government's interest ... the regulation will not be invalid simply because a court concludes that a government's interest could be adequately served by some less-speech-restrictive alternative." *Rock Against Racism,* 491 U.S. at 800.

**\*27** Here, the findings of the City Council make clear that this ordinance is likely the most efficacious way of addressing the problem at issue. The evidence before the City Council established that gang members do not commit other offenses in the presence of police officers and that it is problematic to prosecute them for offenses committed outside the presence of police officers because such cases will necessarily require the testimony of civilian witnesses. The Council also found that loitering by gang members and those who join them has itself become a problem for communities because the presence of a visibly lawless element terrifies residents. invites violence, drives down property values, and otherwise tends to destabilize communities, and that these problems are not adequately addressed by existing laws. And while the legislature's findings are not conclusive when the record contains genuine disputes of fact on the efficacy of a regulation restricting First Amendment activity (*e.g., Turner Broadcasting,* 512 U.S. at 665-68), this record contains no evidence or even an offer of proof from any respondent that there were means available to the City to address the problems engendered by gang loitering in some significantly less restrictive way that would still be as effective-and plainly the testimony before the City Council amply supported its finding that existing laws were inadequate to the challenge posed by gang crime.

Finally, the ordinance leaves open alternative channels for communication. Under the ordinance, gang members remain free to protest, picket, solicit contributions for their gangs, conduct a leafleting campaign, or engage in any other of the innumerable types of expressive conduct that has an "apparent purpose." Gang members also remain free to associate with each other and anyone else indoors or outdoors if they walk instead of loiter together; and they remain free to loiter outdoors as well, either alone, or in groups as long as they obey orders to move on.

Moreover, in evaluating the facial validity of challenged enactments, administrative regulations and guidelines for enforcement should be considered. See *Rock Against* **\*28** *Racism,* 491 U.S. at 795-96. Under General Order 92-4, the gang loitering ordinance is not enforced throughout Chicago, but only in those limited areas designated by police district commanders as "areas in which the presence of gang members has a demonstrable effect on the activities of law abiding persons in the surrounding community." Pet. App. 68a. Thus, in most areas of the City, the ordinance has no effect on the activities of gang members and their associates. [17]

In short, there remain many-indeed innumerable-opportunities available to gang members to express their ideas and to associate with others. They are required to refrain from no more than remaining in place after having received a police order to move along. Accordingly, whether or not an ordinance directed at loitering can be said to regulate conduct that qualifies as speech, assembly, or association within the ambit of the First Amendment, this ordinance does not impermissibly impinge upon anything protected by that Amendment.

**B. The Gang Loitering Ordinance Contains Appropriate Standards For Its Enforcement.**

As we explained at the outset of this discussion, when a challenged enactment does not reach a substantial amount of constitutionally protected conduct, it should be invalidated on its face only if it is vague in all its applications. To invalidate an enactment for this reason, it must be **\*29** vague "in the sense that no standard of conduct is specified at all." *Coates v. City of Cincinnati,* 402 U.S. 611, 614 (1971). By contrast, when "a penal statute define[s] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement," *Kolender v. Lawson,* 461 U.S. at 357, the requisite specificity is present. Thus, this doctrine has two prongs, focusing "on actual notice to citizens and arbitrary enforcement...." *Id.* at 358. There is no constitutional infirmity on either prong here.

### 1. *The ordinance provides fair notice of what it prohibits.*

Due process requires that "laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Hoffman Estates,* 455 U.S. at 498 (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972)). The gang loitering ordinance easily satisfies this test. No one who has been given a police order to move on could fail to understand what is required of him, and under our ordinance, no arrest can be made unless there is first a police order to disperse and then a refusal to comply with that order. On this point, *Colten v. Kentucky* should be dispositive. As we note above, Colten had attempted to debate a police officer while the officer was issuing a traffic ticket to Colten's friend and then disobeyed the officer's order to move along. See 407 U.S. at 106-07. The Court upheld the Kentucky disorderly conduct statute under which Colten had been convicted against a vagueness attack, noting that anyone "should understand that he could be convicted ... if he fails to obey an order to move on." *Id.* at 110. Since the statute required disobedience of a police order, it was "sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." *Ibid.*

The Illinois Supreme Court thought that the gang loitering ordinance failed to provide the requisite notice **\*30** because of its use of the term "loitering." See Pet. App. 9a-11a. Of course, if the term "loitering" were so vague that people ordinarily cannot tell when they are violating the law, all loitering laws would fall. There is no justification for so radical a conclusion. The ordinance straightforwardly defines the term "loiter" as "to remain in any one place with no apparent purpose" (Pet.App.61a), and surely persons of common intelligence can grasp the concept of remaining in one place, as opposed to moving along, and can judge as well when one's purpose for staying put is not obvious to others who may come along. [18] There may be some imprecision in the concept of loitering, but of course "we can never expect mathematical certainty from our language." *Grayned,* 408 U.S. at 110 (footnote omitted). See also *United States Civil Service Commission v. National Association of Letter Carriers,* 41 U.S. 548, 577-79 (1973).

In any event, the Illinois Supreme Court ultimately acknowledged that there is "a common and accepted meaning of the word 'loiter,' " but added that this "term by itself is inadequate to inform a citizen of its criminal implications." Pet. App. 9a. Even if it is true that persons do not generally know when loitering can subject the loiterer to sanctions, this problem is also solved by the requirement that police officers order a group of loiterers to move on and by authorizing arrest only if this order is disobeyed. As we explain above, no one who has been given a police order to move on could fail to understand what is required of him. This point also addresses the Illinois Supreme Court's related concern that "[p]eople with entirely legitimate and lawful purposes will **\*31** not always be able to make their purposes apparent to a police officer." Pet. App. 10a. While this may occasionally be the case, people will always receive actual notice that they are required to move along before they are subject to arrest. And as *Colten* illustrates, the requirement of fair notice does not entitle persons to debate police officers on the propriety of their orders, or even to receive an explanation for the issuance of an order. Nor does it grant anyone a right to disobey police orders merely because his intentions may be good. At least when people are not engaged in constitutionally protected conduct, they are expected to obey the directives of police officers on pain of arrest. [19]

City of Chicago v. Morales, 1998 WL 328342 (1998)

