**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DARNELL SMITH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 15-cv-03467 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs in this putative class action are African-American and Hispanic residents of the City of Chicago ("City") who claim that they were stopped and frisked by Chicago Police Department ("CPD") officers without justification in violation of their rights under the Fourth Amendment to the United States Constitution. They have sued the City, former Chicago Police Superintendent Garry McCarthy, and numerous individual CPD officers under 42 U.S.C. § 1983 for the alleged constitutional violations. Before the Court are Plaintiffs' motion for certification of several classes under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4). (Dkt. No. 425.) For the reasons that follow, Plaintiffs' motion is granted in part and denied in part. The Court certifies two of Plaintiffs' proposed Rule 23(b)(2) classes: the Fourth Amendment Class and the Fourth Amendment Loitering Subclass. However, the Court denies certification of Plaintiffs' proposed Rule 23(b)(2) Fourteenth Amendment Class and Plaintiffs' proposed Rule 23(b)(3) and Rule 23(c)(4) classes.

## BACKGROUND

In their Sixth Amended Complaint, Plaintiffs allege that Defendants have maintained a policy or custom of unconstitutional stops and frisks of Chicago residents by the CPD, conducted

without reasonable articulable suspicion in violation of the Fourth Amendment and the principles set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). In *Terry*, the Supreme Court held that police officers are permitted to conduct a brief investigatory stop (or *Terry* stop) only when they have a reasonable suspicion that an individual has committed, is committing, or is about to commit a crime. *Terry*, 392 U.S. at 21; *see also United States v. Williams*, 731 F.3d 678, 683 (7th Cir. 2013). Plaintiffs contend that CPD officers nonetheless regularly detain people without reasonable suspicion, and moreover, the CPD has long been aware of this problem but has failed to address it adequately.

## I.     The Court's Prior Ruling

This is Plaintiffs' second attempt at class certification. Plaintiffs previously sought certification of six plaintiff classes under Rule 23(b)(3), seeking money damages. (Pls.' Mot. for Rule 23(b)(3) Class Certification, Dkt. No. 277.) As described in the Court's Memorandum Opinion and Order denying that request (May 29, 2019 Mem. Order & Op., Dkt. No. 388), Plaintiffs' putative class definitions relied heavily upon the CPD's use of Contact Information Cards ("contact cards") to document investigatory stops and enforcement of the City's Gang and Narcotics-Related Loitering Ordinances. Specifically, Plaintiffs sought certification of two Rule 23(b)(3) classes: (1) a Fourth Amendment Class consisting of all persons subjected to investigatory stops by the CPD at any time since April 20, 2013, which resulted in creation of a contact card; and (2) a similar but more limited class consisting of all African Americans and Hispanics[1] subjected to investigatory stops by the CPD at any time since April 20, 2013, which resulted in the creation of a contact card. In the alternative, Plaintiffs sought certification of four

---

[1] Throughout this Opinion, the Court generally uses the terms "African-American" and "Hispanic" when referring to Plaintiffs' racial and ethnic group identities, tracking the proposed class definitions. As also seen in the record, however, the Court will sometimes use the terms "African-American" and "Black" interchangeably.

narrower Rule 23(b)(3) classes: (3) all persons who were encountered by the CPD for enforcement of the Gang and Narcotics Loitering Ordinance at any time since April 20, 2013, which resulted in the creation of a contact card; (4) all African Americans and Hispanics who were encountered by the CPD for enforcement of the Gang and Narcotics Loitering Ordinance at any time since April 20, 2013, which resulted in the creation of a contact card; (5) all persons subjected to an investigatory stop by the CPD at any time since April 20, 2013, which resulted in the creation of a contact card that contains no narrative; and (6) all African Americans and Hispanics who were subjected to an investigatory stop by the CPD at any time since April 20, 2013, which resulted in the creation of a contact card that contains no narrative. As a final alternative, Plaintiffs sought certification of a Rule 23(c)(4) issues-only class addressing questions regarding whether the CPD's policies and practices were intended to target minorities and whether CPD policymakers were deliberately indifferent to the consequences of the investigatory stop policies.

In denying certification of the proposed Rule 23(b)(3) classes, the Court found that Plaintiffs had not shown that their proposed classes met the commonality requirement under Rule 23(a)(2). First, Plaintiffs failed to show that the individualized inquiries for class members—such as whether any given person was stopped and whether the officer who stopped the person lacked reasonable suspicion—could be meaningfully resolved through common questions. Second, the Court rejected Plaintiffs' attempt to identify a common CPD policy that caused class members' unconstitutional stops. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 353 (2011) ("[S]ignificant proof that a [defendant] operated under a general policy . . . conceivably could justify a class); *Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 551 (7th Cir. 2016) (recognizing that "an illegal policy might provide the glue necessary to litigate otherwise highly individualized

claims as a class" (internal quotations omitted)). Plaintiffs argued that the CPD maintained a general policy that had the effect of pressuring officers to stop more people, as evidenced by the Chicago Police Superintendent criticizing commanders and deputy chiefs whose subordinates did not stop enough people and setting quotas for stops. The Court found Plaintiffs' theory legally and factually inadequate, finding that (1) there was not enough evidence that the CPD's actions influenced officers to conduct more stops; and (2) even if the CPD's actions influenced officers' motivations, the subjective motivations of officers when stopping people would not determine the constitutionality of the stops. The Court further noted that the CPD's use of quotas was facially neutral (not directly encouraging officers to conduct unconstitutional investigative stops).

In a separate ruling, the Court also largely granted Defendants' motion to exclude testimony offered by Plaintiffs' expert witnesses. (Sept. 30, 2019 Mem. Op. & Order, Dkt. No. 412.) That testimony concerned more than three million contact cards produced in discovery, which Plaintiffs hoped to use to show that the CPD committed widespread unconstitutional stops. But the Court held that the conclusions drawn by Plaintiffs' proposed experts—for example, that "[d]uring the class period, the CPD engaged in a minimum of 368,436 Unconstitutional Stops"— improperly offered case-determinative legal conclusions or findings reserved for the factfinder. (*See id.* at 7 n.6.) The Court similarly held that Plaintiffs' proposed expert testimony on the reasonableness of stops described in sample contact cards would not be helpful to the jury. Ultimately, the only expert testimony the Court allowed at this stage in the proceedings involved summaries describing how many contact cards matched various search parameters. Notably, Plaintiffs rely on the summaries in connection with the present motion to show racial disparities in the CPD's stop and frisk program.

## II.      Plaintiffs' Present Motion

Plaintiffs now have moved again for class certification. This time they seek certification of three classes under Rule 23(b)(2), seeking declaratory and injunctive relief; renew in part their motion for class certification under Rule 23(b)(3), seeking damages; and again move in the alternative for certification of an issues-only class under Rule 23(c)(4). Plaintiffs' proposed classes are similar and in some cases substantially identical to the proposed classes from their initial motion. Because the Court rejected those classes based on a lack of commonality—a requirement for Rule 23(b)(2) and Rule 23(b)(3) classes alike—a threshold question for the Court is whether Plaintiffs' arguments merit revisiting the commonality issue.

Class certification decisions are interlocutory and subject to revision by the Court at any time prior to final judgment. Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."); *see Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) (describing class certification orders as "inherently tentative."). Here, the Court finds it appropriate to consider anew in connection with the present motion whether Plaintiffs' can demonstrate commonality because they have presented a new theory and new evidence. Plaintiffs previously focused heavily on the contact cards (and the largely excluded expert testimony) in arguing that the CPD's investigatory stop quotas caused unconstitutional stops, but they now contend that the CPD failed to implement adequate training, supervision, and accountability measures to address a known problem of the stops violating individuals' rights under the Fourth and Fourteenth Amendments. This theory is distinct from Plaintiffs' previous argument that the CPD enforces an illegal investigatory stop quota and warrants fresh consideration of the requirements for class certification and, in particular, the commonality requirement.

### A.     Evidentiary Record

The parties have adduced a voluminous evidentiary record in support of their latest arguments for and against class certification. The evidence is summarized below.[2]

### 1.     The CPD's Stop and Frisk Practices

During the time period relevant to this lawsuit, the CPD used two sets of forms to document investigatory stops. Initially, police officers recorded stops on contact cards, which, as Defendants acknowledge, include a narrative section for officers to record the reasonable articulable suspicion justifying the investigatory stop or reason for contact. (Defs.' Resp. at 13 n.12, Dkt. No. 425-50.) While contact cards were used to record both investigatory stops and voluntary interactions as of September 2011, their use was limited to investigatory stops and enforcement of Chicago's gang and narcotics loitering ordinances as of April 3, 2014. (Mot., Ex. 39, Special Order S04-13-09 (2011) § 3, Dkt. No. 425-39.; Mot., Ex. 7, Special Order S04-13-09 (2014) § 4(B)(1), Dkt. No. 425-7.) In 2016, the CPD replaced the contact card with a new, two-page "Investigatory Stop Report" ("ISR"), requiring police officers to complete a more detailed form when documenting investigatory stops. (Mot., Ex. 18, Special Order S04-13-09 (2017), Dkt. No. 425-18.) CPD policies direct police officers to make investigatory stops only under certain circumstances and to document standardized information about those stops on ISRs and contact cards. (Special Order S04-13-09 (2014); Special Order S04-13-09 (2017).) Contact cards and

---

[2] The parties have submitted declarations, reports, and other documents containing or constituting hearsay that would not be admissible at trial. In the Seventh Circuit, contested expert opinions must meet the standards of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to be considered in connection with class certification. *See Messner v. NorthShore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012). The Seventh Circuit has not ruled on whether fact evidence in support of class certification is subject to the same admissibility requirements as would apply at trial, but other circuits have rejected such a requirement, allowing hearsay and other inadmissible evidence to be considered for class certification purposes. *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1005 (9th Cir. 2018); *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 612–13 (8th Cir. 2011). The Court follows the approach of those circuits.