In the same vein, the Illinois Supreme Court also concluded that the gang loitering ordinance "fails to distinguish between innocent conduct and conduct calculated to cause harm and 'makes criminal activities which by modern standards are normally innocent.' " Pet. App. 9a (citation omitted) (quoting *Papachristou v. City of Jacksonville,* 405 U.S. 156, 163 (1972)). Again, whatever problem is created by a law that criminalizes conduct people normally believe to be innocent is solved when persons receive actual notice from a police order of what they are expected to do. And for just that reason, the vagueness problem in the *Papachristou* case on which the Illinois Supreme Court primarily relied was quite different. The vagrancy ordinance at issue in *Papachristou* was so broadly written that it reached any person walking anywhere in Jacksonville at night, at least if the person did so on more than one occasion. See 405 U.S. at 163. Thus, the Court reasoned, virtually anyone could fall into this "vagrancy net." *Ibid.* That reasoning does not reach **\*32** the gang loitering ordinance, which requires actual notice to loiterers of what is required before they are subject to arrest. [20]

To be sure, the Illinois Supreme Court was correct that if police officers are afforded standardless discretion to order individuals to move on, the mere fact that a police order is given does not serve to sustain the order. See Pet. App. 12a-14a. As the court below recognized, dicta in *Shuttlesworth v. City of Birmingham,* 382 U.S. 87 (1965), indicates that an ordinance granting the police discretion to order anyone standing on a sidewalk to move on would be impermissibly vague. The Court's concern, however, was not lack of fair notice, but rather that the ordinance could be used against First Amendment activities and authorized the police to act arbitrarily and discriminatorily. See *id.* at 90-91 & n. 5. That concern is not present here; we explain above that orders issued under this ordinance do not reach conduct protected by the First Amendment, and we address the question of standards for enforcement in Part I.B.2 below. The *Shuttlesworth* dicta thus does not preclude use of a police order as a means of providing fair notice to the public. Indeed, an ordinance requiring disobedience of a police order before an arrest can be made is the antithesis of vague: people are told precisely what they must do-move along-to avoid arrest.

**\*33  2. *The ordinance does not authorize arbitrary or discriminatory enforcement.***

Due process also requires that "laws must provide explicit standards for those who apply them." *Hoffman Estates,* 455 U.S. at 498 (quoting *Grayned,* 408 U.S. at 108). This principle mandates that "a legislature establish minimal guidelines to govern law enforcement." *Kolender,* 461 U.S. at 358 (quoting *Smith v. Goguen,* 415 U.S. 566, 574 (1974)). The requirement that laws contain enforcement standards is designed to ensure that the authorities are not authorized to conduct " 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.' " *Kolender,* 461 U.S. at 358 (quoting *Smith,* 415 U.S. at 575). The ordinance considered in *Shuttlesworth,* for example, flunked this test because it contained no standards for when police could order someone standing on a public way to move on. See 382 U.S. at 90-91.

On this basis, enactments that are enforced based on the wholly subjective judgments of police officers should be condemned. For example, the statute at issue in *Kolender* required a loiterer to provide "credible and reliable" identification to a police officer, and thereby permitted officers to make inherently subjective credibility determinations about a suspect's identification. This left "virtually complete discretion in the hands of the police to determine whether the suspect has satisfied the statute...." 461 U.S. at 358. See also *Coates,* 402 U.S. at 614 (ordinance prohibiting "annoying" conduct was impermissibly vague because it depended on a police officer's subjective reactions and accordingly "no standard of conduct is specified at all"). But a law that "sets forth objective criteria" for enforcement should be upheld. See *Posters 'N' Things, Ltd. v. United States,* 511 U.S. 513, 526 (1994). The gang loitering ordinance specifies such objective standards.

First, under the plain meaning of the term "loitering" used in the ordinance, it does not permit officers to issue **\*34** any type of order to anyone who is moving along or who has an apparent purpose. Second, the ordinance permits no arrest if individuals have dispersed after having received a police order. These two limitations mean that enforcement is based on what a police officer actually observes, and not on inherently subjective assessments of a suspect's intent or credibility.

Third, and most important, the ordinance contains an expressly objective test for the propriety of an order directing loiterers to move-when the officer "reasonably believes" that the group contains a member of a criminal street gang. Pet. App. 61a.[21] This facially objective standard for enforcement unambiguously cabins discretion. And permitting police officers to act based only on their objectively reasonable beliefs is sufficient to address vagueness **\*35** concerns. In *Kolender,* for example, the Court explained that a loitering ordinance would be valid if it authorized investigative stops based on reasonable suspicion of criminal activity under the standard announced in *Terry v. Ohio,* 392 U.S. 1 (1968), since this standard provides "neutral limitations on the conduct of individual officers." 461 U.S. at 361 (quoting *Brown v. Texas,* 443 U.S. 47, 51 (1979)). The *Terry* test, of course, is an objective one, even though the police must form their own judgments based on their reasonable beliefs when applying it. And if the *Terry* "reasonable suspicion" standard is an appropriately neutral limitation on an officer's authority to detain loiterers, then surely requiring an officer to have a reasonable basis to identify a loiterer as a member of a criminal street gang is an equally neutral limitation on the power to order loiterers to move on.

Police officers thus do not receive "unfettered discretion" under this law, as the Illinois Supreme Court claimed (Pet.App.16a), but instead must have an objectively reasonable basis on which to identify a loiterer as a member of a criminal street gang. Certainly there is nothing about the concept of membership in a criminal street gang so amorphous and subjective that it is impossible to have objectively based beliefs on this point. In fact, gangs frequently have a quite coherent structure and methods of recruitment and admission.[22] Many jurisdictions have even made gang membership an element of an offense or a basis for sentencing enhancement, and vagueness attacks on such enactments have repeatedly been rejected.[23] As **\*36** General Order 92-4 reflects, there are a variety of objective indicia of membership in a criminal street gang, such as an individual's admissions, his display of distinctive signs or symbols, or the existence of information from a reliable informant. See Pet. App. 67a-68a. In addition, the General Order provides that only specially trained and designated officers familiar with gang crime can make gang loitering arrests. See Pet. App. 65a.

Nor does vagueness doctrine prohibit laws that empower a police officer to issue an enforceable order based on his objectively reasonable belief. This Court approved just such a law in *Boos v. Barry,* 485 U.S. 312 (1988). In that case, the Court considered a vagueness attack on a law governing congregations near foreign embassies that had been construed to permit the police to order groups to disperse " 'only when the police reasonably believe that a threat to the security or peace of the embassy is present.' " *Id.* at 330 (quoting *Finzer v. Barry,* 798 F.2d 1450, 1471 (D.C.Cir.1986)). The Court concluded that the statute, as construed, "withstands ... vagueness challenge" because it contained a prohibition expressed "in words of common understanding." 485 U.S. at 332 (citations omitted). And permitting officers to act on their reasonable beliefs is hardly novel. The Fourth Amendment permits persons to be detained on a police officer's reasonable suspicion of criminal activity (*e.g., United States v. Hensley,* 469 U.S. 221, 227-29 (1985)), and permits arrests based on probable cause, a standard requiring only "reasonably trustworthy information to warrant a prudent [person] in believing" that a crime has been committed (*e.g., Hunter v. Bryant,* 502 U.S. 224, 228 (1991) (per curiam)). These standards necessarily rely **\*37** on the reasonable beliefs of police officers. And under these standards, police officers have long relied on their reasonable beliefs to issue and enforce orders to persons that they encounter in public, as decisions such as *Colten v. Kentucky* illustrate.