ISRs are not used to document arrests; rather, they generally document interactions in which police officers suspect but do not uncover criminal activity. (*Id.*)

Deposition testimony from CPD executives evidences the standards and practices associated with contact cards. Alfonza Wysinger was First Deputy Superintendent with the CPD from 2011 to October 2015, appointed to that position by McCarthy. (Mot., Ex. 8, Dep. of Alfonza Wysinger at 25–26, Dkt. No. 25-8). Wysinger was responsible for the daily operations of the police department and oversaw the CPD's various bureaus: investigative services, administrative services, organized crime, and detectives. (*Id.* at 66.) Wysinger testified that from 2011 through 2015, officers conducting investigatory stops were required to record the facts justifying reasonable articulable suspicion using contact cards and supervisors were required to review every contact card to confirm the reasonable articulable suspicion for those stops. (Wysinger Dep. at 65.) Depositions of McCarthy and former interim Superintendent John Escalante indicate that stop and frisk policies, like other department-wide policies, were developed by a centralized executive team with the Superintendent wielding final policymaking authority. (Mot., Ex. 24, Dep. of Garry McCarthy at 29, Dkt. No. 425-24.; Mot., Ex. 23, Dep. of John Escalante at 24–25.)

During McCarthy's tenure, increasing stop and frisk encounters—as measured by contact cards—was emphasized as a performance objective. The CPD tracked the number of contact cards written in each of the police department's districts and communicated those numbers down the chain of command, reaching patrol officers. CompStat meetings were a primary forum for this communication. First Deputy Superintendent Wysinger testified that McCarthy criticized district commanders for having low contact card numbers, raising his voice and yelling at them. (*Id.* at 92.) CompStat meeting summaries show McCarthy pressuring commanders and deputy chiefs to

produce more contact cards, including ranking each police district by the average number of contact cards produced per officer. (*See, e.g.*, Mot., Ex. 9, CompStat Summ. (1.17.13) at 15, Dkt. No. 425-9 ("We can't be patient anymore . . . Only 13 contact cards in 28 days by our best performers? Your supervisors are not carrying the load . . . We can't tolerate this any more [sic].");[3] Mot., Ex. 10, CompStat Summ. (3.14.13) at 8, Dkt. No. 425-10 ("At the bottom of the list is the 11th District on the average number of contact cards written per officer. You don't want to be last . . . Just improve the contact cards.").)[4] The summaries of CompStat meetings show a singular focus on contact cards; in one such meeting, Wysinger closed out the meeting by saying "You already know what I'm going to talk about today," discussing a decrease in contact cards. (Mot., Ex. 12, CompStat Summ. (5.16.15) at 14.) Wysinger warned that the decline in contact cards was endangering officers, attributing two incidents where officers were fired upon to a decline in street stops and concluding that stopping more people "will keep our officers alive." (*Id.*)

The record contains less information about ISRs. Still, Plaintiffs' evidence indicates that ISRs serve essentially the same purpose as contact cards in documenting investigatory stops. (Special Order S04-13-09 (2017).) CPD officers are required to document the facts that establish reasonable articulable suspicion when writing ISRs. (*Id.* § III(D)(1)(a).) The CPD directive governing ISRs also requires officers to comply with constitutional limits on stop and frisk

---

[3] Following McCarthy's comments, Chief Robert Tracy admonished the commander of the 11th District to "improve overall activity and especially contact cards." (CompStat Summ. (1.17.13) at 15.) Later in the same meeting, McCarthy admonished the 19th District Commander that "We've got to put our hands on people . . . Three contact cards in 28 days is not good." (*Id.* at 16.) First Deputy Wysinger added, "WRONG FOOT! . . . We have to get more aggressive we have to have a sense of urgency we have to put our hands on people." (*Id.* (emphasis in original).)

[4] Although CompStat meeting notes are not verbatim accounts, they were distributed across the CPD to guide policing strategy.

activities, including defining the reasonable articulable suspicion requirement and prohibiting officers from engaging in racial profiling or bias-based policing. (*Id.* §§ II(C), III(B), (E).)

## 2. Data

McCarthy served as Superintendent of the CPD from May 2011 to December 2015. (McCarthy Dep. at 16, 48.) Stop and frisk patterns in Chicago can be roughly divided into three phases for present purposes: pre-McCarthy, McCarthy, and post-McCarthy. During McCarthy's tenure, Chicago police officers stopped dramatically more people—hundreds of thousands more—and after his departure, stops plummeted. Table 1, Chart 1, and Table 2 below were created using data from Plaintiff's evidentiary submissions.[5]

| Table 1: CPD Contact Cards and ISRs by Year and Race | | | | |
|---|---|---|---|---|
| Year | # Contact Cards / ISRs | # Stops (Black) | # Stops (Hispanic) | # Stops (White) |
| 2010 | 335,864 | 212,047 | 73,181 | 44,300 |
| 2011 | 380,349 | 247,211 | 82,434 | 44,897 |
| 2012 | 517,660 | 350,379 | 105,980 | 54,587 |
| 2013 | 703,308 | 483,947 | 131,669 | 77,108 |
| 2014 | 715,892 | 514,596 | 122,563 | 69,114 |
| 2015 | 603,712 | 431,189 | 109,581 | 54,832 |
| 2016 | 106,239 | 74,812 | 21,526 | 8,501 |
| 2017 | 110,019 | 78,694 | 21,501 | 8,655 |

---

[5] As discussed below, not every contact card or ISR reflects an investigatory stop. The table and chart refer to these cards as "stops" for the sake of convenience. Further, both Black Hispanic and White Hispanic entries were included in the "Hispanic" category and excluded from the Black or White categories.



(Mot., Ex. 20, Keys's Third Report at 22, Dkt. No. 425-20; Mot., Ex. 13, App. E to Expert Report of F. Eli Nelson at 1, Dkt No. 425-13.) The data shows that contact cards increased dramatically during McCarthy's tenure, increasing from 335,864 during 2010, the last full year before McCarthy started, to a height of 715,892 in 2014. Stops decreased to only 106,239 in 2016—less than a third of the number of stops in 2010—the year after McCarthy left CPD.

The disproportionate rate at which police officers stopped African-American residents increased during this period. In 2010, 63.1% of police stops were of African-American individuals. By 2014, that rate had increased more than eight percentage points to 71.9%, and remained roughly constant through 2017. While police officers stopped Hispanic residents much more often than white residents, the overall proportion of stops of Hispanic residents actually decreased during this period:

| Table 2: Racial Concentration of CPD Contact Cards / ISRs by Year | | | |
|---|---|---|---|
| Year | % Stops (African American) | % Stops (Hispanic) | % Stops (White) |
| 2010 | 63.1% | 21.8% | 13.2% |
| 2011 | 65.0% | 21.7% | 11.8% |
| 2012 | 67.7% | 20.5% | 10.5% |
| 2013 | 68.8% | 18.7% | 11.0% |
| 2014 | 71.9% | 17.1% | 9.7% |
| 2015 | 71.4% | 18.2% | 9.1% |
| 2016 | 70.4% | 20.3% | 8.0% |
| 2017 | 71.5% | 19.5% | 7.9% |

(Keys's Third Report at 22; Nelson App. E. at 1.)

### 3. Notice of Unconstitutional Activity and Supervision Deficits

From 2000 to 2006, McCarthy served as the deputy commissioner of operations for the New York City Police Department ("NYPD"), describing himself as "New York City's principal crime strategist in a political sense at the right hand of the police commissioner." (Mot., Ex. 24, Dep. of Garry McCarthy at 23, 25, Dkt. No. 425-24.) McCarthy ran NYPD's CompStat system and developed and authorized crime reduction strategies. (*Id.* at 26.) NYPD's stop and frisk practices during the period January 2004 through June 2012 were later held unconstitutional by a federal court in the Southern District of New York. *Floyd v. City of New York* ("*Floyd II*"), 959 F. Supp. 2d 540 (S.D.N.Y. 2013). The *Floyd* court found that the NYPD was "deliberately indifferent to violations of the plaintiff class's Fourth and Fourteenth Amendment rights." *Id.* at 590. As relevant here, the court further found that the NYPD had notice of its officers' unconstitutional stops and disproportionate stopping of African-American and Hispanic residents but nevertheless increased its use of stop and frisk sevenfold between 2002 and 2011. *Id.* This increase was implemented through CompStat meetings—the accountability mechanism that

McCarthy ran through 2006—at which commanders were pressured to increase stops, leading to pressure on police managers and officers to stop more people. *Id.*

Even as the NYPD pressured officers to stop more people, it failed to address the known issue of unconstitutional stops. *Id.* The NYPD was on notice of the issue of unconstitutional stops because a 1999 report by the New York Attorney General had found that 15% of UF-250s—the New York equivalent of contact cards—included facts that did not sustain the reasonable suspicion necessary to justify a search, even after resolving "every ambiguity of factual or legal interpretation" in favor of such justification. *Id.* at 591. The *Floyd* court described the pressure on officers to increase stops without emphasizing constitutional policing as "a predictable formula for producing unjustified stops." *Id.* at 602. The court similarly found that the NYPD's policy of targeting "the right people," which was understood by the NYPD's top uniformed officer to allow for indirect racial profiling based on people's race and age, led officers to stop people based on their race. *Id.* at 603–04.