Finally, there is nothing either arbitrary or discriminatory about the fact that this ordinance applies only to a particular class of individuals-members of criminal street gangs and those who loiter with them. In fact, it is well settled that the

government may make an individual's membership in a class of potentially dangerous persons a basis for regulation, and the government may do this even if it could not constitutionally impose punishment based on membership in the class alone. Perhaps no case makes this clearer than *Lewis v. United States,* 445 U.S. 55 (1980), in which the Court upheld a statute prohibiting all convicted felons from possessing firearms, even if their convictions were uncounseled and hence unconstitutionally obtained, since there was a rational basis to deny all convicted persons access to firearms. See *id.* at 65-68.

Here, as we explain above, the legislature had an ample basis to believe that loitering by groups containing criminal street gang members posed special dangers to gang members themselves, innocent bystanders, and the surrounding community. Requiring such groups to move along when ordered is thus anything but arbitrary and discriminatory-in light of the City Council's findings on the dangers associated with loitering by and with gang members, it was plainly rational to limit this group's freedom to loiter, just as "Congress' judgment that a convicted felon, even one whose conviction was allegedly uncounseled, is among the class of persons who should be disabled from dealing in or possessing firearms because of potential dangerousness [wa]s rational." *Lewis,* 445 U.S. at 67 (footnote omitted). See also, *e.g., Michael M. v. Superior Court,* 450 U.S. 464 (1981) (upholding statutory rape law proscribing sexual intercourse with females under age 18 not married to the accused); *DeVeau v. Braisted,* 363 U.S. 144 (1960) (upholding as an anti- **\*38** corruption measure disqualification of convicted felons from holding any position in waterfront union).

Certainly if a prosecutor targeted enforcement of a generally applicable law against gang members, a claim of improper selective prosecution would be rejected; the special dangers gangs pose would mean that such a policy was neither arbitrary nor discriminatory.[24] Here too, selecting gangs for special treatment is justified by the special challenges they pose for law enforcement. And for this reason as well, the ordinance considered in *Papachristou* again involved a far different problem. The Jacksonville vagrancy ordinance identified no discrete class of individuals who posed a threat to their communities, and hence there were "no standards governing the exercise of the discretion granted by the ordinance...." 405 U.S. at 170. As we have explained, the same cannot be said of the gang loitering ordinance.

Of course, this ordinance will strike many as strong medicine. While persons with an apparent purpose-such as individuals waiting at a marked bus stop or playing basketball on a public court-are not subject to the ordinance, it is true that gang members and others with them who are merely sitting on a park bench, chatting on a sidewalk, or otherwise remaining in one public place for any other purpose not immediately discernable to a police officer, can be ordered to disperse. But while a law that requires persons to obey all police orders may be tough, it is surely not vague. The real objection to harsh laws is that they may not advance legitimate governmental interests. That, however, is a substantive due process objection, and not one of vagueness. It is thus to that issue that we next turn.

### **\*39  II. THE GANG LOITERING ORDINANCE DOES NOT OFFEND SUBSTANTIVE DUE PROCESS &**

The Illinois Supreme Court determined that the gang loitering ordinance was inconsistent with principles of substantive due process. As with all facial challenges not based on the First Amendment, this result can stand only if the ordinance is invalid in all its applications. See *Reno v. Flores,* 507 U.S. 292, 300-01 (1993). And as we explain below, substantive due process does not support the court's novel holding that the Constitution secures the right to stand still on the public way even when one is not engaged in speech, assembly, or other conduct that enjoys affirmative constitutional protection.

### **A. The Gang Loitering Ordinance Appropriately Advances Legitimate Governmental Interests.**

Under substantive due process principles, a law that infringes no fundamental right or liberty interest need only be rationally related to a legitimate governmental interest. See, *e.g., Washington v. Glucksberg,* 117 S. Ct. 2258, 2271-72 (1997); *Reno v. Flores,* 507 U.S. at 301-03. That is the test applicable here, since our Constitution recognizes no fundamental right to loiter.

As we explain above, the gang loitering ordinance infringes no right of speech, assembly, or association. Despite the Illinois Supreme Court's invocation of a "general right to associate with others" (Pet.App.18a), we explain in Part I.A above why there is no such First Amendment right, and certainly no protected associational interest, in disobeying a police order to move along. The Illinois Supreme Court also invoked the "right to travel" and the "right of locomotion" (Pet.App.18a), but these concepts are even more misplaced. The right to travel that this Court has recognized embraces the opportunity to travel abroad or from one state to another without facing unreasonable barriers as one leaves or enters a jurisdiction. See, *e.g., Shapiro v. Thompson,* 394 U.S. 618, 629-31 (1969) (right to travel between states); *Aptheker* **\*40** *v. Secretary of State,* 378 U.S. 500, 505-06 (1964) (right to travel abroad). The Court has never recognized a generalized right to walk wherever one wishes. Indeed, as we explain above, the Court's decisions in *Colten* and *Stanglin* refuse to recognize a right to go-or remain-wherever one wants. In any event, whatever protections the concept of substantive due process offers to those asserting the "right to travel" or the "right of locomotion," surely loitering is the antithesis of travel. If gang members and their associates only obey orders to move along when issued-exercising the very right to travel the Illinois Supreme Court supposed was infringed by the ordinance-they will not be subject to arrest.

Aside from its incorrect reliance on associational and travel rights, the Illinois Supreme Court relied on *Papachristou* for the conclusion that the right to loiter is one of the "amenities of American life." Pet. App. 17a. The *Papachristou* opinion, however, never states that some form of heightened judicial scrutiny is required of any regulation of loitering. And the Court should hesitate to create such a rule. In fact, "the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights,* 503 U.S. 115, 125 (1992). This Court instead " 'exercise[s] the utmost care whenever we are asked to break new ground in this field,' lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the members of this Court." *Glucksberg,* 117 S. Ct. at 2268 (citations omitted) (quoting *Moore v. City of East Cleveland,* 431 U.S. 494, 502 (1977) (plurality opinion)).