Later, from 2006 to 2011, McCarthy served as Police Director of the Newark Police Department. (McCarthy Dep. at 16.) In Newark, as in Chicago, McCarthy used CompStat to influence police commanders to implement the Newark Police Department's preferred crime control strategies. (*Id.* at 38–40.) On July 22, 2014, the U.S. Department of Justice released a report concluding that the Newark Police Department violated the Fourth Amendment in the majority of its stops, finding that facts supporting reasonable articulable suspicion were not recorded in 75% of stops between January 2009 and June 2012. (Mot., Ex. 6, Investigation of the Newark Police Department at 8–9, Dkt. No. 425–6.) The report also concluded that Newark's policing practices had a disparate impact on the city's African-American population, describing the disparity as "stark and unremitting," but did not opine on whether this disparity violated the

Fourteenth Amendment. (*Id.* at 16.) The report attributed the Newark Police Department's pattern of constitutional violations, in part, to management and supervision failures. Specifically, the report noted that the Newark Police Department did not require "meaningful review of officer actions by supervisors," treating review of stops as an administrative necessity, not an opportunity to enforce constitutional policing practices. (*Id.* at 42.)

The evidence adduced by Plaintiffs is sufficient to show that McCarthy knew, or should have known, that there was a meaningful risk that his CompStat-driven stop and frisk policy caused unconstitutional stops. The *Floyd* decision and the Department of Justice's report on the Newark Police Department—both of which were issued while McCarthy was still the CPD's Superintendent—should have led the CPD to grapple with the constitutionality of its own stop and frisk program. But although McCarthy indicated that he was familiar with the *Floyd* decision and the Newark investigation, his deposition testimony in this case revealed that he knew little of the *Floyd* case and had not read the Department of Justice's report. (McCarthy Dep. at 51–65.)

In March 2015, the ACLU of Illinois released a report finding that Chicago police officers gave unlawful reasons for stops or did not provide enough information to justify a stop on almost half of all contact cards reviewed by the ACLU. (ACLU Report at 2.) Per capita, the CPD stopped residents at more than four times the rate of the NYPD at the height of New York's stop and frisk program. (*Id.* at 3.) In August 2015, the City entered into a settlement agreement with the ACLU, committing to provide training to police officers and supervisors to prevent unconstitutional stops and appointing the Honorable Arlander Keys (retired) as supervising consultant to the agreement (Mot. Ex. 17, Investigatory Stop and Protective Pat Down Settlement Agreement, Dkt. No. 425-17.)

Under the ACLU agreement, the CPD's Integrity Section audits ISRs for errors, including both administrative mistakes (like failing to check a box) and substantive deficiencies (failing to justify reasonable articulable suspicion.) (Keys's Third Report at 88.) Officers are required to document the support for their reasonable articulable suspicion to conduct a stop. (Special Order S04-13-09 § III(D)(1)(a).) When officers do not record enough information to justify reasonable articulable suspicion, the underlying stop can be regarded as at least facially unlawful. CPD's own audits of ISRs indicated that 10–11% of stops in the first half of 2017 violated the Fourth Amendment for lack of justification, and around 15% of stops in the second half of 2017 violated the Fourth Amendment. (Keys's Third Report at 88–89.) Judge Keys characterized this increase as reflecting "according to the CPD's data . . . a pattern of increasingly unjustified numbers of stops and frisks from Period 2 [the second half of 2016] to Period 4 [the second half of 2017]." (*Id.* at 90.)

As the supervising consultant to the ACLU agreement, Judge Keys and a team of experts reviewed a broad range of data, including ISR stop data, sample ISRs, audit reports, and the CPD's workflow protocols for creating and reviewing ISRs. (*Id.* at 31 n.24.) In this review, Judge Keys concluded that the CPD's ISR policies allowed the CPD to cover up Fourth Amendment violations in investigatory stops. In theory, the CPD's ISR review policies should flag Fourth Amendment violations—where officers lacked reasonable articulable suspicion for stops—and ensure that officers making such stops are corrected and monitored to ensure constitutional policing. But CPD supervisors routinely allowed officers to modify their written justifications for stops under a "return and resubmission" process. (*Id.* at 51.) Some police officers were allowed to revise a single ISR up to seven times, and the revision process could take months, far longer than a police officer could realistically remember the details of a stop and frisk. (*Id.*) Judge Keys

described this process as improper "as a matter of law," writing, "the only purpose for returning an ISR for correction appears to be to ensure that it is approved." (*Id.*)

According to Judge Keys, the CPD's abuse of the ISR review process was "not a mere technicality" but instead indicative of "widespread disregard of the basic and express accountability and transparency requirements" caused by "prevalent misuse by reviewing supervisors . . . and the acquiescence of this misuse by executive officers." (*Id.* at 26.) Judge Keys found that this policy effectively hid unlawful stops because the CPD audited only the finalized, "corrected" ISRs—which had been modified to create the (false) impression of lawful police action. (*Id.* at 27.) Judge Keys further found that police supervisors "tell the officer to articulate certain facts not apparent in the first narrative or to change elements of the original ISR in a manner that the original narrative remarks tend not to support. In other words, supervisors are dictating information that the officer never provided." (Keys's Third Report at 75.)

Judge Keys's findings of widespread facially unconstitutional stops based on ISRs are mirrored in an analysis conducted by Defendants' expert Stephen Parker, a former federal prosecutor who, among other things, served as the lead Department of Justice attorney in the federal consent decree over the New Orleans Police Department. (Resp., Ex. BB,, Parker Report at 3–4.) Parker reviewed a sample of 10,820 contact cards created between 2010 and 2015. (Parker Report Ex. 4, Dkt. No. 321-4.) He found that the narratives contained in 6,016 of these contact cards did not suggest investigatory stops, instead reflecting events such as a consensual encounter or (most often) having insufficient information to determine the nature of the interaction. (Resp., Ex. BB, Parker Report Ex. 5, Dkt. No. 450-28.) Of the approximately 5,200 stops suggesting an investigatory stop, reasonable articulable suspicion was suggested by the officer's narrative in only 1,326 stops (25.6%), while 3,863 stops (74.4%) did not include a

narrative suggesting reasonable articulable suspicion. (*Id.* (percentages calculated by the Court).) In all, 3,863 of 11,205 contact cards—34.5% of those in the sample reviewed by Defendants' expert witness—suggested an investigatory stop conducted without reasonable articulable suspicion in violation of the Fourth Amendment. (*Id.*)

Parker also opines that the contact cards cannot reliably determine whether a stop violated the Fourth Amendment because the narratives omit information relevant to the stop's constitutionality (*Id.* at 21, 23–24.) The Court agrees. Nonetheless, the Court concludes that the reasons presented on contact cards or ISRs provide insight into the existence and extent of Fourth Amendment violations for purposes of class certification, particularly where CPD's policies have required officers to provide the reasons justifying reasonable articulable suspicion.

Defendants do not directly contest Judge Keys's findings that the ISR review process facilitated the coverup of unconstitutional stops. Instead, Defendants assert that CPD has conducted audits to ensure constitutional stops. But Defendants offer no evidence that these audits were used to change behavior or to reduce unconstitutional stops, and evidence suggests that the problem of unconstitutional stops has worsened since CPD began its audits, as discussed above.

Furthermore, as discussed above, third parties investigating and reporting on CPD's accountability structure found that supervisors did not take action to ensure constitutional policing. The Department of Justice's investigation in particular decried the "breadth and depth of CPD's failure to provide proper supervision," writing, "Our overarching impression of supervisors from officers is that, with notable exceptions supervisors do not lead. we were told on several occasions that sergeants are 'not there to ruffle any feathers.'" (DOJ Report at 105.) Supervisors reported being "wary of intervening to correct rule or tactical errors, because 'no one wants to be the bad guy.'" (*Id.*) The investigation concluded that structural failures of

management, training, accountability and intervention prevented meaningful supervision and assurance of constitutional policing. (*Id.* at 107–116.) The Police Accountability Task Force echoed these findings, concluding that the CPD failed to effectively manage "problem officers" known by supervisors and CPD's leadership to commit misconduct, including not using tools used in other departments to detect and manage misconduct.[6] (PATF Report at 96.) As one example of this lack of accountability, First Deputy Superintendent Wysinger testified that although there were supposed to be audits of contact cards, he could not recall ever reviewing such an audit. (Wysinger Dep. at 65.) Plaintiffs allege, and Defendants do not rebut, that no audits of the contact card system were conducted during McCarthy's tenure as Superintendent.

### 4.    Training

The CPD's emphasis on contact cards between 2011 and 2015, and the hundreds of thousands of additional annual stops that resulted, were not accompanied by training to ensure that officers observed constitutional limits. Plaintiffs present evidence of the CPD's training program gathered from third-party reports and investigations. (Mot., Ex. 14, ACLU of Illinois, *Stop and Frisk in Chicago* ("ACLU Report"), Dkt. No. 425-14; Mot., Ex. 15, Police Accountability Task Force, *Recommendations for Reform: Restoring Trust between the Chicago Police and the Communities they Serve* ("PATF Report"), Dkt. No. 425-15; Mot., Ex. 16, U.S. Department of Justice & U.S. Attorney's Office, Northern District of Illinois, *Investigation of the Chicago Police Department* ("DOJ Report",) Dkt. No. 425-16.) While the Court affords this evidence less weight than direct documentation of CPD's training programs or testimony from people involved in CPD's training, the Court does find Plaintiffs' evidence probative of the

---

[6] The Police Accountability Task Force report explains that although the CPD has attempted various supervision reforms over the past three decades, those efforts "were allowed to wither on the vine or were never executed at all." (PATF Report at 99–100.)