To assess a claim that a right or liberty interest should be treated as fundamental, "[o]ur Nation's history, legal traditions, and practices ... provide the crucial 'guideposts for responsible decisionmaking' that direct and restrain our exposition of the Due Process Clause." *Glucksberg,* 117 S. Ct. at 2268 (citation omitted) (quoting **\*41** *Collins,* 503 U.S. at 125). The court below, however, identified no history, tradition, or practice of respecting a right to loiter. In fact, history and tradition are quite to the contrary. The drafters of the Model Penal Code, for example, comprehensively traced the history of loitering laws before recommending one of their own, and observed that such laws have a considerable pedigree-they were first enacted to help feudal lords control their serfs, later expanded as a means of controlling often dangerous bands of the unemployed, and ultimately were adopted in 49 states by statute and the remaining one by common law. See American Law Institute, *Model Penal Code* § 250.6, Comment 1 (1980).[25] The Model Penal Code itself recommends a prohibition on loitering under circumstances that reasonably warrant alarm for the safety of persons or property. See *id.* § 250.6 & Comment 3. Our ordinance, of course, is simply a more precise version of this model, since it specifies one particular circumstance in which the legislature found that loitering reasonably warrants alarm.

Nor can loitering laws fairly be characterized as "one of those 'arbitrary impositions' or 'purposeless restraints' at odds with the Due Process Clause...." *Glucksberg,* 117 S. Ct. at 2275 (Souter, J., concurring in the judgment). Preserving legislative freedom to regulate loitering is, to the contrary, part of the community's basic entitlement to create a safe

and secure environment for all. The judgment that anti-loitering provisions are useful in preventing crime is supported not only by the findings of **\*42** the Chicago City Council, but, as we explain above, by the verdict of history and the substantial body of scholarly opinion that supports the "Broken Windows" thesis that underlies this and similar public order laws. And surely no one could doubt that the "general interest in preventing crime is compelling." *United States v. Salerno,* 481 U.S. at 750. The governmental interest in preserving, and indeed enhancing, the stability and desirability of urban neighborhoods is equally so: " '[T]he City's interest in attempting to preserve [or improve] the quality of urban life is one that must be accorded high respect.' " *Taxpayers For Vincent,* 466 U.S. at 807 (brackets in original) (quoting *Young v. American Mini-Theatres, Inc.,* 427 U.S. 50, 71 (1976) (plurality opinion)). Thus, to circumscribe legislative power to enact loitering and similar public order laws would impinge upon critical governmental interests. Perhaps even worse, such a holding would disregard the famous admonition from Justice Brandeis: "To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the nation." *New State Ice Co. v. Liebmann,* 285 U.S. 262, 311 (1932) (dissenting opinion). Accord, *e.g., Cruzan v. Director,* 497 U.S. 261, 292 (1990) (O'Connor, J., concurring); *Chandler v. Florida,* 449 U.S. 560, 579-80 (1981).

Nor should it matter if loitering can be considered one of the "amenities of life." *Papachristou,* 405 U.S. at 164. In organized society, the "amenities" of some must sometimes be regulated for the benefit of the community as a whole. And in assessing such regulation, as the California Supreme Court observed while upholding a civil injunction against loitering by gang members, a court "begins with the acknowledgement that the interests of the community are not invariably less important than the freedom of individuals." *People ex rel. Gallo v. Acuna,* 14 Cal. 4th 1090, 1102, 929 P.2d 596, 603, 60 Cal. Rptr. 2d 277, 284, cert. denied, 117 S. Ct. 2513 (1997). This ordinance, of course, was enacted precisely because the intimidating **\*43** presence of gang members often prevents law-abiding persons from enjoying their own "amenities of life." And preserving the ability of the politically accountable branches of government to weigh the competing claims of different constituencies whose liberties may come into conflict is how we "maximize individual freedoms within a framework of ordered liberty." *Kolender,* 461 U.S. at 357.

Thus, to the extent that language in *Papachristou* suggests that loitering laws are suspect because they have the potential to reach conduct that can be innocuous in nature, this represents a brand of substantive due process that should surely be interred. Enactment of all prophylactic laws involves weighing the benefits of prevention against the cost of prohibiting conduct that is sometimes innocent. The Court has long recognized the propriety of legislation that proscribes particular conduct not because it is invariably malicious or even inappropriate, but rather because it is unacceptably likely to give rise to substantive evils within the power of government to prohibit. For example, in *Day-Brite Lighting, Inc. v. Missouri,* 342 U.S. 421 (1952), the Court sustained a law requiring employers to grant four hours paid leave on election days, since otherwise employers might use the power to withhold leave as a means of influencing their employees' votes. See *id.* at 423-25. Or, more recently, in *Glucksberg,* in the course of sustaining a prohibition on assisted suicide, the Court explained that, whatever the merits of assisted suicide, this prohibition advanced a legitimate interest in ensuring that the state not start "down the path to voluntary, and perhaps involuntary, euthanasia." 117 S. Ct. at 2274. Accord *id.* at 2290-93 (Souter, J., concurring in the judgment). And, as we observe above, in *Lewis* this Court upheld a prohibition on the possession of firearms by felons whose convictions were uncounseled, largely as a prophylactic measure.

Applying the correct test, it is plain that the gang loitering ordinance should be upheld as reasonably related to **\*44** legitimate government interests. As we explain above, the ordinance advances legitimate-indeed compelling-governmental interests by combatting the deleterious effects of gang loitering. Conversely, it infringes whatever liberty interest there is in using the public ways to a very limited extent-anyone can loiter alone, or even with others, including criminal street gang members, as long as they move along when directed to do so. Of course, we do not contend that the ordinance could never be applied to persons whose conduct may be in fact innocuous or inoffensive. But the benefits from removing a visibly lawless element of loiterers from the public ways-because loitering by gang members and those who join them destabilizes communities, facilitates criminal activity and gang recruitment, intimidates law-abiding residents,

**City of Chicago v. Morales, 1998 WL 328342 (1998)**

lowers property values, and places both gang members and those loitering with them at risk if rival gangs come along- surely could reasonably be thought to justify whatever burden is imposed on persons engaged in "innocent" activity who are directed to move along as a result of this ordinance. And whether the City Council could have crafted a narrower law is quite beside the point-under the rational basis test, the legislature is not required "to have chosen the least restrictive means of achieving its legislative end." *Heller v. Doe,* 509 U.S. 312, 330 (1993). See also *Reno v. Flores,* 507 U.S. at 305 ("narrow tailoring is required only when fundamental rights are involved").

In short, in this ordinance, the legislature identified a particular circumstance in which loitering jeopardizes legitimate governmental interests and authorized police officers to disperse loiterers in that circumstance. Because that authorization is rationally related to legitimate governmental interests, it should not have been set at naught in the name of substantive due process.