CPD's training on constitutional stop and frisk during the McCarthy regime, especially because Defendants have not presented evidence rebutting Plaintiffs' key contentions.

In March 2015, the ACLU of Illinois reported that the CPD had no record of providing training to officers on conducting lawful stop and frisks following police academy training. (ACLU Report at 4, 9.) In July 2016, a similar finding—that CPD had no annual training requirements other than firearms certification—was made by the Police Accountability Task Force (an ad hoc advisory group convened by then-Mayor Rahm Emanuel following the October 20, 2014 police killing of Laquan McDonald.) (PATF Report at 30.) While the CPD offered a range of training content, including playing videos to officers during roll calls, the Task Force described the training regime as "reactive" and inconsistently used. (*Id.*) The U.S. Department of Justice, reporting on its investigation into CPD's unconstitutional policing practices, assessed the department in its January 2017 report:

> CPD's pattern of unlawful conduct is due in part to deficiencies in CPD's training and supervision. CPD does not provide officers or supervisors with adequate training and does not encourage or facilitate adequate supervision of officers in the field. These shortcomings in training and supervision result in officers who are unprepared to police lawfully and effectively; supervisors who do not mentor or support constitutional policing by officers; and a systemic inability to proactively identify areas for improvement, including Department-wide training needs and interventions for officers engaging in misconduct.

(DOJ Report at 10.) More recently, the CPD has increased its required training, providing mandatory training on investigatory stops to all officers and requiring "refresher" trainings for officers who have committed errors in completing ISRs. (Mot., Ex. 22, Deposition of Karen Murphy at 55, 61–65, Dkt No. 425-22.)

Defendants contend that the CPD has provided sufficient training on stop and frisk. CPD cadets receive various trainings on investigatory stops and contact cards at the police academy. (Resp., Ex. HH, CPD Basic Recruit Curriculum, Dkt. No. 450-32.) Similarly, streaming videos,

classroom courses, and electronic trainings are provided to CPD officers, although Defendants do not contend that these trainings were required or universally administered. (Resp., Exs. SS–TT, Lesson Plans and Related PowerPoints, Dkt. Nos. 425-45, 425-46.)

### 5.      Summary

Based on the data and evidence presented, the Court concludes that Plaintiffs have made a sufficient showing for purposes of class certification that the CPD deployed a centralized stop and frisk program during the times relevant to this case. The rapid surges and declines in stops, the use of CompStat to drive investigatory stops, the standardized requirements and reporting, and the active monitoring of investigatory stops are all indicative of a centralized program. Likewise Plaintiffs have made a sufficient showing that the City knew, or should have known, that its stop and frisk program was associated with a risk of widespread Fourth Amendment violations. The evidence shows that many contact cards contained facially insufficient justifications for investigatory stops and that the CPD's own audits show a continuing (and worsening) pattern of unconstitutional stops under the ISR system. Moreover, Plaintiffs have adduced evidence that CPD's response to this problem actually facilitated the coverup of unconstitutional stops, as evidenced by supervisors providing false information to officers to give stops the appearance of constitutionality.

### DISCUSSION

### I.      Legal Standard

Federal Rule of Civil Procedure 23 permits individual plaintiffs to sue as representatives of an aggrieved class. *See* Fed. R. Civ. P. 23. The district court has broad discretion to determine whether to certify a class action. *See Mira v. Nuclear Measurements Corp.*, 107 F.3d 466, 471 (7th Cir. 1997). To be certified, a proposed class must first satisfy all four requirements of Rule

23(a): (1) the class must be so numerous that joinder of all members is impracticable ("numerosity"); (2) there must be questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class ("typicality"); and (4) the representative parties must fairly and adequately protect the interests of the class ("adequacy"). Fed. R. Civ. P. 23(a). Further requirements apply depending on whether plaintiffs seek 23(b)(2) certification (seeking only final, classwide injunctive or declaratory relief) or 23(b)(3) certification (allowing plaintiffs to seek damages). *Id.* 23(b). "Failure to meet any of the Rule's requirements precludes class certification." *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008).

Plaintiffs bear the burden of demonstrating their entitlement to class certification: they must "prove that there are ***in fact*** sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores*, 564 U.S. 338, 350 (2011). The Court engages in a "rigorous analysis" to confirm that Plaintiffs have met this burden. *Falcon,* 457 U.S. at 161. This analysis engages "considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 160 (internal quotation marks omitted). Ultimately, Plaintiffs need not show that the class satisfies each requirement "to a degree of absolute certainty"; instead, they must establish each requirement by a preponderance of the evidence. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

Several class certification requirements, such as whether there are questions of law or fact "common to the class," can only be evaluated by reference to Plaintiffs' underlying claims. Fed. R. Civ. P. 23(a)(2). Thus, the Court briefly discusses the elements of Plaintiffs' claims.[7]

---

[7] In addition to the class claims described here, Plaintiffs' complaint also alleges class claims for the Illinois state-law torts of "assault and battery" and "violation of the right to privacy." But Plaintiffs did not raise any arguments in support of class certification for those claims, and thus the Court does not consider those claims in the present ruling.

Plaintiffs allege that their Fourth Amendment rights were violated, seeking relief pursuant to 42 U.S.C. § 1983. To establish their Fourth Amendment claim, Plaintiffs must demonstrate (1) that they were actually seized, and (2) that the seizure was unconstitutional. *See Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000). In the context of investigatory *Terry* stops, Plaintiffs must demonstrate that the officer who stopped them did not have a reasonable articulable suspicion that Plaintiffs committed a crime or were about to do so. *See Williams*, 731 F.3d at 683 ("Police officers may detain a suspect for a brief investigatory stop if they have a reasonable suspicion based on articulable facts that a crime is about to be or has been committed." (internal quotation marks omitted)).

Plaintiffs also allege violations of the Equal Protection Clause of the Fourteenth Amendment. Police officers may not use race as the basis for deciding who to stop and frisk. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race.... [T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause."). It is not enough for Plaintiffs to show that that police officers disproportionately seize African-American and Hispanic Chicagoans under the stop and frisk program. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977) ("[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact."). Instead, Plaintiffs also must present "[p]roof of racially discriminatory intent or purpose." *Id.* at 265.

Plaintiffs' class claims against the City of Chicago are evaluated under the standard for municipal liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). *Monell* provides that local governments may be held liable for constitutional violations where the challenged action is a "policy statement, ordinance, regulation, or decision

officially adopted and promulgated by that body's officers" or a "governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690–91. To establish a claim under *Monell*, Plaintiffs must establish that (1) they suffered a deprivation of a constitutional right, (2) as a result of an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policymaking authority, that was (3) the cause of the constitutional injury. *See King v. Kramer*, 763 F.3d 635, 649 (7th Cir. 2014). Plaintiffs must also identify an official policy or custom that was the direct cause or moving force behind the deprivation of their constitutional rights. *See Pyles v. Fahim*, 771 F.3d 403, 409–10 (7th Cir. 2014).

## II.     Proposed Rule 23(b)(2) Classes

Plaintiffs seek certification of three classes or subclasses under Rule 23(b)(2):

Fourth Amendment Class: All persons who, since April 20, 2013, have been, or in the future will be, subjected to an investigatory stop by the Chicago Police Department which resulted in the creation of a Contact Information Card or Investigatory Stop Report.

Fourteenth Amendment Subclass: All African Americans and Hispanics who, since April 20, 2013, have been, or in the future will be, subjected to an investigatory stop by the Chicago Police Department which resulted in the creation of a Contact Information Card or Investigatory Stop Report.

Fourth Amendment Loitering Subclass: All persons who, since April 20, 2013, have been, or in the future will be, encountered by the Chicago Police Department, resulting in the creation of a Contact Information Card or Investigatory Stop Report and where the listed contact type was "GANGLTR," defined by the CPD as "Gang and Narcotics-Related Loitering."

(Mot. at 14.) For a proposed class to be certified, Plaintiffs must establish each Rule 23 requirement by the preponderance of the evidence. *Messner*, 669 F.3d at 811. Class certification

under Rule 23(b)(2) would allow class members to seek "final injunctive relief . . . respecting the class as a whole."[8] Fed. R. Civ. P. 23(b).

### A.     Numerosity

Rule 23(a)(1) requires a showing that the proposed class is "so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). While the rule does not require any specific minimum number of plaintiffs, the Seventh Circuit has recognized that a class of 40 members is generally considered sufficient. *See Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 859 (7th Cir. 2017). In this case, Chicago police officers have stopped more than a million people since the start of the proposed class period of April 20, 2013. (Mot. Ex. 13 at 1.) The subjects of those stops were overwhelmingly African-American and Hispanic. And according to analysis of the CPD's stop data by Plaintiffs' attorneys, 30,982 of the stops between April 20, 2013 to December 31, 2015 recorded on contact cards were designated as GANGLTR, "Gang and Narcotics-Related Loitering." (Mot., Ex. 26, Decl. of Kyle Pozan ¶¶ 7, 9, Dkt. No. 425-26.) Another 463 stops recorded on Investigatory Stop Reports between January 1, 2016 and February 28, 2016 were designated GANGLTR, as well as 12,390 stops between February 29, 2016 and January 18, 2018. (Mot., Ex. 27, Decl. of Brian Eldridge ¶¶ 9, 13, Dkt. No. 425-27.) Because Plaintiffs' class definitions rely on contact cards and Investigatory Stop Reports, and the smallest such class contains tens of thousands of members, Plaintiffs easily clear the numerosity requirement for each of the three proposed 23(b)(2) classes.