### B. The Gang Loitering Ordinance Does Not Create A Status Offense.

Substantive due process, incorporating as it does the prohibition on "cruel and unusual punishments" contained **\*45** in the Eighth Amendment, forbids the imposition of criminal penalties based on an individual's status alone. For that reason, in *Robinson v. California,* 370 U.S. 660 (1962), the Court invalidated a statute making it a crime to be a narcotics addict. See *id.* at 666-68. In *Powell v. Texas,* 392 U.S. 514 (1968), however, the Court upheld a public drunkenness statute as applied to an alcoholic, making clear that even behavior persons are compelled to engage in by virtue of their status can be a basis for regulation as long as the law at issue requires that "the accused has committed some act, has engaged in some behavior, which society has an interest in preventing...." *Id.* at 533 (plurality opinion). See also *id.* at 549-50 (White, J., concurring in the result). The gang loitering ordinance, of course, requires an affirmative act, and thus comports with this rule. In fact, two discrete types of conduct are required. Not only must someone first loiter, but he must then disobey an order to disperse. [26]

The intermediate state appellate court held that the ordinance created a status offense because the ordinance "can be triggered only when a gang member is found loitering." Pet. App. 34a. This feature, however, does not make for a forbidden status offense, but rather a special restriction on conduct by persons whose status warrants such a measure. And there is no constitutional prohibition against placing such a restriction on persons whose status warrants such measures, as long as it does not impose penalties based on status alone. Such measures are in fact common.

For example, statutory rape laws are based on the age and sometimes the sex of an individual. Similarly, federal law prohibits possession of firearms by convicted felons, **\*46** persons who illegally use or who are addicted to controlled substances, persons who have been adjudicated mentally ill or who have been committed to a mental institution, aliens unlawfully in the country, persons who have been dishonorably discharged from the armed forces, and persons who have renounced American citizenship. See 18 U.S.C. § 922(g). Under the appellate court's holding, presumably these laws would be invalid because they are "triggered" by the status of an individual. Yet such reasoning cannot be squared with decisions such as *Lewis,* which, as we explain in Part I.B.2 above, upheld the prohibition on possession of firearms by convicted felons even when applied to those whose convictions were unconstitutionally obtained, since they were in a class of persons that could rationally be viewed as potentially dangerous. Similarly, the gang loitering ordinance criminalizes not mere status but rather conduct by gang members and their associates that the City Council reasonably found to have a destructive impact on many communities-"public behavior which may create substantial health and safety hazards ... and which offends the moral and aesthetic sensibilities of a large segment of the community." *Powell,* 392 U.S. at 532. For that reason, this ordinance does not create a forbidden status offense.

City of Chicago v. Morales, 1998 WL 328342 (1998)

---

### III. THE GANG LOITERING ORDINANCE DOES NOT OFFEND THE FOURTH AMENDMENT.

Finally, we address an alternate ground that respondents have continued to press for invalidating the gang loitering ordinance-that it violates the Fourth Amendment.[27] Indeed respondents persuaded the state appellate court that the ordinance authorized arrests without compliance with that Amendment's "probable cause requirement." Pet. App. 35a. That court concluded that the ordinance authorizes "[a]rresting a person on suspicion...." *Ibid.* (quoting *Papachristou,* 405 U.S. at 169).

 **\*47**  This is demonstrably incorrect-the plain terms of the ordinance make clear that it does not permit arrests based on "suspicion." Before loiterers can be arrested, this ordinance-unlike Jacksonville's vagrancy ordinance at issue in *Papachristou*-requires police officers to order loiterers to move on. Even then, no arrests can be made unless the order is disobeyed. At that point, of course, the officer is not acting on suspicion but on his own knowledge that his order has not been obeyed.

Perhaps the appellate court's concern was not that arrests could be made on suspicion, but rather that the underlying orders to move on could be given on suspicion. This also raises no Fourth Amendment problem. An order to move on is simply not subject to attack under the Fourth Amendment. Such an order is not a "seizure," to which that Amendment applies.

This Court has made clear that absent a "seizure" within the meaning of the Fourth Amendment, interaction between a police officer and an individual "implicates no Fourth Amendment interest." *Florida v. Rodriguez,* 469 U.S. 1, 5-6 (1984) (per curiam). A "seizure," in turn, occurs only when a "reasonable person would have believed that he was not free to leave," *Michigan v. Chesternut,* 486 U.S. 567, 573 (1988) (quoting *United States v. Mendenhall,* 446 U.S. 544, 554 (1980) (opinion of Stewart, J.)), or at a minimum, when an individual would not reasonably feel free to "terminate the encounter" with the police, *Florida v. Bostick,* 501 U.S. 429, 436 (1991). In *California v. Hodari D.,* 499 U.S. 621 (1991), the Court applied this test and held that a police officer's order to halt-when not obeyed-is not subject to the Fourth Amendment. Rather, a "seizure" triggering the probable cause requirement occurs only when there is "application of physical force to restrain movement." *Id.* at 626. Accord *Brower v. County of Inyo,* 489 U.S. 593, 596 (1989) ("Violation of the Fourth Amendment requires an intentional acquisition of physical control."). An order to move on under the gang loitering ordinance, of course, involves no such  **\*48**  forcible restraint-indeed the opposite of forcible restraint-and thus is not a seizure.

Nor can an order to disperse be viewed as a "seizure" simply because the recipients' "freedom of movement" is limited to the extent that they must actually move. Such a boundless view of the Fourth Amendment would convert every traffic direction or every crowd control instruction from an officer to a pedestrian into a "seizure" subject to Fourth Amendment review. That expansive notion is, of course, not the law.[28]

In any event, even if an order to move along were a "seizure," it would still not violate the Fourth Amendment. We explain in Part II.A above why the City Council's decision to confer authority on police officers to order gang members and others who loiter with them to move along was reasonably related to legitimate governmental interests. And the Fourth Amendment, of course, proscribes only "unreasonable" seizures. Accordingly, the "touchstone of the Fourth Amendment is reasonableness." *Ohio v. Robinette,* 117 S. Ct. 417, 421 (1996) (quoting *Florida v. Jimeno,* 500 U.S. 248, 250 (1991)). If orders issued under this ordinance reasonably advance legitimate police powers, and we explain in Part II.A above why they do, then they cannot be viewed as constitutionally "unreasonable," any more than other orders an officer issues to persons as a reasonable exercise of the police power-such as a traffic direction or a crowd control instruction-are constitutionally unreasonable.