---

[8] Plaintiffs may pursue injunctive relief without certifying a class; the significance of class certification for injunctive relief (and justifications for subjecting class members to *res judicata* in a Rule 23(b)(2) class) have been vigorously debated. *See* Davis Marcys, *Flawed but Noble: Desegregation Litigation and its Implications for the Modern Class Action*, 63 Fla. L. Rev. 657, 662–70 (2011). Generally, parties seeking equitable relief must demonstrate irreparable harm not adequately remedied by monetary damages, show that the balance of hardships favors the plaintiffs, and show that the injunctive relief would be in the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). In a civil rights case seeking equitable relief, class certification may tip the balance of hardships and the public interest analysis towards plaintiffs by aggregating their claims.

### B.  Commonality

Rule 23(a)(2) requires that there be questions of law and fact common to the class. To satisfy the commonality requirement, the claims of the proposed class members "must depend upon a common contention that is capable of class-wide resolution." *Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 434 (7th Cir. 2015). The determination of the truth or falsity of the common contention must "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. The commonality requirement is not met by simply raising common questions; rather, Plaintiffs must show "the capacity of a classwide proceeding to generate common ***answers*** apt to drive the resolution of the litigation." *Id.* (emphasis in original); *see also id.* at 349 ("[A]ny competently crafted class complaint literally raises common questions. For example: Do all of us plaintiffs indeed work for Wal-Mart? Do our managers have discretion over pay? . . . Reciting these questions is not sufficient to obtain class certification.").

In *Wal-Mart*, the Supreme Court held that even if many female Wal-Mart employees had lost pay and been denied promotions because of gender discrimination, they could not justify class certification without pointing to some "glue" holding together the reasons for the allegedly discriminatory decisions. *Id.* at 352. The Court found that the plaintiffs provided no evidence of a corporate policy or practice causing the discrimination other than a general policy of allowing supervisors to exercise discretion over pay and promotions, and concluded that it was "quite unbelievable" that managers would exercise their discretion "in a common way without some common direction." *Id.* at 355–56. To glue together the challenged pay and promotion decisions, which were highly individualized, the plaintiffs needed (and did not produce) a common causal factor. However, proof of a defendant's "general policy" of unlawful action can justify class

certification. *Wal-Mart*, 564 U.S. at 353; *see also Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 551 (7th Cir. 2016) (recognizing that "an illegal policy might provide the glue necessary to litigate otherwise highly individualized claims as a class" (internal quotations omitted)).

While Plaintiffs here must glue their claims together, they need not show that all, or even most, class members hold winning claims. *See Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir.2009) ("[A] class will often include persons who have not been injured by the defendant's conduct . . . Such a possibility or indeed inevitability does not preclude class certification . . . ."); *Bell*, 800 F.3d at 376 ("A proposed class of plaintiffs must prove the existence of a common question . . . but it need not prove that the answer to that question will be resolved in its favor.") Plaintiffs raise several common questions, which are analyzed in turn below.

### 1. *Fourth Amendment Class*

Plaintiffs offer two common questions for the Fourth Amendment Class's claims: (1) does the CPD have a centralized practice of performing suspicionless stops and frisks, and (2) do flaws in the CPD's systems of training, supervision and accountability contribute to its widespread practice of unlawful stop and frisks? If these questions are at issue, their resolution will drive the litigation forward—the questions go to the *Monell* elements of whether Plaintiffs' constitutional deprivations were caused by an express policy, widespread custom, or deliberative act of a policymaking decision-maker causing the constitutional injuries. *See King*, 763 F.3d at 649. If the CPD has implemented a centralized regime of unlawful stops and frisks, and if training, supervision, and accountability deficiencies contribute to widespread unlawful stop and frisks, then Plaintiffs will have resolved a central issue of their claims "in one stroke." *Wal-Mart*, 564 U.S. at 350. This theory differs significantly from the common question offered in Plaintiffs' first

class certification motion, where Plaintiffs contended that the CPD's alleged use of quotas caused unconstitutional stops.

The *Wal-Mart* plaintiffs' only common allegation was that Wal-Mart caused sex discrimination by giving discretion to supervisors. In contrast, as detailed above, Plaintiffs credibly contend that the CPD implemented a department-wide stop and frisk strategy, failed to train its employees adequately in spite of well-documented and widespread constitutional violations, covered up evidence of police misconduct through the ISR review process, and took all those actions through a hierarchical chain-of-command structure extending to the CPD's highest levels. Plaintiffs also offer substantial evidence that these policies are centralized, in that the policies were developed by a centralized leadership group and approved by the Superintendent. Plaintiffs' evidentiary showing also indicates that their proposed questions can be resolved on a classwide basis and will drive resolution of the litigation. The Court thus finds that Plaintiffs have demonstrated commonality by the preponderance of the evidence.

Certainly, Plaintiffs do not present a plausible argument that their individualized claims could each be efficiently adjudicated through a class action (an issue addressed in more detail below in the discussion of Plaintiffs' proposed Rule 23(b)(3) and Rule 23(c)(4) class certification arguments.) Instead, Plaintiffs have adduced evidence of the kind of illegal policy that *Wal-Mart* and *Phillips* identified as potentially providing the necessary glue for a class action. *Wal-Mart*, 564 U.S. at 353; *Phillips*, 828 F.3d at 541. Defendants raise four specific objections to Plaintiffs' policy and practices arguments for class certification.

First, Defendants fault Plaintiffs for not including allegations regarding the Investigatory Stop System or mentioning ISRs in their Sixth Amended Complaint. Defendants contend that Judge Keys's review of the CPD's ISR system is therefore irrelevant to class certification. But

Plaintiffs' Sixth Amended complaint clearly alleges that Defendants violated the purported class members' Fourth Amendment rights by failing to provide adequate training, supervision and accountability responsive to Fourth Amendment violations. (Sixth Am. Compl. ¶¶ 306–16, Dkt. No. 177.) The Complaint similarly warns Defendants of their intention to obtain equitable relief to prevent future Fourth Amendment violations. (*Id.* ¶ 321.) Thus, the Court finds no merit in Defendants' argument that some failure of notice pleading defeats Plaintiffs' attempt at class certification.

Second, Defendants contend that Plaintiffs have provided no evidence that training, supervision, and accountability shortcomings caused Plaintiffs' alleged Fourth Amendment violations.[9] But Plaintiffs do not have the burden of proving a causal link between the CPD's alleged policies and unconstitutional investigatory stops in order to achieve class certification, and it would be inappropriate to resolve that merits issue at the present stage in the proceedings. Instead, Plaintiffs must demonstrate a common issue that will drive resolution of their claims. Plaintiffs' evidence that the CPD implemented an ISR review system that facilitated the coverup of facially unconstitutional stops, coinciding with an increased rate of facially unconstitutional stops over a two-year period, more than adequately establishes a common issue.

Third, Defendants correctly note that *Monell* claims based on "failure to train" are challenging to prove. Under "limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson,* 563 U.S. 51 (2011). Under that standard, a local government's failure to train must amount to deliberate indifference

---

[9] Defendants also contrast the evidence presented in this case to the extensive statistical analyses and anecdotal evidence presented in other police practices class actions, including the *Floyd* case. (Resp. at 35–37.) However, those cases did not purport to set minimum requirements for the amount of anecdotal and statistical proof required to certify a Rule 23(b)(2) police practices class.

to the rights of the citizens who the officers encounter. *See id.* (citing *Canton v. Harris,* 489 U.S. 378, 388 (1989)). Proof of deliberate indifference in the context of a failure to train case "can take the form of either (1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations by its officers." *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029–30 (7th Cir. 2006). Here, the evidence adduced by Plaintiffs suggests failures to act in response to repeated constitutional violations, including failure to hold CPD officers accountable for facially unconstitutional stops and supervisors providing false information to police officers to cover up constitutional violations. Here again, Plaintiffs' evidence supports the existence of common, classwide questions.

Fourth, Defendants contend that Plaintiffs have not demonstrated a continuing course of conduct necessary to establish deliberate indifference under *Monell*, and that the CPD's efforts to improve its practices rebut claims of deliberate indifference. But Plaintiffs have presented evidence that the CPD, over the course of at least several years, eschewed substantive compliance with the Fourth Amendment for administrative review mechanisms that created only the appearance of constitutional conduct. While the Court cannot presently resolve that claim on the merits, Plaintiffs' evidence is sufficient to establish a common question regarding deliberate indifference.

Defendants also contest whether class certification is tenable given the highly individualized questions regarding whether any given stop violated the Fourth Amendment. Even granting a class members' claim that he or she was stopped in violation of the Fourth Amendment, the cause of that constitutional violation might be poor training, lack of supervision, a simple mistake, or any number of things. But Plaintiffs do not merely allege that training and supervision failures caused their unconstitutional stops; they also allege that the CPD's continuing

28

deliberate indifference to Fourth Amendment violations places Plaintiffs at risk of future injury. (Sixth Am. Compl. ¶ 321.) The drafters of Rule 23 explained that Rule 23(b)(2) classes are appropriate "in the civil-rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration." Fed. R. Civ. P. 23 1966 Advisory Committee Note. Thus, courts have rejected Defendants' position that it is necessary to resolve the constitutionality of allegedly unconstitutional stops for each class member in a Rule 23(b)(2) class. *See Floyd v. City of New York* ("*Floyd I*"), 283 F.R.D. 153, 171 n.114 (S.D.N.Y. May 16, 2012) ("The court cannot (and need not) determine which of the class members' stops were lawful.")