City of Chicago v. Morales, 1998 WL 328342 (1998)

Thus the Fourth Amendment provides no independent basis to attack this ordinance. Indeed, the Fourth Amendment has always been understood to permit a police officer to "arrest a person when he has probable cause to believe **\*49** that person has committed a crime." *Tennessee v. Garner,* 471 U.S. 1, 7 (1985). This classic restatement of the scope of the Fourth Amendment is of course silent about what types of conduct the government may make a crime. Instead its guarantee is procedural-to require only that there be probable cause to believe that some law has been broken before an arrest can be made. *Michigan v. DeFillippo,* 443 U.S. 31 (1979), illustrates the point. DeFillippo had been arrested under an ordinance that authorized police officers to stop individuals based on reasonable cause to believe some further investigation is warranted, and then required such individuals to identify themselves and produce evidence of their identity. See *id.* at 33-34. The state courts later held that the ordinance was impermissibly vague and hence unconstitutional (*id.* at 34), but this Court concluded that DeFillippo's arrest nevertheless comported with the Fourth Amendment. Because DeFillippo had violated the terms of the ordinance, "there was abundant probable cause to satisfy the constitutional prerequisite for an arrest." *Id.* at 37. After all, the Court explained, "[p]olice are charged to enforce laws until and unless they are declared unconstitutional." *Id.* at 38. [29]

Here, too, the Fourth Amendment poses no obstacle to enforcement of a duly enacted law. The gang loitering ordinance, of course, grants no authority to search and seize except when there is probable cause to believe that its terms have been violated-that an order to disperse has been properly given and disobeyed. If the Court accepts our submission that a requirement to obey police orders to move along can be validly placed on gang members **\*50** and their associates, then an arrest made on probable cause to believe that a duly authorized police order has been disobeyed does not offend the Fourth Amendment.

## CONCLUSION

The judgment of the Supreme Court of Illinois should be reversed.

Footnotes

FN

\* Counsel of Record

1. The opinion of the Illinois Supreme Court invalidated the Chicago gang loitering ordinance under the Due Process Clauses of both the federal and state Constitutions. The text of these provisions is virtually identical. Compare U.S. Const. amend. XIV, § 1 with Ill. Const. art. I, § 2. In *Michigan v. Long,* 463 U.S. 1032 (1983), this Court held that when the decision of a state court rests "primarily" on or is "interwoven" with federal law, this Court may exercise jurisdiction unless the opinion of the state court contains a "plain statement" that "clearly and expressly" indicates that its judgment rests on an adequate and independent state ground. *Id.* at 1041. The Court has consistently hewed to this rule in cases in which a state court relies on both federal and state law to support its judgment. See, *e.g., Pennsylvania v. Labron,* 518 U.S. 938, 941 (1996) (per curiam); *Arizona v. Evans,* 514 U.S. 1, 7-10 (1995); *New York v. Class,* 475 U.S. 106, 109-10 (1986). In the decision below, the Illinois Supreme Court expressly invoked federal law and relied primarily on this Court's decisions in invalidating Chicago's gang loitering ordinance. See, *e.g.,* Pet. App. 7a, 17a. And even though respondents brought the holding of *Long* to the Illinois Supreme Court's attention and asked it to make an express statement that any judgment invalidating the gang loitering ordinance would rest on an adequate and independent state ground, there is no plain statement in its opinion that the court's judgment rests on an adequate and independent state ground. Thus, this Court has jurisdiction to review the judgment below.

2. The transcripts of the hearings were lodged with the trial court in each case and were then added as a supplemental record ("Supp. R.") on appeal by stipulation.

3. "Criminal street gang" is defined as "any ongoing organization, association in fact or group of three or more persons, formal or informal, having as one of its substantial activities the commission of one or more of the criminal acts enumerated in [the

King, Sarah 11/14/2017
For Educational Use Only

**City of Chicago v. Morales, 1998 WL 328342 (1998)**

ordinance's definition of "criminal gang activity"], and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." Pet. App. 61a-62a. "Criminal gang activity" and a "pattern of criminal gang activity" as defined in the ordinance (Pet.App.62a, 63a), largely track the definition of an "enterprise" and a "pattern of racketeering activity" in the federal racketeering statute. See 18 U.S.C. § 1961.

Under the General Order the Gang Crimes Section must maintain and disseminate files reflecting the names of persons who the Department has probable cause to believe are members of criminal street gangs. Pet. App. 70a-71a. The files are reviewed semiannually to ensure that they remain current. *Ibid.*

The evidence supporting the convictions was as follows:

The arresting officer observed respondent Gutierrez loitering with two other men. Gutierrez Tr. 8-9, 12. Gutierrez had previously admitted to the officer that he belonged to the Latin Kings. *Id.* at 11-12, 13-14. The officer ordered the group to disperse, and when the officer returned after driving around the block, the loiterers were in the same place, and were arrested. *Id.* at 12-13, 18-19.

The arresting officer saw respondent Washington and several others standing on the street and yelling. Washington Tr. 10, 17. He approached the group, and several persons in it admitted that they were Vice Lords. *Id.* at 11, 16-17. The officer ordered them to disperse. *Id.* at 11. The officer returned later, saw the same youths, and again ordered them to disperse. *Id.* at 11, 18. He returned still later, saw the same group, and arrested them. *Id.* at 12, 18-19.

The arresting officer observed respondent Renteria with the other persons loitering on a corner. Renteria Tr. 16-18. The arresting officer knew that the gang card file for the Satan Disciples contained a card identifying Renteria as a gang member. *Id.* at 14-15. Renteria also admitted to the officers that he was a street gang member. *Id.* at 27. The officer ordered the group to leave. *Id.* at 18, 23-24, 25-26. When she returned 15-20 minutes later, Renteria was still on the corner, and she arrested him. *Id.* at 16-17, 19, 24, 25-26.

Respondent Garvin stipulated to the arresting officer's testimony that he had been loitering with two other persons, they were ordered to move on based on his admission to the officer that he was a member of the Latin Kings and his tattoos, and that Garvin failed to obey the order. Garvin Tr. 9.

Respondent Jimenez stipulated that the allegations in the complaint against him-that he was a known member of the Ambrose gang, and that he remained in a known location for gang activity after being ordered to disperse-were correct. Jimenez R. C.2; Jimenez Tr. 3-4.

Finally, the arresting officer observed loitering by six individuals he believed to be gang members, including respondent Morales. Morales Tr. 6-8. Morales admitted at trial that he knew that he was with members of the Gangster Disciples. *Id.* at 19. The officer ordered the loiterers to move on, but when he returned 5-10 minutes later they were still present, and he arrested them. *Id.* at 11.

The Illinois Supreme Court has mandatory jurisdiction in cases in which the appellate court has issued a certificate of importance. See Ill. Const. art. VI, § 4(c); Ill. Sup. Ct. R. 316. Its exercise of jurisdiction in cases on petition for leave to appeal is discretionary. See Ill. Sup. Ct. R. 315.