Ultimately, Plaintiffs have provided sufficient evidence of a common question of whether supervision and training deficiencies caused the alleged Fourth Amendment violations. Defendants are welcome to defend against these claims by contending that the Fourth Amendment violations did not occur or that the violations were not caused by supervision and training deficiencies, but such a defense does not defeat commonality for purposes of certifying a Rule 23(b)(2) class.

### 2. *Fourteenth Amendment Class*

Plaintiffs propose two common questions for purposes of their proposed Fourteenth Amendment Class: (1) Is the "Racial Profiling General Order" unconstitutional? and (2) Is the practice of stopping "the right people" a type of indirect racial profiling?

The Court finds no merit in Plaintiffs' first proposed question. What Plaintiffs refer to as a "racial profiling" order is in fact a departmental order prohibiting the use of race as a sole factor justifying police action. (Mot., Ex. 40, General Order G02-04, Dkt. No. 425-40.) Plaintiffs cite several CPD employees testifying that race could be used to justify investigatory stops under this

order, but the deposition transcripts reveal that this testimony was given in the context of discussing suspect descriptions, and Plaintiffs do not contend that race may not be considered when matching a person to the description of a crime suspect. (Mot., Ex. 41, Dep. of Robert Tracy. at 226, Dkt. No. 425-41; Mot., Ex. 38, Dep. of Terence Williams at 100–01, Dkt. No. 425-38; Murphy Dep. at 130.) At most, Plaintiffs' evidence indicates that the CPD's directive on racial profiling did not explicitly bar all kinds of racial profiling. But Plaintiffs have not presented a cognizable argument that an incomplete general order, by itself, violates the Fourteenth Amendment. Further, the CPD's 2017 revised general order explicitly prohibits the use of race in routine law enforcement decisions, except for listed characteristics in a specific suspect description. (Resp., Ex. FF, G02-04 (2017), Dkt. No. 450-32.) Without something more linking the CPD's alleged policy deficiencies to unconstitutional conduct, the Court cannot find a common question.

Plaintiffs next propose the common question of whether the CPD's practice of "stopping the right people" had a discriminatory effect and was motivated by a discriminatory intent or purpose—the elements of an Equal Protection Claim pursuant to *Village of Arlington Heights*, 429 U.S. at 265. Under *Wal-Mart*, Plaintiffs must demonstrate that class members "suffered the same injury," a question that overlaps with the merits of Plaintiffs' complaint. 564 U.S. at 349, 351–52. Plaintiffs begin with McCarthy's directive to stop "the right people"—not just "old ladies sweeping their stoops" but instead (presumably) people who look like criminals, however police officers may evaluate that appearance. (*See* Mot., Ex. 43, CompStat Summ. (12.22.11) at 20, Dkt. No. 425-43; Mot., Ex. 44, CompStat Summ. (11.6.14) at 14, Dkt. No. 425-44.) As described above, CPD officers increased the rate at which they stopped African-American residents under McCarthy, and increased that rate further after McCarthy left the department (even as stops and

30

frisks declined dramatically). And while stops of Hispanic residents remained roughly constant on a percentage basis, the disparity between stops of Hispanic and white residents increased during that time. Further, Judge Keys found that African-American and Hispanic residents were "significantly more likely (in statistical terms) to find themselves in a bad (unconstitutional) stop" compared to white residents. (Keys's First Report at 29.) The Police Accountability Task Force report and Department of Justice investigation contain numerous examples of Chicagoans reporting racially discriminatory treatment by Chicago police officers. Finally, the *Floyd* court held that "targeting the right people," as applied in New York City's stop and frisk program, was racially discriminatory in violation of Fourteenth Amendment. *Floyd II*, 959 F. Supp. 2d 540 at 603.

But while Plaintiffs have sketched out a theory of racial discrimination sufficient to survive a motion to dismiss, the Court cannot find that they have met their burden of demonstrating a common question supporting certification of the proposed Fourteenth Amendment subclass. The Court is hesitant to weigh heavily Judge Keys's finding of a statistically significant difference in the rates of stops of African-American and Hispanic residents and white residents. Plaintiffs did not present their own expert analysis of statistical significance, and thus the Court has not weighed the reliability of this expert opinion evidence. While there is no requirement that Plaintiffs support their class certification motion with expert statistical analysis, Plaintiffs have not substantially developed that basis for establishing a common question.

Without a broader base of evidentiary support, the Court cannot find that the CPD's policy of "stopping the right people" was a centralized element of Chicago's stop and frisk program, let alone a sufficient basis for finding common question. The evidence presented by Plaintiffs here is

31

thin compared to peer class actions, such as the *Floyd* case, where plaintiffs presented substantial evidence that investigatory stops were concentrated against African-American and Hispanic residents even after controlling for crime rates, patrol strength, and other relevant factors; that police officers treated African-American and Hispanic residents more harshly during stops; and that police officers gave vague or incoherent explanations for stops more often when stopping African-American and Hispanic people. *See Floyd I*, 283 F.R.D. at 168–69. The *Floyd* court expressed uncertainty that evidence of disproportionate stops of African-American and Hispanic residents after controlling for other relevant factors, on its own, would justify class certification. *Id.* at 168 n.88. But here, Plaintiffs have presented a weaker statistical record, not even establishing disproportionate stops of African-American and Hispanic residents after controlling for other factors.

Further, while the *Floyd* court found the NYPD's unwritten policy of "stopping the right people" (a phrase also used in Chicago's stop and frisk program) to violate the Fourteenth Amendment, the court made this finding based on police executives' acknowledgment that young men of color were targeted for stops based on a general understanding of the demographics of perpetrators and victims of gun shootings. *Floyd II*, 959 F. Supp.2d at 604. Here, Plaintiffs have not demonstrated a common issue of how the directive to "stop the right people" was interpreted or acted on. Plaintiffs rely on a CPD presentation created in response to the ACLU report on stop and frisk, but this after-the-fact analysis does not speak to the CPD's use of stop and frisk as an intentionally racially discriminatory practice. (Mot., Ex. 47, *CPD Presentation Addressing ACLU Report*, Dkt. No. 425-47.)

The Court does not suggest that Plaintiffs must prove intentional racial discrimination to justify class certification; instead, Plaintiffs must present sufficient evidence to conclude that a

common issue actually exists. The plaintiffs in *Wal-Mart* might have made out a common question if they had shown that the company's Chief Executive Officer had told supervisors to "promote the right people," mirroring an initiative that had been found to discriminate by gender at the Chief Executive Officer's previous company, and that gender-based promotion disparities worsened during and after this initiative. But Plaintiffs must at least lay out the channels of a legally viable claim and provide sufficient evidence to establish a common question. If the only element of an Equal Protection Claim were disparate impact, Plaintiffs would have easily met the burden of establishing a common question; as it stands, Plaintiffs have not met their burden.

### 3.  *Fourth Amendment Loitering Subclass*

Finally, Plaintiffs propose the common question of whether the CPD's policies for enforcing the Gang and Narcotics-Related Loitering Ordinances violate the Fourth Amendment. Those ordinances allow police officers to criminalize "loitering" by first informing persons that they are engaged in "gang loitering," then ordering those persons to disperse and informing them that they will be arrested if they do not, and finally arresting anyone who does not disperse or returns to the scene. (Mot., Ex. 30, Chi. Mun. Code § 8-4-015(a) ("Gang and Narcotics Loitering Ordinance"), Dkt. No. 425-30.) Here, Plaintiffs raise the common question of whether the CPD's policy required the unconstitutional seizures of "gang loiterers" as a matter of course. Plaintiffs failed to establish a common question on this claim in their initial class certification motion. Specifically, the Court rejected Plaintiffs' theory that any contact card indicating gang loitering provided irrebuttable proof of an investigatory stop, instead finding that the CPD's policies facially allowed for contact cards to document either (1) investigatory stops or (2) enforcement of the loitering ordinances. (Mem. Order & Op. at 16–17.)

Plaintiffs now present new evidence in support of a common question. Plaintiffs point to an "Investigatory Stop Pocket Guide" that the CPD issued to officers to instruct them on, among other things, how to enforce the Gang and Narcotics Loitering Ordinance. The Pocket Guide instructs that officers should respond to loitering activity prohibited by the Gang and Narcotics Loitering Ordinance by conducting an investigatory stop and then giving a dispersal order. (Mot., Ex. 33, Investigatory Stop Pocket Guide at 1, Dkt. No. 425-33.) This guidance requires officers to conduct stops before issuing a dispersal order, suggesting that the CPD's policy requires officers to make unlawful stops. A loiterer has not committed criminal activity until they refuse to leave a loitering zone *following* a dispersal order. But without suspicion that a crime has happened or is about to happen, an investigatory stop when issuing dispersal orders violates the Fourth Amendment.