That assessment is widely shared. See generally, *e.g.,* Carolyn Rebecca Block & Richard Block, *Street Gang Crime in Chicago* (Nat'l Inst. of Justice Dec. 1993); G. David Curry, Richard A. Ball & Scott H. Decker, *Estimating the National Scope of Gang Crime from Law Enforcement Data,* in *Gangs in America* 21-36 (C. Ronald Huff ed. 1996); U.S. Department of Justice, *Attorney General's Report to the President: A Coordinated Approach to the Challenge of Gang Violence: A Progress Report* (April 1996).

See also, *e.g.,* George L. Kelling & Catherine M. Coles, *Fixing Broken Windows* 71-107 (1996); Charles R. Swanson, Leonard Territo & Robert W. Taylor, *Police Administration: Structures, Processes and Behavior* 3-29 (3d ed. 1993); Samuel Walker, *The, Police in America* 12-29 (1992).

See also, *e.g.,* Kelling & Coles, *supra* at 16-36; Wesley G. Skogan, *Disorder and Decline* 9-10, 51-57, 73-75, 85-124 (1990); Jerome H. Skolnick & David H. Bayley, *Community Policing: Issues and Practices Around the World* 4-19 (Nat'l Inst. of Justice 1988).

See, *e.g.,* Robert C. Ellickson, *Controlling Chronic Misconduct in City Spaces: Of Panhandlers, Skid Rows and Public Space Zoning,* 105 Yale L.J. 1165, 1177-84, 1238-46 (1996); Kahan, *supra* at 389-94; Debra Livingston, *Police Discretion and the Quality of Life in Public Places: Courts, Communities and the New Policing,* 97 Colum. L. Rev. 551, 650-72 (1997); Tracey L. Meares, *Social Organization and Drug Law Enforcement,* 35 Am. Crim. L. Rev. 191, 218-27 (1998).

These figures can be found in a five-year report by the Police Department of the City of Chicago entitled *Gang and Narcotic-Related Crime: 1993-1997,* which has been lodged with the Court and served on counsel for respondents. The homicide

City of Chicago v. Morales, 1998 WL 328342 (1998)

percentages in the report have changed slightly from those we reported in our petition because the results of investigations completed in 1997 of homicides occurring in 1996 have become available, enabling the motive of some homicides to be reclassified. As the report reflects, this pattern of substantial decline in gang-related crime followed by an increase after enforcement of the ordinance ceased was observed for a variety of other types of gang-related crimes. The report also shows that, in every year, at least 92% of all gang-related homicides were committed outdoors. The report further reflects, for 1997, a decline in gang-related homicides but a continued increase in both gang-related aggravated battery with a firearm and drive-by shootings. Based on the available empirical evidence, at least one scholar has offered her tentative view that enforcement of the gang loitering ordinance appeared to combat gang crime effectively. See Meares, *supra* at 224-26.

Accord, *e.g., Osborne v. Ohio,* 495 U.S. 103, 112 (1990); *Board of Airport Commissioners v. Jews For Jesus, Inc.,* 482 U.S. 569, 574 (1987); *City of Houston v. Hill,* 482 U.S. at 459.

Of course, laws regulating social gatherings affect a liberty interest, and thus are subject to review under the rubric of substantive due process. See *Stanglin,* 490 U.S. at 28 (Stevens, J., concurring in the judgment). See also *Swank v. Smart,* 898 F.2d 1247, 1251-52 (7th Cir.), cert. denied, 498 U.S. 853 (1990). We address that doctrine in Part II below.

In fact, because this ordinance proscribes only remaining in one place after being ordered to move rather than what persons can say or write, there is great doubt whether it is even subject to attack as overbroad. At least one circuit has concluded that laws directed at what is generally conduct with no inherently expressive purpose can never be invalidated as overbroad. See *Roulette v. City of Seattle,* 97 F.3d 300, 303-05 (9th Cir.1996) (upholding ordinance prohibiting sitting or lying on sidewalks).

The gang loitering ordinance, which confines its scope to conduct with "no apparent purpose," contrasts sharply with laws that this Court has condemned as overbroad. In *Coates v. City of Cincinnati,* 402 U.S. 611 (1971), for example, the ordinance at issue made it a crime for "three or more persons to ... conduct themselves in a manner annoying to persons passing by." *Id.* at 611. The Court held this ordinance invalid, reasoning that activity protected by the First Amendment is often annoying and hence the ordinance could reach virtually any demonstration, picketing, or public assembly. See *id.* at 615-16. Similarly, in *Shuttlesworth v. City of Birmingham,* 382 U.S. 87 (1965), the ordinance made it "unlawful for any person to stand or loiter upon any street or sidewalk ... after having been requested by any police officer to move on." *Id.* at 90. By effectively granting police officers the authority to prevent anyone from standing still in Birmingham, the ordinance plainly could reach picketing and demonstrations, and hence created an "ever-present potential for arbitrarily suppressing First Amendment liberties...." *Id.* at 90-91.

The California Supreme Court has taken precisely this approach, concluding that a civil injunction prohibiting gang members from associating together in public infringed at most the kind of generalized social associations held to be unprotected in *Stanglin.* See *People ex rel. Gallo v. Acuna,* 14 Cal. 4th 1090, 1110-12, 929 P.2d 596, 608-09, 60 Cal. Rptr. 2d 277, 289-90, cert. denied, 117 S. Ct. 2513 (1997).

The Illinois Supreme Court questioned whether General Order 92-4 had been followed uniformly, observing that respondent Morales was arrested based on a police officer's determination that he was a gang member that, in turn, was based solely on the fact that he was wearing black and blue clothing, in violation of the restrictions on such determinations contained in the General Order. See Pet. App. 16a & n. 1. In fact, as we explain below, the court appears to have misconstrued the record on this point. See *infra* at 34 n. 21. But in any event, the court's observation goes only to the question whether the standards in the order for identifying gang members have been consistently applied. There is no indication in this record that the ordinance has been enforced in any but those areas designated under General Order 92-4.

Indeed the better-reasoned decisions in the lower courts conclude that the term "loitering" has a common sense meaning that reasonable persons can apprehend. See, *e.g., Wiemerslage v. Maine Township High School District 207,* 29 F.3d 1149, 1152 (7th Cir.1994); *People v. Superior Court,* 46 Cal.3d 381, 390-92, 758 P.2d 1046, 1049-50, 250 Cal. Rptr. 515, 518-19 (1988); *State v. Armstrong,* 282 Minn. 39, 42, 162 N.W.2d 357, 360 (1968).

Perhaps the Illinois Supreme Court's concern that the ordinance could be applied to persons with legitimate purposes was not an objection on grounds of vagueness, since the police order makes it perfectly clear what one must do to comply with the law, but instead was a substantive due process concern that the ordinance transgresses the constitutional limitations on the municipal police power. We address that issue in Part II below.