Various CPD personnel testified that the Gang and Narcotics Loitering Ordinance requires CPD officers to conduct investigatory stops when issuing gang dispersal orders. Eric Washington, a deputy chief at the CPD, testified that an investigatory stop was required when giving a dispersal order under the Gang and Narcotics Loitering Ordinance. (Mot., Ex. 37, Dep. of Eric Washington at 215, 17, Dkt. No. 425-37 ("You have to stop them and engage them. That's a street stop . . . You do the street stop in order to give the dispersal order. You are stopping the people that you're going to give a dispersal order to.") Deputy Chief Terrence Williams similarly stated his understanding that the Gang and Narcotics Loitering Ordinance allows officers to "conduct a stop" for gang loitering and described such a stop as non-consensual (by definition, an investigatory stop.) (Williams Dep. at 216–18.) Officer Jon Patterson, an instructor in the Department's Education and Training division, similarly testified that gang and narcotics loitering encounters are not voluntary stops. (Mot., Ex. 25, Dep. of Jon Patterson at 122–23, Dkt. No. 425-

25.) Here, Plaintiffs have presented a common question on their *Monell* claims, including whether CPD officers were instructed to make unconstitutional stops as a matter of policy and whether those instructions were developed and implemented by CPD leadership.

Defendants object that this Court previously denied certification of a similar class because the constitutionality of any given investigatory stop was an individualized question not susceptible to classwide resolution. Of course, a police officer who stops a loiterer to order them to disperse might have reasonable articulable suspicion that such person was committing (or about to commit) a crime, but such a suspicion would be a coincidence and unrelated to enforcement of the ordinance. And the Court need not resolve every class members' stop to grant relief under Rule 23(b)(2); instead, the Court can make findings regarding the extent of Fourth Amendment violations, if any, and grant relief on that basis. *See, e.g.*, *Floyd II*, 959 F. Supp. at 658–60 (making conclusions after trial regarding the extent of the NYPD's unconstitutional stops and the Department's deliberate indifference towards those violations); *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 989 (D. Ariz. 2011) (holding that individualized factual circumstances of traffic stops did not defeat commonality where Plaintiffs identified a common issue regarding unlawful departmental policy.)

In sum, Plaintiffs' new theory and evidence establishes a common question among the proposed class of whether the CPD's enforcement policies are constitutional; the Court gives no opinion at this stage as to whether Plaintiffs will ultimately prevail on their theory.

### 4.    *Prohibition on Across-the-Board Classes*

Over time, courts have become less amenable to "across-the-board" classes, which involve "structural injunctions taking control of executive functions." *Rahman v. Chertoff*, 530 F.3d 622, 626 (7th Cir. 2008). The basic principle is that the judiciary should not attempt to sit in

place of the executive. *Id.* Plaintiffs' 22-part demand for injunctive relief suggests a risk of judicial overreach in this regard. Plaintiffs seek an injunction prohibiting the CPD from continuing suspicionless stop and frisk policies or racial profiling policies; enjoining the use of productivity standards for arrests or stops and frisks; requiring improved training and adequate supervision; implementing a new centralized electronic stop database to record all stops; convening an Independent Panel subject to court supervision to monitor a stop and frisk remedial process; appointing a separate civil training advisory committee to support the CPD in improving its training; and requiring implementation of a new disciplinary program, among numerous other changes. (Sixth Am. Compl. at 75–77.) This smorgasbord of injunctive relief, if granted in full, could potentially enmesh the Court in almost every aspect of Chicago policing, including data collection, officer supervision, police discipline, police tactics, and police training.

Still, the Court does not conclude that their proposed class should therefore be denied. An "across-the-board" class is one where plaintiffs seek to challenge a broader set of policies than those from which they claim injury. *Rahman*, 530 F.3d at 626. The Supreme Court has held that certified classes "must correspond to the injuries received by the representative plaintiffs." *Id.* (citing *Falcon*, 457 U.S. 147). Here, Plaintiffs do not cross the line into proposing an across-the-board class because Plaintiffs' three proposed classes involve specific and discrete stop and frisk practices. Plaintiffs only seek to represent persons who have suffered similar injuries. While Plaintiffs may not be entitled to some of the relief they seek, if they prove that the CPD has implemented centralized stop and frisk policies that violate the Fourth and Fourteenth amendments, the Court can fashion an appropriately limited remedy.

### C. Typicality, Ascertainability, and Overbreadth

The representative parties' claims must be typical of the class. Fed. R. Civ. P. 23(a)(3). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (citation omitted). Here, the named plaintiffs allege they have experienced the same harms as the other class members. Their individual claims match the class claims. (Sixth Am. Compl. ¶¶ 317–52, 373–82, 443–57.) Defendants' arguments that Plaintiffs' encounters do not arise under a single legal theory and are not the result of a single course of conduct by the CPD are addressed above. Importantly, Plaintiffs are not required to sketch out a "typical" police encounter; instead, typicality lies in their common allegations of suffering unlawful stops and frisks and the typicality of those claims with the class as a whole. *See Zollicoffer v. Gold Standard Baking, Inc.*, No. 13 C 1524, 2020 WL 1527903, at *24 (N.D. Ill. Mar. 31, 2020) ("But just because each Plaintiff has unique circumstances—as the Court would expect of every putative class member—that does not make his claims atypical or inadequately aligned with those of the class.")

Defendants identify no meaningful misalignments between the circumstances and interests of the named Plaintiffs and other class members. The fact that some class members' allegedly unconstitutional stops were recorded using contact cards, and others using ISRs, is not at the core of their claims. Plaintiffs allege that they were harmed by CPD's continuing unlawful stop and frisk practices, not from the manner of documentation. The specific theory under which Plaintiffs proceed—that supervision and training defects (and the practices associated with gang and narcotics loitering enforcement) caused the CPD to violate Plaintiffs' Fourth Amendment rights—is not disrupted by the use of two different forms to record stops.

The typicality analysis invites the question of who the class members are, what their claims are, and how many class members actually have viable claims. These questions weigh on whether named Plaintiffs are "typical" of the class as a whole. Some light can be shed on this issue by considering ascertainability, an implicit Rule 23 requirement recognized by the Seventh Circuit requiring that class membership be based on objective criteria. *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 657 (7th Cir. 2015). Here, the Fourth Amendment claim encompasses all persons subjected to investigatory stops resulting in creation of contact cards or Investigatory Stop Reports since April 20, 2013; the Fourth Amendment Loitering Subclass is a subset of the main class whose contact cards or ISRs list the contact type as "GANGLTR," reflecting a gang and narcotics-related loitering stop. (Mot. at 14.)

Under the ascertainability requirement, class definitions cannot succeed if they are "defined too vaguely," if they are "defined by subjective criteria, such as by a person's state of mind," or if they are "defined in terms of success on the merits." *Mullins*, 795 F.3d at 659–660. The class definitions here are not defined too vaguely or by subjective criteria; instead, they encompass all persons subjected to an investigatory stop recorded by a contact card or ISR. The requirement that a class not be defined by success on the merits—known as a "fail-safe" class"— requires more explanation. This requirement prevents Plaintiffs from certifying a class of, for example, all persons whose Fourth Amendment rights were violated as a result of the CPD's failures of training and supervision. Such a definition "is a problem because 'a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment.'" *Id.* (quoting *Messner*, 669 F.3d at 825.) Plaintiffs' proposed definition avoids this problem—it includes all persons subjected to investigatory stops recorded by contact cards and ISRs, not only those whose Fourth Amendment rights were violated.

Defendants also challenge Plaintiffs' proposed classes as overbroad. Although proposed classes often include some persons who suffered no injury, this does not preclude class certification. *Kohen,* 571 F.3d at 677. Instead, a class should not be certified if the class definition encompasses people who could not have been injured or if it contains "a great many persons who have suffered no injury." *Id.* (citations omitted). Assuming that the CPD's internal audits correctly reflect that 10–15% of the CPD's investigatory stops violated the Fourth Amendment, around 85–90% of Plaintiffs' proposed class would not have been directly injured by unconstitutional stops. The question is whether such a class is overbroad because it includes too many people who have not been unconstitutionally stopped.

The Seventh Circuit has found class certification appropriate even when most class members may not have been injured. *Parko v. Shell Oil Co.*, for example, involved a putative class of 150 homeowners who claimed that their property values were damaged by contaminants leaked from an oil refinery. 739 F.3d 1083, 1084 (7th Cir. 2014). The Seventh Circuit rejected a challenge to the class's numerosity based on lack of standing among homeowners whose property values were not reduced by contaminant leakage, explaining:

> To require the district judge to determine whether each of the 150 members of the class has sustained an injury—on the theory that if 140 have not, and so lack standing, and so should be dropped from the class, certification should be denied and the 10 remaining plaintiffs be forced to sue (whether jointly or individually)— would make the class certification process unworkable; the process would require, in this case, 150 trials before the class could be certified . . . . How many (if any) of the class members have a valid claim is the issue to be determined after the class is certified.

*Id.* at 1084–85. So long as the homeowners might have been injured, it was improper to evaluate the merits of each individual's tort claim, even if more than 90% (140 out of 150) of the class members might not be entitled to relief. Where other cases have found overbreadth, those cases tend to rest on (1) the plaintiffs' failure to develop evidence that more than a few people were

injured or (2) a proposed class definition that necessarily includes people who could not have been injured. *See Adashunas v. Negley*, 626 F.2d 600, 604 (7th Cir. 1980) (finding "abstract, conjectural or hypothetical" injuries to "amorphous and diverse" class of all unidentified children with learning disabilities failed to state Article III case or controversy); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 510 (7th Cir. 2006) (affirming district court's denial of class certification for class of all Illinois persons who purchased fountain Diet Coke in Illinois over several-year period, where "countless" class members "could not show any damage" from the alleged deception.) Accordingly, the Court finds no impermissible overbreadth in Plaintiffs' proposed class definitions.