This same point also distinguishes another case cited by the court below, *Lanzetta v. New Jersey,* 306 U.S. 451 (1939). There, the Court invalidated a statute making it a crime to belong to a "gang," which had been construed to mean any group of two or more persons with no lawful purpose but without any requirement that the group be engaged in criminal activity. See *id.* at 456-57. The Court invalidated the statute because it failed to provide sufficient notice to the class of persons subject to its

King, Sarah 11/14/2017
For Educational Use Only

**City of Chicago v. Morales, 1998 WL 328342 (1998)**

prohibition. See *id.* at 457-58. Here, of course, under the gang loitering ordinance, actual notice is provided to persons before they become subject to arrest.

21 General Order 92-4 construes the ordinance to require probable cause to believe that a loiterer is a member of a criminal street gang, and there are rigorous standards for determining membership. Pet. App. 67a-68a, 71a-72a. Such administrative guidelines for enforcement are appropriately considered in evaluating claims of vagueness. See, *e.g., Kolender,* 461 U.S. at 355; *Hoffman Estates,* 455 U.S. at 494 n. 5. The Illinois Supreme Court questioned the efficacy of General Order 92-4, stating that it had made "a thorough examination of the record" and had concluded that police officers "had not followed the guidelines of the general order in a uniform manner." Pet. App. 16a (footnote omitted). The single example the court cited-that respondent Morales was arrested solely because he was wearing blue and black clothing (Pet. App. 16a n. 1)-in fact discloses a misunderstanding of the record. Morales was not arrested because of the colors he was wearing; he was arrested because the loiterers admitted that they belonged to a criminal street gang. See Morales R. C.3. And the trial judge who later convicted Morales found that he had admitted that he was loitering with a member of a criminal street gang, although he denied belonging to the gang. Morales Tr. at 19, 22. In any event, the Illinois Supreme Court's observation, even if correct, considers the record in only one of these 66 consolidated cases, which are themselves a tiny fraction of the cases brought under this ordinance, and surely cannot be taken as a finding that General Order 92-4 has been ignored. There has been no evidentiary hearing on the Chicago Police Department's adherence to the General Order, nor has any state court made an express finding of fact on this point.

22 See, *e.g.,* Jeffrey Fagan, *Gangs, Drugs and Neighborhood Change,* in *Gangs in America* 42-73 (C. Ronald Huff ed. 1996); Martin Sanchez Jankowski, *Islands in the Street: Gangs and American Urban Society* 37-100 (1991); Irving A. Spergel, *The Youth Gang Problem: A Community Approach* 70-109 (1995).

23 See, *e.g., People v. Gardeley,* 14 Cal. 4th 605, 623-24, 927 P.2d 713, 724-25, 59 Cal. Rptr. 2d 356, 367-68 (1996), cert. denied, 118 S. Ct. 148 (1997); *Jackson v. State,* 634 N.E.2d 532, 535-36 (Ind.Ct.App.1994); *Helton v. State,* 624 N.E.2d 499, 505-07 (Ind.Ct.App.1993) cert. denied, 117 S. Ct. 1252 (1997); *State v. Walker,* 506 N.W.2d 430, 431-32 (Iowa 1993). An inventory of state laws that make gang membership an element of an offense or a basis for sentencing enhancement is contained in the Brief Amicus Curiae of Ohio, *et al.* And in *City of Tacoma v. Luvene,* 118 Wash. 2d 826, 827 P.2d 1374 (1992), the court rejected a vagueness attack on a loitering ordinance that permitted enforcement based on gang membership. See *id.* at 846-48 & n. 12, 827 P.2d at 1384-86 & n. 12.

24 See, *e.g., United States v. Turner,* 104 F.3d 1180, 1185 (9th Cir.), cert. denied, 117 S. Ct. 1566 & 1722 (1997); *United States v. Bourgeois,* 964 F.2d 935, 941 (9th Cir.), cert. denied, 506 U.S. 901 (1992); *United States v. Trent,* 718 F. Supp. 39 (D.Or.1989). See generally *United States v. Armstrong,* 517 U.S. 456, 463-71 (1996); *Wayte v. United States,* 470 U.S. 598, 608-10 (1985).

25 See also, *e.g.,* Jeffrey S. Adler, *A Historical Analysis of the Law of Vagrancy,* 27 Criminology 209 (1989); Caleb Foote, *Vagrancy-Type Law and Its Administration,* 104 U. Pa. L. Rev. 608, 615-31 (1956); Rollin M. Perkins, *The Vagrancy Concept,* 9 Hastings L.J. 237 (1958). The authority of police to issue orders to persons to move along as a means of keeping the peace is also deeply rooted. See, *e.g.,* Robert Force, *Decriminalization of Breach of the Peace Statutes: A Nonpenal Approach to Order Maintenance,* 46 Tul. L. Rev. 367, 392-404 (1972). An inventory of current state loitering and dispersal laws is found in the Brief Amicus Curiae of Ohio, *et al.*

26 The lower courts have consistently held that loitering alone can constitute the required conduct. See, *e.g., People v. Superior Court,* 46 Cal. 3d 381, 398, 758 P.2d 1046, 1054-55, 250 Cal. Rptr. 515, 523-24 (1988); *State v. Armstrong,* 282 Minn. 39, 43, 162 N.W.2d 357, 360, (1968); *City of Tacoma v. Luvene,* 118 Wash. 2d 826, 843-44, 827 P.2d 1374, 1382-83 (1992).

27 Respondents pressed this ground at each level in the state courts and have renewed it in this Court in defense of the judgment below. See Brief In Opposition of Respondents Youkhana and Cota at 23-24; Pet. App. 5a, 35a, 58a-59a n. 9.

28 Although the issue has not been frequently litigated, the Seventh Circuit has observed that directions from police officers at an accident scene or to a loiterer to move on do not implicate the Fourth Amendment. See *Kernats v. O'Sullivan,* 35 F.3d 1171, 1181 n. 7 (7th Cir.1994). See also *id.* at 1184 (Crabb, J., concurring).

29 See also, *e.g., Waters v. Barry,* 711 F. Supp. 1125, 1137-38 (D.D.C.1989) (Fourth Amendment permitted arrest under curfew ordinance regardless of its substantive constitutionality under the First and the Fourteenth Amendments); *City of Milwaukee v. Nelson,* 149 Wis. 2d 434, 454-62, 439 N.W.2d 562, 569-72 (as long as probable cause existed to believe defendant had loitered in violation of ordinance his arrest comported with the Fourth Amendment), cert. denied, 493 U.S. 858 (1989).

---

**End of Document**      © 2017 Thomson Reuters. No claim to original U.S. Government Works.