Most likely, some class members' Fourth Amendment rights were not violated while other class members may have experienced more clear-cut Fourth Amendment violations than the named Plaintiffs. But Plaintiffs' claims squarely target the same system of supervision and training that allegedly affected all class members. Plaintiffs therefore meet the typicality requirement.

### D. Adequacy

Under the adequacy requirement, Plaintiffs must establish that: "(1) their claims are not antagonistic to or in conflict with those of the proposed class; (2) they have sufficient interest in the outcome of the case; and (3) experienced, competent counsel represents them. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 599 (N.D. Ill. 2009) (citing *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)). The proposed class representatives, Darnell Smith, Hector Fontanez, Jr., Marcell Davis, Michael Sanders, and Rashawn Lindsey, bring claims typical of the proposed classes and share their interests. (Sixth Am. Compl. ¶¶ 343–51, 373–82, 443–57.) They

have also meaningfully participated in the lawsuit, including participating in discovery and sitting for depositions.

Defendants argue that Sanders and Davis cannot be class representatives because their police encounters described in the complaint were not documented by contact cards. It is true that representative plaintiffs must be a member of the class they purport to represent. *See Gomez v. Illinois State Bd. of Educ.*, 117 F.R.D. 394, 397 (N.D. Ill. 1987) (citing *Davis v. Ball Memorial Hospital, Inc.*, 753 F.2d 1410, 1420 (7th Cir.1985). But the relevant class definitions are defined to include persons who have been subject to a stop resulting in the creation of a contact card or ISR since April 20, 2013. All named Plaintiffs meet this criterion. Defendants acknowledged in their response that Davis had received contact cards during this time period, and even attached Sanders' May 23, 2013 contact card to their response. (Resp., Ex. F, Sanders Contact Cards, Dkt. No. 450-6.) Because the proposed class definitions require that class members were stopped by police resulting in creation of a contact card or ISR, and this is true of all named Plaintiffs, the named Plaintiffs would be members of the proposed classes.

Defendants specifically challenge Lindsey's adequacy as a representative for the Fourth Amendment Loitering Subclass because his encounter did not arise from the challenged gang loitering ordinance. As evidence, Defendants note that under the gang loitering ordinance, police officers may only issue dispersal orders on police beats designated as "Hot Spots" or "High Threat Level Gang Conflicts Zones," and Lindsey was not in such an area when police stopped and frisked him. (Resp. at 10.) But Lindsey's contact card states directly that he was stopped for "Gang and Narcotics-Related Loitering." (Mot. at 44 (attaching screenshot of relevant contact card entry).) This contact card establishes that Lindsey is a member of the class he wants to

represent and allows for the possibility that the Gang and Narcotics Loitering Ordinance was wrongfully enforced against him.

The Court similarly finds that Plaintiffs' counsel are experienced in civil rights litigation and class action litigation, and have and will continue to invest considerable time and effort in bringing Plaintiffs' claims forward. Plaintiffs' counsel thus meet the Rule 23(a)(4) adequacy requirements.

### E.   Rule 23(b)(2) Requirements

Class certification under Rule 23(b)(2) also requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Seventh Circuit has interpreted the Rule to require the contemplated equitable relief to be both "(1) 'appropriate respecting the class as a whole' and (2) 'final.'" *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011). These requirements are "unquestionably satisfied" where, as here, "members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Lippert v. Baldwin*, No. 10 C 4603, 2017 WL 1545672, at *9 (N.D. Ill. Apr. 28, 2017) (quoting *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014)). As Plaintiffs seek the same relief for all members—namely, policy changes and monitoring to bring CPD's stop and frisk program into compliance with the Fourth Amendment—this standard has been met. While Defendants argue that Plaintiffs lack standing because contact cards are no longer used, the true targets of Plaintiffs' claims are the CPD's stop and frisk policies, not the specific form used to record those stops.

Because Plaintiffs' proposed Rule 23(b)(2) Fourth Amendment Class and Fourth Amendment Loitering Subclass both meet the requirements for certification, the Court certifies the classes.

### III.     Proposed Rule 23(b)(3) and 23(c)(4) Classes

As noted above, Plaintiffs previously moved for certification of various classes under Rules 23(b)(3) and 23(c)(4), which the Court denied. Now, Plaintiffs make another attempt. Class certification decisions are "inherently tentative" and may be revisited by the Court as appropriate. *Falcon*, 457 U.S. at 160. Here, the Court considers whether Plaintiffs have offered a sufficiently distinct legal theory or compelling new facts for the Court to revise its previous analysis.

### A.     Rule 23(b)(3) Class

Plaintiffs ask the Court to certify a Rule 23(b)(3) class defined consistently with their Rule 23(b)(2) Fourth Amendment Loitering Subclass, consisting of "[a]ll persons who, since April 20, 2013, have been, or in the future will be, encountered by the Chicago Police Department, resulting in the creation of a Contact Information Card or Investigatory Stop Report where the contact type is designated as "GANGLTR" or "Gang and Narcotics-Related Loitering." (Mot. at 43.) The above analysis of the Rule 23(a) factors applies equally here; Plaintiffs have established numerosity, commonality, typicality, adequacy, and ascertainability for this proposed class, based on the above-discussed evidence and argument. But under Rule 23(b)(3), Plaintiffs must also demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Court considers the class members' interests in individual control of their claims, whether other

lawsuits weigh against certifying a class, the desirability of the forum, and difficulties in managing the class action. *Id.*

In its previous ruling, the Court acknowledged the challenges of assessing whether suspicionless seizures occurred in an individual police stop. Whether a person has been seized within the meaning of the Fourth Amendment depends on, "if, ***in view of all the circumstances surrounding the incident***, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (emphasis added). "Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also ***with the setting*** in which the conduct occurs." *Id.* (emphasis added); *see also United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000) ("The [Fourth] amendment does not prevent all encounters between the police and citizens. It comes into play when a police officer uses physical force or a show of authority to restrain the liberty of a citizen."). In the same way, "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125. Whether an officer had reasonable suspicion sufficient to support a *Terry* stop depends on "the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *United States v. Grogg*, 534 F.3d 807, 810 (7th Cir. 2008).

The major difference between Plaintiffs' proposed Rule 23(b)(3) class and their proposed Rule 23(b)(2) Fourth Amendment Loitering subclass is that members of the Rule 23(b)(3) class, if successful, will obtain money damages for the harms they suffered. Plaintiffs contend that, despite the complexities of assessing damages for individual seizures on a classwide basis, common questions predominate for the Rule 23(b)(3) class: specifically, "(1) whether the [gang loitering]

policy requires investigatory stops in the absence of reasonable articulable suspicion; and (2) if so, whether it is unconstitutional." (Mot. at 51.) Plaintiffs acknowledge that class members might require individualized damages determinations, arguing that 23(b)(3) certification is nevertheless appropriate and that, in the alternative, damages could be assessed on a presumed damages model. But Plaintiffs miss a key step in their predominance analysis, which is that even if the Court found that the gang loitering policy required unconstitutional investigatory stops, it would still be necessary to analyze any given stop to determine whether it was, in fact, unconstitutional. Even if the City's policy required unconstitutional stops and frisks, a person could still consent to a police officer's interview (defeating the "seizure" prong) and the officer could still make a stop with reasonable articulable suspicion of criminal activity (defeating the "reasonable articulable suspicion" prong.) Even after proving that the policy required police officers to take unconstitutional actions, Plaintiffs would be left with tens of thousands of individualized liability and damages determinations.

For this reason, common questions of law and fact do not predominate, and Plaintiffs' proposed Rule 23(b)(3) class will not be certified.

### B.  Rule 23(c)(4) Class

Finally, Plaintiffs propose a 23(c)(4) issues-only class to resolve (1) whether the gang loitering policy requires stops without reasonable articulable suspicion, and (2) whether such a requirement is constitutional. The Seventh Circuit has acknowledged that issues classes may be appropriately certified where "there are genuinely common issues . . . the accuracy of the resolution of which is unlikely to be enhanced by repeated proceedings." *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911 (7th Cir. 2003). Efficiency is the key consideration in this analysis. *See Clark v. Experian Info. Sols., Inc.*, 256 Fed. App'x. 818, 822 (7th Cir. 2007) (affirming denial

of issues-only class certification where, "[b]ecause of the need for individualized findings in such a large class, little efficiency would be gained by certifying a class for only particular issues").[10] Here, as before, the Court finds no efficiencies to be gained in certifying an issues-only class, considering the predominance of individualized questions in establishing liability.

## CONCLUSION

For the above reasons, the Court grants in part and denies in part Plaintiffs' motion for class certification. (Dkt. No. 425.) The Court grants certification of Plaintiffs' proposed Rule 23(b)(2) Fourth Amendment Class and Fourth Amendment Loitering Subclass. The Court denies certification of Plaintiffs' proposed Rule 23(b)(2) Fourteenth Amendment Subclass and proposed Rule 23(b)(3) and 23(c)(4) classes.

ENTERED:

Dated: August 31, 2021

_____
Andrea R. Wood
United States District Judge

---

[10] Clark is an unpublished Seventh Circuit order issued after January 1, 2007. Although not precedential, the order's reasoning is persuasive and provides a useful point of comparison here. *See* Fed. R. App. P. 32.1(a); 7th Cir. R. 32.1(b).